Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RICOH COMPANY, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> AEROFLEX INCORPORATED, et al., <br><br> Defendants. | **Case No.  CV 03-04669 MJJ** <br><br> **DECLARATION OF JONATHAN WEISSGLASS IN SUPPORT OF PLAINTIFF RICOH'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS OF SYNOPSYS** |

I, Jonathan Weissglass, hereby declare as follows:

1.      I am a member in good standing of the State Bar of California and am a partner at

Altshuler, Berzon, Nussbaum, Rubin & Demain, LLP, local counsel for Plaintiff Ricoh Company, Ltd.

("Ricoh").

2.    Attached hereto as Exhibit 1 is a true and correct copy of Ricoh's Notice of Subpoena served on Synopsys on June 13, 2003.

3.    Attached hereto as Exhibit 2 is a true and correct copy of Third Party Synopsys, Inc.'s Objections to Ricoh's Subpoena Duces Tecum.

4.    Attached hereto as Exhibit 3 is a true and correct copy of a letter dated 7/3/03 from E. Meilman to C. Kelley.

5.    Attached hereto as Exhibit 4 is a true and correct copy of a letter dated 7/9/03 from C. Kelley to E. Meilman.

6.    Attached hereto as Exhibit 5 is a true and correct copy of a letter dated 7/14/03 from C. Kelley to E. Meilman.

7.    Attached hereto as Exhibit 6 is a true and correct copy of a letter dated 7/15/03 from E. Meilman to C. Kelley.

8.    Attached hereto as Exhibit 7 is a true and correct copy of a Transcript of a 8/28/03 Hearing in the Delaware District Court.

9.    Attached hereto as Exhibit 8 is a true and correct copy of Synopsys End Users License Agreements.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of November, at San Francisco, California.


_____/s/_____

Jonathan Weissglass

J. WEISSGLASS DECLARATION IN SUPPORT OF RICOH'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| RICOH COMPANY, LTD., | ) | |
| | ) | 2003 JUN 13  PM 3: 59 |
| Plaintiff, | ) | |
| | ) | C.A. No. 03-103-GMS |
| v. | ) | |
| | ) | |
| AEROFLEX INCORPORATED, AMI | ) | |
| SEMICONDUCTOR, INC., MATROX | ) | |
| ELECTRONIC SYSTEMS LTD., | ) | |
| MATROX GRAPHICS INC., MATROX | ) | |
| INTERNATIONAL CORP. and | ) | |
| MATROX TECH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF SUBPOENA

TO:   Francis DiGiovanni, Esq.              Teresa M. Corbin, Esq.
      Connolly Bove Lodge & Hutz, LLP       Howrey Simon Arnold & White LLP
      1220 Market Street                    301 Ravenswood Avenue
      P.O. Box 2207                         Menlo Park, California 94025
      Wilmington, Delaware  19899

      Alan H. MacPherson, Esq.
      MacPherson Kwok Chen & Heid LLP
      2001 Gateway Place
      Suite 195E
      San Jose, California 95014

PLEASE TAKE NOTICE that on June 12, 2003, the attached letter and subpoena duces

tecum were served on Synopsys, Inc. c/o The Corporation Trust Company, Corporation Trust Center,

1209 Orange Street, Wilmington, Delaware  19801.

                                    _____
                                    Robert W. Whetzel (#2288)
                                    Steven J. Fineman (#4025)
                                    Richards, Layton & Finger
                                    One Rodney Square
                                    P.O. Box 551
                                    Wilmington, DE  19899
                                    (302) 651-7700
                                    Attorneys for Plaintiff Ricoh Company, Ltd.

Dated: June 13, 2003

RLF1-2612049-1

# RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
P.O. BOX 551
WILMINGTON, DELAWARE 19899
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

STEVEN J. FINEMAN

DIRECT DIAL
(302) 651-7592

June 12, 2003

**VIA HAND DELIVERY**
Synopsys, Inc.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

Re:     **Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.**
        **Civil Action No. 03-103-GMS**

To Whom It May Concern:

Ricoh Company Ltd. ("Ricoh") hereby withdraws its subpoena dated June 6, 2003 previously served on Synopsys, Inc. ("Synopsys") and in its place serves the attached superseding subpoena.

Very truly yours,

Steven J. Fineman

SJF:ps
Enclosures
cc:     Francis DiGiovanni, Esq. (via hand delivery)

RLF1-2611698-1

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| RICOH COMPANY, LTD., | ) | **SUBPOENA DUCES TECUM** |
| Plaintiff, | ) | |
| | ) | C.A. No. 03-103-GMS |
| v. | ) | |
| | ) | |
| AEROFLEX INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**TO:   Synopsys, Inc.**

    c/o The Corporation Trust Company
    Corporation Trust Center
    1209 Orange Street
    Wilmington , DE 19801

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Schedule A.

| PLACE<br>Richards, Layton & Finger, P.A.<br>920 North King Street, 3rd Floor<br>Wilmington, DE 19801 | DATE AND TIME<br><br>June 26, 2003  9:00 a.m. |
|---|---|

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Steven J. Fineman, Attorney for Plaintiff | DATE<br>June 12, 2003 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Steven J. Fineman
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
302-651-7700

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

# SCHEDULE A

# INSTRUCTIONS

The attached Stipulated Protective Order governs the disclosure of confidential information in this litigation.  Plaintiff recognizes that some of the documents called for below may be subject to the Stipulated Protective Order.

## DEFINITIONS

a) **Communication.**  The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

b) **Document.**  The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data or data compilations.  A draft or non-identical copy is a separate document within the meaning of this term.

c) **Synopsys, Inc.**  The term "Synopsys, Inc." as well as its abbreviated name (e.g., "Synopsys") or a pronoun referring to the foregoing means the Delaware corporation known as Synopsys, Inc and having place of business at 700 E. Middlefield Road, Mountain View, California, and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates.

d) **Parties.**  The terms "plaintiff" and "defendant"  as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates.  Where a document request does not request a response limited to a specific named defendant, the request shall be construed as

1

seeking knowledge and information concerning any and all of the defendants named in this action, including Aeroflex Incorporated, AMI Semiconductor, Inc., Matrox Electronic Systems Ltd., Matrox Graphics Inc., Matrox International Corp., and Matrox Tech, Inc.

e) **Person.** The term "person" is defined as any natural person or any business, legal or governmental entity or association.

f) **Concerning.** The term "concerning" means relating to, referring to, describing, evidencing or constituting.

g) **All/Each.** The terms "all" and "each" shall be construed as all and each.

h) **And/Or.** The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a discovery request all responses that might otherwise be construed to be outside of its scope.

i) **Number.** The use of the singular form of any word includes the plural and vice versa.

j) **Privilege.** Where a claim of privilege is asserted in objecting to any means of discovery or disclosure and an answer is not provided on the basis of such assertion, (1) identify the nature of the privilege (including but not limited to work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and

Provide the following information:

(1) For documents: identify the nature of the documents and such other information sufficient for plaintiff to contest the claim of privilege pursuant to FRCP 45(d)(2), including (i) the type of document, *e.g.*, letter or memorandum; (ii) the general subject matter of the

document; (iii) the date of the document, (iv) where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other; and (v) any other person to whom the document was displayed or to whom any of its contents were revealed;

(2) For oral communications: identify the nature of the communication and such other information sufficient for plaintiff to contest the claim of privilege pursuant to FRCP 45(d)(2), including (i) the name of the person making the communication and the names of persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of communication; (iii) the general subject matter of the communication and (iv) any other person to whom any aspect of the communication was revealed.

(3) When referring to a person, identify to the extent known the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. In any response where more than one individual is identified, identify which three individuals have the most knowledge or information concerning the subject and among those three individuals, identify the individual having

the most knowledge and the individual having the least knowledge concerning the subject.

(4) When referring to documents, identify to the extent known the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s)

k) **Destroyed Documents.** Where a document has been destroyed or alleged to have been destroyed, state the date thereof and the reason for its destruction, identify each person having knowledge of its destruction, identify each person responsible for its destruction, provide the information set forth in paragraph j)(1) above and describe the content of the document to the extent possible.

l) **Sale/Sold/Offered for Sale.** As used herein, "sale," "sold" and "offered for sale" shall include "license," "licensed" and "offered for license."

m) **Patent-in-suit.** As used herein, "patent-in-suit" or "'432 patent" refers to United States Letters Patent Number 4,922,432.

n) **ASIC.** As used herein, "ASIC" refers to any integrated circuit that is designed for a specific application, including but not limited to integrated circuits that are referred to or otherwise denoted in Synopsys' communications as an "application specific integrated circuit" or "ASIC," and other integrated circuits designed to perform a desired function in a specific application, but not including standard, general purpose integrated circuits such as microprocessors and memory chips.

o) **ASIC Product.** The term "ASIC Product" refers to any ASIC or integrated circuit product or item that is designed for a specific application, and/or a product or item that includes such an integrated circuit product that is manufactured, used, sold,

4

offered for sale, imported, or distributed by, on behalf of, or otherwise at the direction of defendant.

p) **ASIC Design System.** As used herein, "ASIC Design System" refers to any and all software, hardware, database library or other components making up or otherwise contributing to systems, modules, tools or products which have been sold, offered for sale, or distributed, provided, or made available by, or on behalf of, or otherwise at the direction of Synopsys on or after May 1, 1990 (unless another date is specifically identified in the document request) for use in the computer-aided design of any ASIC Product (as defined above). ASIC Design Systems include but are not limited to the Synopsys software, hardware, database libraries or other components known as Design Compiler, Knowledge Consultant, Behavioral Compiler, Module Compiler, DesignWare Library/DesignWare Foundation Library, CoCentric System C Compiler, HDL Compiler, and DC Shell. As used herein, ASIC Design System shall not include software, hardware, database libraries or other components that have not been sold, distributed, or provided directly or indirectly by or on behalf of Synopsys to or for defendants.

q) **ASIC Method.** As used herein, "ASIC Method" refers to any and all steps or other activities making up or otherwise contributing to methods and/or processes that use ASIC Design Systems in the computer-aided design of any ASIC Product (as defined above).

r) **Limitations.** Each discovery request shall be construed independently and no discovery request shall limit the scope of any other discovery request.

s) **Design.** The term "design" as used herein refers to any and all acts of creation, development, translation, formulation, transformation, synthesis, or other realization of desired integrated circuit functionality in an ASIC (as defined above).

## DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to show the manner of marketing and promotion by or for Synopsys of each ASIC Design System and ASIC Method including but not limited to brochures, print or other advertisements, and tradeshow materials.

2. Produce documents sufficient to show the capabilities, features, functions, operation, and use of the ASIC Design Systems and ASIC Methods including, but not limited to, any user guides, operation guides, technical bulletins, technical reference manuals, user manuals, training manuals, specifications, source code, tutorials, technical overviews, summaries, functional descriptions, design flow diagrams, operational flow diagrams, design specifications, articles, reports, and memos.

3. Produce documents sufficient to show the capabilities, features, functions, operation, and use of the of the user interface to the ASIC Design Systems, including but not limited to, the DC Shell, and the Verilog, VHDL, HDL, and/or

6

any other, input specification language used in connection with the ASIC Design Systems and ASIC Methods.

4. Produce all documents concerning all hardware, software, libraries and/or databases provided, made available, distributed, or recommended by or on behalf of Synopsys to defendants concerning the practice of an ASIC Method using an ASIC Design System, including, but not limited to, technical reference manuals, technical bulletins, user manuals, installation manuals, training manuals, specifications, source code, tutorials, technical overviews, and summaries.

5. Produce all documents concerning all hardware, software, libraries and/or databases for use in ASIC Design Systems for the selection of architecture-specific hardware cells in designing ASIC Products, including, but not limited to, technical reference manuals, technical bulletins, user manuals, installation manuals, training manuals, specifications, source code, tutorials, technical overviews, and summaries.

6. Produce all documents concerning agreements or other arrangements granting rights in or otherwise concerning ASIC Design Systems and ASIC Methods from Synopsys to any defendant (or from any defendant to Synopsys), including but not limited to contracts, licenses, purchase agreements,

7

indemnification agreements, and hold-harmless agreements/covenants not to sue.

7.  Produce all documents concerning solicitations, offers, or presentations made by or to any defendant with respect to ASIC Design Systems and ASIC Methods, including but not limited to advertising material, proposals, and presentations.

8.  Produce documents sufficient to show the actual or projected cost savings by any defendant as a consequence of licensing or using ASIC Design Systems and ASIC Methods.

9.  Produce documents sufficient to show the annual dollar and unit volume of sales and sales projections by or on behalf of Synopsys of ASIC Design Systems and ASIC Methods to each defendant, including but not limited to indicating how Synopsys defines "sales" and "unit."

10.  Produce documents sufficient to show the gross revenue, as well as the discounts, rebates or other reductions deducted from gross revenue from sales by or on behalf of Synopsys of ASIC Design Systems and ASIC Methods to each defendant, including but not limited to how Synopsys defines each item of discount, rebate or other reduction deducted from gross revenue.

11.  Produce all documents concerning the validity of the patent-in-suit.

12.  Produce all documents concerning the enforceability of the patent-in-suit.

13.  Produce all documents concerning the infringement or possibility of infringement by defendants of the patent-in-suit.

14.  Produce all documents concerning communications between Synopsys and any other person or entity concerning the patent-in-suit.

15.  Produce all documents concerning all materials presented to the Board of Directors of Synopsys and all agendas or notes of Board meetings which refer to, mention or discuss the patent-in-suit.

16.  Produce all patents and pending patent applications which describe all or part of the operation of any ASIC Design System and all or part of any ASIC Method including, but not limited to, any documents filed in connection with such applications, by Synopsys or as to which Synopsys has any rights, in the United States or elsewhere.

17.  Produce all documents concerning any examinations, tests, studies, surveys, or other inquiry conducted by or for Synopsys on behalf of, in conjunction with, or at the request of, defendants on or with respect to any ASIC Design System and ASIC Method.

18. Produce all documents concerning any examinations, tests, studies, surveys, or other inquiry conducted by or for defendants on or with respect to any ASIC Design System and ASIC Method.

19. Produce all documents concerning any returns of ASIC Design Systems made (or requested to be made) by defendants.

20. Produce all documents concerning any replacement of ASIC Design Systems made (or requested to be made) by Synopsys to defendants.

21. Produce all documents concerning communications between Synopsys and any other person or entity concerning the performance, use, placement, operation, or installation of ASIC Design Systems operated by or on behalf of defendants, including, but not limited to, communications with defendants and communications with the Synopsys User Group or "SNUG".

22. Produce all documents concerning conversations, communications, correspondence, discussions or meetings concerning the patent-in-suit.

23. Produce all documents concerning the patent-in-suit.

24. Produce all documents referring to plaintiff and concerning the patent in suit or this litigation.

RLF1-2611599-1

25. Produce all documents concerning articles, papers, presentations, and publications authored in whole or part by Aart de Gues, David Gregory, William Cohen, or Karen Bartlett with respect to ASIC Design Systems and ASIC Methods.

26. Produce all documents concerning any change, alteration or modification made or requested to be made to an ASIC Design System or ASIC Method provided or offered to defendants, regardless of the entity requesting the change, alteration or modification.

27. Produce all documents concerning any technical or operational support provided by or on behalf of Synopsys to any defendant for ASIC Design Systems and ASIC Methods.

28. Produce all documents concerning communications with any defendant regarding ASIC Products, ASIC Design Systems, and ASIC Methods.

29. Produce documents sufficient to show the capabilities, features, functions, operation, and use of the system previously referred to by Synopsys as "Socrates," and of the systems known as the "Gdl" synthesis system, the "LSS" logic synthesis system, and the "Dagon" synthesis system including, but not limited to, any user guides, operation guides, technical bulletins, technical

11

reference manuals, user manuals, training manuals, specifications, source code,

tutorials, technical overviews, summaries, functional descriptions, design flow

diagrams, operational flow diagrams, design specifications, articles, reports,

and memos.

30. Produce all documents concerning all hardware, software, libraries and/or

databases for use in the system previously referred to by Synopsys as

"Socrates," and in the systems known as the "Gdl" synthesis system, the "LSS"

logic synthesis system, and the "Dagon" synthesis system including, but not

limited to, technical reference manuals, technical bulletins, user manuals,

installation manuals, training manuals, specifications, source code, tutorials,

technical overviews, and summaries.

12

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,                    )
                                        )
          Plaintiff,                    )
                                        )   C.A. No. 03-103-GMS
     v.                                 )
                                        )
AEROFLEX INCORPORATED, AMI              )
SEMICONDUCTOR, INC., MATROX             )
ELECTRONIC SYSTEMS LTD.,                )
MATROX GRAPHICS INC., MATROX            )
INTERNATIONAL CORP. and                 )
MATROX TECH, INC.                       )
                                        )
          Defendants.                   )

FILED

JUN - 9 2003

DISTRICT COURT
OF DELAWARE

## STIPULATED PROTECTIVE ORDER

WHEREAS the parties are or may be competitors and believe that confidential information about certain of its research and development activities and other confidential information concerning its activities constitute very valuable commercial information that, if disclosed to competitors or others, would significantly harm it, and

WHEREAS each of the parties expects certain documents, things, and information that are or will be encompassed by discovery demands made to each other or to non-parties constitute trade secret or other confidential research, development, or commercial information within the meaning of Rule 26(c) of the Federal Rules of Civil Procedure.

Each of the parties hereby stipulates that the following Stipulated Protective Order may be entered by the Court:

1

1.      All Confidential Information produced or exchanged in the course of this litigation shall be used solely for the purpose of preparation and trial of this litigation and for no other purpose whatsoever, and shall not be disclosed to any person except in accordance with the terms hereof.

2.      "Confidential Information," as used herein, means any information of any type, kind or character that is designated as "Confidential" by any of the supplying or receiving parties, whether it be a document, information contained in a document, information revealed during a deposition, information revealed in an interrogatory answer or otherwise.  In designating information as "Confidential," a party will make such designation only as to that information that it in good faith believes contains "Confidential Information."

3.      (a) "Confidential Information" includes, but is not limited to, (i) proprietary technical information and specifications, (ii) trade secrets (iii) confidential know-how, and (iv) proprietary business and financial information and any other non-public information, the disclosure of which is likely to have the effect of causing significant competitive harm to the disclosing party or party from which the information was obtained.  Nothing in this paragraph shall be construed to limit the description of "Confidential Information" set forth in paragraph 2.

(b)  Nothing shall be regarded as "Confidential Information" if it is information that:

(i) is in the public domain at the time of disclosure, as evidenced by a written document;

(ii) becomes part of the public domain through no fault of the other party, as evidenced by a written document;

(iii) was in the receiving party's rightful and lawful possession at the time of disclosure, as evidenced by a written document; or

2

(iv) is lawfully received by the receiving party from a third party at a later date without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party.

4.    "Qualified Persons," as used herein means:

(a) To the Court and its officers and staff, including court reporters;

(b) Outside attorneys of record for the parties in this litigation and employees of such attorneys to whom it is necessary that the material be shown for purposes of this litigation;

(c) Outside experts, consultants, advisors or investigators (collectively referred to hereafter as "experts") who have signed an undertaking pursuant to paragraph 5 but only after compliance with the provisions of paragraph 5 below;

(d) To non-party support services including, but not limited to, court reporters, outside copy services, document imaging and database services, design services who have signed confidentiality agreements, jury consultants who have signed confidentiality agreements, mock jurors who have signed confidentiality agreements, and language translators who have signed confidentiality agreements (including support staff) as may be reasonably necessary in connection with the preparation or conduct of this action;

(e) Anyone to whom the parties consent in writing;

(f) If this Court so elects, any other person may be designated as a Qualified Person by order of this Court, after notice and opportunity to be heard to all parties.

5.    Prior to the disclosure of any "Confidential Information" to any expert under Paragraph 4(c), counsel for the Party seeking to make the disclosure shall: (i) deliver a copy of this Protective Order as entered to such person, explain its terms to such person, and secure the signature of such person on a written undertaking in the form attached hereto as Exhibit A, and (ii) transmit by facsimile and mail to counsel for the other Parties a copy of the signed Exhibit A,

3

accompanied by a curriculum vitae, at least ten (10) calendar days before any "Confidential Information" designated under this Protective Order is to be disclosed to the signator. The curriculum vitae should identify the general area(s) of expertise of the expert, provide a brief job history, specify all employment, expert or consulting engagements by the expert within the past five (5) years, and state all present or prior relationships between the expert and any entity directly or indirectly involved in this litigation or providing an indemnity to any such entity, its subsidiaries or its affiliates. Any Party may object to the proposed disclosure to an expert within the ten (10) calendar day period following the transmittal of Exhibit A and the curriculum vitae, by stating specifically in writing the reasons why the Party believes such expert should not receive designated "Confidential Information". If during that ten (10) calendar day period, a Party makes such a written objection, there shall be no disclosure of "Confidential Information" to the expert absent mutual agreement of the Parties, waiver of the objection as stated below, or further order of the Court. After a Party objects to the proposed disclosure to an expert, the objecting Party shall move, by noticed motion or by *ex parte* application, for an order that disclosure not be made to such expert within five (5) business days following the date that the objection is made, or the Party's objection shall be deemed waived and disclosure may be made to the expert. The burden shall be on the objecting Party to establish why the disclosure should not be made. Each Party shall maintain a file of all such signed copies of Exhibit A. However, it shall not be necessary for administrative, secretarial or clerical personnel working for such Qualified Person to sign a written undertaking.

6.      (a) Documents produced in this action may be designated by any party or parties as "Confidential" by marking each page of the document(s) with the designation "Confidential."

4

(b) In lieu of marking the original of a document, if the original is not produced, the designating party may mark the copies that are produced or exchanged. Originals shall be preserved for inspection.

(c) If the document is not in paper form, the producing person or entity shall use other such reasonable means as necessary to identify clearly the document or information as "Confidential."

7.   Discovery responses or other litigation materials may be designated by any party or parties as "Confidential" by marking each page of the response with the designation "Confidential."

8.   The designation of information disclosed during a deposition as "Confidential" shall be made either by a statement on the record at the deposition or within twenty (20) calendar days after receipt by counsel of a copy of the deposition transcript. Such designation will be applied to only those portions of the deposition transcript that include a specific question and response or series of questions and responses containing "Confidential Information." The deposition transcript shall be printed in consecutive pages (whether or not some pages are designated as "Confidential") with a marking on the cover of the deposition transcript indicating the "Confidential" designation contained therein. Unless previously designated otherwise, all deposition transcripts shall be treated as "Confidential" in their entirety prior to the end of the twenty (20) calendar day period following receipt by counsel of a copy of the deposition transcript.

9.   "Confidential Information" shall not be disclosed or made available by the receiving party to persons other than Qualified Persons except that nothing herein is intended to prevent individuals who are in-house counsel or a member of the professional legal department

5

of the Parties from having access to pleadings, briefs and exhibits or declarations filed with the Court and expert reports, including exhibits, that are designated as "Confidential."

10.    (a) Documents to be inspected shall be treated as "Confidential" although such documents need not be marked as "Confidential" prior to inspection. At the time of copying for the receiving parties, any documents containing "Confidential Information" shall be stamped prominently "Confidential" by the producing party.

(b) Nothing herein shall prevent disclosure beyond the terms of this Order if each party designating the information as "Confidential" consents to such disclosure or if the Court, after notice to all effected parties, orders such disclosures. Nothing herein shall prevent any counsel of record from utilizing "Confidential Information" in the examination or cross-examination of any person who is indicated on the document as being an author, source or recipient of the "Confidential Information," irrespective of which party produced such information. Nothing herein shall prevent any counsel of record from utilizing "Confidential Information" in the examination or cross-examination of any person who is a current or former officer, director or employee of the party so designating the information as "Confidential" or of the party that produced the information or of a related entity.

11.    If a party inadvertently discloses any document or thing containing information that it deems confidential without designating it as "Confidential," the disclosing party shall promptly upon discovery of such inadvertent disclosure inform the receiving party in writing, and the receiving party and all Qualified Persons possessing such information shall thereafter treat the information as "Confidential" under this Order. To the extent such information may have been disclosed to persons other than Qualified Persons described in this document, the receiving party shall make every reasonable effort to retrieve the information promptly from such persons and to avoid any further disclosure to and by such persons.

6

12.    A party shall not be obligated to challenge the propriety of a designation as "Confidential" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. Nor will the failure to object be construed as an admission that any particular "Confidential Information" contains or reflects currently valuable trade secrets or confidential commercial information. In the event that any party to this litigation disagrees at any stage of these proceedings with the designation by the designating party of any information as "Confidential," or the designation of any person as a Qualified Person, the parties shall first try to resolve such dispute in good faith on an informal basis, such as production of redacted copies. If the parties are unsuccessful in informally resolving any disputes regarding the designation of any document or information as "Confidential," the Court shall resolve all such disputes. It shall be the burden of the party making any designation to establish that the information so designated is "Confidential" within the meaning of this Protective Order. The "Confidential Information" that is the subject of the dispute shall be treated as originally designated pending resolution of the dispute.

13.    The parties may, by written stipulation filed and approved by the Court, amend this Order, and any party may seek an order of this Court modifying this Protective Order. The parties agree to meet and confer prior to seeking to modify this Protective Order. In addition, the Court may modify this Protective Order in the interest of justice or otherwise at the Court's discretion.

14.    In the event a party wishes to use any "Confidential Information" in any affidavits, briefs, memoranda of law, or other papers filed with the Court in this litigation, such "Confidential Information" used therein shall be filed under seal with the Court.

15.    The Clerk of this Court is directed to maintain under seal all documents and transcripts of deposition testimony and answers to interrogatories, admissions and other

7

pleadings filed under seal with the Court in this litigation that have been designated, in whole or in part, as "Confidential" by a party to this action.

16.     If a Party intends to offer into evidence or otherwise disclose in open court any "Confidential Information" designated by another person or entity, counsel for such Party shall notify the designating person or entity that the Party intends to disclose "Confidential Information" in open court prior to the disclosure, so that the designating person or entity may confer with the Court concerning appropriate procedures for protecting its "Confidential Information."

17.     In the event any person or party that has possession, custody, or control of any information designated as "Confidential" pursuant to the terms of this Protective Order receives a subpoena or other process or order to produce such information, such person or party shall notify by mail within five (5) business days of the Party's receipt of the request, the counsel for the party or persons claiming confidential treatment of the documents sought by such subpoenas or other process or order, shall furnish such counsel with a copy of said subpoena or other process or order, and shall cooperate with respect to any procedure sought to be pursued by the party whose interests may be affected.  The party asserting the "Confidential" treatment shall have the burden of defending against such subpoena, process or order.  The person or party receiving the subpoena or process or order shall be entitled to comply with it except: (a) to the extent the party asserting the "Confidential" treatment is successful in obtaining an order modifying or quashing it; and (b) in complying with the process or order shall, at a minimum, seek to obtain "Confidential" treatment of the "Confidential Information" before producing it in the other proceeding or action.

18.     If the discovery process calls for the production of information that a Party or Non-Party does not wish to produce because the Party or Non-Party believes its disclosure would

8

breach an agreement with another person or entity to maintain such information in confidence, the disclosing Party or Non-Party promptly shall give written notice to the other person or entity that its information is subject to discovery in this litigation, and shall provide such person or entity with a copy of this Protective Order. When such written notice is given to the person or entity, the disclosing Party or Non-Party will advise the potential receiving Party that such notice has been given. The person or entity whose information may be subject to discovery shall have ten (10) business days from receipt of the written notice in which to seek relief from the Court, if the person or entity so desires. If the ten (10) business days elapse without the person or entity seeking relief from the Court, the requested information shall be produced in accordance with the terms of this Protective Order.

19.    In the event that additional persons or entities become Parties, none of such Parties' counsel, experts or consultants retained to assist said counsel, shall have access to "Confidential Information" produced by or obtained from any other producing person or entity until said Party has executed and filed with the Court its agreement to be fully bound by this Protective Order.

20.    This Protective Order shall apply to the parties and any non-party from whom discovery may be sought and who desires protection for the discovery sought. Thus, any non-party requested or required to produce or disclose information in this proceeding, through subpoena or otherwise, may designate such information pursuant to the terms of this Protective Order.

21.    (a) Nothing herein requires disclosure of information, documents or things which the disclosing entity contends is protected from disclosure by the attorney-client privilege or the work-product exception. Nothing herein shall preclude any party from moving this Court for an order directing the disclosure of such information, documents or things.

9

(b) In the event that any privileged attorney-client or work product documents or things are inadvertently produced for inspection and/or provided, the disclosing party shall identify such documents or things within five (5) days of when it discovers that the privileged materials were inadvertently produced for inspection and/or provided, and either (1) copies shall not be provided, or (2) if copies have already been provided, all copies in the receiving party's possession shall be promptly returned (and not relied upon) by the receiving party. Nothing in this paragraph shall prevent the receiving party from contending that the identified materials are not privileged, that the material was not inadvertently produced, or that privilege was waived for reasons other than mere inadvertent production of the material.

22.    Within ninety (90) days after conclusion of this litigation and any and all appeals thereof, any document and all reproductions of "Confidential" documents produced by a party that are in the possession of any Qualified Person shall be returned to the producing party or, with the consent of the producing party, destroyed. If destroyed, counsel for the receiving party shall certify to counsel for the producing party compliance with this paragraph within fourteen (14) calendar days of such destruction. Outside counsel for each party may maintain in its files one copy of all material produced as well as all materials filed with or otherwise presented to the Court, deposition and trial transcripts, and work product (regardless of whether such materials contain or refer to "Confidential" materials). If counsel retains such materials, the materials which contain Confidential Information shall be accessible only by Qualified Persons defined in paragraph 4(b) above. As far as the provisions of any protective orders entered in this action restrict the communication and use of the documents produced thereunder, such orders shall continue to be binding after the conclusion of this litigation including any subsequent appeals or later proceedings, except that (a) there shall be no restriction on documents that are used as exhibits in Court unless such exhibits were filed under seal, and (b) a party may seek the written

10

permission of the producing party or order of the Court with respect to dissolution or modification of such protective orders. The Court shall retain jurisdiction to enforce the performance of said obligations.

23.    This Order shall not bar any attorney herein in the course of rendering advice to his client with respect to this litigation from conveying to any party client his evaluation in a general way of "Confidential Information" produced or exchanged herein; provided, however, that in rendering such advice and otherwise communicating with his client, the attorney shall not disclose the specific contents of any "Confidential Information" produced by another party herein, which disclosure would be contrary to the terms of this Protective Order.

24.    This Protective Order may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

SO ORDERED this   9th   day of   June   , 2003.


UNITED STATES DISTRICT JUDGE

11

AGREED:

By: _____

Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
Post Office Box 551
Wilmington, Delaware 19899
(302) 651-7700

Gary M. Hoffman
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
   OSHINSKY LLP
2101 L Street NW
Washington, D.C. 20037-1526
(202) 828-4879

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
   OSHINSKY LLP
1177 Avenue of the America
New York, New York 10036
(212) 896-5471


Counsel for Plaintiff,
Ricoh Company Ltd.

_____

Francis DiGiovanni (#3189)
Connolly Bove Lodge
   & Hutz LLP
1220 Market Street
P.O. Box 2207
Wilmington, DE 19801
(302) 658-9141
Attorneys for Defendants

OF COUNSEL:
Teresa M. Corbin
Howrey Simon Arnold & White, LLP
301 Ravenswood Ave.
Menlo Park, CA 94025
(650) 463-8100
Attorneys for Defendants

Alan H. MacPherson
MacPherson Kwok Chen & Heid LLP
2001 Gateway Place, Suite 195E
San Jose, CA 95014
(408) 392-9250
Attorney for AMI Semiconductor, Inc.

12

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICOH COMPANY, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 03-103-GMS |
| v. | ) | |
| | ) | |
| AEROFLEX INCORPORATED, AMI | ) | |
| SEMICONDUCTOR, INC., MATROX | ) | |
| ELECTRONIC SYSTEMS LTD., | ) | |
| MATROX GRAPHICS INC., MATROX | ) | |
| INTERNATIONAL CORP. and | ) | |
| MATROX TECH, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## UNDERTAKING

My name is _____. I hereby acknowledge that I have been provided with a copy of, have read, and am fully familiar with, the terms of the Stipulated Protective Order entered in this action on _____, 2003. I agree to be bound by, and to comply fully with, the terms of the Protective Order. I agree not to disclose or disseminate any "Confidential Information," as defined by the Stipulated Protective Order, except as permitted therein.

I hereby submit myself to the jurisdiction of the United States District Court for the District of Delaware in connection with the enforcement of the Protective Order.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _____, 2003.

_____

13

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of June 2003, true and correct copies of the foregoing were caused to be served on counsel of record at the following addresses as indicated:

**BY HAND DELIVERY:**
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz, LLP
1220 Market Street
P.O. Box 2207
Wilmington, Delaware  19899
Attorneys for Defendants

**VIA FEDERAL EXPRESS**
Teresa M. Corbin, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Avenue
Menlo Park, California 94025
Attorneys for Defendants

**VIA FEDERAL EXPRESS**
Alan H. MacPherson, Esq.
MacPherson Kwok Chen & Heid LLP
2001 Gateway Place
Suite 195E
San Jose, California 95014
Attorneys for AMI Semiconductor, Inc.


Steven J. Fineman (#4025)

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICOH COMPANY, LTD., <br><br> Plaintiff, <br><br> v. <br><br> AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP. and MATROX TECH, INC., <br><br> Defendants. | Civil Action No. 03-103-GMS |

## THIRD PARTY SYNOPSYS, INC.'S OBJECTIONS TO PLAINTIFF'S SUBPOENA DUCES TECUM

Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, third party Synopsys, Inc. ("Synopsys") hereby responds to Plaintiff Ricoh Company, Ltd.'s ("Ricoh") subpoena duces tecum.

In responding to this subpoena, Synopsys will make the reasonable, diligent, and good faith search for responsive documents as required under the Federal Rules and Local Rules. This response, however, is based on information presently available to and reviewed by Synopsys and its attorneys at the present time. Synopsys reserves the right to supplement its response when, and if, additional information becomes available.

This response is made without waiving, in any way: (1) the right to object on any basis permitted by law to the use of any such information, for any purpose, in whole or in part, in any subsequent proceeding in this action or any other action; and (2) the right to object on any basis permitted by law to any other discovery request or proceeding involving or relating to the subject matter of this response.

## GENERAL OBJECTIONS

1.     Synopsys objects to Ricoh's subpoena duces tecum to the extent that it seeks information protected by the attorney-client privilege, work product doctrine or any other privilege or protection afforded by state or federal law.  Such protected material may include the impressions, conclusions, opinions, legal research or theories of attorneys, whether or not communicated to their client, and/or any other applicable privilege.  To the extent that documents are otherwise responsive and relevant, Synopsys will provide identification of those privileged or protected documents in a privileged document log.  Any inadvertent production of documents that are subject to any such privilege or protection shall not be deemed a waiver of any privilege or protection with respect to such documents or information.

2.     Synopsys objects to Ricoh's subpoena duces tecum to the extent that it seeks information that is subject to any protective order, privacy interest, contractual obligation, non-disclosure agreement, confidentiality agreement or other such confidentiality obligation owed to any third party.  Without third party permission, Synopsys typically cannot provide such information unless directed to do so by the Court.

3.     Synopsys objects to Ricoh's subpoena duces tecum to the extent that it seeks documents that are a matter of public record or are equally available or readily ascertainable by Ricoh from some other source.

4.     Synopsys objects to Ricoh's subpoena duces tecum to the extent that it seeks information or the identification of documents that are not within the possession, custody, or control of Synopsys, or refers to persons, entities, or events not known to Synopsys, subjecting them to unreasonable and undue annoyance, oppression, burden, and expense, and would impose upon them an obligation to discover information or materials from third parties or services who are equally accessible to Ricoh.

5.     Synopsys objects to Ricoh's subpoena duces tecum to the extent that it is unlimited in time or otherwise not limited to a time frame relevant to this litigation and to U.S. Patent No. 4,922,432 (the "'432 patent"), on the grounds that each such request for production is

- 2 -

overly broad, unduly burdensome, and seeks the discovery of information that is not relevant to a claim or defense of any party or to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

6.    Synopsys objects to Ricoh's subpoena duces tecum to the extent that it seeks a legal conclusion.

7.    Synopsys objects to Ricoh's subpoena duces tecum, including its Definitions and Instructions, to the extent that they seek to modify or expand the requirements of the Federal Rules of Civil Procedure and the Local Rules of the District Court of Delaware and/or other applicable law. Synopsys will respond to Ricoh's subpoena duces tecum in accordance with the Federal Rules of Civil Procedure, the Local Rules of the District Court of Delaware and/or other applicable law.

8.    Synopsys objects to Ricoh's subpoena duces tecum to the extent that the attached document requests are compound and contain unrelated subparts in violation of Rule 33(a) of the Federal Rules.

9.    Synopsys objects to Ricoh's subpoena duces tecum to the extent that the attached document requests are unreasonably cumulative, redundant, or duplicative of other Document Requests, or seek information that is obtainable from some other source that is more convenient, less burdensome, or less expensive.

10.    Synopsys objects to Ricoh's subpoena duces tecum to the extent it seeks information from Synopsys concerning Synopsys' contentions regarding the construction, validity, enforceability and non-infringement of the '432 patent. Synopsys has initiated a lawsuit in the Northern District of California in which it asks for a declaratory judgment of invalidity and non-infringement. Synopsys will provide discovery in connection with that lawsuit at an appropriate time, in accordance with the schedule set for discovery in that matter.

11.    Synopsys objects to Ricoh's subpoena duces tecum to the extent it seeks information or documents about design synthesis tools not used within the United States, and will not produce information or documents concerning such products.

12.     Synopsys objects to Ricoh's subpoena duces tecum to the extent that it seeks confidential technical information regarding Synopsys' products. Production of confidential technical information is not appropriate where the requesting party cannot make a showing of sufficient need for access to the confidential information.

## SPECIFIC OBJECTIONS TO DEFINITIONS & INSTRUCTIONS

1.     Synopsys objects to Definition/Instruction a on the grounds that it is unduly burdensome, overbroad, and purports to impose obligations on Synopsys far beyond those imposed by the Federal or Local Rules.

2.     Synopsys objects to Ricoh's Definition/Instruction c to the extent that the term "Synopsys" extends to any person or entity other than Synopsys' present employees and agents.

3.     Synopsys objects to Ricoh's Definition/Instruction j to the extent that it purports to impose requirements other than or in addition to the requirements of the Federal Rules of Civil Procedure and the Local Rules of this Court.

4.     Synopsys objects to Ricoh's Definition/Instruction p on the basis that the definition of "ASIC Design System" is vague and overly broad. Synopsys further objects to the inclusion of products dating back to 1990. Under any set of circumstances, Ricoh would be barred from claiming damages for activities dating back to 1990.

5.     Synopsys objects to Ricoh's Definition/Instruction q to the extent that the definition of "ASIC Method" is vague and overly broad.

## THIRD PARTY SYNOPSYS, INC.'S OBJECTIONS TO PLAINTIFF'S SUBPOENA DUCES TECUM

REQUEST FOR PRODUCTION No. 1

1.     Produce documents sufficient to show the manner of marketing and promotion by or for Synopsys of each ASIC Design System and ASIC Method including but not limited to brochures, print or other advertisements, and tradeshow materials.

- 4 -

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The manner of marketing and promotion by Synopsys of design synthesis tools is not relevant to any issue in the present litigation.

REQUEST FOR PRODUCTION No. 2

2.      Produce documents sufficient to show the capabilities, features, functions, operation, and use of the ASIC Design Systems and ASIC Methods including, but not limited to, any user guides, operation guides, technical bulletins, technical reference manuals, user manuals, training manuals, specifications, source code, tutorials, technical overviews, summaries, functional descriptions, design flow diagrams, operational flow diagrams, design specifications, articles, reports, and memos.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The capabilities, features, functions, etc. of Synopsys' design synthesis software are not relevant to any issue in the present litigation.

REQUEST FOR PRODUCTION No. 3

3.      Produce documents sufficient to show the capabilities, features, functions, operation, and use of the user interface to the ASIC Design Systems, including but not limited to, the DC Shell, and the Verilog, VHDL, HDL, and/or any other, input specification language used in connection with the ASIC Design Systems and ASIC Methods.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The capabilities, features, functions, etc. of the user interface to Synopsys' design synthesis software are not relevant to any issue in the present litigation.

REQUEST FOR PRODUCTION No. 4

4.     Produce all documents concerning all hardware, software, libraries and/or databases provided, made available, distributed, or recommended by or on behalf of Synopsys to defendants concerning the practice of an ASIC Method using an ASIC Design System, including, but not limited to, technical reference manuals, technical bulletins, user manuals, installation manuals, training manuals, specifications, source code, tutorials, technical overviews, and summaries.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The hardware, software, libraries and/or databases used in Synopsys' design synthesis software are not relevant to any issue in the present litigation.

REQUEST FOR PRODUCTION No. 5

5.     Produce all documents concerning all hardware, software, libraries and/or databases for use in ASIC Design Systems for the selection of architecture-specific hardware cells in designing ASIC Products, including, but not limited to, technical reference manuals, technical bulletins, user manuals, installation manuals, training manuals, specifications, source code, tutorials, technical overviews, and summaries.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The hardware, software, libraries and/or databases used in Synopsys' design synthesis software are not relevant to any issue in the present litigation.

REQUEST FOR PRODUCTION No. 6

6.    Produce all document concerning agreements or other arrangements granting rights in or otherwise concerning ASIC Design Systems and ASIC Methods from Synopsys to any defendant (or from any defendant to Synopsys), including but not limited to contracts, licenses, purchase agreements, indemnification agreements, and hold-harmless agreements/covenants not to sue.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The content of any contracts, licenses, purchase agreements, indemnification agreements and the like between Synopsys and any defendant is typically treated as highly confidential information and is not relevant to any issue in the present litigation. If information about contracts, licenses, purchase agreements, etc. could be shown to have any relevance to the present litigation, this information should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 7

7.    Produce all documents concerning solicitations, offers, or presentations made by or to any defendant with respect to ASIC Design Systems and ASIC Methods, including but not limited to advertising material, proposals, and presentations.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The content of any solicitations, offers, or presentations to any defendant regarding Synopsys' design synthesis tools is typically treated as highly confidential information and is not relevant to any issue in the present litigation. If information about solicitations, offers or presentations could be shown to have any relevance to the present litigation, this information should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 8

8.    Produce documents sufficient to show the actual or projected cost savings by any defendant as a consequence of licensing or using ASIC Design Systems and ASIC Methods.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The cost savings resulting from use of Synopsys' design synthesis tools is not relevant to any issue in the present litigation. If information about cost savings could be shown to have any relevance to the present litigation, this information should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 9

9.    Produce documents sufficient to show the annual dollar and unit volume of sales and sales projections by or on behalf of Synopsys of ASIC Design Systems and ASIC Methods to each defendant, including but not limited to indicating how Synopsys defines "sales" and "unit."

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The volume of sales of Synopsys' design synthesis tools to defendants is not relevant to any issue in the present litigation. If sales volumes could be shown to have any relevance to the present litigation, this information should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 10

10.    Produce documents sufficient to show the gross revenue, as well as the discounts, rebates or other reductions deducted from gross revenue from sales by or on behalf of Synopsys of ASIC Design Systems and ASIC Methods to each defendant, including but not limited to how Synopsys defines each item of discount, rebate or other reduction deducted from gross revenue.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The revenues to Synopsys resulting from sales of any design synthesis tools to defendants is not relevant to any issue in the present litigation. If revenues could be shown to have any relevance to the present litigation, this information should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 11

11.    Produce all documents concerning the validity of the patent-in-suit.

RESPONSE:

In addition to its general and specific objections, Synopsys objects to this request to the extent that it seeks the production of documents protected by the attorney-client privilege and/or

- 9 -

the work product doctrine. Synopsys is not presently aware of the existence of any non-privileged documents directly addressed to the question of the validity of the patent-in-suit. In another lawsuit pending in the Northern District of California, Synopsys seeks a declaratory judgment of the invalidity of the '432 patent. In due course during that litigation Synopsys intends to produce documentary evidence to Ricoh establishing the invalidity of the patent. Synopsys is not a party to the present suit and it is unreasonably burdensome to ask Synopsys to duplicate such discovery in this suit.

REQUEST FOR PRODUCTION No. 12

12.    Produce all documents concerning the enforceability of the patent-in-suit.

RESPONSE:

Synopsys is not aware of the existence of any such documents.

REQUEST FOR PRODUCTION No. 13

13.    Produce all documents concerning the infringement or possibility of infringement by defendants of the patent-in-suit.

RESPONSE:

Synopsys is not aware of any such documents.

REQUEST FOR PRODUCTION No. 14

14.    Produce all documents concerning communications between Synopsys and any other person or entity concerning the patent-in-suit.

RESPONSE:

In addition to its general and specific objections, Synopsys objects to this request on the basis that it seeks the production of documents protected by the attorney-client privilege and/or the work product doctrine. Synopsys further objects to this request on the basis that it is not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case.

Without waiving any of the foregoing objections, Synopsys will produce non-privileged documents, if any, discovered after a reasonable search, relating to previous occasions on which Synopsys has been approached regarding offers to license the '432 patent.

REQUEST FOR PRODUCTION No. 15

15.    Produce all documents concerning all materials presented to the Board of Directors of Synopsys and all agendas or notes of Board meetings which refer to, mention or discuss the patent-in-suit.

RESPONSE:

In addition to its general and specific objections, Synopsys objects to this request on the basis that it seeks the production of documents protected by the attorney-client privilege and/or the work product doctrine. Synopsys further objects to this request on the basis that it is not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. Discussions by Synopsys' Board of Directors on the subject of the patent in suit are not intrinsically relevant to any issue in the present case.

Without waiving any of the foregoing objections, Synopsys will produce non-privileged documents, if any, discovered after a reasonable search, relating to previous occasions on which Synopsys has been approached regarding offers to the '432 patent.

REQUEST FOR PRODUCTION No. 16

16.    Produce all patents and pending patent applications which describe all or part of the operation of any ASIC Design System and all or part of any ASIC Method including, but not limited to, any documents filed in connection with such applications, by Synopsys or as to which Synopsys has any rights, in the United States or elsewhere.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it seeks the production of materials that are protected by the attorney-client privilege and/or the work product doctrine. Synopsys further objects that the request is overly

broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Patents issued to Synopsys are available to Ricoh in a less burdensome manner from public sources. Pending patent applications are highly confidential and Ricoh has made no showing of relevance, let alone compelling need, for such documents.

REQUEST FOR PRODUCTION No. 17

17.    Produce all documents concerning any examinations, tests, studies, surveys, or other inquiry conducted by or for Synopsys on behalf of, in conjunction with, or at the request of, defendants on or with respect to any ASIC Design System and ASIC Method.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The nature of any technical or operational support provided for any Synopsys design synthesis tool is, therefore, not relevant to any issue in the present litigation. If examinations, tests, studies, surveys or other inquiries concerning design synthesis systems could be shown to be relevant to any issue in the present litigation, information about these examinations, tests, studies, etc. should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 18

18.    Produce all documents concerning any examinations, tests, studies, surveys, or other inquiry conducted by or for defendants on or with respect to any ASIC Design System and ASIC Method.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in

this case. The nature of any technical or operational support provided for any Synopsys design synthesis tool is, therefore, not relevant to any issue in the present litigation. If examinations, tests, studies, surveys or other inquiries concerning design synthesis systems could be shown to have relevance to any issue in the present litigation, information about these examinations, test, studies, etc. should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 19

19.    Produce all documents concerning any returns of ASIC Design Systems made (or requested to be made) by defendants.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. Returns of Synopsys design synthesis systems by defendants are not relevant to any issue in the present litigation. If the return of Synopsys design synthesis systems could be shown to have relevance to any issue in the present litigation is should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 20

20.    Produce all documents concerning any replacement of ASIC Design Systems made (or requested to be made) by Synopsys to defendants.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The replacement of any Synopsys design synthesis tool is not relevant to any issue in the present litigation. If the replacement of Synopsys design synthesis systems could be shown to have

relevance to any issue in the present litigation, the requested documents should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 21

21.    Produce all documents concerning communications between Synopsys and any other person or entity concerning the performance, use, placement, operation, or installation of ASIC Design Systems operated by or on behalf of defendants, including, but not limited to, communications with defendants and communications with the Synopsys User Group or "SNUG".

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Synopsys is not a party to the present litigation.  Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case.  The nature of any performance, use, placement, etc. of Synopsys design synthesis tools is not relevant to any issue in the present litigation.  To the extent that the performance, use, placement, etc. could be shown to have relevance to any issue in the present litigation, information about such use, placement, operation, etc. should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 22

22.    Produce all documents concerning conversations, communications, correspondence, discussions or meetings concerning the patent-in-suit.

RESPONSE:

In addition to it general and specific objections, Synopsys further objects to this request on the basis that it seeks the production of documents subject to attorney-client privilege and the work product doctrine.  Discussions internal to Synopsys regarding the '432 patent are not intrinsically relevant to any issue in the present litigation.

Without waiving any of the foregoing objections, Synopsys will produce non-privileged responsive documents that can found after a reasonable search which are relevant to the substantive rights of defendants, including documents, if any, relating to prior occasions on which Synopsys was approached regarding licensing of the '432 patent.

REQUEST FOR PRODUCTION No. 23

23.    Produce all documents concerning the patent-in-suit.

RESPONSE:

In addition to it general and specific objections, Synopsys further objects to this request on the basis that it seeks the production of documents subject to attorney-client privilege and the work product doctrine.  Discussions internal to Synopsys regarding the '432 patent are not intrinsically relevant to any issue in the present litigation.

Without waiving any of the foregoing objections, Synopsys will produce non-privileged responsive documents that can found after a reasonable search which are relevant to the substantive rights of defendants, including documents, if any, relating to prior occasions on which Synopsys was approached regarding licensing of the '432 patent.

REQUEST FOR PRODUCTION No. 24

24.    Produce all documents referring to plaintiff and concerning the patent in suit or this litigation.

RESPONSE:

In addition to it general and specific objections, Synopsys further objects to this request on the basis that it seeks the production of documents subject to attorney-client privilege and the work product doctrine.  Discussions internal to Synopsys regarding the '432 patent are not intrinsically relevant to any issue in the present litigation.

Without waiving any of the foregoing objections, Synopsys will produce non-privileged responsive documents that can found after a reasonable search which are relevant to the

substantive rights of defendants, including documents, if any, relating to prior occasions on which Synopsys was approached regarding licensing of the '432 patent.

REQUEST FOR PRODUCTION No. 25

25.    Produce all documents concerning articles, papers, presentations, and publications authored in whole or part by Aart de Gues, David Gregory, William Cohen, or Karen Bartlett with respect to ASIC Design Systems and ASIC Methods.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad and unreasonably burdensome. The documents requested are public materials that can be obtained less burdensomely by Ricoh from public sources.

Without waiving any of the foregoing objections, Synopsys will produce any responsive materials that can be found after a reasonable search and that are dated sufficiently early to constitute possible prior art against the '432 patent under 35 U.S.C. section 102(b).

REQUEST FOR PRODUCTION No. 26

26.    Produce all documents concerning any change, alteration or modification made or requested to be made to an ASIC Design System or ASIC Method provided or offered to defendants, regardless of the entity requesting the change, alteration or modification.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. Synopsys is not a party to the present action. The nature of any change, alteration or modification of any Synopsys design synthesis tool is not relevant to any issue in the present litigation.

REQUEST FOR PRODUCTION No. 27

27.    Produce all documents concerning any technical or operational support provided by or on behalf of Synopsys to any defendant for ASIC Design Systems and ASIC Methods.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. The nature of any technical or operational support provided for any Synopsys design synthesis tool is not relevant to any issue in the present litigation. If the technical or operational support provided by Synopsys could be shown to be relevant to any issue in the present litigation, the requested discovery should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 28

28.    Produce all documents concerning communications with any defendant regarding ASIC Products, ASIC Design Systems, and ASIC Methods.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is overly broad, unreasonably burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Synopsys is not a party to the present litigation. Ricoh has asserted that it is not accusing Synopsys products of infringing the patents at issue in this case. Communications regarding design synthesis between Synopsis and defendants is not relevant to any issue in the present litigation. If these communications could be shown to be relevant to any issue in the present litigation, the requested discovery should be obtained, less burdensomely, directly from the defendants.

REQUEST FOR PRODUCTION No. 29

29.    Produce documents sufficient to show the capabilities, features, functions, operation, and use of the system previously referred to by Synopsys as "Socrates," and of the systems know as the "Gdl" synthesis, the "LSS" logic synthesis system, and the "Dagon" synthesis system including, but not limited to, any user guides, operation guides, technical bulletins, technical reference manuals, user manuals, training manuals, specifications, source

code, tutorials, technical overviews, summaries, functional descriptions, design flow diagrams, operational flow diagrams, design specifications, articles, reports, and memos.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome. Synopsys is not a party to the present action. The materials requested by Ricoh are public materials, were not generated by Synopsys, and can be obtained by Ricoh from public sources. In another lawsuit pending in the Northern District of California, Synopsys seeks a declaratory judgment of the invalidity of the '432 patent. In due course during that litigation Synopsys intends to produce documentary evidence to Ricoh establishing the invalidity of the patent. Synopsys is not a party to the present suit and it is unreasonably burdensome to ask Synopsys to duplicate such discovery in this suit.

REQUEST FOR PRODUCTION No. 30

30.     Produce all document concerning all hardware, software, libraries and/or databases for use in the system previously referred to by Synopsys as "Socrates," and in the systems known as the "Gdl" synthesis system, the "LSS" logic synthesis system, and the "Dagon" synthesis system including, but not limited to, technical reference manuals, technical bulletins, user manuals, installation manuals, training manuals, specifications, source code, tutorials, technical overviews, and summaries.

RESPONSE:

In addition to its general and specific objections, Synopsys further objects to this request on the basis that it is unreasonably burdensome. Synopsys is not a party to the present action. The materials requested by Ricoh are public materials, were not generated by Synopsys, and can be obtained by Ricoh from public sources. In another lawsuit pending in the Northern District of California, Synopsys seeks a declaratory judgment of the invalidity of the '432 patent. In due course during that litigation Synopsys intends to produce documentary evidence to Ricoh

establishing the invalidity of the patent.  Synopsys is not a party to the present suit and it

is unreasonably burdensome to ask Synopsys to duplicate such discovery in this suit.

Dated:  June 26 2003                    By:   _____

                                        Francis DiGiovanni
                                        CONNOLLY BOVE LODGE & HUTZ LLP
                                        1220 Market Street, 10th Floor
                                        Wilmington, DE  19899-2207
                                        (302) 658-9141

                                        Christopher L. Kelley
                                        HOWREY SIMON ARNOLD & WHITE, LLP
                                        301 Ravenswood Avenue
                                        Menlo Park, CA  94025
                                        (650) 463-8100 (Telephone)
                                        (650) 463-8400 (Facsimile)

                                        Attorneys for Third Party
                                        SYNOPSYS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Initial Disclosure Statement of Intervenor Synopsys, Inc. was served this 26th day of June, 2003 on the following,

via Federal Express:

       Steven J. Fineman
       Richards, Layton & Finger
       One Rodney Square
       Wilmington, Delaware  19899

via First Class U.S. Mail:

       Edward A. Meilman
       Dickstein Shapiro Morin & Oshinsky, LLP
       1177 Avenue of the Americas
       New York, NY 10036-2714

Gayle L. Jacob

**EXHIBIT 3**

DICKSTEIN  SHAPIRO  MORIN  &  OSHINSKY  LLP

*1177 Avenue of the Americas • New York, New York 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
Writer's Direct Dial: (212) 896-5471
E-Mail Address: MeilmanE@dsmo.com

July 3, 2003

**BY FACSIMILE: (650) 463-8400**
**CONFIRMATION BY MAIL**

Christopher L. Kelley, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025

Re:    Synopsys Objections to Plaintiffs' Subpoena Duces Tecum
       Civil Action No. 03-103-GMS
       Our Ref.:  R2180.0100

Dear Mr. Kelley:

       The purpose of this letter is to attempt to resolve Synopsys objections before taking this matter to the Court.  You should consider this letter as well as any subsequent discussions that may be had as being pursuant to D.R. 7.1.1.

       I tried to reach you by telephone this morning but you were not available and I have not heard back from you.

       General Objection 2 is not valid and the burden is on Synopsys to seek protection from the Court, not vice versa.  Nevertheless and as a compromise, we will for the time being accept an identification of any third party involved as well as a sufficient identification of any involved documents to identify the documents in a document subpoena instead of actual production of the document, provided you advise us of your agreement to do so within 5 business days and we are given such material before the end of July.

       General Objection 3 is not valid.  The fact that documents may be obtainable from some other source does not excuse Synopsys production of those documents.  See, e.g., *Heat & Control, Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1024-25 (Fed. Cir. 1986)

       As to General Objection 5 as well as Specific Objections 4 and 5, for the present time, we are willing to limit the time frame as being from 1996 to the present unless the document relates to prior art or it represents a communication with a defendant in the case.  For prior art documents and communications with defendants, this objection is not valid.

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*www.legalinnovators.com*

Christopher L. Kelley, Esq.
July 3, 2003
Page 2

General Objections 6, 8 and 10 make no logical sense. No request seeks a legal conclusion or Synopsys contention and Rule 33(a) of the Federal Rules is not applicable to documents.

With regard to General Objection 9, we agree that any given document need only be produced once. To the extent that this objection is based on the assertion the information is obtainable from some other source, it is not valid for reasons set forth above.

As to General Objection 11, we agree to your limiting the document to design synthesis tools that were made, used and/or sold in the United States or may have been used outside of the United States as a part of a process to make products imported into the United States.

Turning to General Objection 12, there is a Protective Order in place that your firm has agreed to and that applies to Synopsys documents. Synopsys is heavily involved in this case, albeit behind the scenes, and you are acting as both Synopsys counsel and counsel for the defendants. We will address the appropriateness of the request in conjunction with a discussion of the individual requests.

In order to expedite production of documents, we are willing to withdraw Request Nos. 1, 8, 10, 15, 19 and 20 provided that we can quickly resolve the other matters. This is offered in the spirit of compromise.

Requests 2 through 8, 14, 17, 18 and 22 through 30 are proper and the objections made are not valid. See, Derry Finance N.V. v. Christiana Companies, Inc., 102 F.R.D. 892, 896-97 (D. Del. 1984) (compelling response to subpoena, and noting that "[b]eing relevant, the documents requested are subject to discovery, even though the process of production may be tedious and expensive") ; Cash Today of Texas, Inc. v. Greenberg, 2002 WL: 31414138 *2, *5 (D. Del. 2002) (denying motion to quash third party subpoena requesting documents since relevance is established when the sought after information is relevant in broad terms to the subject matter of the litigation); Walker v. Lakewood Condominium Owners Assoc., 186 F.R.D. 584, 587 (C.D. Cal. 1999) (objection to discovery request as being "overly broad, burdensome, oppressive and irrelevant" was a "[b]oilerplate, generalized objection that . . . [was] inadequate and tantamount to not making any objection at all"); (citing Josephs v. Harris Corp., 677 F.2d 985, 992 (3d Cir. 1982)). See also Redland Soccer Club, Inc. v. Department of the Army, 55 F.3d 827, 856 (3d Cir. 1995)("In Josephs, we stated 'the mere statement by a party that the interrogatory was overly broad, burdensome, oppressive and irrelevant is not adequate to voice a successful objection to an interrogatory.' Josephs, 677 F.2d at 992 (internal quotations omitted). Instead, 'the party resisting discovery must show specifically how each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive.' Id. (citations, internal ellipses and internal quotations omitted).")

The capabilities, features, functions, etc., of Synopsys design synthesis software (for example, Design Compiler) are most relevant to the issue of patent

Christopher L. Kelley, Esq.
July 3, 2003
Page 3

infringement. The fact that Synopsis is not a party to the present litigation (although it is quite clearly heavily involved in it) is the reason for a subpoena rather than a document request. While Ricoh has not accused Synopsys of patent infringement, what the defendants do with Synopsys products is clearly relevant to a determination of whether or not there is patent infringement. Any cost savings are clearly relevant to issues of damages (Request 8). Request 22, 23 and 24 are clearly relevant to the recognition or non-recognition by Synopsys and/or others of the validity of the patent-in-suit and are also relevant to the possibility of infringement by the defendants. The individuals identified in Request 25 were identified by the defendants in their initial disclosure and any writings relating to ASIC Design Systems and ASIC Methods employed by the defendants are clearly relevant to the issues in this case. Documents relating to changes, etc., to an ASIC Design System or ASIC Method provided or offered to one of the defendants is clearly relevant to the issue of infringement (Request 26). Request 29 and 30 relate to systems which apparently are being asserted as prior art and, therefore, they are very relevant to the issue of patent validity.

With further respect to Request No. 6, the fact that documents can be obtained from the defendants does not excuse Synopsys from producing them and the Protective Order is more than sufficient to protect Synopsys confidential information. The suggestion to get the documents from the defendants is particularly outrageous in that Synopsys' attorneys, acting as defendants' attorneys, are refusing to produce the documents with one of the alleged reasons being that they are confidential to Synopsys.

Notwithstanding the foregoing, we are willing to limit Request 7 to presentations and exclude advertisement materials and promotions, in order to expedite production of documents.

Turning to Request 11, we appreciate the statement that Synopsys is not presently aware of the existence of any non-privileged documents addressed to validity but the limitation of this statement to "directly address" is not acceptable. Documents which may be "indirectly" addressed to validity must be produced. The fact that Synopsys intended to produce evidence in another lawsuit some unknown time in the future is not an excuse for refusing to produce those documents in this case and, in any event, the Judge during the Rule 16 conference clearly rejected your request to stay discovery in Delaware and indicated that any discovery had in this case could be also used in the California case.

With regard to Request 12, we wish to point out that the term "enforceability" includes the defense of laches and/or estoppel and we interpret the response to Request 12 as being there are no documents concerning laches or estoppel in Synopsys possession, custody or control.

The objection to Request 16 is not valid, particularly since it asks Ricoh to assume, *sub silento*, that any and all assignments to Synopsys have been recorded. Nevertheless, we will accept a listing of the patents by number rather than actual production. As to pending patent applications, any which describe the technology

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

Christopher L. Kelley, Esq.
July 3, 2003
Page 4


offered to or used by the defendants are clearly relevant to the issue of infringement. Confidentiality is maintained by the Protective Order.

To expedite this matter, the documents requested in Request 21 can be limited to the performance, use and operation, which are clearly related to the issue of infringement, and documents relating to the placement or installation need not be produced.

Would you please advise us whether or not the objections to production are going to be withdrawn in light of the foregoing by July 9, 2003 so that we will know whether or not a motion to compel would be required. We also propose that we discuss these matters in a telephone conference on July 7 or 8, 2003.


Very truly yours,

Edward A. Meilman


EAM/hc

cc:    Teresa Corbin, Esq. (via fax)
       Francis DiGiovanni, Esq., (via fax)
       Gary Hoffman, Esq.
       Kenneth Brothers, Esq.

**EXHIBIT 4**

**HOWREY** LLP
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

CHRISTOPHER L. KELLEY
PARTNER
650.463.8113
kelleyc@howrey.com

July 9, 2003

**VIA FACSIMILE AND U.S. MAIL**

Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
2101 L Street, N.W.
Washington, DC 20037-1526

Re:   *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
     Civil Action No. 03-103-GMS

Dear Mr. Meilman:

     I have your letter of July 3.

     Ricoh has requested sweeping discovery of the technical details of every aspect of Synopsys' design synthesis software products. *See, e.g.*, Request For Production No. 2 ("Produce documents sufficient to show the capabilities, features, functions, operation and use of the ASIC Design Systems ... including, but not limited to, any user guides, operation guides, technical bulletins, technical reference manuals, user manuals, training manuals, specifications, source code, tutorials, technical overviews, summaries, functional descriptions, design flow diagrams, operational flow diagrams, design specifications, articles, reports, and memos.").

     While Ricoh demands *carte blanche* access to third-party Synopsys' trade secrets, it refuses to provide an explanation of its theory of infringement and to explain what relationship if, any, there is between Synopsys software and its allegations of patent infringement against defendants. This is unacceptable. Ricoh insists that it is not accusing Synopsys of infringing U.S. Patent No. 4,922,432 (the "'432 patent"). Ricoh decided not to make Synopsys a party to the present litigation. It cannot now undertake a broad fishing expedition through all of Synopsys' technical materials hoping to manufacture an infringement case. That kind of unlimited discovery would not be permitted even if Synopsys had been accused of infringement. *See Micro Motion, Inc. v. Kane Steel Co., Inc.* 894 F.2d 1318, 1327 (Fed. Cir. 1990) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable without discovery, not to find out if it has any basis for a claim."). Ricoh's discovery is even more untenable because it is directed against a non-party. Rule 26 discovery must be narrowly tailored and, when the request is made of a third party, the proponent has an especially high burden to meet in order to establish the reasonable scope of the request and its direct relevance to the case. *See Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993); *Cash Today of Texas, Inc. v. Greenberg*, 2002 U.S. Dist. LEXIS 20694 at *13 (D. Del. 2002) (nonparties are afforded "special protection" in the undue burden inquiry); *Solarex Corp.*



*v. Arco Solar, Inc.*, 121 F.R.D. 163, 179 (E.D.N.Y. 1988) (non-party status is a significant factor in determining whether compliance with a discovery demand would constitute an undue burden).

Your letter cites several judicial decisions, but all are either irrelevant or inapplicable on their facts. Of the cases you cite, only *Cash Today* involved discovery from a third party. In that decision, Judge Sleet explicitly recognized that nonparties are afforded special protection from discovery requests. *See Cash Today*, 2002 U.S. Dist LEXIS 20694 at *13-*14. In that case, the particular circumstances of the relationship between the plaintiffs, defendants and third party created a situation where the third party was integrally involved in the relationship between the plaintiff and defendant and had sole possession of certain documents. The party seeking discovery was able to articulate exactly how the documents related to his theory of the case. Ricoh has made no such articulation here, and there is no comparable relationship between Synopsys and either Ricoh or the defendants. The decisions in *Walker v. Lakewood Condominium Owners Assoc.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999) and *Redland Soccer Club, Inc. v. Department of the Army*, 55 F.3d 827, 856 (3rd Cir. 1995) both involved interrogatory responses and have no particular relevance to disputes involving document production. You cite to *Josephs v. Harris Corp*, 677 F.2d 985, 992 (3rd Cir. 1982) to support your assertion that a non-party opposing a discovery request must establish the irrelevance of the requested documents. The decision in *Josephs*, which also involved interrogatories, does not stand for your conclusion. The burden is on Ricoh to demonstrate its need for the documents and that this need outweighs the burden to Synopsys, not the other way around. "[D]iscovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit." *Mannington Mills, Inc. v. Armstrong World Industries, Inc.*, 206 F.R.D. 525, 529 (D. Del. 2002).

Your letter offers no substantive explanation of the relevance of any of the documents requested. In a handful of places you assert that one request or another is relevant to "patent infringement," but since Ricoh has provided no explanation of its theory of infringement, this bald faced assertion lacks any foundation. Since Ricoh apparently intends to keep its patent infringement theory, if it has one, a secret, neither Synopsys nor the Court has any basis to evaluate relevance. An unexplained and unverifiable assertion of relevance does not rise to the showing of relevance required under Fed. R. Civ. P. 26.

Your requests are also objectionable because of their burdensomeness. It is not disputable that providing the documents requested by Ricoh, which appear to include every document bearing on any aspect of the operation of any Synopsys product that can be characterized as "ASIC Design Systems" would be incredibly burdensome. Since Ricoh has made no showing of need, if required, Synopsys will demonstrate to the Court that the job would be unduly burdensome and beyond the scope of Rule 26.

The remainder of this letter will address specific document requests.



Edward A. Meilman
July 9, 2003
Page 3

Your letter offers to withdraw document requests 1, 8, 10, 15, 19 and 20. You offer no explanation of the relevance of these requests. Our objections, therefore, stand as stated. Your letter raises no issues regarding Synopsys' responses to requests 13 and 27.

Your document requests numbered 2 through 5 seek production of "all documents" bearing on any aspect of Synopsys' software that can be encompassed within Ricoh's "ASIC Design System" and "ASIC Method" rubrics. You assert generically that this request is relevant to "patent infringement" but you make no effort to explain what aspect of the Synopsys software you believe relates to Ricoh's patent infringement claims. You have made no attempt to narrowly tailor your request. Because Ricoh will not explain what its infringement theory is, your bald assertion that the confidential technical details of Synopsys software bear on "patent infringement" does not rise to the showing of relevance required under Rule 26.

Your document request number 6 asks for all agreements relating to "ASIC Design Systems" and "ASIC methods." Request number 7 seeks "all documents" relating to offers for sale of "ASIC Design Systems." Request number 9 seeks documents establishing the amount of Synopsys' sales to each defendant. You provide no explanation of the relevance of any of these requests. We fail to see how the terms of Synopsys' contracts with defendants could be relevant to any issue of infringement or damages. Your letter asserts that Synopsys' objection that documents can be obtained from defendants does not excuse Synopsys from producing these documents. A party seeking discovery from a third party cannot make the requisite showing of "substantial need" of obtaining requested documents from a third party until it has exhausted its efforts to obtain the documents from the parties to the case. *See Echostar Comm. Corp. v. News Corp., Ltd.*, 180 F.R.D. 391, 395 (D. Colo. 1998). The fact that defendants have objected on the grounds of relevance and burdensomeness does not establish Ricoh's "substantial need." If Ricoh believes it can persuade the Court of its need, it must do so in a motion directed against the defendants.

Your document request number 11 is phrased in terms of a legal conclusion: it requests all documents concerning the validity of the patent in suit. To determine what documents are responsive to this request requires formulating a legal contention as to what prior art is relevant to this patent. Synopsys is not a party to this suit and is, therefore, not advancing any contention of invalidity in this litigation. Synopsys has advanced contentions in the Northern District case and will produce relevant documents to support those contentions in accordance with the timetable set for that case. Ricoh may not pursue discovery intended for the California case under the guise of conducting third party discovery in the Delaware case. If Ricoh believes that Synopsys may have specific technical documents bearing on the validity of its patent, it should make a specific request for such documents rather than asking for documents relevant to a legal conclusion that Synopsys, as a non-party, has no basis to advance.

Your letter indicates that you interpret Synopsys' statement in its response to your document request number 12 that it is not aware of the existence of any documents concerning the enforceability of the patent in suit as an indication that Synopsys has no documents



Edward A. Meilman
July 9, 2003
Page 4

concerning laches or estoppel in Synopsys' possession, custody or control. This is a misinterpretation. Laches and estoppel render a patent unenforceable rather than enforceable. In order to avoid this kind of confusion in the future, please craft document requests that describe the documents sought rather than calling out for all materials relevant to particular legal conclusions. Synopsys' response to Ricoh's request number 14 explicitly states that Synopsys will produce documents relating to previous occasions on which Synopsys has been approached regarding offers to license the '432 patent. At a minimum, those documents, and perhaps others, will bear on laches and equitable estoppel.

Your document request number 16 seeks all patents and patent applications that describe Synopsys' products that may be characterized as "ASIC Design Systems." Synopsys does not keep track of which issued patents accurately describe the operation of its products. To ask Synopsys to undertake such an analysis would be outrageously burdensome. With respect to patent applications, Ricoh's request adds insult on injury by seeking discovery of highly confidential technical information. Your bald assertion that this request bears on infringement is a contention and does not rise to the "showing" of relevance required under Fed. R. Civ. P. 26.

Your requests numbered 22 through 24 seek "all documents" relating to the patent in suit. Synopsys has agreed to produce any documents in its possession relating to prior occasions on which it was approached regarding licensing of the '432 patent. Synopsys is not presently aware of any other non-privileged communications regarding the patent. Should Synopsys discover non-privileged communications with defendants regarding the patents at issue, it will produce such communications. Internal Synopsys documents regarding the patent and communications with third parties regarding the patent are not relevant to any issue in this case. Your letter asserts that such documents are relevant to recognition by Synopsys or others of the strength or weakness of the patent. That does not, however, demonstrate relevance to Ricoh's lawsuit. The views of Synopsys or other third parties on the patent are irrelevant to any of the substantive questions in this case.

Synopsys agreed to produce documents, if any, responsive to Request 25 that can be found after a reasonable search and that might be relevant as prior art. Your letter is unclear as to whether Ricoh objects to this response.

Your requests 17 and 18 seek "all documents" concerning "examinations" and "tests" of "ASIC Design Systems." Request 21 seeks "all documents" relating to "performance" and "use" of "ASIC Design Systems." Request 26 seeks "all documents" concerning alterations to "ASIC Design Systems." Request 28 seeks all communications with defendants regarding "ASIC Products" and "ASIC Design Systems." Ricoh has not provided any explanation as to the relevance of any of these documents. Searching through Synopsys' files for documents on these specific issues will be an extremely burdensome proposition. Before Synopsys undertakes such a search, Ricoh has an obligation to provide some explanation as to the relevance of this material to Ricoh's case. It is not enough simply to state that the materials are relevant to Ricoh's



Edward A. Meilman
July 9, 2003
Page 5

infringement allegations. The requests must be narrowly tailored to focus on those particular aspects of Synopsys' software that Ricoh intends to argue practices its patents.

In response to your requests 29 and 30, Synopsys will produce those documents within its possession relating to "Socrates," "Gdl," "LSS" and "Dagon" systems that can be discovered after a reasonable search.

In your letter you suggest that Ricoh is aggrieved because defendants have objected that they cannot produce third party confidential information without the consent of a third party. To the extent that defendants have Synopsys' confidential information, you insist that you are concerned that they will refuse to produce that information on that basis. Permit me to assure you that if Ricoh can demonstrate to the satisfaction of Synopsys or the Court that it has met the burden of establishing its need under Rule 26 for access to Synopsys' confidential documents, then Synopsys will authorize defendants to give Ricoh access, under the protective order, to any materials determined to be discoverable.

If Ricoh persists in trying to pursue an unconstrained, unfocused "fishing expedition" review of every aspect of Synopsys' products, we reserve the right to seek an appropriate protective order from the Court.

Very truly yours,

Christopher L. Kelley

CLK:gg

**EXHIBIT 5**

**HOWREY** LLP
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

CHRISTOPHER L. KELLEY
PARTNER
650.463.8113
kelleyc@howrey.com

July 14, 2003

**VIA FACSIMILE AND U.S. MAIL**

Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, NY 10036-2714

Re:    *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
      Civil Action No. 03-103-GMS

Dear Mr. Meilman:

     I have made inquiries regarding certain issues discussed during our telephone conference of Wednesday July 9th.

     In response to your production request number 16, Synopsys will produce a list of issued patents presently assigned to Synopsys. I reiterate my caution that the fact that Synopsys has patents describing certain technologies should not be an indication that these technologies are deployed in Synopsys products.

     In response to your production request numbers 2 and 3, we will supply you with copies of non-confidential documentation describing the operation of Synopsys' Design Compiler and Behavioral Compiler products. The bulk of Synopsys' technical documentation are confidential documents and are made available only to customers with demonstrated need. To date, Ricoh has not identified the particular portions of Synopsys' products that it contends are relevant to its infringement theories. Given that Ricoh has not demonstrated a substantial need for access to this confidential documentation, there is no basis to compel Synopsys to undertake the substantial burden of collecting and disclosing its confidential information.

     If you have any questions, please contact me at (650) 463-8113.

                          Very truly yours,

                          Christopher Kelley

CLK:gg

BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC

**EXHIBIT 6**

DICKSTEIN  SHAPIRO  MORIN  &  OSHINSKY  LLP

*1177 Avenue of the Americas • New York, New York 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
Writer's Direct Dial: (212) 896-5471
E-Mail Address: MeilmanE@dsmo.com

July 15, 2003

**BY FACSIMILE:  (650) 463-8400**

Christopher L. Kelley, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025

     Re:   *Ricoh Company, Ltd., v. Aeroflex Incorporated, et al.*
           Civil Action No. 03-103-GMS
           Our Ref.:  R2180.0100

Dear Mr. Kelley:

     I have had an opportunity to review your letters of July 9, 2003 and July 14, 2003.  While we have made some progress toward resolving the issues concerning the subpoena to Synopsys, the objections which remain are not valid.

     It is clear that confidentially is not a valid objection since, during our telephone conversation, you told me that the protective order was sufficient to allay any concerns Synopsys may have about keeping technical information in confidence. Relevance also is not a valid objection given the fact that you (speaking as counsel for the defendants in the case) told the Court in the Motion to Stay or Transfer that "Ricoh has indicated . . . that its infringement allegations are based on defendants' use of Synopsys Design Compiler software as a part of their engineering processes."  There thus can be no doubt that the Synopsys hardware and software is very relevant to the issue of patent infringement in the case.

     You indicated that Synopsys would supply documents about Synopsys' Design Compiler and Behavioral Compiler products.  Limiting the production to those products is acceptable provided that you agree to produce all documents, both confidential and non-confidential, and you can represent that there is no other Synopsys software, hardware, data base libraries other components that Synopsys has reason to believe were provided to or are being used by the defendants in this case.

     The primary contention in your July 9, 2003 letter was that it is unacceptable for Ricoh to refuse "to provide an explanation of its theory of infringement and to explain what relationship if, any, there is between Synopsys software and its allegation of patent infringement against defendants."  [Your July 14 letter likewise asserts that Ricoh has not identified what part of the products are relevant to Ricoh's infringement theories.]  The first part of this is an attempt to inject the requirements of Northern

Christopher L. Kelley, Esq.
July 15, 2003
Page 2


District of California Rule 3-31 into this Delaware action and that, of course, is improper.  In any event, you have already acknowledged that the "infringement allegations are based on defendants' use of Synopsys Design Compiler software as a part of their engineering processes."  In the second part of the contention, you say the relationship between the products and infringement is not apparent while at the same time relying on that very relationship in an attempt to move the case to California.  The objection is clearly not valid.

During our telephone conversation last week, we addressed the other issues set forth in our letter of July 7 and your response of July 9.  Ricoh has been more than fair in addressing your concerns.  Your letter of July 14, 2003 makes it clear that Synopsys is now only willing to produce certain non-confidential documents and to provide a list of its patents.  This position is clearly unacceptable. We will, therefore, raise the matter with the Court.

Very truly yours,

Edward A. Meilman

EAM/hc
Cc:    Gary Hoffman, Esq.
       Kenneth Brothers, Esq.

EXHIBIT 7

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          IN AND FOR THE DISTRICT OF DELAWARE
 3                      - - -
 4   RICOH COMPANY, LTD.,        :   Civil Action
 5          Plaintiff,          :
 6      v.                      :
 7   AEROFLEX INCORPORATED, AMI  :
     SEMICONDUCTOR, INC.,        :
 8   MATROX ELECTRONIC SYSTEMS   :
     LTD., MATROX INC., GRAPHICS :
 9   MATROX INTERNATIONAL CORP., :
     and MATROX TECH, INC.,      :
10                              :
          Defendants.     :  No. 03-103-GMS
11                       - - -
12
13                Wilmington, Delaware
            Thursday, August 28, 2003
14               11:00 a.m.
           Telephone Conference
15                      - - -
16   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
17   APPEARANCES:
18        ROBERT W. WHETZEL, ESQ., and
          STEVEN J. FINEMAN, ESQ.
19        Richards, Layton & Finger
                 -and-
20        GARY M. HOFFMAN, ESQ.,
          EDWARD A. MEILMAN, ESQ., and
21        KENNETH W. BROTHERS, ESQ.
          Dickstein Shapiro Morin & Oshinsky LLP
22        (Washington, D.C.)
23                Counsel for Plaintiff
24
25
```

Page 2

```
 1   APPEARANCES CONTINUED:
 2        FRANCIS DiGIOVANNI, ESQ.
          Connolly Bove Lodge & Hutz LLP
 3               -and-
          TERESA M. CORBIN, ESQ.,
 4        CHRISTOPHER KELLEY, ESQ., and
          ERIC OLIVER, ESQ.
 5        Howrey Simon Arnold & White, LLP
          (Menlo Park, California)
 6              Counsel for Defendants
 7                      - - -
 8
 9
10        THE COURT:  Good morning, counsel.
11        MR. WHETZEL:  Good morning, Your Honor.  Bob
12   Whetzel from Richards Layton for plaintiff Ricoh.  With me is
13   my colleague here at Richards Layton Steven Fineman.  Also on
14   the call for Ricoh are Messrs. Gary Hoffman, Ed Meilman and
15   Ken Brothers, my co-counsel.  I suspect Mr. Hoffman will be
16   our principal spokesperson this morning.
17        THE COURT:  Good morning, all.
18        For defendants.
19        MR. DiGIOVANNI:  Frank DiGiovanni from Connolly
20   Bove.  Also on the line from Howrey Simon in California are
21   Teresa Corbin and Chris Kelley and Eric Oliver.
22        THE COURT:  Who is going to handle the argument
23   today?
24        MR. DiGIOVANNI:  I will be arguing the first of
25   the agenda items, and I believe Mr. Kelley will be arguing
```

Page 3

```
 1   the remainder.
 2        MR. HOFFMAN:  Your Honor, on behalf of Ricoh, I
 3   Brothers will be arguing the first item.  I will be handling
 4   Items 2, 3, 6 and 8.  And Mr. Meilman will be handling items
 5   5 and 7.
 6        THE COURT:  Okay.  I will try to keep that rule
 7   in mind.
 8        Let's start with Item 1.
 9        MR. BROTHERS:  Your Honor, on Item 1, there is
10   difference of opinion between the parties with respect to the
11   obligations of the order that the Court entered on July
12   31st --
13        MR. DiGIOVANNI:  Your Honor, I don't mean to
14   interrupt.  I don't do that.  But we are the ones, the
15   defendants are the ones --
16        THE COURT:  Are you the movant on that one?
17        MR. DiGIOVANNI:  Yes, we are.
18        THE COURT:  Let's start with the movant.
19        MR. BROTHERS:  I am sorry.  Both parties are
20   seeking relief, just to be clear.
21        THE COURT:  So both of you, you each view
22   yourselves as movants?
23        MR. BROTHERS:  Yes, Your Honor.
24        MR. DiGIOVANNI:  Yes, Your Honor.
25        On behalf of defendants, we did place the call
```

Page 4

1   and initiated the conference.  We consider ourselves primary
2   movants on this issue.
3        MR. BROTHERS:  Your Honor, we can both have our
4   say.
5        THE COURT:  Mr. Brothers, continue.
6        MR. BROTHERS:  Thank you.
7        The order of July 31st, the second paragraph
8   requires the defendants and their counsel to disclose all
9   communications with or relating to Dr. Thomas and to produce
10   all documents sent to, prepared by, or received from Dr.
11   Thomas.  And then it continues, Any documents withheld on the
12   basis of attorney-client privilege or work product doctrine
13   should be submitted to the Court for an in camera inspection
14   and defendants shall provide plaintiffs with a detailed
15   privilege log.
16        We received part of those documents.  We received
17   the e-mails and letters between the Howrey firm and Dr.
18   Thomas.  But defendants and their counsel have refused to
19   produce anything else, namely, any internal communications on
20   an in camera basis to the Court and to give a privilege log
21   to the other side.  We believe that is clearly required by
22   the order.
23        The history of this gives some basis for our
24   concern.
25        Dr. Thomas was deposed on August 14th.  The

## Page 5

1 witness contradicted the representations of Mr. Kelley during
2 the hearing on the 30th on multiple points, which gives us
3 concern as to what the complete story is.
4        For example, you will recall that the Howrey firm
5 served Dr. Thomas with a subpoena in late June but never
6 provided that to counsel for plaintiffs or filed any notices
7 with the Court. And although Mr. Kelley said during the
8 hearing that Dr. Thomas had called them and said he wasn't
9 working for Ricoh, in fact, what these documents that were
10 produced and Dr. Thomas' testimony show is that Dr. Thomas
11 specifically told the Howrey firm that he was under contract,
12 a consulting contract, with counsel for Ricoh, that Dr.
13 Thomas specifically asked Howrey if they had given the
14 subpoena to counsel for Ricoh, and Howrey led him to believe
15 that the subpoena had been given and that the names of
16 experts had been disclosed in the litigation, and that
17 counsel for Ricoh had not named Dr. Thomas as an expert, so
18 Dr. Thomas assumed that we didn't want him as an expert,
19 which wasn't the case. And then the Howrey firm said,
20 according to Dr. Thomas' testimony, if you sever your
21 contract with Ricoh, then we can hire you and we can pay
22 you. And that's what Dr. Thomas did.
23        A second inconsistency was that Mr. Kelley said
24 very explicitly during the hearing that before Dr. Thomas was
25 hired, they asked him if he had received any confidential

## Page 6

1 information or discussed case strategy or other types of
2 information with Ricoh, and that Dr. Thomas had said, no, he
3 hadn't.
4        That is simply not the case.
5        Dr. Thomas was retained. The retention letter
6 was sent on July 17. He signed it on July 21st. The first
7 time any such communications of that nature came up was after
8 we found out about it and objected, and then suddenly there
9 was a flurry of telephone calls and e-mails between the
10 Howrey firm and Dr. Thomas saying, what confidential
11 information did you have? Tell us about it. And there was a
12 phone conference on the 23rd of July and followup e-mails.
13        Dr. Thomas testified at his deposition that there
14 was no question that he had received confidential information
15 from counsel for Ricoh. And he identified a couple of
16 categories of that.
17        During this flurry of information, after counsel
18 for Ricoh had objected, Dr. Thomas had described the
19 categories of this confidential information.
20        Now, Howrey refuses to produce those internal
21 e-mails. We had requested them even prior to the hearing,
22 and the Howrey firm understood we were looking for them.
23 There is a reference by Mr. Kelley in the transcript that, I
24 think it's on Page 14 or so, that he understood we were
25 looking for that information.

## Page 7

1        After all of this, the defendants say, well,
2 maybe we are not going to use Dr. Thomas as an expert after
3 all, but we still want to go forward and take his deposition
4 on the very subjects which were the subject matter on his
5 consulting with Ricoh.
6        They obviously believe that Dr. Thomas is going
7 to give them favorable opinions. Dr. Thomas testified that
8 as a result of his consulting with Ricoh he had formed
9 opinions. What is the basis for their expectation?
10        We need to go forward and try and resolve this.
11 We think the sole basis is that Dr. Thomas has given Howrey
12 some basis to believe that the testimony he is going to give,
13 the opinion testimony that they are seeking, is going to be
14 favorable, and that was developed solely as a result of his
15 confidential consulting with counsel for Ricoh.
16        The issue before the Court not only is the
17 interpretation of Paragraph 2 of the July 31st order. The
18 Court is also aware that we are to file followup letters that
19 will relate to the disqualification of Thomas and any other
20 remedies that might be available. We think it advisable that
21 the Court is provided with this information so it has the
22 full picture of what the appropriate remedy should be.
23        THE COURT: Okay. Mr. DiGiovanni.
24        MR. DIGIOVANNI: First of all, there is no
25 contradiction between what Mr. Kelley represented on the July

## Page 8

1 30th teleconference and Dr. Thomas' deposition. Dr. Thomas
2 was very clear that he was asked by the Howrey Simon
3 attorney, the one single attorney that he talked to for the
4 five-minute period he actually talked to him, do you have any
5 confidential information? And if so, what type of
6 information is it? And Dr. Thomas responded two days later
7 in an e-mail, just listing three short types of information
8 he had: patents, publications, and financial information.
9 None of it was confidential.
10        And all of those e-mails, that e-mail, and there
11 were about six or seven other e-mails, have been produced.
12 And those are the entire universe of documents that went back
13 and forth between Howrey Simon and Dr. Thomas.
14        If you go back to the teleconference on July
15 30th, the request that was made by Mr. Hoffman was that, you
16 ordered that the defendants be required to disclose all the
17 communications that they have had with Dr. Thomas, and
18 produce all the documents to us that have gone back and
19 forth. The Court subsequently ordered Ricoh's counsel to
20 prepare an order outlining the requests that you have made
21 and I will sign it.
22        But what happened later that day or maybe it was
23 the next day, July 31st, counsel submitted an order that
24 included an additional phrase, some additional language. Your
25 Honor, which actually went beyond what they were supposed to

Page 9

1  submit. So that became this July 31st order.
2        The language of the order --
3        THE COURT: Is that the sentence that says any
4  documents withheld on the basis of attorney-client --
5        MR. DiGIOVANNI: No, Your Honor.
6        THE COURT: Which language is it?
7        MR. DiGIOVANNI: In the same paragraph, Paragraph
8  2, the first sentence, it says, No later than August 6, 2003
9  defendants and their counsel are ordered to, right where it
10  says disclose, it says disclose all communications with or
11  relating to Dr. Thomas. That clause was brand-new. That was
12  not part of what Your Honor ordered on that teleconference,
13  this disclose all communications with or relating to Dr.
14  Thomas. The second clause of that, ordered to produce all
15  documents sent to, prepared by or received from Dr. Thomas,
16  that's what we talked about on the teleconference. That's
17  what we have done. We have produced every single piece of
18  paper, all e-mails that were sent back and forth between
19  counsel and Dr. Thomas. It didn't amount to much. It was
20  only about six or seven e-mails.
21        We also gave them a cover letter to those
22  e-mails. It described the communications, and it also
23  described the type of internal communications that we had
24  amongst attorneys, between attorney and clients. We noted of
25  course those were privileged, that those weren't required

Page 10

1  under the production portion of Paragraph 2, because
2  Paragraph 2 says, when it talks about producing documents, it
3  says, produce all documents sent to, prepared by or received
4  from. Then it goes on to talk about documents, any documents
5  withheld, et cetera, et cetera. So we didn't withhold any
6  documents on the basis of privilege. So there was nothing to
7  put on a privilege log. There was nothing to produce in
8  camera.
9        The issue is what does this mean, disclose all
10  communications with or relating to Dr. Thomas? And what
11  counsel for Ricoh is saying is that means that all documents
12  relating to Dr. Thomas had to be produced. That is
13  completely inconsistent with the second phrase, where it
14  talks about the exact scope of production of documents. Our
15  reading of it was, we disclosed in our cover letter precisely
16  what we were supposed to produce, precisely what kind of
17  communications went on.
18        Of course, we didn't produce them. The order
19  doesn't require it. It would never make sense to produce
20  privileged documents, even in camera. An in camera review is
21  often done to determine if there is a privilege, not to
22  actually review some privileged documents to find a basis for
23  a claim. But in any event, the order doesn't call for it,
24  before you even getting into the law regarding in camera
25  review.

Page 11

1        It is also important, Your Honor, that once we
2  received the declaration of Christopher Monti (phonetic),
3  this is the declaration that Mr. Hoffman talked about on the
4  July 30th conference, once we received that, which, by the
5  way, was one week ago, we had to wait until one week ago to
6  get it, once we took the deposition of Dr. Thomas to find out
7  if, indeed, he received confidential information, once we had
8  those two pieces of information, two days later we said,
9  okay, we are not going to retain Dr. Thomas as an expert.
10  And we are not a hundred-percent convinced that he did
11  receive confidential information.
12        But we told them, all right, we are not going to
13  use him as an expert, fully expecting that would end
14  everything. But they said, no, they want to try to
15  disqualify counsel even though there isn't a shred of
16  information, shred of evidence anywhere stating that Dr
17  Thomas provided to counsel for defendants any sort of
18  confidential information. In fact, Dr. Thomas,
19  unequivocally, testified that he had one conversation with
20  attorneys for defendants for five minutes. And here is his
21  quote. He says, I didn't share any information with him --
22  this is talking about the one attorney -- about confidential
23  material.
24        That is it.
25        THE COURT: Okay. Mr. Brothers, Mr. DiGiovanni

Page 12

1  asserts that that clause that he has identified in Paragraph
2  2, all communications with or relating to, goes beyond the
3  letter and spirit of the discussion and subsequent order
4  entered by the Court orally on July 30th.
5        I don't have the transcript in front of me. I
6  don't have total recall. I don't really wish to engage in an
7  extended debate as to what was intended. But Mr.
8  DiGiovanni's reflections do seem to comport with my
9  recollection of that conversation. Go ahead.
10        MR. BROTHERS: Yes. I do have the copy of the
11  transcript in front of me. On Page 9 it references, Line 17
12  through 22, this aspect of the request. And I will read that
13  quote. And this relates to the second paragraph. Quote.
14  That the defendants be required to disclose all
15  communications that they have had with Dr. Thomas and produce
16  all the documents to us that have gone back and forth. If
17  they feel that any documents are privileged or work product,
18  then they can be submitted in camera. But we should get a
19  log so we can sort that out.
20        Prior to that, Mr. Hoffman had noted, on Page 8,
21  we didn't know the details of what had been discussed, and
22  then later on, Mr. Kelley acknowledged that we were seeking
23  the nature of their communications with Dr. Thomas.
24        The issue here is twofold. First, it is not only
25  the communications back and forth between Dr. Thomas and

## Page 13

1  counsel for the defendants. But second, the issue is what
2  did the Howrey firm know and when did it know it with respect
3  to the confidential information that Dr. Thomas had obtained
4  from counsel for Ricoh.
5          There are inconsistencies between Dr. Thomas'
6  testimony and what Mr. Kelley was representing.
7          Now, we ought to be very cautious here. We have
8  not sought to disqualify the Howrey firm. What we are trying
9  to do is get information so that an appropriate determination
10  can be made. What Mr. DiGiovanni has said is, well, we
11  thought by dropping Dr. Thomas that would be the end of it.
12  But they still want to go ahead and take his deposition on
13  the very topics that Mr. Thomas had provided his confidential
14  consulting to counsel for Ricoh. And they just want to sweep
15  under the carpet these inconsistencies and hope that the
16  whole issue will go away.
17          At this point, we don't think that that is
18  appropriate. We think it is appropriate, an appropriate
19  inquiry can be made, but before that can happen, all of the
20  factual information needs to be collected.
21          Prior to our even having the conference with Your
22  Honor on the 30th, we had sent a letter to the Howrey firm,
23  saying, this is what we want. So they knew that we were
24  looking for not only the communications with Dr. Thomas, but
25  the internal communications on an in camera basis if the

## Page 14

1  privilege was not going to be waived, so that the Court could
2  make this determination, because ultimately, that may be the
3  critical issue, the determination of what is in the order and
4  our interpretation.
5          THE COURT: Counsel, let me just ask. The
6  determination being whether the documents at issue are
7  privileged or not.
8          MR. BROTHERS: I am sorry. The determination
9  would be twofold. First, whether the documents would be
10  privileged. But second, if the documents reflect that in
11  fact Howrey had received confidential information from Dr.
12  Thomas, as we believe is likely, based on their continued
13  pursuit of his deposition, so that they can get his opinions,
14  then an appropriate determination should be made.
15          It is important to note that Howrey recognized at
16  the outset that Dr. Thomas was consulting for counsel for
17  Ricoh --
18          THE COURT: Let me interrupt again. So that
19  appropriate determination being whether the Howrey firm
20  should be disqualified or not. Is that what you mean?
21          MR. BROTHERS: That is a decision that we may
22  well ask the Court to make. We are not asking it at this
23  time. We don't know what those documents may show. And we
24  may not ever see those actual documents. But we think that
25  it may be appropriate for the Court to see what is in there

## Page 15

1  so it can make an appropriate determination.
2          We want to be very careful. We are not at this
3  point saying the Howrey firm must be disqualified, because we
4  don't have all the facts from the Howrey side. We have it
5  from Dr. Thomas' side. But we don't have all of the
6  information.
7          THE COURT: Now, let me ask this: Do I
8  understand correctly that Dr. Thomas is more or less out of
9  this litigation at this point?
10          MR. BROTHERS: Counsel for defendants have
11  verbally informed us that they do not intend to retain him as
12  an expert. However, they have said that they intend to go
13  forward and take his deposition, which will include, they
14  say, the opinions that he developed as a result of his
15  consulting for Ricoh.
16          MR. DiGIOVANNI: Your Honor, that is not
17  accurate, with all due deference to Mr. Brothers. We never
18  said we were going to inquire as to any opinion in a
19  third-party deposition of Dr. Thomas, of any opinions he
20  formed while working with Ricoh, which he did for 12 or 14
21  hours. We never said that.
22          We will take his deposition, as we would any
23  other third party. His assignment was very important at the
24  time this invention was being developed. There is no way
25  that Ricoh can lock him up, in other words, put a cage around

## Page 16

1  him so we can't even get to him in this litigation. He is
2  still a fact witness. Ricoh may have talked to 15 or 20
3  witnesses and hired them for 12 hours. That doesn't mean
4  they can lock them up and prevent them from being part of
5  this litigation. We are entitled to take his deposition as a
6  third party. We will not inquire into conversations between
7  Dr. Thomas and Ricoh. We will not do that. We know we
8  can't, and we wouldn't, anyway.
9          THE COURT: Mr. Brothers, what do you say to
10  that?
11          MR. BROTHERS: Well, there are three things in
12  response, Your Honor. First, on the 28th of July, the Howrey
13  firm sent Dr. Thomas an e-mail, saying if the Court rules
14  that we can't use you as a consulting expert, we are going to
15  take your deposition on the things that we have been talking
16  about. And Dr. Thomas testified, when I asked him about
17  that, he said, that looks just like the things that I was
18  consulting with Ricoh about. And it does. And in the
19  communications that we have had with counsel for the
20  defendant, they have said they are precluded from asking Dr.
21  Thomas about those issues.
22          It seems to be a bit of a moving target, based on
23  what Mr. DiGiovanni is telling me today. But the fact is
24  that Dr. Thomas had in-depth consultations with counsel for
25  Ricoh, and he testified he formed opinions as a result of

## Page 17

1  that. That opinion evidence, because they are going to ask
2  him to compare the patent to the prior art, that's
3  information that is all flowing directly from his consulting
4  work. As a result of the conduct of counsel for defendants,
5  Dr. Thomas has become a tainted witness. And it will be very
6  difficult to sort out what is tainted and what is not
7  tainted.
8      MS. CORBIN: Your Honor, I am the lead counsel in
9  this case for defendants.
10      If I could clarify the situation. The concern we
11  have about what we see as the problem with the order, the
12  language that Mr. DiGiovanni culled out, which was disclosure
13  of all communications with, and it's particularly the "or
14  relating to Dr. Thomas" part which gets to Howrey's internal
15  work product and communications with its client, because the
16  fact remains that Dr. Thomas developed one of the major and
17  key pieces of what we believe is invalidating prior art to
18  this patent, that was the genesis in the first place of
19  serving him with a third-party subpoena, to get the testimony
20  necessary to identify all the aspects of that particular
21  prior art and the timing of its development and so on.
22      Going back to the order, this is our concern.
23  The "or relating to" aspect would require us to provide in
24  camera for the Court, which if the Court really wants to see
25  it, we would do that, but it would require us to gather up

## Page 18

1  all the information and internal documentation we have about
2  that particular prior art and the fact that, as we learned,
3  Dr. Thomas was probably the most relevant witness who
4  developed that prior art, and would be the most relevant
5  person from whom to get the information as to the timing and
6  the particular aspects of that technology.
7      I do believe that those underlying facts cannot
8  be -- we are still entitled to discover those. The fact that
9  they hired him for 12 hours of consulting work can't shield
10  what is a major piece of prior art and take that prior art
11  essentially out of the case.
12      THE COURT: I agree with that.
13      MR. HOFFMAN: Your Honor, I am lead counsel for
14  Ricoh. If I could respond, since Ms. Corbin has?
15      THE COURT: Go ahead.
16      MR. HOFFMAN: I would appreciate the Court's
17  indulgence.
18      First of all, on the issue of what the scope is
19  and the timing, that is easily dealt with just by saying that
20  it is a document, internal communications regarding the
21  retention of Dr. Thomas and also putting on a date that
22  starts with the first contact with Dr. Thomas.
23      Let me go to the more significant issue here.
24      Howrey & Simon and the defendants here knew from
25  day one, once they contacted Dr. Thomas, that he was already

## Page 19

1  consulting for Ricoh. There is an e-mail where they said to
2  Dr. Thomas, there appears to be a conflict and consequently
3  we cannot use you.
4      Subsequently, they decided to change their mind
5  and send him a consulting agreement, encourage him to break
6  his agreement, terminate his agreement with Ricoh, and to
7  send him a consulting agreement, which he signed. After he
8  signed it, and after we complained, they went back and asked
9  him about the confidential information and whether or not he
10  got confidential information from Ricoh.
11      We didn't create this problem. Howrey & Simon
12  had a simple thing that they could have done if they chose
13  to. That is, once he indicated, Dr. Thomas said, hey, I am
14  consulting for Ricoh. Thank you very much, nice talking to
15  you, have a good day, goodbye. They chose not to.
16      They chose to go forward with this. And they
17  chose to do it until we found out about the subpoena, which
18  was only after they engaged him, not beforehand, contrary to
19  what they led him to believe, and only after they engaged him
20  already did we complain and did they finally do the checking.
21      They created the problem. We didn't create
22  this. What we are trying to do is to seek the information
23  and to place the information before the Court so that
24  appropriate relief, whatever that may be, can be fashioned.
25  As Mr. Brothers indicated, we are not seeking

## Page 20

1  disqualification today. I don't know that we will ever seek
2  disqualification. There may be and I hope there would be
3  other relief less than that that would be appropriate here.
4      But the first thing we need to do is to find out
5  how deep the poison runs. There is clearly a problem, one of
6  their creation. We are just trying to sort it out so that we
7  can seek from the Court appropriate relief.
8      These documents that we are indicating that they
9  should list on a privilege log and send to the Court are not
10  coming to us at this point. These are not documents we are
11  saying at this point -- eventually, we may get there, once we
12  see what is on the log.
13      THE COURT: Let me ask this, Mr. Hoffman: The
14  communications relating to, is it your position that those
15  communications may reveal, I think the words tainted witness
16  were used before, that is, they may impact in some way upon
17  this potential witness' credibility as that credibility or
18  his testimony pertains to the merits of the case?
19      MR. HOFFMAN: It may relate to that. It may
20  relate to the issue of what is the appropriate relief. It
21  may relate to the issue of the fruits of the poisonous tree,
22  as the cliche goes. There is an overall issue as to what
23  should be the appropriate relief that is fashioned here.
24      THE COURT: Right now, I don't have a motion
25  before me asking for relief in that regard. I think what you

CondenseIt™                                                            **August 28, 2003**

Page 21

1 are suggesting is how -- it has been discussed earlier
2 whether the Howrey firm should be disqualified or not.
3 Should that be my principal concern at this point? I think
4 it was Mr. Brothers who may have used the words tainted
5 witness. I think you are entitled to challenge this witness'
6 credibility before the finder of fact, as that credibility
7 pertains to his opinions regarding the merits of whatever it
8 is he is going to be testifying regarding the actual
9 substance of this litigation. Isn't the retention or the
10 disqualification of the Howrey firm, at least at this
11 juncture, an ancillary issue?
12         MR. HOFFMAN: It is an ancillary issue at this
13 point. But part of the other issues, Your Honor, in trying
14 to fashion relief, is, there is other forms of potential
15 relief. And we haven't sorted out what we are going to ask
16 for yet ourselves. But, for example, we may ask the Court to
17 say, listen, Howrey & Simon knew that this witness had
18 confidential information. They shouldn't be allowed to do
19 through the back door -- obtain his opinions that he formed
20 as a result of consulting with us. He should just be
21 someone, because of the problem that they created, should
22 just be off everyone's list, period. There is other
23 witnesses familiar with the prior art. He is not the only
24 one.
25         That is number one. It may be that there is

Page 22

1 other sanctions. It may be that the individuals who got
2 certain information on Howrey & Simon should not be involved
3 in the case, there should be a Chinese Wall around them.
4 That is another possibility. It does not disqualify the
5 firm. There may be a possibility that the whole firm should
6 be disqualified.
7         Right now, all we are looking for at this time is
8 a list of those communications on a privilege log.
9         MS. CORBIN: Your Honor --
10         THE COURT: Don't interrupt, counsel, please.
11         MS. CORBIN: I am sorry.
12         MR. HOFFMAN: Most people quite often provide a
13 list of privileged documents, anyway. Normally, once the
14 litigation starts, you don't continue. But this is a special
15 situation. And we are asking that the Court -- the way we
16 believe the order read, we ask that the Court require the
17 Howrey & Simon firm and defendants to provide a list of the
18 privileged documents. We also ask that the limited number of
19 documents -- I can't imagine there is many in this
20 category -- be provided to the Court, so that when the Court
21 has the issues laid before it, we can ask for what relief we
22 think is appropriate and the Court can fashion relief that it
23 believes is appropriate.
24         THE COURT: MS. Corbin, what is the extent of the
25 potential production at issue here?

Page 23

1         MS. CORBIN: I wouldn't be able to address that.
2 I wouldn't have personal knowledge at this point.
3         THE COURT: Is there someone who can give the
4 Court that information?
5         MR. KELLEY: I can give you an estimate. I think
6 there is a handful of e-mails.
7         THE COURT: Let's produce them for the Court.
8         MS. CORBIN: Your Honor, my point is -- I don't
9 know whether it is apparent to the Court or not -- we seem to
10 be somewhat making points to cross-purposes here.
11         We did produce all of the exchange of e-mail and
12 any written documentation of an exchange between Howrey and
13 Dr. Thomas to the other side. And as well, Dr. Thomas'
14 deposition was taken. The testimony and those documents show
15 that no confidential information, if Dr. Thomas has any, was
16 ever communicated to Howrey & Simon. And I just want to make
17 clear, because I haven't heard, and I don't believe it's
18 Ricoh's position, that the contrary facts are the case. If
19 so, they haven't stated that.
20         THE COURT: I think they have stated that. Maybe
21 I misunderstood.
22         MS. CORBIN: That is why I wanted to clarify.
23         THE COURT: Let's clarify that.
24         MS. CORBIN: I think what they are complaining
25 about is that he had confidential information and we knew at

Page 24

1 some point, he had mentioned to us that he had consulted for
2 this short time with them and we proceeded anyway.
3         THE COURT: Let's get clarification on that. Mr.
4 Brothers.
5         MR. BROTHERS: Yes. Your Honor, we believe,
6 based on the inconsistencies between what Mr. Kelley said
7 during the hearing and Mr. Thomas' testimony, as well as the
8 intent of defendants to continue to pursue Dr. Thomas'
9 testimony, leads us to believe that something more than
10 innocent communications occurred. We don't know what those
11 are and we don't know the extent to them. We know that there
12 was at least one phone call in which the questions were
13 asked.
14         THE COURT: So in other words, Mr. Brothers, it
15 is at least your position that it may have been the case
16 that -- and I don't want to put words in your mouth, but for
17 purposes of clarifying the record and answering Ms. Corbin's
18 question -- is it your assertion that there is the
19 possibility that they may have known of the confidential
20 relationship and proceeded anyway?
21         MR. BROTHERS: Well, certainly, as I understand
22 it, everybody agrees they knew of the confidential
23 relationship. They elected to proceed anyway.
24         THE COURT: And that in fact confidential
25 information had been received by Dr. Thomas?

## Page 25

1    MR. BROTHERS: Dr. Thomas has testified that in
2  fact confidential information was received.
3    MS. CORBIN: Was received, not transmitted to
4  Howrey Simon.
5    THE COURT: I am sorry. I should have gone that
6  additional step.
7    Is it your position, Mr. Brothers, that it was
8  transmitted?
9    MR. BROTHERS: We believe that there is an
10 inference that supports that. But we don't have the internal
11 Howrey documents that would presumably reflect on that, and
12 Dr. Thomas said he could not recall with specificity the
13 contents of his telephone conversation.
14   THE COURT: I thought, Ms. Corbin, I understood
15 counsel to take the position they have just articulated.
16   MS. CORBIN: My confusion is, Your Honor, they
17 have now taken a deposition and they have all the documents.
18 And they still say they have this inference. But they don't
19 have any statements that he made or any evidence from the
20 document exchange that any confidential information was
21 actually transmitted.
22   THE COURT: What is the basis for drawing the
23 inference, Mr. Brothers? That is what is being questioned
24 here.
25   MR. BROTHERS: There are three specific pieces of

## Page 26

1  evidence, Your Honor. First is the fact that the questions
2  were asked during the telephone conversation what
3  confidential information was there, and there was the inquiry
4  following our complaint, and then there was a followup e-mail
5  to that saying -- and I read it as kind of a self-serving or
6  "let's protect ourselves" e-mail -- saying, we talked about
7  this in the phone call and I want you just to give me a
8  general list of the documents that were talked about.
9    Dr. Thomas didn't testify specifically, he
10 couldn't remember the specifics of the phone conversation.
11 But based on their, Howrey's continued pursuit of Dr. Thomas
12 and the e-mail following this exchange, saying we want to
13 take your deposition on in essence the same things that you
14 consulted with for counsel for plaintiff, that leads us to
15 believe that there is going to be favorable testimony coming
16 out of that. And what is the basis for that? We think that
17 there is only one answer to that. They have got some idea
18 from Dr. Thomas as a result of his consulting with Ricoh
19 about what those opinions were going to be. And that is the
20 confidential information.
21   In any event, Your Honor has ordered the Howrey
22 firm to produce those handful of internal documents. I would
23 ask that, because the order of July 31st provides that by
24 August 31st, we may file a two-page letter, I would just ask
25 that that be postponed until 10 days after the submission of

## Page 27

1  the privilege log and internal documents.
2    THE COURT: That is an acceptable process. We
3  will follow that recommendation.
4    Ms. Corbin and Mr. DiGiovanni, are you clear as
5  to what your responsibilities are?
6    MR. DiGIOVANNI: Your Honor, actually, I am
7  somewhat confused with regard to the scope of production.
8  The only documents -- we described these few letters to
9  Ricoh -- the only documents that we have other than the
10 documents that went back and forth to Dr. Thomas, which were
11 all produced, are documents among the attorneys, the Howrey
12 Simon attorneys, there was some e-mail correspondence,
13 including myself, regarding Dr. Thomas and these issues
14 regarding Dr. Thomas. So every single e-mail communication
15 or other communication has at least as a recipient or the
16 author an attorney. So there is no doubt that all these
17 documents are privileged.
18   THE COURT: Sure.
19   MR. DiGIOVANNI: It sounds like they are trying
20 to break the privilege. However, there is no such exception
21 to the privilege that would allow this to break. For
22 example, in an instance where you have the crime/fraud
23 exception, the U.S. Supreme Court and the Third Circuit have
24 said there has to be at least a prima facie case established
25 before that can even be broken. There has to be a reasonable

## Page 28

1  basis to even inquire into these privileged documents for
2  even in camera review.
3    It is our position Ricoh has not even come close
4  to establishing that, especially because we have taken the
5  deposition of Dr. Thomas and he said, quote, I didn't share
6  any information with him -- the one attorney he talked to --
7  about confidential material. So we are somewhat confused as
8  to what the possible inquiry can be, because this is
9  privileged information.
10   THE COURT: I understand what it is. I know the
11 crime/fraud exception, counsel.
12   Mr. Brothers, do you have a position on the
13 crime/fraud exception? Do you want to say something about
14 that?
15   MR. HOFFMAN: Your Honor, if I can just briefly
16 respond. First of all, to return to one of the points in
17 history because it lays the foundation for this. There was a
18 representation to the Court that Dr. Thomas had told the
19 Howrey people that he received no confidential information
20 from Ricoh.
21   THE COURT: I remember that.
22   MR. HOFFMAN: In fact, the Court made a comment
23 about relying on Dr. Thomas' legal opinion when that was
24 indicated. Dr. Thomas, during his deposition, though,
25 testified that he did receive confidential information from

## Page 29

1  Ricoh, obviously, inconsistent with the representations.
2  There is a number of representations that have been made to
3  the Court that are inconsistent -- I am sorry,
4  representations to the Court that are inconsistent with the
5  documents we have obtained to date and also Dr. Thomas'
6  testimony.
7      Your Honor, I think that the whole issue of
8  making certain representations to the Court that they know
9  are inconsistent and these documents that we are asking be
10 turned over to the Court may further our belief, support our
11 belief, does create an issue of potential fraud upon the
12 Court.
13     THE COURT: I think it does. The Court is going
14 to order the production of the July 30 transcript for its
15 inspection at the same time that it reviews the documents
16 that I have just ordered be produced.
17     MR. KELLEY: I want to raise one point.
18     THE COURT: We are done with this point.
19     MS. CORBIN: So I can understand the scope...
20     THE COURT: Let's make sure we understand the
21 scope.
22     MS. CORBIN: You would like every internal
23 document in Howrey that makes reference to Dr. Thomas.
24     THE COURT: Yes. As I understand it, we are
25 talking about a handful of documents.

## Page 30

1      UNIDENTIFIED SPEAKER: Your Honor, is there a
2  time cutoff for this?
3      THE COURT: Ms. Corbin, is that correct?
4      MS. CORBIN: I can't make any personal
5  representation to that. There may be documents that address
6  that particular piece of prior art.
7      THE COURT: I think it was Mr. Kelley who
8  indicated it would be a relatively few number of documents.
9  Is that correct, Mr. Kelley?
10     MR. KELLEY: Yes, Your Honor.
11     MR. DiGIOVANNI: Your Honor, I am not sure about
12 the time cutoff, because I believe Mr. Hoffman had stated he
13 was interested in the internal documents regarding the
14 retention of Dr. Thomas.
15     MR. HOFFMAN: Your Honor, if I can just respond,
16 I can simplify things by proposing a time cutoff. I believe
17 the subpoena was sent out to Dr. Thomas early July --
18     UNIDENTIFIED SPEAKER: Late June.
19     MR. HOFFMAN: -- late June, from whatever that
20 date of that subpoena is going forward, coming to the
21 present.
22     THE COURT: Is that understood on the other
23 side?
24     MS. CORBIN: Yes, thank you, Your Honor.
25     MR. DiGIOVANNI: Your Honor, if we are talking

## Page 31

1  about documents relating to Dr. Thomas through today, this
2  would include the e-mails leading up to this teleconference
3  regarding strategy.
4      MR. HOFFMAN: I apologize, Your Honor.
5      THE COURT: We don't need that. Through the date
6  of the July 30th telephone conference with the Court.
7      Are we now clear on time parameters?
8      UNIDENTIFIED SPEAKER: It would be June 26th,
9  2003, to July 30th, 2003.
10     THE COURT: MS. Corbin, do you understand the
11 time, and Mr. DiGiovanni, do you understand the time
12 parameters?
13     MS. CORBIN: It would capture our communications
14 with each other in preparation for that call.
15     THE COURT: Well, I don't want that, either.
16 That is not the intent of the Court, to include that,
17 either. Let's be a little more specific. Mr. Hoffman.
18     MR. HOFFMAN: Your Honor, it would be with
19 respect to the issue whether or not to retain Dr. Thomas,
20 what Dr. Thomas discussed with them, what was communicated --
21 in other words, internal discussions about what were the
22 communications with Dr. Thomas, whether or not they should or
23 should not retain him. If it will simplify things, Your
24 Honor, nor that we not capture their internal communications
25 regarding preparing for the telephone conference with the

## Page 32

1  Court, why don't we drop it back a few days prior -- Your
2  Honor, we are not looking for things relating to the strategy
3  in preparing for the telephone conference.
4      MR. BROTHERS: I was trying to make clear that
5  the phone conference was on July 30th and recapping that
6  phone conference, then there were additional e-mails to and
7  from Dr. Thomas up through the date of the hearing. So,
8  obviously, to the extent that an e-mail was sent to or
9  received from Dr. Thomas and forwarded to others with his
10 comments about substance and Dr. Thomas' retention and about
11 what was said, then I think all of those are appropriate to
12 include.
13     THE COURT: I agree.
14     MS. CORBIN: So, Your Honor, are you saying
15 through the date of the deposition? I missed what whoever
16 was speaking last just mentioned.
17     MR. BROTHERS: I believe the subpoena was issued
18 on June 25th or 26th. And the hearing was on July 30th, in
19 which the Court said no further communications with Dr.
20 Thomas. So it would be that 34-day period.
21     MS. CORBIN: Excluding any internal
22 communications from Howrey in preparation for that conference
23 call with the Court.
24     THE COURT: Correct.
25     MS. CORBIN: I have that in mind now. Your

## Page 33

1  Honor.  Thank you.

2  　　　THE COURT:  Okay.  Great.

3  　　　MR. HOFFMAN:  Your Honor, I presume you want to

4  proceed in order?

5  　　　THE COURT:  Yes, sir.

6  　　　MR. HOFFMAN:  Yes, sir.  The second topic is a

7  request of Ricoh.  We served the subpoena that was issued out

8  of Delaware, out of this Court, on Synopsys.  Synopsys is not

9  a party to the litigation.  However, Ms. Corbin has

10  previously indicated to the Court back at the time of the

11  scheduling conference that their position is Synopsys is a

12  real party in interest here.

13  　　　We served the subpoena for documents.  Synopsys

14  has objected to every part of that subpoena, to all the

15  categories.  To date, they have produced as far as anything

16  other than some prior art, they have produced approximately I

17  think it's less than 100 pages of documents.

18  　　　What we are trying to discover in general from

19  Synopsys is information about the software, the systems that

20  they have provided to the defendants.  As the Court may

21  recall, and it's also set forth in defendants' motion to

22  dismiss, part of the issue here regarding the defendants'

23  activities relating to their utilization of Design Compiler.

24  There is also another program called Behavioral Compiler,

25  which may also play a part here.

## Page 34

1  　　　What we indicate, in fact, they have asked us for

2  our basics, some of our infringement positions, and we have

3  set forth a basic explanation of why we think they infringe.

4  It is very general at this point, granted.  But it does in

5  that indicate that part of it involves the use of Design

6  Compiler.  Synopsys has indicated that they are willing to

7  give us some non-confidential, publicly available documents

8  on Design Compiler and Behavioral Compiler, but nothing

9  confidential.

10  　　　We have obviously pushed for more.  We want the

11  confidential documents on both products.  And also we want to

12  know what other products did they provide to the defendants,

13  because there are other products that may come into play

14  here.

15  　　　Synopsys has raised a number of objections.  The

16  first objection that they have raised is that the documents

17  should not have to be produced twice, because that would be

18  duplication, and consequently, they will produce them in the

19  California action and not here.

20  　　　And I start with that one, Your Honor, because in

21  essence during the scheduling conference, Ms. Corbin sought a

22  stay of discovery in this action.  And the Court

23  appropriately indicated that, no, discovery was going to go

24  forward.  What Synopsys is doing here and the defendants are

25  doing here in essence is saying that, no, discovery is not

## Page 35

1  going to go forward.  We are only going to produce the

2  documents in California.

3  　　　We agree, they don't have to be produced twice.

4  But there is no reason not to produce them here.

5  　　　They have also objected on the basis that the

6  documents are confidential.  Well, Your Honor, there is a

7  protective order.  Howrey & Simon, who represents both

8  Synopsys and the defendants, was involved in negotiating that

9  protective order.  They were involved in working out the

10  details of it.  Clearly, they can be produced underneath the

11  protective order.

12  　　　Next, Your Honor, something I had not mentioned

13  Synopsys has not objected on any type of basis that there is

14  no jurisdiction of this Court over this issue, over the

15  subpoena.  So it is appropriately here, the subpoena.

16  　　　The only issue is what subject matter, what

17  documents do they need to produce.  They have also complained

18  or objected that we haven't explained our patent infringement

19  theory.  This also comes up with the objections that have

20  been raised.  Mr. Meilman will get into that later on when we

21  address that topic.

22  　　　We have indicated to them, in fact, they have

23  stated that the issue of infringement relates to the

24  utilization of Design Compiler.  We are fully aware of that.

25  So for them to tell the Court, we don't -- to object on the

## Page 36

1  basis we don't understand what you are charging with

2  infringement at the same time they are telling the Court

3  that, oh, what's being charged with infringement is

4  utilization of Design Compiler is simply disingenuous.

5  　　　They have also objected, indicated that the

6  documents can be obtained from the defendants and we would be

7  better off obtaining it directly from the defendants since

8  they are parties to the litigation.

9  　　　Well, first of all, Your Honor, not all the

10  documents can be.  But more importantly here, the defendants

11  in turn, turn around and say, through the same attorneys,

12  Your Honor, saying that, well, we can't provide you the

13  documents because it's the confidential information of

14  Synopsys.  Well, Your Honor, obviously, the information can

15  be provided.  It can be provided underneath the protective

16  order.

17  　　　We next have an objection that the documents,

18  some of the documents are in the public record and can be

19  obtainable from other sources.  Well, to say, well, some of

20  the documents I have are publicly available and you can

21  obtain them, well, who knows what documents they are?  If

22  they gave us a list, here is the dates of the documents, here

23  is where you can obtain them, fine.  But if they have the

24  documents, whether they are publicly available from other

25  sources or not, they should still be obligated to provide

Page 37

1  them.
2       They also object that apparently some of the
3  documents are confidential information of third parties,
4  unidentified third parties. We have asked them to identify
5  them, these allegedly third parties. They have refused to do
6  that.
7       In essence, what we are getting, what appears to
8  us, Your Honor, is a stonewalling of discovery, a decision to
9  say that basically we are just not going to provide discovery
10 until the Court requires us to. That's the way it looks. Or
11 until the case the case is in California, we are not going to
12 give you discovery. We are not going to provide it in the
13 Delaware action.
14      THE COURT: Okay. Who is going to handle this?
15      MR. KELLEY: Your Honor, I am.
16      Mr. Hoffman just recited several issues that
17 relate to objections that were recorded in our responses to
18 the interrogatories. But it doesn't address the real issue
19 here, which is the breadth -- I said interrogatories, I meant
20 document requests -- which is the breadth of the document
21 requests. If you look at these -- am I talking over
22 someone?
23      THE COURT: No.
24      MR. KELLEY: They have asked for -- I will go to
25 some specific language in a minute. They have asked for

Page 38

1  every engineering document relating to any product produced
2  by Synopsys. Now, Synopsys is a third party, may be required
3  to produce some documents in this litigation. But the basis
4  for that production has to be that there is a need to get
5  this information from third party and that the evidence
6  is directly related to a real critical issue in the case that
7  can't be attained from some other source.
8       It's not proper for them to submit document
9  requests that ask us for every engineering document relating
10 to every product that Synopsys has produced. That is the
11 real issue here. Not about the nature of our objections,
12 about whether a document is confidential or not. If they are
13 willing to focus their document requests on the real critical
14 issues, the key part of the Synopsys product that they think
15 is relevant to their theory of infringement, which, as Mr.
16 Hoffman just admitted, they haven't really spelled out in any
17 kind of detail, then that would be a legitimate basis for a
18 document request.
19      Let's cut to some of the text from the document
20 requests.
21      The order that we would ask the Court to issue is
22 a protective order relating to Document Requests 2 through
23 5. Let me just tell you, read to you a little bit, and I
24 won't do this for all of them, because it will become
25 tedious, but let me just read to you from No. 5. It says.

Page 39

1  Produce all documents concerning all hardware, software
2  libraries, core databases for use in ASIC design systems, and
3  then goes on and on, about including technical reference
4  manuals, technical bulletins, user manuals, installation
5  manuals, training manuals, sourcecodes, tutorials, et cetera
6  et cetera.
7       The real issue here is that these are just not
8  crafted the kind of discovery that one might reasonably
9  expect one could get from a third party to a case. They are
10 not limited in any manner to the products at issue. They are
11 not limited in any manner to the key parts of the products
12 that they are going to contend infringe.
13      The only thing that they have identified in their
14 interrogatory answers to date as being the basis of their
15 infringement allegations is two steps, two steps that are
16 performed by the defendants in this case. The first is
17 providing input to Design Compiler, and the second is using
18 Design Compiler to take the library cells and create some
19 output that will be used to produce an output for (inaudible)
20 ASIC a chip. That is all they have identified.
21      If they are willing to restrict their document
22 requests to specific things relating to those steps and
23 relating to the product they say defendants are using in
24 an infringing manner, then we would have a basis to produce
25 documents. They aren't entitled to a fishing expedition of

Page 40

1  every engineering documents in Synopsys' possession.
2       And I would go on to state, Your Honor, there are
3  a number of documents, document requests, that we have
4  produced documents, agreed to produce documents in response
5  to. This is not an exercise in stonewalling. And we have
6  given them some manuals that describe how, what kind of
7  inputs Design Compiler can accept, and describe exactly the
8  steps involved or the state, describe that Design Compiler is
9  used to select library cells in order to produce an output
10 for ASIC design.
11      THE COURT: You have described, counsel, some
12 parameters. Let's see if they are acceptable to counsel for
13 Ricoh.
14      MR. HOFFMAN: Your Honor, first of all, the
15 documents that they have produced is less than 100 pages.
16      THE COURT: I don't want to go over that. What I
17 am interested in knowing is how you react to the objection
18 which Mr. Kelley says is really at essence here, that is the
19 scope, that your request is overly broad.
20      MR. HOFFMAN: Your Honor, what we have indicated
21 to them is that -- and then I would like to go to what is
22 actually the Request No. 5, because it was not properly read.
23      THE COURT: I don't want to do that. What I want
24 to get to is an agreement. I am really not interested in
25 batting this ping-pong ball back and forth across this

## Page 41

1  table. I want to get to an agreement rather quickly.
2       MR. HOFFMAN: Yes. Your Honor, what we have
3  indicated is we will agree to limit our request to No. 1,
4  Design Compiler documents, Behavioral Compiler documents.
5  And they have agreed -- that is just the starting point, and
6  I will go on from there. But they have agreed to produce
7  documents relating to those products, but only the
8  non-confidential documents.
9       THE COURT: Well, let's talk about that then.
10 Insofar as, Mr. Kelley, counsel has now defined what I hope
11 you will agree is a proper scope, what about the production
12 of confidential information pursuant to the terms of your
13 protective order?
14      MR. KELLEY: Is that a question for me, Your
15 Honor?
16      THE COURT: Yes, sir.
17      MR. KELLEY: The reason that we mentioned
18 confidentiality in the objection is that as a third party
19 confidentiality is one of the considerations that is
20 mentioned in the case law about weighing that burden on the
21 third party versus the need in the case.
22      THE COURT: We are trying to reduce the burden.
23 I do understand your complaint regarding the burden.
24      MR. KELLEY: I apologize. The next point, what
25 they have identified as being the basis of infringement,

## Page 42

1  namely, that the user provide certain inputs to Design
2  Compiler and that that Design Compiler takes those inputs and
3  selects library cells to produce the output, that they can
4  get from public documentation. There really is no need to go
5  into our sourcecode describing exactly in great detail how
6  those functions are performed or into the internal
7  engineering documents describing every aspect of that. If
8  that is what they need from us, they have already got that.
9  And I will correct Mr. Hoffman. We have already produced
10 several hundred pages of manuals.
11      THE COURT: Let's just deal with this discrete
12 issue, this discrete range of documents, Mr. Hoffman. Do you
13 agree that there are alternate sources?
14      MR. HOFFMAN: No, there are not, Your Honor. The
15 information is going to be in the confidential documents. It
16 is going to be in the sourcecode. It is going to be in the
17 other information that comes out of Synopsys or comes out of
18 the defendants.
19      There is many other parts of this claim, such as
20 discussions of expert systems, discussions or rules. Some of
21 those are going to be parts of the (inaudible) of Design
22 Compiler or Behavioral Compiler.
23      So consequently, just inputting information, yes,
24 that is part of the process here, there is no question that
25 is part of the process. But then it's how the system

## Page 43

1  operates is another part of the process, and some of that is
2  not fully available. The details that we want for trial to
3  prove our case, obviously, we have enough information to
4  bring the case and to allege, quite appropriately allege.
5  that that information and that operation is present. But we
6  are entitled to further information to further establish and
7  prove our case.
8       Synopsys, they keep on saying they are a third
9  party. Yet at other times they keep on saying they are the
10 real party in interest and they are the true party here.
11      THE COURT: I don't hear any objection to the
12 relevance, that it's not discoverable. It's a question of
13 sourcing, where you can get it from, whether you can get it
14 from alternate sources and how to protect it.
15      MR. HOFFMAN: There is a protective order and we
16 cannot get this from --
17      THE COURT: What I am getting at is, it seems to
18 me, counsel, if you remove for a moment -- and I know this is
19 difficult to do -- your adversarial hats and think more in
20 the spirit of cooperation, because there is no apparent
21 disagreement as to the relevance of this information, the
22 discoverability of this information, then you could probably
23 come to a point of agreement as to how it should be
24 produced. Is that just beyond your capability? Or what are
25 we talking about here?

## Page 44

1       MS. CORBIN: Your Honor, I think that now they
2  have the identified Design Compiler, Behavioral Compiler --
3  Design Compiler alone, just for point of reference for the
4  Court, is the largest product at Synopsys, accounts for more
5  than 20 percent of its revenue. They still want all
6  engineering documents relating to Design Compiler. We still
7  have a huge problem with respect to overbreadth.
8       THE COURT: I can understand why you would have a
9  problem with that. And it seems to me the plaintiff should
10 be able to narrow that request somewhat.
11      MR. HOFFMAN: Your Honor, if Synopsys is willing
12 to give us the confidential information, they are willing to
13 give us the sourcecode limited to the time of the scope of
14 documents, going back to 1996, so we are not talking about
15 everything that is there, all documents that they have ever
16 had, we are willing to work with them in trying to work out
17 some other limitations. But to say, well, tell us the
18 details of exactly which parts of Design Compiler you are
19 alleging to infringe and give us a detailed claim chart so
20 that then we can decide whether or not we will give you
21 anything is putting the cart before the horse. What they are
22 asking is prove your case and then we will decide if we will
23 give you discovery.
24      THE COURT: Obviously, you don't have to do that.
25      MS. CORBIN: Your Honor, the sourcecode, since it

CondenseIt™                                                          **August 28, 2003**

## Page 45

1 has been mentioned twice now, is of particular import, I
2 think, because that is the most sensitive information about a
3 particular product, it contains a lot of information.  If
4 what they need is an understanding of the inputs that these
5 particular customers input to Design Compiler when they use
6 it, there are other ways to get to that information besides
7 having the sourcecode, which is the most sensitive
8 information in the company, regarding their key product.
9       THE COURT:  Well, inevitably, counsel, in all of
10 these cases, and you know that from your vast experience in
11 this area, there is always information, oftentimes
12 extraordinarily sensitive information like this that is at
13 issue and that needs to be shared in order for the litigation
14 to proceed forward.  That is why we have protective orders.
15 That is why there is a body of law that has grown up around
16 this issue.  But it is incumbent upon counsel to recognize
17 the need to cooperate, and if necessary, to craft new
18 language that will enable this type of information to be
19 shared at appropriate levels.  If it is for attorneys' eyes
20 only -- I think you understand where I am going with this.
21       If there is truly an alternate source that will
22 enable the plaintiff to prosecute its claims in a timely
23 fashion from which it can receive this information, I would
24 be interested in knowing and having the discussion right now
25 as to what that source is and whether it is acceptable to the

## Page 46

1 plaintiff.
2       MS. CORBIN:  Can you address that, please, Chris
3 Kelley?
4       MR. KELLEY:  Yes, absolutely.  That is where I
5 was intending to go.
6       Your Honor, the issue here is that -- of course,
7 they have stated to this Court -- and I don't want to get
8 into the motion to stay or transfer -- but they have stated
9 that their beef is not with Synopsys.  That it's by
10 defendants that are infringing.  They are now suggesting that
11 Synopsys is a third party and as a party to this case has the
12 same obligations in discovery.
13       If you look at the way the interrogatory is
14 drafted, they identify the two things that would have some
15 connection with the user, namely, putting some stuff in at
16 the top of the process and getting something out at the
17 bottom.  And they didn't mention anything about all the other
18 the stuff, which of course I think they are going to argue
19 are all internal to Design Compiler.
20       Their theory of infringement really is these
21 defendants use Design Compiler.  If that is the case, which
22 they haven't come flat out and stated today, they should have
23 sued Synopsys.  Instead, they elected to sue Synopsys'
24 customers.  Now they are trying to back-door, attack
25 Synopsis' product by getting this very broad discovery.

## Page 47

1       I think the progression here is, to the extent
2 they really believe their case of infringement rests on
3 something the defendants are doing and there is some
4 peripheral material that is in the exclusive possession of
5 Synopsys, that is the kind of discovery they should get.  But
6 what I think we are going to find out when we actually have
7 this meeting -- and I think that's the proper way to proceed
8 is for the proper parties to get together and work out
9 exactly what they need and what we can give them, how we can
10 get them the information they need.  I think what we are
11 going to find is everything they need relating exclusively to
12 stuff done by Design Compiler, nothing to what these two
13 defendants here are doing except using Design Compiler,
14 providing the regular inputs that Design Compiler normally
15 takes in and at the end of the process say thank you very
16 much for the output, I am going to take this off to go make
17 the chip.
18       THE COURT:  It is not necessary for you to
19 respond, Mr. Hoffman.  The Court has instructed the parties
20 to get together and discuss this matter.  If you are still at
21 an impasse after that discussion, obviously, we will have to
22 revisit this.
23       Let's go on to No. 3.
24       MR. HOFFMAN:  No. 3, Your Honor --
25       MR. KELLEY:  Your Honor, I think this is our

## Page 48

1 item.
2       THE COURT:  Yes.
3       MR. KELLEY:  This is a relatively simple matter.
4 On the patent at issue, there are two inventors, Mr.
5 Kobayashi and Mr. Shindo.  Ricoh has already agreed to make
6 Mr. Kobayashi available for deposition in Japan.  That is
7 going forward.
8       At a fairly early point during discovery, we
9 asked them whether they were representing Shindo.  I am not
10 going to get this exactly right.  They said, no.  We will see
11 if they will work with us.  Give us your subpoena and we will
12 see if he will accept it, not formally, accept service, but
13 he will respond to it.
14       We haven't yet received from them a commitment,
15 any final word as to, one, whether Mr. Shindo will accept
16 this -- will cooperate in discovery, and two, whether they
17 intend to use him during trial, appear as a witness.
18       Both Mr. Shindo and Mr. Kobayashi, to our
19 knowledge, live in Japan.  We have asked them if they would
20 bring Mr. Shindo to the United States.  They have said, no,
21 you have to go to Japan to take his deposition if you want to
22 take his deposition.  That's assuming of course that he at
23 some point determines to cooperate.
24       The problem we are facing, given the close of
25 discovery in January, the facilities for deposition, which I

Teleconference - Judge Sleet                          Page 45 - Page 48

CondenseIt™                                             **August 28, 2003**

<table>
<tr><td>

**Page 49**

1  assume everyone on the phone is familiar with, depositions in
2  Japan must takes place either at the embassy or one of the
3  consulates. The Tokyo Embassy is already completely booked.
4  There is a little opportunity, some space in the Osaka
5  Consulate, which, to our understanding, that is actually
6  where Mr. Shindo lives, is Osaka.
7      What we would like from the Court is some
8  deadline as to when they actually have to have a final word
9  as to whether Mr. Shindo is going to cooperate or not. Then
10  either to make him available in Japan in accordance -- with
11  one of the windows of opportunity that we have, at the Osaka
12  Embassy, or bring him to the United States for deposition
13  here.
14      THE COURT: Okay.
15      MR. KELLEY: we can depose him in advance of
16  trial.
17      THE COURT: Can we get an answer to the question,
18  counsel?
19      MR. HOFFMAN: Yes. Mr. Shindo, who is a third
20  party, we don't represent him, we have attempted to contact
21  him through numerous ways. He does not respond to any of our
22  requests to see if he would be willing to accept the
23  subpoena.
24      We have asked him to sit for a deposition and
25  produce documents. He does not respond. He is so far, by

</td><td>

**Page 51**

1      MR. HOFFMAN: That is fine, Your Honor. We would
2  be willing to do that by the end of the year.
3      THE COURT: The drop-dead date is the end of
4  discovery.
5      MR. KELLEY: The complicating factor is if he is
6  going to be deposed in Japan.
7      THE COURT: No. I understand. Obviously, there
8  are challenges that would have to be overcome. For instance.
9  on the last day of discovery, you get word that he is
10  available, the Court will be flexible, perhaps, in all
11  likelihood, and permit the parties an additional period of
12  time in which to complete his deposition. But we can
13  certainly deal with that at the time. At least theoretically
14  the drop-dead date is the last day of discovery.
15      MR. HOFFMAN: we have asked the defendants to
16  produce all documents -- let me read it to you, a single
17  document request in this regard: Produce all documents and
18  tangible things identified in Section B, Items 1 through 8.
19  of defendants' initial disclosure dated and served on or
20  about May 30, 2003.
21      This is where they listed the documents that they
22  are going to rely upon in support of their case. We asked
23  them to produce the documents. Part of the response is,
24  defendants further object to this request as unduly
25  burdensome in seeking discovery of information not reasonably

</td></tr>
<tr><td>

**Page 50**

1  lack of response, at least implicitly is indicating he is not
2  going to cooperate. He has been gone from Ricoh over ten
3  years now. It is our belief that he is not going to
4  cooperate. Obviously, if he is not going to cooperate, he is
5  not going to show up at trial or anything else.
6      Both plaintiff and the defendants had listed Mr.
7  Shindo as someone who might have information. He is one of
8  the inventors. I presume he has some information. But no
9  one can force him as a third party to cooperate or to appear
10  for a deposition. We have been unsuccessful in doing that.
11  Consequently, we can't produce him.
12      With Dr. Kobayashi, he lives in Japan. He is
13  also not employed by Ricoh. We asked him. He came back and
14  said, yes, he would be willing to voluntarily appear. And
15  that deposition is set up in September, late September.
16      THE COURT: Mr. Kelley, what would you have
17  counsel do in this situation?
18      MR. KELLEY: I understand the difficult situation
19  he is in. This is the first time I heard he hadn't
20  responded. What I guess I would like is a drop-dead date, if
21  you will forgive the phrase, by which we will know he is
22  either going to cooperate by this date or there is not going
23  to be an opportunity for him to appear at trial. It seems to
24  me that should be sometime before the close of discovery, not
25  the final day of discovery.

</td><td>

**Page 52**

1  calculated to lead to the discovery of admissible evidence.
2  Defendants further object to this document request as unduly
3  burdensome and on the basis that it seeks detailed discovery
4  regarding operations of defendants that has no relevance to
5  defendants' ASIC products or methods.
6      Your Honor, these are the documents that they
7  listed, the categories of documents they listed in their
8  initial disclosure.
9      The purpose of the initial disclosure, obviously
10  is either done over the documents, list the categories so the
11  other side can go ahead and request them. We requested
12  them. They came back and have said, no, they are not
13  relevant. We tried to work it out with them. The response
14  was, and this is from Mr. Mower (phonetic), defendants
15  identified eight categories of documents that were likely to
16  be relevant to this dispute. Defendants did not suggest, as
17  your letter implies, that any documents that go into that
18  that fell into these categories were relevant.
19      Well, Your Honor, if they listed them, you only
20  list what you think is relevant. If it is relevant, we are
21  entitled to them. If they didn't list any -- if the
22  documents they listed are not relevant, then why did they
23  list them in their initial disclosure?
24      THE COURT: I agree. What is the defendants'
25  response to this?

</td></tr>
</table>

Teleconference - Judge Sleet                          Page 49 - Page 52

## Page 53

1  MR. KELLEY: Your Honor, the categories that are
2  identified are relatively generic phrases. Product design,
3  development materials, marketing, promotional materials.
4  Sales and accounting statements. You get the gist. Sort of
5  generic classifications of documents.
6       When we prepared this, this is in the initial
7  disclosure statement, we did not have any idea what their
8  theory of infringement was. All we had was the complaint,
9  which doesn't provide any detail other than you infringe. We
10 did note what our invalidity arguments were going to be and
11 we started collecting that information as quickly as
12 possible. In fact, we have produced the thousands of
13 documents that plaintiffs sometimes refer to in their papers
14 are all prior art articles that we have produced. So we have
15 produced the materials we knew about in describing these
16 categories at that time. We immediately started producing
17 that stuff.
18      Since then, we have agreed to go ahead and get
19 the materials relating to -- and here's where the parties
20 have had some negotiation in the past few days leading up
21 though this call, not ultimately successful but some
22 narrowing of the differences -- we have agreed to produce, to
23 go get documents relating to ASIC products which were
24 developed in a process where there was some logic synthesis.
25 Logic synthesis is the kind of operation performed by Design

## Page 54

1  Compiler and other product.
2       And we wanted to further restrict the documents
3  to documents that had some bearing on the use of, the steps
4  which they have identified in their interrogatory, providing
5  input to the logic synthesis to Design Compiler and using
6  Design Compiler to map library cells to produce an output
7  file.
8       They have agreed that their document requests,
9  which asks for every information, all documents about every
10 ASIC, should properly, they have agreed to narrow their
11 request, just in the last few days, to ASIC, whether there
12 was some logic synthesis, i.e., having something to do with
13 the process that is described in their patent. So then the
14 remaining difference, really, in the document requests is
15 whether they get every document that the defendants have on
16 that ASIC or if they get the documents that are relevant to
17 the claimed process.
18      THE COURT: I have to say, this is the first time
19 that I have ever had to deal with an issue involving
20 production related to initial disclosures. I find it
21 extraordinary. Counsel --
22      MS. CORBIN: Your Honor, I think that the problem
23 was that the initial disclosure was inartfully drafted.
24      THE COURT: Perhaps. But what you need --
25      MS. CORBIN: The problem may be, there was a

## Page 55

1  subset of documents.
2       THE COURT: Ms. Corbin, I am going to talk over
3  you. You can't talk over me. I know we are on this bridge
4  line and sometimes we talk over one another, and that's okay.
5       But you are going to have to go back and finish
6  your conversation about this, counsel. I am not going to
7  spend any more time on this.
8       Let's move on to No. 5.
9       MR. MEILMAN: Your Honor, actually, you have
10 heard part of the discussion on the document requests.
11 Actually, the interrogatory, No. 7, they are also related.
12      THE COURT: Let's talk about them both then.
13      MR. MEILMAN: Right after the Rule 16 conference
14 in May, we served these document requests and interrogatories
15 on defendants about a month later. And as Mr. Kelley
16 indicated, we have been trying to resolve our differences
17 ever since. We have gotten some information in documents.
18 But it's been dribbled in piece by piece.
19      As Mr. Kelley has told you, that they keep
20 objecting on the grounds that we haven't told them our
21 infringement theory. In essence, what they are doing is they
22 want us to give them our Markman construction before they
23 decide what they are going to give us. That's something that
24 was raised during the Rule 16 conference, and the Court
25 refused to push the Markman conference before any discovery.

## Page 56

1       As Mr. Kelley indicated, we have narrowed the
2  definition of what we want, well, the patent in suit is
3  directed to a computer aided design process for making
4  application specific integrated circuits, what has been
5  referred to in this conference call as an ASIC.
6       We have asked them, we have narrowed our request
7  to processes for making ASICs by a computer-aided design
8  process using logic synthesis, development of those
9  processes, what equipment they have used, and any literature
10 they have had about that.
11      Last Friday, they have told us they will provide
12 us details about their current process (inaudible)
13 development. As to two of the three defendants, they have a
14 plant in the U.S. But as Mr. Kelley indicated, they want to
15 restrict that to Design Compiler because we indicated we knew
16 they used Design Compiler in at least some of their
17 processes.
18      Yesterday, they backtracked, as far as I
19 understand it, and said we will give you only details as to
20 some of these substeps in the process.
21      They have told us that one of the defendants,
22 Matrox Tech, did design work in Florida, but we will be
23 getting no information about that because it closed its plant
24 in 2000 and those records don't seem to be located.
25      Then there is an issue on questions of responses

## Page 57

1 by the Matrox defendants done in Canada. We have been told
2 that there are additional process steps those defendants
3 carry out which makes the foreign production provisions of
4 Title 35 U.S.C. 271(g) inapplicable. As you may guess, the
5 minute they said that to us, we said, What are those steps?
6 And we have been refused disclosure on that.
7        Yesterday I got a call from Mr. -- I got a letter
8 from Mr. Kelley indicating that if we want, they will make
9 people available with knowledge about their design work for
10 deposition, but we are not going to get any interrogatory or
11 document request.
12        Basically, on the definition of the products --
13 the processes that we wish to have disclosure on, we believe
14 that limiting that to the computer-aided design process with
15 logic synthesis is narrow enough to give us the discovery we
16 want. We know as to some processes the defendants use Design
17 Compiler. What we don't know is whether they have any other
18 products that they have gotten from other suppliers.
19        We have asked them, do you have those? And
20 produce the documents. We have asked both in general and
21 specifically as to one of their -- one of the companies we
22 know provides equipment called Cadence. And basically, we
23 are told we are not going to get an answer. As to other
24 things, when they don't have any documents or it has not been
25 applicable, we have been told that. But as to the generally,

## Page 58

1 are you using somebody else's equipment, are you using
2 Cadence's equipment, we are getting no answer at all.
3        I think that's basically -- that whole approach
4 filters down to everything that is in dispute pretty much on
5 the interrogatories and document requests. As Mr. Kelley
6 said, it is a question of what we are entitled to as far as
7 breadth goes.
8        THE COURT: Okay.
9        MR. MEILMAN: It may very well be there are no
10 other alternate products that the defendants are using. But
11 I think we are entitled to know that.
12        THE COURT: Okay. Let's hear from the other
13 side.
14        MR. KELLEY: Your Honor, let me talk about the
15 271(g) issue in a minute. Let me deal with the document
16 requests first.
17        The fight that we have been having over the last,
18 it's been about three or four weeks the parties have been
19 discussing this in earnest, is these document requests. Once
20 again, let me just read this: Produce all documents -- I am
21 reading from No. 5, Document Request No. 5: Produce all
22 documents concerning the conception, design, development,
23 manufacture, or sale of each of the defendants' ASIC
24 products. Then it goes on and gives some examples sort of
25 thing.

## Page 59

1        There are several. The ones we have objected to
2 and said these are too broad are that kind of thing. They
3 haven't (inaudible) with all products and anything having to
4 do with the design of that product.
5        Now, Mr. Meilman just said that, he said CAD
6 process. As far as I know, that is the first time I have
7 heard them say, what we really need is stuff about the CAD
8 process. Although I am not sure whether be meant -- well.
9 the thing that is relevant here is logic synthesis. It's not
10 the specification, the engineering specification describing
11 what the product was going to do that was formulated back
12 when people were kicking around ideas about what a good
13 product for the company would be. So that's what we have
14 been fighting about now.
15        Ricoh just a few days ago said we will limit the
16 products, as I mentioned, we will limit the products to those
17 products that use logic synthesis.
18        Now, I think the remaining issue is whether the
19 scope of these document requests should be restricted to
20 documents describing the use of logic synthesis or relating
21 to logic synthesis for those products, and not anything
22 having to do with the specification of the product,
23 engineering, planning meetings, memos about how, we have got
24 bugs, our design isn't working, because none of that has
25 anything to do with the claim.

## Page 60

1        THE COURT: Is that an acceptable limitation,
2 Ricoh?
3        MR. HOFFMAN: Your Honor, what we are looking
4 for, as Mr. Meilman, I thought, had indicated, is the
5 documents that relate to the process for manufacturing these
6 ASICs in the designing of the ASICs using systems that have
7 logic synthesis in them. We are not looking for things
8 relating to debugging of the ASICs themselves. We are not
9 looking for things on other types of -- there is some
10 categories -- and I would have to go back to exactly what Mr.
11 Kelley said -- other things that were pre the designing of
12 these ASICs using the particular types of processes that are
13 involved in the claims and in the patent here of ASIC
14 designing processes using logic synthesis.
15        That is what we are looking for. We have told
16 them that. To date, they have produced less than a thousand
17 pages of documents.
18        THE COURT: Is that a different way of saying
19 that you are in agreement with the limitation that has just
20 been proposed? Or are you broadening?
21        MR. HOFFMAN: No. I think we are in general
22 agreement of some of the things. Mr. Kelley rattled off a
23 number of things.
24        THE COURT: So did you. So, counsel, my question
25 to you is, now having heard one another speak and speaking

## Page 61

1 to one another through me, do you think that you can put a
2 finer point on these requests and resolve the objections?
3 Because the Court has now invested an hour and a half of its
4 time on matters, quite frankly, in a manner in which it quite
5 frankly believes could have been better invested.
6         Are we at a point in this discussion as to Items
7 5 and 7 where counsel can be released to your own devices and
8 work it out?
9         MR. KELLEY: I believe.
10        MR. HOFFMAN: I believe, also, Your Honor.
11        If I can just ask one question, because I think
12 it may help in advancing a number of these things that we are
13 trying to work out. We would hope that, and would like a
14 commitment from counsel for the defendants and for Synopsys
15 to work out all these matters, to work diligently over the
16 next week, between now and the end of next week to work out
17 all these matters, so we can get these documents.
18        THE COURT: So ordered, yes.
19        MR. HOFFMAN: And also that the defendants will
20 not object and tell us we can't give it to you, these
21 documents, because it is the confidential information of
22 Synopsys.
23        THE COURT: You have to work through your
24 protective order.
25        MR. HOFFMAN: We will be underneath the

## Page 62

1 protective order, the documents.
2         THE COURT: I think that's a given, counsel.
3         MR. HOFFMAN: Thank you, Your Honor. I
4 appreciate it.
5         THE COURT: Okay.
6         MR. MEILMAN: Your Honor, Mr. Kelley was about to
7 start raising some material on the Matrox people in Canada.
8 I don't want to get that swept under the rug.
9         MR. HOFFMAN: Your Honor, that also probably ties
10 in with Topic No. 8 that they have raised.
11        THE COURT: Topic No. 8 is a non-starter for the
12 Court. I am not going to grant permission to file a letter
13 in support of the seeking of permission to file summary
14 judgment at this time, no.
15        MR. HOFFMAN: I presume we are also entitled then
16 to get discovery out of the people in Canada.
17        THE COURT: I don't see why not.
18        MR. KELLEY: Can I address that issue briefly?
19        THE COURT: Yes.
20        MR. KELLEY: They are seeking discovery -- this
21 claim relates to the logic synthesis process. What they want
22 is the discovery of logic synthesis work done in Canada.
23        THE COURT: Counsel, you are breaking up on us.
24        MR. KELLEY: It seems to me, I know we don't want
25 to get into the issue of whether they are going to prevail on

## Page 63

1 their 271(g) theory. But that's unusual, to try to apply a
2 U.S. patent to seek discovery on work done outside the United
3 States, on things done outside the United States is very
4 unusual.
5         THE COURT: What is the thinking there, Ricoh?
6         MR. HOFFMAN: Your Honor, if a process of
7 manufacturing a product is carried on outside the United
8 States where that process would infringe a process patent
9 inside the United States, then there is a basis for
10 allegation of infringement, the charge of infringement, just
11 boiling it down to a summary format.
12        The Bayer case they are relying upon is talking
13 about something entirely different. It was talking about
14 strictly -- and I have part of the claim here -- a need for
15 determining whether a substance is an inhibitor or
16 activator.
17        That is not what we are talking about here. We
18 are not talking about a method of determining whether or
19 not -- determination of whether a piece of information is in
20 one category or another. We are talking about part of a
21 manufacturing process, and 271 clearly covers that situation,
22 where the products do flow into the United States, that there
23 is infringement of that process patent.
24        This is a manufacturing process. So it's our
25 position we are entitled to it.

## Page 64

1         THE COURT: Does counsel disagree with counsel's
2 statement regarding the current state of the law?
3         MR. KELLEY: Yes, Your Honor. The Bayer case
4 makes it absolutely clear that the manufacturing process,
5 this is the exact question addressed by the Federal Circuit,
6 the manufacturing process, in order to fall within 271(g),
7 the claimed process has to be one using manufacturing the
8 device, the actual physical things that are going to be
9 imported.
10        MR. HOFFMAN: This is all part of the
11 manufacturing process, Your Honor. And what they are trying
12 to do is say, well, since we disagree and we think that we
13 are entitled to summary judgment, we are not going to give
14 you discovery. And we are entitled to that discovery and to
15 show that it is part of the manufacturing process for
16 manufacturing the products that then flow into the United
17 States.
18        THE COURT: Mr. Kelley.
19        MR. KELLEY: Your Honor, if I may finish my
20 point. The case makes it absolutely clear that there has to
21 be a physical good produced under this process. What their
22 claim process produces is a -- a net list, that is then used
23 to produce -- it is sent off to a foundry that actually
24 produces the devices. It is not used in the process of
25 manufacturing the goods. The Federal Circuit decision make

## Page 65

1  it quite clear that the process set out has to talk about the
2  actual process, the mechanical physical process of creating
3  the thing that is going to be imported.
4       THE COURT: Let's see if your opponent agrees
5  with that statement.  Do you agree that the case stands for
6  that proposition, counsel?
7       MR. HOFFMAN: No, I don't, Your Honor.  The case
8  stands for the proposition -- that is why I read a portion --
9  it stands for the proposition that when all that is
10  determined by the process is a piece of information that is
11  never used in the manufacturing operation, it has nothing to
12  do with manufacturing a product, it is just determining
13  information, that that is not covered by 271.
14       What we have here in this case is one or a series
15  of the steps, the initial steps in designing a product that
16  is -- as part of the manufacturing operation, design and
17  operation, the manufacturing of a product that is imported
18  into the United States.  That is very different.  That is not
19  what the Bayer case is dealing with.
20       THE COURT: Counsel for Matrox.
21       MR. KELLEY: If I am correct about this, then we
22  don't have to have half of the discovery in this case, and if
23  Mr. Meilman is correct, then we do.  What I propose is we
24  brief this question because we are having lawyer argument.
25       THE COURT: What I am going to do first is read

## Page 66

1  Bayer.  That might be of some assistance to this issue.  Let
2  me take a look.  If I feel I need further elucidation on this
3  subject, I will let you further address it in some fashion,
4  whether it be in the form of some limited briefing or further
5  discussion, I don't know exactly at this point.  But we will
6  defer No. 8 while the Court takes an opportunity to read the
7  case.
8       MR. HOFFMAN: In the interim, Your Honor, if we
9  can begin to sort out discovery issues with the defendants,
10  with Matrox on this issue, so at least we can resolve the
11  scope and other issues so we can begin to get discovery from
12  them.
13       MR. KELLEY: We are in fact going forward with
14  discovery.  We are in the process of collecting that
15  information about where we do our design work and the general
16  design flow stuff.  I am not sure what more he wanted.  He
17  wanted the same sort of discovery for Matrox that we had for
18  the other defendants.
19       MR. HOFFMAN: Yes, Your Honor.
20       MR. KELLEY: It seems to me it will take -- I
21  understand the Court has a busy schedule.  But he seems to be
22  asking that we do this very discovery that I am suggesting
23  could be avoided.
24       THE COURT: I think that is correct.  What I am
25  going to order is, as far as the Matrox defendants are

## Page 67

1  concerned, we are going to defer engaging that process.  Mr.
2  Hoffman, for a brief period of time, while I take a look at
3  the case, if necessary, get the benefit of further thoughts
4  from counsel.
5       Let's deal with No. 6.  Have we dealt with No.
6  6?
7       MR. MEILMAN: Your Honor, just, we use the term
8  Matrox defendants.  One of the Matrox defendants was Matrox
9  Tech, which had a plant and was doing work in Florida.  I
10  take it that as far as their objections as to activity in
11  Canada, Your Honor's order does not apply to Matrox Tech.
12       THE COURT: Are we in agreement with that?
13       MR. KELLEY: Yes, Your Honor.  We are in the
14  process of collecting those documents for that work like we
15  are doing for every other -- the other non-Matrox defendants.
16       THE COURT: Then we are in agreement, counsel.
17       MR. MEILMAN: Thank you, Your Honor.
18       MR. HOFFMAN: Your Honor, since it may help avoid
19  a future dispute or arguments, Mr. Kelley has indicated they
20  are collecting documents.  Does he have a date by which he
21  believes they will be produced?
22       THE COURT: Mr. Kelley?
23       MR. KELLEY: We are doing a rolling production.
24  We are getting stuff as quickly as we can get it.  We
25  produced documents just a few days ago.

## Page 68

1       MR. HOFFMAN: Will we have all of them produced
2  by mid-September, Mr. Kelley?
3       MR. KELLEY: I would hope so.
4       THE COURT: No. 6, what do we have left with
5  regard to No. 6?
6       MR. KELLEY: We would like to take that off.
7       THE COURT: That is fine with the Court,
8  counsel.  You don't need to explain.
9       Counsel, I will take a look at the Bayer case.
10  You will hear from me one way or the other shortly.
11       (Counsel say "thank you.")
12       THE COURT: Take care.
13       (Teleconference concluded at 12:40 p.m.)
14           - - -
15  Reporter:  Kevin Maurer
16
17
18
19
20
21
22
23
24
25

**-and** [2]  1:19      2:3
**00** [1]    1:13
**03-103-GMS** [1]
1:10
**1** [4]     3:8      3:9
41:3   51:18
**10** [1]    26:25
**100** [2]   33:17    40:15
**11** [1]    1:13
**12** [4]    15:20    16:3
18:9   68:13
**14** [2]    6:24     15:20
**14th** [1]  4:25
**15** [1]    16:2
**16** [2]    55:13    55:24
**17** [2]    6:6      12:11
**1996** [1]  44:14
**2** [7]     3:4      7:17
9:8    10:1    10:2
12:2   38:22
**20** [2]    16:2     44:5
**2000** [1]  56:24
**2003** [5]  1:13     9:8
31:9   31:9    51:20
**21st** [1]  6:6
**22** [1]    12:12
**23rd** [1]  6:12
**25th** [1]  32:18
**26th** [2]  31:8     32:18
**271** [6]   57:4     58:15
63:1   63:21   64:6
65:13
**28** [1]    1:13
**28th** [1]  16:12
**3** [3]     3:4      47:23
47:24
**30** [2]    29:14    51:20
**30th** [10] 5:2      8:1
8:15   11:4    12:4
13:22  31:6    31:9
32:5   32:18
**31st** [7]  3:12     4:7
7:17   8:23    9:1
26:23  26:24
**34-day** [1]         32:20
**35** [1]    57:4
**40** [1]    68:13
**5** [8]     3:5      38:23
38:25  40:22   55:8
58:21  58:21   61:7
**6** [6]     3:4      9:8
67:5   67:6    68:4
68:5
**7** [3]     3:5      55:11
61:7
**8** [6]     3:4      12:20
51:18  62:10   62:11
66:6
**9** [1]     12:11
**a.m** [1]
**able** [2]  23:1     44:10
**absolutely** [3]     46:4
64:4   64:20
**accept** [5]         40:7

**48:12** 48:12  48:15
49:22
**acceptable** [4]  27:2
40:12  45:25   60:1
**accordance** [1] 49:10
**according** [1]  5:20
**accounting** [1] 53:4
**accounts** [1]   44:4
**accurate** [1]   15:17
**acknowledged** [1]
12:22
**action** [4]     1:4
34:19  34:22   37:13
**activator** [1]  63:16
**activities** [1] 33:23
**activity** [1]   67:10
**actual** [4]     14:24
21:8   64:8    65:2
**additional** [6] 8:24
8:24   25:6    32:6
51:11  57:2
**address** [7]    23:1
30:5   35:21   37:18
46:2   62:18   66:3
**addressed** [1]  64:5
**admissible** [1] 54:2
**admitted** [1]   38:16
**advance** [1]    49:15
**advancing** [1]  61:12
**adversarial** [1] 43:19
**advisable** [1]  7:20
**AEROFLEX** [1]
1:7
**again** [2]             14:18
58:20
**agenda** [1]     2:25
**ago** [4]   11:5     11:5
59:15  67:25
**agree** [8] 18:12   32:13
35:3   41:3    41:11
42:13  52:24   65:5
54:10
**agreed** [8]             40:4
41:5   41:6    48:5
53:18  53:22   54:8
54:10
**agreement** [11]  19:5
19:6   19:6    19:7
40:24  41:1    43:23
60:19  60:22   67:12
67:16
**agrees** [2]             24:22
65:4
**ahead** [5]             12:9
13:12  18:15   52:11
53:18
**aided** [1]      56:3
**allegation** [1] 63:10
**allegations** [1] 39:15
**allege** [2]     43:4
43:4
**allegedly** [1]  37:5
**alleging** [1]   44:19
**allow** [1]      27:21
**allowed** [1]    21:18

**alone** [1]      44:3
**alternate** [4]  42:13
43:14  45:21   58:10
**always** [1]     45:11
**AMI** [1] 1:7
**among** [1]      27:11
**amongst** [1]    9:24
**amount** [1]     9:19
**ancillary** [1]  21:11
21:12
**answer** [4]     26:17
49:17  57:23   58:2
**answering** [1]  24:17
**answers** [1]    39:14
**anyway** [5]     16:8
22:13  24:2    24:20
24:23
**apologize** [2]  31:4
41:24
**apparent** [2]   23:9
43:20
**appear** [4]     48:17
50:5   50:14   50:23
**APPEARANCES** [2]
1:17   2:1
**applicable** [1] 57:25
**application** [1] 56:4
**apply** [2]      63:1
67:11
**appreciate** [2] 18:16
62:4
**approach** [1]   58:3
**appropriate** [18]
7:22   13:9    13:18
13:18  13:18   14:14
14:19  14:25   15:1
19:24  20:3    20:7
20:20  20:23   22:22
22:23  32:11   45:19
**appropriately** [1]
34:23  35:15   43:4
**area** [1]  45:11
**argue** [1]      46:18
**arguing** [3]    2:24
2:25   3:3
**argument** [2]   2:22
65:24
**arguments** [2]  53:10
67:19
**Arnold** [1]     2:5
**art** [11] 17:2   17:17
17:21  18:2    18:4
18:10  18:10   21:23
30:6   33:16   53:14
**articles** [1]   53:14
**articulated** [1] 25:15
**ASIC** [11]      39:2
39:20  40:10   52:5
53:23  54:10   54:11
54:16  56:5    58:23
60:13
**ASICs** [5]      56:7
60:6   60:6    60:8
60:12
**asks** [1] 54:9

**aspect** [3]     12:12
17:23  42:7
**aspects** [2]    17:20
18:6
**assertion** [1]  24:18
**asserts** [1]    12:1
**assignment** [1] 15:23
**assistance** [1] 66:1
**assume** [1]     49:1
**assumed** [1]    5:18
**assuming** [1]   48:22
**attack** [1]     46:24
**attained** [1]   38:7
**attempted** [1]  49:20
**attorney** [6]   8:3
8:3    9:24    11:22
27:16  28:6
**attorney-client** [2]
4:12   9:4
**attorneys** [5]  9:24
11:20  27:11   27:12
36:11
**attorneys'** [1] 45:19
**August** [4]     1:13
4:25   9:8     26:24
**author** [1]     27:16
**available** [9]  7:20
34:7   36:20   36:24
43:2   48:6    49:10
51:10  57:9
**avoid** [1]      67:18
**avoided** [1]    66:23
**aware** [2]      7:18
35:24
**away** [1]  13:16
**B** [1]     51:18
**back-door** [1]  46:24
**backtracked** [1] 56:18
**ball** [1]  40:25
**based** [4]             14:12
16:22  24:6    26:11
**basic** [1] 34:3
**basics** [1]     34:2
**basis** [23]     4:12
4:20   4:23    7:9
7:11   7:12    9:4
10:6   10:22   13:25
25:22  26:16   28:1
35:5   35:13   36:1
38:3   38:17   39:14
39:24  41:25   52:3
63:9
**batting** [1]    40:25
**Bayer** [5]      63:12
64:3   65:19   66:1
68:9
**bearing** [1]    54:3
**became** [1]     9:1
**become** [2]     17:5
38:24
**beef** [1]  46:9
**beforehand** [1] 19:18
**begin** [1]      66:9
66:11

**behalf** [2]
3:25
**Behavioral** [5]  43:24
34:8   41:4    42:21
44:2
**belief** [3]            29:10
29:11  50:3
**believes** [1]          22:23
61:5   67:21
**benefit** [1]           67:3
**better** [3]            36:7
61:5
**between** [13]          8:10
4:17   6:9     9:25
8:13   9:18    9:24
12:25  13:5    16:6
23:12  24:6    61:18
**beyond** [3]            8:25
12:2   43:24
**bit** [2]   16:22   38:23
**Bob** [1]   2:11
**body** [1]  45:15
**boiling** [1]           63:11
**booked** [1]            49:3
**bottom** [1]            46:17
**Bove** [2] 2:2          1:20
**brand-new** [1]         9:11
**breadth** [3]           37:19
37:20  58:7
**break** [3]             19:5
27:20  27:21
**breaking** [1]          62:23
**bridge** [1]            55:3
**brief** [2] 65:24       67:2
**briefing** [1]          66:4
**briefly** [2]           28:15
62:18
**bring** [3] 43:4        48:20
49:12
**broad** [3]             40:19
46:25  59:2
**broadening** [1] 60:20
**broken** [1]            27:25
**Brothers** [31]         1:21
2:15   3:13    3:9
3:19   3:23    4:6
4:5    4:6     41:25
12:10  14:8    14:21
15:10  15:17   16:9
16:11  19:25   21:4
24:4   24:5    24:14
24:21  25:1    25:7
25:9   25:23   25:25
28:12  32:4    32:17
**bugs** [1]  59:24
**bulletins** [1]         39:4
**burden** [1]            41:20
41:22  41:23
**burdensome** [2] 31:25
52:3
**busy** [1]  66:21
**CAD** [2]  59:5         59:7
**Cadence** [1]           37:22
**Cadence's** [1]         38:2
**cage** [1]  15:25

CondenseIt™

calculated · Court

**calculated** [1]    52:1
**California** [5]    2:5
2:20    34:19    35:2
37:11
**calls** [1] 6:9
**camera** [10]    4:13
4:20    10:8    10:20
10:20    10:24    12:18
13:25    17:24    28:2
**Canada** [5]    57:1
62:7    62:16    62:22
67:11
**cannot** [3]    18:7
19:3    43:16
**capability** [1]    43:24
**capture** [2]    31:13
31:24
**care** [1] 68:12
**careful** [1]    15:2
**carpet** [1]    13:15
**carried** [1]    63:7
**carry** [1] 57:3
**cart** [1]    44:21
**case** [36] 5:19    6:1
6:4    17:9    18:11
20:18    22:3    23:18
24:15    27:24    37:11
37:11    38:6    39:9
39:16    41:20    41:21
43:3    43:4    43:7
44:22    46:11    46:21
47:2    51:22    63:12
64:3    64:20    65:5
65:7    65:14    65:19
65:22    66:7    67:3
68:9
**cases** [1] 45:10
**categories** [10]    6:16
6:19    33:15    52:7
52:10    52:15    52:18
53:1    53:16    60:10
**category** [2]    22:20
63:20
**cautious** [1]    13:7
**cells** [4] 39:18    40:9
42:3    54:6
**certain** [3]    22:2
29:8    42:1
**certainly** [2]    24:21
51:13
**cetera** [4]    10:5
10:5    39:5    39:6
**challenge** [1]    21:5
**challenges** [1]    51:8
**change** [1]    19:4
**charge** [1]    63:10
**charged** [1]    36:3
**charging** [1]    36:1
**chart** [1] 44:19
**checking** [1]    19:20
**Chinese** [1]    22:3
**chip** [2] 39:20    47:17
**chose** [4]    19:12
19:15    19:16    19:17
**Chris** [2]    2:21

46:2
**Christopher** [2] 2:4
11:2
**Circuit** [3]    27:23
64:5    64:25
**circuits** [1]    56:4
**Civil** [1] 1:4
**claim** [7]    10:23
42:19    44:19    59:25
62:21    63:14    64:22
**claimed** [2]    54:17
64:7
**claims** [2]    45:22
60:13
**clarification** [1]
24:3
**clarify** [3]    17:10
23:22    23:23
**clarifying** [1]    24:17
**classifications** [1]
53:5
**clause** [3]    9:11
9:14    12:1
**clear** [9] 3:20    8:2
23:17    27:4    31:7
32:4    64:4    64:20
65:1
**clearly** [4]    4:21
20:5    35:10    63:21
**cliche** [1]    20:22
**client** [1]    17:15
**clients** [1]    9:24
**close** [3] 28:3    48:24
50:24
**closed** [1]    56:23
**co-counsel** [1]    2:15
**colleague** [1]    2:13
**collected** [1]    13:20
**collecting** [4]    53:11
66:14    67:14    67:20
**coming** [3]    20:10
26:15    30:20
**comment** [1]    28:22
**comments** [1]    32:10
**commitment** [2]
48:14    61:14
**communicated** [2]
23:16    31:20
**communication** [2]
27:14    27:15
**communications** [29]
4:9    4:19    6:7
8:17    9:10    9:13
9:22    9:23    10:10
10:17    12:2    12:15
12:23    12:25    13:24
13:25    16:19    17:13
17:15    18:20    20:14
20:15    22:8    24:10
31:13    31:22    31:24
32:19    32:22
**companies** [1]    57:21
**company** [1]    1:4
45:8    59:13
**compare** [1]    17:2

**Compiler** [34]    33:23
33:24    34:6    34:8
34:8    35:24    36:4
39:17    39:18    40:7
40:8    41:4    41:4
42:2    42:2    42:22
42:22    44:4    44:18
44:3    44:6    44:18
45:5    46:19    46:21
47:12    47:13    47:14
54:1    54:5    54:6
56:15    56:16    57:17
**complain** [1]    19:20
**complained** [2] 19:8
35:17
**complaining** [1]
23:24
**complaint** [2]    26:4
41:23    53:8
**complete** [2]    5:3
51:12
**completely** [2] 10:13
49:3
**complicating** [1]
51:5
**comport** [1]    12:8
**computer** [1]    56:3
**computer-aided** [1]
56:7    57:14
**conception** [1] 58:22
**concern** [5]    4:24
5:3    17:10    17:22
21:3
**concerned** [1]    67:1
**concerning** [2]    39:1
58:22
**concluded** [1]    68:13
**conduct** [1]    17:4
**conference** [17] 1:14
4:1    6:12    11:4
13:21    31:6    31:25
32:3    32:5    32:6
32:22    33:11    34:21
55:13    55:24    55:25
56:5
**confidential** [39]
5:25    6:10    6:14
6:19    7:15    8:5
8:9    11:7    11:11
11:18    11:22    13:3
13:13    14:11    19:9
19:10    21:18    23:15
23:25    24:19    24:22
24:24    25:2    25:20
26:3    26:20    28:7
28:19    28:25    34:9
34:11    35:6    36:13
37:3    38:12    41:12
42:15    44:12    61:21
**confidentiality** [1]
41:18    41:19
**conflict** [1]    19:2
**confused** [2]    27:7
28:7
**confusion** [1]    25:16
**connection** [1]    46:15
**Connolly** [2]    2:2
2:19

**consequently** [4]
19:2    34:18    42:23
50:11
**consider** [1]    4:1
**considerations** [1]
41:19
**construction** [1]
55:22
**Consulate** [1]    49:5
**consulates** [1]    49:3
**consultations** [1]
16:24
**consulted** [2]    24:1
26:14
**consulting** [17] 5:12
7:5    7:8    7:15
13:14    14:16    15:15
16:14    16:18    17:3
18:9    19:1    19:5
19:7    19:14    21:20
26:18
**contact** [2]    18:22
49:20
**contacted** [1]    18:25
**contains** [1]    45:3
**contend** [1]    39:12
**contents** [1]    25:13
**continue** [3]    4:5
22:14    24:8
**continued** [3]    2:1
14:12    26:11
**continues** [1]    4:11
**contract** [3]    5:11
5:12    5:21
**contradicted** [1]
5:1
**contradiction** [1]
7:25
**contrary** [1]    19:18
23:18
**conversation** [6]
11:19    12:9    25:13
26:2    26:10    55:6
**conversations** [1]
16:6
**convinced** [1]    11:10
**cooperate** [9]    45:17
48:16    48:23    49:9
50:2    50:4    50:4
50:9    50:22
**cooperation** [1] 43:20
**copy** [1] 12:10
**Corbin** [33]    2:3
2:21    17:8    18:14
22:9    22:11    22:24
23:1    23:8    23:22
23:24    25:5    25:14
25:16    27:4    29:19
29:22    30:3    30:4
30:24    31:10    31:13
32:14    32:21    32:25
33:9    34:21    44:1
44:25    46:2    54:22
54:25    55:2
**Corbin's** [1]    24:17
**core** [1] 39:2

**CORP** [1]    6:9
**correct** [7]    30:3
30:9    32:24    42:9
65:21    65:23    66:24
**correctly** [1]    15:8
**correspondence** [1]
27:12
**counsel** [57]    1:23
2:6    2:10    4:8
4:18    5:6    5:12
5:14    5:17    6:15
6:17    7:15    8:19
8:23    9:9    9:19
10:11    11:15    11:17
13:1    13:4    13:14
14:5    14:16    15:10
16:19    16:24    17:4
17:8    18:13    22:10
25:15    26:14    28:11
40:11    40:12    41:10
43:18    45:9    45:16
49:18    50:17    54:21
55:6    60:24    61:7
61:14    62:2    62:23
64:1    65:6    65:20
67:4    67:16    68:8
68:9    68:11
**counsel's** [1]    64:1
**couple** [1]    6:15
**course** [5]    9:25
10:18    46:6    46:18
48:22
**Court** [164]    1:1
2:10    2:17    3:22
3:6    3:11    3:16
3:18    3:21    4:5
4:13    4:20    5:1
7:16    7:18    7:21
7:23    8:19    9:3
9:6    11:25    12:4
14:1    14:5    14:18
14:22    14:25    15:7
16:9    16:13    17:24
17:24    18:12    18:15
19:23    20:7    20:9
20:13    20:24    21:16
22:10    22:15    22:16
22:20    22:20    22:22
22:24    23:3    23:4
23:7    23:7    23:9
23:20    23:23    24:3
24:14    24:24    25:5
25:14    25:22    27:2
27:18    27:23    28:10
28:18    28:21    28:22
29:3    29:4    29:8
29:10    29:12    29:13
29:13    29:18    29:20
29:24    30:3    30:7
30:22    31:5    31:6
31:10    31:15    31:16
32:1    32:13    32:19
32:23    32:24    33:2
33:5    33:8    33:10
33:20    34:22    35:14
35:25    36:2    37:10
37:14    37:23    38:21
40:11    40:16    40:23
41:9    41:16    41:22
42:11    43:11    43:17
44:4    44:8    44:24
45:9    46:7    47:18

Teleconference - Judge Sleet

47:19    48:2    49:7
49:14    49:17    50:16
51:3    51:7    51:10
52:24    54:18    54:24
55:2    55:12    55:24
58:8    58:12    60:1
60:18    60:24    61:3
61:18    61:23    62:2
62:5    62:11    62:12
62:17    62:19    62:23
63:5    64:1    64:18
65:4    65:20    65:25
66:6    66:21    66:24
67:12    67:16    67:22
68:4    68:7    68:7
68:12

**Court's** [1]    18:16
**cover** [2]    9:21
10:15
**covered** [1]    65:13
**covers** [1]    63:21
**craft** [1] 45:17
**crafted** [1]    39:8
**create** [4]    19:11
19:21    29:11    39:18
**created** [1]    19:21
21:21
**creating** [1]    65:2
**creation** [1]    20:6
**credibility** [4]    20:17
20:17    21:6    21:6
**crime/fraud** [3] 27:22
28:11    28:13
**critical** [3]    14:3
38:6    38:13
**cross-purposes** [1]
23:10
**culled** [1]    17:12
**current** [2]    56:12
64:2
**customers** [2]    45:5
46:24
**cut** [1]    38:19
**cutoff** [1]    30:2
30:12    30:16
**D.C** [1]    1:22
**databases** [1]    39:2
**date** [14] 18:21    29:5
30:20    31:5    32:7
32:15    33:15    39:14
50:20    50:22    51:3
51:14    60:16    67:20
**dated** [1]    51:19
**dates** [1] 36:22
**days** [8] 8:6    11:8
26:25    32:1    53:20
54:11    59:15    67:25
**deadline** [1]    49:8
**deal** [5]    42:11    51:13
54:19    58:15    67:5
**dealing** [1]    65:19
**dealt** [2] 18:19    67:5
**debate** [1]    12:7
**debugging** [1]    60:8
**decide** [1]    44:20
44:22    55:23

**decided** [1]    19:4
**decision** [3]    14:21
37:8    64:25
**declaration** [2] 11:2
11:3
**deep** [1] 20:5
**defendant** [1]    16:20
**defendants** [58] 1:17
2:6    2:18    3:15
3:25    4:8    4:14
4:18    7:1    8:16
9:9    11:17    11:20
12:14    13:1    15:10
17:4    17:9    18:24
22:17    24:8    33:20
34:12    34:24    35:8
36:6    36:7    36:10
39:16    39:23    42:18
46:10    46:21    47:3
47:13    50:6    51:15
51:24    52:2    52:4
52:14    52:16    54:15
55:15    56:13    56:21
57:1    57:2    57:16
58:10    61:14    61:19
66:9    66:18    66:25
67:8    67:8    67:15
**defendants'** [6] 33:21
33:22    51:19    52:5
52:24    58:23
**defer** [2] 66:6    67:1
**deference** [1]    15:17
**defined** [1]    41:10
**definition** [2]    56:2
57:12
**Delaware** [4]    1:2
1:12    33:8    37:13
**depose** [1]    49:15
**deposed** [2]    4:25
51:6
**deposition** [27] 6:13
7:3    8:1    11:6
13:12    14:13    15:13
15:19    15:22    16:5
16:15    23:14    25:17
26:13    28:5    28:24
32:15    48:6    48:21
48:22    48:25    49:12
49:24    50:10    50:15
51:12    57:10
**depositions** [1] 49:1
**describe** [1]    40:6
40:7    40:8
**described** [6]    6:18
9:22    9:23    27:8
40:11    54:13
**describing** [1]    58:25
42:7    53:15    59:10
59:20
**design** [43]    33:23
34:5    34:8    35:24
36:4    39:2    39:17
39:18    40:7    40:8
40:10    41:4    42:1
42:2    42:21    44:2
44:3    44:6    44:18
45:5    46:19    46:21
47:12    47:13    47:14
53:2    53:25    54:5

54:6    56:3    56:7
56:15    56:16    56:22
57:9    57:14    59:24
58:22    59:4    59:24
65:16    66:15    66:16
**designing** [4]    60:6
60:11    60:14    65:15
**detail** [1]    38:17
42:5    53:9
**detailed** [3]    4:14
44:19    52:3
**details** [6]    12:21
35:10    43:2    44:18
56:12    56:19
**determination** [9]
13:9    14:2    14:3
14:6    14:8    14:14
14:19    15:1    63:19
**determine** [1]    10:21
**determined** [1]    65:10
**determines** [1]    48:23
**determining** [3] 63:15
63:18    65:12
**developed** [6]    7:14
15:14    15:24    17:16
18:4    53:24
**development** [5]
17:21    53:3    56:8
56:13    58:22
**device** [1]    64:8
**devices** [2]    61:7
64:24
**Dickstein** [1]    1:21
**difference** [2]    3:10
54:14
**differences** [2] 53:22
55:16
**different** [2]    60:18
63:13    65:18
**difficult** [1]    17:6
43:19    50:18
**DiGiovanni** [22]
2:2    2:19    2:19
2:24    3:13    3:17
3:24    7:23    7:24
9:5    9:7    11:25
13:10    15:16    16:23
17:12    27:4    27:6
27:19    30:11    30:25
31:11
**DiGiovanni's** [1]
12:8
**diligently** [1]    61:15
**directed** [1]    56:3
**directly** [3]    17:3
36:7    36:9
**disagree** [2]    64:1
64:12
**disagreement** [1]
43:21
**disclose** [7]    4:8
8:16    9:10    9:10
9:13    10:9    12:4
**disclosed** [2]    5:16
10:15
**disclosure** [9]    17:12
51:19    52:8    52:9

52:23    53:7    54:23
57:6    57:13
**disclosures** [1] 54:20
**discover** [1]    18:8
33:18
**discoverability** [1]
43:22
**discoverable** [1]
43:12
**discovery** [36]    34:22
34:23    34:25    37:8
37:9    37:12    39:8
44:23    46:12    46:25
47:5    48:8    48:16
48:25    50:24    50:25
51:4    51:9    51:14
51:25    52:1    52:3
55:25    57:15    62:16
62:20    62:22    63:2
64:14    64:14    65:22
66:9    66:11    66:14
66:17    66:22
**discrete** [2]    42:11
42:12
**discuss** [1]    37:20
**discussed** [4]    6:1
12:21    21:1    31:20
**discussing** [1]    51:20
**discussion** [6]    12:3
45:24    47:21    55:10
61:6    66:5
**discussions** [3] 31:21
42:20    42:20
**disingenuous** [1]
36:4
**dismiss** [1]    33:22
**dispute** [2]    52:16
58:4    67:19
**disqualification** [4]
7:19    20:1    20:2
21:10
**disqualified** [1] 14:20
15:3    21:2    22:6
**disqualify** [3]    11:15
13:8    22:4
**DISTRICT** [2]    1:1
1:2
**doctrine** [1]    4:12
**document** [28]    19:20
25:20    29:23    37:20
37:20    38:1    38:8
38:9    38:12    38:13
38:18    38:19    38:22
39:21    40:3    51:17
52:2    54:8    54:14
54:15    55:10    55:14
57:11    58:5    58:15
58:19    58:21    59:19
**documentation** [3]
18:1    23:12    42:4
**documents** [118]
4:10    4:11    4:16
5:9    8:12    8:18
9:2    9:15    10:2
10:3    10:4    10:4
10:6    10:11    10:14
10:20    10:22    12:16
12:17    14:6    14:9

14:24
20:10    22:13
22:18    22:19    23:14
25:11    25:17    26:8
26:22    27:1    27:8
27:9    27:10    27:11
27:17    28:1    29:5
29:9    29:15    29:25
30:5    30:8    30:13
31:1    33:13    33:17
34:7    34:11    34:16
35:2    35:6    35:17
36:6    36:10    36:13
36:17    36:18    36:20
36:21    36:22    36:24
37:3    38:3    39:1
39:25    40:1    40:2
40:4    40:4    40:15
41:4    41:4    41:7
41:8    42:7    42:12
42:15    44:6    44:14
44:15    49:25    51:16
51:17    51:21    51:23
52:6    52:7    52:10
52:15    52:17    52:22
53:5    53:13    53:23
54:2    54:3    54:9
54:16    55:1    55:17
57:20    57:24    58:20
58:22    59:20    60:5
60:17    61:17    61:21
62:1    67:14    67:20
67:25
**doesn't** [5]    10:19
10:23    16:3    17:18
53:9
**done** [10]    9:17
10:21    19:12    29:18
47:12    52:10    57:1
62:22    63:2    63:3
**door** [1] 21:19
**doubt** [1]    27:16
**down** [2]    58:4
63:11
**Dr** [94]    4:9    4:10
4:17    4:25    5:1
5:8    5:10    5:13
5:12    5:17    5:15
5:20    5:22    5:24
6:2    6:5    6:10
6:13    6:18    6:25
7:6    7:7    7:11
8:1    8:1    8:10
8:13    8:17    9:11
9:13    9:15    9:19
10:10    10:12    11:6
11:9    11:16    11:18
11:12    12:23    12:25
13:3    13:5    13:11
13:24    14:11    14:16
15:5    15:8    15:19
16:7    16:13    16:16
16:20    16:24    17:5
17:14    17:16    18:3
18:21    18:22    18:25
19:2    19:13    19:13
23:13    23:15    24:8
24:25    25:1    25:12
26:9    26:11    26:18
27:23    27:23    27:14
28:5    28:18    28:23
28:24    29:5    29:23

| 30:14 | 30:17 | 31:1 |
| 31:19 | 31:20 | 31:22 |
| 32:7 | 32:9 | 32:10 |
| 32:19 | 50:12 | |

**drafted** [2]                46:14
54:23

**drawing** [1]               25:22
**dribbled** [1]              55:18
**drop** [1]  32:1
**drop-dead** [3]            50:20
51:3    51:14
**dropping** [1]             13:11
**due** [1]   15:17
**duplication** [1]  34:18
**during** [11]               5:1
5:7    5:24    6:17
24:7    26:2    28:24
34:21   48:8    48:17
55:24

**e-mail** [11]               8:7
8:10    16:13   19:1
23:11   26:4    26:6
26:12   27:12   27:14
32:8

**e-mails** [12]             4:17
6:9    6:12    6:21
8:10    8:11    9:18
9:20    9:22    23:6
31:2    32:6

**early** [2] 30:17   48:8
**earnest** [1]              58:19
**easily** [1]               18:19
**Ed** [1]   2:14
**EDWARD** [1]   1:20
**eight** [1] 52:15
**either** [6]               31:15
31:17   49:2    49:10
50:22   52:10

**elected** [2]              24:23
46:23
**ELECTRONIC** [1]
1:8
**elucidation** [1] 66:2
**embassy** [3]              49:2
49:3    49:12
**employed** [1]            50:13
**enable** [2]               45:18
45:22
**encourage** [1]            19:5
**end** [6]     11:13   13:11
47:15   51:2    51:3
61:16
**engage** [1]               12:6
**engaged** [2]             19:18
19:19
**engaging** [1]             67:1
**engineering** [7] 38:1
38:9    40:1    42:7
44:6    59:10   59:23
**entered** [2]              3:11
12:4
**entire** [1]               8:12
**entirely** [1]            63:13
**entitled** [12]           16:5
18:8    21:5    39:25

| 43:6 | 52:21 | 58:6 |
| 58:11 | 62:15 | 63:25 |
| 64:13 | 64:14 | |

**equipment** [4]            56:9
57:22   58:1    58:2
**Eric** [2]  2:4    2:21
**especially** [1]           28:4
**ESQ** [9]  1:18    1:18
1:20    1:20    1:21
2:2    2:3    2:4
2:4
**essence** [6]             26:13
34:21   34:25   37:7
40:18   55:21
**essentially** [1]         18:11
**establish** [1]           43:6
**established** [1]   27:24
**establishing** [1] 28:4
**estimate** [1]            23:5
**et** [4]    10:5    10:5
39:5    39:6
**event** [2]               10:23
26:21
**eventually** [1]          20:11
**everybody** [1]           24:22
**everyone's** [1]          21:22
**evidence** [6]            11:16
17:1    25:19   26:1
38:5    52:1
**exact** [2] 10:14   64:5
**exactly** [7]             40:7
42:5    44:18   47:9
48:10   60:10   66:5
**example** [3]              5:4
21:16   27:22
**examples** [1]            58:24
**except** [1]              47:13
**exception** [4]           27:20
27:23   28:11   28:13
**exchange** [4]            23:11
23:12   25:20   26:12
**Excluding** [1]           32:21
**exclusive** [1]           47:4
**exclusively** [1]  47:11
**exercise** [1]            40:5
**expect** [1]              39:9
**expectation** [1]  7:9
**expecting** [1]           11:13
**expedition** [1]   39:25
**experience** [1]          45:10
**expert** [8]              5:17
5:18    7:2    11:9
11:13   15:12   16:14
42:20
**experts** [1]             5:16
**explain** [1]             68:8
**explained** [1]           35:18
**explanation** [1] 34:3
**explicitly** [1]          5:24
**extended** [1]            12:7
**extent** [4]              22:24
24:11   32:8    47:1
**extraordinarily** [1]
45:12

**extraordinary** [1]
54:21
**eyes** [1]  45:19
**facie** [1] 27:24
**facilities** [1]           48:25
**facing** [1]              48:24
**fact** [17]  5:9    11:18
14:11   16:2    16:23
17:16   18:2    18:8
21:6    24:24   25:2
26:1    28:22   34:1
35:22   53:12   66:13
**factor** [1]              51:5
**facts** [3] 15:4    18:7
23:18
**factual** [1]             13:20
**fairly** [1]              48:8
**fall** [1]  64:6
**familiar** [2]            21:23
49:1
**far** [7]    33:15   49:25
56:18   58:6    59:6
66:25   67:10
**fashion** [1]             16:14
22:22   45:23   66:3
**fashioned** [2]    19:24
20:23
**favorable** [3]           7:7
7:14    26:15
**Federal** [2]             64:5
64:25
**fell** [1]  52:18
**few** [7]    27:8    30:8
32:1    53:20   54:11
59:15   67:25
**fight** [1] 58:17
**fighting** [1]            59:14
**file** [5]   7:18    26:24
54:7    62:12   62:13
**filed** [1] 5:6
**filters** [1]             58:4
**final** [3] 48:15   49:8
50:25
**finally** [1]             19:20
**financial** [1]           8:8
**finder** [1]              21:6
**fine** [3]  36:23   51:1
68:7
**Fineman** [2]             1:18
2:13
**finer** [1] 61:2
**Finger** [1]              1:19
**finish** [2]              55:5
64:19
**firm** [18] 4:17   5:4
5:11    5:19    6:10
6:22    13:2    13:8
13:22   14:19   15:3
16:13   21:2    21:10
22:5    22:5    22:17
26:22
**first** [23] 2:24    3:3
6:6    7:24    9:8
12:24   14:9    16:12
17:18   18:18   18:22

| 20:4 | 26:1 | 28:16 |
| 34:16 | 36:9 | 39:16 |
| 40:14 | 50:19 | 54:18 |
| 58:16 | 59:6 | 65:25 |

**fishing** [1]             39:25
**five** [1]  11:20
**five-minute** [1] 8:4
**flat** [1]  46:22
**flexible** [1]            51:10
**Florida** [2]             56:22
67:9
**flow** [3] 63:22    64:16
66:16
**flowing** [1]             17:3
**flurry** [2]              6:9
6:17
**focus** [1]               38:13
**follow** [1]              27:3
**following** [2]           26:4
26:12
**followup** [3]            6:12
7:18    26:4
**force** [1] 50:9
**foreign** [1]             57:3
**forgive** [1]             50:21
**form** [1] 66:4
**formally** [1]            48:12
**format** [1]              63:11
**formed** [4]              7:8
15:20   16:25   21:19
**forms** [1]               21:14
**formulated** [1] 59:11
**forth** [9] 8:13    8:19
9:18    12:16   12:25
27:10   33:21   34:3
40:25
**forward** [10]            7:3
7:10    15:13   19:16
30:20   34:24   35:1
45:14   48:7    66:13
**forwarded** [2]           32:9
**found** [2]               6:8
19:17
**foundation** [1] 28:17
**foundry** [1]             64:23
**four** [1]  58:18
**FRANCIS** [1]   2:2
**Frank** [1]               2:19
**frankly** [2]             61:4
61:5
**fraud** [1]               29:11
**Friday** [1]              56:11
**front** [2] 12:5    12:11
**fruits** [1]              20:21
**full** [1]  7:22
**fully** [3] 11:13   35:24
43:2
**functions** [1]           42:6
**future** [1]              67:19
**g** [4]    57:4    58:15
63:1    64:6
**Gary** [2] 1:20    2:14
**gather** [1]              17:25

**general** [6]             26:8
33:18   34:4    57:20
60:21   66:15
**generally** [1]   57:25
**generic** [1]             53:5
53:5
**genesis** [1]     17:18
**gist** [1]  53:4
**given** [6]               6:13
5:15    5:11    40:6
48:24   62:2
**goes** [6]  10:4    12:2
20:22   39:3    38:7
58:24
**gone** [4] 8:18    12:16
25:5    50:2
**good** [6] 2:10    2:11
2:17    19:15   59:12
64:21
**goodbye** [1]     19:16
**goods** [1]       64:25
**grant** [2] 62:12
**granted** [1]     34:4
**GRAPHICS** [1] 1:8
**great** [2] 33:24   42:5
**GREGORY** [1] 1:16
**grounds** [1]     55:20
**grown** [1]       45:15
**guess** [2]       50:20
57:4
**half** [2] 61:3    65:22
**handful** [2]     23:6
26:22   29:25
**handle** [2]      58:22
37:14
**handling** [2]    3:3
3:4
**hardware** [1]    39:1
**hats** [1] 43:19
**hear** [2] 43:11   58:12
68:10
**heard** [5]               23:12
50:19   55:10   59:7
60:25
**hearing** [7]             5:5
5:8    5:24    60:21
24:7    32:7    32:18
**help** [2] 61:12   67:18
**hey** [1]  19:13
**hire** [1]  5:21
**hired** [3] 5:25    16:3
18:9
**history** [2]             11:3
28:17
**Hoffman** [54]            5:20
2:14    2:15    3:2
8:15    11:3    12:20
18:13   18:16   20:13
20:19   21:12   22:12
28:15   28:22   30:12
30:15   30:19   31:4
31:17   31:18   33:3
33:6    37:16   38:16
40:14   40:20   41:2
42:9    42:12   42:14
43:15   44:11   47:19

47:24   49:19   51:1
51:15   60:3    60:21
61:10   61:19   61:25
62:3    62:9    62:15
63:6    64:10   65:7
66:8    66:19   67:2
67:18   68:1
**Honor** [82]      2:11
3:2     3:9     3:13
3:23    3:24    4:3
8:25    9:5     9:12
11:1    13:22   15:16
16:12   17:8    18:13
21:13   22:9    23:8
24:5    25:16   26:1
26:21   27:6    28:15
29:7    30:1    30:10
30:11   30:15   30:24
30:25   31:4    31:18
31:24   32:2    32:14
33:1    33:3    34:20
35:6    35:12   36:9
36:12   36:14   37:8
37:15   40:2    40:14
40:20   41:2    41:15
42:14   44:1    44:11
44:25   46:6    47:24
47:25   51:1    52:6
52:19   53:1    54:22
55:9    58:14   60:3
61:10   62:3    62:6
62:9    63:6    64:3
64:11   64:19   65:7
66:8    66:19   67:7
67:13   67:17   67:18
**Honor's** [1]      67:11
**HONORABLE** [1]
1:16
**hope** [5]  13:15   20:2
41:10   61:13   68:3
**horse** [1]      44:21
**hour** [1]  61:3
**hours** [3]      15:21
16:3    18:9
**Howrey** [40]      2:5
2:20    4:17    5:4
5:11    5:13    5:14
5:19    6:10    6:20
6:22    7:11    8:2
8:13    13:2    13:8
13:22   14:11   14:15
14:19   15:3    15:4
16:12   18:24   19:11
21:2    21:10   21:17
22:2    22:17   23:12
23:16   25:4    25:11
26:21   27:11   28:19
29:23   32:22   35:7
**Howrey's** [2]      17:14
26:11
**huge** [1]  44:7
**hundred** [1]      42:10
**hundred-percent** [1]
11:10
**Hutz** [1]  2:2
**i.e** [1]   54:12
**idea** [2]  26:17   53:7
**ideas** [1] 59:12
**identified** [10]      6:15
12:1    39:13   39:20

41:25   44:2    51:18
52:15   53:2    54:4
**identify** [3]      17:20
37:4    46:14
**imagine** [1]      22:19
**immediately** [1]
53:16
**impact** [1]      20:16
**impasse** [1]      47:21
**implicitly** [1]      50:1
**implies** [1]      52:17
**import** [1]      45:1
**important** [1]      11:1
14:15   15:23
**importantly** [1] 36:10
**imported** [3]      64:9
65:3    65:17
**in-depth** [1]      16:24
**inapplicable** [1]
57:4
**inartfully** [1]      54:23
**inaudible** [4]      39:19
42:21   56:12   59:3
**INC** [3]  1:7     1:8
1:9
**include** [4]      15:13
31:2    31:16   32:12
**included** [1]      8:24
**including** [2]      27:13
39:3
**inconsistencies** [3]
13:5    13:15   24:6
**inconsistency** [1]
5:23
**inconsistent** [5]
10:13   29:1    29:3
29:4    29:9
**INCORPORATED** [1]
1:7
**incumbent** [1]  45:16
**indeed** [1]      11:7
**indicate** [2]      34:1
34:5
**indicated** [17]      19:13
19:25   28:24   30:8
33:10   34:6    34:23
35:22   36:5    40:20
41:3    55:16   56:1
56:14   56:15   60:4
67:19
**indicating** [2]      20:8
50:1    57:8
**individuals** [1]  22:1
**indulgence** [1]  18:17
**inevitably** [1]  45:9
**inference** [1]      25:10
25:18   25:23
**information** [80]
6:1     6:2     6:11
6:14    6:17    6:19
6:25    7:21    8:5
8:6     8:7     8:8
11:7    11:8    11:11
11:16   11:18   11:21
13:3    13:9    13:20
14:11   15:6    17:3

18:1    18:5    19:9
19:10   19:22   19:23
21:18   22:2    23:4
23:15   23:25   24:25
25:2    25:20   26:3
26:20   28:6    28:9
28:19   28:25   33:21
36:13   36:14   37:3
38:5    41:12   42:15
42:17   42:23   43:3
43:5    43:6    43:21
43:22   44:12   45:2
45:3    45:6    45:8
45:11   45:12   45:18
45:23   47:10   50:7
50:8    51:25   53:11
54:9    55:17   56:23
61:21   63:19   65:10
65:13   66:15
**informed** [1]      15:11
**infringe** [5]      34:3
39:12   44:19   53:9
63:8
**infringement** [15]
34:2    35:18   35:23
36:2    36:3    38:15
39:15   41:25   46:20
47:2    53:8    55:21
63:10   63:10   63:23
**infringing** [2]      39:24
46:10
**inhibitor** [1]      63:15
**initial** [8]      51:19
52:8    52:9    52:23
53:6    54:20   54:23
65:15
**initiated** [1]      4:1
**innocent** [1]      24:10
**input** [3] 39:17   45:5
54:5
**inputs** [5]      40:7
42:1    42:2    45:4
47:14
**inputting** [1]      42:23
**inquire** [3]      15:18
16:6    28:1
**inquiry** [1]      13:19
26:3    28:8
**inside** [1]  63:9
**Insofar** [1]      41:10
**inspection** [2]      4:13
29:15
**installation** [1] 39:4
**instance** [1]      27:22
51:8
**Instead** [1]      46:23
**instructed** [1]  47:19
**integrated** [1]  56:4
**intend** [3]      15:11
15:12   48:17
**intended** [1]      12:7
**intending** [1]  46:5
**intent** [1]      24:8
31:16
**interest** [2]      33:12
43:10
**interested** [4]      30:13

40:17   40:24   45:24
**interim** [1]      66:8
**internal** [17]      4:19
6:20    9:23    13:25
17:14   18:1    18:20
25:10   26:22   27:1
29:22   30:13   31:21
31:24   32:21   42:6
46:19
**INTERNATIONAL**
[1]      1:9
**interpretation** [2]
7:17    14:4
**interrogatories** [4]
37:18   37:19   55:14
58:5
**interrogatory** [5]
39:14   46:13   54:4
55:11   57:10
**interrupt** [3]      3:14
14:18   22:10
**invalidating** [1]
17:17
**invalidity** [1]  53:10
**invention** [1]  15:24
**inventors** [1]  48:4
50:8
**invested** [2]      61:3
61:5
**involved** [5]      22:2
35:8    35:9    40:8
60:13
**involves** [1]  34:5
**involving** [1]  54:19
**issue** [42]      4:2
7:16    10:9    12:24
13:1    13:16   14:3
14:6    18:18   18:23
20:20   20:21   20:22
21:11   21:12   22:25
29:7    29:11   31:19
33:22   35:14   35:16
35:23   37:18   38:6
38:11   38:21   39:7
39:10   42:12   45:13
45:16   46:6    48:4
54:19   56:25   58:15
59:18   62:18   62:25
66:1    66:10
**issued** [2]      32:17
33:7
**issues** [8]      16:21
21:13   22:21   27:13
37:16   38:14   66:9
66:11
**item** [4] 3:3     3:8
3:9     48:1
**items** [5]      2:25
3:4     3:4     51:18
61:6
**J** [1]     1:18
**January** [1]      48:25
**Japan** [7]      48:6
48:19   48:21   49:2
49:10   50:12   51:6
**judgment** [2]      62:14
64:13
**July** [20] 3:11   4:7

6:6     6:6     6:12
7:17    7:25    8:14
8:23    9:1     11:4
12:4    16:12   26:23
29:14   30:17   31:6
31:9    32:5    32:18
**juncture** [1]      21:11
**June** [5]  5:5     30:18
30:19   31:8    32:18
**jurisdiction** [1] 35:14
**keep** [4]  3:6     43:8
43:9    55:19
**Kelley** [59]      3:4
2:21    2:25    5:1
5:7     5:23    6:23
7:25    12:22   13:6
23:5    24:6    29:17
30:7    30:9    30:10
37:15   37:24   40:18
41:10   41:14   41:17
41:24   46:3    46:4
47:25   48:3    49:15
50:16   50:18   51:5
53:1    55:15   55:19
56:1    56:14   57:8
58:5    58:14   60:11
60:22   61:9    62:6
62:18   62:20   62:24
64:3    64:18   64:19
65:21   66:13   66:20
67:13   67:19   67:22
67:23   68:2    68:3
68:6
**Ken** [1]  2:15
**KENNETH** [1] 1:21
**Kevin** [1]      68:15
**key** [4]  17:17   38:14
39:11   45:8
**kicking** [1]      59:12
**kind** [8] 10:16   26:5
38:17   39:8    40:6
47:5    53:25   59:2
**knew** [7]      13:23
18:24   21:17   23:25
24:22   53:15   56:15
**knowing** [2]      40:17
45:24
**knowledge** [3]  13:2
48:19   57:9
**known** [1]      34:19
**knows** [1]      36:21
**Kobayashi** [1] 48:5
48:6    48:18   50:12
**lack** [1]  50:1
**laid** [1]  32:10
**language** [6]      8:4
9:2     9:6     17:12
37:25   45:18
**largest** [1]      44:4
**last** [6]  32:16   51:9
51:14   54:11   56:11
58:17
**late** [4]  5:5     30:18
30:19   50:15
**law** [4]  10:24   41:20
45:15   64:2
**lawyer** [1]      05:24

**lays** [1] 28:17
**Layton** [3] 1:19
2:12 2:13
**lead** [3] 17:8 18:13
52:1
**leading** [2] 31:2
53:20
**leads** [2] 24:9 26:14
**learned** [1] 18:2
**least** [7] 21:10 24:12
24:15 27:15 27:24
50:1 51:13 56:16
66:10
**led** [2] 5:14 19:19
**left** [1] 68:4
**legal** [1] 28:23
**legitimate** [1] 38:17
**less** [5] 15:8 20:3
33:17 40:15 60:16
**letter** [9] 6:5 9:21
10:15 12:3 13:22
26:24 52:17 57:7
62:12
**letters** [3] 4:17
7:18 27:8
**levels** [1] 45:19
**libraries** [1] 39:2
**library** [4] 39:18
40:9 42:3 54:6
**likelihood** [1] 51:11
**likely** [2] 14:12
52:15
**limit** [3] 41:3 59:15
59:16
**limitation** [2] 60:1
60:19
**limitations** [1] 44:17
**limited** [5] 22:18
39:10 39:11 44:13
66:4
**limiting** [1] 57:14
**line** [3] 2:20 12:11
55:4
**list** [12] 20:9 21:22
22:8 22:13 22:17
26:8 36:22 52:10
52:20 52:21 52:23
64:22
**listed** [6] 50:6
51:21 52:7 52:7
52:19 52:22
**listen** [1] 21:17
**listing** [1] 8:7
**literature** [1] 56:9
**litigation** [10] 5:16
15:9 16:1 16:5
21:9 22:14 33:9
36:8 38:3 45:13
**live** [1] 48:19
**lives** [2] 49:6 50:12
**LLP** [3] 1:21 2:2
2:5
**located** [1] 56:24
**lock** [2] 15:25 16:4
**Lodge** [1] 2:2

**log** [8] 4:15 4:20
10:7 12:19 20:9
20:12 22:8 27:1
**logic** [14] 53:24
53:25 54:5 54:12
56:8 57:15 59:9
59:17 59:20 59:21
60:7 60:14 62:21
62:22
**look** [5] 37:21 46:13
66:2 67:2 68:9
**looking** [9] 6:22
6:25 13:24 22:7
32:6 60:3 60:7
60:9 60:15
**looks** [2] 16:17
37:10
**LTD** [1] 1:4 1:8
**M** [3] 1:16 1:20
2:3
**major** [1] 17:16
18:10
**makes** [5] 29:23
57:3 64:4 64:20
64:25
**manner** [4] 39:10
39:11 39:24 61:4
**manuals** [6] 39:4
39:4 39:5 39:5
40:6 42:10
**manufacture** [1]
58:23
**manufacturing** [15]
60:5 63:7 63:21
63:24 64:4 64:6
64:7 64:11 64:15
64:16 64:25 65:11
65:12 65:16 65:17
**map** [1] 54:6
**marketing** [1] 53:3
**Markman** [2] 55:22
55:25
**material** [4] 11:23
28:7 46:1 62:7
**materials** [4] 53:3
53:3 53:15 53:19
**Matrox** [15] 1:8
1:8 1:9 1:9
56:22 57:1 62:7
65:20 66:10 66:17
66:25 67:8 67:8
67:8 67:11
**matter** [4] 7:4
35:16 47:20 48:3
**matters** [1] 61:4
61:15 61:17
**Maurer** [1]
68:15
**may** [36] 14:2 14:21
14:23 14:24 14:25
16:2 19:24 20:2
20:11 20:15 20:16
20:19 20:19 20:21
21:4 21:16 21:25
22:1 22:5 24:15
24:19 26:24 29:10
30:5 33:20 33:25
34:13 38:2 51:20
54:25 55:14 57:4

58:9 61:12 64:19
67:18
**mean** [4] 3:13 10:9
14:20 16:3
**means** [1] 10:11
**meant** [2] 37:19
59:8
**mechanical** [1] 65:2
**meeting** [1] 47:7
**meetings** [1] 53:3
**Meilman** [13] 1:20
2:14 3:4 35:20
55:9 55:13 58:9
59:5 60:4 62:6
65:23 67:7 67:17
**memos** [1] 59:23
**Menlo** [1] 2:5
**mention** [1] 46:17
**mentioned** [7] 24:1
32:16 35:12 41:17
41:20 45:1 59:16
**merits** [2] 20:18
21:7
**Messrs** [1] 2:14
**method** [1] 63:18
**methods** [1] 52:5
**mid-September** [1]
68:2
**might** [4] 7:20
39:8 50:7 66:1
**mind** [3] 3:7 19:4
32:25
**minute** [3] 37:25
57:5 58:15
**minutes** [1] 11:20
**missed** [1] 32:15
**misunderstood** [1]
23:21
**moment** [1] 43:18
**month** [1] 55:15
**Monti** [1] 11:2
**Morin** [1] 1:21
**morning** [4] 2:10
2:11 2:16 2:17
**most** [5] 18:3 18:4
22:12 45:2 45:7
**motion** [3] 20:24
33:21 46:8
**mouth** [1] 24:16
**movant** [1] 3:16
3:18
**movants** [2] 3:22
4:2
**move** [1] 55:8
**moving** [1] 16:22
**Mower** [1] 52:14
**Ms** [32] 18:14
22:9 22:11 22:24
23:1 23:8 23:12
23:24 24:17 25:3
25:14 25:16 25:24
29:19 29:22 30:3
30:4 30:24 31:4
31:13 32:14 32:21
32:25 33:9 34:21

44:1 44:25 46:2
54:22 54:25 55:2
**multiple** [1] 5:2
**must** [2] 15:3 49:2
**named** [1] 5:17
**namely** [3] 4:19
42:1 46:15
**names** [1] 5:15
**narrow** [3] 44:10
54:10 57:15
**narrowed** [2] 56:1
56:6
**narrowing** [1] 53:22
**nature** [3] 6:7
12:23 38:11
**necessary** [4] 17:20
45:17 47:18 67:3
**need** [18] 7:10
20:4 31:5 35:17
38:4 41:21 42:4
42:8 45:4 45:17
47:9 47:10 47:11
54:24 59:7 63:14
66:2 68:8
**needs** [2] 13:20
45:13
**negotiating** [1] 35:8
**negotiation** [1] 53:20
**net** [1] 64:22
**never** [5] 5:5
10:19 15:17 15:21
65:11
**new** [1] 45:17
**next** [6] 8:23 35:12
36:17 41:24 61:16
61:16
**nice** [1] 19:14
**non-confidential** [1]
34:7 41:8
**non-Matrox** [1] 67:15
**non-starter** [1] 62:11
**none** [2] 8:9 59:24
**nor** [1] 31:24
**normally** [1] 22:13
47:14
**note** [2] 14:15 53:10
**noted** [1] 9:24
12:20
**nothing** [5] 10:6
10:7 34:8 47:12
65:11
**notices** [1] 5:6
**now** [22] 6:20 13:7
15:7 20:24 22:7
25:17 31:7 32:25
38:2 41:10 44:1
45:1 45:24 46:10
46:24 50:3 59:5
59:14 59:18 60:25
61:3 61:16
**number** [8] 21:25
22:18 29:2 30:8
34:15 40:3 60:23
61:12
**numerous** [1] 49:21
**object** [5] 35:25

37:2 51:24 52:2
61:20
**objected** [8] 6:8
6:18 33:14 35:5
35:13 35:18 36:5
59:1
**objecting** [1] 35:20
**objection** [5] 34:16
36:17 40:17 41:18
43:11
**objections** [2] 34:15
35:19 37:17 38:11
61:2 67:10
**obligated** [1] 36:25
**obligations** [2] 3:11
46:12
**obtain** [3] 21:19
36:21 36:23
**obtainable** [1] 36:19
**obtained** [3] 33:3
29:5 36:6
**obtaining** [1] 36:7
**obviously** [1] 7:6
29:1 32:8 34:10
36:14 43:3 44:24
47:21 50:4 51:7
52:9
**occurred** [1] 24:10
**off** [6] 21:22 36:7
47:16 60:22 64:23
68:6
**often** [2] 10:21 22:12
**oftentimes** [1] 45:11
**Oliver** [2] 2:4
2:21
**once** [9] 11:1 11:4
11:6 11:7 18:25
19:13 20:11 22:13
58:19
**one** [37] 3:16 8:5
11:5 11:5 11:19
11:22 17:16 18:25
20:5 21:24 21:25
24:12 26:17 28:6
28:16 29:17 34:20
39:8 39:9 41:19
48:15 49:2 49:11
50:7 50:9 55:4
56:21 57:21 57:21
60:25 61:1 61:11
63:20 64:7 65:14
67:8 68:10
**ones** [2] 3:14 3:15
59:1
**operates** [1] 43:1
**operation** [5] 43:5
53:25 65:11 65:16
65:17
**operations** [1] 52:4
**opinion** [5] 5:10
7:13 15:18 17:1
28:23
**opinions** [9] 5:10
7:9 14:13 5:14
15:19 16:25 17:7
21:19 26:19
**opponent** [1] 65:4

opportunity [4] 49:4
49:11  50:23  66:6
orally [1]         12:4
order [33]          3:11
4:7      4:22    7:17
8:20     8:23    9:1
9:2     10:18  10:23
12:3    14:3   17:11
17:22   22:16  26:23
29:14   33:4   35:7
35:9    35:11  36:16
38:21   38:22  40:9
41:13   43:15  45:13
61:24   62:1   64:6
66:25   67:11
ordered [8]        8:16
8:19     9:9     9:12
9:14    26:21  29:16
61:18
orders [1]        45:14
Osaka [3]         49:4
49:6    49:11
Oshinsky [1]       1:21
ought [1]          13:7
ourselves [2]      4:1
21:16   26:6
outlining [1]      8:20
output [6]        39:19
39:19   40:9   42:3
47:16   54:6
outset [1]        14:16
outside [1]       63:2
63:3    63:7
overall [1]       20:22
overbreadth [1]   44:7
overcome [1]      51:8
overly [1]        40:19
own [1]           61:7
p.m [1]          68:13
Page [3] 6:24    12:11
12:20
pages [4]         33:17
40:15   42:10  60:17
paper [1]         9:18
papers [1]       53:13
paragraph [8]      4:7
7:17     9:7     9:7
10:1    10:2   12:1
12:13
parameters [3]   31:7
31:12   40:12
Park [1]  2:5
part [20] 4:16    9:12
16:4    17:14  21:13
33:14   33:22  33:25
34:5    38:14  42:24
42:25   43:1   51:23
55:10   63:14  63:20
64:10   64:15  65:16
particular [8]    17:20
18:2    18:6   30:6
45:1    45:3   45:5
60:12
particularly [1] 17:13
parties [11]       3:10
3:19    36:8   37:3
37:4    37:5   47:8

47:19   51:11  53:19
58:18
parts [4] 39:11   42:19
42:21   44:18
party [16]       15:23
16:6    33:9   33:12
38:2    38:5   39:9
41:18   41:21  43:9
43:10   43:10  46:11
46:11   49:20  50:9
past [1]  53:20
patent [10]       17:2
17:18   35:18  48:4
54:13   56:2   60:13
63:2    63:8   63:23
patents [1]       8:8
pay [1]  5:21
people [6]        22:12
28:19   57:9   59:12
62:7    62:16
percent [1]       44:5
performed [3]     39:16
42:6    53:25
perhaps [1]       51:10
54:24
period [5]        8:4
21:22   32:20  51:11
67:2
peripheral [1]    47:4
permission [2]    62:12
62:13
permit [1]        51:11
person [1]        18:5
personal [1]      23:2
30:4
pertains [2]      20:18
21:7
phone [7]         6:12
24:12   26:7   26:10
32:5    32:6   49:11
phonetic [1]      11:2
52:14
phrase [3]        8:24
10:13   50:21
phrases [1]       53:2
physical [3]      64:8
64:21   65:2
picture [1]       7:22
piece [7]9:17     18:10
30:6    55:18  55:18
63:19   65:10
pieces [3]        11:8
17:17   25:25
ping-pong [1]     40:25
place [4]3:25     12:6
19:23   49:2
plaintiff [1]     1:5
1:23    2:12   26:14
44:9    45:22  46:1
50:6
plaintiffs [1]    4:14
5:6     5:13
planning [1]      59:23
plant [3] 56:14   56:23
67:9
play [2] 33:25    34:13

point [23]        13:17
15:3    15:9   20:10
20:11   21:3   21:13
23:2    23:8   24:1
29:17   29:18  34:4
41:5    41:24  43:23
44:3    44:8   48:23
61:2    61:6   64:20
66:5
points [3]        5:2
23:10   28:16
poison [1]        20:5
poisonous [1]     20:21
portion [2]       5:6
65:8
position [9]      20:14
23:18   24:15  25:7
25:15   28:13  28:12
33:11   63:25
positions [1]     34:2
possession [2]    40:1
47:4
possibility [3]   22:4
22:5    24:19
possible [1]      28:8
53:12
postponed [1]     26:25
potential [4]     20:17
21:14   22:25  29:11
pre [1]  60:11
precisely [2]     10:15
10:16
precluded [1]     16:20
preparation [2]   31:14
32:22
prepare [1]       8:20
prepared [4]      4:10
9:15    10:3   53:6
preparing [1]     31:25
32:3
present [2]       30:21
43:5
presumably [1]    25:11
presume [1]       33:3
50:8    62:15
pretty [1]        58:4
prevail [1]       62:25
prevent [1]       16:4
previously [1]    33:10
prima [1]         27:24
primary [1]       4:1
principal [2]     2:16
21:3
privilege [12]    4:12
4:15    4:20   10:6
10:7    10:21  14:1
20:9    22:8   27:1
27:20   27:21
privileged [11]   9:25
10:20   10:22  11:20
14:7    14:10  22:13
22:18   27:17  28:1
28:9
problem [10]      17:11
19:11   19:21  20:5
21:21   44:7   44:9

48:24   54:22  54:25
proceed [1]       24:23
33:4    45:14  47:7
proceeded [2]     24:2
24:20
process [40]      27:2
42:24   42:25  43:1
46:16   47:15  53:24
54:13   54:17  56:3
56:8    56:12  56:20
57:2    57:14  59:6
59:8    60:5   62:21
63:6    63:8   63:21
63:21   63:23  63:24
64:4    64:6   64:7
64:11   64:15  64:21
64:22   64:24  65:1
65:2    65:2   65:10
66:14   67:1   67:14
processes [7]     56:7
56:9    56:17  57:13
57:16   60:12  60:14
produce [37]      4:9
4:19    6:20   8:18
9:14    10:3   10:7
10:16   10:18  10:19
12:15   23:7   23:11
26:22   34:18  35:1
35:4    35:17  38:3
39:1    39:19  39:24
40:4    40:9   41:6
42:3    49:25  50:11
51:16   51:17  51:23
53:22   54:6   57:20
58:20   58:21  64:23
produced [25]     5:10
8:11    9:17   10:12
27:11   29:16  33:15
33:16   34:17  35:3
35:10   38:1   38:10
40:4    40:15  42:9
43:24   53:12  53:14
53:15   60:16  64:21
67:21   67:25  68:1
produces [2]      64:22
64:24
producing [1]     10:2
53:16
product [21]      4:12
12:17   17:15  38:1
38:10   38:14  39:23
44:4    45:3   45:8
46:25   53:2   54:1
59:4    59:11  59:13
59:22   63:7   65:12
65:15   65:17
production [10]   10:1
10:14   22:25  27:7
29:14   38:4   41:11
54:20   57:3   67:23
products [19]     34:11
34:12   34:13  39:10
39:11   41:7   52:5
53:23   57:12  57:18
58:10   58:24  59:3
59:16   59:16  59:17
59:21   63:22  64:16
program [1]       33:24
progression [1]   47:1

promotional [1]
53:3
proper [4]        38:8
41:11   47:7   47:8
properly [2]      40:22
54:10
propose [1]       65:23
proposed [1]      60:20
proposing [1]     30:16
proposition [3]   65:6
65:8    65:9
prosecute [1]     45:22
protect [1]       26:6
43:14
protective [10]   35:7
35:9    35:11  36:15
38:22   41:13  43:15
45:14   61:24  62:1
prove [1]         43:3
43:7    44:22
provide [12]      1:14
17:23   22:12  22:17
34:12   36:12  36:25
37:9    37:12  42:1
53:9    56:11
provided [8]      3:6
7:21    11:12  13:13
22:20   33:20  36:15
36:15
provides [2]      26:23
57:22
providing [1]     39:17
47:14   54:4
provisions [1]    57:3
public [2]        36:18
42:4
publications [1]
8:8
publicly [3]      34:7
36:20   36:24
purpose [1]       52:9
purposes [1]      34:17
pursuant [1]      34:8
pursue [1]        54:8
pursuit [1]       44:13
26:11
push [1] 55:25
pushed [1]        34:10
put [4]  10:7    55:25
24:16   61:1
putting [1]       58:21
44:21   46:15
questioned [1]    25:23
questions [1]     34:12
26:1    56:25
quickly [3]       41:1
53:11   67:24
quite [5] 22:12   13:4
61:4    61:4   65:1
quote [4]         1:21
12:13   12:13  28:5
raise [1] 29:17
raised [6]        54:20
34:16   35:20  34:24
62:10

**raising** [1]              62:7
**range** [1]               42:12
**rather** [1]              41:1
**rattled** [1]             60:22
**react** [1] 40:17
**read** [11] 12:12    22:16
  26:5    38:23    38:25
  40:22    51:16    58:20
  65:8    65:25    66:6
**reading** [1]             10:15
  58:21
**real** [7]    33:12    37:18
  38:6    38:11    38:13
  39:7    43:10
**really** [10]            12:6
  17:24    38:16    40:18
  40:24    42:4    46:20
  47:2    54:14    59:7
**reason** [2]             35:4
  41:17
**reasonable** [1]    27:25
**reasonably** [2]    39:8
  51:25
**recapping** [1]         32:5
**receive** [3]           11:11
  28:25    45:23
**received** [17]         4:10
  4:16    4:16    5:25
  6:14    9:15    10:3
  11:2    11:4    11:7
  14:11    24:25    25:2
  25:3    28:19    32:9
  48:14
**recipient** [1]         27:15
**recited** [1]           37:16
**recognize** [1]        45:16
**recognized** [1]       14:15
**recollection** [1] 12:9
**recommendation** [1]
  27:3
**record** [2]           24:17
  36:18
**recorded** [1]         37:17
**records** [1]          56:24
**reduce** [1]           41:22
**refer** [1] 53:13
**reference** [4]         6:23
  29:23    39:3    44:3
**references** [1]       12:11
**referred** [1]         56:5
**reflect** [1]          14:10
  25:11
**reflections** [1]     12:8
**refused** [4]          4:18
  37:5    55:25    57:6
**refuses** [1]          6:20
**regard** [2]          20:25
  27:7    51:17    68:5
**regarding** [14]     10:24
  18:20    21:7    21:8
  27:13    27:14    30:13
  31:3    31:25    33:22
  41:23    45:8    52:4
  64:2
**regular** [1]          47:14

**relate** [6]           7:19
  20:19    20:20    20:21
  37:17    60:5
**related** [3]           38:6
  54:20    55:11
**relates** [3]          12:13
  35:23    62:21
**relating** [24]         4:9
  9:11    9:13    10:10
  10:12    12:2    17:14
  17:23    20:14    31:1
  32:2    33:23    38:1
  38:9    38:22    39:22
  39:23    41:7    44:6
  47:11    53:19    53:23
  59:20    60:8
**relationship** [2] 24:20
  24:23
**relatively** [3]       30:8
  48:3    53:2
**released** [1]         61:7
**relevance** [3]       43:12
  43:21    52:4
**relevant** [11]        18:3
  18:4    38:15    52:13
  52:16    52:18    52:20
  52:20    52:22    54:16
  59:9
**relief** [11]           3:20
  19:24    20:3    20:7
  20:20    20:23    20:25
  21:14    21:15    22:21
  22:22
**rely** [1]  51:22
**relying** [2]          28:23
  63:12
**remainder** [1]        3:1
**remaining** [2]       54:14
  59:18
**remains** [1]         17:16
**remedies** [1]         7:20
**remedy** [1]           7:22
**remember** [2]        26:10
  28:21
**remove** [1]          43:18
**Reporter** [1]        68:15
**represent** [1]       49:20
**representation** [2]
  28:18    30:5
**representations** [5]
  5:1    29:1    29:2
  29:4    29:8
**represented** [1] 7:25
**representing** [2]
  13:6    48:9
**represents** [1]      35:7
**request** [16]         8:15
  12:12    33:7    38:18
  40:19    40:22    41:3
  44:10    51:17    51:24
  52:2    52:11    54:11
  56:6    57:11    58:21
**requested** [2]        6:21
  52:11
**requests** [19]        8:20
  37:20    37:21    38:9
  38:13    38:20    38:22

**39:22    40:3    49:22**
  54:8    54:14    55:14
  55:14    58:5    58:16
  58:19    59:19    61:2
**require** [4]          10:19
  17:23    17:25    22:16
**required** [5]          8:2
  8:16    9:25    12:14
  38:2
**requires** [1]          4:8
  37:10
**resolve** [4]          7:10
  55:16    61:2    66:10
**respect** [4]          3:10
  13:2    31:19    44:7
**respond** [5]          7:10
  28:16    30:15    47:19
  48:13    49:21    54:10
**responded** [2]        8:6
  50:20
**response** [6]        16:12
  40:4    50:1    51:23
  52:13    52:25
**responses** [2]       37:17
  56:25
**responsibilities** [1]
  27:5
**restrict** [3]         39:21
  54:2    56:15
**restricted** [1]      59:19
**rests** [1] 47:2
**result** [7]            7:8
  7:14    15:14    16:25
  17:4    21:20    26:18
**retain** [1]           11:9
  15:11    31:19    31:23
**retained** [1]         6:5
**retention** [5]        6:5
  18:21    21:9    30:14
  32:10
**return** [1]           28:16
**reveal** [1]           20:15
**revenue** [1]          44:5
**review** [4]           10:20
  10:22    10:25    28:2
**reviews** [1]          29:15
**revisit** [1]          47:22
**Richards** [3]         1:13
  2:12    2:13
**Ricoh** [44]            1:4
  2:12    2:14    3:2
  5:9    5:12    5:14
  5:17    5:21    6:2
  6:15    6:18    7:5
  7:8    7:15    10:11
  13:4    13:14    14:17
  15:15    15:20    15:25
  16:2    16:7    16:18
  16:25    18:14    19:1
  19:6    19:10    19:14
  26:18    27:9    28:3
  28:20    29:1    33:7
  40:13    48:5    50:2
  50:13    59:15    60:2
  63:5
**Ricoh's** [2]          8:19
  23:18

**right** [7] 9:9         11:12
  20:24    22:17    45:24
  48:10    55:13
**ROBERT** [1]          1:18
**rolling** [1]          67:23
**roster** [1]            3:6
**rug** [1]  62:8
**Rule** [2]  55:13    55:24
**rules** [2] 16:13    42:20
**runs** [1] 20:5
**sale** [1]  58:23
**Sales** [1] 53:4
**sanctions** [1]        22:1
**says** [9]  9:3        9:8
  9:10    9:10    10:2
  10:3    11:21    38:25
  40:18
**schedule** [1]        66:21
**scheduling** [2]     33:11
  34:21
**scope** [10]           10:14
  18:18    27:7    29:19
  29:21    40:19    41:11
  44:13    59:19    66:11
**second** [9]            4:7
  5:23    9:14    10:13
  12:13    13:1    14:10
  33:6    39:17
**Section** [1]         51:18
**see** [11]  14:24    14:25
  17:11    17:24    20:12
  40:12    48:10    48:12
  49:22    62:17    65:4
**seek** [4]  19:22    20:1
  20:7    63:2
**seeking** [7]          3:20
  7:13    12:22    19:25
  51:25    62:13    62:20
**seeks** [1]            52:3
**seem** [3] 12:8        23:9
  56:24
**select** [1]           40:9
**selects** [1]          42:3
**self-serving** [1] 26:5
**SEMICONDUCTOR**
  [1]      1:7
**send** [3]  19:5      19:7
  20:9
**sense** [1]           10:19
**sensitive** [3]       45:2
  45:7    45:12
**sent** [10] 4:10      6:6
  9:15    9:18    10:3
  13:22    16:13    30:17
  32:8    64:23
**sentence** [2]         9:3
  9:8
**September** [2]       50:15
  50:15
**series** [1]          65:14
**served** [5]           5:5
  33:7    33:13    51:19
  55:14
**service** [1]         48:12
**serving** [1]         17:19

**set** [4]   33:21    34:3
  50:15    65:1
**seven** [2]            8:11
  9:20
**sever** [1] 5:20
**several** [3]         37:16
  42:10    59:1
**shall** [1] 4:14
**Shapiro** [1]         1:21
**share** [2] 11:21     28:5
  28:23
**shared** [2]         45:13
  45:19
**shield** [1]          48:9
**Shindo** [9]          48:5
  48:9    48:15    48:18
  48:20    49:6    49:9
  49:19    50:7
**short** [3] 8:7        34:2
**shortly** [1]         68:10
**show** [5] 5:10      14:23
  23:14    50:5    64:15
**shred** [2]           41:15
  11:16
**side** [7]  4:21      15:4
  15:5    23:13    30:23
  52:11    58:13
**sign** [1]  8:21
**signed** [3]           6:6
  19:7    19:8
**significant** [1]     18:23
**Simon** [13]           2:5
  2:20    8:2    8:13
  18:24    19:11    21:17
  22:2    22:17    23:16
  25:4    27:12    35:7
**simple** [2]          19:12
  48:3
**simplify** [2]        30:16
  31:23
**simply** [2]          60:6
  36:4
**single** [4]           3:5
  9:17    27:14    51:16
**sit** [1]  49:24
**situation** [5]       37:10
  22:15    50:17    50:18
  63:21
**six** [2]   8:11      9:20
**SLEET** [1]           1:16
**software** [2]        13:19
  39:1
**sole** [1]  7:11
**solely** [1]          5:14
**someone** [4]        21:21
  23:3    37:22    50:7
**sometime** [1]       50:24
**sometimes** [2]      53:13
  55:4
**somewhat** [4]       33:10
  27:7    28:7    44:10
**sorry** [5] 3:19      14:8
  22:11    25:5    39:3
**sort** [8]  11:17     21:9
  17:6    20:6    33:4
  58:24    66:9    66:17

**sorted** [1]              21:15
**sought** [2]             13:8
  34:21
**sounds** [1]             27:19
**source** [3]             38:7
  45:21    45:25
**sourcecode** [5]   42:5
  42:16   44:13   44:25
  45:7
**sourcecodes** [1] 39:5
**sources** [4]            36:19
  36:25   42:13   43:14
**sourcing** [3]          43:13
**space** [1]               49:4
**speak** [1]              60:25
**SPEAKER** [3]   30:1
  30:18   31:8
**speaking** [2]         32:16
  60:25
**special** [1]            22:14
**specific** [5]          25:25
  31:17   37:25   39:22
  56:4
**specifically** [4] 5:11
  5:13   26:9   57:21
**specification** [3]
  59:10   59:10   59:22
**specificity** [1]    25:12
**specifics** [1]      26:10
**spelled** [1]           38:16
**spend** [1]             55:7
**spirit** [2]             12:3
  43:20
**spokesperson** [1]
  2:16
**stands** [3]            65:5
  65:8   65:9
**start** [4]   3:8      3:18
  34:20   62:7
**started** [2]          53:11
  53:16
**starting** [1]         41:5
**starts** [2]            18:22
  22:14
**state** [3]  40:2     40:8
  64:2
**statement** [3]       53:7
  64:2   65:5
**statements** [2]   25:19
  53:4
**States** [10]            1:1
  48:20   49:12   63:3
  63:3   63:8   63:9
  63:22   64:17   65:18
**stating** [2]          11:16
**stay** [3]  34:22    46:8
**step** [1]   25:6
**steps** [9] 39:15   39:15
  39:22   40:8   54:3
  57:2   57:5   65:15
  65:15
**Steven** [2]           1:18
  2:13
**still** [9]   7:3      13:12
  16:2   18:8   25:18

36:25   44:5    44:6
47:20
**stonewalling** [2]
  37:8   40:5
**story** [1] 5:3
**strategy** [3]          6:1
  31:3   32:2
**strictly** [1]          63:14
**stuff** [7] 46:15   46:18
  47:12   53:17   59:7
  66:16   67:24
**subject** [3]           7:4
  35:16   66:3
**subjects** [1]          7:4
**submission** [1] 26:25
**submit** [2]            9:1
  38:8
**submitted** [3]       4:13
  8:23   12:18
**subpoena** [15]       5:5
  5:14   5:15   17:19
  19:17   30:17   30:20
  32:17   33:7   33:13
  33:14   35:15   35:15
  48:11   49:23
**subsequent** [1] 12:3
**subsequently** [2]
  8:19   19:4
**subset** [1]           55:1
**substance** [3]     21:9
  32:10   63:15
**substeps** [1]       56:20
**successful** [1]     53:21
**such** [3]  6:7       27:20
  42:19
**suddenly** [1]        6:8
**sue** [1]  46:23
**sued** [1] 46:23
**suggest** [1]         52:16
**suggesting** [3]    21:1
  46:10   66:22
**suit** [1]  56:2
**summary** [3]       62:13
  63:11   64:13
**suppliers** [1]      57:18
**support** [3]        29:10
  51:22   62:13
**supports** [1]        25:10
**supposed** [2]       8:25
  10:16
**Supreme** [1]       27:23
**suspect** [1]          2:15
**sweep** [1]            13:14
**swept** [1]            62:8
**Synopsis'** [1]     46:25
**Synopsys** [25]    33:8
  33:8   33:11   33:13
  33:19   34:6   34:15
  34:24   35:8   35:13
  36:14   38:2   38:2
  38:10   38:14   42:17
  43:8   44:4   44:11
  46:9   46:11   46:23
  47:5   61:14   61:22
**Synopsys'** [1]    40:1

46:23
**synthesis** [14]    53:24
  53:25   54:5   54:12
  56:8   57:15   59:9
  59:17   59:20   59:21
  60:7   60:14   62:21
  62:22
**system** [1]         42:25
**systems** [5]          1:8
  33:19   39:2   42:20
  60:6
**table** [1] 41:1
**tainted** [5]          17:5
  17:6   17:7   20:15
  21:4
**takes** [4] 42:2    47:15
  49:2   66:6
**talks** [2] 10:2    10:14
**tangible** [1]        51:18
**target** [1]          16:22
**Tech** [4] 1:9     56:22
  67:9   67:11
**technical** [2]       39:3
  39:4
**technology** [1]   18:6
**tedious** [1]          33:8
**teleconference** [6]
  8:1   8:14   9:12
  9:16   31:2   68:13
**telephone** [7]    1:14
  6:9   25:13   26:2
  31:6   31:25   32:3
**telling** [2]          16:23
  36:2
**ten** [1]  50:2
**Teresa** [1]          2:3
  2:21
**term** [1] 67:7
**terminate** [1]      19:6
**terms** [1]           41:12
**testified** [7]       6:13
  7:7   11:19   16:16
  16:25   25:1   28:25
**testify** [1]         26:9
**testifying** [1]     21:8
**testimony** [12]  5:17
  5:20   7:12   7:13
  13:6   17:19   20:18
  23:14   24:7   24:9
  26:15   29:6   24:9
**text** [1] 38:19
**thank** [8]            4:6
  19:14   30:24   33:1
  47:15   62:3   67:17
  68:11
**themselves** [1] 60:8
**theoretically** [1]
  51:13
**theory** [6]          13:9
  38:15   46:20   53:8
  55:21   63:1
**thinking** [1]       63:5
**third** [15]          15:23
  16:6   27:23   39:7
  37:4   37:5   38:2
  38:5   39:9   41:18

41:21   43:8    46:11
49:19   50:9
**third-party** [1]   15:19
  17:19
**Thomas** [85]        4:9
  4:11   4:18   4:25
  5:5   5:8   5:10
  5:13   5:17   5:18
  5:22   5:24   6:2
  6:5   6:10   6:13
  6:18   7:2   7:6
  7:7   7:11   7:19
  8:1   8:6   8:13
  8:17   9:11   9:14
  9:15   9:19   9:10
  10:12   11:6   11:9
  11:17   11:18   12:15
  12:23   12:25   13:3
  13:11   13:13   13:24
  14:12   14:16   15:8
  15:19   16:7   16:13
  16:16   16:21   16:24
  17:5   17:14   17:16
  18:3   18:21   18:22
  18:25   19:2   19:13
  23:13   23:15   24:25
  25:1   25:12   26:9
  26:11   26:18   27:10
  27:13   27:14   28:5
  28:18   28:24   29:23
  30:14   30:17   31:1
  31:19   31:20   31:22
  32:7   32:9   32:20
**Thomas'** [11]    5:10
  5:20   8:1   13:5
  15:5   23:13   24:7
  24:8   28:23   29:5
  32:10
**thought** [3]        13:11
  25:14   60:4
**thoughts** [1]       67:3
**thousand** [1]      60:16
**thousands** [1]    53:12
**three** [5] 8:7     16:11
  25:25   56:13   58:18
**through** [12]       12:12
  21:19   31:1   31:5
  32:7   32:25   36:11
  38:22   49:21   51:18
  61:1   61:23
**Thursday** [1]     1:13
**ties** [1]  62:9
**timely** [1]         45:22
**times** [1]           43:9
**timing** [1]         17:21
  18:5   18:19
**Title** [1] 57:4
**today** [5]           2:23
  16:23   20:1   31:1
  46:22
**together** [2]       47:8
  47:20
**Tokyo** [1]          49:3
**too** [1]   59:2
**took** [1] 46:16
**top** [1]  46:16
**topic** [4] 33:6   35:21
  62:10   62:11

**topics** [1]         13 13
**total** [1] 12:6
**training** [1]       39:5
**transcript** [4]    6:23
  12:5   12:11   29:14
**transfer** [1]       46:8
**transmitted** [3] 25:3
  25:8   25:21
**tree** [1] 20:21
**trial** [5]  43:2   48:17
  49:16   50:5   50:23
**tried** [1] 52:13
**true** [1] 43:10
**truly** [1] 45:21
**try** [4]   3:6     51:10
  11:14   63:1
**trying** [13]         13:8
  19:22   20:6   21:13
  27:19   32:4   33:18
  41:22   44:16   46:24
  55:16   61:13   64:11
**turn** [2] 36:11   36:11
**turned** [1]         29:10
**tutorials** [1]      39:5
**twice** [2]          34:17
  35:3   45:1
**two** [10] 8:6     11:8
  11:8   39:15   39:15
  46:14   47:12   48:4
  48:16   56:13
**two-page** [1]    26:24
**twofold** [1]      12:24
  14:9
**type** [4] 8:5     9:23
  35:13   45:18
**types** [4]            6:1
  8:7   60:9   60:12
**U.S** [3]  27:23   56:14
  63:2
**U.S.C** [1]          57:4
**U.S.D.C.J** [1]   5:10
**ultimately** [1]  14:2
  53:21
**under** [5]           5:11
  10:1   13:15   62:8
  64:21
**underlying** [1]  18:7
**underneath** [3] 35:10
  36:15   61:25
**understand** [16] 5:8
  24:21   28:10   29:19
  29:20   29:24   31:10
  31:11   36:1   41:23
  44:8   45:20   50:18
  51:7   56:19   60:14
**understood** [4]  0:22
  6:24   25:14   30:22
**unduly** [1]        51:24
  52:2
**unequivocally** [1]
  11:19
**unidentified** [4]
  30:1   30:18   31:8
  37:4
**United** [10]          1

CondenseIt™

universe - yourselves

| | | |
|---|---|---|
| 48:20 | 49:12 | 63:2 |
| 63:3 | 63:7 | 63:9 |
| 63:22 | 64:16 | 65:18 |

**universe** [1] 8:12

**unsuccessful** [1]
50:10

**unusual** [2] 63:1
63:4

**up** [12] 6:7 15:25
16:4 17:25 31:2
32:7 35:19 45:15
50:5 50:15 53:20
62:23

**used** [9] 20:16 21:4
39:19 40:9 56:9
56:16 64:22 64:24
65:11

**user** [3] 39:4 42:1
46:15

**using** [12] 39:17
39:23 47:13 54:5
56:8 58:1 58:1
58:10 60:6 60:12
60:14 64:7

**utilization** [3] 33:23
35:24 36:4

**v** [1] 1:6

**vast** [1] 45:10

**verbally** [1] 15:11

**versus** [1] 41:21

**view** [1] 3:21

**voluntarily** [1] 50:14

**W** [2] 1:18 1:21

**wait** [1] 11:5

**waived** [1] 14:1

**Wall** [1] 22:3

**wants** [1] 17:24

**Washington** [1] 1:22

**ways** [2] 45:6 49:21

**week** [4] 11:5 11:5
61:16 61:16

**weeks** [1] 58:18

**weighing** [1] 41:20

**Whetzel** [3] 1:18
2:11 2:12

**White** [1] 2:5

**whole** [4] 13:16
22:5 29:7 58:3

**willing** [9] 34:6
38:13 39:21 44:11
44:12 44:16 49:22
50:14 51:2

**Wilmington** [1] 1:12

**windows** [1] 49:11

**wish** [2] 12:6 57:13

**withheld** [3] 4:11
9:4 10:5

**withhold** [1] 10:5

**within** [1] 64:6

**witness** [8] 5:1
16:2 17:5 18:3
20:15 21:5 21:17
48:17

**witness'** [2] 20:17
21:5

**witnesses** [2] 16:3
21:23

**word** [3] 48:15 49:8
51:9

**words** [6] 15:25
20:15 21:4 24:14
24:16 31:21

**written** [1] 23:12

**year** [1] 51:2

**years** [1] 50:3

**Yesterday** [2] 56:18
57:7

**yet** [3] 21:16 43:9
48:14

**yourselves** [1] 3:22

EXHIBIT 8



# AMENDMENT NO. 1 TO END USER SOFTWARE LICENSE AGREEMENT

This Amendment No. 1 dated as of June 28, 2002 modifies that certain END USER SOFTWARE LICENSE AGREEMENT No. EUL01-70003938 ("EULA") dated as of April 1, 2001 between Synopsys, Inc. ("Synopsys") as licensor ("Synopsys") and Aeroflex UTMC Microelectronic Systems Inc., with offices at 4350 Centennial Boulevard, Colorado Springs, CO 80907 ("Licensee") as licensee. Capitalized terms not defined in this Amendment No. 1 shall have the meanings set forth in the EULA.

## RECITALS

WHEREAS, effective April 1, 2001, Synopsys and Licensee entered into the EULA;

WHEREAS the EULA provides in Section 2.1 that that the license to use Licensed Software shall be "nontransferable" and "without right of sublicense",

WHEREAS Licensee wishes to obtain pursuant to the EULA the licenses to Licensed Software listed in Quotation No. UTMC_6-21-02bc_SEC in the quantities therein specified (the "Subject Licenses") with a limited right to transfer them; and

WHEREAS Synopsys wishes to permit the transfer of the Subject Licenses subject to certain conditions;

NOW THEREFORE, in consideration of the mutual promises set forth herein, the parties hereby agree as follows:

1. Provided that (a) the EULA has not been terminated at the time of the requested transfer, and that Licensee is in compliance with the terms and conditions of the EULA at the time of the requested transfer, (b) the transferee agrees in writing to be bound with respect to the Subject Licenses by terms and conditions identical to the EULA and all executed supplements thereto, or, at Synopsys' option, Synopsys' then-current form of end user software license agreement, (c) the transferee agrees to be bound by terms and conditions identical to the Support Agreement executed by Licensee and Synopsys in conjunction with the EULA, or, at Synopsys' option, its then-current form of agreement for maintenance and/or support of licensed software, then Synopsys shall, upon written request of Licensee, permit a one-time transfer of the Subject Licenses to either the National Security Agency of the United States of America, or to L-3 Communications Systems-East, Camden, NJ.

2. No further right of transfer or sublicense of the Subject Licenses other than the one-time transfer referred to in Section 1, above, is intended hereby.

3. Except as provided herein, all other terms and conditions of the EULA, any executed supplements thereto, and the Support Agreement executed in connection therewith, shall remain in full force and effect.

CONFIDENTIAL

DEF018619

IN WITNESS WHEREOF, the parties have caused this Amendment No. 1 to be executed as of the date set forth above.

IN WITNESS WHEREOF, THE PARTIES HAVE SET FORTH BELOW THEIR CONSENT BY THEIR DULY AUTHORIZED REPREESNTATIV.:S AS OF THE DATE SET FORTH ABOVE.

SYNOPSYS, INC.                          AEROFLEX UTMC

By: _____                   By: _____

Name: __Phillip Maroc__                 Name: _Peter C. Milliken_
      __Sr. Contracts Negotiator__

Title: _____                Title: _Dir. Semiconductor Products_

CONFIDENTIAL

DEF018620

AGREEMENT NO. ___EUL01 -70003938___

# END USER SOFTWARE LICENSE AGREEMENT

### between

### SYNOPSYS, INC.

### 700 East Middlefield Road
### Mountain View, California 94043

### and

Aeroflex UTMC Microelectronic Systems, Inc.

### ("Licensee")

4350 Centennial Blvd.

### Address

Colorado Springs                    CO                    80907

| City | State | Zip Code |

Attention: ___Mr. Peter Milliken___

Telephone #: ___719-594-8382___

Facsimile #: ___719-594-8010___

April 1, 2001

### Effective Date

Synopsys, Inc. ("Synopsys") and Licensee each hereby acknowledge that they have read and understand the terms of this End User Software License Agreement ("Agreement"), and that by signing below they become parties to this Agreement and agree to be bound by all terms, conditions and obligations contained herein.

## 1. DEFINITIONS

1.1 "Bug Fix Release" means an embodiment of the Licensed Product that corrects Errors.

1.2 "Client" means an enabled instance of the Licensed Product running on a single processor computational node.

1.3 "Confidential Information" means (i) the Licensed Product, in object and source code form, and any related technology, idea, algorithm or information contained therein, including without limitation Design Techniques,

CONFIDENTIAL

DEF018621

and any trade secrets related to any of the foregoing; (ii) SOLV-NET!; (iii) Designs; (iv) either party's product plans, costs, prices and names; non-published financial information; marketing plans; business opportunities; personnel; research; development or know-how; (v) any information designated by the disclosing party as confidential in writing or, if disclosed orally, designated as confidential at the time of disclosure and reduced to writing and designated as confidential in writing within thirty (30) days; and (vi) the terms and conditions of this Agreement; provided, however that "Confidential Information" will not include information that: (a) is or becomes generally known or available by publication, commercial use or otherwise through no fault of the receiving party; (b) is known and has been reduced to tangible form by the receiving party at the time of disclosure and is not subject to restriction; (c) is independently developed by the receiving party without use of the disclosing party's Confidential Information; (d) is lawfully obtained from a third party who has the right to make such disclosure; and (e) is released for publication by the disclosing party in writing.

1.4 "Design" means the representation of an electronic circuit or device(s), derived or created by Licensee through the use of the Licensed Product in their various formats including, but not limited to, equations, truth tables, schematic diagrams, textual descriptions, hardware description languages and netlists.

1.5 "Design Techniques" means the Synopsys-supplied data, circuit and logic elements, libraries, algorithms, search strategies, rule bases and technical information incorporated in the Licensed Product and employed in the process of creating Designs.

1.6 "DesignWare" means Implementation IP and Verification IP.

1.7 "Documentation" means any user manuals, reference manuals, release, application and methodology notes, written utility programs and other materials in any form provided for use with the Licensed Product.

1.8 "End User(s)" means the authorized person(s) who access and use the Client.

1.9 "Error" means a defect which causes the Licensed Product not to perform substantially in accordance with the specification set forth in Synopsys' Documentation.

1.10 "FTP Server" means the Synopsys server which can be accessed by Licensee via the internet, subject to the terms set forth in Section 5.5 regarding delivery by Electronic Software Transfer.

1.11 "Implementation IP" means any of the reusable designs, excluding Verification IP, that are licensed to Licensee by Synopsys as identified in the applicable Documentation, including any Bug Fix Releases and Minor Enhancement Releases provided by Synopsys pursuant to the terms of the Support Agreement and this Agreement, and any Software Upgrade that may be licensed by Synopsys to Licensee.

1.12 "Integrated Design" means a Design that combines Implementation IP with additional Design elements that: (i) Licensee has developed and incorporated into a particular Design; and (ii) cause the fair market value of such Design to significantly exceed the fair market value of the same Design if it were to consist only of Implementation IP.

1.13 "Intellectual Property Rights" means all patents, patent rights, copyrights, trade secrets, service marks, maskworks and trademarks, and any applications for any of the foregoing, in all countries in the world.

CONFIDENTIAL

DEF018622

1.14 "Key Server" means the one or three computational nodes, as identified in the License Key, which control access to and enable the Licensed Product.

1.15 "License Key" means a document (in physical or electronic format) provided by Synopsys to Licensee which reflects the applicable Licensee purchase order and lists: (i) the Licensed Product, including version number and quantity, licensed to Licensee; (ii) the Key Server(s); and (iii) the codes which Licensee must input to initialize use of the Key Server(s).

1.16 "Licensed Product(s)" means collectively DesignWare and the Licensed Software.

1.17 "Licensed Software" means the Synopsys computer software program(s), exclusive of DesignWare, which are licensed by Licensee in object code form and identified in the applicable License Key, including any Bug Fix Releases and Minor Enhancement Releases provided by Synopsys pursuant to the terms of the Support Agreement and this Agreement and any Software Upgrade which may be licensed by Synopsys to Licensee.

1.18 "Minor Enhancement Release" means an embodiment of the Licensed Product that delivers minor improvement, incremental features or enhancements of existing features, and/or functionality to the Licensed Product.

1.19 "Software Upgrade" means an embodiment of the Licensed Product that delivers substantial performance improvements, architectural changes or new features and/or functionality to the Licensed Product for which Synopsys may charge a separate license fee.

1.20 "Use Area" means the Key Server(s), Client(s) and End User(s) all located within the same five (5) mile radius.

1.21 "Verification IP" means the Synopsys software models that simulate and verify the functionality of certain electronic circuits or devices which are licensed to Licensee by Synopsys in object code form, as identified in the applicable Documentation, including any Bug Fix Releases and Minor Enhancement Releases provided by Synopsys pursuant to the terms of the Support Agreement and this Agreement, and any Software Upgrade which may be licensed by Synopsys to Licensee.

## 2. GRANT OF RIGHTS

2.1 Software License. Synopsys hereby grants Licensee a nonexclusive, nontransferable license, without right of sublicense, to use the Licensed Software and Design Techniques only: (i) in the quantity authorized by a License Key; (ii) in accordance with the Documentation; and(iii) in the Use Area. Licensee may make a reasonable number of copies of the Licensed Software for backup and/or archival purposes only.

2.1.1 Term of License. The term of any perpetual licenses granted herein shall be continuous until non-renewal of the Support Agreement, (unless the license is sooner terminated in accordance with Section 8 of this Agreement), whereupon Licensee shall be granted a twenty (20) year key to use the Licensed Software at the last-supported level. The term of any term licenses for the Licensed Software granted herein shall be as indicated in the applicable quote and License Key.

2.2 DesignWare License. If Licensee has purchased a license to DesignWare, Synopsys hereby grants Licensee the following nonexclusive, nontransferable rights to DesignWare, with no right to sublicense (except as provided below):

CONFIDENTIAL

DEF018623

(i)    Licensee may use DesignWare in the quantity authorized by the DesignWare License Key, in accordance with the Documentation, in the Use Area;

(ii)   Licensee may integrate Implementation IP into Licensee's Designs to create Integrated Designs;

(iii)  Licensee may make, have made, use and distribute products that are physical implementations of the Integrated Designs; and

(iv)   if Licensee has purchased from Synopsys the right to use certain Implementation IP in source code format, Licensee may modify such Implementation IP in support of Licensee's development of Integrated Designs.

Licensee may make a reasonable number of copies of DesignWare for backup and/or archival purposes only.

2.3 Documentation License. Synopsys hereby grants Licensee a nonexclusive, nontransferable license, without right of sublicense, to use the Documentation and to make a reasonable number of copies of the Documentation solely for its own internal business purposes to support Licensee's use of the Licensed Product.

2.4 Evaluation License. In the event Licensee obtains evaluation copies (which excludes any copy of the Licensed Products issued pursuant to Licensee's purchase order) of the Licensed Product, the terms and conditions of this Agreement shall govern, except as follows: (i) Licensee may use such Licensed Product only for internal, nonproduction evaluation for the purpose of deciding whether to purchase a license for such Licensed Product from Synopsys; (ii) the term of the Evaluation license will be as specified in the applicable License Key; and (iii) Section 9 is amended such that the Licensed Product is provided "AS IS."

2.5 Back-up or Relocation of Hardware. A single back-up computational node may be used temporarily as a substitute for a Key Server upon written request to Synopsys during any time when such original Key Server is inoperative due to malfunction, repair or maintenance. Except for such a temporary transfer, Licensee may not transfer or install the Key Server on any computational node not identified in the License Key or relocate the Key Server without the prior written consent of Synopsys.

2.6 Compliance. Licensee shall provide information as reasonably requested by Synopsys to ensure compliance by Licensee with the terms of this Agreement.

2.7 Proprietary Notices. Licensee must reproduce and include the copyright notice and any other notices that appear on the original copy of the Licensed Product and Documentation on any copies made thereof by Licensee in any media.

2.8 License Restrictions. Licensee acknowledges that the scope of the licenses granted hereunder do not permit Licensee (and Licensee shall not allow any third party) to: (i) decompile, disassemble, reverse engineer or attempt to reconstruct, identify or discover any source code, underlying ideas, underlying user interface techniques or algorithms of the Licensed Product by any means whatever, or disclose any of the foregoing; (ii) distribute, lease, lend, use for timesharing, service bureau, and/or application service provider purposes the Licensed Product; (iii) use the Licensed Product for the benefit of third parties or allow third parties to use the Licensed Product; (iv) modify, incorporate into or with other software, or create a derivative work of any part of the Licensed Product; (v) disclose the results of any benchmarking of the Licensed Product (whether or not obtained with Synopsys' assistance) to third parties; (vi) use the Licensed Product to develop or enhance any product that competes with a Licensed Product; or (vii) employ the Licensed Product in, or in the development of, life critical applications or in any other application where failure of the Licensed Product or any results from the use thereof can reasonably be expected to result in personal injury.

CONFIDENTIAL

DEF018624

2.9 <u>Use by Telecommuting Employees</u>. Notwithstanding Section 2.1(iii) Licensee's employees may access and use the Licensed Product from their principal private residences, even if not within the Use Area, provided that such residence is not more than 35 miles from their primary work location and that the Licensed Product accessed by an employee is hosted on a server located within a Use Area that includes their primary work location. Employees who telecommute may use the Licensed Product only for the benefit of Licensee.

## 3. OWNERSHIP

3.1 <u>Synopsys Ownership</u>. Synopsys and/or its licensors own and shall retain all right, title and interest in and to the Licensed Product, Design Techniques and Documentation, including all Intellectual Property Rights embodied therein, and Licensee shall have no rights with respect thereto other than the rights expressly set forth in this Agreement. Title, in the media only, passes upon Synopsys' delivery of the Licensed Product to a common carrier or, for international shipments, delivery to the foreign port of entry. Third party proprietary information may have been used in the development of certain Licensed Products, and any third party licensors of such products may enforce their rights under this Section as third party beneficiaries. Such third parties are listed in the applicable Documentation.

3.2 <u>Licensee Designs</u>. Licensee shall retain all right, title and interest in and to Designs, Integrated Designs and all copies and portions thereof, subject to Synopsys' underlying rights in any DesignWare incorporated in such Designs and Integrated Designs.

3.3 <u>Design Techniques</u>. Synopsys retains all right, title and interest in and to Design Techniques incorporated into the Licensed Product, including all Intellectual Property Rights embodied therein. Licensee acknowledges that Synopsys is in the business of licensing Licensed Product which incorporate Design Techniques. Licensee agrees that in the event Licensee voluntarily discloses any design techniques related to Licensee's use of the Licensed Product to Synopsys without designating such as Confidential Information, Synopsys shall have the unrestricted, royalty-free right to incorporate such design techniques into its software, documentation and other products, and to sublicense third parties to use such incorporated design techniques.

## 4. ADMINISTRATION OF LICENSED PRODUCT

Synopsys employs a License Key system to enable use of the Licensed Product in the Use Area. Synopsys will deliver the License Key to Licensee after Synopsys' receipt from Licensee of all information required to generate the License Key. In accordance with its distribution method, Synopsys may include on the media with the Licensed Product additional computer programs which are not currently licensed by Licensee and to which the License Key will not permit Licensee access. Inclusion of such additional computer programs in no way implies a license from Synopsys and Licensee may not access or use such programs unless the License Key provided by Synopsys specifically authorizes such access and use. In the event, Licensee loses or damages the media such lost or damaged media will be replaced by Synopsys at minimal charge.

## 5. DELIVERY TERMS

5.1 <u>Purchase Order</u>. In order to obtain products and services from Synopsys, Licensee must first submit a purchase order. As part of a purchase order, Licensee must identify the Licensed Product it wishes to license, the identity (by machine ID number) of the Key Server(s) and the location of such Key Server(s). All purchase orders are subject to acceptance by Synopsys, in its sole discretion. Licensee's receipt and use of all Licensed Product and Documentation shall be governed by: (i) the terms and conditions of this Agreement; and (ii) any Agreement Supplement(s) which are executed by both parties. Nothing contained in any purchase order, purchase order acknowledgment, or invoice shall in any way modify such terms or add any additional terms or conditions; provided, however, that such standard variable terms as price, quantity, delivery date, shipping instructions and the like, as well as tax exempt status, if applicable, shall be specified on each purchase order or acknowledgment. Licensee's purchase order will include the license fees and payment terms as set forth in

CONFIDENTIAL

DEF018625

the applicable Synopsys quotation. Licensee agrees to pay Synopsys the license fees, plus applicable taxes as set forth below, in accordance with the payment terms specified in the applicable Synopsys quotation and/or invoice.

5.2 Transaction Taxes. Fees payable to Synopsys under this Agreement are exclusive of any transaction taxes (including sales, use, consumption, value-added and similar transactions taxes) which may be imposed, in accordance with applicable laws, as a result of the licenses granted by Synopsys to Licensee. Licensee agrees to bear or reimburse Synopsys for all such transaction taxes.

5.3 Withholding Taxes. If the payments made hereunder are subject to deduction of any withholding taxes imposed by a tax treaty then in force between the parties' respective governments, Licensee shall deduct such withholding taxes paid to the relevant authorities from the total amount due Synopsys. Licensee shall obtain official documentation evidencing payment thereof and shall provide such documentation to Synopsys within a reasonable period of time.

5.4 Delivery. Upon the acceptance of an order by Synopsys and the satisfaction of all Synopsys prerequisites prior to delivery, Synopsys shall deliver to Licensee, at Synopsys' expense, the Licensed Product, License Key and/or Documentation, as appropriate.

5.5 Delivery by Electronic Software Transfer. Electronic Software Transfer ("EST") delivery of the Licensed Products is available to Licensee's domestic United States locations only. Licensee may elect to receive the Licensed Products by EST by executing the Synopsys EST Qualification Form and submitting it to Synopsys together with Licensee's purchase order. An EST Qualification Form must be completed by Licensee for each qualifying Licensee location. Upon the acceptance of an EST order by Synopsys, and the satisfaction of all Synopsys prerequisites prior to delivery, Synopsys shall make available to Licensee electronically, the Licensed Product, License Key and/or Documentation, as appropriate. The Licensed Product and Documentation will be made available to Licensee on the FTP Server and the License Key will be made available to Licensee on SOLV-NET!.

Licensee's site administrator and receiving department, as identified in the EST Qualification Form(s) submitted by Licensee, will be notified electronically that Licensee's order has been fulfilled and is available. Licensee will be responsible for obtaining access to the internet and retrieving the fulfilled order from the FTP Server and SOLV-NET!. Licensee acknowledges and agrees that, if the EST Qualification Form is completed and submitted in accordance with the preceding paragraph, Synopsys will only deliver the Licensed Product electronically and Licensee will not receive the Licensed Product on tangible media. Licensee agrees that upon availability of the Licensed Product and/or Documentation on the FTP Server and availability of the License Key through SOLV-NET!, Synopsys will have fulfilled its obligation to deliver the Licensed Product and/or Documentation to Licensee and applicable payment, if any, will be due and payable in accordance with Section 5.1.

## 6. SUPPORT SERVICES

Support services shall be provided by Synopsys under the terms and conditions set forth herein and in the Support Agreement.

## 7. CONFIDENTIALITY

Each party will protect the other's Confidential Information from unauthorized dissemination and use with the same degree of care that each such party uses to protect its own like information. Neither party will use the other's Confidential Information for purposes other than those necessary to directly further the purposes of this Agreement. Neither party will disclose to third parties the other's Confidential Information without the

CONFIDENTIAL
DEF018626

prior written consent of the other party.

## 8. TERMINATION OF LICENSE

8.1 <u>Termination</u>. Either party has the right to terminate this Agreement if the other party breaches or is in default of any obligation hereunder, which default is incapable of cure or which, being capable of cure, has not been cured with fifteen (15) business days after receipt of written notice from the nondefaulting party or within such additional cure period as the nondefaulting party may authorize, except that the Licensed Product's failure to substantially conform to the specifications in the Licensed Product Documentation shall not be deemed a default under this Section 8.1 but shall be subject to the exclusive remedies provided in Section 9.1.

8.2 <u>Effect of Bankruptcy</u>. In the event that Licensee becomes the subject of any voluntary or involuntary proceeding in bankruptcy, liquidation, dissolution, receivership, attachment or composition, or makes a general assignment for the benefit of creditors, amounts that have been paid to Synopsys in respect of goods or services not yet delivered may be applied in whole or in part in satisfaction of obligations owed by Licensee to Synopsys in respect of goods or services delivered but not yet paid for under this Agreement or any other agreement between Synopsys and Licensee.

8.3 <u>Effect of Termination</u>. Upon termination, Licensee shall immediately cease all use of the Licensed Product (other than DesignWare incorporated into Designs prior to termination, for which Licensee's license shall continue according to its terms), Design Techniques and Documentation and return or destroy all such copies and all portions of the Licensed Product (other than DesignWare incorporated into Designs prior to termination) and so certify in writing to Synopsys. Termination will not relieve Licensee or Synopsys from any liability arising from any breach of this Agreement. Neither party will be liable to the other for damages of any sort solely as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement will be without prejudice to any other right or remedy of either party. The provisions of Sections 3, 7, 8.2, 8.3, 9.2, 11, 12 and 13 shall survive any termination or expiration of this Agreement.

## 9. LIMITED WARRANTY AND DISCLAIMER

9.1 <u>Limited Warranty</u>. Synopsys warrants for a period of ninety (90) days from delivery of the Licensed Product to Licensee that such Licensed Product, as delivered, will be free from defects in the media and will substantially conform to the specifications in the Licensed Product Documentation. In the event of nonconformance of the Licensed Product, Licensee shall promptly notify Synopsys and provide Synopsys with all available information in written or electronic form so that Synopsys can reproduce the Error. Synopsys' sole obligation is to undertake reasonable commercial efforts to correct the Errors reported to Synopsys in writing or in electronic form during the warranty period. SYNOPSYS' SOLE LIABILITY AND LICENSEE'S EXCLUSIVE REMEDY WITH RESPECT TO BREACH OF THE FOREGOING LIMITED WARRANTY WILL BE LIMITED TO ERROR CORRECTION OR PRODUCT REPLACEMENT, OR IF NEITHER IS IN SYNOPSYS' OPINION COMMERCIALLY FEASIBLE, REFUND OF THE LICENSE FEE RECEIVED BY SYNOPSYS FROM LICENSEE FOR THE LICENSED PRODUCT THAT DOES NOT CONFORM WITH THE FOREGOING WARRANTY.

9.2 <u>Disclaimer</u>. EXCEPT FOR THE ABOVE EXPRESS LIMITED WARRANTY, THE LICENSED PRODUCT, DESIGN TECHNIQUES AND DOCUMENTATION ARE LICENSED "AS IS," AND SYNOPSYS MAKES NO OTHER WARRANTIES EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE LICENSED PRODUCT, DESIGN TECHNIQUES OR DOCUMENTATION. SYNOPSYS SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, OR ARISING FROM A COURSE OF DEALING OR USAGE OF TRADE.

## 10. PATENT AND COPYRIGHT INFRINGEMENT

10.1 <u>Indemnity</u>. Synopsys agrees, at its own expense, to defend or, at its option, to settle, any claim or action brought against Licensee to the extent it is based on a claim that the Licensed Software as used within the

CONFIDENTIAL
DEF018627

scope of this Agreement infringes or violates any United States patent, copyright, trademark, trade secret or other proprietary right of a third party, and Synopsys will indemnify and hold Licensee harmless from and against any damages, costs and fees reasonably incurred (including reasonable attorneys' fees) that are attributable to such claim or action and which are assessed against Licensee in a final judgment. Licensee agrees that Synopsys shall be released from the foregoing obligation unless Licensee provides Synopsys with: (i) prompt written notification of the claim or action; (ii) sole control and authority over the defense or settlement thereof; and (iii) all available information, assistance and authority to settle and/or defend any such claim or action.

10.2 Limited Remedies. If any Licensed Software becomes, or in the opinion of Synopsys is likely to become, the subject of an infringement claim or action, Synopsys may at its sole option: (i) procure, at no cost to Licensee, the right to continue using the Licensed Software; (ii) replace or modify the Licensed Software to render it noninfringing, provided there is no material loss of functionality; or (iii) if, in Synopsys' reasonable opinion, neither (i) nor (ii) above are commercially feasible, terminate the license and refund the amounts Licensee paid for such Licensed Software as depreciated on a straight-line sixty (60) month basis.

10.3 Exceptions. Synopsys will have no liability under this Section 10 for any claim or action where: (i) such claim or action would have been avoided but for modifications of the Licensed Software, or portions thereof, made after delivery to Licensee; (ii) such claim or action would have been avoided but for the combination or use of the Licensed Software, or portions thereof, with other products, processes or materials not supplied or specified in writing by Synopsys; (iii) Licensee continues allegedly infringing activity after being notified thereof or after being informed of modifications that would have avoided the alleged infringement; or (iv) Licensee's use of the Licensed Software is not strictly in accordance with the terms of this Agreement. Licensee will be liable for all damages, costs, expenses, settlements and attorneys' fees related to any claim of infringement arising as a result of (i)-(iv) above.

10.4 Disclaimer. THE FOREGOING PROVISIONS OF THIS SECTION 10 STATE THE ENTIRE LIABILITY AND OBLIGATIONS OF SYNOPSYS, AND THE EXCLUSIVE REMEDY OF LICENSEE, IF ANY, WITH RESPECT TO ANY ACTUAL OR ALLEGED INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS BY ALL PRODUCTS, DESIGN TECHNIQUES AND DOCUMENTATION PROVIDED HEREUNDER.

**11. LIMITATION OF LIABILITY**
11.1 Direct Damages. SYNOPSYS' TOTAL LIABILITY FOR DIRECT DAMAGES UNDER THIS AGREEMENT SHALL NOT EXCEED THE LICENSE FEE RECEIVED BY SYNOPSYS FROM LICENSEE FOR THE PARTICULAR LICENSED PRODUCT INVOLVED.

11.2 Consequential Damages. UNDER NO CIRCUMSTANCES, SHALL SYNOPSYS BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING IN ANY WAY OUT OF THIS AGREEMENT OR THE USE OF THE LICENSED PRODUCT, DESIGN TECHNIQUES AND DOCUMENTATION, HOWEVER CAUSED, (WHETHER ARISING UNDER A THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE); OR OTHERWISE), INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST PROFITS, LOSS OF DATA, OR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES. THE LIMITATIONS ON SYNOPSYS' LIABILITY SET FORTH IN THIS SECTION 11 SHALL APPLY NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY OF THE LIMITED REMEDIES SET FORTH IN SECTION 9.1 ABOVE. THIS SECTION 11.2 SHALL IN NO WAY LIMIT THE APPLICABILITY OF SECTION 10 ABOVE.

**12. GOVERNMENT MATTERS**
12.1 Export Controls. Licensee agrees and certifies that neither the Licensed Product, nor any other technical data received from Synopsys, nor the direct product thereof, will be exported or re-exported outside the United States except as authorized and as permitted by the laws and regulations of the United States.

CONFIDENTIAL
DEF018628

12.2 <u>Government Use</u>. If Licensee is acquiring any Licensed Product on behalf of any unit or agency of the United States Government, then the Licensed Product and related Documentation is commercial computer software, and, pursuant to FAR 12.212 or DFARS 227.7202 and their successors, as applicable, shall be licensed to the Government under the terms and conditions of this Agreement.

## 13. GENERAL PROVISIONS

13.1 <u>Choice of Law</u>. This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California excepting that body of California law governing conflicts of law.

13.2 <u>Jurisdiction</u>. The federal and state courts within Santa Clara County, California shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement. Each party hereto expressly consents to the personal jurisdiction of, and venue in, such courts and service of process being effected upon it by registered mail and sent to the address set forth at the beginning of this Agreement.

13.3 <u>Assignment</u>. This Agreement may not be assigned by Licensee without the prior written consent of Synopsys.

13.4 <u>Notices</u>. Any notice, report, approval or consent required or permitted hereunder shall be in writing and will be deemed to have been duly given if delivered personally, by facsimile, or mailed by first-class, registered or certified mail, postage prepaid to the respective addresses of the parties as set forth in this Agreement. If to Synopsys, Attention: General Counsel.

13.5 <u>No Waiver</u>. Failure by either party to enforce any provision of this Agreement will not be deemed a waiver of future enforcement of that or any other provision.

13.6 <u>Independent Contractors</u>. The relationship of Synopsys and Licensee established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed (i) to give either party the power to direct or control the day-to-day activities of the other or (ii) to constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking.

13.7 <u>Severability</u>. If for any reason a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be unenforceable, that provision of the Agreement will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement will continue in full force and effect.

13.8 <u>Attorneys' Fees</u>. The prevailing party in any action to enforce the Agreement shall be entitled to recover costs and expenses including, without limitation, reasonable attorneys' fees.

13.9 <u>Injunctive Relief</u>. The parties agree that a material breach of this Agreement adversely affecting Synopsys' Intellectual Property Rights in the Licensed Product, Design Techniques or Documentation would cause irreparable injury to Synopsys for which monetary damages would not be an adequate remedy and Synopsys shall be entitled to equitable relief in addition to any remedies it may have hereunder or at law.

13.10 <u>Force Majeure</u>. Except for the obligation to make payments hereunder, nonperformance of either party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental action, failure of suppliers, earthquake, or any other reason where failure to perform is beyond the reasonable control of the nonperforming party.

CONFIDENTIAL
DEF018629

13.11 <u>Entire Agreement</u>. This Agreement, including all Supplements, constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior agreements or representations, oral or written, regarding such subject matter. This Agreement may not be modified or amended except in a writing signed by a duly authorized representative of both parties.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives:

LICENSEE

By: _____

Name: _Peter C. Milliken_

Title: _Dir. Semicustom Prod_

Date: _April 9, 2001_

SYNOPSYS, INC.

By: _____

Name: _Joann M. Kondo_
_Contracts Manager_

Title: _____

Date: _04/10/01_

CONFIDENTIAL
DEF018630

AGREEMENT NO. _EUL99 - 7000 2153_

## END USER SOFTWARE LICENSE AGREEMENT

between

### SYNOPSYS, INC.

**700 East Middlefield Road**

**Mountain View, California 94043**

and

American Microsystems, Inc.
_____

**("Licensee")**

2300 Buckskin Road
_____

**Address**

Pocatello                    ID              83201
_____

**City**                         **State**                    **Zip Code**

**Attention:** Jon F. Fredricks, C.P.M.

**Telephone #:** (208) 234-6645

**Facsimile #:** (208) 234-6697

29 September 1999
_____

**Effective Date**

Synopsys, Inc. ("Synopsys") and Licensee each hereby acknowledge that they have read and understand the terms of this End User Software License Agreement ("Agreement"), and that by signing below they become parties to this Agreement and agree to be bound by all terms, conditions and obligations contained herein.

## 1. DEFINITIONS

1.1 "Bug Fix Release" means an embodiment of the Licensed Product that corrects Errors.

CONFIDENTIAL
DEF018650

1.2 "Client" means an enabled instance of the Licensed Product running on a single processor computational node.

1.3 "Confidential Information" means (i) the Licensed Product, in object and source code form, and any related technology, idea, algorithm or information contained therein, including without limitation Design Techniques, and any trade secrets related to any of the foregoing; (ii) SOLV-NET!; (iii) Designs; (iv) either party's product plans, costs, prices and names; non-published financial information; marketing plans; business opportunities; personnel; research; development or know-how; (v) any information designated by the disclosing party as confidential in writing or, if disclosed orally, designated as confidential at the time of disclosure and reduced to writing and designated as confidential in writing within thirty (30) days; and (vi) the terms and conditions of this Agreement; provided, however that "Confidential Information" will not include information that: (a) is or becomes generally known or available by publication, commercial use or otherwise through no fault of the receiving party; (b) is known and has been reduced to tangible form by the receiving party at the time of disclosure and is not subject to restriction; (c) is independently developed by the receiving party without use of the disclosing party's Confidential Information; (d) is lawfully obtained from a third party who has the right to make such disclosure; and (e) is released for publication by the disclosing party in writing.

1.4 "Design" means the representation of an electronic circuit or device(s), derived or created by Licensee through the use of the Licensed Product in their various formats including, but not limited to, equations, truth tables, schematic diagrams, textual descriptions, hardware description languages and netlists.

1.5 "Design Techniques" means the Synopsys-supplied data, circuit and logic elements, libraries, algorithms, search strategies, rule bases and technical information incorporated in the Licensed Product and employed in the process of creating Designs.

1.6 "DesignWare" means any of the reusable designs which are licensed to Licensee by Synopsys, as identified in the applicable License Key.

1.7 "Documentation" means any user manuals, reference manuals, release, application and methodology notes, written utility programs and other materials in any form provided for use with the Licensed Product.

1.8 "End User(s)" means the authorized person(s) who access and use the Client.

1.9 "Error" means a defect which causes the Licensed Product not to perform substantially in accordance with the specification set forth in Synopsys' Documentation.

1.10 "FTP Server" means the Synopsys server which can be accessed by Licensee via the internet, subject to the terms set forth in Section 5.5 regarding delivery by Electronic Software Transfer.

1.11 "Intellectual Property Rights" means all patents, patent rights, copyrights, trade secrets, service marks, maskworks and trademarks, and any applications for any of the foregoing, in all countries in the world.

1.12 "Key Server" means the one or three computational nodes, as identified in the License Key, which control access to and enable the Licensed Product.

1.13 "License Key" means a document (in physical or electronic format) provided by Synopsys to Licensee which reflects the applicable Licensee purchase order and lists: (i) the Licensed Product, including version

CONFIDENTIAL

DEF018651

number and quantity, licensed to Licensee; (ii) the Key Server(s); and (iii) the codes which Licensee must input to initialize use of the Key Server(s).

1.14 "Licensed Product(s)" means collectively DesignWare and the Licensed Software.

1.15 "Licensed Software" means the Synopsys computer software program(s), exclusive of DesignWare, which are licensed by Licensee in object code form and identified in the applicable License Key, including any Bug Fix Releases and Minor Enhancement Releases provided by Synopsys pursuant to the terms of the Support Agreement and this Agreement and any Software Upgrade which may be licensed by Synopsys to Licensee.

1.16 "Minor Enhancement Release" means an embodiment of the Licensed Product that delivers minor improvement, incremental features or enhancements of existing features, and/or functionality to the Licensed Product.

1.17 "Software Upgrade" means an embodiment of the Licensed Product that delivers substantial performance improvements, architectural changes or new features and/or functionality to the Licensed Product for which Synopsys may charge a separate license fee.

1.18 "Use Area" means the Key Server(s), Client(s) and End User(s) all located within the same five (5) mile radius.

## 2. GRANT OF RIGHTS

2.1 Software License. Synopsys hereby grants Licensee a nonexclusive, nontransferable license, without right of sublicense, to use the Licensed Software and Design Techniques only: (i) in the quantity authorized by a License Key; (ii) in accordance with the Documentation; and (iii) in the Use Area. Licensee may make a reasonable number of copies of the Licensed Software for backup and/or archival purposes only.

2.1.1 Term of License. The term of any perpetual licenses granted herein shall be continuous until non-renewal of the Support Agreement, (unless the license is sooner terminated in accordance with Section 8 of this Agreement), whereupon Licensee shall be granted a twenty-(20) year key to use the Licensed Software at the last-supported level. The term of any term licenses for the Licensed Software granted herein shall be as indicated in the applicable quote and License Key.

2.2 DesignWare License. If Licensee has purchased a license to DesignWare, Synopsys hereby grants Licensee a nonexclusive, nontransferable license, without right of sublicense (except as provided below), only to: (i) install DesignWare in the Use Area for use in the quantity authorized by a License Key; (ii) incorporate such DesignWare into Licensee's own Designs; and (iii) manufacture physical implementations of such Designs. Such manufactured Designs may be used in Licensee's products, or sold for use in third party products. Additionally, Licensee shall have the right to sublicense a third party to manufacture physical implementations of Licensee's Designs incorporating DesignWare, provided that Licensee must enter into a written agreement with such third party limiting such third party's use of DesignWare to the manufacture of Licensee's Designs. Except in furtherance of such manufacture, Licensee may not distribute DesignWare in netlist form to any third party. Except as provided in this Section, Licensee shall have no right to sublicense DesignWare to any third party or to include DesignWare in designs developed by Licensee for the benefit of any third party. Licensee may make a reasonable number of copies of DesignWare for backup and/or archival purposes only. The license set forth in this Section 2.2 shall be for a

**CONFIDENTIAL**

**DEF018652**

term of one (1) year, as set forth in the applicable License Key, unless sooner terminated in accordance with Section 8 of this Agreement.

2.3 Documentation License. Synopsys hereby grants Licensee a nonexclusive, nontransferable license, without right of sublicense, to use the Documentation and to make a reasonable number of copies of the Documentation solely for its own internal business purposes to support Licensee's use of the Licensed Product.

2.4 Evaluation License. In the event Licensee obtains evaluation copies (which excludes any copy of the Licensed Products issued pursuant to Licensee's purchase order) of the Licensed Product, the terms and conditions of this Agreement shall govern, except as follows: (i) Licensee may use such Licensed Product for internal evaluation purposes only; (ii) the term of the Evaluation license will be as specified in the applicable License Key; and (iii) Section 9 is amended such that the Licensed Product is provided "AS IS."

2.5 Back-up or Relocation of Hardware. A single back-up computational node may be used temporarily as a substitute for a Key Server upon written request to Synopsys during any time when such original Key Server is inoperative due to malfunction, repair or maintenance. Except for such a temporary transfer, Licensee may not transfer or install the Key Server on any computational node not identified in the License Key or relocate the Key Server without the prior written consent of Synopsys.

2.6 Compliance. Licensee shall provide information as reasonably requested by Synopsys to ensure compliance by Licensee with the terms of this Agreement.

2.7 Proprietary Notices. Licensee must reproduce and include the copyright notice and any other notices that appear on the original copy of the Licensed Product and Documentation on any copies made thereof by Licensee in any media.

2.8 License Restrictions. Licensee acknowledges that the scope of the licenses granted hereunder do not permit Licensee (and Licensee shall not allow any third party) to: (i) decompile, disassemble, reverse engineer or attempt to reconstruct, identify or discover any source code, underlying ideas, underlying user interface techniques or algorithms of the Licensed Product by any means whatever, or disclose any of the foregoing; (ii) provide, lease, lend, use for timesharing or service bureau purposes the Licensed Product; (iii) use the Licensed Product for the benefit of third parties or allow third parties to use the Licensed Product; (iv) modify, incorporate into or with other software, or create a derivative work of any part of the Licensed Product; (v) disclose the results of any benchmarking of the Licensed Product (whether or not obtained with Synopsys' assistance) to third parties; or (vi) employ the Licensed Product in, or in the development of, life critical applications or in any other application where failure of the Licensed Product or any results from the use thereof can reasonably be expected to result in personal injury.

2.9 Use by Telecommuting Employees. Notwithstanding Section 2.1(iii) Licensee's employees may access and use the Licensed Product from their principal private residences, even if not within the Use Area, provided that such residence is not more than 35 miles from their primary work location and that the Licensed Product accessed by an employee is hosted on a server located within a Use Area that includes their primary work location. Employees who telecommute may use the Licensed Product only for the benefit of Licensee.

3. OWNERSHIP

CONFIDENTIAL

DEF018653

3.1 <u>Synopsys Ownership</u>. Synopsys and/or its licensors own and shall retain all right, title and interest in and to the Licensed Product, Design Techniques and Documentation, including all Intellectual Property Rights embodied therein, and Licensee shall have no rights with respect thereto other than the rights expressly set forth in this Agreement. Title, in the media only, passes upon Synopsys' delivery of the Licensed Product to a common carrier or, for international shipments, delivery to the foreign port of entry.

3.2 <u>Licensee Designs</u>. Licensee shall retain all right, title and interest in and to Designs and all copies and portions thereof, subject to Synopsys' underlying rights in any DesignWare incorporated in such Designs.

3.3 <u>Design Techniques</u>. Synopsys retains all right, title and interest in and to Design Techniques incorporated into the Licensed Product, including all Intellectual Property Rights embodied therein. Licensee acknowledges that Synopsys is in the business of licensing Licensed Product which incorporate Design Techniques. Licensee agrees that in the event Licensee voluntarily discloses any design techniques to Synopsys without designating such as Confidential Information, Synopsys shall have the unrestricted, royalty-free right to incorporate such design techniques into its software, documentation and other products, and to sublicense third parties to use such incorporated design techniques.

## 4. ADMINISTRATION OF LICENSED PRODUCT

Synopsys employs a License Key system to enable use of the Licensed Product in the Use Area. Synopsys will deliver the License Key to Licensee after Synopsys' receipt from Licensee of all information required to generate the License Key. In accordance with its distribution method, Synopsys may include on the media with the Licensed Product additional computer programs which are not currently licensed by Licensee and to which the License Key will not permit Licensee access. Inclusion of such additional computer programs in no way implies a license from Synopsys and Licensee may not access or use such programs unless the License Key provided by Synopsys specifically authorizes such access and use. In the event, Licensee loses or damages the media such lost or damaged media will be replaced by Synopsys at minimal charge.

## 5. DELIVERY TERMS

5.1 <u>Purchase Order</u>. In order to obtain products and services from Synopsys, Licensee must first submit a purchase order. As part of a purchase order, Licensee must identify the Licensed Product it wishes to license, the identity (by machine ID number) of the Key Server(s) and the location of such Key Server(s). All purchase orders are subject to acceptance by Synopsys, in its sole discretion. Licensee's receipt and use of all Licensed Product and Documentation shall be governed by: (i) the terms and conditions of this Agreement; and (ii) Agreement Supplement(s) which shall contain information specific to the Term as authorized by Synopsys. Nothing contained in any purchase order, purchase order acknowledgment, or invoice shall in any way modify such terms or add any additional terms or conditions; provided, however, that such standard variable terms as price, quantity, delivery date, shipping instructions and the like, as well as tax exempt status, if applicable, shall be specified on each purchase order or acknowledgment. Licensee's purchase order will include the license fees and payment terms as set forth in the applicable Synopsys quotation. Licensee agrees to pay Synopsys the license fees, plus applicable taxes as set forth below, in accordance with the payment terms specified in the applicable Synopsys quotation and/or invoice.

5.2 <u>Transaction Taxes</u>. Fees payable to Synopsys under this Agreement are exclusive of any transaction taxes (including sales, use, consumption, value-added and similar transactions taxes) which may be imposed, in accordance with applicable laws, as a result of the licenses granted by Synopsys to Licensee.

CONFIDENTIAL
DEF018654

Licensee agrees to bear or reimburse Synopsys for all such transaction taxes.

5.3 <u>Withholding Taxes</u>. If the payments made hereunder are subject to deduction of any withholding taxes imposed by a tax treaty then in force between the parties' respective governments, Licensee shall deduct such withholding taxes paid to the relevant authorities from the total amount due Synopsys. Licensee shall obtain official documentation evidencing payment thereof and shall provide such documentation to Synopsys within a reasonable period of time.

5.4 <u>Delivery</u>. Upon the acceptance of an order by Synopsys and the satisfaction of all Synopsys prerequisites prior to delivery, Synopsys shall deliver to Licensee, at Synopsys' expense, the Licensed Product, License Key and/or Documentation, as appropriate.

5.5 <u>Delivery by Electronic Software Transfer</u>. Electronic Software Transfer ("EST") delivery of the Licensed Products is available to Licensee's domestic United States locations only. Licensee may elect to receive the Licensed Products by EST by executing the Synopsys EST Qualification Form and submitting it to Synopsys together with Licensee's purchase order. An EST Qualification Form must be completed by Licensee for each qualifying Licensee location. Upon the acceptance of an EST order by Synopsys, and the satisfaction of all Synopsys prerequisites prior to delivery, Synopsys shall make available to Licensee electronically, the Licensed Product, License Key and/or Documentation, as appropriate. The Licensed Product and Documentation will be made available to Licensee on the FTP Server and the License Key will be made available to Licensee on SOLV-NET!.

Licensee's site administrator and receiving department, as identified in the EST Qualification Form(s) submitted by Licensee, will be notified electronically that Licensee's order has been fulfilled and is available. Licensee will be responsible for obtaining access to the internet and retrieving the fulfilled order from the FTP Server and SOLV-NET!. Licensee acknowledges and agrees that, if the EST Qualification Form is completed and submitted in accordance with the preceding paragraph, Synopsys will only deliver the Licensed Product electronically and Licensee will not receive the Licensed Product on tangible media. Licensee agrees that upon availability of the Licensed Product and/or Documentation on the FTP Server and availability of the License Key through SOLV-NET!, Synopsys will have fulfilled its obligation to deliver the Licensed Product and/or Documentation to Licensee and applicable payment, if any, will be due and payable in accordance with Section 5.1.

## 6. SUPPORT SERVICES

Support services shall be provided by Synopsys under the terms and conditions set forth herein and in the Support Agreement.

## 7. CONFIDENTIALITY

Each party will protect the other's Confidential Information from unauthorized dissemination and use with the same degree of care that each such party uses to protect its own like information. Neither party will use the other's Confidential Information for purposes other than those necessary to directly further the purposes of this Agreement. Neither party will disclose to third parties the other's Confidential Information without the prior written consent of the other party.

Enduser_9908                                      6                              Confidential

CONFIDENTIAL
DEF018655

## 8. TERMINATION OF LICENSE

8.1 Termination. Either party has the right to terminate this Agreement if the other party breaches or is in default of any obligation hereunder, which default is incapable of cure or which, being capable of cure, has not been cured within fifteen (15) business days after receipt of written notice from the nondefaulting party or within such additional cure period as the nondefaulting party may authorize, except that the Licensed Product's failure to substantially conform to the specifications in the Licensed Product Documentation shall not be deemed a default under this Section 8.1 but shall be subject to the exclusive remedies provided in Section 9.1.

8.2 Effect of Bankruptcy. In the event that Licensee becomes the subject of any voluntary or involuntary proceeding in bankruptcy, liquidation, dissolution, receivership, attachment or composition, or makes a general assignment for the benefit of creditors, amounts that have been paid to Synopsys in respect of goods or services not yet delivered may be applied in whole or in part in satisfaction of obligations owed by Licensee to Synopsys in respect of goods or services delivered but not yet paid for under this Agreement or any other agreement between Synopsys and Licensee.

8.3 Effect of Termination. Upon termination, Licensee shall immediately cease all use of the Licensed Product (other than DesignWare incorporated into Designs, for which Licensee's license shall continue according to its terms), Design Techniques and Documentation and return or destroy all such copies and all portions of the Licensed Product (other than DesignWare incorporated into Designs) and so certify in writing to Synopsys. Termination will not relieve Licensee or Synopsys from any liability arising from any breach of this Agreement. Neither party will be liable to the other for damages of any sort solely as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement will be without prejudice to any other right or remedy of either party. The provisions of Sections 3, 7, 8.2, 8.3, 9.2, 11, 12 and 13 shall survive any termination or expiration of this Agreement.

## 9. LIMITED WARRANTY AND DISCLAIMER

9.1 Limited Warranty. Synopsys warrants for a period of ninety (90) days from delivery of the Licensed Product to Licensee that such Licensed Product, as delivered, will be free from defects in the media and will substantially conform to the specifications in the Licensed Product Documentation. In the event of nonconformance of the Licensed Product, Licensee shall promptly notify Synopsys and provide Synopsys with all available information in written or electronic form so that Synopsys can reproduce the Error. Synopsys' sole obligation is to undertake reasonable commercial efforts to correct the Errors reported to Synopsys in writing or in electronic form during the warranty period. SYNOPSYS' SOLE LIABILITY AND LICENSEE'S EXCLUSIVE REMEDY WITH RESPECT TO BREACH OF THE FOREGOING LIMITED WARRANTY WILL BE LIMITED TO ERROR CORRECTION OR PRODUCT REPLACEMENT, OR IF NEITHER IS IN SYNOPSYS' OPINION COMMERCIALLY FEASIBLE, REFUND OF THE LICENSE FEE RECEIVED BY SYNOPSYS FROM LICENSEE.

9.2 Disclaimer. EXCEPT FOR THE ABOVE EXPRESS LIMITED WARRANTY, THE LICENSED PRODUCT, DESIGN TECHNIQUES AND DOCUMENTATION ARE LICENSED "AS IS," AND SYNOPSYS MAKES NO OTHER WARRANTIES EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE LICENSED PRODUCT, DESIGN TECHNIQUES OR DOCUMENTATION. SYNOPSYS SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, OR ARISING FROM A COURSE OF DEALING OR USAGE OF TRADE.

CONFIDENTIAL

DEF018656

## 10. PATENT AND COPYRIGHT INFRINGEMENT

10.1 Indemnity. Synopsys agrees, at its own expense, to defend or, at its option, to settle, any claim or action brought against Licensee to the extent it is based on a claim that the Licensed Software as used within the scope of this Agreement infringes or violates any United States patent, copyright, trademark, trade secret or other proprietary right of a third party, and Synopsys will indemnify and hold Licensee harmless from and against any damages, costs and fees reasonably incurred (including reasonable attorneys' fees) that are attributable to such claim or action and which are assessed against Licensee in a final judgment. Licensee agrees that Synopsys shall be released from the foregoing obligation unless Licensee provides Synopsys with: (i) prompt written notification of the claim or action; (ii) sole control and authority over the defense or settlement thereof; and (iii) all available information, assistance and authority to settle and/or defend any such claim or action.

10.2 Limited Remedies. If any Licensed Software becomes, or in the opinion of Synopsys is likely to become, the subject of an infringement claim or action, Synopsys may at its sole option: (i) procure, at no cost to Licensee, the right to continue using the Licensed Software; (ii) replace or modify the Licensed Software to render it noninfringing, provided there is no material loss of functionality; or (iii) if, in Synopsys' reasonable opinion, neither (i) nor (ii) above are commercially feasible, terminate the license and refund the amounts Licensee paid for such Licensed Software as depreciated on a straight-line sixty (60) month basis.

10.3 Exceptions. Synopsys will have no liability under this Section 10 for any claim or action where: (i) such claim or action would have been avoided but for modifications of the Licensed Software, or portions thereof, made after delivery to Licensee; (ii) such claim or action would have been avoided but for the combination or use of the Licensed Software, or portions thereof, with other products, processes or materials not supplied or specified in writing by Synopsys; (iii) Licensee continues allegedly infringing activity after being notified thereof or after being informed of modifications that would have avoided the alleged infringement; or (iv) Licensee's use of the Licensed Software is not strictly in accordance with the terms of this Agreement. Licensee will be liable for all damages, costs, expenses, settlements and attorneys' fees related to any claim of infringement arising as a result of (i)-(iv) above.

10.4 Disclaimer. THE FOREGOING PROVISIONS OF THIS SECTION 10 STATE THE ENTIRE LIABILITY AND OBLIGATIONS OF SYNOPSYS, AND THE EXCLUSIVE REMEDY OF LICENSEE, IF ANY, WITH RESPECT TO ANY ACTUAL OR ALLEGED INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS BY ALL PRODUCTS, DESIGN TECHNIQUES AND DOCUMENTATION PROVIDED HEREUNDER.

## 11. LIMITATION OF LIABILITY

11.1 Direct Damages. SYNOPSYS' TOTAL LIABILITY FOR DIRECT DAMAGES UNDER THIS AGREEMENT SHALL NOT EXCEED THE LICENSE FEE RECEIVED BY SYNOPSYS FROM LICENSEE.

11.2 Consequential Damages. UNDER NO CIRCUMSTANCES, SHALL SYNOPSYS BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING IN ANY WAY OUT OF THIS AGREEMENT OR THE USE OF THE LICENSED PRODUCT, DESIGN TECHNIQUES AND

CONFIDENTIAL
DEF018657

DOCUMENTATION, HOWEVER CAUSED, (WHETHER ARISING UNDER A THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE); OR OTHERWISE), INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST PROFITS, LOSS OF DATA, OR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES. THE LIMITATIONS ON SYNOPSYS' LIABILITY SET FORTH IN THIS SECTION 11 SHALL APPLY NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY OF THE LIMITED REMEDIES SET FORTH IN SECTION 9.1 ABOVE. THIS SECTION 11.2 SHALL IN NO WAY LIMIT THE APPLICABILITY OF SECTION 10 ABOVE.

## 12. GOVERNMENT MATTERS

12.1 Export Controls. Licensee agrees and certifies that neither the Licensed Product, nor any other technical data received from Synopsys, nor the direct product thereof, will be exported or re-exported outside the United States except as authorized and as permitted by the laws and regulations of the United States.

12.2 Government Use. If Licensee is acquiring any Licensed Product on behalf of any unit or agency of the United States Government, then the Licensed Product and related Documentation is commercial computer software, and, pursuant to FAR 12.212 or DFARS 227.7202 and their successors, as applicable, shall be licensed to the Government under the terms and conditions of this Agreement.

## 13. GENERAL PROVISIONS

13.1 Choice of Law. This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California excepting that body of California law governing conflicts of law.

13.2 Jurisdiction. The federal and state courts within Santa Clara County, California shall have exclusive jurisdiction to adjudicate any dispute arising out of this Agreement. Each party hereto expressly consents to the personal jurisdiction of, and venue in, such courts and service of process being effected upon it by registered mail and sent to the address set forth at the beginning of this Agreement.

13.3 Assignment. This Agreement may not be assigned by Licensee without the prior written consent of Synopsys.

13.4 Notices. Any notice, report, approval or consent required or permitted hereunder shall be in writing and will be deemed to have been duly given if delivered personally, by facsimile, or mailed by first-class, registered or certified mail, postage prepaid to the respective addresses of the parties as set forth in this Agreement. If to Synopsys, Attention: General Counsel.

13.5 No Waiver. Failure by either party to enforce any provision of this Agreement will not be deemed a waiver of future enforcement of that or any other provision.

13.6 Independent Contractors. The relationship of Synopsys and Licensee established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed (i) to give either party the power to direct or control the day-to-day activities of the other or (ii) to constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking.

CONFIDENTIAL

DEF018658

13.7 Severability. If for any reason a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be unenforceable, that provision of the Agreement will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement will continue in full force and effect.

13.8 Attorneys' Fees. The prevailing party in any action to enforce the Agreement shall be entitled to recover costs and expenses including, without limitation, reasonable attorneys' fees.

13.9 Injunctive Relief. The parties agree that a material breach of this Agreement adversely affecting Synopsys' Intellectual Property Rights in the Licensed Product, Design Techniques or Documentation would cause irreparable injury to Synopsys for which monetary damages would not be an adequate remedy and Synopsys shall be entitled to equitable relief in addition to any remedies it may have hereunder or at law.

13.10 Force Majeure. Except for the obligation to make payments hereunder, nonperformance of either party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental action, failure of suppliers, earthquake, or any other reason where failure to perform is beyond the reasonable control of the nonperforming party.

13.11 Entire Agreement. This Agreement, including all Supplements, constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior agreements or representations, oral or written, regarding such subject matter. This Agreement may not be modified or amended except in a writing signed by a duly authorized representative of both parties.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives:

LICENSEE

By: _____

Name: Jon E. Fredricks, C.P.M.

Title: Director of Purchasing

Date: 9.29.99

SYNOPSYS, INC.

By: _____

Name: JOANN M. KONDO
SR. CONTRACTS NEGOTIATOR

Title: _____

Date: 10/01/99

CONFIDENTIAL
DEF018659



**SYNOPSYS**

The Synthesis Company

**AGREEMENT FOR LICENSED PRODUCTS**

AGREEMENT NO: MAT 001

MATIC-A00066

COPY

The following Agreement sets forth the terms and conditions under which SYNOPSYS , Inc. ("Synopsys") will license the Licensed Products and sell its services to _MATROX  LTD_ ("Customer"). In addition to Sections 1-15 below, the following Addenda and Exhibits are incorporated into this Agreement:

System Description Addendum(a) _____  Exhibit A - Customer Disk Back-Up Policy
Software Support Agreement(s) _____  OEM Addendum _____
_____  Other Addenda _____

This Agreement constitutes a Master License Agreement. Additional or subsequent licenses of Licensed Products shall be evidenced by separate System Description Addenda consecutively labelled or dated or by revisions to an existing System Description Addenda. Upon acceptance by Synopsys, as evidenced by authorized signature on such new or revised System Description Addenda, such additional license shall become part of this Agreement.

Each license granted hereunder for each Licensed Product is subject to and conditioned upon annual renewal of the applicable Software Support Agreement for such product. **FAILURE TO RENEW THE SOFTWARE SUPPORT AGREEMENT WITH RESPECT TO A LICENSED PRODUCT WILL RESULT IN THE AUTOMATIC TERMINATION OF CUSTOMER'S LICENSE TO USE SUCH LICENSED PRODUCT.**

Except as to fees and terms for payment set forth in Customer's "Purchase Order," this Agreement shall not be modified, explained, supplemented or construed by any additional or conflicting terms or conditions in any "Purchase Order" or form, except in writing executed by duly authorized representatives of both parties.

**CUSTOMER ACKNOWLEDGES THAT IT HAS READ THIS AGREEMENT AND EACH ADDENDUM OR EXHIBIT INCORPORATED HEREIN, UNDERSTANDS IT, AND AGREES TO BE BOUND BY ITS TERMS AND CONDITIONS. CUSTOMER FURTHER ACKNOWLEDGES THAT THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO ITS SUBJECT MATTER AND SUPERSEDES ALL PRIOR PROPOSALS, NEGOTIATIONS AND COMMUNICATIONS, ORAL OR WRITTEN, BETWEEN THE PARTIES AND THEIR REPRESENTATIVES. NO DEVIATION FROM THIS AGREEMENT SHALL BE BINDING UNLESS IN WRITING AND SIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF THE PARTY AGAINST WHOM THE DEVIATION IS SOUGHT TO BE ENFORCED.**

EFFECTIVE DATE: _October 18, 1988_

**SYNOPSYS, INC.**
1500 Salado Drive
Mountain View, CA  94043

(By) _Vice President, Finance & Administration_
(Title) _October 18, 1988_
(Date)

**CUSTOMER**

_MATROX  LTD_
(Address) _1055 ST-REGIS BLVD,_
_DORVAL, QUE, CAN, H9P 2T4_

(By) _Jacques Villemaire, Eng._
(Title) _GRAPHICS GROUP DIRECTOR_
(Date) _88 / 10 / 17_

Agreement for Licensed Products
Revision: 7/26/88

Page 1 of 4

Synopsys Incorporated

CONFIDENTIAL

DEF018631

## 1. DEFINITIONS

a. "Licensed Software" means the computer pr_____n(s) listed as such on any System Description Add_____ hereto and any other Synopsys software product(s) obtained by Customer in connection _____with, whether in object code, reconfigurable binary, _____ce code, or any other form, any materials in written or graphic form including Documentation and training aids; and any updates, derivative works, ___lifications, enhancements, and extensions of any of the foregoing received by Customer from time to time pursuant to this License Agreement or any Software Support Agreement as well as any backups of the foregoing made by Customer at any time.

b. "Sublicensed Software" means the computer programs listed as such on any System Description Addenda hereto, whether in object code, source code, firmware, or any other form; any materials in written or graphic form including Documentation; and any updates, derivative works, modifications, enhancements and extensions of any of the foregoing received by Customer from time to time, pursuant to software support addenda, if any, or otherwise.

c. "Licensed Product (s)" means the Licensed Software and Sublicensed Software.

d. "Documentation" means all Licensed Products user manuals, documentation binders, release notes, installation notes, written utility programs and other written materials related to the Licensed Products.

e. "Designated Machine" means (with reference to each copy of Licensed Software) the central processing unit (CPU), whether a single processor or computer containing multiple processors, operating under a single operating system or local area network as identified by 1) location, 2) whether single user or multi-tasking, 3) single or multi-processor, 4) model and serial number and 5) if applicable, number of user devices in any System Description Addenda hereto as the hardware on which such copy of Licensed Software will reside.

f. "Designated Site" means (with reference to each Designated Machine) the physical location where such machine resides.

g. "Usage," "Use" or "Used" means transferring, transmitting, compiling, executing, interpreting, processing, storing or displaying any portion of the Licensed Products through the use of computer and/or video equipment, and/or utilizing Documentation for any purpose.

h. "Design" means the representation of an electronic circuit or device(s), derived or created through the Use of the Licensed Products by Customer, in its various forms including, but not limited to, equations, truth tables, schematic diagrams, textual descriptions, and netlists.

i. "Design Techniques" means the data, circuit and logic elements, Synopsys-developed libraries, algorithms, search strategies, rule bases, and technical information employed in the process of creating Designs through the Use of the Licensed Products and any other information relating the foregoing disclosed to or learned by Synopsys in the course of its relationship with Customer; provided, however, that Customer shall not have any obligation to disclose any Design Techniques to Synopsys at any time.

j. "Qualified System Configuration" means a combination of CPU or CPU's, operating system software and all other associated peripheral systems and subsystems qualified from time to time by Synopsys for use with the Licensed Products. A list of Qualified System Configurations is available from Synopsys.

k. "Proprietary Information" includes the Licensed Product(s), including without limitation, any Documentation, Design Techniques, and software code in any form, any additional written material identified as proprietary by appropriate legend, or information conveyed orally and confirmed in writing as being proprietary to Synopsys within 30 days.

## 2. LICENSE GRANT AND RESTRICTED USE

a. Subject to the conditions herein, Synopsys grants to Customer a non-transferable, non-exclusive, limited license to use Licensed Products in machine readable form on the Designated Machine(s) at the Designated Site(s) as described in the System Description Addenda of this Agreement. Customer shall store any magnetic media on which the Licensed Products are transmitted to Customer, any back-up media if and as permitted pursuant to Section 2 (c) below, and any Documentation in a safe and secure place under access and use restrictions not less strict than those applied to Customer's own sensitive proprietary and confidential information or materials, and such magnetic media shall not be transferred, reproduced or Used in any other way.

b. Customer shall not make, have made, or permit to be made by its employees or by any third party any copies or translations of the Licensed Products, in whole or in part, for any reason, including, but not limited to, "backing up" data and other files which have been merged with the Licensed Products.

c. Notwithstanding Section 2 (b) above, if Customer demonstrates (or represents and warrants in writing as Exhibit A to this Agreement) to Synopsys that it has in effect, and consistently follows, written business policies and procedures to back-up ALL data and other files on Designated Machine (i.e., performs routine "Disk Back-Ups"); then Customer may perform such Disk Back-Ups, including Licensed Products, solely in accordance with such Customer's written policies and procedures.

d. Customer shall not reverse-engineer, decompile or disassemble any portion or version of the Licensed Products or attempt any of the foregoing, or aid, abet or permit others to do so.

e. In the event that, and only for so long as, Customer's Designated Machine is not operative due to malfunction, repair, maintenance or other modification which renders it inoperative, Synopsys shall assist upon request of Customer to transfer to and Use the Licensed Product(s) on Customer's substitute system. The designated substitute system shall be the Designated Machine during any substitution period only.

f. Licensed Products shall be Used on only one (1) single Designated Machine at a time. Customer may NOT move or transfer Licensed Products electronically between any computer or file server which is not a Designated Machine through the use of a local area network or otherwise. Customer shall maintain the Designated Machine in a Qualified System Configuration at all times during the term of this agreement.

g. Customer shall not provide Use of the Licensed Products in a computer service business, rental or commercial timesharing arrangement.

h. Documentation shall be used solely to support Use of Licensed Products. Customer acknowledges that extra copies of Documentation may be licensed from Synopsys.

i. Customer acknowledges and agrees that: (i) unauthorized reproduction, reverse engineering, electronic transfer or other Use of Licensed Products which is prohibited by Sections 2(a) through 2(h) is a breach of a material obligation of this Agreement; and (ii) in the event that unauthorized copies of Licensed Products are Used by Customer or its personnel on other than Designated Machines, and Synopsys elects not to terminate this Agreement pursuant to Section 9, Customer shall by virtue of such act(s) be deemed to order and accept a license for and shall pay Synopsys the list price license fee for each such unauthorized reproduction, electronic Use or other unauthorized Use or transfer of Licensed Products. This license fee shall be the Synopsys published list price existing on the date such unauthorized Use first occurred. This amount shall be due, for purposes of Section 7 hereof, thirty (30) days following discovery by Synopsys of such unauthorized use.

j. Prior to disposing of any Designated Machine, software media (e.g. disks or backup records) or other similar apparatus, Customer shall ensure that any Licensed Products contained on such media or stored in such apparatus has been completely erased or otherwise destroyed.

k. In the event that Synopsys reasonably deems itself insecure with respect to Customer's compliance with the foregoing provisions, Customer shall grant Synopsys such access to Customer's facilities, equipment and records as may be necessary to verify compliance with the terms of this Agreement, provided that Customer may take all steps necessary to maintain the integrity of its proprietary or sensitive information and may limit such access to reasonable times and circumstances. In addition, Customer shall upon request by Synopsys, but not more frequently than annually, provide Synopsys confirmation of the accuracy of the information provided in System Description Addenda hereto.

88/10/17    J.W.

10-18-88

CONFIDENTIAL
DEF018632

3.   SUPPORT CONDITION
a.  Each license granted hereunder is subject to customer maintaining a valid Software Support agreement with respect to each Licensed Product as provided therein. Customer agrees and acknowledges that immediately upon any lapse (or failure to renew) the Software Support Agreement relating to a Licensed Product, the license for such product shall automatically terminate, and Customer shall promptly destroy or return to Synopsys such product, (including all Documentation, copies, modifications and all other related material). This Agreement, however, will remain in effect as to all other Licensed Products for which valid Software Support Agreements are maintained.
b.  Notwithstanding the foregoing, if all Licensed Product licenses hereunder are terminated pursuant to Section 3(a), then this agreement shall terminate in accordance with Section 9.

4.   TERM  This Agreement is effective from its execution by Synopsys and Customer until Customer discontinues the Use of the Licensed Products, unless sooner terminated pursuant to Section 9.

5.   DELIVERY AND ACCEPTANCE  Synopsys shall deliver the Licensed Software to a common carrier, F.O.B. Synopsys facilities.  Customer acknowledges that prior to the initial delivery of each Licensed Product licensed hereby, it has had the opportunity to evaluate, test and verify the performance of such product in a Qualified System Configuration and Customer further acknowledges and agrees that acceptance shall occur upon delivery of the Licensed Software by Synopsys to Customer or a common carrier, subject only to the warranty provided in Section 12.

6.   TITLE  Title to an ownership of all Licensed Software and Sublicensed Software, and any copies thereof, any patents, trademarks or copyrights incorporated therein and to the Synopsys Proprietary Information shall at all times remain with Synopsys and its licensors.

7.   PAYMENTS AND TAXES  Customer shall pay to Synopsys the license fee(s) in accordance with the payment terms set forth in Customer's Purchase Order accepted by Synopsys, and any amounts due under Section 2(i) in the event of unauthorized Use of Licensed Products.  In addition to any other sums payable hereunder, Customer shall pay to or reimburse Synopsys for all taxes, however designated, arising from or based upon the Licensed Products and software maintenance and support services provided in connection therewith including any sale and/or use tax, value added tax, local privilege or excise tax, tariff, duty, property tax or assessment (but excluding taxes based on Synopsys' income) and related interest and penalties, if any, imposed by any governmental authority at any time.  All such taxes shall be invoiced to Customer by Synopsys.  Customer shall pay or reimburse Synopsys promptly for such amounts.

8.   EXPORT AND RELOCATION RESTRICTIONS  Customer may relocate Designated Machine to a new  Designated Site controlled by Customer  in the United States or Canada provided Customer gives Synopsys written notice not more than 30 days after such relocation.  This Agreement, the Licensed Products and the rights granted hereunder are subject to any and all laws, regulations, orders or other restrictions relative to export, re-export or redistribution of Licensed Products that may now or in the future be imposed by the government of the United States or any agency thereof.  Customer may relocate the Designated Machine outside the United States or Canada to a new Designated Site controlled by Customer only after satisfying all such applicable laws and regulations, giving Synopsys thirty (30) days PRIOR written notice, and providing such further assurances as Synopsys in its sole discretion deems appropriate.

9.   TERMINATION
a.  This Agreement shall terminate prior  to the event set forth in Section 4 above, upon occurrence of any of the following events: (i) the failure or neglect of Customer to pay Synopsys any sums or amounts due hereunder in a timely manner where such delinquency  is not fully corrected within fifteen (15) days of Synopsys' written  demand; or (ii) The failure or neglect of Customer to observe, keep or perform any of the material covenants, terms and conditions of this Agreement (except as set forth in Section 3) where such non-performance is not fully remedied by Customer within thirty (30) days after prior written notice by Synopsys; or (iii) any breach of Section 2 hereof (effective immediately); or (iv) the failure and termination of all licenses hereunder pursuant to Section 3(b). or (v) The filing of a petition for Customer's bankruptcy, whether voluntary or involuntary, or an assignment of Customer's assets made for the benefit of creditors, or the appointment of a trustee or receiver to take charge of the business of Customer for any reason, or Customer's becoming insolvent or voluntarily or involuntarily being dissolved.
b.  Notwithstanding the foregoing, the provisions of Sections 2, 6, 10, 11, 12, and 14 shall survive the termination of this Agreement.
c.  Within fifteen (15) days following the termination date, Customer shall cease to Use and shall either destroy or return to Synopsys all of the Licensed Products, copies thereof, any documents, notes, and other materials related to the Licensed Products in the Customer's possession or under Customer's control, together with Customer's written certification by a duly authorized officer that the original and all updates of the Licensed Products, including copies, modifications and other related materials, are no longer in Use and have been returned to Synopsys or destroyed.
d.  Termination of this Agreement under this Section 9 shall be in addition to, and not a waiver of, any remedy at law or in equity available to Synopsys arising from Customer's breach of this Agreement.

10.   PROTECTION AND SECURITY OF SOFTWARE
Customer understands and agrees that the Licensed Product constitutes a trade secret of Synopsys, is furnished by Synopsys to Customer in confidence, and contains proprietary and confidential information of Synopsys. Customer shall hold the Licensed Products in confidence and shall not disclose the Licensed Products (including methods or concepts utilized therein) to anyone, except to employees of Customer to whom disclosure is necessary in conjunction with the license granted in Section 2 of this Agreement. Customer shall further take all necessary precautions and actions, including, without limitation, the precautions Customer employs with respect to its own proprietary information, to avoid the unauthorized disclosure or use of the Software or any part hereof. Any Proprietary Information disclosed by Synopsys to Customer or its employees in connection with any training, installation or under a Software Support Agreement or in connection with any additional consulting activities shall also be protected by Customer as provided herein. Any copyright notice used in connection with Licensed Products shall not be deemed to imply that any part of the Licensed Products has been published, has been placed in the public domain, or has removed the obligation to hold any proprietary information contained on or in the Licensed Products in confidence.

11.   RIGHTS TO DESIGNS AND METHODS  Customer and Synopsys agree that Customer shall be the owner of all Designs created or derived through the Use of the Licensed Products and that Synopsys shall retain all rights to Design Techniques whether or not embodied in the Licensed Products.  Accordingly, Synopsys and Customer agree that Customer shall be the owner of the Designs and Synopsys assigns to Customer all of its rights, if any, thereto.  Synopsys shall retain all rights, title and interest in all Design Techniques, and Customer assigns all rights, if any, in Design Techniques to Synopsys.

12.   WARRANTIES
a.  Performance Warranties.  Synopsys warrants for a period of ninety (90) days from the date of delivery that the Licensed Software for the Designated Machine shall substantially conform to the specifications therefore set forth in the Documentation, subject to the condition that the

88/10/17 J.N.
10-18-88 Dan

CONFIDENTIAL
DEF018633

Designated Machine is installed in a Qualified System Configuration. In the event of any nonconformance of the Licensed Software, Customer shall promptly notify Synopsys and provide Synopsys with evidence and documentation which reproduces the claimed error and resultant output from the execution of such code or data. Synopsys' sole obligation under this warranty shall be limited to use of its best efforts to promptly correct such defects. Except as provided under a valid Software Support Agreement Synopsys will not be under any obligation to provide Customer with any updates, releases or enhancements other than to remedy non-conformance under this warranty. Synopsys' warranty obligations shall be void if the Licensed Software is Used on other than in a Qualified System Configuration or is modified without the written consent of Synopsys.

b. **No Further Warranties.** EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 12, SYNOPSYS AND ITS SUPPLIERS DO NOT MAKE ANY EXPRESS, IMPLIED OR STATUTORY WARRANTIES, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, OR ARISING FROM A COURSE OF DEALING, TRADE USAGE OR TRADE PRACTICE. THE SOLE AND EXCLUSIVE REMEDY FOR ANY BREACH OF THE WARRANTIES AS SET FORTH IN THIS AGREEMENT SHALL BE REJECTION AND REFUND OF ANY AMOUNTS ACTUALLY PAID BY CUSTOMER TO SYNOPSYS.

**13.  PATENT, TRADE SECRET AND COPYRIGHT INDEMNIFICATION**

**a. Defense of Suits.** Synopsys shall, at its own expense, defend or at its option settle any claim, suit or proceeding brought against the Customer on the issue of infringement of any United States patent, copyright or other proprietary rights, of any third party, by virtue of Customer's Usage of any of the Licensed Software pursuant to the terms of this Agreement ("Infringement"). Synopsys shall indemnify Customer against any costs, expense or damages awarded in such action, provided that Customer promptly notifies Synopsys in writing of the action and provided, further, that Customer permits Synopsys full authority to defend or settle the action and cooperates and provides all available information, assistance and authority to defend or settle the action and cooperates and provides all available information, assistance and authority to enable Synopsys to do so. Synopsys shall not be liable for any costs, expenses, damages or fees incurred by Customer in defending such action or claim unless authorized in writing by Synopsys.

**b. Prosecution of Suits.** Any action to be brought to prevent or enjoin any third party from infringement of any patent, copyright or other proprietary rights of Synopsys with respect to the Licensed Software shall be brought exclusively by Synopsys, in its sole discretion and at its sole cost and expense.

**c. Infringement Remedies** If Licensed Software is, or in Synopsys' opinion is likely to become, the subject of a claim, suit or proceedings of infringement, Synopsys may (i) procure for Customer, at no cost to Customer, the right to continue Usage of the Licensed Software, (ii) replace or modify the Licensed Software, at no cost to Customer, to make it non-infringing, provided that the same function is performed by the replacement or modified Licensed Software, or (iii) if the right to continue Usage cannot be procured for Customer for a cost not exceeding the amounts paid or to be paid hereunder by Customer or the Licensed Software cannot be replaced or modified to make it non-infringing, and within thirty (30) days after Synopsys being notified of the Infringement and the Licensed Software, remove the Licensed Software and grant Customer a credit thereon in such amounts as are depreciated on a straight-line sixty (60) month basis.

**d. Non-Conforming Use.** Synopsys shall have no liability for any claim, suit or proceeding of infringement based on the (a) Usage of other than the then latest release of the Licensed Software from Synopsys, if such Infringement could have been avoided by the Usage of the latest release of Licensed Software and such latest version has been made available to Customer, or (b) Usage or combination of the Licensed Software with software, hardware or other materials not provided, recommended, or approved by Synopsys if such Infringement could have been avoided without such use or combination, or (c) Usage of Licensed Software after Customer's receiving notice that the Licensed Software infringes a trade secret right of a third party.

**14.  LIMITATION OF LIABILITY**

**a. Limitation on Damages.** IN NO EVENT WILL SYNOPSYS OR ITS SUPPLIERS BE LIABLE FOR ANY LOSS OF OR DAMAGE TO REVENUES, PROFITS, OTHER ECONOMIC LOSS OR GOODWILL OR OTHER SPECIAL, INCIDENTAL, EXEMPLARY, INDIRECT AND CONSEQUENTIAL DAMAGES OF ANY KIND , RESULTING FROM ITS PERFORMANCE OR FAILURE TO PERFORM PURSUANT TO THE TERMS OF THIS AGREEMENT OR ANY OF THE ATTACHMENTS HERETO, OR RESULTING FROM THE FURNISHING, PERFORMANCE, DELAY IN DELIVERY, OR USE OR LOSS OF USE OF ANY LICENSED PRODUCTS OR OTHER MATERIALS DELIVERED TO CUSTOMER HEREUNDER, WHETHER RESULTING FROM BREACH OF CONTRACT OR BREACH OF WARRANTY, EVEN IF SYNOPSYS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**b. Maximum Liability.** Except for Synopsys' obligations pursuant to Section 13, Synopsys' and its suppliers' liability to Customer under any provision of this Agreement shall be limited to the amounts paid to Synopsys by Customer. Synopsys' limitation of liability is cumulative with all Customer's payments being aggregated to determine satisfaction of this limit. The existence of more than one claim will not enlarge or extend this limit.

**15.  MISCELLANEOUS**

This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of laws provisions thereof. Any action related to this Agreement shall be brought in the federal or state courts in the State of California. In the event that any provision of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, the remaining portions hereof shall remain in full force and effect. Neither this Agreement nor any rights or obligations hereunder, in whole or in part, shall be assignable or otherwise transferable by Customer except in connection with any acquisition of Customer by another. Any attempt by Customer to assign or transfer this Agreement or any rights or obligations hereunder shall be null and void. Any notices required or permitted to be given pursuant to his Agreement shall be in writing, sent via certified mail, return receipt requested, express overnight courier, or by facsimile (a confirmed copy of which to be sent promptly by mail to addressee) to the address of Synopsys or Customer as set forth herein or to such other address as may be specified from time to time by notice in writing, and such notice shall be deemed to have been received on the earlier of (i) the date when actually received or (ii) if by facsimile, when the sending party shall have received a facsimile confirmation that the message has been received by the receiving party's facsimile machine. No term of this Agreement shall be deemed waived or amended by either party, and no breach excused by such party, unless in writing. The prevailing party in any action to enforce the terms of this Agreement shall be entitled to reasonable attorney's fees and other costs and expenses incurred by it in connection with such action.

Agreement for Licensed Products
Revision: 7/26/88

Page 4 of 4

8 8/10/17
10-18-88

Synopsys Incorporated

CONFIDENTIAL
DEF018634

# synopsys® COPY



## AGREEMENT FOR LICENSED PRODUCTS

### AMENDMENT ONE

This **Amendment One** to the Agreement for Licensed Products (with an initial effective date of October 18, 1988 and an initial number of MAT 001), the "Agreement," is made by and between Synopsys Incorporated, a Delaware Corporation, with its principal place of business at 700 E. Middlefield Road, Mountain View Ca. 94043, hereinafter referred to as "Synopsys," and Matrox Electronics Systems, Ltd. a Canadian Corporation, with its principal place of Business at 1055 St. Regis Boulevard, Dorval, Quebec H9P2T4, Canada, hereinafter referred to as "Licensee." This Amendment will supersede the previous agreement effective October 1, 1991 and will be known by Agreement Number MAT1C-A00066.

The System Description Addendum is included herein by reference and is an integral part of this Agreement. In addition, the Software Support Agreement is included herein by reference and is an integral part of this Agreement during the initial term and during any period of active Support thereafter.

This Agreement constitutes a Master License Agreement. Individual licenses for Licensed Products under the terms and conditions herein provided shall be evidenced by separate System Description Addenda consecutively labelled and dated. Upon acceptance by Synopsys of each System Description Addendum, such license shall become part of this Agreement.

Each license granted hereunder for each Licensed Product is subject to a minimum one (1) year Software Support Agreement for each such Licensed Product. Upon non-renewal of the Software Support Agreement, Licensee shall be granted a twenty (20) year license to Use the Licensed Product(s) pursuant to this Agreement. Synopsys shall enable each Licensed Product as required to permit Licensee's authorized continuing Use. This Agreement and the Software Support Agreement shall at all times be treated as and in accordance with Proprietary Information as defined herein.

BOTH PARTIES ACKNOWLEDGE THAT THIS AGREEMENT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE MUTUAL UNDERSTANDING OF THE PARTIES AND ██████████ AND CANCELS ALL CONFLICTING TERMS AND CONDITIONS AND ALL PREVIOUS AND CONTEMPORANEOUS WRITTEN AND ORAL AGREEMENTS AND COMMUNICATIONS RELATING TO THE SUBJECT MATTER HEREIN, INCLUDING ANY TERMS AND CONDITIONS THAT MAY BE INDICATED IN ANY LICENSEE PURCHASE ORDER. THIS AGREEMENT MAY NOT BE MODIFIED, SUPPLEMENTED, QUALIFIED OR INTERPRETED BY ANY TRADE USAGE OR PRIOR COURSE OF DEALING NOT MADE A PART OF THIS AGREEMENT BY ITS EXPRESS TERMS. THIS AGREEMENT MAY NOT BE MODIFIED OR AMENDED EXCEPT IN WRITING AND EXECUTED BY DULY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES.

BOTH PARTIES ACKNOWLEDGE THAT THEY HAVE READ THIS AGREEMENT, UNDERSTAND IT AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS.

Synopsys Incorporated
700 E. Middlefield Road
Mountain View, CA 94043

(By) Glenda Goulette-Schwem
     Section Manager, Contracts

(Title)

(Date)

LICENSEE:  Matrox Electronics Systems, Ltd.
1055 St. Regis Boulevard, Dorval
Quebec, H9P2T4, Canada

(By) Signature of Authorized Representative
     Branko Matic, Chairman
(Print Name and Title)

(Date)

CONFIDENTIAL
DEF018635

# 1.0    DEFINITIONS

**1.1    Licensed Software:** means the Synopsys computer program(s) listed on any System Description Addenda hereto and any other Synopsys software product(s) obtained by Licensee in connection therewith, whether in object code, reconfigurable binary, or any other form; any materials in written or graphic form including: Documentation and training aids; any Updates, derivative works, modifications, enhancements, and/or extensions of any of the foregoing, received by Licensee from time to time, pursuant to this Agreement or the Software Support Agreement (if applicable), as well as any backup or archival copies of the foregoing made by Licensee at any time.

**1.2    Sublicensed Software:** means the computer programs listed on any System Description Addenda hereto, whether in object code, firmware, or any other form; any materials in written or graphic form including: Documentation and training aids; any Updates, derivative works, modifications, enhancements and/or extensions of any of the foregoing, received by Licensee from time to time, pursuant to this Agreement or the Software Support Agreement (if applicable), as well as any backup or archival copies of the foregoing made by Licensee at any time.

**1.3    Licensed Product(s):** means the Licensed Software and Sublicensed Software.

**1.4    Documentation:** means all Licensed Product user manuals, documentation binders, release notes, installation notes, written utility programs and other written materials related to the Licensed Product.

**1.5    Designated Machine:** means (with reference to each copy of the Licensed Product) the central processing unit (CPU), whether a single processor or computer containing multiple processors, operating under a single operating system or local area network as identified by: (a) location; (b) whether single user or multi-user; (c) single or multi-process; (d) model and serial number; and if applicable, (e) number of user devices in any System Description Addenda hereto as the hardware on which such copy of the Licensed Product will reside.

**1.6    Designated Site:** means (with reference to each Designated Machine) the physical location where such machine resides.

**1.7    Usage, Using, Use, or Used:** means the transmitting, compiling, executing, interpreting, processing, storing or displaying of any portion of the Licensed Product through the use of computer and/or video equipment, and/or utilizing Documentation for any purpose.

**1.8    Update(s):** means a derivative work extension, enhancement or modification of a Licensed Product made by or for Synopsys, which Synopsys in its sole discretion, determines to be an improvement of the Licensed Products performance or functionality and which Synopsys releases to its licensees. Updates shall not include any new, additional features, enhancements, or options which increase the basic functionality of the Licensed Product for which Synopsys charges a separate or additional fee (e.g. new or different Licensed Product).

**1.9    Design:** means the representation of an electronic circuit or device(s), derived or created through the Use of the Licensed Product by Licensee in its various formats including, but not limited to, equations, truth tables, schematic diagrams, textual descriptions, hardware description languages, and netlists.

**1.10    Design Techniques:** means the Synopsys supplied data, circuit and logic elements, libraries, algorithms, search strategies, rule bases, and technical information incorporated in the Licensed Products and Documentation, and employed in the process of creating Designs.

**1.11    Qualified System Configuration:** means a combination of CPU or CPU's, operating system software and all other associated peripheral systems and subsystems qualified from time to time by Synopsys for use with the Licensed Product. A list of Qualified System Configurations is available upon request .

**1.12    Synopsys Proprietary Information:** shall mean: (a) the Licensed Product(s), including without limitation, any Documentation, Design Techniques, and software code in any form; (b) information relating to Synopsys' manufacturing or design processes; (c) any information relating to Synopsys' marketing, business, or other strategies or plans, and (d) any other trade secrets or other information which in each case has been disclosed to Licensee in writing and appropriately marked or identified as proprietary or confidential or, if disclosed orally or by electronically stored media without legend, has been confirmed in writing as being proprietary within thirty (30) days of its initial disclosure.

**1.13    Licensee Proprietary Information:** shall mean: (a) Designs and any information relating to functional characteristics; (b) any Licensee-developed design libraries; (c) information relating to Licensee's manufacturing processes, and (d) any information relating to Licensee's marketing, business, or other strategies or plans and (e) any other trade secrets or other information which in each case has been disclosed to Synopsys in writing and appropriately marked or identified as proprietary or confidential or, if disclosed orally or by electronically stored media without legend, has been confirmed in writing as being proprietary within thirty (30) days of its initial disclosure.

**1.14    Proprietary Information:** includes Synopsys Proprietary Information and Licensee Proprietary Information. In all cases the definition shall not apply to any information: (a) which is in the public domain at the time of disclosure; or (b) which can be established and documented as being in the possession of, or known by, the receiving party prior to its receipt from the disclosing party; or (c) which is rightfully disclosed to the receiving party by a third party not in violation of the proprietary rights of others or the rights of the disclosing party, or any other person or entity; or (d) which the receiving party can

establish as being developed independently of Proprietary Information received from the disclosing party.

# 2.0    LICENSE GRANT AND RESTRICTED USE

**2.1** Subject to the conditions herein, Synopsys grants to Licensee a non-transferable, non-sublicensable, non-exclusive, limited license to Use the Licensed Product(s) in machine readable form on the Designated Machine(s) at the Designated Site(s) as described in any System Description Addenda made part hereof. Licensee shall store any magnetic media on which the Licensed Product(s) is delivered to Licensee, any back-up media permitted pursuant to Section 2.2 below, and any Documentation in a safe and secure place under access and use restrictions not less strict than those applied to Licensee's own Proprietary, and confidential Information, and such media or Documentation shall not be transferred, reproduced or used in any other way except as provided for under the terms of this Agreement.

**2.2** Licensee may make copies of the Licensed Product(s), for back-up or archival purposes only. Licensee shall not otherwise make, have made or permit to be made, by its employees or by any third party, any copies or translations of the License Product(s), in whole or in part.

**2.3** Licensee shall not reverse-engineer, decompile or disassemble any portion or version of the Licensed Product(s) or attempt any of the foregoing, or aid, abet or permit others to do so.

**2.4** In the event that, and only for so long as, Licensee's Designated Machine is not operative due to malfunction, repair, maintenance or other modification which renders it inoperative, and Licensee maintains an effective Software Support Agreement, Synopsys shall use its commercial best efforts to assist upon request of Licensee, to transfer to and Use the Licensed Product(s) on Licensee's substitute system. The designated substitute system shall be the Designated Machine during any substitution period only.

**2.5** Licensed Product(s) shall be Used on only one (1) single Designated Machine at a time. Licensee shall maintain the Designated Machine in a Qualified System Configuration at all times during the term of this Agreement.

**2.6** Licensee shall not provide Use of the Licensed Product(s) in a computer service business, rental or commercial timesharing arrangement.

**2.7** Documentation shall be used solely to support Use of Licensed Product(s). Licensee acknowledges that extra copies of Documentation may be licensed from Synopsys.

**2.8** Licensee acknowledges and agrees that: (a) unauthorized reproduction, reverse engineering, electronic transfer or other Use of Licensed Product(s) which is not expressly authorized by this Section 2 is a breach of a material obligation of this Agreement; and (b) in the event that unauthorized copies of Licensed Product(s) are made and/or Used by Licensee or its personnel on other than Designated Machine(s), and Synopsys elects not to terminate this Agreement pursuant to Section 9, Licensee shall by virtue of such act(s) be deemed to order and accept a license for and shall pay Synopsys the list price license and applicable support fees for each such unauthorized reproduction, electronic Use, other unauthorized Use, or transfer of Licensed Products. These fees shall be Synopsys' published list prices existing on the date such unauthorized Use first occurred. This amount shall be due, for purposes of Section 7.0, thirty (30) days following discovery by Synopsys of such unauthorized use.

**2.9** Prior to disposing of any Designated Machine, software media (e.g. disks or backup records) or other similar apparatus, Licensee shall erase or otherwise destroy any Licensed Product contained on such media or stored in such apparatus.

**2.10** In the event that Synopsys reasonably deems itself insecure with respect to Licensee's compliance with the foregoing provisions, Licensee shall, within ten (10) days written notification, either: (a) provide written certification by a duly authorized officer of the compliance with the terms of this Section 2.0 to Synopsys; or (b) grant Synopsys such access to Licensee's facilities, equipment and records as may be necessary to verify compliance with the terms of this Agreement, provided that Licensee may take all steps necessary to maintain the integrity of its Proprietary or sensitive Information and may limit such access to reasonable times and circumstances. In addition, Licensee shall upon request by Synopsys, but not more frequently than annually, provide Synopsys confirmation of the accuracy of the information provided in System Description Addenda made part hereof.

# 3.0    SUPPORT CONDITION

**3.1** Any and all Software Support for a Licensed Product is predicated upon Licensee having a valid, paid in full Software Support Agreement with respect to each Designated Machine as provided for in the applicable System Description Addenda. Failure to renew the Software Support Agreement for a Licensed Product after the initial term, or at the completion of any term thereafter, shall terminate all responsibilities from Synopsys for providing Support to Licensee in any form whatsoever. Rehost privileges shall be at Synopsys' then current, standard rates.

**3.2** In the event Licensee elects to reinstate the Software Support Agreement, Synopsys' then current standard, reinstatement charges shall prevail. If Licensee elects to reinstate support for a Licensed Product, and a Master Software Support Agreement is in place, then the terms of the original Software Support Agreement shall prevail.

# 4.0    TERM

**4.1** This Agreement is effective from its execution by Licensee and Synopsys and is valid until Licensee: (a) discontinues the Use of the Licensed Product: (b) does not renew the Software Support Agreement,

---

CONFIDENTIAL
DEF018636

whereby Licensee is granted a twenty (20) year non-e       le, non-transferable, non-sublicensable, limited license to Use the Licensed Product(s) in accordance with the terms of this Agreement with the twenty (20) year term commencing on the last day of the last valid Effective Period of support, or (c) unless sooner terminated pursuant to Section 9.0.

**5.0     DELIVERY AND ACCEPTANCE**
5.1     Synopsys shall deliver the Licensed Product(s) to a common carrier, F.O.B. Synopsys' facilities.
5.2     Licensee further acknowledges and agrees that acceptance shall occur upon delivery of the Licensed Product by Synopsys to a common carrier, subject only to the warranty provided in Section 12.0.

**6.0     TITLE**
6.1     Subject to the licenses granted herein, all right, title and interest in and to the Licensed Products(s), Synopsys Proprietary Information and any other patents, patent applications, trademarks, copyrights or trade secrets owned by or the rights in which are held by Synopsys and its licensors shall remain with Synopsys and its licensors.
6.2     Subject to the licenses granted hereunder, all right, title and interest in and to Licensee Proprietary Information, and any other patents, patent applications, trademarks copyrights or trade secrets owned by or the rights to which are held by Licensee shall remain with Licensee.

**7.0     PAYMENT TERMS AND TAXES**
7.1     Payment terms are net thirty (30) days after delivery, as delineated in Section 5.0, of the Licensed Product(s) by Synopsys to Licensee.
7.2     Licensee shall pay to Synopsys the license fee(s) set forth in the relevant Synopsys quotation as referenced on Licensee's purchase order and accepted by Synopsys, and any amounts due under Section 2.8(b) in the event of unauthorized Use of Licensed Product(s).
7.3     This Agreement number and the Software Support Agreement number (if applicable), must appear on all correspondence related to this Agreement or any subsequent order placed hereunder.
7.4     All invoices will be mailed to Licensee's Accounts Payable Department specified in the applicable Licensee Purchase Order.
7.5     In addition to any other sums payable hereunder, Licensee shall pay to or reimburse Synopsys for any and all taxes arising from or based upon the license or Use of the Licensed Product(s) (excluding taxes based on Synopsys' income) as well as the collection of or withholding of such tax, including penalties and interest.

**8.0     EXPORT AND RELOCATION RESTRICTIONS**
8.1     Licensee may relocate Designated Machine and/or the Licensed Product to a new Designated Site controlled by Licensee provided Licensee gives Synopsys written notice not more than thirty (30) days after such relocation.
8.2     This Agreement, the Licensed Product(s), the direct product resulting from the Use of the Licensed Product(s), and the rights granted hereunder are subject to any and all laws, regulations, orders or other restrictions relative to export, re-export or redistribution of the Licensed Product(s) that may now or in the future be imposed by the government of the United States or any agency thereof. Licensee may relocate the Designated Machine and/or the Licensed Product(s) outside the United States to a new Designated Site controlled by Licensee only after satisfying all such applicable laws and regulations.

**9.0     TERMINATION**
9.1     Synopsys shall have the right, in its sole discretion to terminate this Agreement and the licenses hereunder prior to the events set forth in Section 4.0 above, upon the occurrence of any of the following events: (a) the failure or neglect of Licensee to pay Synopsys any sums or amounts due hereunder in a timely manner where such delinquency is not fully corrected within thirty (30) days of Synopsys' written demand (failure to pay the License fee will result in the termination of the License, failure to pay for Software Support will result in failure to receive Software Support); or (b) the failure or neglect of Licensee to observe, keep, or perform any of the material covenants, terms and conditions of this Agreement where such non-performance is not fully remedied by Licensee within thirty (30) days of Synopsys' written demand; or (c) any breach of Section 2.1 or 2.3 hereof (effective immediately upon written notification, at Synopsys' option); or (d) the filing of a petition for Licensee's bankruptcy which is not discharged within sixty (60) days, whether voluntary or involuntary, or an assignment of Licensee's assets made for the benefit of creditors, or the appointment of a trustee or receiver to take charge of Licensee's business for any reason, or Licensee becoming insolvent or commencing proceedings for voluntarily or involuntarily dissolution.
9.2     Notwithstanding the foregoing, the provisions of Sections 2.0, 6.0, 10.0, 11.0, 12.0, 13.0 and 14.0 shall survive the termination of this Agreement.
9.3     Within fifteen (15) days following the termination date, Licensee shall cease to Use and shall either destroy or return to Synopsys all of the Licensed Products, Documentation, copies thereof, and all Synopsys Proprietary Information related to the Licensed Product in Licensee's possession or under Licensee's control, together with Licensee's written certification by a duly authorized officer, that the original and all Updates of the Licensed Product(s), including copies, modifications or Documentation, and Synopsys Proprietary

Information are no long,       Use and have been returned to Synopsys or destroyed.
9.4     Termination of this Agreement under this Section 9.0 shall be in addition to, and not a waiver of, any remedy at law or in equity available to Synopsys arising from Licensee's breach of this Agreement.

**10.0     PROTECTION AND SECURITY OF PROPRIETARY INFORMATION**
10.1     Synopsys and Licensee hereby acknowledge that each party considers its Proprietary Information (including the Licensed Product(s) in the case of Synopsys) valuable trade secrets and agrees to hold all such Proprietary Information received from the other in strict confidence and to not disclose the same to any other party, except employees or agents of the receiving party to whom disclosure is necessary in connection with the licenses granted hereunder and the support obligations under the terms of this Agreement and the Software Support Agreement. Synopsys and Licensee agree to take all reasonable precautions and actions, including without limitation, those precautions utilized by the receiving party with respect to its own Proprietary and confidential Information, to prevent unauthorized disclosure thereof. Any copyright notice used in connection with Licensed Product(s) shall not be deemed to imply that any part of the Licensed Product(s): has been published; has been placed in the public domain, or has removed the obligation to hold any Proprietary or confidential Information contained on or in the Licensed Product(s) in confidence.

**11.0     RIGHTS TO DESIGNS AND METHODS**
11.1     Licensee and Synopsys agree that Licensee shall be the owner of all Designs created or derived through the Use of the Licensed Product. Accordingly, Synopsys and Licensee agree that Licensee shall be the owner of the Designs and Synopsys assigns to Licensee all of its rights, if any, thereto.
11.2     Licensee and Synopsys agree that Synopsys shall retain all rights to Design Techniques and Licensee assigns to Synopsys all of its rights, if any, thereto. Notwithstanding the limitations set forth in Section 10.0, Licensee agrees that Synopsys will have the irrevocable right to use in the Licensed Product any Licensee contributed or voluntarily disclosed information relating to Design Techniques disclosed to Synopsys in the course of its relationship with Licensee, except where Synopsys is advised otherwise by Licensee in advance and in writing of each instance and such information or Design Techniques have been appropriately marked or identified as proprietary or confidential or, if disclosed orally or by electronically stored media without legend, has been confirmed in writing as being proprietary within thirty (30) days of its initial disclosure to Synopsys, in which case such information and Design Techniques will not be used by Synopsys for any purpose and shall be subject to the restrictions of Section 10.0.

**12.0     WARRANTIES**
12.1     Performance Warranties: Synopsys warrants that it has the right to enter this Agreement and to grant the licenses hereunder. Synopsys warrants for a period of ninety (90) days from the date of delivery that the Licensed Product for the Designated Machine shall be free from defects in media and shall substantially conform to the material specifications therefore set forth in the Documentation, subject to the condition that the Designated Machine is installed in a Qualified System Configuration. In the event of any nonconformance of the Licensed Product, Licensee shall promptly notify Synopsys in writing, and provide Synopsys with evidence and documentation which reproduces the claimed error and resultant output from the execution of such code or data. Synopsys' sole obligation under this warranty shall be limited to use of its commercial best efforts to promptly correct such defects. Except as provided under a valid Software Support Agreement, Synopsys will not be under any obligation to provide Licensee with any Updates, releases or enhancements other than to remedy non-conformance under this warranty. Synopsys' warranty obligations shall be void if the Licensed Product is Used on other than in a Qualified System Configuration or is modified without the advance written consent of Synopsys.
12.2     NO FURTHER WARRANTIES: EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 12.0, SYNOPSYS AND ITS LICENSORS DO NOT MAKE ANY EXPRESS, IMPLIED OR STATUTORY WARRANTIES, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, OR ARISING FROM A COURSE OF DEALING, TRADE USAGE OR TRADE PRACTICE. THE SOLE AND EXCLUSIVE REMEDY FOR ANY BREACH OF THE WARRANTIES AS SET FORTH IN THIS AGREEMENT SHALL BE REJECTION AND REFUND OF ANY AMOUNTS ACTUALLY PAID BY LICENSEE TO SYNOPSYS.

**13.0     PATENT, TRADE SECRET AND COPYRIGHT INDEMNIFICATION**
13.1     Defense of Suits: Synopsys shall, at its own expense, defend or at its option, settle any claim, suit or proceeding brought against Licensee on the issue of infringement of any valid United States or Canadian patent, copyright or other proprietary rights, of any third party, by virtue of Licensee's Usage of any of the Licensed Products pursuant to the terms of this Agreement. Synopsys shall indemnify Licensee against any costs, expense or damages awarded in such action, provided that Licensee: (a) promptly notifies Synopsys in writing of the action and provided further that: (b) Licensee permits

CONFIDENTIAL
DEF018637

Synopsys full authority to defend or settle the _____ ind (c) cooperates and provides all available information, assistance and _____ ty to defend or settle the action. Synopsys shall not be liable for any costs, expenses, damages or fees incurred by Licensee in defending such action or claim unless authorized in advance, in writing by Synopsys.

13.2    **Prosecution of Suits:**   Any action to be brought to prevent or enjoin any third party from infringement of any patent, copyright or other proprietary rights of Synopsys with respect to the Licensed Product(s) shall be brought exclusively by Synopsys, in its sole discretion and at its sole cost and expense.

13.3    **Infringement Remedies:**   If Licensed Product(s) is, or in Synopsys' opinion is likely to become, the subject of a claim, suit, or proceedings of infringement, Synopsys may:  (a) procure at no cost to Licensee, the right to continue Usage of the Licensed Product; (b) replace or modify the Licensed Product, at no cost to Licensee, to make it non-infringing, provided that substantially the same function is performed by the replacement or modified Licensed Product, or (c) if the right to continue Usage cannot be procured for Licensee for a cost not exceeding the amounts paid or to be paid hereunder by Licensee, or the Licensed Product cannot be replaced or modified to make it non-infringing, terminate the license of such, remove the Licensed Product and grant Licensee refund credit thereon ~~as depreciated ratably over a sixty (60) month~~ basis.

13.4    **Non-Conforming Use.**   Synopsys shall have no liability for any claim, suit or proceeding of infringement based on the: (a) Usage of other than the then latest release of the Licensed Product from Synopsys, if such infringement could have been avoided by the Usage of such release, and such latest release has been made available at no cost provided Licensee maintains an effective Software Support Agreement; or (b) Usage or combination of the Licensed Product with software, hardware or other materials not provided, recommended, or approved by Synopsys if such Infringement could have been avoided without such use or combination, or (c) Usage of Licensed Product after Licensee receiving notice that the Licensed Product Infringes a trade secret right of a third party.

13.5    **No other Obligations:**   The foregoing states Synopsys' sole obligations and entire liability with respect to any claimed infringement of the Licensed Product(s) or of any intellectual property or other rights of any third party.

## 14.    LIMITATION OF LIABILITY

14.1    **Limitation on Damages.**   IN NO EVENT WILL SYNOPSYS OR ITS SUPPLIERS BE LIABLE FOR ANY LOSS OF OR DAMAGE TO REVENUES, PROFITS, OTHER ECONOMIC LOSS OR GOODWILL OR COSTS OF REPLACEMENT GOODS OR SERVICES OR OTHER SPECIAL, INCIDENTAL, EXEMPLARY, INDIRECT AND CONSEQUENTIAL DAMAGES OF ANY KIND , RESULTING FROM ITS PERFORMANCE OR FAILURE TO PERFORM   PURSUANT TO THE TERMS OF THIS AGREEMENT OR RESULTING FROM THE FURNISHING, PERFORMANCE, DELAY IN DELIVERY, OR USE OR LOSS OF USE OF ANY LICENSED PRODUCTS OR OTHER MATERIALS DELIVERED TO LICENSEE HEREUNDER, WHETHER RESULTING FROM BREACH OF CONTRACT, BREACH OF WARRANTY, TORT OR STRICT LIABILITY EVEN IF SYNOPSYS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

14.2    **Maximum Liability.**  ~~Subject to~~ Synopsys' obligations ~~under Section 13.0,~~ Synopsys' and its suppliers' liability to Licensee under any provision of this Agreement shall be ~~limited to the~~ license fees actually paid by ~~Licensee to Synopsys.~~ Synopsys' limitation of liability is cumulative with all Licensee's payments being aggregated to determine satisfaction of this limit. The existence of more than one claim will not enlarge or extend this limit.

## 15.0    RELEASE OF PERFORMANCE INFORMATION

15.1    Licensee shall not distribute externally, or to third parties, any reports or statements that directly compare the timing, speed, or other performance results of circuit designs created or designed through the Use of the Licensed Product with results obtained through the Use of any other similar products of Licensee or any third party without the prior written approval of Synopsys

15.2    Neither party shall announce or publicly disclose the terms and conditions of this Agreement without prior written approval from the other party.

## 16.0    GOVERNING LAW.

16.1    This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of laws provisions thereof.

## 17.0    ASSIGNMENT

17.1    Neither this Agreement nor any rights or obligations hereunder, in whole or in part, shall be assignable or otherwise transferable by Licensee except upon prior written approval of Synopsys in the event of acquisition, substantial sale of assets or reorganization. Such approval shall not be unreasonably withheld. Any unauthorized attempt by Licensee to assign or transfer this Agreement or any rights or obligations hereunder shall be null and void.

## 18.0    NOTICE

18.1    Any notices required or permitted to be given pursuant to his Agreement shall be in writing, sent via certified mail, return receipt requested, express overnight courier, or by facsimile (a confirmed copy of which to be sent promptly by mail to addressee) to the address of Synopsys or Licensee as set forth below or to such other address as may be specified from time to time by notice in writing, and such notice shall be deemed to have been received on the earlier of (a) the date when actually received or (b) if by facsimile, when the sending party shall have received a facsimile confirmation that the message has been received by the receiving party's facsimile machine.

If to Synopsys:

Synopsys, Inc
700 E. Middlefield Road
Mountain View, CA 94043
Attn: Manager, Contracts

Telephone Number:        (415) 962-5000
Facsimile Number:        (415) 694-4087

If to Licensee:
Matrox Electronics Systems, Ltd.
1055 St. Regis Blvd., Dorval
Quebec, H9P2T4, Canada

Attn:   Daniel Leduc

Telephone Number:      (519) 685-2630
Facsimile Number:      (514) 685-7030

## 19.0    SEVERABILITY AND WAIVER

19.1    The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions of this Agreement and shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

19.2    The waiver by either party of any default or breach of this Agreement shall not constitute a waiver of any other subsequent default or breach.

19.3    Failure or delay by either party in exercising any right or power hereunder shall not operate as a waiver of such right or power.

19.4    The prevailing party in any action to enforce the terms of this Agreement shall be entitled to reasonable attorney's fees and other costs and expenses incurred by it in connection with such action.

## 20.0    SYNOPSYS QUOTATION

20.1    For the initial procurement made against this Amendment, Synopsys Quotation #TD910906M will be incorporated into this Agreement for Licensed Product. The Matrox letter contract of September 30, 1991 is also incorporated for this initial order.

**End of Document**

CONFIDENTIAL
DEF018638

  

## Amendment Number **Two**

This Amendment, with an Effective Date of <u>1 October 1991</u>, is an amendment to the Agreement for Licensed Products, number <u>MAT1C-A00066</u>, made by and between Synopsys Incorporated (Synopsys) and <u>Matrox Electronics Systems, Ltd.</u> (Licensee), and modifies the terms and conditions under which Licensee will Use the Licensed Product(s) referenced in the applicable System Description Addendum hereto.

THIS AMENDMENT TO THE AGREEMENT FOR LICENSED PRODUCTS ADDS NETWORK LICENSING CAPABILITY TO THE SYNOPSYS LICENSED PRODUCT.

**Section 1.0**    **Definitions,** is amended as follows:
    1.6    Add to the definition of 1.6 after the words "Designated Machine" the words: "or Server".
    1.15    **Network, Networked:**  means a plurality of computational nodes that are interconnected for the transfer of data and which are physically located within the same Site where the Server(s) resides.  The term computational nodes shall include Server(s).
    1.16    **Designated Server(s):**  means the Network file Server(s) that are enumerated on the System Description Addendum attached hereto and by this reference made a part hereof.  The System Description Addendum shall include the Designated Site where such Server is located.  Licensee may only designate one, three or five computational nodes as Servers.  The Servers shall control access to the Licensed Products by managing the distribution of the Network License Keys.  If multiple servers are used for redundancy, the servers act as one (1) logical server node, hereinafter referred to as the "Server."
    1.17    **Network License Key:** means the software protection method utilized by Synopsys, using an encrypted character stream which enables the Use of the Licensed Product.  Each Network License Key allows one instance of the application or feature to run.  Each Licensed Product is single-process and single-user, and may be used on any supported platform on the Network

**Section 2.0**    **License Grant and Restricted Use,** is amended to add:
    2.11    Subject to the conditions herein, Synopsys grants to Licensee a non-transferable, non-sublicensable, non-exclusive, limited license to Use the Licensed Product(s) in machine readable form on the Licensee's Network, on the Server(s).
    2.12    Licensee represents, warrants and agrees that the Network on which the Licensed Product is installed, is privately owned by Licensee, and will be Used only by Licensee.  Licensee shall ensure that only employees of Licensee shall have access to the Licensed Product(s) on the Network.

**Section 7**    **Payment Terms,** is amended to add:
    7.6    The license fee and support fee will be based upon the applicable Synopsys Price List in effect for the country in which the Server(s) resides.

**Section 8.**    **Export and Relocation Restrictions,** is amended to read:
    8.3    Licensee may relocate the Network Licensed Product to a new Server (which shall then be designated on the System Description Addendum hereto), provided that such Server is located in the same country.  Licensee shall give Synopsys written notice not more than thirty (30) days after such relocation.
    8.4    For Networked Licensed Product(s), Licensee acknowledges and agrees that the Licensed Product(s), the direct product resulting from the Use of the Licensed Product(s), and the rights granted hereunder are subject to any and all laws, regulations, orders or other restrictions relating to export, re-export or redistribution that may now or in the future be imposed by the government of the United States or any agency thereof.  Licensee assumes all responsibility for the export of the Licensed Product(s) from the United States or the relocation of the Licensed Product(s) outside the United States and further assumes full responsibility for compliance with all applicable U. S. and other export laws, regulations and orders, including without limitation the Export Administration Regulations.

EXCEPT AS AMENDED HEREIN, ALL OTHER TERMS AND CONDITIONS ARE UNCHANGED AND REMAIN IN FULL FORCE AND EFFECT.

| | |
|---|---|
| Synopsys Incorporated<br>700 East Middlefield Road<br>Mountain View, CA  94043-4033 | Licensee:  Matrox Electronics Systems, Ltd.<br>1055 St. Regis Boulevard, Dorval<br>Quebec, H9P2T4, Canada |
| *Glenda Goulette - Schwem* | *(signature)* |
| (By)    Glenda Goulette-Schwem | (By) Signature of Authorized Representative |
| Section Manager, Contracts | Branko Matic, Chairman |
| (Title) | (Print Name and Title) |
| 15 October 1991 | Oct 16/91 |
| (Date) | (Date) |

CONFIDENTIAL
DEF018639

☑002

AGREEMENT NO. _____

EULA - 70000054

# END USER SOFTWARE LICENSE AGREEMENT

COPY

between

SYNOPSYS, INC.

700 East Middlefield Road

Mountain View, California 94043

and

MATROX GRAPHICS, INC.

("Licensee")

1055 St-Regis Blvd.

Dorval, Quebec, H9P 2T4

9 April, 1999

Effective Date

Synopsys, Inc. ("Synopsys") and Matrox Graphics, Inc. ("Licensee") each hereby agree as follows:

The terms and conditions of that certain Agreement for Licensed Products between Synopsys, Inc. and Matrox Electronic Systems, Ltd. dated October 18, 1988, including any Amendments and Supplements thereto in effect on the Effective Date set forth hereinabove, are hereby incorporated by reference as if fully set forth below, with Matrox Graphics, Inc. substituted as Customer and Licensee, and as further amended herein. This End User Software License Agreement may also be referred to in other agreements between the parties as the "Agreement for Licensed Products" or the "End User License Agreement."

The following is added to the Definitions:

1.18 "Use Area" means the Key Server(s), Client(s) and End User(s) all located within the same five (5) mile radius.

The parties further agree as follows:

Unless otherwise agreed to by the parties in writing, Licenses hereunder are for use only in the Use Area.

The parties waive any requirements to prepare System Description Addenda in connection with software licensed hereunder.

Commercial software products licensed to Licensee by Synopsys prior to the Effective Date hereof shall be governed by the terms and conditions of this End User Software License Agreement.

*[signature page follows immediately hereafter]*

*MGI EUSLA – Rev. 080499*

CONFIDENTIAL
DEF018640

⊠003

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

SYNOPSYS, INC.

MATROX GRAPHICS, INC.

By: _____

By: _____

Name: _____

Name: LORNE TROTTIER

Title: _____
      Steven K. Shevick
      Vice President
      General Counsel

Title: PRESIDENT

*MGI EUSLA – Rev. 080499*

CONFIDENTIAL
DEF018641

Synopsys Canada

72723

COPY

SUPPLEMENT NO. R-00066-001

## TIME BASED SUPPLEMENT

This Time Based Supplement ("Supplement") is entered into and effective as of the 23rd day of November, 1995 ("Supplement Effective Date") by and between Synopsys, Inc., ("Synopsys") and Matrox Electronic Systems ("Licensee").

This Supplement is an exhibit to the End User Software License Agreement, Number 106 ("License Agreement") by and between Synopsys and Licensee. Except where superseded by this Supplement, all other terms and conditions of the License Agreement are incorporated by reference. Capitalized terms that are not defined herein have the same meaning as in the License Agreement.

1.  **TERM**

    Notwithstanding Section 8.1 of the License Agreement, for Licensed Software provided to Licensee under the terms of this Supplement, the license set forth in Section 2.1 of the License Agreement shall be as set forth in the applicable License Key, unless the license is sooner terminated in accordance with Section 8.2 of the License Agreement.

2.  **EXPIRATION**

    Upon expiration or termination of the Term, Licensee shall immediately cease all use of the Licensed Software and Documentation, and return or destroy all such copies and all portions thereof and so certify in writing to Synopsys.

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed by their duly authorized representatives:

**LICENSEE**                                  **SYNOPSYS, INC.**

By: _Jacques Villeneuve_            By: _____

Name: _JACQUES VELLEMBERE_       Name: _____
          (Print)                                        (Print)

Title: _VP ENGR_                          Title: _____

_MATROX_

CONFIDENTIAL
DEF018642



SUPPLEMENT NO. _WAN-70000054-001_

## CONTINENTAL
## WIDE-AREA NETWORK (WAN) SUPPLEMENT

This Continental WAN Supplement ("Supplement") is entered into and effective as of the _10th_ day of _Nov_, _1999_ ("Supplement Effective Date") by and between Synopsys, Inc., ("Synopsys") and Matrox Graphics, Inc. ("Licensee") for the purpose of setting forth the conditions under which Licensee may use Synopsys software over a Continental wide area network.

This Supplement is an exhibit to the Agreement for Licensed Products or the End User Software License Agreement, Number EUL99-70000054 ("License Agreement") dated April 9, 1999 by and between Synopsys and Licensee. Except where superseded by this Supplement, all other terms and conditions of the License Agreement remain unchanged. In the event of a conflict, the terms of this Supplement will govern. Capitalized terms that are not defined herein have the same meaning as in the License Agreement.

### 1.    DEFINITIONS

1.1    "Continental WAN Software" means the Synopsys computer software program(s) which are specified in Exhibit A to this Supplement and identified in the applicable License Key, including any Updates provided by Synopsys pursuant to the terms of the Support Agreement. Except where there is a conflict with the terms of this Supplement, the defined terms "Licensed Product" and/or "Licensed Software" as they appear in the License Agreement shall be read to include Continental WAN Software.

1.2    "Continent" means the applicable continent specified in Exhibit A, within which Licensee is permitted to use the WAN Software specified in Exhibit A.

1.3    "End User" means, for the purposes of this Supplement, Matrox Graphics Inc.; Matrox Tech Inc. in Boca Raton, Florida; Typhoon Technologies Inc. in Markham, Ontario; Matrox Electronic Systems Inc. in Dorval, Quebec, and Matrox Semiconductor Inc. in Dorval, Quebec. Matrox Graphics Inc. represents that it has the authority to cause its End Users to affirm and agree to the terms of the License and Maintenance/Support Agreements, and agrees to guarantee the performance of its End Users' obligations under the License and Maintenance/Support Agreements. End Users shall not include entities which are competitors or affiliates of a competitor of Synopsys.

1.4    "Key Server" means the one or three computational nodes, as identified in the License Key, which control access to and enable the Continental WAN Software.

1.5    "License Key" means a document (in physical or electronic format) provided by Synopsys to Licensee which identifies: (i) the Continental WAN Software, including version number and quantity, licensed to Licensee; (ii) the Key Server(s); and (iii) the codes which Licensee must input to initialize use of the Key Server(s).

### 2.    GRANT OF RIGHTS

Notwithstanding the terms of Section 2.1 of the License Agreement, and subject to the further requirements of this section, Synopsys grants Licensee a non-exclusive, nontransferable license, without right of sublicense, to permit its End Users within the Continent to access and use, over a wide-area network, the Continental WAN Software for such Continent hosted on the Key Server located at the Key Server Site, all as specified in Exhibit A. The License Keys for the Continental WAN Software must be installed on a Key Server wherein all of the License Keys for Licensed Product(s) installed on such Key Server are for Continental WAN Software for the same Continent.

**CONFIDENTIAL
DEF018643**

Synopsys agrees that the Licensee may, upon consent from Synopsys, change the Key Server Site and/or add Key Server Sites and add End User Matrox Sites in the Continent provided in Exhibit A, at no additional cost to the Licensee. Licensee shall give at least 30 days prior notice to Synopsys. Synopsys consent shall not be unreasonably withheld.

3. **DELIVERY TERMS**

Synopsys shall deliver to the Key Server Site, at Synopsys' expense, the Licensed Product, License Key and/or Documentation, as appropriate. Licensee will be responsible for all costs associated with the distribution, access and use of the Licensed Product and/or Documentation to End Users within the Continent.

4. **TERM AND TERMINATION OF LICENSE**

4.1 <u>Term</u>. The license set forth in Section 2 above shall be for the term as set forth in the applicable License Key, unless the license is sooner terminated in accordance with this Supplement.

4.2 <u>Termination</u>. In the event of a breach by Licensee of this Supplement, Synopsys may, in its sole discretion, immediately terminate this Supplement in whole or in part. This Supplement and the rights granted herein shall terminate immediately upon any termination of the License Agreement.

5. **ENTIRE AGREEMENT**

This Supplement, the License Agreement and the Support Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior agreements or representations, oral or written, regarding such subject matter. This Supplement may not be modified or amended except in a writing signed by a duly authorized representative of both parties.

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed by their duly authorized representatives:

**LICENSEE**                                          SYNOPSYS, INC.

By: _____                           By: _____

Name: _____                           Name: _____
Branko Matic                                                        Irene Sun
         (Print)                                               (Print)
Secretary-Treasurer                                   Sr. Contracts Negotiator

Title: _____                          Title: _____

Date: 10 May 2002                                     Date: May 10, 2002

**CONFIDENTIAL
DEF018644**

**EXHIBIT A TO THE**
**CONTINENTAL**
**WIDE-AREA NETWORK (WAN) SUPPLEMENT**

| CONTINENT | WAN SOFTWARE IN CONTINENT | KEY SERVER SITE/END USER SITES FOR CONTINENT |
|---|---|---|
| [ X ]   North America<br>[ ]   Europe<br>[ ]   Asia Pacific<br>    (excluding Japan)<br>[ ]   Japan | Product Name          Quantity<br>PrimeTime                    10<br>DC Ultra                       13<br>HDL Compiler Verilog      6<br>Power Compiler              2<br>VHDL Compiler               6<br>Physical Compiler Add-On  10<br>VCS                             4<br>DesignWare                   6<br>ClockTree Compiler        4 | Key Server Site:  Matrox Graphics Inc.<br>City, State, Zip Code:<br>1055 Boul. Saint-Regis<br>Dorval, Quebec, Canada, H9P 2T4<br><br>End User Sites:<br>Matrox Graphics Inc.<br>1055 Boul. Saint-Regis<br>Dorval, Quebec<br>Canada<br>H9P 2T4<br><br>Matrox Tech Inc.<br>1075 Broken Sound Parkway<br>Boca Raton, Florida<br>USA<br><br>Typhoon Technologies Inc.<br>3500 Steels Ave E.<br>Tower 1, Floor 3<br>Markham, Ontario<br>CANADA<br>L3R 0X1<br><br>Matrox Electronic Systems Inc.<br>1055 Boul. Saint-Regis<br>Dorval, Quebec<br>Canada<br>H9P 2T4<br><br>Matrox Semiconductor Inc.<br>1055 Boul. Saint-Regis<br>Dorval, Quebec<br>Canada<br>H9P 2T4<br><br>Contact Name: Andre-Claude Chagnon<br>Phone Number: 514.822.6000<br>Ext:2046<br>Fax Number: 514.685.7030 |

CONFIDENTIAL
DEF018645



SUPPLEMENT NO. DW501-70000054    SITE NO. _____

## DESIGNWARE SUPPLEMENT

This DesignWare Supplement ("Supplement") is effective as of the 10th day of May, 20 02 (the "Effective Date") by and between Synopsys, Inc., ("Synopsys") and Matrox Graphics, Inc. ("Licensee"). This Supplement is made with reference to the following facts and circumstances:

    A.   Synopsys and Licensee are parties to an existing Agreement for Licensed Products or End User Software License Agreement, Number EUL99-70000054 ("License Agreement"), which states terms and conditions generally applicable to Licensee's use of Synopsys products, including DesignWare;

    B.   The parties wish to agree upon and record in this Supplement certain additional terms and conditions applicable to Licensee's copying and use of DesignWare so that the rights and duties of the parties with respect to DesignWare are clear.

Now therefore, for good and valuable consideration, the parties hereby agree as follows:

### SCOPE OR SUPPLEMENT

This Supplement states certain rights and duties of the parties with respect to Licensee's use of DesignWare and is made a part of the License Agreement. Except where superseded by this Supplement, all other terms and conditions of the License Agreement are incorporated by reference. In the event of a conflict between the License Agreement and this Supplement, the terms of this Supplement shall govern, except that any General Definitions already included in the License Agreement take precedence over any General Definitions in this Supplement. Capitalized terms that are not defined herein shall have the same meaning as in the License Agreement.

**1.    GENERAL DEFINITIONS**

1.1   "Client" means an enabled instance of the Licensed Product running on a single processor computational node, owned or controlled by Licensee.

1.2   "End User(s)" means all the persons who access or use the Licensed Product.

1.3   "Key Server" means the computational node(s), as identified in the License Key, which control access to and enable the Licensed Product.

1.4   "License Key" means a document (in physical or electronic format) provided by Synopsys to Licensee which reflects the applicable Licensee purchase order and lists: (i) the Licensed Product, including version number and quantity, licensed to Licensee; (ii) the Key Server(s); and (iii) the codes which Licensee must input to initialize use of the Key Server(s).

1.5   "Use Area" means the Key Server(s), Client(s) and End User(s) all located within the same five (5) mile radius.

**2.    DESIGNWARE DEFINITIONS**

2.1   "DesignWare" means Implementation IP and Verification IP. Except where there is a conflict with the terms of this Supplement, the defined term "Licensed Product" as it appears in the License Agreement shall be read to include DesignWare.

**CONFIDENTIAL**    **DEF018646**

2.2 "Implementation IP" means any of the reusable designs, excluding Verification IP, as identified in the applicable Documentation.

2.3 "Integrated Design" means a Design that combines Implementation IP with additional Design elements that: (i) Licensee has developed or acquired from a third party and incorporated into the Design; and (ii) cause the fair market value of such Design to significantly exceed the fair market value of the same Design if it were to consist only of Implementation IP.

2.4 "Verification IP" means the Synopsys software models, in source or object code form, that simulate and verify the functionality of certain electronic circuits or devices as identified in the applicable Documentation.

## 3.     GRANT OF RIGHTS

3.1 DesignWare License. If Licensee has purchased a license to DesignWare, Synopsys hereby grants Licensee the following nonexclusive, nontransferable rights to DesignWare, with no right to sublicense (except as provided below):

   (i)     Licensee may use DesignWare in the quantity authorized by the DesignWare License Key, in accordance with the Documentation, in the Use Area, and for the sole purpose of creating, validating, testing, or simulating Designs;

   (ii)    Licensee may integrate Implementation IP into Licensee's Designs to create Integrated Designs;

   (iii)   Licensee may make, have made, use and distribute physical implementations of the Integrated Designs;

   (iv)    Licensee may distribute Implementation IP as part of an Integrated Design in netlist or GDSII format to third parties, and may sublicense such third parties the right to use, make, have made and distribute  physical implementations of the Integrated Designs, provided that Licensee first obtain the written agreement of each such third party that it (a) may only distribute the physical implementation of the entire Integrated Design as received from Licensee, and not any portion or modification thereof; (b) receives no right, express or implied, to modify or make derivative works of DesignWare; and (c) receives no warranties, express or implied, from Synopsys in connection with the Integrated Design;

   (v)     Licensee may also distribute design databases incorporating DesignWare in any format (other than, with respect to Implementation IP, unencrypted source code) to a third party with whom Licensee is working on a common Design, provided that (a) such third party has a valid Synopsys end user license to use DesignWare; (b) use of DesignWare by such third party complies with such end user software license; and  (c) all exchanged DesignWare contains the  notice of copyright and all other proprietary legends. (For the avoidance of doubt, the right granted in this paragraph does not include any right to assign or otherwise sublicense the DesignWare licensed by Licensee.); and

   (vi)    if Licensee has purchased from Synopsys the right to use certain Implementation IP in source code format, Licensee may modify such Implementation IP in support of Licensee's development of Integrated Designs.

3.2 License Restrictions. Except as otherwise provided under Section 3.1 above, the license restrictions in Section 2.8 of the License Agreement shall apply to the use of DesignWare.

3.3 Patent and Copyright Indemnity. THE TOTAL LIABILITY OF SYNOPSYS FOR ANY OBLIGATIONS OF INDEMNITY UNDER SECTION 10 OF THE LICENSE AGREEMENT WITH RESPECT TO DESIGNWARE SHALL BE LIMITED TO AND NOT EXCEED THE TOTAL OF THE LICENSE AND SUPPORT FEES RECEIVED BY SYNOPSYS FROM LICENSEE FOR DESIGNWARE.

## 4.     OWNERSHIP

CONFIDENTIAL
DEF018647

4.1    DesignWare. Synopsys and/or its licensors shall retain all right, title and interest in and to DesignWare, and all copies and portions thereof in any form, including all Intellectual Property Rights embodied therein. Synopsys does not grant Licensee any rights or license to any Intellectual Property Rights in DesignWare, except for those rights expressly granted herein. Third party proprietary information may have been used in the development of DesignWare, and any third party licensors of DesignWare may enforce their rights under this Section as third party beneficiaries. Such third parties are listed in the applicable DesignWare Documentation.

4.2    Licensee Designs. Licensee shall retain all right, title and interest in and to all Designs, Integrated Designs and all copies and portions thereof, subject to Synopsys' underlying rights in any DesignWare incorporated in such Integrated Designs.

## 5.    TERM AND TERMINATION

5.1    Term. For DesignWare provided to Licensee under the terms of this Supplement, the term of the license set forth in Section 3 above shall be as set forth in the applicable License Key, unless the license is sooner terminated in accordance with the termination section of the License Agreement.

5.2    Effect of Termination.    Upon termination, Licensee's rights under Section 3. 1 hereof shall immediately terminate and Licensee shall immediately cease all use of DesignWare (other than DesignWare incorporated into Designs prior to termination, for which Licensee's license shall continue according to its terms) and return or destroy all copies of DesignWare (other than DesignWare incorporated into Designs prior to termination) and all portions thereof and so certify in writing to Synopsys.  All other provisions of this Supplement shall, in accordance with its terms, survive any termination or expiration of this Supplement.

## 6.    ENTIRE AGREEMENT

This Supplement and the License Agreement into which it is incorporated, constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede all prior agreements or representations, oral or written, regarding such subject matter. Except to the extent that a provision of the License Agreement is expressly contradicted or superseded by this Supplement, all terms and conditions of the License Agreement remain in full force and effect and state additional rights and duties of the parties with respect to Licensee's use of DesignWare. This Supplement may not be modified or amended except in a writing signed by a duly authorized representative of both parties.

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed by their duly authorized representatives:

| LICENSEE | SYNOPSYS, INC. |
|---|---|
| By | By: |
| Name: Branko Matic | Name: Irene Sun |
| (Print) | (Print) Sr. Contracts Negotiator |
| Title: May 10 2002 | Title: |
| Secretary-Treasurer | |

CONFIDENTIAL
DEF018648

Date: _____          Date: ___May 10, 2002___

CONFIDENTIAL
DEF018649