Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| RICOH COMPANY, LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| AEROFLEX INCORPORATED, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

CASE NO. CV 03-04669-MJJ

**DECLARATION OF EDWARD A. MEILMAN IN SUPPORT OF RICOH'S MOTION TO ADVANCE THE CASE MANAGEMENT CONFERENCE**

**Date:  Not Set**
**Time: Not Set**
**Courtroom:  11**

Edward A. Meilman declares as follows:

1.    I am an attorney at law licensed to practice in the State of New York and admitted in this case *pro hac vice*, and am a partner in the law firm of Dickstein Shapiro Morin & Oshinsky, LLP, attorneys for plaintiff Ricoh Company, Ltd.  The matters set forth in this declaration are based on my personal knowledge, except where indicated, and if called as a witness, I could and would testify competently thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of the May 30, 2003 Scheduling Order in the above captioned action.

3.    Attached hereto as Exhibit B is a true and correct copy of a Case Management Report which the parties have already submitted in *Synopsys Inc. v. Ricoh Company Ltd*, CV 03-02289 MJJ.

4.    At a "meet and confer" held between counsel for the parties on November 13, 2003, the submission of a request for an earlier Case Management Conference was discussed and counsel for the defendants stated they had no objection in principal to the request.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Signed at New York, NY on November 18, 2003.

*Edward A. Meilman*

Edward A. Meilman

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

RICOH COMPANY, LTD.,           :    CIVIL ACTION
                               :
        Plaintiff              :
                               :
    vs.                        :
                               :
AEROFLEX INCORPORATED, AMI     :
SEMICONDUCTOR, INC., MATROX    :
ELECTRONIC SYSTEMS LTD.,       :
MATROX GRAPHICS INC., MATROX   :
INTERNATIONAL CORP., and       :
MATROX TECH, INC.,             :
                               :
    Defendants                 :    NO. 03-103 (GMS)


- - -

Wilmington, Delaware
Friday, May 16, 2003
2:00 o'clock, p.m.

- - -

BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

- - -


APPEARANCES:

        RICHARDS, LAYTON & FINGER, P.A.
        BY:  ROBERT W. WHETZEL, ESQ. and
             STEVEN J. FINEMAN, ESQ.

             -and-




                        Valerie J. Gunning
                        Official Court Reporter

Multi-Page™

**Page 2**

```
1   APPEARANCES (Continued):

2           DICKSTEIN, SHAPIRO, MORIN & OSHINSKY
            BY:  GARY M. HOFFMAN, ESQ. and
3           EDWARD A. MEILMAN, ESQ.
            (Washington, D.C.)
4
            Counsel for Plaintiff
5
6           CONNOLLY, BOVE, LODGE & HUTZ LLP
            BY:  FRANCIS DIGIOVANNI, ESQ.
7
              -and-
8
            HOWREY, SIMON, ARNOLD & WHITE
9           BY:  TERESA M. CORBIN, ESQ.
            (Menlo Park, California)
10
            Counsel for Defendants
11
12          MacPHERSON, KWOK, CHEN & HEID LLP
            BY:  ALAN H. MacPHERSON, ESQ. (VIA TELEPHONE)
13          (San Jose, California)
14          Counsel for Defendat AMI Semiconductor
15               - - -
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2         P R O C E E D I N G S
3
4       (Proceedings commenced in chambers, beginning at
5   2:00 p.m.)
6
7       THE COURT:  Good afternoon.
8       MR. WHETZEL:  Your Honor, may I introduce
9   Gary Hoffman from Dickstein Shapiro and his partner,
10  Ed Meilman.
11      MR. DiGIOVANNI:  This is Teresa Corbin of Howrey
12  Simon in California.
13      And we also expected to have --
14      THE COURT:  We have him on the phone.
15      MR. DiGIOVANNI:  Alan MacPherson representing
16  AMI.
17      THE COURT:  Yes.
18      Your name, counsel?
19      MR. FINEMAN:  Steve Fineman from Richards
20  Layton.
21      MR. WHETZEL:  I'm sorry, your Honor.
22      THE COURT:  That's all right.
23      Mr. MacPherson?
24      MR. MacPHERSON:  Yes.
25      THE COURT:  Hi.  Everyone is here.  This is Judge
```

**Page 4**

```
1   Sleet.  We're going to get right into the business of
2   scheduling.
3       I have received the joint status report and the
4   competing proposals for schedule and I have taken the liberty
5   of making some modifications.
6       My approach to scheduling is not altogether
7   rigid, and I will discuss matters with counsel and make
8   adjustments that I think are appropriate to make, depending
9   upon what counsel advise me and whether I'm convinced that
10  the adjustment should be made.
11      So with that sort of a proviso, why don't we
12  begin.
13      You pretty much don't agree on anything with
14  regard to actual scheduling other than the cutoff, and that's
15  not totally agreed for discovery.  I think plaintiff proposes
16  that all discovery be completed by the March 15, '04 date.
17  The defendants resist that proposition and want to stage
18  discovery, which the Court is inclined to do.
19      But if the plaintiff really feels -- plaintiff on
20  this side --
21      MR. HOFFMAN:  Yes, your Honor.
22      THE COURT:  -- feels adamant about this, I'm
23  willing to hear you on it.
24      MR. HOFFMAN:  Well, we had thought it was
25  appropriate, looking at it again this morning, your Honor,
```

**Page 5**

```
1   we're willing to stage discovery.
2       We would like to start the opening expert reports
3   a little bit earlier.  The defendants have proposed April
4   9th.  We would suggest April 2 and rebuttal April 16th and
5   the expert reports.
6       THE COURT:  Well, the opening actually based on
7   the schedule I have crafted here would be 3/22.
8       MR. HOFFMAN:  Okay.
9       THE COURT:  With the rebuttals being 4/23.
10      Let me jump to the back end of this schedule.
11  This case is going to come to trial on October 11 of '04.
12  Okay?
13      We will have a pretrial order due date of 8/16
14  and we will have a pretrial conference here in this building
15  on September the 13th at 9:30, commencing at 9:30.
16      We can now go back to the beginning.  That will
17  at least help give you some context for what we're going to
18  talk about here.
19      MS. CORBIN:  Right.
20      THE COURT:  Go ahead.
21      MS. CORBIN:  Your Honor, I think there are some
22  things that I should apprise the Court of.
23      THE COURT:  Okay.
24      MS. CORBIN:  In addition to representing the
25  defendants in this suit, I am representing Synopsis, which
```

Multi-Page™

1  is a company that is in the design synthesis business also
2  in California.
3      THE COURT: Not a party to this action?
4      MS. CORBIN: They're not a party to this
5  action. They filed a suit in the Northern District of
6  California yesterday against Ricoh, basically on one of
7  the same patents, the one patent that's in this suit.
8      THE COURT: The '432 patent?
9      MS. CORBIN: Yes. Essentially, it had
10  come to our attention that the statement had been made
11  to Mr. MacPherson, and this is the only indication
12  we have because we cannot glean anything about the
13  infringement allegations from the complaint that the
14  bases of the complaint is really these defendants use of a
15  product called Design Compiler that Synopsis manufactures
16  and sells.
17      It came to our attention and then again late
18  last week that, in fact, RICO was engaged in a worldwide
19  campaign of sending letters to our customers. We got copies
20  of some of those letters which RICO had sent to additional of
21  the customers and indicated in the letter that that should be
22  kept confidential, but it has come to Synopsis' attention,
23  and they felt that it was critical to take the bull by the
24  horns if that, in fact, is the case, that the genesis of this
25  case is a Synopsis part.

1      And they are in California and a large number of
2  the players, witnesses and the documents are there as well.
3      And the letters that have been going out to the
4  other customers mention another patent that is a continuation
5  in part of the patent we have in suit here. Synopsis does
6  intend and had hoped to do that by today, but probably will
7  not happen until Monday to file the motion to stay and/or
8  transfer this customer case.
9      THE COURT: To stay the case out in California?
10      MS. CORBIN: No. To stay this case or to
11  transfer this case to California.
12      THE COURT: On what basis are they going
13  to file a motion in this case? I'm not certain that I
14  exactly --
15      MS. CORBIN: I'm sorry. The defendants, the
16  defendants in this case would file a motion to stay.
17      THE COURT: You said Synopsis.
18      MS. CORBIN: I apologize. I'm representing those
19  parties as well, and they feel that if the genesis of this
20  complaint is really the Design Compiler part of Synopsis,
21  that that issue could be handled in California and would
22  resolve the issues here.
23      THE COURT: Sure. Sure. I understand.
24      Well, we can talk about this a little bit. It
25  strikes me that there's no prejudice to either party since I

1  have you all here in embarking on a schedule in any event
2  because discovery has to be done.
3      MS. CORBIN: I wanted to apprise you of the
4  facts. I would have mentioned it in the status report. At
5  that time it had been unresolved.
6      THE COURT: Certainly the Court recognizes should
7  the motion to transfer be filed and should I rule that the
8  case should be transferred, it will then come under the
9  rules -- this is in the Northern District?
10      MS. CORBIN: Yes.
11      THE COURT: Which rules are very different
12  from this Court's and you would embark upon an entirely
13  new schedule, but I don't think you'd be any the worse
14  for wear.
15      MS. CORBIN: Absolutely. I think we should
16  proceed.
17      THE COURT: Okay. Counsel, anything further to
18  that?
19      MR. HOFFMAN: I guess there's no point in getting
20  into a debate over the lawsuit that they just filed.
21  Obviously, I just became aware of it. However, we've made no
22  threats against Synopsis. We'll be moving to dismiss the
23  lawsuit.
24      THE COURT: Why am I not surprised?
25      MR. HOFFMAN: There's no reason for my trying to

1  explain the issues at this point. That will be an issue that
2  will be out there in California.
3      THE COURT: Well, apparently.
4      Okay. So with that, we can now go ahead and see
5  what we can come up with here.
6      I see a difference in the Rule 26(a) time that
7  you've -- deadline you've set. I had picked 5:30.
8      Is there a particular reason the defendants feel
9  June 13 is more appropriate than 5:30? I thought we should
10  let's get on with it.
11      MS. CORBIN: If the Court is inclined that way,
12  we will do our best to do that.
13      THE COURT: I'm inclined to do that. I tried to
14  sort of pick a compromise date as to amendment and joinder
15  and I selected July 30. I don't know if anybody feels real
16  strongly about that one way or the other.
17      MR. HOFFMAN: That's fine, your Honor.
18      THE COURT: All right. As to the election and
19  the production, the election of reliance on advice of counsel
20  and production of those opinions, the defendant proposes ten
21  days after the Markman. That's the first time I've seen that
22  type of proposal on this.
23      I'm not quite certain why you would want --
24  the Markman, by the way -- well, we'll just move along
25  in some order here, but perhaps you could tell me why you

EXHIBIT B

1   Teresa M. Corbin (SBN 132360)
    Christopher Kelley (SBN 166608)
2   Thomas C. Mavrakakis (SBN 177927)
    HOWREY SIMON ARNOLD & WHITE, LLP
3   301 Ravenswood Avenue
    Menlo Park, California  94025
4   Telephone:  (650) 463-8100
    Facsimile:  (650) 463-8400
5
    Attorneys for Plaintiff Synopsys, Inc.
6
    Gary M. Hoffman, *admitted pro hac vice*
7   Kenneth W. Brothers, *admitted pro hac vice*
    DICKSTEIN SHAPIRO MORIN & OSHINSKY, LLP
8   2101 L Street, N.W.
    Washington, D.C.  20037-1526
9   Telephone:  (202) 785-9700
    Facsimile:  (202) 887-0689
10
    Edward A. Meilman, *admitted pro hac vice*
11  Dickstein Shapiro Morin &  Oshinsky LLP
    1177 Avenue of the Americas
12  New York, New York  10036-2714
    Phone:  (212) 835-1400
13  Fax:  (212) 992-9880
14  Jeffrey B. Demain (SBN 126715)
    Jonathan Weissglass (SBN 185008)
15  ALTSHULER, BERZON, NUSSBAUM,
    RUBIN & DEMAIN
16  177 Post Street, Suite 300
    San Francisco, California  94108
17  Phone:  (415) 421-7151
    Fax:  (415) 362-8064
18
    Attorneys for Defendant Ricoh Company, Ltd.
19
                    UNITED STATES DISTRICT COURT
20
                  NORTHERN DISTRICT OF CALIFORNIA
21
                      SAN FRANCISCO DIVISION
22
23  SYNOPSYS, INC.,                    ) Case No. C03-02289 MJJ
                                       )
24              Plaintiff,             ) **JOINT CASE MANAGEMENT**
                                       ) **CONFERENCE STATEMENT AND**
25      vs.                            ) **PROPOSED ORDER**
                                       )
26  RICOH COMPANY, LTD.,               ) Date:        October 28, 2003
                                       ) Time:        2:00 p.m.
27              Defendant.             ) Courtroom: 11
                                       )
28  _____)

1    Pursuant to FRCP 26(f) and L.R. 16-9, Plaintiff Synopsys, Inc. ("Synopsys") and Defendant

2    Ricoh Company, Ltd. ("Ricoh"), jointly submit this Joint Case Management Conference Statement and

3    Proposed Order.

4    **DESCRIPTION OF THE CASE**

5    **1.    A brief description of the events underlying the action:**

6    **a.    Synopsys' Position**

7    **(1)    Synopsys' comment on Ricoh's description of the case**

8    Synopsys objects to Ricoh's misuse of this case management conference statement.  Under the

9    Federal Rules of Civil Procedure and the Local Rules of this Court, the parties are required to provide

10   a "brief description" of the case.  Instead of presenting a "brief" description of *this declaratory*

11   *judgment* case, Ricoh is attempting to use this statement as a platform to discuss at length (six pages!)

12   the substance and issues of the Delaware action that is not yet docketed in the Northern District of

13   California, much less consolidated with this action and before this Court.  In addition, as noted below,

14   Synopsys intends to move to stay the Delaware action once it is docketed in the Northern District,

15   which would render virtually all of the issues that Ricoh identifies below moot.  Ricoh's description of

16   this case is largely inappropriate and entirely premature.

17   Synopsys will respond to Ricoh's numerous misstatements of fact and law at the proper time –

18   when the Delaware action is docketed in the Northern District and a case management conference is

19   held regarding *that* case.  *See* L.R. 16-2(c).

20   **(2)    Synopsys' Description**

21   The present action is an action by Plaintiff Synopsys seeking a declaratory judgment that U.S.

22   Patent Nos. 4,977,432 ("the '432 patent) and 5,197,016 ("the '016 patent") are invalid and not

23   infringed by Synopsys' Design Compiler software.  Synopsys brought the present declaratory

24   judgment action against Ricoh to protect itself and its customers from Ricoh's threats of patent

25   infringement suits based on these patents.

26   Prior to Synopsys' filing of the instant declaratory judgment action, Defendant Ricoh had filed

27   an infringement suit against six of Synopsys' Design Compiler customers alleging infringement of

28   method claims 13-20 of the '432 patent in the District of Delaware.  Importantly, even though Ricoh

2

1   was accusing Synopsys' customers of infringing the '432 patent based on their ordinary use of Design

2   Compiler, Ricoh did not name Synopsys as a defendant in, and Synopsys was therefore not a party to,

3   the Delaware action.[1]  Ricoh also threatened other Synopsys customers with patent infringement suits

4   for their use of Synopsys' Design Compiler software based on both the '432 patent and the related

5   '016 patent.

6        About six weeks ago, the Delaware court found that Ricoh's infringement action against

7   Synopsys' customers was essentially one between Ricoh and Synopsys that would best be litigated in

8   the present declaratory judgment action.  Significantly, the Delaware court found that this "court's

9   determination regarding infringement and validity of the '432 patent will efficiently dispose of the

10  infringement issues regarding Synopsys' customers" in the Delaware action.  Based on these

11  conclusions, the Delaware court decided to transfer Ricoh's infringement action to this district.

12       Based on these same conclusions, Synopsys will be filing a motion seeking an order from this

13  Court staying Ricoh's transferred patent infringement suit against its customers pending the outcome

14  of the present declaratory judgment action.  Synopsys' positions in this case management conference

15  statement and the proposed case schedule it includes assume that the Court stays the transferred

16  Delaware action against Synopsys' customers after it is docketed and consolidated with this matter,

17  and that the only issues necessarily adjudicated at this time in this action are those related to Synopsys'

18  declaratory judgment action.

19                    **b.    Ricoh's Description**

20       The Court is already acquainted with the events underlying this action, as set forth in this

21  Court's order of September 22, 2003.  Ricoh vigorously disputes Synopsys' continuing effort to

22  preclude Ricoh from pressing its patent infringement claims against the parties who are actually

23  infringing the '432 patent – the Delaware defendants.  The now-transferred Delaware action should be

24  consolidated with Synopsys' declaratory judgment action, and the two cases proceed simultaneously

25

26  _____

27  [1] This fact is important since Ricoh continually attempts to unite the Delaware defendants and
    Synopsys, and thereby impose obligations from the Delaware action on Synopsys, even though
28  Synopsys was not a party to that action.

                                          3

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1  through discovery, claim construction and trial.  Absent such a process, then Ricoh will be denied its

2  ability to obtain relief from the actual infringing parties or compelled to try its case twice.

3      There are several issues to be resolved, including (1) whether the Delaware action should be

4  consolidated with this action; (2) whether Ricoh should be considered as if it was the plaintiff, since it

5  is the patent owner and initiated the earlier-filed action against the actual infringers; (3) whether the

6  refusal by Synopsys and the Delaware defendants to meaningfully participate in discovery can be

7  resolved, or whether their stonewalling will continue in this case; (4) whether Synopsys will be able to

8  circumvent the court-ordered investigation for possible fraud on the Delaware court; and (5) whether

9  Synopsys' claim with respect to the '016 patent should be dismissed, since that patent was not

10  discussed in the September 22 opinion and Ricoh has not sued or threatened to sue any entity on that

11  patent.  We discuss each of these issues in turn after outlining the status of the actions.  Because the

12  local rules did not contemplate this submission being made while a transferred case was being

13  processed, a more complete description of the background is appropriate.

