Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| SYNOPSYS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RICOH COMPANY, LTD., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) **CASE NO. C-03-2289-MJJ** <br><br> **CASE NO. C-03-4669-MJJ** |
| RICOH COMPANY, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> AEROFLEX INCORPORATED, et al., <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) **RICOH'S NOTICE OF MOTION AND MOTION FOR SANCTIONS AND SUPPORTING BRIEF** <br><br> **Date:  January 6, 2004** <br> **Time:  9:30 a.m.** <br> **Courtroom:  11** |

## <u>TABLE OF CONTENTS</u>

BACKGROUND FACTS ........................................................................................................... 2

    A.    Ricoh's Consulting Relationship With Dr. Thomas ............................. 2

    B.    Howrey's Initial Contacts With Dr. Thomas And Their
           Conclusion That Retaining Him Would Be A Conflict Of
           Interest ................................................................................................ 3

    C.    Howrey's Undisclosed Subpoena To And Retention Of Dr.
           Thomas ................................................................................................ 4

    D.    Ricoh's Objection And Howrey's Belated "Investigation"
           Of Whether There Was A Conflict Of Interest .................................. 7

    E.    Howrey's Representations During The July 30 Hearing
           And The Court-Ordered Investigation ....................................... 9

    F.    The August 28 Hearing And The Disregard Of The Court's
           Orders ............................................................................................... 11

ARGUMENT ........................................................................................................................ 12

  I.    THE ASIC DEFENDANTS, SYNOPSYS AND HOWREY
       KNOWINGLY INDUCED DR. THOMAS TO SWITCH SIDES ................. 12

  II.   MISREPRESENTATIONS TO THE COURT ................................................ 15

  III.  SYNOPSYS, THE ASIC DEFENDANTS AND HOWREY
       REFUSED TO COMPLY WITH JUDGE SLEET'S ORDERS ..................... 17

  IV.  SYNOPSYS AND THE ASIC DEFENDANTS SHOULD NOT
       BENEFIT FROM THEIR WRONGFUL CONDUCT .................................... 18

  V.   SANCTIONS ARE REQUIRED ..................................................................... 19

    A.    Because Dr. Thomas Is A Tainted Witness, His Testimony
           Should Not Be Taken Or Admitted ................................................. 19

    B.    Ricoh Should Receive Its Fees and Expenses .................................. 22

    C.    This Court Should Impose Sanctions Upon The Howrey
           Attorneys Responsible For the Improper Conduct ........................... 23

CONCLUSION ..................................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Actel Corp. v. Quicklogic Corp.*, 1996 U.S. Dist. LEXIS 11815 (N.D. Cal. 1996) ....21, 23

*Advanced Cardiovascular System v. Medtronic, Inc.*, 47 U.S.P.Q. 2d (BNA) 1536
    (N.D. Cal. 1998)................................................................................20

*Biocore Medical Tech., Inc., v. Khasrowshahi*, 181 F.R.D. 660 (D. Kan. 1998).............13

*Campbell Ind. v. M/V Gemini*, 619 F.2d 24 (9th. Cir. 1980) ........................................13

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)..........................................................20

*In Re Complex Asbestos Litigation*, 232 Cal. App. 3d 572........................................21, 23

*Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575 (D.N.J. 1994)...........................18, 20, 21

*English Feedlot Inc. v. Norden Laboratories, Inc.*, 833 F. Supp. 1498
    (D. Colo. 1993) .................................................................................20

*Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996)..........................................13, 21

*Hansen v. Umtech Indus.*, 1996 Lexis 10949 (D. Del. 1996) .........................................19

*MMR/Wallace Power & Indus., Inc. v. Thames Assoc.*, 764 F. Supp. 712
    (D. Conn. 1991) .................................................................................21

*Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271 (S.D. Ohio 1988)......................20

*Rohn v. United States*, 2002 U.S. Dist. LEXIS 19122 (E.D. Cal. 2002) ...................20, 21

*Shadow Traffic* Network *v. Superior Court,* 24 Cal. App. 4th 1067
    (Cal. App. 1994) ..............................................................................21, 23

*Space Systems/Loral v. Martin Marietta Corp.*, 1995 U.S. Dist. LEXIS 22305
    (N.D. Cal. Nov. 14, 1995)...................................................................20

*Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080 (C.D. Cal. 2001)...............................20

*Terrebonne, Ltd. v. Murray*, 1 F. Supp. 2d 1050 (E.D. Cal. 1998)............................22, 23

*Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246 (E.D. Va. 1991) .........................20

*Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993) .................................20

*Williams. v. Trans World Airlines, Inc.*, 588 F. Supp. 1037 (E.D. Mo. 1984) .................21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STATUTES AND RULES**

28 U.S.C. § 1927..................................................................................................22

Fed. R. Civ. P. 26(b)(4)........................................................................................17

Fed. R. Civ. P. 30(b)(1)........................................................................................17

Fed. R. Civ. P. 45(b)(1)........................................................................................17

**MISCELLANEOUS**

2 Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering* § 3.4:402 (2d ed.
    Supp. 1994)....................................................................................................13

1

## NOTICE OF MOTION AND RELIEF REQUESTED

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3      PLEASE TAKE NOTICE that on January 6, 2004, at 9:30 a.m. in Courtroom 11 of the above-

4  referenced court plaintiff and declaratory judgment defendant Ricoh Company, Ltd. ("Ricoh"), will and

5  hereby does move the Court for sanctions against declaratory judgment plaintiff Synopsys, Inc.

6  ("Synopsys") in Case No. C-03-2289-MJJ; accused infringement defendants Aeroflex Incorporated

7  ("Aeroflex"), AMI Semiconductor, Inc. ("AMI"), Matrox Electronic Systems Ltd. ("Matrox"), Matrox

8  Graphics Inc. ("Matrox Graphics"), Matrox Int'l. Corp. ("Matrox Int'l.") and Matrox Tech Inc.

9  ("Matrox Tech") (collectively the "ASIC defendants") in Case No. C-03-4669-MJJ; and counsel for the

10 foregoing parties in both cases, Howrey, Simon, Arnold & White ("Howrey").  This motion is based

11 upon the intentional actions of Synopsys, the ASIC defendants and Howrey to wrongfully induce

12 Ricoh's consulting expert, Dr. Thomas, to break his agreement with Ricoh, switch sides to become a

13 consulting expert to Synopsys, misrepresent the relevant facts to Judge Sleet of the District of Delaware,

14 then fail to comply with the Court's order with respect to the Court's investigation of the apparent fraud

15 on the Court.

16      Ricoh bases this motion upon the following Memorandum of Points and Authorities, the

17 supporting declarations and evidence, all pleadings on file in these cases, and such argument as may be

18 heard by this Court.  A proposed order is submitted herewith.

19

## MEMORANDUM OF POINTS AND AUTHORITIES

20      Ricoh takes no pleasure in bringing this motion for sanctions.  It would rather litigate the merits,

21 but the alternative is to ignore the fact that Synopsys and the ASIC defendants have repeatedly violated

22 the applicable rules when they persuaded one of Ricoh's experts who had received considerable Ricoh

23 confidential information and attorney work product to switch sides, and then misrepresented the facts to

24 the Court.  The case law makes clear that such conduct will not be tolerated, and sanctions can include

25

26

27

28

the preclusion of the expert and the reimbursement of Ricoh's fees and costs.  Ricoh defers to the judgment of this Court with respect to the appropriate sanction as to the individuals involved.

Because the resolution of this motion is necessarily fact-dependent, half of this brief is dedicated to recounting the facts relating to Ricoh's retention of Dr. Thomas, the circumstances behind his switching sides to become a consultant for Synopsys at Howrey's behest, the representations to the Delaware District Court, and the Court-ordered investigation into a potential fraud on the court.

