Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
2101 L Street, NW
Washington, DC 20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California 94108
Phone (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| SYNOPSYS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RICOH COMPANY, LTD., <br><br> Defendant. | **CASE NO. C-03-2289-MJJ** <br><br> **CASE NO. C-03-4669-MJJ** |
| RICOH COMPANY, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> AEROFLEX INCORPORATED, et al., <br><br> Defendants | **DECLARATION OF KENNETH W. BROTHERS IN SUPPORT OF RICOH'S MOTION FOR SANCTIONS** <br><br> **Date: January 6, 2004** <br> **Time: 9:30 a.m.** <br> **Courtroom: 11** |

Kenneth W. Brothers declares as follows:

1.      I am an attorney at law licensed to practice in the State of Colorado and the District of Columbia and admitted in this case *pro hac vice*, and am a partner in the law firm of Dickstein Shapiro Morin & Oshinsky, LLP, attorneys for Ricoh Company, Ltd.  The matters set forth in this declaration are based on my personal knowledge, except where indicated, and if called as a witness, I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the July 28, 2003 Declaration of Christopher A. Monsey.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Confidentiality Agreement between Dr. Thomas, Dickstein Shapiro Morin & Oshinsky, LLP, and Ricoh Co., Ltd.

4.      Attached hereto as Exhibit 3 is a true and correct copy of a March 31, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000005), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a August 14, 2003 Deposition Transcript of Dr. Thomas.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a April 1, 2003 e-mail from Dr. Thomas to L. Campbell (PTH000007), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

7.      Attached hereto as Exhibit 6 is a true and correct copy of a April 3, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000009), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a April 4, 2003 e-mail from Dr. Thomas to L. Campbell (PTH000011), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

9.     Attached hereto as Exhibit 8 is a true and correct copy of a April 8, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000017), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

10.     Attached hereto as Exhibit 9 is a true and correct copy of the ASIC defendants' June 25, 2003 subpoena issued to Dr. Thomas.

11.     Attached hereto as Exhibit 10 is a true and correct copy of a July 2, 2003 e-mail from Dr. Thomas to L. Campbell (PTH000024), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

12.     Attached hereto as Exhibit 11 is a true and correct copy of e-mail correspondence between L. Campbell and Dr. Thomas (PTH000018-23), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

13.     Attached hereto as Exhibit 12 is a true and correct copy of the July 30, 2003 hearing transcript before Judge Sleet.

14.     Attached hereto as Exhibit 13 is a true and correct copy of a September 17, 2003 letter from C. Kelley to G. Hoffman.

15.     Attached hereto as Exhibit 14 is a true and correct copy of a July 7, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000025), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

16.     Attached hereto as Exhibit 15 is a true and correct copy of a July 7, 2003 e-mail from Dr. Thomas to L. Campbell (PTH000026), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

17.     Attached hereto as Exhibit 16 is a true and correct copy of a July 7, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000027), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

18.     Attached hereto as Exhibit 17 is a true and correct copy of a July 8, 2003 e-mail from Dr. Thomas to L. Campbell (PTH000028), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

19.     Attached hereto as Exhibit 18 is a true and correct copy of a July 8, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000033), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a July 10, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000042), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

21.     Attached hereto as Exhibit 20 is a true and correct copy of a July 11, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000043), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

22.     Attached hereto as Exhibit 21 is a true and correct copy of a July 17, 2003 transmittal letter and retainer agreement (PTH000044-48), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

23.     Attached hereto as Exhibit 22 is a true and correct copy of a letter from L. Campbell to E. Meilman, which was faxed on July 22, 2003.

24.     Attached hereto as Exhibit 23 is a true and correct copy of two July 22, 2003 letters from G. Hoffman to Dr. Thomas and T. Corbin.

25.     Attached hereto as Exhibit 24 is a true and correct copy of a July 23, 2003 letter from G. Hoffman to C. Kelley.

26.     Attached hereto as Exhibit 25 is a true and correct copy of a July 25, 2003 letter from C. Kelley to G. Hoffman.

27.     Attached hereto as Exhibit 26 is a true and correct copy of a July 23, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000051), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

28.     Attached hereto as Exhibit 27 is a true and correct copy of a July 24, 2003 e-mail from Dr. Thomas to L. Campbell (PTH000052), which was produced by Dr. Thomas in response to a subpoena from Ricoh

29.     Attached hereto as Exhibit 28 is a true and correct copy of a July 28, 2003 e-mail from L. Campbell to Dr. Thomas (PTH000055), which was produced by Dr. Thomas in response to a subpoena from Ricoh

30.     Attached hereto as Exhibit 29 is a true and correct copy of a August 5, 2003 letter from C. Kelley to G. Hoffman.

31.     Attached hereto as Exhibit 30 is a true and correct copy of the July 31, 2003 Order.

32.     Attached hereto as Exhibit 31 is a true and correct copy of the August 28, 2003 hearing transcript.

33.     Attached hereto as Exhibit 32 is a true and correct copy of a August 7, 2003 e-mail from Dr. Thomas to L. Campbell (PTH000057), which was produced by Dr. Thomas in response to a subpoena from Ricoh.

34.     Attached hereto as Exhibit 33 is a true and correct copy of a September 9, 2003 letter from L. Campbell to G. Hoffman.

35.     Attached hereto as Exhibit 34 is a true and correct copy of the ASIC defendants' notices of subpoena and deposition of Brian Bershader and Knowledge Edge, Inc., dated August 29, 2003, but which were not received by my firm until September 5, 2003, when Mr. Bershader transmitted it to us. Mr. Bershader advised that he was served with this subpoena on September 2, 2003.

36.     Attached hereto as Exhibit 35 is a true and correct copy of a September 9, 2003 letter from G. Hoffman to C. Kelley.

1

37.  On August 25, 2003, counsel for the ASIC defendants and Synopsys verbally offered to

2

drop Dr. Thomas as a consulting expert, but insisted that they were still entitled to depose Dr. Thomas as

3

a fact witness on the character of prior art logic synthesis systems and their relevance to the validity of

4

Ricoh's patents.

5

38.   On December 1, 2003, counsel for Ricoh engaged in a meet and confer with counsel for

6

Synopsys and the ASIC defendants.  One of the agenda items were the issues presented in Ricoh's

7

motion for sanctions, namely the provision of a privilege log of the documents submitted for in camera

8

review on October 30, 2003; preclusion of any substantive testimony from Dr. Thomas; payment of

9

Ricoh's attorneys' fees with Dr. Thomas commencing on July 22, 2003; and preclusion of Louis

10

Campbell and Christopher Kelley from further work on this matter.  Counsel for Synopsys and the ASIC

11

defendants declined to agree to any of the requests or any subset thereof.

12

39   Following is a summary of the billing records and time entries from July 22, 2003

13

through November 30, 2003, associated with my firm's investigation of and subsequent motions relating

14

to the retention of Dr. Thomas by Synopsys, Inc.  My firm first learned that Synopsys had retained Dr.

15

Thomas on July 22, 2003.  My partner, Gary Hoffman, immediately objected to both Dr. Thomas and

16

counsel for Synopsys and the ASIC defendants, as reflected by Exhibit 23.  Counsel for Synopsys and

17

the ASIC defendants declined to terminate their retention of Dr. Thomas, and instead insisted that Ricoh

18

seek judicial relief, as reflected by Exhibit 25.  Gary Hoffman and I sought an emergency hearing before

19

Judge Sleet of the District of Delaware, and a hearing was scheduled for July 30.  Between July 23 and

20

July 28, associate Chris Monsey conducted a thorough review of his dealings with Dr. Thomas and

21

prepared a 24 paragraph declaration (Ex. 1), which was referenced during the July 30 hearing.  On July

22

31, Judge Sleet entered an order (Ex. 30) compelling the production of certain documents and the

23

deposition of Dr. Thomas.  I prepared for the Thomas deposition by reviewing the documents produced

24

pursuant to Judge Sleet's order; internal documents, and documents obtained from Dr. Thomas by

25

subpoena.  On August 13, I traveled to Pittsburgh and deposed Dr. Thomas on August 14 (Ex. 4).  The

26

27

28

travel costs associated with this deposition are $1251.61, and the transcription costs were $397.43. On August 28, a second hearing was held before Judge Sleet with respect to Dr. Thomas. On October 30, counsel for Synopsys and the ASIC defendants submitted certain Thomas-related documents for an in-camera inspection, but declined to provide a privilege log. In November, Mr. Monsey and I prepared Ricoh's motion for sanctions. The amount of time spent on the foregoing activities is as follows:

| | | |
|---|---|---|
| Gary Hoffman | 3.5 hours at $525/hour: | $1,837.50 |
| Kenneth Brothers | 48.1 hours at $425/hour: | $20,442.50 |
| Chris Monsey | 69.2 hours at $270/hour: | $18,684 |
| Attorney Time Subtotal: | | $40,964 |
| Travel costs and transcription fees: | | $1,649 |
| Total | | $42,613 |

The foregoing accounting of time does not include all of the time spent by Mr. Hoffman, Mr. Monsey or me on matters relating to Dr. Thomas, and does not include any of the time spent by any other attorneys or legal assistants on matters related to Dr. Thomas, even though several other persons were involved in assisting with the investigation and in meeting and conferring with opposing counsel. The foregoing accounting of time is conservative and, if paid, would not fully reimburse Ricoh for the time and expense of its counsel in investigating the Thomas matter.

40.    The billing rates for Mr. Hoffman, Mr. Monsey and me are market-based and consistent with those rates charged by intellectual property attorneys with similar experience at law firms of similar size. Prior to joining Dickstein Shapiro Morin & Oshinsky, I was a partner at Howrey Simon Arnold & White. My 2003 billing rate of $425/hour at Dickstein Shapiro Morin & Oshinsky is lower than my Howrey Simon Arnold & White 2001 billing rate for California matters such as its representation of Synopsys and the ASIC defendants. The foregoing billing rates for Mr. Hoffman and Mr. Monsey are lower than Howrey Simon Arnold & White 2001 billing rates for persons of similar experience working on California matters such as its representation of Synopsys and the ASIC defendants.

41.    Attached hereto as Exhibit 36 is a true and correct copy of *Hansen v. Umtech Indus.*, 1996 WL 622557 (D. Del. 1996).

42.    Attached hereto as Exhibit 37 is a true and correct copy of *Space Systems/Loral v. Martin Marietta Corp.*, 1995 U.S. Dist. LEXIS 22305 (N.D. Cal. Nov. 14, 1995).

43.    Attached hereto as Exhibit 38 is a true and correct copy of *Rohn v. United States*, 2002 U.S. Dist. LEXIS 19122 (E.D. Cal. 2002).

44.    Attached hereto as Exhibit 39 is a true and correct copy of *Actel Corp. v. Quicklogic Corp.*, 1996 U.S. Dist. LEXIS 11815 (N.D. Cal. 1996).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Signed at Washington, D.C. on December 2, 2003.

/s/ Kenneth W. Brothers

_____

Kenneth W. Brothers

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICOH COMPANY, LTD., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 03-103-GMS |
| AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP., and MATROX TECH, INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### DECLARATION OF CHRISTOPHER A. MONSEY

1.  My name is Christopher Monsey. I am an attorney with the law firm of Dickstein Shapiro Morin & Oshinsky LLP, counsel for Ricoh Company, Limited ("Ricoh"). I am over the age of 21 and am competent to make this declaration. Based on my personal knowledge and information, I hereby declare to all of the facts in this declaration.

2.  In May of 2002, I contacted Dr. Donald E. Thomas, a professor of electrical and computer engineering at Carnegie Mellon University in Pittsburgh, and ascertained that he was available and interested in acting as a consultant for Ricoh and my law firm. We generally discussed the subject matter of the underlying technology, and I explained that we were interested in having him examine the patent at issue, discuss possible claim interpretations, review and comment upon potential prior art, and help analyze whether various defendants were infringing Ricoh's patent. We agreed upon a billing rate.

3.  After I had ascertained that Dr. Thomas was available and interested in acting as a consultant for Ricoh and my law firm, but before I disclosed any confidential information, I asked Dr. Thomas to sign a confidentiality agreement. On May 29, 2002, I sent to Dr. Thomas by facsimile a one-page confidentiality agreement that states as follows:

    I, Donald E. Thomas, am a candidate to serve as a consultant for Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C. ("DSMO") and Ricoh Company, Ltd. ("Ricoh") in connection with patent-related litigation. I recognize that the discussions relating to my being retained as a consultant have advanced to a

stage where the disclosure of sensitive, confidential and/or privileged information is necessary for the discussions to further advance.

I therefore agree that any information received by me during the discussions and/or consulting services concerning the affairs of Ricoh, including but not limited to patent and trade secret information, system testing or experimentation conducted by Ricoh, and/or information concerning infringement investigations conducted by Ricoh, will be held by me in confidence and will not be revealed to any other persons, firms or organizations.

I realize that in the course of these discussions, DSMO may provide me with materials containing information of the type described above. All information and materials provided to me will be held by me in confidence and will not be revealed to any other persons, firms or organizations. At the termination of either our discussions and/or any subsequent consulting services, I agree to return all such materials and all copies thereof to DSMO.

It has been agreed that I will be compensated for any work I am requested by DSMO to do, up to a maximum of ten hours of consulting, at my regular hourly rate for consulting services, and for my out-of-pocket expenses in connection with these discussions. I understand that a subsequent consulting agreement may be entered into for continued services relating to the matters discussed above.

4. Dr. Thomas signed and returned the confidentiality agreement the same day. A copy of the confidentiality agreement signed by Dr. Thomas is attached as Exhibit 1. Also on May 29, 2002, Eric Oliver, a Dickstein Shapiro partner, countersigned the confidentiality agreement and sent it to Dr. Thomas. Exhibit 2 is a copy of Eric Oliver's May 29, 2002 cover letter.

5. After I had received the signed confidentiality agreement from Dr. Thomas, I sent him the '432 patent and an additional reference exceeding 50 pages in length, and an instruction letter. I asked Dr. Thomas to analyze the reference and compare it to the '432 patent.

6. On June 2, 2002, Dr. Thomas sent me a two page email reporting on the results of his analysis and discussing the impact of the reference upon the '432 patent.

7. On June 5, 2002, I had a 90 minute telephone conversation with Dr. Thomas discussing his analysis in greater detail. During that conversation, I discussed Ricoh's confidential infringement positions and certain potential prior art. During this conversation, Dr. Thomas expressed his opinions with respect to the validity of the '432 patent.

8. On June 6, 2002, I sent an additional document of 12 pages to Dr. Thomas and asked for his analysis compared to the '432 Patent.

2

9. On June 7, 2002, Dr. Thomas sent a one-page email reporting on his analysis. I had a follow up phone conversation with Dr. Thomas the same day regarding his analysis. After our conversation, I sent Dr. Thomas two additional document of approximately 50 pages and asked for his further analysis.

10. On June 10, 2002, I had a 20 minute phone conversation with Dr. Thomas regarding those documents. I discussed my work product relating to affirmative defenses of invalidity and non-infringement that the defendants might attempt to raise.

11. On June 17, 2002, I had an 80 minute conversation with Dr. Thomas, in which he reported on the results of his analysis. During this conversation, I further disclosed confidential and privileged information, and Dr. Thomas expressed several opinions with respect to the proper claim construction, validity and infringement of the '432 patent. After that conversation, I sent Dr. Thomas an additional document of more than 10 pages and requested his analysis.

12. On June 18, 2002, I sent Dr. Thomas an email specifically asking for his opinions on the infringement issues that are presented in this litigation. On June 19, 2002, Dr. Thomas responded with a one-page email in which he expressed several opinions and proposed alternative theories.

13. On June 21, 2002, I had a one hour conversation with Dr. Thomas in which we further discussed my attorney work product and his opinions regarding claim construction, validity and infringement. Dr. Thomas also sent me a follow-up email on June 21, 2002, communicating further opinions. After that conversation I sent him more than 100 pages of additional material for his analysis.

14. On June 24, 2002, I had a 30 minute phone conversation with Dr. Thomas. On June 26, 2002, I had a 55 minute conversation with Dr. Thomas. During both of these conversations, I further disclosed my legal analysis regarding Ricoh's litigation strategy, and he expressed further opinions regarding claim construction, validity and infringement.

15. Through these confidential discussions, Dr. Thomas became well-informed of the heart of Ricoh's case strategy.

16. The May 29, 2002 confidentiality agreement provided that Dr. Thomas was authorized to spend 10 hours doing his analysis. During our conversation on June 26, 2002, Dr. Thomas said that he had exceeded 10 hours. On June 28, 2002, my firm authorized Dr. Thomas to spend an additional ten hours of consulting work.

17. Dr. Thomas billed and was paid by my firm for time and expenses for his consulting work on the '432 patent.

18. On July 12, 2002, I asked Dr. Thomas for more information with respect to potential prior art. The same day, he sent me a 160 page document.

19. On September 24, 2002, Dr. Thomas sent me at my request a 50 page document.

20. Between September 2002 and April 2003, my firm completed its analysis of the '432 patent and defendants' infringing activities, and prepared and filed the complaint. I kept Dr. Thomas informed of these activities, and told him that we wanted to having him act as a consulting expert.

21. During the week of March 2, 2003, I contacted Dr. Thomas but he was out of town. I left a message, which Dr. Thomas returned on March 10, 2003 in the form of an email acknowledging that I had called him the previous week; he indicated a call time in his email. I contacted Dr. Thomas on March 11, 2003 and March 12, 2003.

22. I again called Dr. Thomas on April 1, 2003 regarding this litigation and his consulting activities; this telephone call lasted about seven minutes.

23. On April 4, 2003, Dr. Thomas informed me that he did not want to be a testifying expert in this action, but said he could continue acting as a non-testifying expert.

24. On July 8, 2003, Dr. Thomas terminated his agreement with Ricoh and my firm. At no time did Dr. Thomas disclose that he had communicated substantively with or agreed to consult for counsel for defendants.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 28, 2003.

Christopher A. Monsey

EXHIBIT 1

# CONFIDENTIALITY AGREEMENT

I, Donald E. Thomas, am a candidate to serve as a consultant for Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C. ("DSMO") and Ricoh Company, Ltd. ("Ricoh") in connection with patent related litigation. I recognize that the discussions relating to my being retained as a consultant have advanced to a stage where the disclosure of sensitive, confidential and/or privileged information is necessary for the discussions to further advance.

I therefore agree that any information received by me during the discussions and/or consulting services concerning the affairs of Ricoh, including but not limited to patent and trade secret information, system testing or experimentation conducted by Ricoh, and/or information concerning infringement investigations conducted by Ricoh, will be held by me in confidence and will not be revealed to any other persons, firms or organizations.

I realize that in the course of these discussions, DSMO may provide me with materials containing information of the type described above. All information and materials provided to me will be held by me in confidence and will not be revealed to any other persons, firms or organizations. At the termination of either our discussions and/or any subsequent consulting services, I agree to return all such materials and all copies thereof to DSMO.

It has been agreed that I will be uncompensated for any work I am requested by DSMO to do, up to a maximum of ten hours of consulting, at my regular hourly rate for consulting services, and for my out-of-pocket expenses in connection with these discussions. I understand that a subsequent consulting agreement may be entered into for continued services relating to the matters discussed above.

Date: 5-29-02

Donald E. Thomas

Date: _____

Eric Oliver
Dickstein Shapiro Morin & Oshinsky LLP

EXHIBIT 2

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689

Writer's Direct Dial: (202) 861-9185
E-Mail Address: OliverE@DSMO.com

May 29, 2002

**VIA FACSIMILE AND UPS**
    **(412) 268-1374**

Dr. Donald E. Thomas
1611 Tier Drive
Pittsburgh, PA 15241

Re:    Patent Analysis

Dear Dr. Thomas

Please accept our thanks for agreeing to provide your services concerning our patent analysis. We look forward to speaking with you in connection with our analysis. As we discussed, you will be reimbursed for your time and expenses associated with your efforts on our behalf for consulting at your rate of $ 200.00 per hour up to ten hours in connection with the current project. We will authorize additional time as necessary to further our analysis.

We have received your signed confidentiality agreement. We are enclosing a signed agreement for your records. We are also enclosing copies of certain documents involved in the present matter for your review. We request that you review the enclosed documents and determine if the elements of patent claim 1 and claim 13 are disclosed in each document.

We look forward to hearing your opinion concerning this matter. If you have any questions or comments, please contact us at your convenience.

Very truly yours,

Eric Oliver

EO/CAM
Enclosures

1177 Avenue of the Americas • 41st Floor • New York, New York 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.legalinnovators.com

1458258 v1; V7NK01!.DOC

2

# CONFIDENTIALITY AGREEMENT

I, Donald E. Thomas, am a candidate to serve as a consultant for Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C. ("DSMO") and Ricoh Company, Ltd. ("Ricoh") in connection with patent related litigation. I recognize that the discussions relating to my being retained as a consultant have advanced to a stage where the disclosure of sensitive, confidential and/or privileged information is necessary for the discussions to further advance.

I therefore agree that any information received by me during the discussions and/or consulting services concerning the affairs of Ricoh, including but not limited to patent and trade secret information, system testing or experimentation conducted by Ricoh, and/or information concerning infringement investigations conducted by Ricoh, will be held by me in confidence and will not be revealed to any other persons, firms or organizations.

I realize that in the course of these discussions, DSMO may provide me with materials containing information of the type described above. All information and materials provided to me will be held by me in confidence and will not be revealed to any other persons, firms or organizations. At the termination of either our discussions and/or any subsequent consulting services, I agree to return all such materials and all copies thereof to DSMO.

It has been agreed that I will be compensated for any work I am requested by DSMO to do, up to a maximum of ten hours of consulting, at my regular hourly rate for consulting services, and for my out-of-pocket expenses in connection with these discussions. I understand that a subsequent consulting agreement may be entered into for continued services relating to the matters discussed above.

Date: 5-29-02

Donald E. Thomas

Date: _____

Eric Oliver
Dickstein Shapiro Morin & Oshinsky LLP

3

From: CampbellL@howrey.com
Date: Mon Mar 31, 2003 4:52:35 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: VLSI Design Automation Assistant

Dear Mr. Thomas:

I am writing in connection with your work on the VLSI Design Automation Assistant and more generally with regard to your early work in the field of logic synthesis.

I am serving as counsel to Synopsys and several of its customers in connection, who have been charged with infringing a patent relating to specific logic synthesis techniques. Part of our work is to determine the state of the art of logic synthesis in the mid to late 1980s. It appears that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with us. In addition we are looking for consultants with expertise in the logic synthesis area in order to assist us in gathering relevant technical information in connection with our case. Please let me know if you do consulting work or know of other persons in this area who serve as consultants. Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com


This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.


PTH000005

**4**

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4    RICOH COMPANY, LTD.,              )

5                    Plaintiff,        )   CIVIL ACTION

6        vs.                           )   No. 03-103-GMS

7    AEROFLEX INCORPORATED, AMI        )

8    SEMICONDUCTOR, INC., MATROX       )

9    ELECTRONIC SYSTEMS, LTD.,         )

10   MATROX GRAPHICS INC., MATROX      )

11   INTERNATIONAL CORP., and          )

12   MATROX TECH, INC.,                )

13                    Defendants.      )

14

15

16       REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED

17      WITHOUT THE AUTHORIZATION OF THE CERTIFIED

18                        AGENCY

19

20

21

22       DEPOSITION OF DONALD E. THOMAS, JR.

23          Thursday, August 14, 2003

24

25

**TRAVEL TRANSCRIPT**

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

---

Page 2

```
 1
 2            DEPOSITION OF DONALD E. THOMAS, JR.
 3     taken pursuant to the Federal Rules of Civil Procedure,
 4     before Lisa Ann Bauer, Certified Realtime
 5     Reporter-Notary Public in and for the Commonwealth of
 6     Pennsylvania, on Thursday, August 14, 2003, at the
 7     offices of Buckler & Associates Court Reporters, 1805
 8     Law & Finance Building, 429 Fourth Avenue, Pittsburgh,
 9     Pennsylvania 15219, commencing at 9:00 o'clock a.m.
10                     - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                             MARKED FOR
 2     EXHIBITS                 IDENTIFICATION
 3     Thomas Deposition Exhibit 1
 4     Thomas Deposition Exhibit 2
 5     Thomas Deposition Exhibit 3
 6     Thomas Deposition Exhibit 4
 7     Thomas Deposition Exhibit 5
 8     Thomas Deposition Exhibit 6
 9     Thomas Deposition Exhibit 7
10     Thomas Deposition Exhibit 8
11     Thomas Deposition Exhibit 9
12     Thomas Deposition Exhibit 10
13     Thomas Deposition Exhibit 11
14                     - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              A P P E A R A N C E S
 2                     - - -
 3     On behalf of the Plaintiff:
 4         Kenneth W. Brothers, Esquire
 5         Dickstein Shapiro Morin & Oshinsky, LLP
 6         2101 L Street NW
 7         Washington, DC  20037
 8
 9     On behalf of the Defendants:
10         Francis DiGiovanni, Esquire
11         Connolly Bove Lodge & Hutz, LLP
12         1220 Market Street
13         Wilmington, DE  19899
14
15                     - - -
16
17              I N D E X
18     WITNESS          EXAMINATION BY          PAGE
19     DONALD E. THOMAS    Mr. Brothers
20              Mr. DiGiovanni
21
22
23
24
25
```

Page 5

```
 1              P R O C E E D I N G S
 2                 (9:00 o'clock a.m.)
 3                 DONALD E. THOMAS, JR.
 4     the deponent, having been first duly sworn, was deposed
 5     and testified as follows:
 6                 EXAMINATION
 7     BY MR. BROTHERS:
 8        Q.  State your complete name, please.
 9        A.  Donald E. Thomas, Jr.
10        Q.  Your business address, please?
11        A.  Carnegie Mellon University, 5000 Forbes Avenue,
12     ECE Department, Pittsburgh, PA 15213.
13        Q.  Your home address?
14        A.  1611 Tier Drive, Pittsburgh 15241.
15        Q.  Dr. Thomas, my name is Ken Brothers.  We met
16     before the start of the deposition.  I represent Ricoh
17     in this action.
18            Do you understand that the court has entered
19     an order with respect to your deposition today?
20        A.  I have just received that, yes.
21        Q.  When did you receive a copy of that order?
22        A.  I think that that is -- is that this item?
23        Q.  Yes.  Let me mark a copy of the original letter
24     which you brought with you.  I am marking as Thomas
25     Deposition Exhibit 1 a copy of a letter dated
```

2 (Pages 2 to 5)

Page 6

1    August 8th, 2003.
2        A.  Received by me on August 12th.
3            (Thomas Deposition Exhibit 1
4        was marked for identification.)
5    BY MR. BROTHERS:
6        Q.  So was it sent by regular mail to you?  You
7    have the envelope with you and it was regular mail; is
8    that correct?
9        A.  Yes.
10       Q.  When you received what we've marked as Thomas
11   Exhibit 1, did you read it?
12       A.  Yes.
13       Q.  Did you understand at that time, as set forth
14   in paragraph 1, that pending further order of this
15   court, neither defendants nor their counsel shall have
16   any communication with you regarding the merits of this
17   case?
18       A.  Yes.
19       Q.  Had anybody told you that prior to your receipt
20   of Thomas Exhibit 1?
21       A.  No, no.
22       Q.  The letter on the first page of Thomas
23   Exhibit 1 is from an attorney named Erik Moller with
24   the Howrey law firm.
25           Do you know who Mr. Moller is?

Page 7

1        A.  I have never met personally any of these
2    people.
3        Q.  Have you spoken with Mr. Moller?
4        A.  No.  I think the only one I've spoken with is
5    Mr. Campbell, Louis Campbell.
6        Q.  You have not spoken with Chris Kelly of the
7    Howrey firm?
8        A.  I don't think so.
9        Q.  Have you spoken with Terry Corbin of the Howrey
10   firm?
11       A.  I don't think I've spoken with anybody but
12   Mr. Campbell.
13       Q.  Have you ever spoken with Frank DiGiovanni or
14   anyone else?
15       A.  I don't believe so.
16       Q.  Do you understand whether or not anybody is
17   representing you at your deposition today?
18       A.  I don't know whether Mr. DiGiovanni is or not.
19   I obviously appeared with no counsel on my own.
20       Q.  One other item with respect to Thomas
21   Exhibit 1.  Do you understand that as set forth in
22   paragraph 3, the subject of today's deposition is
23   limited to all communications with defendants, their
24   attorneys, or Synopsys regarding the 432 patent?
25       A.  Yes.

Page 8

1        Q.  I would ask you, during your deposition today,
2    to refrain from discussing any other issues,
3    specifically including any communications you may have
4    had with counsel for Ricoh.
5            Is that agreeable?
6        A.  Yes.
7            MR. DiGIOVANNI:  I, too, would like to
8    state on the record that I would like to caution the
9    witness to refrain from stating the substance of any
10   of the communications you've had with counsel for
11   Ricoh.
12           (Thomas Deposition Exhibit 2
13       was marked for identification.)
14   BY MR. BROTHERS:
15       Q.  Thomas Exhibit 2 is a copy of a notice of
16   subpoena and subpoena dated August 8th, 2003.
17       A.  This one isn't to me.
18       Q.  Let me direct your attention to the third page
19   of Thomas Exhibit 2.
20       A.  Okay, fine.  All right.
21       Q.  Do you recognize --
22       A.  Yes, yes.
23       Q.  -- the subpoena?
24       A.  Yes.
25       Q.  This was a subpoena you received last Friday?

Page 9

1        A.  Right here.
2        Q.  You have the original of the subpoena in front
3    of you?
4        A.  Yes.
5        Q.  And when you received the subpoena, did you
6    review it?
7        A.  Yes.
8        Q.  And in response to the document specifications
9    that are set forth beginning at page 8, did you do a
10   search for responsive documents?
11       A.  Yes.
12       Q.  And were those the documents that you dropped
13   off at this office, this court reporter office here in
14   Pittsburgh, last Monday?
15       A.  Yes.
16       Q.  What did you do to locate documents that were
17   responsive to the subpoena?
18       A.  Well, I thought back over the last end months,
19   whatever that is back to March, what communications
20   I've had and then made my own notes about that.  Most
21   of them -- in fact, all except for one phone call, from
22   what I can recollect -- were, in fact, all in e-mail,
23   and so I went back through -- through all my e-mail
24   that's saved in my in box, the e-mail that's saved in
25   my sent folder, the e-mail that was in my deleted

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

---

Page 10

1  folder, and anything from Howrey that had to do with
2  this, I copied back into a special folder and printed
3  all those out, and that's what you have there.
4      Q.  Did you have only one telephone conversation
5  with the Howrey firm?
6      A.  Well, to the best of my recollection -- now,
7  there might have been a second one with Louis Campbell
8  because we had trouble getting in touch with each
9  other, but I think that there was only one.  And I
10  point out that as I said in the documents I presented
11  here, I don't keep telephone records of what goes on,
12  and so unless they happen to be referenced in the
13  e-mails -- and in fact, one was -- that's the one I
14  remembered having.
15      Q.  Did you make any notes during that telephone
16  conversation?
17      A.  No.
18      Q.  Did you exchange any voice mails with anybody
19  from Howrey?
20      A.  I think I might have had a voice mail -- I
21  can't remember if I've had a voice mail from Howrey or
22  not.  I think most of the conversations I've had with
23  them have been through e-mail.
24      Q.  But sitting here today, you don't remember
25  whether or not you left voice mails for Mr. Campbell or

---

Page 11

1  anybody else at Howrey?
2      A.  If I did, it was what I said in my e-mails.
3      Q.  And sitting here today, you don't remember
4  whether Mr. Campbell or anybody else from Howrey left
5  you any voice mails?
6      A.  That's right.
7      Q.  Were the only methods of communication between
8  you and the Howrey firm e-mails, the one telephone
9  conversation or possibly two that you had with
10  Mr. Campbell, and possible voice mails?
11      A.  And the letter that was in here.
12      Q.  The retainer letter from Howrey?
13      A.  That's right.
14      Q.  Aside from that?
15      A.  And I -- that's right.  To the best of my
16  knowledge, I do want to point out that in here, back in
17  here, there was something referring to a fax, but I
18  only received the cover.  I didn't receive the content.
19  There was an e-mail in there referring to that.
20      Q.  Aside from that single fax cover sheet, did you
21  receive any other fax transmissions from Howrey?
22      A.  No.  Only as I seem to get a copy of the letter
23  and then a fax -- a fax and then I get the physical
24  copy of the letter.  So there were things that were
25  sent, but the letter came.  There was a duplicate.

---

Page 12

1      Q.  As to which letter are you referring, the
2  retainer letter?
3      A.  Well, for instance, the retainer letter, yeah.
4      Q.  Did you ever learn from Mr. Campbell of any
5  communications that he had with attorneys -- other
6  attorneys at Howrey?
7      A.  No.  Some of the e-mails say I spoke with my
8  colleagues, but there was never anything more than
9  that.  Or my colleagues want to set up a meeting.
10      Q.  He never reported to you any information from
11  any of his colleagues?
12      A.  That's right.
13      Q.  In response to the subpoena, I'd like to
14  identify some of the documents that you produced and
15  mark them.
16      A.  Sure.
17          (Thomas Deposition Exhibit 3
18          was marked for identification.)
19  BY MR. BROTHERS:
20      Q.  Exhibit 3 is a compilation of documents that
21  you had identified as being responsive to Items 1, 2,
22  3, and 4.  I will note that our firm, after receiving
23  the originals from you, added the numbers down at the
24  bottom, which we call Bates numbers, and I will also
25  note that we removed approximately eight or ten pages

---

Page 13

1  that related to communications between yourself and
2  counsel for Ricoh.
3      A.  Fine.
4      Q.  Because they were beyond the scope of the
5  subpoena and beyond the scope of the court order.
6          So for identification, I will identify
7  Exhibit 3 as comprising PTH000002 through 57, with the
8  exception of pages 3, 4, 6, page 30 has been redacted,
9  31 and 32 have been removed, and 35 through 40 have
10  been removed.  And Mr. Thomas was sent a letter and a
11  privilege log with respect to those pages.
12          MR. DiGIOVANNI:  Mr. DiGiovanni.
13          MR. BROTHERS:  I'm sorry.
14  Mr. DiGiovanni.
15          MR. DiGIOVANNI:  That's correct.
16  BY MR. BROTHERS:
17      Q.  Looking through the documents that comprise
18  Exhibit 3, do you recognize these as the e-mails that
19  you printed out as I have described them?
20      A.  They appear to be, yes.
21      Q.  So you were the one that selected all of these
22  e-mails from your computer system and printed them out?
23      A.  Yes.
24      Q.  And you wrote the first page of Exhibit 3, that
25  text that appears there?

---

4 (Pages 10 to 13)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 14

1    A.  The following pages?
2    Q.  Yes.
3    A.  Yes.
4    Q.  Before we get into the specifics of Exhibit 3,
5    I'll just identify the remaining pages that you
6    produced.
7         (Thomas Deposition Exhibit 4
8    was marked for identification.)
9    BY MR. BROTHERS:
10   Q.  Exhibit 4 comprises a copy of your calendar,
11   and I'll ask you to verify that.  Is Exhibit 4, in
12   fact, a copy of your calendar that you produced
13   responsive to the subpoena?
14   A.  Yes.  It appears to be.
15        (Thomas Deposition Exhibit 5
16   was marked for identification.)
17   BY MR. BROTHERS:
18   Q.  Exhibit 5, is that a copy of the notes that you
19   prepared with respect to Item 9?
20   A.  Yes, that appears to be.
21   Q.  Did you look for copies of your phone bills?
22   A.  It wasn't clear to me that you were asking for
23   phone bills.
24   Q.  So you didn't look for them?
25   A.  So I did not look for them.

Page 15

1         (Thomas Deposition Exhibit 6
2    was marked for identification.)
3    BY MR. BROTHERS:
4    Q.  Exhibit 6, is that a copy of your transmittal
5    letter summarizing the documents that you've produced?
6    A.  Yes, that appears to be.
7    Q.  With the exception of those few pages that were
8    communications between you and counsel for Ricoh, have
9    we identified all of the documents that you produced
10   responsive to the subpoena that we marked as Exhibit 2?
11   A.  Yes, these appear to be.
12   Q.  Did you assume that counsel for the defendants,
13   the Howrey firm, had informed counsel for Ricoh about
14   the subpoena that you received back in June?
15   A.  I had made that assumption, yes.
16   Q.  Why had you made that assumption?
17   A.  I don't know.  I don't know anything about how
18   courts work, okay?  So I just assumed that if there was
19   really some litigation going on, some trial in process
20   or being developed, I assumed that that would have been
21   communicated.
22   Q.  Did counsel for the defendants, the Howrey
23   firm, in fact, ever tell you that they hadn't given a
24   copy of that subpoena or otherwise given notice of that
25   subpoena to counsel for Ricoh?

Page 16

1    A.  I don't remember that.  They may have.
2    Q.  Do you remember asking about that in one of
3    your e-mails?
4    A.  Oh, yes, I did ask.  That's right.  I did ask,
5    and it may, in fact, be in there.  I can take a look,
6    if you want.
7    Q.  But sitting here today, you have no
8    recollection of the Howrey firm ever telling you that
9    they told counsel for Ricoh about that June subpoena?
10   A.  Well, we can look at the records here.
11   Q.  And I'm happy to do that and we will go through
12   those.  I'm just asking for your current recollection
13   as you sit here.
14   A.  Well, the recollection is here on these sheets,
15   so that should have been somewhere in July.  (Witness
16   reviews documents.)
17   Q.  Let me direct your attention to the numbers
18   starting with page 26 down at the bottom.
19   A.  Okay.
20   Q.  Do you recognize that as -- and looking at the
21   top, an e-mail from you dated July 7th to Louis
22   Campbell?
23   A.  Yeah, uh-huh.
24   Q.  In which you wrote, "I assume that they know
25   that you subpoenaed me for documentation and

Page 17

1    deposition."
2    A.  Right.
3    Q.  "Have they listed me as a consultant?"
4    A.  Yes, I wrote that, yes.
5    Q.  And looking at the next page, which is a
6    response from Mr. Campbell to you, do you see that he
7    did not answer your question with respect to whether
8    the Howrey firm had given Ricoh's counsel notice of the
9    subpoena and deposition?
10   A.  Okay, yes.
11   Q.  And he just said, "They have not listed you as
12   a consultant in this case."
13        Do you see that?
14   A.  Correct.
15        MR. DiGIOVANNI:  Objection to form,
16   foundation.
17   BY MR. BROTHERS:
18   Q.  Did you ever think about why Mr. Campbell did
19   not respond to your inquiry about whether the Howrey
20   firm had told Ricoh's counsel about the subpoena they
21   had served on you?
22        MR. DiGIOVANNI:  Objection to form and
23   foundation.
24        MR. BROTHERS:  You can answer.
25   A.  Actually, no, because I was more surprised by

5 (Pages 14 to 17)

S.E. Manno & Associates, Inc.
888-819-8282

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 18

1  the fact that I was not listed as a consultant in this
2  case, and that overrode any other thoughts about this,
3  why wasn't I.
4      Q.  Did you have the understanding that at this
5  stage of the litigation there was no obligation upon
6  counsel for any party to identify who their consultants
7  were?
8      A.  I am not privy to that knowledge.
9      Q.  So did you give thought, one way or the other,
10 as to whether the time had come to disclose
11 consultants?
12         MR. DiGIOVANNI:  Objection to form.
13         THE WITNESS:  Go ahead and answer.
14         MR. BROTHERS:  Yes.
15     A.  I had assumed that since I was asked in March
16 that lists had been made up of who was going to be a
17 consultant for whom, and that was the conversation that
18 I had where I said I won't testify for Ricoh.  So I
19 had assumed that consultant lists were being made up.
20 Did I know that they were being made up or did I know
21 that they were or were not published?  No, I'm not
22 privy to any of that.  Literally, my involvement in
23 this is pretty much limited to the time where I got
24 these e-mails and you, know, I'm not spending any time
25 on this case other than...

Page 19

1      Q.  I would again caution you not to disclose any
2  communications that you may have had between yourself
3  and counsel for Ricoh.
4      A.  Okay.
5      Q.  And so I would ask and move to strike that
6  portion of the last answer.
7         When Mr. Campbell wrote to you, quote, "They
8  have not listed you as a consultant in this case," how
9  did you understand that?
10     A.  I understood it as it was written, that this
11 case is proceeding and I'm not listed.  I'm not
12 employed by anybody specifically for this case.
13     Q.  So did you understand from Mr. Campbell's
14 answer that lists of consultants had been exchanged?
15     A.  I assumed.
16     Q.  And you further understood from Mr. Campbell's
17 answer that those lists that you assumed had been
18 exchanged did not identify you as a consultant for any
19 party?
20     A.  Based on what was written here, yes.
21     Q.  And that assumption that you made was based
22 upon the response you got from Mr. Campbell; is that
23 correct?
24     A.  Yes.  And let me add to that that I have not
25 received any further communication from them.

Page 20

1      Q.  And with respect to further communication from
2  Ricoh, were you expecting a communication from Ricoh
3  because of your assumption that the Howrey firm had
4  given counsel for Ricoh notice of your subpoena and
5  deposition?
6      A.  Not specifically, no.  Maybe I should say not
7  directly.  My assumption there was based on the notion
8  that I'm starting to receive subpoenas, so something
9  must be happening in this case.  So why have I not
10 received anything from Ricoh?  And so it's just a
11 general observation on my part.
12     Q.  And going back to the point we discussed
13 earlier, with respect to the subpoena that you received
14 from the Howrey firm, did you expect that the Howrey
15 firm had given notice to Ricoh's counsel of that
16 subpoena?
17         MR. DiGIOVANNI:  Objection to form.
18         MR. BROTHERS:  You can answer.
19     A.  I think that I had -- yes, I had assumed that
20 Ricoh would have known of this.  Again, nobody is
21 saying anything to me, okay?  Two months after any
22 communication -- actually, four months after any
23 communication, I get a subpoena totally out of the
24 blue.
25     Q.  Let me represent to you, sir, that, in fact,

Page 21

1  the Howrey firm did not give notice of that subpoena to
2  you until the 22nd of July and prior to that time --
3      A.  Which subpoena are we talking about now?
4      Q.  The subpoena from the Howrey firm that you
5  received in late June that triggered the communications
6  between you and Mr. Campbell, some of those that we
7  were talking to, that the Howrey firm did not give
8  notice to counsel for Ricoh in any way of that subpoena
9  until July 22nd.
10     A.  Okay.
11         MR. DiGIOVANNI:  Objection.  It's not a
12 question.
13 BY MR. BROTHERS:
14     Q.  With that representation in mind, does it cause
15 you to question what Mr. Campbell was telling you in
16 early July with respect to your assumption that notice
17 had been given by the Howrey firm of your subpoena to
18 counsel for Ricoh?
19         MR. DiGIOVANNI:  Objection to form.
20     A.  I thought we determined from the e-mail that
21 that was not stated.
22     Q.  My question is somewhat different.  My question
23 is, with the representation in mind that the Howrey
24 firm did not give notice to counsel for Ricoh of your
25 subpoena until July 22nd, does that cause you to

6 (Pages 18 to 21)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 22

1 reconsider what Mr. Campbell is telling you in early
2 July when you wrote him --
3    A.   Which e-mail am I supposed to look at here now?
4    Q.   The e-mails that we have looked at on pages 26
5 and 27 of July 7th in which you inquired with respect
6 to whether the Howrey firm had given notice of your
7 deposition.
8        Does that cause you to consider whether or not
9 the Howrey firm was being candid with you?
10       MR. DiGIOVANNI:  Objection to form.
11    A.   You're asking for my response now?
12    Q.   Yes.
13    A.   I would say no.  And the reason is that I don't
14 know the procedures, okay, of litigation.  I don't know
15 when somebody is supposed to tell somebody something,
16 you know.  These are unknown things to me.  So should
17 he have done that?  I don't know.  So I had assumed,
18 okay, but I didn't know whether that is supposed to
19 happen or not.
20    Q.   Let's go back to the start of your e-mail
21 communications.  Looking at the second page of
22 Exhibit 3, which is Bates numbered page 5, was this
23 communication, which is an e-mail to you from Lou
24 Campbell, dated March 31st, 2003, was this the first
25 communication from the Howrey firm with respect to this

Page 23

1 matter?
2    A.   Yes, with respect to any matter.
3    Q.   You had never done any --
4    A.   No.
5    Q.   -- prior work for the Howrey firm before?
6    A.   No.
7    Q.   Did you understand from reading this e-mail,
8 which has reference to the fact that Mr. Campbell
9 serves as counsel to Synopsys and several of its
10 customers who have been charged with infringing a
11 patent, did you understand that litigation was then
12 pending?
13    A.   Let me look at my own copies of all of this,
14 because that was a record for me of when things
15 happened, okay?  If I understood the question right, I
16 don't think I knew at that time that a case had been
17 filed, and there is two issues here.  Although I had
18 received a phone call, it was a voice mail and we had
19 never talked, Ricoh and I had never talked.
20    Q.   I would again caution you to set aside and not
21 talk about communications between counsel for Ricoh.
22    A.   So there are really is, no, I did not know
23 that there was litigation, and nor did I know that
24 Synopsys was involved.
25    Q.   And my question is specifically directed to the

Page 24

1 second paragraph of the e-mail, which refers to
2 Synopsys and its customers having been charged with
3 infringement.
4        When you read that, did you understand that
5 there was litigation?
6    A.   Oh, this mail told me it?
7    Q.   Yes.
8    A.   Right.  I'm sorry.  I thought you asked if I
9 knew it before.  This mail told me it.  I saw it there
10 and said, okay, this has happened.
11    Q.   So as of March 31st when you received this
12 e-mail, you understood that there was litigation
13 pending?
14    A.   (Nodding head affirmatively.)
15    Q.   You have to answer audibly.
16    A.   That is the assumption that I took from this.
17 That's what I read from this.
18    Q.   Did you further understand from this e-mail
19 that the Howrey firm was interested in retaining you as
20 a consultant?
21    A.   Yes.
22    Q.   The next page of Exhibit 3, which is Bates
23 numbered 7, is that your response?
24    A.   There wasn't anything taken out between there,
25 was there?

Page 25

1    Q.   In the original documents that you provided to
2 us, there was an intervening page which was a
3 communication between yourself and counsel for Ricoh,
4 which we have removed.
5    A.   Okay.  So let me make sure I'm understanding
6 where we are in time here.  Okay.  So your question on
7 this is...?
8    Q.   Looking at page 7 --
9    A.   You want to know if this was my response.  Yes,
10 this was my response to Mr. Campbell.
11    Q.   You wrote in your response of April 1st,
12 2003, quote, "I am interested, but I'm quite busy
13 today."
14        Why were you interested?
15    A.   Because, in fact, I wasn't sure whether this
16 was something different or the same, having to do with
17 previous work, and so I wanted to at least express, you
18 know, the interest to him that I will get back to you,
19 and I look at it more as a courtesy of, you know,
20 saying, yes, I'll talk to you, but I can't right now.
21        And then part of the reason that it says I'm
22 quite busy was that I felt, you know, maybe this is
23 the same thing I was talking, you know, seven months
24 prior about, and if that's the case, I needed to check
25 that out, and I didn't want to say that right up

7 (Pages 22 to 25)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

**Page 26**

1  front. I just wanted to say I'm quite busy, let me
2  get back to you.
3      Q.  And the response from Mr. Campbell as shown in
4  the next page was, in essence, we look forward to
5  hearing from you, understanding the ball was in your
6  court to get back?
7      A.  That's right. I just looked at it as a
8  courteous response.
9      Q.  Looking at the next page, there is a follow-up
10  response two days later, April 3rd, from
11  Mr. Campbell.
12      Is it fair to say that you had not gotten back
13  with Mr. Campbell in the intervening two days?
14      A.  That's right. He was tapping his foot and
15  saying why haven't I responded.
16      Q.  Had you spoken to the Howrey firm in the
17  meantime?
18      A.  No.
19      Q.  Now, there is a reference to a teleconference
20  on Wednesday, the first day we are all free.
21      How, as you understand it, did Mr. Campbell
22  know that was the first day you were all free if there
23  weren't any intervening communications?
24      A.  The "we" is referring to the lawyers in this
25  case. I have talked to the other lawyers on this case

**Page 27**

1  and we would like to set up.
2      Q.  So that's not referring to your schedule?
3      A.  That's right.
4      Q.  Did he ever identify the other lawyers?
5      A.  No. I mean, there are later -- later on, there
6  are letters that have other names, obviously.
7      Q.  The next communication is on page 11, which is
8  your response to Mr. Campbell's e-mail of April 3rd,
9  response of April 4th.
10      A.  Yes. I don't think there is anything in the
11  middle there, yes, so this should be it.
12      Q.  Now, in this e-mail of April 4th, you tell
13  Mr. Campbell that you have done some consulting on the
14  topic before for the firm of Dickstein Shapiro Morin
15  and Oshinsky LLP, and then you say, quote, "This was
16  mainly as an expert to help them read through and
17  understand various papers of the time (approximately
18  1984). This activity was mostly last summer and I
19  hadn't heard from them since early fall, but when I
20  received your e-mail, I thought I should look into
21  whether this was tied in. It appears that it is and
22  I'm not sure how/if to produce. If we can proceed, I
23  can make some time available on Wednesday, 4/9.
24  Sometime before noon and 2 Eastern time could be worked
25  out. I'm going to try to figure out what to do here.

**Page 28**

1  Any thoughts/comments would be appreciated," end of
2  quote.
3      Did I read that correctly?
4      A.  Yes.
5      Q.  Why did you think it was appropriate to
6  disclose that you had previously done some consulting
7  for the Dickstein firm on this topic?
8      A.  At that point, I wasn't sure whether these, in
9  fact, were the same, were related, and I felt I needed
10  to say enough to let him know, well, I have had some
11  work in this field recently and I wanted to give at
12  least the nature of it so that he would be able to say,
13  as, in fact, I think he did in the next e-mail where he
14  responded where that is, indeed, the same. And in
15  fact, until that point, I didn't really know that that
16  was the same.
17      Q.  Why did you think it was appropriate for you to
18  tell counsel for the defendants and Synopsys, the
19  Howrey firm, that you had been doing consulting for the
20  Dickstein firm? Why even raise it?
21      A.  Well, as I just said, I was looking for a way
22  to say, I have had work in this field before and I was
23  trying to give him enough information to be able to
24  connect the dots for me and say, yes, this is the same
25  thing, and I -- you know, you don't want me to say what

**Page 29**

1  other e-mail I sent, but I sent other e-mail to
2  somebody else asking the same question.
3      Q.  Did you see any problem with consulting for the
4  Dickstein firm at the same time that you were
5  consulting for the Howrey firm on the same matter?
6      A.  If it's on the same matter, then, obviously, I
7  can't consult for both.
8      Q.  Why?
9      A.  That would be a conflict of interest.
10      Q.  How would it be a conflict of interest?
11      MR. DiGIOVANNI:  Objection to form,
12  foundation.
13      A.  As far as I'm concerned, I can consult for one
14  or I can consult for the other, but I can't consult for
15  both. I don't feel that that would be right.
16      Q.  Can you tell me why?
17      A.  Possible conflict in terms of confidential
18  information.
19      Q.  Aside from a possible conflict with regard to
20  confidential information, would there be any other
21  reason why it wouldn't be right, in your mind?
22      A.  To me, that's the main reason. I mean, you
23  know, I signed an agreement that was still in effect,
24  you know, even though no work had been done for a
25  while, but it essentially said I should not talk about

8 (Pages 26 to 29)

Deposition of:
Donald E. Thomas, Jr.                                             August 14, 2003

---

Page 30

1  what was going on there, and I didn't feel that what I
2  said here was giving away any confidences. Again, I
3  was trying to make sure he understood, you know, where
4  I was coming from, where I had been, so that he could
5  decide and tell me whether, in fact, that's the same or
6  that's different.
7     Q. Why were you asking the Howrey firm for advice
8  on whether or if you could proceed?
9     A. Because I didn't know exactly what to do. It
10 may have, in fact, been something different, and so I
11 was looking for somebody to say, yes, this is the same,
12 no, this is different.
13    Q. During this time period, April 2003, did anyone
14 from the Howrey firm ever ask you if you had signed a
15 confidentiality agreement with counsel for Ricoh?
16    A. During which time frame?
17    Q. April 2003.
18    A. Nobody -- no, I was not asked that.
19    Q. Did anyone --
20    A. They do know that I was doing consulting for
21 them.
22    Q. But nobody asked if you had signed a
23 confidentiality agreement with counsel?
24    A. No. All the communication is right here.
25    Q. And you never told the Howrey firm that you had

---

Page 31

1  signed a confidentiality agreement with counsel for
2  Ricoh?
3     A. No, I didn't. My communications are right
4  here. My assumption is that's a given that I would
5  be -- every time I've worked with a lawyer, there has
6  always been a confidentiality agreement.
7     Q. Are all of your communications in March and
8  April 2003 between you and the Howrey firm in the
9  e-mails that you produced?
10    A. Yes.
11    Q. There were no letters, faxes, or telephone
12 calls during that time period?
13    A. That's right.
14    Q. Did anyone from the Howrey firm in the March
15 and April 2003 time period ever ask you if you had
16 formed or given any opinions to counsel for Ricoh?
17    A. No.
18    Q. Looking at Mr. Campbell's response of
19 April 7 -- this is on page 13 -- his initial response
20 is, "We are looking into this to see if it would be
21 proper for you to talk to us at this time. Let's hold
22 off on Wednesday for now."
23       Do you see that?
24    A. Uh-huh. And I understand that to be a response
25 to my e-mail saying I heard you.

---

Page 32

1     Q. Did you have any understanding why it might not
2  be proper for you to talk with the Howrey firm?
3        MR. DiGIOVANNI: Objection to form.
4     A. Well, to talk with them about exactly what,
5  okay? I know it is not proper to talk about the
6  details, you know, of what we were discussing the
7  previous summer. I understand that for sure, yes.
8     Q. The next response from Mr. Campbell is dated
9  Tuesday, April 8th. This is on page 17. I'll just
10 note you have two copies of the prior e-mail.
11    A. Yeah, there is two copies.
12    Q. Do you see the e-mail that's set forth on page
13 17, dated April 8th, 2003 from Mr. Campbell to you?
14    A. Yes.
15    Q. Do you recall this as being the next
16 communication between the two of you on the subject?
17    A. Yes, yes.
18    Q. Let me read that into the record. I'll ask you
19 if I read it right.
20       From Mr. Campbell to you, quote: "Thank you
21 for your interest in this matter, but Dickstein
22 Shapiro Morin & Oshinsky LLP is, indeed, the counsel
23 for the opposing side in this matter. This means that
24 there is most likely a conflict if we would talk to
25 you in detail about the matter. So, unfortunately, it

---

Page 33

1  appears that we cannot go forward, but I thank you
2  very much for your interest, and if things change or
3  we happen to run into this technology in an unrelated
4  matter, I will get back in touch with you. However,
5  one thing you can do for us is to let us know about
6  anyone else who is knowledgeable in this technology or
7  its development, whether or not they were
8  contemporaneously involved with its development.
9  Sincerely, Louis L. Campbell," end of quote.
10       Did I read that correctly?
11    A. Yes.
12    Q. When you read the first sentence, did that
13 confirm your prior assumption that, in fact, the
14 Dickstein firm was on the other side of the Howrey firm
15 in this matter?
16    A. Yes.
17    Q. When you received this e-mail, were you
18 disappointed?
19    A. Actually, no. It was one less thing I would
20 need to do that week. I mean, I'll be quite blunt
21 about it. I'm a little guy sitting between two big
22 corporations. The last thing I need to do is this.
23    Q. The second sentence, quote, "This means that
24 there is most likely a conflict if we would talk to you
25 in detail about the matter", end of quote.

---

9 (Pages 30 to 33)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 34

1     What understanding, if any, did you have from
2  that?
3     A.  I thought it was pretty straightforward that
4  since you're on opposing sides of this that it would be
5  a conflict for me to work with them at the same time
6  that I worked with Ricoh.
7     Q.  Did you understand why the Howrey firm could
8  not, as they put it, quote, "talk to you in detail
9  about the matter," end of quote?
10         MR. DiGIOVANNI:  Objection to form.
11     A.  Well, my understanding of detail comes from the
12  comment, actually, that I made just a few minutes ago.
13  I would not feel it was appropriate to talk about the
14  details that we had discussed the previous summer.
15     Q.  Did you understand from this e-mail that you
16  could not consult with the Howrey firm because it would
17  be a conflict of interest?
18     A.  At the same time as I would be consulting with
19  Ricoh.
20     Q.  Do you believe it is appropriate to have been
21  retained as an expert for one side and then resign and
22  go to work for other side?
23         MR. DiGIOVANNI:  Objection to form.  And
24  we're now getting into the subject matter that's
25  beyond the court ordered scope of this deposition.

Page 35

1         MR. BROTHERS:  You can answer.
2     A.  I feel that my work for Ricoh was in patent
3  analysis.  I taught them certain things as if they had
4  come to a classroom and I taught them something.  They
5  would ask a question, I would explain something.  If
6  somebody else asked me those same questions, as people
7  have done over the years and people will over other
8  years, I would feel free to answer those questions.
9     Q.  I don't think you answered my question, so I'll
10  move to strike your answer and ask it as a general
11  principle, without regard to the specific facts of this
12  case.
13         Do you believe it appropriate to have
14  consulted for one side in the litigation matter and
15  then resigned and gone to work for the other side?
16         MR. DiGIOVANNI:  Same objection.  It's
17  beyond the scope of the deposition notice entered by
18  the Court.
19     A.  As long as I do not tell the new company what
20  had transpired as part of the previous agreement or the
21  previous consulting.  Do you want me to amplify on
22  that?
23     Q.  No.
24         In the March and April time frame when you
25  were communicating with Howrey, did you tell them that

Page 36

1  you were still under contract with counsel for Ricoh
2  for consulting services?
3     A.  No.  I don't think that that's stated in March
4  or April or any of these e-mails, although let me look
5  here.  (Witness reviews documents.)
6         No, I did not say that to them.
7     Q.  You understood from Mr. Campbell's April 8th,
8  2003 e-mail that it would be a conflict if Howrey was
9  to talk to you in detail about the matter so you could
10  not consult for them; is that right?
11         MR. DiGIOVANNI:  Objection to form.
12     A.  That's what I read them saying here, yes.
13     Q.  But Howrey did not sever all communications
14  with you, did they?  They continued to talk with you
15  over the next few weeks?
16         MR. DiGIOVANNI:  Objection to form.
17     A.  Yes, considering there are e-mail records here.
18     Q.  Did you ever discuss with Mr. Kowalksi your
19  communications with the Howrey firm and anything with
20  respect to the 432 patent?
21         MR. DiGIOVANNI:  I'm going to insert an
22  objection here.  This is far beyond the scope of the
23  deposition as ordered by the Court.
24         MR. BROTHERS:  I disagree.  On page 23 of
25  Exhibit 3 it references Mr. Thomas' communications

Page 37

1  with Ted Kowalski, and it ties in directly with his
2  communications with Howrey.  Let me put it another
3  way.
4  BY MR. BROTHERS:
5     Q.  Did you ever talk with the Howrey firm with
6  respect to your communications with Mr. Kowalski with
7  respect to the 432 patent?
8     A.  My contacts with Ted in the sense of nominating
9  him as a person who knows about this material, as well
10  as Alice Parker, were only for the notion of trying to
11  suggest other people that know this material.  And, in
12  fact, any dumb bunny would be able to come up with
13  those names, because Ted Kowalski wrote the thesis for
14  which this was -- that's the main issue.  I had trouble
15  tracking down Ted because I hadn't talked to him in a
16  number of years, but when I finally did, I told him
17  that there was some litigation going on and that he
18  might be contacted.  Well, it turned out he had already
19  been contacted.
20     Q.  Were your only communications I guess in the
21  April and May time frame with the Howrey firm with
22  respect to Mr. Kowalski, as well as Alice Parker, those
23  that are reflected in the e-mails?
24     A.  Yes.
25     Q.  There were no phone conferences or voice mails

10 (Pages 34 to 37)

Deposition of:
Donald E. Thomas, Jr.                                        August 14, 2003

---

Page 38

1  during that time frame?
2    A.  No, no.
3    Q.  We also received e-mails from the Howrey firm,
4  and I'll mark as Exhibit 7 an e-mail that did not
5  appear in your files but did appear in the e-mails that
6  the Howrey firm sent to us.
7        (Thomas Deposition Exhibit 7
8        was marked for identification.)
9  BY MR. BROTHERS:
10   Q.  I'll ask you to look at Exhibit 7 and see if
11 you recognize it.
12   A.  (Witness reviews document.)  Actually, yes, I
13 do.  I'm not exactly sure why this was not in any of my
14 files.  I read mail from a number of different places
15 and sometimes networks mess things up, so I might have
16 lost this e-mail.  Yes, I do recognize this as being
17 sent to me and having read it.
18   Q.  Exhibit 7 appears to be -- well, let me
19 withdraw and restate.
20       Is Exhibit 7 a copy of an e-mail that responds
21 to your e-mail that is set forth on Bates page 23 of
22 Exhibit 3?
23   A.  Right.  It's the e-mail that's shown right
24 directly on the bottom, yes.
25   Q.  Am I correct that you searched only your work

---

Page 39

1  computer for e-mails?
2    A.  Sometimes I work from home, but I use an IMAP
3  server, and what that means is that all the e-mails are
4  stored centrally in one location, so even from home, I
5  have to be online to be able to receive those e-mails
6  from that central server.  Sometimes from home, there
7  are problems in the communications and so sometimes
8  things get lost, and that might have been what happened
9  here.  I don't know.  I don't have an explanation for
10 why I don't have this e-mail.  Sometimes electronics
11 don't work as planned.
12   Q.  So is it fair to say that you searched only
13 your work computer system for responsive e-mails?
14   A.  That's correct, and that is because with an
15 IMAP server, that is where all the files are stored.
16 They are not stored locally on any machine.
17   Q.  Having reviewed Exhibit 7, is it apparent to
18 you that your search didn't reveal all of the e-mails?
19   A.  That's right.  This one was not there.
20   Q.  Now, was the next communication between you and
21 the Howrey firm the subpoena that you received?
22   A.  From April --
23   Q.  We were looking at e-mails dated May 6th and
24 Mr. Campbell's response, which was marked as Exhibit 7.
25   A.  Yes, that's correct.  There were no other

---

Page 40

1  contacts.
2    Q.  I will mark as Exhibit 8 a copy of that
3  subpoena.
4        (Thomas Deposition Exhibit 8
5        was marked for identification.)
6  BY MR. BROTHERS:
7    Q.  Exhibit 8 is a copy of a subpoena dated
8  June 25th, 2003, which was faxed to the Dickstein
9  firm on July 23, 2003.
10       When did you receive this subpoena,
11 Dr. Thomas?
12   A.  I don't know the actual date.  I don't have
13 that in my memory.  I could look at a calendar and
14 maybe come up with a date.  I would assume that whoever
15 served it on me recorded that it was served.  That
16 should be in the record somewhere.
17   Q.  I'll direct you to the last page of Exhibit 8,
18 which references down at the bottom a service date of
19 June 26, if that helps refresh your recollection at
20 all.
21   A.  Okay.
22   Q.  When you received this subpoena, what did you
23 do?
24   A.  I read through it a couple of times and noted
25 the dates, future dates for my calendar, and if I

---

Page 41

1  remember correctly, that might have been a Thursday or
2  a Friday, and I think I read it -- reread it over the
3  weekend to think about it and try to put my head around
4  the whole thing of what really was being asked for and
5  to start planning how to produce all of this
6  information, which, in fact, was a considerable amount
7  of information.
8    Q.  The response, the e-mail that we have in
9  Exhibit 3 on page No. 24, was this your first inquiry
10 or communication to the Howrey firm after you received
11 the subpoena from the Howrey firm?
12   A.  Yes.  To the best of my knowledge, yes.
13       MR. DiGIOVANNI:  I'm sorry.  What was the
14 reference to the document?
15       MR. BROTHERS:  Page No. 24 on Exhibit 3.
16       MR. DiGIOVANNI:  Thanks.
17 BY MR. BROTHERS:
18   Q.  What were you asking the Howrey firm to do on
19 July 7th?
20   A.  Well, as it states there, I was starting to get
21 concerned about the reimbursement issue here and, also,
22 in some sense, my time.  It certainly does state here
23 that I'm commanded to appear and at the time specified,
24 and it wasn't clear -- after having produced, you know,
25 this much -- I'm indicating about ten inches worth of

---

11 (Pages 38 to 41)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 42

1   documentation, double sided, that I was going to send
2   in with regards to this -- I realized this was going to
3   take a considerable amount of my time to respond to
4   this.
5       And so I was asking, first of all, what about
6   reimbursements for any of this, for my assistant, who
7   tracked most of the information down, for all the
8   copying that was done for it, and also, even the fact
9   that I would have to show up somewhere and somebody
10  ought to pay my parking, right, and do I get anything
11  for the fact that a couple of companies want to sue
12  each other.
13      Q.  So were you looking for reimbursement not only
14  for your out-of-pocket expenses, but also the amount of
15  time you had spent?
16      A.  I was hoping there might be some reimbursement
17  for that, yes.
18      Q.  Was Mr. Campbell's response --
19      A.  Because I did say personal time.
20      Q.  Was Mr. Campbell's response, is that what is
21  shown on page 25 of Exhibit 3?
22      A.  I think so, yeah, yeah.  I don't think there is
23  anything in the middle there, yes.
24      Q.  How did you understand or how did you interpret
25  Mr. Campbell's response?

Page 43

1       MR. DiGIOVANNI:  Objection to form.
2       A.  May I ask a question?  When you say objection
3   to form, what do you mean?
4       MR. DiGIOVANNI:  Do you want to explain
5   or I can explain.
6       MR. BROTHERS:  Sure.  There is no judge
7   here, and so objections are made and if the judge
8   later decides that there is a basis for the objection,
9   when somebody says objection to form, it's because he
10  thinks that there is a problem with the way I phrased
11  the question and it's my choice to either rephrase the
12  question or to think to myself, the judge can decide
13  later whether the question is proper or not.  In
14  depositions, unless you're specifically instructed not
15  to answer a question, whether an objection is made
16  shouldn't affect whether or not you answer the
17  question.
18      THE WITNESS:  I just want to know what
19  form meant.
20      MR. BROTHERS:  It's lawyerspeak for
21  Mr. DiGiovanni telling me he thinks there is a problem
22  with the question, and that's something that judges
23  can sort out later, if they so choose.
24  BY MR. BROTHERS:
25      Q.  Anyway, do you have the question in mind?

Page 44

1       A.  Can you restate the question again?
2       Q.  Sure, sure.  How did you understand
3   Mr. Campbell's response of July 7th to your e-mail
4   inquiry of July 2nd?
5       MR. DiGIOVANNI:  Objection to form.
6       A.  Well, I think it's pretty obvious from the
7   e-mail, you know, that if I'm no longer consultant to
8   Ricoh, then they would consider -- if Ricoh is not
9   going to serve as my counsel, then, in fact, Howrey
10  would consider paying for these expenses.
11      Q.  Did you interpret Mr. Campbell's response as an
12  invitation to sever your consulting relationship with
13  Ricoh?
14      A.  No, no.  It clearly states in there you should
15  contact Ricoh in certain situations.
16      Q.  Your response on page 26 is something that we
17  looked at earlier in the deposition, but now that we
18  have it in context, why did you think it appropriate
19  for you to tell the Howrey firm that in March of 2003
20  you told Ricoh's counsel that you wouldn't be an expert
21  witness for them during trial?
22      MR. DiGIOVANNI:  Objection to form, and I
23  consider that to be outside the scope of the
24  deposition as ordered by the Court.
25      MR. BROTHERS:  You may answer.

Page 45

1       A.  I was trying at that point to let them know
2   that I didn't feel like I was working for anybody in
3   this, and I can't say anything more because I'm not
4   allowed to talk about the various conversations and
5   what I told Ricoh the previous summer or the previous
6   March when I talked to them.  But seeing that you know
7   what those conversations are and you also know that
8   between March and this particular time, as it states
9   here, there were no conversations, as far as I was
10  concerned, I wasn't employed by anybody, you know, and
11  the fact that there was no termination date on the
12  contract of the previous summer was of no issue to me
13  at all.  I just hadn't been contacted for anything
14  intellectual since the previous summer, and so as far
15  as I was concerned, I wasn't even part of this anymore.
16      Q.  My question is a little bit different.  My
17  question is, why did you think it was appropriate for
18  you to tell the Howrey firm about what you wrote in
19  this e-mail, quote, "I told them I wouldn't be an
20  expert witness for them during trial," end of quote.
21      Why did you think that was appropriate to tell
22  the Howrey firm?
23      MR. DiGIOVANNI:  Same objection, form and
24  beyond the scope of the deposition as ordered by the
25  Court.

12 (Pages 42 to 45)

Deposition of:
Donald E. Thomas, Jr.                                                    August 14, 2003

---

Page 46

1    A.  I felt it was appropriate to say something like
2  this because I was being viewed by them as somebody
3  actively working for the other side, which, in fact,
4  I'm not and I wasn't.
5    Q.  You then wrote, quote, "They" -- and are you
6  there referring to Ricoh's counsel?
7    A.  Yes.
8    Q.  "So they have not offered to serve as my
9  counsel during the deposition," end of quote.
10        There you were assuming that Ricoh's counsel
11  knew about Howrey's request for your deposition,
12  correct?
13    A.  Yes, that's correct.
14    Q.  Neither Mr. Campbell nor anybody else from the
15  Howrey firm in July of 2003 told you that they had not
16  provided the Dickstein firm or any other counsel for
17  Ricoh with a copy of your subpoena until July 23rd,
18  did they?
19        MR. DiGIOVANNI:  Objection to form.
20    A.  No, I did not know that.
21    Q.  The response from Mr. Campbell in which he
22  wrote, "I take it from your e-mail that you do not
23  believe yourself to be in an ongoing consulting
24  relationship with Ricoh," end of quote, is it accurate
25  that as of July 7, 2003, you were still under contract

---

Page 47

1  with counsel for Ricoh?
2        MR. DiGIOVANNI:  Objection, calls for a
3  legal conclusion.
4    A.  As the contract -- or actually, yeah, it's
5  called a contract, which you haven't produced here, did
6  not have an official ending date.  It could have been
7  ten years later and I would still be under that.  Now,
8  it's only four months later, okay, so, legally, yes.
9  But had I been contacted about anything intellectual
10  regarding anything to do with consulting?  Not
11  for, at this point, essentially 11 months.  So, no.
12        Do you understand?  Yes, officially there was
13  no termination date until I sent the letter, and I
14  should have sent that letter in March, which is what I
15  later state, okay?  But de facto, there had been no
16  communication.  As far as I was concerned, it was all
17  over.
18    Q.  As of July 7th, 2003, you still had a valid,
19  binding consulting agreement with counsel for Ricoh,
20  didn't you?
21    A.  Yes.
22        MR. DiGIOVANNI:  Objection to form.
23  Again, we're beyond the scope of the deposition as
24  ordered by the Court.
25  BY MR. BROTHERS:

---

Page 48

1    Q.  Looking at your response on July 8th, was
2  that the first time that you told counsel for Howrey
3  that you were under a consulting contract with counsel
4  for Ricoh and that that contract had never been
5  terminated?
6        MR. DiGIOVANNI:  Objection to form.
7    A.  Well, they knew earlier here that I had been a
8  consultant for Ricoh, okay, because that's in the
9  earlier e-mails.  That it had never been terminated,
10  that's the first time I said that there on July 8th.
11    Q.  Is your July 8th e-mail marked as page 28 of
12  Exhibit 3, is that the first time that you had ever
13  made reference to a consulting contract in your
14  communications with Howrey, a consulting contract
15  between you and counsel for Ricoh?
16    A.  That's the first time I had used the word
17  contract.  However, on July 7th, for instance, I
18  talked about consultation.  And normally, consultation
19  has a contract to go with it, but that's the first time
20  I used the word contract, yes.
21    Q.  Was your e-mail of July 8th intended to
22  inform the Howrey firm that as of July 8th, you still
23  had an active contract with counsel for Ricoh, but you
24  were intending to terminate it?
25    A.  Yes.  That's what that e-mail says.

---

Page 49

1    Q.  Looking now at page 33, is this Mr. Campbell's
2  response to your e-mail that we were just looking at
3  and which is actually reprinted right below it?
4    A.  I think so, yeah.  This is page 33?
5    Q.  Yes.
6    A.  Yes, yes.  That was the response.
7    Q.  You understood Mr. Campbell to be inviting you
8  to send to him an estimate of your costs after you had
9  terminated the agreement with Ricoh?
10    A.  Yes.
11    Q.  Did you ever have an understanding as to why
12  the Howrey firm told you to first terminate your
13  consulting agreement with counsel for Ricoh before
14  sending to Howrey a cost estimate?
15        MR. DiGIOVANNI:  Objection to form.
16    A.  Well, as we had talked about on the previous
17  mail, he felt that if I was -- if Ricoh was
18  representing me, then they should be paying for this,
19  and so since I'm no longer with Ricoh, he'll pay for
20  it.
21    Q.  Were you of the opinion on July 8th that it
22  would be improper for you to consult for both counsel
23  for the defendants represented by the Howrey firm and
24  counsel for Ricoh, the Dickstein firm, at the same
25  time?

---

13 (Pages 46 to 49)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

---

Page 50

1　　　MR. DiGIOVANNI: Objection to form and
2　objection because the question is beyond the court
3　ordered scope of the deposition.
4　　　A. Well, as I stated before, I have problems with
5　consulting for both sides at the same time.
6　　　MR. DiGIOVANNI: You can take a break, if
7　you'd like, at any point. All you have to say is you
8　need to take a break.
9　　　MR. BROTHERS: Let's take a break.
10　　　(Recess.)
11　　　(Thomas Deposition Exhibit 9
12　was marked for identification.)
13　BY MR. BROTHERS:
14　　　Q. Exhibit 9 appears to be another e-mail that was
15　not in the materials that you provided. If you look at
16　page 33 of Exhibit 3, you'll note that the next e-mail
17　in that exhibit is a July 10th e-mail, so Exhibit 9
18　is a July 9th e-mail from you to Lou Campbell.
19　　　I'll just ask you to verify if, in fact, you
20　recognize Exhibit 9 as I've described.
21　　　A. Yes, yes.
22　　　Q. When you wrote to Mr. Campbell that you hadn't
23　heard an acknowledgment back from Ricoh yet, were you
24　referring Mr. Campbell to your intention of terminating
25　your consulting agreement with Ricoh?

---

Page 51

1　　　A. Yes.
2　　　Q. The next page in Exhibit 3, page 41, this
3　e-mail is in a little bit different form, so I want to
4　spend a little bit of time with that.
5　　　Is the bottom portion of Exhibit 41 the
6　text --
7　　　MR. DiGIOVANNI: Page 41?
8　　　MR. BROTHERS: I'm sorry. Page 41.
9　Thank you.
10　BY MR. BROTHERS:
11　　　Q. Is the bottom portion of page 41 of Exhibit 3
12　starting with the words "the agreement with Ricoh" and
13　ending with your signature, is that the content of an
14　e-mail that you sent to Lou Campbell on Thursday,
15　July 10th?
16　　　A. I think that this is one -- there are a couple
17　of cases. I think this is one -- where I didn't have
18　the original of this e-mail as a separate file on my
19　system. I just had it as a response. So let me try to
20　find this here, because I made some notes here myself.
21　(Witness reviews documents.) Maybe I didn't find this.
22　Let me just go back to this, then.
23　　　So your question is, let's see, on page 41 we
24　have the mail from Campbell, and then as part of that
25　mail, there is an original message with a "from Don

---

Page 52

1　Thomas" in it, and within that, there is another one
2　which is from Lou Campbell.
3　　　Q. Right.
4　　　A. And this actually shows three e-mails in a row
5　here.
6　　　Q. And my question to you is, with respect to the
7　text at the bottom starting with "the agreement with
8　Ricoh" and ending with your signature, is that the
9　content of an e-mail that you sent on Thursday,
10　July 10th, 2003, at 6:26 a.m., as noted in the
11　original message text box?
12　　　A. To make sure I'm understanding the e-mail here,
13　it appears that -- I think what you said is true, so
14　this message from me to Louis Campbell on Thursday,
15　July 10th, this full message down here on the bottom
16　includes an inserted quote from a previous e-mail and
17　then begins "The agreement with Ricoh has been
18　terminated." So, yes, that was sent on July 10th,
19　6:26 a.m.
20　　　Q. And then Mr. Campbell responded to that with
21　the e-mail shown at the very top?
22　　　A. Yes, July 10th, 8:03 p.m. Eastern.
23　　　Q. Let's look, then, at the content of your e-mail
24　to Lou Campbell on July 10th at 6:26 a.m.
25　　　Was that the first time that you told counsel

---

Page 53

1　for Howrey that you had terminated -- I'm sorry.
2　Let's try that all over again.
3　　　Was your e-mail of July 10th at 6:26 a.m.
4　the first time that you told the Howrey firm that you
5　had terminated your consulting agreement with Ricoh
6　through the Dickstein firm?
7　　　A. Yes, I believe that to be true. I don't think
8　there are any other e-mails here in the midst.
9　　　Q. Down at the bottom, your last sentence is,
10　quote, "I think I can be of great help to the defense,"
11　end of quote.
12　　　What did you mean by that?
13　　　A. Sometimes you have to justify your obnoxiously
14　high rates. So part of it, I think, is to say, you
15　know, I might charge you a lot of money here per hour,
16　but I think I'm well suited for this type of litigation
17　and for this particular topic, and so I wanted to state
18　that.
19　　　Q. When you wrote that you thought you could be of
20　great help to the defense, did you have in mind at all
21　the fact that you had just terminated your consulting
22　relationship with counsel for the plaintiffs when you
23　wrote that?
24　　　MR. DiGIOVANNI: Objection to form.
25　　　A. No. It's really as written here, here is what

---

14 (Pages 50 to 53)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 54

1  I charge and I think I would be a good person.
2     Q.  When you terminated your consulting
3  relationship with Ricoh and told that to the Howrey
4  firm, you knew that the lawsuit was pending, didn't
5  you?
6     A.  Yes, because that was established in March.
7     Q.  As shown in the next page, Mr. Campbell sent
8  you two e-mails.  The first one on page 41 said, we,
9  referring to the Howrey firm, would be willing to
10  pursue a consulting relationship, and then he quickly
11  sent you another e-mail expressing greater enthusiasm.
12     Do you remember receiving those two e-mails?
13     A.  Yes.
14     Q.  How did you interpret receiving those two
15  e-mails?
16     MR. DiGIOVANNI:  Objection to form.
17     A.  I look at it as a follow-on to the previous
18  e-mails that they would be interested in having me as a
19  consultant, and then in the second one, he felt he
20  wasn't polite or enthusiastic enough and wanted to
21  express a little bit more, that's all.
22     Q.  Were you a little bit flattered that the Howrey
23  firm was enthusiastic or had enthusiasm about their
24  relationship with you?
25     MR. DiGIOVANNI:  Objection to form.

Page 55

1     A.  That's generally true of anybody that I could
2  call up and pay that amount of money about it.  Yes, of
3  course, it is flattering.
4     Q.  Your response, as shown on page 43 of
5  Exhibit 3, you say, quote, "Yes, I'd be interested in
6  pursuing a consulting relationship (with enthusiasm)."
7     Was that a follow-on to his second e-mail?
8     A.  Yes.  Just a slight bit of humor.  In
9  engineering, we do that.
10     (Thomas Deposition Exhibit 10
11     was marked for identification.)
12  BY MR. BROTHERS:
13     Q.  Exhibit 10 is another e-mail from the Howrey
14  firm which didn't make it into your compilation.
15  You'll see on looking at page 43 of Exhibit 3, you have
16  Lou Campbell's e-mail saying, great, let me know when
17  you get back from vacation, and then Exhibit 10 is your
18  vacation information and mailing information.
19     Do you recognize Exhibit 10 as a response --
20     A.  Yes, I did send this.  I can tell you
21  explicitly this one got lost because of being sent from
22  home and having troubles with the server.
23     Q.  While you were on vacation, was that when
24  Mr. Campbell sent you the engagement letter that is
25  contained --

Page 56

1     A.  I think it did arrive while I was on vacation.
2     Q.  Let's look at that --
3     A.  Thursday, the 17th.  Yes, I was on vacation.
4     Q.  Looking at page 44, this is an e-mail from
5  somebody with an e-mail address of hobbsw@howrey.com.
6  I'll note that this is not an e-mail that Howrey
7  produced.  This is just one that we got from you.
8     Did you get this engagement letter through
9  both e-mail and Federal Express?
10     A.  Yes.
11     Q.  When did you read the cover letter and the
12  engagement letter?  Was that after you came back from
13  vacation?
14     A.  Oh, yes.  I don't have any cell phone or any
15  electronic access on this vacation, so, no.  It was
16  after the vacation and the vacation ended sometime on
17  Sunday, which would have been July 20, I guess.
18     Q.  The cover letter dated July 17th, a portion
19  of it says, quote, on the next page -- this is Bates
20  No. 45 of Exhibit 3, the second paragraph -- "Once we
21  have a signed copy of this letter, we will notify Ricoh
22  that you have entered into a consulting agreement with
23  us and put the July 31, 2003 deposition on hold."
24     Do you see that?
25     A.  Yes.

Page 57

1     Q.  Did you understand from that that prior to this
2  time, the Howrey firm had not informed counsel for
3  Ricoh of their communications with you?
4     MR. DiGIOVANNI:  Objection to form.
5     A.  Can you ask that again?
6     Q.  Sure.
7     Did you understand from that sentence in the
8  cover letter that I read in which Mr. Campbell said
9  once you've signed the letter, we'll notify Ricoh that
10  you've entered into a consulting relationship with us
11  and put the deposition on hold, did you understand
12  from that that prior to this time, the Howrey firm had
13  not told counsel for Ricoh about their communications
14  with you?
15     MR. DiGIOVANNI:  Objection to form.
16     A.  No.  No, I did not take that from this.  They
17  could have notified Ricoh of conversations.  This is
18  talking about the actual consulting agreement.  So I
19  don't read that into it.
20     Q.  Before you signed the consulting agreement, did
21  you read it?
22     A.  Yes.
23     Q.  Looking at the consulting agreement which
24  comprises pages 46 through 48 of Exhibit 3, let me
25  direct your attention to the fourth full paragraph on

15 (Pages 54 to 57)

S.E. Manno & Associates, Inc.
888-819-8282

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 58

1  the second page. This is on page 47. It is the
2  paragraph beginning --
3      A. Oh, 47?
4      Q. Yes.
5      A. "The following obligations..."?
6      Q. Yes. If you can review that to yourself and
7  let me know when you're done, please.
8      A. (Witness reviews document.) Okay.
9      Q. How did you understand that paragraph to apply
10  to you?
11      MR. DiGIOVANNI: Objection to form and
12  also objection that the question is beyond the court
13  ordered scope of the deposition.
14      A. I take this to mean that they are going to talk
15  to me about certain topics and that what's in those
16  topics is going to be confidential and I should hold
17  them in strict confidence.
18      Q. Did you understand that the fact that attorneys
19  for the defendants would talk to you about certain
20  topics would, in and of itself, be confidential?
21      MR. DiGIOVANNI: Same objections.
22      A. You mean what they say to me would be
23  confidential?
24      Q. Yes.
25      A. Yes.

Page 59

1      Q. Did you understand that you were not to reveal
2  to anybody else either what the Howrey attorneys told
3  you or what you told the Howrey attorneys?
4      MR. DiGIOVANNI: Same objections.
5      A. Yes.
6      Q. The sixth paragraph on that page starting with
7  "You agree during the time you are acting as our
8  consultant on behalf of Synopsys, Inc., you will not
9  act as consultant for or on behalf of Ricoh or any
10  Ricoh affiliate (more than 25 percent owned or
11  controlled by Ricoh) and will agree not to give expert
12  testimony adverse to Synopsys, Inc.," and then the rest
13  of that.
14      Tell me when you're done reviewing that,
15  please.
16      A. (Witness reviews document.) Uh-huh.
17      Q. Did you ever have an understanding why you
18  could not act as a consultant for or on behalf of Ricoh
19  at the same time you were acting as a consultant on
20  behalf of Synopsys?
21      A. Well, I've said in the past that I understand
22  why I cannot act as both, as a consultant for both.
23      Q. And was that understanding that you had
24  expressed earlier in the deposition the same basis for
25  your agreeing to this condition?

Page 60

1      MR. DiGIOVANNI: Same objections as I had
2  made, form and beyond the scope of the deposition
3  ordered by the Court.
4      A. Despite all of that, I'm not exactly sure what
5  you're asking there.
6      Q. You referenced in your last answer to what you
7  had said earlier about not being able to consult for
8  both Ricoh and Synopsys at the same time.
9      A. Right.
10      Q. And my question to you is, when you signed this
11  consulting agreement with the Howrey firm on behalf of
12  Synopsys, did you understand that the reason why you
13  could not also consult for Ricoh is that it would be a
14  conflict of interest?
15      A. Yes.
16      MR. DiGIOVANNI: Same objections.
17  BY MR. BROTHERS:
18      Q. There is the phrase in that sentence that you,
19  quote, "will agree not to give expert testimony adverse
20  to Synopsys, Inc.," close quote.
21      Do you see that?
22      A. Uh-huh.
23      Q. Did you understand that by signing this
24  agreement, your opinions were now subject to somebody
25  else's approval?

Page 61

1      MR. DiGIOVANNI: Objection to form and
2  beyond the scope.
3      A. If I didn't agree with Synopsys, then I would
4  not want to be a consultant for that side and so I
5  would resign.
6      Q. Had you already formed opinions with respect to
7  Synopsys and your retention by Synopsys as of this
8  time?
9      A. You're asking me to reveal conversations that I
10  had with Ricoh's attorneys.
11      Q. I am not asking you to reveal those
12  communications. I am simply asking you a yes or no
13  question, whether you had -- as of the date that you
14  signed this consulting agreement for Synopsys, whether
15  you had formed opinions prior to July 21st, 2003 with
16  respect to the subject matter? You can answer that yes
17  or no.
18      MR. DiGIOVANNI: Objection to form.
19  Also, objection beyond the scope and the witness can
20  answer that in any way he pleases, not necessarily yes
21  or no.
22      MR. BROTHERS: Maybe I'm wrong. Either
23  you had formed opinions or you hadn't formed opinions.
24  If it's something else, please tell me.
25      A. I have some opinions, yes. They are general

16 (Pages 58 to 61)

Page 62

1  opinions.  They are not detailed opinions.
2      Q.  And those were opinions that you had formed
3  prior to July 21st, 2003 when you signed this
4  agreement, correct?
5          MR. DiGIOVANNI:  Same objection.
6      A.  Yes.  And it's actually a basis for the comment
7  I made in March to counsel.
8      Q.  The last sentence of that sixth paragraph
9  states, quote, "We will not ask you to disclose what
10  information or opinions you supplied to Ricoh's counsel
11  and you should not reveal any Ricoh confidential
12  information that may have been supplied to you," end of
13  quote.
14          Do you see that?
15      A.  Yes.
16      Q.  Prior to your signing this agreement, did you
17  discuss in any way with the Howrey firm whether or not
18  you had received any Ricoh confidential information?
19      A.  No.  There is no reference in those e-mails to
20  any such material.  No, I have not.
21      Q.  And there were no other communications other
22  than e-mails prior to July 21st, 2003 between you and
23  the Howrey firm?
24      A.  That's correct, to the best of my knowledge.
25      Q.  So is it fair to say that prior to your signing

Page 63

1  the retention agreement with the Howrey firm, nobody
2  from the Howrey firm ever asked and you never told them
3  whether or not you had received any Ricoh confidential
4  information?
5      A.  That's right.  They had not asked.
6          MR. DiGIOVANNI:  Objection to form.
7      A.  They had not asked.
8      Q.  And you had not told them?
9      A.  And I had not told them.  I had not offered any
10  information.
11      Q.  The third page of the agreement below your
12  signature, it says, "Seen and agreed to:  Synopsys
13  Corporation."
14          Did you ever talk with anyone from Synopsys?
15      A.  Regarding this, no.
16      Q.  Did you understand that you were being retained
17  as a consultant by the Howrey firm on behalf of
18  Synopsys Corporation?
19      A.  Yes, based on having that there, as well as
20  other references in here.
21      Q.  On the subpoena that Howrey sent you that we
22  marked as Exhibit 8, there is a reference to Ricoh
23  Company versus Aeroflex, Incorporated?
24      A.  Et al.
25      Q.  Et al.  Did you ever have any of the

Page 64

1  understandings as to who Aeroflex, Incorporated, or the
2  rest of the et al. are?
3      A.  No one has ever explained that to me.  If you
4  want to, you can.
5      Q.  Did you assume that Synopsys Corporation was
6  one of the defendants in the lawsuit which had led to
7  your subpoena?
8      A.  Or were tied in.  As far as I know, they are
9  investors in Synopsys.  I don't understand.  I don't
10  know, but there were a number of places where Synopsys
11  has come up as the -- Synopsys, I think, is a phrase in
12  some of this.  It says Synopsys and their customers.
13      Q.  Did you understand that you were being retained
14  by Synopsys' customers, as opposed to just Synopsys?
15      A.  As far as I could tell, it was just Synopsys.
16      Q.  Did you sign the agreement and fax it back to
17  the Howrey firm on July 21st?
18      A.  Yes.  I think I mailed it, but I can't
19  remember.
20      Q.  The next document is page 49 of Exhibit 3,
21  which is an e-mail from you to Lou Campbell dated
22  July 23 in which you reference a phone message from
23  Louis Campbell.
24          Do you remember what that phone message was?
25      A.  It was a request for a meeting, and this is

Page 65

1  responding to, you know, so when can we talk.  He
2  called me to ask for a meeting and said what times are
3  good.
4      Q.  In the second paragraph of your e-mail, you
5  say, "I didn't receive the letter that you mentioned."
6  Would that have been a letter he mentioned in the voice
7  mail?
8      A.  I think that that letter ended up being the
9  letter from Ricoh.
10      Q.  I understand.  My question is, how did you know
11  about a letter if it wasn't in Mr. Campbell's voice
12  mail?
13      A.  It had to have been.  We'll talk about the
14  letter or something.  I don't remember the voice mail,
15  but this e-mail in response was a direct response to
16  that phone message, so I just sat down and answered the
17  phone message.
18      Q.  Was the voice mail that Mr. Campbell left you
19  more than just Dr. Thomas, this is Lou Campbell, please
20  give me a call, goodbye?
21      A.  No.  This e-mail is responding to it.  We want
22  to talk to you, and he had to have brought up this
23  letter.  And so he was asking for a time when we could
24  meet on the telephone to talk about things.
25      Q.  So in the voice mail from Mr. Campbell, he

17 (Pages 62 to 65)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

---

Page 66

1  talked about both wanting you to call him, wanting to
2  have a meeting, and a letter relating to anything in
3  particular?
4      MR. DiGIOVANNI: Objection to form.
5      A. I'm pretty sure that it was just a letter,
6  because I had no idea what the letter -- what he meant
7  by that.
8      Q. You reference to Mr. Campbell forwarding to
9  Mr. Hoffman an e-mail that he had sent to Mr. Oliver.
10      Had you previously discussed with Mr. Campbell
11  any of your communications with Mr. Oliver?
12      A. Wait. I'm lost in all this. So Mr. Hoffman
13  called and said are you -- do you want me to tell you
14  this, what Mr. Hoffman said?
15      Q. I don't.
16      A. Then in response to what Mr. Hoffman said, I
17  forwarded the e-mails that have been taken out that
18  were -- some of them were actually in here, but having
19  to do with, you know, I want to terminate the contract.
20  So that is my response, saying that I had talked to a
21  Mr. Hoffman and I had forwarded the information
22  regarding my terminating the contract to Mr. Oliver. I
23  re-sent all of those e-mails to Mr. Hoffman.
24      Q. Did you forward to Mr. Campbell any of the
25  e-mails that you had had with anybody at the Dickstein

Page 67

1  firm?
2      A. No.
3      Q. Had you previously told Mr. Campbell who
4  Mr. Oliver was?
5      A. I'm not sure if I had or not. If it's in these
6  e-mails that I had mentioned that name, I think that
7  might have been the first time that that name came up.
8  I think that name might actually have been in the
9  letter.
10      Q. The letter that you hadn't seen?
11      A. At this point, yeah.
12      Q. So Mr. Campbell would have described to you the
13  content of that letter?
14      A. No, he didn't.
15      MR. DiGIOVANNI: Objection to form.
16      A. No, he didn't. No. I'm not sure whether I
17  ever mentioned the name Mr. Oliver previous.
18      Q. Do you recall, in fact, getting a letter from
19  Mr. Hoffman?
20      A. Yes.
21      Q. Your next e-mail, page 50, says, "I just
22  received the fax of the letter to me."
23      What letter is that?
24      A. This letter that's being referenced right here.
25  At 8:51 on page 49, I hadn't received the letter. At

Page 68

1  9:30, July 23rd, I received the letter.
2      Q. At the bottom of your first e-mail of
3  8:51 a.m., you write, quote, "Sounds like I may have
4  stirred up a mess."
5      What did you mean by that?
6      A. That's some more of that engineering humor.
7      Q. What kind of mess did you think you may have
8  stirred up?
9      MR. DiGIOVANNI: Objection to the form
10  and objection as beyond the scope of this deposition
11  as ordered by the Court.
12      A. The mess that has led to this hearing, to this
13  deposition.
14      (Thomas Deposition Exhibit 11
15  was marked for identification.)
16  BY MR. BROTHERS:
17      Q. Exhibit 11 is a letter dated July 22nd to you
18  from Mr. Hoffman. Is this the letter that you were
19  referencing in your e-mails of July 23rd marked on
20  pages 49 and 50?
21      A. Yes.
22      Q. Did you talk about this letter at any time with
23  Mr. Campbell?
24      A. No, I don't think I did. Only in the sense
25  that I have received this letter. I'm not even sure I

Page 69

1  even said that to him. Yeah, I did. I just received a
2  fax of the letter.
3      Q. So the e-mail on page 50 of Exhibit 3, when you
4  said "I just received the fax of the letter to me,"
5  that is the letter we've marked as Exhibit 11?
6      A. That's right.
7      Q. Aside from that single e-mail, did you have any
8  other communications with Mr. Campbell or anyone else
9  from the Howrey firm about anything in Exhibit 11?
10      MR. DiGIOVANNI: Objection to form.
11      A. I don't remember talking about this to
12  Mr. Campbell. If I said anything, it's pointing out
13  that, again, there was confidential information that I
14  can't give to him, but I certainly didn't read the
15  letter to him. And even though I don't know all of
16  these names down here, including Mr. DiGIOVANNI here,
17  who I see now is on the list, I assumed that these were
18  people that were in the Howrey firm.
19      Q. Was it apparent to you, since Mr. Campbell had
20  left you a message specifically mentioning a letter,
21  that he was talking about the letter we've marked as
22  Exhibit 11?
23      A. Oh, I assumed that it was this letter, yes,
24  yes.
25      Q. Do you believe that you told Mr. Campbell that

---

18 (Pages 66 to 69)

S.E. Manno & Associates, Inc.
888-819-8282

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 70

1  there was confidential information that you had
2  received from counsel for Ricoh that you could not
3  disclose to him?
4       MR. DiGIOVANNI: Objection to form.
5       A. Actually, he asked that question later of me,
6  and that's in the e-mails.
7       Q. And what did you tell him?
8       A. I told him that -- that's the e-mail on page
9  52.
10      MR. DiGIOVANNI: What page is that?
11      THE WITNESS: 52.
12 BY MR. BROTHERS:
13      Q. Let me narrow the question, because that e-mail
14 is dated on the 24th and you had previously told me
15 that you had a phone conversation with Mr. Campbell on
16 the 23rd.
17      A. Right, 23rd, that's right.
18      Q. So did you tell Mr. Campbell during that phone
19 conversation on the 23rd that you had received
20 confidential information from Ricoh and that you
21 couldn't disclose it to him?
22      MR. DiGIOVANNI: Objection to form.
23      A. He asked if I had received confidential
24 information, and I said the information that I received
25 was under these categories of patents, published

Page 71

1  articles, whether conferences, journals, or theses, and
2  one that appears to be a rough draft of corporate
3  literature. I said those are the things that I
4  received. I didn't tell him what the titles were, what
5  the content was. I just told him that those were the
6  things that I received, which I think are, you know,
7  typically -- typical of anybody doing patent analysis,
8  which is what I was hired to do, what I received. It's
9  a question of whether these are -- these things are, in
10 fact, as far as I know, published, published documents
11 publicly available probably under IEEE, Institute of
12 Electrical and Electronic Engineers, or ACM,
13 Association of Computing Machinery, or under the
14 Carnegie Mellon report series, which is published and
15 available to anybody for basic cost.
16      Q. Tell me about the telephone conversation that
17 you had on July 23rd. Who participated in that
18 conversation?
19      A. I think it was just Mr. Campbell and me.
20      Q. Did you understand that any other Howrey
21 attorneys were listening in but not talking?
22      A. I don't remember that. I don't remember that
23 being stated. It's possible that he might have stated
24 that, but I don't remember talking with anybody else.
25      Q. Do you remember that Mr. Campbell was on a

Page 72

1  speaker phone?
2       A. No, I don't. Some people use speaker phones
3  whether or not there is someone else in the office.
4       Q. How long did that telephone conversation on
5  July 23rd last?
6       A. I don't think it went for -- I think on the
7  order of five minutes. I didn't time it.
8       Q. This was the first time you had actually spoken
9  in a telephone conversation with anyone from Howrey?
10      A. I think so, yes.
11      Q. Tell me, as best you can, what was said during
12 that conversation, what you said to Mr. Campbell and
13 what he said to you.
14      A. Well, we talked about this letter, and he was
15 concerned about what I had received that was
16 confidential, and he wanted to understand what of
17 confidentiality I had received, and so he had asked me
18 for an explanation of that, I assume so that he could
19 understand what response they might have to the letter
20 here that's in question. And, actually, after the
21 phone conversation, he e-mailed a clarification that he
22 only wanted to know the specific categories, as opposed
23 to anything in detail.
24      And I do remember in that e-mail -- or, sorry,
25 in that phone conversation -- saying, well, I'll have

Page 73

1  to go back and look to see exactly what they sent me.
2  And, actually, as far as I can tell, everything that
3  was sent was sent in a PDF file electronically, and so
4  I looked at all the titles to those and remembered for
5  myself what was there and made up this list for him.
6  And so that's why it was actually sent probably the
7  next day, if I remember right. Yeah, the next day.
8       Q. So the conversation you had with Mr. Campbell
9  took place prior to your receipt of the e-mail on page
10 51 of Exhibit 3; is that right?
11      A. Yes.
12      Q. And Mr. Campbell sent you that e-mail as a
13 clarification of the telephone conversation that you
14 had?
15      MR. DiGIOVANNI: Objection, form,
16 foundation.
17      A. Yes.
18      Q. And you responded to that e-mail the next day?
19      A. Right.
20      Q. As shown on page 52?
21      A. I wanted to do some due diligence to look at
22 what's there, so, yes.
23      Q. Going back to the telephone conversation on
24 July 23rd, was that the first time that anybody from
25 the Howrey firm asked you about whether you had

19 (Pages 70 to 73)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

Page 74

1 received any confidential information and to
2 characterize your communications with counsel for
3 Ricoh?
4      MR. DiGIOVANNI: Objection to foundation,
5 form, misrepresentation.
6      A. This was the only time -- this was the first
7 time that I had been asked for a characterization of
8 what was confidential.
9      Q. Did you try to be sensitive during the
10 telephone conversation with Mr. Campbell on July 23rd
11 to not reveal to him any confidential information you
12 may have received from counsel for Ricoh?
13      A. That's correct, and it's why I essentially
14 deferred to say I'll answer you later so that I can
15 look this up and be sure of what I'm saying.
16      Q. Did you, during that telephone conversation,
17 believe that you had, in fact, received confidential
18 information from Ricoh and declined to share that with
19 Mr. Campbell?
20      A. I didn't share any information with him about
21 confidential material.
22      Q. My question is a little bit different. During
23 that telephone conversation with Mr. Campbell on
24 July 23rd, were you mentally aware that you should
25 not share with Mr. Campbell any confidential

Page 75

1 information that you obtained as a result of your prior
2 consulting relationship with Ricoh?
3      A. Yes, yes.
4      MR. DiGIOVANNI: I'm going to object.
5 It's beyond the scope of this deposition as ordered by
6 the Court.
7 BY MR. BROTHERS:
8      Q. In your opinion, during your consulting
9 relationship for Ricoh, did you obtain confidential
10 information from Ricoh? I just want you to tell me yes
11 or no, if you can.
12      MR. DiGIOVANNI: Objection to form,
13 foundation, and beyond the scope of the deposition.
14      A. I don't particularly look at patents or
15 published articles as being confidential, because
16 everybody, in fact, can look at them. Now, the fact
17 that they brought them to my attention is confidential,
18 and so I did not talk about any of the details or, as
19 I've showed here, not even what the titles are or
20 anything like that. It's really just the general
21 category of what was given. So there was no corporate
22 literature, you know, in support of Patent 432, you
23 know, earlier writings of the man or anything like that
24 that actually wrote that. Nothing like that was given
25 to me. Everything I received was public.

Page 76

1      Q. Did Mr. Campbell ever ask you to describe to
2 him any of the conversations that you had with Ricoh's
3 counsel?
4      A. No.
5      Q. Do you believe that the conversations that you
6 had with Ricoh's counsel are confidential information?
7      A. The conversations I had with Ricoh's counsel?
8 Oh, yes.
9      Q. Did you tell Mr. Campbell that you believed
10 that the conversations that you had with Ricoh's
11 counsel were confidential information?
12      A. I did not say that to him.
13      Q. And he did not ask?
14      A. He did not ask and it wasn't part of the
15 conversation. He was quite careful.
16      Q. Is there any doubt in your mind, Dr. Thomas,
17 that as a result of your consulting relationship with
18 Ricoh, you received confidential information from
19 Ricoh's counsel?
20      MR. DiGIOVANNI: Objection to form,
21 foundation, beyond the scope.
22      A. I feel that the fact that they were bringing
23 these articles to my attention was confidential.
24      Q. And the fact and content of your conversations
25 with Ricoh's counsel, were those also confidential

Page 77

1 information?
2      MR. DiGIOVANNI: Objection to form.
3      A. Yes.
4      Q. Did you discuss with Mr. Campbell the fact that
5 Ricoh has asserted that you had a conflict of interest
6 that would preclude you from consulting with the Howrey
7 firm?
8      A. We discussed that briefly in conjunction with
9 this letter. I'm talking about the letter of July 22,
10 Exhibit 11.
11      Q. Directing your attention to page 55 of
12 Exhibit 3, it's an e-mail from Mr. Campbell dated
13 July 28th, and I'll ask you to review that to
14 yourself and let me know when you're done.
15      A. Page 55?
16      Q. Yes.
17      A. (Witness reviews document.) Okay.
18      Q. Had you discussed with the Howrey firm the fact
19 that you might not be able to continue consulting with
20 them?
21      MR. DiGIOVANNI: Objection to form.
22      A. No, but I think that that was understood from
23 some of these other e-mails that there may be a finding
24 that I cannot consult. That's what's stated in here,
25 you know, if I cannot continue consulting for Howrey,

20 (Pages 74 to 77)

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

---

Page 78

1　why, then, they will re-issue the subpoena for the
2　information -- or not the information, but for the
3　deposition.
4　Q.　Now, the last sentence of Mr. Campbell's
5　July 28th, 2003 e-mail to you says, in essence, if
6　the court rules you -- the last two sentences.  Quote,
7　"If the Court rules that you cannot consult with
8　defendants, we will reschedule the deposition for a
9　date of mutual convenience.  At that deposition, we
10　will seek testimony regarding the character of prior
11　art logic synthesis systems and their relevance to the
12　validity of Ricoh's patents," end of quote.
13　　　Do you see that?
14　A.　Yes.
15　Q.　Is the subject matter of that deposition the
16　same thing that you had already told Mr. Campbell was
17　the subject matter of your consulting for Ricoh?
18　　　MR. DiGIOVANNI:  Objection to form.
19　A.　I certainly didn't use those words logic
20　synthesis, I wouldn't think.
21　Q.　Do you understand that the subject matter of
22　your proposed deposition as described by Mr. Campbell
23　covered the same topics that you had previously told
24　him was the subject matter of your consulting for
25　Ricoh?

---

Page 79

1　　　MR. DiGIOVANNI:  Objection to form.
2　A.　Yes.  I know this is the same topic area.
3　　　MR. BROTHERS:  I have no further
4　questions.
5　　　(Recess.)
6　　　　EXAMINATION
7　BY MR. DiGIOVANNI:
8　Q.　I do have a clarification, in fact, to that
9　very last question, follow-up to that last question.
10　I'm not sure I understood the answer to that.
11　A.　So we're on the record, then?
12　Q.　We're on the record.  When you gave your last
13　answer in this deposition, were you stating that you
14　told Mr. Campbell at some point that the subject of
15　your consultation with Ricoh pertained to the character
16　of prior art logic synthesis systems and their
17　relevance to the validity of Ricoh's patents?
18　A.　I don't think I ever used that phrase with him,
19　prior art logic synthesis systems.  I never said that
20　to him, okay?  What I had said to him was in the
21　e-mails of March, the March time frame.
22　　　MR. DiGIOVANNI:  Thank you.  That's all I
23　have.
24　　　　EXAMINATION
25　BY MR. BROTHERS:

---

Page 80

1　Q.　Had you completed your answer, Dr. Thomas?
2　A.　Essentially, yes.
3　Q.　When you reviewed the July 28th e-mail and
4　read that last sentence, did you conclude that the
5　proposed subject matter of your deposition was
6　essentially the same thing that you had previously been
7　doing for Ricoh, as you had told Mr. Campbell back in
8　March and April?
9　　　MR. DiGIOVANNI:  Objection to form.
10　A.　That's right.  I think that what's going on
11　here is that I never said exactly what I had dealt with
12　with Ricoh about and he never said what the exact issue
13　in the trial was, but it's clear that I had talked to
14　Ricoh about that topic before and that I was
15　knowledgeable in that field, and so there is this body
16　of knowledge here that he happens to be characterizing
17　that way that he's referring to, but I never used that
18　specific phrase with him.
19　Q.　And was it your interpretation of the last
20　sentence of the July 28th e-mail from Mr. Campbell
21　that even if you were not permitted to consult with the
22　Howrey firm that they would still take your deposition
23　and that deposition would be on the subject matter that
24　you had previously provided consulting work to counsel
25　for Ricoh?

---

Page 81

1　A.　Or at least in that field, yes, of knowledge.
2　Q.　If not the exact same thing; is that right?
3　　　MR. DiGIOVANNI:  Objection to form.
4　A.　It's hard to say that it would be the exact
5　same thing.  These are very difficult issues.
6　Q.　But certainly the same subject matter?
7　A.　Same subject.  I helped invent the subject.
8　　　MR. BROTHERS:  No further questions on
9　cross.
10　　　MR. DiGIOVANNI:  I have none.
11　　　MR. BROTHERS:  For stipulations, we are
12　happy to agree that the witness can read and sign
13　before any notary, not necessarily the original court
14　reporter.  Other than that, follow the Federal Rules.
15　Fair enough.
16　　　MR. DiGIOVANNI:  I agree with that.
17　　　MR. BROTHERS:  Dr. Thomas, you'll be
18　given an opportunity to review and make any
19　corrections to the transcript 30 days after you
20　receive it.  The court reporter -- let's go off the
21　record.
22　　　(Discussion off the record.)
23　　　MR. BROTHERS:  We have agreed that the
24　court reporter will send the official transcript
25　directly to the witness and the witness will have 30

---

21 (Pages 78 to 81)

S.E. Manno & Associates, Inc.
888-819-8282

Deposition of:
Donald E. Thomas, Jr.

August 14, 2003

---

Page 82

1  days to read and sign, and, Dr. Thomas, you would then
2  send it back to the court reporter and she will take
3  care of getting it to the attorneys.
4       Fair enough?
5       THE WITNESS:  Yes.
6       MR. BROTHERS:  I don't have any more.
7       THE WITNESS:  I have to have a notary?
8       MR. BROTHERS:  Typically, for
9  verification, it's a notarized page, although some may
10 be a declaration, but we have agreed you can read and
11 sign before any notary, not this specific court
12 reporter, and the court reporter will give you a
13 letter explaining all this.
14      (Witness excused.)
15      (Signature not waived.)
16      (Deposition concluded at 11:25
17 o'clock a.m.)
18          - - -
19
20
21
22
23
24
25

---

Page 84

1
2
3
4
5
6       I, DONALD E. THOMAS, JR., having read the
7  foregoing deposition, certify that all corrections to
8  the deposition that I desire to make, together with my
9  reasons for such corrections, appear on the preceding
10 page, and I further certify that the foregoing
11 deposition is a true record of my testimony.
12
13                                      .
14 _____
15 DONALD E. THOMAS, JR.
16
17
18 _____
19 DATE
20
21
22
23
24
25          lab

---

Page 83

1       DEPOSITION OF DONALD E. THOMAS, JR.
2            CHANGES AND/OR CORRECTIONS
3
4  PAGE   LINE   NOW READS: _____
5  _____
6  SHOULD READ: _____
7  _____
8  REASON FOR CHANGE: _____
9  PAGE   LINE   NOW READS: _____
10 _____
11 SHOULD READ: _____
12 _____
13 REASON FOR CHANGE: _____
14 PAGE   LINE   NOW READS: _____
15 _____
16 SHOULD READ: _____
17 _____
18 REASON FOR CHANGE: _____
19 PAGE   LINE   NOW READS: _____
20 _____
21 SHOULD READ: _____
22 _____
23 REASON FOR CHANGE: _____
24
25

---

Page 85

1
2
3       C E R T I F I C A T I O N
4
5       I hereby certify pursuant to F.R.C.P. No.
6  30(f)(1), that the witness, DONALD E. THOMAS, JR., was
7  duly sworn by me and that the foregoing deposition is a
8  true record of the testimony of the witness.
9       The foregoing certification does not apply to
10 any reproduction of this transcript in any respect
11 unless under the direct control and/or direction of the
12 certifying reporter.
13
14                                      .
15
16 _____
17 Lisa Ann Bauer
18 Notary Public
19
20
21 My Commission expires April 13, 2007.
22
23
24
25

---

22 (Pages 82 to 85)

**5**

From: Don Thomas <thomas@ece.cmu.edu>
Date: Tue Apr 1, 2003 8:29:56 AM US/Eastern
To: CampbellL@howrey.com
Subject: Re: VLSI Design Automation Assistant

I'll be back in touch with you about this, but probably sometime tomorrow (Wed). I am interested but am quite busy today.
-Don Thomas-


On Monday, March 31, 2003, at 04:52 PM, CampbellL@howrey.com wrote:

Dear Mr. Thomas:

I am writing in connection with your work on the VLSI Design Automation
Assistant and more generally with regard to your early work in the field of
logic synthesis.

I am serving as counsel to Synopsys and several of its customers in
connection, who have been charged with infringing a patent relating to
specific logic synthesis techniques. Part of our work is to determine the
state of the art of logic synthesis in the mid to late 1980s. It appears
that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with us.
In addition we are looking for consultants with expertise in the logic
synthesis area in order to assist us in gathering relevant technical
information in connection with our case. Please let me know if you do
consulting work or know of other persons in this area who serve as
consultants. Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law. If you are not the intended recipient, you are hereby
notified that any unauthorized use, dissemination, distribution or copying
of this communication is strictly prohibited. If you are not the intended
recipient, please delete the document without opening any attachments,
destroy any hard copies you may have printed and immediately notify Howrey
Simon Arnold & White that you received this e-mail in error.

PTH000007

**6**

From: CampbellL@howrey.com
Date: Thu Apr 3, 2003 7:38:32 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: VLSI Design Automation Assistant

Hello,

Well, it would seem you have been very busy. But, that's alright, I have
also been far too busy to focus on this.

I've talked with the other lawyers on this case, and we'd like to set up a
teleconference with you on Wednesday (the first day we are all free). Are
you available any time after 9 a.m. PT (noon ET) on Wednesday?


———Original Message———
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, April 01, 2003 5:30 AM
To: CampbellL@howrey.com
Subject: Re: VLSI Design Automation Assistant


I'll be back in touch with you about this, but probably sometime
tomorrow (Wed). I am interested but am quite busy today.
~Don Thomas~


On Monday, March 31, 2003, at 04:52 PM, CampbellL@howrey.com wrote:

Dear Mr. Thomas:

I am writing in connection with your work on the VLSI Design Automation
Assistant and more generally with regard to your early work in the
field of
logic synthesis.

I am serving as counsel to Synopsys and several of its customers in
connection, who have been charged with infringing a patent relating to
specific logic synthesis techniques. Part of our work is to determine
the
state of the art of logic synthesis in the mid to late 1980s. It
appears
that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with
us.
In addition we are looking for consultants with expertise in the logic
synthesis area in order to assist us in gathering relevant technical
information in connection with our case. Please let me know if you do
consulting work or know of other persons in this area who serve as
consultants. Please contact me by reply e-mail or at (650) 463-8135.

Thank you for your assistance.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com


This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law. If you are not the intended recipient, you are
hereby
notified that any unauthorized use, dissemination, distribution or
copying
of this communication is strictly prohibited. If you are not the

PTH000009

**7**

**From: Don Thomas <thomas@ece.cmu.edu>**
**Date: Fri Apr 4, 2003 9:00:16 AM US/Eastern**
**To: CampbellL@howrey.com**
**Subject: Re: VLSI Design Automation Assistant**

Sorry for not getting back to you. I was busy but was also waiting for another contact.

I have done some consulting on the topic before for the firm of Dickstein Shapiro Morin & Oshinsky LLP. This was mainly as an expert to help them read through and understand various papers of the time (approx 1984).

This activity was mostly last summer and I hadn't heard from them since early Fall. But, when I received your email, I thought I should look into whether this was tied in.

It appears that it is and I'm not sure how/if to proceed. If we can proceed, I can make some time available on Wed 4/9. Some time between noon and 2 (ET) could be worked out.

I'm going to try to figure out what to do here. Any thoughts/comments appreciated.
-Don Thomas-

On Thursday, April 3, 2003, at 07:38 PM, CampbellL@howrey.com wrote:

Hello,

Well, it would seem you have been very busy. But, that's alright, I have also been far too busy to focus on this.

I've talked with the other lawyers on this case, and we'd like to set up a teleconference with you on Wednesday (the first day we are all free). Are you available any time after 9 a.m. PT (noon ET) on Wednesday?

-----Original Message-----
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, April 01, 2003 5:30 AM
To: CampbellL@howrey.com
Subject: Re: VLSI Design Automation Assistant

I'll be back in touch with you about this, but probably sometime tomorrow (Wed). I am interested but am quite busy today.
-Don Thomas-

On Monday, March 31, 2003, at 04:52 PM, CampbellL@howrey.com wrote:

Dear Mr. Thomas:

I am writing in connection with your work on the VLSI Design Automation Assistant and more generally with regard to your early work in the field of
logic synthesis.

I am serving as counsel to Synopsys and several of its customers in connection, who have been charged with infringing a patent relating to specific logic synthesis techniques. Part of our work is to determine the
state of the art of logic synthesis in the mid to late 1980s. It appears
that your work may be particularly relevant to our investigation.

I would be grateful if you would be willing to discuss your work with us.
In addition we are looking for consultants with expertise in the logic synthesis area in order to assist us in gathering relevant technical information in connection with our case. Please let me know if you do consulting work or know of other persons in this area who serve as

PTH000011

**8**

From: CampbellL@howrey.com
Date: Tue Apr 8, 2003 12:57:22 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: VLSI Design Automation Assistant

Thank you for your interest in this matter, but, Dickstein Shapiro Morin &
Oshinsky LLP is indeed the counsel for the opposing side in this matter.
This means that there is most likely a conflict if we would talk to you in
detail about the matter.  So, unfortunately, it appears that we cannot go
forward.  But, I thank you very much for your interest and if things change
or we happen to run into this technology in an unrelated matter, I will get
back in touch with you.  However, one thing you can do for us, is to let us
know about anyone else who is knowledgeable in this technology or its
development, whether or not they were contemporaneously involved with its
development.

Sincerely,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use, dissemination,
distribution or copying of this communication is strictly prohibited.  If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed and
immediately notify Howrey Simon Arnold & White that you received this e-mail
in error.

PTH000017

**9**

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

_____ WESTERN ____ DISTRICT OF PENNSYLVANIA _____

RICOH COMPANY, LTD.

                                           SUBPOENA IN A CIVIL CASE

                    v.

AEROFLEX INCORPORATED, et al.              Case Number: [1]  03-103-GMS


TO:  Donald Thomas, Ph.D.
     Carnegie Mellon, ECE Department
     Pittsburgh, PA  15213

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to
     testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
     the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| AKF Court Reporting and Videotech Services, Inc., 436 Boulevard Of The Allies, Pittsburgh, PA  15219 | July 31, 2003 9:00 a.m. |

☒    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
     place, date, and time specified below (list documents or objects):
SEE ATTACHMENT A

| PLACE | DATE AND TIME |
|---|---|
| HOWREY SIMON ARNOLD & WHITE, LLP 301 Ravenswood Avenue Menlo Park, CA  94025 | July 11, 2003 5:00 p.m. |

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* LOUIS CAMPBELL, ESQ.: ATTORNEY FOR DEFENDANT | JUNE 25, 2003 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER
HOWREY SIMON ARNOLD & WHITE, LLP                       (650) 463-8100
301 Ravenswood Avenue, Menlo Park, CA  94025

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

AO 88 (Rev. 11/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
|      |       |

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
|                        |                   |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
|                        |       |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE                              SIGNATURE OF SERVER

                                                          ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to

the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A

## DEFINITIONS

1.  The term "DAA" means the VLSI Design Automation Assistant system described, in part, in the article, "The VLSI Design Automation Assistant: An IBM System / 370 Design," found in the February 1984 edition of IEEE Design & Test of Computers from pages 60-69 (attached to this subpoena as exhibit A).

2.  The term "SAW" means the System Architect's Workbench system described, in part, in the article, "The System Architect's Workbench," found in the Proceedings of the 25th Design Automation Conference from page 337-343 (attached to this subpoena as exhibit B).

3.  The term "document" means any writing or other tangible thing from which data or information can be obtained (translated if necessary through detection devices into reasonably usable form), and which is known to you, or in your custody, possession, or control, whether printed, recorded, reproduced by any process, or written or produced by hand, whether or not claimed to be privileged or exempt from production for any reason. Set forth below is a list of examples of writings and tangible things which are included within this definition. The list is not an exclusive definition of the writings and tangible things included within this definition, but is intended to aid you in answering the document requests that follow. Examples of writings and tangible things included within this definition of document are as follows:

> Documents: letters, tape recordings, reports, agreements,
> communications including intercompany communications,
> correspondence, telegrams, memoranda, summaries, forecasts,
> photographs, models, statistical statements, graphs, laboratory and
> engineering reports and notebooks, charts, plans drawings, minutes
> or records of meetings including directors' meetings minutes or
> records of conferences, expressions or statements of policy, lists of
> persons attending meetings or conferences, customer lists, reports
> and/or summaries of interviews, reports and/or summaries of
> investigations, opinions or reports of consultants, appraisals,
> records, reports or summaries of negotiations, brochures,

- 3 -

pamphlets, advertisements, circulars, trade letters, press releases, drafts of any documents, revisions of drafts of any documents, canceled checks, bank statements, invoices, receipts and originals of promissory notes, surveys, computer printouts, computer disks and storage.

In addition to the items on the foregoing list, any comment or notation appearing on any of the documents described above, and not a part of the original text, is considered a separate document and any draft or preliminary form of any document is also considered a separate document.

4. The term "documents relating to" means documents discussing, containing, showing, evidencing or referring to in any way, either directly or indirectly, and is meant to include among other documents, documents underlying, supporting now or previously attached or appended to, or used in the preparation of any documents called for by each request.

5. The words "communication" or "communications" are used in the broadest possible sense and mean, without limitation, any transmittal and receipt of information, whether such was by chance, prearranged, formal or informal, and specifically include conversations in person, conversations by telephone, telegrams, letters or memoranda, formal statements, press releases and newspaper articles.

6. The terms "party" or "person" shall mean any natural person, sole proprietorship, partnership, limited partnership, corporation, joint venture, trust, association, or other entity as well as all current and former officers, directors, agents, salespeople, representatives, employees, attorneys, and others acting or purporting to act on behalf of such party or person.

7. The word "identify" when used with respect to a person shall mean to state for each person: name, last known business and residence address and telephone numbers; job title(s) and dates of association with the designated company; last known employer; and, where appropriate to the extent of the interrogatory, the basis for such person's knowledge and the years for which such person is believed to have knowledge.

- 4 -

8.  The terms "relate," "relating," or "relating to" include referring to, alluding to, or responding to, concerning, connected with, commenting on, regarding, discussing, showing, describing, reflecting, analyzing, constituting, including, mentioning, in respect of, about, or in any way logically or factually connected with the matter described in the Interrogatory.

9.  The terms "and" and "or" shall be given such meaning as to bring the greatest scope to the request in question and shall not be given a meaning that would exclude information from a Interrogatory.

## INSTRUCTIONS

1.  Any recipient of this set of Requests who withholds any documents covered by this set of Requests by reason of a claim of privilege, or who objects to any part of any request for production, shall furnish to Synopsys a list identifying each such document for which the privilege is claimed or to which the objection relates, together with the following information:

(a) The reason(s) for each objection or claim of privilege;

(b) The identity of each person having knowledge of the actual basis, if any, on which the privilege or other ground for objection is based;

(c) The exact name and title of the document;

(d) The date of, and all serial or identification numbers appearing on the document;

(e) The identity of each person wrote, signed, initiated, dictated, or otherwise participated in the creation of the document;

(f) The general subject matter of the document;

(g) The identity of each person who was an addressee of and/or who received the document or a copy thereof;

(h) The identity of each person having custody or control of the document or a copy thereof;

(i) The specific location of any file or files where the document, or any copy thereof, is normally or presently kept, and the identity of the custodian thereof;

(j)  The paragraph of this Request to which the document relates; and

(k)  In the case of any withheld document relates in any way to a meeting or to any other conversation, all participants in the meeting or conversation are to be identified.

2.  In the event that any document called for by this set of Requests is known to have been destroyed (either as a result of a document destruction policy or otherwise), those documents or class of documents are to be identified as follows: addressor, addressee, indicated or blind copies, date, subject matter, number of pages, attachments or appendices, all person to whom distributed, shown, or explained, date of destruction, persons authorizing destruction, and persons destroying the document.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Documents related to the conception, design and development of the DAA system, including articles, presentations, manuals, design notes, patents and copies of the source code for the DAA system.

### REQUEST FOR PRODUCTION NO. 2:

Research notes, notebooks, or other documents containing the work records of persons involved in the development of the DAA system, including Donald Thomas and his collaborators.

### REQUEST FOR PRODUCTION NO. 3:

Documents referring to or describing the incorporation of the algorithms or technology of the DAA system, in whole or in part, in any other design synthesis system or other piece of software.

### REQUEST FOR PRODUCTION NO. 4:

Documents, if any, describing or referring to the use of the DAA software in the design of electrical systems or devices (whether those systems or devices were fabricated or not) including documents sufficient to establish the first dates of use of the DAA software.

## REQUEST FOR PRODUCTION NO. 5:

Documents related to the conception, design and development of the SAW system, including articles, presentations, manuals, design notes, patents and copies of the source code for the SAW system.

## REQUEST FOR PRODUCTION NO. 6:

Research notes, notebooks, or other documents containing the work records of persons involved in the development of the SAW system, including Donald Thomas and his collaborators.

## REQUEST FOR PRODUCTION NO. 7:

Documents referring to or describing the incorporation of the algorithms or technology of the SAW system, in whole or in part, in any other design synthesis system or other piece of software.

## REQUEST FOR PRODUCTION NO. 8:

Documents, if any, describing or referring to the use of the SAW software in design of electrical devices or systems (whether those devices or systems were fabricated or not) including documents sufficient to establish the first dates of use of the SAW software.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,                               )       Civil Action No. 03-103-GMS
                                                   )
              Plaintiff,                           )
                                                   )
       v.                                          )
                                                   )
AEROFLEX INCORPORATED, AMI                         )
SEMICONDUCTOR, INC., MATROX                        )
ELECTRONIC SYSTEMS, LTD., MATROX                   )
GRAPHICS INC., MATROX                              )
INTERNATIONAL CORP. and MATROX                     )
TECH, INC.,                                        )
                                                   )
              Defendants.                          )
                                                   )

### NOTICE OF SUBPOENA FOR DOCUMENTS AND NOTICE OF DEPOSITION OF DONALD THOMAS, Ph.D. PURSUANT TO FED. R. CIV. P. 45

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

YOU ARE HEREBY NOTIFIED that, pursuant to Federal Rules of Civil Procedure 45, defendants AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS, LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP. and MATROX TECH, INC. ("Defendants") have served Donald Thomas, Ph.D. the attached subpoena for production of documents and deposition testimony.

Donald Thomas, Ph.D. is required to produce the documents in his custody, possession, or control specified in Attachment A by 5:00 p.m. on Friday, July 11, 2003, at the offices of Howrey Simon Arnold & White, 301 Ravenswood Ave, Menlo Park CA 94025.

Defendants, by and through their attorneys, will take the deposition upon oral examination of Donald Thomas, Ph.D. The deposition will commence on Thursday, July 31, 2003 at 9:00 a.m. at the offices of AKF Court Reporting and Videotech Services, Inc. located at

436 Boulevard Of The Allies, Pittsburgh, PA 15219 and will continue from day to day until completed.

The oral examination may be videotaped and transcribed stenographically, and will take place before an officer who is duly authorized to administer oaths. Defendants reserve the right to use the videotape testimony at trial.

Dated: June 25, 2003            Respectfully submitted,

HOWREY SIMON ARNOLD & WHITE, LLP


By: _Louis Campbell_____

Louis Campbell
Attorneys for Defendants
AEROFLEX INCORPORATED, AMI
SEMICONDUCTOR, INC., MATROX
ELECTRONIC SYSTEMS, LTD., MATROX
GRAPHICS INC., MATROX
INTERNATIONAL CORP. and MATROX
TECH, INC.

- 2 -

> pamphlets, advertisements, circulars, trade letters, press releases,
> drafts of any documents, revisions of drafts of any documents,
> canceled checks, bank statements, invoices, receipts and originals
> of promissory notes, surveys, computer printouts, computer disks
> and storage.

In addition to the items on the foregoing list, any comment or notation appearing on any of the documents described above, and not a part of the original text, is considered a separate document and any draft or preliminary form of any document is also considered a separate document.

4. The term "documents relating to" means documents discussing, containing, showing, evidencing or referring to in any way, either directly or indirectly, and is meant to include among other documents, documents underlying, supporting now or previously attached or appended to, or used in the preparation of any documents called for by each request.

5. The words "communication" or "communications" are used in the broadest possible sense and mean, without limitation, any transmittal and receipt of information, whether such was by chance, prearranged, formal or informal, and specifically include conversations in person, conversations by telephone, telegrams, letters or memoranda, formal statements, press releases and newspaper articles.

6. The terms "party" or "person" shall mean any natural person, sole proprietorship, partnership, limited partnership, corporation, joint venture, trust, association, or other entity as well as all current and former officers, directors, agents, salespeople, representatives, employees, attorneys, and others acting or purporting to act on behalf of such party or person.

7. The word "identify" when used with respect to a person shall mean to state for each person: name, last known business and residence address and telephone numbers; job title(s) and dates of association with the designated company; last known employer; and, where appropriate to the extent of the interrogatory, the basis for such person's knowledge and the years for which such person is believed to have knowledge.

- 4 -

8.  The terms "relate," "relating," or "relating to" include referring to, alluding to, or responding to, concerning, connected with, commenting on, regarding, discussing, showing, describing, reflecting, analyzing, constituting, including, mentioning, in respect of, about, or in any way logically or factually connected with the matter described in the Interrogatory.

9.  The terms "and" and "or" shall be given such meaning as to bring the greatest scope to the request in question and shall not be given a meaning that would exclude information from a Interrogatory.

## INSTRUCTIONS

1.  Any recipient of this set of Requests who withholds any documents covered by this set of Requests by reason of a claim of privilege, or who objects to any part of any request for production, shall furnish to Synopsys a list identifying each such document for which the privilege is claimed or to which the objection relates, together with the following information:

(a) The reason(s) for each objection or claim of privilege;

(b) The identity of each person having knowledge of the actual basis, if any, on which the privilege or other ground for objection is based;

(c) The exact name and title of the document;

(d) The date of, and all serial or identification numbers appearing on the document;

(e) The identity of each person wrote, signed, initiated, dictated, or otherwise participated in the creation of the document;

(f) The general subject matter of the document;

(g) The identity of each person who was an addressee of and/or who received the document or a copy thereof;

(h) The identity of each person having custody or control of the document or a copy thereof;

(i) The specific location of any file or files where the document, or any copy thereof, is normally or presently kept, and the identity of the custodian thereof;

- 5 -

(j)  The paragraph of this Request to which the document relates; and

(k)  In the case of any withheld document relates in any way to a meeting or to any other conversation, all participants in the meeting or conversation are to be identified.

2.  In the event that any document called for by this set of Requests is known to have been destroyed (either as a result of a document destruction policy or otherwise), those documents or class of documents are to be identified as follows: addressor, addressee, indicated or blind copies, date, subject matter, number of pages, attachments or appendices, all person to whom distributed, shown, or explained, date of destruction, persons authorizing destruction, and persons destroying the document.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Documents related to the conception, design and development of the DAA system, including articles, presentations, manuals, design notes, patents and copies of the source code for the DAA system.

### REQUEST FOR PRODUCTION NO. 2:

Research notes, notebooks, or other documents containing the work records of persons involved in the development of the DAA system, including Donald Thomas and his collaborators.

### REQUEST FOR PRODUCTION NO. 3:

Documents referring to or describing the incorporation of the algorithms or technology of the DAA system, in whole or in part, in any other design synthesis system or other piece of software.

### REQUEST FOR PRODUCTION NO. 4:

Documents, if any, describing or referring to the use of the DAA software in the design of electrical systems or devices (whether those systems or devices were fabricated or not) including documents sufficient to establish the first dates of use of the DAA software.

**REQUEST FOR PRODUCTION NO. 5:**

Documents related to the conception, design and development of the SAW system, including articles, presentations, manuals, design notes, patents and copies of the source code for the SAW system.

**REQUEST FOR PRODUCTION NO. 6:**

Research notes, notebooks, or other documents containing the work records of persons involved in the development of the SAW system, including Donald Thomas and his collaborators.

**REQUEST FOR PRODUCTION NO. 7:**

Documents referring to or describing the incorporation of the algorithms or technology of the SAW system, in whole or in part, in any other design synthesis system or other piece of software.

**REQUEST FOR PRODUCTION NO. 8:**

Documents, if any, describing or referring to the use of the SAW software in design of electrical devices or systems (whether those devices or systems were fabricated or not) including documents sufficient to establish the first dates of use of the SAW software.

- 7 -

JUL-23-2003 10:10 FROM:                              TO:16504639400        P:2
JUL-1-2003 09:56A FROM:                              TO:17485347175

Louis Campbell, Esq.                    (650) 463-8100    FOR COURT USE ONLY
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025-0000              Ref. No. or File No.
ATTORNEY FOR (Name): Defendants         06916.0060.000000

United Sates District Court - Western District of Pennsylvania

Pittsburgh, PA

PLAINTIFF:

Ricoh Company, Inc.

DEFENDANT:

Areoflex Incorporated, et al.

| PROOF OF SERVICE | DATE: | TIME: | DEPT/DIV: | CASE NUMBER: |
|---|---|---|---|---|
| | | | | 03-103 GMS |

## UNITED STATES DISTRICT COURT
## DECLARATION OF SERVICE

THE UNDERSIGNED, DECLARE UNDER PENALTY OF PERJURY THAT I WAS ON THE DATE HEREIN REFERRED TO
OVER THE AGE OF 18 YEARS AND NOT A PARTY TO THE WITHIN ENTITLED ACTION. I SERVED THE:

Subpoena in a Civil Case (Attachment A); Notice of Subpoena for Documents and
Notice of Deposition of Donald Thomas, Ph.D. Pursuant to Fed.R.Civ.P.45
(Attachment A)

ON: DONALD THOMAS, Ph.D.

IN THE ABOVE MENTIONED ACTION BY DELIVERING TO AND LEAVING WITH THE AVOVE NAMED PERSON A COPY
THEREOF, AT:

Carnegie Mellon University - ECE Department
Pittsburgh, PA 15213-0000
(BUSINESS)

ON: June 26, 2003
AT: 04:30 pm

Registration No.: 14
County:

I declare under penalty of perjury under the laws of the United States
of America that the foregoing information contained in the return of
service and statement of service fees is true and correct and that this
declaration was executed on June 27, 2003.

Signature: _Christian Blose_

**10**

**From: Don Thomas <thomas@ece.cmu.edu>**
**Date: Wed Jul 2, 2003  9:51:02 AM US/Eastern**
**To: CampbellL@howrey.com**
**Subject: Subpoena**

Mr. Campbell,

I received the subpoena for information and later my appearance.  I'm in the process of tracking down the information you requested.

The question I have regards reimbursement.

There's a fair amount of copying that is being done.  I have a stack of docs about 6-8 inches high (that's probably it, but there may be more) — mostly double sided copying.  I have an assistant spending a fair amount of time collecting  this and copying.  And, of course I have to take what might be a fair amount of personal time for the deposition.  What are your reimbursement policies?
~Don Thomas~

PTH000024

11

**From: Don Thomas <thomas@ece.cmu.edu>**
**Date: Thu Apr 10, 2003  9:59:11 AM US/Eastern**
**To: CampbellL@howrey.com**
**Subject: Re: VLSI Design Automation Assistant**

I suggest trying Ted Kowalski (Thaddeus J.) who was a PhD student of mine in the early 80's.  Wrote his thesis about a knowledge based expert system to do VLSI design.  Last I knew, he worked for Lucent Tech.
—Don Thomas—

On Tuesday, April 8, 2003, at 12:57 PM, CampbellL@howrey.com wrote:

Thank you for your interest in this matter, but, Dickstein Shapiro Morin &
Oshinsky LLP is indeed the counsel for the opposing side in this matter.
This means that there is most likely a conflict if we would talk to you in
detail about the matter.  So, unfortunately, it appears that we cannot go
forward.  But, I thank you very much for your interest and if things change
or we happen to run into this technology in an unrelated matter, I will get
back in touch with you.  However, one thing you can do for us, is to let us
know about anyone else who is knowledgeable in this technology or its
development, whether or not they were contemporaneously involved with its
development.

Sincerely,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650–463–8135 (phone)
650–463–8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use, dissemination,
distribution or copying of this communication is strictly prohibited.  If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed and
immediately notify Howrey Simon Arnold & White that you received this e-mail
in error.

PTH000018

From: CampbellL@howrey.com
Date: Thu May 1, 2003  1:15:24  PM US/Eastern
To: thomas@ece.cmu.edu
Subject: Ted Kowalski's contact information

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact information for him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited.  If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.

PTH000019

**From: Don Thomas <thomas@ece.cmu.edu>**
**Date: Thu May 1, 2003  1:47:47  PM US/Eastern**
**To: CampbellL@howrey.com**
**Subject: Re: Ted Kowalski's contact information**

I'll check around.  I haven't talked with him in about 10 years, but I have a few leads.
–Don–

**On Thursday, May 1, 2003, at 01:15  PM, CampbellL@howrey.com wrote:**

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact information for
him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650–463–8135 (phone)
650–463–8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use, dissemination,
distribution or copying of this communication is strictly prohibited.  If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed and
immediately notify Howrey Simon Arnold & White that you received this e-mail
in error.

PTH000020

**From: CampbellL@howrey.com**
**Date: Thu May 1, 2003 1:48:01 PM US/Eastern**
**To: thomas@ece.cmu.edu**
**Subject: RE: Ted Kowalski's contact information**

**Thank you**

——Original Message——
**From: Don Thomas [mailto:thomas@ece.cmu.edu]**
**Sent: Thursday, May 01, 2003 10:48 AM**
**To: CampbellL@howrey.com**
**Subject: Re: Ted Kowalski's contact information**

I'll check around.  I haven't talked with him in about 10 years, but I
have a few leads.
–Don–

On Thursday, May 1, 2003, at 01:15 PM, CampbellL@howrey.com wrote:

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact
information for
him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the
employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use,
dissemination,
distribution or copying of this communication is strictly prohibited.
If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed
and
immediately notify Howrey Simon Arnold & White that you received this
e-mail
in error.

PTH000021

From: Don Thomas <thomas@ece.cmu.edu>
Date: Sat May 3, 2003  11:15:57  AM US/Eastern
To: CampbellL@howrey.com
Subject: Re: Ted Kowalski's contact information
Reply-To: thomas@ece.cmu.edu

I heard from Ted that you were able to reach him at AT&T.  Hope he works
out for you.
–Don–


CampbellL@howrey.com wrote:

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact information for
him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650–463–8135 (phone)
650–463–8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged, confidential and exempt from disclosure
under applicable law.  If you are not the intended recipient or the employee
or agent responsible for delivering this communication to the intended
recipient, you are hereby notified that any unauthorized use, dissemination,
distribution or copying of this communication is strictly prohibited.  If
you are not the intended recipient, please delete the document without
opening any attachments, destroy any hard copies you may have printed and
immediately notify Howrey Simon Arnold & White that you received this e-mail
in error.

PTH000022

**From:** Don Thomas <thomas@ece.cmu.edu>
**Date:** Tue May 6, 2003  3:43:50  PM US/Eastern
**To:** CampbellL@howrey.com
**Subject:** Re: Ted Kowalski's contact information

Ted and I spoke and it appears that you were able to be in touch with him, and that he said no.

The other person that comes to mind is Prof Alice Parker at USC.

mailto:Alice Parker <parker@eve.usc.edu>

Even though she didn't participate in Ted's work, she was in the synthesis research area at the time and certainly understands how the tools work.

Hope this helps.
~Don Thomas~


On Thursday, May 1, 2003, at 01:15  PM, CampbellL@howrey.com wrote:

Dear Dr. Thomas:

I'm trying to contact Ted Kowalski.  Do you have any contact information for him?

Thanks for your help,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com


This communication is for the named recipient only and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any unauthorized use, dissemination, distribution or copying of this communication is strictly prohibited.  If you are not the intended recipient, please delete the document without opening any attachments, destroy any hard copies you may have printed and immediately notify Howrey Simon Arnold & White that you received this e-mail in error.

PTH000023

**12**

1

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                             - - -

 4   RICOH COMPANY, LTD.,          :        CIVIL ACTION
                                   :
 5              Plaintiff          :
                                   :
 6           vs.                   :
                                   :
 7   AEROFLEX INCORPORATED, AMI    :
     SEMICONDUCTOR INC., MATROX    :
 8   ELECTRONIC SYSTEMS LTD., MATROX :
     GRAPHICS INC., MATROX         :
 9   INTERNATIONAL CORP., and MATROX :
     TECH, INC.,                   :
10              Defendants         :        NO. 03-0103 (GMS)

11                             - - -

12
                                   Wilmington, Delaware
13                                 Wednesday, July 30, 2003
                                   11:35 o'clock, a.m.
14                                 ***Telephone conference

15                             - - -

16   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

17                             - - -

18   APPEARANCES:

19              RICHARDS, LAYTON & FINGER, P.A.
                BY:  ROBERT W. WHETZEL, ESQ. and
20                   STEVEN FINEMAN, ESQ.

21                   -and-

22

23
                                   Valerie J. Gunning
24                                 Official Court Reporter

25
</pre>

1   APPEARANCES (Continued):

2               DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP
            BY:   GARY M. HOFFMAN, ESQ. and
3                 EDWARD A. MEILMAN, ESQ.
                  (Washington, D.C.)
4
                Counsel for Plaintiff
5

6               CONNOLLY, BOVE, LODGE & HUTZ LLP
            BY:   FRANCIS DiGIOVANNI, ESQ.
7
                  -and-
8
            HOWREY SIMON ARNOLD & WHITE LLP
9           BY:   CHRISTOPHER L. KELLEY, ESQ. and
                  TERESA M. CORBIN, ESQ.
10                (Menlo Park, California)

11              Counsel for Defendants

12                  -  -  -

13

14

15          P R O C E E D I N G S

16

17          (REPORTER'S NOTE:  The following telephone

18   conference was held in chambers, beginning at 11:35 a.m.)

19

20          THE COURT:  Good morning.  Why don't we start

21   with introductions, beginning with Ricoh?

22          MR. WHETZEL:    Good morning, your Honor.  This is

23   Bob Whetzel for Ricoh.  Steve Fineman is on the line with me

24   in my office.  We also have Gary Hoffman and Ed Meilman from

25   the Dickstein Shapiro firm, representing Ricoh.

3

1       THE COURT:  And who's going to carry the argument

2   today?

3       MR. WHETZEL:  Primarily Mr. Hoffman.

4       MR. HOFFMAN:  Good morning, your Honor.

5       THE COURT:  Good morning.

6       And for defendant?

7       MR. DiGIOVANNI:  Good morning, your Honor.  Frank

8   DiGiovannia from Connolly Bove.

9       With me on the line in California are Terry

10  Corbin and Chris Kelley from Howrey Simon.

11      THE COURT:  All right.

12      MR. DiGIOVANNI:  And I believe Chris Kelley is

13  going to carry the primary argument, your Honor.

14      THE COURT:  Great.  Good morning.  Have we

15  accounted for everyone?  I hope that we have.

16      All right.  I think that this is -- bear with me

17  just a second here.  Yes.  This is Ricoh's request; is that

18  correct?

19      MR. HOFFMAN:  That is correct, your Honor.

20      THE COURT:  Let me address just one objection

21  that I have.  I'm sure everyone is aware that in a letter

22  of July 29, there's an objection to the last sentence or

23  last paragraph in the July 28 -- the Ricoh letter of

24  July 28.

25      As I understand it, that dispute, that

4

1   discovery dispute is between plaintiff and a nonparty

2   named Synopsis; is that correct?

3           MR. HOFFMAN;  it is, your Honor, although

4   the attorneys representing Synopsis and the attorneys

5   representing the defendants are the same attorneys.

6           THE COURT:  Okay.  In what district is that

7   dispute taking place?  What Court has jurisdiction over

8   that?

9           MR. HOFFMAN:  Your Honor, there's really no one.

10  Well, let me back up.

11          The subpoena that led to that was served

12  out of Delaware, and they have, Synopsis has filed

13  objections, so the subpoena is before the District

14  of Delaware.

15          THE COURT:  Where was the subpoena served?

16  In Delaware?

17          MR. HOFFMAN:  In Delaware.

18          THE COURT:  Is that where Synopsis is located?

19          MR. HOFFMAN:  Synopsis is incorporated in

20  Delaware, headquartered out in California.

21          THE COURT:  All right.  Well, a couple of

22  things.  I'm not sure that whatever district in California,

23  District Court wherever Synopsis is located wouldn't be the

24  district where that would be resolved.  The point that's made

25  in the objection regarding the amenability of Synopsis to the

5

1    discovery process outlined in my Court may or may not be

2    well-taken, I'm not sure, but it does not seem that that

3    issue has really been teed up correctly for the Court, so I

4    am not going to entertain it today.  If it's still extant at

5    some point in the future and you want to raise it with the

6    Court, you can do it according to the process outlined in the

7    schedule.  Okay?

8              MR. HOFFMAN:  Okay, your Honor.

9              Should we proceed by filing a motion, a discovery

10   motion in connection with that?  We're more than willing to

11   proceed that way.

12             THE COURT:  No, I'm not going to permit a

13   motion.  It's just that you are not compliant with the time

14   line as it's pointed out by the defendants.

15             What I require is that you give me a letter 48

16   hours in advance of the teleconference and that rule has not

17   been complied with.  You know, just quite apart from whether

18   Synopsis should be subject to, as a nonparty, to this Court's

19   outlined process for resolving discovery disputes.

20             Do you understand what I'm saying?

21             MR. HOFFMAN:  Yes, I do, your Honor.

22             THE COURT:  Okay.  Great.  Then why don't we deal

23   with the issue that's on the table for today.

24             MR. HOFFMAN:  Okay.  Your Honor, the issue

25   involves a Dr. Thomas, who's a professor at Carnegie Mellon

1  University.

2          In May of 2002, we engaged Dr. Thomas, a

3  consulting expert on behalf of Ricoh, in the preparatory

4  work that we were doing leading up to the present lawsuit.

5          Dr. Thomas, in May of 2002, had signed a

6  confidentiality agreement with us.  And from May of 2002

7  through April of 2003, there were numerous telephone

8  conversations with Dr. Thomas, at least eight telephone

9  conferences with him, numerous written communications.  We

10  sent him many documents.  We had discussions with him and

11  disclosed to him both certain opinions we had, litigation

12  strategy and also obtained from him various opinions that he

13  had with respect to issues involving claim construction,

14  infringement, validity and various strategies for the

15  litigation.

16          We filed the lawsuit in January of 2003,

17  so the discussions commenced before the lawsuit was filed,

18  and there were also some conferences after the lawsuit

19  was filed.

20          Some of this, your Honor, there is a declaration

21  that I've given -- that we've provided, that Mr. Whetzel

22  has that can be provided outlining these various

23  communications without getting into the substance,

24  obviously, since they're privileged and confidential

25  communications.

1          In April of 2003, after the lawsuit was filed,

2     Dr. Thomas informed us that while he did not want to be a

3     testifying expert, he could continue to consult for us.

4          On July 8th, Dr. Thomas sent us an e-mail

5     terminating his agreement, indicating he did not want to

6     continue working on the matter.

7          On July 22, we received a communication from

8     defendant's counsel informing us that they were not going to

9     proceed with a deposition of Dr. Thomas.  That was noticed

10    for July 31, since they had engaged Dr. Thomas as a

11    consultant.

12         We had two major problems that we immediately

13    raised.  Number one, we had never received any subpoena

14    that had been served on Dr. Thomas, nor notice of deposition,

15    nor the subpoena for documents that they had served on

16    Dr. Thomas.  We found out subsequently when they sent it

17    to us that they had served that on him apparently in

18    June, before he terminated his relationship with us.

19    Also, there was nothing filed with the Court indicating

20    that any such subpoena was filed.  There's nothing on the

21    docket sheets.  Neither Mr. Whetzel's office nor my office

22    received it.

23         We also immediately objected to it because

24    Dr. Thomas had been a consultant for us and he received

25    during that consulting period confidential information,

1   attorney work product information, concepts of some of our

2   litigation strategy, concepts of some of the claim

3   interpretation issues, provided us with opinions on claim

4   interpretation and opinions on infringement issues as well as

5   validity issues.

6           So we immediately objected to the defendants

7   using Dr. Thomas as an expert and we requested that they

8   cease all communications with him and that they also send us

9   copies of all the correspondence with Dr. Thomas and all

10  documents that they received from Dr. Thomas.

11          So far all that they've indicated is that they're

12  willing not to consult with him while this matter is pending

13  before the Court if we brought the matter quickly to the

14  Court within two weeks, which we've done.

15          They have not said -- in fact, they have said

16  that they will continue to talk with Dr. Thomas.  They've

17  also not produced any documents to us.

18          So at this point we don't know what documents

19  Dr. Thomas has given to the defendants.  We don't know what

20  has been, the details of what has been discussed, except that

21  obviously he's someone that should not be used by the other

22  side as an expert, as a consultant of any type, since he has

23  confidential information of ours.

24          The defendants have indicated that they were

25  aware that he had consulted for us but felt that since, as I

1   understand their position, the only information he had was

2   with respect to prior art and validity opinions, that nothing

3   was protected, and after researching it they felt they were

4   free to go forward.

5           Obviously, the consulting arrangement we had

6   with Dr. Thomas extended beyond validity, into infringement,

7   claim construction and trial strategy, but even if it was

8   only on validity issues and validity opinions, they still --

9   it would still be inappropriate for them to use him as a

10  consultant.

11          What we're asking for, your Honor, is we're

12  trying to get further information on the following:

13          Number one, that there be no further

14  communications with Dr. Thomas regarding the merits of the

15  case or the patent in suit unless counsel for all parties are

16  present or consent to such communications in writing.

17          That the defendants be required to disclose all

18  the communications that they've had with Dr. Thomas and

19  produce all the documents to us that have gone back and

20  forth.  If they feel that any documents are privileged or

21  work product, then they can be submitted in-camera, but we

22  should get a log so we can sort that out.

23          We also would like to take his deposition, but

24  we're also concerned about taking his deposition.  If the

25  first question is please state your name for the record and

1    he proceeds to disclose everything we ever told him or

2    discussed with him, obviously we have a problem.

3              So what I'd like to do is to take his deposition,

4    but on a basis where the only use that can be made of that

5    transcript is, or of the deposition transcript, is for

6    resolving this matter.

7              Then, once we obtain more information, then we

8    can come back and see what, if anything else, needs to be

9    done besides disqualifying Dr. Thomas from working with the

10   defendants.

11             It's an unusual problem, your Honor.

12             THE COURT:  I should say.

13             MR. HOFFMAN:  It's unfortunate it exists and we

14   need to bring it before the Court.

15             THE COURT:  All right.

16             MR. HOFFMAN:  But obviously once we found out

17   late last week that this had occurred, we felt we needed to

18   immediately bring it before the Court.

19             THE COURT:  Okay.  Thank you, Mr. Hoffman.

20             Is it Mr. Kelley?

21             MR. KELLEY:  Yes.

22             THE COURT:  Okay.

23             MR. KELLEY:  Yes, your Honor.

24             Defendants do not understand what the purpose of

25   the release that Ricoh is asking for would serve.  We've

1    already committed in a letter dated July 25th that to not

2    have substantive communications with Dr. Thomas, except on

3    two specific issues, and one, the first issue was just

4    procedural matters relating to the -- to his response to our

5    subpoena, the documents he might produce.

6             And while we're talking about that subject,

7    I will add that we have received documents from Dr. Thomas.

8    We've Bates-stamped all of them.  Copies have been made and

9    I believe copies should be on their way as we speak to

10   Ricoh.

11            So that problem should be resolved forthwith.

12            The subpoena that we sent him was directed

13   exclusively to prior art issues.  I have not looked at the

14   documents, but that's my understanding what he produced to

15   us.  If there are any kind of communications that he has

16   received from them, we did not ask for those and we did not

17   receive any such communications.

18            So I know that the second -- second topic that we

19   indicated we would -- we wanted to reserve the possibilities

20   of talking to Dr. Thomas about was this:  If Ricoh, in the

21   process of trying to establish that there is a conflict of

22   interest, puts on some evidence that they communicated

23   confidential information to Dr. Thomas, we wanted at least to

24   have the opportunity to invite Dr. Thomas to respond, so that

25   we didn't have a situation where only one side was able to

1    put on their evidence on this issue.

2              And let me back up now and give you a little bit

3    of the history of this.

4              When this case was first filed, we went out and

5    started trying to find who was a suitable expert for us and

6    among the names that came up was Dr. Thomas.  We contacted

7    him at that time and he told us then that he had worked with

8    counsel for Ricoh about a year prior to that.  And so at that

9    point we decide not to pursue it, because we didn't know if

10   they were going to go back to him or not and use him in an

11   ongoing matter in the litigation.

12             We then subpoenaed him in in order to get the

13   information that he has about the prior art system because he

14   is actually one of the leading luminaries in this field and

15   worked on a system that we believe will be very relevant to

16   prior art when we get to the merits of the case.

17             That subpoena, unfortunately, because of a

18   screw-up in our office, did not get distributed to plaintiff

19   and was not filed with the Court.

20             We have gone back.  When we discovered this,

21   we've gone back and made sure that that won't happen again.

22   But that was an oversight.  And the fact that it was an

23   oversight is demonstrated by the fact that as soon as we had

24   retained Dr. Thomas, we immediately sent a letter to Ricoh

25   saying, Oh, we've taken this deposition that we noticed off

1   calendar and we're giving you notice that we've retained

2   Dr. Thomas.

3          So we were not trying to hide the ball here.  It

4   was just an accidental mistake, but copies were not sent to

5   plaintiff of the original subpoena.

6          So let me get to the second thing that counsel

7   for plaintiff wants, and that is that they want to get into,

8   they want to discover what materials we have provided to

9   Dr. Thomas or what the nature of our communications with

10  Dr. Thomas has been.

11         And the point that we want to make here first

12  is that until plaintiff establishes that there is, in fact, a

13  conflict of interest that would prevent Dr. Thomas from

14  working for us as a consultant, there really is no basis to

15  get into that secondary examination of what communications

16  we had with him.

17         THE COURT:  You don't think --

18         MR. KELLEY:  We had in passing.

19         THE COURT:  Mr. Kelley, you say until the

20  plaintiff establishes that there's a conflict of interest.

21  I'm just trying to understand that, where we are in terms of

22  that prima facie showing.

23         You indicate that when you communicated with

24  Dr. Thomas, you learned at that time that plaintiff's counsel

25  had worked with him a year prior on another case or this

1   case?

2            MR. KELLEY:  Well, we didn't get into that.  I

3   presumed it was in preparation for this matter, had something

4   to do with this patent.

5            THE COURT:  And that on its face in your view

6   would not present at least the potential for the appearance

7   of a conflict?

8            MR. KELLEY:  That's why we did not pursue it

9   at that time.  I understand the question of the Court.

10           THE COURT:  Okay.

11           MR. KELLEY:  Let me give you a little bit more

12   history, then.

13           THE COURT:  Okay.

14           MR. KELLEY:  When we sent the subpoena to

15   Don Thomas, he called us back.  We didn't hear from his

16   counsel.  He didn't give it to plaintiff and say, You folks

17   deal with it, I'm working for you.  He called us back and

18   indicated to us he wasn't working with them and indicated

19   that he was interested in working with us.

20           And so we, not wanting to tread into the subject

21   matter, we were put in this situation.  We're very interested

22   in working with Dr. Thomas given that he's a leading luminary

23   in the field, but also we're concerned about this prior work

24   he had done.

25           So what we asked:  Have you received anything

1  confidential from Ricoh, did you talk to them about case

2  strategy?  We understand those are the two kinds of things

3  that create a conflict of interest.  And he assured us he had

4  not.

5       Whether he did, obviously counsel for plaintiff

6  is indicating that he did receive that information.  Sitting

7  here, I have no idea who's correct on that dispute.  But

8  having asked Dr. Thomas, well, if what he said is true, we

9  should be able to use his services under the relevant case

10  law and so what we did is say we're interested in retaining

11  you, but we're going to notify the other side.  We're not

12  going to do anything about the fact we want to work with

13  you.  We're not going to consult with you.  We're not going

14  ask to ask for your opinions yet.  We are going to give them

15  notice we want to enter into this relationship, which is how

16  we ended up where we are today.

17       Yes, I was aware that we were certainly aware

18  there was a possibility that he might have a conflict of

19  interest, but he had indicated he had not received any such

20  information that would create a conflict.  If that's true, we

21  wanted to get into that consulting relationship.

22       THE COURT:  Well, that's his legal opinion?

23       MR. KELLEY:  It's not his legal opinion.  We have

24  to walk a little carefully.  I didn't say please tell us what

25  you received so we can make an independent evaluation, but

1  what we did say is, if you get anything that's confidential,

2  any kind of confidential information, did you folks talk

3  about case strategy?

4          THE COURT:  Well, that may be in the eye of

5  beholder, perhaps, Mr. Kelley.  Yes, no, maybe?

6          MR. KELLEY:  Certainly, and I guess that is what

7  I would suggest:  Is that since I have no way of knowing

8  exactly what happened and what transpired, this is a point on

9  which Ricoh has the burden to produce some evidence

10  indicating that, in fact, there were communications that

11  would be the basis for disqualification.

12          THE COURT:  So you want the Court to require

13  Mr. Hoffman to submit an affidavit to that effect?

14          MR. KELLEY:  Well --

15          THE COURT:  What is it that you require in the

16  way of proof, Mr. Kelley?

17          MR. KELLEY:  Well, the case law talks about, it

18  indicates the burden is on the plaintiff, suggesting there is

19  a conflict of interest.

20          THE COURT:  Okay.

21          MR. KELLEY:  And procedurally how to go about

22  doing that, I suppose this affidavit, which I have not seen

23  that Mr. Hoffman talks about, would be one way to get that in

24  evidence into the records or to present it to the Court.

25          THE COURT:  Okay.  I have not seen it either.  In

1   fact, I've forgotten exactly how it was described.

2              What type of affidavit was this, Mr. Hoffman?

3              MR. HOFFMAN:  What it is, your Honor, is a

4   four-page affidavit by one of the attorneys in my office who

5   was the primary contact with Dr. Thomas.

6              It sets forth, without disclosing the details of

7   the conversations, it sets forth the dates of various

8   contacts.  It attaches a copy of the confidentiality

9   agreement, indicates how long the telephone conferences

10  were.  It does not have all the telephone conferences, but

11  many of them or most of them.

12             It identifies the type of topics discussed during

13  those conferences, identifies various e-mails that were sent

14  or received by Dr. Thomas, sent to him or received from him,

15  including the fact that he provided comments on claim

16  interpretation in e-mails and comments on infringement issues

17  in e-mails and lays out in 24 paragraphs various activities

18  that occurred, starting prior to the litigation, in May of

19  2002 through April 4, 2003, and then the fact that on July 8,

20  2003, he, Dr. Thomas terminated the agreement with us.

21             The first we learned that he had been engaged by

22  the defendants was when we received a letter from the

23  defendants on July 22, I believe it was, indicating that they

24  were not proceeding with a deposition subject, you know,

25  based on the subpoena, because they had already engaged him

1    as an expert.  They did not contact us and say we're

2    contemplating engaging him, do you have any objection.

3          Immediately we sent them a letter objecting and,

4    your Honor, what the response was was that there's no problem

5    because all that he had done was, in their opinion, okay, was

6    discuss prior art with us and provided validity opinions and

7    therefore that's not a problem.

8          They then state, and this is a letter from them

9    on July 23:  After we objected to this, we have reviewed the

10   relevant case law, and given the particular circumstances of

11   the work performed by Dr. Thomas, we conclude he may perform

12   consulting work or appear as an expert on behalf of

13   defendants without giving rise to a conflict of interest.

14         In order, however, to allow you to seek judicial

15   resolution of this dispute, we will refrain from consulting

16   with Dr. Thomas for a period of two weeks.

17         This is not a situation where they said, Oh, you

18   know, we're contemplating hiring him, do you have any

19   objection.  This was one where they had engaged him and then

20   only after we complained did they say, Well, we'll give you

21   two weeks to go to court.

22         There are many leading experts in this area, your

23   Honor.  Dr. Thomas is hardly unique.

24         We're entitled to find out what else he disclosed

25   to them.  Obviously, according to what Mr. Kelley is saying,

1   Dr. Thomas was less than candid with them in the nature of

2   the disclosure.

3           The declaration I can have hand-carried over to

4   your Honor.  It could be there within a half-hour.

5           THE COURT:  Well, hold on a second.

6           Mr. Kelley, given the description of the

7   declaration, if it exists, and I have no reason to believe

8   that Mr. Hoffman is being any less than candid as an officer

9   of this Court and I'm sure you don't question his candor,

10  would that satisfactory, based upon the research you've done,

11  the prima facie burden that he carries?

12          MR. HOFFMAN:  Well, your Honor, I mean I have not

13  seen it.

14          THE COURT:  Whether you've seen it or not, I've

15  just said given the description, we've all heard it --

16          MR. KELLEY:  I understand.  What I'm trying to

17  get at is this:  If he's -- it's my understanding from the

18  case law, if he offers an opinion, right, says, Well, I've

19  looked at your patent, I've looked at the prior art and I

20  conclude, you know, that your patent is invalid, that's a

21  discoverable opinion.  It's an opinion that he had.  There's

22  nothing -- they can't keep us from gaining access to that

23  opinion by saying, Oh, Dr. Thomas is our expert and we're not

24  going to produce him.  That's the sort of thing we're

25  entitled to discover.

1      Likewise, his characterization or understanding

2  of the prior art.  So what I heard from Mr. Hoffman was a lot

3  of times and circumstances.  I didn't hear the sort of

4  communication that would, in fact, create a conflict of

5  interest.  Namely --

6      THE COURT:  You don't want to answer my question,

7  do you, Mr. Kelley?

8      MR. KELLEY:  I'm sorry.  What was that?

9      THE COURT:  I said you don't want to answer my

10  question, do you?

11      MR. KELLEY:  No.  I'm trying to get at it.

12      THE COURT:  You're going all around Robin Hood's

13  barn, Mr. Kelley.

14      Based upon the description of the contents of the

15  affidavit, does it at least satisfy the -- cross the prima

16  facie threshold that would warrant the Court ordering the

17  taking of a deposition or some further process?  That's all

18  I'm trying to get you to talk about.

19      A VOICE:  Your Honor --

20      THE COURT:  I don't want to hear from anybody

21  else; I want to hear from Mr. Kelley.

22      MR. KELLEY:  All I heard was they sent him

23  something on such and such a date and it depends on what

24  that something is.

25      THE COURT:  All right.  If you are going to be

1    disingenuous with the Court in your response, I have a simple

2    answer for that.

3              Mr. Hoffman, prepare an order outlining the

4    request that you have just made and I will sign it.  Fax it

5    over.

6              MR. HOFFMAN:  Thank you very much, your Honor.

7              THE COURT:  That's the end of this discussion.

8              MR. HOFFMAN:  Thank you very much, your Honor.

9              THE COURT:  Good day.

10             (Telephone conference concluded at 12:00 p.m.)

11                        - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**13**



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

Christopher L. Kelley
Partner
650.463.8113
kelleyc@howrey.com

September 17, 2003

**VIA FACSIMILE AND U.S. MAIL**

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky, LLP
2102 L Street NW
Washington, DC 20037-1526

Re:    *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
       Civil Action No. 03-103-GMS

Dear Mr. Hoffman:

I have your letter of September 9.

There is a mistaken reference in my letter of September 8 to service of process on Brian Bershrader "yesterday." Mr. Bershrader was served on Thursday, September 4. My letter of the 8th was actually drafted late in the day on Friday the 5th, but not sent until Monday. I failed to catch the reference to "yesterday" when I reviewed the letter on the 8th. I apologize for any confusion.

The suggestion in your letter that we have been slow to provide you with copies of process served on other parties is inaccurate. The Knowledge Edge/Bershrader subpoenas were sent to you the day after process was affected on Mr. Bershrader. The dates on which the subpoenas were signed are irrelevant. Our practice is to provide opposing counsel with notice of process after service is successfully completed.

You have received copies of every subpoena for a third party: James Davis, Don Thomas, IBM, Brian Bershrader, Knowledge Edge, Hideaki Kobayashi and Masahiro Shindo.

Your letter revisits several other issues that have already been exhaustively addressed. With respect to the location for the Kobayashi deposition, there is no factual basis for your assertion that we "insisted that the depositions [of Dr. Kobayashi] only be taken in Tokyo." With regard to the retention of Dr. Thomas, there is no factual basis for your assertion that I lied to Judge Sleet. What I told Judge Sleet on July 30 was entirely consistent with Dr. Thomas' later testimony about what he had told Defendants' counsel.

Very truly yours,

Christopher Kelley /gg

Christopher L. Kelley

CLK:gg

Brussels    Chicago    Houston    Irvine    London    Los Angeles    Menlo Park    San Francisco    Washington, DC

**14**

From: "Campbell, Louis" <CampbellL@howrey.com>
Date: Mon Jul 7, 2003 4:17:08 PM US/Eastern
To: "'thomas@ece.cmu.edu'" <thomas@ece.cmu.edu>
Subject: Subpoena costs

Dear Dr. Thomas:

If you are no longer a consultant for Ricoh and Ricoh will not serve as your counsel during the deposition nor work with you prior to the deposition, we may be willing to pay your costs for copying documents and time spent at the deposition. If you are no longer working with Ricoh, please send us an estimate of the costs associated with the discovery we have requested.

On the other hand, if you are still in a consulting relationship with Ricoh, you should contact Ricoh about covering your costs.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain information that is privileged or confidential. If you are not the intended recipient please delete the document, destroy any hard copies, and immediately notify the sender that you received this email in error.

PTH000025

15

From: Don Thomas <thomas@ece.cmu.edu>
Date: Mon Jul 7, 2003 4:53:34 PM US/Eastern
To: "Campbell, Louis" <CampbellL@howrey.com>
Cc: Don Thomas <thomas@ece.cmu.edu>
Subject: Re: Subpoena costs

Dear Mr. Campbell,

Thank you for the reply.

I have not been contacted by Ricoh (Dickstein Shapiro...) for consultation since last summer. I spoke with them briefly on the phone this March, when you sent your original email to me. I told them I wouldn't be an expert witness for them during trial.

They have not offered to serve as my counsel during the deposition, and I assume that they know that you subpoenaed me for documentation and deposition. Have they listed me as a consultant?
--Don Thomas--


On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:

Dear Dr. Thomas:

If you are no longer a consultant for Ricoh and Ricoh will not serve as your counsel during the deposition nor work with you prior to the deposition, we may be willing to pay your costs for copying documents and time spent at the deposition. If you are no longer working with Ricoh, please send us an estimate of the costs associated with the discovery we have requested.

On the other hand, if you are still in a consulting relationship with Ricoh, you should contact Ricoh about covering your costs.


Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain information that is privileged or confidential. If you are not the intended recipient please delete the document, destroy any hard copies, and immediately notify the sender that you received this email in error.

PTH000026

**16**

From: CampbellL@howrey.com
Date: Mon Jul 7, 2003 6:57:53 PM US/Eastern
To: thomas@ece.cmu.edu
Subject: RE: Subpoena costs

I take it from your email that you do not believe yourself to be in an
ongoing consulting relationship with Ricoh. They have not listed you as a
consultant in this case. If my assumption is correct, please send us an
estimate of your costs.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Monday, July 07, 2003 1:54 PM
To: Campbell, Louis
Cc: Don Thomas
Subject: Re: Subpoena costs

Dear Mr. Campbell,

Thank you for the reply.

I have not been contacted by Ricoh (Dickstein Shapiro...) for
consultation since last summer. I spoke with them briefly on the phone
this March, when you sent your original email to me. I told them I
wouldn't be an expert witness for them during trial.

They have not offered to serve as my counsel during the deposition, and
I assume that they know that you subpoenaed me for documentation and
deposition. Have they listed me as a consultant?
–Don Thomas–

On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:

> Dear Dr. Thomas:
>
> If you are no longer a consultant for Ricoh and Ricoh will not serve
> as your
> counsel during the deposition nor work with you prior to the
> deposition, we
> may be willing to pay your costs for copying documents and time spent
> at the
> deposition. If you are no longer working with Ricoh, please send us an
> estimate of the costs associated with the discovery we have requested.
>
> On the other hand, if you are still in a consulting relationship with
> Ricoh,
> you should contact Ricoh about covering your costs.
>
>
> Louis L. Campbell
>
> Howrey Simon Arnold & White, LLP
> 301 Ravenswood Avenue
> Menlo Park, CA 94025
> 650–463–8135 (phone)
> 650–463–8400 (fax)
> CampbellL@howrey.com
>
>
> This communication is for the named recipient only and may contain
> information that is privileged or confidential. If you are not the
> intended
> recipient please delete the document, destroy any hard copies, and
> immediately notify the sender that you received this email in error.

PTH000027

17

From: Don Thomas <thomas@ece.cmu.edu>
Date: Tue Jul 8, 2003 9:02:30 AM US/Eastern
To: CampbellL@howrey.com
Subject: Re: Subpoena costs

That's right, I don't see an ongoing relationship at this point.

Let me explain that I was hired early last summer for ten hours of work. That was later extended by another ten. The second ten was never fully charged out. Also, the contract was never terminated either. But I've heard nothing from them since late last summer, except for when I told them I wouldn't be a witness for them.

I'll send them a note officially terminating that agreement.
–Don Thomas–


On Monday, July 7, 2003, at 06:57 PM, CampbellL@howrey.com wrote:

> I take it from your email that you do not believe yourself to be in an
> ongoing consulting relationship with Ricoh. They have not listed you as a
> consultant in this case. If my assumption is correct, please send us an
> estimate of your costs.
>
> ——–Original Message——–
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Monday, July 07, 2003 1:54 PM
> To: Campbell, Louis
> Cc: Don Thomas
> Subject: Re: Subpoena costs
>
>
> Dear Mr. Campbell,
>
> Thank you for the reply.
>
> I have not been contacted by Ricoh (Dickstein Shapiro…) for
> consultation since last summer. I spoke with them briefly on the phone
> this March, when you sent your original email to me. I told them I
> wouldn't be an expert witness for them during trial.
>
> They have not offered to serve as my counsel during the deposition, and
> I assume that they know that you subpoenaed me for documentation and
> deposition. Have they listed me as a consultant?
> –Don Thomas–
>
>
>
> On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:
>
>> Dear Dr. Thomas:
>>
>> If you are no longer a consultant for Ricoh and Ricoh will not serve
>> as your
>> counsel during the deposition nor work with you prior to the
>> deposition, we
>> may be willing to pay your costs for copying documents and time spent
>> at the
>> deposition. If you are no longer working with Ricoh, please send us an
>> estimate of the costs associated with the discovery we have requested.
>>
>> On the other hand, if you are still in a consulting relationship with
>> Ricoh,
>> you should contact Ricoh about covering your costs.
>>
>>
>> Louis L. Campbell
>>
>> Howrey Simon Arnold & White, LLP
>> 301 Ravenswood Avenue

PTH000028

**18**

From: "Campbell, Louis" <CampbellL@howrey.com>
Date: Tue Jul 8, 2003 8:29:30 PM US/Eastern
To: "'Don Thomas'" <thomas@ece.cmu.edu>
Subject: RE: Subpoena costs

Ok. Please send an estimate of your costs after you have terminated the
agreement with Ricoh.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Tuesday, July 08, 2003 6:03 AM
To: CampbellL@howrey.com
Subject: Re: Subpoena costs


That's right, I don't see an ongoing relationship at this point.

Let me explain that I was hired early last summer for ten hours of
work. That was later extended by another ten. The second ten was
never fully charged out. Also, the contract was never terminated
either. But I've heard nothing from them since late last summer,
except for when I told them I wouldn't be a witness for them.

I'll send them a note officially terminating that agreement.
-Don Thomas-



On Monday, July 7, 2003, at 06:57 PM, CampbellL@howrey.com wrote:

> I take it from your email that you do not believe yourself to be in an
> ongoing consulting relationship with Ricoh. They have not listed you
> as a
> consultant in this case. If my assumption is correct, please send us
> an
> estimate of your costs.
>
> ——Original Message——
> From: Don Thomas [mailto:thomas@ece.cmu.edu]
> Sent: Monday, July 07, 2003 1:54 PM
> To: Campbell, Louis
> Cc: Don Thomas
> Subject: Re: Subpoena costs
>
>
> Dear Mr. Campbell,
>
> Thank you for the reply.
>
> I have not been contacted by Ricoh (Dickstein Shapiro...) for
> consultation since last summer. I spoke with them briefly on the phone
> this March, when you sent your original email to me. I told them I
> wouldn't be an expert witness for them during trial.
>
> They have not offered to serve as my counsel during the deposition, and
> I assume that they know that you subpoenaed me for documentation and
> deposition. Have they listed me as a consultant?
> -Don Thomas-
>
>
>
> On Monday, July 7, 2003, at 04:17 PM, Campbell, Louis wrote:
>
>> Dear Dr. Thomas:
>>
>> If you are no longer a consultant for Ricoh and Ricoh will not serve
>> as your
>> counsel during the deposition nor work with you prior to the
>> deposition, we

PTH000033

**19**

From: "Campbell, Louis" <CampbellL@howrey.com>
Date: Thu Jul 10, 2003 9:47:23 PM US/Eastern
To: "'Don Thomas'" <thomas@ece.cmu.edu>
Subject: RE: Subpoena costs

My last email should have read: If you would be willing, we would be
interested in pursuing a consulting relationship with you.  The prior
wording loses some of the desired enthusiasm.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, July 10, 2003 6:26 AM
To: Campbell, Louis
Subject: Re: Subpoena costs


On Tuesday, July 8, 2003, at 08:29 PM, Campbell, Louis wrote:

> Ok.  Please send an estimate of your costs after you have terminated
> the
> agreement with Ricoh.


The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
LLP ) has been terminated.

You should be receiving the subpoenaed material this morning.  I sent
it a day early in case there were some questions.  I leave for a week's
vacation on Saturday.

As for copy charges, I figure there's at least 1000 pages times two
sides times $.03.  That would be $60.  A check made out to "Carnegie
Mellon University" for $60 and sent to me would find its way to our
administrative support account.

The Fed–Ex was payed for by your charge number — thank you.

It is hard to estimate the costs for the deposition on July 31 as I
don't know how long this might take.  My recent charges for background
consulting of this type have been at $250/hour.  I think I can be of
great help to the defense.
–Don–

PTH000042

**20**

From: "Campbell, Louis" <CampbellL@howrey.com>
Date: Fri Jul 11, 2003 8:14:32 PM US/Eastern
To: "'Don Thomas'" <thomas@ece.cmu.edu>
Subject: RE: Subpoena costs

Great! Let me know when you get back from your vacation and we will get
started.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Friday, July 11, 2003 6:11 AM
To: CampbellL@howrey.com
Cc: Don Thomas
Subject: Re: Subpoena costs


Yes, I'd be interested in pursuing a consulting relationship (with
enthusiasm). Thanks you for your consideration.
–Don Thomas–


On Thursday, July 10, 2003, at 08:03 PM, CampbellL@howrey.com wrote:

We will be sending you a check for $60 and pay your standard
consulting rate
for time at the deposition.

If you would be interested, we would be willing to pursue a consulting
relationship.

——Original Message——
From: Don Thomas [mailto:thomas@ece.cmu.edu]
Sent: Thursday, July 10, 2003 6:26 AM
To: Campbell, Louis
Subject: Re: Subpoena costs


On Tuesday, July 8, 2003, at 08:29 PM, Campbell, Louis wrote:

Ok. Please send an estimate of your costs after you have terminated
the
agreement with Ricoh.


The agreement with Ricoh (through Dickstein Shapiro Morin & Oshinsky
LLP ) has been terminated.

You should be receiving the subpoenaed material this morning. I sent
it a day early in case there were some questions. I leave for a week's
vacation on Saturday.

As for copy charges, I figure there's at least 1000 pages times two
sides times $.03. That would be $60. A check made out to "Carnegie
Mellon University" for $60 and sent to me would find its way to our
administrative support account.

The Fed–Ex was payed for by your charge number — thank you.

It is hard to estimate the costs for the deposition on July 31 as I
don't know how long this might take. My recent charges for background
consulting of this type have been at $250/hour. I think I can be of
great help to the defense.
–Don–

PTH000043

21

**From: hobbsw@howrey.com**
**Date: Thu Jul 17, 2003 7:53:32 PM US/Eastern**
**To: thomas@ece.cmu.edu**
**Subject: 07-17-03 Cover letter and Engagement Letter**

Dr. Thomas-

I work with Louis Campbell. Louis had me send you a cover letter and an engagement letter for your signature. I neglected to enclose a copy of the letter for you to sign and keep for your information and files. As such, please see the attachments to this e-mail. The original of each letter should arrive tomorrow via Federal Express Overnight. If you have any questions or concerns you can e-mail or call me at 650/463-8132.

Thank you.

07.17.03 Campbell to D... (46.2 KB)  07.17.03 Campbell to D... (179 KB)

(Next Pages)

PTH000044



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

July 17, 2003

Direct Dial 650.463.8135
File 06816.0060.000000

***VIA FEDERAL EXPRESS***

Donald E. Thomas, Ph.D.
ECE Department
Carnegie Mellon University
Pittsburgh, Pennsylvania 15213

Re:     Ricoh Co. v. Aeroflex, Inc., et al, Case No. 03-103-GMS.
        Our ref. # 06816.0060.000000

Dear Professor Thomas:

I hope you had an enjoyable vacation.

Enclosed with this letter is an engagement letter. Please sign and return the enclosed engagement letter and feel free to make a photocopy of it for your files. We will send a photocopy of the fully executed agreement to you, when we have obtained all the signatures on the engagement letter.

Once we have a signed copy of this letter, we will notify Ricoh that you have entered into a consulting agreement with us and we will put the July 31, 2003 deposition on hold. So, it is imperative that you return the signed engagement letter as soon as you are able.

Please feel free to call me directly at (650) 463-8135 if you have any questions or concerns.

Very truly yours,

*Louis Campbell*

Louis Campbell

LC:wmh
Enclosure

**PTH000045**



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

July 17, 2003

### VIA FEDERAL EXPRESS

Donald E. Thomas, Ph.D.
ECE Department
Carnegie Mellon University
Pittsburgh, Pennsylvania 15213

Re:    Intellectual Property Dispute Involving Synopsys, Inc.

Dear Professor Thomas:

As we previously discussed, Synopsys, Inc. has engaged us to represent them with respect to patent matters arising in connection with the assertion made by Ricoh Corp. that Synopsys's customers are practicing claims of U.S. patent number 4,922,432. Ricoh has made these allegations in connection with a lawsuit filed by Ricoh against several Synopsys customers in U.S. District Court for the District of Delaware.

We are very pleased to confirm your engagement as an expert consultant in connection with this dispute on behalf of Synopsys, Inc. This letter will serve to describe the terms of your engagement and the professional services Howrey Simon Arnold & White LLP would like you to perform for us in connection with our legal representation of Synopsys in this matter.

The scope of this work may include analyzing U.S. patent 4,922,432, evaluating claim construction, infringement, validity and enforceability issues regarding this patent, providing an explanation of historical issues surrounding prior art synthesis systems, analyzing specific prior art references and assisting us with the preparation of factual issues for presentation to the Court.

Your work on this matter will be done in response to directions given by Howrey attorneys working on this case. If you are in doubt about what we have asked you to do at any time or whether any particular expenses are authorized, please contact us. Should the need arise for outside assistance or for the purchase of any item in connection with any assignment from us, please let us know in advance.

**PTH000046**

**HOWREY**
HOWREY
SIMON
ARNOLD
& WHITE
ATTORNEYS AT LAW

Donald E. Thomas, Ph.D.
July 17, 2003
Page 2

You will be paid at your standard hourly billing rate ($250/hour) for consulting services we authorize you to perform. You will be reimbursed for travel and other expenses related to this work for us. We expect the services to be performed by you alone or by persons working with you who you identify in advance to us and whom we approve.

Please submit your bills monthly, or at mutually convenient intervals, for services and disbursements to my attention at the address above.

This agreement will continue until terminated. This agreement may be terminated at will, upon written notice, by you or us, but such notice of termination will not prejudice your right to compensation for work performed or expenses incurred, if authorized prior to termination, or our right of receipt of work performed by you under the agreement.

The following obligations, however, will survive the termination of this agreement. It is understood and agreed that your work under this agreement is for us and is done at our direction as attorneys in aid of litigation, and that all activities performed by you under this agreement, including, but not limited to, all communications, whether written or oral, between you and any attorney or other employee of the firm, or between you and any Synopsys employee or agent, are confidential and privileged matters which you will maintain in confidence and secrecy and not reveal to any other person or use for any purpose other than in connection with this case, except as authorized by us or required by law. You will promptly inform us of any contact or communication regarding this case from any other person, including, but not limited to attorneys or representatives of Ricoh.

In addition, in connection with work on this case, you and anyone working with you, may be required to sign protective orders governing the treatment of confidential information of others.

You agree that during the time you are acting as our consultant on behalf of Synopsys, Inc. you will not act as a consultant for, or on behalf of, Ricoh or any Ricoh affiliate (more than 25% owned and controlled by Ricoh) and will agree not to give expert testimony adverse to Synopsys, Inc. We understand that you previously consulted for Ricoh's counsel regarding design synthesis technology of the 1980s. We will not ask you to disclose what information or opinions you supplied to Ricoh's counsel and you should not reveal any Ricoh confidential information that may have been supplied to you.

You are, of course, a professional independent contractor and not an employee or agent of this law firm, our clients or any of their affiliated

PTH000047

**HOWREY**
HOWREY
SIMON
ARNOLD
& WHITE
ATTORNEYS AT LAW

Donald E. Thomas, Ph.D.
July 17, 2003
Page 3

companies. This agreement is a personal services contract and may not be
assigned or transferred in whole or in part by either party without prior written
consent of the other party.

     We look forward to working with you on this project. Please signify your agreement to
the above terms by signing and dating a copy of this letter in the space provided below, and
returning the signed copy to me.

     Very truly yours,

*Louis Campbell*

Louis L. Campbell

LC:wmh

Seen and agreed to:

Dr. Donald E. Thomas

Date: July 21, 2003

Seen and agreed to:
Synopsys Corporation

By_____

Date: _____, 2003

**PTH000048**

**22**



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

DIRECT DIAL 650.463.8135
FILE 06816.0060.000000

July 17, 2003

**BY FACSIMILE**

Edward Meilman
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

     Re: *Ricoh Company Ltd. v. Aeroflex Incorporated, et al.*
     Civil Action No. 03-103-GMS

Dear Mr. Meilman:

     This letter is to inform you that we have retained Dr. Donald Thomas as a consultant. We are, therefore, taking the deposition of Dr. Thomas, currently scheduled for July 31, 2003, off calendar.

     Should you have any questions, please call me at (650)463-8135.

          Very truly yours,

          Louis Campbell

LC:wmh



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434

## FACSIMILE COVER SHEET

**DATE:** July 22, 2003

**TO:**

**NAME:** Edward A. Meilman, Esq.

**COMPANY:** Dickstein Shapiro Morin & Oshinsky LLP

**FAX NUMBER:** (212) 997-9880        **PHONE NUMBER:** (212) 835-1400

**CITY:** New York

**FROM:**

**NAME:** Louis Campbell, Esq.

**DIRECT DIAL NUMBER:** (650) 463-8113        **USER ID:** 5172

**NUMBER OF PAGES, _INCLUDING_ COVER:** 2        **CHARGE NUMBER:** 06816.0060.000000

☐ ORIGINAL WILL FOLLOW VIA:

☐ REGULAR MAIL        ☐ OVERNIGHT DELIVERY        ☐ HAND DELIVERY        ☐ OTHER:

☒ ORIGINAL WILL NOT FOLLOW

**SUPPLEMENTAL MESSAGE:**

Please see attached letter.  Thank you.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

**23**

DICKSTEIN  SHAPIRO  MORIN  &  OSHINSKY  LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

July 22, 2003

**BY FACSIMILE ((412) 268-1374) AND U.S. MAIL**

Dr. Donald E. Thomas
Carnegie Mellon University
ECE Dept.
5000 Forbes Avenue
Pittsburgh, PA 15213

Re:      <u>Ricoh v. Aeroflex et al.</u>

Dear Dr. Thomas:

We have been informed that you have been engaged by Howrey & Simon,

which firm represents the defendants in the present litigation, in the above case

contrary to the interests of Ricoh.  As you are aware, our firm previously engaged you

as a consultant in this matter and you have already begun to provide your services on

behalf of Ricoh.  During the course of such representation, you received confidential

and privileged information as acknowledged by the agreement you signed.

We object to your subsequent engagement by Howrey & Simon.

We demand that you cease and desist all activities not performed on behalf of

Ricoh in connection with and/or related to this matter as it is a violation of your

agreement with Ricoh and Dickstein Shapiro.

Very truly yours,

Gary M. Hoffman

GMH/MAW

Cc:      Edward Meilman, Esq.
         Christopher Kelly, Esq. (via facsimile)



*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*www.DicksteinShapiro.com*

1641901 v1; Z6WD01!.DOC

July 22, 2003
Page 2


      Erik Moller, Esq. (via facsimile)
      Robert Whetzel, Esq. (via facsimile)
      Francis DiGiovanni, Esq. (via facsimile)

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

July 22, 2003

**BY FACSIMILE**

Theresa M. Corbin, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Ave.
Menlo Park, CA 94025

Re:     Ricoh v. Aeroflex et al.

Dear Terry:

        We have just learned that your firm has engaged the services of Dr. Donald
Thomas. This is to inform you that Dr. Thomas has a significant conflict of interest in
being engaged by your firm in connection with the present litigation. Dr. Thomas has
previously been engaged by our firm in connection with this matter. In his
representation, he obtained confidential and privileged information from us.

        Consequently, we demand that you immediately cease and desist from any
further discussions with Dr. Thomas. This matter needs to be quickly and immediately
resolved.

                                Very truly yours,

                                Gary M. Hoffman

GMH/ncz
Cc:     Edward Meilman, Esq. (via facsimile)
        Robert W. Whetzel, Esq. (via facsimile)
        Francis DiGiovanni, Esq. (via facsimile)

1177 Avenue of the Americas • New York, NY 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.DicksteinShapiro.com

**24**

# DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*Writer's Direct Dial: (202) 828-2228*
*E-Mail Address: HoffmanG@dsmo.com*

July 23, 2003

**BY FACSIMILE**

Christopher Kelley, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Ave.
Menlo Park, CA 94025

Re:     <u>Ricoh v. Aeroflex et al.</u>

Dear Mr. Kelly:

      As you know, yesterday we learned that your firm has engaged the services of Dr. Donald Thomas in connection with the present litigation, even though you were aware that Dr. Thomas had been previously engaged by our firm on behalf of Ricoh. That engagement was in connection with this very same matter; Dr. Thomas had signed a confidentiality agreement, and Dr. Thomas had obtained confidential and privileged information from us. Yesterday, I sent a letter to Terry Corbin advising her of this significant conflict of interest and demanded that your firm immediately cease and desist from any further communications with Dr. Thomas. We have received no response to this letter and request the courtesy of an immediate reply indicating an agreement by your firm, the defendants and Synopsys that none of you will have any further communications with Dr. Thomas.

      In order to assess the impact of your firm's actions relative to Dr. Thomas, we request that defendants, their attorneys, and Synopsys agree to the following: 1) immediately disclose all communications with or relating to Dr. Thomas and produce all documents sent to or received from Dr. Thomas, with no withholding of any documents on the basis of the attorney-client privilege or work-product doctrine; 2) produce Dr. Thomas for a deposition regarding all communications with defendants, their attorneys and/or Synopsys regarding the '432 or '016 patent; and 3) stipulate that such deposition of Dr. Thomas shall not be used for any purpose other than determining what remedies should apply as a result of your firm's communications with Dr. Thomas.

      We request your response by no later than 5:00 p.m. Eastern Time on Thursday, July 24, 2003.

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*www.DicksteinShapiro.com*

1642491 v1; 27CR01!.DOC

Christopher Kelley, Esq.
July 23, 2003
Page 2

Sincerely,

Gary M. Hoffman

GMH/ncz
Cc:    Edward Meilman, Esq. (via facsimile)
       Robert W. Whetzel, Esq. (via facsimile)
       Francis DiGiovanni, Esq. (via facsimile)
       Teresa M. Corbin, Esq. (via facsimile)

**25**



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

Christopher L. Kelley
Partner
650.463.8113
kelleyc@howrey.com

July 25, 2003

**VIA FACSIMILE AND U.S. MAIL**

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky, LLP
2102 L Street NW
Washington, DC  20037-1526

Re:     *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
        Civil Action No. 03-103-GMS

Dear Mr. Hoffman:

I have your letter of July 23rd regarding Dr. Don Thomas.  I believe that many of the issues that you raise were anticipated by my letter to you sent earlier on the same date.

I understand that Ricoh has requested assurances that defendants will not begin consulting with Dr. Thomas before Ricoh's claims of conflict of interest can be heard by the Court.  As stated in my letter of July 23, if Ricoh presents this dispute to the Court by August 6, we will refrain from consulting with Dr. Thomas while the matter is under active consideration by the Court.

Depending upon what Ricoh alleges in any motion that it brings, we may, however, communicate with Dr. Thomas in order to request that he provide evidence to the Court relevant to resolution of this dispute.  The question of whether Dr. Thomas may work for defendants without creating a conflict of interest turns on whether he received confidential information from Ricoh.  Dr. Thomas has stated that he received nothing confidential during his work for your firm.  If Ricoh makes allegations to the contrary, it may be appropriate for Dr. Thomas to respond to those allegations and we may ask him to do so.  We may also communicate with Dr. Thomas regarding procedural matters arising in connection with his response to defendants' subpoena duces tecum.



Gary M. Hoffman, Esq.
July 25, 2003
Page 2

Your letter requests discovery of our communications with Dr. Thomas. Your discovery request is unwarranted, as Ricoh has not established that Dr. Thomas was in any way precluded from communicating with defendants.

If you have any further questions please contact me at (650) 463-8113.

Very truly yours,

Christopher Kelley/gg

Christopher L. Kelley

CLK:gg

cc: Dr. Donald Thomas

26

From: "Campbell, Louis" <CampbellL@howrey.com>
Date: Wed Jul 23, 2003 4:37:02 PM US/Eastern
To: "'thomas@ece.cmu.edu'" <thomas@ece.cmu.edu>
Subject: review of documents

I just thought of a clarification about your review of the pdfs you
received. I only want to know if they were published. It is important that
you do not tell me any specifics about these pdfs such as title, author,
dates, etc.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650–463–8135 (phone)
650–463–8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged or confidential. If you are not the intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.

PTH000051

27

**From:** Don Thomas <thomas@ece.cmu.edu>
**Date:** Thu Jul 24, 2003 8:56:11 AM US/Eastern
**To:** "Campbell, Louis" <CampbellL@howrey.com>
**Cc:** Don Thomas <thomas@ece.cmu.edu>
**Subject:** Re: review of documents

The documents I received from DSMO fall under the categories of:

■ patents

■ published articles, whether conference, journal, or thesis

■ and one that appears to be a rough draft of corporate literature (includes sections like "company overview" and "XXX services and products").
–Don Thomas–

On Wednesday, July 23, 2003, at 04:37 PM, Campbell, Louis wrote:

I just thought of a clarification about your review of the pdfs you
received. I only want to know if they were published. It is important that
you do not tell me any specifics about these pdfs such as title, author,
dates, etc.

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650–463–8135 (phone)
650–463–8400 (fax)
CampbellL@howrey.com

This communication is for the named recipient only and may contain
information that is privileged or confidential. If you are not the intended
recipient please delete the document, destroy any hard copies, and
immediately notify the sender that you received this email in error.

PTH000052

**28**

From: CampbellL@howrey.com
Date: Mon Jul 28, 2003 2:28:29 PM US/Eastern
To: thomas@ece.cmu.edu
Cc: KelleyC@howrey.com, hoffmang@dsmo.com, mellmane@dsmo.com
Subject: Deposition on July 31

Dear Dr. Thomas:

    I received your email of today inquiring as to whether your deposition noticed for July 31st, would still proceed.

    Given your agreement to consult on behalf of defendants we have withdrawn the deposition date scheduled. As you know, Ricoh, has asserted that you have a conflict of interest that would preclude you from consulting with defendants. This is a question that may be resolved by the District Court in Delaware. If the Court rules that you cannot consult with defendants we will re-schedule the deposition for a date of mutual convenience. At that deposition we will seek testimony regarding the character of prior art logic synthesis systems and their relevance to the validity of Ricoh's patents.

Sincerely,

Louis L. Campbell

Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025
650-463-8135 (phone)
650-463-8400 (fax)
CampbellL@howrey.com

PTH000055

29



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

CHRISTOPHER L. KELLEY
PARTNER
650.463.8113
kelleyc@howrey.com

August 5, 2003

**VIA FACSIMILE AND U.S. MAIL**

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky, LLP
2102 L Street NW
Washington, DC  20037-1526

Re:  *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
     Civil Action No. 03-103-GMS

Dear Mr. Hoffman:

Pursuant to the Court's order of July 31, we are hereby producing copies of all written communication between Don Thomas and this law firm, which is serving as counsel for defendants in the above captioned case and for Synopsys in an action in the Northern District of California. We have also enclosed a copy of a consulting agreement sent to Dr. Thomas.

There have been no face-to-face meetings between counsel for defendants and Dr. Don Thomas. There has been only one direct telephone communication, on July 23, between counsel for defendants and Dr. Thomas. Prior to that phone call there was an exchange of non-substantive voice messages between Mr. Louis Campbell, an attorney with Howrey Simon Arnold & White, and Dr. Thomas. Mr. Campbell and Dr. Thomas were the only participants on the July 23 call. Mr. Campbell informed Dr. Thomas that he wanted to verify that Dr. Thomas had not received confidential information from Ricoh or its counsel. Mr. Campbell also stated that he did not want to know the specifics of what materials had been supplied by Ricoh or its counsel, but only the general character of these materials. Mr. Campbell then asked if Dr. Thomas had received anything confidential from Ricoh or its counsel. Dr. Thomas stated that he did not think he had but that he was not entirely certain. Mr. Campbell asked Dr. Thomas to investigate to determine the answer to this question. Mr. Campbell then asked whether Dr. Thomas had received any information related to case strategy. Dr. Thomas said he had not. Nothing further regarding Dr. Thomas' earlier work for Ricoh or its counsel was discussed. Mr.



Gary M. Hoffman, Esq.
August 6, 2003
Page 2

Campbell and Dr. Thomas also discussed reimbursement of Dr. Thomas' costs for copying documents produced pursuant to defendants' subpoena.

Very truly yours,

Christopher L. Kelley

CLK:gg
Enclosures

**30**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICOH COMPANY, LTD., | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 03-103-GMS |
| AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP., and MATROX TECH, INC., | ) | |
| Defendants. | ) | |

```
    FILED

  JUL 3 1 2003

U.S. DISTRICT COURT
DISTRICT OF DELAWARE
```

**ORDER**

The Court, having considered the issue of whether to preclude Dr. Donald
E. Thomas from providing expert consulting services to defendants and their counsel,

IT IS HEREBY ORDERED AS FOLLOWS:

1.      Pending further Order of this Court, neither defendants nor their
counsel shall have any communication with Dr. Thomas regarding the merits of this
case or the patent in suit unless counsel for plaintiff is present or consents in writing.

2.      No later than August 6, 2003, Defendants and their counsel are
ordered to disclose all communications with or relating to Dr. Thomas and to produce
all documents sent to, prepared by, or received from Dr. Thomas.  Any documents
withheld on the basis of the attorney-client privilege or the work-product doctrine

should be produced to the Court for an in camera inspection, and Defendants shall provide Plaintiff with a detailed privilege log.

      3.     No later than August 18, 2003, Dr. Thomas shall sit for a deposition limited to all communications with defendants, their attorneys or Synopsys regarding the '432 patent, with that deposition to not be used for any purpose other than in connection with resolution of issues relating to the retention of Dr. Thomas.

      4.     On or before August 31, 2003, plaintiff may file with the Court a two page letter, exclusive of exhibits, identifying any issues remaining in dispute relating to the retention of Dr. Thomas and the relief sought in connection therewith. Defendants shall file within five (5) days from the date of service of the opening letter an answering letter of no more than two pages, exclusive of exhibits. Plaintiff may then file a reply letter of no more than two pages, exclusive of exhibits, within three (3) days from the date of service of the answering letter.

      5.     Plaintiff shall arrange a telephonic conference with the Court to be scheduled for a date after completion of the submissions described above.

IT IS SO ORDERED this 31st day of July, 2003.

_____
United States District Judge

**31**

CondenseIt™                                          **August 28, 2003**

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
2           IN AND FOR THE DISTRICT OF DELAWARE
3                    - - -
4   RICOH COMPANY, LTD.,        :    Civil Action
5           Plaintiff,          :
6      v.                       :
7   AEROFLEX INCORPORATED, AMI  :
    SEMICONDUCTOR, INC.,        :
8   MATROX ELECTRONIC SYSTEMS   :
    LTD., MATROX INC., GRAPHICS :
9   MATROX INTERNATIONAL CORP., :
    and MATROX TECH, INC.,      :
10                              :
           Defendants.          :    No. 03-103-GMS
11                   - - -
12              Wilmington, Delaware
13             Thursday, August 28, 2003
14                 11:00 a.m.
               Telephone Conference
15                   - - -
16  BEFORE: HONORABLE GREGORY M. SLEET, U.S.D.C.J.
17  APPEARANCES:
18      ROBERT W. WHETZEL, ESQ., and
        STEVEN J. FINEMAN, ESQ.
19      Richards, Layton & Finger
            -and-
20      GARY M. HOFFMAN, ESQ., and
        EDWARD A. MEILMAN, ESQ., and
21      KENNETH W. BROTHERS, ESQ.
        Dickstein Shapiro Morin & Oshinsky LLP
22      (Washington, D.C.)
23              Counsel for Plaintiff
24
25
```

Page 2

```
1   APPEARANCES CONTINUED:
2       FRANCIS DIGIOVANNI, ESQ.
        Connolly Bove Lodge & Hutz LLP
3           -and-
        TERESA M. CORBIN, ESQ.,
4       CHRISTOPHER KELLEY, ESQ., and
        ERIC OLIVER, ESQ.
5       Howrey Simon Arnold & White, LLP
        (Menlo Park, California)
6
                Counsel for Defendants
7                    - - -
8
9
10          THE COURT: Good morning, counsel.
11          MR. WHETZEL: Good morning, Your Honor. Bob
12  Whetzel from Richards Layton for plaintiff Ricoh. With me is
13  my colleague here at Richards Layton Steven Fineman. Also on
14  the call for Ricoh are Messrs. Gary Hoffman, Ed Meilman and
15  Ken Brothers, my co-counsel. I suspect Mr. Hoffman will be
16  our principal spokesperson this morning.
17          THE COURT: Good morning, all.
18          For defendants.
19          MR. DIGIOVANNI: Frank DiGiovanni from Connolly
20  Bove. Also on the line from Howrey Simon in California are
21  Teresa Corbin and Chris Kelley and Eric Oliver.
22          THE COURT: Who is going to handle the argument
23  today?
24          MR. DIGIOVANNI: I will be arguing the first of
25  the agenda items, and I believe Mr. Kelley will be arguing
```

Page 3

```
1   the remainder.
2           MR. HOFFMAN: Your Honor, on behalf of Ricoh, I
3   Brothers will be arguing the first item. I will be handling
4   items 2, 3, 6 and 8. And Mr. Meilman will be handling its
5   5 and 7.
6           THE COURT: Okay. I will try to keep that roster
7   in mind.
8           Let's start with Item 1.
9           MR. BROTHERS: Your Honor, on Item 1, there is a
10  difference of opinion between the parties with respect to the
11  obligations of the order that the Court entered on July
12  31st --
13          MR. DIGIOVANNI: Your Honor, I don't mean to
14  interrupt. I don't do that. But we are the ones, the
15  defendants are the ones --
16          THE COURT: Are you the movant on that one?
17          MR. DIGIOVANNI: Yes, we are.
18          THE COURT: Let's start with the movant.
19          MR. BROTHERS: I am sorry. Both parties are
20  seeking relief, just to be clear.
21          THE COURT: So both of you, you each view
22  yourselves as movants?
23          MR. BROTHERS: Yes, Your Honor.
24          MR. DIGIOVANNI: Yes, Your Honor.
25          On behalf of defendants, we did place the call
```

Page 4

```
1   and initiated the conference. We consider ourselves primary
2   movants on this issue.
3           MR. BROTHERS: Your Honor, we can both have our
4   say.
5           THE COURT: Mr. Brothers, continue.
6           MR. BROTHERS: Thank you.
7           The order of July 31st, the second paragraph
8   requires the defendants and their counsel to disclose all
9   communications with or relating to Dr. Thomas and to produce
10  all documents sent to, prepared by, or received from Dr.
11  Thomas. And then it continues, Any documents withheld on the
12  basis of attorney-client privilege or work product doctrine
13  should be submitted to the Court for an in camera inspection
14  and defendants shall provide plaintiffs with a detailed
15  privilege log.
16          We received part of those documents. We received
17  the e-mails and letters between the Howrey firm and Dr.
18  Thomas. But defendants and their counsel have refused to
19  produce anything else, namely, any internal communications on
20  an in camera basis to the Court and to give a privilege log
21  to the other side. We believe that is clearly required by
22  the order.
23          The history of this gives some basis for our
24  concern.
25          Dr. Thomas was deposed on August 14th. The
```

## Page 5

1   witness contradicted the representations of Mr. Kelley during
2   the hearing on the 30th on multiple points, which gives us
3   concern as to what the complete story is.
4       For example, you will recall that the Howrey firm
5   served Dr. Thomas with a subpoena in late June but never
6   provided that to counsel for plaintiffs or filed any notices
7   with the Court.  And although Mr. Kelley said during the
8   hearing that Dr. Thomas had called them and said he wasn't
9   working for Ricoh, in fact, what these documents that were
10  produced and Dr. Thomas' testimony show is that Dr. Thomas
11  specifically told the Howrey firm that he was under contract,
12  a consulting contract, with counsel for Ricoh, that Dr.
13  Thomas specifically asked Howrey if they had given the
14  subpoena to counsel for Ricoh, and Howrey led him to believe
15  that the subpoena had been given and that the names of
16  experts had been disclosed in the litigation, and that
17  counsel for Ricoh had not named Dr. Thomas as an expert, so
18  Dr. Thomas assumed that we didn't want him as an expert,
19  which wasn't the case.  And then the Howrey firm said,
20  according to Dr. Thomas' testimony, if you sever your
21  contract with Ricoh, then we can hire you and we can pay
22  you.  And that's what Dr. Thomas did.
23      A second inconsistency was that Mr. Kelley said
24  very explicitly during the hearing that before Dr. Thomas was
25  hired, they asked him if he had received any confidential

## Page 6

1   information or discussed case strategy or other types of
2   information with Ricoh, and that Dr. Thomas had said, no, he
3   hadn't.
4       That is simply not the case.
5       Dr. Thomas was retained.  The retention letter
6   was sent on July 17.  He signed it on July 21st.  The first
7   time any such communications of that nature came up was after
8   we found out about it and objected, and then suddenly there
9   was a flurry of telephone calls and e-mails between the
10  Howrey firm and Dr. Thomas saying, what confidential
11  information did you have?  Tell us about it.  And there was a
12  phone conference on the 23rd of July and followup e-mails.
13      Dr. Thomas testified at his deposition that there
14  was no question that he had received confidential information
15  from counsel for Ricoh.  And he identified a couple of
16  categories of that.
17      During this flurry of information, after counsel
18  for Ricoh had objected, Dr. Thomas had described the
19  categories of this confidential information.
20      Now, Howrey refuses to produce those internal
21  e-mails.  We had requested them even prior to the hearing,
22  and the Howrey firm understood we were looking for them.
23  There is a reference by Mr. Kelley in the transcript that, I
24  think it's on Page 14 or so, that he understood we were
25  looking for that information.

## Page 7

1       After all of this, the defendants say, well,
2   maybe we are not going to use Dr. Thomas as an expert after
3   all, but we still want to go forward and take his deposition
4   on the very subjects which were the subject matter on his
5   consulting with Ricoh.
6       They obviously believe that Dr. Thomas is going
7   to give them favorable opinions.  Dr. Thomas testified that
8   as a result of his consulting with Ricoh he had formed
9   opinions.  What is the basis for their expectation?
10      We need to go forward and try and resolve this.
11  We think the sole basis is that Dr. Thomas has given Howrey
12  some basis to believe that the testimony he is going to give,
13  the opinion testimony that they are seeking, is going to be
14  favorable, and that was developed solely as a result of his
15  confidential consulting with counsel for Ricoh.
16      The issue before the Court not only is the
17  interpretation of Paragraph 2 of the July 31st order.  The
18  Court is also aware that we are to file followup letters that
19  will relate to the disqualification of Thomas and any other
20  remedies that might be available.  We think it advisable that
21  the Court is provided with this information so it has the
22  full picture of what the appropriate remedy should be.
23      THE COURT:  Okay.  Mr. DiGiovanni.
24      MR. DiGIOVANNI:  First of all, there is no
25  contradiction between what Mr. Kelley represented on the July

## Page 8

1   30th teleconference and Dr. Thomas' deposition.  Dr. Thomas
2   was very clear that he was asked by the Howrey Simon
3   attorney, the one single attorney that he talked to for the
4   five-minute period he actually talked to him, do you have any
5   confidential information?  And if so, what type of
6   information is it?  And Dr. Thomas responded two days later
7   in an e-mail, just listing three short types of information
8   he had:  patents, publications, and financial information.
9   None of it was confidential.
10      And all of those e-mails, that e-mail, and there
11  were about six or seven other e-mails, have been produced.
12  And those are the entire universe of documents that went back
13  and forth between Howrey Simon and Dr. Thomas.
14      If you go back to the teleconference on July
15  30th, the request that was made by Mr. Hoffman was that you
16  ordered that the defendants be required to disclose all the
17  communications that they have had with Dr. Thomas, and
18  produce all the documents to us that have gone back and
19  forth.  The Court subsequently ordered Ricoh's counsel to
20  prepare an order outlining the requests that you have made
21  and I will sign it.
22      But what happened later that day or maybe it was
23  the next day, July 31st, counsel submitted an order that
24  included an additional phrase, some additional language.  You
25  Honor, which actually went beyond what they were supposed to

## Page 9

1  submit. So that became this July 31st order.

2      The language of the order --

3      THE COURT: Is that the sentence that says any

4  documents withheld on the basis of attorney-client --

5      MR. DiGIOVANNI: No, Your Honor.

6      THE COURT: Which language is it?

7      MR. DiGIOVANNI: In the same paragraph, Paragraph

8  2, the first sentence, it says, No later than August 6, 2003

9  defendants and their counsel are ordered to, right where it

10  says disclose, it says disclose all communications with or

11  relating to Dr. Thomas. That clause was brand-new. That was

12  not part of what Your Honor ordered on that teleconference,

13  this disclose all communications with or relating to Dr.

14  Thomas. The second clause of that, ordered to produce all

15  documents sent to, prepared by or received from Dr. Thomas,

16  that's what we talked about on the teleconference. That's

17  what we have done. We have produced every single piece of

18  paper, all e-mails that were sent back and forth between

19  counsel and Dr. Thomas. It didn't amount to much. It was

20  only about six or seven e-mails.

21      We also gave them a cover letter to those

22  e-mails. It described the communications, and it also

23  described the type of internal communications that we had

24  amongst attorneys, between attorney and clients. We noted of

25  course those were privileged, that those weren't required

## Page 10

1  under the production portion of Paragraph 2, because

2  Paragraph 2 says, when it talks about producing documents, it

3  says, produce all documents sent to, prepared by or received

4  from. Then it goes on to talk about documents, any documents

5  withheld, et cetera, et cetera. So we didn't withhold any

6  documents on the basis of privilege. So there was nothing to

7  put on a privilege log. There was nothing to produce in

8  camera.

9      The issue is what does this mean, disclose all

10  communications with or relating to Dr. Thomas? And what

11  counsel for Ricoh is saying is that means that all documents

12  relating to Dr. Thomas had to be produced. That is

13  completely inconsistent with the second phrase, where it

14  talks about the exact scope of production of documents. Our

15  reading of it was, we disclosed in our cover letter precisely

16  what we were supposed to produce, precisely what kind of

17  communications went on.

18      Of course, we didn't produce them. The order

19  doesn't require it. It would never make sense to produce

20  privileged documents, even in camera. An in camera review is

21  often done to determine if there is a privilege, not to

22  actually review some privileged documents to find a basis for

23  a claim. But in any event, the order doesn't call for it,

24  before you even getting into the law regarding in camera

25  review.

## Page 11

1      It is also important, Your Honor, that once we

2  received the declaration of Christopher Monti (phonetic),

3  this is the declaration that Mr. Hoffman talked about on the

4  July 30th conference, once we received that, which, by the

5  way, was one week ago, we had to wait until one week ago to

6  get it, once we took the deposition of Dr. Thomas to find out

7  if, indeed, he received confidential information, once we had

8  those two pieces of information, two days later we said,

9  okay, we are not going to retain Dr. Thomas as an expert.

10  And we are not a hundred-percent convinced that he did

11  receive confidential information.

12      But we told them, all right, we are not going to

13  use him as an expert, fully expecting that would end

14  everything. But they said, no, they want to try to

15  disqualify counsel even though there isn't a shred of

16  information, shred of evidence anywhere stating that Dr.

17  Thomas provided to counsel for defendants any sort of

18  confidential information. In fact, Dr. Thomas,

19  unequivocally, testified that he had one conversation with

20  attorneys for defendants for five minutes. And here is his

21  quote. He says, I didn't share any information with him --

22  this is talking about the one attorney -- about confidential

23  material.

24      That is it.

25      THE COURT: Okay. Mr. Brothers, Mr. DiGiovanni

## Page 12

1  asserts that that clause that he has identified in Paragraph

2  2, all communications with or relating to, goes beyond the

3  letter and spirit of the discussion and subsequent order

4  entered by the Court orally on July 30th.

5      I don't have the transcript in front of me. I

6  don't have total recall. I don't really wish to engage in an

7  extended debate as to what was intended. But Mr.

8  DiGiovanni's reflections do seem to comport with my

9  recollection of that conversation. Go ahead.

10      MR. BROTHERS: Yes. I do have the copy of the

11  transcript in front of me. On Page 9 it references, Line 17

12  through 22, this aspect of the request. And I will read that

13  quote. And this relates to the second paragraph. Quote.

14  That the defendants be required to disclose all

15  communications that they have had with Dr. Thomas and produce

16  all the documents to us that have gone back and forth. If

17  they feel that any documents are privileged or work product,

18  then they can be submitted in camera. But we should get a

19  log so we can sort that out.

20      Prior to that, Mr. Hoffman had noted, on Page 8,

21  we didn't know the details of what had been discussed, and

22  then later on, Mr. Kelley acknowledged that we were seeking

23  the nature of their communications with Dr. Thomas.

24      The issue here is twofold. First, it is not only

25  the communications back and forth between Dr. Thomas and

## Page 13

1 counsel for the defendants. But second, the issue is what
2 did the Howrey firm know and when did it know it with respect
3 to the confidential information that Dr. Thomas had obtained
4 from counsel for Ricoh.
5         There are inconsistencies between Dr. Thomas'
6 testimony and what Mr. Kelley was representing.
7         Now, we ought to be very cautious here. We have
8 not sought to disqualify the Howrey firm. What we are trying
9 to do is get information so that an appropriate determination
10 can be made. What Mr. DiGiovanni has said is, well, we
11 thought by dropping Dr. Thomas that would be the end of it.
12 But they still want to go ahead and take his deposition on
13 the very topics that Mr. Thomas had provided his confidential
14 consulting to counsel for Ricoh. And they just want to sweep
15 under the carpet these inconsistencies and hope that the
16 whole issue will go away.
17         At this point, we don't think that that is
18 appropriate. We think it is appropriate, an appropriate
19 inquiry can be made, but before that can happen, all of the
20 factual information needs to be collected.
21         Prior to our even having the conference with Your
22 Honor on the 30th, we had sent a letter to the Howrey firm,
23 saying, this is what we want. So they knew that we were
24 looking for not only the communications with Dr. Thomas, but
25 the internal communications on an in camera basis if the

## Page 14

1 privilege was not going to be waived, so that the Court could
2 make this determination, because ultimately, that may be the
3 critical issue, the determination of what is in the order and
4 our interpretation.
5         THE COURT: Counsel, let me just ask. The
6 determination being whether the documents at issue are
7 privileged or not.
8         MR. BROTHERS: I am sorry. The determination
9 would be twofold. First, whether the documents would be
10 privileged. But second, if the documents reflect that in
11 fact Howrey had received confidential information from Dr.
12 Thomas, as we believe is likely, based on their continued
13 pursuit of his deposition, so that they can get his opinions,
14 then an appropriate determination should be made.
15         It is important to note that Howrey recognized at
16 the outset that Dr. Thomas was consulting for counsel for
17 Ricoh --
18         THE COURT: Let me interrupt again. So that
19 appropriate determination being whether the Howrey firm
20 should be disqualified or not. Is that what you mean?
21         MR. BROTHERS: That is a decision that we may
22 well ask the Court to make. We are not asking it at this
23 time. We don't know what those documents may show. And we
24 may not ever see those actual documents. But we think that
25 it may be appropriate for the Court to see what is in there

## Page 15

1 so it can make an appropriate determination.
2         We want to be very careful. We are not at this
3 point saying the Howrey firm must be disqualified, because we
4 don't have all the facts from the Howrey side. We have it
5 from Dr. Thomas' side. But we don't have all of the
6 information.
7         THE COURT: Now, let me ask this: Do I
8 understand correctly that Dr. Thomas is more or less out of
9 this litigation at this point?
10         MR. BROTHERS: Counsel for defendants have
11 verbally informed us that they do not intend to retain him as
12 an expert. However, they have said that they intend to go
13 forward and take his deposition, which will include, they
14 say, the opinions that he developed as a result of his
15 consulting for Ricoh.
16         MR. DiGIOVANNI: Your Honor, that is not
17 accurate, with all due deference to Mr. Brothers. We never
18 said we were going to inquire as to any opinion in a
19 third-party deposition of Dr. Thomas, of any opinions he
20 formed while working with Ricoh, which he did for 12 or 14
21 hours. We never said that.
22         We will take his deposition, as we would any
23 other third party. His assignment was very important at the
24 time this invention was being developed. There is no way
25 that Ricoh can lock him up, in other words, put a cage around

## Page 16

1 him so we can't even get to him in this litigation. He is
2 still a fact witness. Ricoh may have talked to 15 or 20
3 witnesses and hired them for 12 hours. That doesn't mean
4 they can lock them up and prevent them from being part of
5 this litigation. We are entitled to take his deposition as a
6 third party. We will not inquire into conversations between
7 Dr. Thomas and Ricoh. We will not do that. We know we
8 can't, and we wouldn't, anyway.
9         THE COURT: Mr. Brothers, what do you say to
10 that?
11         MR. BROTHERS: Well, there are three things in
12 response, Your Honor. First, on the 28th of July, the Howrey
13 firm sent Dr. Thomas an e-mail, saying if the Court rules
14 that we can't use you as a consulting expert, we are going to
15 take your deposition on the things that we have been talking
16 about. And Dr. Thomas testified, when I asked him about
17 that, he said, that looks just like the things that I was
18 consulting with Ricoh about. And it does. And in the
19 communications that we have had with counsel for the
20 defendant, they have said we are precluded from asking Dr
21 Thomas about those issues.
22         It seems to be a bit of a moving target, based on
23 what Mr. DiGiovanni is telling me today. But the fact is
24 that Dr. Thomas had in-depth consultations with counsel for
25 Ricoh, and he testified he formed opinions as a result of

## Page 17

1  that. That opinion evidence, because they are going to ask
2  him to compare the patent to the prior art, that's
3  information that is all flowing directly from his consulting
4  work. As a result of the conduct of counsel for defendants,
5  Dr. Thomas has become a tainted witness. And it will be very
6  difficult to sort out what is tainted and what is not
7  tainted.
8        MS. CORBIN: Your Honor, I am the lead counsel in
9  this case for defendants.
10       If I could clarify the situation. The concern we
11  have about what we see as the problem with the order, the
12  language that Mr. DiGiovanni culled out, which was disclosure
13  of all communications with, and it's particularly the "or
14  relating to Dr. Thomas" part which gets to Howrey's internal
15  work product and communications with its client, because the
16  fact remains that Dr. Thomas developed one of the major and
17  key pieces of what we believe is invalidating prior art to
18  this patent, that was the genesis in the first place of
19  serving him with a third-party subpoena, to get the testimony
20  necessary to identify all the aspects of that particular
21  prior art and the timing of its development and so on.
22       Going back to the order, this is our concern.
23  The "or relating to" aspect would require us to provide in
24  camera for the Court, which if the Court really wants to see
25  it, we would do that, but it would require us to gather up

## Page 18

1  all the information and internal documentation we have about
2  that particular prior art and the fact that, as we learned,
3  Dr. Thomas was probably the most relevant witness who
4  developed that prior art, and would be the most relevant
5  person from whom to get the information as to the timing and
6  the particular aspects of that technology.
7        I do believe that those underlying facts cannot
8  be -- we are still entitled to discover those. The fact that
9  they hired him for 12 hours of consulting work can't shield
10 what is a major piece of prior art and take that prior art
11 essentially out of the case.
12       THE COURT: I agree with that.
13       MR. HOFFMAN: Your Honor, I am lead counsel for
14 Ricoh. If I could respond, since Ms. Corbin has?
15       THE COURT: Go ahead.
16       MR. HOFFMAN: I would appreciate the Court's
17 indulgence.
18       First of all, on the issue of what the scope is
19 and the timing, that is easily dealt with just by saying that
20 it is a document, internal communications regarding the
21 retention of Dr. Thomas and also putting on a date that
22 starts with the first contact with Dr. Thomas.
23       Let me go to the more significant issue here.
24 Howrey & Simon and the defendants here knew from
25 day one, once they contacted Dr. Thomas, that he was already

## Page 19

1  consulting for Ricoh. There is an e-mail where they said to
2  Dr. Thomas, there appears to be a conflict and consequently
3  we cannot use you.
4        Subsequently, they decided to change their mind
5  and send him a consulting agreement, encourage him to break
6  his agreement, terminate his agreement with Ricoh, and to
7  send him a consulting agreement, which he signed. After he
8  signed it, and after we complained, they went back and asked
9  him about the confidential information and whether or not he
10 got confidential information from Ricoh.
11       We didn't create this problem. Howrey & Simon
12 had a simple thing that they could have done if they chose
13 to. That is, once he indicated, Dr. Thomas said, hey, I am
14 consulting for Ricoh: Thank you very much, nice talking to
15 you, have a good day, goodbye. They chose not to.
16       They chose to go forward with this. And they
17 chose to do it until we found out about the subpoena, which
18 was only after they engaged him, not beforehand, contrary to
19 what they led him to believe, and only after they engaged him
20 already did we complain and did they finally do the checking.
21       They created the problem. We didn't create
22 this. What we are trying to do is to seek the information
23 and to place the information before the Court so that
24 appropriate relief, whatever that may be, can be fashioned.
25 As Mr. Brothers indicated, we are not seeking

## Page 20

1  disqualification today. I don't know that we will ever seek
2  disqualification. There may be and I hope there would be
3  other relief less than that that would be appropriate here.
4        But the first thing we need to do is to find out
5  how deep the poison runs. There is clearly a problem, one of
6  their creation. We are just trying to sort it out so that we
7  can seek from the Court appropriate relief.
8        These documents that we are indicating that they
9  should list on a privilege log and send to the Court are not
10 coming to us at this point. These are not documents we are
11 saying at this point -- eventually, we may get there, once we
12 see what is on the log.
13       THE COURT: Let me ask this, Mr. Hoffman: The
14 communications relating to, is it your position that those
15 communications may reveal, I think the words tainted witness
16 were used before, that is, they may impact in some way upon
17 this potential witness' credibility as that credibility or
18 his testimony pertains to the merits of the case?
19       MR. HOFFMAN: It may relate to that. It may
20 relate to the issue of what is the appropriate relief. It
21 may relate to the issue of the fruits of the poisonous tree,
22 as the cliche goes. There is an overall issue as to what
23 should be the appropriate relief that is fashioned here.
24       THE COURT: Right now, I don't have a motion
25 before me asking for relief in that regard. I think what you

**Page 21**

1  are suggesting is how -- it has been discussed earlier
2  whether the Howrey firm should be disqualified or not.
3  Should that be my principal concern at this point? I think
4  it was Mr. Brothers who may have used the words tainted
5  witness. I think you are entitled to challenge this witness'
6  credibility before the finder of fact, as that credibility
7  pertains to his opinions regarding the merits of whatever it
8  is he is going to be testifying regarding the actual
9  substance of this litigation. Isn't the retention or the
10  disqualification of the Howrey firm, at least at this
11  juncture, an ancillary issue?
12      MR. HOFFMAN: It is an ancillary issue at this
13  point. But part of the other issues, Your Honor, in trying
14  to fashion relief, is, there is other forms of potential
15  relief. And we haven't sorted out what we are going to ask
16  for yet ourselves. But, for example, we may ask the Court to
17  say, listen, Howrey & Simon knew that this witness had
18  confidential information. They shouldn't be allowed to do
19  through the back door -- obtain his opinions that he formed
20  as a result of consulting with us. He should just be
21  someone, because of the problem that they created, should
22  just be off everyone's list, period. There is other
23  witnesses familiar with the prior art. He is not the only
24  one.
25      That is number one. It may be that there is

**Page 22**

1  other sanctions. It may be that the individuals who got
2  certain information on Howrey & Simon should not be involved
3  in the case, there should be a Chinese Wall around them.
4  That is another possibility. It does not disqualify the
5  firm. There may be a possibility that the whole firm should
6  be disqualified.
7      Right now, all we are looking for at this time is
8  a list of those communications on a privilege log.
9      MS. CORBIN: Your Honor --
10      THE COURT: Don't interrupt, counsel, please.
11      MS. CORBIN: I am sorry.
12      MR. HOFFMAN: Most people quite often provide a
13  list of privileged documents, anyway. Normally, once the
14  litigation starts, you don't continue. But this is a special
15  situation. And we are asking that the Court -- the way we
16  believe the order read, we ask that the Court require the
17  Howrey & Simon firm and defendants to provide a list of the
18  privileged documents. We also ask that the limited number of
19  documents -- I can't imagine there is many in this
20  category -- be provided to the Court, so that when the Court
21  has the issues laid before it, we can ask for what relief we
22  think is appropriate and the Court can fashion relief that it
23  believes is appropriate.
24      THE COURT: Ms. Corbin, what is the extent of the
25  potential production at issue here?

**Page 23**

1      MS. CORBIN: I wouldn't be able to address that.
2  I wouldn't have personal knowledge at this point.
3      THE COURT: Is there someone who can give the
4  Court that information?
5      MR. KELLEY: I can give you an estimate. I think
6  there is a handful of e-mails.
7      THE COURT: Let's produce them for the Court.
8      MS. CORBIN: Your Honor, my point is -- I don't
9  know whether it is apparent to the Court or not -- we seem to
10  be somewhat making points to cross-purposes here.
11      We did produce all of the exchange of e-mail and
12  any written documentation of an exchange between Howrey and
13  Dr. Thomas to the other side. And as well, Dr. Thomas'
14  deposition was taken. The testimony and those documents show
15  that no confidential information, if Dr. Thomas has any, was
16  ever communicated to Howrey & Simon. And I just want to make
17  clear, because I haven't heard, and I don't believe it's
18  Ricoh's position, that the contrary facts are the case. If
19  so, they haven't stated that.
20      THE COURT: I think they have stated that. Maybe
21  I misunderstood.
22      MS. CORBIN: That is why I wanted to clarify.
23      THE COURT: Let's clarify that.
24      MS. CORBIN: I think what they are complaining
25  about is that he had confidential information and we knew at

**Page 24**

1  some point, he had mentioned to us that he had consulted for
2  this short time with them and we proceeded anyway.
3      THE COURT: Let's get clarification on that. Mr.
4  Brothers.
5      MR. BROTHERS: Yes. Your Honor, we believe,
6  based on the inconsistencies between what Mr. Kelley said
7  during the hearing and Mr. Thomas' testimony, as well as the
8  intent of defendants to continue to pursue Dr. Thomas'
9  testimony, leads us to believe that something more than
10  innocent communications occurred. We don't know what those
11  are and we don't know the extent to them. We know that there
12  was at least one phone call in which the questions were
13  asked.
14      THE COURT: So in other words, Mr. Brothers, it
15  is at least your position that it may have been the case
16  that -- and I don't want to put words in your mouth, but for
17  purposes of clarifying the record and answering Ms. Corbin's
18  question -- is it your assertion that there is the
19  possibility that they may have known of the confidential
20  relationship and proceeded anyway?
21      MR. BROTHERS: Well, certainly, as I understand
22  it, everybody agrees they knew of the confidential
23  relationship. They elected to proceed anyway.
24      THE COURT: And that in fact confidential
25  information had been received by Dr. Thomas?

Page 25

1    MR. BROTHERS: Dr. Thomas has testified that in
2 fact confidential information was received.
3    MS. CORBIN: Was received, not transmitted to
4 Howrey Simon.
5    THE COURT: I am sorry. I should have gone that
6 additional step.
7    Is it your position, Mr. Brothers, that it was
8 transmitted?
9    MR. BROTHERS: We believe that there is an
10 inference that supports that. But we don't have the internal
11 Howrey documents that would presumably reflect on that, and
12 Dr. Thomas said he could not recall with specificity the
13 contents of his telephone conversation.
14    THE COURT: I thought, Ms. Corbin, I understood
15 counsel to take the position they have just articulated.
16    MS. CORBIN: My confusion is, Your Honor, they
17 have now taken a deposition and they have all the documents.
18 And they still say they have this inference. But they don't
19 have any statements that he made or any evidence from the
20 document exchange that any confidential information was
21 actually transmitted.
22    THE COURT: What is the basis for drawing the
23 inference, Mr. Brothers? That is what is being questioned
24 here.
25    MR. BROTHERS: There are three specific pieces of

Page 26

1 evidence, Your Honor. First is the fact that the questions
2 were asked during the telephone conversation what
3 confidential information was there, and there was the inquiry
4 following our complaint, and then there was a followup e-mail
5 to that saying -- and I read it as kind of a self-serving or
6 "let's protect ourselves" e-mail -- saying, we talked about
7 this in the phone call and I want you just to give me a
8 general list of the documents that were talked about.
9    Dr. Thomas didn't testify specifically, he
10 couldn't remember the specifics of the phone conversation.
11 But based on their, Howrey's continued pursuit of Dr. Thomas
12 and the e-mail following this exchange, saying we want to
13 take your deposition on in essence the same things that you
14 consulted with for counsel for plaintiff, that leads us to
15 believe that there is going to be favorable testimony coming
16 out of that. And what is the basis for that? We think that
17 there is only one answer to that. They have got some idea
18 from Dr. Thomas as a result of his consulting with Ricoh
19 about what those opinions were going to be. And that is the
20 confidential information.
21    In any event, Your Honor has ordered the Howrey
22 firm to produce those handful of internal documents. I would
23 ask that, because the order of July 31st provides that by
24 August 31st, we may file a two-page letter, I would just ask
25 that that be postponed until 10 days after the submission of

Page 27

1 the privilege log and internal documents.
2    THE COURT: That is an acceptable process. We
3 will follow that recommendation.
4    Ms. Corbin and Mr. DiGiovanni, are you clear as
5 to what your responsibilities are?
6    MR. DiGIOVANNI: Your Honor, actually, I am
7 somewhat confused with regard to the scope of production.
8 The only documents -- we described these few letters to
9 Ricoh -- the only documents that we have other than the
10 documents that went back and forth to Dr. Thomas, which were
11 all produced, are documents among the attorneys, the Howrey
12 Simon attorneys, there was some e-mail correspondence,
13 including myself, regarding Dr. Thomas and these issues
14 regarding Dr. Thomas. So every single e-mail communication
15 or other communication has at least as a recipient or the
16 author an attorney. So there is no doubt that all these
17 documents are privileged.
18    THE COURT: Sure.
19    MR. DiGIOVANNI: It sounds like they are trying
20 to break the privilege. However, there is no such exception
21 to the privilege that would allow this to break. For
22 example, in an instance where you have the crime/fraud
23 exception, the U.S. Supreme Court and the Third Circuit have
24 said there has to be at least a prima facie case established
25 before that can even be broken. There has to be a reasonable

Page 28

1 basis to even inquire into these privileged documents for
2 even in camera review.
3    It is our position Ricoh has not even come close
4 to establishing that, especially because we have taken the
5 deposition of Dr. Thomas and he said, quote, I didn't share
6 any information with him -- the one attorney he talked to --
7 about confidential material. So we are somewhat confused as
8 to what the possible inquiry can be, because this is
9 privileged information.
10    THE COURT: I understand what it is. I know the
11 crime/fraud exception, counsel.
12    Mr. Brothers, do you have a position on the
13 crime/fraud exception? Do you want to say something about
14 that?
15    MR. HOFFMAN: Your Honor, if I can just briefly
16 respond. First of all, to return to one of the points in
17 history because it lays the foundation for this. There was a
18 representation to the Court that Dr. Thomas had told the
19 Howrey people that he received no confidential information
20 from Ricoh.
21    THE COURT: I remember that.
22    MR. HOFFMAN: In fact, the Court made a comment
23 about relying on Dr. Thomas' legal opinion when that was
24 indicated. Dr. Thomas, during his deposition, though,
25 testified that he did receive confidential information from

## Page 29

1 Ricoh, obviously, inconsistent with the representations.
2 There is a number of representations that have been made to
3 the Court that are inconsistent -- I am sorry,
4 representations to the Court that are inconsistent with the
5 documents we have obtained to date and also Dr. Thomas'
6 testimony.
7 　　　Your Honor, I think that the whole issue of
8 making certain representations to the Court that they know
9 are inconsistent and these documents that we are asking be
10 turned over to the Court may further our belief, support our
11 belief, does create an issue of potential fraud upon the
12 Court.
13 　　　THE COURT: I think it does. The Court is going
14 to order the production of the July 30 transcript for its
15 inspection at the same time that it reviews the documents
16 that I have just ordered be produced.
17 　　　MR. KELLEY: I want to raise one point.
18 　　　THE COURT: We are done with this point.
19 　　　MS. CORBIN: So I can understand the scope...
20 　　　THE COURT: Let's make sure we understand the
21 scope.
22 　　　MS. CORBIN: You would like every internal
23 document in Howrey that makes reference to Dr. Thomas.
24 　　　THE COURT: Yes. As I understand it, we are
25 talking about a handful of documents.

## Page 30

1 　　　UNIDENTIFIED SPEAKER: Your Honor, is there a
2 time cutoff for this?
3 　　　THE COURT: Ms. Corbin, is that correct?
4 　　　MS. CORBIN: I can't make any personal
5 representation to that. There may be documents that address
6 that particular piece of prior art.
7 　　　THE COURT: I think it was Mr. Kelley who
8 indicated it would be a relatively few number of documents.
9 Is that correct, Mr. Kelley?
10 　　　MR. KELLEY: Yes, Your Honor.
11 　　　MR. DiGIOVANNI: Your Honor, I am not sure about
12 the time cutoff, because I believe Mr. Hoffman had stated he
13 was interested in the internal documents regarding the
14 retention of Dr. Thomas.
15 　　　MR. HOFFMAN: Your Honor, if I can just respond,
16 I can simplify things by proposing a time cutoff. I believe
17 the subpoena was sent out to Dr. Thomas early July --
18 　　　UNIDENTIFIED SPEAKER: Late June.
19 　　　MR. HOFFMAN: -- late June, from whatever that
20 date of that subpoena is going forward, coming to the
21 present.
22 　　　THE COURT: Is that understood on the other
23 side?
24 　　　MS. CORBIN: Yes, thank you, Your Honor.
25 　　　MR. DiGIOVANNI: Your Honor, if we are talking

## Page 31

1 about documents relating to Dr. Thomas through today, this
2 would include the e-mails leading up to this teleconference
3 regarding strategy.
4 　　　MR. HOFFMAN: I apologize, Your Honor.
5 　　　THE COURT: We don't need that. Through the date
6 of the July 30th telephone conference with the Court.
7 　　　Are we now clear on time parameters?
8 　　　UNIDENTIFIED SPEAKER: It would be June 26th,
9 2003, to July 30th, 2003.
10 　　　THE COURT: Ms. Corbin, do you understand the
11 time, and Mr. DiGiovanni, do you understand the time
12 parameters?
13 　　　MS. CORBIN: It would capture our communications
14 with each other in preparation for that call.
15 　　　THE COURT: Well, I don't want that, either.
16 That is not the intent of the Court, to include that,
17 either. Let's be a little more specific. Mr. Hoffman.
18 　　　MR. HOFFMAN: Your Honor, it would be with
19 respect to the issue whether or not to retain Dr. Thomas,
20 what Dr. Thomas discussed with them, what was communicated --
21 in other words, internal discussions about what were the
22 communications with Dr. Thomas, whether or not they should or
23 should not retain him. If it will simplify things, Your
24 Honor, nor that we not capture their internal communications
25 regarding preparing for the telephone conference with the

## Page 32

1 Court, why don't we drop it back a few days prior -- Your
2 Honor, we are not looking for things relating to the strategy
3 in preparing for the telephone conference.
4 　　　MR. BROTHERS: I was trying to make clear that
5 the phone conference was on July 30th and recapping that
6 phone conference, then there were additional e-mails to and
7 from Dr. Thomas up through the date of the hearing. So,
8 obviously, to the extent that an e-mail was sent to or
9 received from Dr. Thomas and forwarded to others with the
10 comments about substance and Dr. Thomas' retention and about
11 what was said, then I think all of those are appropriate to
12 include.
13 　　　THE COURT: I agree.
14 　　　MS. CORBIN: So, Your Honor, are you saying
15 through the date of the deposition? I missed what whoever
16 was speaking last just mentioned.
17 　　　MR. BROTHERS: I believe the subpoena was issued
18 on June 25th or 26th. And the hearing was on July 30th, in
19 which the Court said no further communications with Dr.
20 Thomas. So it would be that 34-day period.
21 　　　MS. CORBIN: Excluding any internal
22 communications from Howrey in preparation for that conference
23 call with the Court.
24 　　　THE COURT: Correct.
25 　　　MS. CORBIN: I have that in mind now. Your

## Page 33

1  Honor.  Thank you.
2         THE COURT:  Okay.  Great.
3         MR. HOFFMAN:  Your Honor, I presume you want to
4  proceed in order?
5         THE COURT:  Yes, sir.
6         MR. HOFFMAN:  Yes, sir.  The second topic is a
7  request of Ricoh.  We served the subpoena that was issued out
8  of Delaware, out of this Court, on Synopsys.  Synopsys is not
9  a party to the litigation.  However, Ms. Corbin has
10  previously indicated to the Court back at the time of the
11  scheduling conference that their position is Synopsys is a
12  real party in interest here.
13        We served the subpoena for documents.  Synopsys
14  has objected to every part of that subpoena, to all the
15  categories.  To date, they have produced as far as anything
16  other than some prior art, they have produced approximately I
17  think it's less than 100 pages of documents.
18        What we are trying to discover in general from
19  Synopsys is information about the software, the systems that
20  they have provided to the defendants.  As the Court may
21  recall, and it's also set forth in defendants' motion to
22  dismiss, part of the issue here regarding the defendants'
23  activities relating to their utilization of Design Compiler.
24  There is also another program called Behavioral Compiler,
25  which may also play a part here.

## Page 34

1         What we indicate, in fact, they have asked us for
2  our basics, some of our infringement positions, and we have
3  set forth a basic explanation of why we think they infringe.
4  It is very general at this point, granted.  But it does in
5  that indicate that part of it involves the use of Design
6  Compiler.  Synopsys has indicated that they are willing to
7  give us some non-confidential, publicly available documents
8  on Design Compiler and Behavioral Compiler, but nothing
9  confidential.
10        We have obviously pushed for more.  We want the
11  confidential documents on both products.  And also we want to
12  know what other products did they provide to the defendants,
13  because there are other products that may come into play
14  here.
15        Synopsys has raised a number of objections.  The
16  first objection that they have raised is that the documents
17  should not have to be produced twice, because that would be
18  duplication, and consequently, they will produce them in the
19  California action and not here.
20        And I start with that one, Your Honor, because in
21  essence during the scheduling conference, Ms. Corbin sought a
22  stay of discovery in this action.  And the Court
23  appropriately indicated that, no, discovery was going to go
24  forward.  What Synopsys is doing here and the defendants are
25  doing here in essence is saying that, no, discovery is not

## Page 35

1  going to go forward.  We are only going to produce the
2  documents in California.
3         We agree, they don't have to be produced twice.
4  But there is no reason not to produce them here.
5         They have also objected on the basis that the
6  documents are confidential.  Well, Your Honor, there is a
7  protective order.  Howrey & Simon, who represents both
8  Synopsys and the defendants, was involved in negotiating that
9  protective order.  They were involved in working out the
10  details of it.  Clearly, they can be produced underneath the
11  protective order.
12        Next, Your Honor, something I had not mentioned
13  Synopsys has not objected on any type of basis that there is
14  no jurisdiction of this Court over this issue, over the
15  subpoena.  So it is appropriately here, the subpoena.
16        The only issue is what subject matter, what
17  documents do they need to produce.  They have also complained
18  or objected that we haven't explained our patent infringement
19  theory.  This also comes up with the objections that have
20  been raised.  Mr. Meilman will get into that later on when we
21  address that topic.
22        We have indicated to them, in fact, they have
23  stated that the issue of infringement relates to the
24  utilization of Design Compiler.  We are fully aware of that
25  So for them to tell the Court, we don't -- to object on the

## Page 36

1  basis we don't understand what you are charging with
2  infringement at the same time they are telling the Court
3  that, oh, what's being charged with infringement is
4  utilization of Design Compiler is simply disingenuous.
5         They have also objected, indicated that the
6  documents can be obtained from the defendants and we would be
7  better off obtaining it directly from the defendants since
8  they are parties to the litigation.
9         Well, first of all, Your Honor, not all the
10  documents can be.  But more importantly here, the defendants
11  in turn, turn around and say, through the same attorneys,
12  Your Honor, saying that, well, we can't provide you the
13  documents because it's the confidential information of
14  Synopsys.  Well, Your Honor, obviously, the information can
15  be provided.  It can be provided underneath the protective
16  order.
17        We next have an objection that the documents,
18  some of the documents are in the public record and can be
19  obtainable from other sources.  Well, to say, well, some of
20  the documents I have are publicly available and you can
21  obtain them, well, who knows what documents they are?  If
22  they gave us a list, here is the dates of the documents, here
23  is where you can obtain them, fine.  But if they have the
24  documents, whether they are publicly available from other
25  sources or not, they should still be obligated to provide

Page 37

1  them.
2  They also object that apparently some of the
3  documents are confidential information of third parties,
4  unidentified third parties.  We have asked them to identify
5  them, these allegedly third parties.  They have refused to do
6  that.
7  In essence, what we are getting, what appears to
8  us, Your Honor, is a stonewalling of discovery, a decision to
9  say that basically we are just not going to provide discovery
10  until the Court requires us to.  That's the way it looks.  Or
11  until the case the case is in California, we are not going to
12  give you discovery.  We are not going to provide it in the
13  Delaware action.
14  THE COURT: Okay.  Who is going to handle this?
15  MR. KELLEY: Your Honor, I am.
16  Mr. Hoffman just recited several issues that
17  relate to objections that were recorded in our responses to
18  the interrogatories.  But it doesn't address the real issue
19  here, which is the breadth -- I said interrogatories, I meant
20  document requests -- which is the breadth of the document
21  requests.  If you look at these -- am I talking over
22  someone?
23  THE COURT: No.
24  MR. KELLEY: They have asked for -- I will go to
25  some specific language in a minute.  They have asked for

Page 38

1  every engineering document relating to any product produced
2  by Synopsys.  Now, Synopsys is a third party, may be required
3  to produce some documents in this litigation.  But the basis
4  for that production has to be that there is a need to get
5  this information from the third party and that the evidence
6  is directly related to a real critical issue in the case that
7  can't be attained from some other source.
8  It's not proper for them to submit document
9  requests that ask us for every engineering document relating
10  to every product that Synopsys has produced.  That is the
11  real issue here.  Not about the nature of our objections,
12  about whether a document is confidential or not.  If they are
13  willing to focus their document requests on the real critical
14  issues, the key part of the Synopsys product that they think
15  is relevant to their theory of infringement, which, as Mr.
16  Hoffman just admitted, they haven't really spelled out in any
17  kind of detail, then that would be a legitimate basis for a
18  document request.
19  Let's cut to some of the text from the document
20  requests.
21  The order that we would ask the Court to issue is
22  a protective order relating to Document Requests 2 through
23  5.  Let me just tell you, read to you a little bit, and I
24  won't do this for all of them, because it will become
25  tedious, but let me just read to you from No. 5.  It says.

Page 39

1  Produce all documents concerning all hardware, software
2  libraries, core databases for use in ASIC design systems, and
3  then goes on and on, about including technical reference
4  manuals, technical bulletins, user manuals, installation
5  manuals, training manuals, sourcecodes, tutorials, et cetera,
6  et cetera.
7  The real issue here is that these are just not
8  crafted as the kind of discovery that one might reasonably
9  expect one could get from a third party to a case.  They are
10  not limited in any manner to the products at issue.  They are
11  not limited in any manner to the key parts of the products
12  that they are going to contend infringe.
13  The only thing that they have identified in their
14  interrogatory answers to date as being the basis of their
15  infringement allegations is two steps, two steps that are
16  performed by the defendants in this case.  The first is
17  providing input to Design Compiler, and the second is using
18  Design Compiler to take the library cells and create some
19  output that will be used to produce an output for (inaudible)
20  ASIC a chip.  That is all they have identified.
21  If they are willing to restrict their document
22  requests to specific things relating to those steps and
23  relating to the product that they say defendants are using in
24  an infringing manner, then we would have a basis to produce
25  documents.  They aren't entitled to a fishing expedition of

Page 40

1  every engineering documents in Synopsys' possession.
2  And I would go on to state, Your Honor, there are
3  a number of documents, document requests, that we have
4  produced documents, agreed to produce documents in response
5  to.  This is not an exercise in stonewalling.  And we have
6  given them some manuals that describe how, what kind of
7  inputs Design Compiler can accept, and describe exactly the
8  steps involved or the state, describe that Design Compiler is
9  used to select library cells in order to produce an output
10  for ASIC design.
11  THE COURT: You have described, counsel, some
12  parameters.  Let's see if they are acceptable to counsel for
13  Ricoh.
14  MR. HOFFMAN: Your Honor, first of all, the
15  documents that they have produced is less than 100 pages.
16  THE COURT: I don't want to go over that.  What I
17  am interested in knowing is how you react to the objection
18  which Mr. Kelley says is really at essence here, that is the
19  scope, that your request is overly broad.
20  MR. HOFFMAN: Your Honor, what we have indicated
21  to them is that -- and then I would like to go to what is
22  actually the Request No. 5, because it was not properly read.
23  THE COURT: I don't want to do that.  What I want
24  to get to is an agreement.  I am really not interested in
25  batting this ping-pong ball back and forth across this

## Page 41

1  table. I want to get to an agreement rather quickly.

2  　　MR. HOFFMAN: Yes. Your Honor, what we have

3  indicated is we will agree to limit our request to No. 1,

4  Design Compiler documents, Behavioral Compiler documents.

5  And they have agreed -- that is just the starting point, and

6  I will go on from there. But they have agreed to produce

7  documents relating to those products, but only the

8  non-confidential documents.

9  　　THE COURT: Well, let's talk about that then.

10  Insofar as, Mr. Kelley, counsel has now defined what I hope

11  you will agree is a proper scope, what about the production

12  of confidential information pursuant to the terms of your

13  protective order?

14  　　MR. KELLEY: Is that a question for me, Your

15  Honor?

16  　　THE COURT: Yes, sir.

17  　　MR. KELLEY: The reason that we mentioned

18  confidentiality in the objection is that as a third party

19  confidentiality is one of the considerations that is

20  mentioned in the case law about weighing that burden on the

21  third party versus the need in the case.

22  　　THE COURT: We are trying to reduce the burden.

23  I do understand your complaint regarding the burden.

24  　　MR. KELLEY: I apologize. The next point, what

25  they have identified as being the basis of infringement,

## Page 42

1  namely, that the user provide certain inputs to Design

2  Compiler and that that Design Compiler takes those inputs and

3  selects library cells to produce the output, that they can

4  get from public documentation. There really is no need to go

5  into our sourcecode describing exactly in great detail how

6  those functions are performed or into the internal

7  engineering documents describing every aspect of that. If

8  that is what they need from us, they have already got that.

9  And I will correct Mr. Hoffman. We have already produced

10  several hundred pages of manuals.

11  　　THE COURT: Let's just deal with this discrete

12  issue, this discrete range of documents, Mr. Hoffman. Do you

13  agree that there are alternate sources?

14  　　MR. HOFFMAN: No, there are not, Your Honor. The

15  information is going to be in the confidential documents. It

16  is going to be in the sourcecode. It is going to be in the

17  other information that comes out of Synopsys or comes out of

18  the defendants.

19  　　There is many other parts of this claim, such as

20  discussions of expert systems, discussions or rules. Some of

21  those are going to be parts of the (inaudible) of Design

22  Compiler or Behavioral Compiler.

23  　　So consequently, just inputting information, yes,

24  that is part of the process here, there is no question that

25  is part of the process. But then it's how the system

## Page 43

1  operates is another part of the process, and some of that is

2  not fully available. The details that we want for trial to

3  prove our case, obviously, we have enough information to

4  bring the case and to allege, quite appropriately allege.

5  that that information and that operation is present. But we

6  are entitled to further information to further establish and

7  prove our case.

8  　　Synopsys, they keep on saying they are a third

9  party. Yet at other times they keep on saying they are the

10  real party in interest and they are the true party here.

11  　　THE COURT: I don't hear any objection to the

12  relevance, that it's not discoverable. It's a question of

13  sourcing, where you can get it from, whether you can get it

14  from alternate sources and how to protect it.

15  　　MR. HOFFMAN: There is a protective order and we

16  cannot get this from --

17  　　THE COURT: What I am getting at is, it seems to

18  me, counsel, if you remove for a moment -- and I know this is

19  difficult to do -- your adversarial hats and think more in

20  the spirit of cooperation, because there is no apparent

21  disagreement as to the relevance of this information, the

22  discoverability of this information, then you could probably

23  come to a point of agreement as to how it should be

24  produced. Is that beyond your capability? Or what are

25  we talking about here?

## Page 44

1  　　MS. CORBIN: Your Honor, I think that now they

2  have identified Design Compiler, Behavioral Compiler --

3  Design Compiler alone, just for point of reference for the

4  Court, is the largest product at Synopsys, accounts for more

5  than 20 percent of its revenue. They still want all

6  engineering documents relating to Design Compiler. We still

7  have a huge problem with respect to overbreadth.

8  　　THE COURT: I can understand why you would have a

9  problem with that. And it seems to me the plaintiff should

10  be able to narrow that request somewhat.

11  　　MR. HOFFMAN: Your Honor, if Synopsys is willing

12  to give us the confidential information, they are willing to

13  give us the sourcecode limited to the time of the scope of

14  documents, going back to 1996, so we are not talking about

15  everything that is there, all documents that they have ever

16  had, we are willing to work with them in trying to work out

17  some other limitations. But to say, well, tell us the

18  details of exactly which parts of Design Compiler you are

19  alleging to infringe and give us a detailed claim chart so

20  that then we can decide whether or not we will give you

21  anything is putting the cart before the horse. What they are

22  asking is prove your case and then we will decide if we will

23  give you discovery.

24  　　THE COURT: Obviously, you don't have to do that.

25  　　MS. CORBIN: Your Honor, the sourcecode, since it

## Page 45

1  has been mentioned twice now, is of particular import, I
2  think, because that is the most sensitive information about a
3  particular product, it contains a lot of information.  If
4  what they need is an understanding of the inputs that these
5  particular customers input to Design Compiler when they use
6  it, there are other ways to get to that information besides
7  having the sourcecode, which is the most sensitive
8  information in the company, regarding their key product.
9      THE COURT:  Well, inevitably, counsel, in all of
10  these cases, and you know that from your vast experience in
11  this area, there is always information, oftentimes
12  extraordinarily sensitive information like this that is at
13  issue and that needs to be shared in order for the litigation
14  to proceed forward.  That is why we have protective orders.
15  That is why there is a body of law that has grown up around
16  this issue.  But it is incumbent upon counsel to recognize
17  the need to cooperate, and if necessary, to craft new
18  language that will enable this type of information to be
19  shared at appropriate levels.  If it is for attorneys' eyes
20  only -- I think you understand where I am going with this.
21      If there is truly an alternate source that will
22  enable the plaintiff to prosecute its claims in a timely
23  fashion from which it can receive this information, I would
24  be interested in knowing and having the discussion right now
25  as to what that source is and whether it is acceptable to the

## Page 46

1  plaintiff.
2      MS. CORBIN:  Can you address that, please, Chris
3  Kelley?
4      MR. KELLEY:  Yes, absolutely.  That is where I
5  was intending to go.
6      Your Honor, the issue here is that -- of course,
7  they have stated to this Court -- and I don't want to get
8  into the motion to stay or transfer -- but they have stated
9  that their beef is not with Synopsys.  That it's by
10  defendants that are infringing.  They are now suggesting that
11  Synopsys is a third party and as a party to this case has the
12  same obligations in discovery.
13      If you look at the way the interrogatory is
14  drafted, they identify the two things that would have some
15  connection with the user, namely, putting some stuff in at
16  the top of the process and getting something out at the
17  bottom.  And they didn't mention anything about all the other
18  the stuff, which of course I think they are going to argue
19  are all internal to Design Compiler.
20      Their theory of infringement really is these
21  defendants use Design Compiler.  If that is the case, which
22  they haven't come flat out and stated today, they should have
23  sued Synopsys.  Instead, they elected to sue Synopsys'
24  customers.  Now they are trying to back-door, attack
25  Synopsis' product by getting this very broad discovery.

## Page 47

1      I think the progression here is, to the extent
2  they really believe their case of infringement rests on
3  something the defendants are doing and there is some
4  peripheral material that is in the exclusive possession of
5  Synopsys, that is the kind of discovery they should get.  But
6  what I think we are going to find out when we actually have
7  this meeting -- and I think that's the proper way to proceed.
8  is for the proper parties to get together and work out
9  exactly what they need and what we can give them, how we can
10  get them the information they need.  I think what we are
11  going to find is everything they need relating exclusively to
12  stuff done by Design Compiler, nothing to what these two
13  defendants here are doing except using Design Compiler,
14  providing the regular inputs that Design Compiler normally
15  takes in and at the end of the process say thank you very
16  much for the output, I am going to take this off to go make
17  the chip.
18      THE COURT:  It is not necessary for you to
19  respond, Mr. Hoffman.  The Court has instructed the parties
20  to get together and discuss this matter.  If you are still at
21  an impasse after that discussion, obviously, we will have to
22  revisit this.
23      Let's go on to No. 3.
24      MR. HOFFMAN:  No. 3, Your Honor --
25      MR. KELLEY:  Your Honor, I think this is our

## Page 48

1  item.
2      THE COURT:  Yes.
3      MR. KELLEY:  This is a relatively simple matter.
4  On the patent at issue, there are two inventors, Mr.
5  Kobayashi and Mr. Shindo.  Ricoh has already agreed to make
6  Mr. Kobayashi available for deposition in Japan.  That is
7  going forward.
8      At a fairly early point during discovery, we
9  asked them whether they were representing Shindo.  I am not
10  going to get this exactly right.  They said, no.  We will see
11  if they will work with us.  Give us your subpoena and we will
12  see if he will accept it, not formally, accept service, but
13  he will respond to it.
14      We haven't yet received from them a commitment
15  any final word as to, one, whether Mr. Shindo will accept
16  this -- will cooperate in discovery, and two, whether they
17  intend to use him during trial, appear as a witness.
18      Both Mr. Shindo and Mr. Kobayashi, to our
19  knowledge, live in Japan.  We have asked them if they would
20  bring Mr. Shindo to the United States.  They have said, no.
21  you have to go to Japan to take his deposition if you want to
22  take his deposition.  That's assuming of course that he at
23  some point determines to cooperate.
24      The problem we are facing, given the close of
25  discovery in January, the facilities for deposition, which I

**August 28, 2003**

## Page 49

1  assume everyone on the phone is familiar with, depositions in
2  Japan must takes place either at the embassy or one of the
3  consulates. The Tokyo Embassy is already completely booked.
4  There is a little opportunity, some space in the Osaka
5  Consulate, which, to our understanding, that is actually
6  where Mr. Shindo lives, is Osaka.
7       What we would like from the Court is some
8  deadline as to when they actually have to have a final word
9  as to whether Mr. Shindo is going to cooperate or not. Then
10  either to make him available in Japan in accordance -- with
11  one of the windows of opportunity that we have, at the Osaka
12  Embassy, or bring him to the United States for deposition
13  here.
14       THE COURT: Okay.
15       MR. KELLEY: We can depose him in advance of
16  trial.
17       THE COURT: Can we get an answer to the question,
18  counsel?
19       MR. HOFFMAN: Yes. Mr. Shindo, who is a third
20  party, we don't represent him, we have attempted to contact
21  him through numerous ways. He does not respond to any of our
22  requests to see if he would be willing to accept the
23  subpoena.
24       We have asked him to sit for a deposition and
25  produce documents. He does not respond. He is so far, by

## Page 50

1  lack of response, at least implicitly is indicating he is not
2  going to cooperate. He has been gone from Ricoh over ten
3  years now. It is our belief that he is not going to
4  cooperate. Obviously, if he is not going to cooperate, he is
5  not going to show up at trial or anything else.
6       Both plaintiff and the defendants had listed Mr.
7  Shindo as someone who might have information. He is one of
8  the inventors. I presume he has some information. But no
9  one can force him as a third party to cooperate or to appear
10  for a deposition. We have been unsuccessful in doing that.
11  Consequently, we can't produce him.
12       With Dr. Kobayashi, he lives in Japan. He is
13  also not employed by Ricoh. We asked him. He came back and
14  said, yes, he would be willing to voluntarily appear. And
15  that deposition is set up in September, late September.
16       THE COURT: Mr. Kelley, what would you have
17  counsel do in this situation?
18       MR. KELLEY: I understand the difficult situation
19  he is in. This is the first time I heard he hadn't
20  responded. What I guess I would like is a drop-dead date, if
21  you will forgive the phrase, by which we will know he is
22  either going to cooperate by this date or there is not going
23  to be an opportunity for him to appear at trial. It seems to
24  me that should be sometime before the close of discovery, not
25  the final day of discovery.

## Page 51

1       MR. HOFFMAN: That is fine, Your Honor. We would
2  be willing to do that by the end of the year.
3       THE COURT: The drop-dead date is the end of
4  discovery.
5       MR. KELLEY: The complicating factor is if he is
6  going to be deposed in Japan.
7       THE COURT: No. I understand. Obviously, there
8  are challenges that would have to be overcome. For instance,
9  on the last day of discovery, you get word that he is
10  available, the Court will be flexible, perhaps, in all
11  likelihood, and permit the parties an additional period of
12  time in which to complete his deposition. But we can
13  certainly deal with that at the time. At least theoretically
14  the drop-dead date is the last day of discovery.
15       MR. HOFFMAN: We have asked the defendants to
16  produce all documents -- let me read it to you, a single
17  document request in this regard: Produce all documents and
18  tangible things identified in Section B, Items 1 through 8,
19  of defendants' initial disclosure dated and served on or
20  about May 30, 2003.
21       This is where they listed the documents that they
22  are going to rely upon in support of their case. We asked
23  them to produce the documents. Part of the response is,
24  defendants further object to this request as unduly
25  burdensome in seeking discovery of information not reasonably

## Page 52

1  calculated to lead to the discovery of admissible evidence.
2  Defendants further object to this document request as unduly
3  burdensome and on the basis that it seeks detailed discovery
4  regarding operations of defendants that has no relevance to
5  defendants' ASIC products or methods.
6       Your Honor, these are the documents that they
7  listed, the categories of documents they listed in their
8  initial disclosure.
9       The purpose of the initial disclosure, obviously
10  is either done over the documents, list the categories so the
11  other side can go ahead and request them. We requested
12  them. They came back and have said, no, they are not
13  relevant. We tried to work it out with them. The response
14  was, and this is from Mr. Mower (phonetic), defendants
15  identified eight categories of documents that were likely to
16  be relevant to this dispute. Defendants did not suggest, as
17  your letter implies, that any documents that go into that
18  that fell into these categories were relevant.
19       Well, Your Honor, if they listed them, you only
20  list what you think is relevant. If it is relevant, we are
21  entitled to them. If they didn't list any -- if the
22  documents they listed are not relevant, then why did they
23  list them in their initial disclosure?
24       THE COURT: I agree. What is the defendants'
25  response to this?

## Page 53

1    MR. KELLEY: Your Honor, the categories that are
2  identified are relatively generic phrases. Product design,
3  development materials, marketing, promotional materials.
4  Sales and accounting statements. You get the gist. Sort of
5  generic classifications of documents.
6        When we prepared this, this is in the initial
7  disclosure statement, we did not have any idea what their
8  theory of infringement was. All we had was the complaint,
9  which doesn't provide any detail other than you infringe. We
10  did note what our invalidity arguments were going to be and
11  we started collecting that information as quickly as
12  possible. In fact, we have produced the thousands of
13  documents that plaintiffs sometimes refer to in their papers
14  are all prior art articles that we have produced. So we have
15  produced the materials we knew about in describing these
16  categories at that time. We immediately started producing
17  that stuff.
18        Since then, we have agreed to go ahead and get
19  the materials relating to -- and here's where the parties
20  have had some negotiation in the past few days leading up
21  though this call, not ultimately successful but some
22  narrowing of the differences -- we have agreed to produce, to
23  go get documents relating to ASIC products which were
24  developed in a process where there was some logic synthesis.
25  Logic synthesis is the kind of operation performed by Design

## Page 54

1  Compiler and other product.
2        And we wanted to further restrict the documents
3  to documents that had some bearing on the use of, the steps
4  which they have identified in their interrogatory, providing
5  input to the logic synthesis to Design Compiler and using
6  Design Compiler to map library cells to produce an output
7  file.
8        They have agreed that their document requests,
9  which asks for every information, all documents about every
10  ASIC, should properly, they have agreed to narrow their
11  request, just in the last few days, to ASIC, whether there
12  was some logic synthesis, i.e., having something to do with
13  the process that is described in their patent. So then the
14  remaining difference, really, in the document requests is
15  whether they get every document that the defendants have on
16  that ASIC or if they get the documents that are relevant to
17  the claimed process.
18        THE COURT: I have to say, this is the first time
19  that I have ever had to deal with an issue involving
20  production related to initial disclosures. I find it
21  extraordinary. Counsel --
22        MS. CORBIN: Your Honor, I think that the problem
23  was that the initial disclosure was inartfully drafted.
24        THE COURT: Perhaps. But what you need --
25        MS. CORBIN: The problem may be, there was a

## Page 55

1  subset of documents.
2        THE COURT: Ms. Corbin, I am going to talk over
3  you. You can't talk over me. I know we are on this bridge
4  line and sometimes we talk over one another, and that's okay
5        But you are going to have to go back and finish
6  your conversation about this, counsel. I am not going to
7  spend any more time on this.
8        Let's move on to No. 5.
9        MR. MEILMAN: Your Honor, actually, you have
10  heard part of the discussion on the document requests.
11  Actually, the interrogatory, No. 7, they are also related.
12        THE COURT: Let's talk about them both then.
13        MR. MEILMAN: Right after the Rule 16 conference
14  in May, we served these document requests and interrogatories
15  on defendants about a month later. And as Mr. Kelley
16  indicated, we have been trying to resolve our differences
17  ever since. We have gotten some information in documents.
18  But it's been dribbled in piece by piece.
19        As Mr. Kelley has told you, that they keep
20  objecting on the grounds that we haven't told them our
21  infringement theory. In essence, what they are doing is they
22  want us to give them our Markman construction before they
23  decide what they are going to give us. That's something that
24  was raised during the Rule 16 conference, and the Court
25  refused to push the Markman conference before any discovery.

## Page 56

1        As Mr. Kelley indicated, we have narrowed the
2  definition of what we want, well, the patent in suit is
3  directed to a computer aided design process for making
4  application specific integrated circuits, what has been
5  referred to in this conference call as an ASIC.
6        We have asked them, we have narrowed our request
7  to processes for making ASICs by a computer-aided design
8  process using logic synthesis, development of those
9  processes, what equipment they have used, and any literature
10  they have had about that.
11        Last Friday, they have told us they will provide
12  us details about their current process (inaudible)
13  development. As to two of the three defendants, they have a
14  plant in the U.S. But as Mr. Kelley indicated, they want to
15  restrict that to Design Compiler because we indicated we knew
16  they used Design Compiler in at least some of their
17  processes.
18        Yesterday, they backtracked, as far as I
19  understand it, and said we will give you only details as to
20  some of these substeps in the process.
21        They have told us that one of the defendants,
22  Matrox Tech, did design work in Florida, but we will be
23  getting no information about that because it closed its plant
24  in 2000 and those records don't seem to be located.
25        Then there is an issue on questions of responses

## Page 57

1  by the Matrox defendants done in Canada. We have been told
2  that there are additional process steps those defendants
3  carry out which makes the foreign production provisions of
4  Title 35 U.S.C. 271(g) inapplicable. As you may guess, the
5  minute they said that to us, we said, What are those steps?
6  And we have been refused disclosure on that.
7         Yesterday I got a call from Mr. -- I got a letter
8  from Mr. Kelley indicating that if we want, they will make
9  people available with knowledge about their design work for
10 deposition, but we are not going to get any interrogatory or
11 document request.
12        Basically, on the definition of the products --
13 the processes that we wish to have disclosure on, we believe
14 that limiting that to the computer-aided design process with
15 logic synthesis is narrow enough to give us the discovery we
16 want. We know as to some processes the defendants use Design
17 Compiler. What we don't know is whether they have any other
18 products that they have gotten from other suppliers.
19        We have asked them, do you have those? And
20 produce the documents. We have asked both in general and
21 specifically as to one of their -- one of the companies we
22 know provides equipment called Cadence. And basically, we
23 are told we are not going to get an answer. As to other
24 things, when they don't have any documents or it has not been
25 applicable, we have been told that. But as to the generally,

## Page 58

1  are you using somebody else's equipment, are you using
2  Cadence's equipment, we are getting no answer at all.
3         I think that's basically -- that whole approach
4  filters down to everything that is in dispute pretty much on
5  the interrogatories and document requests. As Mr. Kelley
6  said, it is a question of what we are entitled to as far as
7  breadth goes.
8         THE COURT: Okay.
9         MR. MEILMAN: It may very well be there are no
10 other alternate products that the defendants are using. But
11 I think we are entitled to know that.
12        THE COURT: Okay. Let's hear from the other
13 side.
14        MR. KELLEY: Your Honor, let me talk about the
15 271(g) issue in a minute. Let me deal with the document
16 requests first.
17        The fight that we have been having over the last,
18 it's been about three or four weeks the parties have been
19 discussing this in earnest, is these document requests. Once
20 again, let me just read this: Produce all documents -- I am
21 reading from No. 5, Document Request No. 5: Produce all
22 documents concerning the conception, design, development,
23 manufacture, or sale of each of the defendants' ASIC
24 products. Then it goes on and gives some examples sort of
25 thing.

## Page 59

1         There are several. The ones we have objected to
2  and said these are too broad are that kind of thing. They
3  haven't (inaudible) with all products and anything having to
4  do with the design of that product.
5         Now, Mr. Meilman just said that, he said CAD
6  process. As far as I know, that is the first time I have
7  heard them say, what we really need is stuff about the CAD
8  process. Although I am not sure whether he meant -- well,
9  the thing that is relevant here is logic synthesis. It's not
10 the specification, the engineering specification describing
11 what the product was going to do that was formulated back
12 when people were kicking around ideas about what a good
13 product for the company would be. So that's what we have
14 been fighting about now.
15        Ricoh just a few days ago said we will limit the
16 products, as I mentioned, we will limit the products to those
17 products that use logic synthesis.
18        Now, I think the remaining issue is whether the
19 scope of these document requests should be restricted to
20 documents describing the use of logic synthesis or relating
21 to logic synthesis for those products, and not anything
22 having to do with the specification of the product,
23 engineering, planning requests, memos about how, we have got
24 bugs, our design isn't working, because none of that has
25 anything to do with the claim.

## Page 60

1         THE COURT: Is that an acceptable limitation,
2  Ricoh?
3         MR. HOFFMAN: Your Honor, what we are looking
4  for, as Mr. Meilman, I thought, had indicated, is the
5  documents that relate to the process for manufacturing these
6  ASICs in the designing of the ASICs using systems that have
7  logic synthesis in them. We are not looking for things
8  relating to debugging of the ASICs themselves. We are not
9  looking for things on other types of -- there is some
10 categories -- and I would have to go back to exactly what Mr.
11 Kelley said -- other things that were pre the designing of
12 these ASICs using the particular types of processes that are
13 involved in the claims and in the patent here of ASIC
14 designing processes using logic synthesis.
15        That is what we are looking for. We have told
16 them that. To date, they have produced less than a thousand
17 pages of documents.
18        THE COURT: Is that a different way of saying
19 that you are in agreement with the limitation that has just
20 been proposed? Or are you broadening?
21        MR. HOFFMAN: No. I think we are in general
22 agreement of some of the things. Mr. Kelley rattled off a
23 number of things.
24        THE COURT: So did you. So, counsel, my question
25 to you is, now having heard one another speak, and speaking

1  to one another through me, do you think that you can put a
2  finer point on these requests and resolve the objections?
3  Because the Court has now invested an hour and a half of its
4  time on matters, quite frankly, in a manner in which it quite
5  frankly believes could have been better invested.
6        Are we at a point in this discussion as to Items
7  5 and 7 where counsel can be released to your own devices and
8  work it out?
9        MR. KELLEY: I believe.
10       MR. HOFFMAN: I believe, also, Your Honor.
11       If I can just ask one question, because I think
12 it may help in advancing a number of these things that we are
13 trying to work out. We would hope that, and would like a
14 commitment from counsel for the defendants and for Synopsys
15 to work out all these matters, to work diligently over the
16 next week, between now and the end of next week to work out
17 all these matters, so we can get these documents.
18       THE COURT: So ordered, yes.
19       MR. HOFFMAN: And also that the defendants will
20 not object and tell us we can't give it to you, these
21 documents, because it is the confidential information of
22 Synopsys.
23       THE COURT: You have to work through your
24 protective order.
25       MR. HOFFMAN: We will be underneath the

1  protective order, the documents.
2        THE COURT: I think that's a given, counsel.
3        MR. HOFFMAN: Thank you, Your Honor. I
4  appreciate it.
5        THE COURT: Okay.
6        MR. MEILMAN: Your Honor, Mr. Kelley was about to
7  start raising some material on the Matrox people in Canada.
8  I don't want to get that swept under the rug.
9        MR. HOFFMAN: Your Honor, that also probably ties
10 in with Topic No. 8 that they have raised.
11       THE COURT: Topic No. 8 is a non-starter for the
12 Court. I am not going to grant permission to file a letter
13 in support of the seeking of permission to file summary
14 judgment at this time, no.
15       MR. HOFFMAN: I presume we are also entitled then
16 to get discovery out of the people in Canada.
17       THE COURT: I don't see why not.
18       MR. KELLEY: Can I address that issue briefly?
19       THE COURT: Yes.
20       MR. KELLEY: They are seeking discovery -- this
21 claim relates to the logic synthesis process. What they want
22 is the discovery of logic synthesis work done in Canada.
23       THE COURT: Counsel, you are breaking up on us.
24       MR. KELLEY: It seems to me, I know we don't want
25 to get into the issue of whether they are going to prevail on

1  their 271(g) theory. But that's unusual, to try to apply a
2  U.S. patent to seek discovery on work done outside the United
3  States, on things done outside the United States is very
4  unusual.
5        THE COURT: What is the thinking there, Ricoh?
6        MR. HOFFMAN: Your Honor, if a process of
7  manufacturing a product is carried on outside the United
8  States where that process would infringe a process patent
9  inside the United States, then there is a basis for
10 allegation of infringement, the charge of infringement, just
11 boiling it down to a summary format.
12       The Bayer case they are relying upon is talking
13 about something entirely different. It was talking about
14 strictly -- and I have part of the claim here -- a need for
15 determining whether a substance is an inhibitor or
16 activator.
17       That is not what we are talking about here. We
18 are not talking about a method of determining whether or
19 not -- determination of whether a piece of information is in
20 one category or another. We are talking about part of a
21 manufacturing process, and 271 clearly covers that situation,
22 where the products do flow into the United States, that there
23 is infringement of that process patent.
24       This is a manufacturing process. So it's our
25 position we are entitled to it.

1        THE COURT: Does counsel disagree with counsel's
2  statement regarding the current state of the law?
3        MR. KELLEY: Yes, Your Honor. The Bayer case
4  makes it absolutely clear that the manufacturing process,
5  this is the exact question addressed by the Federal Circuit,
6  the manufacturing process, in order to fall within 271(g),
7  the claimed process has to be one using manufacturing the
8  device, the actual physical things that are going to be
9  imported.
10       MR. HOFFMAN: This is all part of the
11 manufacturing process, Your Honor. And what they are trying
12 to do is say, well, since we disagree and we think that we
13 are entitled to summary judgment, we are not going to give
14 you discovery. And we are entitled to that discovery and to
15 show that it is part of the manufacturing process for
16 manufacturing the products that then flow into the United
17 States.
18       THE COURT: Mr. Kelley.
19       MR. KELLEY: Your Honor, if I may finish my
20 point. The case makes it absolutely clear that there has to
21 be a physical good produced under this process. What their
22 claim process produces is a -- a net list, that is then used
23 to produce -- it is sent off to a foundry that actually
24 produces the devices. It is not used in the process of
25 manufacturing the goods. The Federal Circuit decision make

Page 65

1  it quite clear that the process set out has to talk about the
2  actual process, the mechanical physical process of creating
3  the thing that is going to be imported.
4       THE COURT: Let's see if your opponent agrees
5  with that statement. Do you agree that the case stands for
6  that proposition, counsel?
7       MR. HOFFMAN: No, I don't, Your Honor. The case
8  stands for the proposition -- that is why I read a portion --
9  it stands for the proposition that when all that is
10 determined by the process is a piece of information that is
11 never used in the manufacturing operation, it has nothing to
12 do with manufacturing a product, it is just determining
13 information, that that is not covered by 271.
14      What we have here in this case is one or a series
15 of the steps, the initial steps in designing a product that
16 is -- as part of the manufacturing operation, design and
17 operation, the manufacturing of a product that is imported
18 into the United States. That is very different. That is not
19 what the Bayer case is dealing with.
20      THE COURT: Counsel for Matrox.
21      MR. KELLEY: If I am correct about this, then we
22 don't have to have half of the discovery in this case, and if
23 Mr. Meilman is correct, then we do. What I propose is we
24 brief this question because we are having lawyer argument.
25      THE COURT: What I am going to do first is read

Page 66

1  Bayer. That might be of some assistance to this issue. Let
2  me take a look. If I feel I need further elucidation on this
3  subject, I will let you further address it in some fashion,
4  whether it be in the form of some limited briefing or further
5  discussion, I don't know exactly at this point. But we will
6  defer No. 8 while the Court takes an opportunity to read the
7  case.
8       MR. HOFFMAN: In the interim, Your Honor, if we
9  can begin to sort out discovery issues with the defendants,
10 with Matrox on this issue, so at least we can resolve the
11 scope and other issues so we can begin to get discovery from
12 them.
13      MR. KELLEY: We are in fact going forward with
14 discovery. We are in the process of collecting that
15 information about where we do our design work and the general
16 design flow stuff. I am not sure what more he wanted. He
17 wanted the same sort of discovery for Matrox that we had for
18 the other defendants.
19      MR. HOFFMAN: Yes, Your Honor.
20      MR. KELLEY: It seems to me it will take -- I
21 understand the Court has a busy schedule. But he seems to be
22 asking that we do this very discovery that I am suggesting
23 could be avoided.
24      THE COURT: I think that is correct. What I am
25 going to order is, as far as the Matrox defendants are

Page 67

1  concerned, we are going to defer engaging that process. Mr.
2  Hoffman, for a brief period of time, while I take a look at
3  the case, if necessary, get the benefit of further thoughts
4  from counsel.
5       Let's deal with No. 6. Have we dealt with No.
6  6?
7       MR. MEILMAN: Your Honor, just, we use the term
8  Matrox defendants. One of the Matrox defendants was Matrox
9  Tech, which had a plant and was doing work in Florida. I
10 take it that as far as their objections as to activity in
11 Canada, Your Honor's order does not apply to Matrox Tech.
12      THE COURT: Are we in agreement with that?
13      MR. KELLEY: Yes, Your Honor. We are in the
14 process of collecting those documents for that work like we
15 are doing for every other -- the other non-Matrox defendants.
16      THE COURT: Then we are in agreement, counsel.
17      MR. MEILMAN: Thank you, Your Honor.
18      MR. HOFFMAN: Your Honor, since it may help avoid
19 a future dispute or arguments, Mr. Kelley has indicated they
20 are collecting documents. Does he have a date by which he
21 believes they will be produced?
22      THE COURT: Mr. Kelley?
23      MR. KELLEY: We are doing a rolling production.
24 We are getting stuff as quickly as we can get it. We
25 produced documents just a few days ago.

Page 68

1       MR. HOFFMAN: Will we have all of them produced
2  by mid-September, Mr. Kelley?
3       MR. KELLEY: I would hope so.
4       THE COURT: No. 6, what do we have left with
5  regard to No. 6?
6       MR. KELLEY: We would like to take that off.
7       THE COURT: That is fine with the Court,
8  counsel. You don't need to explain.
9       Counsel, I will take a look at the Bayer case.
10 You will hear from me one way or the other shortly.
11      (Counsel say "thank you.")
12      THE COURT: Take care.
13      (Teleconference concluded at 12:40 p.m.)
14          - - -
15 Reporter: Kevin Maurer
16
17
18
19
20
21
22
23
24
25

-and [2]    1:19        2:3
00 [1]       1:13
03-103-GMS [1]
  1:10
1 [4]        3:8         3:9
  41:3       51:18
10 [1]       26:25
100 [2]      33:17       40:15
11 [1]       1:13
12 [4]       15:20       16:3
  18:9       68:13
14 [2]       6:24        15:20
14th [1]     4:25
15 [1]       16:2
16 [2]       55:13       55:24
17 [2]       6:6         12:11
1996 [1]     44:14
2 [7]        3:4         7:17
  9:8        10:1        10:2
  12:2       38:22
20 [2]       16:2        44:5
2000 [1]     56:24
2003 [5]     1:13        9:8
  31:9       31:9        51:20
21st [1]     6:6
22 [1]       12:12
23rd [1]     6:12
25th [1]     32:18
26th [2]     31:8        32:18
271 [6]      57:4        58:15
  63:1       63:21       64:6
  65:13
28 [1]       1:13
28th [1]     16:12
3 [3]        3:4         47:23
  47:24
30 [2]       29:14       51:20
30th [10] 5:2           8:1
  8:15       11:4        12:4
  13:22      31:6        31:9
  32:5       32:18
31st [7]     3:12        4:7
  7:17       8:23        9:1
  26:23      26:24
34-day [1]              32:20
35 [1]       57:4
40 [1]       68:13
5 [8]        3:5         38:23
  38:25      40:22       55:8
  58:21      58:21       61:7
6 [6]        3:4         9:8
  67:5       67:6        68:4
  68:5
7 [3]        3:5         55:11
  61:7
8 [6]        3:4         12:20
  51:18      62:10       62:11
  66:6
9 [1]        12:11
a.m [1]
able [2]     23:1        44:10
absolutely [3]          46:4
  64:4       64:24
accept [5]              40:7

48:12       48:12       48:15
49:22
acceptable [4]          27:2
  40:12      45:25       60:1
accordance [1]          49:10
according [1]           5:20
accounting [1]          53:4
accounts [1]            44:4
accurate [1]            15:17
acknowledged [1]
  12:22
action [4]              1:4
  34:19      34:22       37:13
activator [1]           63:16
activities [1]          33:23
activity [1]            67:10
actual [4]              14:24
  21:8       64:8        65:2
additional [6]          8:24
  8:24       25:6        32:6
  51:11      57:2
address [7]             23:1
  30:5       35:21       37:18
  46:2       62:18       66:3
addressed [1]           64:5
admissible [1]          52:1
admitted [1]            38:16
advance [1]             41:12
advancing [1]           61:12
adversarial [1]         43:19
advisable [1]           7:20
AEROFLEX [1]
  1:7
again [2]               14:18
  58:20
agenda [1]              2:25
ago [4]      11:5        11:5
  59:15      67:25
agree [8] 18:12         32:13
  35:3       41:3        41:11
  42:13      52:24       65:5
agreed [8]              40:4
  41:5       41:6        48:5
  53:18      53:22       54:8
  54:10
agreement [11]          19:5
  19:6       19:6        19:7
  40:24      41:1        43:23
  60:19      60:22       67:12
  67:16
agrees [2]              24:22
  65:4
ahead [5]               12:9
  13:12      18:15       52:11
  53:18
aided [1]               56:3
allegation [1]          63:10
allegations [1]         39:15
allege [2]              43:4
  43:4
allegedly [1]           37:5
alleging [1]            44:19
allow [1]               37:21
allowed [1]             21:18

alone [1]               44:3
alternate [4]           42:13
  43:14      45:21       58:10
always [1]              45:11
AMI [1] 1:7
among [1]               27:11
amongst [1]             9:24
amount [1]              9:19
ancillary [1]           21:11
  21:12
answer [4]              26:17
  49:17      57:23       58:2
answering [1]           24:17
answers [1]             14:17
anyway [5]              16:8
  22:13      24:2        24:20
  24:23
apologize [2]           31:4
  41:24
apparent [2]            23:9
  43:20
appear [4]              48:17
  50:9       50:14       50:23
APPEARANCES [1]
  1:17       2:1
applicable [1]          57:25
application [1]         56:4
apply [1]               63:1
  67:11
appreciate [2]          18:16
  62:4
approach [1]            58:3
appropriate [18]
  7:22       13:9        13:18
  13:18      13:18       14:14
  14:19      14:25       15:1
  19:24      20:3        20:7
  20:20      20:23       21:2
  22:23      32:11       45:19
appropriately [1]
  34:23      35:15       43:4
area [1]     45:11
argue [1]               46:18
arguing [3]             2:24
  2:25       3:3
argument [2]            2:22
  65:24
arguments [2]           53:10
  67:19
Arnold [1]              2:5
art [11]     17:2        17:17
  17:21      18:2        18:4
  18:10      18:10       21:23
  30:6       33:16       53:14
articles [1]            53:14
articulated [1]         25:15
ASIC [1]                39:2
  39:20      40:10       52:5
  52:23      54:10       54:11
  54:16      56:5        58:23
  60:13
ASICs [5]               56:7
  60:6       60:6        60:8
  60:12
asks [1]     54:9

aspect [3]              12:12
  17:23      42:7
aspects [1]             17:20
  18:6
assertion [1]           24:18
asserts [1]             12:1
assignment [1]          15:23
assistance [1]          66:1
assume [1]              49:1
assumed [1]             5:18
assuming [1]            48:22
attack [1]              46:24
attained [1]            38:7
attempted [1]           49:20
attorney [6]            8:3
  8:3        9:24        11:22
  27:16      28:6
attorney-client [2]
  4:12       9:4
attorneys [5]           9:24
  11:20      27:11       27:12
  36:11
attorneys' [1]          45:19
August [1]              1:13
  4:25       9:8         26:24
author [1]              27:16
available [9]           7:20
  34:7       36:20       36:24
  43:2       48:6        49:10
  51:10      57:9
avoid [1]               67:18
avoided [1]             66:23
aware [1]               7:18
  35:24
away [1] 13:16
B [1]        51:18
back-door [1]           46:24
backtracked [1] 56:18
ball [1]     40:25
based [4]               14:12
  16:22      24:6        26:11
basic [1] 34:3
basics [1]              34:2
basis [23]              4:12
  4:20       4:23        7:9
  7:11       7:12        9:4
  10:6       10:22       13:25
  25:22      26:16       28:1
  35:5       35:13       36:1
  38:3       38:17       39:14
  39:24      41:25       52:3
  63:9
batting [1]             40:25
Bayer [5]               63:12
  64:3       65:19       66:1
  68:9
bearing [1]             54:3
became [1]              9:1
become [2]              17:5
  38:24
beef [1]     46:9
beforehand [1]  19:18
begin [2]               66:9
  66:11

behalf [2]              3:2
  3:25
Behavioral [5]  33:24
  34:8       41:4        42:2
  44:2
belief [3]              29:10
  29:11      50:3
believes [1]            22:23
  61:5       67:21
benefit [1]             67:3
better [2]              36:7
  61:5
between [13]            3:10
  4:17       6:9         6:25
  8:13       9:18        9:24
  12:25      13:5        16:6
  23:12      24:6        61:16
beyond [1]              3:25
  12:2       43:24
bit [2]      16:22       38:23
Bob [1]      2:11
body [1] 45:15
boiling [1]             63:11
booked [1]              49:3
bottom [1]              46:17
Bove [2] 2:2            2:20
brand-new [1]  9:11
breadth [1]             37:19
  37:20      58:7
break [3]               19:5
  27:20      27:21
breaking [1]            62:23
bridge [1]              55:3
brief [2] 65:24         67:2
briefing [1]            66:4
briefly [2]             28:15
  62:18
bring [3] 43:4          48:20
  49:12
broad [1]               40:19
  46:25      59:2
broadening [1]  60:20
broken [1]              27:25
Brothers [31]           2:1
  2:15       3:13        3:9
  3:19       3:23        4:1
  4:5        4:6         4:25
  12:10      14:8        14:21
  15:10      15:17       16:9
  16:11      19:25       21:4
  24:4       24:5        24:14
  24:21      25:1        25:7
  25:9       25:23       25:25
  28:12      32:4        32:17
bugs [1]     59:24
bulletins [1]           39:4
burden [3]              41:20
  41:22      41:23
burdensome [2]  31:25
  52:3
busy [1]     66:21
CAD [2] 59:5            59:7
Cadence [1]             57:22
Cadence's [1]           58:2
cage [1]     15:25

CondenseIt™

calculated - Court

| | | | | |
|---|---|---|---|---|
| **calculated** [1] 52:1 | 46:2 | **Compiler** [34] 33:23 | **consequently** [4] | **CORP** [1] 1:9 |
| **California** [5] 2:5 | **Christopher** [2] 2:4 | 33:24 34:6 34:8 | 19:2 34:18 42:23 | **correct** [7] 30:3 |
| 2:20 34:19 35:2 | 11:2 | 34:8 35:24 36:4 | 50:11 | 30:9 32:24 42:9 |
| 37:11 | **Circuit** [3] 27:23 | 39:17 39:18 40:7 | **consider** [1] 4:1 | 65:21 65:23 66:24 |
| **calls** [1] 6:9 | 64:5 64:25 | 40:8 41:4 41:4 | **considerations** [2] | **correctly** [1] 15:8 |
| **camera** [10] 4:13 | **circuits** [1] 56:4 | 42:2 42:2 42:22 | 41:19 | **correspondence** [1] |
| 4:20 10:8 10:20 | **Civil** [1] 1:4 | 42:22 44:2 44:2 | **construction** [1] | 27:12 |
| 10:20 10:24 12:18 | **claim** [7] 10:23 | 44:3 44:6 44:18 | 55:22 | **counsel** [57] 1:23 |
| 13:25 17:24 28:2 | 42:19 44:19 59:25 | 45:5 46:19 46:21 | **Consulate** [1] 49:5 | 2:6 2:10 4:8 |
| **Canada** [3] 57:1 | 62:21 63:14 64:22 | 47:12 47:13 47:14 | **consulates** [1] 49:3 | 4:18 5:6 5:12 |
| 62:7 62:16 62:22 | **claimed** [2] 54:17 | 54:1 54:5 54:6 | **consultations** [1] | 5:14 5:17 6:15 |
| 67:11 | 64:7 | 56:15 56:16 57:17 | 16:24 | 6:17 7:15 8:19 |
| **cannot** [3] 18:7 | **claims** [2] 45:22 | **complain** [1] 19:20 | **consulted** [2] 24:1 | 8:23 9:9 9:19 |
| 19:3 43:16 | 60:13 | **complained** [2] 19:8 | 26:14 | 10:11 11:15 11:17 |
| **capability** [1] 43:24 | **clarification** [1] | 35:17 | **consulting** [17] 5:12 | 13:1 13:4 13:14 |
| **capture** [2] 31:13 | 24:3 | **complaining** [1] | 7:5 7:8 7:15 | 14:5 14:16 15:10 |
| 31:24 | **clarify** [3] 17:10 | 23:24 | 13:14 14:16 15:15 | 16:19 16:24 17:4 |
| **care** [1] 68:12 | 23:22 23:23 | **complaint** [3] 26:4 | 16:14 16:18 17:3 | 17:8 18:13 22:10 |
| **careful** [1] 15:2 | **clarifying** [1] 24:17 | 41:23 53:8 | 18:9 19:1 19:5 | 25:15 26:14 28:11 |
| **carpet** [1] 13:15 | **classifications** [1] | **complete** [2] 5:3 | 19:7 19:14 21:20 | 40:11 40:12 41:10 |
| **carried** [1] 63:7 | 53:5 | 51:12 | 26:18 | 43:18 45:9 45:16 |
| **carry** [1] 57:3 | **clause** [3] 9:11 | **completely** [2] 10:13 | **contact** [2] 18:22 | 49:18 50:17 54:21 |
| **cart** [1] 44:21 | 9:14 12:1 | 49:3 | 49:20 | 55:6 60:24 61:7 |
| **case** [36] 5:19 6:1 | **clear** [9] 3:20 8:2 | **complicating** [1] | **contacted** [1] 18:25 | 61:14 62:2 62:23 |
| 6:4 17:9 18:11 | 23:17 27:4 31:7 | 51:5 | **contains** [1] 45:3 | 64:1 65:6 65:20 |
| 20:18 22:3 23:18 | 32:4 64:4 64:20 | **comport** [1] 12:8 | **contend** [1] 39:12 | 67:4 67:16 68:8 |
| 24:15 27:24 37:11 | 65:1 | **computer** [1] 56:3 | **contents** [1] 25:13 | 68:9 68:11 |
| 37:11 38:6 39:9 | **clearly** [4] 4:21 | **computer-aided** [1] | **continue** [3] 4:5 | **counsel's** [1] 64:1 |
| 39:16 41:20 41:21 | 20:5 35:10 63:21 | 56:7 57:14 | 22:14 24:8 | **couple** [1] 6:15 |
| 43:3 43:4 43:7 | **cliche** [1] 20:22 | **conception** [1] 58:22 | **continued** [3] 2:1 | **course** [5] 9:25 |
| 44:22 46:11 46:21 | **client** [1] 17:15 | **concern** [5] 4:24 | 14:12 26:11 | 10:18 46:6 46:18 |
| 47:2 51:22 63:12 | **clients** [1] 9:24 | 5:3 17:10 17:22 | **continues** [1] 4:11 | 48:22 |
| 64:3 64:20 65:5 | **close** [3] 28:3 48:24 | 21:3 | **contract** [3] 5:11 | **Court** [164] 1:1 |
| 65:7 65:14 65:19 | 50:24 | **concerned** [1] 67:1 | 5:12 5:21 64:2 | 2:10 2:17 2:22 |
| 65:22 66:7 67:3 | **closed** [1] 56:23 | **concerning** [2] 39:1 | **contradicted** [1] | 3:6 3:11 3:16 |
| 68:9 | **co-counsel** [1] 2:15 | 58:22 | 5:1 | 3:18 3:21 4:5 |
| **cases** [1] 45:10 | **colleague** [1] 2:13 | **concluded** [1] 68:13 | **contradiction** [1] | 4:13 4:20 5:7 |
| **categories** [10] 6:16 | **collected** [1] 13:20 | **conduct** [1] 17:4 | 7:25 | 7:16 7:18 7:21 |
| 6:19 33:15 52:7 | **collecting** [4] 53:11 | **conference** [17] 1:14 | **contrary** [2] 19:18 | 7:23 8:19 9:2 |
| 52:10 52:15 52:18 | 66:14 67:14 67:20 | 4:1 6:12 11:4 | 23:18 | 9:6 11:25 12:4 |
| 53:1 53:16 60:10 | **coming** [3] 20:10 | 13:21 31:6 31:25 | **conversation** [6] | 14:1 14:5 14:18 |
| **category** [2] 22:20 | 26:15 30:20 | 32:3 32:5 32:6 | 11:19 12:9 25:13 | 14:22 14:25 15:7 |
| 63:20 | **comment** [1] 28:22 | 32:22 33:11 34:21 | 26:2 26:10 55:6 | 16:9 16:13 17:24 |
| **cautious** [1] 13:7 | **comments** [1] 32:10 | 55:13 55:24 55:25 | **conversations** [1] | 17:24 18:12 18:15 |
| **cells** [4] 39:18 40:9 | **commitment** [2] | 56:5 | 16:6 | 19:23 20:7 20:9 |
| 42:3 54:6 | 48:14 61:14 | **confidential** [39] | **convinced** [1] 11:10 | 20:13 20:24 21:16 |
| **certain** [1] 22:2 | **communicated** [1] | 5:25 6:10 6:14 | **cooperate** [9] 45:17 | 22:12 22:15 22:16 |
| 29:8 42:1 | 23:16 31:20 | 6:19 7:15 8:5 | 48:16 48:23 49:9 | 22:20 22:20 22:24 |
| **certainly** [2] 24:21 | **communication** [2] | 8:9 11:7 11:11 | 50:2 50:4 50:4 | 22:24 23:3 23:4 |
| 51:13 | 27:14 27:15 | 11:18 11:22 13:3 | 50:9 50:22 | 23:7 23:7 23:9 |
| **cetera** [4] 10:5 | **communications** [29] | 13:13 14:11 19:9 | **cooperation** [1] 43:20 | 23:20 23:23 24:3 |
| 10:5 39:5 39:6 | 4:9 4:19 6:7 | 19:10 21:18 23:15 | **copy** [1] 12:10 | 24:14 24:24 25:5 |
| **challenge** [1] 21:5 | 8:17 9:10 9:13 | 23:25 24:19 24:22 | **Corbin** [33] 2:3 | 25:14 25:22 27:2 |
| **challenges** [1] 51:8 | 9:22 9:23 10:10 | 24:24 25:2 25:20 | 2:21 17:8 18:14 | 27:18 27:23 28:10 |
| **change** [1] 19:4 | 10:17 12:2 12:15 | 26:3 26:20 28:7 | 22:9 22:11 22:24 | 28:18 28:21 28:22 |
| **charge** [1] 63:10 | 12:23 12:25 13:24 | 28:19 28:25 34:9 | 23:1 23:8 23:22 | 29:3 29:4 29:8 |
| **charged** [1] 36:3 | 13:25 16:19 17:13 | 34:11 35:6 36:13 | 23:24 25:3 25:14 | 29:10 29:12 29:13 |
| **charging** [1] 36:1 | 17:15 18:20 20:14 | 37:3 38:12 41:12 | 25:16 27:4 29:19 | 29:13 29:18 29:20 |
| **chart** [1] 44:19 | 20:15 22:8 24:10 | 42:15 44:12 61:21 | 29:22 30:3 30:4 | 29:24 30:3 30:7 |
| **checking** [1] 19:20 | 31:13 31:22 31:24 | **confidentiality** [2] | 30:24 31:10 31:13 | 30:22 31:5 31:6 |
| **Chinese** [1] 22:3 | 32:19 32:22 | 41:18 41:19 | 32:14 32:21 32:25 | 32:1 32:13 32:19 |
| **chip** [2] 39:20 47:17 | **companies** [1] 57:21 | **conflict** [1] 19:2 | 33:9 34:21 44:1 | 32:23 32:24 33:2 |
| **chose** [4] 19:12 | **company** [1] 1:4 | **confused** [2] 27:7 | 44:25 46:2 54:22 | 33:5 33:8 33:10 |
| 19:15 19:16 19:17 | 45:8 59:13 | 28:7 | 54:25 55:2 | 33:20 34:22 35:14 |
| **Chris** [2] 2:21 | **compare** [1] 17:2 | **confusion** [1] 25:16 | **Corbin's** [1] 24:17 | 35:25 36:2 37:10 |
| | | **connection** [1] 46:15 | **core** [1] 39:2 | 37:14 37:23 38:6 |
| | | **Connolly** [2] 2:2 | | 40:11 40:16 40:23 |
| | | 2:19 | | 41:9 41:16 41:22 |
| | | | | 42:11 43:11 43:17 |
| | | | | 44:4 44:8 44:24 |
| | | | | 45:9 46:7 47:18 |

47:19    48:2      49:7
49:14    49:17    50:16
51:3      51:7      51:10
52:24    54:18    54:24
55:2      55:12    55:24
58:8      58:12    60:1
60:18    60:24    61:3
61:18    61:23    62:2
62:5      62:11    62:12
62:17    62:19    62:23
63:5      64:1      64:18
65:4      65:20    65:25
66:6      66:21    66:24
67:12    67:16    67:22
68:4      68:7      68:7
68:12

**Court's** [1]          18:16
**cover** [1]              9:21
10:15
**covered** [1]          65:13
**covers** [1]            63:21
**craft** [1] 45:17
**crafted** [1]           39:8
**create** [4]           19:11
19:21    29:11    39:18
**created** [1]          19:21
21:21
**creating** [1]          65:2
**creation** [1]          20:6
**credibility** [4]     20:17
20:17    21:6      21:6
**crime/fraud** [3] 27:22
28:11    28:13
**critical** [3]           14:3
38:6      38:13
**cross-purposes** [1]
23:10
**culled** [1]            17:12
**current** [2]          56:12
64:2
**customers** [2]      45:5
46:24
**cut** [1]    38:19
**cutoff** [3]              30:2
30:12    30:16
**D.C** [1]    1:22
**databases** [1]      39:2
**date** [14] 18:21    29:5
30:20    31:5      32:7
32:15    33:15    39:14
50:20    50:22    51:3
51:14    60:16    67:20
**dated** [1]             51:19
**dates** [1] 36:22
**days** [8] 8:6        11:8
26:25    32:1      53:20
54:11    59:15    67:25
**deadline** [1]         49:8
**deal** [5] 42:11    51:13
54:19    58:15    67:5
**dealing** [1]          65:19
**dealt** [2] 18:19    67:5
**debate** [1]            12:7
**debugging** [1]      60:8
**decide** [3]           44:20
44:22    55:23

**decided** [1]          19:4
**decision** [3]        14:21
37:8      64:25
**declaration** [2]    11:2
11:3
**deep** [1] 20:5
**defendant** [1]      16:20
**defendants** [58] 1:10
2:6      2:18      3:15
3:25      4:8      4:14
4:18      7:1      8:16
9:9      11:17    11:20
12:14    13:1      15:10
17:4      17:9      18:24
22:17    24:8      33:20
34:12    34:24    35:8
36:6      36:7      36:10
39:16    39:23    42:18
46:10    46:21    47:3
47:13    50:6      51:15
51:24    52:2      52:4
52:14    52:16    54:15
55:15    56:13    56:21
57:1      57:2      57:16
58:10    61:14    61:19
66:9      66:18    66:25
67:8      67:8      67:15
**defendants'** [6] 33:21
33:22    51:19    52:5
52:24    58:23
**defer** [2] 66:6      67:1
**deference** [1]      15:17
**defined** [1]          41:10
**definition** [2]      56:2
57:12
**Delaware** [4]        1:2
1:12      33:8      37:13
**depose** [1]          49:15
**deposed** [2]        4:25
51:6
**deposition** [27] 6:13
7:3      8:1      11:6
13:12    14:13    15:13
15:19    15:22    16:5
16:15    23:14    25:17
26:13    28:5      28:24
32:15    48:6      48:21
48:22    48:25    49:12
49:24    50:10    50:15
51:12    57:10
**depositions** [1] 49:1
**describe** [1]        40:6
40:7      40:8
**described** [6]      6:18
9:22      9:23      27:8
40:11    54:13
**describing** [5]     42:5
42:7      53:15    59:10
59:20
**design** [43]        33:23
34:5      34:8      35:24
36:4      39:2      39:17
39:18    40:7      40:8
40:10    41:4      42:1
42:2      42:21    44:2
44:3      44:6      44:18
45:5      46:19    46:21
47:12    47:13    47:14
53:2      53:25    54:5

54:6      56:3      56:7
56:15    56:16    56:22
57:9      57:14    57:16
58:22    59:4      59:24
65:16    66:15    66:16
**designing** [4]      60:6
60:11    60:14    65:15
**detail** [3]           38:17
42:5      53:9
**detailed** [3]        4:14
44:19    52:3
**details** [6]         12:21
35:10    43:2      44:18
56:12    56:19
**determination** [9]
13:9      14:2      14:3
14:6      14:8      14:14
14:19    15:1      63:19
**determine** [1]      10:21
**determined** [1] 65:10
**determines** [1] 48:23
**determining** [3] 63:15
63:18    65:12
**developed** [6]      7:14
15:14    15:24    17:16
18:4      53:24
**development** [5]
17:21    53:3      56:8
56:13    58:22
**device** [1]            64:8
**devices** [1]          61:7
64:24
**Dickstein** [1]      1:21
**difference** [2]      3:10
54:14
**differences** [3] 53:22
55:16
**different** [3]      60:18
63:13    65:18
**difficult** [1]        17:6
43:19    50:18
**DiGiovanni** [22]
2:2      2:19      2:19
2:24      3:13      3:17
3:24      7:23      7:24
9:5      9:7      11:25
13:10    15:16    16:23
17:12    27:4      27:6
27:19    30:11    30:25
31:11
**DiGiovanni's** [1]
12:8
**diligently** [1]      61:15
**directed** [1]        56:3
**directly** [1]        17:3
36:7      38:6
**disagree** [2]        64:1
64:12
**disagreement** [1]
43:21
**disclose** [7]        4:8
8:16      9:10      9:10
9:13      10:9      12:4
**disclosed** [2]      5:16
10:15
**disclosure** [9]    17:12
51:19    52:8      52:9

52:23    53:7      54:23
57:6      57:13
**disclosures** [1] 54:20
**discover** [2]        18:8
33:18
**discoverability** [1]
43:22
**discoverable** [1]
43:12
**discovery** [36]    34:22
34:23    34:25    37:8
37:9      37:12    39:8
44:23    46:12    46:25
47:5      48:8      48:16
48:25    50:24    50:25
51:4      51:9      51:14
51:25    52:1      52:3
55:25    57:15    62:16
62:20    62:22    63:2
64:14    64:14    65:22
66:9      66:11    66:14
66:17    66:22
**discrete** [2]        42:11
42:12
**discuss** [1]        47:20
**discussed** [4]      6:1
12:21    21:1      31:20
**discussing** [1] 58:19
**discussion** [6]    12:3
45:24    47:21    55:10
61:6      66:5
**discussions** [3] 31:21
42:20    42:20
**disingenuous** [1]
36:4
**dismiss** [1]        33:22
**dispute** [3]        52:16
58:4      67:19
**disqualification** [4]
7:19      20:1      20:2
21:10
**disqualified** [4] 14:20
15:3      21:2      22:6
**disqualify** [3]    11:15
13:8      22:4
**DISTRICT** [2]      1:1
1:2
**doctrine** [1]        4:12
**document** [28]    18:20
25:20    29:23    37:20
37:20    38:1      38:3
38:9      38:12    38:13
38:18    38:19    38:22
39:21    40:3      51:17
52:2      54:8      54:14
54:15    55:10    55:14
57:11    58:5      58:15
58:19    58:21    59:19
**documentation** [3]
18:1      23:12    42:4
**documents** [118]
4:10      4:11      4:16
5:9      8:12      8:18
9:4      9:15      10:1
10:3      10:4      10:4
10:6      10:11    10:14
10:20    12:10    12:16
12:17    14:6      14:9

14:10    14:23    14:24
20:8      20:10    22:13
22:18    22:19    23:14
25:11    25:17    26:8
26:22    27:1      27:8
27:9      27:10    27:11
27:17    28:1      29:5
29:9      29:15    29:25
30:5      30:8      30:13
31:1      33:13    33:17
34:7      34:11    34:16
35:2      35:6      35:17
36:6      36:10    36:13
36:17    36:18    36:20
36:21    36:22    36:24
37:3      38:3      39:1
39:25    40:1      40:4
40:4      40:4      40:15
41:4      41:4      41:7
41:8      42:7      42:12
42:15    44:6      44:14
44:15    49:25    51:16
51:17    51:21    51:23
52:6      52:7      52:10
52:15    52:17    52:22
53:5      53:13    53:23
54:2      54:3      54:9
54:16    55:1      55:17
57:20    57:24    58:20
58:22    59:20    60:5
60:17    61:17    61:21
62:1      67:14    67:20
67:25
**doesn't** [5]        10:19
10:23    16:3      37:18
53:9
**done** [10]            9:17
10:21    19:12    29:18
47:12    52:10    57:1
62:22    63:2      63:3
**door** [1] 21:19
**doubt** [1]            27:16
**down** [2]              58:4
63:11
**Dr** [94]              4:10
4:17      4:25      5:1
5:8      5:10      5:10
5:12      5:17    5:17
5:20      5:22    55:4
6:2      6:5      6:10
6:13      6:18      7:5
7:6      7:7      7:11
8:1      8:1      8:6
8:13      8:17      8:23
9:13      9:15      9:19
10:10    10:12    10:21
11:9      11:16    11:18
12:15    12:23    12:25
13:3      13:5    13:11
13:24    14:11    14:16
15:5      15:8    15:19
16:7      16:13    16:16
16:20    16:24    16:25
17:14    17:16    18:5
18:21    18:22    18:25
19:2      19:13    23:13
23:13    23:15    24:8
24:25    25:1    25:12
26:9      26:11    26:18
27:10    27:13    27:14
28:5      28:18    28:23
28:24    29:5    59:23

30:14    30:17    31:1
31:19    31:20    31:22
32:7     32:9     32:10
32:19    50:12

**drafted** [2]        46:14
54:23

**drawing** [1]        25:22

**dribbled** [1]       55:18

**drop** [1] 32:1

**drop-dead** [3]      50:20
51:3     51:14

**dropping** [1]       13:11

**due** [1]   15:17

**duplication** [1] 34:18

**during** [11]        5:1
5:7      5:24    6:17
24:7     26:2    28:24
34:21    48:8    48:17
55:24

**e-mail** [11]        8:7
8:10     16:13   19:1
23:11    26:4    26:6
26:12    27:12   27:14
32:8

**e-mails** [12]       4:17
6:9      6:12    6:21
8:10     8:11    9:18
9:20     9:22    23:6
31:2     32:6

**early** [2] 30:17    48:8

**earnest** [1]        58:19

**easily** [1]         18:19

**Ed** [1]    2:14

**EDWARD** [1]  1:20

**eight** [1] 52:15

**either** [6]         31:15
31:17    49:2    49:10
50:22    52:10

**elected** [1]        24:23
46:23

**ELECTRONIC** [1]
1:8

**elucidation** [1] 66:2

**embassy** [3]        49:2
49:3     49:12

**employed** [1]  50:13

**enable** [2]         45:18
45:22

**encourage** [1]      19:5

**end** [6]   11:13    13:11
47:15    51:2    51:3
61:16

**engage** [1]         12:6

**engaged** [2]        19:18
19:19

**engaging** [1]       67:1

**engineering** [7] 38:1
38:9     40:1    42:7
44:6     59:10   59:23

**entered** [2]        3:11
12:4

**entire** [1]         8:12

**entirely** [1]       63:13

**entitled** [12]      16:5
18:8     21:5    39:25

43:6     52:21   58:6
58:11    62:15   63:25
64:13    64:14

**equipment** [4]      56:9
57:22    58:1    58:2

**Eric** [2]  2:4      2:21

**especially** [1]     28:4

**ESQ** [9] 1:18    1:18
1:20     1:20    1:21
2:2      2:3     2:4
2:4

**essence** [6]        26:13
34:21    34:25   37:7
40:18    55:21

**essentially** [1]    18:11

**establish** [1]      43:6

**established** [1] 27:24

**establishing** [1] 28:4

**estimate** [1]       23:5

**et** [4]    10:5     10:5
39:5     39:6

**event** [1]          10:23
26:21

**eventually** [1]     20:11

**everybody** [1]   44:22

**everyone's** [1]  21:22

**evidence** [6]       11:16
17:1     25:19   26:1
38:5     52:1

**exact** [2] 10:14    64:5

**exactly** [7]        40:7
42:5     44:18   47:9
48:10    60:10   66:5

**example** [1]        5:4
21:16    27:22

**examples** [1]    58:24

**except** [1]         47:13

**exception** [4]      27:20
27:23    28:11   28:13

**exchange** [4]       23:11
23:12    25:20   26:12

**Excluding** [1]   32:21

**exclusive** [1]      47:4

**exclusively** [1] 47:11

**exercise** [1]       40:5

**expect** [1]         39:9

**expectation** [1] 7:9

**expecting** [1]      11:13

**expedition** [1]  39:25

**experience** [1]  45:10

**expert** [8]         5:17
5:18     7:2     11:9
11:13    15:12   16:14
42:20

**experts** [1]        5:16

**explain** [1]        68:8

**explained** [1]   35:18

**explanation** [1] 34:3

**explicitly** [1]     5:24

**extended** [1]       12:7

**extent** [4]         22:24
24:11    32:8    47:1

**extraordinarily** [1]
45:12

**extraordinary** [1]
54:21

**eyes** [1]  45:19

**facie** [1] 27:24

**facilities** [1]     48:25

**facing** [1]         48:24

**fact** [17] 5:9      11:18
14:11    16:2    16:23
17:16    18:2    18:8
21:6     24:24   25:2
26:1     28:22   34:1
35:22    53:12   66:13

**factor** [1]         51:5

**facts** [3] 15:4     18:7
23:18

**factual** [1]        13:20

**fairly** [1]         48:8

**fall** [1]  64:6

**familiar** [2]       21:23
49:1

**far** [7]   33:15    49:25
56:18    58:6    59:6
66:25    67:10

**fashion** [4]        21:14
22:22    45:23   66:3

**fashioned** [2]      19:24
20:23

**favorable** [3]      7:7
7:14     26:15

**Federal** [2]        64:5
64:25

**fell** [1]  52:18

**few** [7]   27:8     30:8
32:1     53:20   54:11
59:15    67:25

**fight** [1] 58:17

**fighting** [1]       59:14

**file** [5]  7:18     26:24
54:7     62:12   62:13

**filed** [1] 5:6

**filters** [1]        58:4

**final** [3] 48:15    49:8
50:25

**finally** [1]        19:20

**financial** [1]      8:8

**finder** [1]         21:6

**fine** [2]  36:23    51:1
68:7

**Fineman** [2]        1:18
2:13

**finer** [1] 61:2

**Finger** [1]         1:19

**finish** [2]         55:5
64:19

**firm** [18] 4:17     5:4
5:11     5:19    6:10
6:22     13:2    13:8
13:22    14:19   15:3
16:13    21:2    21:17
22:5     22:5    22:17
26:22

**first** [23] 2:24    3:3
6:6      7:24    9:8
12:24    14:9    16:12
17:18    18:18   18:22

20:4     26:1    28:16
34:16    36:9    39:16
40:14    50:19   54:18
58:16    59:6    65:25

**fishing** [1]        39:25

**five** [1]  11:20

**five-minute** [1] 8:4

**flat** [1]  46:22

**flexible** [1]       51:10

**Florida** [2]        56:22
67:9

**flow** [3]  63:22    64:16
66:16

**flowing** [1]        17:3

**flurry** [2]         6:9
6:17

**focus** [1]          38:13

**follow** [1]         27:3

**following** [1]      26:4
26:12

**followup** [3]       6:12
7:18     26:4

**force** [1] 50:9

**foreign** [1]        57:3

**forgive** [1]        50:21

**form** [1]  66:4

**formally** [1]       48:12

**format** [1]         63:11

**formed** [4]         7:8
15:20    16:25   21:19

**forms** [1]          21:14

**formulated** [1]  59:11

**forth** [9] 8:13     8:19
9:18     12:16   12:25
27:10    33:21   34:3
40:25

**forward** [10]       7:3
7:10     15:13   19:16
30:20    34:24   35:1
45:14    48:7    66:13

**forwarded** [1]   32:9

**found** [2]          6:8
19:17

**foundation** [1]  28:17

**foundry** [1]        64:23

**four** [1]  58:18

**FRANCIS** [1]        2:2

**Frank** [1]          2:19

**frankly** [2]        61:4
61:5

**fraud** [1]          29:11

**Friday** [1]         56:11

**front** [2] 12:5     12:11

**fruits** [1]         20:21

**full** [1]  7:22

**fully** [3] 11:13    35:24
43:2

**functions** [1]      42:6

**future** [1]         67:19

**g** [4]     57:4     58:15
63:1     64:6

**Gary** [2]  1:20     2:14

**gather** [1]         17:25

**general** [6]        26:8
33:18    34:4    57:20
60:21    66:15

**generally** [1]      57:25

**generic** [1]        53:5

**genesis** [1]        17:18

**gist** [1]  53:4

**given** [6]          8:13
5:15     7:11    40:6
48:24    62:2

**goes** [6]  10:4     12:2
20:22    39:3    58:7
58:24

**gone** [4]  8:18     12:16
25:5     50:2

**good** [6]  2:10     2:11
2:17     19:15   59:12
64:21

**goodbye** [1]        19:15

**goods** [1]          64:25

**grant** [1] 62:12

**granted** [1]        34:4

**GRAPHICS** [1] 1:8

**great** [2] 33:2     42:5

**GREGORY** [1] 1:16

**grounds** [1]        55:20

**grown** [1]          45:15

**guess** [2]          50:20
57:4

**half** [2]  61:3     65:22

**handful** [3]        23:6
26:22    29:25

**handle** [1]         32:22
37:14

**handling** [2]       3:4

**hardware** [1]       39:1

**hats** [1]  43:19

**hear** [2]  43:11    58:12
68:10

**heard** [5]          23:17
50:19    55:10   59:7
60:25

**hearing** [7]        5:5
5:8      5:24    65:1
24:7     32:7    65:6

**help** [2]  61:12    67:18

**hey** [1]   19:13

**hire** [1]  5:21

**hired** [3] 5:25     16:3
18:9

**history** [2]        14:3
28:17

**Hoffman** [54]       4:20
2:14     2:15    4:20
8:15     11:3    12:20
18:13    18:16   20:13
20:19    21:12   22:12
28:15    28:22   30:12
30:15    30:19   31:4
31:17    31:18   33:3
33:6     37:16   38:16
40:14    40:20   41:2
42:9     42:12   42:19
43:15    44:11   47:19

47:24   49:19   51:1
51:15   60:3    60:21
61:10   61:19   61:25
62:3    62:9    62:15
63:6    64:10   65:7
66:8    66:19   67:2
67:18   68:1
**Honor** [82]         2:11
3:2     3:9     3:13
3:23    3:24    4:3
8:25    9:5     9:12
11:1    13:22   15:16
16:12   17:8    18:13
21:13   22:9    23:8
24:5    25:16   26:1
26:21   27:6    28:15
29:7    30:1    30:10
30:11   30:15   30:24
30:25   31:4    31:18
31:24   32:2    32:14
33:1    33:3    34:20
35:6    35:12   36:9
36:12   36:14   37:8
37:15   40:2    40:14
40:20   41:2    41:15
42:14   44:1    44:11
44:25   46:6    47:24
47:25   51:1    52:6
52:19   53:1    54:22
55:9    58:14   60:3
61:10   62:3    62:6
62:9    63:6    64:3
64:11   64:19   65:7
66:8    66:19   67:7
67:13   67:17   67:18
**Honor's** [1]        67:11
**HONORABLE** [1]
1:16
**hope** [5] 13:15   20:2
41:10   61:13   68:3
**horse** [1]          44:21
**hour** [1] 61:3
**hours** [3]          15:21
16:3    18:9
**Howrey** [40]        2:5
2:20    4:17    5:4
5:11    5:13    5:14
5:19    6:10    6:20
6:22    7:11    8:2
8:13    13:2    13:8
13:22   14:11   14:15
14:19   15:3    15:4
16:12   18:24   19:11
21:2    21:10   21:17
22:2    22:17   23:12
23:16   25:4    25:11
26:21   27:11   28:19
29:23   32:22   35:7
**Howrey's** [2]       17:14
26:11
**huge** [1] 44:7
**hundred** [1]        42:10
**hundred-percent** [1]
11:10
**Hutz** [1] 2:2
**i.e** [1]            54:12
**idea** [2] 26:17   53:7
**ideas** [1] 59:12
**identified** [10]    6:15
12:1    39:13   39:20

41:25   44:2    51:18
52:15   53:2    54:4
**identify** [3]       17:20
37:4    46:14
**imagine** [1]        22:19
**immediately** [1]
53:16
**impact** [1]         20:16
**impasse** [1]        47:21
**implicitly** [1]     50:1
**implies** [1]        52:17
**import** [1]         45:1
**important** [3]      11:1
14:15   15:23
**importantly** [1] 36:10
**imported** [3]       64:9
65:3    65:17
**in-depth** [1]       16:24
**inapplicable** [1]
57:4
**inartfully** [1]     54:23
**inaudible** [4]      39:19
42:21   56:12   59:3
**INC** [3] 1:7    1:8
1:9
**include** [4]        15:13
31:2    31:16   32:12
**included** [1]       8:24
**including** [2]      27:13
39:3
**inconsistencies** [3]
13:5    13:15   24:6
**inconsistency** [1]
5:23
**inconsistent** [5]
10:13   29:1    29:3
29:4    29:9
**INCORPORATED** [1]
1:7
**incumbent** [1] 45:16
**indeed** [1]         11:7
**indicate** [2]       34:1
34:5
**indicated** [17]     19:13
19:25   28:24   30:8
33:10   34:6    34:23
35:22   36:5    40:20
41:3    55:16   56:1
56:14   56:15   60:4
67:19
**indicating** [1]     20:8
50:1    57:8
**individuals** [1]  22:1
**indulgence** [1]   18:17
**inevitably** [1]   45:9
**inference** [1]    25:10
25:18   25:23
**information** [80]
6:1     6:2     6:11
6:14    6:17    6:19
6:25    7:21    8:5
8:6     8:7     8:8
11:7    11:8    11:11
11:16   11:18   11:21
13:3    13:9    13:20
14:11   15:6    15:9

18:1    18:5    19:9
19:10   19:22   19:23
21:18   22:2    23:4
23:15   23:25   24:25
25:2    25:20   26:3
26:20   28:6    28:9
28:19   28:25   33:19
36:13   36:14   37:3
38:5    41:12   42:15
42:17   42:23   43:3
43:5    43:6    43:21
43:22   44:12   45:2
45:3    45:6    45:8
45:11   45:12   45:18
45:23   47:10   50:7
50:8    51:25   53:11
54:9    55:17   56:23
61:21   63:19   65:10
65:13   66:15
**informed** [1]       15:11
**infringe** [5]       34:3
39:12   44:19   53:9
63:8
**infringement** [15]
34:2    35:18   35:23
36:2    36:3    38:15
39:15   41:25   46:20
47:2    53:8    55:21
63:10   63:10   63:21
**infringing** [2]     39:24
46:10
**inhibitor** [1]      63:15
**initial** [8]        51:19
52:8    52:9    52:23
53:6    54:20   54:23
65:15
**initiated** [1]      4:1
**innocent** [1]       24:10
**input** [3] 39:17    45:5
54:5
**inputs** [5]         40:7
42:1    42:2    45:4
47:14
**inputting** [1]      42:23
**inquire** [1]        15:18
16:6    28:1
**inquiry** [3]        13:19
26:3    28:8
**inside** [1]         63:9
**Insofar** [1]        41:10
**inspection** [2]     4:13
29:15
**installation** [1] 39:4
**instance** [2]       27:22
51:8
**Instead** [1]        46:23
**instructed** [1]   47:19
**integrated** [1]   56:4
**intend** [3]         15:11
15:12   48:17
**intended** [1]       12:7
**intending** [1]      46:5
**intent** [2]         24:8
31:16
**interest** [2]       33:12
43:10
**interested** [4]   30:13

40:17   40:24   45:24
**interim** [1]        66:8
**internal** [1]       4:19
6:20    9:23    13:25
17:14   18:1    18:20
25:10   26:22   27:1
29:22   30:13   31:21
31:24   32:21   42:6
46:19
**INTERNATIONAL**
[1]             1:9
**interpretation** [2]
7:17    14:4
**interrogatories** [4]
37:18   37:19   55:14
58:5
**interrogatory** [5]
39:14   46:13   54:4
55:11   57:10
**interrupt** [3]      3:14
14:18   22:10
**invalidating** [1]
17:17
**invalidity** [1]   53:10
**invention** [1]    15:24
**inventors** [1]    48:4
50:8
**invested** [2]       61:3
61:5
**involved** [5]       22:2
35:8    35:9    40:8
60:13
**involves** [1]     34:5
**involving** [1]    54:19
**issue** [42]         4:2
7:16    10:9    12:24
13:1    13:16   14:3
14:6    18:18   18:23
20:20   20:21   20:22
21:11   21:12   22:25
29:7    29:11   31:19
33:22   35:14   35:16
35:23   37:18   38:6
38:11   38:21   39:7
39:10   42:12   45:13
45:16   46:6    48:4
54:19   56:25   58:15
59:18   62:18   62:25
66:1    66:10
**issued** [2]         32:17
33:7
**issues** [8]         16:21
21:13   22:21   27:13
37:16   38:14   66:9
66:11
**item** [4] 3:3    3:8
3:9     48:1
**items** [2]          2:25
3:4     3:4     51:18
61:6
**J** [1]    1:18
**January** [1]      48:25
**Japan** [7]          48:6
48:19   48:21   49:2
49:10   50:12   51:6
**judgment** [2]     62:14
64:13
**July** [20] 3:11   4:7

6:6     6:6     6:12
7:17    7:25    8:14
8:23    9:1     11:4
12:4    16:12   26:23
29:14   30:17   31:6
31:9    32:5    32:18
**juncture** [1]     21:11
**June** [5] 5:5     30:18
30:19   31:8    32:18
**jurisdiction** [1] 35:14
**keep** [4] 3:6     43:8
43:9    55:19
**Kelley** [59]        2:4
2:21    2:25    5:1
5:7     5:23    6:23
7:25    12:22   13:6
23:5    24:6    29:17
30:7    30:9    30:10
37:15   37:24   40:18
41:10   41:14   41:17
41:24   46:3    46:4
47:25   48:3    49:15
50:16   50:18   51:5
53:1    55:15   55:19
56:1    56:14   57:8
58:5    58:14   60:11
60:22   61:9    62:6
62:18   62:20   62:24
64:3    64:18   64:19
65:21   66:13   66:20
67:13   67:19   67:22
67:23   68:2    68:3
**Ken** [1]   2:15
**KENNETH** [1] 1:21
**Kevin** [1]          68:15
**key** [4] 17:17   38:14
39:11   45:8
**kicking** [1]      59:12
**kind** [8] 10:16   26:5
38:17   39:8    40:6
47:5    53:25   59:2
**knew** [7]           13:23
18:24   21:17   23:25
24:22   53:15   56:15
**knowing** [1]      40:17
45:24
**knowledge** [3]    13:2
48:19   57:9
**known** [1]          24:19
**knows** [1]          36:21
**Kobayashi** [4]      48:6
48:6    48:18   50:12
**lack** [1] 50:1
**laid** [1] 52:13
**language** [6]       8:24
9:2     9:6     17:12
37:25   45:18
**largest** [1]        44:4
**last** [6] 32:16   51:9
51:14   54:11   56:11
58:17
**late** [4] 5:5     30:18
30:19   50:15
**law** [4] 10:24   41:20
45:15   64:2
**lawyer** [1]         65:24

lays [1] 28:17
Layton [1]          1:19
    2:12    2:13
lead [3] 17:8      18:13
    52:1
leading [2]        31:2
    53:20
leads [2] 24:9     26:14
learned [1]        18:2
least [1]          24:12
    24:15   27:15   27:24
    50:1    51:13   56:16
    66:10
led [2] 5:14      19:19
left [1] 68:4
legal [1] 28:23
legitimate [1]     38:17
less [5] 15:8      20:3
    33:17   40:15   60:16
letter [9] 6:5      9:21
    10:15   12:3    13:22
    26:24   52:17   57:7
    62:12
letters [3]        4:17
    7:18    27:8
levels [1]         45:19
libraries [1]      39:2
library [4]        39:18
    40:9    42:3    54:6
likelihood [1]     51:11
likely [2]         14:12
    52:15
limit [3] 41:3     59:15
    59:16
limitation [2]     60:1
    60:19
limitations [1]    44:17
limited [5]        22:18
    39:10   39:11   44:13
    66:4
limiting [1]       57:14
line [3] 2:20     12:11
    55:4
list [12] 20:9     21:22
    22:8    22:13   22:17
    26:8    36:22   52:10
    52:20   52:21   52:23
    64:22
listed [6]         50:6
    51:21   52:7    52:7
    52:19   52:22
listen [1]         21:17
listing [1]        8:7
literature [1]     56:9
litigation [10]    5:16
    15:9    16:1    16:5
    21:9    22:14   33:9
    36:8    38:3    45:13
live [1] 48:19
lives [2] 49:6    50:12
LLP [3] 1:21       2:2
    2:5
located [1]        56:24
lock [2] 15:25    16:4
Lodge [1]          2:2

log [8]   4:15     4:20
    10:7    12:19   20:9
    20:12   22:8    27:1
logic [14]         53:24
    53:25   54:5    54:12
    56:8    57:15   59:9
    59:17   59:20   59:21
    60:7    60:14   62:21
    62:22
look [5] 37:21    46:13
    66:2    67:2    68:9
looking [9]        6:22
    6:25    13:24   22:7
    32:2    60:3    60:7
    60:9    60:15
looks [2]          16:17
    37:10
LTD [2] 1:4        1:8
M [3]    1:16     1:20
    2:3
major [2]          17:16
    18:10
makes [5]          29:23
    57:3    64:4    64:20
    64:25
manner [4]         39:10
    39:11   39:24   61:4
manuals [6]        39:4
    39:4    39:5    39:5
    40:6    42:10
manufacture [1]
    58:23
manufacturing [15]
    60:5    63:7    63:21
    63:24   64:4    64:6
    64:7    64:11   64:15
    64:16   64:25   65:11
    65:12   65:16   65:17
map [1] 54:6
marketing [1]      53:3
Markman [2]        55:22
    55:25
material [4]       11:23
    28:7    47:4    62:7
materials [4]      53:3
    53:3    53:15   53:19
Matrox [15]
    1:8     1:9     1:9
    56:22   57:1    62:7
    65:20   66:10   66:17
    66:25   67:8    67:8
    67:8    67:11
matter [4]         7:4
    35:16   47:20   48:3
matters [3]        61:4
    61:15   61:17
Maurer [1]
    68:15
may [36] 14:2     14:21
    14:23   14:24   14:25
    16:2    19:24   20:2
    20:11   20:15   20:16
    20:19   20:19   20:21
    21:4    21:16   21:25
    22:1    22:5    24:15
    24:19   26:24   29:10
    30:5    33:20   33:25
    34:13   38:2    51:20
    54:25   55:14   57:4

58:9    61:12   64:19
    67:18
mean [4] 3:13      10:9
    14:20   16:3
means [1]          10:11
meant [2]          37:19
    59:8
mechanical [1]     65:2
meeting [1]        47:7
meetings [1]       59:23
Meilman [13]       1:20
    2:14    3:4     35:20
    55:9    55:13   58:9
    59:5    60:4    62:6
    65:23   67:7    67:17
memos [1]          59:23
Menlo [1]          2:5
mention [1]        46:17
mentioned [7]      24:1
    32:16   35:12   41:17
    41:20   45:1    59:16
merits [1]         20:18
    21:7
Messrs [1]         2:14
method [1]         63:18
methods [1]        52:5
mid-September [1]
    68:2
might [1]          7:20
    39:8    50:7    66:1
mind [3] 3:7       19:4
    32:25
minute [3]         37:25
    57:5    58:15
minutes [1]        11:20
missed [1]         32:15
misunderstood [1]
    23:21
moment [1]         43:18
month [1]          55:15
Monti [1]          11:2
Morin [1]          1:21
morning [4]        2:10
    2:11    2:16    2:17
most [5] 18:3     18:4
    22:12   45:2    45:7
motion [1]         20:24
    33:21   46:8
mouth [1]          24:16
movant [2]         3:16
    3:18
movants [2]        3:22
    4:2
move [1]           55:8
moving [1]         16:22
Mower [1]          52:14
Ms [32] 17:8      18:14
    22:9    22:11   22:24
    23:1    23:8    23:22
    23:24   24:17   25:3
    25:14   25:16   27:4
    29:19   29:22   30:3
    30:4    30:24   31:10
    31:13   32:14   32:21
    32:25   33:9    34:21

44:1    44:25   46:2
    54:22   54:25   55:2
multiple [1]       5:2
must [2] 15:3     49:2
named [1]          5:17
namely [3]         4:19
    42:1    46:15
names [1]          5:15
narrow [3]         44:10
    54:10   57:15
narrowed [1]       56:1
    56:6
narrowing [1]      53:22
nature [3]         6:7
    12:23   38:11
necessary [4]      17:20
    45:17   47:18   67:3
need [18]          7:10
    20:4    31:5    35:17
    38:4    41:21   42:4
    42:8    45:4    45:17
    47:9    47:10   47:11
    54:24   59:7    63:14
    66:2    68:8
needs [2]          13:20
    45:13
negotiating [1]    35:8
negotiation [1]    53:20
net [1] 64:22
never [2]          5:5
    10:19   15:17   15:21
    65:11
new [1] 45:17
next [6] 8:23     35:12
    36:17   41:24   61:16
    61:16
nice [1] 19:14
non-confidential [1]
    34:7    41:8
non-Matrox [1] 67:15
non-starter [1]    54:3
none [2] 8:9      59:24
nor [1] 31:24
normally [2]       22:13
    47:14
note [2] 14:15    53:10
noted [1]          9:24
    12:20
nothing [5]        10:6
    10:7    34:8    47:12
    65:11
notices [1]        5:6
now [22] 6:20     13:7
    15:7    20:24   22:7
    25:17   31:7    32:25
    38:2    41:10   44:1
    45:1    45:24   46:10
    46:24   50:3    59:5
    59:14   59:18   60:25
    61:3    61:16
number [8]         21:25
    22:18   29:2    30:8
    34:15   40:3    60:23
    61:12
numerous [1]       49:21
object [5]         35:25

37:2    51:24   52:2
    61:20
objected [8]       6:8
    6:18    33:14   35:5
    35:13   35:18   35:5
    59:1
objecting [1]      35:20
objection [5]      34:16
    36:17   40:17   41:18
    43:11
objections [6]     34:15
    35:19   37:17   38:11
    61:2    67:10
obligated [1]      36:25
obligations [2]    3:11
    46:12
obtain [3]         21:19
    36:21   36:23
obtainable [1]     36:19
obtained [3]       13:3
    29:5    36:6
obtaining [1]      36:7
obviously [11]     7:6
    29:1    32:8    34:10
    36:14   43:3    44:24
    47:21   50:4    51:7
    52:9
occurred [1]       24:10
off [6]  21:22    36:7
    47:16   60:22   64:23
    68:6
often [2] 10:21   22:12
oftentimes [1]     45:11
Oliver [1]         2:4
    2:21
once [9] 11:1     11:4
    11:6    11:7    18:25
    19:13   20:11   22:13
    58:19
one [37] 3:16      8:5
    11:5    11:13   11:19
    11:22   17:16   18:25
    20:5    21:24   21:25
    24:12   26:17   28:6
    28:16   29:17   34:20
    39:8    39:9    41:19
    48:15   49:2    49:11
    50:7    50:9    55:4
    56:21   57:21   57:21
    60:25   61:1    61:14
    63:20   64:7    65:14
    67:8    68:10
ones [3] 3:14      3:15
    59:1
operates [1]       43:1
operation [5]      13:5
    53:25   65:11   65:16
    65:17
operations [1]     52:4
opinion [5]        3:10
    7:13    15:18   17:1
    28:23
opinions [9]       5:4
    7:9     14:13   15:4
    15:19   16:25   21:7
    21:19   26:19
opponent [1]       3:4

**opportunity** [4] 49:4
49:11  50:23  66:6
**orally** [1]          12:4
**order** [33]          3:11
4:7    4:22    7:17
8:20   8:23    9:1
9:2    10:18   10:23
12:3   14:3    17:11
17:22  12:16   26:23
29:14  33:4    35:7
35:9   35:11   36:16
38:21  38:22   40:9
41:13  43:15   43:15
61:24  62:1    64:6
66:25  67:11
**ordered** [8]        8:16
8:19   9:9     9:12
9:14   26:21   29:16
61:18
**orders** [1]         45:14
**Osaka** [3]          49:4
49:6   49:11
**Oshinsky** [1]       1:21
**ought** [1]          13:7
**ourselves** [3]      4:1
21:16  26:6
**outlining** [1]      8:20
**output** [6]         39:19
39:19  40:9    42:3
47:16  54:6
**outset** [1]         14:16
**outside** [3]        63:2
63:3   63:7
**overall** [1]        20:22
**overbreadth** [1] 44:7
**overcome** [1]       51:8
**overly** [1]         40:19
**own** [1] 61:7
**p.m** [1] 68:13
**Page** [3] 6:24      12:11
12:20
**pages** [4]          33:17
40:15  42:10   60:17
**paper** [1]          9:18
**papers** [1]         53:13
**paragraph** [8]      4:7
7:17   9:7     9:7
10:1   10:2    12:1
12:13
**parameters** [3]     31:7
31:12  40:12
**Park** [1] 2:5
**part** [20] 4:16     9:12
16:4   17:14   21:13
33:14  33:22   33:25
34:5   38:14   42:24
42:25  43:1    51:23
55:10  63:14   63:20
64:10  64:15   65:16
**particular** [8]     17:20
18:2   18:6    30:6
45:1   45:3    45:5
60:12
**particularly** [1] 17:13
**parties** [11]       3:10
3:19   36:8    37:3
37:4   37:5    47:8

47:19  51:11   53:19
58:18
**parts** [4] 39:11    42:19
42:21  44:18
**party** [16]         15:23
16:6   33:9    33:12
38:2   38:5    39:9
41:18  41:21   43:9
43:10  43:10   46:11
46:11  49:20   50:9
**past** [1] 53:20
**patent** [10]        17:2
17:18  35:18   48:4
54:13  56:2    60:13
63:2   63:8    63:23
**patents** [1]        8:8
**pay** [1] 5:21
**people** [6]         22:12
28:19  57:9    59:12
62:7   62:16
**percent** [1]        44:5
**performed** [3]      39:16
42:6   53:25
**perhaps** [2]        51:10
54:24
**period** [5]         8:4
21:22  32:20   51:11
67:2
**peripheral** [1]     47:4
**permission** [2]    62:12
62:13
**permit** [1]         51:11
**person** [1]         18:5
**personal** [2]       23:2
30:4
**pertains** [2]       20:18
21:7
**phone** [7]          6:12
24:12  26:7    26:10
32:5   32:6    49:1
**phonetic** [1]       11:2
52:14
**phrase** [3]         8:24
10:13  50:21
**phrases** [1]        53:2
**physical** [3]       64:8
64:21  65:2
**picture** [1]        7:22
**piece** [7] 9:17     18:10
30:6   55:18   55:18
63:19  65:10
**pieces** [1]         11:8
17:17  25:25
**ping-pong** [1]      40:25
**place** [4] 3:25     17:18
19:23  49:2
**plaintiff** [1]      1:5
1:23   2:12    26:14
44:9   45:22   46:1
50:6
**plaintiffs** [1]     4:14
5:6    53:13
**planning** [1]       59:23
**plant** [3] 56:14    56:23
67:9
**play** [2] 33:25     34:13

**point** [23]         13:17
15:3   15:9    20:10
20:11  21:3    21:13
23:2   23:8    24:1
29:17  29:18   34:4
41:5   41:24   43:23
44:3   48:8    48:23
61:2   61:6    64:20
66:5
**points** [3]         5:2
23:10  28:16
**poison** [1]         20:5
**poisonous** [1]      20:21
**portion** [1]        10:1
65:8
**position** [9]       20:14
23:18  24:15   25:7
25:15  28:3    28:12
33:11  63:25
**positions** [1]      34:2
**possession** [2]     40:1
47:4
**possibility** [1]    22:4
22:5   24:19
**possible** [2]       28:8
53:12
**postponed** [1]      26:25
**potential** [4]      20:17
21:14  22:25   29:11
**pre** [1]  60:11
**precisely** [1]      10:15
10:16
**precluded** [1]      16:20
**preparation** [2]  31:14
32:22
**prepare** [1]        8:20
**prepared** [4]       4:10
9:15   10:3    53:6
**preparing** [1]      31:25
32:3
**present** [2]        30:21
43:5
**presumably** [1]   25:11
**presume** [2]        33:3
50:8   62:15
**pretty** [1]         58:4
**prevail** [1]        62:25
**prevent** [1]        16:4
**previously** [1]     33:10
**prima** [1]          27:24
**primary** [1]        4:1
**principal** [2]      2:16
21:3
**privilege** [12]     4:12
4:15   4:20    10:6
10:7   10:21   14:1
20:9   22:8    27:1
27:20  27:21
**privileged** [11]   9:25
10:20  10:22   12:13
14:7   14:10   22:13
22:18  27:17   28:1
28:9
**problem** [10]      17:11
19:11  19:21   20:5
21:21  44:7    44:9

48:24  54:22   54:25
**proceed** [4]        24:23
33:4   45:14   47:7
**proceeded** [2]      24:2
24:20
**process** [40]       27:2
42:24  42:25   43:1
46:16  47:15   53:24
54:13  54:17   56:3
56:8   56:12   56:20
57:2   57:14   59:6
59:8   60:5    62:21
63:6   63:8    63:8
63:21  63:23   63:24
64:4   64:6    64:7
64:11  64:15   64:21
64:22  64:24   65:1
65:2   65:5    65:10
66:14  67:1    67:14
**processes** [7]      56:7
56:9   56:17   57:13
57:16  60:12   60:14
**produce** [37]       4:9
4:19   6:20    8:18
9:14   10:3    10:7
10:16  10:18   10:19
12:15  23:7    23:11
26:22  34:18   35:1
35:4   35:17   38:3
39:1   39:19   39:24
40:4   40:9    41:6
42:3   49:25   50:11
51:16  51:17   51:23
53:22  54:6    57:20
58:20  58:21   64:23
**produced** [25]      5:10
8:11   9:17    10:12
27:11  29:16   33:15
33:16  34:17   35:3
35:10  38:1    38:10
40:4   40:15   42:9
43:24  53:12   53:14
53:15  60:16   64:21
67:21  67:25   68:1
**produces** [2]       64:22
64:24
**producing** [1]      10:2
53:16
**product** [21]       4:12
12:17  17:15   38:1
38:10  38:14   39:23
44:4   45:3    45:8
46:25  53:2    54:1
59:4   59:11   59:13
59:22  63:7    65:12
65:15  65:17
**production** [10]   10:1
10:14  22:25   27:7
29:14  38:4    41:11
54:20  57:3    67:23
**products** [19]     34:11
34:12  34:13   39:10
39:11  41:7    52:5
53:23  57:12   57:18
58:10  58:24   59:3
59:16  59:16   59:17
59:21  63:22   64:16
**program** [1]        33:24
**progression** [1]  47:1

**promotional** [1]
53:3
**proper** [4]         38:8
41:11  47:7    47:8
**properly** [2]      40:22
54:10
**propose** [1]       65:23
**proposed** [1]      60:20
**proposing** [1]     30:16
**proposition** [3] 65:6
65:8   65:9
**prosecute** [1]     45:22
**protect** [1]        26:6
43:14
**protective** [10]  35:7
35:9   35:11   36:15
38:22  41:13   43:15
45:14  61:24   62:1
**prove** [1]          43:3
43:7   44:22
**provide** [12]      4:14
17:23  22:12   22:17
34:12  36:20   36:25
37:9   37:12   42:1
53:9   56:11
**provided** [8]       5:6
7:21   12:22   13:13
22:20  33:20   36:15
36:15
**provides** [2]      26:23
57:22
**providing** [3]    39:17
47:14  54:6
**provisions** [1]   57:3
**public** [2]        36:18
42:4
**publications** [1]
8:8
**publicly** [3]       34:7
36:20  36:24
**purpose** [1]       32:9
**purposes** [1]      24:17
**pursuant** [1]      41:12
**pursue** [1]         24:8
**pursuit** [2]       14:13
26:11
**push** [1] 55:25
**pushed** [1]        44:10
**put** [4]   10:7     25:25
24:16  61:1
**putting** [3]       18:21
44:21  46:15
**questioned** [1]   25:23
**questions** [3]     24:12
26:1   56:25
**quickly** [1]       41:1
53:11  67:24
**quite** [5] 22:12   13:4
61:4   61:4    65:1
**quote** [4]          1:21
12:13  12:13   28:5
**raise** [1] 29:17
**raised** [5]        34:15
34:16  35:20   35:24
62:10

**raising** [1]        62:7
**range** [1]         42:12
**rather** [1]        41:1
**rattled** [1]       60:22
**react** [1] 40:17
**read** [11] 12:12    22:16
  26:5   38:23   38:25
  40:22   51:16   58:20
  65:8   65:25   66:6
**reading** [2]       10:15
  58:21
**real** [7]  33:12    37:18
  38:6   38:11   38:13
  39:7   43:10
**really** [10]        12:6
  17:24   18:16   40:18
  40:24   42:4   46:20
  47:2   54:14   59:7
**reason** [2]        35:4
  41:17
**reasonable** [1]    27:25
**reasonably** [2]    39:8
  51:25
**recapping** [1]     32:5
**receive** [3]       11:11
  28:25   45:23
**received** [17]      4:10
  4:16   4:16   5:25
  6:14   9:15   10:3
  11:2   11:4   11:7
  14:11   24:25   25:2
  25:3   28:19   32:9
  48:14
**recipient** [1]     27:15
**recited** [1]       37:16
**recognize** [1]     45:16
**recognized** [1]    14:15
**recollection** [1] 12:9
**recommendation** [1]
  27:3
**record** [2]        24:17
  36:18
**recorded** [1]      37:17
**records** [1]       56:24
**reduce** [1]        41:22
**refer** [1] 53:13
**reference** [4]     6:23
  29:23   39:3   44:3
**references** [1]    12:11
**referred** [1]      56:5
**reflect** [2]       14:10
  25:11
**reflections** [1]   12:8
**refused** [4]       4:18
  37:5   55:25   57:6
**refuses** [1]       6:20
**regard** [4]        20:25
  27:7   51:17   68:5
**regarding** [14]    10:24
  18:20   21:7   21:8
  27:13   27:14   30:13
  31:3   31:25   33:22
  41:23   45:8   52:4
  64:2
**regular** [1]       47:14

**relate** [6]        7:19
  20:19   20:20   20:21
  37:17   60:5
**related** [3]       38:6
  54:20   55:11
**relates** [1]       12:13
  35:23   62:21
**relating** [24]     4:9
  9:11   9:13   10:10
  10:12   12:2   17:14
  17:23   20:14   31:1
  32:2   33:23   38:1
  38:9   38:22   39:22
  39:23   41:7   44:6
  47:11   53:19   53:23
  59:20   60:8
**relationship** [2] 24:20
  24:23
**relatively** [3]    30:8
  48:3   53:2
**released** [1]      61:7
**relevance** [1]     43:12
  43:21   52:4
**relevant** [11]     18:3
  18:4   38:15   52:13
  52:16   52:18   52:20
  52:20   52:22   54:16
  59:9
**relief** [11]       3:20
  19:24   20:3   20:7
  20:20   20:23   20:25
  21:14   21:15   22:21
  22:22
**rely** [1] 51:22
**relying** [2]       28:23
  63:12
**remainder** [1]     3:1
**remaining** [2]     54:14
  59:18
**remains** [1]       17:16
**remedies** [1]      7:20
**remedy** [1]        7:22
**remember** [2]      26:10
  28:21
**remove** [1]        43:18
**Reporter** [1]      68:15
**represent** [1]     49:20
**representation** [2]
  28:18   30:5
**representations** [5]
  5:1   29:1   29:2
  29:4   29:8
**represented** [1] 7:25
**representing** [2]
  13:6   48:9
**represents** [1]    35:7
**request** [16]      8:15
  12:12   33:7   38:18
  40:19   40:22   41:3
  44:10   51:17   51:24
  52:2   52:11   54:11
  56:6   57:11   58:21
**requested** [2]     6:21
  52:11
**requests** [19]     8:20
  37:20   37:21   38:9
  38:13   38:20   38:22

**39:22   40:3   49:22
  54:8   54:14   55:10
  55:14   58:5   58:16
  58:19   59:19   61:2
**require** [4]       10:19
  17:23   17:25   22:16
**required** [5]      4:21
  8:16   9:25   12:14
  38:2
**requires** [2]      4:8
  37:10
**resolve** [2]       7:10
  55:16   61:2   66:10
**respect** [4]       3:10
  13:2   31:19   44:7
**respond** [7]       18:14
  28:16   30:15   47:19
  48:13   49:21   60:2
**responded** [2]     8:6
  50:20
**response** [6]      16:12
  40:4   50:1   51:23
  52:13   52:25
**responses** [2]     37:17
  56:25
**responsibilities** [1]
  27:5
**restrict** [3]      39:21
  54:2   56:15
**restricted** [1]    59:19
**rests** [1] 47:2
**result** [7]        7:8
  7:14   15:14   16:25
  17:4   21:20   26:18
**retain** [1]        11:9
  15:11   31:19   31:23
**retained** [1]      6:5
**retention** [5]     6:5
  18:21   21:9   30:14
  32:10
**return** [1]        28:16
**reveal** [1]        20:15
**revenue** [1]       44:5
**review** [4]        10:20
  10:22   10:25   28:2
**reviews** [1]       29:15
**revisit** [1]       47:22
**Richards** [3]      11:7
  2:12   2:13
**Ricoh** [44]        1:4
  2:12   2:14   3:2
  5:9   5:12   5:14
  5:17   5:21   6:2
  6:15   6:18   7:5
  7:8   7:15   10:11
  13:4   13:14   14:17
  15:15   15:20   15:25
  16:2   16:7   16:18
  16:25   18:14   19:1
  19:6   19:10   19:14
  26:18   27:9   28:3
  28:20   29:1   33:7
  40:13   48:5   50:2
  50:13   59:15   60:2
  63:5
**Ricoh's** [2]       8:19
  23:18

**right** [7] 9:9     11:12
  20:24   27:7   45:24
  48:10   55:13
**ROBERT** [1]        1:18
**rolling** [1]       67:23
**roster** [1]        3:6
**rug** [1]           42:12
**Rule** [2] 55:13    55:24
**rules** [2] 16:13   42:20
**runs** [1] 20:5
**sale** [1]  58:23
**Sales** [1] 53:4
**sanctions** [1]     22:1
**says** [9]  9:3     9:8
  9:10   9:10   10:2
  10:3   11:21   38:25
  40:18
**schedule** [1]      66:21
**scheduling** [2]    33:11
  34:21
**scope** [10]        10:14
  18:18   27:7   29:19
  29:21   40:19   41:11
  44:13   59:19   66:11
**second** [9]        4:7
  5:23   9:14   10:13
  12:13   13:1   14:10
  33:6   39:17
**Section** [1]       51:18
**see** [11]  14:24   14:25
  17:11   17:24   20:12
  40:12   48:10   48:12
  49:22   62:17   65:4
**seek** [4]  19:22   20:1
  20:7   63:2
**seeking** [7]       3:20
  7:13   12:22   19:25
  51:25   62:13   62:20
**seeks** [1]         52:3
**seem** [3] 12:8     23:9
  56:24
**select** [1]        40:9
**selects** [1]       45:12
**self-serving** [1] 26:5
**SEMICONDUCTOR**
  [1]    1:7
**send** [3] 19:5     19:7
  20:9
**sense** [1]         10:19
**sensitive** [2]     45:2
  45:7   45:12
**sent** [10] 4:10    6:6
  9:15   9:18   10:3
  13:22   16:13   30:17
  32:8   64:23
**sentence** [2]      9:3
  9:8
**September** [2]     50:15
  50:15
**series** [1]        65:14
**served** [5]        5:5
  33:7   33:13   51:19
  55:14
**service** [1]       48:12
**serving** [1]       17:19

**set** [4]  33:21    34:3
  50:15   65:1
**seven** [2]         8:11
  9:20
**sever** [1] 5:20
**several** [3]       37:16
  42:10   59:1
**shall** [1] 4:14
**Shapiro** [1]       3:21
**share** [2] 11:21   28:5
**shared** [2]        45:13
  45:19
**shield** [1]        48:9
**Shindo** [9]        48:5
  48:9   48:15   48:18
  48:20   49:6   49:9
  49:19   50:7
**short** [2] 8:7     24:2
**shortly** [1]       68:10
**show** [5] 5:10     14:23
  23:14   50:5   64:15
**shred** [2]         41:15
  11:16
**side** [7]  4:21    15:4
  15:5   23:13   30:23
  52:11   58:13
**sign** [1] 8:21
**signed** [2]        6:6
  19:7   19:8
**significant** [1]  18:23
**Simon** [13]        2:5
  2:20   8:2   8:13
  18:24   19:11   21:17
  22:2   22:17   23:16
  25:4   27:12   35:7
**simple** [2]        19:12
  48:3
**simplify** [2]      30:16
  31:23
**simply** [2]        6:8
  36:4
**single** [2]        38:5
  9:17   27:14   51:16
**sit** [1]  49:24
**situation** [5]     37:10
  22:15   50:17   50:18
  63:21
**six** [2]  8:11     9:20
**SLEET** [1]         1:16
**software** [2]      33:19
  39:1
**sole** [1]  7:11
**solely** [1]        7:14
**someone** [4]       21:21
  23:3   37:22   50:7
**sometime** [1]      30:24
**sometimes** [2]     33:13
  55:4
**somewhat** [4]      23:10
  27:7   28:7   44:10
**sorry** [5] 3:19    14:8
  22:11   25:5   29:3
**sort** [8]  11:17   21:19
  17:6   20:6   33:4
  58:24   66:9   68:13

CondenseIt™

sorted - United

sorted [1]                21:15
sought [2]                13:8
  34:21
sounds [1]                27:19
source [3]                38:7
  45:21    45:25
sourcecode [5]            42:5
  42:16    44:13    44:25
  45:7
sourcecodes [1] 39:5
sources [4]               36:19
  36:25    42:13    43:14
sourcing [1]              43:13
space [1]                 49:4
speak [1]
SPEAKER [3]               30:1
  30:18    31:8
speaking [2]              32:16
  60:25
special [1]               22:14
specific [5]              25:25
  31:17    37:25    39:22
  56:4
specifically [4] 5:11
  5:13    26:9    57:21
specification [3]
  59:10    59:10    59:22
specificity [1]  25:12
specifics [1]             26:10
spelled [1]               38:16
spend [1]                 55:7
spirit [2]                12:3
  43:20
spokesperson [1]
  2:16
stands [3]                65:5
  65:8    65:9
start [4]    3:8    3:18
  34:20    62:7
started [2]               53:11
  53:16
starting [1]              41:5
starts [2]                18:22
  22:14
state [3]    40:2    40:8
  64:2
statement [3]             53:7
  64:2    65:5
statements [2]   25:19
  53:4
States [10]               1:1
  48:20    49:12    63:3
  63:3    63:8    63:9
  63:22    64:17    65:18
stating [1]               11:16
stay [2]    34:22    46:8
step [1]    25:6
steps [9] 39:15    39:15
  39:22    40:8    54:3
  57:2    57:5    65:15
  65:15
Steven [2]                1:18
  2:13
still [9]    7:3    13:12
  16:2    18:8    25:18

36:25    44:5    44:6
  47:20
stonewalling [2]
  37:8    40:5
story [1] 5:3
strategy [2]              6:1
  31:3    32:2
strictly [1]              63:14
stuff [7] 46:15    46:18
  47:12    53:17    59:7
  66:16    67:24
subject [3]               7:4
  35:16    66:3
subjects [1]              7:4
submission [1] 26:25
submit [1]                9:1
  38:8
submitted [3]    4:13
  8:23    12:18
subpoena [15]    5:5
  5:14    5:15    17:19
  19:17    30:17    30:20
  32:17    33:7    33:13
  33:14    35:15    35:15
  48:11    49:23
subsequent [1]   12:3
subsequently [2]
  8:19    19:4
subset [1]                55:1
substance [3]             21:9
  32:10    63:15
substeps [1]              56:20
successful [1]   53:21
such [5]    6:7    27:20
  42:19
suddenly [1]              6:8
sue [1]    46:23
sued [1]    46:23
suggest [1]               52:16
suggesting [3]   21:1
  46:10    66:22
suit [1]    56:2
summary [3]               62:13
  63:11    64:13
suppliers [1]             57:18
support [3]               29:10
  51:22    62:13
supports [1]              25:10
supposed [1]              8:25
  10:16
Supreme [1]               27:23
suspect [1]               2:15
sweep [1]                 13:14
swept [1]                 62:8
Synopsis' [1]    46:25
Synopsys [25]    33:8
  33:8    33:11    33:13
  33:19    34:6    34:15
  34:24    35:8    35:13
  36:14    38:2    38:2
  38:10    38:14    42:17
  43:8    44:4    44:11
  46:9    46:11    46:23
  47:5    61:14    61:22
Synopsys' [1]    40:1

46:23
synthesis [14]   53:24
  53:25    54:5    54:12
  56:8    57:15    59:9
  59:17    59:20    60:7
  60:7    60:14    62:21
  62:22
system [1]                42:25
systems [5]               1:8
  33:19    39:2    42:20
  4:20
table [1] 41:1
tainted [5]               17:5
  17:6    17:7    20:15
  21:4
takes [4] 42:2    47:15
  49:2    66:6
talks [2] 10:2    10:14
tangible [1]              51:18
target [1]                16:22
Tech [4] 1:9    56:22
  67:9    67:11
technical [1]             39:3
  39:4
technology [1]   18:6
tedious [1]               38:25
teleconference [6]
  8:1    8:14    9:1
  9:16    31:2    68:13
telephone [7]    1:14
  6:9    25:13    26:2
  31:6    31:25    32:3
telling [2]               16:23
  36:2
ten [1]    50:2
Teresa [2]                2:3
  2:21
term [1]    67:7
terminate [1]             19:6
terms [1]                 41:12
testified [7]             6:13
  7:7    11:19    16:16
  16:25    25:1    28:25
testify [1]               26:9
testifying [1]   21:8
testimony [12]   5:14
  5:20    7:12    7:13
  13:6    17:19    20:18
  23:14    24:7    24:9
  26:15    29:6
text [1] 38:19
thank [8]                 4:6
  19:14    30:24    33:1
  47:15    62:3    67:17
  68:11
themselves [1]   60:8
theoretically [1]
  51:13
theory [6]                35:19
  38:15    46:20    53:8
  55:21    63:1
thinking [1]              63:5
third [15]                15:23
  16:6    27:23    37:3
  37:4    37:5    38:2
  38:5    39:9    41:18

41:21    43:8    46:11
  47:19    50:9
third-party [2] 15:19
  17:19
Thomas [85]               4:9
  4:11    4:18    4:25
  5:5    5:8    5:10
  5:13    5:17    5:18
  5:22    5:24    6:2
  6:5    6:10    6:13
  6:18    7:2    7:6
  7:7    7:11    7:19
  8:1    8:6    8:13
  8:17    9:11    9:14
  9:15    9:19    9:10
  10:12    11:6    11:9
  11:17    11:18    12:15
  12:23    12:25    13:3
  13:11    13:13    13:24
  14:12    14:16    15:8
  15:19    16:7    16:13
  16:16    16:21    16:24
  17:5    17:14    17:16
  18:3    18:21    18:22
  18:25    19:2    19:13
  23:13    23:15    24:25
  26:11    26:18    27:10
  27:13    27:14    28:5
  28:18    28:24    29:23
  30:14    30:17    31:1
  31:12    31:20    31:22
  32:7    32:9    32:20
Thomas' [11]              5:10
  5:20    8:1    13:5
  15:5    23:13    24:8
  24:8    28:23    29:5
  32:10
thought [3]               13:11
  25:14    60:4
thoughts [1]              67:3
thousand [1]              60:16
thousands [1]    53:12
three [5] 8:7    16:11
  25:25    56:13    58:18
through [2]               12:12
  21:19    31:1    31:5
  32:7    32:25    36:11
  38:22    49:21    51:18
  61:1    61:23
Thursday [1]              1:13
ties [1]    62:9
timely [1]                45:22
times [1]                 43:9
timing [1]                17:21
  18:5    18:19
Title [1] 57:4
today [5]                 2:23
  16:23    20:1    31:1
  46:22
together [2]              47:8
  47:20
Tokyo [1]                 49:3
too [1]    59:2
took [1]    11:6
top [1]    46:16
topic [4] 33:6    35:21
  62:10    62:11

topics [1]                13 13
total [1] 12:6
training [1]              39:5
transcript [4]   6:23
  12:5    12:11    29:14
transfer [1]              46 8
transmitted [3]  25 3
  25:8    25:21
tree [1] 20:21
trial [5] 43:2    48 17
  49:16    50:5    50 23
tried [1] 52:13
true [1] 43:10
truly [1] 45:21
try [4]    3:6    7:10
  11:14    63:1
trying [13]               13 8
  19:22    20:6    21 13
  27:19    32:4    33 18
  41:22    44:16    46 24
  55:16    61:13    64 11
turn [2] 36:11    36 11
turned [1]                29 10
tutorials [1]             39 5
twice [1]                 34 17
  35:3    45:1
two [10] 8:6    11 8
  11:8    39:15    39 15
  46:14    47:12    48 4
  48:16    56:13
two-page [1]              26 24
twofold [1]               42 24
  14:9
type [4] 8:5    9 23
  35:13    45:14
types [4]                 6 1
  8:7    60:9    60 12
U.S [3] 27:23    56 14
  63:2
U.S.C [1]                 57 4
U.S.D.C.J [1]    1 10
ultimately [2]   14 2
  53:21
under [5]                 5 11
  10:1    13:15    62 8
  64:21
underlying [1]   18 7
underneath [3]   35 10
  36:15    61:25
understand [16]  15 8
  24:21    28:10    29 19
  29:20    29:24    31 10
  31:11    36:1    41 23
  44:8    45:20    50 18
  51:7    56:19    56 21
understood [4]   50 22
  6:24    25:14    50 22
unduly [2]                51 24
  52:2
unequivocally [1]
  11:19
unidentified [4]
  30:1    30:18    31 8
  37:4
United [10]

48:20    49:12    63:2
63:3    63:7    63:9
63:22    64:16    65:18
**universe** [1]    8:12
**unsuccessful** [1]
50:10
**unusual** [2]    63:1
63:4
**up** [12]    6:7    15:25
16:4    17:25    31:2
32:7    35:19    45:15
50:5    50:15    53:20
62:23
**used** [9]    20:16    21:4
39:19    40:9    56:9
56:16    64:22    64:24
65:11
**user** [3]    39:4    42:1
46:15
**using** [12]    39:17
39:23    47:13    54:5
56:8    58:1    58:1
58:10    60:6    60:12
60:14    64:7
**utilization** [3]    33:23
35:24    36:4
**v** [1]    1:6
**vast** [1]    45:10
**verbally** [1]    15:11
**versus** [1]    41:21
**view** [1] 3:21
**voluntarily** [1]    50:14
**W** [2]    1:18    1:21
**wait** [1]    11:5
**waived** [1]    14:1
**Wall** [1] 22:3
**wants** [1]    17:24
**Washington** [1] 1:22
**ways** [2] 45:6    49:21
**week** [4] 11:5    11:5
61:16    61:16
**weeks** [1]    58:18
**weighing** [1]    41:20
**Whetzel** [3]    1:18
2:11    2:12
**White** [1]    2:5
**whole** [4]    13:16
22:5    29:7    58:3
**willing** [9]    34:6
38:13    39:21    44:11
44:12    44:16    49:22
50:14    51:2
**Wilmington** [1] 1:12
**windows** [1]    49:11
**wish** [2] 12:6    57:13
**withheld** [3]    4:11
9:4    10:5
**withhold** [1]    10:5
**within** [1]    64:6
**witness** [8]    5:1
16:2    17:5    18:3
20:15    21:5    21:17
48:17
**witness'** [2]    20:17
21:5

**witnesses** [2]    16:3
21:23
**word** [3] 48:15    49:8
51:9
**words** [6]    15:25
20:15    21:4    24:14
24:16    31:21
**written** [1]    23:12
**year** [1]    51:2
**years** [1] 50:3
**Yesterday** [2]    56:18
57:7
**yet** [3]    21:16    43:9
48:14
**yourselves** [1]    3:22

**32**

**From:** Don Thomas <thomas@ece.cmu.edu>
**Date:** Thu Aug 7, 2003 3:04:22 PM US/Eastern
**To:** CampbellL@howrey.com
**Cc:** Don Thomas <thomas@ece.cmu.edu>
**Subject:** Ted Kowalski

Mr. Campbell,
I spoke with Ted (my former student who did the work on the Design Automation Assistant "DAA") about a month ago.  As it turns out, he mentioned that he would be retiring from ATT.  That might open him up for being a consultant.  You  might want to re-contact him.
-Don Thomas-

PTH000057

33



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

September 9, 2003

*VIA FACSIMILE (202) 202-887-0689 AND U.S. MAIL*

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037-1526

      **RE:    *Ricoh Company, Ltd. v. Aeroflex, et al.***

Dear Gary:

      Synopsys and Ricoh have both sought to retain Thaddeus J. Kowalski, Ph.D., as a consultant in this matter. Having reviewed the '432 patent and the merits of each party's contentions, Dr. Kowalski has determined to serve as a consultant to Synopsys. Ricoh should have no further direct communication with Dr. Kowalski.

                  Very truly yours,

                  Louis Campbell, Esq.

LC:wmh

**34**

1  Teresa M. Corbin (SBN 132360)
   Christopher Kelley (SBN 166608)
2  Erik K. Moller (SBN 147674)
   HOWREY SIMON ARNOLD & WHITE, LLP
3  301 Ravenswood Avenue
   Menlo Park, California 94025
4  Telephone: (650) 463-8100
   Facsimile: (650) 463-8400
5
   Attorneys for Defendants
6  AEROFLEX INCORPORATED,
   AMI SEMICONDUCTOR, INC., MATROX
7  ELECTRONIC SYSTEMS, LTD.,
   MATROX GRAPHICS INC., MATROX
8  INTERNATIONAL CORP. and
   MATROX TECH, INC.
9

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                       SAN FRANCISCO DIVISION

14  RICOH COMPANY, LTD           ) Case No.: Unassigned
                                  ) (Transferred from the U.S.D.C.
15              Plaintiff,        ) District of Delaware
                                  ) Civil Action No. 03-103 GMS)
16       vs.                      )
                                  ) NOTICE OF SUBPOENA FOR DOCUMENTS
17  AEROFLEX INCORPORATED, AMI    ) AND NOTICE OF DEPOSITION OF BRIAN
    SEMICONDUCTOR, INC., MATROX   ) BERSHADER PURSUANT TO
18  ELECTRONIC SYSTEMS, LTD.,     ) FED.R.CIV.P. 45
    MATROX GRAPHICS, INC., MATROX )
19  INTERNATIONAL CORP., and MATROX )
    TECH, INC.,                   )
20                                )
                                  )
21              Defendant.        )
    _____ )

22  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

23       YOU ARE HEREBY NOTIFIED that, pursuant to Federal Rules of Civil Procedure 45,

24  AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC

25  SYSTEMS, LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP. and

26  MATROX TECH, INC. ("Defendants"), have served on Brian Bershader the attached subpoena for

27  production of documents and deposition testimony.

28  Case No. :Unassigned (Transferred from the U.S.D.C.          - 1 -
    District of Delaware Civil Action No. 03-103 GMS)
    NOTICE OF SUBPOENA FOR DOCUMENTS AND DEPOSITION
    OF BRIAN BERSHADER PURSUANT TO FED.R.CIV.P. 45

HOWREY
SIMON
ARNOLD &
WHITE

1    Brian Bershader is required to produce the documents in his custody, possession, or control

2  specified in Attachment A by 5:00 p.m. on Friday October 3, 2003, at the offices of Howrey Simon

3  Arnold & White, 301 Ravenswood Ave, Menlo Park CA 94025, or by alternative means to be

4  arranged.

5    Defendants, by and through their attorneys, will take the deposition upon oral examination of

6  Brian Bershader.  The deposition will commence on Friday, October 17, 2003, or on a date mutually

7  agreed upon by the parties, at 9:00 a.m. at the offices of Howrey Simon Arnold & White, LLP, 301

8  Ravenswood Ave, Menlo Park, California and will continue from day to day until completed.

9    The oral examination shall be videotaped and transcribed stenographically, and will take place

10  before an officer who is duly authorized to administer oaths.

11

12  Dated:  August 29, 2003                    Respectfully submitted,

13                                             HOWREY SIMON ARNOLD & WHITE, LLP

14

15  By: _Louis Campbell_____

16                                             Teresa M. Corbin
                                               Christopher Kelley
                                               Erik K. Moller
17                                             Louis Campbell
                                               Attorneys for Defendants
18                                             AEROFLEX INCORPORATED, AMI
                                               SEMICONDUCTOR, INC., MATROX
19                                             ELECTRONIC SYSTEMS, LTD., MATROX
                                               GRAPHICS INC., MATROX INTERNATIONAL
20                                             CORP. and MATROX TECH, INC.

21

22

23

24

25

26

27

28

Case No. :Unassigned (Transferred from the U.S.D.C.    - 2 -
District of Delaware Civil Action No. 03-103 GMS)
HOWREY
SIMON
ARNOLD &
WHITE
NOTICE OF SUBPOENA FOR DOCUMENTS AND DEPOSITION
OF BRIAN BERSHADER PURSUANT TO FED.R.CIV.P. 45

Issued by the

# UNITED STATES DISTRICT COURT

NORTHERN          DISTRICT OF CALIFORNIA

RICOH COMPANY, LTD.

**SUBPOENA IN A CIVIL CASE**

v.

AEROFLEX INCORPORATED, et al.

Case Number:[1] Case No. Unassigned
(Transferred from the U.S.D.C.
District of Delaware No. 03-103)

TO:  BRIAN BERSHADER - c/o KNOWLEDGE EDGE, INC.
201 SAN ANTONIO CIRCLE, STE.225
MOUNTAIN VIEW, CA  94040

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION HOWREY SIMON ARNOLD & WHITE, LLP, 301 RAVENSWOOD AVENUE, MENLO PARK, CA  94025 TEL# (650)463-8100 | DATE AND TIME October 17, 2003 9:00 a.m. |
|---|---|

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE ATTACHMENT A.

| PLACE HOWREY SIMON ARNOLD & WHITE, LLP 301 Ravenswood Avenue Menlo Park, CA  94025 | DATE AND TIME October 3, 2003 5:00 p.m. |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) *Louis Campbell* LOUIS CAMPBELL, ESQ., ATTORNEY FOR DEFENDANT | DATE AUGUST 29, 2003 |
|---|---|
| ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER HOWREY SIMON ARNOLD & WHITE, LLP 301 Ravenswood Avenue, Menlo Park, CA  94025 | (650) 463-8100 |

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# ATTACHMENT A

## DEFINITIONS

1. The term "'432 patent" means U.S. Patent No. 4,922,432.

2. The term "'016 patent" means U.S. Patent No. 5,197,016.

3. "ICC" means International Chip Corporation.

4. "KBSC" means Knowledge Based Silicon Corporation.

5. "Knowledge Edge" means Knowledge Edge K. K. and any of its predecessor entities including ICC and KBSC.

6. "Ricoh" means Ricoh Corporation, Ltd. and any of its subsidiaries, agents, or counsel.

7. The term "document" means any writing or other tangible thing from which data or information can be obtained (translated if necessary through detection devices into reasonably usable form), and which is known to you, or in your custody, possession, or control, whether printed, recorded, reproduced by any process, or written or produced by hand, whether or not claimed to be privileged or exempt from production for any reason. Set forth below is a list of examples of writings and tangible things which are included within this definition. The list is not an exclusive definition of the writings and tangible things included within this definition, but is intended to aid you in answering the document requests that follow. Examples of writings and tangible things included within this definition of document are as follows:

Documents: letters, tape recordings, reports, agreements, communications including intercompany communications, correspondence, telegrams, memoranda, summaries, forecasts, photographs, models, statistical statements, graphs, laboratory and engineering reports and notebooks, charts, plans drawings, minutes or records of meetings including directors' meetings minutes or records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, customer lists, reports and/or summaries of interviews, reports and/or summaries of investigations, opinions or reports of consultants, appraisals, records, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of any documents, revisions of drafts of any documents, canceled checks, bank statements, invoices, receipts and originals

- 3 -

of promissory notes, surveys, computer printouts, computer disks
and storage.

In addition to the items on the foregoing list, any comment or notation appearing
on any of the documents described above, and not a part of the original text, is considered a
separate document and any draft or preliminary form of any document is also considered a
separate document.

8.  The term "documents relating to" means documents discussing, containing, showing,
evidencing or referring to in any way, either directly or indirectly, and is meant to include among
other documents, documents underlying, supporting now or previously attached or appended to,
or used in the preparation of any documents called for by each request.

9.  The words "communication" or "communications" are used in the broadest possible
sense and mean, without limitation, any transmittal and receipt of information, whether such was
by chance, prearranged, formal or informal, and specifically include conversations in person,
conversations by telephone, telegrams, letters or memoranda, formal statements, press releases
and newspaper articles.

10. The terms "party" or "person" shall mean any natural person, sole proprietorship,
partnership, limited partnership, corporation, joint venture, trust, association, or other entity as
well as all current and former officers, directors, agents, salespeople, representatives, employees,
attorneys, and others acting or purporting to act on behalf of such party or person.

11. The word "identify" when used with respect to a person shall mean to state for each
person: name, last known business and residence address and telephone numbers; job title(s) and
dates of association with the designated company; last known employer; and, where appropriate
to the extent of the interrogatory, the basis for such person's knowledge and the years for which
such person is believed to have knowledge.

12. The terms "relate," "relating," or "relating to" include referring to, alluding to, or
responding to, concerning, connected with, commenting on, regarding, discussing, showing,

- 4 -

describing, reflecting, analyzing, constituting, including, mentioning, in respect of, about, or in any way logically or factually connected with the matter described in the Interrogatory.

13. The terms "and" and "or" shall be given such meaning as to bring the greatest scope to the request in question and shall not be given a meaning that would exclude information from a Interrogatory.

## INSTRUCTIONS

1. Any recipient of this set of Requests who withholds any documents covered by this set of Requests by reason of a claim of privilege, or who objects to any part of any request for production, shall furnish to Synopsys a list identifying each such document for which the privilege is claimed or to which the objection relates, together with the following information:

(a) The reason(s) for each objection or claim of privilege;

(b) The identity of each person having knowledge of the actual basis, if any, on which the privilege or other ground for objection is based;

(c) The exact name and title of the document;

(d) The date of, and all serial or identification numbers appearing on the document;

(e) The identity of each person wrote, signed, initiated, dictated, or otherwise participated in the creation of the document;

(f) The general subject matter of the document;

(g) The identity of each person who was an addressee of and/or who received the document or a copy thereof;

(h) The identity of each person having custody or control of the document or a copy thereof;

(i) The specific location of any file or files where the document, or any copy thereof, is normally or presently kept, and the identity of the custodian thereof;

(j) The paragraph of this Request to which the document relates; and

- 5 -

(k) In the case of any withheld document relates in any way to a meeting or to any other conversation, all participants in the meeting or conversation are to be identified.

2. In the event that any document called for by this set of Requests is known to have been destroyed (either as a result of a document destruction policy or otherwise), those documents or class of documents are to be identified as follows: addressor, addressee, indicated or blind copies, date, subject matter, number of pages, attachments or appendices, all person to whom distributed, shown, or explained, date of destruction, persons authorizing destruction, and persons destroying the document.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All communications between any persons employed or affiliated with Knowledge Edge.

**REQUEST FOR PRODUCTION NO. 2:**

All contracts between Knowledge Edge and Ricoh.

**REQUEST FOR PRODUCTION NO. 3:**

Any documents regarding the relationship between Knowledge Edge and Ricoh regarding the use of intellectual property including, but not limited to, any agreement regarding the assertion of U.S. Patent Nos. 4,922,432 or 5,197,016 (the '432 and '016 patents respectively) or regarding the payment of any maintenance fees associated with these patents.

**REQUEST FOR PRODUCTION NO. 4:**

All documents dated prior to 1989 regarding the conception of the invention described in the '432 patent.

**REQUEST FOR PRODUCTION NO. 5:**

All documents dated prior to 1990 regarding the conception of the invention described in the '106 patent.

/ / /

/ / /

- 6 -

**REQUEST FOR PRODUCTION NO. 6:**

All documents dated prior to 1990 regarding the design, development, and operation of the "KBSC", "EDSIM", and "PSCS" programs described in the '016 patent.

**REQUEST FOR PRODUCTION NO. 7:**

All documents dated prior to 1989 regarding the design, development, and operation of the "KBSC", "EDSIM", and "PSCS" programs described in the '432 patent.

**REQUEST FOR PRODUCTION NO. 8:**

All documents dated prior to 1990 regarding the design, development, and operation of any product, or proposed product, developed under the name "REX" or "CAKE"

**REQUEST FOR PRODUCTION NO. 9:**

All documents regarding any offers to license or sell the '432 or '016 patents.

**REQUEST FOR PRODUCTION NO. 10:**

All documents regarding any attempts by Knowledge Edge to bring any product to market that practiced any part of the inventions disclosed in the '432 or '016 patents.

- 7 -

1    Teresa M. Corbin (SBN 132360)
     Christopher Kelley (SBN 166608)
2    Erik K. Moller (SBN 147674)
     HOWREY SIMON ARNOLD & WHITE, LLP
3    301 Ravenswood Avenue
     Menlo Park, California 94025
4    Telephone: (650) 463-8100
     Facsimile: (650) 463-8400

5

6    Attorneys for Defendants
     AEROFLEX INCORPORATED,
7    AMI SEMICONDUCTOR, INC., MATROX
     ELECTRONIC SYSTEMS, LTD.,
8    MATROX GRAPHICS INC., MATROX
     INTERNATIONAL CORP. and
9    MATROX TECH, INC.

10

11               UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14    RICOH COMPANY, LTD        )   Transferred from the U.S.D.C.
                                     )   District of Delaware
15            Plaintiff,        )   Civil Action No. 03-103 GMS
                                     )
16         vs.                  )   **CERTIFICATE OF SERVICE**
                                     )
17    AEROFLEX INCORPORATED, AMI    )
     SEMICONDUCTOR, INC., MATROX    )
18    ELECTRONIC SYSTENS, LTD.,      )
     MATROX GRAPHICS, INC., MATROX   )
19    INTERNATIONAL CORP., and MATROX )
     TECH, INC.,                  )
20                                      )
           Defendant.       )
21    _____ )

22

23

24

25

26

27

28

   Case No.
   Certificate of Service            -1-

1

**CERTIFICATE OF SERVICE**

2  I am employed in the County of San Mateo, State of California. I am over the age of eighteen

3  (18) years and not a party to the within action; my business address is 301 Ravenswood Avenue,

4  Menlo Park, California 94025.

5  On September 5, 2003, at my place of business, I served by mail and facsimile the following

6  document(s):

7  I.   NOTICE OF SUBPOENA FOR DOCUMENTS AND NOTIFE OF DEPOSITION

8      OF BRIAN BERSHADER PURSUANT TO FED.R.CIV.P. 45;

9  II.  SUBPOENA IN A CIVIL CASE TO BRIAN BERSHADER.;

10  to be served on the parties in this action addressed as follows:

11
Robert W. Whetzel
Steven J. Findman
12
Richard, Layton & Finger, P.A.
13
One Rodney Square
Post Office Box 551
14
Wilmington, Delaware 1899
Tel (302) 651-7700
15
Fax (320) 651-7701

16
Edward A. Meilman
17
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
18
New York, NY 10036-2714
Tel (212) 835-1400
19
Fax (212) 997-9880

20
Gary M. Hoffman
21
Eric Oliver
Dickstein Shapiro Morin & Oshinsky LLP
22
2101 L. Street, N.W.
Washington, DC 20037-1526
23
Tel (202) 828-2228
24
Fax (202) 887-0689

25
26  I declare that I am employed in the office of a member of the Bar of this Court at whose

27  direction this service was made.

28

1    I declare under penalty of perjury that the foregoing is true and correct. Executed at Menlo

2  Park, California on September 5, 2003.

3

4    _Wendy M. Hobbs_

5    Wendy M. Hobbs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case No.
Certificate of Service                                    -3-

1   Teresa M. Corbin (SBN 132360)
    Christopher Kelley (SBN 166608)
2   Erik K. Moller (SBN 147674)
    HOWREY SIMON ARNOLD & WHITE, LLP
3   301 Ravenswood Avenue
    Menlo Park, California 94025
4   Telephone: (650) 463-8100
    Facsimile: (650) 463-8400

5

6   Attorneys for Defendants
    AEROFLEX INCORPORATED,
7   AMI SEMICONDUCTOR, INC., MATROX
    ELECTRONIC SYSTEMS, LTD.,
8   MATROX GRAPHICS INC., MATROX
    INTERNATIONAL CORP. and
9   MATROX TECH, INC.

10

11                 UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14   RICOH COMPANY, LTD          )  Case No.: Unassigned
                        )  (Transferred from the U.S.D.C.
15         Plaintiff,        )  District of Delaware
                        )  Civil Action No. 03-103 GMS)
16       vs.                  ) 
                        )  NOTICE OF SUBPOENA FOR DOCUMENTS
17   AEROFLEX INCORPORATED, AMI    )  AND NOTICE OF DEPOSITION OF
    SEMICONDUCTOR, INC., MATROX   )  KNOWLEDGE EDGE, INC. PURSUANT TO
18   ELECTRONIC SYSTEMS, LTD.,     )  FED.R.CIV.P. 45 AND FED.R.CIV.P. 30(b)(6)
    MATROX GRAPHICS, INC., MATROX  )
19   INTERNATIONAL CORP., and MATROX  )
    TECH, INC.,                )
20                          )
             Defendant.       )
21   _____ )

22   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

23         YOU ARE HEREBY NOTIFIED that, pursuant to Federal Rules of Civil Procedure 45,

24   AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC

25   SYSTEMS, LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP. and

26   MATROX TECH, INC. ("Defendants"), have served on Knowledge Edge, Inc. the attached subpoena

27   for production of documents and deposition testimony.

28

    Case No. :Unassigned (Transferred from the U.S.D.C.     - 1 -
    District of Delaware Civil Action No. 03-103 GMS)
  NOTICE OF SUBPOENA FOR DOCUMENTS AND DEPOSITION
    OF KNOWLEDGE EDGE, INC. PURSUANT TO FED.R.CIV.P. 45

1   Knowledge Edge, Inc. is required to produce the documents in his custody, possession, or

2 control specified in Attachment A by 5:00 p.m. on Friday October 3, 2003, at the offices of Howrey

3 Simon Arnold & White, 301 Ravenswood Ave, Menlo Park CA 94025, or by alternative means to be

4 arranged.

5   Defendants, by and through their attorneys, will take the deposition upon oral examination of

6 person or persons designated by Knowledge Edge, Inc. as most knowledgeable regarding the subject

7 areas listed in Attachment B. The deposition will commence on Thursday, October 16, 2003, or on a

8 date mutually agreed upon by the parties, at 9:00 a.m. at the offices of Howrey Simon Arnold & White,

9 LLP, 301 Ravenswood Ave, Menlo Park, California and will continue from day to day until

10 completed.

11   The oral examination shall be videotaped and transcribed stenographically, and will take place

12 before an officer who is duly authorized to administer oaths.

13

14 Dated: August 29, 2003     Respectfully submitted,

15           HOWREY SIMON ARNOLD & WHITE, LLP

16

17         By: _Louis Campbell_

18           Teresa M. Corbin
            Christopher Kelley

19           Erik K. Moller
            Louis Campbell

20           Attorneys for Defendants
            AEROFLEX INCORPORATED, AMI

21           SEMICONDUCTOR, INC., MATROX
            ELECTRONIC SYSTEMS, LTD., MATROX

22           GRAPHICS INC., MATROX INTERNATIONAL
            CORP. and MATROX TECH, INC.

23

24

25

26

27

28

Case No. :Unassigned (Transferred from the U.S.D.C. - 2 -
District of Delaware Civil Action No. 03-103 GMS)
NOTICE OF SUBPOENA FOR DOCUMENTS AND DEPOSITION
OF KNOWLEDGE EDGE, INC. PURSUANT TO FED.R.CIV.P. 45 AND 30(b)(6)

HOWREY
SIMON
ARNOLD &
WHITE

Issued by the

# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF CALIFORNIA

RICOH COMPANY, LTD.

### SUBPOENA IN A CIVIL CASE

v.

AEROFLEX INCORPORATED, et al.

Case Number:[1] Case No. Unassigned
(Transferred from the U.S.D.C.
District of Delaware No. 03-103)

TO:  KNOWLEGE EDGE, INC.
     201 SAN ANTONIO CIRCLE, STE. 225
     MOUNTAIN VIEW, CA  94040

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| HOWREY SIMON ARNOLD & WHITE, LLP, 301 RAVENSWOOD AVENUE, MENLO PARK, CA  94025 TEL# (650)463-8100 | October 16, 2003 9:00 a.m. |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE ATTACHMENTS "A" and "B".

| PLACE | DATE AND TIME |
|---|---|
| HOWREY SIMON ARNOLD & WHITE, LLP 301 Ravenswood Avenue Menlo Park, CA  94025 | October 3, 2003 5:00 p.m. |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Louis Campbell* LOUIS CAMPBELL, ESQ., ATTORNEY FOR DEFENDANT | AUGUST 29, 2003 |
| ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER HOWREY SIMON ARNOLD & WHITE, LLP 301 Ravenswood Avenue, Menlo Park, CA  94025 | (650) 463-8100 |

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| **SERVED** |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) **PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to

the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) **DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT A

## DEFINITIONS

1. The term "'432 patent" means U.S. Patent No. 4,922,432.

2. The term "'016 patent" means U.S. Patent No. 5,197,016.

3. "ICC" means International Chip Corporation.

4. "KBSC" means Knowledge Based Silicon Corporation.

5. "Knowledge Edge" means Knowledge Edge, Inc. and any of its predecessor entities including ICC and KBSC.

6. "Ricoh" means Ricoh Corporation, Ltd. and any of its subsidiaries, agents, or counsel.

7. The term "document" means any writing or other tangible thing from which data or information can be obtained (translated if necessary through detection devices into reasonably usable form), and which is known to you, or in your custody, possession, or control, whether printed, recorded, reproduced by any process, or written or produced by hand, whether or not claimed to be privileged or exempt from production for any reason. Set forth below is a list of examples of writings and tangible things which are included within this definition. The list is not an exclusive definition of the writings and tangible things included within this definition, but is intended to aid you in answering the document requests that follow. Examples of writings and tangible things included within this definition of document are as follows:

Documents: letters, tape recordings, reports, agreements, communications including intercompany communications, correspondence, telegrams, memoranda, summaries, forecasts, photographs, models, statistical statements, graphs, laboratory and engineering reports and notebooks, charts, plans drawings, minutes or records of meetings including directors' meetings minutes or records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, customer lists, reports and/or summaries of interviews, reports and/or summaries of investigations, opinions or reports of consultants, appraisals, records, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of any documents, revisions of drafts of any documents, canceled checks, bank statements, invoices, receipts and originals of promissory notes, surveys, computer printouts, computer disks and storage.

3

HOWREY
SIMON
ARNOLD &
WHITE

1    In addition to the items on the foregoing list, any comment or notation appearing on any

2  of the documents described above, and not a part of the original text, is considered a separate

3  document and any draft or preliminary form of any document is also considered a separate document.

4    8. The term "documents relating to" means documents discussing, containing, showing,

5  evidencing or referring to in any way, either directly or indirectly, and is meant to include among other

6  documents, documents underlying, supporting now or previously attached or appended to, or used in

7  the preparation of any documents called for by each request.

8    9. The words "communication" or "communications" are used in the broadest possible sense

9  and mean, without limitation, any transmittal and receipt of information, whether such was by chance,

10 prearranged, formal or informal, and specifically include conversations in person, conversations by

11 telephone, telegrams, letters or memoranda, formal statements, press releases and newspaper articles.

12    10. The terms "party" or "person" shall mean any natural person, sole proprietorship,

13 partnership, limited partnership, corporation, joint venture, trust, association, or other entity as well as

14 all current and former officers, directors, agents, salespeople, representatives, employees, attorneys,

15 and others acting or purporting to act on behalf of such party or person.

16    11. The word "identify" when used with respect to a person shall mean to state for each person:

17 name, last known business and residence address and telephone numbers; job title(s) and dates of

18 association with the designated company; last known employer; and, where appropriate to the extent of

19 the interrogatory, the basis for such person's knowledge and the years for which such person is

20 believed to have knowledge.

21    12. The terms "relate," "relating," or "relating to" include referring to, alluding to, or

22 responding to, concerning, connected with, commenting on, regarding, discussing, showing,

23 describing, reflecting, analyzing, constituting, including, mentioning, in respect of, about, or in any

24 way logically or factually connected with the matter described in the Interrogatory.

25    13. The terms "and" and "or" shall be given such meaning as to bring the greatest scope to the

26 request in question and shall not be given a meaning that would exclude information from a

27 Interrogatory.

28

HOWREY
SIMON
ARNOLD &
WHITE

# INSTRUCTIONS

1.  Any recipient of this set of Requests who withholds any documents covered by this set of Requests by reason of a claim of privilege, or who objects to any part of any request for production, shall furnish to Synopsys a list identifying each such document for which the privilege is claimed or to which the objection relates, together with the following information:

(a) The reason(s) for each objection or claim of privilege;

(b) The identity of each person having knowledge of the actual basis, if any, on which the privilege or other ground for objection is based;

(c) The exact name and title of the document;

(d) The date of, and all serial or identification numbers appearing on the document;

(e) The identity of each person wrote, signed, initiated, dictated, or otherwise participated in the creation of the document;

(f) The general subject matter of the document;

(g) The identity of each person who was an addressee of and/or who received the document or a copy thereof;

(h) The identity of each person having custody or control of the document or a copy thereof;

(i) The specific location of any file or files where the document, or any copy thereof, is normally or presently kept, and the identity of the custodian thereof;

(j) The paragraph of this Request to which the document relates; and

(k) In the case of any withheld document relates in any way to a meeting or to any other conversation, all participants in the meeting or conversation are to be identified.

2.  In the event that any document called for by this set of Requests is known to have been destroyed (either as a result of a document destruction policy or otherwise), those documents or class of documents are to be identified as follows: addressor, addressee, indicated or blind copies, date, subject matter, number of pages, attachments or appendices, all person to whom distributed, shown, or explained, date of destruction, persons authorizing destruction, and persons destroying the document.

HOWREY
SIMON
ARNOLD &
WHITE

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All communications between any persons employed or affiliated with Knowledge Edge and any person employed by Ricoh.

**REQUEST FOR PRODUCTION NO. 2:**

All contracts between Knowledge Edge and Ricoh.

**REQUEST FOR PRODUCTION NO. 3:**

Any documents regarding the relationship between Knowledge Edge and Ricoh regarding the use of intellectual property, including, but not limited to, any agreement regarding the assertion of U.S. Patent Nos. 4,922,432 or 5,197,016 (the '432 and '016 patents respectively) or regarding the payment of any maintenance fees associated with these patents.

**REQUEST FOR PRODUCTION NO. 4:**

All documents dated prior to 1989 regarding the conception of the invention described in the '432 patent.

**REQUEST FOR PRODUCTION NO. 5:**

All documents dated prior to 1990 regarding the conception of the invention described in the '106 patent.

**REQUEST FOR PRODUCTION NO. 6:**

All documents dated prior to 1990 regarding the design, development, and operation of the "KBSC", "EDSIM", and "PSCS" programs described in the '016 patent.

**REQUEST FOR PRODUCTION NO. 7:**

All documents dated prior to 1989 regarding the design, development, and operation of the "KBSC", "EDSIM", and "PSCS" programs described in the '432 patent.

**REQUEST FOR PRODUCTION NO. 8:**

All documents dated prior to 1990 regarding the design, development, and operation of any product, or proposed product, developed under the name "REX" and "CAKE".

///

6


HOWREY
SIMON
ARNOLD &
WHITE

1  **REQUEST FOR PRODUCTION NO. 9:**

2  All documents regarding any offers to license or sell the '432 or '016 patents.

3  **REQUEST FOR PRODUCTION NO. 10:**

4  All documents regarding any attempts by Knowledge edge to bring any product to market that

5  practiced any part of the inventions disclosed in the '432 or '016 patents.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT B

Pursuant to Fed.R.Civ.P. 30(b)(6), Knowledge Edge shall designate and produce to testify on its behalf one or more officers, directors, managing agents, or other persons who are most qualified, knowledgeable, and competent to testify as to all matters known or reasonably available to Knowledge Edge with respect to the following topics:

1. The relationship between Knowledge Edge and Ricoh, including, but not limited to, any contractual or financial relationship between Knowledge Edge and Ricoh.

2. Any projects, including research and development projects, which were the result of or based on the relationship between Knowledge Edge and Ricoh.

3. The design, development, and operation of any product or system that resulted from or was based on projects between Knowledge Edge and Ricoh.

4. The relationship between Knowledge Edge and Ricoh regarding the use of intellectual property including, but not limited to, any agreement regarding the assertion of U.S. Patent Nos. 4,922,432 or 5,197,016 (the '432 and '016 patents respectively) or regarding the payment of any maintenance fees associated with these patents.

5. The design, development, and operation of the "KBSC" system described in the '432 patent.

6. The design, development, and operation of the "EDSIM" program described in the '432 patent.

7. The design, development, and operation of the "PSCS" program described in the '432 patent.

8. The design, development, and operation of any product, or proposed product, developed under the name "REX."

9. The design, development, and operation of any product, or proposed product, developed under the name "CAKE."

Knowledge Edge is requested to identify in writing the name and position of the individual(s) so designated and to set forth the matters on which that person will testify no later than three days prior to the agreed-upon deposition date.

8

HOWREY
SIMON
ARNOLD &
WHITE

1   Teresa M. Corbin (SBN 132360)
    Christopher Kelley (SBN 166608)
2   Erik K. Moller (SBN 147674)
    HOWREY SIMON ARNOLD & WHITE, LLP
3   301 Ravenswood Avenue
    Menlo Park, California 94025
4   Telephone: (650) 463-8100
    Facsimile: (650) 463-8400

5

6   Attorneys for Defendants
    AEROFLEX INCORPORATED,
7   AMI SEMICONDUCTOR, INC., MATROX
    ELECTRONIC SYSTEMS, LTD.,
8   MATROX GRAPHICS INC., MATROX
    INTERNATIONAL CORP. and
9   MATROX TECH, INC.

10

11              UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| 14   RICOH COMPANY, LTD | ) | Transferred from the U.S.D.C. |
| 15           Plaintiff, | ) | District of Delaware |
| | ) | Civil Action No. 03-103 GMS |
| 16       vs. | ) | **CERTIFICATE OF SERVICE** |
| 17   AEROFLEX INCORPORATED, AMI | ) | |
|     SEMICONDUCTOR, INC., MATROX | ) | |
| 18   ELECTRONIC SYSTENS, LTD., | ) | |
|     MATROX GRAPHICS, INC., MATROX | ) | |
| 19   INTERNATIONAL CORP., and MATROX | ) | |
|     TECH, INC., | ) | |
| 20 | ) | |
|           Defendant. | ) | |
| 21 | ) | |

22

23

24

25

26

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case No.
Certificate of Service

-1-

**CERTIFICATE OF SERVICE**

1

2      I am employed in the County of San Mateo, State of California. I am over the age of eighteen

3 (18) years and not a party to the within action; my business address is 301 Ravenswood Avenue,

4 Menlo Park, California 94025.

5      On September 5, 2003, at my place of business, I served by mail and facsimile the following

6 document(s):

7      I.     NOTICE OF SUBPOENA FOR DOCUMENTS AND NOTIFE OF DEPOSITION

8                OF KNOWLEDGE EDGE, INC. PURSUANT TO FED.R.CIV.P. 45 AND FED.R.

9                CIV.P. 30(b)(6);

10      II.    SUBPOENA IN A CIVIL CASE TO KNOWLEDGE EDGE, INC.;

11 to be served on the parties in this action addressed as follows:

12 Robert W. Whetzel
Steven J. Findman
13 Richard, Layton & Finger, P.A.
One Rodney Square
14 Post Office Box 551
15 Wilmington, Delaware 1899
Tel (302) 651-7700
16 Fax (320) 651-7701

17 Edward A. Meilman
18 Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
19 New York, NY 10036-2714
Tel (212) 835-1400
20 Fax (212) 997-9880

21 Gary M. Hoffman
22 Eric Oliver
Dickstein Shapiro Morin & Oshinsky LLP
23 2101 L. Street, N.W.
Washington, DC 20037-1526
24 Tel (202) 828-2228
Fax (202) 887-0689
25

26      I declare that I am employed in the office of a member of the Bar of this Court at whose

27 direction this service was made.

28

**HOWREY SIMON ARNOLD & WHITE**   Case No.
Certificate of Service

-2-

1         I declare under penalty of perjury that the foregoing is true and correct. Executed at Menlo

2 Park, California on September 5, 2003.

3

4                                 _Wendy M. Hobbs_____

5                                 Wendy M. Hobbs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.
Certificate of Service

-3-

35

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

September 9, 2003

**BY FACSIMILE**

Christopher Kelley, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Ave.
Menlo Park, CA  94025

Re:      Ricoh v. Aeroflex et al.

Dear Chris:

We have received your letter of September 8, 2003, and we are responding to a few of your comments at this time.

In your letter, you have stated that the service of the subpoena on Knowledge Edge and Brian Bershrader was completed the day before your letter, on September 7. However, we were informed by Mr. Bershrader several days before you allege the service occurred, that both Knowledge Edge already had been served with the subpoenas. Contrary to your representation, the service actually took place the beginning of last week. In addition, the Notice attached to the subpoena indicating when we were placed on notice about the deposition was signed on August 29. However, you delayed providing us with a copy of the subpoena until we raised an objection to your failure to serve us. Your firm's failure to timely service of documents on us seems to be a continuing problem.

In addition, you have failed to respond to the other issue that I raised in my letter to Terry Corbin. We request that you immediately send us a complete list of all of the subpoenas that you have served on all third parties in connection with the present litigation. At this time, we do not know what other subpoenas you have failed to provide us with copies of. The list should be faxed to us today.

With respect to your comments regarding contacting Mr. Berzon, we still do not understand why you would have contacted him instead calling Jeffrey Demain when you were unable to reach Jonathan Weissglass. If you simply looked at the pleadings in the California action, you would have seen Mr. Demain's name listed.

1177 Avenue of the Americas • New York, NY 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.DicksteinShapiro.com

1661374 v1: ZLX@01!.DOC

Christopher Kelley, Esq.
September 9, 2003
Page 2

With respect to the location of Dr. Kobayashi's deposition, we had informed you several weeks ago that the deposition could be taken at any of the U.S. Consulate offices in Japan. When you had originally selected the dates of September 24 and 25, we informed you about the conflicts with the Jewish holidays and requested that you pick other dates. We also had indicted that the Consulate offices in other locations in Japan typically had many open dates for the taking of these depositions. However, you insisted that the depositions only be taken in Tokyo. We are glad to see that you are now willing to utilize one of the other facilities and we will check on the availability of Dr. Kobayashi for being deposed on November 24 and 25.

With respect to your allegations in the next to last paragraph regarding our "running out the clock" the statement is simply false. The clock actually ran out at the end of August. After that it became impossible to obtain the visas in a timely manner. In spite of your failure to timely submit and obtain an order from Judge Sleet in August, so that visas could be obtained by September 19, you chose to wait in persuing this matter and consequently created the dilemma that now exists.

With respect to the last paragraph of your letter, if you will check the transcript from the Court Hearing on August 28, you will see that the Judge stated that he agreed with us that it appeared that the defendants had committed a fraud upon the Court. We again request that you immediately comply with Judge Sleet's Order and submit these documents and the transcripts from the July and August hearings as soon as the case is docketed in the Northern District of California.

Sincerely,

Gary M. Hoffman

GMH/ncz
cc:     Teresa M. Corbin, Esq. (via facsimile)
        Edward Meilman, Esq. (via facsimile)

**36**

1996 WL 622557                                                           **Page   1**
**(Cite as: 1996 WL 622557 (D.Del.))**
< KeyCite History >

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

Joseph A. HANSEN, Plaintiff,
v.
UMTECH INDUSTRIESERVICE UND SPEDITION, GMBH, a Foreign Corporation, Defendant.

Civ. A. No. 95-516 MMS.

July 3, 1996.

Jan R. Jurden, and Matthew P. Denn, Young, Conaway, Stargatt & Taylor, and Vincent A. Bifferato, Jr., Herrmann & Bifferato, Wilmington, DE, for plaintiff.

John S. Spadaro, and Patricia A. Garthwaite, Murphy, Welch & Spadaro, Wilmington, DE, for defendant.

*MEMORANDUM OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

I. Introduction

*1 The motions presently before the Court arise out of a personal injury action brought by plaintiff Joseph A. Hansen ("Hansen") against defendant Umtech Industrieservice Und Spedition, GmbH ("Umtech"). Hansen alleges personal injuries to his arm and hand, suffered while attempting to free his pant leg from a machine allegedly sold and installed by Umtech. Hansen sued under various theories of negligence, strict liability, and breach of implied warranty. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332.

II. Factual Background

The facts underlying the complaint giving rise to these motions are relatively simple. Hansen, a Maryland citizen, was employed by K-F Environmental Technologies, Inc. ("K-F"), and at all times relevant to this action, was assigned to work at the Kent County Waste Water Treatment Plant. [FN1] Docket Item ("D.I.") 6 ("Complaint") at ¶¶ 1, 4. [FN2] Umtech is a German corporation with its principal place of business in Edenkoben, Germany. *Id.* ¶ 2. On October 1, 1993, Hansen was working with a waste treatment dryer allegedly sold and installed by Umtech ("Dryer 2"). *Id.* ¶¶ 5, 6. While Hansen was working, the leg of his pants became caught in an exposed moving drive chain and sprocket assembly. In the attempt to free his pant leg from the assembly, his left hand became caught in the assembly. *Id.* ¶ 7. As a result, Hansen suffered the loss of three fingers, a fracture of his left arm, and pain and suffering. *Id.* ¶ 8.

   FN1. K-F is not a party to this litigation.

   FN2. All references to the complaint are made to plaintiff's Second Amended Complaint, D.I. 6, filed September 27, 1995.

Hansen filed this action against Umtech alleging liability arising out of the sale and installation of the dryer which caused Hansen's injury. The litigation has generated several motions. Hansen has moved to compel certain discovery from Umtech. D.I. 41. Umtech has moved to disqualify Hansen's vocational rehabilitation expert, D.I. 44, and has also moved to disqualify Hansen's medical experts and an economist. D.I. 60. Umtech has also moved for summary judgment on Hansen's negligence claim, D.I. 72, as well as on his claims for strict liability and for breach of implied warranty of merchantability. D.I. 70.

Oral argument was held on June 19, 1996. The Court denied in part Hansen's motion to compel, D.I. 41, and the remaining grounds for the motion, through the course of the argument, became moot. The Court also denied Umtech's motion to disqualify Hansen's medical experts and his economist, D.I. 60. The motions remaining for consideration are (1) Umtech's motion to disqualify Hansen's vocational rehabilitation expert, D.I. 44; (2) Umtech's motion for

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




summary judgment on the negligence claim, D.I. 72; and (3) Umtech's motion for summary judgment on the strict liability and breach of implied warranty of merchantability claims, D.I. 70. Each motion will be addressed separately.

**A. Umtech's Motion to Disqualify Plaintiff's Expert Castro**

Umtech has moved to disqualify plaintiff's vocational rehabilitation expert Jose Castro ("Castro") from testifying as an expert witness, and from offering expert services or other assistance in the prosecution of this case. D.I. 44. Umtech further moved to disqualify Castro's employer, the Delaware Valley Rehabilitation Services, Inc. ("DVRS"), from participating in this case, *id.*, and moved to prevent plaintiff from relying on or otherwise making use of any work product or advice prepared or offered by DVRS.

**\*2** On December 4, 1995, Umtech's counsel Patricia Garthwaite ("Garthwaite") contacted Thomas L. Yohe ("Yohe"), a vocational rehabilitation expert employed by DVRS. D.I. 45 at 3. During the initial conversation with Yohe, Garthwaite inquired whether DVRS had any conflict of interest which might preclude it from consulting on the case. Yohe telephoned Garthwaite back promptly and responded that no conflict existed. *Id.* at 4. During this second telephone conversation, Garthwaite discussed certain substantive matters relating to the case with Yohe. According to a certification in the record, Garthwaite's discussion with Yohe included the following topics:

[A]t a minimum, we discussed the date of the plaintiff's accident; my knowledge (as of December 4) of the function and operation of the sludge dryer unit at issue in this case; my analysis (as of the same date) of how the accident might have occurred; specific facts relating to the plaintiff's job duties and salary that I regarded as potentially relevant to the issue of vocational rehabilitation; and the relative strengths and weaknesses of our defense posture on those issues, in light of the plaintiff's age, level of training and marketable skills.

*Id.,* Exhibit ("Exh.") A, ¶ 5. The following day, Garthwaite sent a confirmation letter confirming the retention of Yohe as an expert, and included a sentence requesting confidentiality. *Id.* at Exh. B. That same day, Yohe sent by facsimile a document entitled "Typical Records Needed in Personal Injury Cases" to Garthwaite. *Id.* at Exh. C. However, neither Yohe nor Garthwaite took any further action with respect to this facsimile in particular, or to the case in general.

Meanwhile, in February, 1996, Hansen retained the same firm of DVRS to consult for its case, specifically retaining expert Castro. Before the retainer was finalized, Hansen inquired as to whether any conflicts of interest existed which might affect or prohibit Castro from working on the case. Castro ran a conflicts check in the DVRS computer system which tracks conflicts of interest. However, Yohe's representation of Hansen's adversary did not surface, because Yohe had failed to enter the information regarding his representation of Umtech into the computer system, and because Yohe himself was on vacation at the time. Thus, Castro told Hansen that there was no conflict, and agreed to the representation.

In furtherance of the representation, Castro began to work on Hansen's case. On February 29, 1996, Castro, on behalf of DVRS, issued a 13-page, single- spaced report which analyzed topics including Hansen's medical status, social/educational factors, vocational history, transferable skills, career assessment, and wage earning capacity. D.I. 50 at B14-26. On March 7, 1996, Hansen's counsel sent a check in the amount of $1,440.02 to DVRS for its services. *Id.* at B27.

Umtech contends that Castro should be disqualified because Umtech's counsel, Garthwaite, retained DVRS in a confidential relationship and confidential information passed between them. D.I. 45. Umtech also urges that the disclosure of confidential information on the part of Castro should be irrebuttably presumed, and that policy considerations such as avoiding the appearance of impropriety support

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




disqualification. Finally, Umtech argues that the interest in preventing jury confusion in the likely event that Umtech would cross-examine Castro on his affiliation with the same firm as Umtech's prior expert supports disqualification.

**\*3** Hansen responds by arguing that Castro should not be disqualified because Castro has not and will not discuss the case with Yohe. D.I. 49. Hansen argues that Umtech did not have a confidential relationship with Yohe and did not disclose confidential information. Further, Hansen argues that Umtech would not be prejudiced by Hansen's use of DVRS as expert consultants. Finally, Hansen disputes Umtech's analogy to attorney conflicts cases, where courts are more apt to disqualify attorneys with conflicting loyalties.

Central to resolution of this issue is what standard applies to the disqualification issue. After briefing was complete, the parties now agree that the standard for conflicts disqualification for attorneys is more stringent than that of experts. *Compare*, D.I. 49 at 14, and D.I. 51 at 14-15 (Umtech arguing that "irrespective of the "attorney rules" debate, disclosure of confidential information by DVRS to Hansen should be irrebuttably presumed). This proposition is amply supported by case law. *See, e.g., EEOC v. Locals 14 and 15, Int'l Union of Operating Engineers*, 24 Fair Empl. Prac. Cas. (BNA) 1821; 25 Empl. Prac. Dec. (CCH) ¶ 31,783 at 6 (S.D.N.Y. Feb. 11, 1981) (rejecting analogy to attorney-client disqualification); *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 281 (S.D. Ohio 1988) (same); *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1501 (D. Colo. 1993) (same); *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 580 (D.N.J. 1994) (same).

There are two scenarios in which motions to disqualify experts typically arise. The first is where one expert is originally retained by one party to litigation, and that expert subsequently switches sides to consult as an expert for that party's adversary. These cases are referred to as "side-switching" cases, and form the most common basis for motions to disqualify. A second scenario, such as in the

case *sub judice*, occurs where an expert is retained by a party to litigation, and then the adversary retains an expert who is in some way affiliated with the expert retained by the first party. In both cases, a conflict of interest may arise which may preclude one or both parties from using its retained expert, depending on the nature and extent of the relationship and the exchange of confidential information between each party and its expert.

While there is relatively sparse case law on expert disqualification concerning either factual scenario, analysis must begin with the recognition of the inherent power of federal courts to disqualify experts. *English Feedlot*, 833 F. Supp. at 1501; *Cordy*, 156 F.R.D. at 579-80; *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp 1246, 1248 (E.D. Va. 1991). This power exists to further the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process. *Wang*, 762 F. Supp at 1248; *Paul*, 123 F.R.D. at 278.

**\*4** Courts have fashioned a two-part inquiry used to determine whether disqualification is necessary:
First, was it objectively reasonable for the first party who claims to have retained the consultant to conclude that a confidential relationship existed?
Second, was any confidential or privileged information disclosed by the first party to the consultant?
*Paul*, 123 F.R.D. at 278; *Wang*, 762 F. Supp at 1248. In *Paul*, the plaintiff had suffered extensive head injuries from being struck by a baseball while wearing a helmet manufactured by defendant sporting goods company. Plaintiff retained an expert in mechanical engineering to consult in connection with his personal injury action against defendant. However, defendant had previously used the same expert for the purpose of engaging in extensive testing of its helmets, but the court found that the consultation was not specifically for the purpose of the lawsuit. Applying the two-part test, the court found that although defendant's counsel reasonably believed that a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works





confidential relationship had been established with the expert, no confidential or privileged information passed from defendant to the expert. *Id.* at 280. Thus, disqualification was not warranted.

The result reached in *Paul* is appropriately characterized by a situation where "despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul,* 123 F.R.D. at 278. In connection with the two-part test set forth in *Paul,* a negative answer to either prong should result in a finding of no disqualification. *Wang,* 762 F. Supp at 1248 ("But disqualification is likely inappropriate if either inquiry yields a negative result."). As the *Wang* court explained, in interpreting *Paul,* even if a confidential relationship exists, disqualification is inappropriate unless some privileged or confidential information passed; if this were not the rule, then a lawyer could potentially disqualify an expert merely by retaining him with no intention of actually using the expert's services, to disable his opponent from using the expert for himself. *Id.* at 1248.

The *Paul* two-part inquiry has been repeatedly cited and utilized by courts ruling on motions to disqualify experts who have engaged in side-switching. In *Wang,* 762 F. Supp. 1246, the court disqualified an expert who had consulted with plaintiff on the issue of the validity of plaintiff's patent, communicated to plaintiff's counsel that in his opinion the patent was invalid, and then was subsequently retained by defendant for the same litigation. The court found a confidential relationship existed because the plaintiff's attorney gave the expert a detailed memorandum used by the expert containing, *inter alia,* the patent file history and potential defenses to the lawsuit, both of which the court found to be protected confidential work product. *Id.* at 1249. Similarly, in *Cordy,* 156 F.R.D. 575, the court disqualified defendant's expert who had previously consulted with plaintiff's counsel in

a personal injury action, and then changed sides to consult for the defendant. Plaintiff had made telephone calls to the expert, executed a retainer agreement, forwarded a retainer check, sent a three-ring binder of documents to the expert relating to the investigation of the injury, and had been billed for 27 hours of work in the amount of $2,094.23. Further, the expert had issued an oral report for plaintiff, all before the expert switched sides. *Id.* at 577.

**\*5** However, in *Mayer v. Dell,* 139 F.R.D. 1 (D.D.C. 1991), the court reached an opposite conclusion. That court declined to disqualify defendant's expert on plaintiff's motion, finding that plaintiff, who had purported to retain the same expert before defendant, had never actually retained the expert, had only met with the expert on one occasion, had only given the expert one document, which was the complaint, had not received the benefit of any of the expert's work, had never asked the expert to sign a confidentiality agreement, and had paid no fee to the expert. *Id.* at 2. In *English Feedlot,* 833 F. Supp. 1498, the court also denied a motion to disqualify plaintiff's expert who had previously consulted for defendant in prior litigation, because defendant had not disclosed confidential information to the expert. *Id.* at 1501.

These cases illustrate the types of factors considered by courts ruling on motions to disqualify. All of these cases, however, involved side-switching experts. There are even fewer cases dealing with conflicts caused by experts who are affiliated with experts consulting for the other side. *EEOC,* 25 Empl. Prac. Dec. (CCH) ¶ 31,783, addressed this situation. There, counsel for defendant contacted an expert for the purposes of consulting on Title VII litigation. Consultations were limited to two days, and included discussions about the relevant labor market, defense theories, and the strengths and weaknesses of the defense and the EEOC's positions. *Id.* at 3. Less than one year later, that expert founded a new consulting firm whose shares were owned in part by another expert who was subsequently retained by the EEOC for the same litigation. *Id.* at 4.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




The court found that because there was no evidence that any substantive information was exchanged among the expert- partners, nor was there evidence of danger of future inadvertent disclosure, disqualification was not warranted. *Id.* at 7. Indeed, the court found that because the experts had limited contact, separate offices, no mutual access to computer accounts in which they store data, separate file areas, and a strong ethic of maintaining client confidentiality, the danger of leakage of information was "minimal." *Id.*

The other case dealing with affiliated experts disqualification motion is *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.*, 734 F. Supp. 334 (N.D. Ill. 1990). There, plaintiff retained a consulting firm to determine the cause of failure of its ship's bearings. The consulting firm employed an expert in metallurgy to consult, with the intention to use his testimony at trial against the defendant who sold the ship to plaintiff. *Id.* at 335. Defendant filed a third-party complaint against the bearing manufacturer. The third-party defendant then retained its own expert. *Id.* Plaintiff moved to disqualify the third-party defendant's expert on the ground that he worked at the same consulting firm at which its own expert occasionally worked and, in fact, frequently supervised plaintiff's expert's work. *Id.*

**\*6** The court reviewed the *Paul* line of cases, noting that the facts of those cases were unlike those before it: "[t]he other cases involved the 'switching sides' expert who at one time or another did work for a party's adversary." *Id.* at 338. The only case with similar facts the *Great Lakes* court cited was *EEOC, supra.* Concluding that disqualification would be denied, the court noted the following relevant factors: neither party alleged it had disclosed confidential or privileged information to the opposing side's expert; plaintiff's expert had not discussed the case with the firm which employs defendant's expert; defendant's expert denied knowledge of plaintiff's expert's work; "no communication or 'leakage' whatsoever of any information, whether confidential, privileged, or otherwise" had occurred; and both parties

were aware of the situation and could take steps to prevent inadvertent disclosure. *Id.* at 338-39. Thus, while not expressly applying the *Paul* test for side-switching experts, the court considered the same confidentiality concerns.

A party seeking to disqualify another party's expert bears the burden of demonstrating the existence of a confidential relationship and the passing of confidential information. *Cordy*, 156 F.R.D. at 580; *English Feedlot*, 833 F. Supp. at 1501-02. In this case, Umtech bears the burden of demonstrating that Umtech and Yohe had a confidential relationship and that confidential or privileged information passed between them, such that plaintiff should be prohibited from using his expert from the same firm.

*1. Confidential Relationship Between Umtech and Yohe*

Umtech argues that a confidential relationship existed between Umtech and Yohe. It argues that DVRS was retained in December, 1995, with the intent to use Yohe as a consulting, and possibly a testimonial, expert. According to Garthwaite's certification, she spoke with Yohe twice on the telephone to discuss the possibility of retaining him. D.I. 45 at Exh. A. Yohe was formally retained during the second conversation, which was confirmed by written letter (mistakenly) dated December 4, 1995. Also during that second conversation, Garthwaite discussed aspects of the case including the date of the plaintiff's accident, her knowledge (as of December 4) of the function and operation of the sludge dryer unit at issue in this case, her analysis (as of the same date) of how the accident might have occurred, specific facts relating to the plaintiff's job duties and salary that she regarded as potentially relevant to the issue of vocational rehabilitation, and the relative strengths and weaknesses of Umtech's defense posture on those issues, in light of the plaintiff's age, level of training and marketable skills. *Id.* ¶ 5. Garthwaite further states that she asked about the records Yohe would need to conduct his analysis, and the next day, she received a facsimile of a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works





document entitled "Typical Records Needed in Personal Injury Cases." *Id.* ¶¶ 5, 6.

*\*7* *Paul* requires a court to determine whether counsel reasonably believes a confidential relationship has been established with the expert. *Paul,* 123 F.R.D. at 278. In this case, Garthwaite might reasonably have believed a confidential relationship was created between herself and Yohe, given the fact that she sent a confirmation letter regarding the retention of Yohe, which contained a reminder of the need for confidentiality. Whether that belief was reasonable need not be determined. It will be assumed that a confidential relationship between attorney an expert did exist.

### 2. *Exchange of Confidential Information*

Despite the existence of a confidential relationship, the amount of confidential information which passed to the expert is questionable. Garthwaite certifies that she has had no further personal contact with Yohe since December 5, 1995, and that she never forwarded any documentation to Yohe so that he might begin his analysis. The record does not indicate that Umtech or Garthwaite's law firm ever paid any money to Yohe or DVRS. Yohe, in a letter dated March 8, 1996, states that he "did not open a file [in December] as [he] was anticipating receiving materials in the near future." D.I. 45 at Exh. D. He explained that he typically opens a case upon receipt of the materials needed, *id.,* and it has been his experience that occasionally following initial attorney contact, he never hears about the case again. He further admitted that he "frankly, forgot about the matter until [his] phone call with [defense counsel]" on March 8, 1996. *Id.* He stated he "never had reason to speak about this case" with Castro until the conflict surfaced, *id.,* and that he does not, at any rate, work closely with Castro or participate in any details of Castro's work.

While counsel stated that she discussed her analysis of the case, including its strengths and weaknesses, with Yohe, Yohe has no recollection of the details of that conversation. D.I. 45 at Exh. D. Additionally, Garthwaite's

disclosures in connection with the liability phase of the case are not germane to either Yohe's expertise or expert opinion. Further, Yohe forgot about the case entirely until the conflict was made known to him by Castro and Umtech's counsel. *Id.* It is clear, then, that to the extent that counsel disclosed confidential information, Yohe did not in any way use that information. Furthermore, and more importantly, Yohe never discussed the case with anyone, including Castro. Suffice it to say that if the expert himself can't remember any of the information, he certainly could not have passed it along to the other expert. Like *Paul,* this is a case where "despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul,* 123 F.R.D. at 278.

*\*8* The most important consideration in expert disqualification cases, as noted above, is the preservation of confidentiality. The *Paul* inquiry relates to side-switching experts, and its rationale of confidentiality, rather than the two-part inquiry, guides this Court, as it is faced with a dissimilar factual context. Like the *EEOC* and *Great Lakes* courts, the absence of evidence that any substantive information was exchanged among the affiliated experts, and their being no prospect of future inadvertent disclosure, leads the Court to conclude that disqualification is not warranted. Like those cases, Yohe and Castro maintain separate practices and have limited contact beyond "pleasant conversation." D.I. 45 at Exh. D. Neither has a supervisory relationship over the other. *Id.* Accordingly, Umtech's motion to disqualify Castro will be denied. Similarly, Umtech's request to disqualify DVRS from participating in the case, and to prevent Hansen from relying on any work product or advice from DVRS, will be denied.

### B. Umtech's Motion for Summary Judgment: Negligence

Before examining the arguments in this

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




1996 WL 622557
(Cite as: 1996 WL 622557, *8 (D.Del.))

motion, it is important to identify the theory under which Hansen asserts liability by Umtech. His complaint refers to Umtech's duty as *manufacturer* of Dryer 2. D.I. 5, ¶¶ 9-16. However, plaintiff appears to have abandoned his manufacturer theory and relies exclusively on theories of duty as seller to warn, and a duty as the installer to make the equipment safe.

Umtech moves for summary judgment on several grounds. First, Umtech argues that plaintiff's contributory negligence is the dominant, if not the sole, proximate cause of his injury, in that Hansen (1) was aware of the danger of exposure to the chain drive yet chose to clean the dryer without first shutting it off, and then (2) failed to shut off the machine once his pant leg was caught; (3) twice failed to look before attempting to free his pant leg; and (4) failed to immediately call for help. D.I. 73. Umtech further argues that it bears no liability for K-F's negligent operation of Dryer 2, that K-F was a sophisticated purchaser and was provided a safety manual with warnings, and that Umtech had no reason to know of a defect in Dryer 2. Umtech's reply brief more succinctly (if not differently) states its defense in legal terms: Umtech owed Hansen no duty; K-F's negligence is a superseding cause of Hansen's injuries; Hansen's own negligence is a superseding cause of his injuries; and at a minimum, Hansen's own negligence is the main proximate cause of his injuries. D.I. 86.

### 1. *Negligence Standard*

In order to recover in an action for negligence, a plaintiff must show by a preponderance of the evidence that the defendant's negligent act or omission violated a duty which was owed to the plaintiff. *Culver v. Bennett*, 588 A.2d 1094, 1096-97 (Del. 1991). [FN3] Plaintiff must also show that the defendant's act of negligence was the proximate cause of plaintiff's injury. *Id.* at 1097. With respect to proximate cause, Delaware adheres to the "but for" rule: "a defendant's conduct is the cause of an event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would

have occurred without it." *Reese v. Home Budget Ctr.*, 619 A.2d 907, 910 (Del. 1992). Delaware also recognizes there can be more than one proximate cause of an injury. *Id.; see also Culver*, 588 A.2d at 1097. The issue of proximate cause is ordinarily a question of fact to be submitted to the jury. *Id.; see also Duphily v. Delaware Elec. Coop., Inc.*, 662 A.2d 821, 830 (Del. 1995).

> FN3.  The parties have stipulated that Delaware law applies to this dispute. *See infra* Part C(1).

### 2. *Contributory Negligence*

**\*9** In 1984, Delaware enacted a modified comparative negligence statute, 10 *Del. C.* § 8132, which provides:
> In all actions brought to recover damages for negligence which results in death or injury to person or property, the fact that the plaintiff may have been contributorily negligent shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the negligence of the defendant or the combined negligence of all defendants against whom recovery is sought, but any damages awarded shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

This statute has been interpreted by the Supreme Court of Delaware as follows:
> [I]f the plaintiff's contributory negligence is 50% or less, the plaintiff is permitted to recover, although the recovery is reduced proportionally. However, if the plaintiff's contributory negligence is 51% or greater, it is an absolute bar to recovery according to the Delaware statute.
> *Culver*, 588 A.2d at 1098.

Umtech's central argument is that Hansen's contributory negligence was the main, if not the sole, cause of his injury, and therefore, his claim is barred. Umtech argues that the accident would never have occurred but for Hansen's negligence. It argues that Hansen was aware of the danger of exposure to the chain drive yet chose to clean the dryer without first shutting it off, and then neglected three safe alternative courses of conduct by failing to shut off the machine once

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works





his pant leg was caught, failing to look before attempting to free his pant leg, and failing to immediately call for help. Umtech argues that these acts amount to the dominant, if not the sole, proximate cause of his injuries. D.I. 73. In short, Umtech argues that Hansen chose the risky path by attempting to clean the dryer without first shutting it off, and then failed to use reasonable methods to shut it off once his pants were caught.

Umtech relies heavily on *Johnson v. Hockessin Tractor, Inc.*, 420 A.2d 154 (Del. 1980). In that case, plaintiff was injured while attempting to shut off a tractor engine by reaching under the carburetor for a valve, without looking, and instead placed his fingers into an operating belt and pulley system. *Id.* at 155. The court found that plaintiff knew of the danger created by shutting off the tractor engine with that valve rather than with the "kill button," and his attempt to shut off the engine with that valve in any event, without looking, constituted contributory negligence. Accordingly, the court affirmed the trial court's grant of summary judgment in favor of defendants:

In addition, we note that plaintiff could have used an inherently safe method ... to shut off the tractor engine. Instead he chose to use ... a method which he knew was fraught with risk, particularly when done without looking. If a person has the choice of two alternate paths, one known to be safe, the other known to be risky, the unnecessary choice of the risky path constitutes contributory negligence.
*10 Accordingly, we find no error in the Trial Court's conclusion of contributory negligence as a matter of law.
*Id.* at 158-59 (citations omitted).

Reliance on *Johnson* is unavailing to Umtech. *Johnson* was decided in 1982, two years before the Delaware Legislature enacted the modified comparative negligence statute, 10 *Del. C.* § 8132. When *Johnson* was decided, the Supreme Court of Delaware was using the common law contributory negligence doctrine, which held that contributory negligence was an absolute bar to any recovery by a plaintiff in Delaware. *See Culver*, 588 A.2d at 1097.

Thus, once the court found any negligence on the part of the plaintiff, summary judgment would necessarily be entered against him. Now, however, a finding of negligence on the part of the plaintiff does not necessarily yield the same result. Only upon a finding that the plaintiff was more than 50% negligent will summary judgment be granted against him. Stripped to its most basic element, Umtech is asking this Court to decide that the combination of Hansen's acts and omissions amounts to more than 50% of the negligence which led to his injury. This determination cannot be made as a matter of law, and therefore must be made by a jury. Summary judgment on the ground of contributory negligence will be denied. [FN4]

FN4.    Umtech's reply brief argues that Hansen's negligence was also the superseding cause of his injuries, which would absolve Umtech from liability. Despite the fact that Umtech raises a new legal defense in its reply brief, this argument is without merit. Superseding causes refer to new and independent acts, *see Duphily*, 662 A.2d at 829, not to the plaintiff's own negligence. The proper defense arising out of plaintiff's own negligence is contributory negligence, as Umtech had originally argued.

### 3. *Effect of Alleged Negligent Operation of Facility by K-F*

Umtech argues that it bears no liability for the negligent operation of Dryer 2 by Hansen's employer, K-F. Hansen stated in his deposition that K-F had increased production at the facility, which increased the frequency of clogging of the dryer. D.I. 74 at A-70-72. Increased production also rendered it infeasible, according to Hansen, to shut off the dryer when cleaning was needed. *Id.* at A-151-52. Further, Hansen alleges that the blower on the platform was broken, and this caused poor visibility on the platform, further adding to the danger. *Id.* at A-198. Umtech asserts these allegations are properly directed at K-F, not Umtech, and Umtech bears no responsibility for K- F's failures.

While not clearly stated in its opening brief, Umtech's reply brief argues that K-F's alleged

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works





acts of negligence are the superseding cause of Hansen's injuries. D.I. 86 at 15. A superseding cause is a new and independent act, itself a proximate cause, which breaks the causal connection between the original tortious conduct and the injury. *Duphily,* 662 A.2d at 829. If the intervening act of negligence was not reasonably foreseeable to the original tortfeasor, the intervening act supersedes and becomes the sole proximate cause of the plaintiff's injuries, relieving the original tortfeasor of liability. *Id.*

The Supreme Court of Delaware has held that the question of superseding cause is "fact-driven" and is a question for the jury. *Id.* The *Duphily* court explained:

[A]n intervening negligent act will not relieve the original tortfeasor from liability if: the original tortfeasor at the time of his negligence *should have realized* (foreseen) that another's negligence might cause harm; or, if a *reasonable person* would not consider the occurrence of the intervening act as *highly extraordinary;* or if the intervening act was not *extraordinarily negligent.* Considerations of foreseeability and what a reasonable person would regard as highly extraordinary are factual questions ordinarily reserved for the jury.

*11 *Id.* at 830-31 (emphasis in original); *see also* Restatement (Second) of Torts § 453 cmt. b (1965) ("[if] under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, the question should be left to the jury.").

As noted above, a superseding cause is a new and independent act, *itself a proximate cause,* which breaks the causal connection between the original tortious conduct and the injury. *Duphily,* 662 A.2d at 829 (emphasis supplied). Umtech has failed to demonstrate how K-F's alleged acts of negligence are the proximate cause of Hansen's injuries. According to both parties, the acts of K-F were (1) the increased production at the facility, coupled with the changes in chemicals used, which caused an exponential increase in dryer clogging, and (2) the failure to repair the blower on the top of the platform, which caused poor visibility and

obscured Hansen's vision. Neither of these acts, alone or in the aggregate, was the "but for" cause of Hansen's injuries. Poor visibility did not cause Hansen's pant leg to become caught: the exposed chain drive was the cause of his entanglement. Increased production did not cause his pant leg to become caught: if anything, it made the number of occasions on which Hansen was on the platform greater. However, even if Hansen's job required him to stand on the platform all day long, a protected chain drive would have still prevented his accident. Thus, the superseding cause argument cannot prevail as a matter of law at this stage of the proceeding, because there has been no demonstration of proximate cause on the part of K-F.

Even if Umtech had demonstrated how K-F's alleged negligence proximately caused Hansen's injuries, the superseding cause argument would have to be left to the jury. The Court will not make factual determinations on summary judgment as to whether it was foreseeable to Umtech, at the time of its alleged negligent installation of the dryer, that K-F would increase productivity and/or change the formula for the sludge cake, which Umtech asserts causes more clogging of the dryer, or whether it was foreseeable that a blower might break, and cause poor visibility on the platform. Summary judgment on the ground of superseding cause will be denied.

4. *Sophisticated Purchaser Defense to Duty to Warn*

Umtech also argues that it supplied K-F with a detailed operating manual for Dryer 2, which was more than 60 pages in length. Umtech argues that it was entitled to rely on K-F to warn its employees of the dangers or defects as set out in the manual. The manual was provided by Umtech to K-F, in German; K-F's president, Petra Freuhbis, translated it into English. The safety manual provided to K-F by Umtech contains the following warnings:
3.1 MAKE SURE ALL COVERS AND DOORS ARE LOCKED AND SECURED TIGHTLY BEFORE START-UP!
3.2 KEEP ALL TROUGH COVERS AND DOORS AT CHAIN DRIVES CLOSED.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Screws on covers and doors may only be opened during shutdowns. Ensure that it is not possible to accidentally start the equipment during cleaning and maintenance procedures (Lock Out Tag Out Systems!). Upon completion of cleaning and maintenance all covers and doors must be closed and secured.

**\*12** 3.3 SAFETY COVERS ON CHAIN DRIVES may not be removed during operation. Equipment must be shut off for repairs and secured against accidental start-up (see 3.2).

D.I. 83 at B98 (emphasis in original).

The Supreme Court of Delaware has not addressed whether the so-called "sophisticated purchaser" defense has a place in Delaware jurisprudence. While Delaware trial court decisions do not control where the Delaware Supreme Court has not spoken, a decision of the Delaware state trial court may be considered when a federal court engages in the hazardous chore of divining state law. *Cf. Robinson v. Jiffy Executive Limousine Co.*, 4 F.3d 237 (3d Cir. 1993).

Several Delaware Superior Court decisions recognize the so-called "sophisticated purchaser" defense. This defense was first discussed in *In re Asbestos Litigation (Mergenthaler)*, 542 A.2d 1205 (Del. Super. Ct. 1986) ("*Mergenthaler*"). There, plaintiffs had brought an action against several asbestos suppliers alleging, *inter alia,* failure to warn of the dangers associated with asbestos products. *Id.* at 1207. The defendants argued that plaintiffs' employers were sophisticated purchasers of the products and knew of the dangers of asbestos exposure. The court reviewed decisions of courts across the country and concluded that "some version of a 'sophisticated purchaser' defense is the norm in most jurisdictions." *Id.* at 1211. The standard which must be met to invoke the defense was set forth as follows:

[W]hen a supplier provides a product it knows to be dangerous to a purchaser/employer whom the supplier knows or reasonably believes is aware of that danger, there is no duty on the part of the supplier to warn the employees of that purchaser unless the

supplier knows or has reason to suspect that the requisite warning will fail to reach the employees, the users of the product.
*Id.* at 1212.

This standard has been analyzed as a two-part inquiry to determine whether the sophisticated purchaser defense is available to a defendant:

First, did the supplier of the dangerous product know or reasonably believe that the purchaser was aware of the dangers of the product? If the answer is no, the supplier may not avail himself of this defense. If the answer is yes, the purchaser is considered "sophisticated," and the seller may rely on the purchaser to warn others of the danger of the product. The next inquiry is whether the supplier knew or had reason to suspect that the warning would fail to reach the purchaser's employees or the users of the product? If the answer is yes, the supplier is not relieved from his duty to warn.
*Sanderson v. Firestone Tire & Rubber Co.*, 1994 WL 807899 at *2 (Del. Super. Ct. July 28, 1994).

The *Mergenthaler* court, applying the standard above, ultimately concluded that summary judgment for defendants was improper. As to the first inquiry, the court found that the purchaser was sophisticated as a matter of law because it was involved with asbestos, had knowledge of the asbestos industry, and held itself out as following all OSHA regulations relating to asbestos. *Id.* at 1213. As to the second inquiry, however, the court held it was a jury question as to whether the supplier knew or had reason to suspect that the warnings were not being given to the purchaser's employees. *Id.* The court noted that while the supplier had never sent an agent to the purchaser's plant to observe its safety measures, in addition to the fact that the purchaser had represented that it was following OSHA regulations, the supplier was nonetheless aware of the purchaser's warnings because it had seen the purchaser's warning labels. The court stated that if a jury determined that the warning labels were inadequate, it may also find that the supplier was on notice that the purchaser's safety

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




measures were inadequate. *Id.*

*13 In *Steffen v. Colt Indus. Operating Corp.,* 1987 WL 8689 (Del. Super. Ct. Feb. 4, 1987), the court, in dicta, discussed this defense in connection with an industrial accident similar to the accident in the case *sub judice.* There, plaintiff was injured at work while attempting to lubricate a pump manufactured by defendant. Defendant had sent plaintiff's employer a safety manual containing the warning "Do not relubricate the pump while it is running." *Id.* at *2. Plaintiff, however, had not been instructed by his employer to first shut off the pump before attempting to relubricate it. *Id.* The court rejected plaintiff's failure to warn argument against the defendant, finding that defendant discharged its duty to warn by providing the safety manual to the employer, and reasonably believed that the employer was aware of the dangers associated with relubricating a moving pump. *Id.* at *4. Further, the court noted that defendant had no reason to suspect that the employer was not providing the warning to its employees, as it has an "economic incentive in not exposing its employees to unnecessary dangers." *Id.*

Umtech argues its duty to warn did not extend to Hansen because the warnings provided to K-F, a sophisticated purchaser, should have satisfied its duty. Applying the two-part test of *Mergenthaler* to these facts, the first inquiry is whether Umtech knew or reasonably believed that K-F was aware of the dangers of the product. Umtech argues that K-F provides sophisticated services at the Kent County site, including "dewatering of waste-activated sludge" and "[sludge] drying services." D.I. 73 at 32. Umtech notes that K-F employs roughly thirty-five employees. *Id.* Further, Umtech states that K-F operates waste treatment facilities for other government and private entities in the United States. *Id.* Because of these factors, Umtech believes that K-F is a sophisticated purchaser of Dryer 2 as a matter of law.

After reviewing the record, the Court concludes that the issue of K-F's sophistication should be determined by a jury. As noted above, "sophistication" for the purpose of this defense refers to the purchaser's awareness of the dangers of the product. This means K-F is sophisticated if Umtech reasonably believed K-F was aware of the dangers posed by Dryer 2. The record simply does not support that determination as a matter of law. Umtech provided a safety manual to K-F containing warnings about the dangers of exposed chain drives, and the necessity to replace guards if they are removed. However, one could argue that the absence of the guard over the chain drive which caused Hansen's injury suggests that Umtech did not believe this particular chain drive to pose a threat.

As an additional matter, the only evidence Umtech provided regarding K-F's sophistication is the number of persons K-F employs, its line of business, and its nationwide operations in this line of business. These facts do not necessarily support a conclusion that K-F is knowledgeable about all the individual component machines and constituent parts which comprise a waste treatment plant such as the one at Kent County. Furthermore, K-F's *lack* of sophistication with respect to this dryer could be reasonably inferred from the fact that Umtech had to supply the personnel to install the machine in the first place. *See* D.I. 74 at A-220. Finally, K-F's president testified that K-F currently manages only two or three facilities in the country. *Id.* at A-7. Whether this fact warrants a conclusion that K-F is "sophisticated" should be determined by a jury. *See Sanderson,* 1994 WL 807899 at *2 (because the record was unclear as to whether the defendant knew or reasonably believed that the purchaser was aware of the dangers, i.e., whether the purchaser was sophisticated, summary judgment for defendant was improper).

*14 Even assuming *arguendo* that K-F could be deemed "sophisticated," the next inquiry, whether Umtech knew or had reason to suspect that the warning would fail to reach K-F's employees, is also a jury question incapable of resolution at the summary judgment stage. First and foremost, Umtech had no on- site personnel overseeing

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works





operations at the Kent County plant after Dryer 2 was installed. Thus, it did not know if K-F was following its warnings in the safety manual regarding the importance of turning off the machine for cleaning. Further, after carefully reviewing the record, there is no evidence which supports an inference that Umtech knew or had any reason to suspect that warnings would reach K-F's employees. Therefore, the Court will not decide this issue as a matter of law at summary judgment. The "sophisticated purchaser" defense must be evaluated by a jury.

Umtech's final argument is that it had no duty to warn Hansen of defects, as it was merely the seller of a product which it did not manufacture. Umtech argues that a seller of goods has no duty to test or inspect a product for danger if the seller "neither knows nor has reason to know that [the product] is, or is likely to be, dangerous." D.I. 73 at 33 (quoting *Spaur v. Owens- Corning Fiberglas Corp.,* 510 N.W.2d 854, 864 (Iowa 1994)).

Hansen argues that "Umtech had a duty to be aware of defects in Dryer No. 2 that reasonably should have been discovered in light of Umtech's peculiar opportunity and competence as a dealer in this particular type of chattel." D.I. 82 at 10-11. Hansen argues that Umtech held itself out as a sophisticated seller and installer of waste dryers, and that Umtech was aware of the danger of unguarded chain drives, as evidenced by its extensive warnings in the safety manual regarding the need to replace chain guards that are removed. *Id.* at 11-14. Hansen argues that because Umtech was more than a mere seller, its duty to warn exceeded that of a mere seller.

Both parties cite *In re Asbestos Litigation,* C.A. No. 90C-10-72 (Del. Super. Ct. June 2, 1993), as authority for their arguments. Umtech urges that this case supports its position that a seller has only a limited duty to inspect for defects. Hansen argues that this case also held that where the seller of the product also engages in installation, it may be held to a higher standard of care. D.I. 82 at 11. Specifically, Hansen points to the following

language from the *Asbestos* opinion: [Defendant] ... was, however, more than just a supplier of products. It also conducted an insulation installation business according to evidence in the record. When, as here, a supplier exceeds its role as a mere supplier of goods, it may be held to a higher standard of care. In a case very similar to this case the Maryland Court of Appeal[s] rejected the standard sought by defendant. In particular, the Maryland Court held that a supplier of asbestos products who also installed those products had a duty to warn if it knew, or had reason to know, *or should have known* of these hazards.

  *15 *Asbestos, supra* at 3 (citations omitted) (emphasis in original).

Whether Umtech or Hansen correctly states the limit of the *Asbestos* court's rule, the Court concludes that even if Umtech is held to the lower duty standard applicable to mere sellers, there is sufficient evidence of record which could demonstrate to a jury that Umtech breached this duty. Umtech cites to the Supreme Court of Iowa for the proposition that a seller of goods has no duty to test or inspect a product for danger "who neither knows nor has reason to know that it is, or is likely to be, dangerous." D.I. 73 at 33 (quoting *Spaur,* 510 N.W.2d at 864). Umtech then cites an analogous rule from lower court decisions in Delaware. D.I. 73 at 33. Assuming *arguendo* that this standard would be applied by the Supreme Court of Delaware, by Umtech's own admission in its safety manual, it *had knowledge* that the chain drives should be protected by guards. Umtech provided ample warning in the safety manual that the guards of moving chain drives must be replaced before the machine may safely be turned on. *See* D.I. 83 at B88, B100. Thus, even if Umtech's duty as seller was merely to warn of defects it knew to be dangerous, a reasonable jury may find that Umtech breached this duty. Umtech's motion for summary judgment on this ground will be denied.

  C. Umtech's Motion for Summary Judgment: Breach of Implied Warranty and Strict Liability

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works





Page  13

Umtech also moves for summary judgment on Counts III and IV of the Complaint, which respectively set forth claims for breach of implied warranties and strict liability.

### 1. *Strict Liability*

On May 2, 1996, Umtech moved for summary judgment on the issue of choice of law. D.I. 65. Umtech's position was that Delaware law governs the dispute. *Id.* On May 17, 1996, counsel for Hansen responded to the motion by letter, advising that he did not contest the application of Delaware law to the dispute. D.I. 79. On May 22, 1996, the Court denied Umtech's motion for summary judgment on choice of law, given the agreement between the parties that Delaware law applies. D.I. 84.

Delaware does not recognize a claim for strict liability in tort arising out of the sale of a product, due to the adoption of the Uniform Commercial Code. *Cline v. Prowler Indus., Inc.,* 418 A.2d 968 (Del. 1980). In light of Hansen's agreement that Delaware law applies, Hansen has elected not to pursue its claim for strict liability. *See* D.I. 82 at 1. Accordingly, Umtech's motion for summary judgment on the strict liability claim is unopposed and will be granted.

### 2. *Breach of Implied Warranty of Merchantability*

Count III of Hansen's complaint alleges a breach of implied warranty of merchantability under 6 *Del. C.* § 2-314. A well-pleaded merchantability claim requires proof of the following elements:
(1) that a merchant sold goods;
(2) which were defective at the time of the sale;
(3) causing injury to the ultimate consumer;
*16 (4) the proximate cause of which was the defective nature of the goods; and
(5) that the seller received notice of the injury.
*Neilson Business Equip. Ctr. Inc. v. Monteleone,* 524 A.2d 1172, 1174 (Del. 1987); *DiIenno v. Libbey Glass Div., Owens-Ill., Inc.,* 668 F. Supp. 373, 377 (D. Del. 1987).

Umtech argues that this claim should be

dismissed because Hansen's own contributory negligence was the dominant, if not the sole, proximate cause of his injuries. D.I. 71 at 4. Hansen argues that Umtech's argument is legally flawed because Delaware recognizes that there can be more than one proximate cause of a plaintiff's injury. The Court agrees. *See Reese,* 619 A.2d at 910; *see also Culver,* 588 A.2d at 1097. Umtech's argument is without merit, and summary judgment on this claim will be denied.

### IV. Conclusion

Umtech's motion to disqualify Hansen's expert Castro will be denied. Umtech's motion for summary judgment on the negligence claim will be denied. Umtech's motion for summary judgment on the strict liability claim will be granted. Umtech's motion for summary judgment on the breach of implied warranty of merchantability claim will be denied. An appropriate order will be entered.

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works





**37**

SPACE SYSTEMS/LORAL, Plaintiff, v. MARTIN MARIETTA CORPORATION, Defendant.

CIVIL NO. 95-20122 SW

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

1995 U.S. Dist. LEXIS 22305

November 14, 1995, Decided
November 15, 1995, Filed

**DISPOSITION:** [*1] Defendant's motion to disqualify certain expert witnesses and opposing counsel granted in part and denied in part.

**CORE TERMS:** disqualification, confidential information, technology, satellite, confidential, disqualify, disclosure, patent, disqualified, consulting, expert witness, law firm, privileged information, testifying, disclose, motion to disqualify, patent infringement, filed suit, misappropriation, attorney-client, involvement, retention, customers, privy, disclosing, imputed, taint, factual information, injunctive relief, trade secrets

**COUNSEL:** For SPACE SYSTEMS/LORAL, Plaintiff: James H. Wallace, Jr., Gregory Lyons, John B. Wyss, Wiley Rein & Fielding, Washington, DC.

For SPACE SYSTEMS/LORAL, Plaintiff: Edward V. King, Jr., Michael J. Higgins, King & Kelleher LLP, San Francisco, CA.

For LOCKHEED MARTIN CORPORATION, defendant: Cecilia O. Lofters, White & Case, Edward V. Filardi, Robert B. Smith, Skadden Arps Slate Meagher & Flom LLP, New York, NY.

For LOCKHEED MARTIN CORPORATION, defendant: Mary B. Cranston, Pillsbury Madison & Sutro LLP, Ellen M. King, White & Case LLP, Palo Alto, CA.

For LOCKHEED MARTIN CORPORATION, defendant: Roger P. Kennedy, Lockheed Martin Missiles and Space, Sunnyvale, CA.

For LOCKHEED MARTIN CORPORATION, Counter-claimant: Cecilia O. Lofters, White & Case, Edward V. Filardi, Robert B. Smith, Skadden Arps Slate Meagher & Flom LLP, New York, NY.

For LOCKHEED MARTIN CORPORATION, Counter-claimant: Mary B. Cranston, Pillsbury

Madison & Sutro LLP, J. David Black, Ellen M. King, White & Case LLP, Palo Alto, CA.

For LOCKHEED MARTIN CORPORATION, Counter-claimant: [*2] Roger P. Kennedy, Lockheed Martin Missiles and Space, Sunnyvale, CA.

For SPACE SYSTEMS/LORAL, Counter-defendant: James H. Wallace, Jr., Gregory Lyons, John B. Wyss, Wiley Rein & Fielding, Washington, DC.

For SPACE SYSTEMS/LORAL, Counter-defendant: Edward V. King, Jr., Michael J. Higgins, King & Kelleher LLP, San Francisco, CA.

**JUDGES:** SPENCER WILLIAMS, United States District Judge.

**OPINIONBY:** SPENCER WILLIAMS

**OPINION:** ORDER GRANTING IN PART AND DENYING IN PART MARTIN MARIETTA'S MOTION TO DISQUALIFY CERTAIN EXPERT WITNESSES AND OPPOSING COUNSEL

Plaintiff Space Systems/Loral, Inc. ("SSL") brought this action against Martin Marietta Corporation ("Martin Marietta") alleging patent infringement. Martin Marietta has now moved to disqualify two of SSL's expert witnesses and certain of SSL's attorneys. Based on the following, Martin Marietta's motion IS GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

SSL, Martin Marietta and Hughes Aircraft Company ("Hughes") are the major U.S. competitors in the communications satellite systems industry. The three companies regularly compete for the same contracts, customers, consultants and employees.

Over the last fifteen years, Martin Marietta has [*3] designed and manufactured a line of satellite systems called the Series 3000 (beginning in 1980), the Series 4000 (beginning in 1981), the Series 5000 (beginning in 1986), and the Series 7000 (beginning in 1988). Each series in the line has an ever-increasing payload

capacity. Hughes has manufactured a similar line of satellites, the most recent of which is the HS-601.

In the summer of 1993, SSL began investigating possible infringement of two of its patents by Martin Marietta's Series 7000 and Hughes' HS-601 satellite technology. These patents, U.S. Patent No 4,767,084 (filed September 18, 1986) and U.S. Patent No. 5,100,084 (filed September 7, 1990), both cover "attitude control" technology which enables satellites to maintain a constant orientation towards the earth.

To conduct its investigation, SSL's in-house patent counsel, Anthony Karambelas, retained the services of Dr. Marshall Kaplan and Dr. Ludwig Muhlfelder, both of whom are independent experts in the field of satellite attitude control. Kaplan and Muhlfelder had both previously done work for Martin Marietta and Hughes. Karambelas also retained the Washington, D.C. law firm of Wiley, Rein & Fielding as outside counsel. [*4]

In late 1994, SSL's team concluded that Martin Marietta and Hughes were infringing SSL's patents. SSL thereafter informed Martin Marietta and Hughes of this determination. SSL filed suit against Hughes on December 6, 1994 n1 and against Martin Marietta on February 21, 1995.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The Hughes case is currently pending before Judge Illston, is in active discovery, and has already had one summary judgment motion.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

During the early stages of the current litigation, Martin Marietta learned that SSL had retained Kaplan and Muhlfelder. Martin Marietta immediately became concerned that these two former employees might have communicated confidential proprietary information to SSL. Consequently, in March 1995, Martin Marietta filed suit in federal district court in New Jersey against SSL alleging patent infringement and misappropriation of trade secrets. Martin Marietta Corporation v. Loral Corporation, C-95-1402 MTB (D.N.J. 1995). Martin Marietta sought immediate injunctive relief to prevent SSL from employing Kaplan [*5] and Muhlfelder. The New Jersey court denied injunctive relief, dismissed Martin Marietta's misappropriation claims for lack of subject matter jurisdiction and transferred the patent infringement claims to the Northern District of California.

Now Martin Marietta moves to disqualify Muhlfelder, Kaplan, Karambelas and the law firm of Wiley, Rein & Fielding from participation in this action.

## ANALYSIS

### I. SSL'S EXPERT WITNESSES

#### A. Legal Standard

Federal courts have the inherent power to disqualify expert witnesses in certain circumstances to protect the integrity of the adversary process and to promote public confidence in the legal system. Wang Laboratories, Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248 (E.D. Va. 1991). When determining whether to disqualify an expert witness, courts should balance the competing policy objectives. English Feedlot, Inc. v. Norden Laboratories, Inc., 833 F. Supp. 1498, 1505 (D. Colo. 1993). Policies favoring disqualification include ensuring fairness and preventing conflicts of interest. Id. Policies militating against disqualification include guaranteeing that parties have access to expert witnesses [*6] who possess specialized knowledge and allowing experts to pursue their professional callings. Id. at 1504-05.

One situation where disqualification may be appropriate is when a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of their employment. See In re Data General Corporation Antitrust Litigation, 1986 U.S. Dist. LEXIS 22076, 5 Fed. R. Serv. 3d (Callaghan) 510 (N.D. Cal. 1986). To determine whether disqualification of an expert is warranted based on a prior relationship with the adversary, the court must undertake a two part inquiry: (1) Did the adversary have a confidential relationship with the expert?; and (2) Did the adversary disclose confidential information to the expert that is relevant to the current litigation? Toshiba, 762 F. Supp. at 1248.

#### B. Muhlfelder

There is no doubt that Muhlfelder must be disqualified as an expert witness in this litigation. Muhlfelder was privy to substantial confidential information from Martin Marietta that is relevant to the issues in this case. He worked for Martin Marietta's predecessor from 1962-1991 as head of the group responsible for satellite [*7] navigation, guidance and control. During his employment, Muhlfelder had significant involvement in designing the attitude control systems for the Series 3000, 4000, 5000, and 7000 satellites. He was also the named inventor of several Martin Marietta patents relating to attitude control. After his retirement, Muhlfelder's consulting activities for Martin Marietta and its customers allowed him access to confidential

attitude control technology until quite recently. Muhlfelder's employment and consulting activities for Martin Marietta required him to sign numerous confidentiality agreements promising not to disclose any trade secrets or other confidential information.

Perhaps realizing the weakness of its argument here, SSL does not strongly dispute the impropriety of using Muhlfelder as an expert witness in this case. In fact, SSL states than it intends to use Muhlfelder as an expert solely in its litigation with Hughes. Accordingly, Martin Marietta's motion to disqualify Muhlfelder is GRANTED.

C. Kaplan

Kaplan's situation is not quite as clear. Kaplan consulted for Martin Marietta's predecessors in the area of satellite attitude control from 1974-1988. Prior to 1980, Kaplan collaborated [*8] with Muhlfelder on the attitude control technology used in the Series 3000. Thereafter, from 1980-88, Kaplan was given access to confidential attitude control technology regarding the Series 4000 through his consulting activities for Martin Marietta customers. Kaplan also signed numerous confidentiality agreements with Martin Marietta.

Martin Marietta asserts that although Kaplan did not have access to the specific technology used in the Series 7000, he was involved in the development of the Series 3000 and 4000 attitude control systems which evolved into the system used in the Series 7000. Martin Marietta contends that Kaplan's intimacy with the Series 3000 and 4000 is crucial because the Series 7000 is based upon the earlier series and is "operationally similar". Martin Marietta also points out that Kaplan's knowledge is central to one of its defenses in this action: that SSL's patents are invalid because prior art existed in the form of the Martin Marietta's Series 3000 and 4000 systems.

SSL responds that the Series 3000 and 4000 technology is "antiquated" and bears little resemblance to that used in the Series 7000. Consequently, SSL contends that Kaplan does not possess any [*9] confidential information relevant to the current litigation. Furthermore, SSL argues that even if Kaplan has relevant factual information, Martin Marietta would have to produce this information during discovery anyway. Lastly, SSL distinguishes the cases upon which Martin Marietta relies by pointing out that nearly all of them involved situations where experts had obtained information directly related to the litigation, such as attorney work product or documents protected by the attorney-client privilege. Here, in contrast, Kaplan stopped consulting for Martin Marietta more than five years before this litigation commenced, and at least a year prior to the development of the technology at issue, the Series 7000.

The Court agrees with SSL. The relevant knowledge that Kaplan could have obtained through confidential means during his consulting at Martin Marietta is minimal at best. Kaplan's meaningful involvement with Martin Marietta ended after the development of the Series 3000 in 1980, over 15 years ago. Both parties agree that he possesses no confidential information concerning the Series 7000, the specific technology at issue in this lawsuit. The chance that Martin Marietta will [*10] be prejudiced by allowing SSL to continue its retention of Kaplan is therefore low.

In contrast, the hardship the SSL would suffer if the Court were to disqualify Kaplan is great. Kaplan is a renowned expert in the field of satellite attitude control. He has participated in this case from the beginning, since SSL's pre-filing investigation more than two years ago. Ordering his disqualification almost nine months after SSL filed suit would be extremely burdensome to SSL.

Moreover, SSL is correct that the cases upon which Martin Marietta relies are factually distinguishable. Some of them provide only that an adversary may not retain an expert who was personally involved in the preparation of the adversary's case. See, e.g., American Protection Ins. Co. v. MGM Grand Hotel - Las Vegas, Inc., 1986 U.S. Dist. LEXIS 28326, 1986 WL 57464 (D. Nev. Mar. 11 1986). Others merely forbid the retention of experts who have switched sides in the litigation after obtaining privileged information. See, e.g., Cordy v. Sherwin Williams, Co., 156 F.R.D. 575 (D.N.J. 1994); Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc., 709 F. Supp. 1279, 1989 U.S. Dist. LEXIS 3007, 1989 WL 31524 (S.D.N.Y. 1989); Toshiba, 762 F. Supp. at 1248. [*11] Even the case upon which Martin Marietta places the most reliance, Data General, is inapposite. In Data General, the court's decision to disqualify certain expert witnesses was based at least in part upon the fact that they had become privy to matters protected by the attorney-client and possibly work-product privileges. 1986 U.S. Dist. LEXIS 22076, 5 Fed. R. Serv. 3d at 513.

In sum, because there is little danger that Kaplan's participation as an expert will prejudice these proceedings, Martin Marietta's motion to disqualify Kaplan is DENIED. However, the Court finds that the approach taken by the court in the case of Wang Laboratories, Inc. v. CFR Associates, Inc., 125 F.R.D. 10 (D. Mass. 1989), would be appropriate here. In CFR Associates, the defendant hired an expert witness specifically because he had confidential knowledge pertaining to the patented technology at issue. The

court decided that although total disqualification was not warranted, the expert would be limited to testifying based on information he obtained prior to or subsequent to his employment with the plaintiff. Id. at 14. Therefore, in this case, Kaplan is prohibited from disclosing [*12] to SSL or testifying about any knowledge he obtained while bound by his confidential disclosure agreements with Martin Marietta. Kaplan may, however, provide his expert opinion based on his independent research and expertise in the field of satellite attitude control.

## II. SSL'S ATTORNEYS

Martin Marietta also requests that the Court disqualify SSL's in-house counsel Karambelas and its outside law firm of Wiley, Rein & Fielding due to their retention of Muhlfelder and Kaplan. SSL responds that disqualification of its attorneys is unjustified.

In certain situations, courts have disqualified counsel who improperly retained experts possessing confidential information obtained from the opposing party. The justification for such disqualification is that the "taint" of the expert's illicit knowledge is imputed to the attorneys. See, e.g., American Protection, 1986 U.S. Dist. LEXIS 28326, 1986 WL 57464 at *2; MMR/Wallace Power & Industry, Inc. v. Thames Associates, 764 F. Supp. 712, 718 (D. Conn. 1991). However, courts should be extremely cautious when considering motions for disqualification of counsel "both because of the immediate effect disqualification has on a client by [*13] separating him from his counsel of choice, and because such motions are often interposed for tactical reasons". MMR/Wallace Power, 764 F. Supp. at 718 ("courts should hesitate to impose so drastic a measure as disqualification except when absolutely necessary").

Here, Martin Marietta's request for disqualification is unwarranted for two reasons. First, Martin Marietta has not demonstrated that Kaplan or Muhlfelder have disclosed or are likely to disclose any confidential information to SSL's attorneys from which a taint can be imputed. Martin Marietta offers only unsubstantiated speculation that there is some risk of confidential disclosure. The Court therefore agrees with the New Jersey court's assessment of Martin Marietta's allegations: "It seems clear . . . that in any event there is no evidence that there has been any use or disclosure of the confidential information which underlies [Martin Marietta's misappropriation claims] . . . and no evidence that there is any real basis for believing that there will be use or disclosure in the future". Martin Marietta v. Loral Corp., Unpub. Opinion at 9.

Second, the cases upon which Martin Marietta relies again involve [*14] experts who were privy to an adversary's work product or attorney-client privileged information, not merely confidential factual material obtained outside the context of the litigation. See, e.g., American Protection, 1986 WL 57464 at *2; MMR/Wallace Power, 764 F. Supp. at 718; Shadow Traffic Network et al. v. Superior Court, 24 Cal. App. 4th 1067, 1070 (1994). The concerns raised by the disclosure of litigation-related, privileged information are naturally great, since the integrity of the adversary system could easily be undermined. In contrast, disclosure of independently obtained, factual information which is subject to discovery anyway does not raise the same level of concern.

In sum, Martin Marietta's motion to disqualify SSL's attorneys is DENIED. Martin Marietta has not demonstrated either that SSL's counsel acted unreasonably or that their continued involvement in this case poses any threat to the fairness of this litigation. See Marcum v. Channel Lumber Co., 1995 U.S. Dist. LEXIS 3799, 1995 WL 225708 at *2 (N.D. Cal. Mar. 24 1995) (commenting that disqualification is proper only if the attorneys' misconduct will have a "continuing [*15] effect on the judicial proceedings before the court").

## CONCLUSION

Based on the foregoing, Martin Marietta's motion is GRANTED IN PART and DENIED IN PART. Muhlfelder is disqualified as an expert in this litigation. Kaplan is not disqualified, but he is prohibited from disclosing or testifying about any confidential information he obtained from Martin Marietta. Karambelas and the law firm of Wiley Rein & Fielding are not disqualified.

IT IS SO ORDERED.

DATE: 11/14/95

SPENCER WILLIAMS

United States District Judge

**38**

WARREN ROHN, et ux., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. and ALL RELATED MATTERS

NO. CIV. S-01-0602 FCD PAN, NO. CIV. S-00-1628 FCD PAN, NO. CIV. S-00-1629 FCD PAN, NO. CIV. S-00-2515 FCD PAN, NO. CIV. S-00-2516 FCD PAN, NO. CIV. S-01-0061 FCD PAN, NO. CIV. S-01-0074 FCD PAN, NO. CIV. S-01-0076 FCD PAN, NO. CIV. S-01-0191 FCD PAN, NO. CIV. S-01-0330 FCD PAN, NO. CIV. S-01-0331 FCD PAN, NO. CIV. S-01-0599 FCD PAN, NO. CIV. S-01-0601 FCD PAN

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

2002 U.S. Dist. LEXIS 19122

August 27, 2002, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff real property owners sued defendant, the United States, under the Federal Tort Claims Act, alleging that government agents allowed a prescribed fire to escape onto the owners' property. The court issued an order to show cause why sanctions should not be imposed on the owners' counsel for his involvement in a scheme to engage in witness tampering of one of the government's expert witnesses.

**OVERVIEW:** Counsel represented the plaintiffs in several actions relating to the fire. The expert witness involved was a real estate agent in the area of the fire. One of the owners telephoned the witness, and counsel and some of his clients participated in preparation of a newspaper advertisement advocating a boycott of the witness who would "turn on her neighbors." The court found that clearly counsel and his clients attempted to wrongfully influence a witness by promoting a boycott of her business. Counsel argued before a magistrate that the conduct was protected by the attorney-client privilege and the First Amendment. Counsel expressed no regret when his arguments were rejected, and objected to the magistrate's report and recommendation. Only in his response to the show cause order did counsel express regret and remorse for his behavior. Contrary to his contention, counsel had more involvement than only ensuring that the ad was factually correct, and the record contradicted counsel's characterization of his behavior as being in the "heat of passion." He offered several substantive revisions to a draft of the ad and approved the final version. The court thus ordered monetary sanctions.

**OUTCOME:** The district court imposed monetary sanctions and other obligations, including, inter alia, undertaking continuing legal education in professional ethics, upon the owners' counsel.

**CORE TERMS:** advertisement, involvement, declaration, settlement, judicial process, attesting, revision, inherent power, monetary, tampering, realtor, remorse, faxed, Federal Tort Claims Act, clear and convincing evidence, disqualification, predicate, contempt, punish, Rules of Professional Conduct, criminal liability, sanctions imposed, total recovery, phone call, law school, instituting, personally, treatises, wrongly, passion

## LexisNexis(TM) HEADNOTES - Core Concepts

### Civil Procedure > Sanctions > Misconduct & Unethical Behavior

[HN1]Federal courts have inherent powers to manage their own proceedings and control the conduct of persons appearing before them. By invoking the inherent power to punish bad faith conduct that threatens the integrity of the judicial process, a court must exercise discretion in fashioning appropriate sanctions. District judges have an arsenal of sanctions they can impose for unethical behavior including monetary sanctions, contempt, and disqualification of counsel.

### Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Witness Tampering

[HN2]Witness tampering is subject to criminal liability under 18 U.S.C.S. § 1512(c).

### Civil Procedure > Sanctions > Misconduct & Unethical Behavior

[HN3]A district court has a range of sanctions available to it for misconduct of counsel, including (1) instituting proceedings to disbar counsel from the court's district; (2) disqualifying counsel from the case; (3) instituting criminal contempt proceedings; (4) monetary sanctions; and (5) lesser sanctions.

**COUNSEL:** [*1] For WARREN ROHN, SANDRA ROHN, plaintiffs: Richard Pachter, Stevens and O'Connell, Sacramento, CA. Darin Patrick Wright, Darin P Wright Attorney at Law, Lewiston, CA.

For USA, defendant: Kendall J Newman, David T Shelledy, United States Attorney, Sacramento, CA.

**JUDGES:** FRANK C. DAMRELL, Jr., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** FRANK C. DAMRELL, Jr.

**OPINION:** ORDER FOR SANCTIONS

Plaintiffs in these related actions have brought actions under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 through 2680 against Defendant United States of America ("the Government"). Plaintiffs allege that agents and employees of the Government negligently allowed a prescribed fire started on the Government's property to escape onto the property occupied or owned by the plaintiffs.

On July 29, 2002, this court issued an order to show cause why sanctions should not be imposed on plaintiffs' counsel, Darin Wright, for his involvement in the scheme to engage in witness tampering of one of the Government's expert witnesses. Plaintiffs' counsel filed a declaration in response to the order to show cause on August 7, 2002. The Government filed a response on August 16, 2002. A hearing [*2] on the order to show cause was held on August 26, 2002 at which plaintiffs' counsel appeared with his own counsel, James J. Banks. For the reasons below, the court finds that sanctions should be imposed on plaintiffs' counsel.

**STANDARD** n1

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The "Background" section has been omitted for the sake of brevity since the parties are familiar with the factual background of these cases. For further background, the court directs the reader to its July 29, 2002 order.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN1]Federal courts have inherent powers to manage their own proceedings and control the conduct of persons appearing before them. See Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27, reh'g denied, 501 U.S. 1269, 112 S. Ct. 12, 115 L. Ed. 2d 1097 (1991). By invoking the inherent power to punish bad faith conduct that threatens the integrity of the judicial process, a court must exercise discretion in fashioning appropriate sanctions. See Chambers, 501 U.S. at 44-45, 111 S. Ct. at 2132-2133. [*3] "District judges have an arsenal

of sanctions they can impose for unethical behavior" including monetary sanctions, contempt, and disqualification of counsel. Erickson v. Newmar Corp., 87 F.3d 298, 303 (9th Cir. 1996). n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n2 In Shepherd v. Am. Broad. Co., 314 U.S. App. D.C. 137, 62 F.3d 1469 (D.C. Cir. 1995), the D.C. Circuit held that "for those inherent power sanctions that are fundamentally penal--dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines--the district court must find clear and convincing evidence of the predicate conduct." 62 F.3d at 1478. The court has been unable to locate any Ninth Circuit authority on the standard of proof required for a district court's decision to sanction an attorney under its inherent power. However, even if the "clear and convincing" standard enunciated in Shepherd applies, the court finds that plaintiffs' counsel's underlying predicate conduct has been proved by clear and convincing evidence. Indeed, plaintiffs' counsel has never disputed that he engaged in the conduct. Rather, he only argued that the conduct was justified.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*4]

**ANALYSIS**

The position of plaintiffs' counsel in response to the court's order to show cause has changed markedly regarding the conduct in question. While Mr. Wright now expresses regret for his actions, his current position is far different from his testimony before the magistrate judge and his objections to the magistrate judge's findings and recommendations filed on behalf of plaintiffs Warren and Sandra Rohn.

In the Rohns' objections and before the magistrate judge, Mr. Wright asserted that his conduct, and the conduct of his clients, was protected by both the attorney-client privilege and the First Amendment. Yet when the magistrate judge found that neither defense had merit, Mr. Wright did not express regret about his actions. Far from apologizing for his behavior, he asserted that such conduct was both legal and reasonable. In the objections filed on behalf of the Rohns, Mr. Wright asserted that parties have a right to speak with witnesses, "so long as they do not attempt

to wrongly influence their testimony in doing so." Pls.' Objections, filed July 3, 2002, at 15. According to plaintiffs' counsel, the advertisement as well as plaintiff Marijane Poulton's phone call [*5] to the Government's expert Cheryl Mikkola did not constitute an attempt to "wrongly influence" Mikkola. Through his counsel at the hearing before the magistrate judge, Mr. Wright argued that the advertisement did not pose any threat to the integrity of the judicial process. In his declaration in response to the order to show cause, Mr. Wright continues to maintain that at the time the proposed advertisement was being formulated, he "believed the advertisement would not have influenced [Mikkola's] testimony or her willingness to testify." Wright Decl., filed August 7, 2002, at 3. As stated in its order filed July 29, 2002, the court does not find this testimony -- that Mr. Wright had no idea of the impact of the advertisement -- credible in the least. n3 Nor does the court accept his contention that the advertisement or Poulton's phone call to Mikkola was innocent. Clearly counsel and his clients attempted to wrongfully influence a witness by promoting a countywide boycott of her business.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 The advertisement read, in pertinent part:Ms. Mikkola receives $ 85.00 per hour to testify against the Lowden Fire victims. Do you really want a realtor who, for the right price will turn on her neighbors? When you decide to buy or sell your property, choose a realtor who supports our local communities. Choose a realtor you can respect.The intent of the advertisement is clear on its face.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*6]

Now, however, in response to the order to show cause, Mr. Wright expresses regret and remorse for his behavior and states that after reviewing this court's July 29, 2002 order, he *now* sees that his "failure to appreciate the full impact the proposed advertisement could have on the judicial process constituted an error in judgment." Wright Decl., filed August 7, 2002, at 3. He states that he *now* realizes he should have "simply counseled [his] clients to refrain from publicizing their concerns regarding the government report, and, instead, address their concerns in the course of the litigation." Id. at 3. In an effort to explain his conduct, Mr. Wright characterizes his actions as motivated by his "frustrations and passions" "boiling over" and "clouding [his] judgment" Id. at 2-3. He further states

that his involvement with the advertisement was limited to ensuring that the advertisement was factually correct. See id. at 3. Mr. Wright contends that he did not intend to violate any ethical or legal bounds and his lack of bad faith is demonstrated by his decision to halt publication of the advertisement once the Government's counsel indicated that the Government [*7] opposed the publication of the advertisement. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 The record is unclear as to why the advertisement was not run. At the hearing before the magistrate judge, Mikkola testified that Sara Weninger, the editor of the Trinity County Journal, called Mikkola to tell her that Weninger had decided not to run the advertisement. The court has no way of determining what or who caused Weninger to decide not to run the advertisement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Plaintiffs' counsel also asks this court to consider that he (1) represents a large number of plaintiffs in these related cases and most of the settlements that have been reached are for allegedly small sums compared to the amounts claimed; (2) has limited his attorneys' fees to 20% of recovery, as opposed to the 25% allowed under the Federal Tort Claims Act; (3) has fronted litigation costs for the plaintiffs; (4) assisted many of the plaintiffs on a pro bono basis with other issues arising from the fire; (5) has lived in his Lewiston office, away from his family, for the past three years in order [*8] to provide moral and legal support to his clients; and (6) has received very little income from these cases over the past three years and has been prevented from taking other cases due to the time constraints imposed by his representation of the plaintiffs. n5 At the hearing, Mr. Wright, through counsel, asked this court to consider that Mr. Wright has never been accused of professional misconduct in his nine-year career; is a solo practitioner; and took these cases when no other lawyer would.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 However at the hearing, Mr. Wright stated that he has approximately twenty other clients whom he represents in matters involving real estate transactions and wills and trust.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

While Mr. Wright currently professes that he has seen the error of his ways, it seems that his remorse may have more to do with the specter of monetary sanctions than a newfound appreciation of the Rules of Professional Conduct of the State Bar of California or Title 18 of the United States Code. That Mr. Wright may have suffered some hardships **[*9]** in connection with the representation of the plaintiffs in these cases does not excuse his conduct. Nor does his personal or emotional involvement with his clients allow him to abandon the ethics of his profession and engage in witness tampering. n6 Moreover, the court finds Mr. Wright's characterization of his behavior as being in the "heat of passion" contradicted by the record.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Mr. Wright's assertion that some of his clients have settled for far less than their original claims, implying that his clients have given up monies belonging to them, similarly does not sway this court. Those plaintiffs that settled made a conscious decision to do so. If they felt the settlement was not equitable, they could have chosen not to settle.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

On May 3, 2002, Mr. Wright faxed documents to plaintiff Connor Nixon which purported to be documents from the report showing the involvement of Mikkola. On May 10, 2002, plaintiffs' counsel faxed a letter addressed to "Connor/Gary/Jesse" which stated that Jesse Rogers had faxed Mr. **[*10]** Wright a copy of the "letter" to be printed in the Trinity Journal. In that fax, Mr. Wright offered several substantive suggestions for revision, including the revision of several paragraphs. See Privilege Log, filed June 4, 2002, Ex. 2. Indeed, at the hearing held before the magistrate judge on June 6, 2002, Mr. Wright admitted that his involvement in the revision of the advertisement consisted of more than just "factual corrections." On May 16, 2002, after receiving an email from Marijane Poulton asking if the letter was a "go," Mr. Wright replied "It's a go" and thanked Poulton for her "work on this matter."

Mr. Wright's fax of May 3, 2002 likely provided the stimulus for the advertisement. The drafting and revision of the advertisement took place over the course of approximately a week. The record clearly demonstrates that this advertisement was the result of forethought and planning. n7 Far from an act of "passion," plaintiffs' counsel's involvement was deliberate and premeditated.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 For pertinent text of the advertisement, see supra at 4 n.3.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

**[*11]**

The advertisement was to be published in the Trinity County Journal, the only newspaper serving the sparsely populated area. n8 As this court has previously found, the quarter-page advertisement was clearly intended either to punish Mikkola for testifying or induce her not to testify by soliciting a boycott of her business by residents of Trinity County. If the scheme which led to the advertisement had been successful, Mikkola's business would have been severely damaged if not destroyed. The egregious nature of counsel's conduct and the clear threat posed to the judicial process is patent.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 As noted in the court's prior order, the population of Trinity County is approximately 13,500.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

It is noteworthy that one plaintiff, Paul Schmidt, the Trinity County Sheriff, would not allow use of his name on the advertisement. The court finds it difficult to believe that Sheriff Schmidt understood the dangers of this conduct and Mr. Wright did not. If, however, plaintiffs' counsel in fact did not understand, as he argues, **[*12]** the court is extremely concerned about Mr. Wright's representation of clients before this court or any other court. This concern is magnified by Mr. Wright's failure to recognize that he exposed not only himself but his own clients to possible criminal liability. n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 [HN2]Witness tampering of this type is subject to criminal liability under 18 U.S.C. § 1512(c).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

As indicated above, [HN3]the court has a range of sanctions available to it, including (1) instituting proceedings to disbar Mr. Wright from this district; (2) disqualifying Mr. Wright from these cases; (3) instituting criminal contempt proceedings; (4) monetary sanctions n10; and (5) lesser sanctions.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 The court notes that California Business and Professions Code § 6068(o)(3) imposes a duty upon an attorney to report sanctions over $ 1,000.00 to the State Bar and § 6086.7(c) imposes a duty upon a court to notify the State Bar of sanctions over $ 1,000.00.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*13]

The court believes that sanctions are necessary for several reasons. First, Mr. Wright's conduct is deserving of sanctions. Second, failure to sanction Mr. Wright's conduct could serve as a signal to other attorneys that this court will not disapprove of this type of deplorable conduct, and could even indicate tacit acceptance of such conduct if the perpetrator exhibits remorse.

While sanctions will be imposed, in light of Mr. Wright's lengthy involvement as counsel for the plaintiffs, n11 the court finds disbarment or disqualification at this stage of the litigation unfairly prejudicial to Mr. Wright's clients. However, the court does believe that other sanctions will cause plaintiff's counsel to reflect on his professional responsibilities and, in turn, will serve to modify future conduct. n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n11 Mr. Wright's involvement with these cases has lasted for at least three years.

n12 While Mr. Wright attests that he has not received substantial fees in connection with these cases, he has made no effort to quantify the fees he has received to date. Therefore, the sanctions imposed have no relationship to the fees received. Instead, the court must impose sanctions that reflect the seriousness of plaintiffs' counsel's conduct.

However, at the request of the court, the Government provided the following information about the settlements in these cases:A. Total Completed Administrative Settlements $ 1,052,197.66

B. Total Administrative Settlements Awaiting Final Approval $ 1,903,923.15
C. Total Verbal Settlements Awaiting Signed Agreements and Final Approval $ 172,100.00
D. Total Completed Settlements of District Court Case $ 256,629.55
E. Total of All Settlements **$ 3,384,850.36**Notice of Information, filed August 21, 2002. At the hearing, Mr. Wright represented that he has advanced his clients' costs in the total amount of approximately $ 500,000, which will be taken out of the total recovery before Mr. Wright's fees are calculated. Therefore, if Mr. Wright's fee is 20% of the total recovery less the costs, once all the settlements are approved, he will have collected $ 576,970.07 in fees ([$ 3,384,850.36 - $ 500,000] x 20%) as well as being reimbursed for the $ 500,000 in costs that he has advanced.

At the hearing, Mr. Wright indicated that there are five other administrative cases and seven other cases before this court which have not reached any understanding as to settlement. While the court will not speculate on the value of these remaining twelve cases, it is likely that they will result in the generation of even more, possibly substantially more, fees for plaintiffs' counsel. Based on this information, the court is skeptical of counsel's claim that he has not received substantial fees in connection with these cases.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*14]

## CONCLUSION

The following is hereby ordered:1. Counsel shall pay sanctions in the amount of **$ 15,000.00**. Payment should be in the form of a check made payable to The Clerk Of The Court. The sum is to be paid personally by plaintiffs' counsel **not later than ninety (90) days** from the filing of this Order for Sanctions. **Not later than one hundred (100) days** from the filing of this

2002 U.S. Dist. LEXIS 19122

Order, plaintiffs' counsel shall file a declaration attesting that he has paid the $ 15,000.00 sanction.

2. This sanction is personal to the attorney, is to be borne by him personally, and is not to be transmitted to his clients by way of a charge of attorney's fees and/or costs.

3. Counsel shall read the Rules of Professional Conduct of the State Bar of California in their entirety **within thirty (30) days** of the filing of this Order for Sanctions. **Not later than forty (40) days** from the filing of this Order, plaintiffs' counsel shall file a declaration attesting that he has read the Rules.

4. Counsel shall complete twenty hours of continuing legal education in professional ethics **within one hundred eighty (180) days** of the filing of this Order. **[*15]** This may include attending CLE courses or law school lectures or reading treatises or books. **Not later than one hundred ninety (190) days** from the filing of this Order, plaintiffs' counsel shall file a declaration attesting to his completion of the twenty hours, including providing the names and dates of the CLE courses or law school lectures attended or the titles and authors of treatises or books read.

5. Pursuant to California Business and Professions Code § 6068(o)(3), counsel shall report these sanctions to the California State Bar Association **within thirty (30) days** of the filing of this Order. **Not later than forty (40) days** from the filing of this Order, plaintiffs' counsel shall file a declaration attesting that he has reported these sanctions to the California State Bar Association.

6. Pursuant to California Business and Professions Code § 6086.7(c), this court shall report the sanctions imposed on counsel to the California State Bar Association.

7. These related cases are set for a further status hearing on February 21, 2003 at 10 a.m.

IT IS SO ORDERED.

DATED: August 27, 2002.

FRANK C. DAMRELL, Jr.

UNITED STATES DISTRICT JUDGE **[*16]**

39

ACTEL CORPORATION, a California corporation, Plaintiff and Counterclaim Defendant, v. QUICKLOGIC CORPORATION, a California corporation, Defendant and Counterclaimant.

NO. C-94 20050 JW (PVT)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

1996 U.S. Dist. LEXIS 11815

April 23, 1996, Decided

[*1]

**SUBSEQUENT HISTORY:** Adopting Order of May 29, 1996, Reported at: 1996 U.S. Dist. LEXIS 11816.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant corporation sought the disqualification of the law firm representing plaintiff corporation, because an attorney employed by plaintiff's law firm and assigned to the instant litigation had previously worked on defendant's case while employed as a law clerk by the law firm representing defendant in the same patent infringement case.

**OVERVIEW:** On defendant's motion for disqualification, plaintiff argued that it would suffer extreme prejudice if it were stripped of its counsel, and that the attorney, when employed as a clerk by defendant's law firm, was not a lawyer and did not "represent" defendant. The special master found that the attorney, while employed as a clerk, understood the obligation of confidentiality and possessed defendant's confidential information. The court considered several factors, including plaintiff's right to choice of counsel and maintaining the public trust. The court applied the non-lawyer analysis and held that once defendant had established that the attorney possessed material confidential information, a rebuttable presumption arose that the information would be disclosed in his present employment. Plaintiff failed to rebut the presumption by formally screening the attorney from the case. As the hiring firm, plaintiff's counsel had the responsibility to protect attorney-client confidences. The equitable considerations of the motion as a defense tactic and plaintiff's financial burden were not justification for the denial of disqualification.

**OUTCOME:** The court granted defendant's motion to disqualify the law firm representing plaintiff. The court ordered plaintiff's law firm to turn over its records and provide assistance to the successor counsel.

**CORE TERMS:** confidential information, disqualification, case file, recollection, asbestos, confidential, declaration, exposed, patent, non-lawyer, work product, law clerk, confidences, disqualified, confidentiality agreement, screened, briefed, law firm, lyon, successor, nonlawyer, assigned, actually received, financial burden, time record, disqualify, reexamination, clerkship, urges, judicial process

## LexisNexis(TM) HEADNOTES - Core Concepts

*Legal Ethics > Client Relations > Conflicts of Interest*

*Civil Procedure > Counsel*

[HN1]In the exercise of judicial scrutiny over a motion for disqualification of counsel, the court must consider these significant interests: 1. The right of the non-moving party to counsel of its choice; 2. The law firm of the non-moving party's interest in representing its client; 3. The financial burden on the non-moving party if the motion to disqualify is granted; 4. Whether litigation tactical abuse underlies filing of the disqualification motion; 5. The right of the challenged attorney to change employment and move freely in the employment community. While these factors must be considered in applying the standards for disqualification, in order to prevent literalism from possibly overcoming substantial justice to the parties the most important consideration must be the preservation of the public trust in the scrupulous administration of justice and integrity of the bar. That trust can only be maintained by preserving client confidences.

*Legal Ethics > Client Relations*

[HN2]Every lawyer has the duty to uphold the integrity of the judicial process.

*Legal Ethics > Client Relations > Conflicts of Interest*

*Civil Procedure > Counsel*

[HN3]The test for disqualification of non-lawyers is as follows: The party seeking disqualification must show that its present or past attorney's former employee possesses confidential attorney-client information materially related to the proceedings before the court.

The party should not be required to disclose the actual information contended to be confidential. However, the court should be provided with the nature of the information and its material relationship to the proceeding. Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment. To rebut the presumption, the challenged attorney has the burden of showing that the practical effect of formal screening has been achieved.

*Legal Ethics > Client Relations > Conflicts of Interest*

*Civil Procedure > Counsel*

[HN4]The showing that a formal screening of the challenged attorney has been achieved must satisfy the trial court that the employee has not had and will not have any involvement with the litigation, or any communication with attorneys or coemployees concerning the litigation, that would support a reasonable inference that the information has been used or disclosed. If the challenged attorney fails to make this showing, then the court may disqualify the attorney and law firm.

*Legal Ethics > Client Relations > Conflicts of Interest*

*Civil Procedure > Counsel*

[HN5]Possession of confidential information can be shown without revealing the actual client confidences by competent evidence of the former employee's job responsibilities or participation in privileged communications.

**COUNSEL:** For ACTEL CORPORATION, Plaintiff: Jeffrey A. Miller, Perez & McNabb, Orinda, CA. Patrick Lynch, Mark A. Samuels, O'Melveny & Myers, Los Angeles, CA.

For QUICKLOGIC CORPORATION, a California corporation, defendant: Alan H. MacPherson, Skjerven Morrill MacPherson Franklin & Friel, San Jose, CA. Terrence P. McMahon, Jackson Tufts Cole & Black, San Jose, CA. Terrence P. McMahon, Orrick Herrington & Sutcliffe, Palo Alto, CA. Terrence P. McMahon, Orrick Herrington & Sutcliffe, Menlo Park, CA.

For QUICKLOGIC CORPORATION, Counter-claimant: Alan H. MacPherson, Skjerven Morrill MacPherson Franklin & Friel, San Jose, CA.

For ACTEL CORPORATION, Counter-defendant: Steven D. Hemminger, Lyon & Lyon, San Jose, CA. James W. Geriak, Lyon & Lyon, Costa Mesa, CA.

For QUICKLOGIC CORPORATION, Counter-claimant: Alan H. MacPherson, Skjerven Morrill MacPherson Franklin & Friel, San Jose, CA. Terrence P. McMahon, Jackson Tufts Cole & Black, San Jose, CA. Terrence P. McMahon, Orrick Herrington & Sutcliffe, Palo Alto, CA.

For ACTEL CORPORATION, Counter-defendant: Steven D. Hemminger, Lyon & Lyon, San Jose, CA. Jeffrey A. Miller, Perez & McNabb, Orinda, CA. James W. Geriak, Lyon & Lyon, **[*2]** Costa Mesa, CA.

**JUDGES:** Paul C. Valentine, SPECIAL MASTER. Judge James Ware

**OPINIONBY:** Paul C. Valentine

**OPINION: RECOMMENDATION OF THE SPECIAL MASTER TO GRANT QUICKLOGIC MOTION TO DISQUALIFY LYON & LYON**

**INTRODUCTION**

In this Motion for Disqualification, Defendant QuickLogic seeks to disqualify the law firm of Lyon & Lyon, counsel for plaintiff Actel Corporation. The basis for the motion is the employment by Lyon & Lyon of Michael Oleinik, an attorney at Lyon & Lyon who worked as a law clerk at Skjerven Morrill for part of a summer during the time he was attending law school. This litigation was on-going during that summer, and although Mr. Oleinik has said he has no recollection of the events, his time sheets show that he worked on this same litigation during his time at Skjerven Morrill. Since being employed at Lyon & Lyon, he has also performed work on this case. Skjerven Morrill brought this motion after seeing Mr. Oleinik at a motion before the Special Master in January, 1996. Lyon & Lyon vigorously disputes that disqualification is proper in these circumstances, particularly given the serious prejudice to its client, Actel Corporation, if this Motion is granted.

**I. SUMMARY [*3] OF THE ARGUMENTS**

**A. QuickLogic** Michael Oleinik was employed as a law clerk by Skjerven Morrill during the summer of 1994. Mr. Oleinik was briefed by the firm that all work was confidential and executed a confidentiality agreement on June 1, 1994. On June 9, 1994, Mr. Oleinik was requested by Ms. Alexandra Horne to do a research project on this *Actel v. QuickLogic* case. Mr. Oleinik did the assignment, prepared a memorandum for Ms. Horne and recorded 2 hours of time in his time log for the *Actel v. QuickLogic* case which included his handwritten entry "...reading the case file."

Mr. Oleinik was employed as a lawyer by Lyon & Lyon a year later, in September, 1995, and was

assigned to work on the *Actel v. QuickLogic* case at that time. While Skjerven Morrill knew that Mr. Oleinik had gone to work for Lyon & Lyon, Skjerven Morrill did not know that he had been assigned to this case until Skjerven Morrill attorneys saw Mr. Oleinik at a conference with the Master on January 30, 1996. On January 31 Skjerven Morrill notified Lyon & Lyon of QuickLogic's concerns about the apparent conflict of interest.

QuickLogic argues that this patent infringement case is critical and [*4] threatens the continued existence of the company; that QuickLogic has great concern regarding the dissemination, either consciously or unconsciously, about the dissemination of its confidential information about this case which was communicated to him by Skjerven Morrill attorneys and which was included in the case file which Mr. Oleinik apparently read while working as a clerk at Skjerven Morrill. QuickLogic argues that under the law Lyon & Lyon had the responsibility to assure that Mr. Oleinik had not worked on this case and had not been exposed to QuickLogic confidential information while working as a clerk there before assigning him to the case at Lyon & Lyon. If Lyon & Lyon had made the telephone call to check those facts it would have learned that Mr. Oleinik had worked on the case and screened him with a "cone of silence" as required by law. Lyon & Lyon did not assure itself that Mr. Oleinik had not worked on the case and not only did not screen him, they assigned him directly to work on this case.

QuickLogic argues that it realizes the harshness of disqualification, but that Lyon & Lyon created the problem and no other remedy will protect the rights of QuickLogic.

**B. Actel [*5]  Corporation**

Actel argues that QuickLogic's motion should be denied for several reasons: 1) there is simply no conflict, no facts and no legal theory which would justify disqualification; 2) QuickLogic has failed to carry its initial burden of establishing that Mr. Oleinik ever received any QuickLogic confidential information while working at Skjerven Morrill and thus there is no conflict; 4) Actel corporation would suffer extreme prejudice if it were stripped of its chosen attorneys at this stage of the proceeding; 5) Mr. Oleinik, when employed by Skjerven Morrill was not a lawyer and did not, and could not, "represent" QuickLogic, so the standard to be applied in determining whether there is a conflict of interest to warrant the disqualification of Actel's long-standing patent lawyers is that of a non-lawyer; 6) The fact that Mr. Oleinik later became a lawyer does not change the standard to be applied.

Allen v. Academic Games Leagues of America, Inc., 831 F. Supp. 785 (C.D. Cal. 1993).

Actel argues that under legal theory applicable to warrant disqualification under the non-lawyer standard, QuickLogic must first establish that Mr. Oleinik actually received confidential information [*6] material to the current proceeding; if that is not established, there is no conflict and disqualification is not warranted. If QuickLogic establishes that Mr. Oleinik actually received confidential information material to the current proceeding, even then disqualification is not automatic. Under those circumstances, this Court must determine whether Mr. Oleinik disclosed those confidences to Lyon & Lyon, or that Mr. Oleinik is likely to reveal to that confidential information. If the confidences have not been revealed and it is not likely that the confidences will be revealed, disqualification is not warranted.

Actel urges that QuickLogic has not established that Mr. Oleinik actually received confidential information and cannot establish this fact because as evidenced by Mr. Oleinik's declaration, he never received any QuickLogic confidential information, much less any QuickLogic information material to the current proceeding.

Actel also argues that even assuming that Mr. Oleinik received QuickLogic confidences, this Motion still should be denied because Mr. Oleinik's two hours of work that was billed to QuickLogic, related to basic research concerning an issue of this case that [*7] was resolved at least 18 months ago, well prior to Mr. Oleinik's employment at Lyon & Lyon; that issue dealt with whether the Court should stay this litigation pending the outcome of the reexamination of Actel's patents. Thus, to the extent that Mr. Oleinik could even conceivably have actually received QuickLogic confidential information, that information is not "material to the current proceeding." The case has evolved well past those peripheral and procedural issues to a point where those issues are no longer material to this proceeding.

Actel urges that QuickLogic has waived its rights to bring this motion, by failing to raise the issue when one of the original Skjerven Morrill attorneys of record in this case was informed that Mr. Oleinik was considering employment with Lyon & Lyon in October, 1994. Actel urges that Skjerven Morrill attorney had a duty to warn Lyon & Lyon at that time that Mr. Oleinik had been exposed to QuickLogic confidential information in his employ at Skjerven Morrill; or that Ms. Horne, who had given Mr. Oleinik that assignment at Skjerven Morrill should have warned Lyon & Lyon when she saw Mr. Oleinik

working in Lyon & Lyon's San Jose office in September, [*8] 1995.

Finally, Actel asserts that the facts surrounding the bringing of this Motion lead to the conclusion that the filing of this motion is not about protecting QuickLogic's information, but rather as retaliation for Actel's successful motion for sanctions and as a litigation tactic to cause extreme financial burden on Actel and further delay this case.

## II. FACTS

### A. Facts Not in Dispute

Many of the facts relevant to this Motion are not in dispute:

1. In the spring of 1994, Michael Oleinik had just completed his second year at Pepperdine University School of Law. On approximately June 1, Mr. Oleinik began a temporary summer clerkship at Skjerven Morrill which ended on approximately August 10, 1994. Oleinik P5. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n1 Throughout this Recommendation a name followed by a "P" refers to the paragraph of the person's declaration and a name followed by "Tr." refers to the "page:line" of the person's deposition transcript.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

2. During Mr. Oleinik's employment at Skjerven Morrill, he [*9] performed general legal research on a variety of topics and was given some patent prosecution assignments. Oleinik P7.

3. On January 20, 1994 Actel filed suit against QuickLogic for the alleged infringement of four Actel patents: U.S. Patent No. 4,758,745, U.S. Patent No. 4,873,459, U.S. Patent No. 5,055,718, and U.S. Patent No. 5,198,705. On February 10, 1994, QuickLogic answered Actel's complaint, denying Actel's allegations of infringement.

4. By the summer of 1994, when Mr. Oleinik was employed by Skjerven Morrill, QuickLogic and its counsel were involved in discovery and the development of strategies for the long-term management of this litigation. MacPherson P 2.

5. On April 19, 1994, QuickLogic filed requests for reexamination with the Patent and Trademark Office ("PTO") of two of the four Actel patents-in-suit: U.S. Patent No. 4,758,745 (the " '745 patent") and U.S. Patent 4,873,459 (the " '459 patent). At almost the same time, on April 18, 1994, QuickLogic served its Motion to Stay Proceedings Pending Reexamination of Patent. The Court denied QuickLogic's motion on May 20, 1994. In response, on June 7, 1994, QuickLogic filed a Motion to Reconsider QuickLogic's [*10] Motion to Stay Proceedings Pending Reexamination of Patents. On July 20, 1994, the Court granted QuickLogic's motion and the litigation was stayed.

6. It was in this time frame, on June 9 and 10, 1994, that Alexandra J. Horne, an associate with Skjerven Morrill, met with Mr. Oleinik to discuss the litigation. Horne P 2.

7. Mr. Oleinik's and Ms. Horne's time sheets reflect these conferences, as does the July 1, 1994 billing invoice to QuickLogic. Specifically, on June 9, 1994, Mr. Oleinik's timesheet recorded in his own handwriting states: "discussion with Alexandra on ..., reading of case file." MacPherson P 3.

8. Consistent with Ms. Horne's practice of discussing research assignments with associates, Ms. Horne declared that she would have discussed the details of the litigation and the rationale behind QuickLogic's strategy with Mr. Oleinik. Horne P 3. Ms. Horne does not now have a recollection that she did in fact have this discussion with Mr. Oleinik. Horne Tr. 21:21-22:3.

9. In the summer of 1994 the *Actel v. QuickLogic* case file contained notes and correspondence regarding witnesses, reexamination, and technical analyses of the four Actel patents initially [*11] asserted against QuickLogic and other privileged communications. MacPherson P 10.

10. Mr. Oleinik completed his clerkship at Skjerven on approximately August 10, 1994. Oleinik, P32.

11. In August, 1994, as part of his job search for a full-time position after graduating from law school, Mr. Oleinik sent his resume to Lyon & Lyon. On October 4, 1994, Mr. Oleinik interviewed in Lyon & Lyon's San Jose office with Messrs. Steven Hemminger and Jeffrey Miller, counsel for Actel in the *Actel v. QuickLogic* case. Both Mr. Hemminger and Mr. Miller asked Mr. Oleinik if during his clerkship at Skjerven Morrill he had worked on *Actel v. QuickLogic,* or any other projects involving QuickLogic. Hemminger P4; Miller P2.

1996 U.S. Dist. LEXIS 11815

12. Mr. Oleinik told both Messrs. Hemminger and Miller that he had no recollection of having worked on the *Actel v. QuickLogic* case. Hemminger P4; Miller P2; Oleinik P28.

13. On September 15, 1994, Mr. Oleinik received an offer of permanent employment from Skjerven Morrill in a letter signed by Mr. Anthony deAlcuaz, a partner at Skjerven Morrill who originally was an attorney of record in this litigation Miller P12, 13, 14, Oleinik P27. Shortly after **[*12]** receiving this offer, Mr. Oleinik telephoned Mr. de Alcuaz to discuss whether Skjerven Morrill would keep its offer open longer so that Mr. Oleinik could consider employment offers from other firms, including employment at Lyon & Lyon in its San Jose office. Oleinik P27. Mr. de Alcuaz said nothing to Mr. Oleinik about any potential conflicts because Skjerven Morrill represented QuickLogic, and Lyon & Lyon represented Actel, in this case. Nor did Mr. de Alcuaz caution Mr. Oleinik in this phone call that he had ever been exposed to QuickLogic confidential information. Oleinik P27.

14. Neither Mr. de Alcuaz nor anyone else from Skjerven Morrill contacted Lyon & Łyon to discuss the possibility that hiring Mr. Oleinik could raise any conflict issues. Hemminger P11.

15. On October 13, 1994, Lyon & Lyon extended an offer to Mr. Oleinik and on October 14, 1994, Mr. Oleinik sent a letter to Mr. de Alcuaz at Skjerven Morrill declining its offer. Oleinik P28. In this letter, Mr. Oleinik specifically stated that he would be working at Lyon & Lyon's San Jose office. After receiving this letter, neither Mr. de Alcuaz, an attorney of record at one time in this case, nor anyone else from Skjerven **[*13]** Morrill attempted to contact Mr. Oleinik to inform him of any potential conflict issues raised by his employment with Lyon & Lyon. Oleinik P30. Further, neither Mr. de Alcuaz nor anyone else at Skjerven Morrill contacted Lyon & Lyon to discuss a conflict issue. Hemminger P11.

16. Mr. Oleinik began working at Lyon & Lyon's San Jose office on September 6, 1995. Oleinik P32. When Mr. Oleinik started, Lyon & Lyon again confirmed with Mr. Oleinik that he did not do any work for QuickLogic while clerking for Skjerven Morrill. Lyon & Lyon also confirmed that Mr. Oleinik did not receive any QuickLogic confidential information. Hemminger P5; Oleinik P32. At Lyon & Lyon's request, Mr. Oleinik wrote a confirming memorandum to file. Oleinik P32.

17. Since working at Lyon & Lyon, Mr. Oleinik's involvement in this litigation has been limited. He aided Actel's attorneys in collecting documents for production to QuickLogic, reviewed those documents for privilege, drafted a motion to compel the production of documents and aided in the drafting of a motion for sanctions related to the motion to compel.

18. This lawsuit has evolved and accelerated in scope, pace and intensity since the **[*14]** summer of 1994.

19. While Mr. Oleinik was not effectively screened from *Actel v. QuickLogic* when he was hired by Lyon and Lyon. In fact, he was assigned to the case, he has been effectively screened from the case since February 6, 1996. Oppn. Exb. J.

**B. Facts In Dispute**

These facts are in dispute:

1. Whether Mr. Oleinik was advised by Skjerven Morrill that he would be exposed to confidential information in his work as a law clerk.

Actel argues that Skjerven Morrill never advised Mr. Oleinik that he would be exposed to confidential information during his clerkship, relying first on Mr. MacPherson's inability to recall any communications with Mr. Oleinik during the summer of 1994. MacPherson Tr. 21:24-22:2; and on Mr. Oleinik's declaration:"To my recollection, nothing I received from Ms. Horne was marked confidential or attorney-client privileged and Ms. Horne never indicated to me that anything she told me was confidential or privileged". Oleinik Decl. P 15.

QuickLogic asserts that Mr. Oleinik was advised when he began employment as a law clerk that everything he did at Skjerven Morrill was confidential and that Mr. Oleinik executed the **[*15]** firm's form of confidentiality agreement on June 1 1994. Reply, Exb. E. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n2 Actel's Motion to Strike the Skjerven Morrill written confidentiality agreement as new matter first submitted in QuickLogic's Reply is denied on grounds that the memorandum was submitted in rebuttal to Mr. Oleinik's assertion in the Opposition that he had never been briefed about confidentiality at Skjerven Morrill.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

2. Whether Mr. Oleinik was exposed to QuickLogic confidential information at Skjerven Morrill.

QuickLogic argues that it is virtually impossible for Mr. Oleinik in the two hours he recorded on the *Actel v. QuickLogic* assignment to have met with Ms. Horne, had the background and litigation strategy of this litigation explained to him, read the QuickLogic "case file", done the research and written a legal memorandum. There simply would have been too much file to digest estimated in June 1994 to include no less than 29 papers on file with the court constituting a stack nearly six inches high, (Miller P16). Including [*16] the background of the litigation since May 1991 and the file histories of the four patents-in-suit and the reexamination proceedings the case file was a stack well over three feet high. (Miller P17).

Further, Actel argues that no one has ever saw Mr. Oleinik reading the QuickLogic case file. (MacPherson Tr. 38:13-21; Horne Tr. 23:2-5), and as Mr. Oleinik explains in his declaration, the reference to "reading the case file" in his time sheets does not refer to a QuickLogic litigation file but to a file folder with reported court cases in it that he recalls Ms. Horne gave to him. (Oleinik P10, 13). Mr. Oleinik declares that he never even knew that a QuickLogic case file existed. (Oleinik P13).

QuickLogic argues that Mr. Oleinik's recollection of the facts about his work at Skjerven Morrill is not credible. Mr. Oleinik wrote in his September 13, 1995 memo to Mr. Hemminger that "...to the best of my recollection, I never performed any tasks with respect to that (QuickLogic) representation, nor do I have any recollection of any aspect of that representation whatsoever" (Reply, Exh. A). Mr. Oleinik told Mr. Hemminger and Mr. Miller on two occasions, when interviewed for the position at [*17] Lyon & Lyon and then after he was hired that he had no recollection of having worked on the QuickLogic case. Hemminger P 4, 5; Miller P 2, 3.

Then in his declaration Mr. Oleinik recalled that Ms. Horne had given him a file folder containing reported court opinions and asked him to investigate an issue with regard to those reported cases in the file. Oleinik, P10. This is the "case file" that Mr. Oleinik says he meant with reference to having "read the case file" on his time sheet Oleinik, P25. Mr. Oleinik also recalled in his declaration that his conversation with Ms. Horne was extremely short and that Ms. Horne did not provide any details about this litigation to Mr. Oleinik when giving him the assignment. Oleinik, P10. In fact, to the best of his recollection, Ms. Horne did not even tell him that this assignment was for QuickLogic. Oleinik, P16.

QuickLogic argues that Mr. Oleinik's declaration is totally inconsistent with his multiple affirmation to Lyon & Lyon of having no recollection of having worked on the *Actel v. QuickLogic* case, of the written memorandum he prepared in the case and the written time record that he had worked on the case and "...read the case file."

### [*18] C. Findings of Fact as to the Disputed Facts

As to the facts which are in dispute, paragraph III (B) above, the Special Master finds that:

1. The execution of the Skjerven Morrill confidentiality agreement by Mr. Oleinik on June 1, 1994 (Reply, Exh. E) is conclusive evidence that he was briefed and understood that his all his work as a law clerk at the firm was confidential.

2. The discussion Mr. Oleinik had with Ms. Horne, the written memorandum prepared by Mr. Oleinik in the *Actel v. QuickLogic* case, his written time record of having "read the case file", the fact that the case file in the summer of 1994 included substantial information which was confidential to QuickLogic, establish a preponderance of circumstantial evidence that Mr. Oleinik was exposed to, and now possesses QuickLogic confidential information.

### IV. THE APPLICABLE STANDARD.

[HN1]In the exercise of judicial scrutiny of this Motion, this Court must consider these significant interests:1. The right of Actel Corporation to counsel of its choice;

2. Lyon & Lyon's interest in representing its client, Actel;

3. The financial burden on Actel if this Motion to Disqualify is granted;

4. [*19] Whether litigation tactical abuse underlies filing of this Motion;

5. The right of Mr. Oleinik to change employment and move freely in the employment community.While these factors must be considered in applying the standards for disqualification, in order to "prevent literalism from possibly overcoming substantial justice to the parties" the most important consideration must be the preservation of the public trust in the scrupulous administration of justice and integrity of the bar. That trust can only be maintained by preserving client confidences. Ultimately, Actel's right to counsel of its choice must yield to considerations of ethics which run

to the very integrity of our judicial process. See *In Re Complex Asbestos Litigation*, 232 Cal. App. 3d 572, 586; 283 Cal. Rptr. 732 at 739-40 (Cal. App. 1st Dist. 1991).

The *Asbestos* case provides an excellent summary of applicable California law on motions for disqualification. The case is controlling in situations where a nonlawyer employee moves from one firm to another when the two firms are litigating the same case, as occurred here when Mr. Oleinik became employed by Lyon & Lyon in September of 1995 after having [*20] been employed by Skjerven Morrill as a law clerk during the summer of 1994.

But the *Asbestos* case can be distinguished in two significant ways:

1. In *Asbestos* the nonlawyer employee, Vogel, was engaged in much more aggressive conduct as a paralegal in searching Brobeck's files and computer systems about the asbestos cases before he moved to the Harrison firm; his conduct was substantially more egregious than occurred here;

2. However, the personal status of Mr. Oleinik in the context of this case is more troublesome than that of the paralegal in *Asbestos*. While Mr. Oleinik was a nonlawyer when employed as a law clerk by Skjerven Morrill, he was a lawyer when Mr. Oleinik was questioned by members of Lyon & Lyon whether he had worked on the *Actel v. QuickLogic* case while at Skjerven Morrill.

[HN2]Every lawyer has the duty to uphold the integrity of the judicial process. Even though Mr. Oleinik was a nonlawyer when he worked at Skjerven Morrill, he was a lawyer charged with that duty at the time of the most critical event which triggered this Motion: when he accepted assignment at Lyon & Lyon to work on the *Actel v. QuickLogic* case. Given the intense litigation atmosphere [*21] in this locale today and the difficulty conflict-of-interest problems pose for all law firms, no lawyer can safely have such a dim recollection of his past work as Mr. Oleinik had in this case Cf. *Allen v. Academic Games Leagues of America* (C.D. Cal. 1993) 831 F. Supp. 785 (while finding it could not apply lawyer standard under rules of professional conduct to non-lawyer board member who later became a lawyer, court nonetheless disqualified him and his law firm based on breach of fiduciary duty because despite "loophole" in the rules there was a failure to uphold the integrity of bar).

Notwithstanding the serious concerns that this situation raises, because Mr. Oleinik was a non-lawyer when exposed to the QuickLogic confidential information at Skjerven Morrill, the more stringent test [HN3]for disqualification of non-lawyers set forth in *Asbestos*.

n3 See *Allen v. Academic Games Leagues of America* (C.D. Cal. 1993) 831 F. Supp. 785. That test is as follows:The party seeking disqualification must show that its present or past attorney's former employee possesses confidential attorney-client information materially related to the proceedings before the court. [footnote [*22] omitted] The party should not be required to disclose the actual information contended to be confidential. However, the court should be provided with the nature of the information and its material relationship to the proceeding. [citation omitted] . . . .

Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment. . . . To rebut the presumption, the challenged attorney has the burden of showing that the practical effect of formal screening has been achieved. [HN4]The showing must satisfy the trial court that the employee has not had and will not have any involvement with the litigation, or any communication with attorneys or coemployees concerning the litigation, that would support a reasonable inference that the information has been used or disclosed. If the challenged attorney fails to make this showing, then the court may disqualify the attorney and law firm.

*Asbestos*, 232 Cal. App. 3d at 596.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 Since the Special Master recommends that Lyon & Lyon be disqualified, no further analysis of the "substantial relationship" test which is applied to lawyers is made. Because the "substantial relationship" test creates a conclusive presumption that the attorney possesses confidential information of the former client, the attorney test for disqualification is more easily met than the requirement of having to show actual access to confidential information for the non-lawyer under **Asbestos**.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*23]

## V. CONCLUSIONS OF LAW

A. QUICKLOGIC HAS MET ITS BURDEN THAT LYON AND LYON POSSESSES QUICKLOGIC CONFIDENTIAL INFORMATION.

Under the standard for non-lawyers set forth in *Asbestos* it cannot be conclusively presumed that Mr. Oleinik was exposed to QuickLogic confidential information at Skjerven Morrill. It is QuickLogic's burden to show that he possesses confidential information materially related to these proceedings. [HN5]Possession of the information can be shown without revealing the actual confidences by "competent evidence of the former employee's job responsibilities or participation in privileged communications." *Asbestos, 232 Cal. App. 3d at 596, fn. 13.*

To this day Mr. Oleinik states that he has no recollection of having worked on the *Actel v. QuickLogic* case. In his declaration he denies vigorously that he was ever briefed on the *Actel v. QuickLogic* case and that he ever read the case file. He states that the only "case file" he ever saw was a "file of cases". n4 However sincere this may be, it flies in the face of the fact of his meetings with Ms. Horne to discuss the case, his assignment and preparation of a written memorandum for this case and [*24] a time record in his own handwriting showing he read "the case file". The case file as it existed at that time contained QuickLogic confidential information which is still relevant to this case. What appears to have occurred is that Mr. Oleinik has forgotten not only that he was briefed and did execute a confidentiality agreement but also that he did work on the *Actel v. QuickLogic* case at Skjerven Morrill. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Even if Mr. Oleinik is correct in this recollection, such a "file of cases" would itself be confidential, showing the work product of Ms. Horne.

n5 Skjerven Morrill's memories also are dim as to precisely what was said in meetings with Mr. Oleinik, and no one saw Mr. Oleinik read the *Actel v. QuickLogic* case file which included confidential information. In the face of the written record, however, this does not change the fact that Mr. Oleinik had actual, not merely hypothetical or potential, access to confidences. See *Asbestos, fn. 13.*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

While the declarations of the parties to this [*25] motion are somewhat in conflict, QuickLogic has met its burden of showing by a preponderance of competent evidence that Mr. Oleinik is in actual possession of QuickLogic confidential information which is material to this case. Actel's argument that the confidential information in the file in the summer of 1994 is not material because the issues in the summer of 1994 have now been resolved is rejected. The test for materiality is met by Mr. Oleinick's having worked on this case. See *Asbestos.*

## B. LYON & LYON HAS NOT REBUTTED THE PRESUMPTION OF SHARED CONFIDENCES.

Absent written consent from QuickLogic, once Skjerven Morrill has established that Mr. Oleinik possesses QuickLogic confidential information materially related to the *Actel v. QuickLogic* case, a rebuttable presumption arises that the information has or will be disclosed in his present employment at Lyon & Lyon. To rebut the presumption Lyon & Lyon must show that the practical effect of formally screening Mr. Oleinik from the case has been achieved.

Mr. Oleinik has not been screened from the *Actel v. QuickLogic* case. In fact, he accepted an assignment from Lyon & Lyon to work on the case in September, 1995. [*26] His screening did not begin until February 6, 1996, after this matter arose.

## C. AS THE HIRING LAW FIRM, LYON & LYON HAD THE RESPONSIBILITY TO PROTECT THE CONFIDENTIALITY OF QuickLogic ATTORNEY-CLIENT CONFIDENCES

While these facts are not in dispute, the parties do vigorously dispute which firm had the responsibility to protect QuickLogic confidential information in these circumstances. Recognizing the realities of faulty memories and the need for certainty in rules for disqualification in the not-uncommon situation of lawyers and nonlawyers moving between firms, the court in *Asbestos* put primary responsibility on the firm with the most knowledge and best able to protect against a conflicts of interest: the employing law firm. Under *Asbestos* only Lyon & Lyon had responsibility to prevent the compromise of QuickLogic confidential information. As the employing law firm, only Lyon & Lyon had the knowledge that Mr. Oleinik would be assigned to the *Actel v. QuickLogic* case. Lyon & Lyon could not reasonably have relied on the simple denial of Mr. Oleinik that he had worked on the case for the very reason which occurred here: memories fade. If, before assigning Mr. Oleinik [*27] to the case, Lyon & Lyon had made a telephone call to Skjerven Morrill to confirm whether Mr. Oleinik had worked on *Actel v. QuickLogic,* or been exposed to QuickLogic confidential information this conflict would not have

arisen: Mr. Oleinik would have been screened by Lyon & Lyon.

## D. SKJERVEN MORRILL HAD NO DUTY UNDER CALIFORNIA LAW TO WARN LYON & LYON THAT MR. OLEINIK POSSESSED QUICKLOGIC CONFIDENTIAL INFORMATION.

Skjerven Morrill had no duty to warn Lyon & Lyon about protecting QuickLogic confidential information when it learned that Mr. Oleinik was going to work there. Skjerven could and did reasonably assume that Mr. Oleinik would be screened from the case until it learned otherwise at the January 30, 1996 hearing. ABA Informal Opinion 88-1526 does suggest that better practice for Skjerven Morrill might have been to contact Lyon & Lyon to warn about Mr. Oleinik's exposure to confidential information when it learned Mr. Oleinik was going to work at Lyon & Lyon. That would have been better practice between counsel who communicate more effectively than counsel in this case ever have but that advice is not a duty under the law in California.

## E. EQUITABLE CONSIDERATIONS [*28] DO NOT JUSTIFY DENIAL OF THIS MOTION.

In exercising its discretion with respect to a motion for disqualification, a court may properly consider the possibility that the party brought the motion as a tactical device. *Asbestos* at 599. Actel argues that this is the case here, particularly because this Motion was brought shortly after Actel's motion for sanctions against QuickLogic was granted by the Special Master.

The Special Master finds on the record before him that QuickLogic acted promptly on first learning that Mr. Oleinik was working on this case, and that the motion was brought in good faith. No evidence exists that this Motion was brought as a litigation tactic or for any reason other that to protect the rights of QuickLogic n6.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n6 After the Master submitted a Recommendation to grant sanctions to Actel, the parties agreed to resolve the matter without appeal of the Recommendation to the Court under such circumstances that QuickLogic and the Master believed the matter closed. QuickLogic's motion to strike all reference to the sanctions episode at the hearing of this Motion, Tr 105:14-21, is denied on the grounds that Actel had not agreed that the

Recommendation, which is a public document, would be kept confidential if the matter were resolved without appeal to the Court.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*29]

Moreover, although it is true that Actel will be prejudiced substantially by the disqualification of its long-time counsel in the *Actel v. QuickLogic* case, the loss of services of knowledgeable counsel is the type of prejudice implicated in any disqualification motion and is not the type of extreme prejudice contemplated by the courts in denying a motion on those grounds. "Even if tactical advantages attend the motion for disqualification, that alone does not justify denying an otherwise meritorious motion." *Asbestos* at 599.

## F. WHILE THE RECOMMENDATION IS TO GRANT THE MOTION TO DISQUALIFY LYON & LYON, THE FACTS OF THIS CASE DO NOT JUSTIFY THE EXTREME REMEDIES SOUGHT BY QUICKLOGIC.

QuickLogic seeks an Order disqualifying Lyon & Lyon from representing Actel Corporation in this case, prohibiting any Lyon & Lyon attorneys from communicating about the case with Actel attorneys or successor counsel, and requiring that all Lyon & Lyon work product since September 1995 to be destroyed. The *Asbestos* case provides no guidance as to the standards for consideration of remedies ancillary to a motion for disqualification. Nor does any other case in the Ninth Circuit.

Only [*30] *First Wisconsin Mortgage Trust v. First Wisconsin Corporation, 584 F.2d 201 (7th Cir. 1978)* (en banc) provides guidance here. In a wide ranging opinion the Court considers at length the appropriateness of access to pre-disqualification work product by successor counsel. The case can be distinguished from this case, but nonetheless articulates principles applicable here:"(Citations omitted) The court then stated what we deem to be an important guiding principle in cases of the present try, namely, that 'disqualification in circumstances such as these where specific injury to the moving party has not been shown is primarily justified as a vindication of the integrity of the bar'. (Citation omitted) This again brings a differing focus to what we regard as disparate aspects of these cases: the disqualification, which when cause exists although having some impact upon the client, is primarily a sanction against the lawyer, which the prohibition of the turnover of the work

product, created during the period subsequently determined to be a time of violation, but which has derived no advantage from the dual representation, such a would result from use of confidential information, **[*31]** causes the sanction to be imposed on the client not the lawyer.

...We decline to apply the principle which ... urges that if there is disqualification there is per se taint denying the use of work product during the period of disqualification. To apply this inflexible rule would:

...destroy the work done by disqualified counsel, irrespective of any fault on the part of the party for whom the work was done;

...would do this regardless of whether the work destroyed involved the use of any confidential information obtained from the complaining party;

...would foreclose trial courts from any exercise of discretion in determining what effect an order of disqualification should have upon the parties to litigation;

...would seriously impede the administration of justice...because...it would for all practical purposes...impose a moratorium upon trial preparation for such period of time as it might take to rule upon a motion for disqualification.;

...would do a major injustice to the clients of disqualified counsel, causing them to pay a second time for the same work;

...would encourage the public in its dissatisfaction with the expense and delay involved in the administration of **[*32]** the judicial system;

...would provide no benefit to the complaining party other than the satisfaction of imposing an unnecessary financial burden on its opponent; and

...would in no way discipline disqualified counsel whose actions have been the cause of the disqualification order. _First Wisconsin Mortgage_ 584 F.2d at 208-9.

These principles apply here. Because a) QuickLogic has made no showing of special damage as a result of use of any confidential information; b) the disqualification here is primarily a sanction against Lyon & Lyon and vindication of the integrity of the bar and the judicial process; and c) Actel Corporation was not at fault in any way and destruction of work product would be a major injustice and financial burden to that company, the request of QuickLogic for destruction of work product and prohibition of communication with successor counsel and Actel attorneys should be denied. Further, consistent with the principle of fairness and justice to Actel Corporation, the Court in exercise of its discretion should order that Lyon & Lyon be disqualified from the date of the Order and the Lyon & Lyon may turn over its files and

offer assistance in the transition **[*33]** to successor counsel.

## V. RECOMMENDATION

For the reasons stated above it is recommended:

A. That the Motion of QuickLogic to disqualify Lyon & Lyon should be granted, effective the date of Order of this Court;

B. That to minimize prejudice to Actel Corporation, Lyon & Lyon should be permitted to turn over its records and files and provide assistance in the transition to successor counsel.

## RELATED MOTIONS

1. Actel's Motion to Strike the confidentiality agreement executed by Mr. Oleinik (Tr. at 117) for the reason that the agreement is new matter submitted by QuickLogic in its Reply is denied. The agreement was submitted to rebut Mr. Oleinik's affirmation in the Opposition that he had not been briefed about security matters by Skjerven Morrill.

2. Actel's Motion for a Recommendation that this Motion, if granted, be certified for appeal (Tr. at 117) is denied. Once the Recommendation on the Motion is filed, the Master is without further power with respect to the matter submitted.

3. Actel's Motion to Strike the reference in QuickLogic's Reply to Ms. Horne's June 21 time record (Tr. at 117-18) is granted. See Horne Tr. 17:18-23.

4. QuickLogic's Motion to Strike **[*34]** the Recommendation concerning sanctions (Opposition, Exh. G) is denied. While it was the understanding of QuickLogic and Actel that the sanctions matter was closed, the Recommendation is a public record and Actel made to express agreement that it would not refer to the Recommendation or that it was confidential.

5. The Ruling of the Special Master Striking Declarations to QuickLogic's Motion for Disqualification was entered March 14, 1996. The Ruling struck declarations of attorney expert witnesses proposed to testify about the custom and practice of law firms in this area on the subject of this Motion. The Ruling was entered: 1) to expedite pleading of this Motion by eliminating need for depositions of four experts, two for each party; 2) because the testimony of experts was not relevant to issues in this Motion, and 3) because in the opinion of the Master this Court is well able to determine this Motion based on the facts and applicable law without expert opinion. It was provided in this Ruling that the matter was not a

1996 U.S. Dist. LEXIS 11815

dispositive pre-trial discovery matter and the while each party agreed not to appeal the Ruling in the interest of expediting this hearing, the Ruling could be appealed **[\*35]** to the Court at a later time i.e. in the filing of objections to this Recommendation.

Dated: April 23, 1996

Paul C. Valentine

SPECIAL MASTER