Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Plaintiff Ricoh Company, Ltd.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SYNOPSYS, INC.,<br><br>            Plaintiff,<br><br>    vs.<br><br>RICOH COMPANY, LTD.,<br><br>            Defendant. | **CASE NO. C-03-2289-MJJ**<br><br>**CASE NO. C-03-4669-MJJ** |
| RICOH COMPANY, LTD.,<br><br>            Plaintiff,<br><br>    vs.<br><br>AEROFLEX INCORPORATED, et al.,<br><br>            Defendants | **RICOH'S REPLY IN SUPPORT OF ITS MOTION FOR SANCTIONS**<br><br>**Date:  Not Set**<br>**Time: Not Set**<br>**Courtroom:  11** |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

I.    RICOH'S MOTION SHOULD BE GRANTED ON THE STRENGTH OF THE UNDISPUTED FACTS ........................................................................................................ 3

II.    RESPONDENTS HAVE MISSTATED THE APPLICABLE LAW .................................... 9

    A.    The Controlling Standard of Proof for Sanctions Motions ................................. 9

    B.    This Court Has The Power and Right to Protect Ricoh's Confidential Information ........................................................................................................ 10

    C.    Mr. Campbell's Ongoing Contacts With Dr. Thomas Were Improper ............. 10

III.    THE DISPUTED FACTS FURTHER SUPPORT RICOH'S MOTION ............................ 11

    A.    Respondents' Conduct Was Inconsistent With *Shadow Traffic* and *Wang* ...... 11

    B.    Dr. Thomas Has Been Tainted By Respondents' Conduct ............................... 12

    C.    Respondents Have Wrongfully Refused to Produce a Privilege Log ............... 13

    D.    Respondents Misled the Court ........................................................................... 13

IV.    CONCLUSION: SANCTIONS ARE APPROPRIATE ...................................................... 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Atari Corp v. Sega of America*, 161 F.R.D. 417 (N.D. Cal. 1994) .................................................. 11

*Biocore Medical Tech., Inc., v. Khasrowshahi*, 181 F.R.D. 660 (D. Kan. 1998) .................................. 5

*Campbell Ind. v. M/V Gemini*, 619 F.2d 24 (9th. Cir. 1980) ............................................. 9, 10, 11

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ................................................................................ 9

*Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575 (D.N.J. 1994) ................................................ 4, 10, 15

*Crouse v. National Warehouse Investment Co.*, 2003 U.S. Dist. LEXIS 9066
   (S.D. Indiana 2003) ................................................................................................................ 5

*Durflinger v. Artiles*, 727 F.2d 888 (10th Cir. 1984) ....................................................................... 11

*Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996) ............................................................. 10, 11

*F.J. Hanshaw Enterprises v. Emerald River Development, Inc.*,
   244 F.3d 1128 (9th Cir. 2000) ................................................................................................. 9

*Primus v. Batarse*, 115 F.3d 644 (9th Cir. 1997) ............................................................................. 9

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) ................................................................... 9

*Rubel v. Eli Lilly*, 160 F.R.D. 458 (S.D.N.Y. 1995) ....................................................................... 13

*Shadow Traffic v. Superior Court*, 24 Cal. App. 4th 1067 (1994) .......................................... passim

*In Re Silberkraus*, 253 B.R. 890 (Bankr. C.D. Cal. 2000) ............................................................ 10

*Space Systems/Loral v. Martin Marietta Corp.*, 1995 U.S. Dist. LEXIS 22305
   (N.D. Cal. Nov. 14, 1995) .................................................................................................... 10

*Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993) ................................. 2, 6, 11, 12

## FEDERAL STATUTES

28 U.S.C. § 1927 ........................................................................................................................ 9, 10

## MISCELLANEOUS

2 Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering* § 3.4:402
   (2d ed. Supp. 1994) .............................................................................................................. 10

**INTRODUCTION**

Ricoh's counsel has made multiple attempts to amicably resolve this unfortunate matter, including the latest meet and confer on December 10, 2003. Rather than consider any compromise, however, Synopsys and the ASIC defendants (collectively "respondents") have responded with defiant adjectives, claiming that Ricoh's motion is "dishonest" and "perverse." (Opp. Br. at 13, 20, 24.)[1] Notwithstanding such vitriol, the reality is that counsel for Synopsys and the ASIC defendants knowingly persuaded one of Ricoh's long-time consulting experts to switch sides, misrepresented the circumstances to Ricoh and the Court, then refused to comply with the Court's orders to produce a privilege log. As a result, the witness has been irrevocably tainted; Ricoh has expended tens of thousands of dollars unnecessarily; and the Court must decide whether respondents' attorneys should be disqualified.

Most of the important facts in Ricoh's moving papers are undisputed. As set forth in Section I, there is no dispute that Dr. Thomas was retained by Ricoh in May 2002, signed a written confidentiality agreement, helped Ricoh's counsel develop a litigation strategy by helping analyze the '432 patent and construe the claims of the patent, explore the prior art, evaluate a possible affirmative defense of invalidity, and assess whether respondents were infringing the '432 patent. There is also no dispute that, in early April 2003, respondents were placed on notice that Dr. Thomas was consulting with Ricoh's counsel, that respondents recognized that further communications with Dr. Thomas would be a conflict of interest, and that despite the recognized conflict, they continued to exchange emails with Dr. Thomas about the case. There is no dispute that respondents failed to serve either the Thomas subpoena or a notice of deposition, and that Ricoh's counsel was unaware of the communications between Dr. Thomas and attorney Campbell, which caused Dr. Thomas to terminate his 14 month consulting relationship with Ricoh and enter into a consulting relationship with Synopsys.

