Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Ricoh Company, Ltd.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD., | ) CASE NO. C-03-4669-MJJ (EMC) |
| Plaintiff, | ) **DECLARATION OF MICHAEL WEINSTEIN** |
| vs. | ) **IN SUPPORT OF RICOH'S NOTICE OF** |
| | ) **MOTION AND MOTION FOR LEAVE TO** |
| | ) **FILE AMENDED COMPLAINT** |
| AEROFLEX ET AL, | ) |
| | ) **Date:  March 30, 2004** |
| Defendants. | ) **Time:  9:30 a.m.** |
| | ) **Courtroom:  11** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael A. Weinstein declares as follows:

1.   My name is Michael A. Weinstein, an attorney with the law firm of Dickstein, Shapiro, Morin & Oshinsky, LLP, counsel for Ricoh Company Limited ("Ricoh").  I am over the age of 21 and am competent to make this declaration.  Based on my personal knowledge and information, I hereby declare to all the facts in this declaration

2.   Attached hereto as Ex. 1 is a true and correct copy of Ricoh's First Set Of Interrogatories To All Defendants, dated May 30, 2003.

3.   Attached hereto as Ex. 2 is a true and correct copy of Aeroflex Inc.'s Responses To Ricoh's First Set Of Interrogatories To All Defendants, dated June 30, 2003.

4.   Attached hereto as Ex. 3 is a true and correct copy of the Joint Case Management Conference Statement and Proposed Order, dated February 2, 2004.

5.   Attached hereto as Ex. 4 is a true and correct copy of a website printout from Aeroflex's web page referring to "Aeroflex Microelectronic Solutions – Colorado Springs, Colorado."

6.   Attached hereto as Ex. 5 is a true and correct copy of Aeroflex Inc.'s SEC 10-K 2003 filing.

7.   Attached hereto as Ex. 6 is a true and correct copy of Matrox Electronic Systems Ltd. and Matrox Graphics Inc.'s Notice of Motion and Motion for Summary Judgment of Non-infringement, dated December 2, 2003.

8.   Attached hereto as Ex. 7 is a true and correct copy of Notice of withdrawal of Matrox Electronic Systems Ltd. and Matrox Graphics Inc.'s Motion for Summary Judgment of Non-infringement, dated February 10, 2004.

9.    Attached hereto as Ex. 8 is a true and correct copy of a website printout from Aeroflex's website.

10.  Attached hereto as Ex. 9 is a true and correct copy of a letter from the Defendants, dated February 17, 2004.

1

2

3
      I declare under penalty of perjury under the laws of the United States of America that the

4
foregoing is true and correct.  Signed at Washington, D.C. on February 18, 2004.

5

6
                /s___Michael A. Weinstein___

7
                Michael A. Weinstein

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MICHAEL WEINSTEIN IN SUPPORT OF RICOH'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RICOH COMPANY, LTD.,                    )
                                        )
        Plaintiff,                      )
                                        )    C.A. No. 03-103-GMS
    v.                                  )
                                        )
AEROFLEX INCORPORATED, AMI              )
SEMICONDUCTOR, INC., MATROX             )
ELECTRONIC SYSTEMS LTD.,                )
MATROX GRAPHICS INC., MATROX            )
INTERNATIONAL CORP. and                 )
MATROX TECH, INC.                       )
                                        )
        Defendants.                     )

**PLAINTIFF'S FIRST SET OF**
**INTERROGATORIES TO ALL DEFENDANTS**

**PLEASE TAKE NOTICE** that plaintiff demands, pursuant to Rule 33 of the Federal

Rules of Civil Procedure, that the defendants provide answers to the following interrogatories on

the 30th day after service of these interrogatories.

**DEFINITIONS AND INSTRUCTIONS**

(1) **Communication.** The term "communication" means the transmittal of

information (in the form of facts, ideas, inquiries or otherwise).

(2) **Document.** The term "document" is defined to be synonymous in meaning and

equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including,

without limitation, electronic or computerized data or data compilations. A draft or non-identical

copy is a separate document within the meaning of this term.

(3) **Identify (with respect to persons).** When referring to a person, "identify"

means to give, to the extent known, the person's full name, present or last known address, and

1

when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. In any response where more than one individual is identified, identify which three individuals have the most knowledge or information concerning the subject and among those three individuals, identify the individual having the most knowledge and the individual having the least knowledge concerning the subject.

(4) **Identify (with respect to documents).** When referring to documents, "identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

(5) **Parties.** The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, agents, partners, corporate parent, subsidiaries or affiliates. Where a discovery request does not request a response limited to a specific named defendant, the request shall be construed as seeking knowledge and information in the possession, custody, control and/or known to each and every one of the defendants named in the caption of this discovery request.

(6) **Person.** The term "person" is defined as any natural person or any business, legal or governmental entity or association.

(7) **Concerning.** The term "concerning" means relating to, referring to, describing, evidencing or constituting.

(8) **All/Each.** The terms "all" and "each" shall be construed as all and each.

2

(9) **And/Or.** The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a discovery request all responses that might otherwise be construed to be outside of its scope.

(10) **Number.** The use of the singular form of any word includes the plural and vice versa.

(11) **Privilege.** Where a claim of privilege is asserted in objecting to any means of discovery or disclosure and an answer is not provided on the basis of such assertion,

(a) Identify the nature of the privilege (including but not limited to work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and

(b) Provide the following information:

(1) For documents: (i) the type of document, *e.g.*, letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; (iv) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addresses, and recipients to each other; and (v) identify any other person to whom the document was displayed or to whom any of its contents were revealed;

(2) For oral communications: (i) the name of the person making the communication and the names of persons present while the communication was

3

made and the relationship of the persons present to the person making the communication; (ii) the date and place of communication; (iii) the general subject matter of the communication; and (iv) identify any other person to whom any aspect of the communication was revealed.

(12) **Destroyed Documents.** Where a document has been destroyed or alleged to have been destroyed, state the date thereof and the reason for its destruction, identify each person having knowledge of its destruction, identify each person responsible for its destruction, provide the information set forth in paragraph (11)(b)(1) above and describe the content of the document to the extent possible.

(13) **Patent-in-suit.** As used herein, "patent-in-suit" or "'432 patent" refers to United States Letters Patent Number 4,922,432.

(14) **ASIC.** As used herein, "ASIC" refers to any integrated circuit that is designed for a specific application, including but not limited to integrated circuits that are referred to or otherwise denoted in defendant's communications as an "application specific integrated circuit" or "ASIC," and other integrated circuits designed to perform a desired function in a specific application, but not including standard, general purpose integrated circuits such as microprocessors and memory chips.

(15) **ASIC PRODUCT.** The term "ASIC Product" refers to any integrated circuit product or item that is designed for a specific application, and/or a product or item that includes such an integrated circuit product that is manufactured, sold, offered for sale, imported, or distributed by, on behalf of, or otherwise at the direction of defendant.

4

(16) **ASIC Method.** As used herein, "ASIC Method" refers to any and all steps or other activities making up or otherwise contributing to methods and/or processes which have been used by, on behalf of, or otherwise at the direction of defendant on or after May 1, 1990 (unless another date is specifically identified) in the computer-aided design of any ASIC Product (as defined above) designed, developed, manufactured, sold, offered for sale, imported, or distributed by, on behalf of, or otherwise at the direction of defendant.

(17) **Limitations.** Each discovery request shall be construed independently and no discovery request shall limit the scope of any other discovery request.

(18) **Supplementation.** Each defendant is reminded of the continuing duty to supplement discovery responses set forth in rule 26(e) of the Federal Rules of Civil Procedure.

(19) **Design.** The term "design" as used herein refers to any and all acts of creation, development, translation, formulation, transformation, synthesis, or other realization of desired integrated circuit functionality in an ASIC Product (as defined above).

## INTERROGATORIES

Interrogatory No. 1: Describe the organizational structure of defendant, including, but not limited to those groups, divisions, teams and other organizations having any involvement in defendant's ASIC Method at any time, and identify all individuals who can testify about such organization.

Interrogatory No. 2:    Identify each and every ASIC Product designed, manufactured, sold, offered for sale, imported, or distributed by or on behalf of defendant, and separately identify for

5

each product any and all order numbers, product numbers, trade names, trade designations, trademarks, common names, model numbers, version numbers, internal code or project names, catalog numbers, and any other designations used by defendant (whether or not known to third parties) in connection with that product, including indicating whether the manufacture, offer for sale, or importation of that product is presently continuing, and if not, indicating the date of termination thereof.

Interrogatory No. 3: Separately for each product identified in answer to Interrogatory No. 2, describe with specificity and particularity all of the steps or other activities making up the ASIC Method used to design that product, including the date(s) such steps or other activity occurred, and where such step or activity is not performed by defendant, identify the person performing such step or activity.

Interrogatory No. 4: Separately for each product identified in answer to Interrogatory No. 2, identify each individual (including their job title and description) involved in any way (including but not limited to managerial responsibility) in research and development, design, manufacturing, testing, sales or marketing of, or in the decision to design, develop, or manufacture that product, and describe their activity concerning such involvement.

Interrogatory No. 5: Separately for each product identified in answer to Interrogatory No. 2, identify each individual (including their job title and description) who participated in any way in performing an ASIC Method for that product, and describe all of the acts of each individual that contributed to performing the ASIC Method for that product.

6

<u>Interrogatory No. 6:</u>  State when, from whom and under what circumstances defendant first became aware of the patent-in-suit, and identify all documents and communications relating thereto, including but not limited to any opinion(s) concerning the patent-in-suit.

<u>Interrogatory No. 7:</u>    Separately for each of the paragraphs of the response to the Complaint in this action by the defendant responding to this inquiry, identify all individuals having knowledge or information concerning the contents of such paragraph and identify the documents on which such response is based.

<u>Interrogatory No. 8:</u>  Separately for each product identified in answer to Interrogatory No. 2, identify each individual who can testify about defendant's marketing activities, including but not limited to market research, product testing, business planning, sales, advertising, and production for that product.

<u>Interrogatory No. 9:</u>    Describe defendant's procedures, facilities and policies for generating, maintaining, retaining and destroying records and the types of data processing and storage systems maintained by defendant, and identify all documents relating to or referring to such procedures, policies and systems and all persons having knowledge thereof.

<u>Interrogatory No. 10:</u>  In the event that any request for admission is denied in whole or in part, identify the request by number and set forth in detail each and every reason of the denial, including the identity of the documents upon which such denial is based.

Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
Post Office Box 551
Wilmington, Delaware 19899
(302) 651-7700
Attorneys for Plaintiff

OF COUNSEL:
Gary M. Hoffman
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
  OSHINSKY LLP
2101 L Street NW
Washington, D.C. 20037-1526
(202) 828-2228

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
  OSHINSKY LLP
1177 Avenue of the America
New York, New York 10036
(212) 896-5471

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICOH COMPANY, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 03-103-GMS |
| | ) | |
| AEROFLEX INCORPORATED, AMI | ) | |
| SEMICONDUCTOR, INC., MATROX | ) | |
| ELECTRONIC SYSTEMS LTD., | ) | |
| MATROX GRAPHICS INC., MATROX | ) | |
| INTERNATIONAL CORP. and | ) | |
| MATROX TECH, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that true and correct copies of Plaintiff's First Set of

Interrogatories to all Defendants were served on May 30, 2003 on counsel of record in the manner

indicated:

**VIA HAND DELIVERY**
Francis DiGiovanni, Esq.
Connolly, Bove, Lodge & Hutz, LLP
1220 Market Street
P. O. Box 2207
Wilmington, Delaware 19899
Attorneys for Defendants

**VIA FEDERAL EXPRESS**
Teresa M. Corbin, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Avenue
Menlo Park, California 94025
Attorneys for Defendants

**VIA FEDERAL EXPRESS**
Alan H. MacPherson, Esq.
MacPherson Kwok Chen & Heid LLP
2001 Gateway Place
Suite 195E
San Jose, California 95014
Attorney for AMI Semiconductor, Inc.

Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Attorneys for Plaintiff

OF COUNSEL:
Gary M. Hoffman
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
  OSHINSKY LLP
2101 L Street NW
Washington, D.C.  20037-1526
(202) 828-2228

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
  OSHINSKY LLP
1177 Avenue of the America
New York, New York  10036
(212) 896-5471

Dated:  May 30, 2003

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of May 2003, true and correct copies of the foregoing were caused to be served on counsel of record at the following addresses as indicated:

**BY HAND DELIVERY:**
Francis DiGiovanni, Esq.
Connolly Bove Lodge & Hutz, LLP
1220 Market Street
P.O. Box 2207
Wilmington, Delaware  19899
Attorneys for Defendants

**VIA FEDERAL EXPRESS**
Teresa M. Corbin, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Avenue
Menlo Park, California 94025
Attorneys for Defendants

**VIA FEDERAL EXPRESS**
Alan H. MacPherson, Esq.
MacPherson Kwok Chen & Heid LLP
2001 Gateway Place
Suite 195E
San Jose, California 95014
Attorney for AMI Semiconductor, Inc.


Steven J. Fineman (#4025)

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| RICOH COMPANY, LTD., ) | **Civil Action No. 03-103-GMS** |
| Plaintiff, ) | |
| v. ) | |
| AEROFLEX INCORPORATED, AMI ) SEMICONDUCTOR, INC., MATROX ) ELECTRONIC SYSTEMS, LTD., MATROX ) GRAPHICS INC., MATROX ) INTERNATIONAL CORP. and MATROX ) TECH, INC., ) | |
| Defendants. ) | |

## DEFENDANT AEROFLEX INCORPORATED'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO ALL DEFENDANTS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Aeroflex Incorporated ("Defendant") hereby responds to Ricoh Company, Ltd's ("Ricoh") First Set of Interrogatories.

These responses are based on information reasonably available to Defendant at the present time. Defendant reserves the right to supplement these responses when, and if, additional information becomes available. Defendant also reserves the right to object on any ground at any time to such other or supplemental Interrogatories Ricoh may propound involving or relating to the subject matter of these Interrogatories.

Nothing herein shall be construed as an admission regarding privilege, materiality, admissibility or relevance of any response to the Interrogatories and any document or thing identified in any response. The inadvertent disclosure of such information or the inadvertent identification or production of any document shall not constitute a waiver of any applicable

privilege as to that information or document or any other document identified or produced by Defendant.

## GENERAL OBJECTIONS

1.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they seek information protected by the attorney-client privilege, including the impressions, conclusions, opinions, legal research or theories of attorneys, whether or not communicated to their client, and/or any other applicable privilege.

2.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they seek information protected by the work product doctrine, including the impressions, conclusions, opinions, legal research or theories of attorneys.

3.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they seek information protected by any other privilege or protection afforded by state or federal law.

4.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they seek information that is subject to any protective order, privacy interest, contractual obligation, non-disclosure agreement, confidentiality agreement or other such confidentiality obligation owed to any third party.  Without third party permission, Defendant will not provide such information unless required by the Court.

5.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they seek information that is not relevant to a claim or defense of any party or to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

6.    Defendant objects to Ricoh's First Set of Interrogatories as overly broad and unduly burdensome to the extent that they seek information beyond what is available from a reasonable search of Defendant's files likely to contain relevant or responsive documents and a reasonable inquiry of Defendant's employees.

7.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they seek documents that are a matter of public record or are equally available or readily ascertainable by Ricoh from some other source.

8.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they seek information or the identification of documents that are not within the possession, custody, or control of Defendants, or refer to persons, entities, or events not known to Defendants, subjecting them to unreasonable and undue annoyance, oppression, burden, and expense, and would impose upon them an obligation to discover information or materials from third parties or services who are equally accessible to Ricoh.

9.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they are unlimited in time or otherwise not limited to a time frame relevant to this litigation and to U.S. Patent No. 4,922,432  (the "'432 patent"), on the grounds that each such request for production is overly broad, unduly burdensome, and seeks the discovery of information that is not relevant to a claim or defense of any party or to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

10.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they seek a legal conclusion.

11.    Defendant objects to Ricoh's First Set of Interrogatories, including its Definitions and Instructions, to the extent that they seek to modify or expand the requirements of the Federal Rules of Civil Procedure and the Local Rules of the District Court of Delaware and/or other applicable law.  Defendant will respond to Ricoh's First Set of Interrogatories in accordance with the Federal Rules of Civil Procedure, the Local Rules of the District Court of Delaware and/or other applicable law.

12.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they are compound and contain unrelated subparts in violation of Rule 33(a) of the Federal Rules.

13.    Defendant objects to Ricoh's First Set of Interrogatories to the extent that they are unreasonably cumulative, redundant, or duplicative of other Interrogatories, or seek information

- 3 -

that is obtainable from some other source that is more convenient, less burdensome, or less expensive.

14.    Defendant objects to Ricoh's First Set of Interrogatories to the extent they seek information from Defendants concerning the positions they will take at trial, on the grounds that discovery in this action is in its earliest stages and Ricoh has not yet made a proper identification of its own claims and contentions. Defendants reserve the right to supplement these Responses as discovery progresses.

## SPECIFIC OBJECTIONS TO DEFINITIONS & INSTRUCTIONS

1.    Defendant objects to Ricoh's Definition/Instruction 5 to the extent that the term "defendant" extends to any person or entity other than Defendant's present employees and agents.

2.    Defendant objects to Ricoh's Definition/Instruction 11 to the extent that it purports to impose requirements other than or in addition to the requirements of the Federal Rules of Civil Procedure and the Local Rules of this Court.

3.    Defendant objects to Ricoh's Definition/Instruction 14 to the extent that the definition of "ASIC" is vague, overly broad and not reasonably calculated to lead to the discovery of admissible evidence.

4.    Defendant objects to Ricoh's Definition/Instruction 15 to the extent that the definition of "ASIC PRODUCT" is vague, overly broad and not reasonably calculated to lead to the discovery of admissible evidence.

5.    Defendant objects to Ricoh's Definition/Instruction 16 to the extent that the definition of "ASIC Method" is vague, overly broad and not reasonably calculated to lead to the discovery of admissible evidence.

**DEFENDANT'S ANSWERS TO RICOH'S FIRST SET OF INTERROGATORIES**

Interrogatory No. 1:

Describe the organizational structure of defendant, including, but not limited to those groups, divisions, teams and other organizations having any involvement in defendant's ASIC Method at any time, and identify all individuals who can testify about such organization.

Response to Interrogatory No. 1:

Defendant incorporates by reference its General Objections. Defendant further objects to this interrogatory as unduly burdensome and on the basis that it seeks detailed discovery regarding operations of Defendant that have no relevance to Defendant's ASIC Products or Methods.

Subject to and without waiving the foregoing general and specific objections, Defendant responds as follows:

Pursuant to FRCP Rule 33(d), Defendant will produce non-privileged business records for organizational structure that are responsive to this interrogatory and contain the requested information to the extent such records currently exist within Defendant's possession, custody or control.

Interrogatory No. 2:

Identify each and every ASIC Product designed, manufactured, sold, offered for sale, imported, or distributed by or on behalf of defendant, and separately identify for each product any and all order numbers, product numbers, trade names, trade designations, trademarks, common names, model numbers, version numbers, internal code or project names, catalog numbers, and any other designations used by defendant (whether or not known to third parties) in connection with that product, including indicating whether the manufacture, offer for sale, or importation of that product is presently continuing, and if not, indicating the date of termination thereof.

Response to Interrogatory No. 2:

Defendant incorporates by reference its General Objections.  Defendant further objects to this interrogatory on the basis that it is unduly burdensome, seeks discovery regarding semiconductor products having no relationship to any infringement allegations made by Ricoh against Defendant, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant designs and manufactures a large number of products.  Plaintiff has not identified any theory of infringement or which specific design step(s) or activities are relevant to its allegations of infringement, or what activities Plaintiff considered during the reasonable pre-filing investigation, if any, that it conducted prior to filing the present lawsuit.  To answer the interrogatory as drafted, therefore, might require the identification of every product manufactured by Defendant that includes an integrated circuit.

Interrogatory No. 3:

Separately for each product identified in answer to Interrogatory No. 2, describe with specificity and particularity all of the steps or other activities making up the ASIC Method used to design that product, including the date(s) such steps or other activity occurred, and where such step or activity is not performed by defendant, identify the person performing such step or activity.

Response to Interrogatory No. 3:

Defendant incorporates by reference its General Objections.  Defendant further objects to this interrogatory as unduly burdensome and seeking discovery of information regarding design processes that have no relationship to ASIC design and are not reasonably calculated to lead to the discovery of admissible evidence.  Defendant designs and manufactures a large number of products and employs a large number of personnel involved in product design.  Plaintiff has not identified any theory of infringement or which specific design step(s) or activities are relevant to its allegations of infringement, or what activities Plaintiff considered during the reasonable pre-filing investigation, if any, that it conducted prior to filing the present lawsuit.  To answer the

- 6 -

interrogatory as drafted, therefore, might require a narrative describing every design step performed by every employee who had any involvement in design work on any product that includes an integrated circuit.

Interrogatory No. 4:

Separately for each product identified in answer to Interrogatory No. 2, identify each individual (including their job title and description) involved in any way (including but not limited to managerial responsibility) in research and development, design, manufacturing, testing, sales, or marketing of, or in the decision to design, develop, or manufacture that product, and describe their activity concerning such involvement.

Response to Interrogatory No. 4:

Defendant incorporates by reference its General Objections. Defendant further objects to this interrogatory as unduly burdensome and seeking discovery of information regarding design processes that have no relationship to ASIC design and are not reasonably calculated to lead to the discovery of admissible evidence. Defendant designs and manufactures a large number of products and employs a large number of personnel involved in product design. Plaintiff has not identified any theory of infringement or which design step(s) or activities are relevant to its allegations of infringement or what activities Plaintiff considered during the reasonable pre-filing investigation, if any, that it conducted prior to filing the present lawsuit. To answer the interrogatory as drafted, therefore, might require a narrative describing the functions performed by each employee who had any involved in design work on any product that includes an integrated circuit.

Interrogatory No. 5:

Separately for each product identified in answer to Interrogatory No. 2, identify each individual (including their job title and description) who participated in any way in performing an

- 7 -

ASIC Method for that product, and describe all of the acts of each individual that contributed to performing the ASIC Method for that product.

Response to Interrogatory No. 5:

Defendant incorporates by reference its General Objections.  Defendant further objects to this interrogatory as unduly burdensome and seeking discovery of information regarding design processes that have no relationship to ASIC design and are not reasonably calculated to lead to the discovery of admissible evidence.  Defendant designs and manufactures a large number of products and employs a large number of personnel involved in product design.  Plaintiff has not identified any theory of infringement or which design step(s) or activities are relevant to its allegations of infringement or what activities Plaintiff considered during the reasonable pre-filing investigation, if any, that it conducted prior to filing the present lawsuit.  The interrogatory as drafted, therefore, calls for an open-ended narrative describing the functions performed by any employee having any role in the computer-aided design of any product that includes an integrated circuit.


Interrogatory No. 6:

State when, from whom and under what circumstances defendant first became aware of the patent-in-suit, and identify all documents and communications relating thereto, including but not limited to any opinion(s) concerning the patent-in-suit.

Response to Interrogatory No. 6:

Defendant incorporates by reference its General Objections.  Defendant further objects to this interrogatory to the extent that it calls for the disclosure of information protected by the attorney-client privilege.

Subject to and without waiving the foregoing general and specific objections, Defendant responds as follows:

Defendant first became aware of the patent-in-suit upon receipt of the complaint in this lawsuit.

<u>Interrogatory No. 7:</u>

Separately for each of the paragraphs of the response to the Complaint in this action by the defendant responding to this inquiry, identify all individuals having knowledge or information concerning the contents of such paragraph and identify the documents on which such response is based.

<u>Response to Interrogatory No. 7:</u>

Defendant incorporates by reference its General Objections. Defendant further objects to this interrogatory on the ground that it contains impermissible subparts. *See* D. Del. LR 26.1(b). By propounding an interrogatory that requires Defendant to state all factual bases and identify all individuals or documents concerning the allegations made in 50 separate paragraphs, Ricoh has in fact served 100 separate interrogatories and far exceeded the 50-interrogatory limit. *See id.* *See Lawrence v. First Kansas Bank & Trust Co.*, 169 F.R.D. 657, 660-61 (D. Kan. 1996); *Kendall v. GES Exposition Services, Inc.*, 174 F.R.D. 684, 685-86 (D. Nev. 1997).

Defendant further objects to this interrogatory on the ground that it is premature. Defendant has just begun to conduct its investigation of the relevant facts. The factual bases and documents supporting each of Defendant's contentions addressed in this interrogatory will become known through fact and expert discovery.

Defendant further objects to this interrogatory to the extent that it seeks the disclosure of information or the identification of documents that are protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Defendant further objects to this interrogatory on the basis that it seeks identification of "all persons" having knowledge of the facts set out in Defendant's response to the Complaint in this action. To identify each person employed by or associated with Defendant and having such knowledge would be unreasonably burdensome.

Subject to and without waiving the foregoing general and specific objections, Defendant responds as follows:

James Davis has information regarding Defendant's equitable defenses. Hideaki Kobayashi and Masahiro Shindo have information regarding the invalidity of the asserted patents.

Interrogatory No. 8:

Separately for each product identified in answer to Interrogatory No. 2, identify each individual who can testify about defendant's marketing activities, including but not limited to market research, product testing, business planning, sales, advertising, and production for that product.

Response to Interrogatory No. 8:

Defendant incorporates by reference its General and Specific Objections. Defendant incorporates by reference its response to Interrogatory No. 2.

Interrogatory No. 9:

Describe defendant's procedures, facilities and policies for generating, maintaining, retaining and destroying records and the types of data processing and storage systems maintained by defendant, and identify all documents relating to or referring to such procedures, policies and systems and all persons having knowledge thereof.

Response to Interrogatory No. 9:

Defendant incorporates by reference its General Objections.

Subject to and without waiving the foregoing general and specific objections, Defendant responds as follows:

Pursuant to FRCP Rule 33(d), Defendant will produce non-privileged business records for policies regarding the retention or destruction of documents that are responsive to this interrogatory and contain the requested information to the extent such records currently exist within Defendant's possession, custody or control.

Interrogatory No. 10:

In the event that any request for admission is denied in whole or in part, identify the request by number and set forth in detail each and every reason of the denial, including the identity of the documents upon which such denial is based.

Response to Interrogatory No. 10:

Defendant incorporates by reference its General Objections.

Defendant further objects to this interrogatory on the ground that it contains impermissible subparts. *See* D. Del. LR 26.1(b).

Defendant further objects to this interrogatory on the ground that it is premature. Discovery in this case has just recently begun. Defendant will make available additional information regarding the factual bases for its contentions at a later point during discovery.

Subject to and without waiving the foregoing general and specific objections, Defendant responds as follows:

Where Defendant denied Ricoh's Requests for Admission, it did so because these Requests for Admission were false. Regarding requests for admission involving the validity and enforceability of the patents: Defendant is aware of a number of invalidating prior art references which will be produced; detailed contentions regarding specific references will be supplied at an appropriate time during discovery. Regarding requests relating to equitable defenses: the '432 patent issued on May 1, 1990; Ricoh filed this complaint in January 2003; agents of the inventors and assignees made previous attempts to license this patent that were abandoned. Regarding requests relating to construction of specific elements of claim language and practice of those claim elements: the claims of the '432 patent refer to a particular design process not employed by Defendant; Defendant, is the beneficiary of equitable defenses included laches, equitable estoppel and an implied license and, as a licensed user of Synopsys design synthesis software, is the beneficiary of the equitable defenses that Synopsys has against assertion of the '432 patent.

Defendant reserves the right to identify additional grounds for its contentions and additional evidence as discovery develops.


Dated: June 30 2003                          By:_____
                                                  Francis DiGiovanni
                                                  CONNOLLY BOVE LODGE & HUTZ LLP
                                                  1220 Market Street, 10th Floor
                                                  Wilmington, DE  19899-2207
                                                  (302) 658-9141

                                                  Christopher L. Kelley
                                                  HOWREY SIMON ARNOLD & WHITE,
                                                  LLP
                                                  301 Ravenswood Avenue
                                                  Menlo Park, CA  94025
                                                  (650) 463-8100 (Telephone)
                                                  (650) 463-8400 (Facsimile)

                                                  Attorneys for Defendant
                                                  AEROFLEX INCORPORATED

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing DEFENDANT AEROFLEX INCORPORATED'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO ALL DEFENDANTS was served this 30TH day of June, 2003 on the following via Federal Express:


Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, NY 10036-2714

Gary M. Hoffman
Dickstein Shapiro Morin & Oshinsky, LLP
2101 L Street, N.W.
Washington, DC  20037-1526

Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
Wilmington, DE  19899


Gayle L. Jacob

1   Gary M. Hoffman, *admitted pro hac vice*
    Kenneth W. Brothers, *admitted pro hac vice*
2   DICKSTEIN SHAPIRO MORIN & OSHINSKY, LLP
    2101 L Street, N.W.
3   Washington, D.C.  20037-1526
    Telephone:  (202) 785-9700
4   Facsimile:  (202) 887-0689

5   Edward A. Meilman, *admitted pro hac vice*
    DICKSTEIN SHAPIRO MORIN & OSHINSKY, LLP
6   1177 Avenue of the Americas
    New York, New York  10036-2714
7   Phone:  (212) 835-1400
    Fax:  (212) 992-9880

8
    Jeffrey B. Demain (SBN 126715)
9   Jonathan Weissglass (SBN 185008)
    ALTSHULER, BERZON, NUSSBAUM,
10  RUBIN & DEMAIN
    177 Post Street, Suite 300
11  San Francisco, California  94108
    Phone:  (415) 421-7151
12  Fax:  (415) 362-8064

13  Attorneys for Plaintiff Ricoh Company, Ltd.

14  Teresa M. Corbin (SBN 132360)
    Christopher Kelley (SBN 166608)
15  Thomas C. Mavrakakis (SBN 177927)
    HOWREY SIMON ARNOLD & WHITE, LLP
16  301 Ravenswood Avenue
    Menlo Park, California  94025
17  Telephone:  (650) 463-8100
    Facsimile:  (650) 463-8400

18
    Attorneys for Defendants AEROFLEX, INC., et al.
19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD., | ) Case No. C03-04669 MJJ |
| | ) |
| Plaintiff, | ) **JOINT CASE MANAGEMENT** |
| | ) **CONFERENCE STATEMENT AND** |
| vs. | ) **PROPOSED ORDER** |
| | ) |
| AEROFLEX INC., et al. | ) Date:        February 10, 2004 |
| | ) Time:        2:00 p.m. |
| Defendant. | ) Courtroom:  11 |
| | ) |

1        Pursuant to FRCP 26(f) and L.R. 16-9, Plaintiff Ricoh Company, Ltd. ("Ricoh") and

2 Defendants Aeroflex Inc. et al. (the "ASIC Defendants"), jointly submit this Joint Case Management

3 Conference Statement and Proposed Order.

**DESCRIPTION OF THE CASE**

4

5      **1.**      **A brief description of the events underlying the action:**

6      **a.**     **Ricoh's Description**

7        The Court is already acquainted with the events underlying this action, as set forth in this

8 Court's order of September 22, 2003, and subsequent hearings.

9      **The Initial Delaware Activity.** In January 2003, Ricoh sued several designers and

10 manufacturers of computer chips in the District of Delaware (C.A. No. 03-103-GMS) for patent

11 infringement, alleging that those defendants were using the steps recited in the process claims of

12 Ricoh's '432 patent. The '432 patent describes a highly advanced technical process used in designing

13 and manufacturing certain types of computer chips called ASICs. In carrying out their infringement of

14 the patented process, the ASIC defendants use software supplied by Synopsys, and perhaps other

15 suppliers as part of their process in manufacturing ASICs that they sell.. Further information about the

16 infringing activities of the ASIC defendants will be set out in Ricoh's preliminary infringement charts

17 provided in accordance with the Local Patent Rules; contrary to the ASIC defendants' representations,

18 the activities that infringe certain of the process claims of the '432 patent involve more than the

19 "ordinary use" of Design Compiler. Ricoh is seeking in its Complaint damages based upon the

20 defendants use of the patented process and the sale of the ASIC made utilizing this process. It is not

21 unfair to ask the ASIC defendants to defend what they actually do without limitation to particular

22 equipment they may employ when so acting. Although Synopsys chose not to try to intervene in the

23 Delaware case, its attorneys assumed control of the defense and have filed multiple declaratory

24 judgment counterclaims against Ricoh. Synopsys engaged, is paying for and instructing the attorneys

25 representing the ASIC defendants. Initially all of the ASIC defendants had separate counsel, but those

26 attorneys are no longer involved in this action. Synopsys' attorneys unsuccessfully argued that the

27

28

1  Delaware court should stay discovery in that action pending the outcome of the action in California.

2  Synopsys' attorneys have filed all papers on behalf of each of the ASIC defendants; have attended the

3  Rule 16 conference, negotiated a protective order; and have taken and responded to discovery.  With

4  the agreement of the parties, the Delaware court entered a pretrial order governing discovery on all

5  issues of both liability, damages and willful infringement and set a trial date for October of 2004 on all

6  issues, a copy of which is attached hereto as Exhibit 1.  There is no reason to now separate discovery

7  and trial into a series of separate actions spanning a period of many years as now proposed by the

8  ASIC defendants.  When the ASIC defendants sought a transfer of this action to this Court they argued

9  that such a transfer was not for purpose of delaying this action and that the transfer would not delay the

10  resolution of the issues in this action.  Based in part on those representations, on August 29, 2003, the

11  Delaware court granted the ASIC defendants' motion to transfer that action to this Court.

12

13       **The Declaratory Judgment Action.**  After months of litigating the Delaware case, Synopsys

14  filed a declaratory judgment action (Case No.  CV 03-02289 MJJ) with respect to the '432 patent and

15  another patent (the '016 patent) that Ricoh did not assert in the Delaware case.  Ricoh has never

16  accused Synopsys itself of infringing the '432 patent or the '016 patent and has stated that it will not

17  bring any action for infringement of the '432 patent or the '016 patent against Synopsys with respect to

18  Synopsys' past or current software products.  Ricoh has advised others of the availability of a license

19  under the '016 patent but has not threatened anyone with infringement of that patent.  On September

20  22, 2003, this Court denied Ricoh's motion to dismiss Synopsys' declaratory judgment action.  This

21  Court also deferred to a later time the determination of consolidating the instant case with the

22  declaratory judgment action.

