1   Gary M. Hoffman (*Pro Hac Vice*)
    Kenneth W. Brothers(*Pro Hac Vice*)
2   DICKSTEIN SHAPIRO MORIN
      & OSHINSKY, LLP
3   2101 L Street, NW
    Washington, DC  20037-1526
4   Phone (202) 785-9700
    Fax (202) 887-0689
5

6   Edward A. Meilman (*Pro Hac Vice*)
    DICKSTEIN SHAPIRO MORIN
      & OSHINSKY, LLP
7   1177 Avenue of the Americas
    New York, New York  10036-2714
8   Phone (212) 835-1400
    Fax (212) 997-9880
9

10  Jeffrey B. Demain, State Bar No. 126715
    Jonathan Weissglass, State Bar No. 185008
    ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
11  177 Post Street, Suite 300
    San Francisco, California  94108
12  Phone  (415) 421-7151
    Fax (415) 362-8064
13

14  Attorneys for Ricoh Company, Ltd.

15              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
16               SAN FRANCISCO DIVISION

17  ─────────────────────────────────
    RICOH COMPANY, LTD.,                )   CASE NO. C-03-4669-MJJ (EMC)
18                                      )
                       Plaintiff,       )   DECLARATION OF MICHAEL WEINSTEIN
19                                      )   IN SUPPORT OF RICOH'S REPLY IN
            vs.                         )   SUPPORT OF ITS MOTION TO AMEND
20                                      )   COMPLAINT
    AEROFLEX ET AL,                     )
21                                      )   Date:  April 6, 2004
                       Defendants.      )   Time: 9:30 a.m.
22                                      )   Courtroom:  11
                                        )
23  ─────────────────────────────────

24  Michael A. Weinstein declares as follows:

25      1.   My name is Michael A. Weinstein, an attorney with the law firm of Dickstein, Shapiro,

26  Morin & Oshinsky, LLP, counsel for Ricoh Company Limited ("Ricoh").  I am over the age of

27

28

21 and am competent to make this declaration. Based on my personal knowledge and information, I hereby declare to all the facts in this declaration

2. Attached hereto as Ex. A is a true and correct copy of *United States of America v. Conagra, Inc.*, 1997 U.S. Dist. LEXIS 21401 (D. Id. 1997)

3. Attached hereto as Ex. B is a true and correct copy of the Transcript of the 5/16/03 Hearing before Judge Sleet.

4. Attached hereto as Ex. C is a true and correct copy of the Letter from C. Kelley to E. Meilman, dated 2/4/04.

5. Attached hereto as Ex. D is a true and correct copy of *Network Caching Technology, LLC v. Novell, Inc.*, 2003 U.S. Dist. LEXIS 9881 (N.D. Cal. 2003).

6. Attached hereto as Ex. E is a true and correct copy of the Reply Brief in Support of Defendants' Motion to Stay, filed 8/5/03, and

7. Attached hereto as Ex. F is a true and correct copy of the Sur-Reply in Opposition to Defendants' Motion to Stay, filed 8/22/03.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed at Washington, D.C. on March 30, 2004.

/s/ Michael A. Weinstein
Michael A. Weinstein

LEXSEE

**UNITED STATES OF AMERICA, Plaintiff, v. CONAGRA, INC., Defendant.**

**Case No. CV 96-0134-S-LMB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO**

*1997 U.S. Dist. LEXIS 21401*

**December 31, 1997, Decided**
**December 31, 1997, Filed**

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** [*1] For USA, plaintiff: D Marc Haws, AUSA, US ATTORNEY'S OFFICE, Boise, ID. Douglas M Conde, OFFICE OF ATTORNEY GENERAL, Boise, ID. Lois J Schiffer, Patrick M Casey, US DEPT OF JUSTICE, Washington, DC. Mark A Ryan, Ted Yackulic, US DEPT OF JUSTICE, Seattle, WA. Fataima Z Ahmad, US DEPT OF JUSTICE, Washington, DC. Marc Ryan, EPA REGION X, Boise, ID. Keith E Cohon, ENVIRONMENTAL PROTECTION AGENCY, Seattle, WA.

For CONAGRA INC., defendant: John J Schirger, Thomas C McGowan, MCGRATH NORTH MULLIN & KRATZ, Omaha, NE. Kristen R Thompson, THOMPSON ASHCRAFT & BURNHAM, Boise, ID.

**JUDGES:** LARRY M. BOYLE, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** LARRY M. BOYLE

**OPINION:**

MEMORANDUM DECISION AND ORDER

Currently pending before the Court are the United States' Partial Motion for Summary Judgment On Defendant ConAgra, Inc.'s Affirmative Defenses 1-18 (Docket No. 87), United States' Motion for Partial Summary Judgment as to Liability (Docket No. 89), Defendant's Motion for Partial Summary Judgment (Docket No. 91), Defendant's Third Motion in Limine (Docket [*2] No. 94), ConAgra's Motion to Dismiss Under *F.R.C.P. 12(b)(6)* (Docket No. 96), Defendant's Second Motion in Limine (Docket No. 98), Defendant's Motion to Strike Declaration of Joseph Roberto in Support of Summary Judgment on Affirmative Defenses (Docket No. 112), Defendant's Motion to Strike Declaration of Joseph Roberto in Support of Liability Summary Judgment (Docket No. 114), Plaintiff's Motion to Strike Statement of Facts Re: Groundwater (Docket No. 128), Defendant's Motion for Order Denying Subject Matter Jurisdiction (Docket No. 140) and Defendant's Motion to Supplement Record (Docket No. 150).

Having carefully reviewed the record, considered oral arguments, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order.

I.

**BACKGROUND**

Defendant ConAgra, Inc. owns and operates a beef slaughterhouse and a cattle feeding operation at its facility in Nampa, Idaho. Cattle are slaughtered and processed in the slaughterhouse, and the Concentrated Animal Feeding Operation ("CAFO") holds cattle in preparation for slaughter.

Defendant generates large amounts of wastewater during the slaughtering process. The wastewater, which is contaminated [*3] with blood and other animal waste, is treated in the facility's wastewater treatment plant prior to discharge into Indian Creek. Defendant's wastewater treatment consists primarily of a treatment pond followed by mechanical and chemical wastewater treatment.

The operations at the facility are regulated by two federal pollution discharge permits: a National Pollution Discharge Elimination System ("NPDES") permit dated June 27, 1985; and a CAFO permit dated March 27,

1987. Plaintiff United States alleges that Defendant has been discharging numerous pollutants in violation of the permits, and brought the instant enforcement action seeking civil penalties for the alleged violations.

The action is presently before the Court on several dispositive motions filed by the parties as well as on several pretrial motions in limine.

## II.

### CONAGRA'S MOTION TO DISMISS

Defendant has moved to dismiss Plaintiff's complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief may be granted, arguing that the complaint does not meet the requirements of notice pleading set forth in *Fed. R. Civ. P. 8* because it is overly vague. *See* Docket No. 96. Defendant [*4] claims that it was only able to determine what Plaintiff considered to be violations when Plaintiff filed its motions for summary judgment which contained details from discovery of what Plaintiff actually alleged Defendant had done in violation of federal law and regulations.

The First Claim for relief contained in Plaintiff's complaint alleges that at "numerous times from January 1992 through February 1996, ConAgra discharged pollutants not authorized" by ConAgra's NPDES permit. *See* Amended Complaint, at PP 15, 22. The Second Claim for relief alleges that at "numerous times from January 1992 through at least February 1996, ConAgra discharged pollutants in excess of effluent limitations" in ConAgra's permit. *See id.* at PP 16, 24. The Third Claim for relief alleges that at "numerous times from April 1992 through January 1994, ConAgra failed to comply with monitoring and reporting violations. *See id.* at PP 17, 28. Finally, the Fourth Claim for relief alleges that at "numerous times from January 1992 through October 1992, ConAgra failed to comply with records contents requirements." *See id.* at PP 18, 28.

First, Defendant argues that the above cited allegations are too [*5] vague, and do not give them notice sufficient to defend against the possible claims. However, Plaintiff has responded that the allegations state a relevant time period, and explain which statutes it claims were violated. The violations come from documents within ConAgra's possession, and are thus self reported. Under these circumstances, the notice pleading requirements of Rule 8 are clearly met.

Next, Defendant argues that Plaintiff is required to plead each of the approximately 600 alleged violations as separate claims pursuant to *Fed. R. Civ. P. 10(b)*. Rule 10(b) does provide that "each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count," however, the Rule continues to state that

such claims "shall be stated in a separate count or defense *whenever a separation facilitates the clear presentation of the matters set forth.*" (Emphasis added), Thus, claims must be separated only when such separation clarifies the matters set forth, but claims are not required to be separated. In this action, Plaintiff argues that it would not clarify matters to plead each of the approximately 600 violations as separate claims. Rather, the Complaint [*6] is made more clear by grouping the alleged violations by type, as Plaintiff has done. The Court concludes that it is not necessary in this action for Plaintiff to separately plead each of the approximately 600 alleged violations.

As this Court has held in earlier decisions in this same action, Plaintiff's Amended Complaint is sufficient under *Fed, R. Civ. P. 8* to give Defendant notice of Plaintiff's claims. The process of discovery is designed to give Defendant further notice of what specific actions Plaintiff claims constitute violations. In this action, the parties have done just that, and in the discovery process have submitted interrogatories which ask the opposing party to list out the claims or affirmative defenses. The Court concludes that this process has fairly notified all parties of the opposition's position, and meets the requirements of the Federal Rules of Civil Procedure. Accordingly, Defendant's motion to dismiss for failure to state a claim is denied.

## III.

### SUBJECT MATTER JURISDICTION

Defendant has moved to dismiss the claims regarding groundwater from this action for lack of subject matter jurisdiction arguing that this Court only has jurisdiction over [*7] pollutants discharged into surface water, while the State of Idaho has exclusive jurisdiction over pollutants discharged into groundwater. Plaintiff's main allegations against Defendant stem from violations of the CWA from alleged discharge of pollutants into the surface water of Indian Creek. The Court clearly has jurisdiction over those alleged violations pursuant to the CWA. However, Plaintiff has indicated that it also intends to prove at trial "additional violations of the CWA, including, but not limited to unauthorized discharges of pollutants from french drains into Indian Creek and unauthorized discharges of pollutants via ground water from ConAgra's wastewater land application site." Memorandum, at 1, n. 2 (Docket No. 90). It is the alleged violations which stem from alleged discharge of pollutant via french drains and groundwater over which Defendant claims this Court lacks subject matter jurisdiction.

There is a split of opinion and authority among courts which have addressed the issue of whether federal courts have subject matter jurisdiction over discharges to

surface water via groundwater. The Ninth Circuit Court of Appeals has not yet addressed the issue. However, several [*8] district courts in the Ninth Circuit have addressed the issues presented here and, interestingly, there is also split of authority among those courts within the same circuit. Defendant urges the Court to follow and adopt the reasoning of those courts which have concluded that the Court lacks subject matter jurisdiction over discharges to surface water via groundwater, and seeks an order of the Court dismissing the claims based on such discharges. However, Plaintiff argues that the majority view is to retain jurisdiction of discharges to surface water via groundwater when the groundwater is hydro geologically connected to the surface water.

The most recent and comprehensive opinion on the issue of jurisdiction over waters discharged via groundwater is *Umatilla Water Quality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc., 962 F. Supp. 1312 (D.Or. 1997)*. In *Umatilla*, the district court thoroughly and in a scholarly manner analyzed the CWA, the legislative history behind the CWA, and the applicable case law, and concluded that "the [CWA] as written, as intended by Congress, and as applied in Oregon for over two decades does not regulate even hydrologically-connected groundwater." [*9] *Id. at 1318*.

In reaching this conclusion, the *Umatilla* decision begins with an analysis of the history and language of the CWA:

> In 1972, Congress enacted the Clean Water Act (CWA) in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *33 U.S.C. § 1251*(a). To carry out this goal, the Act provides that, "except as in compliance" with its provisions, "the discharge of any pollutant by any person shall be unlawful." *33 U.S.C. § 1311*(a). . . . The CWA defines "discharge of a pollutant" to include . . . "any addition of any pollutant to navigable waters from any point source". . . . *33 U.S.C. § 1362*(12). . . . "Navigable waters," for purposes of the CWA, are "waters of the United States, including the territorial seas." *33 U.S.C. § 1362*(7). Courts have upheld EPA's broad interpretation of this term to include, essentially, any surface water body capable of affecting interstate commerce.

*Id. at 1314* (citations omitted). The court continues by recognizing that the Ninth Circuit, like the EPA, has consistently given a broad definition to the term

"navigable waters" for purposes of the CWA. *Id. at 1316*. [*10] However, the Ninth Circuit has not yet visited the issue of whether the CWA, as broad as it is, applies to discharges to underground waters. *Id. at 1316-17*.

While the Ninth Circuit has not yet addressed this precise issue, other courts are divided on whether the CWA applies to discharges to groundwater. Some courts have held that the CWA does apply to discharges to groundwater which are made through groundwater which affects surface water. *See Friends of Santa Fe County v. LAC Minerals, 892 F. Supp. 1333, 1357-58 (D.N.M. 1995)* (holding that the Tenth Circuit's decision in *Quivira Mining Co. v. United States Envtl. Protection Agency, 765 F.2d 126 (10th Cir. 1985), cert. denied, 474 U.S. 1055, 106 S. Ct. 791, 88 L. Ed. 2d 769 (1986)*, foreclosed "any argument that the CWA does not protect groundwater with some connection to surface waters" because the Tenth Circuit had expansively interpreted the CWA's jurisdictional reach in a non-groundwater context); *Washington Wilderness Coalition v. Hecla Mining Co., 870 F. Supp. 983, 989-90 (E.D.Wash. 1994)* (holding that, although "Congress did not intend to include isolated groundwater as part of the 'navigable waters' "that [*11] the CWA regulates, the CWA does apply to discharges of pollutants that reach surface waters through groundwater); *Sierra Club v. Colorado Refining Co., 838 F. Supp. 1428, 1434 (D.Colo. 1993)* (holding that discharges into "navigable waters" include discharges that reach navigable waters through groundwater); *McClellan Ecological Seepage Situation v. Weinberger, 707 F. Supp. 1182, 1193-96 (E.D.Cal. 1988), vacated on other grounds, 47 F.3d 325 (9th Cir.), cert. denied, 516 U.S. 807, 116 S. Ct. 51, 133 L. Ed. 2d 16 (1995)* (noting that although "Congress did not intend to require NPDES permits for discharges of pollutants to isolated groundwater," plaintiff could state a claim if it could "establish that the groundwater is naturally connected to surface waters that constitute 'navigable waters' under the Clean Water Act.").

However, the court in *Umatilla* found more persuasive those decisions which held that the CWA's permitting provisions do not apply to any groundwater. *See Town of Norfolk v. United States Army Corps of Engineers, 968 F.2d 1438, 1451 (1st Cir. 1992)* (deferring to the Army Corps' definition, which limited CWA coverage to surface waters); [*12] *Kelley v. United States, 618 F. Supp. 1103, 1106-07 (W.D.Mich. 1985)* (holding that Congress's intent was to leave regulation of contaminated groundwater to the states); *United States v. GAF Corp., 389 F. Supp. 1379, 1383-84 (S.D.Tex. 1975)*.

Further, the court concluded "that discharges of pollutants into groundwater are not subject to the CWA's

NPDES permit requirement even if that groundwater is hydrologically connected to surface water." *Umatilla, 962 F. Supp. at 1320.* The court reached that conclusion for four main reasons. First, the court examined the language of the statute itself, and concluded that as a matter of statutory interpretation, the CWA NPDES permit requirements do not apply to groundwater:

> I note that when Congress wanted certain provisions of the CWA to apply to groundwater, it stated so explicitly. Thus, it commanded that "the Administrator shall prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters." *33 U.S.C. § 1252*(a). Similarly, the Administrator shall "establish, equip, and maintain [*13] a water quality surveillance system for the purpose of monitoring the quality of the navigable waters and ground waters and the contiguous zone and the oceans . . . ." *33 U.S.C. § 1254*(a)(5). In contrast, section 1342, which establishes the NPDES permitting system, makes no reference to groundwater.

*962 F. Supp. at 1318.*

Second, the court concluded in *Umatilla* that the quoted language indicated that Congress did not intend for the NPDES permit requirements to apply to groundwater:

> The quoted references strongly indicate that Congress considered "ground waters" to be a different category of waters from "navigable waters." Indeed, throughout the CWA, Congress appeared to have four categories of waters in mind--"navigable waters," the contiguous zone; the ocean, and "ground waters." Only the first three of these, moreover, are included within the definition of "discharge of a pollutant," *33 U.S.C. § 1362*(12), indicating that Congress did not consider discharges to groundwater to be discharges that would trigger the NPDES permit requirement. *See 33 U.S.C. § 1342*(a)(1).

*Id.*

Third, the court in *Umatilla* concluded that the legislative history indicated [*14] that Congress did not intend for the NPDES permit requirements to apply to groundwater:

> The CWA's legislative history suggests that Congress did not intend to regulate groundwater in any form. As the Eastern District of California has noted:

>> The report accompanying the Senate version of the Clean Water Act stated:

>> Several bills pending before the Committee provided authority to establish Federally approved standards for groundwaters which permeate rock, soil and other surface formations.

>> Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation.

>> S. Rep. No. 414, 92d Cong., 1st Sess. 73 (1971), U.S.Code Cong. & Admin. News 1972, P. 3668, 3749, *reprinted in* 2 Congressional Research Service of the Library of Congress, A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess., at 1491 (Comm. Print 1973) (hereinafter "Leg Hist.").

>> In addition, the House specifically rejected an amendment introduced by Rep. Aspin that would have brought groundwater within the permitting and enforcement sections of the bill. 118 Cong.Rec. 10,669 (1972), [*15] 1 Leg. Hist. 597. In opposing this amendment, Rep. Clausen,

a sponsor of the House bill, stated:

Mr. Chairman, in the early deliberations within the committee which resulted in the introduction of H.R. 11896, a provision for ground waters, similar to that suggested by the gentleman from Wisconsin, was thoroughly reviewed and it was determined by the committee that there was not sufficient information on ground waters to justify the types of controls that are required for navigable waters.

118 Cong. Rec. 10,667 (1972, 1 Leg. Hist. 590-91 (remarks of Rep. Clausen). Thus, both the Senate and the House specifically rejected attempts to require permits for discharges to groundwater under the NPDES program.

*McClellan Ecological Seepage Situation v. Weinberger, 707 F. Supp. at 1194.* The failure of a proposed amendment "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 200, 95 S. Ct. 392, 401, 42 L. Ed. 2d 378 (1974).*

*962 F. Supp. at 1318-19.*

Fourth, the *Umatilla* decision noted that because the EPA has offered no formal interpretation of the CWA that [*16] would cover discharges to groundwater, no deference need be given the agency at this time:

EPA has offered no formal or consistent interpretation of the CWA that would subject discharges to groundwater to the NPDES permitting requirement. I note that an agency's interpretation of a statute that it administers is entitled to great deference. *Chemical Manufacturers Ass'n v. Natural Resources Defense*

*Council, 470 U.S. 116, 125, 105 S. Ct. 1102, 1107-08, 84 L. Ed. 2d 90 (1985); Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-44, 104 S. Ct. 2778, 2781-83, 81 L. Ed. 2d 694 (1984).* Here, however, the most formal interpretations from EPA indicate that the NPDES program does not apply to discharges to groundwater. The Office of General Counsel advised EPA that:

Section 402 [ *33 U.S.C. § 1342]* authorizes the Administrator to issue a permit "for the discharge of a pollutant." Under § 502(12) the term "discharge of a pollutant" is defined so as to include only discharges into navigable waters (or the contiguous zone of the ocean) Discharges into ground waters are not included. Accordingly, permits may not be issued, and no application is required, [*17] unless a discharge into navigable waters is proposed or is occurring.