14

15      **The Delaware Action.**  In January 2003, Ricoh sued several designers and manufacturers of

16  computer chips in the District of Delaware (C.A. No. 03-103-GMS) for patent infringement, alleging

17  that those defendants were using the steps recited in the process claims of Ricoh's '432 patent.  The

18  '432 patent describes a highly advanced technical process used in designing and manufacturing certain

19  types of computer chips.  In carrying out their infringement of the patented process, the Delaware

20  defendants use software supplied by the plaintiff in the instant action, Synopsys, and perhaps other

21  suppliers.

22

23      Although Synopsys chose not to try to intervene in the Delaware case, its attorneys assumed

24  control of the defense and have filed multiple declaratory judgment counterclaims against Ricoh.

25  Synopsys' attorneys unsuccessfully argued that the Delaware court should stay discovery in that action

26  pending the outcome of the action in California.  Synopsys' attorneys have filed all papers on behalf of

27  each of Delaware defendants; have attended the Rule 16 conference, negotiated a protective order; and

28  have taken and responded to discovery.  The Delaware court entered a pretrial order governing

4

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

discovery, a copy of which is attached hereto as Exhibit 1.  On August 29, 2003, the Delaware court

granted the Delaware defendants' motion to transfer that action to this Court.  Even though the file was

sent to this Court on September 8, 2003 and was received by this Court on September 12, 2003, a

docket number was not assigned until October 16, 2003.  The case was randomly assigned to Judge

Trumbull; the new case number is C-03-4669 PVT.  Pursuant to Local Rule 3-12, Ricoh filed a notice

of related case on October 20, 2003.

During the transfer process of the Delaware case,  the parties in the Delaware action have

continued to be governed by the pretrial schedule established by the Delaware court (and attached as

Exhibit 1).  The parties have exchanged documents, scheduled depositions and engaged in third party

discovery.  Ricoh submits that the Delaware pretrial schedule should be incorporated into this Court's

schedule.

**The Declaratory Judgment Action.**  After months of litigating the Delaware case, Synopsys

filed the instant declaratory judgment action with respect to the '432 patent and another patent (the

'016 patent) that Ricoh did not assert in the Delaware case.  Ricoh has never accused Synopsys itself

of infringing the '432 patent or the '016 patent and has stated that it will not bring any action for

infringement of the '432 patent or the '016 patent against Synopsys with respect to Synopsys' past or

current software products.  Ricoh has advised others of the availability of a license under the '016

patent but has not threatened anyone with infringement of that patent.  On September 22, 2003, this

Court denied Ricoh's motion to dismiss Synopsys' declaratory judgment action.  There remains an

open issue with respect to the unasserted '016 patent, as the September 22 decision focused solely

upon the '432 patent.

Following are the most pressing open issues:

**Issue No. 1:  Whether the Delaware Action should be consolidated with this action.**  The

parties agree that the Delaware action should be consolidated before this Court.  Synopsys' counsel,

acting on behalf of the Delaware defendants, sought a stay of the Delaware action, arguing that the

declaratory judgment action should resolve all issues.  The Delaware court rejected that argument and

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1  instead transferred that action to this Court. Synopsys' counsel has announced its intention to renew

2  its motion. Ricoh will vigorously oppose any such motion. Indeed, Ricoh submits that is would be

3  more efficient for this Court to instruct the parties at the Case Management Conference that the two

4  actions will be consolidated and to establish a common pretrial and trial schedule. Ricoh's positions

5  and proposed case schedule are set forth in this case management conference statement assume that the

6  Court will consolidate the transferred Delaware action against Synopsys' customers after it is docketed

7  with this matter.

8        The two cases should be consolidated and tried together for four reasons.

9        First, Synopsys' counsel already tried but failed to have the Delaware action stayed. Discovery

10  in the Delaware action is advanced, and is readily applicable to Synopsys' declaratory judgment action.

11

12        Second, Ricoh's claims are against the direct infringers – the corporations who actually are

13  practicing the process disclosed in the '432 patent. Ricoh's damage calculations will be based upon

14  the design, manufacture and sale of ASIC chips by those defendants, the actual, direct infringers, and

15  not any sales of Design Compiler by Synopsys. Ricoh's right to an injunction is against the Delaware

16  defendants. Although Synopsys has a limited indemnification obligation to its customers, that

17  contractual relationship can not and should not prevent Ricoh from recovering infringement damages

18  from the direct infringers.

19        Third, eliminating the only parties (the actual infringers) that Ricoh has sued for patent

20  infringement would turn this action into a purely advisory opinion case. It would deny Ricoh with its

21  ability to enforce its '432 patent and deny it with an ability to obtain an injunction during the life of the

22  patent since the action against the Delaware defendants will be delayed for several years.

23

24        Fourth, consolidation promotes judicial economy. Synopsys and each of the Delaware

25  defendants have asserted declaratory judgment claims (or counterclaims) against Ricoh, and are not

26  represented by different attorneys (which could give rise to complications). Ricoh has asserted direct

27  infringement claims under the '432 patent against the Delaware defendants. All of these claims (and

28  counterclaims) are inextricably intertwined, and should be resolved together.

6

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

It further should be noted that a stay of the Delaware action would permit Synopsys to avoid rulings by the Delaware court (see Issue 3 below) and an inquiry into a possible fraud on the court (see Issue 4 below).

**Issue No. 2:  Whether Ricoh should be the plaintiff, since it is the patent owner and initiated the earlier-filed action.**  Synopsys would have this Court ignore the fact that Ricoh is the owner of the patent and has the earlier-filed action.  Consolidating the two cases and treating Ricoh as the plaintiff is consistent with the case law and makes intrinsic sense.  Otherwise, trial will be a disjointed and an unusually prolonged affair.

**Issue No. 3:  Whether the refusal by Synopsys and the Delaware defendants to meaningfully participate in discovery can be resolved, or whether their stonewalling will continue in this case.**  There are a number of open discovery issues in the transferred case because the Delaware defendants and Synopsys generally have refused to respond to Ricoh's discovery requests.  For example:

> ?? The Delaware defendants have refused to produce the documents they listed in their initial disclosure, contending that the documents they listed are now "irrelevant."  At a hearing on August 28, 2003, Judge Sleet said it was "extraordinary" that the Delaware defendants had refused to produce their initial disclosure documents, and their counsel conceded that the Delaware defendants' "initial disclosure was inartfully drafted."  (Ex. 2, 8/28/03 transcript at 54.)  Ricoh has requested that the defendants either produce these documents or submit a revised initial disclosure.  Despite the Court's instructions to defendants, they have refused even to respond to Ricoh's request.

> ?? The Delaware defendants have withheld almost all of their confidential documents, including those concerning the design libraries and source code which would provide confirmation of patent infringement, and recently refused to engage in a meet-and-confer to resolve the matter, even though a Protective Order protecting confidential information has been entered.  The Delaware court ordered the parties to resolve all

7

1  such issues quickly, and the Delaware defendants had represented to the Delaware
2  Court that it would make such production by mid-September.  (Ex. 2, 8/28/03 transcript
3  at 67-68.)  To date, the representation has not been honored.

4  ??  Synopsys has refused to produce virtually any documents in response to Ricoh's
5  subpoena, and recently refused to engage in a meet-and-confer to resolve the matter,
6  even though the Delaware court ordered counsel to meet and resolve all such issues by
7  September 5, 2003 and Synopsys had represented to the Delaware Court that it would
8  make production by mid-September.  (*Id.*)  To date, the representation has not been
9  honored.

10  ??  Synopsys has refused to provide certain documents pursuant to the subpoena which was
11  served on it on the grounds the documents should be obtained from the Delaware
12  defendants while the Delaware defendants (represented by the same counsel) refuse to
13  provide the same documents on the grounds they are confidential to Synopsys.

14  ??  The Delaware defendants have not timely served notices of subpoenas upon counsel for
15  Ricoh, which has led to problems with respect to counsel contacting persons already
16  represented by Ricoh's counsel.

**Issue No. 4:  Whether the court-ordered investigation for possible fraud on the Delaware court will be resolved.**  The day before it transferred the case, the Delaware court agreed that counsel for the Delaware defendants and Synopsys may have committed a fraud upon the Court by misrepresenting the circumstances of their actions in persuading an expert consultant under contract to Ricoh to switch sides.  Contrary to Synopsys' counsel representation to the Delaware court, this expert had received confidential work product information from Ricoh's counsel; when deposed, the expert testified that he received such information.  Synopsys' counsel engaged the expert even though it knew of the conflict.

On July 30, 2003, the Delaware court ordered the Delaware defendants, Synopsys and their counsel to cease all communications with the expert, and also ordered expedited discovery on the

8

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

issue.  At a subsequent hearing on August 28, 2003, the court agreed with counsel for Ricoh that the

conduct of counsel for Synopsys and the Delaware defendants "created an issue of potential fraud upon

the Court":

> MR. HOFFMAN: . . . Your Honor, I think that the whole issue of making certain
> representations to the Court that they know are inconsistent and these documents that we are asking
> be turned over to the Court may further our belief, support our belief, does create an issue of
> potential fraud upon the Court.
> THE COURT:  I think it does.

(Ex. 2, 8/28/03 transcript at 29.)  During that same hearing, the Court ordered counsel for Synopsys

and the Delaware defendants to produce for in camera inspection "a handful" of documents on this

matter, and to provide a log of the documents to Ricoh's counsel.  (*Id.* at 23, 27-33.)  Synopsys' counsel

has refused to comply with this order, however.

**Issue No. 5:  Whether Synopsys' claim with respect to the '016 patent should be**

**dismissed, since that patent was not discussed in the September 22 opinion and Ricoh has not**

**sued or threatened to sue any entity on that patent.**  A particularly unusual issue exists with respect

to the '016 patent:  Ricoh has never sued or threatened to sue any entity with respect to that patent.

(See, e.g., Exhibit 3.)  Ricoh has already covenanted that it will not sue Synopsys on the '016 patent

based upon the sale of Synopsys' current products.  Given these facts, makes little sense to proceed on

the '016 patent.

If, however, Synopsys insists on maintaining its declaratory action on the '016 patent, then

pursuant to Patent Local Rule 3-3 and 3-5, Synopsys should be obligated to come forward with its

Preliminary Invalidity Contentions including a claims chart showing why none of its products infringe

the '016 patent.  Synopsys is the only party raising an issue on the '016 patent in seeking an

adjudication that none of its products infringe the '016 patent.  Ricoh has not asserted the '016 patent

against any party and yet Synopsys is trying to put the burden on Ricoh to prove infringement on the

'016 patent.  As established by Pat. L. R. 3-1, 3-5, Ricoh has no obligation with respect to the '016

patent to provide any disclosure of asserted claims nor any Preliminary Infringement Contentions.

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1       **2.    Principal factual and legal issues in dispute.**

2               **a.    Synopsys' Position**

3                       **(1)    Synopsys' comment on Ricoh's identification of the principal**

4                               **factual and legal issues in dispute***

5       As with Ricoh's description of the case, Synopsys objects to Ricoh's identification of factual

6   and legal issues that are irrelevant to this declaratory judgment action and even in Ricoh's view

7   relevant only to the Delaware case.

8               **(2)    Synopsys' Description**

9       a.      The proper construction of the '432 patent claims;

10      b.      The proper construction of the '016 patent claims;

11      c.      Whether Synopsys' Design Compiler software infringes any properly construed claim

12  of the '432 patent;

13      d.      Whether Synopsys' Design Compiler software infringes any properly construed claim

14  of the '016 patent;

15      e.      The validity of the '432 patent claims;

16      f.      The validity of the '016 patent claims.

17              **b.    Ricoh's Description**

18      *Factual issues relating to jurisdiction:*[2]

19      a.      Whether Ricoh does business in California.

20      b.      Whether Ricoh has ever licensed or otherwise authorized anyone in California to sell

21  products embodying the '432 patent.

22      c.      Whether Ricoh or anyone else sells or offers for sale any Ricoh products embodying the

23  '432 patent in California.

24      d.      Whether Ricoh ever communicated with Synopsys regarding the '432 patent.

25

26  _____

27  [2] If the facts do not support Synopsys' claims with respect to jurisdiction over Ricoh, then dismissal of
    Synopsys' declaratory judgment complaint would be required.  In addition, if the '016 patent remains
28  in the case, then the factual issues listed herein would also apply to that patent.

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

e.       Whether there is any connection between Ricoh, the patented process disclosed in the '432 patent, and California.

f.       Whether there is a nexus between the Ricoh products placed into commerce and the '432 patent.

g.       Whether Synopsys' declaratory judgment action arose out of, or related to, Ricoh's in-state activities.

h.       Whether there was an alleged communication with Synopsys by a then co-owner (and not Ricoh) of the '432 patent, and if so, whether that communication has any effect upon the pending litigation with respect to the Delaware defendants, all of whom were unaware of the alleged communication.

*Factual issues relating to Ricoh's claims against the Delaware defendants:*

i.       Whether the Delaware defendants, as the actual ASIC chip designers and/or manufacturers, are the real parties in interest.

j.       Whether the Delaware defendants practice the process disclosed in the '432 patent.

k.       Whether the Delaware defendants can prove that the claims of the '432 patent are invalid.

l.       The amount of damages to be awarded to Ricoh.

m.       Whether the Delaware defendants acted willfully in infringing the '432 patent.

*Factual issues relating to Synopsys' declaratory judgment action:*

n.       Whether Synopsys' Complaint seek only an advisory opinion concerning the '432 patent, since Ricoh has made no infringement allegation against Synopsys or its customers.

o.       Whether Synopsys' Complaint with respect to the '016 patent should be dismissed, since Ricoh has never threatened to sue either Synopsys or any of its customers on that patent.

p.       Whether Synopsys can prove that none of its products infringe or induce infringement of the '016 patent.

*Ricoh's statement of disputed legal issues:*

q.       Whether the Delaware defendants infringe the '432 patent.

11

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1        r.      Whether Synopsys and the Delaware defendants can prove by clear and convincing

2 evidence that the '432 patent is not valid.

3        s.      Whether the Delaware defendants can prove its asserted estoppel and laches that would

4 preclude Ricoh from enforcing its '432 patent against the Delaware defendants or limit Ricoh's right to

5 damages.

6        t.      Whether, with respect to the '016 patent, Synopsys seeks a purely advisory opinion

7 since Ricoh has not asserted the '016 patent against Synopsys nor any of Synopsys' customers.

8        **3.**      **The other factual issues which remain unresolved:**

9              **a.**      **Synopsys' Description**

10 None.

11              **b.**      **Ricoh's Description**

12 Ricoh believes that the principal issues are set forth above.

13        **4.**      **Parties which have not been served:**

14 None.

15        **5.**      **The additional parties which the parties intend to join and the intended**

16              **time frame for such joinder:**

17              **a.**      **Synopsys' Position.**

18 Synopsys believes that there are no additional parties that need to be joined in this action.

19 Synopsys further objects to Ricoh's position regarding joinder of parties. Aeroflex is not a

20 party to this action, and, therefore, joining Aeroflex's subsidiary Aeroflex UTMC is nonsensical.

21              **b.**      **Ricoh's Position.**

22 On August 19, 2003, Delaware defendant Aeroflex disclosed that its subsidiary, Aeroflex

23 UTMC, was a purchaser of relevant software from plaintiff Synopsys, and that another company may

24 also engage in relevant design work. These entities may be appropriate for joinder after consolidation.

25        **6.**      **The following parties consent to assignment of this case to the United States**

26              **Magistrate Judge for trial:**

27 If the Court desires for scheduling purposes, Ricoh is amenable to having the Markman hearing

28 and any related tutorial held before a Magistrate Judge. Synopsys does not consent to an assignment to

12

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1  a Magistrate Judge for any purpose.  Neither party consents to assignment to a Magistrate Judge for

2  trial.

3  **ALTERNATIVE DISPUTE RESOLUTION**

4  **7.    The parties have not filed a Stipulation and Proposed Order Selecting an**

5  **ADR process and the ADR process to which the parties jointly (or**

6  **separately) request referral:**

7  **a.    Synopsys' Position**

8  Since the parties have unsuccessfully engaged in negotiations, Synopsys does not believe that

9  pursuing any ADR would be effective at this time.  However, if Synopsys were required to choose an

10  ADR procedure, Synopsys would request referral to the Court's ENE ADR process.

11  **b.    Ricoh's Position**

12  There has been a single meeting between business representatives of Ricoh and Synopsys, but

13  the parties have not engaged in negotiations.  Ricoh has invited the Delaware defendants to negotiate

14  with respect to a license, but the Delaware defendants have refused.  Ricoh is willing to enter into

15  ADR with the Delaware defendants.  Ricoh is also willing to enter into an ADR with Synopsys,

16  however, Ricoh recognizes that an ADR with Synopsys may not be fruitful until further discovery has

17  been completed.  If Ricoh were required to choose an ADR procedure, Ricoh would prefer mediation

18  by a knowledgeable patent attorney.

19  **DISCLOSURES**

20  **8.    The parties certify that they have made the following disclosures:**

21  Pursuant to FRCP Rule 26(a)(1), the parties have agreed to exchange initial disclosures by

22  November 12, 2003.

23  Ricoh notes that, in the Delaware action, Ricoh has filed its initial disclosures in the Delaware

24  action and produced documents identified therein.  The Delaware defendants have submitted their

25  initial disclosures (which they later asserted were "inartfully drafted"), but have refused to produce *any*

26  of the documents identified in *any* of the categories of those disclosures.  Almost all of the documents

27  that those defendants have produced in response to Ricoh discovery requests is prior art.  Few of these

28  documents relate to Ricoh's infringement claims or those defendants design or manufacture of ASIC

13

1  computer chips.  Synopsys has repeatedly refused to produce documents in response to Ricoh's

2  subpoena and has produced only a small number of documents to date in the now transferred Delaware

3  action (some of which only because production was compelled by this court at the motion to dismiss

4  hearing).