## BACKGROUND FACTS

### A.    Ricoh's Consulting Relationship With Dr. Thomas

In May 2002, counsel for Ricoh contacted Dr. Thomas to inquire about his interest and availability to consult with respect to Ricoh's investigation of potential infringement of the '432 patent. (Ex. 1, Monsey Decl. ¶ 2.)[1]  Dr. Thomas agreed to consult for Ricoh.  (*Id.*)  On May 29, 2002, Ricoh's counsel sent to Dr. Thomas a confidentiality agreement which Dr. Thomas signed and returned the same day.  That agreement (Ex. 2) provided in relevant part:

> I therefore agree that any information received by me during the discussions and/or consulting services concerning the affairs of Ricoh, including but not limited to patent and trade secret information, system testing or experimentation conducted by Ricoh, and/or information concerning infringement investigations conducted by Ricoh, will be held by me in confidence and will not be revealed to any other persons, firms or organizations.  I realize that in the course of these discussions, DSMO may provide me with materials containing information of the type described above.  All information and materials provided to me will be held by me in confidence and will not be revealed to any other persons, firms or organizations.  At the termination of either our discussions and/or any subsequent consulting services, I agree to return all such materials and all copies thereof to DSMO.

In the next month, Ricoh's counsel sent hundreds of pages of documents to Dr. Thomas and sought his evaluation.  (Ex. 1, Monsey Decl. ¶¶ 3-5.)  In June of 2002, Dr. Thomas sent Ricoh's counsel a number of substantive e-mails containing his opinions regarding those documents and with respect to the '432 patent.  As set forth in greater detail in the attached declaration of Ricoh attorney Christopher Monsey (Ex. 1), Dr. Thomas assisted Ricoh's counsel during its pre-litigation analysis of the '432

---

[1]  All exhibits cited herein are attached to the declaration of Kenneth W. Brothers, filed contemporaneously with this motion.

Patent.  Between May 2002 and July 2003, Ricoh's counsel had multiple discussions with Dr. Thomas regarding the interpretation, validity and infringement of the '432 Patent.  Dr. Thomas studied and commented on a large volume of documents, some of which he selected and some of which were provided to him by counsel.  He actively discussed the issues of defendants' liability under the '432 Patent.  Dr. Thomas analyzed and discussed with Ricoh's counsel the strategies of Ricoh's case.  Dr. Thomas and Ricoh's counsel exchanged multiple substantive emails and had at least six lengthy phone conversations where the parties discussed and formulated Ricoh's litigation strategy, claim interpretation, and responses to affirmative defenses of non-infringement and invalidity that someone might attempt to raise.  Dr. Thomas billed and was paid for his consultations.  Through these confidential discussions, Dr. Thomas became well-informed of the heart of Ricoh's case strategy. (Ex. 1, Monsey Decl. ¶¶ 5-15.)[2]

On June 27, 2002, Dr. Thomas submitted an invoice for $2436.83 in time and expenses for his consulting work on the '432 patent.  (Ex. 1, Monsey Decl. ¶ 17.)  Ricoh authorized Dr. Thomas to perform further consulting work relating to the '432 patent.  (*Id*. ¶ 16.)  For the rest of 2002, Ricoh's counsel regularly communicated with Dr. Thomas with respect to the '432 patent.  (*Id*. ¶ 15-19; 21-22.) In January 2003, Ricoh sued the ASIC defendants.

**B.  Howrey's Initial Contacts With Dr. Thomas And Their Conclusion That Retaining Him Would Be A Conflict Of Interest**

On March 31, 2003, Dr. Thomas received an email from Howrey attorney Louis Campbell requesting him to consult for Synopsys.  (Ex. 3, PTH000005.)  Dr. Thomas responded the next day indicating "I am interested, but I'm quite busy today."  (Ex. 4, Thomas Dep. Tr. at 25; Ex. 5, PTH000007.)  Mr. Campbell sent a follow-up email to Dr. Thomas on April 3, again inquiring about availability to serve as an expert.  (Ex. 4, Thomas Dep. Tr. at 26; Ex. 6, PTH000009.)  The next day, Dr.

---

[2] If so requested by the Court, Ricoh is prepared to submit for in-camera review the large volume of documents provided to, received from and analyzed by Dr. Thomas, as well as a more specific description of the work product that Dr. Thomas helped to generate.

Thomas responded that had already been retained by Ricoh's counsel to consult on the subject.  (Ex. 4, Thomas Dep. Tr. at 27-29; Ex. 7, PTH000011.)[3]  In response, Mr. Campbell sent an email to Dr. Thomas stating:

> Thank you for your interest in this matter, but Dickstein, Shapiro, Morin and Oshinsky is indeed the counsel for the opposing side in this matter.  ***This means that there is most likely a conflict if we would talk to you in detail about this matter.  So, unfortunately, it appears that we cannot go forward***, but I thank you very much for your interest, and if things change or we happen to run into this technology in an unrelated matter, I will get back in touch with you.  However, one thing you can do for us is to let us know about anyone else who is knowledgeable about this technology or its development, whether or not they were contemporaneously involved with its development.

(Ex. 8, PTH000017, emphasis added; Ex. 4, Thomas Dep. Tr. at 32-33.)[4]  Ricoh learned about these communications in August of 2003.

### C.    Howrey's Undisclosed Subpoena To And Retention Of Dr. Thomas

On June 25, 2003, the ASIC defendants issued a subpoena for documents and a deposition of Dr. Thomas (Ex. 9), but failed to serve Ricoh or to file a proof of service with the court.[5]  Dr. Thomas was served on June 26, and he later testified that he assumed that notice had been provided to Ricoh, with whom he was still under contract.  (Ex. 4, Thomas Dep. Tr. at 40.)

On July 2, 2003, Dr. Thomas sent an email to Howrey attorney Campbell asking about reimbursement.  (Ex. 10, PTH000024.)  Mr. Campbell replied:

> If you are no longer a consultant for Ricoh and Ricoh will not serve as your counsel during the deposition nor work with you prior to the deposition, we may be willing to pay for your costs for copying documents and time spent at the deposition.  If you are no longer working with Ricoh,

---

[3] The same day, April 4, 2003, Dr. Thomas informed Ricoh's counsel that he did not want to be a testifying expert in this action, but could continue acting as a non-testifying expert.  (Ex. 1, Monsey Decl. ¶ 19.)

[4] Despite knowing Dr. Thomas was a Ricoh expert, Mr. Campbell continued his correspondence with Dr. Thomas about the pending litigation.  See Ex. 11 (six emails between April 10 and May 6, 2003).

[5] The failure to serve Ricoh was said to be "a screw-up" and appropriate steps were said to have been taken to ensure it would not happen again.  (Ex. 12, 7/30/03 Tr. at 12.)  Since then, there has been a failure to timely serve Ricoh with two other third party subpoenas, justified by a "practice . . . to provide opposing counsel with notice of process after service is successfully completed."  (Ex. 13, Kelley 9/17/03 letter to Hoffman.)

please send us an estimate of the costs associated with the discovery we have requested. On the other hand, if you are still in a consulting relationship with Ricoh, you should contact Ricoh about covering your costs.

(Ex. 14, PTH000025.)  Dr. Thomas responded:

I have not been contacted by Ricoh (Dickstein, Shapiro …) for consulting since last summer. I spoke with them briefly on the phone this March, when you sent your original email to me. I told them I wouldn't be an expert witness for them during trial. They have not offered to serve as my counsel during the deposition, and ***I assume that they know you subpoenaed me for documentation and deposition***. Have they listed me as a consultant?"

(Ex. 15, PTH000026; Ex. 4, Thomas Dep. Tr. 16-17, emphasis added.)  Mr. Campbell's response did not address Dr. Thomas's assumption.  Instead, even though the time for disclosing experts was more than seven months in the future, Mr. Campbell replied:

I take it from your email that you do not believe yourself to be in an ongoing consulting relationship with Ricoh. ***They have not listed you as a consultant in this case.*** If my assumption is correct, please send us an estimate of your costs."