There is also no dispute that, prior to entering into the formal consulting relationship with Synopsys, no one asked Dr. Thomas if he received any confidential information from Ricoh, whether there was a conflict of interest, or whether Ricoh had any objection to respondents consulting with Dr. Thomas. Instead, the matter

---

[1] The ASIC defendants filed an opposing brief, two declarations and voluminous exhibits in Case No. C-03-4669-MJJ. Synopsys filed what appears to be an identical brief, declarations and exhibits in Case No. C-03-2289-MJJ. Cites to "Opp. Br." are to the ASIC defendants brief.

CASE NO. C-03-2289-MJJ and C-03-4669-MJJ    Page 1
RICOH'S REPLY IN SUPPORT OF ITS MOTION FOR SANCTIONS

1  was kept secret until Dr. Thomas signed the retainer agreement that provided that he would "not give expert
2  testimony adverse to Synopsys."  Respondents did not ask if Ricoh had any objections, but announced it as a
3  done deed.  When Ricoh objected, respondents did not ask Ricoh to explain why there was a conflict of
4  interest, or whether Dr. Thomas had received Ricoh confidential information, but instead forced Ricoh to seek
5  the intervention of the Court or waive its objections.

6  There is no dispute that only after Synopsys retained Dr. Thomas and Ricoh objected, did respondents
7  initiate for the first time an investigation of the factual basis for the conflict of interest that they acknowledged
8  more than three months earlier.  There is also no dispute that, even before Dr. Thomas had responded to this
9  inquiry, respondents told Ricoh: "Before we considered retaining Dr. Thomas as a consultant, we made an
10 investigation to determine that his would not create a conflict of interest for Dr. Thomas."  There is no dispute
11 that this representation was, and is, false.

12 There is no dispute about the words Mr. Kelley spoke to Judge Sleet at the July 30 hearing, although
13 respondents now try to parse those words in an attempt to fashion an argument.  There is also no dispute that, at
14 the August 28 hearing, Judge Sleet recalled Mr. Kelley's earlier representations, and agreed that there may have
15 been a "fraud on the Court."  Finally, there is no dispute that respondents have not provided a privilege log,
16 despite the July 31 Order and the instructions of the Court during the August 28 hearing.

17 There are three disputed issues of law, which are addressed in Section II.  Respondents erroneously
18 argue for a higher burden of proof that has been required by the Ninth Circuit.  Respondents are also incorrect
19 when they attempt to limit the type of confidential information protected by courts in side-switching cases to
20 attorney-client privilege and exclude information protected by the attorney work product doctrine.  In *Shadow*
21 *Traffic,* the potential for disclosure of attorney work product with an unretained expert led to disqualification.
22 Respondents also miscite a single case to justify their repeated ex parte contacts with Dr. Thomas while he was
23 still a Ricoh consultant.

24 There are only four disputed issues to be resolved: (1) whether respondents' conduct was consistent
25 with *Shadow Traffic* and *Wang*; (2) whether respondents' conduct has tainted Dr. Thomas' testimony on fact
26 issues; (3) whether respondents have defied a Court Order to produce a privilege log; and (4) whether
27 respondents misled the Court during the July 30 and August 28 hearings.  We address each of these issues in
28 Section III.

The undisputed facts alone strongly suggest that Ricoh's motion should be granted. Ricoh is confident that when the Court resolves the remaining disputed issues, it will exercise its discretion to fashion a remedy that is appropriate to protect the interests of justice.

## I. RICOH'S MOTION SHOULD BE GRANTED ON THE STRENGTH OF THE UNDISPUTED FACTS

There following facts and principles of law are undisputed by respondents:

**Uncontested Fact No. 1:** Ricoh retained Dr. Thomas as a consulting expert in May 2002. (Brothers Decl. Ex. 1, Monsey Decl. ¶¶ 2-4.)

**Uncontested Fact No. 2:** Dr. Thomas signed a written consulting agreement where he specifically promised to keep confidential all information provided to him. (Id. ¶ 3; Brothers Decl. Ex. 2.)

**Uncontested Fact No. 3:** Respondents completely ignore the Monsey declaration, which details the disclosure of Ricoh's confidential information to Dr. Thomas as follows:

> 5. After I had received the signed confidentiality agreement from Dr. Thomas, I sent him the '432 patent and an additional reference exceeding 50 pages in length, and an instruction letter. I asked Dr. Thomas to analyze the reference and compare it to the '432 patent.
>
> 6. On June 2, 2002, Dr. Thomas sent me a two page email reporting on the results of his analysis and discussing the impact of the reference upon the '432 patent.
>
> 7. On June 5, 2002, I had a 90 minute telephone conversation with Dr. Thomas discussing his analysis in greater detail. During that conversation, I discussed Ricoh's confidential infringement positions and certain potential prior art. During this conversation, Dr. Thomas expressed his opinions with respect to the validity of the '432 patent.
>
> 8. On June 6, 2002, I sent an additional document of 12 pages to Dr. Thomas and asked for his analysis compared to the '432 Patent.
>
> 9. On June 7, 2002, Dr. Thomas sent a one-page email reporting on his analysis. I had a follow up phone conversation with Dr. Thomas the same day regarding his analysis. After our conversation, I sent Dr. Thomas two additional document of approximately 50 pages and asked for his further analysis.
>
> 10. On June 10, 2002, I had a 20 minute phone conversation with Dr. Thomas regarding those documents. I discussed my work product relating to affirmative defenses of invalidity and non-infringement that the defendants might attempt to raise.
>
> 11. On June 17, 2002, I had an 80 minute conversation with Dr. Thomas, in which he reported on the results of his analysis. During this conversation, I further disclosed confidential and privileged information, and Dr. Thomas expressed several opinions with respect to the proper claim construction, validity and infringement of the '432 patent. After that conversation, I sent Dr. Thomas an additional document of more than 10 pages and requested his analysis.
>
> 12. On June 18, 2002, I sent Dr. Thomas an email specifically asking for his opinions on the infringement issues that are presented in this litigation. On June 19, 2002, Dr. Thomas responded with a one-page email in which he expressed several opinions and proposed

            alternative theories.