23

24          **b.**    **Defendants' Description**

25       Ricoh alleges that each of the six defendants practice the method claims 13-20 of its '432

26  patent.  The Defendants contend that the activities that Ricoh claims as the basis of its infringement

27  allegations are nothing more than the ordinary use of Synopsys' Design Compiler software, and that

28  Ricoh's lawsuit ought to have been against Synopsys.  Ricoh contends to the contrary.

Defendants suspect that the Preliminary Infringement Contentions required from Ricoh under the Local Patent Rules will demonstrate that Ricoh is alleging infringement based on Defendants' performance of steps that are nothing more than ordinary use of the Design Compiler software. In that event, Defendants may renew their motion to stay the present action until the underlying dispute between Ricoh and Synopsys is resolved. In the alternative, Defendants propose that this case be coordinated with Synopsys' Declaratory Judgment action, and that an initial joint trial be held exclusively on the question of liability, including infringement and invalidity. The issue of damages, including the existence or absence of willfulness, should be tried separately and only after a determination of liability. The damages calculation, if liability for infringement is found, will involve complicated questions of fact specific to each of the individual defendants. Defendants, therefore, believe that the question of damages should be reserved.

The Defendants have conducted some limited discovery regarding the pre-filing investigation conducted by Ricoh. It appears that Ricoh's pre-filing "analysis" was limited to a review of the capabilities of the Synopsys' Design Compiler product and evidence that Ricoh believed indicated that each of the defendants utilize Design Compiler. No analysis of competing software tools was done, and there is no basis for the suggestion in Ricoh's description of the case that its scope ought to be expanded to include other software products beyond Design Compiler. Defendants' estimates of trial length are based on the assumption that the case will focus exclusively on allegations involving Design Compiler. If additional software manufacturers become involved in the case, additional trial time will be required.

Ricoh's description includes several argumentative elements that cannot go unchallenged:

- Ricoh's characterization of the relationship between Synopsys and the Defendants is not accurate. Defendants and Synopsys are both represented by the same counsel. Synopsys will, of course, defend its customers against accusations made by Ricoh that use of Synopsys' products practices Ricoh's patents. However, Ricoh's allegations that Synopsys "controls" this litigation are not accurate. Because Synopsys and the Defendants are represented by the same

counsel, Ricoh's statement that Synopsys' attorneys have filed all papers on behalf of the Defendants is meaningless. Ricoh could just as easily have asserted that Aeroflex's counsel have filed all papers on behalf of Synopsys in Synopsys' declaratory judgment action.

- Ricoh refers to the pre-trial scheduling order issued by the Delaware court, which was plainly mooted when the case was subsequently transferred to the Northern District. Many months have been lost as a result of the transfer so that the schedule defined in the Delaware order is now impossible. Furthermore, the Delaware schedule fails to accommodate normal practice in this district. In particular, it does not follow the schedule prescribed in the Local Patent Rules.

### 2.    Principal factual and legal issues in dispute.

#### a.    Ricoh's Description

*Factual issues relating to Ricoh's claims against the ASIC defendants:*

a.    Whether the ASIC defendants, as the actual ASIC chip designers and/or manufacturers, are the real parties in interest.

b.    Whether the ASIC defendants practice the process disclosed in the '432 patent.

c.    Whether the ASIC defendants infringe the '432 patent.

d.    The amount of damages to be awarded to Ricoh.

e.    Whether the ASIC Defendants acted willfully in infringing the '432 patent.

*Ricoh's statement of disputed legal issues:*

f.    Whether ASIC defendants can prove by clear and convincing evidence that the '432 patent is not valid.

g.    Whether the ASIC defendants can prove their affirmative defenses of estoppel and laches that would preclude Ricoh from enforcing its '432 patent against them, or limit Ricoh's right to damages.

#### b.    Defendants' Description

Defendants agree that the issues identified in b – e are presented in this case. Additional factual issues are in dispute:

1    h.    Whether the '432 patent is invalid.

2    i.    Whether Ricoh is barred, under a theory of laches or estoppel, from enforcing its '432

3  patent against some or all of the allegedly infringing activities.

4    j.    Whether the actions that Ricoh identifies as the basis of its infringement allegations are

5  anything other than ordinary steps involved in use of Synopsys' Design Compiler product.

6    k.    Whether this action should be stayed pending resolution of the *Synopsys, Inc. v. Ricoh*

7  *Company, Ltd.* declaratory judgment action.

8    Additionally, the following legal issue is presented in this case:

9    l.    Whether the design activities claimed in the asserted method claims of Ricoh's '432

10  patent, if undertaken in Canada, can serve as the basis of an allegation of infringement under 35 U.S.C.

11  § 271(g).

12
13    **3.    The other factual issues which remain unresolved:**

14    **a.    Ricoh's Description**

15  Ricoh believes that the principal issues are set forth above in Ricoh's description.

16    **b.    Defendants' Description**

17  Defendants believe that there are none.

18    **4.    Parties which have not been served:**

19  None.

20    **5.    The additional parties which the parties intend to join and the intended**

21    **time frame for such joinder:**

22    **a.    Ricoh's Position.**

23    On August 19, 2003, ASIC defendant Aeroflex disclosed that its subsidiary, Aeroflex UTMC,

24  was a purchaser of relevant software from plaintiff Synopsys, and that another company may also

25  engage in relevant design work.  After over 9 months of discovery, defendant Aeroflex has still failed

26  and have refused to provide any additional information with respect to its subsidiary.  These Aeroflex

27  entities may be appropriate for joinder after further discovery.

28

1    Since the only activities being accused of infringement in this action are those of the ASIC

2 defendants and possibly other affiliates or subsidiaries of such defendants, there is no other need to

3 join any unrelated parties to this action.

4                              · b.        **Defendants' Description**

5    Ricoh's assertion that "Aeroflex has refused to provide any additional information with

6 respect to its subsidiary" is without merit.  Defendant Aeroflex is collecting and will produce

7 information regarding logic synthesis operations at its Aeroflex Colorado Springs facility (formerly

8 UTMC Microelectronic Systems, Inc.).

9    Defendants are not aware of any parties that should be joined to this action.  Defendants

10 contend that Ricoh's allegations should be limited to logic synthesis activities involving alleged use of

11 Synopsys' Design Compiler product.  Ricoh has suggested that it would like to expand the scope of

12 this case to include the use of other software products.  To do so would work a grievous injustice to

13 Defendants, who should not be forced to defend a third-party software company's products against

14 Ricoh's allegations.  If Ricoh intends to broaden the scope of this case to include software

15 manufacturers other than Synopsys, which Defendants will oppose, it should be required to seek

16 joinder of these software companies immediately.

17          **6.       The following parties consent to assignment of this case to the United States**

18                     **Magistrate Judge for trial:**

19    If the Court desires for scheduling purposes, Ricoh is amenable to having the Markman hearing

20 and any related tutorial held before a Magistrate Judge.  Neither party consents to assignment to a

21 Magistrate Judge for trial.  Defendants do no not consent to have Markman determinations made by a

22 Magistrate Judge.

23

24

25

26

27

28

**ALTERNATIVE DISPUTE RESOLUTION**

7.    **The parties have not filed a Stipulation and Proposed Order Selecting an ADR process and the ADR process to which the parties jointly (or separately) request referral:**

a.    **Ricoh's Position**

There has been a single meeting between business representatives of Ricoh and Synopsys Inc. (which is controlling this litigation on behalf of the ASIC defendants), but the parties have not engaged in negotiations. Ricoh has invited the ASIC defendants to negotiate with respect to a license, but the ASIC defendants have refused. Ricoh is willing to enter into ADR with the ASIC defendants. If Ricoh were required to choose an ADR procedure, Ricoh would prefer mediation by a knowledgeable patent attorney.

b.    **Defendants' Description**

Defendants do not believe that there is any purpose to settlement negotiations between Ricoh and Defendants that do not include Synopsys. Settlement of this case is most likely if there is a global settlement negotiated between Ricoh and Synopsys. If Defendants were required to choose an ADR procedure, they request referral to the Court's ENE ADR process.

**DISCLOSURES**

8.    **The parties certify that they have made the following disclosures:**

a.    **Ricoh's Position**

In May 2003, Ricoh served its initial disclosures in the Delaware action and produced documents identified therein. The ASIC defendants also served an initial disclosure (which they later asserted were "inartfully drafted"), but, as set forth in a pending motion to compel, they have refused to produce many documents identified in many of the categories of that disclosure. Almost all of the documents that the ASIC defendants have produced in response to Ricoh discovery requests is prior art. Few of these documents relate to Ricoh's infringement claims or those defendants' design or manufacture of ASIC computer chips. Now 8 months after serving their initial disclosures and after numerous complaints by Ricoh, the ASIC defendants, seeking to avoid the pending motion to compel, on January 20, 2004, served an amended initial disclosure.

1      **b.    Defendants' Position**

2      The Defendants served an initial disclosure statement on May 30, 2003, and an amended

3      version of their initial disclosure statement on January 20, 2004.  Defendants have produced prior art

4      that they believe demonstrates the invalidity of the patent and manuals describing Synopsys' Design

5      Compiler product that demonstrate that Design Compiler does not practice Ricoh's patents.

6                              **DISCOVERY**

7      **9.      The parties agree to the following discovery plan:**

8              **a.    Ricoh's Position.**

9      In Delaware, counsel for all of the parties agreed that each side would have 240 hours of

10     deposition testimony.  The ASIC defendants have identified over thirty (30) people who have relevant

11     factual information in their initial disclosure and therefore the additional deposition time is needed.

12     Ricoh believes that such a modification of the Federal Rules of Civil Procedure is useful here.  There is

13     no reason to deviate from this prior agreement of counsel.

14     The ASIC defendants set forth no reason for their change of heart set forth in their statement

15     below nor is any apparent.  Moreover, it is possible for plaintiff to have 160 hours for depositions

16     while the defendants are allowed 320 hours under the new position of the ASIC defendants, a

17     divergence which is particularly unfair.  Even further, under this new proposal, the plaintiff's

18     deposition time must be split over 7 entities (the 6 defendants plus Synopsys) whereas previously, it

19     only had to be split over the 6 defendants.

20             **b.    Defendants' Description**

21     The Defendants now believe that a total of 160 hours of deposition time is ample modification

22     from the limits on deposition testimony set in the Federal Rules of Civil Procedure to obtain the

23     discovery necessary in this litigation.  Also, because many of Ricoh's witnesses will likely require a

24     translator, each hour of deposition testimony requiring translation should be treated as 30 minutes

25     against this time limit.  Furthermore, since the parties have stipulated that testimony taken in this

26     action will be admissible in *Synopsys, Inc. v. Ricoh Company, Ltd.*, Case No. CV 03-02289 MJJ, and

27     vice versa, the total time for deposition testimony in the two actions combined should not exceed this

28     limit.  The Defendants are not advocating that the Court give Synopsys 160 hours and grant them an

1  additional 160 hours.

2                              **PROPOSED SCHEDULE**

3          **10.**     **A proposed schedule is provided below:**

4                      **a.     Ricoh's Position.**

5          Ricoh asserted an infringement claim with respect to the '432 patent, and agrees that it should

6  be treated as the party claiming infringement of that patent.  Ricoh's proposed schedule contains actual

7  dates that generally are consistent with the Patent Local Rules.

8          Assessment of the defendants' liabilities and responsibility for damages should take place

9  concurrently; bifurcation of the proceedings is not appropriate.  Bifurcation is not a prudent use of

10  judicial resources, but is more a delay tactic by ASIC defendants to draw out the proceeding out .

11  Contrary to the ASIC defendants' representation, the identification of each of the ASIC manufactured

12  utilizing the infringing process and proof of such infringement is initially part of the liability issue not

13  just a damage issue.

14

15                      **b.     Defendants' Description**

16          Depending upon what Ricoh alleges in its Preliminary Infringement Contentions, Defendants

17  may seek a stay of the present action to allow the underlying dispute to be resolved in the *Synopsys,*

18  *Inc. v. Ricoh Company, Ltd.* declaratory judgment action.  If a request for stay is not made, or is

19  denied, Defendants believe that trial of this matter should be bifurcated, into separate trials on liability

20  and damages (which would include the question of whether infringement was willful or not).

21          The question of liability presents a single question, uniform for each of the defendants: is there

22  a mode of usage of the Design Compiler software that results in infringement of Ricoh's '432 patent?

23  Trial of liability issues will also have to address the question of whether defendants use the software in

24  the allegedly infringing mode, but this question is less likely to involve contentious factual disputes.

25  The question of damages, on the other hand, is complicated and particular to each of the defendants,

26  and, will require specific inquiry into each product alleged to have been designed using the infringing

27  process.  Ricoh contends that it is entitled to a portion of the revenue stream from each such product.

28  Defendants expect to contend that the ASIC products designed using the allegedly infringing process

1   could have been designed using non-infringing alternative techniques and that Ricoh's recovery must,

2   therefore, be limited to the difference in cost of the two design techniques.  Proving or disproving each

3   of these damages theories will require delving into the particulars of each design alleged to have been

4   produced by the infringing method, and will be quite time consuming.

5        Defendants, therefore, believe that, if the present action is not stayed, the question of liability

6   should be tried first, jointly with Synopsys' declaratory judgment action.  The schedule below

7   establishes a date only for the liability trial.  If liability is established, a separate damages trial can be

8   scheduled.

9          **c.**     **The Parties' Proposed Schedules.**

| Event | Time (Patent Local Rule, if applicable) | Ricoh's Proposed Dates[1] | Defendants' Proposed Dates |
|---|---|---|---|
| Ricoh's Disclosure of Asserted Claims and Preliminary Infringement Contentions ('432 Patent) | No later than 10 days after the defendant serves its answer, or 10 days after the Initial Case Management Conference, which ever is later.   (Pat. L. R. 3-3) | February 20, 2004 | February 20, 2004 |
| Preliminary Invalidity Contentions (the '432 patent) | 45 days after Disclosure of Asserted Claims (Pat. L. R. 3-3) | April 5, 2004 | April 5, 2004 |
| Exchange of Proposed Terms and Claim Elements for Construction | 10 days after Preliminary Invalidity Contentions (Pat. L. R. 4-1(a)) | April 15, 2004 | April 15, 2004 |
| Exchange of Proposed Claim Constructions and Extrinsic Evidence | 20 days after Exchange of Proposed Terms and Claim Elements (Pat. L. R. 4-2(a)) | May 5, 2004 | May 5, 2004 |
| Joint Claim Construction and Prehearing Statement | 60 days after Preliminary Invalidity Contentions (Pat. L. R. 4-3) | June 4, 2004 | June 4, 2004 |
| Deadline to join parties and amend pleadings | L.R. 16-10(b) | June 4, 2004 (Neither party provides blanket consent to joinder of new parties.) | June 4, 2004 (Neither party provides blanket consent to joinder of new parties.) |
| Completion of Claim Construction Discovery | 30 days after Joint Claim Construction and Prehearing Statement (Pat. L. R. 4-4) | July 2, 2004 | July 2, 2004 |

[1] Ricoh in its list of proposed dates suggests trial beginning on May 2, 2005.  However, since counsel for the ASIC defendants has a trial scheduled to begin on May 24, 2005, which could possibly conflict with the ASIC defendants proposed trial date of June 6, 2005.  Ricoh is willing to accelerate this schedule so this case is tried in April of 2005.  Prior to transfer of this action from Delaware, the parties had agreed upon, and the Court had ordered, having this case ready for trial in October of 2004.

| Event | Time (Patent Local Rule, if applicable) | Ricoh's Proposed Dates[1] | Defendants' Proposed Dates |
|---|---|---|---|
| Opening Claim Construction Brief | 45 days after Joint Claim Construction and Prehearing Statement (Pat. L. R. 4-5(a)) (15 days after Completion of Claim Construction Discovery) | July 19, 2004 | July 19, 2004 |
| Responsive Claim Construction Brief | 14 days after Opening Claim Construction Brief (Pat. L. R. 4-5(b)) | August 2, 2004 | August 2, 2004 |
| Reply Claim Construction Brief | 7 days after Responsive Claim Construction Brief (Pat. L. R. 4-5(c)) | August 9, 2004 | August 9, 2004 |
| Claim Construction Hearing | At least 14 days after Reply Claim Construction Brief (Pat. L. R. 4-6) | Late August 2004, no earlier than August 24, 2004 (date to be determined by court) | Late August 2004, no earlier than August 24, 2004 (date to be determined by court) |
| Claim Construction Ruling ("CCR") | | Provided by the Court | Provided by the Court |
| Final Infringement Contentions (the '432 patent) | 30 days after CCR (Pat. L. R. 3-6) | October 20, 2004 | October 20, 2004 or 30 days after CCR (Pat. L. R. 3-6) whichever is later[2] |
| Fact discovery cut-off | | November 23, 2004 | October 20, 2004 or 30 days after CCR whichever is later[3] |
| Final Invalidity Contentions | 50 days after claim construction ruling (CCR)(Pat. L. R. 3-6) | November 9, 2004 | November 9, 2004 or 50 days after CCR (Pat. L. R. 3-6) whichever is later |
| Deadline to disclose reliance upon opinion of counsel and produce related documents | 50 days after claim construction ruling (CCR)(Pat. L. R. 3-8) | November 9, 2004 | November 9, 2004 or 50 days after CCR (Pat. L. R. 3-8) whichever is later |
| Submission of expert reports by party with the burden of proof | | November 9, 2004 | November 19, 2004 or 60 days after CCR whichever is later |

[2] The Defendants believe that their proposed schedule based on time periods following the Court's claim construction ruling is reasonable, but suggest that an additional case management conference following the Court's claim construction ruling may be necessary to set the post-claim construction case schedule.

[3] Ricoh's Statement:  Ricoh submits that the final invalidity contentions should be provided prior to the close of fact discovery.

Defendants' Statement:  The Defendants believe that their proposed dates for fact discovery cut-off and final invalidity contentions are appropriate.  However, should the Court decide otherwise, the Defendants request that their final invalidity contentions are due at least two weeks after fact discovery cut-off.

| Event | Time (Patent Local Rule, if applicable) | Ricoh's Proposed Dates[1] | Defendants' Proposed Dates |
|---|---|---|---|
| Submission of responsive expert reports | | December 9, 2004 | December 17, 2004 or 80 days after CCR whichever is later |
| Expert discovery cut-off | | January 20, 2005 | January 28, 2005 or 100 days after CCR whichever is later |
| Dispositive motion cut-off | | February 11, 2005 | February 18, 2005 or 120 days after CCR whichever is later |
| Dispositive motion hearing date | | To be set by the Court | March 29, 2005 or 155 days after CCR whichever is later |
| File motions in limine | | March 11, 2005 | April 11, 2005 or 170 days after CCR whichever is later |
| File oppositions to motions in limine | | March 25, 2005 | April 25, 2005 or 184 days after CCR whichever is later |
| File Joint Proposed Final Pre-trial Order | | April 8, 2005 | May 9, 2005 or 198 days after CCR whichever is later |
| Pre-trial Conference | | April 19, 2005 | May 19, 2005 or 208 days after CCR whichever is later |
| Trial Date | | May 2, 2005 | June 6, 2005 or 220 days after CCR whichever is later[4] |

# CLAIM CONSTRUCTION HEARING

**11.    Hearing date:**

The parties propose that a Claim Construction Pre-hearing Conference be held on a date to be set by the Court prior to the Claim Construction Hearing.  The parties propose that the Claim Construction Hearing be held before the Court in late August 2004, but no earlier than August 24,  (if the Court's schedule permits).

---

[4] Ricoh's Statement:  Since the June date proposed by the ASIC defendants may not work for their lead counsel, Ricoh encourages the Court to select the date in May proposed by Ricoh to further accommodate the ASIC defendants, Ricoh is willing to advance the schedule so that this case can be ready for trial in April of 2005.

Defendants' Statement:  The Defendants can tentatively propose a date for trial 220 days after the Court's claim construction ruling.  However, defendants' lead trial counsel currently has trial set to begin on May 24, 2005.

1    **12.    Tutorial:**

2        The parties believe that it would be helpful to present tutorial information about the technology

3    underlying the case in advance of the Claim Construction Hearing.

4    **13.    Live Testimony:**

5        The parties would like to reserve the right to use live testimony at the Claim Construction

6    Hearing (exclusive of the time required for any tutorial) and believe that the total presentation

7    (testimony and argument) will be approximately four (4) hours divided equally between Ricoh and the

8    ASIC Defendants.

9

10        Ricoh also believes that this four (4) hour time period for the Claim Construction Hearing

11   should be used if this is consolidated with the Hearing in Synopsys, Inc. v. Ricoh Company, Ltd.

12        However, if the Claim Construction Hearing in this action is held jointly with the Claim

13   Construction Hearing in *Synopsys, Inc. v. Ricoh Company, Ltd.*, Case No. CV 03-02289 MJJ, the

14   defendants believe that the total presentation will be approximately six hours divided equally between

15   Ricoh, on one side, and the ASIC defendants and Synopsys, on the other.

16

17   **14.    Order of Presentation:**

18   **a.    Ricoh's Position.**

19        As plaintiff and owner of the '432 patent, Ricoh should go first at the Claim Construction

20   Hearing.  Ricoh is the first-to-file and the patentee.  Further, this case has not been subordinated by the

21   customer-suit exception, and Ricoh has a separate interest in litigating this case.  Therefore Ricoh

22   should be the first to present its claim construction.

23

24

25

26

27

28

1    **b.    Defendants' Position.**

2    Because the present case has been designated a "customer suit" and subordinated to Synopsys'

3    declaratory judgment action, Synopsys and the Defendants should be permitted to present argument

4    and testimony first at the Claim Construction Hearing.

5    **TRIAL**

6
7    **15.    The parties request a trial date as follows:**

8    **a.    Ricoh's Position.**

9    Ricoh has proposed that trial begin on May 2, 2005.  Since counsel for the ASIC defendants

10   has indicated that she has a trial scheduled to begin on May 24, 2005, which may conflict with the

11   ASIC defendants proposed trial date of June 6, 2005, the May 2 date would avoid that conflict.  In

12   addition, Ricoh is willing to accelerate this schedule so this case is tried in April of 2005 to further

13   accommodate counsel for the defendants.[5]

14   **b.    Defendants' Position.**

15
16   June 6, 2005, or 220 days after the Court's claim construction ruling whichever is later.  Again,

17   the customer defendants can tentatively propose a date for trial 220 days after the Court's claim

18   construction ruling.  However, the defendants' lead trial counsel currently has another trial set to begin

19   on May 24, 2005.

20   **16.    The parties expect that the trial will last for the following number of days:**

21
22   **a.    Ricoh's Position.**

23   Ten days if not consolidated and twelve trial days if consolidated with the related Synopsys

24   declaratory judgment action.

25
26
27
28   [5] Prior to transfer of this action from Delaware, the parties had agreed upon, and the Delaware Court ordered, having this case ready for trial in October of 2004.

1

**b.    Defendants' Position.**

2    Defendants believe that, if the present action is not stayed, the question of liability, including

3  infringement and validity, should be tried first, jointly with Synopsys' declaratory judgment action.

4  Defendants, therefore, believe that this trial could be completed in approximately ten to twelve days.

5  If infringement allegations against logic synthesis products beyond Design Compiler are introduced

6  into the case, additional trial time will be required.  If liability is established, a separate trial can be

7  scheduled to determine damages.  Defendants believe that such a trial would require approximately

8  two weeks.

9

10

11  Dated: February 2, 2004                DICKSTEIN SHAPIRO MORIN & OSHINSKY

12

13                                         By:    /s/ Ken Brothers
                                                  Gary M. Hoffman
14                                                Kenneth W. Brothers
                                                  Attorneys for Ricoh Company, Ltd.
15
    Dated: February 2, 2004                HOWREY SIMON ARNOLD & WHITE, LLP
16

17

18                                         By:    /s/ Teresa Corbin
                                                  Teresa M. Corbin
19                                                Attorneys for Defendants

20

21

22

23

24

25

26

27

28

1

2

**CASE MANAGEMENT ORDER**

The Case Management Statement and Proposed Order is hereby adopted by the Court as the

Case Management Order for the case and the parties are ordered to comply with this order.  In addition

the Court orders:

3

4

5

6

7

8

9

10

11

12

13

14    Dated: _____                    _____

15                                                                        HON. MARTIN J. JENKINS

16

17

18

19

20

21

22

23

24

25

26

27

28



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT Of DELAWARE

RICOH COMPANY, LTD.            )
                              )
        Plaintiff,            )
                              )
    v.                        )        C.A. No.03-103-GMS
                              )
AEROFLEX INCORPORATED, AMI    )
SEMICONDUCTOR, INC., MATROX   )
ELECTRONIC SYSTEMS LTD.,      )
MATROX GRAPHICS INC., MATROX  )
INTERNATIONAL CORP. and       )
MATROX TECH, INC.             )
                              )
        Defendants.          )

RECEIVED

MAY 3 0 2003

Robert W. Whetzel

FILED

MAY 3 0 2003

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## SCHEDULING ORDER

This 30 th day of _____ May _____ 2003, the Court having conducted an initial

Rule 16 scheduling and planning conference pursuant to Local Rule 16.2(b) on May 16, 2003,

and the parties having determined after discussion that the matter cannot be resolved at this

juncture by settlement, voluntary mediation or binding arbitration;

IT IS ORDERED that:

1.    **Rule 26(a) Initial Disclosures**. Unless otherwise agreed to by the parties, they

shall make their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a) on or before

May 30, 2003.

2.    **Joinder of other Parties and Amendment of Pleadings**. All motions to join

other parties and amend the pleadings shall be filed on or before July 30, 2003.

3.    **Reliance Upon Advice of Counsel**. Defendants shall inform plaintiff whether

they intend to rely upon advice of counsel as a defense to willful infringement no later than

December 9, 2003. If defendants elect to rely on advice of counsel as a defense to willful infringement, defendants shall produce any such opinions on which defendants intend to rely to plaintiff no later than December 19, 2003.

4.    ***Markman* Claim Construction Hearing.**  A *Markman* claim construction hearing shall be held on March 2, 2004 at 9:30 a.m. The *Markman* hearing is scheduled for a total of not more than 1 day. The parties shall meet and confer regarding narrowing and reducing the number of claim construction issues no later than January 5, 2004 and shall exchange initial claim charts no later than January 12, 2004. On or before January 20, 2004, the parties shall submit a final joint claim chart which shall include citations to intrinsic evidence. The parties shall exchange opening claim construction briefs on January 23, 2004, and the answering claim construction briefs on February 6, 2004.

5.    **Discovery.**  All fact discovery in this case shall be initiated so that it will be completed on or before January 9, 2004. Opening expert reports shall be exchanged on March 22, 2004 and rebuttal expert reports shall be exchanged on April 23, 2004. Expert Discovery in this case shall be initiated so that it will be completed on or before June 23, 2004. The total time allowed for depositions shall be 240 hours per side, excluding expert discovery, unless extended by agreement of the parties.

a.    **Discovery Disputes.**  Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6470 to schedule a telephone conference. Not less than forty-eight hours prior to the conference, by hand delivery or facsimile at (302) 573-6472, the party seeking relief shall file with the Court a letter agenda not to exceed two (2) pages outlining the issues in dispute. Should the Court find further

briefing necessary upon conclusion of the telephone conference, the Court shall order the party

seeking relief to file with the Court a **TWO PAGE LETTER**, exclusive of exhibits, describing

the issues in contention.  The responding party shall file within five (5) days from the date of

service of the opening letter an answering letter of no more than **TWO PAGES**.  The party

seeking relief may then file a reply letter of no more than **TWO PAGES** within three (3) days

from the date of service of the answering letter.

6.    **Confidential Information and Papers filed under Seal.**  Should counsel find it

will be necessary to apply to the Court for a protective order specifying terms and conditions for

the disclosure of confidential information, they should confer and attempt to reach an agreement

on a proposed form of order and submit it to the Court within 10 days from the date of this order.

When filing papers under seal, counsel should deliver to the Clerk an original and two copies of

the papers.

**If after making a diligent effort the parties are unable to agree on the contents of the
joint proposed protective order, then they shall follow the dispute resolution process
outlined in paragraph 5(a).**

7.    **Settlement Conference.**  Pursuant to 28 U. S.C. §636, this matter is referred to

the United States Magistrate for the purpose of exploring the possibility of a settlement.  If the

parties agree that the possibility of settlement may be enhanced by such referral, the parties shall

contact Magistrate Judge Thynge to schedule a settlement conference with counsel and clients.

8.    **Summary Judgment Motions.**  Prior to filing any summary judgment motion,

the parties must submit letter briefs seeking permission to file the motion.  The opening letter

brief shall be no longer than five (5) pages and shall be filed with the Court no later than

February 12, 2004. Answering letter briefs shall be no longer than five (5) pages and filed with the Court no later than February 27, 2004. Reply letter briefs shall be no longer than three (3) pages and filed with the Court on or before March 8, 2004. The Court shall hold a status conference to hear argument and to determine whether the filing of any motion will be permitted on March 23, 2004 at 11:00 a.m. **Unless the Court directs otherwise, no letter requests to file a motion for summary judgment may be filed at a time before the dates set forth in paragraph 8.**

9.    **Case Dispositive Motions.** Should the Court permit the filing of summary judgment motions an opening brief and affidavits, if any, in support of the motion shall be served and filed on or before April 2, 2004. Parties must submit an original and two (2) copies. Briefing will be presented pursuant to the Court's Local Rules, unless the parties agree to an alternative briefing schedule. Any such agreement shall be in writing and filed with the Court for approval.

10.    **Applications by Motion.** Except as provided in this Order or for matters relating to scheduling, any application to the Court shall be by written -motion filed with the Clerk. Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers. Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

11.    **Oral Argument.** If the Court believes that oral argument is necessary, the Court will schedule a hearing Pursuant to Local Rule 7.1.4.

12.    **Status/Daubert Conference.** On or before June 30, 2004, the parties shall meet and confer on any Daubert issues and motion in limine issues that any party wants to raise. On or before July 2, 2004, the parties shall submit a joint agenda identifying any Daubert issues that the

parties intend to raise.  The Court will hold a telephone conference on July 7, 2004 at 11:00 a.m. to discuss Daubert issues identified in the joint agenda.

13.    **Pretrial Conference.**  On September 13, 2004, the Court will hold a Pretrial Conference in Chambers with counsel beginning at 9:30 a.m.  Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement in Federal Rule of Civil Procedure 26(a)(3).  Thirty (30) days before the joint proposed pretrial order is due, plaintiff's counsel shall forward to defendants' counsel a draft of the pretrial order containing the information plaintiff proposes to include in the draft. Defendants' counsel shall, in turn, provide to plaintiff's counsel any comments on the plaintiff's draft as well as the information defendants propose to include in the proposed pretrial order. *Motions in limine*: No party shall file more than ten (10) motions in limine.  Briefs (opening, answering and reply) on all motions *in limine* shall be filed by August 6, 2004.  Opening and answering briefs shall not exceed five (5) pages and reply briefs shall not exceed three (3) pages. The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before August 16, 2004.