Opinion, Office of General Counsel (December 13, 1973), as *reprinted in Exxon Corp. v. Train, 554 F.2d 1310 at 1320 n.21* (emphasis added). Moreover, EPA twice promulgated regulations restricting its authority over groundwater in accordance with this opinion. *38 Fed.Reg. 13,528* (May 22, 1973), *codified as 40 C.F.R. § 125.26(a)(1) (1977); 44 Fed.Reg. 32,854, 32,870* (June 7, 1979). Courts interpreting the CWA's NPDES permit program as applying to hydrologically-connected groundwater have uniformly failed to address this interpretive history. *Friends of Santa Fe County, 892 F. Supp. at 1357-58; Washington Wilderness Coalition v. Hecla Mining Co., 870 F. Supp. at 990-91; Sierra Club v. Colorado Refining Co., 838 F. Supp. at 1432-34; McClellan Ecological Seepage Situation v. Weinberger, 707 F. Supp. at 1195-96.*

As noted, EPA has not since promulgated regulations asserting that hydrologically connected groundwater can be subject to NPDES permitting. Nor, apparently, has it published official guidance on this subject. Given the General Counsel's interpretation that the NPDES permitting program [*18] does not apply to ground water and EPA's previous regulatory activity confirming this interpretation, I do not believe that EPA's recent parenthetical comment in its discussion of storm water permit application regulations, without more, should be accorded the power to reshape the CWA's plain language and almost twenty-five years of water quality regulation in Oregon.

*Id.* at 1319. Based primarily on the foregoing reasons, the court in *Umatilla* concluded "that discharges of pollutants into groundwater are not subject to the CWA's NPDES permit requirement even if that groundwater is hydrologically connected to surface water." *Id.* at 1320. This Court agrees with the well reasoned and scholarly opinion of the Oregon district court, and for the same reasons stated therein concludes that discharges of pollutants into groundwater are not subject to the CWA's NPDES permit requirement even if that groundwater is hydrologically connected to surface water. Accordingly, this Court does not have jurisdiction over the violations alleged by Plaintiff of discharges to the surface water of Indian Creek via groundwater.

However, the Court notes that Plaintiff in this instant action [*19] has alleged two distinct types of discharges other than direct discharges from surface water. Plaintiff has stated that it intends to prove at trial violations from discharges to surface water via groundwater and that it intends to prove at trial violations from discharges to surface water via french drains. As indicated above, the Court has concluded in this action that it does not have jurisdiction over the alleged permit violations from discharges via groundwater, however, Plaintiff has alleged and submitted evidence into the record that the discharges via the french drains are not discharges from groundwater, but are rather discharges from a point source. Accordingly, the Court concludes that there remain genuine issues of material fact regarding the Court's jurisdiction over those discharges Accordingly, at the trial in this matter, the Court will determine from the evidence presented whether the discharges from the french drains are discharges from a point source or are discharges via groundwater.

IV.

## MOTIONS FOR SUMMARY JUDGMENT

Presently before the Court are the United States' Partial Motion for Summary Judgment On Defendant ConAgra, Inc.'s Affirmative Defenses [*20] 1-18 (Docket No. 87), United States' Motion for Partial Summary Judgment as to Liability (Docket No. 89), Defendant's Motion for Partial Summary Judgment (Docket No. 91) and Defendant's Motion for Order Denying Subject Matter Jurisdiction (Docket No. 140).

However, before the Court can address the pending dispositive motions, in light of the pending motions to strike, it must first be determined what will be considered in support of and in opposition to those motions. Thus, the Court will first address the pending motions to strike, and will then proceed to address the parties' dispositive motions.

### A. Motions to Strike

Defendant has filed a Motion to Strike Declaration of Joseph Roberto in Support of Summary Judgment on Affirmative Defenses (Docket No. 112) and a Motion to Strike Declaration of Joseph Roberto in Support of Liability Summary Judgment (Docket No. 114), and Plaintiff has, filed a Motion to Strike Statement of Facts Re: Groundwater (Docket No. 128).

#### 1. Motion to Strike Roberto Declaration in Support of Motion on Affirmative Defenses

In support of its motion for summary judgment on Defendant's affirmative defenses, Plaintiff has submitted the Declaration [*21] of Joseph Roberto. Defendant argues that such declaration should be stricken from the record because it is conclusory and because there is no way to determine whether it is based on the personal knowledge of Roberto. The Court denied this motion to strike at the August 4, 1997 hearing in this matter. This order memorializes that oral ruling.

#### 2. Motion to Strike Declaration of Joseph Roberto Regarding Liability

In support of its motion for summary judgment on liability, Plaintiff submitted another declaration from Joseph Roberto. Defendant argues that this declaration should be stricken from the record because it is inherently unreliable and because it is not based upon his personal knowledge. At the August 4, 1997 hearing in this matter, the Court denied Defendant's motion to strike the declaration of Roberto submitted in support of the motion regarding liability and this order memorializes that ruling.

#### 3. United States' Motion to Strike ConAgra's Statement of Facts Re: Groundwater Issues

Defendant submitted a statement of facts not in dispute regarding its motion for summary judgment after the dispositive motion deadline in this action. The Court previously [*22] struck from the record in this matter the motion for summary judgment and the memorandum in support thereof, but did not strike the statement of facts submitted by Defendant in support of the stricken motions. Plaintiff has moved to have this statement of facts, as well as the exhibits attached to it, stricken from the record in this matter. One of the exhibits attached to the statement of facts is the affidavit of expert witness Mallotte. Plaintiff argues that this affidavit should be stricken because the statements made by the affiant are not contained in his expert report.

Defendant has responded by explaining that the statement of facts is also relevant to the pending motion for summary judgment regarding the jurisdictional question which the Court allowed to be filed after the dispositive deadline.

At the August 4, 1997 hearing in this matter, the Court denied the motion to strike the statement of facts regarding groundwater and also denied the motion to strike the expert affidavit attached thereto. However, the Court indicated that in all fairness, Plaintiff should be allowed to depose Mallotte on any opinions given in the affidavit which were not previously provided in his [*23] expert report. This order memorializes that oral ruling from the bench.

**B. Summary Judgment Standard**

Motions for summary judgment are governed by *Fed. R. Civ. P. 56.* Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).*

The United States Supreme Court has made it clear that under Rule 56, summary judgment is required if the nonmoving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he/she will bear the burden of proof at trial. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* If the nonmoving party fails to make such a showing on any essential element of his case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts [*24] immaterial." *Id. at 323.* n1

n1 *See also* Rule 56(e), which provides in part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

U.S.S.C. Court Rules, Rules of Civil Procedure, Rule 56(e) (Law. Co-op. 1987 & Supp. 1991).

Under Rule 56 it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions [*25] of the truth at trial," *Hahn v. Sargent, 523 F.2d 461, 463 (1st Cir. 1975)* (quoting *First Nat'l Bank v. Cities Serv. Co., Inc., 391 U.S. 253, 289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)), cert. denied 425 U.S. 904, 47 L. Ed. 2d 754, 96 S. Ct. 1495 (1976)* or when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 212 (1986).* The Ninth Circuit cases are in accord. *See British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund, 882 F.2d 371 (9th Cir. 1989).*

In ruling on summary judgment motions, the court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T. W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626 (9th Cir. 1987).* Moreover, all inferences must be drawn in the light most favorable to the nonmoving party. *Id. at 631.* As the Ninth Circuit Court of Appeals has stated, "put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment [*26] must be denied." *Id.*

In order to withstand a motion for summary judgment, the Ninth Circuit has held that a nonmoving party:

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the nonmoving party's claim implausible.

*British Motor Car Distributors, 882 F.2d at 374* (citation omitted). Moreover, the Ninth Circuit has held that where the moving party meets its initial burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must "produce 'specific facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983)* (citing *Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 445 U.S. 951, 63 L. Ed. 2d 786, 100 S. Ct. 1600 (1980))*. [*27]

The Ninth Circuit Court of Appeals has acknowledged that in recent years the Supreme Court, "by clarifying what the nonmoving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006, 98 L. Ed. 2d 650, 108 S. Ct. 698 (1988)*. As the Ninth Circuit has expressly stated: "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

In addressing the application of the "Summary Judgment Test," the Ninth Circuit has specifically explained that:

A "material" fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the *substantive law* governing the claim or defense. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

*T. W. Electrical Serv., Inc., 809 F.2d at 630* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct.* [*28] *2505 (1986))* (emphasis added).

## C. Plaintiff's Motion for Summary Judgment Regarding Liability

Plaintiff has moved for partial summary judgment on the issue of liability. Plaintiff argues that it is undisputed that Defendant discharged pollutants into waters of the United States on at least nine occasions without a NPDES permit, that it is undisputed that Defendant discharged pollutants into waters of the United States in excess of the effluent limitations contained in its NPDES permit, and that it is undisputed that Defendant failed to comply with the monitoring, reporting and record keeping requirements of its NPDES permit, resulting in 632 violations of the CWA. n2

> n2 The Court notes at this time that Plaintiff's motion only addresses the alleged discharges into the surface waters of Indian Creek. However, Plaintiff has indicated that it intends to prove additional violations at trial stemming from unauthorized discharges of pollutants from french drains and via groundwater. It is the additional allegations regarding french drains and groundwater which are the subject of Defendant's motion regarding subject matter jurisdiction. There has been no challenge raised to the Court's subject matter jurisdiction over the allegations of violations addressed in the instant motion for summary judgment on liability for violations of the NPDES permit requirements regarding discharges to surface water.

discharges of pollutants from point sources other than 010 and 004. *See* Undisputed Facts, PP 20-26. These violations allegedly occurred on January 11, 1992, December 30, 1992, June 25, 1993, July 2, 1993, July 8, 1993, December 1, 1994, and February 8, 1996. In addition to those self reported violations, on March 26, 1994, an EPA inspector observed two discharges of cow manure into Indian Creek at points other than 010 or 004. n3

> n3 The other requirements for a prima facie case are met: (1) ConAgra is a corporation which is a "person" as defined by the CWA, *see 33 U.S.C. § 1352(5)*; (2) all of the discharges contained "pollutants" as defined by *33 U.S.C. § 1362(6)* and *40 C.F.R. § 401.11(f)*, *see* Plaintiff's Statement of Facts, at P 9, (3) the discharges were from a "point source" as defined in *33 U.S.C. § 1362(12), (14)*, and (4) Indian Creek is a water of the United States.

[*29]

In response to Plaintiff's motion, Defendant claims that it has raised affirmative defenses to each of the nine alleged violations, and claims that those affirmative defenses raise a genuine issue of material fact. Specifically, Defendant has raised an "upset defense" in response to Plaintiff's allegations of violations on January 11, 1992; June 25, 1993; July 2, 1993; December 1, 1994 and February 8, 1996. Defendant's permit defines an "upset" as follows:

> an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors outside of the reasonable control of the permittee. *An upset does not include* noncompliance to the extent caused by operational error, improperly designed treatment facilities, lack of preventative measures, or careless or improper operation.

NPDES Permit, at 6, P 6 (emphasis added). In order for Defendant to avoid liability based on an "upset defense" it has the burden to establish that:

> a. An upset occurred and that the permittee can identify the cause(s) of the upset;
>
> b. The permitted facility was at the time being properly operated;
>
> c. [*30] The permittee submitted notice of the upset as required under Part II.I. Twenty-four Hour Notice of Noncompliance Reporting: and
>
> d. The permittee complied with any remedial measures required under Part III.D. Duty to Mitigate.

NPDES Permit, at 12 (emphasis in original). Proper operation of a plant requires the permittee to "properly operate and maintain all facilities and systems of treatment and control . . . which are installed or used by the permittee to achieve compliance with the conditions of this permit." NPDES Permit, at 10. Defendant's duty to mitigate includes taking "all reasonable steps to minimize or prevent any discharge in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment." NPDES Permit, at 10.

In support of this defense, Defendant has cited the Court to the notices of upset condition sent to Plaintiff,

which Plaintiff has used as evidence of the violations. After carefully considering the evidence contained in the record, as well as the legal positions made in briefing and oral arguments, the Court is of the opinion that a genuine issues of material fact exist with respect to the application [*31] of the "upset defense" to the alleged violations of January 11, 1992; June 25, 1993; July 2, 1993 and December 1, 1994. Accordingly, summary judgment with respect to these alleged violations is denied.

Regarding the alleged unauthorized discharge on December 30, 1992, Defendant argues that Plaintiff's evidence offered to support the existence of a violation is ambiguous and is insufficient to support summary judgment. Exhibit 11, attached to Plaintiff's Motion for Summary Judgement, allegedly supports Plaintiff's claim that on December 30, 1992, an unauthorized discharge of 65,000 gallons of untreated effluent from Armour holding ponds was made into Indian Creek. However, Exhibit 11 states only that there was a "discharge of 65,000 gallons on December 30, 1992 due to the repair of a frozen line. There was chlorine added to the effluent during this discharge to maintain a low fecal coliform count." The Court concludes that this raises a question of fact regarding the issue of whether Defendant discharged untreated wastewater into Indian Creek on December 30, 1992. Accordingly, summary judgment is not appropriate.

Regarding the discharge admitted to have occurred on July 8, 1993, Defendant [*32] acknowledged that approximately 300,000 gallons had been discharged into Indian Creek, but asserts that the water had been properly treated and was in compliance with the permit. *See* Ex. 11, attached to Plaintiff's motion. The Court concludes that such is sufficient to create a question of fact regarding the issue of whether pollutants were discharged in violation of the NPDES permit.

Regarding the alleged unauthorized discharge on February 8, 1996, Defendant argues that the evidence supports a finding only that "it is possible that a small amount [of effluent] could have went [sic] into Indian Creek." Galliher letter, Ex. 11, attached to Plaintiff's Motion (Docket No. 89). The Court concludes that Joseph Roberto's testimony that when Defendant called to report the spill, its wastewater treatment plant manager told the EPA that 200 gallons of raw wastewater spilled into Indian Creek, is contradicted by the letter stating that it is possible that some wastewater spilled into the Creek. This conflict is sufficient to create a genuine issue of material fact as to the alleged unauthorized discharge on February 8, 1996.

However, in the Court's view, Defendant has not met its burden [*33] of coming forward with evidence

supporting its affirmative defenses on the two violations which occurred on March 26, 1994. Accordingly, the Court grants Plaintiff's motion for summary judgment on the two unauthorized discharges which occurred on March 26, 1994.

Based on the foregoing, Plaintiff's motion for partial summary judgment as to liability on nine claims of unauthorized discharge of pollutants is granted in part and denied in part. The motion is granted as to the two discharges of March 26, 1994. The motion is denied as to the violations alleged to have occurred on January 11, 1992, December 30, 1992, June 25, 1993, July 2, 1993, July 8, 1993, December 1, 1994 and February 8, 1996.

**2. Alleged Discharges in Excess of Effluent Limitations in Permit**

Plaintiff's Second Claim alleges that Defendant discharged pollutants in excess of the effluent limits of its slaughterhouse permit. In order to establish a prima facie case against ConAgra for discharging in violation of its permit effluent limits, Plaintiff must establish (1) that Defendant is a "person", and (2) that Defendant discharged effluent in excess of the limit set in its NPDES permit. *See SPIRG v. P.D. Oil [*34] & Chem. Storage, Inc., 627 F. Supp. 1074, 1090 (D.N.J. 1986).*

In the instant action, it is clear and undisputed that Defendant is a "person" as contemplated in the CWA. In support of its conclusion that Defendant discharged effluent in excess of the amounts allowed in its permit, Plaintiff uses the Daily Monitoring Report ("DMR") submitted by Defendant itself. Plaintiff argues that the DMRs, like other records that must be kept as part of a valid regulatory scheme, are admissions for the purpose of establishing civil liability. *See Sierra Club v. Union Oil Co., 813 F.2d 1480, 1492 (9th Cir. 1987), vacated on other grounds, 108 S. Ct. 1102-03 (1988), judgment reinstated, 853 F.2d 667 (9th Cir. 1988)* (holding that self-monitoring reports constitute conclusive evidence of an exceedence of a permit). Plaintiff directs the Court to the DMRs submitted by Defendant in support of its claims that Defendant exceeded its daily maximum 79 times, and violated its monthly maximum over 6 months, for a total of 181 days of violation. Based on these numbers, Plaintiff claims that Defendant acted in violation of its NPDES permit 260 times. n4

n4 This number is reached by taking the daily maximum discharge violations (79) and adding to it the 181 days during which the monthly limits were exceeded. The reason there are 181 violations for 6 months of daily average violation is that when a person violates the daily average effluent discharge limit in any given

month, that violation is one separate violation for each day of the month. *See Atlantic States Legal Foundation v. Tyson Foods, 897 F.2d 1128, 1139 (11th Cir. 1990).*

[*35]

Defendant does not contest the fact that it exceeded its effluent discharge limit on the occasions cited by Plaintiff. Rather, Defendant attempts to avoid liability on the violations alleged in Plaintiff's Second Claim for relief by arguing that those discharges were made at outfalls 10A, B, and C which are not governed by the NPDES permit, and by arguing that the NPDES permit which governs Defendant's discharges does not contain a monthly discharge limit.

Because Defendant has not contested the fact that it admitted to violating the effluent limits with those discharges made from outfall 010, the Court concludes that Plaintiff's motion for summary judgment regarding the 79 violations of the daily maximum effluent limit should be granted.

Regarding the monthly average violations for the 6 months alleged, Defendant argues that its NPDES permit does not set a monthly average limit, and thus concludes that it cannot be held liable for any alleged violations of a monthly average. While the actual language of the permit does not state a "monthly average" limit, it does provide for a "daily average limit." The permit goes on to provide that the "daily average limits" are calculated based [*36] on a monthly average of effluent data collected by Defendant. Thus, Defendant's claim that its permit does not provide a limit for monthly averages is merely a conflict over terms which mean the same thing. *See Atlantic States Legal Foundation v. Tyson Foods, 897 F.2d at 1139-40, n.20* ("for purposes of discussion, a violation of the daily average will be referred to as a 'monthly violation' to differentiate it from a 'daily violation' which refers to a violation of the daily maximum."); *United States v. Aluminum Co. of America, 824 F. Supp. 640, 649-50, n.15 (E.D.Tex. 1993)* ("The term 'daily average' is often referred to as 'monthly average.' The terms may be used interchangeably."). Plaintiff has submitted evidence of 181 daily average limit violations under the permit, which arise out of violations spanning 6 months. Defendant does not dispute the fact that those violations occurred, and the Court concludes that Plaintiff's motion for summary judgment on this issue should be granted.