5        In response to Ricoh's statement, Synopsys notes that the initial disclosures filed in the

6  Delaware case are irrelevant to this action and this case management conference.

7  **DISCOVERY**

8        **9.**     **The parties agree to the following discovery plan:**

9        **a.**     **Synopsys' Position.**

10        Synopsys believes that discovery should be limited as provided by the Federal Rules of Civil

11  Procedure, but is willing to agree that each side be allowed 105 hours of deposition testimony.  Also,

12  because many of Ricoh's witnesses will likely require a translator, each hour of deposition testimony

13  requiring translation will be treated as 30 minutes against this time limit.

14        **b.**     **Ricoh's Position.**

15        In the Delaware action, counsel for the parties agreed that each side would have 240 hours of

16  deposition testimony.  Ricoh believes that such a modification of the Federal Rules of Civil Procedure

17  is useful here.

18  **PROPOSED SCHEDULE**

19        **10.**     **A proposed schedule is provided below:**

20        **a.**     **Synopsys' Position.**

21        It became apparent, at the meet and confer, that Ricoh intends to argue that it need not serve a

22  Disclosure of Asserted Claims with respect to the '016 patent because it takes the position that it has

23  not accused any party of infringing that patent.  However, Ricoh's stated position stands in stark

24  contrast to the facts; Ricoh has clearly asserted that the '016 patent has been infringed.  First, as

25  demonstrated in Synopsys' opposition to Ricoh's motion to dismiss, Ricoh has asserted the '016 patent

26

27

28

14

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1  against Synopsys' customers in cease and desist correspondence.  Furthermore, in answer to Synopsys'

2  complaint, Ricoh denies Synopsys' allegation that no Synopsys product infringes the '016 patent.[3]

3       However, if Ricoh extends its covenant not to sue Synopsys to cover all of Synopsys'

4  customers' use of Synopsys' Design Compiler software, or stipulates to a judgment that the use of the

5  Design Compiler software does not infringe the '016 patent, Synopsys would agree to dismiss Counts

6  III and IV of the Complaint.  Otherwise, Patent L.R. 3-1 requires that "[n]ot later than 10 days after the

7  Initial Case Management Conference, a party claiming patent infringement must serve on all parties a

8  'Disclosure of Asserted Claims and Preliminary Infringement Contentions.'"  Therefore, the Patent

9  Local Rules require that Ricoh serve its Preliminary Infringement Contentions for both the '432 and

10 '016 patents within 10 days of the October 28, 2003 Initial Case Management Conference (i.e.,

11 November 12, 2003) as provided in Synopsys' Proposed Case Schedule.  Ricoh's assertion that

12 Synopsys should instead provide a non-infringement chart for the '016 patent is not only contrary to

13 the Patent Local Rules but is simply absurd.

14      Last, by improperly separating the '432 and '016 patents, Ricoh would impose an inefficient

15 schedule for the adjudication of these related patents.[4]  Assuming Ricoh's hypothesis, under the Patent

16 Local Rules adjudication of the '016 patent should follow a considerably different procedural path than

17 the '432 patent.  For example, the Exchange of Proposed Terms and Claim Elements for Claim

18 Construction would be November 24, 2003 for the '016 patent and January 15, 2004 for the '432

19 patent (10 days after Preliminary Invalidity Contentions (Pat. L. R. 4-1(a)).  It would of course follow

20 that two claim construction hearings would be necessitated by Ricoh's position.[5]  Ricoh's argument is

21 contrary to the facts, inconsistent with the Patent Local Rules, and simply an inefficient use of judicial

22 resources.

23

24 [3] Ricoh has also accused Synopsys' customers of infringing the '432 patent both in correspondence
25 and in the transferred Delaware action.  Furthermore, in answer to Synopsys' Complaint, Ricoh also
   denies the allegation that no Synopsys product infringes the '432 patent.

26 [4] The application which resulted in the '016 patent was a continuation-in-part of the '432 patent
   application.

27 [5] Ricoh's proposed schedule obviously deviates considerably from that required by the Patent Local
   Rules for the '016 patent.
28

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1    The following schedule proposed by Synopsys follows the timing set forth in the Patent local

2    Rules except for the proposed date for the Preliminary Invalidity Contentions, which was extended

3    until after the New Years Holiday (i.e., January 5, 2004).

4                                **b.    Ricoh's Position.**

5    Ricoh asserted an infringement claim with respect to the '432 patent, but has not asserted any

6    infringement claim with respect to the '016 patent.  By filing an overbroad declaratory judgment

7    action, Synopsys has injected the '016 patent into this litigation.  The patent local rules specifically

8    provide that a declaratory judgment plaintiff such as Synopsys bears the burden of producing its

9    Preliminary Invalidity Contentions.  As shown by Ricoh's proposal, following the local rules with

10   respect to each of the patents is not inefficient; only one hearing will be necessary.[6]

11   **The '432 Patent.**  Ricoh agrees that, in a consolidated action against the Delaware defendants

12   and Synopsys, Ricoh should be treated as the party claiming infringement of its '432 patent.

13   **The '016 Patent.**  With respect to the '016 patent, however, Ricoh *never* has claimed that the

14   '016 patent has been infringed.  Synopsys is wrong when it claims (in section 10(a), *supra*) that "in

15   answer to Synopsys' complaint, Ricoh denies Synopsys' allegation that no Synopsys product infringes

16   the '016 patent."  Ricoh's answer states that Ricoh "has not asserted any allegation of infringement of

17   the '016 patent against Synopsys, the Delaware defendants or the companies to whom Ricoh has

18   offered licenses under the '432 and '016 patents."  (Ricoh Answer ¶ 8.)  Paragraph 22 of the Answer

19   states:

20           Ricoh lacks information sufficient to form a belief as to whether Synopsys has made, used,
             offered to sell or sold, within the United States, or imported into the United States, any
21           products or processes that infringe any valid claim of the '016 Patent, either directly, indirectly,
             contributorily or otherwise, and has induced others to infringe the '016 Patent and on that basis,
22           denies that allegation.

23           Likewise, Synopsys erroneously asserts that Ricoh has threatened others with respect to the

24   '016 patent.  Ricoh has never said or threatened to sue anyone on the '016 patent.  Synopsys has

25   mischaracterized Ricoh's licensing letters as "threats" and "cease and desist correspondence", when

26

27   _____

     [6] It is likely that Synopsys would drop its declaratory judgment claim with respect the '016 patent
28   rather than produce its Preliminary Invalidity Contentions as required by the local rules.

                                              16

1   even a casual review reveals that the letter simply places the recipient on notice and invites a dialog on

2   licensing.  (See example attached as Exhibit 3.)  Ricoh has already covenanted that it will not sue

3   Synopsys on the '016 patent based upon Synopsys' current products.  Given these facts, it makes no

4   sense to proceed on the '016 patent.  The declaratory judgment claim with respect to the '016 patent

5   should be dismissed without prejudice.

6          If, however, Synopsys insists on maintaining its declaratory action on the '016 patent, then it

7   should be obligated to come forward with its Preliminary Invalidity Contentions.  Pursuant to Pat. L.

8   R. 3-5 and 3-3, Synopsys should provide to Ricoh, within 10 days of the Case Management

9   Conference, its Preliminary Invalidity Contentions which should include a claims chart showing why

10  none of its products infringe the '016 patent.  Synopsys is the only party seeking an adjudication

11  relating to the '016 patent.  Even though Ricoh has not asserted the '016 patent against any party, or

12  even any non-party, Synopsys is trying to put the burden on Ricoh to prove infringement on the '016

13  patent.  Pat. L. R. 3-5 establishes that since Synopsys has filed this declaratory judgment action

14  seeking resolution that the '016 patent is not infringed, is invalid, or is unenforceable and that Synopsys

15  has not filed this in response to any complaint alleging infringement of the '016 patent, Ricoh has no

16  obligation to provide a "Disclosure Of Asserted Claims And Preliminary Infringement Contentions."

17

18         Ricoh's proposed dates with respect to the '016 patent have been dovetailed to match up with

19  the dates relating to the '432 patent.  Contrary to Synopsys' representation that the '016 patent would

20  follow a "considerably different procedural path," Ricoh's proposed schedule easily accommodates the

21  obligations of both parties, and only one claim construction hearing would be required.

22                  c.      **The Parties' Proposed Schedules.**

23         The parties largely are in agreement with respect to the proposed schedule, with a couple of

24  exceptions:  (1) whether Ricoh is required to file a Disclosure of Asserted Claims and Preliminary

25  Infringement Contentions pursuant to Pat. L.R. 3-1 for the '016 patent on November 12, 2003, or

26  Synopsys is required to file its Preliminary Invalidity Contentions pursuant to Pat. L.R. 3-5(a) on

27

28

17

November 12, 2003; and (2) the date for disclosure of reliance upon opinions of counsel. With respect

to post-Markman hearing events, Ricoh has added dates that are consistent with the patent local rules.

| Event | Time (Patent Local Rule, if applicable) | Synopsys' Proposed Date | Ricoh's Proposed Date |
|---|---|---|---|
| Disclosure of Asserted Claims and Preliminary Infringement Contentions (for both the '432 patent and the '016 patent) | 10 days after Initial Case Management Conference (Pat. L. R. 3-1) | November 12, 2003 | N/A (see next 2 entries) |
| Ricoh's Disclosure of Asserted Claims and Preliminary Infringement Contentions ('432 Patent) | | November 12, 2003 | November 12, 2003 |
| Ricoh's Disclosure of Asserted Claims and Preliminary Infringement Contentions ('016 Patent) | | November 12, 2003 | No response required. (Pat. L. R. 3-5) |
| Synopsys' Disclosure of Basis for Declaratory Judgment Claims III and IV, Identification of Products that Synopsys Claims Are Not Infringed and Bases for its Preliminary Non-Infringement Contentions ('016 Patent) | | Ricoh's attempt to manufacture a requirement that Synopsys provide a non-infringement disclosure for the '016 patent has no basis in the Patent local Rules. Synopsys is simply not required to make any such disclosure at anytime. | November 12, 2003. Ricoh believes that disclosure should be provided 10 days after the later of the Initial Case Management Conference or the Defendant Serves his answer (cf. Pat. L. R. 3-5, and 3-3) |
| Deadline to join parties and amend pleadings | L.R. 16-10(b) | December 29, 2003 | December 29, 2003 |
| Preliminary Invalidity Contentions (the '432 patent) | 45 days after Disclosure of Asserted Claims (Pat. L. R. 3-3) | January 5, 2004 | January 5, 2004 |
| Preliminary Invalidity Contentions (the '016 patent) | No later than 10 days after the defendant serves its answer, or 10 days after the Initial Case Management Conference, which ever is later. (Pat. L. R. 3-3) | January 5, 2004 | November 12, 2003 |
| Exchange of Proposed Terms and Claim Elements for Construction | 10 days after Preliminary Invalidity Contentions (Pat. L. R. 4-1(a)) | January 15, 2004 | January 15, 2004 |
| Exchange of Proposed Claim Constructions and Extrinsic Evidence | 20 days after Exchange of Proposed Terms and Claim Elements (Pat. L. R. 4-2(a)) | January 26, 2004 | January 26, 2004 |
| Joint Claim Construction and Prehearing Statement | 60 days after Preliminary Invalidity Contentions (Pat. L. R. 4-3) | March 5, 2004 | March 5, 2004 |
| Completion of Claim Construction Discovery | 30 days after Joint Claim Construction and Prehearing Statement (Pat. L. R. 4-4) | April 2, 2004 | April 2, 2004 |

18

| Event | Time (Patent Local Rule, if applicable) | Synopsys' Proposed Date | Ricoh's Proposed Date |
|---|---|---|---|
| Opening Claim Construction Brief | 45 days after Joint Claim Construction and Prehearing Statement (Pat. L. R. 4-5(a)) (15 days after Completion of Claim Construction Discovery) | April 20, 2004 | April 20, 2004 |
| Responsive Claim Construction Brief | 14 days after Opening Claim Construction Brief (Pat. L. R. 4-5(b)) | May 4, 2004 | May 4, 2004 |
| Reply Claim Construction Brief | 7 days after Responsive Claim Construction Brief (Pat. L. R. 4-5(c)) | May 11, 2004 | May 11, 2004 |
| Claim Construction Hearing | At least 14 days after Reply Claim Construction Brief (Pat. L. R. 4-6) | No earlier than May 25, 2004 | No earlier than May 25, 2004 |
| Claim Construction Ruling | | Provided by the Court | Provided by the Court |
| Final Infringement Contentions (the '432 patent) | 30 days after claim construction ruling (CCR)(Pat. L. R. 3-6) | 30 days after claim construction ruling ("CCR") | July 16, 2004 |
| Final Infringement Contentions (the '016 patent) | | 30 days after claim construction ruling ("CCR") | No obligation as there is no obligation to provide preliminary Infringement Conditions.  (Pat. L. R. 3-5) |
| Final Invalidity Contentions | 50 days after claim construction ruling (CCR)(Pat. L. R. 3-6) | 50 days after CCR | August 13, 2004 |
| Fact discovery cut-off | | 30 days after CCR | July 16, 2004 |
| Deadline to disclose reliance upon opinion of counsel and produce related documents[7] | 50 days after claim construction ruling (CCR)(Pat. L. R. 3-8) | 50 days after CCR | December 29, 2003 (date agreed to under the Delaware Scheduling Order) |
| Submission of expert reports by party with the burden of proof | | 50 days after CCR | August 13, 2004 |

---

[7] Synopsys states:  Ricoh's attempt to insert this event earlier in the schedule is improper and contrary to the Patent local Rules.  Under Patent L.R. 3-8, a party opposing a claim of patent infringement that intends to rely on an opinion of counsel must produce all related documents 50 days after service of the claim construction ruling.  Ricoh's statement is misleading.  Synopsys was not a party to the Delaware action or any agreement to provide an opinion of counsel earlier that the local rules require.

Ricoh states:  Counsel for all of the parties agreed, and the Delaware court ordered, that opinions of counsel should be disclosed and the document produced on December 29, 2003.  The Delaware defendants' counsel simultaneously represented Synopsys and was mindful of Synopsys' interests when it agreed upon this date.  Synopsys and the Delaware defendants should be obligated to comply with this agreement as set forth in the Delaware Scheduling Order.

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

| Event | Time (Patent Local Rule, if applicable) | Synopsys' Proposed Date | Ricoh's Proposed Date |
|---|---|---|---|
| Submission of responsive expert reports | | 70 days after CCR | September 3, 2004 |
| Expert discovery cut-off | | 90 days after CCR | September 24, 2004 |
| Dispositive motion cut-off | | 110 days after CCR | October 8, 2004 |
| File motions in limine | | 160 days after CCR | November 19, 2004 |
| File oppositions to motions in limine | | 170 days after CCR | December 2, 2004 |
| File Joint Proposed Final Pre-trial Order | | 190 days after CCR | December 22, 2004 |
| Pre-trial Conference | | 197 days after CCR | January 4, 2005 |
| Trial Date | | No earlier than 210 days after CCR | January 18, 2005 |

## CLAIM CONSTRUCTION HEARING

**11.    Hearing date:**

The parties propose that a Claim Construction Prehearing Conference be held on a date to be set by the Court prior to the Claim Construction Hearing. The parties further propose that the Claim Construction Hearing be held before the Court on May 25, 2004 (if the Court's schedule permits).

**12.    Tutorial:**

The parties believe that it would be helpful to present tutorial information about the technology underlying the case in advance of the Claim Construction Hearing.

**13.    Live Testimony:**

The parties would like to reserve the right to use live testimony at the Claim Construction Hearing (exclusive of the time required for any tutorial) and believe that the total presentation (testimony and argument) will be approximately four hours divided equally between Synopsys and Ricoh.

**14.    Order of Presentation:**

**a.    Synopsys' Position.**

Synopsys, as the plaintiff in this action, believes that it should present its arguments and testimony regarding the proper construction of the '432 and '016 patent claims first at the Claim

1  Construction Hearing.  Ricoh's comments about infringement below are not only contrary to the

2  applicable law but irrelevant to the issue order of presentation at the claim construction hearing.

   **b.    Ricoh's Position.**

3

4          Ricoh has made no assertions against Synopsys or Synopsys' customers as to the '016 patent.

5  Consequently, Synopsys should present and bear the burden of proving non-infringement as to the '016

6  patent, since Synopsys is the only party insisting on litigating the '016 patent even though there is no

7  justiciable controversy regarding this patent.  However, with respect to issues of claim construction,

8  since Ricoh is the owner of these patents, Ricoh submits that as the process is followed in virtually

9  every patent litigation, the patent owner should go first at the Claim Construction Hearing.

10

11                                    **TRIAL**

12         **15.    The parties request a trial date as follows:**

13  January 18, 2005

14         **16.    The parties expect that the trial will last for the following number of days:**

15                 **a.    Synopsys' Position.**

16  Synopsys proposes eight trial days for the declaratory judgment action.

17                 **b.    Ricoh's Position.**

18  Ten trial days for the consolidated action.

19

20  Dated:  October 20, 2003                    HOWREY SIMON ARNOLD & WHITE, LLP

21

22

23                                              By:    /s/
                                                   Teresa M. Corbin
24                                                 Attorneys for Plaintiff Synopsys, Inc.