(Ex. 16, PTH000027, emphasis added; Ex. 4, Thomas Dep. Tr. at 17.)  In response to Mr. Campbell's July 7 email, Dr. Thomas wrote:

That's right, I don't see an ongoing relationship at this point. Let me explain that I was hired early last summer for ten hours of work. That was later extended by another ten. The second ten was never fully charged out. Also, the contract was never terminated either. But I've heard nothing from them since last summer, except for when I told them I wouldn't be a witness for them. I'll send them a note officially terminating that agreement.

(Ex. 17, PTH000028; Ex. 4, Thomas Dep. Tr. at 48.)  Dr. Thomas has testified that he understood Mr. Campbell's statement that "they have not listed you as a consultant in this case," to mean "that this case is proceeding and I'm not listed.  I'm not employed by anybody specifically for this case."  (Ex. 4, Thomas Dep. Tr. at 19.)  He assumed that, based on Mr. Campbell's answer to his question regarding listings of experts, that lists of consultants had been exchanged and that those lists did not identify him as a consultant for any party.  (*Id*.)  He did not think about why Mr. Campbell did not answer his question of whether the Howrey firm had advised Ricoh's counsel of the subpoena because he "was more surprised by the fact that I was not listed as a consultant in this case, and that overrode any other thoughts about this, why wasn't I."  (*Id*. at 17-18.)

Mr. Campbell instructed Dr. Thomas to terminate his consulting contract with Ricoh before sending a cost estimate for his work on this case to Howrey.  (Ex. 4, Thomas Dep. Tr. at 49; Ex. 18, PTH000033.)[6]  Mr. Campbell sent Dr. Thomas an e-mail stating:  "If you would be willing, we would be interested in pursuing a consulting relationship with you," and an e-mail expressing "enthusiasm" of the prospect of retaining him.  (Ex. 19, PTH000042.)  On July 10, 2003, Dr. Thomas confirmed that he had terminated his relationship with Ricoh and said, "I think I can be of great help to the defense." (Ex. 19, PTH000042; Ex. 4, Thomas Dep. Tr. at 51-53.)  Mr. Campbell responded, "Great!  Let me know when you get back from your vacation and we will get started."  (Ex. 20, PTH000043.)  Special arrangements were made to get the retainer agreement to Dr. Thomas at his vacation destination.  (Ex. 4, Thomas Dep. Tr. at 56; Ex. 21, PTH000044-48.)

The Howrey-Thomas retainer agreement was on behalf of Synopsys, and not the ASIC defendants, even though the Delaware case was in the middle of discovery, while the Synopsys declaratory judgment complaint had just been filed.  The Synopsys retainer agreement addressed confidentiality and the likelihood that Dr. Thomas had received confidential Ricoh information and had already formed opinions as a result of his Ricoh work:

> It is understood and agreed that your work under this agreement is for us and is done at our direction as attorneys in aid of litigation, and that all activities performed by you under this agreement, including, but not limited to, all communications, whether written or oral, between you and any attorney or other employee of the firm, or between you and any Synopsys employee or agent, are confidential and privileged matters which *you will maintain in confidence and secrecy and not reveal to any other person or use for any purpose* other than in connection with this case, except as authorized by us or required by law.  You will promptly inform us of any contact or communication regarding this case from any other person, including, but not limited to attorneys or representative of Ricoh. . . .
>
> You agree that during the time you are acting as our consultant on behalf of Synopsys, Inc. you will not act as a consultant for, or on behalf of, Ricoh or any Ricoh affiliate (more than 25% owned or controlled by Ricoh) and will agree not to give expert testimony adverse to Synopsys, Inc. *We understand that you have consulted for Ricoh's counsel regarding design synthesis technology of the 1980s.  We will not ask you disclose what information or opinions you*

---

[6] On July 8, Dr. Thomas sent an email to Rich's counsel terminating his agreement with Ricoh and its counsel.  He did not disclose that he had communicated substantively with or agreed to consult for counsel for defendants.  (Ex. 1, Monsey Decl. ¶ 24.)

***supplied to Ricoh's counsel and you should not reveal any Ricoh confidential information that may have been supplied to you.***

(Ex. 21, PTH000047, emphasis added.)  On July 21, 2003, Dr. Thomas sent his signed retainer

agreement back to Howrey.  (Ex. 4, Thomas Dep. Tr. at 64.)

Critically, there is no evidence that, before Howrey retained Dr. Thomas, the attorneys did any

investigation whatsoever into whether Dr. Thomas had access to any confidential information from

Ricoh or its attorneys.  At a July 30, 2003 hearing – only nine days after Dr. Thomas was retained –

Howrey attorney Chris Kelley admitted that Howrey's knowledge of Ricoh's relationship with Dr.

Thomas, standing alone, presented at least the potential for the appearance of a conflict of interest:

> Yes, I was aware that we were certainly aware there was a possibility that he might have a conflict of interest, but he [Dr. Thomas] had indicated that he had not received any such information that would create a conflict.  If that's true, we wanted to get into that consulting relationship.

(Ex. 12, 7/30/03 Tr. at 15.)  Mr. Kelley further represented that, prior to retaining Dr. Thomas, Howrey

had conducted an investigation to determine whether Dr. Thomas had received anything confidential

from Ricoh, or whether he had received anything about case strategy, and that Dr. Thomas assured

Howrey that he had not.  (*Id*. at 14-15.)  As shown below, however, the undisputed record shows that

Howrey conducted no such investigation before Dr. Thomas was retained.

**D.    Ricoh's Objection And Howrey's Belated "Investigation" Of Whether There Was A Conflict Of Interest**

On July 22, 2003, Howrey provided, for the first time, notice that it had subpoenaed Dr. Thomas

for a deposition on July 31; that Dr. Thomas has been retained by Howrey; and that the deposition

would not go forward.  (Ex. 22.)[7]  Counsel for Ricoh immediately faxed objection letters to Dr. Thomas

and Howrey.  (Ex. 23.)

---

[7]  The letter is misdated as July 17, but as reflected on the fax cover sheet, it was not transmitted until July 22.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dr. Thomas has testified that only after Ricoh objected was he ever asked by Howrey about whether or not he had received Ricoh confidential information.  (Ex. 4, Thomas Dep. Tr. at 71-74.)  On July 23, Dr. Thomas had a telephone conversation with Louis Campbell (who was on a speakerphone but did not identify any other Howrey attorneys present) in which Mr. Campbell asked whether Dr. Thomas received confidential information from Ricoh, and to characterize his communications with Ricoh's counsel for Howrey.[8]  Although Dr. Thomas does not recall his exact response during the conference call, he has testified that there was no question that he had received a considerable amount of confidential information from Ricoh during conversations with Ricoh's counsel.  (Ex. 4, Thomas Dep. Tr. at 75-77.)  Dr. Thomas also stated that, as a result of his consultancy for Ricoh, he had formed opinions regarding Synopsys and the subject matter of the '432 patent prior to his retention by Synopsys on July 21, 2003.  (Ex. 4, Thomas Dep. Tr. at 61-62.)

Ricoh sought to assess the impact of defendants' actions relative to Dr. Thomas.  On July 23, Ricoh's counsel requested that defendants and their attorneys agree to the following: 1) immediately disclose all communications with or relating to Dr. Thomas, and produce all documents sent to or received from Dr. Thomas, with no withholding of documents on the basis of the work-product doctrine; 2) produce Dr. Thomas for a deposition regarding all communications with defendants, their attorneys or Synopsys regarding the '432 patent; and 3) stipulate that the Thomas deposition shall not be used for any purpose other than determining what remedies, if any, should apply as a result of Howrey's communications with Dr. Thomas.  (Ex. 24.)  Synopsys' counsel (Mr. Kelley) responded by acknowledging that Synopsys retained Dr. Thomas with full knowledge of his prior retention by Ricoh and its counsel, but refused to comply with Ricoh's requests.  (Ex. 25.)  Instead, Mr. Kelley promised to "refrain from consulting with Dr. Thomas for a period of two weeks" so Ricoh could "seek judicial

---

[8]  After the conference call, Mr. Campbell sent an email stating: "I just thought of a clarification about your review of the pdfs you received.  I only want to know if they were published.  It is important you do not tell me any specifics about these pdfs such as title, author, dates, etc." (Ex. 26, PTH000051.)

resolution of this dispute." (*Id.*) Ricoh immediately sought the intervention of the Delaware District Court, and a hearing was scheduled for July 30.