13. On June 21, 2002, I had a one hour conversation with Dr. Thomas in which we further discussed my attorney work product and his opinions regarding claim construction, validity and infringement. Dr. Thomas also sent me a follow-up email on June 21, 2002, communicating further opinions. After that conversation I sent him more than 100 pages of additional material for his analysis.

14. On June 24, 2002, I had a 30 minute phone conversation with Dr. Thomas. On June 26, 2002, I had a 55 minute conversation with Dr. Thomas. During both of these conversations, I further disclosed my legal analysis regarding Ricoh's litigation strategy, and he expressed further opinions regarding claim construction, validity and infringement.

15. Through these confidential discussions, Dr. Thomas became well-informed of the heart of Ricoh's case strategy.

(Brothers Decl. Ex. 1.) Counsel's selection of the hundreds of pages of documents provided to Dr. Thomas that Mr. Monsey detailed is core work product. *Cordy v. Sherwin Williams,* 156 F.R.D. 575, 581 (D.N.J. 1994) (holding that an attorney's selection of documents is protectible work product).[2]

**Uncontested Fact No. 4:** Dr. Thomas testified that he recognized his receipt of Ricoh's confidential information :

Q. Is there any doubt in your mind, Dr. Thomas, that as a result of your consulting relationship with Ricoh, you received confidential information from Ricoh's counsel?

A. I feel that the fact that they were bringing these articles to my attention was confidential.

*Q. And the fact and content of your conversations with Ricoh's counsel, were those also confidential information?*

*A. Yes.*

(Brothers Decl. Ex. 4, Thomas Dep. Tr. at 76-77, emphasis added.)

**Uncontested Fact No. 5:** On April 4, 2003, Howrey attorney Louis Campbell was informed by Dr. Thomas that Ricoh had already engaged him as a consulting expert. (Brothers Decl. Ex. 7.) Mr. Campbell recognized that "there is most likely a conflict if we would talk to you in detail about the matter. So, unfortunately, it appears that we cannot go forward." (Brothers Decl. Ex. 8.)

**Uncontested Fact No. 6:** Shortly after initial contact with Mr. Campbell, Dr. Thomas informed Ricoh that "he did not want to be a testifying expert in this action, but said he could continue acting as a non-testifying expert" pursuant to Rule 26(b)(4)(B). (Brothers Decl. Ex. 1, Monsey Decl. ¶ 23.) Dr. Thomas thus expressly

---

[2] The documents that were provided to Dr. Thomas also contained annotations and highlighting from Ricoh and Ricoh's counsel. (Monsey 12/23/03 Decl. ¶ 2.)

agreed to continue acting as a Ricoh consultant.  (*Id.*)

**Uncontested Fact No. 7:**  Mr. Campbell did not promptly contact Ricoh in early April to inquire whether Ricoh had an objection to Synopsys' consulting with Dr. Thomas.  Instead, Mr. Campbell waited for 3 1/2 months during which he persuaded Dr. Thomas to terminate his consulting agreement with Ricoh, switch sides, and formally engaged him to be a consulting expert for Synopsys, and only then did Mr. Campbell inform Ricoh.  (Brothers Decl. Exs. 11, 14-22.)

**Uncontested Fact No. 8:**  Respondents failed to serve Ricoh with a copy of the subpoena to Dr. Thomas.  Although Mr. Kelley now characterizes this as a "screw-up" on his firm's part (Brothers Decl. Ex. 12, 7/30/03 Tr. at 13), there is no dispute that the Howrey firm's "practice is to provide opposing counsel with notice of process **after** service is successfully completed." (Brothers Decl. Ex. 13, Kelley 9/17/03 letter to Hoffman, emphasis added.)[3]

**Uncontested Fact No. 9:**  Respondents also failed to serve Ricoh with a notice of the July 30 deposition of Dr. Thomas.  (Brothers Decl. Ex. 9.)  Respondents' declarations do not explain why the deposition notice was not served.

**Uncontested Fact No. 10:**  As part of his effort to persuade Dr. Thomas to switch sides, Mr. Campbell told Dr. Thomas that Ricoh had not named him as a witness.  (Campbell Decl. ¶ 9.)  Mr. Campbell states that the basis of this statement was his review of Ricoh's Rule 26(a) initial disclosure statement (*id.*), although Rule 26(a) statements do not require the disclosure of non-testifying expert witnesses. *Crouse v. National Warehouse Investment Co.*, 2003 U.S. Dist. LEXIS 9066 at *5-*6 (S.D. Ind. 2003)(Monsey 12/23/03 Decl. Ex. 3).  Moreover, at the time the case schedule did not require the disclosure of experts until March 22, 2004. (Monsey 12/23/03 Decl. Ex. 1.)