14.    **Trial.**  This matter is scheduled for a seven day jury trial beginning at 9:00 a.m. on October 12, 2004.

15.    **Scheduling.**  The parties shall direct any requests or questions regarding the scheduling and management of this matter to Chambers at (302) 573-6470.

UNITED STATES DISTRICT JUDGE

HOME   ABOUT US   PRODUCTS   SYSTEMS   SUPPORT   CONTACT US   Enter your search term here...    GO



**About AMS**
- About AMS
- Assembly Services
- Avionic µElectronics
- Broadband Microwave
- Circuit Card Assembly
- Multichip Modules
- Mixed-Signal IC's
- Power Electronics
- RadHard µElectronics
- Thin-Film Interconnect
- Trade Shows
- Contact Us
- Aeroflex AMS Home

Who are the Aeroflex Microelectronic Solutions divisions? Listed below is a brief history of these three divisions.

**Aeroflex Microelectronic Solutions - Colorado Springs, Colorado**

Formerly known as Aeroflex UTMC, we were established by United Technologies Corporation (UTC) of Hartford in 1980 as a supplier of custom and semicustom microelectronics to its aerospace and defense divisions. In 1985, UTMC expanded its charter to market semicustom and standard VLSI circuits to external high-reliability aerospace and defense companies. We also engage in governmen- and customer-funded research and development. In 1996, UTMC added circuit card assembly capability. In February, 1999, Aeroflex Corporation purchased UTMC. We diversified our portfolio in 2000 with mixed-signal IC design services.

**Aeroflex Microelectronic Solutions - Plainview, Long Island, New York**

Aeroflex has been manufacturing hybrid microcircuits in Plainview since 1974. In January, 1994, Aeroflex acquired Marconi-Circuit Technology Corporation (MCTC), one of the initial pioneers in thick-film hybrid technology and CMOS ASIC design. GEC had acquired Circuit Technology Incorporated (CTI) in January 1981 and later in July, 1990, MCTC became part of GEC Plessey Semiconductors. CTI was founded in 1967 as a spin off company of General Instrument.

The two facilities were integrated into a new 25,000-sq. ft. clean room in Aeroflex's Plainview facility in July, 1994. The merged microelectronics operation was renamed Aeroflex Circuit Technology (ACT) to retain the trade names of both companies.

**Aeroflex Microelectronic Solutions - Pearl River, New York**

In March, 1995 Aeroflex acquired MIC Technology to add thin film ceramic substrate to its portfolio of interconnect technologies for RF, Microwave and High Frequency telecom circuitry. Two years later Aeroflex acquired certain equipment, inventory, licenses for technology and patents of two of Lucent Technologies' Microelectronics component units, multi-chip modules and film integrated Circuits (FIC). These units manufactured microelectronic modules and interconnect products. A multi-year supply agreement was signed with Lucent to provide thin-film integrated circuits for use in the telecommunications industry. The thin-film and MCM operations of Lucent's (AT&T) Merrimac Valley, Massachusetts facility was the largest manufacturer of thin film hybrids in the world shipping over 40 Million square inches/year of thin film ceramic substrates and over a million thin

Case 5:03-cv-04669-JW    Document 107-5    Filed 02/18/2004    Page 2 of 2

Thin Film hybrids per year. The Thin Film operations were shipped to MIC's Pearl River Facility and the MCM operations were shipped to ACT Plainview facility.

Copyright © 2003 by Aeroflex Incorporated. All Rights Reserved.

Privacy Policy    Site Map

QuickLinks -- Click here to rapidly navigate through this document
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

--------------

# FORM 10-K

### FOR ANNUAL AND TRANSITION REPORTS

### PURSUANT TO SECTIONS 13 OR 15(d) OF THE

### SECURITIES EXCHANGE ACT OF 1934

(Mark
One)

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES

### EXCHANGE ACT OF 1934

For the fiscal year ended June 30, 2003

**OR**

o   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition                          to
period from

Commission File No. 000-02324
Aeroflex Incorporated
--------------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)
Delaware                         11-1974412
------------------------------------   -------------------------------------
(State or other jurisdiction of      (I.R.S. Employer Identification No.)
incorporation or organization)

35 South Service Road, Plainview, New                    11803
York             --------------------------------------
--------------------------------------                 (Zip Code)
(Address of Principal Executive
Offices)

Registrant's telephone number,                (516) 694-6700
including area code:        --------------------------------------

```
        Securities registered pursuant to Section 12(b) of the Act:
                                          Name of Each Exchange on
              Title of Class                   Which Registered
    --------------------------------    --------------------------------
                  None
    Securities registered pursuant to        Common Stock, $.10 par value
    Section 12(g) of the Act:           --------------------------------
                                                 (Title of Class)
```

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K o

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☒    No o

State the aggregate market value of the voting stock held by non-affiliates of the registrant. (The aggregate market value shall be computed by reference to the price at which the stock was sold, or the average bid and asked prices of such stock, as of a specified date within 60 days prior to the date of filing). As of September 26, 2003-approximately $530,699,000.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date (applicable only to corporate registrants). Common Stock, par value $.10 per share; outstanding as of September 26, 2003-65,977,017 (excluding 4,388 shares held in treasury).

```
        Documents incorporated by reference: Part III (Items 10, 11, 12, 13 and
    14)-Registrant's definitive proxy statement to be filed pursuant to Regulation
    14A of the Securities Act of 1934.
    -------------------------------------------------------------------------------
    -------------------------------------------------------------------------------
    -------------------------------------------------------------------------------
```

## ITEM 1-BUSINESS

```
Overview
```

We use our advanced design, engineering and manufacturing abilities to produce microelectronic and testing solutions. Our products are used in the aerospace, defense and broadband communications markets. We also design and manufacture motion control systems and shock and vibration isolation systems which are used for commercial, industrial and defense applications.

We are a Delaware corporation, founded in 1937.

Our operations are grouped into three segments:

.   Microelectronic Solutions

.   Test Solutions

.   Isolator Products

These segments, their products and the markets they serve are described below.

```
Microelectronic Solutions


Silicon Integrated Circuits
```

We have been a designer and supplier of silicon integrated circuits for more than 20 years. Our products include both custom and standard integrated circuits such as databuses, transceivers, microcontrollers, microprocessors and memories. Many of these circuits are radiation tolerant for satellite and space applications. Our products are on over 100 aerospace platforms. Our standard and semicustom circuits are available in the latest 0.6 and 0.25 micron silicon wafer technologies.

Our standard circuits include the primary processor, memory and databus functionality, and our semi-custom gate arrays are available with up to three million usable gates. These gate arrays are available in both radiation tolerant and non-radiation tolerant technologies and have been used frequently to replace field programmable gate array implementations. We have pioneered the use of commercial foundries to produce radiation tolerant components, known as Commercial RadHard , for the commercial space marketplace.

Our Colorado Springs Circuit Card Assembly capability consists of full assembly, test and coat in a high mix/low-to-medium volume operation. Our processes and test capabilities provide for state-of-the-art manufacturing. Our SpaceCard  combines best commercial practices of circuit card assembly with our radiation-hardened integrated circuits to provide CCA solutions for the commercial space industry. Our CCA operation also assembles the UT131 Embedded Controller Card, a Standard Product Card. The UT131 ECC is ideal for space applications.

Microelectronic Modules

We design, develop and manufacture sub-assemblies and modules for communication systems. Our manufacturing equipment, methods and processes are designed to maintain the critical tolerances required for aerospace and defense components and high Gigahertz RF and microwave signals. Our manufacturing methods are designed to use automatic placement equipment and batch processing for maximum cost efficiency and reliability.

We are one of the world's leading manufacturers of space hybrid microcircuits. We hold several prime space contractor certifications. We offer numerous application specific multi-function modules and hybrid designs that are highly reliable, small and lightweight; attributes that are significant for space components.

2
--------------------------------------------------------------------------------

Thin Film Circuits and Interconnects

We design, develop, manufacture and market advanced integrated interconnect products based on thin film manufacturing technology. Primary product requirements for this advanced technology include the following attributes:

. miniaturization;

    .    ease of assembly;

. improved thermal management;

. reduced power consumption; and

. critical component (laser) alignment.

Due to the unique dimensional, thermal and electrical capabilities of our PIMIC  interconnect technology, our products have become an essential component in:

. high-frequency military airborne modules;

. fiber optic transmitters, receivers and amplifiers;

. cable trunk amplifiers, line extenders, pre-amplifiers and power doublers; and

. point-to-point and point-to-multipoint microwave radios.

Our products also play an important role in the development and expansion of the broadband cable and HFC architecture. Applications in trunk amplifiers, line extenders, pre-amplifiers, post-amplifiers and power doublers has enabled greater bandwidth, improved loss characteristics and increased channel capability at the systems level. Additionally, in the wireless marketplace, the advance of dual and tri-mode handsets has resulted in our design of a series of miniaturized diplexers and triplexers for these communications devices.

In September 2003, we acquired MCE Technologies, Inc. MCE designs, manufactures and markets a broad range of devices, components and subsystems that are used in defense related applications, as well as throughout mobile and fixed wireless infrastructure equipment and related test equipment applications, MCE products are also used in wireless broadband access, cable head-end systems, fiber optic networking, and satellite applications. MCE sells products that operate over the full range of frequencies commonly used in wireless communications transmission, known as RF, including radio frequencies, microwave frequencies and millimeter wave frequencies. MCE's customers use its products to control, condition and enhance RF signals. Typical applications include power level control, power distribution, signal detection, amplification and impedance matching of defense electronics equipment, and mobile and fixed wireless communications equipment.

```
Test Solutions


Instrumentation
```

Our high-speed test equipment provides product enhancements to communications systems manufacturers. Our line of frequency synthesizers offers a superior combination of high-speed and low phase noise available, covering all communications frequencies. Our FS1000/1200 family of synthesizers are microwave frequency synthesizers that have been developed to support the requirements of mixed signal test systems used in the semiconductor market. Our test systems are designed to dramatically reduce test time for radio frequency semiconductors which allows end users to increase throughput without increasing costs. These benefits are derived from a design architecture that yields superior phase noise and switching speed performance-technology for which we believe we are well-known in the industry.

3
--------------------------------------------------------------------------------

Our test system products allow communication manufacturers to test communication satellite payloads and transmit/receive modules faster and more economically than ever before. Our digital signal processing equipment and proprietary software algorithms allow users to simultaneously measure multiple functions, eliminating the need for individual instruments. These testers are based on our proprietary software, firmware, frequency conversion and high-speed data acquisition technologies and allow for higher throughputs and increased flexibility.

Our acquisitions, each in October 2000, of Altair Aerospace Corporation and RDL Inc. extended our capabilities in Test Solutions. Altair brought the power and flexibility of a modern software development platform to provide control and user interface solutions for complex test and control environments. RDL enlarged and enhanced our product offerings in communication test equipment and allowed us to extend our comprehensive solutions to high speed testing requirements.

IFR Systems, Inc., which we acquired in May 2002, develops and manufactures test and measurement equipment for the digital and analog communications, wireless and avionics marketplace. IFR's communication test equipment products are designed to test mobile radio products, such as mobile telephones and cellular telephones, as well as base station equipment. These products are typically portable and self-contained units which emulate the required system parameters so the systems can be tested for proper frequency transmission, signal modulation, power levels and other key performance parameters.

IFR also develops and manufactures sophisticated instruments for the test and maintenance of digital and analog communication systems. In addition, IFR's products support the measurement of electromagnetic signals and radio frequency data for the aviation and automated test equipment industries. Products include spectrum analyzers, signal generators, counter power meters, microwave analyzers and modulation analyzers.

IFR's avionics test instruments include portable and stationary precision simulators that duplicate airborne conditions to test the communications, weather radar, instrument landing systems and navigational systems that are installed in aircraft and ground stations. IFR offers a line of high volume automated test equipment (ATE), which includes products designed for the automotive, consumer electronics and communications industries, including products such as manufacturing defect analyzers, in-circuit analyzers and functional analyzers. IFR also offers calibration, repair and on-site field services for most types and makes of electronic test equipment.

In July 2003, we acquired Racal Instruments Wireless Solutions Group which provided the world's first test system for GSM (Global System for Mobile Communications) in 1989 and is committed to maintaining its leading position in the wireless communications test market. Racal Instruments Wireless Solutions is an industry leader in wireless system test for 2G, 2.5G, and 3G technologies. Through its product development investments and the resulting products, systems and solutions, Racal Instruments Wireless Solutions offers an extensive line of standard test sets for base stations, mobile, and cell integrity test, as well as protocol test systems and interference analyzers.

Racal Instruments Wireless Solutions supplies its products primarily to the research and development and verification/validation markets specific to the wireless cellular markets. Racal Instruments Wireless Solutions supplies its products to the leading manufacturers within the wireless cellular industry. Nokia, Motorola, Ericsson, Samsung and Siemans are just a few select customers of the Racal Instruments Wireless Solutions team.

```
Motion Control Systems
```

Motion control systems includes three divisions: stabilization and tracking devices, magnetic motors and scanning devices. We design, develop and produce stabilization tracking devices and systems. These products play an important role in high altitude aircraft, as well as in other aircraft, ships and ground

4

--------------------------------------------------------------------------------

vehicles which require precise, highly stable mounting for cameras, antennae and lasers. Magnetic motors are utilized in our stabilization and tracking systems and in other applications where precise movement is required, such as for positioning antennae, optical systems, mechanical vanes and valves. We make electro-optical scanning devices that are low cost, lightweight thermal imaging devices that detect targets based on thermal radiation contrasts with the background. These sights are intended for use on standard issue United States Army assault rifles and crew served weapons.

```
Isolator Products
```

We design, develop, manufacture and sell shock and vibration isolation systems. These devices include rubber, spring and steel wire rope shock and vibration and noise control devices. Purchasers of isolators are manufacturers or users of equipment sensitive to shock and vibration who need to reduce shock /vibration to levels compatible with equipment fragility to extend the useful life of their equipment. There are multiple markets for isolation systems including commercial, industrial and defense.

```
Customers
```

We have hundreds of customers in the communications, satellite, aerospace/defense, transportation and construction industries. Except for Lockheed Martin (10.8%) in fiscal 2002 and Agere (10.8%) in fiscal 2001, no one customer accounted for more than 10% of our net sales in each of the years in the three year period ended June 30, 2003.

Marketing and Distribution

We use a team-based sales approach to assist our personnel to closely manage relationships at multiple levels of the customer's organization, including management, engineering and purchasing personnel. Our integrated sales approach involves a team consisting of a senior executive, a business development specialist and members of our engineering department. Our use of experienced engineering personnel as part of the sales effort enables close technical collaboration with our customers during the design and qualification phase of new communications equipment. We believe that this is critical to the integration of our product into our customers' equipment. Some of our executive officers are also involved in all aspects of our relationships with our major customers and work closely with their senior management. We also use manufacturers' representatives and independent sales representatives as needed. Our recent acquisitions of IFR, Racal Instruments Wireless Solutions Group and MCE Technologies, Inc. expanded the number of our sales and distribution locations to include additional offices in California, Kansas, Maryland, Michigan, New Jersey, Stevenage and Slough, United Kingdom, Scotland, France, Spain, Germany, Denmark, Hong Kong, Beijing, Shenzen and Nanjing, China.

Research and Development

Our research and development efforts primarily involve engineering and design relating to:

.   developing new products

.  improving existing products

.  adapting such products to new applications

.  developing prototype components to bid on specific programs

Certain product development and similar costs are recoverable under contractual arrangements and those that are not recoverable are expensed in the year incurred. The costs of our self-funded research activities were approximately $31.1 million for fiscal 2003, $23.1 million for fiscal 2002 and

5

--------------------------------------------------------------------------------

$18.8 million for fiscal 2001. The increases are primarily attributable to the addition of the expenses of IFR and our efforts to develop new integrated circuits. Also, in connection with our acquisition of IFR Systems, Inc. in fiscal 2002, we allocated $1.1 million of the purchase price to incomplete research and development projects. In connection with our acquisition of RDL, Inc. in fiscal 2001, we allocated $1.5 million of the purchase prices to incomplete research and development projects. Since the research and development projects had not reached technological feasibility at the time of the acquisition, these amounts were charged to expense, in the respective years of acquisition, in addition to the self-funded research and development costs, in accordance with accounting principles generally accepted in the United States of America.

```
Backlog
```

We include in backlog firm purchase orders or contracts providing for delivery of products and services. At June 30, 2003, our order backlog was approximately $118.4 million, approximately 78% of which was scheduled to be delivered on or before June 30, 2004. Approximately 44% of this backlog represents commercial contracts and approximately 56% of this backlog represents defense contracts. Generally, government contracts are cancelable with payment to us of amounts which we have spent under the contract together with a reasonable profit, if any, while commercial contracts are not cancelable.

At June 30, 2002, our backlog of orders was approximately $120.7 million. Approximately 81% of this backlog was scheduled to be delivered before June 30, 2003. Approximately 43% of this backlog represented orders for military or national defense purposes.

```
Competition
```

In all phases of our operations, we compete primarily on the basis of both performance and price. In the manufacture of microelectronics, we believe our primary competitors are NTK, Texas Instruments, ILC/Data Devices Corp., Honeywell International and Kyocera International. In the manufacture of test products, we believe our primary competitors are Agilent Technolgies, Rhode & Schwartz, Anritsu, Spirent and Anite. In the manufacture of isolators, we believe our primary competitor is Mason Industries, Inc. We also experience significant competition from the in-house capabilities of our current and potential customers. We believe that in all of our operations we compete favorably in the principal competitive areas of:

.  technology

.  performance

.  reliability

    .    quality

.  customer service

    .    price

We believe that to remain competitive in the future, we will need to invest significant financial resources in research and development.

To the extent that we are engaged in government contracts, our success or failure, to a large measure, is based upon our ability to compete successfully for contracts and to complete them at a profit. Government business is necessarily affected by many factors such as variations in the military requirements of the government and defense budget allocations.

6

--------------------------------------------------------------------------------

Government Sales

Approximately 37% of our sales for fiscal 2003, 43% of our sales for fiscal 2002 and 29% of our sales for fiscal 2001 were to agencies of the United States Government or to prime defense contractors or subcontractors of the United States Government. Our defense contracts have been awarded either on a bid basis or after negotiation. The contracts are primarily fixed price contracts, though we also have or had defense contracts providing for cost plus fixed fee. Our defense contracts contain customary provisions for termination at the convenience of the government without cause. In the event of such termination, we are generally entitled to reimbursement for our costs and to receive a reasonable profit, if any, on the work done prior to termination.

Manufacturing

We assemble, test, package and ship products at our manufacturing facilities located in:

- Sunnyvale, California,

- Colorado Springs, Colorado,

- Boca Raton, Florida,

- Wichita, Kansas,

- Bloomingdale, New Jersey,

- Whippany, New Jersey,

- Frederick, Maryland,

- Ann Arbor, Michigan

- Hauppauge, New York,

- Pearl River, New York,

- Plainview, New York,

- Powell, Ohio,

- Elancourt, France,

- Slough, United Kingdom, and

- Stevenage, United Kingdom.

We have been manufacturing products for defense programs for many years in compliance with stringent military specifications. Our microelectronic module manufacturing is certified to the status of Class "K," which means qualified for space. We believe we have brought to the commercial market the manufacturing quality and discipline we have demonstrated in the defense market. For example, many of our manufacturing plants are ISO-9001 or 9002 certified, our Plainview plant is also certified to the more stringent Boeing D1-9000 standard, and our Colorado Springs plant is also a QML (Qualified Manufacturers List) supplier at V, Q and T levels.

Historically, our volume production requirements for the defense market did not justify our widespread implementation of highly automated manufacturing processes. Over the last several years, we have expanded our use of high-volume manufacturing techniques for product assembly and testing. We believe that we have the manufacturing capacity required to meet the growing demand for our products.

7

--------------------------------------------------------------------------------

The principal materials we use to manufacture and assemble our products are:

.   ceramic,

.   magnetic materials,

    .   gold,

    .   steel,

    .   aluminum,

    .   rubber,

    .   iron and

    .   copper.

Many of the component parts we use in our products are also purchased, including:

.   semiconductors,

.   transformers and

.   amplifiers.

Although we have several sole source arrangements, all the materials and components we use, including those purchased from a sole source, are readily available and are or can be purchased from time to time in the open market. We have no long-term commitments for their purchase. No supplier provides more than 10% of our raw materials.

Patents and Trademarks

We own several patents, patent licenses and trademarks. In order to protect our intellectual property rights, we rely on a combination of trade secret, copyright, patent and trademark laws and employee and third-party nondisclosure agreements. We also limit access to and distribution of our proprietary information. While we believe that in the aggregate our patents and trademarks are important to our operations, we do not believe that one or any group of them is so important that its termination could materially affect us.

Employees

As of June 30, 2003, we had approximately 1,860 employees, of whom 1,080 were employed in a manufacturing capacity, and 780 were employed in engineering, sales, administrative or clerical positions. Approximately 200 of our employees are covered by two collective bargaining agreements. One of the collective bargaining agreements expires October 18, 2003. We are currently engaged in negotiations and expect to renew this agreement. We believe that our employee relations are satisfactory.

Regulation

Our operations are subject to various environmental, health and employee safety laws. We have spent money and management has spent time complying with environmental, health and worker safety laws which apply to our operations and facilities and we expect that we will continue to do so. Our principal products or services do not require any governmental approval except for the requirement that we obtain expert licenses for certain of our products. Compliance with environmental laws has not historically materially affected our capital expenditures, earnings or competitive position. We do not expect compliance with environmental laws to have a material effect on us in the future.

8
--------------------------------------------------------------------------------

Because we participate in the defense industry, we are subject to audit from time to time for our compliance with government regulations by various agencies, including (1) the Defense Contract Audit Agency, (2) the Defense Investigative Service and (3) the Defense Logistics Agency. These and other governmental agencies may also, from time to time, conduct inquiries or investigations regarding a broad range of our activities. Responding to any audits, inquiries or investigations may involve significant expense and divert management attention. Also, an adverse finding in any audit, inquiry or investigation could involve penalties that may have a material adverse effect on our business, results of operations or financial condition.

We believe that we generally comply with all applicable environmental, health and worker safety laws and governmental regulations. Nevertheless, we cannot guarantee that in the future we will not incur additional costs for compliance or that those costs will not be material.

Financial Information About Industry Segments

The sales and operating profits of each industry segment and the identifiable assets attributable to each industry segment for each of the three years in the period ended June 30, 2003 are set forth in Note 16 of Notes to Consolidated Financial Statements.

Financial Information About Geographic Areas

Most of our customers are located in the United States, but export sales accounted for 34% of our total sales in 2003, 16% in 2002 and 15% in 2001. In fiscal 2003, 66% of our sales were to customers located in the United States, 26% to Europe and the Middle East, 6% to Asia and Australia, and 2% to the rest of the world. In fiscal year 2002, 84% of our sales were to customers located in the United States, 11% Europe and the Middle East, 4% to Asia and Australia, and 1% to the rest of the world.

9
--------------------------------------------------------------------------------

Available Information

The public may read and copy any materials filed by us with the SEC at the SEC's public reference room at 450 Fifth Street, NW, Washington D.C., 20549. The public may obtain information about the operation of the SEC's public reference rooms by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website at http://www.sec.gov that contains reports, proxy and information statements and other information about issuers like us that file electronically with the SEC.

In addition, we make available free of charge on our website at http:// www.aeroflex.com our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) under the Exchange Act as soon as reasonably practical after we electronically file such material with, or furnish it to, the SEC.

**ITEM 2-PROPERTIES**

```
        Following is a description of the properties owned and leased by us at
June 30, 2003:
```

.   Our executive offices and the manufacturing facilities of Aeroflex Plainview, Inc. (formerly Aeroflex Laboratories, Inc.), one of our subsidiaries, are an aggregate of approximately 69,000 square feet and are located in premises which we own in Plainview, Long Island, New York.

.   Aeroflex Plainview, Inc., also leases manufacturing facilities in Hauppauge, Long Island, New York of approximately 47,000 square feet and Boca Raton, Florida of approximately 11,000 square feet. The annual rental of these properties is approximately $279,000 for Hauppauge and $170,000 for Boca Raton. The Hauppauge lease expires in 2010 and the Boca Raton lease expires in November 2003.

.   Our subsidiary, Aeroflex Pearl River, Inc. (formerly Aeroflex MIC Technology Corporation), owns its manufacturing facility in Pearl River, New York consisting of approximately 66,000 square feet.

.   Our subsidiary, Vibration Mountings and Controls, Inc., conducts manufacturing operations at a plant located in Bloomingdale, New Jersey. The plant, which we own, is approximately 72,000 square feet.

.   Our subsidiary, Aeroflex Powell, Inc. (formerly Aeroflex Lintek Corp.), leases approximately 20,000 square feet of space in Powell, Ohio, with an annual rental of approximately $220,000. The lease expires in 2008.

.   Our subsidiary, Aeroflex Colorado Springs, Inc. (formerly Aeroflex UTMC Microelectronic Systems, Inc.), conducts manufacturing operations at a plant located in Colorado Springs, Colorado. The plant, which we own, is approximately 102,000 square feet.

.   Our subsidiary, Aeroflex Wichita, Inc. (formerly IFR Systems, Inc.), conducts manufacturing operations at a plant located in Wichita, Kansas. The plant, which we own, is approximately 156,000 square feet.

.   Our subsidiary, Aeroflex International Ltd. (formerly IFR Systems Inc.), conducts manufacturing operations at three owned facilities in Stevenage, England comprising approximately 81,000, 34,000 and 27,000 square feet.

We believe that our facilities are adequate for our current and presently foreseeable needs and that we will be able to renew or replace our expiring leases on our rental properties on commercially reasonable terms.

```
                                     10
--------------------------------------------------------------------------------
```

```
Legal Proceedings
```

We are involved in various routine legal matters. We believe the outcome of these matters will not have a material adverse effect on us.

ITEM 4-SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

Not applicable.

### PART II

ITEM 5-MARKET FOR THE COMPANY'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

```
        (a)    Our common stock trades on the Nasdaq National Market under the
symbol "ARXX". The following table sets forth, for the fiscal periods
indicated, the high and low closing sales prices of our common stock as
reported by the Nasdaq National Market.
```

|  | Common Stock | |
|---|---|---|
|  | High | Low |

```
Fiscal Year Ended June 30, 2002
```

```
First Quarter                                     $ 12.09  $  7.00
Second Quarter                                      19.53    10.85
Third Quarter                                       21.18     9.37
Fourth Quarter                                      15.02     6.95


Fiscal Year Ended June 30, 2003
First Quarter                                     $  8.01  $  3.36
Second Quarter                                        8.20    4.50
Third Quarter                                         8.25    5.03
Fourth Quarter                                        7.87    4.82


Fiscal Year Ending June 30, 2004
First Quarter (through September 15, 2003)        $ 10.38  $  7.41
```

(b)   As of September 15, 2003, there were approximately 600 record holders of our common stock.

(c)   We have never declared or paid any cash dividends on our common stock. There have been no stock dividends declared or paid on our common stock during the past three years except for a five-for-four stock split, which was paid on July 7, 2000 for record holders as of June 26, 2000 and a two-for-one stock split, which was paid on November 22, 2000 for record holders as of November 16, 2000. We currently intend to retain any future earnings for use in the operation and development of our business and for acquisitions and, therefore, do not intend to declare or pay any cash dividends on our common stock in the foreseeable future. In addition, our bank loan and security agreement, as amended, prohibits us from paying cash dividends.

```
                                  11
--------------------------------------------------------------------------------
```

## ITEM 6-SELECTED FINANCIAL DATA

(In thousands, except percentages, footnotes and per share amounts)

```
                  (Restated, Note 2 to Consolidated Financial Statements)
                                   Years ended June 30,
                 -----------------------------------------------------------------
                    2003        2002         2001          2000         1999
                 ---------   ---------    ---------     ---------     ---------
```

| | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| **Operations Statement Data** | | | | | |
| Net sales | $ 291,780 | $ 202,129 | $ 232,553 | $ 188,750 | $ 160,382 |
| Income from continuing operations | 8,533 | 324 (1) | 22,864 (2) | 14,379 | 9,765 (3) |
| Discontinued operations | (2,138 ) | (11,105 ) | (1,642 ) | – | – |
| Cumulative effect of a change in accounting | – | – | 132 | – | – |
| Net income (loss) | 6,395 | (10,781 ) (1) | 21,354 (2) | 14,379 | 9,765 (3) |
| Income from continuing operations per common share | | | | | |
| Basic | $   0.14 | $    0.01 (1) | $    0.39 (2) | $   0.30 | $    0.22 (3) |
| Diluted | 0.14 | 0.01 (1) | 0.37 (2) | 0.28 | 0.20 (3) |
| Weighted average number of common shares outstanding | | | | | |
| Basic | 60,193 | 59,973 | 58,124 | 48,189 | 45,011 |
| Diluted | 60,753 | 62,012 | 61,041 | 51,474 | 48,371 |

```
                                           June 30,
                 -----------------------------------------------------------------
```

|                      | 2003      | 2002      | 2001      | 2000      | 1999      |
|----------------------|-----------|-----------|-----------|-----------|-----------|
| Balance Sheet Data   |           |           |           |           |           |
| Working capital      | $ 161,556 | $ 144,896 | $ 152,374 | $ 133,586 | $  50,060 |
| Total assets         | 330,616   | 318,465   | 312,746   | 249,495   | 165,672   |
| Long-term debt (including current portion) | 12,835 | 14,809 | 13,333 | 15,085 | 31,371 |
| Stockholders' equity | 258,415   | 249,482   | 255,121   | 201,644   | 101,826   |
| Other Statistics     |           |           |           |           |           |
| After tax profit margin from continuing operations | 2.9 % | 0.2 %(1) | 9.8 %(2) | 7.6 % | 6.1 %(3) |
| Return on average stockholders' equity from continuing operations | 3.4 % | 0.1 %(1) | 10.0 %(2) | 9.5 % | 10.4 %(3) |
| Stockholders' equity per share (4) | $    4.30 | $    4.16 | $    4.28 | $    3.59 | $    2.18 |

---------------

(1) Includes $9.1 million ($5.8 million, net of tax, or $.09 per diluted share) for the consolidation of three of our manufacturing operations in order to take advantage of excess manufacturing capacity and reduce operating costs including charges related to excess equipment capacity primarily in our microelectronic segment and impairments to intangibles related to our microelectronics fiber optic acquisition. Also includes $1.1 million ($1.1 million, net of tax, or $.02 per diluted share) for the write-off of in-process research and development acquired in connection with the purchase of IFR Systems, Inc. in May 2002.

(2) Includes $1.5 million ($990,000, net of tax, or $.02 or diluted share) for the write-off of in-process research and development acquired in connection with the purchase of RDL, Inc. in October 2000.

12
--------------------------------------------------------------------------------

(3) Includes $3.5 million ($3.5 million, net of tax, or $.07 per diluted share) for the write-off of in-process research and development acquired in connection with the purchase of UTMC Microelectronic Systems, Inc. in February 1999.

(4) Calculated by dividing stockholders' equity, at the end of the year, by the number of shares outstanding at the end of the year.

Note:   All share and per share amounts have been restated to reflect a five-for-four stock split paid on July 7, 2000 and a two-for-one stock split paid on November 22, 2000.

## ITEM 7-MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Overview

We use our advanced design, engineering and manufacturing abilities to produce microelectronic and testing solutions. Our products are used in the aerospace, defense, fiber optic, wireless and satellite communications markets. We also design and manufacture motion control systems and shock and vibration isolation systems which are used for commercial, industrial and defense applications.   Our operations are grouped into three segments:

.  microelectronic solutions

        .   test solutions

.  isolator products

Our consolidated financial statements include the accounts of Aeroflex Incorporated and all of our subsidiaries. In October 2000, we merged with Altair Aerospace Corporation. This transaction was accounted for as a pooling-of-interests and, accordingly, for all periods prior to the business combination, our historical consolidated financial statements have been restated to include the accounts and results of operations of Altair. All of our subsidiaries are wholly-owned.

Our microelectronic solutions segment has been designing, manufacturing and selling state-of-the-art microelectronics for the electronics industry since 1974. In January 1994, we acquired substantially all of the net operating assets of the microelectronics division of Marconi Circuit Technology Corporation, which manufactures a wide variety of microelectronic assemblies. In March 1996, we acquired MIC Technology Corporation (now Aeroflex Pearl River, Inc.) which designs, develops, manufactures and markets microelectronic products in the form of passive thin film circuits and interconnects. Effective July 1, 1997, MIC Technology acquired certain equipment, inventory, licenses for technology and patents of two of Lucent Technologies' telecommunications component units-multi-chip modules and film integrated circuits. These units manufacture microelectronic modules and interconnect products. In February

1999, we acquired all of the outstanding stock of UTMC Microelectronic Systems, Inc. (now Aeroflex Colorado Springs, Inc.), consisting of UTMC's integrated circuit business. That operation designs and supplies radiation tolerant integrated circuits for defense and satellite communications. In September 2000, we acquired all of the operating assets of AmpliComm, Inc. (merged into Aeroflex Plainview, Inc), which designs and develops fiber optic amplifiers and modulator drivers used by manufacturers of advanced fiber optic systems.