Based on the foregoing, the Court concludes that there are no genuine issues of material fact and that Plaintiff's motion for summary judgment as to liability on its Second Claim for Relief [*37] should be granted. Accordingly, Defendant is liable for 260 violations of its

daily maximum and daily average ("monthly average") effluent limitations set in its NPDES permit, which constitutes 260 violations of the CWA.

### 3. Alleged Failure to Monitor and Report Effluent

Plaintiff's Third Claim for relief alleges that Defendant violated the terms of its NPDES by failing to comply with its monitoring and reporting requirements. In order to establish a prima facie case for failure to comply with monitoring and reporting requirements, Plaintiff must demonstrate (1) that Defendant is a "person", (2) who discharged, (3) pollutants, (4) from a point source, (5) to waters of the United States, (6) without complying with the monitoring or reporting requirements of its NPDES permit. *See Sierra Club v. Simkins Indust., 847 F.2d 1109 (4th Cir. 1988), cert. denied, 491 U.S. 904, 105 L. Ed. 2d 694, 109 S. Ct. 3185 (1989).*

The NPDES permit issued to Defendant requires it to monitor and report its discharges of pollutants to Indian Creek from outfalls 010 and 004. *See* NPDES Permit, at 7. Defendant is required to report the monitoring results to EPA on DMRs each month. *See* [*38] *id.* Plaintiff claims that the DMRs submitted by Defendant between April 1992 and November 1992 did not Include the required monitoring data in at least 51 instances. In support of its conclusion that the DMRs from that time period failed to properly report the monitoring results, Plaintiff has submitted the Declaration of Joseph Roberto. Roberto is a compliance officer with the EPA. Roberto personally reviewed the DMRs submitted by Defendant for 1992 through 1996. In reviewing those DMRs, Roberto discovered 51 instances in which Defendant failed to properly monitor and report effluent discharges to Indian Creek or failed to properly monitor and report stream conditions in Indian Creek. Roberto Decl., at P 6, Ex. 9 to Plaintiff's Motion (Docket No. 89). Each deficient DMR was signed by a representative of Defendant. *Id.*

In response to Plaintiff's motion and the evidence submitted, Defendant has not come forward with evidence to create a question of fact regarding the issue of whether it failed to comply with its monitoring and reporting requirements. Accordingly, Plaintiff's motion for summary judgment as to liability on its Third Claim for Relief is granted. Defendant is liable [*39] for 51 violations of the monitoring and reporting requirements set forth in its NPDES permit.

### 4. Allegations That Defendant Failed to Properly Maintain Records

Plaintiff's Fourth Claim for Relief alleges that Defendant failed to maintain records relating to its

wastewater discharges as required by the terms of its NPDES permit. Regarding the requirement of maintaining records, Defendant's NPDES permit provides that records be kept for a minimum of three years. On October 7 and 24, 1994 and on April 25, 1995, the EPA sent information requests to Defendant pursuant to section 308 of the CWA. Part of the information requested was copies of backup documentation required to be maintained in Defendant's files by its NPDES permit. Because the requests came in 1994 and 1995, Defendant should have supplied all information it was required to maintain pursuant to its permit from 1991 forward. In reviewing the documentation provided by Defendant, Roberto was unable to locate 312 documents which should have been maintained pursuant to the permit. Roberto Decl., at P 7.

Defendant has not responded with any evidence that it did in fact maintain those records as required by the permit. [*40] Rather, Defendant has responded by arguing that because the permit only requires records to be maintained for three years, a complaint brought in 1996 cannot allege violations stemming from records missing from 1992. However, the records were requested in 1994 and 1995, well within the three year maintenance requirement. Because they were not produced, a civil penalty action was filed in 1996. The statute of limitations on CWA violations is five years, so filing the complaint in 1996 does not violate any applicable statute of limitations, and the complaint seeks a penalty for Defendant's failure to produce records for the previous three years when requested in 1994 and 1995. Thus, Defendant's arguments regarding timing and the statute of limitations are without merit.

Because Defendant has offered no proof or evidence that it did in fact maintain the records sought by Plaintiff in 1995, there is no genuine issue of material fact before the Court. Accordingly, Plaintiff's motion for summary judgment on its Fourth Claim for relief is granted and Plaintiff is liable for 312 violations of the records maintenance provision of its NPDES permit.

### D. Plaintiff's Motion for Summary Judgment [*41] Regarding Affirmative Defenses

Plaintiff has also moved for partial summary judgment on each of Defendant's eighteen affirmative defenses, arguing that there is no basis in fact or law for any of the defenses.

### 1. Defendant's First, Third and Tenth Affirmative Defenses

Plaintiff has moved for summary judgment on Defendant's first, third and tenth affirmative defenses arguing that they were inserted merely as a matter of form and are otherwise lacking in content.

#### a. First Affirmative Defense

Defendant's first affirmative defense states that "Defendants [sic] deny each and every allegation of Plaintiff's Complaint unless specifically admitted herein."

The Court concludes that Defendant's first affirmative defense is really a general denial which is adequately covered in the Answer, and to the extent it is contemplated as an affirmative defense it should be stricken.

#### b. Third Affirmative Defense

Defendant's third affirmative defense states that "Plaintiff fails to provide adequate information or specific parameters as to the type, date, and extent of any alleged violations. Therefore, Defendant asserts as an affirmative defense that the complaint [*42] is inadequately drafted to permit a responsive answer." Plaintiff argues first that this is not an "affirmative defense" and second, that the issue has already been resolved and the Court has held that the complaint is not overly vague.

Because the Court has previously concluded that Plaintiff's complaint is not overly vague, and denied Defendant's motion to dismiss on that basis, the issue raised here is moot and no further action is necessary.

#### c. Tenth Affirmative Defense

Defendant's tenth affirmative defense states that "Plaintiff mischaracterizes types of alleged violations." Specifically, Defendant maintains that Plaintiff has improperly counted single alleged violations as multiple violations. Defendant maintains that at trial it will demonstrate that two violations were counted as seventy. Again, Plaintiff argues that this is not an affirmative defense and should be stricken.

The proper characterization of the violations will be an element that Plaintiff will be required to prove at trial. The Court agrees and Defendant's tenth affirmative defense will be stricken.

#### 2. Defendant's Second, Fourth Through Ninth and Eleventh Through Eighteenth Affirmative Defenses [*43]

Plaintiff claims that Defendant's second, fourth through ninth and eleventh through eighteenth affirmative defenses are conclusory and are unsupportable.

#### a. Defendant's Second Affirmative Defense

Defendant's second affirmative defense states that "Plaintiff's complaint fails to state a claim upon which relief can be granted." As the Court has already denied Defendant's motion to dismiss the complaint for failure to state a claim, Plaintiff's motion to strike this affirmative defense is moot and no further action is necessary.

#### b. Defendant's Fourth Affirmative Defense

Defendant's fourth affirmative defense states that "Plaintiff's claims are barred by the doctrines of estoppel and laches." Plaintiff argues that under the circumstances present in this action, neither of those affirmative defenses is supportable.

The Ninth Circuit has explained that "the doctrine of equitable estoppel is available if the following elements are present: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant [*44] of the true facts; and (4) he must rely on the former's conduct to his injury." *Lavin v. Marsh, 644 F.2d 1378, 1382 (9th Cir. 1981)* (citations omitted). "In addition, to invoke estoppel against the Government, the party claiming estoppel must show 'affirmative misconduct' as opposed to mere failure to inform or assist." *Id.* Plaintiff argues that summary judgment on the defense of estoppel is appropriate at this time because Defendant has come forward with no evidence of "affirmative misconduct" on the part of the Government to support such a defense.

Additionally, the defense of laches is not available as a defense against the United States when it is acting to enforce a public right or interest. *See Costello v. United States, 365 U.S. 265, 281, 5 L. Ed. 2d 551, 81 S. Ct. 534 (1961).*

The documents which provide the alleged basis in the instant action were sent to Plaintiff. To establish affirmative misconduct, Defendant maintains that, at the time the complaint was filed, Plaintiff was aware that backup documents might not exist because Defendant was only required to maintain records for three years. Defendant further argues that Plaintiff intentionally waited to file [*45] the complaint until Defendant's operator was unavailable to testify and that documents were wrongfully removed by disgruntled employees. Finally, Defendant asserts that Plaintiff's failure to renew or modify Defendant's request for a permit for over seven years constitutes affirmative misconduct.

The Court concludes that the allegations of affirmative misconduct contained in the answer and briefing do not create a genuine issue of material fact which is sufficient to withstand summary judgment. Accordingly, Defendant's fourth affirmative defense is stricken to the extent that Defendant seeks to avoid liability based on this defense.

However, Defendant has argued that even if the defenses of estoppel and laches cannot form the basis for a complete bar of Plaintiff's claims, at least they should be considered as a factor in mitigating any amount that must be paid as a civil penalty. The Court agrees. Although evidence supporting the existence of estoppel and laches shall not be introduced to support an affirmative defense, Defendant shall have the opportunity to submit such evidence regarding Plaintiff's conduct which would have a mitigating effect upon possible damages should that [*46] issue be reached.

### c. Defendant's Fifth Affirmative Defense

Defendant's fifth affirmative defense claims that "excursion allegation, if defined, may be due to a bypass and are therefore excusable under the permit. " Defendant's NPDES permit defines bypass as "the intentional diversion of waste from any portion of a treatment facility." NPDES Permit, at 6, P 7. The permit prohibits bypasses unless the following conditions are met:

> (1) The bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;
> (2) There were no feasible alternatives to the bypass . . . and
> (3) The permittee submitted notices as required under [the permit].

*Id. at 11.*

Plaintiff argues that Defendant has failed to provide facts to support the affirmative defense. According to Plaintiff, Defendant has failed to make a showing of unavoidability, alternatives, and submission of notice. Defendant urges the Court to examine Figure 1, which includes facts contained in Exhibit 9, at page six of its brief in opposition to Plaintiff's motion for summary judgment, to determine whether a factual dispute has been created.

After reviewing Figure 1, along with [*47] the arguments presented by the parties, the Court concludes that summary judgment is inappropriate. A genuine issue of material fact regarding the applicability of this defense has been created. Accordingly, Defendant's fifth affirmative defense will not be stricken.

### d. Defendant's Sixth Affirmative Defense

Defendant's sixth affirmative defense is that "excursion allegations, if defined, may be due to an upset or exceptional incident beyond the reasonable control of the Defendant and are therefore excusable under the permit." Defendant's NPDES permit defines an upset as:

> An exceptional incident in which there is unintentional and temporary noncompliance with technology-based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

NPDES Permit, at 6, P 6. Defendant's permit also states that such an upset will be an affirmative defense as long as Defendant can

> Demonstrate, through properly [*48] signed, contemporaneous operating logs, or other relevant evidence that:
>
> > a. An upset occurred and that the permittee can identify the cause(s) of the upset;
> >
> > b. The permitted facility was at the time being properly operated;
> >
> > c. The permittee submitted notice of the upset as required under Part II.I. Twenty-four Hour Notice of Noncompliance Reporting; and
> >
> > d. The permittee complied with any remedial measures required under Part III.D. Duty to Mitigate.
>
> Burden of proof. In any enforcement proceeding, the permittee seeking to establish the occurrence of an upset has the burden of proof.

NFDES Permit, at 12.

Defendant maintains that it sent the required notice. To support a finding that upsets occurred, Defendant relies upon a letter sent by Plaintiff's expert, Brian Harrington, in which he stated that there were upsets at the facility. Defendant asserts that not only does the defense apply to technology-based limitations, but also to water based limitations pursuant to *National*

*Resources Defense Council, Inc. v. EPA, 859 F.2d 156, 209-10 (D.C. Cir. 1988).* Defendant asserts that the D.C. Circuit, in *National Resources Defense Council,* [*49] held that the EPA's failure to extend the upset defense to water quality-based limitations was arbitrary and capricious. Finally, Defendant maintains that all of the conditions are supported by the facts outlined in Figure 1.

First, Plaintiff argues that this defense is inapplicable to Defendant's ammonia, chlorine, and fecal coliform effluent violations because these are water quality-based limits and not technology based. Plaintiff concedes that Brian Harrington was of the opinion that upsets had occurred, however, his use of the word was made under the common meaning, which includes causes expressly excluded by Defendant's permit. Further, Plaintiff maintains that Defendant has failed to produce sufficient facts to create a genuine dispute with regard to the four required conditions relating to technology based limitations.

*National Resources Defense Council* held that the EPA acted arbitrarily and capriciously in not extending the upset defense to water quality-based limitations and ordered EPA to "conduct further proceedings to determine whether to extend the upset defense to violations of water quality-based permit limitations." *859 F.2d at 210.* The current regulation does [*50] not extend the upset defense to water quality-based limits. *See 40 C.F.R. § 122.41(n).* Inasmuch as the agency has not extended the defense, water quality-based limits are not defensible with the upset defense.

With respect to the technology-based limitations, the Court is of the view that Defendant has provided sufficient facts to create a genuine issue of material fact. Therefore, Defendant's sixth affirmative defense shall not be stricken.

### e. Defendant's Seventh Affirmative Defense

Defendant's seventh affirmative defense states that "excursion allegations, if defined, may be due to severe property damage or damage to the treatment facilities and are therefore excusable under the permit." This defense relates to and is part of a bypass defense. As discussed above, in order to establish a bypass defense, Defendant must establish three conditions, i.e. the bypass was unavoidable to prevent damage, no alternatives to the bypass existed, and notice was given. NPDES Permit, at 11.

In support of this defense, Defendant cites Figure 1, which provides all of the required factual basis. Upon careful consideration of the evidence contained in the record, the Court concludes [*51] that a genuine issue of material fact exists regarding this defense. Accordingly,

Defendant's seventh affirmative defense shall not be stricken.

### f. Defendant's Eighth Affirmative Defense

The eighth affirmative defense is that "excursion allegations, if defined, may be due to the potential for substantial loss of natural resources and are therefore excusable under the permit." This defense relates to a bypass defense. In support, Defendant points to Figure 1. The existing record creates a genuine issue of material fact with respect to the applicability of this defense. Therefore, Defendant's eighth affirmative defense shall not be stricken.

### g. Defendant's Ninth Affirmative Defense

Defendant's ninth affirmative defense is that the "excursion allegations, if defined, may be due to damage to the treatment facility which caused the facility to become incapable of operation and are therefore excusable under the permit." Again, this relates to and is part of a bypass defense, therefore, the ninth affirmative defense shall not be stricken.

### h. Defendant's Eleventh Affirmative Defense

The eleventh affirmative defense is that "Defendant is not required to pay [*52] the alleged Twenty-five thousand dollars ($ 25,000) per violation." This is not an affirmative defense and is insufficient to defeat any asserted liability for alleged CWA violations. While not technically an affirmative defense in the traditional sense, it is a general denial and the Court will construe it as such. Accordingly, the eleventh affirmative defense shall not be stricken but may be asserted to reduce the amount of civil liability should that issue be reached.

### i. Defendant's Twelfth Affirmative Defense

Defendant's twelfth affirmative defense is that "Defendant did not willfully or negligently violate permit conditions." Whether Defendant acted willfully or negligently is irrelevant. Plaintiff is not required to prove willfulness or negligence since liability is strict under Section 309(b) and (d) of the CWA. *See United States v. Brace, 41 F.3d 117, 122 (3d Cir. 1994).* Accordingly, Defendant's twelfth affirmative defense shall be stricken.

### j. Defendant's Thirteenth Affirmative Defense

Defendant's thirteenth affirmative defense that "Defendant may have had no feasible alternative to bypass and therefore, without more specific data on each allegation, [*53] Plaintiff cannot take an enforcement action against the Defendant" relates to a bypass defense for which a genuine issue of material fact exists based on the record. Accordingly, Defendant's thirteenth affirmative defense shall not be stricken.

### k. Defendant's Fourteenth Affirmative Defense

"Defendant may have had bypass conditions identifiable during times when the facility was being operated properly and may have complied with remedial measures as required." This defense shall remain inasmuch as a genuine issue of material fact has been created by the evidence contained in the record.

### l. Defendant's Fifteenth Affirmative Defense

Defendant asserts the defense of "an Act of God." This defense is not provided in the CWA or in the case law as a defense to the instant action. Liability for the alleged violations at issue here is strict. Further, there is no evidence submitted in the record to establish that an act of God occurred. Accordingly, Defendant's fifteenth affirmative defense is stricken.

### m. Defendant's Sixteenth Affirmative Defense

Defendant claims that "alleged violations, if any, may have resulted from the acts of third parties not employed [*54] by or under the control of the Defendant." Defendant asserts that sampling errors, sample breakage and frozen samples are all third-party actions. This defense is not recognized by the CWA. Liability under Section 301 of the CWA is strict. Inasmuch as the defense is not applicable to the claims asserted by Plaintiff, Defendant's sixteenth affirmative defense is stricken.

### n. Defendant's Seventeenth Affirmative Defense

Defendant's seventeenth affirmative defense is that the "alleged violations, if any, may be due to sampling, testing or laboratory error." Defendant asserts that Figure 1 along with Exhibits 9 and 10 establish that sufficient factual support exists to withstand summary judgment on the affirmative defense of testing errors. According to Defendant, lab error was held to be a partial defense under an NPDES Permit under the CWA. In support of this assertion, Defendant cites the Court to *Public Interest Research Group of New Jersey, Inc. v. Elf Atochem North America, Inc., 817 F. Supp. 1164 (D.N.J. 1993).*

Plaintiff argues that Defendant has failed to specify or submit any facts into the record that would support actual sampling errors. Further, Plaintiff argues [*55] that the controlling law has been pronounced by the Ninth Circuit Court of Appeals in that a permittee may not impeach its own reports by showing sampling error. *Sierra Club v. Union Oil Co., 813 F.2d 1480, 1491-93 (9th Cir. 1987) vacated on other grounds, 485 U.S. 931 (1988).*

The Court concludes that this defense is not allowed by the Ninth Circuit, as cited above, and accordingly, Defendant's seventeenth affirmative defense is stricken.

### o. Defendant's Eighteenth Affirmative Defense

Defendant's eighteenth affirmative defense states that "alleged violations, if any, provided no economic benefit to the Defendant." While this factor may be relevant to the Court's imposition of an appropriate penalty, it will not act as a bar to liability. Accordingly, Defendant's eighteenth affirmative defense is stricken.

Based on the foregoing, Plaintiff's motion for partial summary judgment with respect to Defendant's affirmative defenses is granted in part and denied in part. The motion is granted with respect to Defendant's first, fourth, tenth, twelfth, fifteenth, sixteenth, seventeenth, and eighteenth affirmative defenses. The motion is denied with respect to Defendant's [*56] fifth, sixth, seventh, eighth, ninth, eleventh, thirteenth, and fourteenth affirmative defenses. The motion is moot with respect to the second and third affirmative defenses.

### E. Defendant's Partial Motion for Summary Judgment

Defendant's partial motion for summary judgment seeks an order from the Court that the penalty sought by Plaintiff in its Amended Complaint, of up to $ 25,000 per day for each violation, is contrary to the specific terms of the NPDES permit issued to Defendant, which provides that the maximum penalty for violation is $ 10,000 per day for such violation.