25

26

27

28

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1  Dated:  October 20, 2003                    DICKSTEIN SHAPIRO MORIN & OSHINSKY

2

3                                        By:  ___/s/_____

4                                             Jeffrey B. Demain
                                              Gary M. Hoffman
                                              Attorneys for Defendant Ricoh Company, Ltd.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CASE MANAGEMENT ORDER**

The Case Management Statement and Proposed Order is hereby adopted by the Court as the

Case Management Order for the case and the parties are ordered to comply with this order.  In addition

the Court orders:

Dated:  _____                    _____

HON. MARTIN J. JENKINS

JOINT CASE MANAGEMENT CONFERENCE
AND PROPOSED ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 1



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT Of DELAWARE

RICOH COMPANY, LTD.                    )
                                        )
            Plaintiff,                  )
                                        )
        v.                              )        C.A. No.03-103-GMS
                                        )
AEROFLEX INCORPORATED, AMI              )
SEMICONDUCTOR, INC., MATROX             )
ELECTRONIC SYSTEMS LTD.,                )
MATROX GRAPHICS INC., MATROX            )
INTERNATIONAL CORP. and                 )
MATROX TECH, INC.                       )
                                        )
            Defendants.                 )

**RECEIVED**

MAY 3 0 2003

**Robert W. Whetzel**

FILED

MAY 3 0 2003

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## SCHEDULING ORDER

This __30th__ day of _____May_____ 2003, the Court having conducted an initial

Rule 16 scheduling and planning conference pursuant to Local Rule 16.2(b) on May 16, 2003,

and the parties having determined after discussion that the matter cannot be resolved at this

juncture by settlement, voluntary mediation or binding arbitration;

IT IS ORDERED that:

1.    **Rule 26(a) Initial Disclosures.**  Unless otherwise agreed to by the parties, they

shall make their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a) on or before

May 30, 2003.

2.    **Joinder of other Parties and Amendment of Pleadings.**  All motions to join

other parties and amend the pleadings shall be filed on or before July 30, 2003.

3.    **Reliance Upon Advice of Counsel.**  Defendants shall inform plaintiff whether

they intend to rely upon advice of counsel as a defense to willful infringement no later than

RLF1-2602387-3                         -1-

December 9, 2003. If defendants elect to rely on advice of counsel as a defense to willful

infringement, defendants shall produce any such opinions on which defendants intend to rely to

plaintiff no later than December 19, 2003.

4.    *Markman* **Claim Construction Hearing**. A *Markman* claim construction

hearing shall be held on March 2, 2004 at 9:30 a.m. The *Markman* hearing is scheduled for a

total of not more than 1 day. The parties shall meet and confer regarding narrowing and reducing

the number of claim construction issues no later than January 5, 2004 and shall exchange initial

claim charts no later than January 12, 2004. On or before January 20, 2004, the parties shall

submit a final joint claim chart which shall include citations to intrinsic evidence. The parties

shall exchange opening claim construction briefs on January 23, 2004, and the answering claim

construction briefs on February 6, 2004.

5.    **Discovery**. All fact discovery in this case shall be initiated so that it will be

completed on or before January 9, 2004. Opening expert reports shall be exchanged on March

22, 2004 and rebuttal expert reports shall be exchanged on April 23, 2004. Expert Discovery in

this case shall be initiated so that it will be completed on or before June 23, 2004. The total time

allowed for depositions shall be 240 hours per side, excluding expert discovery, unless extended

by agreement of the parties.

a.    **Discovery Disputes**. Should counsel find they are unable to resolve a

discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6470 to

schedule a telephone conference. Not less than forty-eight hours prior to the conference, by hand

delivery or facsimile at (302) 573-6472, the party seeking relief shall file with the Court a letter

agenda not to exceed two (2) pages outlining the issues in dispute. Should the Court find further

briefing necessary upon conclusion of the telephone conference, the Court shall order the party

seeking relief to file with the Court a **TWO PAGE LETTER**, exclusive of exhibits, describing

the issues in contention.  The responding party shall file within five (5) days from the date of

service of the opening letter an answering letter of no more than **TWO PAGES**.  The party

seeking relief may then file a reply letter of no more than **TWO PAGES** within three (3) days

from the date of service of the answering letter.

      6.    **Confidential Information and Papers filed under Seal.**  Should counsel find it

will be necessary to apply to the Court for a protective order specifying terms and conditions for

the disclosure of confidential information, they should confer and attempt to reach an agreement

on a proposed form of order and submit it to the Court within 10 days from the date of this order.

When filing papers under seal, counsel should deliver to the Clerk an original and two copies of

the papers.

      **If after making a diligent effort the parties are unable to agree on the contents of the**

**joint proposed protective order, then they shall follow the dispute resolution process**

**outlined in paragraph 5(a).**

      7.    **Settlement Conference.**  Pursuant to 28 U. S.C. §636, this matter is referred to

the United States Magistrate for the purpose of exploring the possibility of a settlement.  If the

parties agree that the possibility of settlement may be enhanced by such referral, the parties shall

contact Magistrate Judge Thynge to schedule a settlement conference with counsel and clients.

      8.    **Summary Judgment Motions.**  Prior to filing any summary judgment motion,

the parties must submit letter briefs seeking permission to file the motion.  The opening letter

brief shall be no longer than five (5) pages and shall be filed with the Court no later than

February 12, 2004.  Answering letter briefs shall be no longer than five (5) pages and filed with

the Court no later than February 27, 2004.  Reply letter briefs shall be no longer than three (3)

pages and filed with the Court on or before March 8, 2004.  The Court shall hold a status

conference to hear argument and to determine whether the filing of any motion will be permitted

on March 23, 2004 at 11:00 a.m.  **Unless the Court directs otherwise, no letter requests to file**

**a motion for summary judgment may be filed at a time before the dates set forth in**

**paragraph 8.**

       9.    **Case Dispositive Motions.**  Should the Court permit the filing of summary

judgment motions an opening brief and affidavits, if any, in support of the motion shall be served

and filed on or before April 2, 2004.  Parties must submit an original and two (2) copies.  Briefing

will be presented pursuant to the Court's Local Rules, unless the parties agree to an alternative

briefing schedule.  Any such agreement shall be in writing and filed with the Court for approval.

       10.    **Applications by Motion.**  Except as provided in this Order or for matters relating

to scheduling, any application to the Court shall be by written -motion filed with the Clerk.

Unless otherwise requested by the Court, counsel shall not deliver copies of papers or

correspondence to Chambers.  Any non-dispositive motion should contain the statement required

by Local Rule 7.1.1.

       11.    **Oral Argument.**  If the Court believes that oral argument is necessary, the Court

will schedule a hearing Pursuant to Local Rule 7.1.4.

       12.    **Status/Daubert Conference.**  On or before June 30, 2004, the parties shall meet

and confer on any Daubert issues and motion in limine issues that any party wants to raise.  On or

before July 2, 2004, the parties shall submit a joint agenda identifying any Daubert issues that the

RLF1-2602387-3                                                   -4-

parties intend to raise.  The Court will hold a telephone conference on July 7, 2004 at 11:00 a.m. to discuss Daubert issues identified in the joint agenda.

13.    **Pretrial Conference.**  On September 13, 2004, the Court will hold a Pretrial Conference in Chambers with counsel beginning at 9:30 a.m.  Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement in Federal Rule of Civil Procedure 26(a)(3).  Thirty (30) days before the joint proposed pretrial order is due, plaintiff's counsel shall forward to defendants' counsel a draft of the pretrial order containing the information plaintiff proposes to include in the draft.  Defendants' counsel shall, in turn, provide to plaintiff's counsel any comments on the plaintiff's draft as well as the information defendants propose to include in the proposed pretrial order.  *Motions in limine*: No party shall file more than ten (10) motions in limine.  Briefs (opening, answering and reply) on all motions *in limine* shall be filed by August 6, 2004.  Opening and answering briefs shall not exceed five (5) pages and reply briefs shall not exceed three (3) pages.  The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before August 16, 2004.

14.    **Trial.**  This matter is scheduled for a seven day jury trial beginning at 9:00 a.m. on October 12, 2004.

15.    **Scheduling.**  The parties shall direct any requests or questions regarding the scheduling and management of this matter to Chambers at (302) 573-6470.

UNITED STATES DISTRICT JUDGE

EXHIBIT 2

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4    RICOH COMPANY, LTD.,           :      Civil Action
                                     :
 5              Plaintiff,           :
                                     :
 6          v.                       :
                                     :
 7    AEROFLEX INCORPORATED, AMI     :
      SEMICONDUCTOR, INC.,           :
 8    MATROX ELECTRONIC SYSTEMS      :
      LTD., MATROX INC., GRAPHICS    :
 9    MATROX INTERNATIONAL CORP.,    :
      and MATROX TECH, INC.,         :
10                                   :
                Defendants.          :      No. 03-103-GMS
11                          - - -

12
                      Wilmington, Delaware
13                 Thursday, August 28, 2003
                          11:00 a.m.
14                    Telephone Conference

15                          - - -

16    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

17    APPEARANCES:

18            ROBERT W. WHETZEL, ESQ., and
              STEVEN J. FINEMAN, ESQ.
19            Richards, Layton & Finger
                       -and-
20            GARY M. HOFFMAN, ESQ.,
              EDWARD A. MEILMAN, ESQ., and
21            KENNETH W. BROTHERS, ESQ.
              Dickstein Shapiro Morin & Oshinsky LLP
22            (Washington, D.C.)

23                       Counsel for Plaintiff

24

25
```

v1; ZKXZ01!.DOC

```
1    APPEARANCES CONTINUED:

2         FRANCIS DiGIOVANNI, ESQ.
          Connolly Bove Lodge & Hutz LLP
3              -and-
          TERESA M. CORBIN, ESQ.,
4         CHRISTOPHER KELLEY, ESQ., and
          ERIC OLIVER, ESQ.
5         Howrey Simon Arnold & White, LLP
          (Menlo Park, California)
6
                    Counsel for Defendants
7
                         - - -
8

9

10        THE COURT:  Good morning, counsel.

11        MR. WHETZEL:  Good morning, Your Honor.  Bob

12   Whetzel from Richards Layton for plaintiff Ricoh.  With me is

13   my colleague here at Richards Layton Steven Fineman.  Also on

14   the call for Ricoh are Messrs. Gary Hoffman, Ed Meilman and

15   Ken Brothers, my co-counsel.  I suspect Mr. Hoffman will be

16   our principal spokesperson this morning.

17        THE COURT:  Good morning, all.

18        For defendants.

19        MR. DiGIOVANNI:  Frank DiGiovanni from Connolly

20   Bove.  Also on the line from Howrey Simon in California are

21   Teresa Corbin and Chris Kelley and Eric Oliver.

22        THE COURT:  Who is going to handle the argument

23   today?

24        MR. DiGIOVANNI:  I will be arguing the first of

25   the agenda items, and I believe Mr. Kelley will be arguing
```

1   the remainder.

2              MR. HOFFMAN:  Your Honor, on behalf of Ricoh, Mr.

3   Brothers will be arguing the first item.  I will be handling

4   Items 2, 3, 6 and 8.  And Mr. Meilman will be handling items

5   5 and 7.

6              THE COURT:  Okay.  I will try to keep that roster

7   in mind.

8              Let's start with Item 1.

9              MR. BROTHERS:  Your Honor, on Item 1, there is a

10  difference of opinion between the parties with respect to the

11  obligations of the order that the Court entered on July

12  31st --

13             MR. DiGIOVANNI:  Your Honor, I don't mean to

14  interrupt.  I don't do that.  But we are the ones, the

15  defendants are the ones --

16             THE COURT:  Are you the movant on that one?

17             MR. DiGIOVANNI:  Yes, we are.

18             THE COURT:  Let's start with the movant.

19             MR. BROTHERS:  I am sorry.  Both parties are

20  seeking relief, just to be clear.

21             THE COURT:  So both of you, you each view

22  yourselves as movants?

23             MR. BROTHERS:  Yes, Your Honor.

24             MR. DiGIOVANNI:  Yes, Your Honor.

25             On behalf of defendants, we did place the call

1  and initiated the conference.  We consider ourselves primary

2  movants on this issue.

3              MR. BROTHERS:  Your Honor, we can both have our

4  say.

5              THE COURT:  Mr. Brothers, continue.

6              MR. BROTHERS:  Thank you.

7              The order of July 31st, the second paragraph

8  requires the defendants and their counsel to disclose all

9  communications with or relating to Dr. Thomas and to produce

10  all documents sent to, prepared by, or received from Dr.

11  Thomas.  And then it continues, Any documents withheld on the

12  basis of attorney-client privilege or work product doctrine

13  should be submitted to the Court for an in camera inspection

14  and defendants shall provide plaintiffs with a detailed

15  privilege log.

16              We received part of those documents.  We received

17  the e-mails and letters between the Howrey firm and Dr.

18  Thomas.  But defendants and their counsel have refused to

19  produce anything else, namely, any internal communications on

20  an in camera basis to the Court and to give a privilege log

21  to the other side.  We believe that is clearly required by

22  the order.

23              The history of this gives some basis for our

24  concern.

25              Dr. Thomas was deposed on August 14th.  The

1    witness contradicted the representations of Mr. Kelley during

2    the hearing on the 30th on multiple points, which gives us

3    concern as to what the complete story is.

4            For example, you will recall that the Howrey firm

5    served Dr. Thomas with a subpoena in late June but never

6    provided that to counsel for plaintiffs or filed any notices

7    with the Court.  And although Mr. Kelley said during the

8    hearing that Dr. Thomas had called them and said he wasn't

9    working for Ricoh, in fact, what these documents that were

10   produced and Dr. Thomas' testimony show is that Dr. Thomas

11   specifically told the Howrey firm that he was under contract,

12   a consulting contract, with counsel for Ricoh, that Dr.

13   Thomas specifically asked Howrey if they had given the

14   subpoena to counsel for Ricoh, and Howrey led him to believe

15   that the subpoena had been given and that the names of

16   experts had been disclosed in the litigation, and that

17   counsel for Ricoh had not named Dr. Thomas as an expert, so

18   Dr. Thomas assumed that we didn't want him as an expert,

19   which wasn't the case.  And then the Howrey firm said,

20   according to Dr. Thomas' testimony, if you sever your

21   contract with Ricoh, then we can hire you and we can pay

22   you.  And that's what Dr. Thomas did.

23           A second inconsistency was that Mr. Kelley said

24   very explicitly during the hearing that before Dr. Thomas was

25   hired, they asked him if he had received any confidential

1    information or discussed case strategy or other types of

2    information with Ricoh, and that Dr. Thomas had said, no, he

3    hadn't.

4              That is simply not the case.

5              Dr. Thomas was retained.  The retention letter

6    was sent on July 17.  He signed it on July 21st.  The first

7    time any such communications of that nature came up was after

8    we found out about it and objected, and then suddenly there

9    was a flurry of telephone calls and e-mails between the

10   Howrey firm and Dr. Thomas saying, what confidential

11   information did you have?  Tell us about it.  And there was a

12   phone conference on the 23rd of July and followup e-mails.

13             Dr. Thomas testified at his deposition that there

14   was no question that he had received confidential information

15   from counsel for Ricoh.  And he identified a couple of

16   categories of that.

17             During this flurry of information, after counsel

18   for Ricoh had objected, Dr. Thomas had described the

19   categories of this confidential information.

20             Now, Howrey refuses to produce those internal

21   e-mails.  We had requested them even prior to the hearing,

22   and the Howrey firm understood we were looking for them.

23   There is a reference by Mr. Kelley in the transcript that, I

24   think it's on Page 14 or so, that he understood we were

25   looking for that information.

1          After all of this, the defendants say, well,

2   maybe we are not going to use Dr. Thomas as an expert after

3   all, but we still want to go forward and take his deposition

4   on the very subjects which were the subject matter on his

5   consulting with Ricoh.

6          They obviously believe that Dr. Thomas is going

7   to give them favorable opinions.  Dr. Thomas testified that

8   as a result of his consulting with Ricoh he had formed

9   opinions.  What is the basis for their expectation?

10          We need to go forward and try and resolve this.

11   We think the sole basis is that Dr. Thomas has given Howrey

12   some basis to believe that the testimony he is going to give,

13   the opinion testimony that they are seeking, is going to be

14   favorable, and that was developed solely as a result of his

15   confidential consulting with counsel for Ricoh.

16          The issue before the Court not only is the

17   interpretation of Paragraph 2 of the July 31st order.  The

18   Court is also aware that we are to file followup letters that

19   will relate to the disqualification of Thomas and any other

20   remedies that might be available.  We think it advisable that

21   the Court is provided with this information so it has the

22   full picture of what the appropriate remedy should be.

23          THE COURT:  Okay.  Mr. DiGiovanni.

24          MR. DiGIOVANNI:  First of all, there is no

25   contradiction between what Mr. Kelley represented on the July

1    30th teleconference and Dr. Thomas' deposition.  Dr. Thomas

2    was very clear that he was asked by the Howrey Simon

3    attorney, the one single attorney that he talked to for the

4    five-minute period he actually talked to him, do you have any

5    confidential information?  And if so, what type of

6    information is it?  And Dr. Thomas responded two days later

7    in an e-mail, just listing three short types of information

8    he had:  patents, publications, and financial information.

9    None of it was confidential.

10            And all of those e-mails, that e-mail, and there

11    were about six or seven other e-mails, have been produced.

12    And those are the entire universe of documents that went back

13    and forth between Howrey Simon and Dr. Thomas.

14            If you go back to the teleconference on July

15    30th, the request that was made by Mr. Hoffman was that, you

16    ordered that the defendants be required to disclose all the

17    communications that they have had with Dr. Thomas, and

18    produce all the documents to us that have gone back and

19    forth.  The Court subsequently ordered Ricoh's counsel to

20    prepare an order outlining the requests that you have made

21    and I will sign it.

22            But what happened later that day or maybe it was

23    the next day, July 31st, counsel submitted an order that

24    included an additional phrase, some additional language, Your

25    Honor, which actually went beyond what they were supposed to