Meanwhile, on July 28, Mr. Campbell told Dr. Thomas his deposition had been cancelled. He observed that Ricoh had asserted a conflict of interest, and added:

> If the court rules that you cannot consult with defendants, we will reschedule the deposition for a date of mutual convenience. At that deposition, we will seek testimony regarding the character of prior art logic synthesis systems and their relevance to the validity of Ricoh's patents.

(Ex. 28, PTH000055.) As noted above, Dr. Thomas had participated in a number of discussions with Ricoh on these very issues, including a June 17, 2002 conversation that discussed claim interpretation, patent validity in view of the confidential documents disclosed, and his interpretation of the '432 patent. (Ex. 1, Monsey Decl. ¶ 5-15.)

**E.    Howrey's Representations During The July 30 Hearing And The Court-Ordered Investigation**

On July 30, 2003, nine days after the retention of Dr. Thomas by Synopsys, Judge Sleet of the Delaware District Court held a hearing in response to Ricoh's emergency motion. Counsel for Ricoh summarized the history of Ricoh's consulting efforts with Dr. Thomas and offered to provide a detailed declaration documenting how Dr. Thomas had become privy to a Ricoh's work product, litigation strategy, and core analyses of the merits. (Ex. 12, 7/30/03 Tr. at 5-10.)

Mr. Kelley conceded that Howrey had long been aware that Dr. Thomas was a consultant to Ricoh. (*Id.* at 12.) The Court asked Mr. Kelley if Howrey's knowledge of Ricoh's relationship with Dr. Thomas, without more, presented at least the potential for the appearance of a conflict. (*Id.* at 14.) Mr. Kelley replied: "Yes, I was aware that we were certainly aware there was a possibility that he might have a conflict of interest, but he had indicated that he had not received any such information that would create a conflict. It that's true, we wanted to get into that consulting relationship." (*Id.* at 15.)

Mr. Kelley told Judge Sleet that Howrey had inquired of Dr. Thomas if he had received anything confidential from Ricoh or received anything about case strategy, and, according to Mr. Kelley, Dr. Thomas said he had not. (*Id.* at 14-15.) Dr. Thomas has testified that prior to signing the retainer

agreement, he did not discuss in any way whether or not he had received Ricoh confidential information with Howrey. (Ex. 4, Thomas Dep. Tr. at 62-63.)  Dr. Thomas also said that Howrey counsel did not ask him whether or not he had formed any opinions with respect to the matters related to his consulting on behalf of Ricoh.  (*Id*. at 31.)  Five days after the hearing, Mr. Kelley wrote that Dr. Thomas had said that he did not know whether or not he had received confidential information from Ricoh.  (Ex. 27, Kelley 8/5/03 letter to Hoffman.)  Less than two weeks after that, Dr. Thomas testified that he had in fact received Ricoh confidential information.  (Ex. 4, Thomas Dep. Tr. at 75-77.)

During the July 30 hearing, however, Judge Sleet accepted Mr. Kelley's representation that, prior to his retention, Howrey had inquired of Dr. Thomas whether he had received Ricoh confidential information, and the Court focused on whether relying on Dr. Thomas' view of whether he received confidential information was sufficient:

> The Court:  Well, that's his legal opinion?
> Mr. Kelley: It's not his legal opinion.  We have to walk a little carefully.  I didn't say please tell us what you received so we can make an independent evaluation, but what we did say is, if you get anything that's confidential, any kind of confidential information, did you folks talk about case strategy?
> The Court:  Well, that may be in the eye of the beholder, Mr. Kelley, Yes, no, maybe?
> Mr. Kelley:  Certainly . . . .

(Ex. 12, 7/30/03 Tr. at 15-16.)  At the Court's request, counsel for Ricoh summarized the declaration of Mr. Monsey detailing the communications with Dr. Thomas.  (*Id*. at 17-19.)  Judge Sleet asked, "Mr. Kelley, given the description of the declaration, if it exists, and I have no reason to believe that Mr. Hoffman is being any less than candid as an officer of this Court and I'm sure you don't question his candor, would that [be] satisfactory, based upon the research you've done, the prima facia burden that he carries?"  (*Id*. at 19.)  Not satisfied with the first and second responses (i*d*. at 20), Judge Sleet said,

> The Court:  You're going all around Robin Hood's barn, Mr. Kelley.  Based upon the description of the affidavit, does it at least satisfy the – cross the prima facia threshold that would warrant the Court ordering the taking of a deposition or some further processes?  That's all I'm trying to get you to talk about? . . . I don't want to hear from anyone else; I want to hear from Mr. Kelley.
> Mr. Kelley:  All I heard was they sent him something on such and such date and it depends on what that something is.

The Court:  All right.  If you are going to be disingenuous with the Court in your response, I have a simple answer for that.  Mr. Hoffman, prepare an order outlining the request that you have just made and I will sign it.  Fax it over.

(Ex. 12, 7/30/03 Tr. at 20-21.)  The next day, the Court entered the following order:

"1.  Pending further Order of this Court, neither defendants nor their counsel shall have any communication with Dr. Thomas regarding the merits of this case or the patent in suit unless counsel for plaintiff is present or consents in writing.

2.  No later than August 6, 2003, Defendants and their counsel are ordered to disclose all communications with or relating to Dr. Thomas and to produce all documents sent to, prepared by, or received from Dr. Thomas.  Any documents withheld on the basis of the attorney-client privilege or the work-product doctrine should be produced to the Court for an in camera inspection, and Defendants *shall provide Plaintiff with a detailed privilege log*.

3.  No later than August 18, 2003, Dr. Thomas shall sit for a deposition limited to all communications with defendants, their attorneys or Synopsys regarding the '432 patent, with that deposition to not be used for any purpose other than in connection with resolution of issues relating to the retention of Dr. Thomas.

(Ex. 30, emphasis added.)[9]  To date, no privilege log has ever been served.

Dr. Thomas was deposed on August 14, 2003.  (Ex. 4.)  On August 25, the ASIC defendants orally offered to drop Dr. Thomas as a consulting expert (Brothers Decl. ¶ 37), but insisted that they were still entitled to depose Dr. Thomas on "the character of prior art logic synthesis systems and their relevance to the validity of Ricoh's patents."  (Ex. 28, PTH000055.)

### F.    The August 28 Hearing And The Disregard Of The Court's Orders

On August 28, Judge Sleet held another hearing to consider what further action was appropriate with respect to Dr. Thomas.  It was noted that no privilege log had ever been produced, and no documents had been filed in camera, as required by the July 31 order.  Considering a summary of the inconsistencies between Howrey's representations and Dr. Thomas' testimony, Judge Sleet found that the evidence raised the possibility of fraud on the court and ordered the filing of the transcript of the July 30 hearing and the in camera review of all relevant internal Howrey documents, and that a privilege log

---

[9] Howrey sent Dr. Thomas the order by regular mail on August 3.  Dr. Thomas received it on August 8. (Ex. 4, Thomas Dep. Tr. at 5-6.)  In the interim, Dr. Thomas continued to email case-related information to Howrey.  (Ex. 32, PTH000057.)

of those documents be served upon Ricoh, so the Court could determine whether a fraud on the court did

in fact occur.  (Ex. 31, 8/28/03 Tr. at 27-29.)

Two months later, Synopsys and the ASIC defendants submitted the documents to this Court, but

have not complied with Judge Sleet's order with respect to the privilege log.  After still another

unsuccessful meet and confer (Brothers Decl. ¶ 38), this motion followed.