**Uncontested Fact No. 11:**  Synopsys formally retained Dr. Thomas as a consulting expert on July 21, 2003.  (Brothers Decl. Ex. 21.)  The retainer agreement presumes that Dr. Thomas had previously received Ricoh confidential information, and committed Dr. Thomas that he "will agree not to give expert testimony adverse to Synopsys, Inc." (*Id*. at PTH000047.)

---

[3] The opposition briefs make no apologies for this "practice" (Opp. Br. at 7 n.3) even thought it violates Rule 45.  *Biocore Medical Tech., Inc., v. Khasrowshahi*, 181 F.R.D. 660, 667 (D. Kan. 1998) (the failure to give opposing counsel notice of a subpoena **prior** to service violates Rule 45).

**Uncontested Fact No. 12:** Only after Dr. Thomas was formally retained did respondents notify Ricoh of this fact as a *fait accompli:*

> This letter is to inform you that we have retained Dr. Donald Thomas as a consultant. We are, therefore, taking the deposition of Dr. Thomas, currently scheduled for July 31, 2003, off calendar.

(Brothers Decl. Ex. 22.) After Ricoh immediately objected (Brothers Decl. Ex. 23), Synopsys refused to withdraw, or ask Ricoh to explain why Dr. Thomas should not consult for Synopsys, but instead insisted that Ricoh present the issue to the Delaware court within 14 days or waive the issue. (Campbell Decl. Ex. I; Brothers Decl. Ex. 25.)

**Uncontested Fact No. 13:** Counsel for respondents conducted no pre-retention investigation of Dr. Thomas to determine whether he had entered into a confidential relationship with Ricoh, and whether he had received Ricoh confidential information. (Brothers Decl. Ex. 4, Thomas Dep. Tr. at 62-63.) In their opposition papers, respondents finally admit that no such investigation was done, but seek to justify it because to do a "full inquiry" into the matter "before disclosing their intention to consult with him" would have been "fraught with peril" and "contrary to the guidance of *Wang* and *Shadow Traffic* that early disclosure to opposing counsel is best." (Opp. Br. at 9, ll.19-22.)

**Uncontested Fact No. 14.** Respondents concede that the only time that Dr. Thomas was asked about whether he had a conflict of interest was during a short telephone conversation with Mr. Campbell on July 23, after Dr. Thomas was already retained and after Ricoh objected. (Opp. Br. at 4.) Mr. Campbell "wanted to understand what of confidentiality [Dr. Thomas] had received." (Brothers Decl. Ex. 4, Thomas Dep. Tr. at 72.) Dr. Thomas replied that he was not sure whether he had or not;[4] but did not, as Mr. Kelley told the Court seven days later, "assure[] us that he had not" received Ricoh confidential information. (7/30/03 Tr. at 15.) Mr. Campbell also asked Dr. Thomas to describe the types of documents that Ricoh's counsel had sent to him. (Opp. Br. at 4 ll.9-11; Brothers Decl. Ex. 27.) The next day, Dr. Thomas sent an email that inaccurately

---

[4] Dr. Thomas could not recall many details from this telephone conversation. (Brothers Decl. Ex. 4, Thomas Dep. Tr. at 72-77.) The statement that Dr. Thomas was not certain of whether he received confidential information is based on an August 5 letter from Mr. Kelley purporting to summarize the conversation. (Brothers Decl. Ex. 29.) Neither Mr. Kelley nor Mr. Campbell have provided a declaration of their recollection of the conversation.

identified those documents. (*Id.*)[5]

**Uncontested Fact No. 15:** Before Dr. Thomas sent his July 24 email responding to Mr. Campbell's inquiry, the Howrey firm asserted that it had conducted an investigation prior to ever retaining Dr. Thomas:

> **Before we considered retaining Dr. Thomas as a consultant, we made an investigation to determine that this would not create a conflict of interest for Dr. Thomas.** We understand that some time in the past your firm retained Dr. Thomas retained Dr. Thomas to provide technical information about historical design synthesis systems. There is nothing confidential or otherwise protectible about technical characterizations of the prior art or, if such opinions were offered, about Dr. Thomas' conclusions about the validity of the patent in suit. Dr. Thomas was not given any confidential information and was not consulted on questions of litigation strategy. We understand that Dr. Thomas' consulting work ended at some point prior to the initiation of the present suit.

(Campbell Decl. Ex. I, Kelley 7/23/03 letter to Hoffman, emphasis added.) There is now no dispute that nearly every sentence of this paragraph is factually incorrect. Howrey made no pre-retention investigation to determine whether there was a conflict of interest, as both Dr. Thomas testified (Brothers Decl. Ex. 8, Thomas Dep. Tr. at 62-63), and respondents now admit. (Opp Br. at 9.) Dr. Thomas was not consulted by Ricoh to "provide technical information about historical design synthesis systems," but to analyze the '432 patent and help determine issues relating to validity, infringement and litigation strategy. (Monsey Dec. ¶¶ 5-15.) Dr. Thomas received Ricoh confidential information. (*Id.*; Ex. 4, Thomas Dep. Tr. at 76-77.) And Dr. Thomas did not terminate his relationship with Ricoh "prior to the initiation of the present suit," but was a Ricoh consultant until July 2003, when he terminated his agreement at Mr. Campbell's behest. (*Id.* at 54.)

**Uncontested Fact No. 16:** At the emergency hearing on July 30, Mr. Kelley repeated his July 23 assertion to Ricoh's counsel when he told Judge Sleet that Dr. Thomas "had indicated he had not received any such information that would create a conflict. If that's true, we wanted to get into that consulting relationship." (Brothers Dec. Ex. 12, 7/30/03 Tr. at 15.)