Our test solutions segment consists of two divisions: (1) instruments and (2) motion control products, including the following product lines:

.    Comstron, a leader in radio frequency and microwave technology used in the manufacture of fast switching frequency signal generators and components, which we acquired in November 1989. Comstron is currently an operating division of Aeroflex Plainview, Inc., one of our wholly-owned subsidiaries.

13

--------------------------------------------------------------------------------

.    Lintek (now Aeroflex Powell, Inc.), a leader in high speed instrumentation antenna measurement systems, radar systems and satellite test systems, which we acquired in January 1995.

.    Europtest, S.A. (France), which we acquired in September 1998. Europtest develops and sells specialized software-driven test equipment used primarily in cellular, satellite and other communications applications.

.    Altair, which we merged with in October 2000 in a pooling-of-interests business combination. Altair (merged into Aeroflex Powell, Inc.) designs and develops advanced object-oriented control systems software based upon a proprietary software engine.

.    RDL, which we acquired in October 2000. RDL (merged into Aeroflex Plainview, Inc.) designs, develops and manufactures advanced commercial communications test and measurement products and defense subsystems.

.    IFR, which we acquired in May 2002. IFR (now Aeroflex Wichita, Inc.) designs and manufactures advanced test solutions for communications, avionics and general test and measurement applications.

.    Our motion control products division has been engaged in the development and manufacture of electro-optical scanning devices used in infra-red night vision systems since 1975. Additionally, it is engaged in the design, development and production of stabilization tracking devices and systems and magnetic motors used in satellites and other high reliability applications.

Our isolator products segment has been designing, developing, manufacturing and selling severe service shock and vibration isolation systems since 1961. These devices are primarily used in defense applications. In October 1983, we acquired Vibration Mountings & Controls, Inc., which manufactures a line of off-the-shelf rubber and spring shock, vibration and structure borne noise control devices used in commercial and industrial applications. In December 1986, we acquired the operating assets of Korfund Dynamics Corporation, a manufacturer of an industrial line of heavy duty spring and rubber shock mounts.

In December 2002, our Board of Directors approved a formal plan to discontinue our fiber optic lithium niobate modulator operation which was acquired in March 2001. The plan called for an immediate cessation of operations and disposal of existing assets. The abandonment of the operation resulted in a charge of $2.6 million ($1.7 million, net of tax) in the quarter ended December 31, 2002. The charge included a cash requirement of $1.4 million, primarily for equipment leases and payroll costs, and a non-cash charge of $1.2 million, primarily for the write-off of owned equipment. In accordance with SFAS No. 144, the abandonment has been reported as a discontinued operation and, accordingly, losses from operations and the loss on abandonment have been reported separately from continuing operations.

We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the selling price is fixed or determinable and collectibility of the resulting receivable is reasonably assured. For arrangements other than certain long-term contracts, revenue (including shipping and handling fees) is recognized when products are shipped and title is passed to the customer. Revenues associated with certain long-term contracts are recognized in accordance with Statement of Position No. 81-1 "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" ("SOP 81-1"). Under SOP 81-1, we use the percentage-of-completion method, whereby revenues and associated costs are recognized as work on a contract progresses. We measure the extent of progress toward completion generally based upon one of the following (based upon an assessment of which method most closely aligns to the underlying earnings process): (i) the units-of-delivery method, (ii) the cost-to-cost method, using the ratio of contract costs incurred as a percentage of total estimated costs at contract completion (based upon engineering and production

14

--------------------------------------------------------------------------------

estimates), or (iii) the achievement of contractual milestones. Provisions for anticipated losses or revisions in estimated profits on contracts-in-process are recorded in the period in which such anticipated losses or revisions become evident.

Approximately 37% of our sales for fiscal 2003, 43% of our sales for fiscal 2002 and 29% of our sales for fiscal 2001 were to agencies of the United States government or to prime defense contractors or subcontractors of the United States government. Our government contracts have been awarded either on a bid basis or after negotiation. Our government contracts are primarily fixed price contracts, although we also have or had government contracts providing for cost plus fixed fee. Our defense contracts have customary provisions for termination at the convenience of the government without cause. In the event of such termination, we are entitled to reimbursement for our costs and to receive a reasonable profit, if any, on the work done prior to termination.

Our product development efforts primarily involve engineering and design relating to:

.   developing new products

.   improving existing products

.   adapting existing products to new applications

.   developing prototype components to bid on specific programs

Some of our development efforts are reimbursed under contractual arrangements. Product development and similar costs which we cannot recover under contractual arrangements are expensed in the period incurred.

15

--------------------------------------------------------------------------------

Statement of Operations

The following table sets forth our net sales and operating income (loss) by business segment for the periods indicated. The special charges represent the write-offs of in-process research and development acquired in connection with the purchases of businesses of $1.1 million and $1.5 million in the years ended June 30, 2002 and 2001, respectively, and restructuring charges of $9.1 million in the year ended June 30, 2002.

| Years Ended June 30, | 2003 | 2002 | 2001 |
|---|---|---|---|
| | --------- | --------- | --------- |
| | | (In thousands) | |
| | | | |
| Net Sales: | | | |
| Microelectronic Solutions | $ 105,555 | $ 103,791 | $ 144,646 |
| Test Solutions | 169,987 | 82,738 | 68,394 |
| Isolator Products | 16,238 | 15,600 | 19,513 |
| | --------- | --------- | --------- |
| Net Sales | $ 291,780 | $ 202,129 | $ 232,553 |
| | --------- | --------- | --------- |
| Operating Income (Loss): | | | |

```
Microelectronic Solutions        $ 15,319   $ 12,977   $ 36,936
Test Solutions                      4,683        975      1,971
Isolator Products                     739        994      2,326
General Corporate Expenses         (7,046 )   (4,555 )   (7,293 )
                                 ---------  ---------  ---------
                                   13,695     10,391     33,940
Special Charges                         -    (10,229 )   (1,500 )
                                 ---------  ---------  ---------
  Operating Income (Loss)        $ 13,695   $    162   $ 32,440
                                 ---------  ---------  ---------
```

The following table sets forth certain items from our statement of operations as a percentage of net sales for the periods indicated. The special charges represent the write-offs of in-process research

--------------------------------------------------------------------------------

and development acquired in connection with the purchases of businesses for the years ended June 30, 2002 and 2001 and restructuring charges for the year ended June 30, 2002.

| | Years Ended June 30, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| Net Sales | 100.0 % | 100.0 % | 100.0 % |
| Cost of Sales | 61.2 | 63.1 | 58.7 |
| Gross Profit | 38.8 | 36.9 | 41.3 |
| Operating Expenses: | | | |
|   Selling, General and Administrative Costs | 23.4 | 20.3 | 18.7 |
|   Research and Development Costs | 10.7 | 11.4 | 8.1 |
|   Special Charges | - | 5.1 | 0.6 |
|     Total Operating Expenses | 34.1 | 36.8 | 27.4 |
| Operating Income (Loss) | 4.7 | 0.1 | 13.9 |
| Other Expense (Income), Net | 0.3 | (0.1 ) | (1.0 ) |
| Income (Loss) Before Income Taxes | 4.4 | 0.2 | 14.9 |
| Provision (Benefit) For Income Taxes | 1.5 | - | 5.1 |
| Income (Loss) From Continuing Operations | 2.9 | 0.2 | 9.8 |
| Discontinued Operations | (0.7 ) | (5.5 ) | (0.7 ) |
| Cumulative Effect of a Change in Accounting | - | - | 0.1 |
| Net Income (Loss) | 2.2 % | (5.3 )% | 9.2 % |

**Fiscal Year Ended June 30, 2003 Compared to Fiscal Year Ended June 30, 2002**

Net Sales.   Net sales increased 44.4% to $291.8 million in fiscal 2003 from $202.1 million in fiscal 2002. Net sales in the microelectronic solutions segment increased 1.7% to $105.6 million in fiscal 2003 from $103.8 million in fiscal 2002 due primarily to an increase in sales volume of our specialty semiconductor products of $10.7 million, partially offset by a decrease in sales volume of thin film interconnects of $5.4 million. Net sales in the test solutions segment increased 105.5% to $170.0 million in fiscal 2003 from $82.7 million in fiscal 2002 primarily due to the inclusion of a full year of IFR Systems, Inc. ("IFR") in fiscal 2003 versus only 6 weeks in fiscal 2002. Net sales in the isolator products segment increased 4.1% to $16.2 million in fiscal 2003 from $15.6 million in fiscal 2002 due to increased sales volume in the commercial and industrial product lines.

Gross Profit.   Cost of sales includes materials, direct labor and overhead expenses such as engineering labor, fringe benefits, allocable occupancy costs, depreciation and manufacturing supplies. Gross profit increased 51.7% to $113.3 million (including a $400,000 charge related to the bankruptcy of Space Systems Loral) (38.8% of net sales) in fiscal 2003 from $74.7 million (36.9% of net sales) in fiscal 2002 (excluding $900,000 of restructuring charges, see note 4 to the Consolidated Financial Statements). The increase was primarily due to the inclusion of IFR for a full year in fiscal 2003 compared with only six weeks in fiscal 2002.

Selling, General and Administrative Costs.   Selling, general and administrative costs include office and management salaries, fringe benefits and commissions. Selling, general and administrative costs increased 66.4% to $68.5 million (23.4% of net sales) in fiscal 2003 (including a $700,000 charge related to the Loral bankruptcy) from $41.1 million (20.3% of net sales) in fiscal 2002 (excluding $8.2 million of restructuring charges, see note 4 to the Consolidated Financial Statements). The increase was primarily due to higher corporate expenses and the inclusion of IFR for the entire year in fiscal 2003 compared with only six weeks in fiscal 2002.

17
--------------------------------------------------------------------------------

Research and Development Costs.   Research and development costs include material, engineering labor and allocated overhead. Our self-funded research and development costs increased 34.4% to $31.1 million (10.7% of net sales) in fiscal 2003 from $23.1 million (11.4% of net sales) in fiscal 2002. The increase was primarily due to IFR's full year expenses in fiscal 2003 compared with only six weeks in fiscal 2002.

Acquired In-Process Research and Development.   In connection with the fiscal 2002 acquisition of IFR, we allocated $1.1 million of the purchase price to incomplete research and development projects. This allocation represents the estimated fair value based on future cash flows that have been adjusted by the projects' completion percentage. At the acquisition date, the development of these projects had not yet reached technological feasibility and the research and development in progress had no alternative future uses. Accordingly, we expensed these costs as of the acquisition date.

Other Expense (Income).   Interest expense increased to $1.4 million in fiscal 2003 from $1.3 million in fiscal 2002. Other income of $577,000 in fiscal 2003 consists primarily of $945,000 of interest income, partially offset by $547,000 in realized foreign currency transaction losses. Other income of $1.5 million in fiscal 2002 consists primarily of $1.9 million of interest income offset by $199,000 of realized foreign currency transaction losses and a $185,000 decrease in the fair value of our interest rate swap agreements. Interest income decreased primarily due to lower levels of cash and cash equivalents, which were used to acquire IFR, and lower market interest rates.

Provision for Income Taxes.   The income tax provision was $4.4 million (an effective income tax rate of 33.8%) in fiscal 2003 and the income tax provision was $50,000 (an effective income tax rate of 13.4%) in fiscal 2002. The income tax provisions for the two periods differed from the amount computed by applying the U.S. Federal income tax rate to income before income taxes primarily due to in-process R&D, foreign, state and local income taxes and research and development credits.

Income from Continuing Operations.   Income from continuing operations for the year ended June 30, 2003 was $8.5 million or $.14 per diluted share which is net of a $1.1 million charge ($720,000, net of tax) or $.01 per diluted share related to the Loral bankruptcy versus income from continuing operations of $324,000, or $.01 per diluted share in 2002. Fiscal 2002 income from continuing operations included a $9.1 million charge ($5.8 million, net of tax) or $.09 per diluted share, for restructuring charges related to the consolidation of certain operations and a $1.1 million charge ($1.1 million, net of tax) or $.02 per diluted share, for in-process research and development related to the acquisition of IFR Systems, Inc.

Fiscal Year Ended June 30, 2002 Compared to Fiscal Year Ended June 30, 2001

Net Sales.   Net sales decreased 13.1% to $202.1 million in fiscal 2002 from $232.6 million in fiscal 2001. Net sales in the microelectronic solutions segment decreased 28.2% to $103.8 million in fiscal 2002 from $144.6 million in fiscal 2001 due primarily to decreased sales volume in microelectronic modules and thin film interconnects as a result of the slowdown of the fiber optics market. Net sales in the test solutions segment increased 21.0% to $82.7 million in fiscal 2002 from $68.4 million in fiscal 2001 primarily due to the acquisition of IFR in May 2002 and an increase in sales of satellite test systems partially offset by a decline in sales of our RDL product line. Net sales in the isolator products segment decreased 20.1% to $15.6 million in fiscal 2002 from $19.5 million in fiscal 2001 due to reduced sales volume in the commercial and industrial product lines.

Gross Profit.   Gross profit decreased 22.3% to $74.7 million (36.9% of net sales) in fiscal 2002 (excluding $900,000 of restructuring charges, see note 4 to the Consolidated Financial Statements) from $96.1 million (41.3% of net sales) in fiscal 2001. The decreases were primarily a result of the decreased sales volume and the fixed nature of certain labor and overhead costs in the microelectronic solutions segment.

18

--------------------------------------------------------------------------------

Selling, General and Administrative Costs.   Selling, general and administrative costs decreased 5.2% to $41.1 million (20.3% of net sales) in fiscal 2002 (excluding $8.2 million of restructuring charges, see note 4 to the Consolidated Financial Statements) from $43.4 million (18.7% of net sales) in fiscal 2001. The decrease was primarily due to lower corporate expenses and decreased expenses in the microelectronic solutions segment which were partially offset by the addition of the expenses of IFR.

Research and Development Costs.   Our self-funded research and development costs increased 23.1% to $23.1 million (11.4% of net sales) in fiscal 2002 from $18.8 million (8.1% of net sales) in fiscal 2001. The increase was primarily due to UTMC's efforts toward the development of new integrated circuits and the additional expenses of IFR.

Acquired In-Process Research and Development.   In connection with the acquisition of IFR, we allocated $1.1 million of the purchase price to incomplete research and development projects. This allocation represents the estimated fair value based on future cash flows that have been adjusted by the projects' completion percentage. At the acquisition date, the development of these projects had not yet reached technological feasibility and the research and development in progress had no alternative future uses. Accordingly, we expensed these costs as of the acquisition date.

The value assigned to these assets was determined by identifying significant research projects for which technological feasibility had not been established. At the acquisition date, IFR was conducting design, development, engineering and testing activities associated with the completion of new technologies for its radio test set and signal sources product lines. The projects under development at the valuation date represent technologies which are expected to address emerging market demands in the communications test industry. We intend to continue with these development efforts and, if successfully completed, release the products to market.

At its acquisition date, IFR expected to spend approximately $3.5 million to complete all phases of the research and development, with anticipated completion dates ranging from 5 to 10 months from that date.

We determined the value assigned to purchased in-process technology by estimating the contribution of the purchased in-process technology in developing a commercially viable product, estimating the resulting net cash flows from the expected sales of such a product, and discounting the net cash flows to their present value using an appropriate discount rate.

Revenue growth rates for the acquired company were estimated based on a detailed forecast, as well as discussions with the finance, marketing and engineering personnel of IFR. Allocation of total projected revenues to in-process research and development was based on discussions with IFR's management. Selling, general and administrative expenses and profitability estimates were determined based on forecasts as well as an analysis of comparable companies' margin expectations.

The projections utilized in the transaction pricing and purchase price allocation exclude the potential synergetic benefits related specifically to our ownership. Due to the stage of the development and reliance on future, unproven products and technologies, the nature of the forecast and the risks associated with the projected growth and profitability of the development projects, a discount rate of 30% to 35% was used to discount cash flows from the in-process technology. The discount rate was commensurate with IFR's market position, the uncertainties in the economic estimates described above, the inherent uncertainty surrounding the successful development of the purchased in-process technology, the useful lives of such technology, the profitability levels of such technology, and the uncertainty related to technological advances that could render development stage technologies obsolete.

We believe that the foregoing assumptions used in the forecasts were reasonable at the time of the acquisition. No assurance can be given, however, that the underlying assumptions used to estimate sales, development costs or profitability, or the events associated with such projects will transpire as estimated. For these reasons, actual results may vary from projected results.

--------------------------------------------------------------------------------

Remaining development efforts for IFR's research and development included various phases of design, development and testing. Funding for such projects is expected to come primarily from internally generated sources.

As evidenced by the continued support of the development of IFR's projects, we believe we have a reasonable chance of successfully completing the research and development programs. However, as with all of our technology development, there is risk associated with the completion of the research and development projects, and there is no assurance that technological or commercial success will be achieved.

If the development of these in-process research and development projects is unsuccessful, our sales and profitability may be adversely affected in future periods. Commercial results are also subject to certain market events and risks, which are beyond our control, such as trends in technology, changes in government regulation, market size and growth, and product introduction or other actions by competitors.

Restructuring Charges.    We initiated strategic plans to consolidate three of our manufacturing operations to take advantage of excess manufacturing capacity in certain of our facilities and reduce operating costs. In connection with this restructuring, we recorded a charge of $9.1 million in the fiscal year ended June 30, 2002. The restructuring charge includes $218,000 of charges for the impairment of intangibles, $3.9 million for the write-off of excess equipment and leasehold improvements, $2.4 million for workforce reductions, $1.1 million for buyouts of certain equipment and facility leases, $900,000 for the write-off of inventory and $602,000 relating to facility closing and clean-up. The restructuring charges were allocated $7.0 million to the Microelectronics Solutions Segment and $2.1 million to the Test Solutions Segment.

Other Expense (Income).    Interest expense decreased to $1.3 million in fiscal 2002 from $1.4 million in fiscal 2001, primarily due to reduced levels of borrowings throughout most of 2002. Other income of $1.5 million in fiscal 2002 consists primarily of $1.9 million of interest income offset by $199,000 of realized foreign currency transaction losses and a $185,000 decrease in the fair value of our interest rate swap agreements. Other income of $3.6 million in fiscal 2001 consisted primarily of $3.9 million of interest income offset by a $229,000 decrease in the fair value of our interest rate swap agreements. Interest income decreased primarily due to lower interest rates and decreased levels of cash, cash equivalants and marketable securities as a result of the use of approximately $53.7 million in cash to acquire IFR in May 2002.

Provision for Income Taxes.    The income tax provision was $50,000 (an effective income tax rate of 13.4%) in fiscal 2002 and the income tax provision was $11.8 million (an effective income tax rate of 34.0%) in fiscal 2001. The income tax provisions for the two periods differed from the amount computed by applying the U.S. Federal income tax rate to income before income taxes primarily due to non-deductible charges for acquired in-process R&D and amortization of goodwill, state and local income taxes and research and development credits.

Income from Continuing Operations.    On a U.S. GAAP basis, income from continuing operations for the year ended June 30, 2002 was $324,000 or $.01 per diluted share versus $22.9 million or $.37 per diluted share. Income from continuing operations for the year ended June 30, 2002 includes a restructuring charge of $9.1 million ($5.8 million, net of tax) or $.09 per diluted share and a charge of $1.1 million ($1.1 million, net of tax) or $.02 per diluted share for in-process research and development. Income from continuing operations for the year ended June 30, 2001 includes a charge for in-process research and development of $1.5 million ($1.0 million, net of tax) or $.02 per diluted share.

20

--------------------------------------------------------------------------------

Liquidity and Capital Resources


On February 14, 2003, we executed an amended and restated revolving credit and security agreement with two banks which replaced a previous loan agreement. The amended and restated loan agreement increased the line of credit to $50 million through February 2007, continues the mortgage on our Plainview property for $3.3 million and is secured by the pledge of the stock of certain of our subsidiaries. The interest rate on revolving credit borrowings under this agreement is at various rates depending upon certain financial ratios, with the current rate substantially equivalent to prime (4.0% at June 30, 2003). The mortgage is payable in monthly installments of approximately $26,000 through March 2008 and a balloon payment of $1.6 million in April 2008. We have entered into interest rate swap agreements for the outstanding amount under the mortgage agreement at approximately 7.6% in order to reduce the interest rate risk associated with these borrowings.

The terms of the loan agreement require compliance with certain covenants including minimum consolidated tangible net worth and pretax earnings, maintenance of certain financial ratios, limitations on indebtedness and prohibition of the payment of cash dividends. We are currently in full compliance with all of the covenants contained in our loan agreement. In connection with the purchase of certain materials for use in manufacturing, we have a letter of credit of $2.0 million.

In fiscal 2002, we acquired the outstanding stock of IFR. The purchase price was approximately $61.7 million of which $48.8 million was used to fully satisfy IFR's bank indebtedness. The balance was used to purchase IFR's outstanding shares and for various acquisition related costs. The purchase price was paid from available cash and marketable securities. IFR designs and manufactures advanced test solutions for communications, avionics and general test and measurement applications. The acquired company's net sales were approximately $117.8 million for the year ended March 31, 2002.

During fiscal 2002, we announced certain strategic consolidations of our manufacturing operations. The total restructuring charges were $9.4 million with a cash cost of $4.3 million. These restructurings are substantially complete and are expected to

reduce annual operating costs by approximately $6.3 million and result in annual cash savings of approximately $5.3 million. The restructuring charges included the elimination of excess equipment capacity (primarily in the microelectronic solutions segment), severance and other employee related expenses.

In fiscal 2003, our operations provided cash of $21.4 million primarily from our continued profitability, excluding non-cash charges of depreciation and amortization. In fiscal 2003, our investing activities used cash of $7.9 million including $6.4 million of capital expenditures. In fiscal 2003, our financing activities used cash of $1.5 consisting of $2.0 million for payments of debt partially offset by $500,000 of proceeds from the exercise of stock options.

On September 3, 2003, we acquired MCE Technologies, Inc. ("MCE") for approximately 5.8 million shares of common stock and satisfied MCE obligations of an aggregate $22.8 million which was funded by cash-on-hand and available credit lines.

On July 31, 2003, we acquired Racal Instruments Wireless Solutions Group ("WSG") for cash of $38.0 million and a deferred payment of up to $16.5 million in either cash or Aeroflex common stock, at our option, depending on WSG achieving certain performance goals for the year ending July 31, 2004. This acquisition was funded with available cash- on-hand.

We believe that existing cash and unused lines of credit coupled with internally generated funds will be sufficient for our working capital requirements, capital expenditure needs and the servicing of our debt for the foreseeable future.   Our cash and lines of credit are available to fund acquisitions and other potential large cash needs that may arise. At June 30, 2003, our available unused line of credit was $46.8 million after consideration of letters of credit. We used 19.0 million of this line to fund the acquisition of MCE on September 3, 2003.

21

--------------------------------------------------------------------------------

The following table summarizes our obligations and commitments to make future payments under debt and operating leases as of June 30, 2003:

| | Total | Less Than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Long-term debt | $ 12,835 | $ 1,879 | $  3,003 | $ 2,957 | $  4,996 |
| Operating leases | 34,697 | 6,259 | 9,270 | 5,821 | 13,347 |
| Total | $ 47,532 | $ 8,138 | $ 12,273 | $ 8,778 | $ 18,343 |

The operating lease commitments shown in the above table have not been reduced by future minimum sub-lease rentals of $15.8 million.

In the normal course of business, we routinely enter into binding and non-binding purchase obligations primarily covering anticipated purchases of inventory and equipment. None of these obligations are individually significant. We do not expect that these commitments as of June 30, 2003 will materially adversely affect our liquidity.

Legal Proceedings

We are involved in various routine legal matters. We believe the outcome of these matters will not have a materially adverse effect on our consolidated financial statements.

We are undergoing routine audits by various taxing authorities of our Federal and state income tax returns covering periods from 1997 to 2001. We believe that the probable outcome of these various audits should not materially affect our consolidated financial statements.

Backlog

Our backlog of orders was $118.4 million at June 30, 2003 and $120.7

million at June 30, 2002.

Accounting Policies Involving Significant Estimates

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the recognition of revenue and expenses during the period reported. The following accounting policies require us to make estimates and assumptions based on the circumstances, information available and our experience and judgment. These estimates and assumptions are reviewed periodically and the effects of revisions are reflected in the period that they are determined to be necessary. If actual results differ significantly from our estimates, our financial statements could be materially impacted.

Revenue and Cost Recognition Under Long-Term Contracts

We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the selling price is fixed or determinable and collectibility of the resulting receivable is reasonably assured. For arrangements other than certain long-term contracts, revenue (including shipping and handling fees) is recognized when products are shipped and title is passed to the customer. Revenues associated with certain long-term contracts are recognized in accordance with Statement of Position No. 81-1 "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" ("SOP 81-1"). Under SOP 81-1, we use the percentage-of-completion method, whereby revenues and associated costs are recognized as work on a contract progresses.

22

--------------------------------------------------------------------------------

We measure the extent of progress toward completion generally based upon one of the following (based upon an assessment of which method most closely aligns to the underlying earnings process): (i) the units-of-delivery method, (ii) the cost-to-cost method, using the ratio of contract costs incurred as a percentage of total estimated costs at contract completion (based upon engineering and production estimates), or (iii) the achievement of contractual milestones. Provisions for anticipated losses or revisions in estimated profits on contracts-in-process are recorded in the period in which such anticipated losses or revisions become evident.

Inventories

Inventories are stated at the lower of cost (first-in, first-out) or market. Inventory levels are maintained in relation to the expected sales volume. We periodically evaluate the net realizable value of our inventory. Numerous analyses are applied including lower of cost or market analysis, forecasted sales requirements and forecasted warranty requirements. After taking these and other factors into consideration, such as technological changes, age and physical condition, appropriate adjustments are recorded to the inventory balance. If actual conditions differ from our expectations, then inventory balances may be over or under valued, which could have a material effect on our results of operations and financial condition.

Recoverability of Long-Lived and Intangible Assets

Property, plant and equipment are stated at cost less accumulated depreciation computed on a straight-line basis over the estimated useful lives of the related assets. Leasehold improvements are amortized over the life of the lease or the estimated life of the asset, whichever is shorter. Changes in circumstances such as technological advances or changes to our business model can result in the actual useful lives differing from our estimates. To the extent the estimated useful lives are incorrect, the value of these assets may be over or under stated, which in turn could have a material effect on our results of operations and financial condition.

Long-lived assets other than goodwill, are reviewed for impairment periodically and whenever events or changes in circumstances indicate that the carrying value of any such asset may be impaired. We evaluate the recoverability of such assets by estimating future cash flows. If the sum of the undiscounted cash flows expected to result from the use of the assets and their eventual disposition is less than the carrying amount of the assets, we will recognize an impairment loss to the extent of the excess of the carrying amount of the assets over the discounted cash flow.

SFAS No. 142 requires that we perform an assessment of whether there is an indication that goodwill is impaired on an annual basis unless events or circumstances warrant a more frequent assessment. The impairment assessment involves, among other

things, an estimation of the fair value of each of our reporting units (as defined in SFAS No. 142). Such estimations are inherently subjective, and subject to change in future periods.

If the impairment review of goodwill, intangible assets and other long-lived assets differ significantly from actual results, it could have a material effect on our results of operations and financial condition.

Restructuring Charges

When circumstances warrant a restructuring charge, we estimate and record all appropriate expenses. These expenses include severance, retention bonuses, fringe benefits, asset impairment, buyout of leases and inventory write-downs. To the extent that our estimates differ from actual expenses, there could be significant additional expenses or reversals of previously recorded charges in the future.

                                    23
--------------------------------------------------------------------------------

Income Taxes

The carrying value of our net deferred tax assets assumes that we will be able to generate sufficient future taxable income in certain tax jurisdictions. If this assumption changes in the future, we may be required to record additional valuation allowances against our deferred tax assets resulting in additional income tax expense in our consolidated statement of operations. We evaluate the realizability of the deferred tax assets and assess the adequacy of the valuation allowance quarterly.

Seasonality

Although our business is not affected by seasonality, historically our revenues and earnings increase sequentially from quarter to quarter within a fiscal year, but the first quarter is typically less than the previous year's fourth quarter.

Recent Accounting Pronouncements

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities," which was effective January 1, 2003. SFAS No. 146 provides that an exit cost liability should not always be recorded at the date of an entity's commitment to an exit plan, but instead should be recorded when the obligation is incurred. An entity's commitment to a plan, by itself, does not create an obligation that meets the definition of a liability. Such adoption did not have any impact on our consolidated financial statements.

In November 2002, the FASB issued Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45"). Fin 45 requires certain guarantees to be recorded at fair value regardless of the probability of the loss. FIN 45 has been adopted prospectively by us as of January 1, 2003. The adoption resulted in additional disclosure in the consolidated financial statements.

In November 2002, the Emerging Issues Task Force ("EITF") finalized EITF Issue 00-21, "Revenue Arrangements with Multiple Deliverables", which provides guidance on the timing and method of revenue recognition for sales arrangements that include the delivery of more than one product or service. EITF Issue 00-21 is effective prospectively for arrangements entered into in fiscal periods beginning after June 15, 2003. We are currently analyzing the impact of its adoption on our consolidated financial statements.

In December 2002, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure." SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value method of accounting for stock-based employee compensation as originally provided by SFAS No. 123 "Accounting for Stock-Based Compensation." Additionally, SFAS No. 148 amends the disclosure requirements of SFAS No. 123 in both annual and interim financial statements. We have adopted the disclosure portion of this statement for the fiscal year ended June 30, 2003. The adoption did not have any impact on our consolidated financial position or results of operations.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities," which amends and clarifies accounting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133. The statement is effective (with certain exceptions) for

contracts entered into or modified after June 30, 2003. We do not believe the adoption of this statement will have a material impact on our consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity." The statement establishes standards for how an issuer clarifies and measures certain financial instruments with characteristics of both liabilities and equity. It requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in

24

--------------------------------------------------------------------------------

some circumstances). It is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. We do not believe the adoption of this statement will have a material impact on our consolidated financial statements.

In July 2003, the EITF reached a consensus on Issue 03-5, "Applicability of AICPA Statement of Position 97-2 ("SOP 97-2") to Non-Software Deliverables" ("EITF 03-5"). The consensus was reached that SOP 97-2 is applicable to non-software deliverables if they are included in an arrangement that contains software that is essential to the non-software deliverables' functionality. This consensus is to be applied to fiscal periods beginning after August 13, 2003. We are currently analyzing the impact of this consensus on our consolidated financial statements.

Forward-Looking Statements

All statements other than statements of historical fact included in this Annual Report, including without limitation statements under "Management's Discussion and Analysis of Financial Condition and Results of Operations" regarding our financial position, business strategy and plans and objectives of our management for future operations, are forward-looking statements. When used in this Annual Report, words such as "anticipate," "believe," "estimate," "expect," "intend" and similar expressions, as they relate to us or our management, identify forward-looking statements. Such forward-looking statements are based on the current beliefs of our management, as well as assumptions made by and information currently available to our management. Actual results could differ materially from those contemplated by the forward-looking statements as a result of certain factors, including but not limited to, competitive factors and pricing pressures, the integration of the business of each of MCE Technologies and of the Racal Instruments Wireless Solutions Group with Aeroflex, changes in legal and regulatory requirements, technological change or difficulties, product development risks, commercialization difficulties and general economic conditions. Such statements reflect our current views with respect to the future and are subject to these and other risks, uncertainties and assumptions relating to Aeroflex's financial condition, results of operations, growth strategy and liquidity. Aeroflex does not undertake any obligation to update such forward-looking statements.

We are exposed to market risk related to changes in interest rates and to foreign currency exchange rates. Most of our debt is at fixed rates of interest or at a variable rate with an interest rate swap agreement which effectively converts the variable rate debt into fixed rate debt. Therefore, if market interest rates increase by 10% from levels at June 30, 2003, the effect on our net income would be a reduction of approximately $17,000 per year. Most of our invested cash and cash equivalents are at variable rates of interest. If market interest rates decrease by 10 percent from levels at June 30, 2003, the effect on our net income would be approximately $36,000. If foreign currency exchange rates (primarily the British Pound and the Euro) change by 10% from levels at June 30, 2003, the effect on our other comprehensive income would be approximately $4.1 million.