Plaintiff's Amended Complaint does in fact seek a penalty of up to $ 25,000 per violation for each time Defendant is found to have violated the terms of its NPDES permit. The NPDES permit under which Defendant operates became effective June 27, 1985. The permit was to expire by its own terms at midnight on June 26, 1990. However, Defendant filed a renewal application before the permit was to expire, and the parties thereafter agree that the permit was administratively extended in its entirety without modification. Defendant has been and continues to operate under the terms of the June 27, 1985 NPDES [*57] permit.

Regarding penalties for violation of the terms of the permit, the permit provides in part:

> B. Penalties for Violations of Permit Conditions: The Clean Water Act provides that any person who violates a permit condition implementing § 301 . . . of the Clean Water Act is subject to a civil penalty not to exceed $ 10,000 per day of such violation.

NPDES Permit, at 10, Ex. A to McGowan Aff. n5 Defendant argues that because the permit specifically provides that the penalties for violation will not exceed $ 10,000 per day of such violation, Plaintiff is bound by

the terms of the permit and should be prohibited from seeking a fine of up to $ 25,000 per day for each violation.

n5 The penalties provision does continue to state that "any person who willfully or negligently violates permit conditions" is subject to a fine of not more than $ 25,000 per day of violations. *See id.* However, Plaintiff does not appear to be arguing, nor is there any evidence to support a finding, that Defendant willfully or negligently caused the alleged violations to occur.

[*58]

Plaintiff has responded by explaining that in 1985, when this permit was issued, the CWA did in fact provide that civil penalties for violation of the Act could not exceed $ 10,000 per day for such violation, and thus the permit refers to that when it states, the "Clean Water Act provides that any person who violates a permit condition . . . is subject to a civil penalty not to exceed $ 10,000 per day . . . ." However, in 1987 the CWA was amended to provide that a person who violates the Act could be subject to a civil penalty not to exceed $ 25,000 per day per violation. *See* CWA § 309(d), *33 U.S.C. § 1319*(d). Plaintiff argues that the reference to the CWA in the permit indicates that the permit penalties are meant to be the same as those under the Act, and thus concludes that for violations after 1987, Defendant is subject to a penalty of up to $ 25,000 per day per violation.

In support of its conclusion that the $ 25,000 per day per violation penalty should apply, Plaintiff directs the Court to a series of cases in which different courts have held that for violations before 1987, the $ 10,000 per day penalty applies, while for violations after 1987, the $ 25,000 [*59] per day per violation penalty applies. *See eg., Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1138 (11th Cir. 1990)* (holding that where a party violated its NPDES permit both before and after 1987, "maximum penalties must be assessed in accordance with both pre- and post-amendment language of the statute"). However, as Defendant notes, none of the cases cited by Plaintiff state whether the NPDES permit in each action contained language similar to the language in Defendant's permit regarding the maximum penalties for violations. In the absence of any language in the permit subjecting it to statutory changes, the Court concludes that the permit language must control. Accordingly, Defendant is subject only to "a civil penalty not to exceed $ 10,000 per day of such violation."

Next, Defendant seeks an order from the Court holding that the language "not to exceed $ 10,000 per

day of such violation" means that for each day of violation, the fine cannot exceed $ 10,000. Plaintiff argues that the language of the permit and of the CWA allows it to seek penalties of up to $ 10,000 per day *per violation*. Thus, under Plaintiff's reading, if Defendant [*60] had five violations on one day, it could be fined up to $ 50,000 for those violations. Whereas under Defendant's reading of the permit, it could only be fined $ 10,000 per day even it were found to have ten violations in that day.

The language in Defendant's permit mirrors the pre-1987 amendment language, which has been interpreted to allow the government to seek a $ 10,000 penalty per violation and not to cap the potential fine at $ 10,000 per day. In *Atlantic States, 897 F.2d at 1139,* the Eleventh Circuit concluded "that the slight change in wording in the 1987 amendment points to the proper interpretation of the statute as originally written." The court noted that "the Conference Report accompanying the amendment makes clear that under the Senate bill, section 309 of the Act *33 U.S.C. § 1319* was amended in part 'to increase the civil judicial penalty limit from $ 10,000 to $ 25,000 per violation, [and] to clarify that each distinct violation is subject to a separate daily penalty assessment of up to $ 25,000 . . . .' H.R.Rep. No. 99-1004, 99th Cong., 2d Sess. 132." *Id.* The court reasoned that "Congress' indication that it intended by its amendment simply to 'clarify' [*61] the language in the statute as previously written convinces us to . . . find that Congress intended the fines to attach to each violation of an effluent limitation separately" under the pre-1987 amendment language. *Id.*

This Court agrees with the Eleventh Circuit's analysis of the Congressional intent behind the statute, and concludes that the language in Defendant's permit which provides for a civil penalty "not to exceed $ 10,000 per day of such violation" means that a penalty not to exceed $ 10,000 can be levied for each violation found in one day.

Based on the foregoing, Defendant's motion for summary judgment is granted in part and denied in part. The motion is granted insofar as it seeks an order holding that Plaintiff can only seek a penalty of up to $ 10,000 per day per violation, but is denied insofar as it seeks to cap or limit the possible penalty at $ 10,000 total per day.

## V.

### MOTIONS IN LIMINE

Defendant has filed two motions in limine which the Court has not yet addressed. Defendant's Second Motion in Limine (Docket No. 98) seeks an order from the Court excluding from the trial in this matter the expert reports and testimony of Brian T. Harrington [*62] of Metcalf

& Eddy and Dr. Gail B. Coad of Industrial Economics, Inc. Defendant's Third Motion in Limine (Docket No. 94) seeks an order from the Court barring Plaintiff from presenting evidence at trial relating to alleged unreported violations of the CWA occurring before the commencement of this action, evidence of violations of the CWA occurring at other facilities owned and operated by Defendant and evidence purporting to establish an economic benefit accruing to Defendant before the date of the instant complaint from violations alleged in the complaint.

### 1. Second Motion in Limine

Defendant moves the Court to exclude the expert report and testimony of both Brian T. Harrington and Dr. Gail B. Coad. Defendant objects to Harrington's report and testimony due to reliance upon documents previously excluded by the Court. Because Dr. Coad relied upon Harrington's report, Defendant seeks to exclude her report and testimony as well.

On April 29, 1997, the Court ordered the exclusion of documents attached to the affidavit of Thomas C. McGowan. Order Regarding Discovery Motions, at 2 (Docket No. 84). The documents excluded, which are relevant to the present motion, included Exhibits [*63] 22 and 24. Exhibit 22 included a letter dated July 17, 1996 from Gregory Sindt, Bolton & Menk, to Robb Casseday and Wes Potter, ConAgra Red Meat Companies, regarding review of wastewater treatment facilities. Affidavit of Thomas C. McGowan (Docket No. 50). Exhibit 24 included a draft report of Armour Fresh Meats, Nampa, Idaho, "Engineering Pre-Design Report Wastewater Treatment Improvements" dated August 1993. *Id.*

Trial judges have broad discretion in determining the admissibility of expert evidence, and will be upheld unless the decision is manifestly erroneous. *Rogers v. Raymark Ind., Inc., 922 F.2d 1426, 1429 (9th Cir. 1991)* (citing *Salem v. United States Lines Co., 370 U.S. 31, 35, 8 L. Ed. 2d 313, 82 S. Ct. 1119 (1962)*).

With respect to the July 17, 1996 letter, Plaintiff maintains that, while Harrington did rely upon the letter, the information relied upon was also gathered from independent sources. Inasmuch as Harrington's report can be substantiated with his own independent research without referencing the July 17, 1996 letter, the Court will not exclude either Harrington's or Coad's report for reliance upon the July 17, 1996 letter.

Plaintiff maintains that [*64] the reports should not be excluded due to reliance upon the August 1993 draft report. Harrington relied upon a final report dated December 1993. Plaintiff points out that the final draft of December 1993 is not the August 1993 draft report

excluded by the Court. Further, the final report was disseminated by ConAgra in 1994 to the EPA, prior to the onset of the instant litigation. Defendant sought exclusion of the August 1993 draft on the basis of privilege. Because the documents are substantially similar, Defendant asserts that the Court should similarly exclude evidence which relies upon the December 1993 final report.

The December 1993 report was not included in the documents that the Court excluded in its April 29, 1997 order. Defendant disseminated the December 1993 final report to the EPA in 1994. Accordingly, the Court will not exclude testimony due to reliance upon the December 1993 final draft.

Based upon the foregoing, Defendant's second motion in limine is denied.

### 2. Third Motion in Limine

Plaintiff seeks to introduce evidence at trial to increase the amount of penalty that this Court should impose in the case liability is established. The current motion revolves [*65] around a dispute as to whether the Court should consider evidence regarding a history of violations and economic benefits which occurred outside the applicable statute of limitations. Additionally, Defendant seeks to exclude evidence of violations at plants which it owns.

The civil penalty provision contained in the Clean Water Act sets out a maximum penalty amount for daily violations. "In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." *33 U.S.C. § 1319*(d). Courts have applied different approaches in determining the appropriate amount of penalties under this provision.

Some courts first determine the maximum amount that could be assessed in light of the number of daily violations. *Atlantic States Legal Foundation v. Tyson Foods, 897 F.2d 1128, 1142 (11th Cir. 1990)*. Once the maximum penalty has been established, the court may reduce the amount based upon [*66] factors listed in section 309(d). *Id.* Other courts determine the amount of the economic benefit that the violator has enjoyed due to non-compliance and then increase that amount based on 309(d) factors. *United States v. Municipal Authority of Union Township, 929 F. Supp. 800, 806 (D.M.D. Penn. 1996)*. While civil penalties are mandatory under the CWA, "the amount to be assessed is wholly within the discretion of the court." *Hawaii's Thousand Friends v.*

*Honolulu, 821 F. Supp. 1368, 1394 (D.Hawaii 1993)* (citing *Atlantic States Legal Foundation v. Tyson Foods, 897 F.2d at 1142).* The evidence supporting the different 309(d) factors is critical in the Court's determination of a proper penalty.

The civil penalty provisions of the CWA are designed to both deter and punish violations. In order to achieve this policy, the penalty must "encompass the economic benefit of noncompliance to ensure that the violator does not profit from its violation of the law . . . [and] the penalty must include a punitive component in the form of a sum in addition to economic benefit which accounts for the degree of seriousness and/or willfulness of the violations." *Municipal Authority of Union* [*67] *Township, 929 F. Supp. at 806.*

While the CWA does not contain a specific statute of limitations, courts have generally applied the five-year limit contained in *28 U.S.C. § 2462* to CWA civil penalty actions. *See Sierra Club v. Chevron U.S.A., Inc., 834 F.2d 1517, 1521 (9th Cir. 1987).* The five-year limitation contained in *28 U.S.C. § 2462* is designed to preclude stale claims. *See Havens Realty Corp. v. Coleman, 455 U.S. 363, 380, 71 L. Ed. 2d 214, 102 S. Ct. 1114 (1982).* As Plaintiff points out, the statute of limitation at issue was designed to limit claims, but not to limit the evidence that may be introduced in support of timely claims. Defendant maintains the position that, if Plaintiff is allowed to increase the potential penalty for the timely claims through the introduction of evidence of stale claims, the policy of the statute of limitations will be circumvented. In essence, Defendant argues that Plaintiff should not be allowed to accomplish indirectly that which it is prohibited from attempting directly.

In support of its position that section 309(d) requires a consideration of evidence outside the statute of limitations period, Plaintiff cites the Court to [*68] *Atlantic States Legal Foundation, Inc. v. Universal Tool & Stamping Co., Inc., 786 F. Supp. 743 (D.N.D. Ind. 1992).* In *Atlantic States,* the court determined that the statutory maximum penalty should not be decreased because the defendant had a history of violations which predated the violations at issue by almost ten years. *786 F. Supp. at 751.* However, while the court did not mitigate the maximum penalty because of the history of abuses outside the statute of limitations period, it also was not used to increase the penalty. In determining the economic benefit that the defendant received due to non-compliance, the court limited its analysis to events which occurred during the limitations period. *786 F. Supp. at 749-51.*

In *United States v. Roll Coater, Inc., 1991 U.S. Dist. LEXIS 8790, 21 ELR 21073, 21076 (D.S.D. Ind. 1991),* the court held that history of violations occurring outside the limitations period was appropriate, but found that the defendant did "not have a history of violations because it has not been found guilty of a violation previous to the one at bar." Alleged violations were not considered in relation to the 309(d) factors in *Friends of the* [*69] *Earth, Inc. v. Laidlaw Environmental Services, Inc., 956 F. Supp. 588, 606 n. 17 (D. S.C. 1997)* because the court determined that 309(d) referred to violations "that form the basis of the penalty being contemplated and not past violations . . . that are not before the court."

The Court must determine an appropriate penalty in order to achieve the policies of deterrence and punishment of the CWA. If this were the only concern, the Court would include all prior violations of Defendant's NPDES permit. However, the Court must also limit Plaintiff's ability to recover for alleged violations which pre-date the statute of limitations. While the Court must impose a penalty upon a showing of liability, the amount of the penalty is within the discretion of the Court. In order to achieve a proper balance, the Court concludes that, as in *Roll Coater,* Defendant's prior history of violations will be examined on a limited basis and only to the extent that it has previously been found guilty of such violations. Evidence relating to the 309(d) factors will not include evidence of allegations of past violations or economic benefit which is alleged to have occurred prior to the statute of limitations [*70] period. Accordingly, Defendant's motion as it relates to the exclusion of evidence of violations and economic gain occurring outside the limitations period is granted.

Not only does Defendant seek to exclude evidence outside the statute of limitations, but Defendant also seeks to exclude evidence of violations at other plants which it owns and operates. Defendant maintains that such evidence is highly prejudicial and as a result, should not be considered. Evidence of permit violations at one plant has been admitted to determine the appropriate penalty for violations at another plant. *Public Interest Research Group v. Hercules, Inc., 830 F. Supp. 1525, 1544-45 (D.N.J. 1993).* The *Hercules* court stated that the adjudicated violations at a different plant were relevant under 309(d) to determine the appropriate penalty for the violations at issue. *Id.* Yet, the court only allowed the evidence of past adjudicated violations after a *Federal Rule of Evidence 403* analysis. At this time, the Court denies Defendant's motion to exclude evidence of adjudicated violations at other plants. However, the Court reserves the opportunity to exclude such evidence pursuant to directions and [*71] an evidentiary ruling at trial. Without the opportunity to view the evidence in its proper context, the Court is unable to properly perform a Rule 403 analysis.

**VI.**

**ORDER**

Based on the foregoing, IT IS HEREBY ORDERED:

1. United States' Partial Motion for Summary Judgment On Defendant ConAgra, Inc.'s Affirmative Defenses 1-18 (Docket No. 87) is GRANTED IN PART and DENIED IN PART and MOOT IN PART as addressed above.

2. United States' Motion for Partial Summary Judgment as to Liability (Docket No. 89) is GRANTED IN PART and DENIED IN PART as addressed above.

3. Defendant's Motion for Partial Summary Judgment (Docket No. 91) is GRANTED IN PART and DENIED IN PART as addressed above.

4. Defendant's Third Motion in Limine (Docket No. 94) is GRANTED IN PART and DENIED IN PART as addressed above.

5. ConAgra's Motion to Dismiss Under *F.R.C.P. 12(b)(6)* (Docket No. 96) is DENIED.

6. Defendant's Second Motion in Limine (Docket No. 98) is DENIED.

7. Motion to Strike Declaration of Joseph Roberto in Support of Summary Judgment on Affirmative Defenses (Docket No. 112) is DENIED.

8. Motion to Strike Declaration of Joseph Roberto in Support of [*72] Liability Summary Judgment (Docket No. 114) is DENIED.

9. Motion to Strike Statement of Facts Re: Groundwater (Docket No. 128) is DENIED.

10. Defendant's Motion for Order Denying Subject Matter Jurisdiction (Docket No. 140) is GRANTED IN PART and DEFERRED IN PART.

11. Defendant's Motion to Supplement Record (Docket No. 150) is GRANTED.

SO ORDERED this 31st day of December, 1997.

LARRY M. BOYLE

UNITED STATES MAGISTRATE JUDGE

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                               - - -

 4    RICOH COMPANY, LTD.,           :    CIVIL ACTION
                                     :
 5              Plaintiff            :
                                     :
 6         vs.                       :
                                     :
 7    AEROFLEX INCORPORATED, AMI     :
      SEMICONDUCTOR, INC., MATROX    :
 8    ELECTRONIC SYSTEMS LTD.,       :
      MATROX GRAPHICS INC., MATROX   :
 9    INTERNATIONAL CORP., and       :
      MATROX TECH, INC.,             :
10                                   :
                Defendants           :    NO. 03-103 (GMS)
11

12                               - - -

13                               Wilmington, Delaware
                                 Friday, May 16, 2003
14                               2:00 o'clock, p.m.

15                               - - -

16    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

17                               - - -

18    APPEARANCES:

19              RICHARDS, LAYTON & FINGER, P.A.
                BY:  ROBERT W. WHETZEL, ESQ. and
20                   STEVEN J. FINEMAN, ESQ.

21                      -and-

22

23

24                               Valerie J. Gunning
                                 Official Court Reporter
25
```

```
 1    APPEARANCES (Continued):

 2              DICKSTEIN, SHAPIRO, MORIN & OSHINSKY
              BY:  GARY M. HOFFMAN, ESQ. and
 3                 EDWARD A. MEILMAN, ESQ.
                   (Washington, D.C.)