```
 1   submit.  So that became this July 31st order.
 2             The language of the order --
 3             THE COURT:  Is that the sentence that says any
 4   documents withheld on the basis of attorney-client --
 5             MR. DiGIOVANNI:  No, Your Honor.
 6             THE COURT:  Which language is it?
 7             MR. DiGIOVANNI:  In the same paragraph, Paragraph
 8   2, the first sentence, it says, No later than August 6, 2003
 9   defendants and their counsel are ordered to, right where it
10   says disclose, it says disclose all communications with or
11   relating to Dr. Thomas.  That clause was brand-new.  That was
12   not part of what Your Honor ordered on that teleconference,
13   this disclose all communications with or relating to Dr.
14   Thomas.  The second clause of that, ordered to produce all
15   documents sent to, prepared by or received from Dr. Thomas,
16   that's what we talked about on the teleconference.  That's
17   what we have done.  We have produced every single piece of
18   paper, all e-mails that were sent back and forth between
19   counsel and Dr. Thomas.  It didn't amount to much.  It was
20   only about six or seven e-mails.
21             We also gave them a cover letter to those
22   e-mails.  It described the communications, and it also
23   described the type of internal communications that we had
24   amongst attorneys, between attorney and clients.  We noted of
25   course those were privileged, that those weren't required
```

1    under the production portion of Paragraph 2, because

2    Paragraph 2 says, when it talks about producing documents, it

3    says, produce all documents sent to, prepared by or received

4    from.  Then it goes on to talk about documents, any documents

5    withheld, et cetera, et cetera.  So we didn't withhold any

6    documents on the basis of privilege.  So there was nothing to

7    put on a privilege log.  There was nothing to produce in

8    camera.

9              The issue is what does this mean, disclose all

10   communications with or relating to Dr. Thomas?  And what

11   counsel for Ricoh is saying is that means that all documents

12   relating to Dr. Thomas had to be produced.  That is

13   completely inconsistent with the second phrase, where it

14   talks about the exact scope of production of documents.  Our

15   reading of it was, we disclosed in our cover letter precisely

16   what we were supposed to produce, precisely what kind of

17   communications went on.

18             Of course, we didn't produce them.  The order

19   doesn't require it.  It would never make sense to produce

20   privileged documents, even in camera.  An in camera review is

21   often done to determine if there is a privilege, not to

22   actually review some privileged documents to find a basis for

23   a claim.  But in any event, the order doesn't call for it,

24   before you even getting into the law regarding in camera

25   review.

1              It is also important, Your Honor, that once we

2    received the declaration of Christopher Monti (phonetic),

3    this is the declaration that Mr. Hoffman talked about on the

4    July 30th conference, once we received that, which, by the

5    way, was one week ago, we had to wait until one week ago to

6    get it, once we took the deposition of Dr. Thomas to find out

7    if, indeed, he received confidential information, once we had

8    those two pieces of information, two days later we said,

9    okay, we are not going to retain Dr. Thomas as an expert.

10   And we are not a hundred-percent convinced that he did

11   receive confidential information.

12             But we told them, all right, we are not going to

13   use him as an expert, fully expecting that would end

14   everything.  But they said, no, they want to try to

15   disqualify counsel even though there isn't a shred of

16   information, shred of evidence anywhere stating that Dr.

17   Thomas provided to counsel for defendants any sort of

18   confidential information.  In fact, Dr. Thomas,

19   unequivocally, testified that he had one conversation with

20   attorneys for defendants for five minutes.  And here is his

21   quote.  He says, I didn't share any information with him --

22   this is talking about the one attorney -- about confidential

23   material.

24             That is it.

25             THE COURT:  Okay.  Mr. Brothers, Mr. DiGiovanni

1    asserts that that clause that he has identified in Paragraph

2    2, all communications with or relating to, goes beyond the

3    letter and spirit of the discussion and subsequent order

4    entered by the Court orally on July 30th.

5           I don't have the transcript in front of me.  I

6    don't have total recall.  I don't really wish to engage in an

7    extended debate as to what was intended.  But Mr.

8    DiGiovanni's reflections do seem to comport with my

9    recollection of that conversation.  Go ahead.

10          MR. BROTHERS:  Yes.  I do have the copy of the

11   transcript in front of me.  On Page 9 it references, Line 17

12   through 22, this aspect of the request.  And I will read that

13   quote.  And this relates to the second paragraph.  Quote,

14   That the defendants be required to disclose all

15   communications that they have had with Dr. Thomas and produce

16   all the documents to us that have gone back and forth.  If

17   they feel that any documents are privileged or work product,

18   then they can be submitted in camera.  But we should get a

19   log so we can sort that out.

20          Prior to that, Mr. Hoffman had noted, on Page 8,

21   we didn't know the details of what had been discussed, and

22   then later on, Mr. Kelley acknowledged that we were seeking

23   the nature of their communications with Dr. Thomas.

24          The issue here is twofold.  First, it is not only

25   the communications back and forth between Dr. Thomas and

1    counsel for the defendants.  But second, the issue is what

2    did the Howrey firm know and when did it know it with respect

3    to the confidential information that Dr. Thomas had obtained

4    from counsel for Ricoh.

5            There are inconsistencies between Dr. Thomas'

6    testimony and what Mr. Kelley was representing.

7            Now, we ought to be very cautious here.  We have

8    not sought to disqualify the Howrey firm.  What we are trying

9    to do is get information so that an appropriate determination

10   can be made.  What Mr. DiGiovanni has said is, well, we

11   thought by dropping Dr. Thomas that would be the end of it.

12   But they still want to go ahead and take his deposition on

13   the very topics that Mr. Thomas had provided his confidential

14   consulting to counsel for Ricoh.  And they just want to sweep

15   under the carpet these inconsistencies and hope that the

16   whole issue will go away.

17           At this point, we don't think that that is

18   appropriate.  We think it is appropriate, an appropriate

19   inquiry can be made, but before that can happen, all of the

20   factual information needs to be collected.

21           Prior to our even having the conference with Your

22   Honor on the 30th, we had sent a letter to the Howrey firm,

23   saying, this is what we want.  So they knew that we were

24   looking for not only the communications with Dr. Thomas, but

25   the internal communications on an in camera basis if the

1    privilege was not going to be waived, so that the Court could

2    make this determination, because ultimately, that may be the

3    critical issue, the determination of what is in the order and

4    our interpretation.

5            THE COURT:  Counsel, let me just ask.  The

6    determination being whether the documents at issue are

7    privileged or not.

8            MR. BROTHERS:  I am sorry.  The determination

9    would be twofold.  First, whether the documents would be

10   privileged.  But second, if the documents reflect that in

11   fact Howrey had received confidential information from Dr.

12   Thomas, as we believe is likely, based on their continued

13   pursuit of his deposition, so that they can get his opinions,

14   then an appropriate determination should be made.

15           It is important to note that Howrey recognized at

16   the outset that Dr. Thomas was consulting for counsel for

17   Ricoh --

18           THE COURT:  Let me interrupt again.  So that

19   appropriate determination being whether the Howrey firm

20   should be disqualified or not.  Is that what you mean?

21           MR. BROTHERS:  That is a decision that we may

22   well ask the Court to make.  We are not asking it at this

23   time.  We don't know what those documents may show.  And we

24   may not ever see those actual documents.  But we think that

25   it may be appropriate for the Court to see what is in there

1    so it can make an appropriate determination.

2        We want to be very careful.  We are not at this

3    point saying the Howrey firm must be disqualified, because we

4    don't have all the facts from the Howrey side.  We have it

5    from Dr. Thomas' side.  But we don't have all of the

6    information.

7        THE COURT:  Now, let me ask this:  Do I

8    understand correctly that Dr. Thomas is more or less out of

9    this litigation at this point?

10        MR. BROTHERS:  Counsel for defendants have

11    verbally informed us that they do not intend to retain him as

12    an expert.  However, they have said that they intend to go

13    forward and take his deposition, which will include, they

14    say, the opinions that he developed as a result of his

15    consulting for Ricoh.

16        MR. DiGIOVANNI:  Your Honor, that is not

17    accurate, with all due deference to Mr. Brothers.  We never

18    said we were going to inquire as to any opinion in a

19    third-party deposition of Dr. Thomas, of any opinions he

20    formed while working with Ricoh, which he did for 12 or 14

21    hours.  We never said that.

22        We will take his deposition, as we would any

23    other third party.  His assignment was very important at the

24    time this invention was being developed.  There is no way

25    that Ricoh can lock him up, in other words, put a cage around

1    him so we can't even get to him in this litigation.  He is

2    still a fact witness.  Ricoh may have talked to 15 or 20

3    witnesses and hired them for 12 hours.  That doesn't mean

4    they can lock them up and prevent them from being part of

5    this litigation.  We are entitled to take his deposition as a

6    third party.  We will not inquire into conversations between

7    Dr. Thomas and Ricoh.  We will not do that.  We know we

8    can't, and we wouldn't, anyway.

9              THE COURT:  Mr. Brothers, what do you say to

10   that?

11             MR. BROTHERS:  Well, there are three things in

12   response, Your Honor.  First, on the 28th of July, the Howrey

13   firm sent Dr. Thomas an e-mail, saying if the Court rules

14   that we can't use you as a consulting expert, we are going to

15   take your deposition on the things that we have been talking

16   about.  And Dr. Thomas testified, when I asked him about

17   that, he said, that looks just like the things that I was

18   consulting with Ricoh about.  And it does.  And in the

19   communications that we have had with counsel for the

20   defendant, they have said we are precluded from asking Dr.

21   Thomas about those issues.

22             It seems to be a bit of a moving target, based on

23   what Mr. DiGiovanni is telling me today.  But the fact is

24   that Dr. Thomas had in-depth consultations with counsel for

25   Ricoh, and he testified he formed opinions as a result of

1    that.  That opinion evidence, because they are going to ask

2    him to compare the patent to the prior art, that's

3    information that is all flowing directly from his consulting

4    work.  As a result of the conduct of counsel for defendants,

5    Dr. Thomas has become a tainted witness.  And it will be very

6    difficult to sort out what is tainted and what is not

7    tainted.

8            MS. CORBIN:  Your Honor, I am the lead counsel in

9    this case for defendants.

10           If I could clarify the situation.  The concern we

11   have about what we see as the problem with the order, the

12   language that Mr. DiGiovanni culled out, which was disclosure

13   of all communications with, and it's particularly the "or

14   relating to Dr. Thomas" part which gets to Howrey's internal

15   work product and communications with its client, because the

16   fact remains that Dr. Thomas developed one of the major and

17   key pieces of what we believe is invalidating prior art to

18   this patent, that was the genesis in the first place of

19   serving him with a third-party subpoena, to get the testimony

20   necessary to identify all the aspects of that particular

21   prior art and the timing of its development and so on.

22           Going back to the order, this is our concern.

23   The "or relating to" aspect would require us to provide in

24   camera for the Court, which if the Court really wants to see

25   it, we would do that, but it would require us to gather up

1   all the information and internal documentation we have about

2   that particular prior art and the fact that, as we learned,

3   Dr. Thomas was probably the most relevant witness who

4   developed that prior art, and would be the most relevant

5   person from whom to get the information as to the timing and

6   the particular aspects of that technology.

7           I do believe that those underlying facts cannot

8   be -- we are still entitled to discover those.  The fact that

9   they hired him for 12 hours of consulting work can't shield

10  what is a major piece of prior art and take that prior art

11  essentially out of the case.

12          THE COURT:  I agree with that.

13          MR. HOFFMAN:  Your Honor, I am lead counsel for

14  Ricoh.  If I could respond, since Ms. Corbin has?

15          THE COURT:  Go ahead.

16          MR. HOFFMAN:  I would appreciate the Court's

17  indulgence.

18          First of all, on the issue of what the scope is

19  and the timing, that is easily dealt with just by saying that

20  it is a document, internal communications regarding the

21  retention of Dr. Thomas and also putting on a date that

22  starts with the first contact with Dr. Thomas.

23          Let me go to the more significant issue here.

24          Howrey & Simon and the defendants here knew from

25  day one, once they contacted Dr. Thomas, that he was already

1    consulting for Ricoh.  There is an e-mail where they said to

2    Dr. Thomas, there appears to be a conflict and consequently

3    we cannot use you.

4            Subsequently, they decided to change their mind

5    and send him a consulting agreement, encourage him to break

6    his agreement, terminate his agreement with Ricoh, and to

7    send him a consulting agreement, which he signed.  After he

8    signed it, and after we complained, they went back and asked

9    him about the confidential information and whether or not he

10   got confidential information from Ricoh.

11           We didn't create this problem.  Howrey & Simon

12   had a simple thing that they could have done if they chose

13   to.  That is, once he indicated, Dr. Thomas said, hey, I am

14   consulting for Ricoh:  Thank you very much, nice talking to

15   you, have a good day, goodbye.  They chose not to.

16           They chose to go forward with this.  And they

17   chose to do it until we found out about the subpoena, which

18   was only after they engaged him, not beforehand, contrary to

19   what they led him to believe, and only after they engaged him

20   already did we complain and did they finally do the checking.

21           They created the problem.  We didn't create

22   this.  What we are trying to do is to seek the information

23   and to place the information before the Court so that

24   appropriate relief, whatever that may be, can be fashioned.

25   As Mr. Brothers indicated, we are not seeking

1   disqualification today.  I don't know that we will ever seek

2   disqualification.  There may be and I hope there would be

3   other relief less than that that would be appropriate here.

4           But the first thing we need to do is to find out

5   how deep the poison runs.  There is clearly a problem, one of

6   their creation.  We are just trying to sort it out so that we

7   can seek from the Court appropriate relief.

8           These documents that we are indicating that they

9   should list on a privilege log and send to the Court are not

10  coming to us at this point.  These are not documents we are

11  saying at this point -- eventually, we may get there, once we

12  see what is on the log.

13          THE COURT:  Let me ask this, Mr. Hoffman:  The

14  communications relating to, is it your position that those

15  communications may reveal, I think the words tainted witness

16  were used before, that is, they may impact in some way upon

17  this potential witness' credibility as that credibility or

18  his testimony pertains to the merits of the case?

19          MR. HOFFMAN:  It may relate to that.  It may

20  relate to the issue of what is the appropriate relief.  It

21  may relate to the issue of the fruits of the poisonous tree,

22  as the cliche goes.  There is an overall issue as to what

23  should be the appropriate relief that is fashioned here.

24          THE COURT:  Right now, I don't have a motion

25  before me asking for relief in that regard.  I think what you

1    are suggesting is how -- it has been discussed earlier

2    whether the Howrey firm should be disqualified or not.

3    Should that be my principal concern at this point?  I think

4    it was Mr. Brothers who may have used the words tainted

5    witness.  I think you are entitled to challenge this witness'

6    credibility before the finder of fact, as that credibility

7    pertains to his opinions regarding the merits of whatever it

8    is he is going to be testifying regarding the actual

9    substance of this litigation.  Isn't the retention or the

10   disqualification of the Howrey firm, at least at this

11   juncture, an ancillary issue?

12           MR. HOFFMAN:  It is an ancillary issue at this

13   point.  But part of the other issues, Your Honor, in trying

14   to fashion relief, is, there is other forms of potential

15   relief.  And we haven't sorted out what we are going to ask

16   for yet ourselves.  But, for example, we may ask the Court to

17   say, listen, Howrey & Simon knew that this witness had

18   confidential information.  They shouldn't be allowed to do

19   through the back door -- obtain his opinions that he formed

20   as a result of consulting with us.  He should just be

21   someone, because of the problem that they created, should

22   just be off everyone's list, period.  There is other

23   witnesses familiar with the prior art.  He is not the only

24   one.

25           That is number one.  It may be that there is

1   other sanctions.  It may be that the individuals who got

2   certain information on Howrey & Simon should not be involved

3   in the case, there should be a Chinese Wall around them.

4   That is another possibility.  It does not disqualify the

5   firm.  There may be a possibility that the whole firm should

6   be disqualified.

7          Right now, all we are looking for at this time is

8   a list of those communications on a privilege log.

9          MS. CORBIN:  Your Honor --

10          THE COURT:  Don't interrupt, counsel, please.

11          MS. CORBIN:  I am sorry.

12          MR. HOFFMAN:  Most people quite often provide a

13   list of privileged documents, anyway.  Normally, once the

14   litigation starts, you don't continue.  But this is a special

15   situation.  And we are asking that the Court -- the way we

16   believe the order read, we ask that the Court require the

17   Howrey & Simon firm and defendants to provide a list of the

18   privileged documents.  We also ask that the limited number of

19   documents -- I can't imagine there is many in this

20   category -- be provided to the Court, so that when the Court

21   has the issues laid before it, we can ask for what relief we

22   think is appropriate and the Court can fashion relief that it

23   believes is appropriate.

24          THE COURT:  Ms. Corbin, what is the extent of the

25   potential production at issue here?

1              MS. CORBIN:  I wouldn't be able to address that.

2     I wouldn't have personal knowledge at this point.

3              THE COURT:  Is there someone who can give the

4     Court that information?

5              MR. KELLEY:  I can give you an estimate.  I think

6     there is a handful of e-mails.

7              THE COURT:  Let's produce them for the Court.

8              MS. CORBIN:  Your Honor, my point is -- I don't

9     know whether it is apparent to the Court or not -- we seem to

10    be somewhat making points to cross-purposes here.

11             We did produce all of the exchange of e-mail and

12    any written documentation of an exchange between Howrey and

13    Dr. Thomas to the other side.  And as well, Dr. Thomas'

14    deposition was taken.  The testimony and those documents show

15    that no confidential information, if Dr. Thomas has any, was

16    ever communicated to Howrey & Simon.  And I just want to make

17    clear, because I haven't heard, and I don't believe it's

18    Ricoh's position, that the contrary facts are the case.  If

19    so, they haven't stated that.

20             THE COURT:  I think they have stated that.  Maybe

21    I misunderstood.

22             MS. CORBIN:  That is why I wanted to clarify.

23             THE COURT:  Let's clarify that.

24             MS. CORBIN:  I think what they are complaining

25    about is that he had confidential information and we knew at