## ARGUMENT

## I.    THE ASIC DEFENDANTS, SYNOPSYS AND HOWREY KNOWINGLY INDUCED DR. THOMAS TO SWITCH SIDES

There is no dispute that the Howrey firm – counsel for both Synopsys and the ASIC defendants

– persuaded Dr. Thomas to switch sides.  When it first approached Dr. Thomas to retain him on behalf

of Synopsys, Howrey was explicitly placed on notice that Dr. Thomas was under contract to consult for

Ricoh and its counsel.  On April 4, 2003, Dr. Thomas informed the Howrey firm that he had been

retained by Ricoh's counsel to consult on the '432 patent (Ex. 7, PTH000011), and the Howrey firm

acknowledged that this fact precluded any further communications with Dr. Thomas:

> Dickstein, Shapiro, Morin and Oshinsky is indeed the counsel for the opposing side in this matter.  This means that there is most likely a conflict if we would talk to you in detail about this matter.  So, unfortunately, it appears that we cannot go forward, but I thank you very much for your interest, and if things change or we happen to run into this technology in an unrelated matter, I will get back in touch with you.

(Ex. 8, PTH000017.)  The matter should have ended there.[10]  But it did not.  Over the next three months,

counsel for Synopsys and the ASIC defendants committed seven crucial errors of judgment that induced

Dr. Thomas to terminate his consulting agreement with Ricoh and switch sides, then intentionally

misrepresented the facts to Ricoh and the Court.

**Error 1:  Continued communications with Dr. Thomas.**  On April 8, Howrey acknowledged

that it would be a conflict of interest to continue discussing the case with Dr. Thomas.  (Ex. 8.)

---

[10] Howrey fully appreciated that opposing counsel should not contact the other side's retained experts. For example, when Howrey engaged another expert, Dr. Kowalski, they instructed Ricoh's counsel to refrain from any communication with Dr. Kowalski.  (Ex. 33.)

1   Nevertheless, over the next few weeks, Mr. Campbell continued to communicate with Dr. Thomas on

2   the subject matter of his consulting work for Ricoh, in connection with an ongoing lawsuit, eventually

3   exchanging a half-dozen e-mails. (Ex. 10.) These communications were improper. *See, e.g., Campbell*

4   *Ind. v. M/V Gemini*, 619 F.2d 24, 27 (9th. Cir. 1980) (sanctioning counsel for ex parte communications

5   with opposing party's expert); *Erickson v. Newmar Corp.*, 87 F.3d 298, 301-02 (9th Cir. 1996) (holding

6   that ex parte communications with the opposing side's expert violated Fed. R. Civ. P. 26(b)(4) and

7   ethical rules); 2 Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering* § 3.4:402 (2d ed.

8   Supp. 1994) ("Since existing rules of civil procedure carefully provide for limited and controlled

9   discovery of an opposing party's expert witnesses, all other forms of contact are impliedly prohibited.").

10      **Error 2:  Failure to serve Ricoh's counsel with a copy of the Thomas subpoena or notice of**

11  **deposition.**  Howrey told the Court that the failure to serve Ricoh with a copy of the subpoena served

12  upon Dr. Thomas was a "screw-up." (Ex. 12, 7/30/03 Tr. at 12.)  In fact, Mr. Kelley's practice was to

13  refrain from serving opposing counsel with a notice of subpoena until after service had been completed:

14  "Our practice is to provide opposing counsel with notice of process after service is successfully

15  completed." (Ex. 13, Kelley 9/17/03 letter to Hoffman.)  Thus, the decision to not serve Ricoh at the

16  same time the subpoena was delivered to the process server was intentional.  Howrey's practice to

17  refrain from timely serving subpoenas violates Fed. R. Civ. P. 45(b)(1).  *Biocore Medical Tech., Inc., v.*

18  *Khasrowshahi*, 181 F.R.D. 660, 667 (D. Kan. 1998) (holding that the failure to give opposing counsel

19  notice of a subpoena prior to service violates Rule 45).

20      As for the failure to serve Ricoh's counsel with either a notice of the subpoena or a notice of the

21  July 30 deposition as required by Fed. R. Civ. P. 30(b)(1) after Dr. Thomas was served on June 26, no

22  explanation of the "screw up" has ever been provided.  Mr. Kelley told the Delaware court on July 30

23  that he had taken steps to ensure that the "screw up" was never repeated, yet less than a month later

24  Howrey failed to timely serve two additional subpoenas in this case.[11]

25

26

27  [11] On August 29, 2003, Howrey caused two subpoenas to be served upon third parties. (Ex. 34.)
    Howrey did not serve timely Ricoh's counsel with copies of the subpoenas. (Ex. 35, Hoffman 9/8/03

28  letter to Kelley; Brothers Decl. ¶ 35.)

**Error 3:  Howrey's misleading Dr. Thomas to believe that Ricoh was not relying upon Dr. Thomas as an expert.**  Dr. Thomas inquired of Mr. Campbell whether Howrey had disclosed to Ricoh's counsel the fact of the subpoena.  Mr. Campbell avoided the question, but instead said that Ricoh had not listed him as an expert.  Of course, neither side had disclosed any experts, because under the scheduling order, expert discovery was not to commence until 2004.  Thus, Mr. Campbell misled Dr. Thomas into believing that Ricoh had dropped him as an expert.  Dr. Thomas testified that he "was more surprised by the fact that I was not listed as a consultant in this case, and that overrode any other thoughts about this, why wasn't I." (Ex. 4, Thomas Dep. Tr. at 17-18.)  Mr. Campbell's misleading response is a violation of the duty of candor owed by every attorney practicing in California.

**Error 4:  Howrey instructed Dr. Thomas to terminate his consulting agreement with Ricoh.**  Dr. Thomas asked for compensation for his time in preparing for his deposition and for the copy costs for producing the documents responsive to the ASIC defendants' subpoena.  Attorney Campbell said that Dr. Thomas would have to terminate his consulting agreement with Ricoh before financial matters could be discussed, so Dr. Thomas did so.  Mr. Campbell providing legal advice to Dr. Thomas was not in Dr. Thomas' best interests, and is another violation of the Professional Rules.

**Error 5:  Howrey failed to inquire whether there was a conflict of interest before retaining Dr. Thomas.**  At no time before Dr. Thomas signed the retainer agreement with Synopsys did anyone from Howrey ever make any inquiries to determine whether there was a conflict of interest.  (Ex. 4, Thomas Dep. Tr. at 71-74.)  This inexplicable failure to inquire cannot be justified, especially since Howrey had recognized three months earlier that it would be a conflict of interest for Howrey to talk to Dr. Thomas.  (Ex. 8.)  The conflict was recognized in the Synopsys retainer agreement, which made specific reference to his prior consulting from Ricoh and the likelihood of having received Ricoh confidential information and having formed opinions for Ricoh.  (Ex. 36.)  The record reflects, however, that rather than "walk a little carefully" as Mr. Kelley told Judge Sleet (7/30/03 Tr. at 15), Howrey rushed in (in the words of Mr. Campbell) with "enthusiasm."  (Ex. 20, PTH000043.)

**Error 6:  Howrey's post-retention "investigation" of whether Dr. Thomas had a conflict of interest was both inadequate and led to the disclosure of Ricoh's work product.**  On July 22,

Howrey disclosed to Ricoh that Synopsys had retained Dr. Thomas and was canceling his (previously undisclosed) July 30 deposition.  (Ex. 22.)  Ricoh immediately objected to any communications between Dr. Thomas and the ASIC defendants, Synopsys or their counsel.  (Ex. 23.)  Although Howrey publicly responded with defiance, privately it initiated an investigation to determine whether Dr. Thomas had received any confidential information from Ricoh or its counsel.  On July 23, Dr. Thomas had a telephone conference with Mr. Campbell where Dr. Thomas was questioned about what he had done for Ricoh.  (Ex. 4, Thomas Dep. Tr. at 70-74.)  Subsequently, Mr. Kelley stated that Dr. Thomas could not say during that July 23 call whether or not he had received confidential information from Ricoh (Ex. 29, 8/5/03 Kelley letter to Hoffman), despite Mr. Kelley's representation to the contrary five days earlier.  (Ex. 12, 7/30/03 Tr. at 14-15.)  At his deposition, Dr. Thomas was adamant in his conclusion that he had, if fact, received Ricoh confidential information.  (Ex. 4, Thomas Dep. Tr. at 71-74.)