**Uncontested Fact No. 17:** The July 31 Order required the production of a privilege log: "Defendants shall provide Plaintiff with a detailed privilege log." (Brothers Decl. Ex. 30, 7/31/03 Order.)

---

[5] Dr. Thomas identified categories of documents, and respondents concluded that all were publicly available. This response is both inaccurate and misses the point. Not all documents sent to Dr. Thomas were publicly available. (Monsey 12/23/03 Decl. ¶ 3.) In addition, some of the documents sent to Dr. Thomas contained marginalia and notes from both Ricoh and its attorneys. (*Id.* ¶ 2.) In any event, the measure of what was communicated to Dr. Thomas is more than just the documents, but also the nature and content of his consultations with Ricoh's counsel.

**Uncontested Fact No. 18:** During the August 28 hearing, Judge Sleet rejected respondents' arguments that their privileged documents should not be produced under the July 31 order. Although they now argue that there was never an order to produce a privilege log, respondents cannot dispute the following August 28 hearing exchange:

> Mr. Hoffman [Ricoh attorney]: ***Right now, all we are looking for at this time is a list of those communication on a privilege log.*** [Interruption omitted] Most people quite often provide a list of privileged documents, anyway. Normally, once the litigation starts, you don't continue. But this is a special situation. And we are asking the Court – the way we believe the [July 31] order read, we ask the Court to require the Howrey & Simon firm and defendants to provide a list of the privileged documents. ***We also ask that the limited number of documents – I can't imagine there is many in this category – to be provided to the Court, so that when the Court has the issues laid before it, we can ask for what relief we think is appropriate and the Court can fashion relief that is believes is appropriate.***
>
> The Court: Ms. Corbin [respondents' attorney], what is the extent of the potential production at issue here?
>
> Ms. Corbin: I wouldn't be able to address that. I wouldn't have personal knowledge at this point.
>
> Mr. Kelley: I can give you an estimate. I think there is a handful of e-mails.
>
> ***The Court: Let's produce them for the Court.***

(Brothers Decl. Ex. 31, 8/28/03 Tr. at 22-23, emphasis added.) The fact that this order included a privilege log was made clear later in the hearing:

> Mr. Brothers [Ricoh attorney]: . . . In any event, Your Honor has ordered the Howrey firm to product those handful of internal documents. I would ask that, because the order of July 31st provides that by August 31st, we may file a two-page letter, I would just ask that that be postponed until 10 days ***after the submission of the privilege log and internal documents.***
>
> The Court: ***That is an acceptable process. We will follow that recommendation.***

(Brothers Decl. Ex. 31, 8/28/03 Tr. at 26-27, emphasis added.)

**Uncontested Fact No. 19:** At the August 28 hearing, Judge Sleet agreed that Mr. Kelley may have attempted a "fraud on the court." Immediately after the Court agreed that respondents should produce the internal Howrey documents to the Court and a privilege log to Ricoh's counsel, respondents' counsel protested that Ricoh was "trying to break the privilege," and the only basis for that was the crime/fraud exception. The colloquy continued:

> The Court: I understand what it is. I know the crime/fraud exception, counsel. Mr. Brothers, do you have a view on the crime fraud exception? Do you want to say anything about that?
>
> Mr. Hoffman: Your Honor, if I can briefly respond. First of all, to return to one of the points in history because it lays the foundation for this. ***There was a representation to the Court that Dr. Thomas had told the Howrey people that he received no confidential information.***

> The Court: *I remember that.*
>
> Mr. Hoffman: In fact, the Court made a comment about relying on Dr. Thomas' legal opinion when that was indicated. Dr. Thomas, during his deposition, though, testified that he did receive confidential information from Ricoh, obviously inconsistent with the representations. There is a number of representations that have been made to the Court that have been inconsistent – I am sorry, representations to the Court that are inconsistent with the documents we have obtained to date and also Dr. Thomas' testimony. *Your Honor, I think that the whole issue of making certain representations to the Court that they know are inconsistent and those documents that we are asking be turned over to the Court may further our belief, support our belief, does create an issue of potential fraud on the Court.*
>
> The Court. *I think it does.* The Court is going to order the July 30 transcript for inspection at the same time that it reviews the documents that I have just ordered to be produced.

(Brothers Decl. Ex. 31, 8/28/03 Tr. at 28-29, emphasis added.) When respondents finally submitted the documents two months later on October 30, they refused to produce a privilege log to Ricoh's counsel.

## II.    RESPONDENTS HAVE MISSTATED THE APPLICABLE LAW

### A.  The Controlling Standard of Proof for Sanctions Motions

Courts can sanction or discipline parties under the Federal Rules of Civil Procedure for discovery abuses, under 28 U.S.C §1927 or, within its inherent powers, for violations that fall outside the Federal Rules or § 1927. The Supreme Court has made clear that a court may exercise its inherent powers to sanction where a party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" or in cases where a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Chambers v. Nasco*, 501 U.S. 32, 45-46 (1991). The Ninth Circuit held that it was within the court's inherent power to exclude the testimony of a side switching expert. *Campbell Industries v. M/V Gemini*, 619 F.2d 24 at 27 (9th Cir. 1980).

Respondents claim that "clear and convincing evidence" is needed. The Ninth Circuit, however, has not held that clear and convincing proof for sanctions is required under a Court's inherent powers. Instead, the Ninth Circuit has stated that "[b]efore awarding sanctions under its inherent powers, however, the court must make an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith.'" *Primus v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997), quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762 (1980).[6] Regardless of the standard – preponderance, clear and convincing, or "explicit finding" – Ricoh's

---

[6] The Ninth Circuit has yet to determine under what standard of proof the district court must make its bad faith determination, clear and convincing or a preponderance of the evidence. *F.J. Hanshaw Enterprises v. Emerald*

motion should be granted.