25

--------------------------------------------------------------------------------

## ITEM 8-FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The financial statements and supplementary data listed in the accompanying Index to Financial Statements and Schedules are attached as part of this report.

ITEM 9-DISAGREEMENTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

        None.

**ITEM 9A-CONTROLS AND PROCEDURES**

Evaluation and Disclosure Controls and Procedures

Based on their evaluation as of September 26, 2003, a date within 90 days of the filing of this Form 10-K, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as required by Exchange Act Rule 13a-15. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

```
Changes in Internal Controls
```

There were no significant changes in our internal controls over financial reporting that occurred during the quarter ended June 30, 2003 that have material affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Limitations on the Effectiveness of Controls

We believe that a control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

**PART III**

The information required by items 10, 11, 12, 13 and 14 of Part III is incorporated by reference to our definitive proxy statement in connection with our Annual Meeting of Stockholders scheduled to be held in November 2003. The proxy statement is to be filed with the Securities and Exchange Commission within 120 days following the end of our fiscal year ended June 30, 2003.

ITEM 15-EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

(a) See Index to Financial Statements at beginning of attached financial statements.

   **(b) Reports on Form 8-K:**

.    Report on Form 8-K/A filed on August 2, 2002-Item 7-Amendment to Report dated May 21, 2002-Consolidated Financial Statements of IFR Systems, Inc. and Subsidiaries and Pro Forma Combined Balance Sheet and Statement of Operations for IFR Systems, Inc. and Aeroflex Incorporated.

```
        .    Report on Form 8-K filed on December 23, 2002-Item 5-Extension
             of Existing Credit Facility
```

```
                                  26
-------------------------------------------------------------------------------
```

(c) Exhibits

3.1 Certificate of Incorporation, as amended. (Exhibit 3.1 to Form 10-Q for the quarter ended September 30, 2001).

3.2 By-Laws, as amended. (Exhibit 3.2 to Quarterly Report on Form 10-Q for the quarter ended September 30, 2001).

4.1 Fifth Amended and Restated Loan and Security Agreement dated as of February 14, 2003 among the Registrant, certain of its subsidiaries, JPMorgan Chase Bank and Fleet National Bank. (Exhibit 10.1 to Form 10-Q for the quarter ended December 31, 2002).

10.11989 Non-Qualified Stock Option Plan, as amended. (Exhibit 10.8 of Annual Report on Form 10-K for the year ended June 30, 1990).

10.2 1994 Non-Qualified Stock Option Plan. (Exhibit 10.2 of Annual Report on Form 10-K for the year ended June 30, 1994).

10.3 1994 Outside Directors Stock Option Plan. (Exhibit 10.3 of Annual Report on Form 10-K for the year ended June 30, 1994).

10.4 Employment Agreement between Aeroflex Incorporated and Harvey R. Blau (Exhibit 10.1 to Report on Form 10-Q for the quarter ended March 31, 1999).

10.5 Employment Agreement between Aeroflex Incorporated and Michael Gorin (Exhibit 10.2 to Report on Form 10-Q for the quarter ended March 31, 1999).

10.6 Employment Agreement between Aeroflex Incorporated and Leonard Borow (Exhibit 10.3 to Report on Form 10-Q for the quarter ended March 31, 1999).

10.7 Deferred Compensation Agreement between Aeroflex Incorporated and Harvey R. Blau (Exhibit 10.4 to Report on Form 8-K dated May 17, 1997).

10.8 Employment Agreement between Aeroflex Incorporated and Carl Caruso (Exhibit 10.5 to Report on Form 8-K dated May 17, 1997).

10.9 Amendment No 1. to Employment Agreement between Aeroflex Incorporated and Carl Caruso dated November 17, 1998. (Exhibit 10.9 to Report on Form 10-K for the fiscal year ended June 30, 2002).

10.10 Amendment No 2. to Employment Agreement between Aeroflex Incorporated and Carl Caruso dated November 17, 1999. (Exhibit 10.10 to Report on Form 10-K for the fiscal year ended June 30, 2002).

10.11 1996 Stock Option Plan. (Exhibit A to Definitive Schedule 14A filed September 30, 1996).

10.12 1998 Stock Option Plan. (Exhibit 10 to Quarterly Report on Form 10-Q for the quarter ended March 31, 1998).

10.13 1999 Stock Option Plan. (Exhibit 4.1 to Registration Statement on Form S-8, Registration Statement #333-31654).

10.14 Key Employee Stock Option Plan. (Exhibit 4.1 to Registration Statement on Form S-8, Registration Statement #333-53622).

10.15 2000 Stock Option Plan, as amended. (Exhibit 4 to Registration Statement on Form S-8, #333-97027).

10.16 2002 Stock Option Plan. (Exhibit 4 to Registration Statement on Form S-8, #333-97029).

27

--------------------------------------------------------------------------------

10.17 Amendment No. 1 to Employment Agreement between Aeroflex Incorporated and Harvey R. Blau, effective September 1, 1999. (Exhibit 10.17 to Form 10-K for the fiscal year ended June 30, 2000).

10.18 Amendment No. 1 to Employment Agreement between Aeroflex Incorporated and Michael Gorin, effective September 1, 1999. (Exhibit 10.18 to Form 10-K for the fiscal year ended June 30, 2000).

10.19 Amendment No. 1 to Employment Agreement between Aeroflex Incorporated and Leonard Borow, effective September 1, 1999. (Exhibit 10.19 to Form 10-K for the fiscal year ended June 30, 2000).

10.20 Amendment No. 2 to Employment Agreement between Aeroflex Incorporated and Harvey R. Blau, effective August 13, 2001. (Exhibit 10.16 to Form 10-K for the fiscal year ended June 30, 2001).

10.21 Amendment No. 2 to Employment Agreement between Aeroflex Incorporated and Michael Gorin, effective August 13, 2001. (Exhibit 10.17 to Form 10-K for the fiscal year ended June 30, 2001).

10.22 Amendment No. 2 to Employment Agreement between Aeroflex Incorporated and Leonard Borow, effective August 13, 2001. (Exhibit 10.18 to Form 10-K for the fiscal year ended June 30, 2001).

10.23 Aeroflex Incorporated Key Employee Deferred Compensation Plan. (Exhibit 10.19 to Form 10-K for the fiscal year ended June 30, 2001).

10.24 Trust Under Deferred Compensation Plan. (Exhibit 10.20 to Form 10-K for the fiscal year ended June 30, 2001).

10.25 Amendment No. 3 to Employment Agreement between Aeroflex Incorporated and Harvey R. Blau, effective November 8, 2001. (Exhibit 10.1 to Form 10-Q for the quarter ended September 30, 2001).

10.26 Amendment No. 3 to Employment Agreement between Aeroflex Incorporated and Michael Gorin, effective November 8, 2001.(Exhibit 10.2 to Form 10-Q for the quarter ended September 30, 2001).

10.27 Amendment No. 3 to Employment Agreement between Aeroflex Incorporated and Leonard Borow, effective November 8, 2001.(Exhibit 10.3 to Form 10-Q for the quarter ended September 30, 2001).

10.28 Agreement and Plan of Merger among Aeroflex Incorporated, Testco Acqusition Corp. and IFR Systems, Inc. dated as of April 13, 2002. (Exhibit 99.1 to Form 8-K filed April 15, 2002).

10.29 Agreement and Plan of Merger, dated as of June 27, 2003, among Registrant, Acquisition, MCE and Michael J. Endres (incorporated by reference to Exhibit 99.1 of Report on Form 8-K filed July 2, 2003).

10.30 Form of Warrant Exchange Agreement (incorporated by reference to Exhibit 99.2 of Report on Form 8-K filed July 2, 2003).

10.31 Form of Shareholders' Agreement (incorporated by reference to Exhibit 99.3 of Report on Form 8-K filed July 2, 2003).

28

--------------------------------------------------------------------------------

22  The following is a list of the Company's subsidiaries as of June 30, 2003:

```
Name                                   Jurisdiction of
-----------------------------------      Incorporation
                                       -------------------------------------
Aeroflex Colorado Springs, Inc.        Delaware
Aeroflex International Ltd.             England
Aeroflex Pearl River, Inc.             Delaware
Aeroflex Plainview, Inc.               Delaware
Aeroflex Powell, Inc.                  Ohio
Aeroflex Systems Corp.                 Delaware
Aeroflex Wichita, Inc.                 Delaware
Europtest, S.A.                        France
Vibration Mountings and Controls, Inc. New York
```

23  Consent of Independent Auditors

31.1 Certification of Chief Executive Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002.

31.2 Certification of Chief Financial Officer pursuant to Section 302 of Sarbanes-Oxley Act of 2002.

32.1 Certification of Chief Executive Officer pursuant to Section 906 of Sarbanes-Oxley Act of 2002.

32.2 Certification of Chief Financial Officer pursuant to Section 906 of Sarbanes-Oxley Act of 2002.

29

--------------------------------------------------------------------------------

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on the 29th day of September 2003.

Aeroflex Incorporated

```
By: /s/  HARVEY R. BLAU
    -------------------------------------
    Harvey R. Blau, Chairman
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below on September 29th, 2003 by the following persons in the capacities indicated:

```
/s/  HARVEY R. BLAU            Chairman of the Board
-------------------------------    (Chief Executive Officer)
Harvey R. Blau


/s/  MICHAEL GORIN             President and Director
-------------------------------    (Chief Financial Officer and Principal
Michael Gorin                  Accounting Officer)


/s/  LEONARD BOROW             Executive Vice President, Secretary and
-------------------------------    Director
Leonard Borow                  (Chief Operating Officer)


/s/  PAUL ABECASSIS            Director
-------------------------------
Paul Abecassis


/s/  MILTON BRENNER            Director
-------------------------------
Milton Brenner



-------------------------------
Ernest E. Courchene, Jr.


/s/  DONALD S. JONES           Director
-------------------------------
Donald S. Jones


/s/  EUGENE NOVIKOFF           Director
-------------------------------
Eugene Novikoff


/s/  JOHN S. PATTON            Director
-------------------------------
John S. Patton


/s/  JOSEPH E. POMPEO          Director
-------------------------------
Joseph E. Pompeo


                          30
--------------------------------------------------------------------------------
```

**AEROFLEX INCORPORATED**


**AND SUBSIDIARIES**

---------------


**FINANCIAL STATEMENTS AND SCHEDULES**

COMPRISING ITEM 8 OF ANNUAL REPORT ON FORM 10-K

TO SECURITIES AND EXCHANGE COMMISSION

AS OF JUNE 30, 2003 AND 2002

AND FOR THE YEARS

```
                  ENDED JUNE 30, 2003, 2002 AND 2001
--------------------------------------------------------------------------------
```

FINANCIAL STATEMENTS AND SCHEDULES

```
                              INDEX
                                                          PAGE
                                                          -----
```

**ITEM FIFTEEN(a)**
**1. FINANCIAL STATEMENTS:**

```
   Independent auditors' report                           S-1


   Consolidated financial statements:


   Balance sheets-June 30, 2003 and 2002                  S-2-3
```

Statements of operations-each of the years in the three year        S-4 period ended June 30, 2003

Statements of stockholders' equity and comprehensive income (loss)    S-5 -each of the years in the three year period ended June 30, 2003

Statements of cash flows-each of the years in the three year        S-6 period ended June 30, 2003

```
   Notes (1-17)                                           S-7-32


   Quarterly financial data (unaudited)                   S-33



   II-Valuation and qualifying accounts                   S-34
```

All other schedules have been omitted because they are inapplicable, not required, or the information is included elsewhere in the financial statements or notes thereto. --------------------------------------------------------------------------------

```
                   Independent Auditors' Report
```

The Board of Directors and Stockholders of Aeroflex Incorporated

We have audited the accompanying consolidated balance sheets of Aeroflex Incorporated and subsidiaries as of June 30, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity and comprehensive income (loss), and cash flows for each of the years in the three-year period ended June 30, 2003. Our audits also included the financial statement schedule listed in the Index at item 15(a)2. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Aeroflex Incorporated and subsidiaries as of June 30, 2003 and 2002, and the results of their operations and their cash flows for each of the years in the three-year period ended June 30, 2003, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the consolidated financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein. KPMG LLP

Melville, New York August 13, 2003

```
                                   S-1
--------------------------------------------------------------------------------
```

## AEROFLEX INCORPORATED
## AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

(In thousands)

|  | June 30, | |
|---|---|---|
|  | 2003 | 2002 |
|  |  | (Restated, note 2) |

### ASSETS
**Current assets:**

| | | |
|---|---|---|
| Cash and cash equivalents | $ 51,307 | $ 38,559 |

Accounts receivable, less allowance for doubtful 65,243 63,384 accounts of $1,153 and $636 at June 30, 2003 and 2002, respectively

| | | |
|---|---|---|
| Income taxes receivable | – | 4,432 |
| Inventories | 74,738 | 72,040 |
| Deferred income taxes | 14,394 | 12,259 |
| Assets of discontinued operations | – | 167 |
| Prepaid expenses and other current assets | 5,556 | 3,360 |

```
                                              ---------  ---------
      Total current assets                     211,238    194,201

Property, plant and equipment, net              69,080     73,473
```

Intangible assets with definite lives, net of        15,111    17,815 accumulated amortization of $9,790 and $6,674 at June 30, 2003 and 2002, respectively

```
Goodwill                                        22,449     20,179

Deferred income taxes                            1,002      2,477

Assets of discontinued operations                    -      1,200

Other assets                                    11,736      9,120
                                              ---------  ---------
      Total assets                          $ 330,616  $ 318,465
                                              ---------  ---------
```

See notes to consolidated financial statements.

```
                              S-2
-------------------------------------------------------------------------------


             LIABILITIES AND STOCKHOLDERS' EQUITY
Current liabilities:
   Current portion of long-term debt         $   1,879  $   2,171

   Accounts payable                             19,694     18,356

   Advance payments by customers                 2,826      1,775

   Liabilities of discontinued operations          973        366

   Accrued expenses and other current liabilities  24,310     26,637
                                              ---------  ---------
      Total current liabilities                 49,682     49,305

Long-term debt                                  10,956     12,638

Other long-term liabilities                     11,563      7,040
                                              ---------  ---------
      Total liabilities                         72,201     68,983
                                              ---------  ---------
Commitments and contingencies
Stockholders' equity:
Preferred Stock, par value $.10 per share; authorized
1,000 shares: Series A Junior
   Participating Preferred Stock, par value $.10 per
share; authorized 110 shares; none
   issued                                            -          -
Common Stock, par value $.10 per share; authorized
110,000 shares; issued 60,122 and
   60,006 at June 30, 2003 and 2002, respectively    6,012      6,001
Additional paid-in capital                     222,943    222,351
```

```
Accumulated other comprehensive income                 3,816      1,881
Retained earnings                                     25,658     19,263
                                                    ---------  ---------
                                                     258,429    249,496
Less:   Treasury stock, at cost (4 shares at June 30,     14         14
2003 and 2002)
                                                    ---------  ---------
      Total stockholders' equity                     258,415    249,482
                                                    ---------  ---------
      Total liabilities and stockholders' equity   $ 330,616  $ 318,465
                                                    ---------  ---------
```

See notes to consolidated financial statements.

S-3

--------------------------------------------------------------------------------

**AEROFLEX INCORPORATED**
**AND SUBSIDIARIES**


**CONSOLIDATED STATEMENTS OF OPERATIONS**

(In thousands, except per share amounts)

|  | Years Ended June 30, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
|  |  | (Restated, note 2) | |
| Net sales | $ 291,780 | $ 202,129 | $ 232,553 |
| Cost of sales (including restructuring charges of $900 in 2002, note 4) | 178,524 | 128,352 | 136,435 |
| Gross profit | 113,256 | 73,777 | 96,118 |
| Operating costs: |  |  |  |
| Selling, general and administrative costs (including restructuring charges of $8,229 in 2002, note 4) | 68,459 | 49,375 | 43,383 |
| Research and development costs | 31,102 | 23,140 | 18,795 |
| Acquired in-process research and development costs (note 3) | – | 1,100 | 1,500 |
| Total operating costs | 99,561 | 73,615 | 63,678 |
| Operating income | 13,695 | 162 | 32,440 |
| Other expense (income): |  |  |  |
| Interest expense | 1,389 | 1,263 | 1,397 |
| Other income, net (including interest income and dividends of $945, $1,893 and $3,853) | (577 ) | (1,475 ) | (3,602 ) |
| Total other expense (income) | 812 | (212 ) | (2,205 ) |
| Income from continuing operations before income taxes | 12,883 | 374 | 34,645 |
| Provision for income taxes | 4,350 | 50 | 11,781 |
| Income from continuing operations | 8,533 | 324 | 22,864 |
| Discontinued operations, net of tax benefit of $1,102, $3,000 and $331 (note 2) | (2,138 ) | (11,105 ) | (1,642 ) |
| Cumulative effect of a change in | – | – | 132 |

```
accounting, net of tax (note 1)                   ---------   ---------   ---------
Net income (loss)                                 $   6,395   $ (10,781 ) $  21,354
                                                  ---------   ---------   ---------
Net income (loss) per common share:
  Basic
    Income from continuing operations             $    0.14   $    0.01   $    0.39
    Discontinued operations                            (0.03 )      (0.19 )      (0.02 )
    Cumulative effect of a change in                       -           -           -
      accounting
                                                  ---------   ---------   ---------
        Net income (loss)                         $    0.11   $   (0.18 ) $    0.37
                                                  ---------   ---------   ---------
  Diluted
    Income from continuing operations             $    0.14   $    0.01   $    0.37
    Discontinued operations                            (0.03 )      (0.18 )      (0.02 )
    Cumulative effect of a change in                       -           -           -
      accounting
                                                  ---------   ---------   ---------
        Net income (loss)                         $    0.11   $   (0.17 ) $    0.35
                                                  ---------   ---------   ---------
Weighted average number of common shares
outstanding:
  Basic                                              60,193      59,973      58,124
  Diluted                                            60,753      62,012      61,041
```

S-4

--------------------------------------------------------------------------------

**AEROFLEX INCORPORATED**
**AND SUBSIDIARIES**

Years Ended June 30, 2003, 2002 and 2001
(In thousands)
(Restated, note 2)

| | Total | Common Stock Shares | Common Stock Par Value | Additional Paid-in Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Treasury Stock Shares | Treasury Stock Cost | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|---|---|---|
| Balance, July 1, 2000 | $ 201,644 | 28,110 | $ 2,811 | $ 190,141 | $ 82 | $ 8,690 | 13 | $ (80 ) | |
| Stock and options issued for acquisition of businesses | 11,766 | 1,153 | 115 | 11,651 | – | – | – | – | |
| Stock issued upon exercise of stock options and warrants | 20,390 | 1,450 | 145 | 20,179 | – | – | (11 ) | 66 | |
| Deferred compensation | 203 | – | – | 203 | – | – | – | – | |
| Two-for-one stock split | – | 28,961 | 2,896 | (2,896 ) | – | – | 2 | – | |
| Other comprehensive loss | (236 ) | – | – | – | (236 ) | – | – | – | $ (236 ) |
| Net income | 21,354 | – | – | – | – | 21,354 | – | – | 21,354 |
| Balance, June 30, 2001 | 255,121 | 59,674 | 5,967 | 219,278 | (154 ) | 30,044 | 4 | (14 ) | $ 21,118 |
| Stock issued upon exercise of stock options | 3,055 | 332 | 34 | 3,021 | – | – | – | – | |
| Deferred compensation | 52 | – | – | 52 | – | – | – | – | |
| Other comprehensive | 2,035 | – | – | – | 2,035 | – | – | – | $ 2,035 |

income

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Net loss | (10,781 ) | - | - | - | - | (10,781 ) | - | - | (10,781 ) |
| Balance, June 30, 2002 | 249,482 | 60,006 | 6,001 | 222,351 | 1,881 | 19,263 | 4 | (14 ) | $ (8,746 ) |
| Stock issued upon exercise of stock options | 591 | 116 | 11 | 580 | - | - | - | - | |
| Deferred compensation | 12 | - | - | 12 | - | - | - | - | |
| Other comprehensive income | 1,935 | - | - | - | 1,935 | - | - | - | $ 1,935 |
| Net income | 6,395 | - | - | - | - | 6,395 | - | - | 6,395 |
| Balance, June 30, 2003 | $ 258,415 | 60,122 | $ 6,012 | $ 222,943 | $ 3,816 | $ 25,658 | 4 | $ (14 ) | $ 8,330 |

See notes to consolidated financial statements.

S-5
--------------------------------------------------------------------------------

**AEROFLEX INCORPORATED**
**AND SUBSIDIARIES**


**CONSOLIDATED STATEMENTS OF CASH FLOWS**


(In thousands)

| | Years Ended June 30, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | | (Restated, note 2) | |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $  6,395 | $ (10,781 ) | $  21,354 |
| Loss from discontinued operations | 2,138 | 11,105 | 1,642 |
| Income from continuing operations | 8,533 | 324 | 22,996 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Acquired in-process research and development | – | 1,100 | 1,500 |
| Depreciation and amortization | 14,677 | 11,340 | 11,084 |
| Amortization of deferred gain | (203 ) | (457 ) | (823 ) |
| Tax benefit from stock option exercises (note 12) | – | – | 8,962 |
| Deferred income taxes | 2,110 | 4,750 | 2,566 |
| Non-cash restructuring charges | – | 5,016 | – |
| Other | 825 | 758 | 296 |
| Change in operating assets and liabilities, net of effects from purchase of businesses: | | | |
| Decrease (increase) in accounts receivable | (1,122 ) | 999 | 4,352 |
| Decrease (increase) in inventories | (1,658 ) | 3,463 | (6,251 ) |
| Decrease (increase) in prepaid expenses and other assets | (291 ) | (4,439 ) | (2,701 ) |
| Increase (decrease) in accounts payable, accrued expenses and other liabilities | (1,755 ) | (5,311 ) | 5,803 |
| Net cash provided by continuing operations | 21,116 | 17,543 | 47,784 |
| Net cash provided by (used in) discontinued operations | 268 | (1,428 ) | (576 ) |
| Net cash provided by operating activities | 21,384 | 16,115 | 47,208 |
| **Cash flows from investing activities:** | | | |
| Payment for purchase of businesses, net of cash acquired | (1,058 ) | (53,828 ) | (14,786 ) |
| Capital expenditures | (6,431 ) | (5,758 ) | (13,112 ) |
| Proceeds from sale of property, plant and equipment | 48 | – | 168 |
| Purchase of marketable securities | – | (5,938 ) | (30,767 ) |
| Proceeds from sale of marketable securities | – | 18,013 | 30,121 |
| Net cash used in continuing operations | (7,441 ) | (47,511 ) | (28,376 ) |

```
Net cash provided by (used in)            (432 )     (375 )        26
discontinued operations
                                        --------   ---------   ---------
Net cash used in investing activities    (7,873 )  (47,886 )  (28,350 )
                                        --------   ---------   ---------
Cash flows from financing activities:
  Borrowings under debt agreements           -          89         635
  Debt repayments                        (1,974 )   (1,801 )   (3,919 )
  Proceeds from the exercise of stock        501      1,737       3,800
  options and warrants
  Amounts paid for withholding taxes on      (90 )   (1,542 )  (22,193 )
  stock option exercises
  Withholding taxes collected for stock       90       1,542      17,983
  option exercises
                                        --------   ---------   ---------
Net cash provided by (used in) financing  (1,473 )        25    (3,694 )
activities
                                        --------   ---------   ---------
Effect of exchange rate changes on cash       710         409          -
and cash equivalents
                                        --------   ---------   ---------
Net increase (decrease) in cash and cash   12,748    (31,337 )     15,164
equivalents
Cash and cash equivalents at beginning of  38,559      69,896      54,732
year
                                        --------   ---------   ---------
Cash and cash equivalents at end of year $ 51,307  $  38,559  $  69,896
                                        --------   ---------   ---------
```

See notes to consolidated financial statements.

S-6

--------------------------------------------------------------------------------

## AEROFLEX INCORPORATED
## AND SUBSIDIARIES


## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS


1.   Summary of Significant Accounting Principles and Policies

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of Aeroflex Incorporated and its subsidiaries (the "Company"), all of which are wholly-owned as of June 30, 2003. All intercompany balances and transactions have been eliminated.

Use of Estimates

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America requires that management of the Company make a number of estimates and assumptions relating to the reporting of assets and liabilities and the disclosure of contingent assets and liabilities. Among the more significant estimates included in the consolidated financial statements are revenue and cost recognition under long-term contracts, the valuation of inventories and the recoverability of long-lived and intangible assets and goodwill. Actual results could differ from those estimates.

```
Cash and Cash Equivalents
```

The Company considers all highly liquid investments having maturities of three months or less at the date of acquisition to be cash equivalents.

Inventories

Inventories are stated at the lower of cost (first-in, first-out) or market. Inventories related to long-term contracts are recorded at cost less amounts expensed under percentage-of-completion accounting.

Financial Instruments and Derivatives

The fair values of all on-balance sheet financial instruments, other than long-term debt (see Note 9), approximate book values because of the short maturity of these instruments.

Effective July 1, 2000, the Company adopted Statement of Financial Accounting Standards ("SFAS") No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended. This statement requires companies to record derivatives on the balance sheet as assets or liabilities at their fair value. For derivatives that are deemed effective under SFAS No. 133, changes in the value of such derivatives are recorded as components of other comprehensive income. For derivatives that are deemed ineffective, the changes are recorded as gains or losses in other income or expense. The impact of this statement did not have a material effect on the Company's consolidated financial statements. The cumulative effect of the adoption of this accounting policy was a $132,000, net of tax, credit in the quarter ended September 30, 2000 which represented the net of tax fair value of certain interest rate swap agreements at July 1, 2000.

Revenue Recognition

The Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the selling price is fixed or determinable and collectibility of

S-7

--------------------------------------------------------------------------------

the resulting receivable is reasonably assured. For arrangements other than certain long-term contracts, revenue (including shipping and handling fees) is recognized when products are shipped and title is passed to the customer. Revenues associated with certain long-term contracts are recognized in accordance with Statement of Position No. 81-1 "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" ("SOP 81-1"). Under SOP 81-1, the Company uses the percentage-of-completion method, whereby revenues and associated costs are recognized as work on a contract progresses. The Company measures the extent of progress toward completion generally based upon one of the following (based upon an assessment of which method most closely aligns to the underlying earnings process): (i) the units-of-delivery method, (ii) the cost-to-cost method, using the ratio of contract costs incurred as a percentage of total estimated costs at contract completion (based upon engineering and production estimates), or (iii) the achievement of contractual milestones. Provisions for anticipated losses or revisions in estimated profits on contracts-in-process are recorded in the period in which such anticipated losses or revisions become evident.

Property, Plant and Equipment

Property, plant and equipment are stated at cost less accumulated depreciation computed on a straight-line basis over the estimated useful lives of the related assets. Leasehold improvements are amortized over the life of the lease or the estimated life of the asset, whichever is shorter.

Research and Development Costs

All research and development costs are charged to expense as incurred. See Note 3 for a discussion of acquired in-process research and development.

Intangible Assets

Intangible assets are carried at cost less accumulated amortization and are being amortized on a straight-line basis over periods ranging from 6 to 16 years. In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," whenever events or changes in circumstances indicate that the carrying value of its intangible assets may be impaired, the Company evaluates the recoverability of such assets by estimating the future cash flows. If the sum of the undiscounted cash flows expected to result from the use of the asset, and its eventual disposition, is less than the carrying amount of the asset, the

Company will recognize an impairment loss to the extent of the excess of the carrying amount of the asset over the discounted cash flow.

In July 2001, the FASB issued SFAS No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 specifies criteria that intangible assets acquired in a business combination must meet to be recognized and reported apart from goodwill. SFAS No. 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized, but instead tested for impairment at least annually in accordance with the provisions of SFAS No. 142. SFAS No. 142 also requires that intangible assets with estimable useful lives be amortized over their respective estimated useful lives, and reviewed for impairment in accordance with SFAS No. 144.

The Company adopted the provisions of SFAS No. 141 and SFAS No. 142 as of July 1, 2001. The Company has tested goodwill for impairment in accordance with the provisions of SFAS No. 142 as of

S-8

--------------------------------------------------------------------------------

July 1, 2001. Based on its evaluation, the Company was not required to recognize any impairment losses as of July 1, 2001. The Company evaluated its intangible assets and goodwill that were acquired in prior purchase business combinations and reclassified $2.6 million net carrying value of intangible assets to goodwill in order to conform with the criteria in SFAS No. 141 for recognition apart from goodwill. In connection with this reclassification, the Company reduced goodwill for the amount of deferred taxes previously recorded on the reclassified intangible assets that are no longer required. The Company also reassessed the useful lives and residual values of all intangible assets acquired, and determined that no adjustment to these estimates was necessary.

Earnings Per Share

In accordance with SFAS No. 128 "Earnings Per Share," net income per common share ("Basic EPS") is computed by dividing net income by the weighted average common shares outstanding. Net income per common share assuming dilution ("Diluted EPS") is computed by dividing net income by the weighted average common shares outstanding plus potential dilution from the exercise of stock options and warrants. The effect of options in a loss period would be anti-dilutive, therefore Basic EPS and Diluted EPS are the same in a loss period.

Accounting for Stock-Based Compensation

The Company records compensation expense for employee and director stock options only if the current market price of the underlying stock exceeds the exercise price on the date of the grant. Effective July 1, 1996, the Company adopted SFAS No. 123, "Accounting for Stock-Based Compensation." The Company has elected not to implement the fair value based accounting method for employee and director stock options, but instead has elected to disclose the pro forma net income and pro forma net income per share for employee and director stock option grants made beginning in fiscal 1996 as if such method had been used to account for stock-based compensation cost as described in SFAS No. 123.

The per share weighted average fair value of stock options granted during fiscal 2003, 2002 and 2001 was $5.24, $7.64 and $18.68, respectively, on the date of grant using the Black Scholes option-pricing model with the following weighted average assumptions: 2003-expected dividend yield of 0%, risk free interest rate of 3.5%, expected stock volatility of 108%, and an expected option life of 5.4 years; 2002-expected dividend yield of 0%, risk free interest rate of 4.9%, expected stock volatility of 122%, and an expected option life of 4.8 years; 2001-expected dividend yield of 0%, risk free interest rate of 5.6%, expected stock volatility of 137%, and an expected option life of 5.1 years. The pro forma compensation cost before income taxes was $43.2 million, $66.0 million and $66.3 million for the years ended June 30, 2003, 2002 and 2001, respectively, based on the aforementioned fair value at

S-9

--------------------------------------------------------------------------------

the grant date only for options granted after fiscal year 1995. The Company's
net income (loss) and net income (loss) per share using this pro forma
compensation cost would have been:

|  | Years Ended June 30, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
|  | --------- | --------- | --------- |

```
                                    (In thousands, except per share
                                              amounts)
```

Income from continuing operations-as    $  8,533  $   324  $ 22,864 reported Deduct: Total stock-based compensation (28,491 )  (43,577 )  (43,735 ) expense determined under fair value based method, net of tax

--------  ---------  --------- Income (loss) from continuing    $ (19,958 ) $ (43,253 ) $ (20,871 ) operations-pro forma

--------  ---------  --------- Income from continuing operations per share-as reported

Basic    $  0.14  $   0.01  $  0.39 Diluted                          0.14     0.01     0.37 Income (loss) from continuing operations per share-pro forma

Basic    $  (0.33 ) $   (0.72 ) $  (0.36 ) Diluted                    *        *        * --------------

\*   As a result of the loss, all options are anti-dilutive.

```
Income Taxes
```

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be realized or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

```
Foreign Currency Translations
```

The financial statements of the Company's foreign subsidiaries are measured in their local currency and then translated into U.S. dollars using the current rate method. Under the current rate method, assets and liabilities are translated using the exchange rate at the balance sheet date. Revenues and expenses are translated at average rates prevailing throughout the year. Gains and losses resulting from the translation of financial statements of the foreign susidiaries are accumulated in other comprehensive income (loss) and presented as part of stockholders' equity. Exchange gains or losses from the settlement of foreign currency transactions are reflected in the consolidated statement of operations in other income (loss).

```
Comprehensive Income
```

Comprehensive income consists of net income and equity adjustments relating to foreign currency translation, fair value of derivatives, minimum pension liability and available-for-sale securities and is presented in the Consolidated Statements of Stockholders' Equity and Comprehensive Income.

```
                                    S-10
```


```
Reclassifications
```

Reclassifications have been made to the 2001 and 2002 consolidated financial statements to conform to the 2003 presentation.