 4
                   Counsel for Plaintiff

 5

 6              CONNOLLY, BOVE, LODGE & HUTZ LLP
              BY:  FRANCIS DiGIOVANNI, ESQ.

 7                      -and-

 8
              HOWREY, SIMON, ARNOLD & WHITE
 9            BY:  TERESA M. CORBIN, ESQ.
                   (Menlo Park, California)

10
                   Counsel for Defendants

11

12              MacPHERSON, KWOK, CHEN & HEID LLP
              BY:  ALAN H. MacPHERSON, ESQ. (VIA TELEPHONE)
13                 (San Jose, California)

14                 Counsel for Defendat AMI Semiconductor

15                       -  -  -

16

17

18

19

20

21

22

23

24

25
```

3

1
2                    P R O C E E D I N G S
3
4              (Proceedings commenced in chambers, beginning at
5    2:00 p.m.)
6
7              THE COURT:  Good afternoon.
8              MR. WHETZEL:  Your Honor, may I introduce
9    Gary Hoffman from Dickstein Shapiro and his partner,
10   Ed Meilman.
11             MR. DiGIOVANNI:  This is Teresa Corbin of Howrey
12   Simon in California.
13             And we also expected to have --
14             THE COURT:  We have him on the phone.
15             MR. DiGIOVANNI:  Alan MacPherson representing
16   AMI.
17             THE COURT:  Yes.
18             Your name, counsel?
19             MR. FINEMAN:  Steve Fineman from Richards
20   Layton.
21             MR. WHETZEL:  I'm sorry, your Honor.
22             THE COURT:  That's all right.
23             Mr. MacPherson?
24             MR. MacPHERSON:  Yes.
25             THE COURT:  Hi.  Everyone is here.  This is Judge

1    Sleet.  We're going to get right into the business of

2    scheduling.

3            I have received the joint status report and the

4    competing proposals for schedule and I have taken the liberty

5    of making some modifications.

6            My approach to scheduling is not altogether

7    rigid, and I will discuss matters with counsel and make

8    adjustments that I think are appropriate to make, depending

9    upon what counsel advise me and whether I'm convinced that

10   the adjustment should be made.

11           So with that sort of a proviso, why don't we

12   begin.

13           You pretty much don't agree on anything with

14   regard to actual scheduling other than the cutoff, and that's

15   not totally agreed for discovery.  I think plaintiff proposes

16   that all discovery be completed by the March 15, '04 date.

17   The defendants resist that proposition and want to stage

18   discovery, which the Court is inclined to do.

19           But if the plaintiff really feels -- plaintiff on

20   this side --

21           MR. HOFFMAN:  Yes, your Honor.

22           THE COURT:  -- feels adamant about this, I'm

23   willing to hear you on it.

24           MR. HOFFMAN:  Well, we had thought it was

25   appropriate, looking at it again this morning, your Honor,

1    we're willing to stage discovery.

2           We would like to start the opening expert reports

3    a little bit earlier.  The defendants have proposed April

4    9th.  We would suggest April 2 and rebuttal April 16th and

5    the expert reports.

6           THE COURT:  Well, the opening actually based on

7    the schedule I have crafted here would be 3/22.

8           MR. HOFFMAN:  Okay.

9           THE COURT:  With the rebuttals being 4/23.

10          Let me jump to the back end of this schedule.

11   This case is going to come to trial on October 11 of '04.

12   Okay?

13          We will have a pretrial order due date of 8/16

14   and we will have a pretrial conference here in this building

15   on September the 13th at 9:30, commencing at 9:30.

16          We can now go back to the beginning.  That will

17   at least help give you some context for what we're going to

18   talk about here.

19          MS. CORBIN:  Right.

20          THE COURT:  Go ahead.

21          MS. CORBIN:  Your Honor, I think there are some

22   things that I should apprise the Court of.

23          THE COURT:  Okay.

24          MS. CORBIN:  In addition to representing the

25   defendants in this suit, I am representing Synopsis, which

1    is a company that is in the design synthesis business also

2    in California.

3                THE COURT:  Not a party to this action?

4                MS. CORBIN:  They're not a party to this

5    action.  They filed a suit in the Northern District of

6    California yesterday against Ricoh, basically on one of

7    the same patents, the one patent that's in this suit.

8                THE COURT:  The '432 patent?

9                MS. CORBIN:  Yes.  Essentially, it had

10   come to our attention that the statement had been made

11   to Mr. MacPherson, and this is the only indication

12   we have because we cannot glean anything about the

13   infringement allegations from the complaint that the

14   bases of the complaint is really these defendants use of a

15   product called Design Compiler that Synopsis manufactures

16   and sells.

17               It came to our attention and then again late

18   last week that, in fact, RICO was engaged in a worldwide

19   campaign of sending letters to our customers.  We got copies

20   of some of those letters which RICO had sent to additional of

21   the customers and indicated in the letter that that should be

22   kept confidential, but it has come to Synopsis' attention,

23   and they felt that it was critical to take the bull by the

24   horns if that, in fact, is the case, that the genesis of this

25   case is a Synopsis part.

1          And they are in California and a large number of

2    the players, witnesses and the documents are there as well.

3          And the letters that have been going out to the

4    other customers mention another patent that is a continuation

5    in part of the patent we have in suit here.  Synopsis does

6    intend and had hoped to do that by today, but probably will

7    not happen until Monday to file the motion to stay and/or

8    transfer this customer case.

9          THE COURT:  To stay the case out in California?

10          MS. CORBIN:  No.  To stay this case or to

11    transfer this case to California.

12          THE COURT:  On what basis are they going

13    to file a motion in this case?  I'm not certain that I

14    exactly --

15          MS. CORBIN:  I'm sorry.  The defendants, the

16    defendants in this case would file a motion to stay.

17          THE COURT:  You said Synopsis.

18          MS. CORBIN:  I apologize.  I'm representing those

19    parties as well, and they feel that if the genesis of this

20    complaint is really the Design Compiler part of Synopsis,

21    that that issue could be handled in California and would

22    resolve the issues here.

23          THE COURT:  Sure.  Sure.  I understand.

24          Well, we can talk about this a little bit.  It

25    strikes me that there's no prejudice to either party since I

1    have you all here in embarking on a schedule in any event

2    because discovery has to be done.

3              MS. CORBIN:  I wanted to apprise you of the

4    facts.  I would have mentioned it in the status report.  At

5    that time it had been unresolved.

6              THE COURT:  Certainly the Court recognizes should

7    the motion to transfer be filed and should I rule that the

8    case should be transferred, it will then come under the

9    rules -- this is in the Northern District?

10             MS. CORBIN:  Yes.

11             THE COURT:  Which rules are very different

12   from this Court's and you would embark upon an entirely

13   new schedule, but I don't think you'd be any the worse

14   for wear.

15             MS. CORBIN:  Absolutely.  I think we should

16   proceed.

17             THE COURT:  Okay.  Counsel, anything further to

18   that?

19             MR. HOFFMAN:  I guess there's no point in getting

20   into a debate over the lawsuit that they just filed.

21   Obviously, I just became aware of it.  However, we've made no

22   threats against Synopsis.  We'll be moving to dismiss the

23   lawsuit.

24             THE COURT:  Why am I not surprised?

25             MR. HOFFMAN:  There's no reason for my trying to

1    explain the issues at this point.  That will be an issue that
2    will be out there in California.
3                 THE COURT:  Well, apparently.
4                 Okay.  So with that, we can now go ahead and see
5    what we can come up with here.
6                 I see a difference in the Rule 26(a) time that
7    you've -- deadline you've set.  I had picked 5:30.
8                 Is there a particular reason the defendants feel
9    June 13 is more appropriate than 5:30?  I thought we should
10   let's get on with it.
11                MS. CORBIN:  If the Court is inclined that way,
12   we will do our best to do that.
13                THE COURT:  I'm inclined to do that.  I tried to
14   sort of pick a compromise date as to amendment and joinder
15   and I selected July 30.  I don't know if anybody feels real
16   strongly about that one way or the other.
17                MR. HOFFMAN:  That's fine, your Honor.
18                THE COURT:  All right.  As to the election and
19   the production, the election of reliance on advice of counsel
20   and production of those opinions, the defendant proposes ten
21   days after the Markman.  That's the first time I've seen that
22   type of proposal on this.
23                I'm not quite certain why you would want --
24   the Markman, by the way -- well, we'll just move along
25   in some order here, but perhaps you could tell me why you

1    feel that.

2    　　　　MS. CORBIN:  Well, primarily it's just the

3    reason, your Honor, that to rely on advice of counsel in a

4    waiver of the privilege.

5    　　　　The privilege is important, so if the defendants

6    feel that they would not choose to do that if it were not

7    necessary to waive that privilege and that it's hard to know

8    at the beginning of this case, you know, what the allegations

9    are, but once there was a claim construction sort of defining

10   the scope of this patent, then the defendants could make an

11   informed judgment on that basis as to whether they really

12   wanted to waive their privilege or not.

13   　　　　THE COURT:  I don't think that, for you

14   to make an order, and I will let plaintiff make his

15   own argument, but I'm having difficulty, a little bit

16   of difficulty with understanding why you couldn't make

17   an informed judgment prior to the Court's disposition of

18   the Markman question.  I mean, it seems to me that if we

19   get far along enough in discovery, in the discovery process,

20   I mean, that's really the basis from which you are going to

21   make that call one way or it shouldn't have anything to do

22   with the call that I make on, you know, the construction of

23   elements.

24   　　　　MR. HOFFMAN:  Your Honor, you stated our

25   concern.  We agree.

1        THE COURT:  Now, I'm going to distress you

2   a little bit, both of you, because I'm going to set that

3   date, by the way, at 12/9, which I think gives counsel

4   ample time.

5        MS. CORBIN:  Discovery?

6        THE COURT:  No.

7        MS. CORBIN:  Oh.

8        THE COURT:  I'm shifting on you a little bit.

9        MS. CORBIN:  Okay.

10       THE COURT:  The deadline for advice on reliance.

11       MS. CORBIN:  Okay.

12       THE COURT:  But only a month after will be

13  the fact discovery cutoff.  That gives you a little less

14  than eight months.

15       This is a one-patent case.  I see no reason

16  why counsel can't, with a diligent effort, get this

17  case discovered by January the 9th, but I will hear

18  from you.

19       MS. CORBIN:  That's fact discovery?

20       THE COURT:  Yes.  Fact discovery.

21       MR. HOFFMAN:  That's fine with us, your Honor.

22       THE COURT:  Did you want to be heard further on

23  that?

24       MS. CORBIN:  You know, your Honor, if that's what

25  you feel, we will do our best to accommodate that --

1           THE COURT:  I don't want to set unrealistic

2   dates.

3           MS. CORBIN:  To the extent we're unable to

4   accomplish everything we need, if we could come back to

5   court.

6           THE COURT:  There's not going to be a lot of

7   room.

8           MS. CORBIN:  Okay.

9           THE COURT:  There's not going to be a

10  lot of room.  It's a fairly tight schedule as I see

11  it.  That date is based on the Court's considerable

12  experience even in the short time that I've been here

13  in this area and understanding generally how long it

14  takes to do things.

15          I am willing, if you were to tell me there's

16  going to be a lot of foreign discovery and there are

17  going to be language problems, something along those

18  lines, I might hear you, but I just don't see the need

19  to spend ten months discovering in a one-patent

20  case.

21          MS. CORBIN:  Well, your Honor, that was

22  part of the issue that I would get into, the phase when

23  we talk about the appropriate scheduling, Markman and the

24  claims construction.

25          Part of our reason, the defendants' reason for

1  wanting an early hearing on that is that we do believe that

2  resolution of that issue has the potential to eliminate a

3  large amount of third-party discovery related to the prior

4  art system.

5          THE COURT:  I'm going to give you a Markman

6  earlier than the one you've asked for.

7          MS. CORBIN:  Oh, okay.  But we do have the

8  inventors here and it's not completely clear to us yet, but

9  it appears to us they're both in Japan.  So we do have some

10  foreign language issues and some international depositions

11  and then, depending on where we end up with the claims

12  construction, there really are a large number of people in

13  this field who are involved in the early eighties in

14  developing design synthesis software.

15          THE COURT:  To the extent that there needs

16  to be an extension of the fact discovery deadline to

17  accommodate the deposition of some individuals, to the

18  extent that that won't impact the case-dispositive

19  motion schedule, I'm willing to be flexible.

20          MS. CORBIN:  Okay.

21          THE COURT:  Right up to the time of trial,

22  quite frankly, and even after, if necessary.  But this is a

23  parochial concern --

24          MS. CORBIN:  Okay.

25          THE COURT:  -- that I have, that you should all

1    have.  That is, giving the Court sufficient time to

2    appropriately address any dispositive motions that I permit

3    to be filed.

4            MS. CORBIN:  All right.  We'll do our best

5    to live with January 9.

6            THE COURT:  All right.  Then that gets us

7    into Markman and to that process.

8            I'm going to require that you meet and

9    confer by the 9th day of January for the purpose of

10   identifying elements in dispute and narrowing that

11   field of conflict.

12           That's just a deadline.  You can meet before

13   then, whatever.

14           MR. HOFFMAN:  Okay.

15           THE COURT:  And, by the way, I'm going to

16   impose on plaintiff to prepare this schedule, because there

17   are going to be some dates that you will probably need to

18   work out on your own.

19           MR. WHETZEL:  We would be glad to, your Honor.

20           THE COURT:  I'd like the exchange of initial

21   claim charts to be completed by January the 16th.  This is

22   going to be rather rigorous here.  I would like final claim

23   charts, joint final submission by the close of business a

24   week later, January 23.  And that should include citations to

25   the intrinsic record.

1    Just to talk a little bit about Markman, the

2  process, I'm going to be interested to hear from you as to

3  how much time you think it's going to take, but I know that

4  it's early in the process.  I wouldn't imagine that we need

5  to set aside more than a day.  I don't take extrinsic

6  evidence in my Markman process.

7    MR. HOFFMAN:  We would agree with your Honor.

8  A day, maximum, should be fine.

9    THE COURT:  Okay.  Do you agree?

10    MS. CORBIN:  Yes, I agree.

11    THE COURT:  All right.  Then that helps.

12    I would like the Markman briefing process to be

13  completed by February the 6th.  An opening and an answer, or

14  you can simultaneously exchange.  You need to join the

15  issues.  I would suggest an opening and an answer.

16    We'll hold our Markman hearing on February the

17  20th, beginning at 9:30.

18    MS. CORBIN:  Your Honor, if I could?

19    THE COURT:  Yes.

20    MS. CORBIN:  So in your schedule, January 9th,

21  the Markman process will begin the same day as the fact

22  discovery closes?

23    THE COURT:  Yes.

24    MS. CORBIN:  Which does not address, and

25  that was the argument I was trying to make, the issue

1    that we have, in that we thought that starting that

2    process earlier may eliminate a large part of what would

3    be third-party discovery, and that was why in the defendants'

4    proposal, we had started that process in August of this

5    year and had hoped to get to that well in advance of the

6    close of discovery so that we could make a decision and

7    not be bothering these third parties with depositions

8    and document production and so on should it prove to be

9    unnecessary.

10            THE COURT:  Well, you still both -- I mean, you

11    want to have your Markman hearing?

12            MS. CORBIN:  Yes.

13            THE COURT:  I'm sorry.  I'm incorrect.  On

14    October 17th.  We can talk about that.

15            I am really generally not amenable anymore

16    to doing early Markmans.  I've been told that early Markmans

17    will -- you know, Judge, we'll settle the case, we'll -- it

18    will do this for the case, it will do that and, inevitably,

19    I've been very disappointed with that.  And I don't want to

20    be disappointed again because it just makes me unhappy and

21    you don't want me to be unhappy.

22            MS. CORBIN:  No.

23            THE COURT:  But I will -- if counsel want to talk

24    about that with me and you convince me that, you know, Judge,

25    it's really going to help us, this will really help us set

1    the direction of the case, may dispose of it, I'm not

2    unwilling to address Markman early.  But I'm also not willing

3    to have the discovery process continues and have you come

4    back and say, Judge, there's additional discovery.  We need

5    to reopen the Markman process.  We've changed our position.

6    And it may be a perfectly legitimate, not dilatory tactic,

7    request.

8                 MS. CORBIN:  Right.  Although I would say to

9    your Honor that discovery is really not so relevant to

10   Markman, since the Markman is, as you said, based on the

11   intrinsic evidence and the --

12                THE COURT:  I have lawyers coming in and

13   talking about prosecution history all the time and prior

14   art and things of that nature in Markman.  They do,

15   but --

16                MS. CORBIN:  The file history is available

17   to everybody presently.

18                THE COURT:  It is.

19                MS. CORBIN:  And presumably, the prior art as

20   well.

21                MR. HOFFMAN:  Your Honor, one of the reasons why,

22   in this case -- we agree with what your Honor is saying, but

23   in addition in this case, so far we've identified one claim.

24   There are 20 claims in the patent.  We've identified at least

25   one claim that we believe infringe, that we have alleged

1    infringe.   There may be many other claims.   We won't know

2    until we get discovery.

3            You know, Claim 13, I've identified this to

4    Ms. Corbin, is being infringed.   That's our position at

5    least.

6            There are a total of five independent claims,

7    20 claims total.   If we have an early Markman before

8    we've taken discovery, we're going to wind up with two

9    Markman hearings.   It just does not make any sense in

10   this case.

11           THE COURT:  Go ahead.

12           MS. CORBIN:  Well, the whole -- the

13   complaint -- the patent as a whole only has four

14   independent claims, but using Claim 13 specifically,

15   because that's the one you reference that you said

16   was the basis at least at this point in time for the

17   allegation of infringement, we believe there are claim

18   elements there which if defined as commensurate with the

19   scope of what is described in the specification would be

20   straightforward, and if the Court were to conclude that,

21   then it would eliminate, as we're saying, a large part

22   of this third-party discovery.

23           If, in fact, plaintiff is going to read

24   that specification or it's going to be its position to

25   this Court that that claim is broader and covers all types

1    of design synthesis, then we are really going to have to do

2    heavy duty third-party discovery, and many parties were

3    developing this design synthesis software in the early

4    eighties.

5            We believe if they construe it on the broader

6    construction, we'll have to engage in this third-party

7    discovery from quite a number of individuals and companies

8    that were developing that material so we can mount our

9    defense and show the Court that if construed in that broader

10   way, that was already in the public domain in the early

11   1980's, well in advance of the filing of the application that

12   resulted in this patent.

13           And that was really our concern because, you

14   know, we conduct third-party discovery all the time but we

15   try to tailor it.

16           Obviously, these defendants will have to do

17   it the best they can to mount their defense and it will

18   entail a large expense and time consumption of parties and

19   companies that really have no interest in the outcome of

20   this suit.

21           THE COURT:  Counsel, your opponent says in

22   addition to bothering people unnecessarily, you are going

23   to spend a lot of money you may not need to spend.

24           MR. HOFFMAN:  Your Honor, I think throughout

25   all of this we're going to be able to focus issues and I

1    hope keep things under control.

2         Both sides have agreed on 240 hours on the

3    number of depositions that the parties can do.

4         THE COURT:  All right.

5         MR. HOFFMAN:  What we're going to do is wind

6    up with multiple Markman hearings, which really makes no

7    sense at all.