1    some point, he had mentioned to us that he had consulted for

2    this short time with them and we proceeded anyway.

3              THE COURT:  Let's get clarification on that.  Mr.

4    Brothers.

5              MR. BROTHERS:  Yes.  Your Honor, we believe,

6    based on the inconsistencies between what Mr. Kelley said

7    during the hearing and Mr. Thomas' testimony, as well as the

8    intent of defendants to continue to pursue Dr. Thomas'

9    testimony, leads us to believe that something more than

10   innocent communications occurred.  We don't know what those

11   are and we don't know the extent to them.  We know that there

12   was at least one phone call in which the questions were

13   asked.

14             THE COURT:  So in other words, Mr. Brothers, it

15   is at least your position that it may have been the case

16   that -- and I don't want to put words in your mouth, but for

17   purposes of clarifying the record and answering Ms. Corbin's

18   question -- is it your assertion that there is the

19   possibility that they may have known of the confidential

20   relationship and proceeded anyway?

21             MR. BROTHERS:  Well, certainly, as I understand

22   it, everybody agrees they knew of the confidential

23   relationship.  They elected to proceed anyway.

24             THE COURT:  And that in fact confidential

25   information had been received by Dr. Thomas?

1          MR. BROTHERS:  Dr. Thomas has testified that in

2     fact confidential information was received.

3          MS. CORBIN:  Was received, not transmitted to

4     Howrey Simon.

5          THE COURT:  I am sorry.  I should have gone that

6     additional step.

7               Is it your position, Mr. Brothers, that it was

8     transmitted?

9          MR. BROTHERS:  We believe that there is an

10    inference that supports that.  But we don't have the internal

11    Howrey documents that would presumably reflect on that, and

12    Dr. Thomas said he could not recall with specificity the

13    contents of his telephone conversation.

14         THE COURT:  I thought, Ms. Corbin, I understood

15    counsel to take the position they have just articulated.

16         MS. CORBIN:  My confusion is, Your Honor, they

17    have now taken a deposition and they have all the documents.

18    And they still say they have this inference.  But they don't

19    have any statements that he made or any evidence from the

20    document exchange that any confidential information was

21    actually transmitted.

22         THE COURT:  What is the basis for drawing the

23    inference, Mr. Brothers?  That is what is being questioned

24    here.

25         MR. BROTHERS:  There are three specific pieces of

1    evidence, Your Honor.  First is the fact that the questions

2    were asked during the telephone conversation what

3    confidential information was there, and there was the inquiry

4    following our complaint, and then there was a followup e-mail

5    to that saying -- and I read it as kind of a self-serving or

6    "let's protect ourselves" e-mail -- saying, we talked about

7    this in the phone call and I want you just to give me a

8    general list of the documents that were talked about.

9         Dr. Thomas didn't testify specifically, he

10   couldn't remember the specifics of the phone conversation.

11   But based on their, Howrey's continued pursuit of Dr. Thomas

12   and the e-mail following this exchange, saying we want to

13   take your deposition on in essence the same things that you

14   consulted with for counsel for plaintiff, that leads us to

15   believe that there is going to be favorable testimony coming

16   out of that.  And what is the basis for that?  We think that

17   there is only one answer to that.  They have got some idea

18   from Dr. Thomas as a result of his consulting with Ricoh

19   about what those opinions were going to be.  And that is the

20   confidential information.

21        In any event, Your Honor has ordered the Howrey

22   firm to produce those handful of internal documents.  I would

23   ask that, because the order of July 31st provides that by

24   August 31st, we may file a two-page letter, I would just ask

25   that that be postponed until 10 days after the submission of

1    the privilege log and internal documents.

2            THE COURT:  That is an acceptable process.  We

3    will follow that recommendation.

4            Ms. Corbin and Mr. DiGiovanni, are you clear as

5    to what your responsibilities are?

6            MR. DiGIOVANNI:  Your Honor, actually, I am

7    somewhat confused with regard to the scope of production.

8    The only documents -- we described these few letters to

9    Ricoh -- the only documents that we have other than the

10   documents that went back and forth to Dr. Thomas, which were

11   all produced, are documents among the attorneys, the Howrey

12   Simon attorneys, there was some e-mail correspondence,

13   including myself, regarding Dr. Thomas and these issues

14   regarding Dr. Thomas.  So every single e-mail communication

15   or other communication has at least as a recipient or the

16   author an attorney.  So there is no doubt that all these

17   documents are privileged.

18           THE COURT:  Sure.

19           MR. DiGIOVANNI:  It sounds like they are trying

20   to break the privilege.  However, there is no such exception

21   to the privilege that would allow this to break.  For

22   example, in an instance where you have the crime/fraud

23   exception, the U.S. Supreme Court and the Third Circuit have

24   said there has to be at least a prima facie case established

25   before that can even be broken.  There has to be a reasonable

1    basis to even inquire into these privileged documents for

2    even in camera review.

3              It is our position Ricoh has not even come close

4    to establishing that, especially because we have taken the

5    deposition of Dr. Thomas and he said, quote, I didn't share

6    any information with him -- the one attorney he talked to --

7    about confidential material.  So we are somewhat confused as

8    to what the possible inquiry can be, because this is

9    privileged information.

10             THE COURT:  I understand what it is.  I know the

11   crime/fraud exception, counsel.

12             Mr. Brothers, do you have a position on the

13   crime/fraud exception?  Do you want to say something about

14   that?

15             MR. HOFFMAN:  Your Honor, if I can just briefly

16   respond.  First of all, to return to one of the points in

17   history because it lays the foundation for this.  There was a

18   representation to the Court that Dr. Thomas had told the

19   Howrey people that he received no confidential information

20   from Ricoh.

21             THE COURT:  I remember that.

22             MR. HOFFMAN:  In fact, the Court made a comment

23   about relying on Dr. Thomas' legal opinion when that was

24   indicated.  Dr. Thomas, during his deposition, though,

25   testified that he did receive confidential information from

1    Ricoh, obviously, inconsistent with the representations.

2    There is a number of representations that have been made to

3    the Court that are inconsistent -- I am sorry,

4    representations to the Court that are inconsistent with the

5    documents we have obtained to date and also Dr. Thomas'

6    testimony.

7              Your Honor, I think that the whole issue of

8    making certain representations to the Court that they know

9    are inconsistent and these documents that we are asking be

10   turned over to the Court may further our belief, support our

11   belief, does create an issue of potential fraud upon the

12   Court.

13             THE COURT:  I think it does.  The Court is going

14   to order the production of the July 30 transcript for its

15   inspection at the same time that it reviews the documents

16   that I have just ordered be produced.

17             MR. KELLEY:  I want to raise one point.

18             THE COURT:  We are done with this point.

19             MS. CORBIN:  So I can understand the scope...

20             THE COURT:  Let's make sure we understand the

21   scope.

22             MS. CORBIN:  You would like every internal

23   document in Howrey that makes reference to Dr. Thomas.

24             THE COURT:  Yes.  As I understand it, we are

25   talking about a handful of documents.

1          UNIDENTIFIED SPEAKER:  Your Honor, is there a

2    time cutoff for this?

3          THE COURT:  Ms. Corbin, is that correct?

4          MS. CORBIN:  I can't make any personal

5    representation to that.  There may be documents that address

6    that particular piece of prior art.

7          THE COURT:  I think it was Mr. Kelley who

8    indicated it would be a relatively few number of documents.

9    Is that correct, Mr. Kelley?

10          MR. KELLEY:  Yes, Your Honor.

11          MR. DiGIOVANNI:  Your Honor, I am not sure about

12    the time cutoff, because I believe Mr. Hoffman had stated he

13    was interested in the internal documents regarding the

14    retention of Dr. Thomas.

15          MR. HOFFMAN:  Your Honor, if I can just respond,

16    I can simplify things by proposing a time cutoff.  I believe

17    the subpoena was sent out to Dr. Thomas early July --

18          UNIDENTIFIED SPEAKER:  Late June.

19          MR. HOFFMAN:  -- late June, from whatever that

20    date of that subpoena is going forward, coming to the

21    present.

22          THE COURT:  Is that understood on the other

23    side?

24          MS. CORBIN:  Yes, thank you, Your Honor.

25          MR. DiGIOVANNI:  Your Honor, if we are talking

1    about documents relating to Dr. Thomas through today, this

2    would include the e-mails leading up to this teleconference

3    regarding strategy.

4            MR. HOFFMAN:  I apologize, Your Honor.

5            THE COURT:  We don't need that.  Through the date

6    of the July 30th telephone conference with the Court.

7            Are we now clear on time parameters?

8            UNIDENTIFIED SPEAKER:  It would be June 26th,

9    2003, to July 30th, 2003.

10           THE COURT:  Ms. Corbin, do you understand the

11   time, and Mr. DiGiovanni, do you understand the time

12   parameters?

13           MS. CORBIN:  It would capture our communications

14   with each other in preparation for that call.

15           THE COURT:  Well, I don't want that, either.

16   That is not the intent of the Court, to include that,

17   either.  Let's be a little more specific.  Mr. Hoffman.

18           MR. HOFFMAN:  Your Honor, it would be with

19   respect to the issue whether or not to retain Dr. Thomas,

20   what Dr. Thomas discussed with them, what was communicated --

21   in other words, internal discussions about what were the

22   communications with Dr. Thomas, whether or not they should or

23   should not retain him.  If it will simplify things, Your

24   Honor, nor that we not capture their internal communications

25   regarding preparing for the telephone conference with the

1    Court, why don't we drop it back a few days prior -- Your

2    Honor, we are not looking for things relating to the strategy

3    in preparing for the telephone conference.

4         MR. BROTHERS:  I was trying to make clear that

5    the phone conference was on July 30th and recapping that

6    phone conference, then there were additional e-mails to and

7    from Dr. Thomas up through the date of the hearing.  So,

8    obviously, to the extent that an e-mail was sent to or

9    received from Dr. Thomas and forwarded to others with the

10   comments about substance and Dr. Thomas' retention and about

11   what was said, then I think all of those are appropriate to

12   include.

13        THE COURT:  I agree.

14        MS. CORBIN:  So, Your Honor, are you saying

15   through the date of the deposition?  I missed what whoever

16   was speaking last just mentioned.

17        MR. BROTHERS:  I believe the subpoena was issued

18   on June 25th or 26th.  And the hearing was on July 30th, in

19   which the Court said no further communications with Dr.

20   Thomas.  So it would be that 34-day period.

21        MS. CORBIN:  Excluding any internal

22   communications from Howrey in preparation for that conference

23   call with the Court.

24        THE COURT:  Correct.

25        MS. CORBIN:  I have that in mind now, Your

1    Honor.  Thank you.

2                    THE COURT:  Okay.  Great.

3                    MR. HOFFMAN:  Your Honor, I presume you want to

4    proceed in order?

5                    THE COURT:  Yes, sir.

6                    MR. HOFFMAN:  Yes, sir.  The second topic is a

7    request of Ricoh.  We served the subpoena that was issued out

8    of Delaware, out of this Court, on Synopsys.  Synopsys is not

9    a party to the litigation.  However, Ms. Corbin has

10   previously indicated to the Court back at the time of the

11   scheduling conference that their position is Synopsys is a

12   real party in interest here.

13                   We served the subpoena for documents.  Synopsys

14   has objected to every part of that subpoena, to all the

15   categories.  To date, they have produced as far as anything

16   other than some prior art, they have produced approximately I

17   think it's less than 100 pages of documents.

18                   What we are trying to discover in general from

19   Synopsys is information about the software, the systems that

20   they have provided to the defendants.  As the Court may

21   recall, and it's also set forth in defendants' motion to

22   dismiss, part of the issue here regarding the defendants'

23   activities relating to their utilization of Design Compiler.

24   There is also another program called Behavioral Compiler,

25   which may also play a part here.

1          What we indicate, in fact, they have asked us for

2    our basics, some of our infringement positions, and we have

3    set forth a basic explanation of why we think they infringe.

4    It is very general at this point, granted.  But it does in

5    that indicate that part of it involves the use of Design

6    Compiler.  Synopsys has indicated that they are willing to

7    give us some non-confidential, publicly available documents

8    on Design Compiler and Behavioral Compiler, but nothing

9    confidential.

10          We have obviously pushed for more.  We want the

11   confidential documents on both products.  And also we want to

12   know what other products did they provide to the defendants,

13   because there are other products that may come into play

14   here.

15          Synopsys has raised a number of objections.  The

16   first objection that they have raised is that the documents

17   should not have to be produced twice, because that would be

18   duplication, and consequently, they will produce them in the

19   California action and not here.

20          And I start with that one, Your Honor, because in

21   essence during the scheduling conference, Ms. Corbin sought a

22   stay of discovery in this action.  And the Court

23   appropriately indicated that, no, discovery was going to go

24   forward.  What Synopsys is doing here and the defendants are

25   doing here in essence is saying that, no, discovery is not

1    going to go forward.  We are only going to produce the

2    documents in California.

3              We agree, they don't have to be produced twice.

4    But there is no reason not to produce them here.

5              They have also objected on the basis that the

6    documents are confidential.  Well, Your Honor, there is a

7    protective order.  Howrey & Simon, who represents both

8    Synopsys and the defendants, was involved in negotiating that

9    protective order.  They were involved in working out the

10   details of it.  Clearly, they can be produced underneath the

11   protective order.

12             Next, Your Honor, something I had not mentioned,

13   Synopsys has not objected on any type of basis that there is

14   no jurisdiction of this Court over this issue, over the

15   subpoena.  So it is appropriately here, the subpoena.

16             The only issue is what subject matter, what

17   documents do they need to produce.  They have also complained

18   or objected that we haven't explained our patent infringement

19   theory.  This also comes up with the objections that have

20   been raised.  Mr. Meilman will get into that later on when we

21   address that topic.

22             We have indicated to them, in fact, they have

23   stated that the issue of infringement relates to the

24   utilization of Design Compiler.  We are fully aware of that.

25   So for them to tell the Court, we don't -- to object on the

1    basis we don't understand what you are charging with

2    infringement at the same time they are telling the Court

3    that, oh, what's being charged with infringement is

4    utilization of Design Compiler is simply disingenuous.

5           They have also objected, indicated that the

6    documents can be obtained from the defendants and we would be

7    better off obtaining it directly from the defendants since

8    they are parties to the litigation.

9           Well, first of all, Your Honor, not all the

10   documents can be.  But more importantly here, the defendants,

11   in turn, turn around and say, through the same attorneys,

12   Your Honor, saying that, well, we can't provide you the

13   documents because it's the confidential information of

14   Synopsys.  Well, Your Honor, obviously, the information can

15   be provided.  It can be provided underneath the protective

16   order.

17          We next have an objection that the documents,

18   some of the documents are in the public record and can be

19   obtainable from other sources.  Well, to say, well, some of

20   the documents I have are publicly available and you can

21   obtain them, well, who knows what documents they are?  If

22   they gave us a list, here is the dates of the documents, here

23   is where you can obtain them, fine.  But if they have the

24   documents, whether they are publicly available from other

25   sources or not, they should still be obligated to provide

1    them.

2            They also object that apparently some of the

3    documents are confidential information of third parties,

4    unidentified third parties.  We have asked them to identify

5    them, these allegedly third parties.  They have refused to do

6    that.

7            In essence, what we are getting, what appears to

8    us, Your Honor, is a stonewalling of discovery, a decision to

9    say that basically we are just not going to provide discovery

10   until the Court requires us to.  That's the way it looks.  Or

11   until the case the case is in California, we are not going to

12   give you discovery.  We are not going to provide it in the

13   Delaware action.

14           THE COURT:  Okay.  Who is going to handle this?

15           MR. KELLEY:  Your Honor, I am.

16           Mr. Hoffman just recited several issues that

17   relate to objections that were recorded in our responses to

18   the interrogatories.  But it doesn't address the real issue

19   here, which is the breadth -- I said interrogatories, I meant

20   document requests -- which is the breadth of the document

21   requests.  If you look at these -- am I talking over

22   someone?

23           THE COURT:  No.

24           MR. KELLEY:  They have asked for -- I will go to

25   some specific language in a minute.  They have asked for

1    every engineering document relating to any product produced

2    by Synopsys.  Now, Synopsys is a third party, may be required

3    to produce some documents in this litigation.  But the basis

4    for that production has to be that there is a need to get

5    this information from the third party and that the evidence

6    is directly related to a real critical issue in the case that

7    can't be attained from some other source.

8            It's not proper for them to submit document

9    requests that ask us for every engineering document relating

10   to every product that Synopsys has produced.  That is the

11   real issue here.  Not about the nature of our objections,

12   about whether a document is confidential or not.  If they are

13   willing to focus their document requests on the real critical

14   issues, the key part of the Synopsys product that they think

15   is relevant to their theory of infringement, which, as Mr.

16   Hoffman just admitted, they haven't really spelled out in any

17   kind of detail, then that would be a legitimate basis for a

18   document request.

19           Let's cut to some of the text from the document

20   requests.

21           The order that we would ask the Court to issue is

22   a protective order relating to Document Requests 2 through

23   5.  Let me just tell you, read to you a little bit, and I

24   won't do this for all of them, because it will become

25   tedious, but let me just read to you from No. 5.  It says,

1    Produce all documents concerning all hardware, software

2    libraries, core databases for use in ASIC design systems, and

3    then goes on and on, about including technical reference

4    manuals, technical bulletins, user manuals, installation

5    manuals, training manuals, sourcecodes, tutorials, et cetera,

6    et cetera.

7        The real issue here is that these are just not

8    crafted as the kind of discovery that one might reasonably

9    expect one could get from a third party to a case.  They are

10   not limited in any manner to the products at issue.  They are

11   not limited in any manner to the key parts of the products

12   that they are going to contend infringe.

13       The only thing that they have identified in their

14   interrogatory answers to date as being the basis of their