**Error 7:  The continuing insistence by Synopsys and Howrey that, one way or the other, it will depose Dr. Thomas on the subject of his consulting for Ricoh.**  On July 28, Mr. Campbell told Dr. Thomas that "If the court rules that you cannot consult with defendants, we will reschedule the deposition for a date of mutual convenience . . . [and] seek testimony regarding the character of prior art logic synthesis systems and their relevance to the validity of Ricoh's patents."  (Ex. 28, PTH000055.)  Even as it dropped him as an expert in late August, Howrey never backed away from its intent to depose Dr. Thomas as a fact witness on the very issues on which Dr. Thomas had been providing confidential consulting to counsel for Ricoh.  (Brothers Decl. ¶ 37.)

## II.    MISREPRESENTATIONS TO THE COURT

These seven errors are serious, and by themselves justify serious remedies (discussed below) such as precluding Dr. Thomas from consulting for any party, ensuring his tainted testimony does not benefit Synopsys or the ASIC defendants, compensating Ricoh for its time and expenses, and evaluating whether the Howrey attorneys should be disqualified.  But the improper conduct did not stop there.  After the fact of Dr. Thomas' switching sides became known, the Howrey attorneys attempted to conceal their errors from the court.

**Misrepresentation No. 1:**  On July 30, 2003, the Delaware District Court held a hearing in response to Ricoh's emergency motion.  During the hearing, Mr. Kelley conceded that Howrey had long been aware that Dr. Thomas was a consultant to Ricoh.  (Ex. 12, 7/30/03 Tr. at 12.)  The Court asked Mr. Kelley to explain why Howrey's knowledge of Ricoh's relationship with Dr. Thomas, without more, did not present at least the potential for the appearance of a conflict.  (*Id*. at 14.)  Mr. Kelley conceded that at least the appearance of a conflict existed, but said that, before Synopsys retained Dr. Thomas, Howrey had inquired of Dr. Thomas if he had received anything confidential from Ricoh and whether he received anything about case strategy.  (*Id*. at 14-15.)  Mr. Kelley stated that Dr. Thomas "assured us that he had not."  (*Id*.)  Mr. Kelley insisted that this inquiry took place *before* Synopsys retained Dr. Thomas:  "Yes, I was aware that we were certainly aware there was a possibility that he might have a conflict of interest, but he had indicated that he had not received any such information that would create a conflict.  It that's true, we wanted to get into that consulting relationship."  (*Id*. at 15.)

This representation was false.  Prior to Synopsys retaining Dr. Thomas, Howrey ***never*** inquired with respect to whether there would be a conflict of interest if Dr. Thomas were to switch sides.  Dr. Thomas unequivocally testified that, prior to his signing of his retainer agreement with Howrey, he did not discuss in any way whether or not he had received Ricoh confidential information with counsel from Howrey. (Ex. 4, Thomas Dep. Tr. 62-63.)

**Misrepresentation No. 2:**  A second misrepresentation was made to the court when counsel for Synopsys and the ASIC defendants insisted that Dr. Thomas never received confidential information from Ricoh.  On July 30, Mr. Kelley insisted that Dr. Thomas had said that he never received confidential information from Ricoh.  (Ex. 12, 7/30/03 Tr. at 14-15.)  In fact, Dr. Thomas had never said any such thing.  Five days after making his misrepresentation to the Court, Mr. Kelley admitted that Dr. Thomas had said that he did not know whether or not he had received confidential information. (Ex. 29, Kelley 8/5/03 letter to Hoffman.)  At his deposition, Dr. Thomas unequivocally testified that he had indeed received confidential information from Ricoh:

"Mr. Brothers:  Is there any doubt in your mind, Dr. Thomas, that as a result of your consulting relationship with Ricoh, you received confidential information from Ricoh's counsel?
A:  I feel that the fact that they were bringing these articles to my attention was confidential.
Q:  And the fact and content of your conversations with Ricoh's counsel, were those also confidential?
A:  Yes.

(Ex. 4, Thomas Dep. Tr. at 76-77.)  Nevertheless, counsel for Synopsys and the ASIC defendants later insisted that

There is no contradiction between what Mr. Kelly represented on the July 30th teleconference and Dr. Thomas' deposition.  Dr. Thomas was very clear that he was asked by the Howrey Simon attorney … do you have any confidential information?  And if so, what type of information is it?  And Dr. Thomas responded two days later in an email, just listing three short types of information he had: patents, publications and financial information.

(Ex. 31, 8/28/03 Tr. at 7-8.)  Both of these representations were and are misleading.  Contrary to Mr. Kelley's representation, no one ever asked Dr. Thomas whether he had confidential information prior to his retention.  The Howrey attorneys assumed that he had such information, because their retainer letter made specific reference to such confidential information.  Only after Ricoh's objection was any real inquiry made, and the response virtually ensured the disclosure of confidential information.  Indeed, Dr. Thomas' characterization of the documents he received – which included unpublished documents – was an unauthorized disclosure.

## III.  SYNOPSYS, THE ASIC DEFENDANTS AND HOWREY REFUSED TO COMPLY WITH JUDGE SLEET'S ORDERS

On two separate occasions, Judge Sleet has ordered the ASIC defendants, Synopsys and Howrey to produce a privilege log of documents.  On July 31, the Delaware court ordered:

No later than August 6, 2003, Defendants and their counsel are ordered to disclose all communications with or relating to Dr. Thomas and to produce all documents sent to, prepared by, or received from Dr. Thomas.  Any documents withheld on the basis of the attorney-client privilege or the work-product doctrine should be produced to the Court for an in camera inspection, and ***Defendants shall provide Plaintiff with a detailed privilege log***.

(Ex. 30, emphasis added.)  No privilege log was ever served.  At another hearing on August 28, Judge Sleet rejected the argument of Synopsys, the ASIC defendants, and Howrey that the July 31 order did not require the preparation of a privilege log or the in camera inspection of privileged documents.  The

1  Court ordered the in camera submission of the privileged documents, and further ordered a privilege log

2  to be prepared and served upon opposing counsel.  (Ex. 31, 8/28/03 Tr. at 26-32.)

3  More than two months after the documents were to be lodged with the court, Synopsys and the

4  ASIC defendants finally submitted the documents to this Court for an in camera inspection, along with a

5  self-serving attempt to deflect their many errors and misrepresentations.  However, they have still failed

6  to comply with Judge Sleet's twice-repeated order to serve a privilege log upon opposing counsel.  No

7  explanation has ever been provided for this willful and repeated contempt of the Court's orders.

8  **IV.    SYNOPSYS AND THE ASIC DEFENDANTS SHOULD NOT BENEFIT FROM THEIR WRONGFUL CONDUCT**

9  

10  After the numerous errors and misrepresentations by Synopsys and the ASIC defendants, and of

11  no fault of Ricoh and its counsel, the parties are in the following positions:  Ricoh has been deprived of

12  a consulting expert, and has spent thousand of dollars in attorney time to investigate, protest, prepare for

13  and participate in multiple hearings, depose Dr. Thomas, and prepare a number of briefs.  So far, the

14  ASIC defendants and Synopsys have successfully deprived Ricoh of its consulting expert and have

15  received unauthorized insights to Ricoh's litigation strategy and work product, but have suffered no

16  adverse consequences.  Indeed, Synopsys and the ASIC defendants are still insisting that they have the

17  right to depose Dr. Thomas and obtain his expert opinions on the very issues that he was consulting for

18  Ricoh.  Unless this Court take decisive action, there will be no deterrent to this wrongful conduct.

19  In a case substantially similar to this case, Judge Kugler of the District of New Jersey surveyed

20  the law with respect to disqualification of an expert who had switched sides, as well as sanctions upon

21  the attorneys to preserve the integrity of the judicial system.  *Cordy v. Sherwin-Williams Co.,* 156 F.R.D.