### B. This Court Has The Power and Right to Protect Ricoh's Confidential Information

Ricoh quoted and cited a number of cases in its opening brief (at pp. 18-23) supporting the proposition that an expert who obtains one side's attorney work product cannot then switch sides and consult for the other side in the same case. Respondents repeatedly suggest, however, that the side-switching cases require the relevant knowledge to be limited to attorney-client information. See Opp. Br. 11-12. Implicitly, respondents suggest that the court is powerless to protect attorney work product. The power of courts is not so narrow, however. The protection of work product led to the disqualification of Latham & Watkins in *Shadow Traffic v. Superior Court*, 24 Cal.App 4th 1067 (1994). This Court has recognized the importance of protecting both attorney-client and work product protected material that could be disclosed in the case of a side switching expert. "The concerns raised by the disclosure of litigation-related, privileged information are naturally great, since the integrity of the adversary system could easily be undermined." *Space Systems/Loral v. Martin Marietta Corp.*, 1995 U.S. Dist. LEXIS 22305 at *14 (N.D. Cal. 1995) (Brothers Decl. Ex. 37). This protection of privileged information expressly includes attorney work product, such as an attorney's selection and grouping of photographs and documents given to an expert, because the selection of those documents represented the mental impressions of the attorney and are therefore protected work product. *Cordy v. Sherwin Williams,* 156 F.R.D. 575, 581 (D.N.J. 1994).

### C. Mr. Campbell's Ongoing Contacts With Dr. Thomas Were Improper

Respondents concede that Mr. Campbell had multiple case-related communications with Dr. Thomas with the knowledge that he was a Ricoh expert. The appropriate course of conduct should have been to terminate all communications as of April 4, when Mr. Campbell was informed that Dr. Thomas was an adverse expert. *See, e.g., Campbell Ind. v. M/V Gemini*, 619 F.2d 24, 27 (9th. Cir. 1980) (sanctioning counsel for ex parte communications with opposing party's expert); *Erickson v. Newmar Corp.*, 87 F.3d 298, 301-02 (9th Cir. 1996) (holding that ex parte communications with the opposing side's expert violated Fed. R. Civ. P. 26(b)(4) and ethical rules). "Since existing rules of civil procedure carefully provide for limited and controlled

---

*River Development, Inc.*, 244 F.3d 1128, 1143 n.11 (9th Cir. 2000) (affirming $200,000 award of fees and noting unresolved issue regarding burden of proof); *In Re Silberkraus*, 253 B.R. 890, 913-14 (Bankr. C.D. Cal. 2000) (explicit finding of bad faith was sufficient).

1 discovery of an opposing party's expert witnesses, all other forms of contact are impliedly prohibited." 2 Geoffrey C. Hazard & W. William Hodes, *The Law of Lawyering* § 3.4:402 (2d ed. Supp. 1994).

But Mr. Campbell did not terminate his communications with Ricoh's expert. Between April 8 and early May, he exchanged a half-dozen emails with Dr. Campbell. All related to this case. Although respondents contend that Mr. Campbell did nothing wrong, his actions were contrary to the admonitions in *Campbell* and *Erickson* and the *The Law of Lawyering* hornbook. Respondents attempt to sidestep the issue by claiming that Mr. Campbell's contacts with respect to Dr. Kowalski's phone number was not an opinion developed by Dr. Thomas for Ricoh, and therefore permissible. The only case cited for this proposition is *Atari Corp v. Sega of America,* 161 F.R.D. 417, 421-22 (N.D. Cal. 1994), which concerns waiver of privilege by voluntary disclosure during a settlement negotiation. *Id*. The witness in *Atari* was a former employee of the opposing side, the inventor and an "instrumental actor" in relation to the disputed patent, not a side-switching, non-actor expert as in the present litigation. *Id*. Thus, *Atari* is inapposite.

More importantly, however, is Mr. Campbell's continued communications with Dr. Thomas *after* the witness was served with Howrey's undisclosed subpoena. Those communications were directly relevant to Dr. Thomas' consulting with Ricoh, but Mr. Campbell never said to Dr. Thomas: "I cannot talk with you as long as you are a consultant for Ricoh." Instead, Mr. Campbell gave incomplete and misleading information that led Dr. Thomas to believe that Ricoh had dropped him as an expert. *See, e.g., Durflinger v. Artiles*, 727 F.2d 888 at 891 (10th Cir. 1984) (defendant's subversive communications with plaintiff's nontestifying expert violated Rule 26; affirming exclusion of any testimony).