```
Recent Accounting Pronouncements
```

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities," which the Company adopted on January 1, 2003. SFAS No. 146 provides that an exit cost liability should not always be recorded at the date of an entity's commitment to an exit plan, but instead should be recorded when the obligation is incurred. An entity's commitment to a plan, by itself, does not create an obligation that meets the definition of a liability. Such adoption did not have any impact on the Company's consolidated financial statements.

In November 2002, the FASB issued Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45"). FIN 45 requires certain guarantees to be recorded at fair value regardless of the probability of the loss. FIN 45 has been adopted prospectively by the Company as of January 1, 2003. The adoption resulted in additional disclosure in the consolidated financial statements (see note 8).

In November 2002, the Emerging Issues Task Force ("EITF") finalized EITF Issue 00-21, "Revenue Arrangements with Multiple Deliverables", which provides guidance on the timing and method of revenue recognition for sales arrangements that include the delivery of more than one product or service. EITF Issue 00-21 is effective prospectively for arrangements entered into in fiscal periods beginning after June 15, 2003. The Company is currently analyzing the impact of its adoption on its consolidated financial statements. In December 2002, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation-Transition and Disclosure." SFAS No. 148 provides alternative methods of transition for a voluntary change to the fair value method of accounting for stock-based employee compensation as originally provided by SFAS No. 123 "Accounting for Stock-Based Compensation." Additionally, SFAS No. 148 amends the disclosure requirements of SFAS No. 123 in both annual and interim financial statements. The Company has adopted the disclosure portion of this statement for the fiscal year ended June 30, 2003. The adoption did not have any impact on the Company's consolidated financial position or results of operations.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities," which amends and clarifies accounting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133. The statement is effective (with certain exceptions) for contracts entered into or modified after June 30, 2003. The Company does not believe the adoption of this statement will have a material impact on its consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity." The statement establishes standards for how an issuer clarifies and measures certain financial instruments with characteristics of both liabilities and equity. It requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances). It is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15,

S-11

--------------------------------------------------------------------------------

2003. The Company does not believe the adoption of this statement will have a material impact on its consolidated financial statements.

In July 2003, the EITF reached a consensus on Issue 03-5, "Applicability of AICPA Statement of Position 97-2 ("SOP 97-2") to Non-Software Deliverables" ("EITF 03-5"). The consensus was reached that SOP 97-2 is applicable to non-software deliverables if they are included in an arrangement that contains software that is essential to the non-software deliverables' functionality. This consensus is to be applied to fiscal periods beginning after August 13, 2003. The Company is currently analyzing the impact of this consensus on its consolidated financial statements.

2.   Discontinued Operation

In December 2002, the Board of Directors of the Company approved a formal plan to discontinue the Company's fiber optic lithium niobate modulator operation due to the continued weakness in the fiber optic end-user market and reductions in pricing. This operation had previously been included in the Microelectronic Solutions segment. The plan called for an immediate cessation of operations and disposal of existing assets. The abandonment of the operation resulted in a charge of $2.6 million ($1.7 million, net of tax) in the quarter ended December 31, 2002. The charge included a cash requirement of $1.4 million, primarily for existing equipment leases and payroll costs, and a non-cash charge of $1.2 million primarily for the write-off of owned equipment.

In accordance with SFAS No. 144, the abandonment has been reported as a discontinued operation and, accordingly, losses from operations and the loss on abandonment have been reported separately from continuing operations. Net sales from discontinued operations for the years ended June 30, 2003, 2002 and 2001 were $58,000, $505,000 and $255,000, respectively. To conform with this presentation, all periods have been restated. As a result, the assets and liabilities of the discontinued operation have been reclassified on the balance sheet from the historical classifications and presented under the captions "assets of discontinued operations" and "liabilities of discontinued operations," respectively. As of June 30, 2003, the liabilities of discontinued operations consisted primarily of $832,000 of lease commitments. As of June 30, 2002, the net assets of discontinued operations consisted primarily of $779,000 of property, plant and equipment.

3.   Acquisition of Businesses and Intangible Assets

IFR Systems

On May 20, 2002, the Company acquired 75.1% of the outstanding stock of IFR Systems, Inc. ("IFR"). Effective June 19, 2002, IFR was merged into a wholly-owned subsidiary of the Company, with IFR as the surviving wholly-owned subsidiary. The Company paid $61.7 million from its available cash and marketable securities, including $48.8 million which was advanced to

IFR to satisfy IFR's bank indebtedness. IFR designs and manufactures advanced test solutions for communications, avionics and general test and measurement applications. As a result of the acquisition, the Company has broadened its Test Solutions Segment product portfolio and its international sales network.

The Company evaluated the acquired tangible and identifiable intangible assets to serve as a basis for allocation of the purchase price. The Company allocated the purchase price, including acquisition

```
                                    S-12
--------------------------------------------------------------------------------
```

costs of approximately $1.8 million, based on the estimated fair value of the assets acquired and liabilities assumed, as follows:

|  | (In thousands) |
|---|---|
| Current assets (excluding cash of $8.0 million) | $    44,046 |
| Property, plant and equipment | 20,242 |
| Developed technology | 8,230 |
| Goodwill | 5,032 |
| In-process research and development | 1,100 |
| Other | 62 |
| Total assets acquired | 78,712 |
| Current liabilities | (22,188 ) |
| Long-term debt | (2,814 ) |
| Total liabilities assumed | (25,002 ) |
| Net assets acquired | $    53,710 |

The developed technology is being amortized on a straight-line basis over 6 years. The goodwill is not deductible for tax purposes. At the acquisition date, the acquired in-process research and development was not considered to have reached technological feasibility and had no alternative future uses. Therefore, in accordance with accounting principles generally accepted in the United States of America, the value of such has been expensed in the quarter ended June 30, 2002 in operating costs. At the acquisition date, IFR was conducting design, development, engineering and testing activities associated with the completion of new technologies for its radio test set product line.

Summarized below are the unaudited pro forma results of operations of the Company as if IFR had been acquired at the beginning of the fiscal periods presented. The $1.1 million write-off has been included in the June 30, 2002 pro forma loss but not the June 30, 2001 pro forma income in order to provide comparability to the respective historical periods.

| | Pro Forma Years Ended June 30, | |
|---|---|---|
| | 2002 | 2001 |
| | (In thousands, except per share data) | |
| Net sales | $    297,002 | $    371,388 |
| Income (loss) from continuing operations | (11,006 ) | 26,497 |
| Income (loss) from continuing operations per share | | |
| Basic | $    (.18 ) | $    .46 |
| Diluted | (.18 ) | .43 |

The pro forma financial information presented above is not necessarily indicative of either the results of operations that would have occurred had the acquisition taken place at the beginning of the periods presented or of future operating results of the combined companies.

S-13

--------------------------------------------------------------------------------

TriLink

Effective March 23, 2001, the Company acquired all of the outstanding stock of TriLink Communications Corp. ("TriLink") for 1.1 million shares of Aeroflex common stock. TriLink designed, developed, manufactured and marketed fiber optic components for the communications industry, including Lithium Niobate modulators and optical switches. The operations of TriLink were discontinued in December 2002. (See Note 2-Discontinued Operation).

**RDL**

On October 23, 2000, the Company acquired all of the outstanding stock of RDL, Inc. ("RDL") for $14.0 million of available cash. RDL designs, develops and manufactures advanced commercial communications test and measurement products and defense subsystems.

The Company evaluated the acquired tangible and identifiable intangible assets to serve as a basis for allocation of the purchase price. The Company allocated the purchase price, including acquisition costs of approximately $100,000, as follows:

|                                    | (In thousands) |
|------------------------------------|---------------:|
| Net tangible assets                | $    6,990     |
| Existing technology                |      2,970     |
| Goodwill                           |      2,640     |
| In-process research and development|      1,500     |
|                                    | ------------   |
|                                    | $   14,100     |

The existing technology is being amortized on a straight-line basis over 7 years. At the acquisition date, the acquired in-process research and development was not considered to have reached technological feasibility and, in accordance with accounting principles generally accepted in the United States of America, the value of such was expensed in the quarter ended December 31, 2000. At the acquisition date, RDL was conducting design, development, engineering and testing activities associated with the completion of its defense and commercial product lines representing next-generation technologies.

S-14

--------------------------------------------------------------------------------

Summarized below are the unaudited pro forma results of operations of the Company as if RDL had been acquired at the beginning of the fiscal period presented.

|                                          | Pro Forma Year Ended June 30, 2001 |
|------------------------------------------|-----------------------------------:|
|                                          | (In thousands, except per share amounts) |
| Net sales                                | $          237,435                 |
| Income from continuing operations        |            22,441                  |
| Income from continuing operations per share: |                                |
|   Basic                                  | $              .39                 |
|   Diluted                                |                .37                 |

The pro forma financial information presented above is not necessarily indicative of either the results of operations that would have occurred had the acquisition taken place at the beginning of the period presented or of future operating results of the combined companies.

Altair

On October 16, 2000, the Company issued 550,000 shares (after adjustment for the 2-for-1 stock split effective in November 2000) of its common stock for all the outstanding common stock of Altair Aerospace Corporation ("Altair"). Altair designs and develops advanced object-oriented control systems software based upon a proprietary software engine. This business combination has been accounted for as a pooling-of-interests and, accordingly, for all periods prior to the business combination, the Company's historical consolidated financial statements have been restated to include the accounts and results of operations of Altair. Altair's net sales were approximately $2.8 million and its net loss was $21,000 for the year ended June 30, 2000.

For periods preceding the combination, there were no intercompany transactions which required elimination from the combined consolidated results of operations and there were no adjustments necessary to conform the accounting practices of the two companies.

Amplicomm

Effective September 7, 2000, Aeroflex Amplicomm, Inc. ("Amplicomm") was formed as a wholly-owned subsidiary of the Company. On September 20, 2000, Amplicomm acquired certain equipment and intellectual property from a third party for approximately $300,000, entered into employment agreements with this third party's former owners and issued 25% of the stock of Amplicomm to them. Effective June 21, 2002, the Company re-acquired the 25% interest for an aggregate $50,000. Amplicomm designs and develops fiber optic amplifiers and modulator drivers used by manufacturers of advanced fiber optic systems. On a pro forma basis, had the Amplicomm acquisition taken place as of the beginning of the periods presented, results of operations for those periods would not have been materially affected.

The acquisitions (except for Altair, as discussed above) have been accounted for as purchases and, accordingly, the acquired assets and liabilities assumed have been recorded at their estimated fair values at the respective dates of acquisition. The operating results of each acquired company are included in the consolidated statements of operations from the respective acquisition dates. Further, with respect to Altair, the Company's historical consolidated financial statements have been restated for all periods prior to the business combination.

S-15

--------------------------------------------------------------------------------

Intangibles with Definite Lives

The components of amortizable intangible assets are as follows:

|  | As of June 30, 2003 | | As of June 30, 2002 | |
|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
|  | (In thousands) | | | |
| Existing technology | $ 23,901 | $ 9,357 | $ 23,489 | $ 6,341 |
| Tradenames | 1,000 | 433 | 1,000 | 333 |
| Total | $ 24,901 | $ 9,790 | $ 24,489 | $ 6,674 |

The aggregate amortization expense for the amortized intangible assets was $3.1 million, $1.8 million and $2.0 million for the years ended June 30, 2003, 2002 and 2001, respectively.

As a result of the continued slowdown in the fiber optics market, the Company evaluated, as of June 30, 2002, the recoverability of certain of its intangibles for existing technology. Based on an evaluation of the future cash flows anticipated to be generated by these assets, the Company, as of June 30, 2002, recorded a $218,000 charge to selling, general and administrative costs for the impairment of intangibles in its microelectronic solutions segment. The Company recognized no such charges in 2003.

The estimated aggregate amortization expense for each fiscal year is as follows:

|      | (In thousands) |
|------|---------------:|
| 2004 | $  3,075 |
| 2005 |    3,065 |
| 2006 |    3,022 |
| 2007 |    3,022 |
| 2008 |    2,529 |

Goodwill

The carrying amount of goodwill is as follows:

|  | Balance as of July 1, 2002 | Acquired (Note a) | Balance as of June 30, 2003 |
|---|---:|---:|---:|
|  | (In thousands) | | |
| Microelectronic Solutions Segment | $  5,367 | $   – | $  5,367 |
| Test Solutions Segment | 14,023 | 2,270 | 16,293 |
| Isolator Products Segment | 789 | – | 789 |
| Total | $ 20,179 | $  2,270 | $ 22,449 |

---------------

Notea- Goodwill recorded during the period as a result of the final purchase price allocation of IFR and contingent payments pursuant to purchase agreements.

S-16

--------------------------------------------------------------------------------

Goodwill (including intangible assets reclassified to goodwill in accordance with SFAS No. 141) amortization for the year ended June 30, 2001 was $1.3 million and generated a tax benefit of $241,000. The following table shows the results of operations as if SFAS No. 141 was applied to prior periods:

|  | For the year ended June 30, 2001 |
|---|---:|
|  | (In thousands, except per share amounts) |
| Net income, as reported | $    21,354 |
| Add Back: Goodwill amortization, net of tax | 1,085 |
| Adjusted net income | $    22,439 |
| Income per share-Basic |  |
| Net income, as reported | $    .37 |
| Goodwill amortization, net of tax | .02 |
| Adjusted net income | $    .39 |
| Income per share-Diluted |  |
| Net income, as reported | $    .35 |
| Goodwill amortization, net of tax | .02 |
| Adjusted net income | $    .37 |

4.   Restructuring Charges

In February and June 2002, the Company initiated strategic plans to consolidate three of its manufacturing operations to take advantage of excess manufacturing capacity in certain of its facilities and reduce operating costs. The Company recorded charges to eliminate excess equipment and facility capacity, primarily in its microelectronics segment, for workforce reductions in both the microelectronics and test solutions segments, and for the impairment of intangibles related to its microelectronic fiber optic acquisition. The last of these consolidations was completed in March 2003. In connection with this restructuring, the Company recorded a charge of $9.1 million in the fiscal year ended June 30, 2002 or $5.8 million, net of tax ($.09 per diluted share). The restructuring charge was allocated $900,000 to cost of sales and $8.2 million to selling, general and administrative expenses. In addition, there were charges of approximately $165,000 directly related to the restructuring plan which could not be accrued in fiscal 2002, but were expensed as incurred in fiscal 2003 in accordance with EITF 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring)" ("EITF 94-3").

    Inventory

The $900,000 charge to write-off inventory consisted of two components- $750,000 of inventory at the Company's Texas thin-film manufacturing facility that was not compatible with the manufacturing platform at the New York facility and $150,000 of fiber optic inventory that was not viable for the current plans of the microelectronics business. These charges were classified as components of cost of sales in accordance with EITF No. 96-9, "Classification of Inventory Markdowns and Other Costs Associated with a Restructuring."

Impairment of Intangibles

Due to the slowdown in the fiber optics market, the Company recorded a charge totaling $218,000 for the impairment of an acquisition related intangible. This non-cash charge was recognized in accordance with SFAS No. 121.

                                    S-17
--------------------------------------------------------------------------------

    Workforce Reduction

During fiscal 2002, workforce reductions of approximately 120 employees resulted in a charge of $2.4 million. This charge included severance pay, retention bonuses and fringe benefits for the remaining workforces at the facilities consolidated under the restructuring plans. Approximately $70,000 of post-production payroll costs, related solely to closing the facilities, was not accrued, but was expensed as incurred, as such costs did not meet the criteria for accrual of EITF No. 94-3.

    Plant Shutdown

During fiscal 2002, the Company recognized a charge of $5.6 million for plant shutdown charges. This charge included $3.9 million for the write-off of excess equipment and leasehold improvements, $1.1 million for buyouts of certain equipment and facility leases and $602,000 relating to facility closing and clean-up. Approximately $95,000 of additional costs were incurred and expensed in fiscal 2003 related to post-production operating costs.

The $3.9 million of asset impairment charges were recognized for property, plant and equipment associated with the consolidation of manufacturing facilities. This non-cash charge was recognized in accordance with SFAS No. 144.

The following table sets forth the charges and payments related to the restructuring reserve for the year ended June 30, 2003:

| | Balance July 1, 2002 | Year Ended June 30, 2003 | | Balance June 30, 2003 |
| | Restructuring Reserve | Adjustments to Restructuring Reserve | Cash Payments | Restructuring Reserve |
| | | (In thousands) | | |
| Workforce reduction | $      1,406 | $        52 | $ (1,367 ) | $        91 |

| | | | | |
|---|---|---|---|---|
| Lease payments | 859 | (4 ) | (754 ) | 101 |
| Plant shutdown and other | 111 | 98 | (86 ) | 123 |
| Total | $ 2,376 | $ 146 | $ (2,207 ) | $ 315 |

## 5.  Inventories

Inventories consist of the following:

| | June 30, | |
|---|---|---|
| | 2003 | 2002 |
| | (In thousands) | |
| Raw materials | $ 33,952 | $ 34,701 |
| Work-in-process | 25,675 | 21,939 |
| Finished goods | 15,111 | 15,400 |
| | $ 74,738 | $ 72,040 |

Inventories include contracts-in-process of $19.3 million and $15.0 million at June 30, 2003 and 2002, respectively, which consist substantially of unbilled material, labor and overhead costs that are or were expected to be billed during the succeeding fiscal year.

S-18

--------------------------------------------------------------------------------

6.  Property, Plant and Equipment

Property, plant and equipment consists of the following:

| | June 30, | | Estimated Useful Life |
|---|---|---|---|
| | 2003 | 2002 | In Years |
| | (In thousands) | | |
| Land | $ 9,563 | $ 9,724 | |
| Building and leasehold improvements | 40,794 | 39,831 | 2 to 40 |
| Machinery, equipment, tools and dies | 60,522 | 56,476 | 3 to 10 |
| Furniture and fixtures | 11,432 | 10,255 | 5 to 10 |
| Assets recorded under capital leases | 6,581 | 6,551 | 5 to 10 |
| | 128,892 | 122,837 | |
| Less accumulated depreciation and amortization | 59,812 | 49,364 | |
| | $ 69,080 | $ 73,473 | |

Repairs and maintenance expense on property, plant and equipment was $3.7 million, $1.6 million and $2.6 million for the years ended June 30, 2003, 2002 and 2001, respectively.

7.  Accrued Expenses and Other Current Liabilities

Accrued expenses and other current liabilities include accrued salaries, wages and other compensation of $8.1 million and $7.2 million at June 30, 2003 and 2002, respectively.

8.   Product Warranty

The Company warrants its products against defects in design, materials and workmanship, generally for one year from their date of shipment. A provision for estimated future costs relating to these warranties is recorded when revenue is recognized and is included in cost of goods sold.

Activity related to the Company's product warranty liability was as follows:

|  | Years Ended June 30, | |
| --- | --- | --- |
|  | 2003 | 2002 |
|  | (In thousands) | |
| Balance at beginning of period | $  1,654 | $   270 |
| Provision for warranty obligations | 1,651 | 733 |
| Liability assumed in acquisition of business | - | 1,324 |
| Charges incurred | (1,965 ) | (673 ) |
| Balance at end of period | $  1,340 | $ 1,654 |

S-19

--------------------------------------------------------------------------------

9.   Long-Term Debt and Credit Arrangements

Long-term debt consists of the following:

|  | June 30, | |
| --- | --- | --- |
|  | 2003 | 2002 |
|  | (In thousands) | |
| Revolving credit and mortgage agreement (a) | $  3,094 | $  3,409 |
| Building mortgage (b) | 3,565 | 3,565 |
| Capitalized equipment lease obligations (c) | 3,183 | 4,210 |
| Capitalized building lease obligations (d) | 2,750 | 2,975 |
| Other | 243 | 650 |
|  | 12,835 | 14,809 |
| Less current maturities | 1,879 | 2,171 |
|  | $ 10,956 | $ 12,638 |

Aggregate long-term debt as of June 30, 2003 matures in each fiscal year as follows:

|  | (In thousands) |
| --- | --- |
| 2004 | $    1,879 |
| 2005 | 1,842 |
| 2006 | 1,161 |
| 2007 | 806 |
| 2008 | 2,151 |
| Thereafter | 4,996 |
|  | $    12,835 |

Interest paid was $1.3 million, $1.1 million and $1.4 million during the years ended June 30, 2003, 2002 and 2001, respectively.

(a)   On February 14, 2003, the Company executed an amended and restated loan and security agreement with two banks which replaced a previous loan agreement. The amended and restated loan agreement increased the line of credit to $50 million through February 2007, continues the mortgage on the Company's Plainview property for $3.1 million and is secured by the pledge of the stock of certain of the Company's subsidiaries. The interest rate on borrowings under this agreement is at various rates depending upon current financial ratios, with the current rate substantially equivalent to prime (4.00% at June 30, 2003) on the revolving credit borrowings. The Company paid a facility fee of $125,000 and is required to pay a commitment fee of .25% per annum of the average unused portion of the credit line. The mortgage is payable in monthly installments of approximately $26,000 through March 2008 and a balloon payment of $1.6 million in April 2008. The Company has entered into an interest rate swap agreement for the outstanding amount under the mortgage agreement at approximately 7.6% in order to reduce the interest rate risk associated with these borrowings. The fair market value of the interest rate swap agreement was a liability of $405,000 as of June 30, 2003 and was included in other long-term liabilities.

The terms of the loan agreement require compliance with certain covenants including minimum consolidated tangible net worth and pretax earnings, maintenance of certain financial ratios, limitations on indebtedness and prohibition of the payment of cash dividends. In connection with the purchase of certain materials for use in manufacturing, the Company has a letter of credit of $2.0 million. At June 30, 2003, the Company's available unused line of credit was approximately $46.8 million after consideration of this and other letters of credit.

S-20

--------------------------------------------------------------------------------

(b)   In December 1998, the Company financed the acquisition and renovation of the land and building of its Pearl River, NY facility and received proceeds amounting to $4.2 million. This debt requires a balloon payment of $3.6 million in 2019.

(c)   During the year ended June 30, 1998, the Company entered into equipment loans with two banks totaling $6.2 million. In June 2000, the remaining balance of these loans of $4.1 million was refinanced under two sale and capital leaseback agreements for approximately $6.0 million. These agreements expire through June 2006 and bear interest at approximately 7.9%.

(d)   In connection with the acquisition of IFR, the Company assumed a capital lease obligation for $3.0 million on IFR's Wichita, KS facility and certain equipment. The obligation requires quarterly payments through 2012 and bears interest at approximately 6.3%.

10.   Stockholders' Equity

Common Stock Split

On November 2, 2000, the Company's Board of Directors authorized a two-for-one stock split of its Common Stock, effective November 16, 2000. The share and per share amounts in the consolidated financial statements give effect to the stock split.

Stock Options and Warrants

Under the Company's stock option plans, options may be granted to purchase shares of the Company's Common Stock exercisable at prices generally equal to the fair market value on the date of grant. During 1990, the Company's shareholders approved the Non-Qualified Stock Option Plan (the "NQSOP"). In December 1993, the Board of Directors adopted the Outside Director Stock Option Plan (the "Directors' Plan") which provides for options to non-employee directors, which become exercisable in three installments. The Directors' Plan, as amended, covers 1.3 million shares of the Company's Common Stock. In November 1994, the shareholders approved the Directors' Plan and the 1994 Non-Qualified Stock Option Plan (the "1994 Plan"). In November 1996, the shareholders approved the 1996 Stock Option Plan (the "1996 Plan"). In April 1998, the Board of Directors adopted the 1998 Stock Option Plan (the "1998 Plan"). In January 2000, the shareholders approved the 1999 Stock Option Plan (the "1999 Plan"). In March 2000, the Board of Directors adopted the 2000 Stock Option Plan (the "2000 Plan"). In November 2000, the shareholders approved the Key Employee Stock Option Plan (the "Key Employee Plan"). In June 2002, the Board of Directors adopted the 2002 Stock Option Plan (the "2002 Plan"). In November 2002, the shareholders approved the 2002 Outside Directors' Stock Opton Plan (the "2002 Directors' Plan"), which provides for options to non-employee directors which become exercisable in three installments. The NQSOP, the 1994 Plan, the 1996 Plan, the 1998 Plan, the 1999 Plan, the 2000 Plan, the Key Employee Plan and the 2002 Plan provide for options which become exercisable in one or more installments and each covers 3.8 million shares of the Company's Common Stock, except for the 1999 Plan which covers 2.3 million shares, the 2000 Plan which covers 6.2 million shares, the Key Employee Plan which covers 4.0 million shares, the 2002 Plan which covers 1.5 million shares and the 2002 Directors' Plan which covers 525,000 shares. Options under the NQSOP and the 1994

Plan expire five years from the date of grant. Options under all other plans shall expire not later than ten years from the date of grant.

In connection with certain of its acquisitions, the Company has also issued to employees, who are not executive officers, options to purchase 1.4 million shares of Common Stock which were not covered by one of the above plans.

S-21

--------------------------------------------------------------------------------

```
        Additional information with respect to the Company's stock options is
as follows:
                                        Weighted        Shares
                                        Average         Under
                                        Exercise      Outstanding
                                         Prices         Options
                                       ----------    -----------

                                           (In thousands)


Balance, July 1, 2000              $      8.65          9,566
  Granted                                21.22          7,128
  Forfeited                               9.22           (148 )
  Exercised                               4.02         (2,702 )
                                                     -----------
Balance, June 30, 2001                   16.02         13,844
  Granted                                 9.44          2,896
  Forfeited                              14.83            (28 )
  Exercised                               5.39           (337 )
                                                     -----------
Balance, June 30, 2002                   15.08         16,375
  Granted                                 6.81            327
  Forfeited                              25.78         (2,739 )
  Exercised                               4.35           (116 )
                                                     -----------
Balance, June 30, 2003             $     12.85         13,847
                                                     -----------
```

The Company's stock option plans allow employees to use shares received from the exercise of the option to satisfy the tax withholding requirements. During fiscal years 2003, 2002 and 2001, payroll tax on stock option exercises were withheld from employees in shares of the Company's Common Stock amounting to $0, $0 and $4.2 million, respectively.

Options to purchase 10.6 million, 8.5 million and 4.4 million shares were exercisable at weighted average exercise prices of $12.57, $14.26 and $10.21 per share as of June 30, 2003, 2002 and 2001, respectively.

S-22

--------------------------------------------------------------------------------

```
        The options outstanding as of June 30, 2003 are summarized in ranges as
follows:
                                            Options Outstanding
                                       ------------------------------------
Range of                               Weighted      Options      Weighted
Exercise                               Average     Outstanding     Average
Prices                                 Exercise    -----------    Remaining
-----------------------------------      Price                      Life
                                       ---------                  ---------

                                            (In thousands)


$1.67-$2.50                        $      1.83          257        3.1 years
$3.28-$4.65                               4.12        1,560        4.9
$5.38-$8.10                               6.88        3,643        7.0
$9.05-$13.56                             12.19        2,887        7.9
$15.34-$22.53                            17.80        4,392        7.2
$26.00-$34.41                            29.49        1,108        7.3
                                                     -----------
```

```
                                                          13,847
                                                         -----------
                                                       Options Exercisable
                                                      -----------------------
                         Range of                  Weighted        Options
                         Exercise                   Average       Exercisable
                          Prices                    Exercise      -----------
-------------------------------------------------   Price
                                                   -----------
                                                                    (In
                                                                  thousands)


$1.67-$2.50                                        $    1.83          257
$3.28-$4.65                                             4.12        1,509
$5.38-$8.10                                             6.68        2,633
$9.05-$13.56                                           12.65        1,806
$15.34-$22.53                                          17.65        3,618
$26.00-$34.41                                          29.49          739
                                                                 -----------
                                                                    10,562
                                                                 -----------
```

As of June 30, 2000, the Company had outstanding warrants to purchase 132,000 shares of its Common Stock exercisable between $2.70 and $3.00 per share. All of these warrants were exercised or expired during fiscal year 2001.

```
Shareholders' Rights Plan
```

On August 13, 1998, the Company's Board of Directors approved a Shareholders' Rights Plan which provides for a dividend distribution of one right for each share to holders of record of the Company's Common Stock on August 31, 1998 and the issuance of one right for each share of Common Stock that shall be subsequently issued. The rights become exercisable only in the event a person or group ("Acquiring Person") accumulates 15% or more of the Company's Common Stock, or if an Acquiring Person announces an offer which would result in it owning 15% or more of the Common Stock. The rights expire on August 31, 2008. Each right will entitle the holder to buy 1/2500 of a share of Series A Junior Participating Preferred Stock, as amended, of the Company at a price of $65. In addition, upon the occurrence of a merger or other business combination, or the acquisition by an Acquiring Person of 50% or more of the Common Stock, holders of the rights, other than the Acquiring Person, will be entitled to purchase either Common Stock of the Company or common stock of the Acquiring Person at half their respective market values. The Company will be entitled to redeem the rights for $.01 per right at any time prior to a person becoming an Acquiring Person.