8         There are five independent claims.  We just wind

9    up with having to deal with other claims later on as we get

10   additional discovery.

11        The arguments I hear Ms. Corbin making are

12   arguments every defendant can make in every single case.

13   They're no different -- this is no different than any other

14   case.

15        THE COURT:  If you go through the process and

16   you determine jointly that you need to -- that it would make

17   sense to come to the Court and ask for an early Markman with

18   assurances that we're not going to come back and revisit

19   Markman, I will certainly consider that request and see if we

20   can insert you somewhere.  But right now I do have this

21   nagging concern about having to duplicate effort and I really

22   don't want to leave that potential for duplication out

23   there.

24        But I understand what you are saying and I

25   certainly am a proponent of saving money.

1          MS. CORBIN:  It's just not my experience,

2    your Honor, that I've ever had two Markman hearings in

3    any case I've been involved in.  So it's often the case,

4    and often in the Northern District, we have earlier Markman

5    hearings, and I have found in my experience that it is

6    helpful in at least narrowing the scope for both the

7    fact and the expert discovery, but primarily this third-party

8    discovery, which we know here in this particular case is

9    going to be a big issue.

10          THE COURT:  With all due respect to the

11    Northern District, and they certainly are vastly experienced

12    in this area, not more experienced than we are, but vastly

13    experienced, we have a different view.  I have a different

14    view of the approach to patent cases than was taken in the

15    Northern District generally.

16          I respect their view, but it does not suit what

17    we believe to be the needs and the approach of litigants and

18    the Court in this district.

19          MS. CORBIN:  Okay.

20          THE COURT:  But, again, if it seems that

21    they are compelling reasons that serve the interests

22    of all, and I do include the Court in that, to have an

23    earlier Markman process and an earlier Markman hearing

24    than the one the Court is presently going to set, I will

25    consider that.

1        MS. CORBIN:  Okay.

2        THE COURT:  Okay?

3        MR. HOFFMAN:  Your Honor, if I can just turn back

4   to one point.

5        THE COURT:  Yes.

6        MR. HOFFMAN:  I believe the hearing date you set

7   was February 20th.

8        THE COURT:  Yes.

9        MR. HOFFMAN:  Unfortunately, I don't have

10  my calendar in front of me, but I believe that's a that's

11  the week I'm supposed to be on vacation.  I booked a

12  vacation with a number of other couples, my wife and

13  myself.

14        THE COURT:  All right.

15        MR. HOFFMAN:  If it would be possible to move

16  that one week later, I'd appreciate it, just as a personal

17  item.

18        THE COURT:  Gail, would you see if a week

19  later --

20        MR. HOFFMAN:  Yes.  I believe the vacation --

21  and I can check afterwards, your Honor, and let you know, but

22  if that may be a flexibility.

23        THE COURT:  I suspect we can do that.

24        Go ahead.

25        MS. CORBIN:  It's a different point, so I didn't

1    want to --

2              THE COURT:  All right.

3              MS. CORBIN:  My only thought, sticking on the

4    Markman, is that since the Court is not inclined to give us

5    the earlier date, I still believe what the plaintiffs

6    themselves had presented was to have an exchange of the

7    proposed claim constructions and the meet and confer on that

8    and sort of the joint -- so you would at least have a

9    document.

10             It wouldn't be the briefing.  It wouldn't

11   be the Markman hearing, but it would be a document that

12   set forth the parties' positions and their support for

13   their constructions and to have that in advance of the

14   day the discovery is closing I believe would be very

15   advantageous.

16             THE COURT:  I have no difficulty with that.

17             MR. HOFFMAN:  I'm sorry, your Honor.

18             THE COURT:  Go ahead.

19             MR. HOFFMAN:  What I would propose, I can work

20   out with Ms. Corbin an informal exchange for some time in

21   September that we can exchange initial positions.  You know,

22   outside of the schedule, I'll be more than glad to work out

23   something with her.

24             THE COURT:  I will go even further to suggest

25   that -- you're talking about the January 16 exchange date?

1    MS. CORBIN:  Yes.

2    THE COURT:  Counsel are free to move that up.

3    MS. CORBIN:  Okay.

4    THE COURT:  And have it reflected in the

5    schedule.

6    MR. HOFFMAN:  All right.

7    THE COURT:  That was a deadline.

8    MS. CORBIN:  Okay.

9    THE COURT:  For me.

10    MR. HOFFMAN:  Okay.

11    THE COURT:  Now, I have taken, I don't

12    think it's unique any longer, I think it's probably

13    well-known, a different position on summary judgment,

14    my summary judgment process in patent cases now than

15    most cases simply because it's not a reflection, it does

16    not mean that I don't like the patent bar.  It just

17    means that these motions can be burdensome.  They're

18    complex.  They involve the challenge initially of lay

19    persons like myself getting up to speed on the technology,

20    and because of the way I do my approach to scheduling, we

21    sort of have to get up to speed twice.

22    Judge Robinson, as you know, I think she's

23    brilliant.  She does it one time.  But I'm not yet quite

24    there.

25    So what I require and will require in this case

1  is that by the 8th day of March, you will have submitted

2  letters to me in support of or in opposition to the filing of

3  case-dispositive motions.  So you can agree on your own

4  schedule for the exchange of those letters.

5         The letter should not exceed five pages.  They're

6  letter briefs.  And that's the process for that.

7         We'll hold a teleconference to discuss those

8  letters on the 23rd day of March at 9:30.

9         You're in California.  That's going to be

10 a little early for you.  Why don't we set that for --

11 Gail, would you check 11:00 o'clock on the 23rd of

12 March?

13         DEPUTY CLERK:  Okay.

14         THE COURT:  Mr. MacPherson, have you been hearing

15 all of this?

16         MR. MacPHERSON:  Yes.  I can hear this, your

17 Honor, very well.

18         THE COURT:  All right.

19         MR. MacPHERSON:  Except for the last letter

20 brief.  Your voice faded.

21         THE COURT:  I'm sorry.  March 23.

22         MR. MacPHERSON:  The one before that.  By March

23 8th you submit letters, and then that whole sentence got

24 missed.

25         THE COURT:  And then we'll talk about them on the

1    23rd of March.

2            MR. MacPHERSON:  Those letters, though, to

3    summarize the basis for summary judgment motions?

4            THE COURT:  Yes.  Whichever party is advancing

5    the proposition that they should be permitted to file,

6    and certainly there's the opportunity to resist that

7    proposition.

8            MR. MacPHERSON:  Yes.  They're just the outline

9    of what would be presented.

10           THE COURT:  I call them letter briefs; you can

11   call them whatever.  But that's right.  It's not the brief

12   itself.

13           MR. MacPHERSON:  Okay.

14           MR. HOFFMAN:  Your Honor, on that, would

15   there be one letter from the person advancing it and also

16   a letter opposing it?

17           THE COURT:  Yes.

18           MR. HOFFMAN:  Okay.  So we'd have to work that

19   out?

20           THE COURT:  Yes.  You need to work out an

21   exchange schedule on your own for that process.

22           MR. HOFFMAN:  Okay.

23           THE COURT:  All I'm concerned about is that they

24   get here by the 8th.

25           The dispositive deadline will be April

1    the 2nd.  You should anticipate that I will rule

2    one way or the other on the teleconference.  There's

3    not going to be a post- teleconference writing unless

4    there's something that really has me scratching my head.

5    But I will get to you within a few days, even if that's

6    the case.

7              By the way, you'll get your Markman ruling

8    within -- no later than 30 days after the hearing.  And

9    the reason that I can promise you that is because

10   you're not going to get a well-analyzed opinion.  What

11   I'm going to do is issue an order, and it's the process

12   that I employ until the Federal Circuit tells me to stop

13   doing it because, as you know, there's de novo review

14   above and I have been for the last almost five years

15   now informally polling patent counsel and they're

16   telling me that they really are not interested in

17   what I have to say.  That's fine.  They were very nice

18   about it.

19             But I really -- at this stage -- go ahead,

20   Ms. Corbin.

21             MS. CORBIN:  That's your practice and that's

22   fine.  I'd be surprised because that wouldn't be my opinion

23   about the reasoning of the Court.

24             THE COURT:  I know some of the judges on the

25   Federal Circuit do want to hear from us.  I feel that those

1    who don't haven't said it.  I wonder whether, in terms of

2    trying to get decisions to our litigants, it seems to me to

3    make sense.  What you really are interested in is how I'm

4    going to instruct that jury.

5                MR. HOFFMAN:  Yes.

6                THE COURT:  So that's my practice at this

7    point.

8                Let's see.  So opening expert reports will

9    be due the 22nd of March; rebuttals a month later, on

10   the 23rd of April; and the cutoff for expert discovery

11   will be June 23.

12               Does that give you adequate time to complete

13   that process?

14               MS. CORBIN:  Yes.  Yes, your Honor.

15               THE COURT:  Okay.  Now, I also convene, in

16   patent cases and other complex civil cases, getting you on

17   the phone not long before the pretrial conference.

18               On June 30 will be this particular -- I'm

19   sorry -- July the 7th at 9:30.  I'm going to call it

20   a Daubert/status conference, and I say Daubert because

21   I want the opportunity to discuss with you in advance of

22   the pretrial conference any Daubert issues that you

23   think might be extant, and we can do that at the

24   teleconference or we could call it a Daubert/motion

25   in limine conference.  Whatever you want -- however you

1   want to style it is fine.

2              I want you to meet and confer on that by the

3   30th of June and then get me an agenda by July 2nd.   It

4   shouldn't take you long to file an agenda over here by July

5   2nd as to the Daubert issues and/or in limine issues that we

6   need to talk about.

7              Of course, you will have the opportunity,

8   and that's provided in my schedule, in my pretrial

9   order form.   The process for preparing and filing

10  motions in limine is set out.

11             It essentially requires -- I limit you

12  to ten a side and it requires you to get them in, I

13  think it's ten days in advance of the pretrial order

14  due date, or is it the pretrial conference?   Pretrial

15  order due date.

16             MR. HOFFMAN:   Your Honor, if I can just

17  back up for one second?

18             THE COURT:   Yes.

19             MR. HOFFMAN:   The conference on July 7th I

20  believe you had indicated was at 9:30?

21             THE COURT:   Yes.   Let's back that up again to

22  11:00 o'clock.   I will put that on at 11:00 o'clock.   Thank

23  you.

24             MR. DiGIOVANNI:   Your Honor, with regard to

25  the agenda, do you just want simple, one sentence, or do

1   you want argument?

2          THE COURT:  I don't really want argument

3   on it.

4          That reminds me.  Let's just chat for a

5   moment about how you get discovery disputes before

6   the Court.

7          I've now adopted a process, it's a three-

8   tier process, where you initiate your complaint with the

9   Court about the other side's behavior in a telephone call to

10   Althea Brown here and she will give you a date for a

11   teleconference.

12          48 hours in advance of that date, submit to

13   me a non-argumentative, no more than two-page agenda letter.

14   I really do mean non-argumentative.  And we'll get on the

15   phone and talk about it.

16          And if it's -- it's the type of matter

17   that it seems to me needs some additional elaboration,

18   I will let you write a two-page letter, an opening,

19   answer and reply, or release you immediately to engage in

20   motions practice.  Probably not going to happen, motions

21   practice.  But those three tiers of dispute resolution

22   are available to you.

23          I encourage you, I urge you, I implore you,

24   please try to work out your own discovery disputes.  It

25   really does require significant work, given the number of

1    patent cases, particularly patent cases that each judge in

2    this district is carrying, and given the fact that we have

3    one Magistrate Judge and she does not do discovery disputes.

4    We do our own in one form or another.

5              We each have a different process, but one form or

6    another, we do them.  So it can take up an inordinate amount

7    of the district judge's time, which I'm trying to guard

8    against, which is why I've gone to the telephone process.

9    Hopefully, there's a little trepidation in dialing that

10   phone.

11             Okay.  That's that.  I think we've accounted

12   for all of the important dates in the life of the

13   case.

14             MR. HOFFMAN:  If we could just go back to

15   the date of the Markman hearing.

16             THE COURT:  Yes.

17             DEPUTY CLERK:  Judge, it will be March 2nd at

18   9:30.

19             MR. HOFFMAN:  Thank you very much.

20             THE COURT:  Glad you reminded me of that.

21             Let's see.  Well, let's talk for a moment about,

22   or maybe more than a moment, about -- we're going to move the

23   trial date one day.  I've been advised that October 11 is

24   Columbus Day; that's a Federal holiday.

25             Now, counsel have, I think jointly suggested that

1    the Court should set aside 12 days of its calendar to try

2    this case.  Why is that?

3                Start with plaintiff.

4                MR. HOFFMAN:  Basically, your Honor, we

5    had proposed ten.  Defendants asked for more.  12.  We

6    said fine.

7                We had thought it would potentially take ten

8    trial days.  It may take less than that.

9                THE COURT:  It will.

10               MR. HOFFMAN:  In all candor.

11               MS. CORBIN:  I could live with the ten.  It just

12   seems like there's five defendants already and it's unclear,

13   if there are to be any other parties in the case, and we do

14   think there are going to be a large number of witnesses in

15   the prior art area.

16               THE COURT:  Well, it is really five defendants?

17   We have Matrox in different --

18               MS. CORBIN:  Different entities.

19               I can't answer that question, your Honor.  I

20   just know four of the Matrox entities, separate entities,

21   each one have been sued.  Whether that continues to trial, I

22   don't know.

23               THE COURT:  I understand.  I understand that,

24   whether it continues.

25               Are we going to have different Matrox personnel?

1    I mean, are there really different entities?

2              MS. CORBIN:  Yes, there are different distinct

3    entities.

4              THE COURT:  That are functioning, operating

5    companies?

6              MS. CORBIN:  Yes.  As I understand it, not

7    all of those entities, and I didn't write down, so I

8    can't indicate right now, some of those entities are not

9    involved and do not use design synthesis tools in their

10   business, and so I don't really know at this point in time

11   why they're in this case.

12             THE COURT:  Okay.  Well, when you say a large

13   number of witnesses, and I think you were specific to say

14   prior art witnesses, what do you mean?  What do you

15   anticipate?

16             MS. CORBIN:  Well --

17             THE COURT:  Or --

18             MS. CORBIN:  You mean number?

19             THE COURT:  Yes.

20             MS. CORBIN:  Well, there were at least

21   six, seven, possibly eight venues in the early eighties,

22   where this type of design synthesis software was being

23   developed.

24             Some of those people now have found themselves,

25   a lot of them back in California, working for one of the

1    Synopsis competitors and/or have gone into academia and those

2    folks are found at U.C. Berkley, Stanford and the University

3    of Southern California.

4              I can't put a number on, at this point on how

5    many of those people we would find critical to be able to

6    come forward and describe, you know, their process that they

7    were engaged in at that time.

8              THE COURT:  So you base your estimate,

9    it's principally on these witnesses, the prior art

10   witnesses is what you think is going to drive, from your

11   perspective?

12             MS. CORBIN:  From the defendants' point of view,

13   I think there will be a large number of the witnesses, plus

14   if it turns out this is really about Design Compiler, you

15   know, whatever witnesses are going to be testifying as to

16   that part.

17             THE COURT:  Okay.

18             MR. HOFFMAN:  Your Honor, I guess our approach,

19   we just gave an outside estimate on the ten days.  In all

20   candor, as I indicated, I think it's probably likely to take

21   less than that.

22             THE COURT:  Yes.  I'm going to set it down for

23   seven days.

24             MS. CORBIN:  Okay.

25             THE COURT:  That will, I think, give us ample

1    time to get it done.  It will carry us over a weekend.

2    Actually two days, since we're starting on Tuesday.

3              MS. CORBIN:  What is your trial schedule, your

4    Honor?

5              THE COURT:  We start at 9:00 o'clock.  We try to

6    keep to the schedule as best we can.  We go to 1:00 for

7    lunch.  We take a morning break of 15 minutes.  We come back

8    after an hour for lunch.  Then I let the jury go at 4:30.  We

9    have another 15-minute break in the afternoon.

10              Now, theoretically, I think that gives you six

11    hours a day, but it really never works out that way.

12              MS. CORBIN:  Right.

13              THE COURT:  It's more like five and a half, five

14    and 15, somewhere in that neighborhood.  I try to keep myself

15    and everybody else as much on schedule as possible, but we

16    all know that things happen.

17              MS. CORBIN:  And is that a four-day week or

18    five-day week?

19              THE COURT:  Five-day week.

20              MS. CORBIN:  Five-day week?

21              THE COURT:  Yes.  And you'll be on timers,

22    so you'll be principally responsible for keeping your own

23    time.

24              I may this time place a limit on the openings

25    and closings.  I had a bad experience recently where I

1    just thought the openings -- they were fine openings.  It

2    was principally the closings.  They were very well done,

3    but they were just a lot longer than they needed or

4    anybody wanted, I'm sure including the defense counsel

5    actually.

6              So I'm thinking about that and we'll talk

7    about that at the pretrial conference and we'll talk

8    about -- we will have a working pretrial conference.  It

9    will, in all likelihood, take a better part of the day, so

10   you should be prepared for that.

11             Be prepared at the pretrial conference to

12   talk to me about jury instructions.  I will have read your

13   jury instructions beforehand.  I know that's the last thing

14   that counsel want to talk about at the pretrial conferences

15   is jury instructions, but they are so critical.  They are

16   critical in any case, but particularly in patent cases, and

17   they're so hard fought and it's a contentious process and I

18   can tell you now, let me preview for you, I'm going to beat

19   you up about them.  I know you don't want to agree, but

20   you're going to agree.  Believe me, you will.  We'll get to a

21   good set of jury instructions that everybody feels good about

22   so we can have a properly instructed jury, but just a preview

23   for you.

24             Let's see.  I think that, from a scheduling point

25   of view, pretty much does it.  I'm interested in

1  understanding whether there have been any efforts to settle

2  this case, any discussion along those lines, if there's an

3  interest in having this matter referred to our Magistrate

4  Judge.

5        Are you considering another ADR approach or

6  something?

7        MR. HOFFMAN:  From the plaintiff's viewpoint,

8  your Honor, we're always interested in talking about

9  settlement.  Our interest is licensing.  We're not trying to

10  stop anyone.  We're interested in licensing the patent.  So

11  we'd be willing to sit down and talk about settlement, you,

12  you know, with the defendants here.

13        THE COURT:  No proposals have been exchanged

14  yet?

15        MR. HOFFMAN:  No.

16        THE COURT:  Are businesspeople talking to one

17  another?

18        MR. HOFFMAN:  Not as of this time, your Honor,

19  but I would be more than glad to set up a meeting.

20        MS. CORBIN:  Synopsis businesspeople attempted to

21  speak with the business folks at RICO, but we have not been

22  able to move that forward.

23        MR. HOFFMAN:  Well, your Honor, Synopsis is not a

24  defendant here.  We have not made any allegations against

25  Synopsis, nor do we intend to make any allegations against

1    Synopsis.

2                    MS. CORBIN:  But is it correct, the basis of the

3    infringement allegations is the compiler part that Synopsis

4    makes?

5                    MR. HOFFMAN:  That is a part of it.  It's

6    the utilization of design compilers, part of the

7    basis.

8                    But our interest is we are willing to sit