15   infringement allegations is two steps, two steps that are

16   performed by the defendants in this case.  The first is,

17   providing input to Design Compiler, and the second is using

18   Design Compiler to take the library cells and create some

19   output that will be used to produce an output for (inaudible)

20   ASIC a chip.  That is all they have identified.

21       If they are willing to restrict their document

22   requests to specific things relating to those steps and

23   relating to the product that they say defendants are using in

24   an infringing manner, then we would have a basis to produce

25   documents.  They aren't entitled to a fishing expedition of

1    every engineering documents in Synopsys' possession.

2            And I would go on to state, Your Honor, there are

3    a number of documents, document requests, that we have

4    produced documents, agreed to produce documents in response

5    to.  This is not an exercise in stonewalling.  And we have

6    given them some manuals that describe how, what kind of

7    inputs Design Compiler can accept, and describe exactly the

8    steps involved or the state, describe that Design Compiler is

9    used to select library cells in order to produce an output

10   for ASIC design.

11           THE COURT:  You have described, counsel, some

12   parameters.  Let's see if they are acceptable to counsel for

13   Ricoh.

14           MR. HOFFMAN:  Your Honor, first of all, the

15   documents that they have produced is less than 100 pages.

16           THE COURT:  I don't want to go over that.  What I

17   am interested in knowing is how you react to the objection

18   which Mr. Kelley says is really at essence here, that is the

19   scope, that your request is overly broad.

20           MR. HOFFMAN:  Your Honor, what we have indicated

21   to them is that -- and then I would like to go to what is

22   actually the Request No. 5, because it was not properly read.

23           THE COURT:  I don't want to do that.  What I want

24   to get to is an agreement.  I am really not interested in

25   batting this ping-pong ball back and forth across this

1    table.  I want to get to an agreement rather quickly.

2              MR. HOFFMAN:  Yes.  Your Honor, what we have

3    indicated is we will agree to limit our request to No. 1,

4    Design Compiler documents, Behavioral Compiler documents.

5    And they have agreed -- that is just the starting point, and

6    I will go on from there.  But they have agreed to produce

7    documents relating to those products, but only the

8    non-confidential documents.

9              THE COURT:  Well, let's talk about that then.

10   Insofar as, Mr. Kelley, counsel has now defined what I hope

11   you will agree is a proper scope, what about the production

12   of confidential information pursuant to the terms of your

13   protective order?

14             MR. KELLEY:  Is that a question for me, Your

15   Honor?

16             THE COURT:  Yes, sir.

17             MR. KELLEY:  The reason that we mentioned

18   confidentiality in the objection is that as a third party

19   confidentiality is one of the considerations that is

20   mentioned in the case law about weighing that burden on the

21   third party versus the need in the case.

22             THE COURT:  We are trying to reduce the burden.

23   I do understand your complaint regarding the burden.

24             MR. KELLEY:  I apologize.  The next point, what

25   they have identified as being the basis of infringement,

1    namely, that the user provide certain inputs to Design

2    Compiler and that that Design Compiler takes those inputs and

3    selects library cells to produce the output, that they can

4    get from public documentation.  There really is no need to go

5    into our sourcecode describing exactly in great detail how

6    those functions are performed or into the internal

7    engineering documents describing every aspect of that.  If

8    that is what they need from us, they have already got that.

9    And I will correct Mr. Hoffman.  We have already produced

10   several hundred pages of manuals.

11          THE COURT:  Let's just deal with this discrete

12   issue, this discrete range of documents, Mr. Hoffman.  Do you

13   agree that there are alternate sources?

14          MR. HOFFMAN:  No, there are not, Your Honor.  The

15   information is going to be in the confidential documents.  It

16   is going to be in the sourcecode.  It is going to be in the

17   other information that comes out of Synopsys or comes out of

18   the defendants.

19          There is many other parts of this claim, such as

20   discussions of expert systems, discussions or rules.  Some of

21   those are going to be parts of the (inaudible) of Design

22   Compiler or Behavioral Compiler.

23          So consequently, just inputting information, yes,

24   that is part of the process here, there is no question that

25   is part of the process.  But then it's how the system

1    operates is another part of the process, and some of that is

2    not fully available.  The details that we want for trial to

3    prove our case, obviously, we have enough information to

4    bring the case and to allege, quite appropriately allege,

5    that that information and that operation is present.  But we

6    are entitled to further information to further establish and

7    prove our case.

8              Synopsys, they keep on saying they are a third

9    party.  Yet at other times they keep on saying they are the

10   real party in interest and they are the true party here.

11             THE COURT:  I don't hear any objection to the

12   relevance, that it's not discoverable.  It's a question of

13   sourcing, where you can get it from, whether you can get it

14   from alternate sources and how to protect it.

15             MR. HOFFMAN:  There is a protective order and we

16   cannot get this from --

17             THE COURT:  What I am getting at is, it seems to

18   me, counsel, if you remove for a moment -- and I know this is

19   difficult to do -- your adversarial hats and think more in

20   the spirit of cooperation, because there is no apparent

21   disagreement as to the relevance of this information, the

22   discoverability of this information, then you could probably

23   come to a point of agreement as to how it should be

24   produced.  Is that just beyond your capability?  Or what are

25   we talking about here?

1          MS. CORBIN:  Your Honor, I think that now they

2    have the identified Design Compiler, Behavioral Compiler --

3    Design Compiler alone, just for point of reference for the

4    Court, is the largest product at Synopsys, accounts for more

5    than 20 percent of its revenue.  They still want all

6    engineering documents relating to Design Compiler.  We still

7    have a huge problem with respect to overbreadth.

8          THE COURT:  I can understand why you would have a

9    problem with that.  And it seems to me the plaintiff should

10   be able to narrow that request somewhat.

11         MR. HOFFMAN:  Your Honor, if Synopsys is willing

12   to give us the confidential information, they are willing to

13   give us the sourcecode limited to the time of the scope of

14   documents, going back to 1996, so we are not talking about

15   everything that is there, all documents that they have ever

16   had, we are willing to work with them in trying to work out

17   some other limitations.  But to say, well, tell us the

18   details of exactly which parts of Design Compiler you are

19   alleging to infringe and give us a detailed claim chart so

20   that then we can decide whether or not we will give you

21   anything is putting the cart before the horse.  What they are

22   asking is prove your case and then we will decide if we will

23   give you discovery.

24         THE COURT:  Obviously, you don't have to do that.

25         MS. CORBIN:  Your Honor, the sourcecode, since it

1   has been mentioned twice now, is of particular import, I

2   think, because that is the most sensitive information about a

3   particular product, it contains a lot of information.  If

4   what they need is an understanding of the inputs that these

5   particular customers input to Design Compiler when they use

6   it, there are other ways to get to that information besides

7   having the sourcecode, which is the most sensitive

8   information in the company, regarding their key product.

9            THE COURT:  Well, inevitably, counsel, in all of

10   these cases, and you know that from your vast experience in

11   this area, there is always information, oftentimes

12   extraordinarily sensitive information like this that is at

13   issue and that needs to be shared in order for the litigation

14   to proceed forward.  That is why we have protective orders.

15   That is why there is a body of law that has grown up around

16   this issue.  But it is incumbent upon counsel to recognize

17   the need to cooperate, and if necessary, to craft new

18   language that will enable this type of information to be

19   shared at appropriate levels.  If it is for attorneys' eyes

20   only -- I think you understand where I am going with this.

21            If there is truly an alternate source that will

22   enable the plaintiff to prosecute its claims in a timely

23   fashion from which it can receive this information, I would

24   be interested in knowing and having the discussion right now

25   as to what that source is and whether it is acceptable to the

1    plaintiff.

2              MS. CORBIN:  Can you address that, please, Chris

3    Kelley?

4              MR. KELLEY:  Yes, absolutely.  That is where I

5    was intending to go.

6              Your Honor, the issue here is that -- of course,

7    they have stated to this Court -- and I don't want to get

8    into the motion to stay or transfer -- but they have stated

9    that their beef is not with Synopsys.  That it's by

10   defendants that are infringing.  They are now suggesting that

11   Synopsis is a third party and as a party to this case has the

12   same obligations in discovery.

13             If you look at the way the interrogatory is

14   drafted, they identify the two things that would have some

15   connection with the user, namely, putting some stuff in at

16   the top of the process and getting something out at the

17   bottom.  And they didn't mention anything about all the other

18   the stuff, which of course I think they are going to argue

19   are all internal to Design Compiler.

20             Their theory of infringement really is these

21   defendants use Design Compiler.  If that is the case, which

22   they haven't come flat out and stated today, they should have

23   sued Synopsys.  Instead, they elected to sue Synopsys'

24   customers.  Now they are trying to back-door, attack

25   Synopsis' product by getting this very broad discovery.

1          I think the progression here is, to the extent

2     they really believe their case of infringement rests on

3     something the defendants are doing and there is some

4     peripheral material that is in the exclusive possession of

5     Synopsys, that is the kind of discovery they should get.  But

6     what I think we are going to find out when we actually have

7     this meeting -- and I think that's the proper way to proceed,

8     is for the proper parties to get together and work out

9     exactly what they need and what we can give them, how we can

10    get them the information they need.  I think what we are

11    going to find is everything they need relating exclusively to

12    stuff done by Design Compiler, nothing to what these two

13    defendants here are doing except using Design Compiler,

14    providing the regular inputs that Design Compiler normally

15    takes in and at the end of the process say thank you very

16    much for the output, I am going to take this off to go make

17    the chip.

18          THE COURT:  It is not necessary for you to

19    respond, Mr. Hoffman.  The Court has instructed the parties

20    to get together and discuss this matter.  If you are still at

21    an impasse after that discussion, obviously, we will have to

22    revisit this.

23          Let's go on to No. 3.

24          MR. HOFFMAN:  No. 3, Your Honor --

25          MR. KELLEY:  Your Honor, I think this is our

1  item.

2              THE COURT:  Yes.

3              MR. KELLEY:  This is a relatively simple matter.

4  On the patent at issue, there are two inventors, Mr.

5  Kobayashi and Mr. Shindo.  Ricoh has already agreed to make

6  Mr. Kobayashi available for deposition in Japan.  That is

7  going forward.

8              At a fairly early point during discovery, we

9  asked them whether they were representing Shindo.  I am not

10  going to get this exactly right.  They said, no.  We will see

11  if they will work with us.  Give us your subpoena and we will

12  see if he will accept it, not formally, accept service, but

13  he will respond to it.

14              We haven't yet received from them a commitment,

15  any final word as to, one, whether Mr. Shindo will accept

16  this -- will cooperate in discovery, and two, whether they

17  intend to use him during trial, appear as a witness.

18              Both Mr. Shindo and Mr. Kobayashi, to our

19  knowledge, live in Japan.  We have asked them if they would

20  bring Mr. Shindo to the United States.  They have said, no,

21  you have to go to Japan to take his deposition if you want to

22  take his deposition.  That's assuming of course that he at

23  some point determines to cooperate.

24              The problem we are facing, given the close of

25  discovery in January, the facilities for deposition, which I

1    assume everyone on the phone is familiar with, depositions in

2    Japan must takes place either at the embassy or one of the

3    consulates.  The Tokyo Embassy is already completely booked.

4    There is a little opportunity, some space in the Osaka

5    Consulate, which, to our understanding, that is actually

6    where Mr. Shindo lives, is Osaka.

7             What we would like from the Court is some

8    deadline as to when they actually have to have a final word

9    as to whether Mr. Shindo is going to cooperate or not.  Then

10   either to make him available in Japan in accordance -- with

11   one of the windows of opportunity that we have, at the Osaka

12   Embassy, or bring him to the United States for deposition

13   here.

14            THE COURT:  Okay.

15            MR. KELLEY:  We can depose him in advance of

16   trial.

17            THE COURT:  Can we get an answer to the question,

18   counsel?

19            MR. HOFFMAN:  Yes.  Mr. Shindo, who is a third

20   party, we don't represent him, we have attempted to contact

21   him through numerous ways.  He does not respond to any of our

22   requests to see if he would be willing to accept the

23   subpoena.

24            We have asked him to sit for a deposition and

25   produce documents.  He does not respond.  He is so far, by

1    lack of response, at least implicitly is indicating he is not

2    going to cooperate.  He has been gone from Ricoh over ten

3    years now.  It is our belief that he is not going to

4    cooperate.  Obviously, if he is not going to cooperate, he is

5    not going to show up at trial or anything else.

6              Both plaintiff and the defendants had listed Mr.

7    Shindo as someone who might have information.  He is one of

8    the inventors.  I presume he has some information.  But no

9    one can force him as a third party to cooperate or to appear

10   for a deposition.  We have been unsuccessful in doing that.

11   Consequently, we can't produce him.

12             With Dr. Kobayashi, he lives in Japan.  He is

13   also not employed by Ricoh.  We asked him.  He came back and

14   said, yes, he would be willing to voluntarily appear.  And

15   that deposition is set up in September, late September.

16             THE COURT:  Mr. Kelley, what would you have

17   counsel do in this situation?

18             MR. KELLEY:  I understand the difficult situation

19   he is in.  This is the first time I heard he hadn't

20   responded.  What I guess I would like is a drop-dead date, if

21   you will forgive the phrase, by which we will know he is

22   either going to cooperate by this date or there is not going

23   to be an opportunity for him to appear at trial.  It seems to

24   me that should be sometime before the close of discovery, not

25   the final day of discovery.

1         MR. HOFFMAN:  That is fine, Your Honor.  We would

2    be willing to do that by the end of the year.

3         THE COURT:  The drop-dead date is the end of

4    discovery.

5         MR. KELLEY:  The complicating factor is if he is

6    going to be deposed in Japan.

7         THE COURT:  No.  I understand.  Obviously, there

8    are challenges that would have to be overcome.  For instance,

9    on the last day of discovery, you get word that he is

10   available, the Court will be flexible, perhaps, in all

11   likelihood, and permit the parties an additional period of

12   time in which to complete his deposition.  But we can

13   certainly deal with that at the time.  At least theoretically

14   the drop-dead date is the last day of discovery.

15        MR. HOFFMAN:  We have asked the defendants to

16   produce all documents -- let me read it to you, a single

17   document request in this regard:  Produce all documents and

18   tangible things identified in Section B, Items 1 through 8,

19   of defendants' initial disclosure dated and served on or

20   about May 30, 2003.

21        This is where they listed the documents that they

22   are going to rely upon in support of their case.  We asked

23   them to produce the documents.  Part of the response is,

24   defendants further object to this request as unduly

25   burdensome in seeking discovery of information not reasonably

1    calculated to lead to the discovery of admissible evidence.

2    Defendants further object to this document request as unduly

3    burdensome and on the basis that it seeks detailed discovery

4    regarding operations of defendants that has no relevance to

5    defendants' ASIC products or methods.

6           Your Honor, these are the documents that they

7    listed, the categories of documents they listed in their

8    initial disclosure.

9           The purpose of the initial disclosure, obviously,

10   is either done over the documents, list the categories so the

11   other side can go ahead and request them.  We requested

12   them.  They came back and have said, no, they are not

13   relevant.  We tried to work it out with them.  The response

14   was, and this is from Mr. Mower (phonetic), defendants

15   identified eight categories of documents that were likely to

16   be relevant to this dispute.  Defendants did not suggest, as

17   your letter implies, that any documents that go into that

18   that fell into these categories were relevant.

19          Well, Your Honor, if they listed them, you only

20   list what you think is relevant.  If it is relevant, we are

21   entitled to them.  If they didn't list any -- if the

22   documents they listed are not relevant, then why did they

23   list them in their initial disclosure?

24          THE COURT:  I agree.  What is the defendants'

25   response to this?

1              MR. KELLEY:  Your Honor, the categories that are

2    identified are relatively generic phrases.  Product design,

3    development materials, marketing, promotional materials.

4    Sales and accounting statements.  You get the gist.  Sort of

5    generic classifications of documents.

6              When we prepared this, this is in the initial

7    disclosure statement, we did not have any idea what their

8    theory of infringement was.  All we had was the complaint,

9    which doesn't provide any detail other than you infringe.  We

10   did note what our invalidity arguments were going to be and

11   we started collecting that information as quickly as

12   possible.  In fact, we have produced the thousands of

13   documents that plaintiffs sometimes refer to in their papers

14   are all prior art articles that we have produced.  So we have

15   produced the materials we knew about in describing these

16   categories at that time.  We immediately started producing

17   that stuff.

18             Since then, we have agreed to go ahead and get

19   the materials relating to -- and here's where the parties

20   have had some negotiation in the past few days leading up

21   though this call, not ultimately successful but some

22   narrowing of the differences -- we have agreed to produce, to

23   go get documents relating to ASIC products which were

24   developed in a process where there was some logic synthesis.

25   Logic synthesis is the kind of operation performed by Design

1    Compiler and other product.

2            And we wanted to further restrict the documents

3    to documents that had some bearing on the use of, the steps

4    which they have identified in their interrogatory, providing

5    input to the logic synthesis to Design Compiler and using

6    Design Compiler to map library cells to produce an output

7    file.

8            They have agreed that their document requests,

9    which asks for every information, all documents about every

10    ASIC, should properly, they have agreed to narrow their

11    request, just in the last few days, to ASIC, whether there

12    was some logic synthesis, i.e., having something to do with

13    the process that is described in their patent.  So then the

14    remaining difference, really, in the document requests is

15    whether they get every document that the defendants have on

16    that ASIC or if they get the documents that are relevant to

17    the claimed process.