22  575 (D.N.J. 1994).  There, an expert was retained by plaintiff's counsel, was paid a $3000 retainer, was

23  provided a number of documents, and provided an oral opinion.  The expert then returned the retainer

24  fee, switched sides and started consulting for defendant Sherwin-Williams.  The district court conducted

25  an evidentiary hearing and examined documents in camera, and concluded that both the expert and the

26  attorneys should be disqualified.  The court's statement of the governing rules is especially pertinent:

27  In disqualification situations, any doubt is to be resolved in favor of disqualification.  *Hull v. Celanese Corporation*, 513 F.2d 568, 571 (2d. Cir. 1975); *Liu v. Real Estate Inv. Group, Inc.*, 771 F. Supp. 83, 86 (S.D.N.Y. 1991) . . . . It is clear why this presumption arises that confidences

28

passed to the attorney.  There is an inherent difficulty in determining, at some later time, whether it happened.  Self-serving affidavits of counsel and others are not helpful because of their "undeniable interest in preserving any tactical advantage they may have garnered." *MMR/Wallace*, 764 F. Supp. at 726-27.  Moreover, a non-lawyer would be more likely to reveal confidential information because he or she might not be as sensitive to the need to safeguard the information as would an attorney.  *Williams. v. Trans World Airlines, Inc.*, 588 F. Supp. 1037, 1043 (E.D. Mo. 1984); *MMR/Wallace*, 764 F. Supp. at 727.

Applying these principles to this matter yields a clear case for disqualification.  The Court realizes that defendant Sherwin-Williams has an interest in being represented by Davis and Penders.  Nevertheless, the fairness and integrity of the judicial process and Plaintiff's interest in a trial free from the risk that confidential information has been unfairly used against him must also be considered and outweighs Defendant's interest.  *Williams*, 588 F. Supp. at 1046.  The preservation of public trust is paramount.  *Hull*, 513 F.2d at 572.

Here, the expert Green did receive confidential information from Brown & Connery.  He was privy to their trial strategy.  Although he and defense counsel deny that he ever divulged it to his new employer, their protestations are unavailing.  To believe Green did not and will not remember and ultimately use that information, even "subliminally," *see Michelson, supra*, defies common sense and human nature.  Defense counsel did nothing to discover the real nature of the relationship between Green and Brown & Connery.  Whether they chose to ignore warning signs or actually encouraged Green's misconduct need not be decided.  Defense counsel's conduct was wanting.

Plaintiff has met the burden of proving that "sufficient doubt exists as to the propriety of representation" of defendant Sherwin-Williams, by Penders and Davis.  *Kaselaan*, 144 F.R.D. at 238.  This is a clear case for disqualification.  Plaintiff's interest in a trial free from the risk that confidential information will be used against him and the public's interest in the integrity of the judicial process itself demand it.  It is not sufficient simply to disqualify the expert to deter such conduct in the future.  Counsel must also understand they are at some risk should they encourage (or fail to discourage) this kind of behavior.

Accordingly, Penders and Davis must be disqualified.  In addition to their disqualification as Defendant's counsel, this Court also concludes that their firm, Marshall, Dennehey, Warner, Coleman & Goggin, must also be disqualified.

*Id.* at 584.  As discussed in greater detail below, sanctions are appropriate to ensure that the ASIC defendants and Synopsys do not benefit from their wrongful conduct with respect to Dr. Thomas.

## V.     SANCTIONS ARE REQUIRED

### A.     Because Dr. Thomas Is A Tainted Witness, His Testimony Should Not Be Taken Or Admitted

There is a well-established body of law setting forth the analytical framework of what to do when an expert switches sides.  In fashioning his orders, Judge Sleet followed *Hansen v. Umtech Indus.*, 1996 Westlaw 622557 (D. Del. 1996) (Ex. 36), where the court reviewed the case law and concluded:

Courts have fashioned a two-part inquiry used to determine whether disqualification is necessary:  First, was it objectively reasonable for the first party who claims to have retained the consultant to conclude that a confidential relationship existed?  Second, was any confidential or privileged information disclosed by the first party to the consultant?

*Id.* at 5 (citing *Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 278 (S.D. Ohio 1988); *Wang Labs., Inc. v. Toshiba Corp.,* 762 F. Supp. 1246, 1248 (E.D. Va. 1991)).  The rule in the Ninth Circuit is no different. *See Advanced Cardiovascular Sys. v. Medtronic, Inc.,* 47 U.S.P.Q.2d (BNA) 1536 (N.D. Cal. 1998); *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080 (C.D. Cal. 2001); *Space Systems/Loral v. Martin Marietta Corp.*, 1995 U.S. Dist. LEXIS 22305 (N.D. Cal. Nov. 14, 1995) (Ex. 37).

Both elements of the "expert side-switching test" are satisfied here:  Ricoh's counsel requested and obtained a written confidentiality agreement from Dr. Thomas, and then explored alternative theories that go to the heart of Ricoh's litigation strategy.  (Ex. 1, Monsey Decl. ¶¶ 5-15.)  Through both written and oral communications, Ricoh's counsel disclosed confidential information to Dr. Thomas, and Dr. Thomas admitted as much.  (Ex. 4, Thomas Dep. Tr. at 74-77.)

"A federal district court has the inherent power to disqualify experts." *Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 579 (D.N.J. 1994); *see English Feedlot Inc. v. Norden Labs., Inc.,* 833 F. Supp. 1498, 1501 (D. Colo. 1993).  "To be sure, no one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained by the adverse party pursuant to the earlier retention.  This is a clear case for disqualification." *Wang Labs., Inc. v. Toshiba Corp.,* 762 F. Supp. 1246, 1248 (E.D. VA. 1991).[12]

In *Rohn v. United States*,  2002 U.S. Dist. LEXIS 19122 (E.D. Cal. 2002) (Ex. 38), the court stated that federal courts have inherent powers to manage their own proceedings and control the conduct of persons appearing before them. *Id.* at 2, citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). By invoking the inherent power to punish bad faith conduct that threatens the integrity of the judicial process, a court must exercise discretion in fashioning appropriate sanctions.  *Id.*  "District judges have

---

[12]  In *Wang*, an attorney for the plaintiff contacted an expert and disclosed confidential information, but the expert formed opinions contrary to Howrey's client and was subsequently hired by the other side. The district court disqualified the expert.  762 F. Supp. at 1248.  The attorney for the plaintiff was a partner with the Howrey firm.  *See Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993).

1    an arsenal of sanctions they can impose for unethical behavior" including monetary sanctions, contempt,

2    and disqualification of counsel.  *Rohn*, at 3, citing *Erickson v. Newmar Corp.*, 87 F.3d 298, 303 (9th Cir.

3    1996).

4         Courts in California and across the country hold that there is a presumption that an expert or

5    employee who has worked for one side, then switches sides, has disclosed confidential information.