### III.   THE DISPUTED FACTS FURTHER SUPPORT RICOH'S MOTION

#### A.   Respondents' Conduct Was Inconsistent With *Shadow Traffic* and *Wang*

Respondents attempt to couch their conduct in terms of what they speculate the courts in *Shadow Traffic v. Superior Court*, 24 Cal.App. 4th 1067 (1994), and *Wang Laboratories v. Toshiba Corp.*, 762 F.Supp. 1246 (E.D. Va. 1991), would propose as "proper conduct." Respondents misquote *Shadow Traffic* to imply that "proper conduct" ended when defense counsel contacted Ricoh regarding Dr. Thomas. (Opp. Br. at 8.) However, they fail to point out that the next step is to obtain consent or, when an objection was raised, present it to the court. *Shadow Traffic,* at 702-03, 705 & n10. *Wang* also encourages that, in addition to prompt disclosure, the matter should be "discussed thoroughly in an effort to resolve the dispute before it is raised in

court." *Wang,* at 1250.  During their belated contact with Ricoh regarding Dr. Thomas, respondents neither discussed the issue with Ricoh in an attempt to gain consent, nor did they actually gain consent, nor did they present their objection to the Court.  Instead, they simply told Ricoh of the fact of their retention of Dr. Thomas and told Ricoh if it objected, then Ricoh needed to get a court order to stop them.  There is a world of difference between respondents' conduct and the proper course, as outlined by *Shadow Traffic* and *Wang.*[7]

Had respondents adhered to the outline of those cases, they would not have continued to communicate with Dr. Thomas after April 4, but would have instead attempted to obtain Ricoh's consent, "discussed thoroughly" the matter with Ricoh's counsel, and then raise it with the Court, *before* ever attempting to retain Dr. Thomas.  This way, respondents would have learned that, under *Shadow Traffic* and *Wang*, there was no reasonable basis to expect that Dr. Thomas could consult for respondents.[8]

### B.  Dr. Thomas Has Been Tainted By Respondents' Conduct

Dr. Thomas was a non-testifying expert retained by Ricoh to help provide technical assistance with respect to the construction of the '432 patent, analyze the prior art, form opinions with respect to the validity of the patent-in-suit, and determine whether respondents were infringing upon the patent.  In hours of phone conversations with Ricoh's counsel, Dr. Thomas was advised of Ricoh's litigation strategy and core work product. (Monsey Decl. ¶¶ 5-15.)  There is no way that Dr. Thomas can separate his pre-Ricoh consulting knowledge from his post-Ricoh consulting knowledge.  Any fact deposition of Dr. Thomas, no matter how closely circumscribed, will inevitably lead to the disclosure of Ricoh's confidential information.[9]

Ricoh's opening brief cited and discussed (at pp. 18-23) a number of cases in which side-switching experts were precluded from providing any testimony.  Respondents argue that Dr. Thomas may have some limited factual knowledge regarding a purported prior art system.  The only evidence they cite in support is an

---

[7] In *Shadow Traffic*, the lower court said all that was needed to avoid the problem was "a simple phone call to [opposing counsel] saying 'We are interested in hiring the expert you talked to that you did not hire.  Is there going to be any problem?'" 24 Cal.App. 4th at 698.  Respondents never made that "simple phone call."

[8] The fact that respondents dropped Dr. Thomas as an expert after receiving the Monsey declaration reinforces the fact that, had respondents made the proper inquiry, no judicial action would have been required.

[9] Ironically, respondents have demonstrated that Dr. Thomas is prone to make "gratuitous" statements in which he inadvertently reveals Ricoh confidential information.  See Opp. Br. at 12, ll.6-18 (citing Dr. Thomas' "gratuitous" testimony).

1 identification of two articles in which Dr. Thomas is listed, not as the lead author, but as a co-author. (D.I. 68,
2 at 2.)  In fact, Synopsys has identified more than 30 persons as potential fact witnesses in the same field as Dr.
3 Thomas.  (Monsey 12/23/03 Decl. Ex. 2, Synopsys Rule 26(a) disclosure.)  Dr. Thomas is merely one of those
4 30 witnesses.  Respondents already have retained Dr. Kowalski, Dr. Thomas' co-author of one of the cited
5 articles, as expert on the same subject (Brothers Decl. Ex. 33), so excluding Dr. Thomas would not preclude
6 respondents from any discovery.  Thus, there is no hardship on respondents by excluding testimony from Dr.
7 Thomas, because any factual evidence he could provide would be cumulative.[10]

8    If respondents were to call Dr. Thomas as a fact witness, it would create a double prejudice to Ricoh.
9 "[P]ermitting one party to call an expert previously retained or consulted by the other side entails a risk of very
10 substantial prejudice stemming from the fact of the prior retention, quite apart from the substance of the
11 testimony."  *Rubel v. Eli Lilly,* 160 F.R.D. 458, 460 (S.D.N.Y. 1995).  In short, there is nothing unique to Dr.
12 Thomas that cannot be obtained from Dr. Kowalski or the other 28 experts in design automation that Synopsys
13 has listed as fact witnesses.

14    **C.  Respondents Have Wrongfully Refused to Produce a Privilege Log**

15    There is no question that respondents have failed to produce a privilege log to Ricoh's counsel.  The
16 only issue is whether the Delaware court required a privilege log to be served.  Ricoh submits that the Court's
17 order of July 31 explicitly required production of a privilege log, and this order was expressly reaffirmed by the
18 Court on August 28, as set forth above at "undisputed fact no. 18."