```
                                    S-23
--------------------------------------------------------------------------------
```

```
Net Income (Loss) Per Share
```

A reconciliation of the numerators and denominators of the Basic EPS and Diluted EPS calculations is as follows:

|  | Years Ended June 30, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
|  | -------- | --------- | -------- |
|  | (In thousands, except per share amounts) | | |
| Computation of Adjusted Net Income (Loss): |  |  |  |
| Income from continuing operations | $ 8,533 | $    324 | $ 22,864 |
| Discontinued operations, net of tax | (2,138 ) | (11,105 ) | (1,642 ) |
| Cumulative effect of a change in accounting, net of tax | - | - | 132 |
| Net income (loss) | $ 6,395 | $ (10,781 ) | $ 21,354 |

```
Computation of Adjusted Weighted Average
Shares Outstanding:
Weighted average shares outstanding          60,193      59,973      58,124
Add: Effect of dilutive options and             560       2,039       2,917
warrants outstanding
                                             --------   ---------   --------
Weighted average shares and common share     60,753      62,012      61,041
equivalents used for computation of
diluted earnings per common share
                                             --------   ---------   --------
Income (Loss) Per Share-Basic:
  Income from continuing operations       $   0.14   $    0.01   $   0.39
  Discontinued operations                    (0.03 )     (0.19 )    (0.02 )
  Cumulative effect of a change in              -           -           -
  accounting
                                             --------   ---------   --------
    Net income (loss)                     $   0.11   $   (0.18 ) $   0.37
                                             --------   ---------   --------
Income (Loss) Per Share-Diluted:
  Income from continuing operations       $   0.14   $    0.01   $   0.37
  Discontinued operations                    (0.03 )     (0.18 )    (0.02 )
  Cumulative effect of a change in              -           -           -
  accounting
                                             --------   ---------   --------
    Net income (loss)                     $   0.11   $   (0.17 ) $   0.35
                                             --------   ---------   --------
```

Options to purchase 11.2 million shares at exercise prices ranging between $6.56 and $34.41 per share were outstanding as of June 30, 2003 but were not included in the computation of Diluted EPS because the exercise prices of these options were greater than the average market price of the common shares.

--------------------------------------------------------------------------------

11.  Comprehensive Income

```
    The components of comprehensive income (loss) are as follows:
                                         Years Ended June 30,
                                     ---------------------------------
                                      2003        2002        2001
                                     --------   ---------   --------
                                           (In thousands)

Net income (loss)                 $  6,395   $ (10,781 ) $ 21,354
Unrealized gain (loss) on interest rate   (117 )     (108 )      (43 )
swap agreement, net of tax
Unrealized investment gain (loss), net of     -          42       (124 )
tax
Minimum pension liability adjustment, net   (2,115 )     (330 )       -
of tax
Foreign currency translation adjustment    4,167       2,431       (69 )
                                     --------   ---------   --------
Total comprehensive income (loss)  $  8,330   $ (8,746 ) $ 21,118
                                     --------   ---------   --------
```

```
    Accumulated other comprehensive income (loss) is as follows:
                    Unrealized   Unrealized    Minimum     Foreign      Total
                       Gain      Investment    Pension     Currency    (net of
                      (Loss)        Gain       Liability  Translation    tax)
                        on         (Loss)      Adjustment  Adjustment   -------
                     Interest    (net of      (net of     -----------
                    Rate Swap      tax)         tax)
                    Agreements   ----------   ----------
                     (net of
                       tax)
                    ----------
```

(In thousands)

| | | | | | |
|---|---|---|---|---|---|
| Balance, July 1, 2000 | $ – | $ 82 | $ – | $ – | $ 82 |
| Annual change | (43 ) | (124 ) | – | (69 ) | (236 ) |
| Balance, June 30, 2001 | (43 ) | (42 ) | – | (69 ) | (154 ) |
| Annual change | (108 ) | 42 | (330 ) | 2,431 | 2,035 |
| Balance, June 30, 2002 | (151 ) | – | (330 ) | 2,362 | 1,881 |
| Annual change | (117 ) | – | (2,115 ) | 4,167 | 1,935 |
| Balance, June 30, 2003 | $ (268 ) | $ – | $ (2,445 ) | $ 6,529 | $ 3,816 |

## 12. Income Taxes

The provision (benefit) for income taxes from continuing operations consists of the following:

| | Years Ended June 30, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (In thousands) | | |
| Current: | | | |
| Federal | $ 1,909 | $ (5,080 ) | $ 8,665 |
| State and local | 172 | 380 | 550 |
| Foreign | 159 | – | – |
| | 2,240 | (4,700 ) | 9,215 |
| Deferred: | | | |
| Federal | 2,106 | 4,708 | 2,309 |
| State and local | 936 | 42 | 257 |
| Foreign | (932 ) | – | – |
| | 2,110 | 4,750 | 2,566 |
| | $ 4,350 | $ 50 | $ 11,781 |

S-25

The provision for income taxes varies from the amount computed by applying the U.S. Federal income tax rate to income from continuing operations before income taxes as a result of the following:

| | Years Ended June 30, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (In thousands) | | |
| Tax at statutory rate | $ 4,380 | $ 127 | $ 12,126 |
| Non-deductible acquired in-process research and development charge | – | 374 | – |
| Impairment and amortization of goodwill | – | – | 210 |
| Undistributed earnings of foreign subsidiaries | (1,479 ) | – | – |
| Valuation allowance against foreign loss | 795 | – | – |

```
State and local income tax                 1,047        11        352
Research and development credit             (550 )     (375 )     (650 )
Other, net                                   157        (87 )     (257 )
                                          --------    ------    --------
                                          $  4,350    $   50    $ 11,781
                                          --------    ------    --------
```

Deferred tax assets and liabilities consist of:

| | June 30, | |
| --- | --- | --- |
| | 2003 | 2002 |
| | (In thousands) | |
| Accounts receivable | $     614 | $     463 |
| Inventories | 9,858 | 9,093 |
| Accrued expenses and other current liabilities | 3,922 | 2,703 |
| Current assets | 14,394 | 12,259 |
| Capital lease obligation | 1,081 | 1,160 |
| Other long-term liabilities | 3,936 | 1,492 |
| Capital loss carryforwards | 673 | 673 |
| Tax loss carryforwards | 4,284 | 10,220 |
| Tax credit carryforwards | 5,703 | 3,402 |
| Less: valuation allowance | (4,630 ) | (4,319 ) |
| Non-current assets | 11,047 | 12,628 |
| Property, plant and equipment | (4,015 ) | (4,830 ) |
| Intangibles | (6,030 ) | (5,321 ) |
| Long-term liabilities | 10,045 ) | (10,151 ) |
| Net non-current assets (liabilities) | 1,002 | 2,477 |
| Total | $  15,396 | $  14,736 |

The Company recorded credits of $90,000, $1.3 million and $20.8 million to additional paid-in capital during the years ended June 30, 2003, 2002 and 2001, respectively, in connection with the tax benefit related to compensation deductions on the exercise of stock options and warrants. The tax loss carryforwards and tax credit carryforwards expire through 2022.

In accordance with SFAS No. 109, the Company records a valuation allowance against deferred tax assets if it is more likely than not that some or all of the deferred tax assets will not be realized. The Company has recorded a valuation allowance primarily against foreign and state net operating loss carryforwards, capital loss carryforwards and certain other tax credit carryforwards which may expire before they can be utilized. The increase in the valuation allowance in fiscal 2003, was primarily for

--------------------------------------------------------------------------------

foreign net operating loss carryforwards, partially offset by a decrease in a valuation allowance against expired credits.

Deferred taxes have not been provided on undistributed earnings of foreign subsidiaries since substantially all of these earnings are expected to be permanently reinvested in foreign operations. Determination of the amount of unrecognized deferred U.S. income tax liabilities and potential foreign tax credits is not practical to calculate because of the complexity of this hypothetical calculation.

The Company is undergoing routine audits by various taxing authorities of its Federal and state income tax returns covering periods from 1997 to 2001. Management believes that the probable outcome of these various audits should not materially affect the consolidated financial statements of the Company.

The Company made income tax payments of $1.4 million, $1.1 million and $227,000 and received refunds of $5.6 million, $609,000 and $2.3 million during the years ended June 30, 2003, 2002 and 2001, respectively.

13. Employment Contracts

As of June 30, 2003, the Company has employment agreements with certain of its officers for periods through June 30, 2007 with annual remuneration ranging from $238,000 to $398,000, plus cost of living adjustments and, in some cases, additional compensation based upon earnings of the Company. Future aggregate minimum payments under these contracts are $1.3 million per year. Certain of the contracts provide for a three-year consulting period at the expiration of the employment term at two-thirds of salary. In addition, these officers have the option to terminate their employment agreements upon a change in control of the Company, as defined, and receive lump sum payments equal to the salary and bonus, if any, for the remainder of the term.

14. Employee Benefit Plans

All employees of the Company and certain subsidiaries who are not members of a collective bargaining agreement are eligible to participate in a company sponsored 401(k) plan. Each participant has the option to contribute a portion of his or her compensation and receive a discretionary employer matching contribution. Furthermore, employees of a certain subsidiary are eligible to participate in a qualified profit sharing plan and receive an allocation of a discretionary share of their subsidiary's profits. For fiscal years ended June 30, 2003, 2002 and 2001, these 401(k) and profit sharing plans had an aggregate expense of $3.2 million, $2.2 million and $2.3 million, respectively.

Effective January 1, 1994, the Company established a Supplemental Executive Retirement Plan (the "SERP") which provides retirement, death and disability benefits to certain of its officers. The SERP expense for the fiscal years ended June 30, 2003, 2002 and 2001 was $1.0 million, $885,000 and $625,000, respectively. The assets of the SERP are held in a Rabbi Trust and amounted to $4.0 million and $3.3 million at June 30, 2003 and 2002, respectively. The accumulated benefit obligation was $8.8 million and $4.6 million at June 30, 2003 and 2002, respectively. The projected benefit obligation was $8.8 million and $6.5 million at June 30, 2003 and 2002, respectively. The intangible asset related to the SERP was $499,000 and $537,000 at June 30, 2003 and 2002, respectively. A discount rate of 6.0%, 7.0% and 7.0% was assumed in the above calculations and a rate of compensation increase of 0%, 3.0% and 3.0% was assumed for the years ended June 30, 2003, 2002 and 2001, respectively. No participants are currently receiving benefits.

```
                                   S-27
--------------------------------------------------------------------------------
```

15. Commitments and Contingencies

```
Operating Leases
```

Several of the Company's operating facilities and certain machinery and equipment are leased under agreements expiring through 2020. The leases for machinery and equipment generally contain options to purchase at the then fair market value of the related leased assets.

```
        Future minimum payments under operating leases as of June 30, 2003 are
as follows for the fiscal years:
```

|  | (In thousands) |
|---|---|
| 2004 | $ 6,259 |
| 2005 | 5,124 |
| 2006 | 4,146 |
| 2007 | 3,390 |
| 2008 | 2,431 |
| Thereafter | 13,347 |
| Future minimum lease payments | 34,697 |
| Sub-lease income | (15,768 ) |
| Net minimum lease payments | $ 18,929 |

Rental expense was $7.6 million, $4.8 million and $3.7 million during the fiscal years 2003, 2002 and 2001, respectively. Sub-lease rental income was $965,000, $86,000 and $0 for the fiscal years 2003, 2002 and 2001, respectively.

Legal Matters

The Company is involved in various routine legal matters. Management believes the outcome of these matters will not have a materially adverse effect on the Company's consolidated financial statements.

16.  Business Segments

The Company's business segments, and major products included in each segment, are as follows:

Microelectronic Solutions:

a) Microelectronic Modules

   b)  Thin Film Interconnects

c) Integrated Circuits

Test Solutions:

a) Instrument Products

   b)  Motion Control Systems

Isolator Products:

a) Commercial Spring and Rubber Isolators

b) Industrial Spring and Rubber Isolators

   c)  Military Wire-rope Isolators

                              S-28
--------------------------------------------------------------------------------

The Company is a manufacturer of advanced technology systems and components for commercial industry, government and defense contractors. Approximately 37%, 43% and 29% of the Company's sales for the fiscal years 2003, 2002 and 2001, respectively, were to agencies of the United States government or to prime defense contractors or subcontractors of the United States government. The only customers which constituted more than 10% of the Company's sales during any year in the period presented were Lockheed Martin which comprised 10.8% of sales in fiscal year 2002, and Agere which comprised 10.8% of sales in fiscal year 2001. Most of the Company's customers are located in the United States, but export sales accounted for 34%, 16% and 15% of sales in fiscal years 2003, 2002 and 2001, respectively. In fiscal year 2003, 66%, 26%, 6% and 2% of the Company's sales were to customers located in the United States, Europe and the Middle East, Asia and Australia, and the rest of the world, respectively. In fiscal year 2002, 84%, 11%, 4% and 1% of the Company's sales were to customers located in the United States, Europe and the Middle East, Asia and Australia, and the rest of the world, respectively.

                              S-29
--------------------------------------------------------------------------------

| | Years Ended June 30, | | |
| --- | --- | --- | --- |
| | 2003 | 2002 | 2001 |
| | (In thousands) | | |
| Business Segment Data: | | | |
| Net sales: | | | |
| Microelectronic Solutions | $ 105,555 | $ 103,791 | $ 144,646 |

| | | | |
|---|---:|---:|---:|
| Test Solutions | 169,987 | 82,738 | 68,394 |
| Isolator Products | 16,238 | 15,600 | 19,513 |
| Net sales | $ 291,780 | $ 202,129 | $ 232,553 |
| **Operating income:** | | | |
| Microelectronic Solutions | $ 15,319 | $ 12,977 | $ 36,936 |
| Test Solutions | 4,683 | 975 | 1,971 |
| Isolator Products | 739 | 994 | 2,326 |
| General corporate expenses | (7,046 ) | (4,555 ) | (7,293 ) |
| | 13,695 | 10,391 | 33,940 |
| Restructuring charges(1) | – | (9,129 ) | – |
| Acquired in-process research and development(2)(3) | – | (1,100 ) | (1,500 ) |
| Interest expense | (1,389 ) | (1,263 ) | (1,397 ) |
| Other income (expense), net | 577 | 1,475 | 3,602 |
| Income before income taxes | $ 12,883 | $ 374 | $ 34,645 |
| **Total assets:** | | | |
| Microelectronic Solutions | $ 94,968 | $ 105,263 | $ 117,303 |
| Test Solutions | 164,323 | 154,565 | 74,308 |
| Isolator Products | 7,718 | 7,538 | 9,445 |
| Corporate | 63,607 | 49,732 | 98,752 |
| Assets of discontinued operations | – | 1,367 | 12,938 |
| Total assets | $ 330,616 | $ 318,465 | $ 312,746 |
| **Capital expenditures:** | | | |
| Microelectronic Solutions | $ 2,631 | $ 3,098 | $ 7,877 |
| Test Solutions | 3,423 | 2,339 | 4,878 |
| Isolator Products | 368 | 164 | 341 |
| Corporate | 9 | 157 | 16 |
| Total capital expenditures | $ 6,431 | $ 5,758 | $ 13,112 |
| **Depreciation and amortization expense:** | | | |
| Microelectronic Solutions | $ 6,086 | $ 7,346 | $ 7,494 |
| Test Solutions | 8,123 | 3,491 | 3,042 |
| Isolator Products | 462 | 484 | 522 |
| Corporate | 6 | 19 | 26 |
| Total depreciation and amortization expense | $ 14,677 | $ 11,340 | $ 11,084 |

---------------

(1) In fiscal year 2002, the operating income of the Microelectronic Solutions and Test Solutions segments has been adjusted to exclude the restructuring charges of $7.0 million and $2.1 million, respectively, for the consolidation of a total of three manufacturing operations.

(2) The fiscal year 2002 special charge for the write-off of in-process research and development acquired in the purchase of IFR ($1.1 million) is allocable fully to the Test Solutions segment.

(3) The fiscal year 2001 special charge for the write-off of in-process research and development acquired in the purchase of RDL ($1.5 million) is allocable fully to the Test Solutions segment.

--------------------------------------------------------------------------------

17.  Subsequent Events

     Acquisition of Racal Instruments Wireless Solutions Group

On July 31, 2003, the Company acquired the Racal Instruments Wireless Solutions Group ("WSG") for cash of $38 million and a deferred payment of up to $16.5 million in either cash or Aeroflex common stock, at the Company's option, depending on WSG achieving certain performance goals for the year ending July 31, 2004. WSG develops, manufactures and integrates digital wireless testing and measurement solutions. The addition of WSG testing solutions products and technologies will enable the Company to provide a full spectrum of wireless testing solutions from development to production and services primarily for infrastructure testing and mobile handset testing.

```
        The Company evaluated the acquired tangible and identifiable assets to
serve as a basis for allocation of the preliminary purchase price. The Company
preliminarily allocated the purchase price, including acquisition costs of
approximately $2.0 million, based on the estimated fair value of the assets
acquired and liabilities assumed as follows:
                                                             (In
                                                          thousands)
                                                          -----------
Current assets (excluding cash of $6.3 million)          $    20,737
Property, plant and equipment                                  6,325
Developed technology                                          15,600
Customer related intangibles                                   1,900
Goodwill                                                      11,975
In-process research and development                            2,700
                                                          -----------
   Total assets acquired                                      59,237
                                                          -----------
Current liabilities                                          (21,606 )
Deferred taxes                                                (5,882 )
                                                          -----------
Total liabilities assumed                                    (27,488 )
                                                          -----------
Net assets acquired                                      $    31,749
                                                          -----------


        Summarized below are the unaudited proforma results of operations of
the Company as if WSG had been acquired at the beginning of the fiscal periods
presented.
                                                          Pro forma
                                                         Years Ended
                                                           June 30,
                                                     ---------------------
                                                       2003        2002
                                                     ---------   ---------
                                                        (In thousands)


Net sales                                            $ 339,318   $ 240,226
Income (loss) from continuing operations                 5,385      (5,919 )
Income (loss) from continuing operations per share
   Basic                                             $    0.09   $   (0.10 )
   Diluted                                                0.09       (0.10 )
```

The pro forma financial information presented above is not necessarily indicative of either the results of operations that would have occurred had the acquisition taken place at the beginning of the periods presented or of future operating results of the combined companies. The operating results of WSG will be included in the consolidated statement of operations from the acquisition date and will be included in the Test Solutions segment.

```
                              S-31
--------------------------------------------------------------------------------


   Acquisition of MCE Technologies, Inc.
```

On September 3, 2003, the Company acquired MCE Technologies, Inc. ("MCE") for approximately 5.8 million shares of Aeroflex common stock. In addition, the Company discharged $22.8 million in MCE outstanding bank, other indebtedness and preferred stock and issued stock options for 315,000 shares of Aeroflex common stock with exercise prices ranging from $2.88 to

$9.59 in exchange for outstanding options of MCE. MCE designs, manufactures and markets a broad range of microelectronic devices, components and multi-function modules servicing wireless, broadband infrastructure, satellite communications and defense markets. These product offerings complement our existing product lines.

The Company evaluated the acquired tangible and identifiable intangible assets to serve as a basis for allocation of the preliminary purchase price. The Company preliminarily allocated the purchase price, including acquisition costs of approximately $1.4 million, based on the estimated fair value of the assets acquired and liabilities assumed as follows:

|  | (In thousands) |
|---|---|
| Current assets (excluding cash of $250,000) | $    18,660 |
| Property, plant and equipment | 10,148 |
| Developed technology | 8,850 |
| Customer related intangibles | 3,620 |
| Goodwill | 45,788 |
| In-process research and development | 420 |
| Other | 35 |
| Total assets acquired | 87,521 |
| Current liabilities | (11,268 ) |
| Long-term debt | (1,277 ) |
| Other long-term liabilities | (6,462 ) |
| Total liabilities assumed | (19,007 ) |
| Net assets acquired | $    68,514 |

Summarized below are the unaudited proforma results of operations of the Company as if MCE had been acquired at the beginning of the fiscal periods presented.

|  | Pro forma Years Ended June 30, | |
|---|---|---|
|  | 2003 | 2002 |
|  | (In thousands) | |
| Net sales | $ 350,303 | $ 273,535 |
| Income from continuing operations | 7,878 | 4,796 |
| Income from continuing operations per share |  |  |
| Basic | $     0.12 | $     0.07 |
| Diluted | 0.12 | 0.07 |

The pro forma financial information presented above is not necessarily indicative of either the results of operations that would have occurred had the acquisition taken place at the beginning of the periods presented or of future operating results of the combined companies. The operating results of MCE will be included in the consolidated statement of operations from the acquisition date and will be included in the Microelectronic Solutions segment.

S-32
--------------------------------------------------------------------------------

Quarterly Financial Data (Unaudited):
(In thousands, except per share amounts and footnotes)

| 2003 | Quarter | | | | Year Ended June 30, |
|---|---|---|---|---|---|
|  | First | Second | Third | Fourth |  |
| Net sales | $ 66,433 | $ 71,764 | $ 74,942 | $ 78,641 | $ 291,780 |

```
Gross profit                   24,943    27,119    29,734    31,460   113,256
Income from continuing      $     874  $  1,684  $  2,925  $  3,050  $   8,533
operations
                            --------  --------  --------  --------  ---------
Income from continuing
operations per share:
  Basic                     $    0.01  $    0.03  $    0.05  $    0.05  $    0.14
                            --------  --------  --------  --------  ---------
  Diluted                   $    0.01  $    0.03  $    0.05  $    0.05  $    0.14
                            --------  --------  --------  --------  ---------
                                                Quarter
2002                        -------------------------------------------    Year
                                                                          Ended
------------------------     First    Second    Third    Fourth   June 30,
                            --------  --------  --------  --------  ---------

Net sales                   $ 39,307  $ 45,996  $ 50,571  $ 66,255  $ 202,129
Gross profit                  13,146    17,020    18,257    25,354    73,777
Income (loss) from          $   (282 ) $  1,769  $ (1,013 ) $   (150 ) $     324
continuing operations(1)
(2)
                            --------  --------  --------  --------  ---------
Income (loss) from
continuing operations per
share:
  Basic(1)(2)               $      -  $    0.03  $  (0.02 ) $      -  $    0.01
                            --------  --------  --------  --------  ---------
  Diluted(1)(2)             $      *  $    0.03  $      *  $      *  $    0.01
                            --------  --------  --------  --------  ---------
---------------
```

(1) Includes $1.1 million ($1.1 million, net of tax), or $.02 per share, for the year and quarter ended June 30, 2002, for the write-off of in-process research and development acquired in connection with the purchase of IFR Systems, Inc.

(2) Includes $5.0 million ($3.4 million, net of tax, or $.06 per share) for the quarter ended March 31, 2002, $4.1 million ($2.4 million, net of tax, or $.04 per share) for the quarter ended June 30, 2002 and $9.1 million ($5.8 million, net of tax, or $.09 per diluted share) for the year ended June 30, 2002 for the consolidation of three manufacturing operations in order to take advantage of excess manufacturing capacity and reduce operating costs, including charges related to excess equipment and facility capacity primarily in the microelectronics segment, workforce reductions in both the microelectronics and test solutions segments and impairments to intangibles related to microelectronics fiber optic acquisition.

Since per share information is computed independently for each quarter and the full year, based on the respective average number of common and common equivalent shares outstanding, the sum of the quarterly per share amounts does not necessarily equal the per share amounts for each year.

*  As a result of the loss, all options are anti-dilutive.

```
                                    S-33
--------------------------------------------------------------------------------
```

```
                       AEROFLEX INCORPORATED
                          AND SUBSIDIARIES
          SCHEDULE II-VALUATION AND QUALIFYING ACCOUNTS
                          (In thousands)
Column A                Column B      Column C          Column D      Column
----------------------  --------   ------------------   ----------      E
                                                                     -------

                                        Additions
                                    ------------------
Description             Balance    Charged   Charged    Deductions    Balance
----------------------     at        to       to other  -describe       at
                        beginning   costs     accounts   ----------    end of
                        of period    and         -                    period
                        ---------  expenses   describe                -------
                                   --------   --------
```

```
YEAR ENDED JUNE 30,
2003:

Allowance for doubtful     $     636 $     885 $        - $      368 (A) $ 1,153
accounts
                           --------- -------- -------- ---------- -------
Reserve for inventory      $   4,563 $   2,832 $        - $      556 (B) $ 6,839
obsolescence
                           --------- -------- -------- ---------- -------
YEAR ENDED JUNE 30,
2002:

Allowance for doubtful     $     459 $     648 $        - $      471 (A) $   636
accounts
                           --------- -------- -------- ---------- -------
Reserve for inventory      $   4,066 $   2,444 $        - $    1,947 (B) $ 4,563
obsolescence
                           --------- -------- -------- ---------- -------
YEAR ENDED JUNE 30,
2001:

Allowance for doubtful     $     509 $      58 $        - $      108 (A) $   459
accounts
                           --------- -------- -------- ---------- -------
Reserve for inventory      $   2,830 $   2,032 $        - $      796 (B) $ 4,066
obsolescence
                           --------- -------- -------- ---------- -------
----------------

Note:
```

(A) - Net write-offs of uncollectible amounts. (B) - Write-off of inventory.

S-34

```
--------------------------------------------------------------------------------

QuickLinks
```

**ITEM 1-BUSINESS**


**ITEM 2-PROPERTIES**
    **ITEM 4-SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

<original-page PART II >

ITEM 5-MARKET FOR THE COMPANY'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS ITEM 6-SELECTED FINANCIAL DATA ITEM 7-MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS


**ITEM 8-FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**
    **ITEM 9-DISAGREEMENTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**
    **ITEM 9A-CONTROLS AND PROCEDURES**

<original-page PART III >

ITEM 15-EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

AEROFLEX INCORPORATED AND SUBSIDIARIES FINANCIAL STATEMENTS AND SCHEDULES COMPRISING ITEM 8 OF ANNUAL REPORT ON FORM 10-K TO SECURITIES AND EXCHANGE COMMISSION AS OF JUNE 30, 2003 AND 2002 AND FOR THE YEARS ENDED JUNE 30, 2003, 2002 AND 2001 FINANCIAL STATEMENTS AND SCHEDULES INDEX

###### ITEM FIFTEEN(a)

Independent Auditors' Report AEROFLEX INCORPORATED AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS (In thousands) AEROFLEX INCORPORATED AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF OPERATIONS (In thousands, except per share amounts) AEROFLEX INCORPORATED AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY AND COMPREHENSIVE INCOME (LOSS) Years Ended June 30, 2003, 2002 and 2001 (In thousands) (Restated, note 2) AEROFLEX INCORPORATED AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS (In thousands) AEROFLEX INCORPORATED AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS Quarterly Financial Data (Unaudited): (In thousands, except per share amounts and footnotes) AEROFLEX INCORPORATED AND SUBSIDIARIES SCHEDULE II-VALUATION AND QUALIFYING ACCOUNTS (In thousands)

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 23

Consent of Independent Auditors

The Board of Directors
Aeroflex Incorporated:

We consent to the incorporation by reference in the registration statements on Form S-8 (No. 33-75496, No. 33-88868, No. 33-88878, No. 333-42399, No. 333-42405, No. 333-64611, No. 333-90173, No. 333-31654, No. 333-53626, No. 333-53622, No. 333-61094, No. 333-73646, No. 333-97027, No. 333-97029,333-108606 and 333-103322) and on Form S-3 (No. 333-53618) of Aeroflex Incorporated of our report dated August 13, 2003, relating to the consolidated balance sheets of Aeroflex Incorporated and subsidiaries as of June 30, 2003 and 2002 and the related consolidated statements of operations, stockholders' equity and comprehensive income (loss) and cash flows, for each of the years in the three-year period ended June 30, 2003, and related consolidated financial statement schedule, which report appears in the June 30,

2003 Annual Report on Form 10-K of Aeroflex Incorporated. /s/ KPMG

Melville, New York
September 29, 2003
--------------------------------------------------------------------------------

QuickLinks

Exhibit 23

Consent of Independent Auditors

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 31.1

**CERTIFICATION**

I, Harvey R. Blau, Chairman of the Board and Chief Executive Officer of Aeroflex Incorporated, certify that:

1. I have reviewed this annual report on Form 10-K of Aeroflex Incorporated;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

```
Date: September 26, 2003
      ------------------------------


/s/ Harvey R. Blau
------------------------------------
Harvey R. Blau
Chairman of the Board (Principal
Executive Officer)
--------------------------------------------------------------------------------


QuickLinks


    Exhibit 31.1
```

**CERTIFICATION**

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 31.2

**CERTIFICATION**

I, Michael Gorin, Chief Financial Officer of Aeroflex Incorporated, certify that:

1.  I have reviewed this annual report on Form 10-K of Aeroflex Incorporated;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 26, 2003 -------------------------

/s/  MICHAEL GORIN
-------------------------------
Michael Gorin
Chief Financial Officer
(Principal Financial Officer)
--------------------------------------------------------------------------------


QuickLinks


    Exhibit 31.2


**CERTIFICATION**

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 32.1

### CERTIFICATION PURSUANT TO

### AS ADOPTED PURSUANT TO

### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Harvey R. Blau, Chief Executive Officer, certify that:

The Form 10-K of Aeroflex Incorporated for the period ended June 30, 2003 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

The information contained in such report fairly presents, in all material respects, the financial condition and results of operations of Aeroflex Incorporated for the periods presented.

```
                              /s/  HARVEY R. BLAU
                              --------------------------------
                              Name:  Harvey R. Blau
                              Date:  September 26, 2003
```

This certification is being furnished pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and, except to the extent required by the Sarbanes-Oxley Act, shall not be deemed to be filed as part of the periodic report described herein nor shall it be deemed filed by Aeroflex Incorporated for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

A signed original of this written statement required by Section 906 has been provided to Aeroflex Incorporated and will be retained by Aeroflex Incorporated and furnished to the Securities and Exchange Commission or its staff upon request. -------------
--------------------------------------------------------------------

QuickLinks

    Exhibit 32.1

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

QuickLinks -- Click here to rapidly navigate through this document

Exhibit 32.2

### CERTIFICATION PURSUANT TO

### AS ADOPTED PURSUANT TO

### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Michael Gorin, Chief Financial Officer, certify that:

The Form 10-K of Aeroflex Incorporated for the period ended June 30, 2003 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

The information contained in such report fairly presents, in all material respects, the financial condition and results of operations of Aeroflex Incorporated for the periods presented.

```
                                  /s/  MICHAEL GORIN
                                  --------------------------------
                                  Name:  Michael Gorin
                                  Date:  September 26, 2003
```

This certification is being furnished pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and, except to the extent required by the Sarbanes-Oxley Act, shall not be deemed to be filed as part of the periodic report described herein nor shall it be deemed filed by Aeroflex Incorporated for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

A signed original of this written statement required by Section 906 has been provided to Aeroflex Incorporated and will be retained by Aeroflex Incorporated and furnished to the Securities and Exchange Commission or its staff upon request. -------------
--------------------------------------------------------------------