9    down and talk to the defendants here.

10                   THE COURT:  Okay.

11                   MS. CORBIN:  It does not seem likely, if that's

12    the basis of the infringement allegation, your Honor, that a

13    settlement could really move forward in the absence of

14    Synopsis.  The customers are going to be looking to Synopsis

15    if that's the basis of the infringement claim to get them out

16    of this situation and so it seems to me the real party in

17    interest is, any way you look at it, involving Synopsis in

18    terms of a settlement posture.

19                   MR. HOFFMAN:  If the defendants are represented,

20    we have no objection to Synopsis being included in that

21    discussion.  But our interest is to license the users, the

22    people who actually make the semiconductors.

23                   THE COURT:  Okay.  Well, let me -- go ahead.

24                   MS. CORBIN:  The one other thing, your Honor, and

25    this only came to light to us at the very end of last week

1    and we were continuing to conduct our investigation, but we

2    had indicated in our status report about amending the

3    pleadings.  We will want to amend the pleadings once we've

4    lined that up to allege equitable estoppel because it is now

5    our understanding that RICO had approached Synopsis about

6    taking licenses to these patents for the Design Compiler

7    software well over a decade ago and they refused to do so at

8    that time and they dropped it and they never brought it up

9    agaom.

10           In fact, RICO and Synopsis have been business

11   parties to business deals from then till now, including, I

12   think, Ricoh is a subscriber customer, licensee under this

13   Design Compiler part.

14           So it would be these defendants' positions, once

15   they're able to fully investigate that, that any allegations

16   that are based on Design Compiler should be equitably

17   estopped.

18           THE COURT:  It does seem that Synopsis should be

19   at the table somewhere somehow.  Maybe not at this table, but

20   I will leave that to you folks.

21           I would suggest that you have me include a

22   referral in the scheduling order to the Magistrate Judge.

23   You can then contact her or she'll contact you.  She's very

24   flexible.  And she'll work with you.  If you ultimately

25   decide that you are not going to use her good offices, then

1    you don't.

2              MS. CORBIN:  Right.

3              THE COURT:  But if you decided it would benefit

4    the process, you do.

5              MS. CORBIN:  Is that a referral to be taken up at

6    a later time?

7              THE COURT:  I would include it in the scheduling

8    order.  Either you will jointly contact her or she'll reach

9    out to you.  She'll say, you know, what's the status of

10   things.  She's not going to order you to do anything at this

11   point.  You might pencil in a date or something.  Maybe you

12   don't.

13             MS. CORBIN:  Okay.

14             THE COURT:  She'll say we'll set a time and we'll

15   talk again.

16             MS. CORBIN:  Okay.

17             THE COURT:  But at some point as you move along

18   in the discovery process, it may occur to you that you want a

19   neutral to get involved.  You are not going to find a more

20   able neutral for free, for sure, but even if you paid for

21   one, you're not going to find a more able one, neutral.  She

22   deals with complex patent matters all the time.  She's a very

23   good neutral.

24             MS. CORBIN:  Yes, I've heard.

25             THE COURT:  And I would suggest that you have me

1    include it in the scheduling order.

2        MR. HOFFMAN:  We very much welcome having that,

3    your Honor.

4        THE COURT:  My form of order is around.   In

5    fact, we're getting ready to put another one on the

6    web specific to patents, but there's something around

7    somewhere.

8        DEPUTY CLERK:  It's on the web now.

9        THE COURT:  It just went up, I guess.  That's

10   good.

11       Counsel, is there anything else we need to talk

12   about?

13       MR. HOFFMAN:  I guess the only other question we

14   would have, your Honor, is on the interrogatories.  Under

15   your rules we understand it's 50 interrogatories.  We would

16   just ask that that be made per side.

17       THE COURT:  I generally don't get involved.  I

18   really don't.  I think the Federal Rules are more than

19   adequate to go over the discovery process.

20       MR. HOFFMAN:  Fine, your Honor.

21       MS. CORBIN:  I guess the only other thing,

22   your Honor, the defense proposal had been, and I guess

23   a letter came to the Court because I didn't understand

24   that we weren't in agreement.  The defendants had originally

25   proposed fewer deposition hours.  Plaintiffs had wanted

1    240.

2            Part of our agreement to that, evidently, we

3    didn't have a meeting of the minds minds and I was unaware

4    of it, on our side we expect we're going to have to take

5    depositions in Japan through a translator.  My experience, it

6    has been customary to have those hours count.  You can't move

7    any faster if you are translating.

8            THE COURT:  Sounds reasonable.

9            MR. HOFFMAN:  Your Honor, I think there

10   will be very few depositions in Japan, but be that as it

11   may, they had raised this issue and that was part of the

12   reason why we changed it from 160 to 240.  We took that

13   into account.

14           If there's more time, I will work that out

15   with Ms. Corbin.  I think that's an issue we can resolve

16   later.

17           THE COURT:  Are you satisfied?

18           MS. CORBIN:  To the extent if I need it, I'm

19   going to be able to count those as 30 minutes instead of --

20   every hour as 30 minutes, that's fine.

21           MR. HOFFMAN:  Your Honor, I would hope that

22   neither side would say it's 240 hours, you cannot have 241 or

23   242.  If anyone needs some additional time, I would think

24   that's something we'll be able to work out.

25           THE COURT:  I guess that should be adequate.

1              MS. CORBIN:  We'll work it out.

2              THE COURT:  All right.  I hope you don't need to

3    resort to me.  If there's an emergency, you can dial up

4    chambers if I'm available and you have a discovery dispute.

5    If you are in a deposition or something, I have been known to

6    get on the phone.  I don't like to do it, but in emergencies,

7    where you're really at an impasse, I will.  But I will yell

8    at you first.  Okay.

9              MR. HOFFMAN:  Fair enough.

10             THE COURT:  All right, counsel.  Have a good

11   weekend.

12             MR. MacPHERSON:  Thank you, your Honor.

13             (Conference concluded at 2:45 p.m.)

14                       - - -

15

16

17

18

19

20

21

22

23

24

25



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

Christopher L. Kelley
Partner
650.463.8113
kelleyc@howrey.com

February 4, 2004

**VIA FACSIMILE AND U.S. MAIL**

Edward A. Meilman
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, NY  10036-2714

Re:    *Ricoh Company, Ltd. v. Aeroflex, Inc., et al.*
       Case No. C 03-04669 MJJ

Dear Mr. Meilman:

I have your letter of February 2.

In order to simplify the issues presented to the Court, Matrox Electronics and Matrox Graphics intend to withdraw the present summary judgment motion and present a narrower motion. The new motion will ask the Court for a determination that practice of Ricoh's patent claims outside the United States cannot be prosecuted under 35 U.S.C. 271(g) and that, therefore, the various Matrox defendants are entitled to summary adjudication of the issue of non-infringement as to ASIC design activities conducted outside the United States. None of the Matrox companies will seek dismissal from the case at this point in the litigation.

Ricoh has now had a chance to take Mr. Dwyer's testimony regarding the design and manufacturing phases of Matrox' operations. If there is additional discovery that Ricoh believes it must have in order to oppose the Matrox motion, please let me know as quickly as possible.

On a much more trivial note, you state in your letter that my January 30 letter was sent "after business hours." My letter was, in fact, transmitted from our office at 2:20 in the afternoon here in California, when most of the people in our office are still working. I understand that this means that your received the letter after 5 P.M. This is an unavoidable consequence of the fact that we work in different time zones, and not the result of a nefarious plot, "tactic," or "litigation games," as you suggest.

Very truly yours,

Christopher L. Kelley

CLK:gg

cc:    Gary M. Hoffman
       Jeffrey B. Demain

2 of 9 DOCUMENTS

**NETWORK CACHING TECHNOLOGY, LLC, Plaintiff, v NOVELL, INC, et al, Defendants.**

**No C-01-2079 VRW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2003 U.S. Dist. LEXIS 9881*

**March 21, 2003, Decided**

**SUBSEQUENT HISTORY:** Partial summary judgment granted by, Request granted *Network Caching Tech., LLC v. Novell, Inc., 2003 U.S. Dist. LEXIS 13356 (N.D. Cal., July 7, 2003)*

**PRIOR HISTORY:** *Network Caching Tech. v. Novell, Inc., 2002 U.S. Dist. LEXIS 26098 (N.D. Cal., Aug. 13, 2002)*

**DISPOSITION:** [*1] Defendants' motions for sanctions and to dismiss denied without prejudice. Defendant Inktomi's motion to compel production of documents terminated; court administratively terminated defendants' motion for partial summary judgment and reinstated it for hearing.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For Network Caching Technology, LLC, Plaintiff: Blaney Harper, Jones Day Reavis & Pogue, Washington, DC. Maria K. Nelson, Jones Day Reavis & Pogue, Los Angeles, CA.

For Novell, Inc., Volera, Inc., Defendants: James C. Otteson, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA. Kimberly P. Zapata, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA. William O'Callaghan, Wilson Sonsini et al, Palo Alto, CA.

For Inktomi Corporation, Defendant: I. Neel Chatterjee, Orrick Herrington & Sutcliffe, Menlo Park, CA. Monte M.F. Cooper, Orrick Herrington, Menlo Park, CA. Rebecca P. Burton, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA.

For Cacheflow Inc., Defendant: Sanajeet K. Dutta, Blakely Sokoloff Taylor & Zafman, LLP, San Jose, CA. Tarek N. Fahmi, Blakely Sokoloff Taylor & Zafman, LLP, San Jose, CA.

For Akamai Technologies Inc., Defendant: Carolyn Chang, Bingham McCutchen LLP, East Palo Alto, CA. James B. Art, Bingham McCutchen LLP, East Palo Alto, [*2] CA. James P. Kleinberg, Bingham McCutchen LLP, East Palo Alto, CA. Mary T. Huser, Bingham McCutchen LLP, East Palo Alto, CA.

For Novell, Inc., Volera, Inc., Counter-claimants: Ariana M. Chung-Han, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA. James C. Otteson, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA. Jennifer Ochs, Wilson Sonsini Godrich & Rosati, Palo Alto, CA. Michael A. Ladra, Wilson Sonsini Goodrich & Rosati, Pao Alto, CA.

For Network Caching Technology, LLC, Counter-defendant: Laura Talley Geyer, Jones Day Reavis & Pogue, Washington, DC.

For Cacheflow Inc., Counter-claimant: Sanajeet K. Dutta, Blakely Sokoloff Taylor & Zafman, LLP, San Jose, CA. Tarek N. Fahmi, Blakely Sokoloff Taylor & Zafman, LLP, San Jose, CA.

**JUDGES:** VAUGHN R WALKER, United States District Judge.

**OPINIONBY:** Vaughn R.WALKER

**OPINION:**

ORDER

Before the court are defendants' motions to dismiss and to sanction plaintiff's counsel for its alleged failure to conduct an adequate pre-filing investigation of its infringement claims and comply with Patent Local Rule 3-1, as described in the court's August 13, 2002, order. See Novell/Volera Mot for Sanctions (Doc # 249); Novell/Volera Mot to Dism (Doc # 266); [*3] Inktomi Mot for Sanctions (Doc # 253); Inktomi Mot to Dism (Doc # 259); Cacheflow Mot to Dism (Doc # 260). For the reasons set forth below, the court DENIES defendants' motions to dismiss (Docs ## 259, 260, 266) and for sanctions (Docs ## 249, 253) without prejudice to renewal if it is shown during subsequent proceedings that NCT's patent infringement allegations are ultimately meritless.

I

On May 29, 2001, plaintiff Network Caching Technology LLC (NCT) commenced this action against defendants Novell, Inc, Volera Inc, Akamai Technologies, Inc, Cacheflow, Inc and Inktomi Corporation, alleging infringement of certain NCT patents. Defendant Akamai Technologies, Inc has since been dismissed from this action. See Notice of Dism (Doc # 236).

NCT alleges that defendants infringed its patents for network services software products. NCT alleges that it is the assignee of four patents at issue in this case: United States patent nos *5,611,049* ('049 patent); *5,892,914* ('914 patent); *6,026,452* ('452 patent); and *6,085,234* ('234 patent). The patents at issue describe an algorithm for directing network traffic and speeding up networks by caching (storing duplicate images of data). Applications [*4] of the patent technology are particularly useful in internet services to speed up and control internet traffic at a company's internet site and in intranet services to speed up and control traffic within a company's proprietary network.

NCT alleges that Novell, Volera and Inktomi make and sell software products that contain algorithms which allegedly infringe the patents. Cacheflow allegedly manufactures and sells computer equipment, specifically network servers, which work by themselves and in conjunction with other software to infringe the patents.

In February and March 2002, defendants brought to the court's attention several discovery disputes regarding, inter alia, NCT's preliminary infringement contentions (PICs). See Docs ## 66-86. On March 15, 2002, the court held a status conference to discuss the parties' discovery disputes. At that conference, NCT admitted that it had not reverse engineered defendants' products to determine whether the products infringed the patents at

issue. See Transcript (Doc # 193), at 41:17-25. The conference concluded with the court suggesting that NCT revise its PICs to provide more detailed infringement allegations. See id at 48:10-50:5. NCT revised [*5] its PICs and, based on further discussions with defendants, revised its PICs a second time. Even with the second revision, defendants contended that NCT's PICs were inadequate and accordingly moved to strike NCT's second revised PICs and to dismiss the complaint for NCT's continued failure to comply with Patent LR 3-1. See Docs ## 115, 126, 129, 134.

By written order dated August 13, 2002, the court found NCT's second revised PICs to be "plainly insufficient", granted defendants' motion to strike and ordered NCT to revise its PICs to comply with the requirements of Patent LR 3-1. The court, however, declined to dismiss NCT's complaint, finding such action to be "premature" on the existing record. 8/13/02 Order (Doc # 227), at 7. The court found "no evidence before it that NCT has not attempted to comply with the court's orders and the local rules in this case. * * * Until this order, the court's involvement has not definitively determined which party has the correct view." Id.

On October 15, 2002, NCT served its third revised PICs. Over two months later, on December 18, 2002, defendants filed the present motions to dismiss NCT's first amended complaint. See Docs ## 259, 260, 266. [*6] Also on that date, Novell, Volera and Inktomi moved for sanctions against NCT and its counsel, Jones Day Reavis & Pogue. See Docs ## 249, 253.

II

Defendants move for dismissal primarily based on NCT's purported continued failure to comply with Patent LR 3-1 despite the court's August 13, 2002, order. See Novell/Volera Mot to Dism (Doc # 266); Inktomi Mot for Sanctions (Doc # 253); Inktomi Mot to Dism (Doc # 259); Cacheflow Mot to Dism (Doc # 260). Alternatively, defendants also urge dismissal under *FRCP 11*, based on inadequacies in the pre-filing investigation conducted by Jones Day Reavis & Pogue, NCT's counsel. See Novell/Volera Mot for Sanctions (Doc # 249). The court discusses each of these arguments below.

A

Defendants argue that NCT's third revised PICS fail to meet the requirements of Patent LR 3-1 and warrants the harsh sanction of dismissal. To support dismissal, defendants present various theories, including (1) NCT's failure to prosecute, pursuant to *FRCP 41(b)*; (2) NCT's defiance of a discovery order, pursuant to *FRCP 37*; and (3) the court's inherent power to discipline willful or reckless misconduct.

Defendants attempt to characterize NCT's latest revised PICs as [*7] its "fifth" consecutive and deliberate failure to comply with Patent LR 3-1. The court previously explained, however, that NCT did not have actual notice that its PICs were deficient until the court's August 13, 2002, order. Notably, in response to NCT's third revised PICs, defendants do not move to strike on the ground of insufficiency, as they did previously, but rather seek dismissal of the entire action.

It is well-settled that NCT has a duty to prosecute its case. See *FRCP 41(b)*. A court possesses the inherent authority to dismiss an action pursuant to *FRCP 41(b)* for failure to prosecute "to achieve the orderly and expeditious disposition of cases." *Link v Wabash R R Co, 370 U.S. 626, 630-32, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962)*; *Oliva v Sullivan, 958 F2d 272, 273 (9th Cir 1992)*. Because dismissal is a harsh penalty, it should be limited as a sanction only in extreme circumstances. *Thompson v Housing Auth, 782 F2d 829, 831 (9th Cir)*, cert denied, *479 U.S. 829, 93 L. Ed. 2d 60, 107 S. Ct. 112 (1986)*. The Ninth Circuit has explained that a district court must weigh several factors to decide whether to dismiss: [*8]

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions.

*Thompson, 782 F2d at 831*. Dismissal is proper "where at least four factors support dismissal, * * * or where at least three factors 'strongly' support dismissal." *Yourish v Calif Amplif, 191 F3d 983, 990 (9th Cir 1999)* (quoting *Ferdik v Bonzelet, 963 F2d 1258, 1263 (9th Cir 1992))*.

*FRCP 37* also provides sanctions for failure to comply with federal rules pertaining to discovery. The court may "make such orders in regard to the failure as are just," including issue- and claim-dispositive findings. See *FRCP 37(b)(2)*.

The parties do not discuss whether *FRCP 37* provides a basis for sanction for violation of Patent LR 3-1. Patent LR 1-2 provides that "the Civil Local Rules of this Court shall also apply to" patent cases, while *Civil LR 1-4* provides that "failure by counsel or a party to comply with any duly promulgated local rule * * * may be a ground [*9] for imposition of any authorized sanction." Other patent local rules, aside from 3-1, specifically authorize certain types of sanctions. See, e g, Patent LR 3-8 (prohibiting reliance on opinion of counsel as part of a defense to willful infringement unless a party

complies with Patent LR 3-8 or otherwise obtains the permission of all other parties or the court).

While *FRCP 37* sanctions are limited to failures to respond to interrogatories and document requests served under *FRCP 33 and 34* or to comply with an order compelling disclosure under *FRCP 37*, the Ninth Circuit has declined to extend these sanctions to general discovery disputes under the rule. *Halaco Engineering Co v Costle, 843 F2d 376, 380 (9th Cir 1988)*. Defendants do not address whether the court may sanction failure to comply with Patent LR 3-1 with the remedies set forth under *FRCP 37(b)(2)*.

Nevertheless, there is no question the court may, again under its inherent authority, sanction failure to comply with court orders, such as the August 13, 2002, order, and for "discovery abuses that may not be a technical violation of the discovery rules." *Id at 381*. Such action by the court may be [*10] justified to "protect[] the due and orderly administration of justice" and "maintain[] the authority and dignity of the court." *Primus Automotive Financial Servs, Inc v Batarse, 115 F3d 644, 648 (9th Cir 1997)* (citing *United States v Hudson, 11 U.S. 32, 7 Cranch 32, 34, 3 L. Ed. 259 (1812))*. Specifically, in the context of discovery abuse, the court must consider (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions and (4) the relationship or nexus between the misconduct drawing the sanction and the matters in controversy in the case. In addition, the court may also consider (5) the prejudice to the party victim of the misconduct and (6) the government interests at stake. *Halaco Engineering Co v Costle, 843 F2d 376, 380 (9th Cir 1988)*.

Regardless of the theory, however, the court finds that dismissal of NCT's action on this ground is unwarranted because its third revised PICs are sufficient to comply with Patent LR 3-1, which requires disclosure of:

> (a) Each claim of each patent in suit that is allegedly [*11] infringed by each opposing party;

> (b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act or other instrumentality * * * of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus must be identified by name or model number, if known. Each method or process must be identified by name, if

known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;

(c) A chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by *35 USC § 112(6)*, the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function;

* * *

By previous order, the court rejected defendants' view that NCT was required to reverse engineer the allegedly infringing products to comply with these disclosure requirements. Instead, the court ruled that "reverse engineering or its equivalent" was required to provide [*12] the requisite level of preliminary infringement information to defendants. While the court did not elaborate on what an "equivalent" to reverse engineering would entail, the court was animated by its concern that NCT's PICs were "replete with vague discussions of the claim terms" and that NCT "had provided no further information to defendants than the claim language itself." 8/13/02 Order (Doc # 227), at 11-12.