18            THE COURT:  I have to say, this is the first time

19    that I have ever had to deal with an issue involving

20    production related to initial disclosures.  I find it

21    extraordinary.  Counsel --

22            MS. CORBIN:  Your Honor, I think that the problem

23    was that the initial disclosure was inartfully drafted.

24            THE COURT:  Perhaps.  But what you need --

25            MS. CORBIN:  The problem may be, there was a

1    subset of documents.

2              THE COURT:  Ms. Corbin, I am going to talk over

3    you.  You can't talk over me.  I know we are on this bridge

4    line and sometimes we talk over one another, and that's okay.

5              But you are going to have to go back and finish

6    your conversation about this, counsel.  I am not going to

7    spend any more time on this.

8              Let's move on to No. 5.

9              MR. MEILMAN:  Your Honor, actually, you have

10   heard part of the discussion on the document requests.

11   Actually, the interrogatory, No. 7, they are also related.

12             THE COURT:  Let's talk about them both then.

13             MR. MEILMAN:  Right after the Rule 16 conference

14   in May, we served these document requests and interrogatories

15   on defendants about a month later.  And as Mr. Kelley

16   indicated, we have been trying to resolve our differences

17   ever since.  We have gotten some information in documents.

18   But it's been dribbled in piece by piece.

19             As Mr. Kelley has told you, that they keep

20   objecting on the grounds that we haven't told them our

21   infringement theory.  In essence, what they are doing is they

22   want us to give them our Markman construction before they

23   decide what they are going to give us.  That's something that

24   was raised during the Rule 16 conference, and the Court

25   refused to push the Markman conference before any discovery.

1              As Mr. Kelley indicated, we have narrowed the

2    definition of what we want, well, the patent in suit is

3    directed to a computer aided design process for making

4    application specific integrated circuits, what has been

5    referred to in this conference call as an ASIC.

6              We have asked them, we have narrowed our request

7    to processes for making ASICs by a computer-aided design

8    process using logic synthesis, development of those

9    processes, what equipment they have used, and any literature

10   they have had about that.

11             Last Friday, they have told us they will provide

12   us details about their current process (inaudible)

13   development.  As to two of the three defendants, they have a

14   plant in the U.S.  But as Mr. Kelley indicated, they want to

15   restrict that to Design Compiler because we indicated we knew

16   they used Design Compiler in at least some of their

17   processes.

18             Yesterday, they backtracked, as far as I

19   understand it, and said we will give you only details as to

20   some of these substeps in the process.

21             They have told us that one of the defendants,

22   Matrox Tech, did design work in Florida, but we will be

23   getting no information about that because it closed its plant

24   in 2000 and those records don't seem to be located.

25             Then there is an issue on questions of responses

1   by the Matrox defendants done in Canada.  We have been told

2   that there are additional process steps those defendants

3   carry out which makes the foreign production provisions of

4   Title 35 U.S.C. 271(g) inapplicable.  As you may guess, the

5   minute they said that to us, we said, What are those steps?

6   And we have been refused disclosure on that.

7          Yesterday I got a call from Mr. -- I got a letter

8   from Mr. Kelley indicating that if we want, they will make

9   people available with knowledge about their design work for

10  deposition, but we are not going to get any interrogatory or

11  document request.

12         Basically, on the definition of the products --

13  the processes that we wish to have disclosure on, we believe

14  that limiting that to the computer-aided design process with

15  logic synthesis is narrow enough to give us the discovery we

16  want.  We know as to some processes the defendants use Design

17  Compiler.  What we don't know is whether they have any other

18  products that they have gotten from other suppliers.

19         We have asked them, do you have those?  And

20  produce the documents.  We have asked both in general and

21  specifically as to one of their -- one of the companies we

22  know provides equipment called Cadence.  And basically, we

23  are told we are not going to get an answer.  As to other

24  things, when they don't have any documents or it has not been

25  applicable, we have been told that.  But as to the generally,

1     are you using somebody else's equipment, are you using

2     Cadence's equipment, we are getting no answer at all.

3                    I think that's basically -- that whole approach

4     filters down to everything that is in dispute pretty much on

5     the interrogatories and document requests.  As Mr. Kelley

6     said, it is a question of what we are entitled to as far as

7     breadth goes.

8                    THE COURT:  Okay.

9                    MR. MEILMAN:  It may very well be there are no

10    other alternate products that the defendants are using.  But

11    I think we are entitled to know that.

12                   THE COURT:  Okay.  Let's hear from the other

13    side.

14                   MR. KELLEY:  Your Honor, let me talk about the

15    271(g) issue in a minute.  Let me deal with the document

16    requests first.

17                   The fight that we have been having over the last,

18    it's been about three or four weeks the parties have been

19    discussing this in earnest, is these document requests.  Once

20    again, let me just read this:  Produce all documents -- I am

21    reading from No. 5, Document Request No. 5:  Produce all

22    documents concerning the conception, design, development,

23    manufacture, or sale of each of the defendants' ASIC

24    products.  Then it goes on and gives some examples sort of

25    thing.

1          There are several.  The ones we have objected to

2    and said these are too broad are that kind of thing.  They

3    haven't (inaudible) with all products and anything having to

4    do with the design of that product.

5          Now, Mr. Meilman just said that, he said CAD

6    process.  As far as I know, that is the first time I have

7    heard them say, what we really need is stuff about the CAD

8    process.  Although I am not sure whether he meant -- well,

9    the thing that is relevant here is logic synthesis.  It's not

10   the specification, the engineering specification describing

11   what the product was going to do that was formulated back

12   when people were kicking around ideas about what a good

13   product for the company would be.  So that's what we have

14   been fighting about now.

15         Ricoh just a few days ago said we will limit the

16   products, as I mentioned, we will limit the products to those

17   products that use logic synthesis.

18         Now, I think the remaining issue is whether the

19   scope of these document requests should be restricted to

20   documents describing the use of logic synthesis or relating

21   to logic synthesis for those products, and not anything

22   having to do with the specification of the product,

23   engineering, planning meetings, memos about how, we have got

24   bugs, our design isn't working, because none of that has

25   anything to do with the claim.

1          THE COURT:  Is that an acceptable limitation,

2    Ricoh?

3          MR. HOFFMAN:  Your Honor, what we are looking

4    for, as Mr. Meilman, I thought, had indicated, is the

5    documents that relate to the process for manufacturing these

6    ASICs in the designing of the ASICs using systems that have

7    logic synthesis in them.  We are not looking for things

8    relating to debugging of the ASICs themselves.  We are not

9    looking for things on other types of -- there is some

10   categories -- and I would have to go back to exactly what Mr.

11   Kelley said -- other things that were pre the designing of

12   these ASICs using the particular types of processes that are

13   involved in the claims and in the patent here of ASIC

14   designing processes using logic synthesis.

15         That is what we are looking for.  We have told

16   them that.  To date, they have produced less than a thousand

17   pages of documents.

18         THE COURT:  Is that a different way of saying

19   that you are in agreement with the limitation that has just

20   been proposed?  Or are you broadening?

21         MR. HOFFMAN:  No.  I think we are in general

22   agreement of some of the things.  Mr. Kelley rattled off a

23   number of things.

24         THE COURT:  So did you.  So, counsel, my question

25   to you is, now having heard one another speak, and speaking

1   to one another through me, do you think that you can put a

2   finer point on these requests and resolve the objections?

3   Because the Court has now invested an hour and a half of its

4   time on matters, quite frankly, in a manner in which it quite

5   frankly believes could have been better invested.

6           Are we at a point in this discussion as to Items

7   5 and 7 where counsel can be released to your own devices and

8   work it out?

9           MR. KELLEY:  I believe.

10          MR. HOFFMAN:  I believe, also, Your Honor.

11          If I can just ask one question, because I think

12  it may help in advancing a number of these things that we are

13  trying to work out.  We would hope that, and would like a

14  commitment from counsel for the defendants and for Synopsys

15  to work out all these matters, to work diligently over the

16  next week, between now and the end of next week to work out

17  all these matters, so we can get these documents.

18          THE COURT:  So ordered, yes.

19          MR. HOFFMAN:  And also that the defendants will

20  not object and tell us we can't give it to you, these

21  documents, because it is the confidential information of

22  Synopsys.

23          THE COURT:  You have to work through your

24  protective order.

25          MR. HOFFMAN:  We will be underneath the

1    protective order, the documents.

2              THE COURT:  I think that's a given, counsel.

3              MR. HOFFMAN:  Thank you, Your Honor.  I

4    appreciate it.

5              THE COURT:  Okay.

6              MR. MEILMAN:  Your Honor, Mr. Kelley was about to

7    start raising some material on the Matrox people in Canada.

8    I don't want to get that swept under the rug.

9              MR. HOFFMAN:  Your Honor, that also probably ties

10   in with Topic No. 8 that they have raised.

11             THE COURT:  Topic No. 8 is a non-starter for the

12   Court.  I am not going to grant permission to file a letter

13   in support of the seeking of permission to file summary

14   judgment at this time, no.

15             MR. HOFFMAN:  I presume we are also entitled then

16   to get discovery out of the people in Canada.

17             THE COURT:  I don't see why not.

18             MR. KELLEY:  Can I address that issue briefly?

19             THE COURT:  Yes.

20             MR. KELLEY:  They are seeking discovery -- this

21   claim relates to the logic synthesis process.  What they want

22   is the discovery of logic synthesis work done in Canada.

23             THE COURT:  Counsel, you are breaking up on us.

24             MR. KELLEY:  It seems to me, I know we don't want

25   to get into the issue of whether they are going to prevail on

1    their 271(g) theory.  But that's unusual, to try to apply a

2    U.S. patent to seek discovery on work done outside the United

3    States, on things done outside the United States is very

4    unusual.

5              THE COURT:  What is the thinking there, Ricoh?

6              MR. HOFFMAN:  Your Honor, if a process of

7    manufacturing a product is carried on outside the United

8    States where that process would infringe a process patent

9    inside the United States, then there is a basis for

10   allegation of infringement, the charge of infringement, just

11   boiling it down to a summary format.

12             The Bayer case they are relying upon is talking

13   about something entirely different.  It was talking about

14   strictly -- and I have part of the claim here -- a need for

15   determining whether a substance is an inhibitor or

16   activator.

17             That is not what we are talking about here.  We

18   are not talking about a method of determining whether or

19   not -- determination of whether a piece of information is in

20   one category or another.  We are talking about part of a

21   manufacturing process, and 271 clearly covers that situation,

22   where the products do flow into the United States, that there

23   is infringement of that process patent.

24             This is a manufacturing process.  So it's our

25   position we are entitled to it.

1          THE COURT:  Does counsel disagree with counsel's

2   statement regarding the current state of the law?

3          MR. KELLEY:  Yes, Your Honor.  The Bayer case

4   makes it absolutely clear that the manufacturing process,

5   this is the exact question addressed by the Federal Circuit,

6   the manufacturing process, in order to fall within 271(g),

7   the claimed process has to be one using manufacturing the

8   device, the actual physical things that are going to be

9   imported.

10          MR. HOFFMAN:  This is all part of the

11  manufacturing process, Your Honor.  And what they are trying

12  to do is say, well, since we disagree and we think that we

13  are entitled to summary judgment, we are not going to give

14  you discovery.  And we are entitled to that discovery and to

15  show that it is part of the manufacturing process for

16  manufacturing the products that then flow into the United

17  States.

18          THE COURT:  Mr. Kelley.

19          MR. KELLEY:  Your Honor, if I may finish my

20  point.  The case makes it absolutely clear that there has to

21  be a physical good produced under this process.  What their

22  claim process produces is a -- a net list, that is then used

23  to produce -- it is sent off to a foundry that actually

24  produces the devices.  It is not used in the process of

25  manufacturing the goods.  The Federal Circuit decision makes

1    it quite clear that the process set out has to talk about the

2    actual process, the mechanical physical process of creating

3    the thing that is going to be imported.

4             THE COURT:  Let's see if your opponent agrees

5    with that statement.  Do you agree that the case stands for

6    that proposition, counsel?

7             MR. HOFFMAN:  No, I don't, Your Honor.  The case

8    stands for the proposition -- that is why I read a portion --

9    it stands for the proposition that when all that is

10   determined by the process is a piece of information that is

11   never used in the manufacturing operation, it has nothing to

12   do with manufacturing a product, it is just determining

13   information, that that is not covered by 271.

14            What we have here in this case is one or a series

15   of the steps, the initial steps in designing a product that

16   is -- as part of the manufacturing operation, design and

17   operation, the manufacturing of a product that is imported

18   into the United States.  That is very different.  That is not

19   what the Bayer case is dealing with.

20            THE COURT:  Counsel for Matrox.

21            MR. KELLEY:  If I am correct about this, then we

22   don't have to have half of the discovery in this case, and if

23   Mr. Meilman is correct, then we do.  What I propose is we

24   brief this question because we are having lawyer argument.

25            THE COURT:  What I am going to do first is read

1    Bayer.  That might be of some assistance to this issue.  Let

2    me take a look.  If I feel I need further elucidation on this

3    subject, I will let you further address it in some fashion,

4    whether it be in the form of some limited briefing or further

5    discussion, I don't know exactly at this point.  But we will

6    defer No. 8 while the Court takes an opportunity to read the

7    case.

8                    MR. HOFFMAN:  In the interim, Your Honor, if we

9    can begin to sort out discovery issues with the defendants,

10   with Matrox on this issue, so at least we can resolve the

11   scope and other issues so we can begin to get discovery from

12   them.

13                   MR. KELLEY:  We are in fact going forward with

14   discovery.  We are in the process of collecting that

15   information about where we do our design work and the general

16   design flow stuff.  I am not sure what more he wanted.  He

17   wanted the same sort of discovery for Matrox that we had for

18   the other defendants.

19                   MR. HOFFMAN:  Yes, Your Honor.

20                   MR. KELLEY:  It seems to me it will take -- I

21   understand the Court has a busy schedule.  But he seems to be

22   asking that we do this very discovery that I am suggesting

23   could be avoided.

24                   THE COURT:  I think that is correct.  What I am

25   going to order is, as far as the Matrox defendants are

1    concerned, we are going to defer engaging that process, Mr.

2    Hoffman, for a brief period of time, while I take a look at

3    the case, if necessary, get the benefit of further thoughts

4    from counsel.

5        Let's deal with No. 6.  Have we dealt with No.

6    6?

7        MR. MEILMAN:  Your Honor, just, we use the term

8    Matrox defendants.  One of the Matrox defendants was Matrox

9    Tech, which had a plant and was doing work in Florida.  I

10    take it that as far as their objections as to activity in

11    Canada, Your Honor's order does not apply to Matrox Tech.

12        THE COURT:  Are we in agreement with that?

13        MR. KELLEY:  Yes, Your Honor.  We are in the

14    process of collecting those documents for that work like we

15    are doing for every other -- the other non-Matrox defendants.

16        THE COURT:  Then we are in agreement, counsel.

17        MR. MEILMAN:  Thank you, Your Honor.

18        MR. HOFFMAN:  Your Honor, since it may help avoid

19    a future dispute or arguments, Mr. Kelley has indicated they

20    are collecting documents.  Does he have a date by which he

21    believes they will be produced?

22        THE COURT:  Mr. Kelley?

23        MR. KELLEY:  We are doing a rolling production.

24    We are getting stuff as quickly as we can get it.  We

25    produced documents just a few days ago.

1          MR. HOFFMAN:  Will we have all of them produced

2    by mid-September, Mr. Kelley?

3          MR. KELLEY:  I would hope so.

4          THE COURT:  No. 6, what do we have left with

5    regard to No. 6?

6          MR. KELLEY:  We would like to take that off.

7          THE COURT:  That is fine with the Court,

8    counsel.  You don't need to explain.

9          Counsel, I will take a look at the Bayer case.

10   You will hear from me one way or the other shortly.

11          (Counsel say "thank you.")

12          THE COURT:  Take care.

13          (Teleconference concluded at 12:40 p.m.)

14                    - - -

15   Reporter:  Kevin Maurer

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 3**

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

March 7, 2003

**BY CERTIFIED MAIL-**
**RETURN RECEIPT REQUESTED**

Mr. Wilson Tzang
President                                                    **CONFIDENTIAL TREATMENT**
Faraday Technology Corporation                                        **REQUESTED**
490 De Guigne Drive
Sunnyvale CA  94085

Dear Mr. Tzang:

      We are writing to you on behalf of Ricoh Company Ltd. because we are aware
that your company is involved with the design of custom ICs that include application
specific designed circuitry.  We understand that in designing these circuits, you use a
computer-aided design system obtained from Synopsys, including Design Compiler.

      As you may know, Ricoh owns two of the basic patents directed to computer-
aided design processes.  These are U.S. Patent Nos. 4,922,432 and 5,197,016.  They cover
significant advances in computer-aided design processes for designing custom designed ICs
for specific applications directly from architecture independent functional specifications for
the integrated circuit.  We are enclosing copies of these patents for your information.

      While Ricoh is currently enforcing these patents in a lawsuit it recently filed in
the U.S. District Court for the District of Delaware, Ricoh remains willing to license the
patents.  In fact, Ricoh has already granted non-exclusive licenses under these patents.
Ricoh also would be willing to provide your company with a non-exclusive license.  For
your information, there are counterpart patents and applications in a number of countries
outside the United States.

      Because Ricoh is at an early stage in its licensing activities, at the current time,
Ricoh is prepared to grant a non-exclusive license on favorable terms.  However, we trust
you will recognize that such favorable terms will cease to exist as time progresses.

      If you are of the opinion that you do not need or want a license from Ricoh, it
would be helpful if you would give us some insight into your reasons.  We request your
response within 60 days from the date of this letter.

Very truly yours,

Gary M. Hoffman

1177 Avenue of the Americas • New York, New York 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.legalinnovators.com

1580776 v1: XVQG01!.DOC