6    *Shadow Traffic Network v. Superior Court,* 24 Cal. App. 4th 1067 (Cal. App. 1994); *Actel Corp. v.*

7    *Quicklogic Corp.*, 1996 U.S. Dist. LEXIS 11815 (N.D. Cal. 1996) (Ex. 39); *In Re Complex Asbestos*

8    *Litigation*, 232 Cal. App. 3d 572; 283 Cal. Rptr. 732 at 739-40 (Cal. App. 1st Dist. 1991); *Cordy,* 156

9    F.R.D. at 584; *MMR/Wallace Power & Indus., Inc. v. Thames Assoc.*, 764 F. Supp. 712, 727 (D. Conn.

10   1991); *Williams v. Trans World Airlines, Inc.*, 588 F. Supp. 1037, 1043 (E.D. Mo. 1984).  Here,

11   however, the Court need not rely solely upon the presumption, because Dr. Thomas in fact conveyed

12   Ricoh confidential information to Howrey, in at least three ways:  First, he disclosed the nature of the

13   prior art that Ricoh's counsel had asked him to review.  These disclosures took place both during the

14   July 23 telephone call and in his July 24 email.  Second, the disclosure that Dr. Thomas had requested of

15   Ricoh's counsel to not be a testifying expert was confidential, but Dr. Thomas revealed that even before

16   he was retained by Howrey.[13]  Third, the ASIC defendants have tacitly admitted that Dr. Thomas

17   disclosed some of his opinions and conclusions, because in their October 30, 2003 submission, they

18   attempted to substantively characterize his work for Ricoh as being adverse to Ricoh.

19        Indeed, "this is a clear case for disqualification."  Dr. Thomas was retained by Ricoh, reviewed

20   numerous confidential documents and engaged in at least a half-dozen conferences in which he helped

21   Ricoh's counsel explore theories, investigate the strengths and weaknesses of the patent-in-suit, develop

22   a claim interpretation, and analyze possible affirmative defenses.  Dr. Thomas admits that he formed

23   opinions as a result of his work with Ricoh, and that he received Ricoh confidential information.  After

24   all of this effort, he was persuaded to change sides in an underhanded fashion by Synopsys' counsel who

25

26   _____

27   [13] In April 2003, Dr. Thomas agreed to continue to consult for Ricoh as a non-testifying consultant.
     This agreement was in force until Dr. Thomas terminated his agreement on July 10, 2003.  Even then,

28   his confidentiality obligations survived the termination of his agreement.

failed to conduct an appropriate investigation, then refused to admit it.  There is no doubt that Dr.

Thomas should be precluded from consulting with or testifying for Synopsys or the ASIC defendants.

The issue is not mooted by the verbal offer by defendants to no longer use Dr. Thomas as a

testifying expert.  Synopsys and the ASIC defendants still intend to depose Dr. Thomas to seek his

opinions on "the character of prior art logic synthesis systems and their relevance to the validity of

Ricoh's patents."  This is not the testimony of a fact witness, but is in fact the very expert testimony that

Dr. Thomas should be precluded from offering under any circumstances.  The "character of prior art

logic synthesis systems" necessarily involves expert analysis of the prior art (which is what Ricoh had

retained Dr. Thomas to do), form opinions on the "character" of that prior art (which is also what Dr.

Thomas did for Ricoh), then opine regarding the "relevance to the validity of Ricoh's patents" (which is

exactly what Dr. Thomas did for Ricoh).  Synopsys and the ASIC defendants should not be able to

obtain the expert opinion testimony of Dr. Thomas indirectly when they are precluded by their own

misconduct from getting it directly.

## B.    Ricoh Should Receive Its Fees and Expenses

The conduct by Synopsys and the ASIC defendants have caused considerable expense to

Ricoh.[14]  There have already been two hearings on the matter.  Ricoh's counsel traveled to Pittsburg to

take the deposition of Dr. Thomas on August 14.  Considerable time has been spent preparing this and

other briefs.  All of these fees and expenses were incurred because Howrey attorneys acted either in bad

faith or with reckless disregard of their duties under the discovery rules, ethics requirements as well as

their obligation of candor to the tribunal.

In *Terrebonne, Ltd. v. Murray*, 1 F. Supp. 2d 1050, 1054 (E.D. Cal. 1998), Judge Wanger

disqualified counsel due to a conflict of interest, then sanctioned the disqualified attorneys more then

$21,817.22 for fees and expanses of opposing counsel.  The court held that the statutory basis for

awarding sanctions is found at 28 U.S.C. § 1927 ("any attorney … who so multiplies the proceedings in

---

[14] When Ricoh learned of, and objected to, Synopsys' retention of Dr. Thomas, the Howrey firm insisted
that Ricoh needed to raise the matter with the Court.  During the July 30 hearing, the Howrey firm
continued to refuse to back off of its position, thereby forcing Ricoh to pursue the matter.

1  any case unreasonably and vexatiously may be required by the court to satisfy personally the excess

2  costs, expenses and attorneys' fees reasonable incurred because of such conduct"), as well as the court's

3  inherent authority. *Terrebonne* at 1055-56 (citing cases). The court also held that sanctions can be

4  appropriately based on reckless conduct alone. *Id.* The court concluded that counsel's conduct was

5  either reckless or in bad faith, and that a monetary sanction was appropriate.

6      A similar award is in order here. As set forth in the attached declaration of Ken Brothers,

7  Ricoh's attorneys spent at least $42,613 in time and expenses directly related to Howrey's improper

8  conduct relating to Dr. Thomas. (Brothers Decl. ¶ 39.) These fees are reasonable, especially when

9  compared with Howrey's billing rates. (*Id.* ¶¶ 39-40.)

### C.    This Court Should Impose Sanctions Upon The Howrey Attorneys Responsible For the Improper Conduct

11     There can be no doubt that Howrey attorneys committed serious errors of judgment in

12  connection with retention of Dr. Thomas, as set forth in detail above in section II, coupled with two

13  misrepresentations to the Court, and willfully disobeyed a court order. Under California law, the entire

14  Howrey firm could be disqualified from any further representation of Synopsys and the ASIC

15  defendants. *See Shadow Traffic Network v. Superior Court*, 24 Cal. App. 4th 1067 (Cal. App. 1994)

16  (disqualifying law firm that retained experts who had consulted with but not been retained by the other

17  side); *Actel Corp. v. Quicklogic Corp.,* 1996 U.S. Dist LEXIS 11815 (N.D. Cal. 1996) (disqualifying

18  attorney for obtaining confidential information from other side); *In Re Complex Asbestos Litigation*, 232

19  Cal. App. 3d 572; 283 Cal. Rptr. 732 at 739-40 (Cal. App. 1st Dist. 1991) (summarizing of California

20  law on motions for disqualification; holding that law firm is disqualified for hiring non-lawyer employee

21  from opposing counsel).

22     Under the facts here, this Court could elect to disqualify the entire Howrey firm from

23  representing the ASIC defendants and Synopsys. The Court may also elect to disqualify the two

24  attorneys directly involved – Louis Campbell and Christopher Kelley. Ricoh defers to the Court's

25  judgment with respect to the appropriate sanction.

## CONCLUSION

Based upon the improper conduct of Synopsys, the ASIC defendants and the Howrey firm, Dr. Thomas should be disqualified, Ricoh should receive its fees and expenses associated with this matter, and the Court should impose appropriate sanctions on the Howrey firm.

Dated: December 2, 2003                      Respectfully submitted,

                                             Ricoh Company, Ltd.


                                             By:  _____Ken Brothers_____

                                             Jeffrey B. Demain, State Bar No. 126715
                                             Jonathan Weissglass, State Bar No. 185008
                                             ALTSHULER, BERZON, NUSSBAUM,
                                                 RUBIN & DEMAIN
                                             177 Post Street, Suite 300
                                             San Francisco, California  94108
                                             Phone:  (415) 421-7151
                                             Fax:  (415) 362-8064

                                             Gary M. Hoffman
                                             Ken Brothers
                                             Eric Oliver
                                             DICKSTEIN SHAPIRO MORIN &
                                                 OSHINSKY  LLP
                                             2101 L Street NW
                                             Washington, D.C.  20037-1526
                                             Telephone: (202) 785-9700
                                             Facsimile: (202) 887-0689

                                             Edward A. Meilman
                                             DICKSTEIN SHAPIRO MORIN &
                                                 OSHINSKY  LLP
                                             1177 Avenue of the Americas
                                             New York, New York  10036
                                             Telephone:  (212) 896-5471
                                             Facsimile:  (212) 997-9880

                                             Attorneys for Ricoh Company, Ltd.