19    **D.  Respondents Misled the Court**

20    As set forth above in "uncontested fact No. 15," on July 23, attorney Kelley represented that, "[b]efore
21 we considered retaining Dr. Thomas as a consultant, we made an investigation to determine that his would not
22 create a conflict of interest for Dr. Thomas."  (Campbell Decl. Ex. I, Kelley 7/23/03 letter to Hoffman.)
23 Respondents now concede this was false.  See *supra* p. 7.  Seven days later, however, Mr. Kelley repeated this
24 false statement to the Court, saying that Dr. Thomas "had indicated he had not received any such information
25 that would create a conflict.  If that's true, we wanted to get into that consulting relationship."  Mr. Kelley's

---

[10] Respondents cite no cases is which a side switching expert who was not a former employee with direct factual knowledge of key events was permitted to provide limited fact testimony.  Dr. Thomas does not meet these strict limitations and respondents should not be rewarded by their misconduct.

complete colloquy with the Court makes clear that he intended to communicate that respondents made an investigation first, and only thereafter decided to retain Dr. Thomas:

> The Court: …I'm just trying to understand that, where we are in terms of the prima facie showing. You indicate that when you communicated with Dr. Thomas, you learned at that time that plaintiff's counsel had worked with him a year prior on another case or this case?
>
> Mr. Kelley: Well, we didn't get into that. I presumed it was in preparation for this matter, had something to do with this patent.
>
> The Court: And that on its face in your view would not present at least the potential for the appearance of a conflict?
>
> Mr. Kelley: That's why we did not pursue it at that time. I understand the question of the Court.
>
> The Court" Okay.
>
> Mr. Kelley: Let me give you a little bit more history then.
>
> The Court: Okay.
>
> Mr. Kelley: When we sent the subpoena to Don Thomas, he called us back. We didn't hear from his counsel. He didn't give it to plaintiff and say, You folks deal with it, I'm working for you. **He called us back and indicated to us he wasn't working with them and indicated that he was interested in working with us.**
>
> **And so we, not wanting to tread into the subject matter, we were put in this situation. We're very interested in working with Dr. Thomas given that he's a leading luminary in the field, but also we're concerned about this prior work he had done.**
>
> **So what we asked: Have** you **received anything confidential from Ricoh, did you talk to them about case strategy? We understand those are the two kinds of things that create a conflict of interest. And he assured us he had not.**
>
> Whether he did, obviously counsel for plaintiff is indicating that he did receive that information. Sitting here, I have no idea who's correct on that dispute. **But having asked Dr. Thomas, well, if what he said is true, we should be able to use his services under the relevant case law and so what we did is say we're interested in retaining you, but we're going to notify the other side.** We're not going to do anything about the fact we want to work with you. We're not going to consult with you. We're not going ask [*sic*] to ask for your opinions yet. We are going to give them notice we want to enter into this relationship, which is how we ended up where we are today.
>
> **Yes, I was aware that we were certainly aware there was a possibility that he might have a conflict of interest, but he had indicated he had not received any such information that would create a conflict. If that's true, we wanted to get into that consulting relationship.**
>
> The Court: Well, that's his legal opinion?
>
> Mr. Kelley: It's not his legal opinion. We have to walk a little carefully. I didn't say please tell us what you received so we can make an independent evaluation, but what we did say is, if you get anything that's confidential, any kind of confidential information, did you folks talk about case strategy?
>
> The Court: Well, that may be in the eye of beholder, perhaps, Mr. Kelley. Yes, no, maybe?
>
> Mr. Kelley: Certainly . . .

(Brothers Decl. Ex. 12, 7/30/03 Tr. at 13-16.) This colloquy makes clear what respondents intended to

1  communicate: "We first did an investigation, and only after we determined that there was no conflict did we
2  retain Dr. Thomas." At the August 28 hearing, Judge Sleet agreed that this was his understanding of
3  respondents' argument. (Brothers Decl. Ex. 31, 8/28/03 Tr. at 29.) There is now no dispute that no such pre-
4  retention investigation ever took place. It was false when it was said, and it remains false today.

Respondents now argue that they did not really mean to say that they did a pre-retention investigation. Their argument echoes another tortured (and unsuccessful) temporal scramble: "It depends on what the meaning of 'is' is." Given both the prior inaccurate representations to counsel and the context of Mr. Kelley's argument, there is explicit and clear evidence that Mr. Kelley misled the Court on July 30.[11]

## IV.  CONCLUSION: SANCTIONS ARE APPROPRIATE

To permit Dr. Thomas to testify would be to reward respondents for their improper conduct in depriving Ricoh of its consulting expert, while subjecting it to the very real risk that Dr. Thomas will divulge confidential Ricoh information. To fail to compensate Ricoh for its expenses would tacitly reward respondents' actions in multiplying this litigation.[12] To fail to hold respondents' counsel accountable would ignore the lessons of *Shadow Traffic* and *Cordy*. Ricoh's motion should be granted.

Dated: December 23, 2003

Respectfully submitted,

Ricoh Company, Ltd.

By: _____Kenneth Brothers_____

| | |
|---|---|
| Jeffrey B. Demain, State Bar No. 126715<br>Jonathan Weissglass, State Bar No. 185008<br>Altshuler, Berzon, Nussbaum, Rubin & Demain<br>177 Post Street, Suite 300<br>San Francisco, California 94108<br>Phone: (415) 421-7151<br>Fax: (415) 362-8064 | Gary M. Hoffman<br>Kenneth W. Brothers<br>DICKSTEIN SHAPIRO MORIN *&*<br>    OSHINSKY  LLP<br>2101 L Street NW<br>Washington, D.C. 20037-1526<br>Telephone: (202) 785-9700<br>Facsimile: (202) 887-0689 |

Attorneys for Ricoh Company, Ltd.

---

[11] This is not the only misrepresentation at issue. During the August 28 hearing, respondents' counsel falsely stated that Dr. Thomas never received Ricoh confidential information, when Dr. Thomas testified that he did. Compare Brothers Decl. Ex. 31, 8/28/03 Tr. at 2-8, with Ex. 4, Thomas Dep. Tr. at 76-77.) Respondents do not mention this misstatement in their opposition papers.

[12] Respondents do not challenge the requested fees or the case law justifying their award; they instead challenge the factual basis for the award.