```
QuickLinks

    Exhibit 32.2
```

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

Teresa M. Corbin (SBN 132360)
Christopher Kelley (SBN 166608)
Thomas C. Mavrakakis (SBN 177927)
HOWREY SIMON ARNOLD & WHITE, LLP
301 Ravenswood Avenue
Menlo Park, California 94025
Telephone:  (650) 463-8100
Facsimile:  (650) 463-8400

Attorneys for Defendants
MATROX ELECTRONIC SYSTEMS LTD. and
MATROX GRAPHICS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD., | Case No. C03-4669 MJJ |
| Plaintiff, | **DEFENDANT MATROX ELECTRONIC SYSTEMS, LTD. AND MATROX GRAPHICS INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT** |
| vs. | |
| AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS, LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP., and MATROX TECH, INC., | |
| Defendants. | Date:    January 6, 2004<br>Time:    9:30 a.m.<br>Ctrm:    11, 19th Floor<br>Judge:   Hon. Martin J. Jenkins |

HOWREY
SIMON
ARNOLD &
WHITE
Case No. C03-4669 MJJ
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

1

# TABLE OF CONTENTS

2    TABLE OF CONTENTS..................................................................................................i

3    NOTICE OF MOTION AND RELIEF SOUGHT..................................................................2

4    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
     MOTION.................................................................................................................2

5    I.    INTRODUCTION AND SUMMARY OF ARGUMENT.............................................2

6    II.   STATEMENT OF ISSUES TO BE DECIDED.......................................................4

7    III.  FACTUAL AND PROCEDURAL BACKGROUND.................................................5

8    IV.   AS A MATTER OF LAW, NEITHER MATROX ELECTRONIC
9          SYSTEMS NOR MATROX GRAPHICS CAN BE HELD LIABLE AS
           AN INFRINGER UNDER SECTION 271(G).........................................................7

10         A.    Legal Standard For Summary Judgment ..............................................7

11         B.    The Federal Circuit's Decision In *Bayer AG v. Housey*
12               *Pharmaceuticals* Is Dispositive Of The Section 271(g)
                 Infringement Claim Against These Two Matrox Defendants.......................8

13               1.    The Language of the Statute.......................................................8

14               2.    Section 271(g) Infringement Is Limited To The
15                     Manufacture Of "Physical Goods" And Does Not
                       Encompass Generation Of "Information".......................................8

16               3.    Section 271(g) Infringement Is Limited To Processes Used
17                     *Directly* in the Manufacture of Physical Products, And
                       Does Not Encompass "Predicate" Processes...............................10

18   V.    CONCLUSION..........................................................................................12

19

20

21

22

23

24

25

26

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-4669 MJJ
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

i

1

**TABLE OF AUTHORITIES**

2   <u>**CASES**</u>

3   *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ........................................................................ 7, 8

4   *Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831 (Fed. Cir.
        1984) ..................................................................................................................................... 7

5   *Bayer AG v. Housey Pharmaceuticals, Inc.*, 340 F. 3d 1367 (Fed. Cir. 2003) ...................... 8, 9, 10, 11

6   *Bio-Technology General Corp. v. Genetech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996)) ............................ 11

7   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 7

8   *Colgate Palmolive Co. v. W.L. Gore & Assoc., Inc.*, 919 F. Supp. 767 (D. N.J.
9        1996) ..................................................................................................................................... 7

10   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................. 8

11   *Tinoco v. Belshe*, 916 F. Supp. 974 (N.D. Cal. 1995) .................................................................. 7

12   <u>**STATUTES**</u>

13   19 U.S.C. § 1337 ........................................................................................................................ 9

14   35 U.S.C. § 271(g) .............................................................................................. 2, 4, 5, 7, 8, 9, 10, 11, 12

15   <u>**OTHER AUTHORITIES**</u>

16   Process Patents Amendments Act ................................................................................................ 9

17   <u>**RULES**</u>

18   Federal Rules of Civil Procedure 12(b)(6) ................................................................................... 4

19   Federal Rules of Civil Procedure 56 ........................................................................................... 2

20

21

22

23

24

25

26

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-4669 MJJ
MATROX ELECTRONIC SYSTEMS and MATROX                    ii
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

**NOTICE OF MOTION AND RELIEF SOUGHT**

Please take notice that, on January 6, 2004 at 9:30 a.m., before the Honorable Martin J. Jenkins in Courtroom 11, 19th Floor, in the United States District Court, 450 Golden Gate Avenue, San Francisco, California, Defendants Matrox Electronic Systems, Ltd. ("Matrox Electronics"), and Matrox Graphics Inc. ("Matrox Graphics") will each seek a judgment from the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, that Matrox Electronics and Matrox Graphics do not infringe claims 13-20 of United States Patent No. 4,922,432 (the "'432 Patent") under 35 U.S.C. § 271(g).[1] This motion is based upon the following memorandum of points and authorities, the accompanying declarations of Ed Dwyer and Erik K. Moller and exhibits in support thereof, the oral arguments of counsel at the hearing on this motion, and all other pleadings and matters of record in this action and in the related declaratory judgment action entitled *Synopsys, Inc. v. Ricoh Company, Ltd.*, N.D. Cal. Case No. C 03 02289 MJJ.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

**I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Ricoh Company ("Ricoh") asserts that Matrox Electronics and Matrox Graphics are infringing the '432 Patent, which purports to disclose and claim computer-aided design methods. In particular, Ricoh alleges that Defendants are using, offering to sell, selling and importing into the U.S. computer chips known as "application specific integrated circuits" (or "ASICs") "designed by or using information generated by" the patented computer-aided design method in claims 13-20 of the '432 Patent. (*See* Complaint at ¶¶ 28 and 34).

Ricoh filed this case initially in the District of Delaware, against Aeroflex, Inc., AMI Semiconductor, Inc., and four Matrox entities, among them Matrox Electronics and Matrox Graphics,

---

[1]    Matrox Electronics and Matrox Graphics have joined in the motion to stay the present action now set to be heard on December 9, 2003, with the other customer defendants. Matrox Electronics and Matrox Graphics believe that this Court should grant that motion. But they also believe that the Court should still address the present dispositive motion, which will relieve these two defendants of the completely unnecessary burden of having the present action pending against them.

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-4669 MJJ
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT                    2

1  both of which are Canadian companies.  Defendants successfully transferred the case to this District,

2  where Synopsys' declaratory judgment action is pending.[2]  While Ricoh did not name Synopsys as a

3  defendant in the Delaware action, at the heart of this case is each of the Defendants' alleged use of

4  Synopsys' product called "Design Compiler," a type of Electronic Design Automation ("EDA")

5  software that has been on the market since at least June 1988.

6        While Matrox Electronics' and Matrox Graphics' use of Design Compiler for their design work

7  does not infringe any of the '432 Patent claims, the question of whether Design Compiler's

8  methodology infringes any claim of the '432 Patent is irrelevant to the present motion.  Equally

9  irrelevant to the present motion is the question of whether either Matrox Electronics or Matrox

10 Graphics use, sell, offer to sell, or import ASICs into the United States.  The sole issue with respect to

11 Matrox Electronics and Matrox Graphics is whether the patented computer-aided design method in the

12 '432 Patent falls within the purview of 35 U.S.C. § 271(g) since there is no dispute that both are

13 Canadian companies that perform all of their integrated-circuit design work <u>outside</u> the United States.

14        The Federal Circuit recently has confirmed that Section 271(g) patent infringement relief is

15 available only for patented processes used *directly* in the manufacture of *physical goods*.  In this case,

16 however, the patented '432 methods generate *information* for an ASIC's design.  This design

17 information eventually can be used to generate the mask data needed to make photomasks, which

18 photomasks are *then* used to create an ASIC; none of these additional steps is part of the patented

19 process.  In other words, the '432 Patent does not even purport to cover the manufacture or production

20 of an ASIC—or any physical product—but instead sits many steps back at the design information

21 level.  Accordingly, as a matter of law, neither Matrox Electronics nor Matrox Graphics can infringe

22 the '432 Patent—whether by using Design Compiler or any other computer-aided design software—

23 and the Court should grant summary judgment of noninfringement of the '432 Patent.

24

25

26   [2]   Among other things, Synopsys seeks declarations of noninfringement and invalidity of the '432
     Patent, as well as U.S. Patent No. 5,197,016 (the "'016 Patent")—which is the result of a continuation
27   in part of the same patent application that issued as the '432 Patent.  Ricoh has not asserted
     infringement of the '016 Patent in this action.
28

HOWREY
SIMON
ARNOLD &
WHITE
Case No. C03-4669 MJJ                                          -3-
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

II.    **STATEMENT OF ISSUES TO BE DECIDED**

*Whether Canadian corporations Matrox Electronics and/or Matrox Graphics, both of which confine all of their circuit-design work to Canada, could be held liable as infringers of the '432 Patent, which purports to cover only methods of integrated-circuit design, and does not cover the manufacture of any chip or other physical product.*

Recently, the Federal Circuit affirmed the dismissal under Rule 12(b)(6) of a patent infringement claim arising under 35 U.S.C. § 271(g), holding that information or data is not "a product which is made by a process" under Section 271(g), and that a "predicate process to identify the product to be manufactured" (rather than a process used directly in the manufacture of the product) is not sufficiently related to the accused product to warrant a claim for infringement under Section 271(g). In other words, infringement under Section 271(g) is strictly limited to physical goods that are manufactured *directly* by the patented processes.

Here, Matrox Electronics' and Matrox Graphics' use of Design Compiler for their design work would not infringe any of the '432 Patent claims even if they performed their design work in the United States. Because their design work is performed exclusively in Canada, however, their use of Design Compiler can only subject them to infringement liability of the '432 Patent's design method under 35 U.S.C. § 271(g).

The use of the '432 Patent's computer-aided design method results in a list that identifies the following design information: 1) the hardware cells and their interconnection requirements; and 2) the controller and control paths for those hardware cells. (*See* Declaration of Erik Moller ("Moller Decl."), Exh. A, '432 Patent 2:21 – 45). Given that the patented '432 method generates only design information, and Section 271(g) infringement is limited to physical goods that are manufactured using the patented processes, the Court must decide whether the '432 Patent's design information could reasonably be characterized as "a product which is made by a [patented] process."

Next, as noted above, the use of the '432 Patent's method results in the design information only. That design information is eventually and after many other essential and complex processes used to generate the mask data needed to make photomasks. It is these photomasks that are then used in the processes that actually manufacture the integrated circuits. (*See id.*; Declaration of Ed Dwyer ("Dwyer

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-4669 MJJ                                           -4-
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

1  Decl.") ¶¶ 2-3). Given that the '432 Patent's design information is used only to generate the

2  information eventually used to make photomasks—which then are used in the processes that

3  manufacture the ASICs—and that infringement under Section 271(g) is limited to processes "used

4  directly in the manufacture of the product," the Court must also decide whether the use of the '432

5  Patent's computer-aided design method could reasonably be defined as a process "used directly in the

6  manufacture" of an ASIC.

7        If the answer to these questions is "No," the Court should grant summary judgment of

8  noninfringement in favor of the Canadian Matrox defendants.

9  III.    **FACTUAL AND PROCEDURAL BACKGROUND**

10       On January 21, 2003, Ricoh filed this case in the District of Delaware, asserting that

11 Defendants Aeroflex, Inc., AMI Semiconductor, Inc., Matrox Electronic Systems, Ltd., Matrox

12 Graphics Inc., Matrox International Corp., and Matrox Tech, Inc. have been and are infringing one or

13 more of claims 13 through 20 of the '432 Patent. (*See generally* Complaint). The present motion

14 relates only to the infringement claims against Matrox Electronics and Matrox Graphics.

15       In general, the '432 Patent purports to describe a computer-aided method for designing an

16 application specific integrated circuit, or "ASIC." (*Id.* ¶ 14; *see generally* Moller Decl., Exh. A, '432

17 Patent). In particular, claim 13 (along with dependent claims 15-17) describes a computer-aided

18 process for the design of an ASIC that results in the generation of information that could be used to

19 generate mask data (which can be used to produce the photomasks eventually used in the manufacture

20 of an ASIC). (*See* Moller Decl., Exh. A, '432 Patent, 16:34 – 17:10). Claim 14 (also dependent from

21 claim 13) describes the same process but adds the step of generating the mask data needed to make the

22 photomasks. (*See* Moller Decl., Exh. A, '432 Patent, 16:34 – 17:10). Similarly, claim 18 (along with

23 dependent claims 19 and 20) describes a design process that, like claims 13 as well as 15 through 17,

24 also results in the generation of design information that could be used to generate mask data. (*See*

25 Moller Decl., Exh. A, '432 Patent, 17:11 – 18:24). None of these claims, however, describes a process

26 used *directly* in the manufacture of *physical goods* (e.g. an ASIC). (*See generally* Moller Decl., Exh.

27 A, '432 Patent).

28

HOWREY
SIMON
ARNOLD &
WHITE
Case No. C03-4669 MJJ                    -5-
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

1    At the heart of this action lies the Customer Defendants' use of a computer-aided design system

2  called "Design Compiler"—a popular and established product of Synopsys, Inc. (*See* Memorandum

3  and Order dated August 29, 2003, Moller Decl., Exh. B at 5).  Design Compiler is logic synthesis

4  software used in the design of integrated circuits. (*See* Dwyer Decl. ¶ 5).  Design Compiler, however,

5  does not generate the information that can be used *directly* to make photomasks. (*See id.* at ¶¶ 2-3, 5).

6  Instead, Design Compiler generates design information, which may be used in the many other essential

7  and complex software processes necessary for producing the information used to make photomasks.

8  (*See id.* at ¶¶ 2, 5).  Typically, the design information generated by logic synthesis software must be

9  used in at least the following additional processes before the information that can be used to

10  manufacture the photomasks is generated:

11    1.  verifying the functionality of the identified components and their
        interconnection;

12    2.  generating the design information known as physical layout using
13        software for placement and routing of the components and their
          interconnections;

14    3.  verifying the physical layout with other software processes such as
          those for timing characterization, design rule checking, layout-
15        versus-schematic, etc;

16    4.  fracturing (or mask-data-preparation) of the physical layout to
          generate the instructions used by the electron beam machine to make
          the photomasks.

17  (*See id.* at ¶¶ 2, 3).

18

19    Once the up to 25 photomasks required to manufacture the integrated circuit have been made,

20  the approximately 100 steps necessary for actually manufacturing the integrated circuit can proceed

21  using those photomasks. (*See id.* at ¶ 4).  These manufacturing steps typically include, but are not

22  limited to, processes such as chemical vapor deposition, physical vapor deposition, etching, chemical

23  mechanical polishing, etc. (*See id.* at ¶ 3).

24    Here both Matrox Electronics and Matrox Graphics are Canadian corporations with their

25  principal places of business in Dorval, Quebec. (*See id.* at ¶ 6).  Matrox Electronics is an industry

26  leader in digital video production hardware, and Matrox Graphics is a highly acclaimed manufacturer

27  of graphics cards for use with LCD video displays. (*See id.*).  Matrox Electronics and Matrox Graphics

28  are involved in the design of integrated circuits, for which process they employ logic synthesis tools,

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-4669 MJJ                                    -6-
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

1  such as Synopsys' Design Compiler. (*See id.* at ¶ 7).  However, Matrox Graphics' and Matrox

2  Electronics' use of those tools and the conduct of their design work take place exclusively within

3  Canada. (*See id.*).[3]  Because of this and the fact that the '432 Patent's method does not fall within

4  Section 271(g), Matrox Graphics and Matrox Electronics design work in Canada simply cannot, as a

5  matter of law, subject either of them to liability for patent infringement in the United States.

6  IV.  **AS A MATTER OF LAW, NEITHER MATROX ELECTRONIC SYSTEMS NOR
      MATROX GRAPHICS CAN BE HELD LIABLE AS AN INFRINGER UNDER**

7      **SECTION 271(g).**

8      A.   **Legal Standard For Summary Judgment**

9          Summary judgment is just as reasonable in a patent case as in any other case. *See Barmag*

10  *Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984).  When facts

11  conclusively establish that a patent is not infringed, there is no reason to allow the case go to a jury.

12  *Cf. id.*  Moreover, "[s]ummary judgment is not a disfavored procedural shortcut, but rather an essential

13  thread in the fabric of the Federal Rules that eliminates unfounded claims without recourse to a costly

14  and lengthy trial." *Colgate Palmolive Co. v. W.L. Gore & Assoc., Inc.*, 919 F. Supp. 767, 769 (D. N.J.

15  1996).  Once a party has made an initial showing that summary judgment is warranted, the opposing

16  party may not rest upon pleadings; rather, "the non-moving party must 'designate specific facts

17  showing that there is a genuine issue for trial.'" *Tinoco v. Belshe*, 916 F. Supp. 974, 979 (N.D. Cal.

18  1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Here, the Court must carefully

19  scrutinize any evidence proffered by Ricoh to determine if it raises a genuine issue of material fact as

20  to whether Matrox Electronics or Matrox Graphics could infringe the '432 Patent.  The Court may

21  grant summary judgment if Ricoh's evidence "is merely colorable, or is not significantly probative."

22  *Tinoco*, 916 F. Supp. at 979 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-250 (1986)).

23          In this case, summary judgment is warranted because the '432 Patent purports to describe a

24  process of *design*, the result of which is information; it does *not* describe a process for the manufacture

25

26

27  [3]  Ricoh is more than likely aware that neither of these Canadian Matrox defendants conducts
    their design work in the United States since Ricoh's complaint does not allege that either company

28  uses the patented design method in the United States. (*See* Complaint at ¶¶ 28 and 34).

HOWREY
SIMON
ARNOLD &
WHITE    Case No. C03-4669 MJJ    -7-
         MATROX ELECTRONIC SYSTEMS and MATROX
         GRAPHICS' MOTION FOR SUMMARY JUDGMENT

1  of an ASIC or of any physical product. Because it is an irrefutable fact that the Canadian Matrox

2  companies perform all of their design work in Canada, it is impossible for either of these defendants to

3  infringe the '432 Patent under Section 271(g). Accordingly, there is no reason the infringement claims

4  against these Matrox defendants should go to the jury, and the Court should grant summary judgment

5  of noninfringement. *See Anderson v. Liberty Lobby*, 477 U.S. at 252; *Matsushita Elec. Indus. Co. v.*

6  *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

7      **B.**    **The Federal Circuit's Decision In *Bayer AG v. Housey Pharmaceuticals* Is**
           **Dispositive Of The Section 271(g) Infringement Claim Against These Two Matrox**
8          **Defendants**

9          1.    **The Language of the Statute**

10        Ricoh's theory of infringement against these two Canadian Matrox companies arises under 35

11  U.S.C § 271(g), which provides:

12          Whoever without authority imports into the United States or offers to
            sell, sells, or uses within the United States a product which is made by a
13          process patented in the United States shall be liable as an infringer, if the
            importation, offer to sell, sale, or use of the product occurs during the
14          term of such process patent. In an action for infringement of a process
            patent, no remedy may be granted for infringement on account of the
15          noncommercial use or retail sale of a product unless there is no adequate
            remedy under this title for infringement on account of the importation or
16          other use, offer to sell, or sale of that product. A product which is made
            by a patented process will, for purposes of this title, not be considered to
17          be so made after - (1) it is materially changed by subsequent processes;
            or (2) it becomes a trivial and nonessential component of another
18          product.

19

20  35 U.S.C. § 271(g).

21          2.    **Section 271(g) Infringement Is Limited To The Manufacture Of "Physical**
22             **Goods" And Does Not Encompass Generation Of "Information"**

23        In August of this year, the Federal Circuit clarified the meaning of the phrase "a product which

24  is made by a process" to require the manufacture of a physical product by an alleged infringer, and in

25  doing so obviated Ricoh's only alleged avenue of relief against the foreign Matrox Defendants. In

26  *Bayer AG v. Housey Pharmaceuticals, Inc.*, the Federal Circuit reviewed the dismissal by the Delaware

27  District Court of Housey's counterclaim of patent infringement, for failure to state a claim against

28  Bayer under Section 271(g). In response to Bayer's declaratory relief action, Housey alleged that

HOWREY
SIMON
ARNOLD &
WHITE
Case No. C03-4669 MJJ
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT
-8-

1 Bayer infringed its patented methods of screening compounds for their ability to inhibit or activate

2 proteins in a cell. The result of the patented screening process was information used to identify and

3 describe new drugs that could then be manufactured using that information. *See Bayer AG v. Housey*

4 *Pharmaceuticals, Inc.*, 340 F. 3d 1367, 1369-70 (Fed. Cir. 2003).

5        The parties agreed that the scope of the counterclaim for infringement extended to both the

6 importation of a drug identified by the patented process as a protein inhibitor or activator, as well as to

7 the importation into or use in the United States of information generated by the patented process, *i.e.,*

8 "knowledge and information reflecting the identification or characterization of a drug acquired from

9 using the patented methods." *Id.* at 1370.

10        In addressing both theories of infringement, the court analyzed both the language and

11 legislative history of Section 271(g) in detail, including a discussion of the enactment of the Process

12 Patents Amendments Act, drafted in response to concerns that competitors could avoid infringement of

13 method patents by employing those methods abroad, and then importing the resulting products into the

14 United States. *Id.* at 1373-74. The Act supplemented existing remedies available from the

15 International Trade Commission ("ITC") under 19 U.S.C. § 1337 (including in its definition of "unfair

16 methods of competition" the importation into or the sale within the United States of articles made by

17 means of a process covered by a United States patent). *See id.* (citing 19 U.S.C. § 1337(a)(1)(B)). The

18 court's analysis of the phrase "product which is made by a process," along with its extensive review of

19 the legislative history, led the Federal Circuit to conclude: "that Congress was concerned solely with

20 physical goods that had undergone manufacture." *Id.* The court noted, "Each and every reference to

21 the provision that became section 271(g) describes it as directed to manufacturing." *Id.* at 1374.

22 Accordingly, the Federal Circuit held that Section 271(g) can apply only to the importation or sale of

23 "physical objects" derived from manufacturing processes, and that "the production of information is

24 not within the scope of processes of 'manufacture.'" *Id.* at 1376-77.[4]

25 ───────────────

26    [4]   The Court found further indications that the statute was concerned exclusively with physical
goods produced by a manufacturing process in the statutory exceptions to Section 271(g). For
27 example, the statute rules out infringement where an allegedly infringing product "is materially
changed by subsequent processes." 35 U.S.C. § 271(g)(1). The Court found Housey's assertion—that
28 the information itself was a "product"—difficult to reconcile with the exception, "which appears to
(Continued...)

Case No. C03-4669 MJJ                                          -9-
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

1       As such, any circuit-design information generated via the Canadian Matrox companies' use of

2   Design Compiler is not a physical object, and thus it cannot be a "product which is made by a process"

3   under Section 271(g). Because Matrox Electronics and Matrox Graphics do all of their circuit-design

4   work exclusively in Canada, they do not, and they simply cannot, infringe the '432 Patent.

5       3.    **Section 271(g) Infringement Is Limited To Processes Used *Directly* in the**
       **Manufacture of Physical Products, And Does Not Encompass "Predicate"**

6       **Processes**

7       Ricoh's allegations of patent infringement against Matrox Electronics and Matrox Graphics

8   include the claim that the two companies are infringing the '432 Patent by "using, offering to sell,

9   and/or by selling and/or importing into the United States application specific integrated circuits

10  *designed by or using information generated by, the process* of one or more of claims 13-20 of the '432

11  Patent[.]" (*See* Complaint ¶¶ 28, 34).

12      As indicated above, the Federal Circuit's analysis, in the *Housey* decision, did not end with the

13  Court's holding that information is not a "product" under Section 271(g). Because Housey's claim of

14  infringement against Bayer also included actual drug products that Housey alleged Bayer had

15  manufactured using the process described in the patent-in-suit, the Court went on to assess the merits

16  of those assertions as well. *See Housey*, 340 F.3d at 1376-77. Neither the court nor the parties

17  disputed the fact that such drugs were physical products that had been manufactured. *See id.* at 1377.

18  Here Ricoh has similarly asserted that Defendants are infringing its process claims via importation or

19  sale of ASICs. (*See* Complaint ¶¶ 28, 34). The Matrox companies do not dispute that an ASIC indeed

20  is also a manufactured product. The issue here, however, as it was in *Housey,* is the "necessary

21  relationship between the 'process patented in the United States' and the resulting product[.]" *Housey*,

22  340 F.3d at 1377.

23

24

25  _____

    (...Continued)

26  contemplate a change in a physical product." *Housey*, 340 F.3d at 1373. Similarly, the Court found
    that the second exception under Section 271(g), which excludes infringement where an accused
27  product "becomes a trivial and nonessential component of another product," appears to contemplate a
    physical product. *Id.*
28

Case No. C03-4669 MJJ          -10-
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

1      In determining whether a drug "identified as useful through the use of a patented process" was

2  a product made by that process under Section 271(g), the *Housey* court observed that it was charged

3  with resolving the "critical question of proximity to the product of the patented process" on a case-by-

4  case basis. *Id.* at 1377 (quoting *Bio-Technology General Corp. v. Genetech, Inc.*, 80 F.3d 1553, 1561

5  (Fed. Cir. 1996)). To assess this requisite "proximity," the Federal Circuit turned once again to the

6  plain language of the statute, noting that it required the allegedly infringing product to have been

7  "made *by* a process patented in the United States." *Id.* at 1377-78 (quoting 35 U.S.C. § 271(g))

8  (emphasis in original). The Court interpreted the word "by" to require that the process be used *directly*

9  in the manufacture of the product, "and not merely as a predicate process to identify the product to be

10  manufactured." *Id.* at 1378. Accordingly, because Bayer did not use the patented process in the actual

11  manufacturing of the drug, the Court held that that drug was not a product "made by" those

12  processes—regardless of the fact that Bayer had been able to study the compound and generate

13  information regarding its characteristics using the claimed processes. *Id.*

14      Likewise, the processes Ricoh claims under the '432 Patent are not, and cannot be, used

15  *directly* in the manufacture of integrated circuits (ASICs). Instead, and as discussed in detail above,

16  such processes result in the generation of design information only. Indeed, as in *Housey*, such

17  processes are merely predicates for the identification of the product to be manufactured. *See id.* at

18  1378. This case fits squarely within the Federal Circuit's analysis. An ASIC is not a product "made

19  by" any process described in the '432 Patent, and the process that *is* contemplated by the '432 Patent

20  merely generates "design information," which is not a manufactured product as required by Section

21  271(g).

22      The computer-aided design methods claimed in Ricoh's '432 Patent do not describe the steps of

23  any process for the manufacture of a physical ASIC, but produce only information used in the process

24  of *designing* a product. Tellingly, Ricoh's complaint does not even allege that Matrox Graphics or

25  Matrox Electronics use Ricoh's patented method in the *manufacture* of their ASICS. Instead Ricoh

26  alleges that they sell ASICS "designed by or using information generated by," the claimed process.

27  (*See* Complaint ¶¶ 28, 34). These allegations are not sufficient to make out a cause of action under

28  Section 271(g). Moreover, amending the complaint to correct this defect would be futile, since the

HOWREY
SIMON
ARNOLD &
WHITE
Case No. C03-4669 MJJ           -11-
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

1  method claimed in Ricoh's patent is, at best, a precursor or predicate method to the manufacture of

2  physical goods, and cannot, as a matter of law, be enforced under Section 271(g). Therefore, summary

3  judgment of noninfringement is proper, and the Court should grant this Motion on behalf of Matrox

4  Electronics and Matrox Graphics.

5  V.    **CONCLUSION**

6       As detailed above, neither Matrox Electronics nor Matrox Graphics has been, or can be,

7  accused of manufacturing a "physical product" that is "made by" the patented methods described in the

8  '432 Patent. The method set forth in the '432 Patent produces information identifying designs for

9  integrated circuits—not the chips themselves or any other physical product. As such, and in

10  accordance with the Federal Circuit's analysis and clarification of Section 271(g), relief is simply not

11  available to a patentee—such as Ricoh—where there are no "physical goods that are manufactured

12  *directly* by the patented process." Accordingly, as a matter of law, neither Matrox Electronics nor

13  Matrox Graphics can infringe the '432 Patent, and the Court should enter summary judgment of

14  noninfringement in their favor.

15

16  Dated: December 2, 2003            Respectfully submitted,

17                               HOWREY SIMON ARNOLD & WHITE, LLP

18

19

20                               By:  /s/
                                   Teresa M. Corbin

21                                     Attorneys for Defendants
                                   MATROX ELECTRONIC SYSTEMS

22                                     LTD. and MATROX GRAPHICS INC.

23

24

25

26

27

28

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-4669 MJJ
MATROX ELECTRONIC SYSTEMS and MATROX
GRAPHICS' MOTION FOR SUMMARY JUDGMENT

-12-

1  Teresa M. Corbin (SBN 132360)
   Christopher Kelley (SBN 166608)
2  Thomas Mavrakakis (SBN 177927)
   HOWREY SIMON ARNOLD & WHITE, LLP
3  301 Ravenswood Avenue
   Menlo Park, California 94025
4  Telephone: (650) 463-8100
   Facsimile: (650) 463-8400
5
   Attorneys for Defendants
6  MATROX ELECTRONIC SYSTEMS LTD. and
   MATROX GRAPHICS INC.
7
                    UNITED STATES DISTRICT COURT
8
                   NORTHERN DISTRICT OF CALIFORNIA
9
                     SAN FRANCISCO DIVISION
10
   RICOH COMPANY, LTD.,                  )  Case No. CV 03-04669 MJJ
11                                       )
             Plaintiff,                  )  **NOTICE OF WITHDRAWAL OF MATROX**
12                                       )  **ELECTRONIC SYSTEMS LTD. AND**
       vs.                               )  **MATROX GRAPHICS INC.'S MOTION**
13                                       )  **FOR SUMMARY JUDGMENT OF**
   AEROFLEX INCORPORATED, AMI            )  **NONINFRINGEMENT**
14 SEMICONDUCTOR, INC., MATROX           )
   ELECTRONIC SYSTEMS, LTD., MATROX      )
15 GRAPHICS INC., MATROX                 )  Date:   March 2, 2004
   INTERNATIONAL CORP., and MATROX       )  Time:   9:30 a.m.
16 TECH, INC.,                           )  Ctrm:   11, 19th Floor
                                         )  Judge:  Hon. Martin J. Jenkins
17           Defendants.                 )
   _____)
18

19        Matrox Electronic Systems, Ltd. ("Matrox Electronics") and Matrox Graphics Inc. ("Matrox

20 Graphics") hereby notify the Court that they withdraw their motion seeking a judgment of the Court

21 that neither party infringes claims 13 -20 of United States Patent No. 4,922,432 (the "'432 Patent")

22 under 35 U.S.C. § 271(g) filed December 2, 2003 and currently pending for hearing on March 2, 2004.

23        In light of the Court's statements at the December 9, 2003 hearing on the Defendants' Motion

24 to Stay the present action, Matrox Electronics and Matrox Graphics provided Ricoh with discovery

25 directed to whether Matrox Electronics's or Matrox Graphics's have any ASIC design operations in the

26 United States, the sole factual issue presented by the summary judgment motion. This discovery

27 included documents directed to this subject and a Rule 30(b)(6) witness to testify on this topic.

28

HOWREY
SIMON
ARNOLD &
WHITE

Case No. C03-04669 MJJ                    -1-
NOTICE OF WITHDRAWAL OF MOTION FOR
SUMMARY JUDGMENT FOR NONINFRINGEMENT

1  However, despite their efforts to provide Ricoh Company, Ltd. ("Ricoh") with discovery reasonably

2  necessary and sufficient to decide the narrow factual question presented in the motion regarding the

3  location of each company's design operations, it became apparent to Matrox Electronics a nd Matrox

4  Graphics that Ricoh would oppose the motion under Rule 56(f) regardless of the discovery that they

5  provided.

6      Instead of burdening themselves or the Court with this pointless exercise, and in light of the

7  Defendants Motion for Judgment on the Plea dings, Matrox Electronics and Matrox Graphics herby

8  withdraw their motion for summary judgment.

9

10  Dated: February 10, 2004                    Respectfully submitted,

11                                              HOWREY SIMON ARNOLD & WHITE, LLP

12

13
                                                By:  /s/ Thomas Mavrakakis
14                                                   Teresa M. Corbin
                                                     Attorneys for Defendants
15                                                   MATROX ELECTRONIC SYSTEMS
                                                     LTD. and MATROX GRAPHICS INC.
16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.  C03-04669 MJJ                          -2-
NOTICE OF WITHDRAWAL OF MOTION FOR
SUMMARY JUDGMENT FOR NONINFRINGEMENT



HOME   ABOUT US   PRODUCTS   SYSTEMS   SUPPORT   CONTACT US    Enter your search term here...    GO



## Products



- Comm & Avionics Test
- General Purpose Test
- Signal Sources
- Motion Control Products
- Filters
- RF/Micro Assemblies
- Avionic Microelectronics
- Broadband Microwave
- ARM7 Microcontrollers
- Power Electronics
- RadHard Microelectronics
- Thin-Film Interconnect
- Isolator Products
- Racal Inst. Wireless Sol
- MCE
- Partners

**Products**

Aeroflex Incorporated is a multi-faceted high technology company that designs, develops, manufactures and markets a diverse range of microelectronic, and test and measurement products. Our products are in worldwide use, supporting communication systems, networks and automatic test systems.

**Related Information:**



Product Info

Software

RFQ

Free Newsletter

Questions/ Comments

Communications and Avionics Test: public mobile radio (PMR), wireless cellular and telecom, military radio and avionics radio test. Aeroflex's superior communications test products continue a legacy dating back more than 50 years to Marconi Instruments, which was acquired by IFR Systems in 1999. Aeroflex, in turn, purchased IFR Systems in 2002. Aeroflex's radio test sets are preeminent in the service market and public safety applications.

General Purpose Test: spectrum analyzers, microwave analyzers, phase noise systems, bit error rate testers. These test sets are used in mobile radio handset service, manufacturing, R&D, as well as base station installation, commissioning and maintenance.

Signal Sources: synthesizers, signal generators and signal analyzers. Aeroflex is one of the top three signal source suppliers worldwide, with patents and intellectual property that have advanced signal generation throughout the industry. The combination of synthesizer, signal generator, analyzer and phase noise instruments, modules, software applications and systems will continue to position Aeroflex as a leading supplier to the industry.

Motion Control Products: Aeroflex Motion Control Systems provides complete and integrated motion solutions for the Space community, the Military, Avionics markets and strategic industrial customers.

Filters: Aeroflex produces constant delay filters with highly selective attenuation, preselectors with ultra-low intermodulation distortion, MUX and channel filters for space applications, n-channel switch filter banks and commercial wireless filters for PCS, LMDS, CDMA and TDMA applications.

R/F Microwave Integrated Assemblies: Acknowledged by many as the leader in High Frequency Fast Switching Frequency Synthesizers, Aeroflex has expanded its focus to include the areas of multi-function modules and integrated subsystems.

Avionic Microelectronics: A broad range of avionics products and capabilities, including MIL-STD-1553 and MIL-STD-1397 databus and transceivers, ARINC products, memories, microprocessors, microcontrollers and Star VII single board computer.

Broadband Microwave: A variety of broadband, RF and microwave products for commercial and aerospace applications.

ARM7 Controllers: Products and capabilities for System-on-Chip applications. Our off-the-shelf microcontroller family is based on the ARM7 core and includes embedded flash memory and data acquisition functions in addition to other integrated peripherals.

Power Electronics: Power electronics for the aerospace and defense applications such as DC-DC converters, motor drivers and solid state

relays/switches.

RadHard Microelectronics: RadHard microelectronics for aerospace and defense applications: RadHard ASICs, Databuses, LVDS, Logic, Memories, Microcontrollers, Microprocessors, and Transceivers, RadHard Muxes, Motor Controllers, Resolver-to-Digital- Converters and Voltage Regulators.

Thin-Film Interconnect: Aeroflex Microelectronic Solutions designs and manufactures passive interconnect solutions, from pattern design and layout to machining, coating and patterning of advanced multi-level circuitry.

Isolator Products: The Isolator Products Group of Aeroflex provides products and engineering services to commercial, industrial, and defense original equipment manufacturers (OEM), as well as the heating, ventilation and air conditioning (HVAC) industry.

Racal Instruments Wireless Solutions Group: A leading developer, manufacturer and integrator of digital wireless testing and measurement solutions.

MCE: MCE Technologies, Inc. is a world leader in the design, manufacture and marketing of microwave and RF devices, components and subsystems for wireless applications.

Partners: Aeroflex is a proud distributor of Kikusui and Navigation Laboratories products.

Copyright © 2004 by Aeroflex Incorporated. All Rights Reserved.

Privacy Policy     Site Map



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

Christopher L. Kelley
Partner
650.463.8113
kelleyc@howrey.com

February 17, 2004

**VIA FACSIMILE AND U.S. MAIL**

Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, NY 10036-2714

     Re:    *Ricoh Company, Ltd. v. Aeroflex, Inc., et al.*
          <u>Case No. CV 03-04669 MJJ (MCC)</u>

Dear Ed:

       I have your letter to me dated February 12.

       We are unable to stipulate to your amendment. For the reasons set out in our Motion on the Pleadings, Ricoh cannot make out an allegation under 35 U.S.C. section 271(g) in the present case. Your proposed amended complaint does nothing to correct this problem. Since the proposed amended complaint still contains the same infringement allegations under section 271(g) we cannot agree to your amendment.

       In addition, Ricoh has provided no explanation as to why it delayed so long before seeking to add infringement allegations under provisions of section 271 other than subdivision (g). The Defendants made Ricoh aware of the problem that it faced in asserting infringement under 271(g) no later than last August. Without some explanation as to why amendment is appropriate or necessary at this late date, the Defendants cannot support your request to amend.

       Finally, your proposed amendment seeks to add an entity that you identify as "Aeroflex UTMC." There is no existing corporate entity with that name that can be sued or served with process. Furthermore, there is no need to add a separate entity to get at activities conducted at Aeroflex's facility in Colorado Springs acquired from United Technologies (UTMC). That entity was acquired by Aeroflex and is now a subsidiary of Defendant Aeroflex, Inc.

                  Very truly yours,

                  Christopher L. Kelley

CLK:gg

cc:    Gary M. Hoffman