NCT has remedied these deficiencies in its third revised PICs. While NCT's responses may not be an exemplary model of disclosure, Patent LR 3-1 does not require NCT to produce evidence of infringement or to set forth ironclad and irrefutable claim constructions. Rather, Patent LR 3-1 is "designed to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *LG Electronics Inc v Q-Lity Computer Inc, 211 FRD 360, 367 (ND Cal 2002)* (quoting *Atmel Corp v Information Storage Devices, Inc, 1998 U.S. Dist. LEXIS 17564, 1998 WL 775115* at *2 (ND Cal 1998)). Whether those theories may ultimately be vindicated through claim construction and at trial is an entirely separate matter from whether Patent [*13] LR 3-1 has been satisfied. At this juncture, a party may comply with Patent LR 3-1 by setting forth particular theories of infringement with sufficient specificity to provide defendants' with notice of infringement beyond that which is provided by the mere language of the patents themselves. See 8/13/02 Order (Doc # 227) ("Patent LR 3-1 * * * takes the place of a series of interrogatories that defendants would likely have propounded had the patent local rules not provided for streamlined discovery.").

Defendants' dozens of objections to NCT's PICs take issue with the ultimate validity of NCT's claim construction or are based on defendants' belief that NCT will be unable to provide evidence of infringement at trial. For example, Inktomi contends that NCT has failed to provide "support for the allegation that [Inktomi's] Traffic Server [product] always saves a copy of the requested data." See Inktomi Mem (Doc # 262), at 11. But PICs are not meant to provide a forum for litigation of the substantive issues; they are merely designed to streamline the discovery process. Inktomi essentially objects to the merits of NCT's theory of infringement. These sorts of concerns clearly are not [*14] meant to be resolved all in the context of NCT's PICs, and the court declines to do so here. Defendants will be afforded shortly the opportunity to press the validity of NCT's construction of its own patent claims and defendants' products. See Jt Case Mgt Conf Stmt (Doc # 247) (Markman hearing scheduled for later this year).

Nor does Patent LR 3-1 require that NCT's preliminary infringement theories be incontrovertible or presented in excruciating detail. While the rule states that these disclosures should be "as specific as possible," there is no requirement that NCT thoroughly present and successfully defend its theories of infringement in the confines of a PIC chart. At this stage, mapping specific elements of defendants' allegedly infringing products onto NCT's claim construction is adequate.

Defendants also contend that by continuing to rely on marketing materials, white papers and other publicly available product documentation, NCT has failed to comply with the court's order which required "reverse engineering or its equivalent." But the question whether NCT conducted "reverse engineering or its equivalent" is not synonymous with whether it has complied with Patent LR 3-1, which, [*15] as discussed, requires a party only to set forth its specific theories of infringement. The court finds that NCT has provided sufficient information in its PICs to satisfy Patent LR 3-1.

B

Despite the court's determination that NCT has complied with Patent LR 3-1, information disclosed by way of PICs may nevertheless present a picture of the sort of prefiling investigation conducted by NCT. Because "NCT must provide in its PICs the relevant facts it obtained in its prefiling inquiry," "NCT's PICs * * * provide an accurate picture of the maximum possible inquiry in which NCT engaged before filing suit." See 8/13/02 Order (Doc # 227), at 8-9. Thus, the investigative methods underlying NCT's third revised PICs are relevant to defendants' alternative argument that

2003 U.S. Dist. LEXIS 9881, *

dismissal and other sanctions are warranted under *FRCP 11*, a subject to which the court turns.

1

*FRCP 11* requires counsel to sign every pleading, written motion or other paper presented to the court. Counsel's signature is a certification that "to the best of the person's knowledge, information, and belief," the paper is not baseless or meant to further "any improper purpose" and was submitted "after an inquiry reasonable [*16] under the circumstances." *FRCP 11(b)*. A party moving for *FRCP 11* sanctions bears the burden of establishing noncompliance. See *Tom Growney Equipment, Inc v Shelley Irr Development, Inc, 834 F2d 833, 837 (9th Cir 1987)*.

The Ninth Circuit has held that, under the "frivolousness prong" of *FRCP 11*, an attorney may be sanctioned for failing to conduct a reasonable pre-filing inquiry if the paper at issue lacks merit. See *In re Keegan Mgt Co Sec Lit, 78 F3d 431, 434 (9th Cir 1995)*. In that case, the Ninth Circuit explained that *FRCP 11* sanctions apply only to "a filing that is both baseless and made without a reasonable and competent inquiry." *Id* (emphasis in original) (quoting *Townsend v Holman Consulting Corp., 929 F2d 1358, 1362 (9th Cir 1990)* (en banc)); see also *Buster v Greisen, 104 F3d 1186, 1190 (9th Cir 1997)*.

In a patent infringement case such as this, the Federal Circuit has explained that *FRCP 11* "require[s] that an attorney interpret the pertinent claims of the patent in issue before filing a complaint alleging patent infringement." *Antonious v Spalding & Evenflo Cos, Inc, 275 F3d 1066, 1072 (Fed Cir 2002)*. [*17] This entails, "at a bare minimum, applying the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted." *View Eng'g Inc v Robotic Vision Systems, Inc, 208 F3d 981, 986 (Fed Cir 2000)*.

Alternatively, the court may sanction conduct under *FRCP 11* intended "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." *FRCP 11(b)*. Objective evidence may be used to demonstrate subjective bad intent. See *Townsend, 929 F2d at 1362*. But while defendants contend that NCT's and Jones Day's failure to conduct an adequate pre-filing investigation was intentional, they do not argue that the improper purpose prong of *FRCP 11* applies. Accordingly, the court limits its inquiry to the frivolousness prong of *FRCP 11*.

2

NCT does not dispute that it did not engage in what is traditionally thought of as "reverse engineering," which generally involves physical scrutiny and deconstruction of the actual product at issue to ascertain its operation. NCT [*18] has admitted that it did not reverse engineer the products at issue prior to filing suit, Transcript (Doc # 193), at 41:17-25, but it contends that it need not have done so. NCT argues that its use of marketing materials is equivalent to traditional reverse engineering and that, as a result, its reliance on those materials is adequate to support a reasonable pre-filing inquiry. NCT presents several engineering treatises and articles to support its view that examination of marketing materials alone can operate as the functional equivalent of traditional reverse engineering.

Those treatises, however, recognize the limitation of relying solely on marketing materials, white papers and other product documentation. While these materials do contain some level of technical discussion (see, e g, Geyer Decl (Doc # 282), Exh I), looking at these indirect sources of information fails to satisfy the pre-filing investigation requirements described both by View Eng'g and the court's previous order.

To satisfy the reasonable inquiry requirement of *FRCP 11*, the Federal Circuit requires, at a "bare minimum", that an attorney bringing an infringement suit apply the patent claims at issue "to an [*19] accused device." NCT, however, contends that it may compare its patent claims to an accused device without any actual examination of the accused device. The Federal Circuit's holding in *Antonious* is instructive on this matter. In that case, the plaintiff's law firm admitted that it had not directly examined most of the products alleged to infringe plaintiff's patents. See *275 F3d at 1075-76*. "Instead, the * * * attorneys inferred that the [products at issue] had an interior structure similar to the [product they had examined]." *Id at 1076*. The Federal Circuit held that, "on remand, the trial court must decide whether that inference was reasonable, given the other information the * * * attorneys had at the time." *Id*.

In the instant case, NCT relies similarly on indirect evidence of infringement. Rather than directly examining of each of the allegedly infringing products, NCT looked to indirect evidence whose reliability and actual resemblance to the products in question is questionable. Here, however, NCT seems to have engaged in even less inquiry than the counsel in Antonious, as NCT apparently failed to examine any of the accused products [*20] directly before filing suit.

The court finds that, under the circumstances, NCT failed to conduct a reasonable pre-filing investigation. NCT does not deny that it had the ability to obtain the allegedly infringing products and examine them to determine, for example, whether they operated materially in the manner described by the marketing materials. It is

also undisputed that NCT was aware of possible infringement by defendants' products as late as October 1999, over 18 months before commencement of this suit on May 29, 2001. See Burton Decl (Doc # 255), Exhs 6-7. NCT's failure to examine the accused products directly is both preposterous and unjustified. Accordingly, the court concludes that its pre-filing investigation was unreasonable and does not comport with the requirements of *FRCP 11*.

The court, however, declines to award *FRCP 11* sanctions at this time because, as earlier described, the Ninth Circuit requires that the filing at issue also be baseless. See *In re Keegan Mgt Co Sec Lit, 78 F3d at 434*. At this juncture, the court is unable to ascertain definitively whether NCT's infringement claims are without any merit. Cf Committee Notes on Amendments to Fed R of Civ P, *146 FRD 401, 590 (1993)* [*21] (noting that *FRCP 11* "should not be employed * * * to test the legal sufficiency or efficacy of allegations in the pleadings").

Defendants' reliance on *View Eng'g* and *Antonious* to support sanctions at this stage of the litigation is factually misplaced. Unlike the counter-claimant in View Eng'g, who dismissed dozens of claims and "admitted that [they] had no factual basis * * *", *208 F3d at 984*, NCT continues to assert that its patent infringement claims have merit. While NCT may have altered its underlying theories of infringement in successive PIC revisions, NCT continues to assert the validity of its claims.

Antonious, also cited by defendants, is inapposite at the present procedural posture because it involved a determination, after summary judgment, that the construction on which the plaintiff's infringement claims were based was frivolous. See *275 F3d at 1071*. Indeed, the trial court "withheld ruling on the sanctions motion until the liability issues were finally resolved." *Id.* Without further proceedings, such as a claim construction or summary judgment hearing, the court cannot definitively assess whether NCT's claims are in fact [*22] baseless.

In addition, the court is reluctant to hold that withdrawal of claims or theories of infringement alone is sufficient to conclude that these claims were baseless. With respect to *FRCP 11* sanctions against the changing contentions contained in the PICs themselves, the court notes that, by its terms, *FRCP 11* sanctions do not extend to discovery disputes. See *FRCP 11(d)*; *Patelco Credit Union v Sahni, 262 F3d 897, 913 n15 (9th Cir 2001)*. Beyond that, however, imposing sanctions merely for withdrawal would ultimately create perverse incentives for parties to extend the lifespan of unsupportable claims

and theories in order to avoid accusations of, and sanctions for, purportedly baseless conduct.

Based on the record before it, the court simply cannot ascertain, from an objective standpoint, whether NCT's patent infringement claims are baseless. The court therefore DENIES their motions for dismissal and for other sanctions under *FRCP 11* without prejudice to renewal as further developments warrant. If renewed, defendants must demonstrate not only that NCT's claims are erroneous but that they are baseless.

III

Inktomi also moves for a monetary award pursuant to [*23] *FRCP 11* for the costs of opposing NCT's motion to strike its affirmative defenses. See Doc # 253. But the court granted nearly the entirety of NCT's motion to strike Inktomi's affirmative defenses. See 12/31/01 Order (Doc # 53) (striking Inktomi's first, third, fourth, fifth, sixth, seventh, eighth, tenth and eleventh affirmative defenses). The only affirmative defense not struck by the court was Inktomi's second affirmative defense, which the court declined to strike because it found Inktomi's pleading "sufficient" "at this early stage in the litigation." Id at 10-11.

As discussed above, *FRCP 11* may only be used to target filings that are baseless. Inktomi cannot credibly contend that NCT's largely successful motion to strike affords a basis for monetary award.

IV

Next, the court considers whether to impose monetary sanctions on NCT and its counsel under *28 USC § 1927. Section 1927 of Title 28 of the United States Code* provides:

> Any attorney * * * who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because [*24] of such conduct.

"Sanctions pursuant to *section 1927* must be supported by a finding of subjective bad faith." *New Alaska Development Corp v Guetschow, 869 F2d 1298, 1306 (9th Cir 1989)*. This section does not apply to the initial filing of a complaint; it covers only subsequent conduct. *In re Keegan Mgt Co Sec Lit, 78 F3d at 435*. Thus, *§ 1927* does not afford defendants a remedy for lapses in NCT's pre-filing investigation.

Because the court has concluded that NCT is in compliance with Patent LR 3-1 and for reasons discussed in the court's August 13, 2002, order, the court finds that defendants have not established that NCT acted in bad

2003 U.S. Dist. LEXIS 9881, *

faith by its numerous PIC revisions. NCT did not have definitive notice of the deficiency of its PICs until the court's August 13, 2002, order, and it complied with Patent LR 3-1's requirements soon thereafter. The court therefore DENIES defendants' motion for sanctions to the extent they are sought under *28 USC § 1927* (Doc # 253).

V

This leaves defendants' motion for partial summary judgment that claims 1,2,3 of the *'234* patent are not entitled to an earlier priority date. At the March 5, 2003, hearing, [*25] in the interest of judicial economy, the court deferred oral argument on defendants' partial summary judgment motion until it had resolved the dispositive motions that are the subject of this order.

Having now determined that dismissal is unwarranted on the present record, the court shall SET a new hearing date so that defendants' motion for partial summary judgment may be heard. Counsel are directed to confer and present to the courtroom deputy within 10 days of the entry of this order a mutually agreeable hearing date.

VI

In sum, the court DENIES defendants' motions for sanctions and to dismiss NCT's complaint (Docs ## 249, 253, 259, 260, 266) without prejudice to renewal if defendants are subsequently able to demonstrate the frivolousness of NCT's patent claims. In addition, the court administratively TERMINATES defendants' motion for partial summary judgment (Doc # 231) and REINSTATES it for hearing on a date to be selected by counsel, who are DIRECTED to inform the courtroom deputy within 10 days of the entry of this order of the new hearing date.

As an administrative matter, the court TERMINATES Inktomi's motion to compel production of documents listed in NCT's privilege [*26] log (Doc # 145). This matter was referred to Magistrate Judge Zimmerman but has not been ruled upon in light of the stay on discovery ordered by the court on August 13, 2001. See 8/13/02 Order (Doc # 227), at 14-15. If necessary, Inktomi may renew the motion before Magistrate Judge Zimmerman.

IT IS SO ORDERED.

03-4-03

/s/

VAUGHN R WALKER

United States District Judge

Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD.,<br><br>            Plaintiff,<br><br>    vs.<br><br>AEROFLEX INCORPORATED, et al.,<br><br>            Defendants. | Case No.  C-03-4669 MJJ (EMC)<br><br>**NOTICE OF MANUAL FILING** |

1    Please take notice that Plaintiff Ricoh Company, Ltd. is filing the following documents on this

2  date in paper form only:

3    1.    Exhibit E to the Declaration Of Michael Weinstein In Support Of Ricoh's Reply In Support Of

4  Its Motion To Amend Complaint, a true and correct copy of Reply Brief in Support of Defendants'

5  Motion to Stay filed 8/5/03, and

6    2.    Exhibit F to the Declaration Of Michael Weinstein In Support Of Ricoh's Reply In Support Of

7  Its Motion To Amend Complaint, a true and correct copy of Sur-Reply in Opposition to Defendants'

8  Motion to Stay filed 8/22/03.

9    These document refer to materials that are designated "Confidential" pursuant to the Stipulated

10  Protective Order entered on June 9, 2003 in *Ricoh Company, Ltd. v. AeroFlex, Inc. et al.*, Case No. 03-

11  103-GMS.  A request to file these documents under seal will be filed contemporaneously.

12

13  Dated: March 30, 2004                    Respectfully submitted,

14                                           Ricoh Company, Ltd.

15                                           By: /s/ Kenneth Brothers

16                                           Jeffrey B. Demain, State Bar No. 126715
                                             Jonathan Weissglass, State Bar No. 185008
17                                           Altshuler, Berzon, Nussbaum, Rubin & Demain
                                             177 Post Street, Suite 300
18                                           San Francisco, California  94108
                                             Phone:  (415) 421-7151
19                                           Fax:  (415) 362-8064

20
                                             Gary M. Hoffman
21                                           Ken Brothers
                                             Eric Oliver
22                                           Michael Weinstein
                                             DICKSTEIN SHAPIRO MORIN &
23                                                OSHINSKY  LLP
                                             2101 L Street NW
24                                           Washington, D.C.  20037-1526
                                             Telephone: (202) 785-9700
25                                           Facsimile: (202) 887-0689

26
                                             Edward A. Meilman
27                                           DICKSTEIN SHAPIRO MORIN &
                                                  OSHINSKY  LLP
28

Case No.  C-03-4669 MJJ (EMC)
NOTICE OF MANUAL FILING
1750655 v1; 11$TB01!.DOC

1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 896-5471
Facsimile:  (212) 997-9880

Attorneys for Ricoh Company, Ltd.

1  Gary M. Hoffman (*Pro Hac Vice*)
   Kenneth W. Brothers(*Pro Hac Vice*)
2  DICKSTEIN SHAPIRO MORIN
     & OSHINSKY, LLP
3  2101 L Street, NW
   Washington, DC  20037-1526
4  Phone (202) 785-9700
   Fax (202) 887-0689
5
   Edward A. Meilman (*Pro Hac Vice*)
6  DICKSTEIN SHAPIRO MORIN
     & OSHINSKY, LLP
7  1177 Avenue of the Americas
   New York, New York  10036-2714
8  Phone (212) 835-1400
   Fax (212) 997-9880
9
   Jeffrey B. Demain, State Bar No. 126715
10 Jonathan Weissglass, State Bar No. 185008
   ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
11 177 Post Street, Suite 300
   San Francisco, California  94108
12 Phone  (415) 421-7151
   Fax (415) 362-8064
13
   Attorneys for Plaintiff
14

15                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
16                     SAN FRANCISCO DIVISION

17

18
   _____
19 RICOH COMPANY, LTD.,                        )
                                               )  **Case No.  C-03-4669 MJJ (EMC)**
20             Plaintiff,                       )
                                               )  **NOTICE OF MANUAL FILING**
21       vs.                                    )
                                               )
22 AEROFLEX INCORPORATED, et al.,               )
                                               )
23             Defendants.                      )
                                               )
24 _____        )

25

26

27

28

1    Please take notice that Plaintiff Ricoh Company, Ltd. is filing the following documents on this

2   date in paper form only:

3    1.    Exhibit E to the Declaration Of Michael Weinstein In Support Of Ricoh's Reply In Support Of

4   Its Motion To Amend Complaint, a true and correct copy of Reply Brief in Support of Defendants'

5   Motion to Stay filed 8/5/03, and

6    2.    Exhibit F to the Declaration Of Michael Weinstein In Support Of Ricoh's Reply In Support Of

7   Its Motion To Amend Complaint, a true and correct copy of Sur-Reply in Opposition to Defendants'

8   Motion to Stay filed 8/22/03.

9    These document refer to materials that are designated "Confidential" pursuant to the Stipulated

10   Protective Order entered on June 9, 2003 in *Ricoh Company, Ltd. v. AeroFlex, Inc. et al.*, Case No. 03-

11   103-GMS.  A request to file these documents under seal will be filed contemporaneously.

12

13   Dated: March 30, 2004                      Respectfully submitted,

14                                              Ricoh Company, Ltd.

15                                              By: /s/ Kenneth Brothers

16                                              Jeffrey B. Demain, State Bar No. 126715
                                                Jonathan Weissglass, State Bar No. 185008
17                                              Altshuler, Berzon, Nussbaum, Rubin & Demain
                                                177 Post Street, Suite 300
18                                              San Francisco, California  94108
                                                Phone:  (415) 421-7151
19                                              Fax:  (415) 362-8064

20
                                                Gary M. Hoffman
21                                              Ken Brothers
                                                Eric Oliver
22                                              Michael Weinstein
                                                DICKSTEIN SHAPIRO MORIN &
23                                                  OSHINSKY  LLP
                                                2101 L Street NW
24                                              Washington, D.C.  20037-1526
                                                Telephone: (202) 785-9700
25                                              Facsimile: (202) 887-0689

26
                                                Edward A. Meilman
27                                              DICKSTEIN SHAPIRO MORIN &
                                                    OSHINSKY  LLP
28

Case No.  C-03-4669 MJJ (EMC)
NOTICE OF MANUAL FILING
1750655 v1; 11$TB01!.DOC

1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 896-5471
Facsimile:  (212) 997-9880

Attorneys for Ricoh Company, Ltd.