1   Teresa M. Corbin (SBN 132360)
Thomas Mavrakakis (SBN 177927)
2   HOWREY SIMON ARNOLD & WHITE, LLP
301 Ravenswood Avenue
3   Menlo Park, California 94025
Telephone: (650) 463-8100
4   Facsimile: (650) 463-8400

5   Attorneys for Plaintiff SYNOPSYS, INC.
and for Defendants AEROFLEX INCORPORATED,
6   AMI SEMICONDUCTOR, INC., MATROX
ELECTRONIC SYSTEMS, LTD., MATROX
7   GRAPHICS, INC., MATROX INTERNATIONAL
CORP. and MATROX TECH, INC.

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12

13  RICOH COMPANY, LTD.,                    )
                                           )   Case No. C03-04669 MJJ (EMC)
            Plaintiff,                      )
14                                          )   Case No. C03-2289 MJJ (EMC)
        vs.                                )
15                                          )   **DECLARATION OF THOMAS C.**
    AEROFLEX INCORPORATED, et al.,          )   **MAVRAKAKIS IN SUPPORT OF**
16                                          )   **PLAINTIFF SYNOPSYS, INC.'S AND**
            Defendants.                     )   **DEFENDANTS' MOTION REQUESTING**
17                                          )   **EQUAL PRESENTATION TIME AT**
                                           )   **TUTORIAL**
18  _____

19  SYNOPSYS, INC.,                         )   Date: To Be Determined
                                           )   Time: To Be Determined
20          Plaintiff,                      )   Courtroom: 11
                                           )   Judge: Martin J. Jenkins
21      vs.                                )
                                           )
22  RICOH COMPANY, LTD., a Japanese         )
    corporation                             )
23                                          )
            Defendant.                      )
24  _____)

25

26

27

28

DECL. OF MAVRAKAKIS IN SUPPORT OF MOTION REQUESTING EQUAL PRESENTATION TIME AT TUTORIAL
Case Nos. C03-04669 MJJ (EMC) and C03-2289 MJJ (EMC)
DM_US\8064071.v1                                                                                    1

DECLARATION OF THOMAS C. MAVRAKAKIS

I, Thomas C. Mavrakakis declare as follows:

1.      I am an attorney associated with the law firm of Howrey Simon Arnold & White, LLP, counsel of record for Synopsys, Inc., Aeroflex Incorporated, AMI Semiconductor, Inc., Matrox Electronic Systems, Ltd., Matrox Graphics, Inc., Matrox International Corp., and Matrox Tech, Inc. am a member in good standing of the State Bar of California and have been admitted to practice before this Court.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Attached as Exhibit A to this declaration is a true and correct copy of a July 14, 2004 Telephone Status Conference Transcript (mistakenly dated June 14, 2004).

3.      Attached as Exhibit B to this declaration is a true and correct copy of a July 22, 2004 Court Order.

4.      Attached as Exhibit C to this declaration is a true and correct copy of an August 9, 2004 Letter from Matthew E. Hocker to Kenneth W. Brothers.

5.      Attached as Exhibit D to this declaration is a true and correct copy of an August 10, 2004 Letter from Matthew E. Hocker to Edward Meilman.

6.      Attached as Exhibit E to this declaration is a true and correct copy of an August 12, 2004 Letter from Matthew E. Hocker to Edward Meilman.

7.      Attached as Exhibit F to this declaration is a true and correct copy of an August 17, 2004 Letter from Matthew E. Hocker to Edward Meilman.

8.      Attached as Exhibit G to this declaration is a true and correct copy of an August 18, 2004 Letter from Matthew E. Hocker to Edward Meilman.

9.      Attached as Exhibit H to this declaration is a true and correct copy of an August 10, 2004 Letter from Edward A. Meilman to Matthew E. Hocker.

10.     Attached as Exhibit I to this declaration is a true and correct copy of an August 11, 2004 Letter from Edward A. Meilman to Matthew E. Hocker.

11.     Attached as Exhibit J to this declaration is a true and correct copy of an August 16, 2004 Letter from Edward A. Meilman to Matthew E. Hocker.

HOWREY
SIMON
ARNOLD &
WHITE

DECL. OF MAVRAKAKIS IN SUPPORT OF MOTION REQUESTING EQUAL PRESENTATION TIME AT TUTORIAL
Case Nos. C03-04669 MJJ (EMC) and C03-2289 MJJ (EMC)
DM_US\8064071.v1

2

1    12.    Attached as Exhibit K to this declaration is a true and correct copy of an August 18,

2    2004 Letter from Edward A. Meilman to Matthew E. Hocker.

3    13.    Attached as Exhibit L to this declaration is a true and correct copy of an August 19,

4    2004 Letter from Edward A. Meilman to Matthew E. Hocker.

5    14.    Attached as Exhibit M to this declaration is a true and correct copy of an August 19,

6    2004 Letter from Matthew E. Hocker to Edward Meilman.

7    15.    Attached as Exhibit N to this declaration is a true and correct copy of an August 20,

8    2004 Letter from Edward A. Meilman to Matthew E. Hocker.

9    16.    Attached as Exhibit O to this declaration is a true and correct copy of an August 23,

10    2004 Letter from Matthew E. Hocker to Gary M. Hoffman.

11    17.    Attached as Exhibit P to this declaration is a true and correct copy of an August 24,

12    2004 Letter from Gary M. Hoffman to Matthew E. Hocker.

13    18.    Attached as Exhibit Q to this declaration is a true and correct copy of an August 31,

14    2004 Letter from Matthew E. Hocker to Gary M. Hoffman.

15    19.    Attached as Exhibit R to this declaration is a true and correct copy of a September 2,

16    2004 Letter from Gary M. Hoffman to Matthew E. Hocker.

17    20.    Attached as Exhibit S to this declaration is a true and correct copy of a September 20,

18    2004 Letter from DeAnna Allen to Matthew E. Hocker, enclosing Ricoh's tutorial outline.

19    21.    Attached as Exhibit T to this declaration is a true and correct copy of a September 20,

20    2004 Letter from Thomas C. Mavrakakis to Kenneth W. Brothers, enclosing Synopsys and

21    Defendants' tutorial outline.

22    22.    Attached as Exhibit U to this declaration is a true and correct copy of a September 21,

23    2004 Letter from Edward A. Meilman to Thomas C. Mavrakakis.

24    23.    Attached as Exhibit V to this declaration is a true and correct copy of a September 22,

25    2004 Letter from Thomas C. Mavrakakis to Edward Meilman.

26    24.    Attached as Exhibit W to this declaration is a true and correct copy of a September 23,

27    2004 Letter from Edward A. Meilman to Thomas C. Mavrakakis.

28

25.     Attached as Exhibit X to this declaration is a true and correct copy of a September 23, 2004 Letter from Thomas C. Mavrakakis to Edward Meilman.

26.     Attached as Exhibit Y to this declaration is a true and correct copy of a September 24, 2004 Letter from Gary M. Hoffman to Tom Mavrakakis.

27.     Attached as Exhibit Z to this declaration is a true and correct copy of a September 24, 2004 Letter from Thomas C. Mavrakakis to Gary M. Hoffman.

28.     Attached as Exhibit AA to this declaration is a true and correct copy of a September 27, 2004 Letter from Gary M. Hoffman to Tom Mavrakakis.

29.     Attached as Exhibit BB to this declaration is a true and correct copy of a September 28, 2004 Letter from Thomas C. Mavrakakis to Gary M. Hoffman.

30.     Attached as Exhibit CC to this declaration is a true and correct copy of an October 1, 2004 Letter from Gary M. Hoffman to Tom Mavrakakis.

31.     Attached as Exhibit DD to this declaration is a true and correct copy of an October 1, 2004 Letter from Thomas C. Mavrakakis to Gary M. Hoffman.

32.     Attached as Exhibit EE to this declaration is a true and correct copy of Ricoh's Claim Construction Opening Brief.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 5, 2004, at San Francisco, California.



                                                    /s/ Thomas C. Mavrakakis
                                                    Thomas C. Mavrakakis

**HOWREY**
**SIMON**
**ARNOLD &**
**WHITE**

DECL. OF MAVRAKAKIS IN SUPPORT OF MOTION REQUESTING EQUAL PRESENTATION TIME AT TUTORIAL
Case Nos. C03-04669 MJJ (EMC) and C03-2289 MJJ (EMC)
DM_US\8064071.v1

4

07.14.04 Transcript of Telephone Status Conf w. Jenkins

PAGES 1 - 15

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### BEFORE THE HONORABLE MARTIN J. JENKINS, JUDGE

| | |
|---|---|
| RICOH COMPANY, LTD., )<br>  )<br>            PLAINTIFF, )<br>  )<br>    VS. )<br>  )<br>AEROFLEX INCORPORATED, )<br>ET AL., )<br>  )<br>            DEFENDANTS. )<br>_____)<br>SYNOPSYS, INC., )<br>  )<br>            PLAINTIFF, )<br>  )<br>    VS. )<br>  )<br>RICOH COMPANY, LTD., )<br>  )<br>            DEFENDANT. )<br>_____) | NO. C 03-4469 MJJ<br>    C 03-2289 MJJ<br><br>WEDNESDAY, JUNE 14, 2004<br>SAN FRANCISCO, CALIFORNIA |

REPORTER'S TRANSCRIPT OF TELEPHONIC PROCEEDINGS

APPEARANCES:

FOR RICOH                DICKSTEIN, SHAPIRO, MORIN &
                              OSHINSKY, LLP
                         2101 L STREET, NW
                         WASHINGTON, DC  20037
                  BY:    KENNETH W. BROTHERS, ESQUIRE


(FURTHER APPEARANCE ON FOLLOWING PAGE)


REPORTED BY:             JOAN MARIE COLUMBINI, CSR 5435
                         OFFICIAL COURT REPORTER

COMPUTERIZED TRANSCRIPTION BY ECLIPSE


JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842


APPEARANCES CONTINUED:


Page 1

07.14.04 Transcript of Telephone Status Conf w. Jenkins
FOR SYSNOPSYS          HOWREY, SIMON, ARNOLD & WHITE, LLP
                       301 RAVENSWOOD AVENUE
                       MENLO PARK, CALIFORNIA  94025
                  BY:  THOMAS C. MAVRAKAKIS, ESQUIRE
                       ERIK K. MOLLER, ESQUIRE

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

1              PROCEEDINGS; WEDNESDAY, JUNE 14, 2004

2

3              THE COURT:  WHO DO I HAVE ON THE LINE?

4              MR. BROTHERS:  THIS IS KEN BROTHERS WITH DICKSTEIN,

5    SHAPIRO REPRESENTING RICOH.

07.14.04 Transcript of Telephone Status Conf w. Jenkins

6          MR. MAVRAKAKIS:   AND TOM MAVRAKAKIS AND ERIK MOLLER

7  OF HOWREY SIMON REPRESENTING SYNOPSYS AND THE DEFENDANTS.

8          THE COURT:   ANYONE ELSE?

9          MR. BROTHERS:   THERE'S NO ONE ON OUR END.   THIS IS

10 KEN BROTHERS.

11          MR. MAVRAKAKIS:   YOUR HONOR, I DON'T KNOW IF WE

12 HAVE A COURT REPORTER, BUT I'VE HOOKED UP THE ABILITY TO

13 RECORD THIS IF YOU WISH, BUT I LEAVE THAT TO YOUR DISCRETION.

14          THE COURT:   WE HAVE A REPORTER.

15          MR. MAVRAKAKIS:   OKAY.

16          THE COURT:   OKAY.   THIS IS -- YOU SENT ME A LETTER

17 DATED JULY 9TH, RAISING TWO SEPARATE, BUT I SUSPECT FROM YOUR

18 VIEW, PROBABLY INTERRELATED ISSUES.   ONE HAS TO DO WITH THE

19 TUTORIAL THAT I'VE SCHEDULED.   THE OTHER ONE HAS TO DO WITH

20 THE CLAIMS CONSTRUCTION HEARING THAT I'VE SCHEDULED.

21          THERE SEEMS TO BE SOME MISUNDERSTANDING, AND

22 PROBABLY BECAUSE, NORMALLY, WHEN I SET UP A CLAIMS

23 CONSTRUCTION HEARING AND SET UP A SCHEDULE, THE TUTORIAL

24 ASPECTS OF IT ALMOST ALWAYS INVOLVES THE PRESENTATION OF

25 EXPERT TESTIMONY BUT NO QUESTIONING, NO EXAMINING, SAVE AND

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

1  EXCEPT BY THE COURT.

2          AND, NORMALLY, WHAT I ASK FOR, AND THIS HAS WORKED

3  FOR SEVEN YEARS, IS THAT THE PATENT AT ISSUE, THE PATENT THAT

4  IS ALLEGEDLY INFRINGED, THAT YOU PROVIDE A TUTORIAL JUST

5  EXPLAINING HOW THAT PRODUCT WORKS.   THAT'S ALL.   NO OTHER

6  AUGMENTATION, NO REFERENCE TO ACCUSED PRODUCTS, NOTHING OF

7  THAT NATURE.   IT'S A VERY PLAINTIFF PRESENTATION.

8          ALL SIDES ARE PRESENT.   IT'S NOT RECORDED.   IT'S

Page 3

07.14.04 Transcript of Telephone Status Conf w. Jenkins

9   NOT -- NO RECORD IS MADE OF THAT, SAVE AND EXCEPT IF YOU WANT

10   TO PRESENT SOME EXHIBITS THAT WOULD HELP ME FOLLOW THROUGH THE

11   EXPLANATION OF HOW THE PRODUCT WORKS.

12          THAT'S ALL THAT HAPPENS AT THE TUTORIAL.

13          ARE THERE ANY QUESTIONS ABOUT THAT?

14          MR. BROTHERS:  THIS IS KEN BROTHERS.  NOT FOR US.

15   WE UNDERSTOOD IT WOULD BE A NON-ADVERSARIAL PRESENTATION AT

16   THE TUTORIAL THAT WOULD FOCUS ON THE PATENT IN SUIT.

17          MR. MAVRAKAKIS:  AND, YOUR HONOR, THIS IS TOM

18   MAVRAKAKIS.  SO WOULD THAT MEAN THAT WE WOULD SPLIT TIME AND

19   EACH SIDE WOULD HAVE --

20          THE COURT:  WHY IS THERE A NEED TO SPLIT TIME?

21          YOU SEE, HERE'S THE ISSUE:  IT'S NOT ADVERSARIAL.

22          MR. MAVRAKAKIS:  OKAY.

23          THE COURT:  TO THE EXTENT THAT YOU HAVE SOME

24   CONCERN -- I GUESS THE POINT WOULD BE THIS:  DO YOU THINK THAT

25   YOUR -- YOU WANT TO PUT ON SOMEBODY WHO WILL EXPLAIN HOW THE

1   PRODUCT WORKS, AND THAT'S GOING TO BE DIFFERENT THAN THE OTHER

2   SIDE?  THE PURPOSE OF IT IS NOT TO CREATE ISSUES.  THE PURPOSE

3   OF IT IS JUST TO WALK THROUGH HOW IT WORKS.

4          IS THERE A DISAGREEMENT ABOUT THAT?

5          MR. MAVRAKAKIS:  WELL, I THINK THAT THERE MAY BE

6   SOME DISAGREEMENT, YOUR HONOR --

7          THE COURT:  WHAT IS IT?

8          MR. MAVRAKAKIS:  -- BETWEEN THE PARTIES ABOUT WHAT

9   THE PATENT DESCRIBES AND DISCLOSES.

10          THE COURT:  NO, NO, WE'RE NOT TALKING ABOUT

11   DISCLOSURES IN TERMS OF INTERPRETATION OF TERMS, JUST HOW IT

07.14.04 Transcript of Telephone Status Conf w. Jenkins

12    WORKS.  THAT'S ALL.

13              MR. MAVRAKAKIS:  HOW THE --

14              THE COURT:  IT'S A 3-D SORT OF DIMENSIONAL

15    PRESENTATION VISUALLY OF HOW IT OPERATES.

16              MR. MAVRAKAKIS:  WHEN YOU SAY "HOW IT OPERATES,"

17    YOU'RE REFERRING TO THE EMBODIMENT IN THE PATENT?

18              THE COURT:  I'M REFERRING TO HOW WHATEVER THE

19    PATENT TEACHES, HOW THAT ACTUALLY IN THREE-DIMENSIONAL REAL

20    TIME WORKS.  NOTHING MORE.

21              I THINK YOU HAVE A DIFFERENT VIEW OF WHAT

22    TRANSPIRES AT THE TUTORIAL.  THIS IS NOT A PLACE TO ARGUE

23    WHETHER OR NOT THE LANGUAGE IN CLAIMS CAN BE INTERPRETED IN

24    DIFFERENT WAYS.  THAT'S FAR REMOVED FROM WHAT I'M ACTUALLY

25    GOING TO SEE.

1              MANY TIMES, FOR EXAMPLE, YOU KNOW, I'VE HAD PATENTS

2    THAT INVOLVE THE SELECTION OF ICONS AND THE STORING OF

3    INFORMATION OF DATA, AND THEY JUST BRING IN A PRESENTATION

4    THAT SHOWS VISUALLY HOW THE PATENT DOES THAT, NOTHING MORE.

5              MR. MAVRAKAKIS:  AND YOU'RE SAYING THAT SHOULD BE

6    DONE BY THE PLAINTIFF AND NOT DEFENDANT?

7              THE COURT:  THAT'S NORMALLY HOW IT'S DONE.  BUT IF

8    YOU WANT TO PUT ON SOMETHING THAT ESTABLISHES, IN YOUR VIEW,

9    HOW IT WORKS, SO BE IT.  I CAN'T SEE WHERE THERE SHOULD BE

10    SIGNIFICANT DISPARITIES FOR THAT.

11              MR. MAVRAKAKIS:  MAYBE THE PARTIES SHOULD MEET AND

12    CONFER AND TRY TO COME UP --

13              THE COURT:  NORMALLY, THEY DO.  NORMALLY, THEY MEET

14    AND CONFER AND SHOW EACH OTHER WHAT THEIR RESPECTIVE SIDE IS

07.14.04 Transcript of Telephone Status Conf w. Jenkins

15  GOING TO PUT ON.

16          MR. MAVRAKAKIS:  OKAY.  SO YOU ENVISION SOMETHING

17  LIKE A POWER POINT PRESENTATION THAT JUST SHOWS --

18          THE COURT:  THAT'S WHAT PEOPLE HAVE DONE IN THE

19  PAST.  I DON'T KNOW ABOUT THIS PATENT.  I DON'T KNOW WHAT THE

20  BEST WAY WOULD BE.  BUT THAT'S WHAT PEOPLE HAVE DONE IN THE

21  PAST SEVEN YEARS I HAVE BEEN HERE, WITHOUT INCIDENT.

22          MR. MAVRAKAKIS:  RIGHT.  I UNDERSTAND THAT, YOUR

23  HONOR.

24          THE COURT:  I DON'T KNOW THAT YOU DO, BUT IF

25  THERE'S A PROBLEM -- I MEAN, IT STRIKES ME THAT THE PRESENTING

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

1  SIDE -- I'M NOT SAYING YOU CANNOT.  IF YOU WANT TO PRESENT

2  SOMEONE WHO WILL ARTICULATE HOW THE PRODUCT WORKS, THE PATENT

3  IN SUIT, SO BE IT.  I DON'T HAVE A PROBLEM WITH THAT.  BUT

4  EACH OF YOU SHOULD EXCHANGE PRIOR IN TIME WHAT IT IS YOU PLAN

5  TO PRESENT AND THE INDIVIDUAL WHO IS GOING TO MAKE THE

6  PRESENTATION SO THAT YOU'RE FAMILIAR WITH IT.  I THINK THAT'S

7  FINE.

8          MR. MAVRAKAKIS:  OKAY.  I MEAN, I THINK -- YEAH, I

9  MEAN, I THINK THAT'S WHAT I ENVISIONED AT THE CLAIM

10  CONSTRUCTION TUTORIAL, IS EACH SIDE WOULD HAVE AN EXPERT

11  PRESENT BACKGROUND INFORMATION ABOUT THE PATENT EMBODIMENT,

12  HOW IT WORKS.

13          AND WE'RE CERTAINLY WILLING TO MEET AND CONFER WITH

14  THE OTHER SIDE AND COME TO SOME SORT OF AGREEMENT AS TO A

15  SCHEDULE FOR EXCHANGING OUR RESPECTIVE PRESENTATIONS, AND AT

16  THAT TIME WE COULD EVEN MEET AND CONFER AND TRY AND SEE IF

17  MAYBE WE CAN AGREE TO ONE PRESENTATION.  DOES THAT SOUND --

Page 6

07.14.04 Transcript of Telephone Status Conf w. Jenkins

18          THE COURT:  I HAVE NEVER HAD THAT PROBLEM BEFORE,

19    WHAT YOU'RE RAISING.  NO ONE HAS EVER TURNED THIS INTO AN

20    ADVERSARY SORT OF ISSUE-ORIENTED PRESENTATION, BUT IF THAT'S

21    WHAT YOU WANT TO DO, I DON'T HAVE A PROBLEM WITH IT.

22          ALL I WANT TO DO IS GET A BETTER UNDERSTANDING SO

23    YOU DON'T HAVE TO SPEND AN HOUR OR TWO IN YOUR PRESENTATION AT

24    THE CLAIMS CONSTRUCTION HEARING SHOWING ME YOUR VIEW OF HOW IT

25    WORKS.

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

1          MR. MAVRAKAKIS:  I UNDERSTAND.

2          THE COURT:  THAT'S WHAT IT INTENDS TO OBVIATE.

3          NOW, THE SECOND PROBLEM OR THE SECOND ISSUE -- LET

4    ME JUST GIVE YOU SORT OF MY GENERAL RULES OF HOW THESE THINGS

5    OCCUR.

6          FIRST, I HAVE NEVER AND DON'T ANTICIPATE HAVING

7    LIVE WITNESS TESTIMONY FROM ANY EXPERT AT A CLAIMS

8    CONSTRUCTION HEARING.

9          MR. MAVRAKAKIS:  OKAY.

10          THE COURT:  SECONDLY, IT'S DIFFICULT -- AND THIS IS

11    PROBABLY WHERE THE AMBIGUITY CAME IN.  IT'S ALWAYS DIFFICULT

12    FOR ME TO TELL WHETHER I'M GOING TO NEED TO HAVE EXPERT

13    DECLARATIONS, THE USE OF EXTRINSIC EVIDENCE IN CONSTRUING THE

14    TERMS OF THE PATENT.  IT'S HARD TO KNOW THAT WITHOUT DELVING

15    INTO THE BRIEFS, WHICH I'M NOT ABLE TO DO THAT WHEN I SET THE

16    SCHEDULE.

17          SO, NORMALLY, WHAT I DO IS SET IT UP SO THAT IF YOU

18    FOLKS REALLY DRIVE THE VEHICLE, IF YOU FEEL THAT THERE'S GOING

19    TO BE A NEED FOR EXPERT TESTIMONY, YOU DISCLOSE THE EXPERTS

20    WHO ARE GOING TO TESTIFY WITH RESPECT TO THE CLAIMS IN

Page 7

07.14.04 Transcript of Telephone Status Conf w. Jenkins

21 DISPUTE.  YOU NORMALLY TAKE THOSE DEPOSITIONS PRIOR IN TIME SO

22 EACH SIDE HAS HAD A CHANCE TO EXAMINE THOSE EXPERTS.  THEN YOU

23 SUBMIT DECLARATIONS, WRITTEN DECLARATIONS, WHICH I THEN WILL

24 DETERMINE WHETHER I CAN CONSIDER OR NOT, BUT NO LIVE

25 TESTIMONY, NO LIVE EXAMINATION.  THAT'S DONE IN DEPOSITIONS

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

1 PRIOR IN TIME.

2            MR. MAVRAKAKIS:  YOUR HONOR --

3            THE COURT:  SO IT WAS NOT YOUR FAULT.  THERE'S SOME

4 BUILT-IN AMBIGUITY, BECAUSE AT THE TIME THAT THE HEARING IS

5 SET, REALLY UP TO TWO OR THREE WEEKS BEFORE THE HEARING, I

6 HAVEN'T READ THE BRIEFS, SO I CAN'T MAKE THAT DETERMINATION.

7 IT'S NOT YOUR FAULT.  BUT THAT'S HOW I CONDUCT THEM.

8            MR. MAVRAKAKIS:  YOUR HONOR, THIS IS TOM

9 MAVRAKAKIS.  COULD I ASK A QUESTION OF CLARIFICATION?

10            THE COURT:  SURE.

11            MR. MAVRAKAKIS:  THE THING THAT I GET CONCERNED

12 ABOUT, AND I'VE DONE A FEW OF THESE UNDER THE LOCAL RULES, IS

13 THAT, YOU KNOW, THE JOINT CLAIM CONSTRUCTION CHART IS SUPPOSED

14 TO SET OUT THE RECORD.

15            THE COURT:  RIGHT.

16            MR. MAVRAKAKIS:  -- THAT BOTH PARTIES HAVE

17 EVERYTHING THEY NEED TO WRITE THEIR BRIEFS.

18            AND WHAT HAS HAPPENED IS THAT THE WORDS OF THE

19 RULES SAY TESTIMONY AT THE CLAIM CONSTRUCTION HEARING -- AND,

20 YOU KNOW, I'VE LIVED AND BEEN SANDBAGGED, YOU KNOW, TWO WEEKS

21 BEFORE MY OPPOSITION IS DUE WITH THE 50-PAGE EXPERT

22 DECLARATION, AND THEN, YOU KNOW, THE PARTY IS TELLING ME THAT,

23 WELL, THE EXPERT IS NOT AVAILABLE, AND THEN I HAVE TO FILE MY

Page 8

07.14.04 Transcript of Telephone Status Conf w. Jenkins

24    OPPOSITION WITHOUT HAVING THE CHANCE TO, YOU KNOW, TAKE THE

25    DEPOSITION OF THIS EXPERT THAT'S NOW FILED A 50-PAGE

1

1    DECLARATION.

2            THE COURT:   I DON'T KNOW WHERE YOU HAVE BEEN.   I

3    WOULDN'T ALLOW THAT TO HAPPEN.   THERE WOULD BE NO SANDBAGGING.

4            MR. MAVRAKAKIS:   OKAY.   BECAUSE THE RULE SAYS --

5            THE COURT:   IT DOESN'T MATTER WHAT THE RULE SAYS.

6    I KNOW WHAT THE RULE SAYS.   I'M TELLING YOU HOW I DO IT.

7            MR. MAVRAKAKIS:   OKAY.

8            THE COURT:   IT'S NOT EFFICIENT TO TAKE LIVE WITNESS

9    TESTIMONY IN A CLAIMS CONSTRUCTION HEARING WHEN YOU FOLKS CAN

10   DO THAT UP FRONT.

11           I UNDERSTAND YOU HAVE CONCERNS, AND THEY MAKE SENSE

12   TO ME, ABOUT THE TIMING OF GETTING INFORMATION TO MAKE SURE

13   YOU'VE HAD A CHANCE TO REALLY FULLY EXAMINE THE OPINIONS THAT

14   ARE GOING TO BE GIVEN AND THE BASIS THEREFORE.   AND, NORMALLY,

15   WHAT HAPPENS IS ONCE YOU GET A CHANCE TO SEE WHAT THE DISPUTED

16   TERMS ARE, WHAT THE BASIS IN THE PATENT IS FOR THE PROPOSED

17   CLAIMS INTERPRETATIONS, WHETHER OR NOT, YOU KNOW, THAT WILL

18   PEND ON EXPERT TESTIMONY OR NOT, THEN USUALLY THERE'S ENOUGH

19   TIME IN THAT SCHEDULE FOR YOU TO TAKE THE DEPOSITIONS OF THOSE

20   PEOPLE, ALSO, IF YOU FEEL LIKE YOU NEED TO, AND THAT'S WHAT I

21   WOULD SUGGEST TO YOU IN THIS CASE.

22           BUT WE WOULDN'T BRING THOSE PEOPLE IN FOR LIVE

23   WITNESS TESTIMONY ON TOP OF WHAT THEY'VE ALREADY PUT IN THEIR

24   REPORTS.   I JUST DON'T KNOW WHETHER THAT'S GOING TO BE NEEDED

25   OR NOT, YOU KNOW.   IT'S DIFFICULT FOR ME TO TELL YOU THAT, BUT

1

1    I CAN TELL YOU, DESPITE WHAT THE LOCAL RULE SAYS, THAT THE

2    EXCHANGE OF EXPERT OPINIONS AND REPORTS AND DEPOSITIONS OUGHT

3    TO OCCUR PRIOR IN TIME.

4          MR. MAVRAKAKIS:  SO ACCORDING -- SO, IN OTHER

5    WORDS, THE EXPERTS' SUMMARY OPINIONS, EVEN IF THE EXPERT

6    TESTIMONY IS GOING TO BE PROVIDED IN WRITTEN FORM ONLY IN

7    DECLARATION, SHOULD BE EXCHANGED AT THE TIME OF THE JOINT

8    CLAIM CONSTRUCTION CHART?

9          THE COURT:  I THINK YOU SHOULD -- WE BUILD THAT IN

10   SO NOBODY IS SANDBAGGED.

11         MR. BROTHERS:  YOUR HONOR, THIS IS KEN BROTHERS.  I

12   GUESS I'M A LITTLE BIT UNCLEAR WITH RESPECT TO THE TIMING FOR

13   THE WHOLE PROCESS.

14         YOU HAD EARLIER REFERENCED THAT SOME OF THESE, THE

15   EXPERT DECLARATIONS, BE PROVIDED IN CONJUNCTION WITH THE

16   BRIEFING SCHEDULE, WHICH IS IN LATE AUGUST AND SEPTEMBER, BUT

17   IS IT YOUR -- THE COURT'S DESIRE THAT --

18         THE COURT:  IT STRIKES ME THAT IF YOU'RE GOING TO

19   RELY -- AND I JUST DON'T KNOW, BUT IF -- IS IT SAFE TO ASSUME

20   THAT EACH OF YOU BELIEVES THAT THE COURT NEEDS TO RESORT TO

21   EXTRINSIC EVIDENCE INCLUDING THE OPINIONS OF EXPERTS TO

22   CONSTRUE THE TERMS HERE?

23         MR. BROTHERS:  WELL, RICOH HAD UNDERSTOOD YOUR

24   EARLIER COMMENTS TO BE THAT THE COURT WOULD NOT RECEIVE EXPERT

25   TESTIMONY AT THE CLAIM CONSTRUCTION HEARING.

07.14.04 Transcript of Telephone Status Conf w. Jenkins

1          THE COURT:  I NORMALLY DON'T.

2          MR. BROTHERS:  BECAUSE OF THAT, WE WERE PROCEEDING

3   TO CONSTRUE THE CLAIMS WITHOUT RELIANCE UPON AN EXPERT, WHEN

4   IT BECAME CLEAR TO RICOH THAT SYNOPSYS AND THE DEFENDANTS WERE

5   INTENDING TO PROVIDE EXPERT TESTIMONY, AND WE IDENTIFIED THE

6   DIFFERENCE IN OPINIONS BECAUSE IT WAS --

7          THE COURT:  LET ME JUST -- MAYBE IT'S MORE

8   FUNDAMENTAL THAN EVEN I THINK.  VICTRONICS SAYS THE COURT

9   DOESN'T GO TO THAT EVIDENCE IF IT DOESN'T HAVE TO.

10          MR. BROTHERS:  THAT'S CORRECT.

11          THE COURT:  SO THAT'S MY RULE OF THUMB, THAT THERE

12   HAS TO BE A SHOWING AS TO WHY THE COURT CAN'T CONSTRUE THE

13   TERMS BASED ON THE INTRINSIC EVIDENCE.  WE DON'T GO TO

14   EXTRINSIC EVIDENCE UNLESS THAT'S NECESSARY.

15          MR. BROTHERS:  IT WOULD BE RICOH'S VIEW THAT NO

16   EXTRINSIC EVIDENCE WOULD BE NECESSARY; HOWEVER, IF OUR --

17          THE COURT:  THEN LET'S DO THIS THEN:  I THINK THIS

18   IS THE ONLY WAY TO RESOLVE IT, AND IT WILL SAVE YOU FOLKS SOME

19   TIME AND MONEY.

20          I'M NOT GOING TO RECEIVE ANY EXPERT TESTIMONY ON

21   CONSTRUCTION OF THESE TERMS.  IF ONCE I GET INTO THE BRIEFS

22   AND IN THE HEARING IT APPEARS TO ME I NEED THAT ASSISTANCE,

23   I'LL SET UP A TIME FOR THAT.

24          MR. BROTHERS:  VERY GOOD, YOUR HONOR.

25          MR. MAVRAKAKIS:  YOUR HONOR, THIS IS TOM

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

1

1   MAVRAKAKIS.  I THINK THAT THERE -- AND OUR POSITION IS THAT

2   THERE ARE TERMS OF ART IN THIS PATENT THAT DO REQUIRE

3   TESTIMONY AND EXTRINSIC EVIDENCE.

Page 11

07.14.04 Transcript of Telephone Status Conf w. Jenkins

4          THE COURT:  YOU MIGHT BE RIGHT, BUT I'M NOT GOING

5    TO MAKE THAT DETERMINATION TODAY.  I'LL HAVE TO READ THE

6    BRIEFS MYSELF AND SEE IF I COME TO THAT CONCLUSION.

7          MR. MAVRAKAKIS:  I UNDERSTAND THAT.

8          THE COURT:  THAT WILL SAVE YOU GUYS SOME TIME AND

9    EFFORT.

10          MR. MAVRAKAKIS:  AND THERE'S SOME CASE LAW THAT

11    SAYS WHEN YOU HAVE TERMS OF ART, THAT IT'S ERROR NOT TO

12    CONSIDER THIS EXPERT TESTIMONY TO MAKE SURE.

13          THE COURT:  WHAT ARE YOU TRYING TO TELL ME?  WHAT

14    ARE YOU TRYING TO TELL ME?  I HAVE NOT -- YOU CONTINUE TO

15    ENGAGE IN THIS MANTRA, AND I'VE TOLD YOU I HAVEN'T READ THE

16    BRIEFS.  YOU MAY BE RIGHT.  I MAY HAVE TO PULL IT OFF THE

17    TABLE AND SAY, YOU KNOW, HE'S ABSOLUTELY RIGHT, IT'S A TERM OF

18    ART, I NEED ASSISTANCE, BUT I CAN'T DO THAT TODAY.

19          MR. MAVRAKAKIS:  MY ONLY CONCERN, YOUR HONOR, IS

20    THAT I INTEND TO SUBMIT A DECLARATION.  SO MY CONCERN IS THAT

21    EVERYTHING IS ON EQUAL FOOTING SO IF WE HAVE TO --

22          THE COURT:  I'M TELLING YOU NOW I'M NOT GOING TO

23    CONSIDER IT UNTIL I SEE A NEED FOR IT.  YOU MAY BE DOING THAT,

24    AND IT MAY BE IRRELEVANT.

25          MR. MAVRAKAKIS:  I UNDERSTAND THAT.

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

1

1          THE COURT:  OKAY.

2          MR. MAVRAKAKIS:  I UNDERSTAND.  I'D LIKE TO MAKE MY

3    RECORD THAT WAY, BUT MY ONLY CONCERN IS THAT IF I'M GOING TO

4    SEE AN EXPERT DECLARATION FROM THE OTHER SIDE, THAT I SEE IT

5    IN A TIMELY MANNER.

6          THE COURT:  YOU ARE THE ONE THAT'S SETTING THIS

07.14.04 Transcript of Telephone Status Conf w. Jenkins

7   ISSUE UP BY DOING WHAT YOU THINK THE LAW SAYS YOU HAVE A RIGHT

8   TO DO AND YOU NEED TO DO.  BUT THE FACT OF THE MATTER IS IF I

9   ULTIMATELY AGREE WITH YOU, THEN I WOULD HAVE TO GIVE THE OTHER

10  SIDE SOME TIME TO RESPOND, AND, OF COURSE, YOU'D HAVE A CHANCE

11  TO RESPOND TO WHAT THEY PROVIDE, AND IT JUST WILL ELONGATE THE

12  PROCESS.

13          MR. BROTHERS:  THIS IS KEN BROTHERS.  WITH THE

14  UNDERSTANDING THAT RICOH -- IF THE JUDGE FEELS THAT EXPERT

15  TESTIMONY MAY BE NEEDED, THAT RICOH COULD BE GIVEN AN

16  OPPORTUNITY TO RESPOND.

17          THE COURT:  ABSOLUTELY.

18          MR. BROTHERS:  YES, WE ARE PREPARED TO PROCEED AT

19  PRESENT WITHOUT SUBMITTING ANY EXTRINSIC EVIDENCE AND

20  PROCEEDING AS THE COURT SUGGESTED.

21          THE COURT:  RIGHT.  AND IF WE GET TO THAT ISSUE,

22  THEN I'LL DEAL WITH IT IN A WAY THAT'S FAIR TO BOTH SIDES.

23          MR. MAVRAKAKIS:  OKAY.

24          SO, YOUR HONOR, JUST ONE MORE POINT OF

25  CLARIFICATION.  IF I WANT TO PUT IN EXPERT TESTIMONY IN THE

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

1

1   FORM OF A DECLARATION, THEN I SHOULD DO SO IN MY -- IN SUPPORT

2   OF MY OPPOSITION.

3          THE COURT:  IF THAT'S WHERE YOU THINK IT

4   APPROPRIATELY GOES, SO BE IT.  I TOLD YOU I'M NOT GOING TO

5   CONSIDER IT IN THE FIRST INSTANCE, BUT YOU CAN SUBMIT IT.

6          MR. MAVRAKAKIS:  OKAY.

7          THE COURT:  ALL RIGHT.

8          MR. BROTHERS:  THANK YOU, YOUR HONOR.

9          THE COURT:  ALL RIGHT.

10          07.14.04 Transcript of Telephone Status Conf w. Jenkins
                        (PROCEEDINGS ADJOURNED.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

CERTIFICATE OF REPORTER

        I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

CERTIFY THAT THE FOREGOING PROCEEDINGS IN C 03-4660 MJJ AND

03-03-2289, RICOH COMPANY LTD. V. AEROFLEX, ET AL., AND

SYNOPSYS, INC. V. RICOH COMPANY, LTD., PAGES NUMBERED 1

THROUGH 15, WERE REPORTED BY ME, A CERTIFIED SHORTHAND

REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION

INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

**Page 14**

07.14.04 Transcript of Telephone Status Conf w. Jenkins

TRUE RECORD OF SAID PROCEEDINGS AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF

SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.

_____

JOAN MARIE COLUMBINI, CSR 5435

JOAN MARIE COLUMBINI, CSR
OFFICIAL COURT REPORTER
415-255-6842

Page 15

E-filing

FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

JUL 2 6 2004

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1

2

3

4  RICOH COMPANY, LTD.,

5          Plaintiff,

6      vs.

7  AEROFLEX INCORPORATED, et al.,

8          Defendants

9  SYNOPSYS, INC.,

10          Plaintiff,

11      vs.

12  RICOH COMPANY, LTD.,

13          Defendant

CASE NO. C-03-4669-MJJ (EMC)

CASE NO. C-03-2289-MJJ (EMC)

[PROPOSED] ORDER REGARDING
TUTORIAL AND CLAIM CONSTRUCTION
HEARING

14    Upon consideration of the Parties' joint letter dated July 9, 2004, and the telephonic status

15  conference conducted on July 14, 2004, it is HEREBY ORDERED:

16    Unless the Court orders otherwise at a later date, the Court will not consider extrinsic evidence,

17  including expert testimony, relating to the claim construction of the patent-in-suit. The claim

18  construction hearing scheduled for October 29, 2004, shall be limited to attorney argument.

19  **THE PARTIES' RESPECTIVE ALTERNATIVE PROPOSALS REGARDING THE
    TUTORIAL:**

20  **Ricoh's Proposal**

21    The tutorial scheduled for October 20, 2004, shall consist of a neutral expert presentation to the

22  Court showing how the invention in the patent-in-suit works. The expert shall only be questioned by

23  the Court. The parties are directed to meet and confer regarding the details of the tutorial presentation

24  to the Court.

25  **Synopsys And Defendants' Proposal**

26    The tutorial scheduled for October 20, 2004, shall consist of a neutral expert demonstration(s)

27  to the Court showing how the product of United States Patent No. 4,922,432 ("the '432 patent) works.

28  Synopsys and the Defendants believe that this is the product referred to in the '432 patent as the

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY
LLP

1795668 v1; 12H1_01! DOC

1  Knowledge Based Silicon Compiler (KBSC) system or software ("KBSC software").  The expert (or

2  experts) shall only be questioned by the Court.  The parties are directed to meet and confer regarding

3  the details of the demonstration(s) for the Court at the tutorial.  Prior to any such meet and confer,

4  Ricoh shall provide Synopsys and Defendants with working copies of the KBSC software or any other

5  '432 patent product(s) that will be demonstrated at the tutorial.

6       IT IS SO ORDERED.

7

8  Dated: _____7/22/2004_____

9                                              HON. MARTIN J. JENKINS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY
LLP



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

August 9, 2004

*VIA FACSIMILE AND U.S. MAIL*

Kenneth W. Brothers, Esq.
Dickstein Shapiro Morin & Oshinsky, LLP
2101 L Street NW
Washington, DC  20037

> **RE:  *Synopsys, Inc v. Ricoh Company, Ltd.***
> ***Case No. CV 03-02289 MJJ (EMC);***
> ***Ricoh Company, Ltd. v. Aeroflex, Inc.***
> ***Case No. CV 03-04669 MJJ (EMC)***

Dear Mr. Brothers:

In light of Judge Jenkins' recent order regarding the tutorial and as a first step in the meet and confer process directed by the Court, please provide a description of Ricoh's proposed tutorial presentation.  In addition, please provide a list of neutral experts you believe would be qualified to make the neutral expert presentation to the Court.  As time is short, we would like to resolve issues regarding the tutorial this week.

If you have any questions, please feel free to contact me.

Very truly yours,

Matthew E. Hocker

meh:sjc

cc:    Edward A. Meilman, Esq.

AMSTERDAM    BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC

**HOWREY**
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

*DATE:* August 9, 2004

*TO:*

1. *NAME:* Kenneth Brothers, Esq.    *COMPANY:* Dickstein Shapiro Morin & Oshinsky
   *CITY:* Washington, DC    *FAX #:* (202) 887-0689    *PHONE #:*

2. *NAME:* Edward A. Meilman, Esq.    *COMPANY:* Dickstein Shapiro Morin & Oshinsky
   *CITY:* New York, NY    *FAX #:* (212) 997-9880    *PHONE #:*

*FROM:*    *NAME:* Susan Crane for Matt Hocker

*DIRECT DIAL NUMBER:* (650) 463-8124    *USER ID:* 4099

*NUMBER OF PAGES, INCLUDING COVER:* 2    *CHARGE NUMBER:* 06816.0060.000000

☒ *ORIGINAL WILL FOLLOW VIA:*

☒ *REGULAR MAIL*    ☐ *OVERNIGHT DELIVERY*    ☐ *HAND DELIVERY*    ☐ *OTHER:*

☐ *ORIGINAL WILL NOT FOLLOW*

*SUPPLEMENTAL MESSAGE:*

Please see attached letter of this date from Matthew Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

```
x   x   x   COMMUNICATION  RESULT  REPORT ( AUG.  9. 2004  3:07PM )  x  x  x

                                                        FAX HEADER 1:
                                                        FAX HEADER 2:

TRANSMITTED/STORED : AUG. 9. 2004  3:04PM
FILE MODE        OPTION           ADDRESS                    RESULT      PAGE
--------------------------------------------------------------------------------
1594 MEMORY TX                    G3  :    (202) 887-0689    OK          2/2
                                  G3  :       2129979880     OK          2/2


----------------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                    E-2) BUSY
E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION
E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:**    August 9, 2004

**TO:**

1.  **NAME:** Kenneth Brothers, Esq.    **COMPANY:** Dickstein Shapiro Morin & Oshinsky

    **CITY:** Washington, DC    **FAX #:** (202) 887-0689    **PHONE #:**

2.  **NAME:** Edward A. Meilman, Esq.    **COMPANY:** Dickstein Shapiro Morin & Oshinsky

    **CITY:** New York, NY    **FAX #:** (212) 997-9880    **PHONE #:**

**FROM:**    **NAME:** Susan Crane for Matt Hocker

**DIRECT DIAL NUMBER:** (650) 463-8124    **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 2    **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

August 10, 2004

DIRECT DIAL 650.463.8245
FILE 06816.0060

**BY FACSIMILE AND U.S. MAIL**

Edward Meilman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

> RE:    *Synopsys, Inc v. Ricoh Company, Ltd.*
>        *Case No. CV 03-02289 MJJ (EMC)*
>        *Ricoh Company, Ltd. v. Aeroflex, Inc.*
>        *Case No. CV 03-04669 MJJ (EMC)*

Dear Ed:

I have your letter of today refusing to meet and confer on the neutral expert presentation to be presented in the tutorial. Synopsys and the Defendants do not believe that a "very plaintiff presentation" as you put it, is the "neutral expert presentation to the Court" that Judge Jenkins requires in his Order of July 26. Further, Ricoh's refusal to meet and confer violates Judge Jenkins' Order directing the parties to meet and confer regarding the details of the tutorial presentation to the Court.

Please provide Ricoh's proposal regarding how all of the parties should proceed to create and present the neutral tutorial presentation required by the Court's Order by the end of day Thursday, August 12, 2004, and a time on Friday, August 13 that Ricoh will be prepared to meet and confer regarding this issue.

Very truly yours,

Matthew E. Hocker

meh:sjc
cc:    Kenneth Brothers, Esq.

**HOWREY**
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

___

*DATE:* August 10, 2004

*TO:*

1. *NAME:* Kenneth Brothers, Esq.    *COMPANY:* Dickstein Shapiro Morin & Oshinsky

   *CITY:* Washington, DC    *FAX #:* (202) 887-0689    *PHONE #:*

2. *NAME:* Edward A. Meilman, Esq.    *COMPANY:* Dickstein Shapiro Morin & Oshinsky

   *CITY:* New York, NY    *FAX #:* (212) 997-9880    *PHONE #:*

*FROM:*    *NAME:* Susan Crane for Matt Hocker

*DIRECT DIAL NUMBER:* (650) 463-8124    *USER ID:* 4099

*NUMBER OF PAGES, INCLUDING COVER:* 2    *CHARGE NUMBER:* 06816.0060.000000

☒ *ORIGINAL WILL FOLLOW VIA:*

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ *ORIGINAL WILL NOT FOLLOW*

*SUPPLEMENTAL MESSAGE:*

Please see attached letter of this date from Matthew Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

```
×  ×  ×  COMMUNICATION RESULT REPORT ( AUG. 10. 2004  5:54PM )  ×  ×  ×

                                                        FAX HEADER 1:
                                                        FAX HEADER 2:

TRANSMITTED/STORED : AUG. 10. 2004  5:38PM
FILE MODE          OPTION          ADDRESS                      RESULT      PAGE
--------------------------------------------------------------------------------
1609 MEMORY TX                     G3  :   (202) 887-0689        OK          2/2
                                   G3  :       2129979880        OK          2/2



--------------------------------------------------------------------------------
        REASON FOR ERROR
        E-1) HANG UP OR LINE FAIL               E-2) BUSY
        E-3) NO ANSWER                          E-4) NO FACSIMILE CONNECTION
        E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:**  August 10, 2004

**TO:**

1.  **NAME:**  Kenneth Brothers, Esq.        **COMPANY:**  Dickstein Shapiro Morin & Oshinsky
    **CITY:**  Washington, DC        **FAX #:**  (202) 887-0689        **PHONE #:**

2.  **NAME:**  Edward A. Meilman, Esq.        **COMPANY:**  Dickstein Shapiro Morin & Oshinsky
    **CITY:**  New York, NY        **FAX #:**  (212) 997-9880        **PHONE #:**

**FROM:**        **NAME:**  Susan Crane for Matt Hocker

        **DIRECT DIAL NUMBER:**  (650) 463-8124        **USER ID:**  4099

**NUMBER OF PAGES, _INCLUDING_ COVER:**  2        **CHARGE NUMBER:**  06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

    ☒ REGULAR MAIL        ☐ OVERNIGHT DELIVERY        ☐ HAND DELIVERY        ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

August 12, 2004

DIRECT DIAL 650.463.8245
FILE 06816.0060

***BY FACSIMILE AND U.S. MAIL***

Edward Meilman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

> **RE:** ***Synopsys, Inc v. Ricoh Company, Ltd.***
> ***Case No. CV 03-02289 MJJ (EMC)***
> ***Ricoh Company, Ltd. v. Aeroflex, Inc.***
> ***Case No. CV 03-04669 MJJ (EMC)***

Dear Ed:

I have your letter of yesterday regarding the meet and confer on the tutorial presentation to the Court. Your letter misunderstands the hearing before Judge Jenkins, and contradicts his Order. Mr. Mavrakakis suggested each party have its own expert make a presentation regarding the claimed invention or, through a meet and confer process, possibly create a single presentation. Judge Jenkins indicated that he did not have a problem with such a tutorial, only that he wanted a better understanding so that each party did not have to spend an hour or two in the claim construction hearing showing their view of how the claimed invention works. The Judge then ordered a "*neutral expert presentation* to the Court" and directed the parties "to meet and confer regarding the *details* of the presentation."

Ricoh's proposal to use "one of Ricoh's experts in making the presentation" and to only "discuss the topics of the presentation" with us, we believe fundamentally fails to comply with the Court's Order. Our clients are very uncomfortable moving forward without having a process by which they will have input and review of the content of the tutorial presentation.

Given the parties' basic disagreement as to the process for creating the tutorial and who may present the tutorial, we do not believe it is too early to begin the Court's directed meet and confer process. Because the parties are likely to be very engaged in claim construction briefing in the coming weeks, we believe we should address the process of how to create the tutorial now, well ahead of due dates of the parties' briefs. Then after the claim construction reply brief is submitted, the parties can re-engage in earnest on the content of the tutorial the week of September 20.

Please provide Ricoh's proposal regarding how the parties should proceed to create and present the neutral tutorial presentation by the end of the day Tuesday, August 17, 2004, and a

**HOWREY** LLP
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

Edward Meilman, Esq.
August 12, 2004
Page 2

time on Wednesday, August 18 that Ricoh will be prepared to meet and confer regarding this issue. Specific points that should be addressed during the meet and confer include, at least: 1) how the expert will be selected and compensated; 2) how Ricoh, Synopsys, and the Defendants will provide input to create the tutorial; and 3) how the parties will interact with the expert in creating and presenting the tutorial.

We look forward to your prompt response.

Very truly yours,

Matthew E. Hocker

meh:sjc
cc:    Kenneth Brothers, Esq.

**HOWREY**
HOWREY SIMON ARNOLD & WHITE | ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

*DATE:* August 12, 2004

*TO:*

1. *NAME:* Kenneth Brothers, Esq.    *COMPANY:* Dickstein Shapiro Morin & Oshinsky
   *CITY:* Washington, DC    *FAX #:* (202) 887-0689    *PHONE #:*

2. *NAME:* Edward A. Meilman, Esq.    *COMPANY:* Dickstein Shapiro Morin & Oshinsky
   *CITY:* New York, NY    *FAX #:* (212) 997-9880    *PHONE #:*

*FROM:*    *NAME:*    Susan Crane for Matt Hocker

   *DIRECT DIAL NUMBER:* (650) 463-8124    *USER ID:* 4099

*NUMBER OF PAGES, INCLUDING COVER:* 3    *CHARGE NUMBER:* 06816.0060.000000

☒ *ORIGINAL WILL FOLLOW VIA:*

   ☒ *REGULAR MAIL*    ☐ *OVERNIGHT DELIVERY*    ☐ *HAND DELIVERY*    ☐ *OTHER:*

☐ *ORIGINAL WILL NOT FOLLOW*

*SUPPLEMENTAL MESSAGE:*

Please see attached letter of this date from Matthew E. Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

* * *  COMMUNICATION  RESULT  REPORT ( AUG. 12. 2004  8:02PM ) * * *

```
                                                            FAX HEADER 1:
                                                            FAX HEADER 2:
TRANSMITTED/STORED : AUG. 12. 2004  7:58PM
FILE MODE       OPTION              ADDRESS                      RESULT      PAGE
-------------------------------------------------------------------------------------
1631 MEMORY TX                      G3  :    (202) 887-0689         OK        3/3
                                    G3  :       2129979880          OK        3/3
```

```
-------------------------------------------------------------------------------------
REASON FOR ERROR
    E-1) HANG UP OR LINE FAIL                    E-2) BUSY
    E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION
    E-5) MAIL SIZE OVER
```



**HOWREY** ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

DATE:     August 12, 2004

TO:

1.  NAME:    Kenneth Brothers, Esq.                    COMPANY:   Dickstein Shapiro Morin & Oshinsky
    CITY:    Washington, DC        FAX #:  (202) 887-0689    PHONE #:

2.  NAME:    Edward A. Meilman, Esq.                   COMPANY:   Dickstein Shapiro Morin & Oshinsky
    CITY:    New York, NY          FAX #:  (212) 997-9880    PHONE #:

FROM:    NAME:    Susan Crane for Matt Hocker

         DIRECT DIAL NUMBER:   (650) 463-8124        USER ID:    4099

NUMBER OF PAGES, INCLUDING COVER:  3        CHARGE NUMBER:   06816.0060.000000

☒ ORIGINAL WILL FOLLOW VIA:

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ ORIGINAL WILL NOT FOLLOW

SUPPLEMENTAL MESSAGE:

Please see attached letter of this date from Matthew E. Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

August 17, 2004

Direct Dial 650.463.8245
File 06816.0060

**BY FACSIMILE AND U.S. MAIL**

Edward Meilman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

> **RE:** *Synopsys, Inc v. Ricoh Company, Ltd.*
> *Case No. CV 03-02289 MJJ (EMC)*
> *Ricoh Company, Ltd. v. Aeroflex, Inc.*
> *Case No. CV 03-04669 MJJ (EMC)*

Dear Ed:

I have your letter of today again refusing to meet and confer with us regarding the tutorial presentation. We disagree with Ricoh's interpretation that the Court granted Ricoh a "very plaintiff presentation" in which Ricoh unilaterally decides the content of the tutorial that Ricoh's expert will give to Judge Jenkins, and that Ricoh need only consider topics Synopsys and the Defendants raise for inclusion in the presentation. Again, Judge Jenkins ordered a "neutral expert presentation" and directed the parties "to meet and confer regarding the details of the tutorial presentation to the Court."

You are misreading the transcript of the hearing. Ricoh's position and refusal to even meet and confer are unreasonable in light of the Order and the following exchange at the hearing:

Page 7
8     MR. MAVRAKAKIS: okay. I mean, I think -- yeah, I
9     mean, I think that's what I envisioned at the claim
10    construction tutorial, is each side would have an expert
11    present background information about the patent embodiment,
12    how it works.
13         And we're certainly willing to meet and confer with
14    the other side and come to some sort of agreement as to a
15    schedule for exchanging our respective presentations, and at
16    that time we could even meet and confer and try and see if
17    maybe we can agree to one presentation. Does that sound --
18         THE COURT: I have never had that problem before,
19    what you're raising. No one has ever turned this into an
20    adversary sort of issue-oriented presentation, but if that's

**HOWREY**
HOWREY
SIMON
ARNOLD
& WHITE
ATTORNEYS AT LAW

Edward Meilman, Esq.
August 17, 2004
Page 2

21    what you want to do, I don't have a problem with it.
22         All I want to do is get a better understanding so
23    you don't have to spend an hour or two in your presentation at
24    the claims construction hearing showing me your view of how it
25    works.
Page 8
1          MR. MAVRAKAKIS:  I understand.
2          THE COURT:  That's what it intends to obviate.
3          Now, the second problem or the second issue….

Synopsys and the Defendants disagree with Ricoh's reading of the Court's Order that: 1) the tutorial "is a presentation by plaintiff;" 2) Ricoh may unilaterally select one of its experts to give the presentation; 3) Ricoh will unilaterally create the presentation; and 4) Ricoh need only discuss the "topics" that Synopsys and the Defendants raise and "consider" whether to include them in the presentation.  As I explained in my letter of August 13, Ricoh's interpretation of the Order directly contradicts Judge Jenkins' statements during the hearing and the language of the Order itself.

We would like to establish how the parties will proceed to create the neutral expert presentation now, so that there is time to select an expert and begin the process ahead of the parties' briefing schedules.  Ricoh's refusals to even meet and confer have now wasted over a week of time. (See my letter of August 9).

Further, while we suggest a fair time to deal with the issues laid out in my letter–you delay and then suggest that we only take this up during the time our claim construction brief is due.  Your position is unreasonable and your refusal to meet and confer leaves us no option but to take the issue to Judge Jenkins for resolution. While you admit that "there is a 'process' in existence, namely, the Court ordered meet and confer," Ricoh refuses to engage in it.

You must provide a time this week for a telephonic conference in which Ricoh will address the issues I outlined in my letter of August 12 on the creation of the tutorial and selection of an expert.

I look forward to your prompt response.

Very truly yours,

Matthew E. Hocker

meh:sjc
cc:    Kenneth Brothers, Esq.

DM_US\8051358.v1

**HOWREY**
HOWREY SIMON ARNOLD & WHITE LLP
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:** August 17, 2004

**TO:**

1. **NAME:** Kenneth Brothers, Esq.    **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** Washington, DC    **FAX #:** (202) 887-0689    **PHONE #:**

2. **NAME:** Edward A. Meilman, Esq.    **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** New York, NY    **FAX #:** (212) 997-9880    **PHONE #:**

**FROM:** **NAME:** Susan Crane for Matt Hocker

**DIRECT DIAL NUMBER:** (650) 463-8124    **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 3    **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew E. Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

* * * COMMUNICATION RESULT REPORT ( AUG. 17. 2004   7:07PM ) * * *

```
                                                              TTI
TRANSMITTED/STORED  AUG. 17. 2004   7:04PM
FILE MODE        OPTION              ADDRESS                    RESULT      PAGE
5138 MEMORY TX                       2#812#912028870689         OK          3/3
                                     2#812#912129979880         OK          3/3
```

```
----------------------------------------------------------------------------------
      REASON FOR ERROR
      E 1) HANG UP OR LINE FAIL                  E 2) BUSY
      E 3) NO ANSWER                             E 4) NO FACSIMILE CONNECTION
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

### FACSIMILE COVER SHEET

*DATE:* __August 17, 2004__

*TO:*

1.  *NAME:* __Kenneth Brothers, Esq.__      *COMPANY:* __Dickstein Shapiro Morin & Oshinsky__

    *CITY:* __Washington, DC__    *FAX #:* __(202) 887-0689__    *PHONE #:* _____

2.  *NAME:* __Edward A. Meilman, Esq.__      *COMPANY:* __Dickstein Shapiro Morin & Oshinsky__

    *CITY:* __New York, NY__    *FAX #:* __(212) 997-9880__    *PHONE #:* _____

*FROM:*    *NAME:* __Susan Crane for Matt Hocker__

    *DIRECT DIAL NUMBER:* __(650) 463-8124__    *USER ID:* __4099__

*NUMBER OF PAGES, INCLUDING COVER:* __3__    *CHARGE NUMBER:* __06816.0060.000000__

☒ *ORIGINAL WILL FOLLOW VIA:*

   ☒ *REGULAR MAIL*    ☐ *OVERNIGHT DELIVERY*    ☐ *HAND DELIVERY*    ☐ *OTHER:* _____

☐ *ORIGINAL WILL NOT FOLLOW*

*SUPPLEMENTAL MESSAGE:*

Please see attached letter of this date from Matthew E. Hocker.

*THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

*IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.*



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

August 18, 2004

Direct Dial 650.463.8245
File 06816.0060

***BY FACSIMILE AND U.S. MAIL***

Edward Meilman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

>   **RE:**   ***Synopsys, Inc v. Ricoh Company, Ltd.***
>             ***Case No. CV 03-02289 MJJ (EMC)***
>             ***Ricoh Company, Ltd. v. Aeroflex, Inc.***
>             ***Case No. CV 03-04669 MJJ (EMC)***

Dear Ed:

   I have your letter of today again refusing to meet and confer regarding the Court ordered neutral expert presentation to the Court. You claim you will meet and confer, but your letter evades the issues we pose and fails to give us a time to hold a meet and confer. Further, your letter today selectively quotes the transcript of the hearing in a way that is misleading and wholly ignores the Court's conclusion.

   We have been asking to meet and confer since my letter of August 9. We asked that you propose a process whereby we could select an expert and create the tutorial. You demanded we list the issues for the meet and confer, so on August 12, I sent you a letter giving you the topics for the meet and confer of ". . . at least: 1) how the expert will be selected and compensated, 2) how Ricoh, Synopsys and the Defendants will provide input to create the tutorial, and 3) how the parties will interact with the expert in creating and presenting the tutorial." (See August 12 letter Hocker to Meilman). Your letter of today ignores these issues and now demands we give you the content we would like in the tutorial for your "consideration" sometime "after Labor Day." Labor Day is September 6, and, as you know, our claim construction brief is due September 10. You disappoint me by your refusal to meet and confer and your sly suggestion that you might address the issues when you know we will be busy with our brief.

   From your letters it is clear that there are at least 4 points on which we fundamentally disagree with Ricoh, and that are ripe for adjudication. Our clients are very uncomfortable proceeding when Ricoh's position is that: 1) Ricoh unilaterally will select Ricoh's expert to present the "neutral expert presentation," 2) Ricoh unilaterally will work with its expert to create the "neutral expert presentation," 3) Ricoh will consider Synopsys' and the defendants' suggestions regarding the "neutral expert presentation," but Ricoh will

HOWREY
HOWREY
SIMON
ARNOLD
& WHITE     ATTORNEYS AT LAW

Edward Meilman, Esq.
August 18, 2004
Page 2

determine the content of the presentation, and 4) Ricoh's position is based on its belief that Judge Jenkins ordered a "very plaintiff presentation."

Synopsys and the Defendants do not agree with any of these four positions Ricoh has taken and believes these issues are ripe for the Court's resolution. A clarification of Judge Jenkins' order is needed so that we have time to select an expert, meet with that expert to create the tutorial and meet and confer with Ricoh to determine the content of the tutorial–indeed "meet and confer regarding the details of the tutorial presentation."

While Ricoh's position as I set it out above has been fairly clear, your last letter seems to signal a significant retreat from Ricoh's stated position. Your letter of today may be read to imply that Ricoh believes that the parties should each prepare a proposal and each select an expert to present the tutorial. Then at some later date, the parties would meet and confer to see if one presentation with only one expert could be agreed upon, and that if an agreement could not be reached each party would put on its own presentation with its expert. Is this what you are suggesting? If so, please let us know. We are only trying to determine Ricoh's position on these issues to determine how we should proceed. Again, a meet and confer on the issue of expert selection and the process by which all parties provide input into the neutral expert presentation may allow us to avoid bringing these issues to Judge Jenkins to resolve. We do not understand why you flatly refuse engage in the Court ordered meet and confer.

I repeat my request that Ricoh provide a time this week for a telephonic conference in which Ricoh will address the issues I outlined in my letter of August 12 on the creation of the tutorial and selection of an expert.

We look forward to your prompt response.

Very truly yours,

Matthew E. Hocker

meh:sjc
cc:     Kenneth Brothers, Esq.
        Gary Hoffman, Esq.

# HOWREY

HOWREY SIMON ARNOLD & WHITE

ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

*DATE:* August 18, 2004

*TO:*

| | | | | |
|---|---|---|---|---|
| 1. | *NAME:* Kenneth Brothers, Esq. | *COMPANY:* Dickstein Shapiro Morin & Oshinsky |
| | *CITY:* Washington, DC | *FAX #:* (202) 887-0689 | *PHONE #:* |

| | | | | |
|---|---|---|---|---|
| 2. | *NAME:* Edward A. Meilman, Esq. | *COMPANY:* Dickstein Shapiro Morin & Oshinsky |
| | *CITY:* New York, NY | *FAX #:* (212) 997-9880 | *PHONE #:* |

| | | | | |
|---|---|---|---|---|
| 3. | *NAME:* Gary Hoffman, Esq. | *COMPANY:* Dickstein Shapiro Morin & Oshinsky |
| | *CITY:* Washington, DC | *FAX #:* (202) 887-0689 | *PHONE #:* |

4. *NAME:* _____

*CITY:* _____ *FAX #* _____ *PHONE #:* _____

5. *NAME:* _____ *COMPANY:* _____

*CITY:* _____ *FAX #:* _____ *PHONE #:* _____

*FROM:* *NAME:* Susan Crane for Matt Hocker

*DIRECT DIAL NUMBER:* (650) 463-8124    *USER ID:* 4099

*NUMBER OF PAGES, INCLUDING COVER:* 3    *CHARGE NUMBER:* 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ *REGULAR MAIL*   ☐ *OVERNIGHT DELIVERY*   ☐ *HAND DELIVERY*   ☐ *OTHER:* _____

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

```
* * * COMMUNICATION RESULT REPORT ( AUG. 18. 2004  6:56PM ) * * *

                                                         FAX HEADER 1:
                                                         FAX HEADER 2:
TRANSMITTED/STORED : AUG. 18. 2004  6:51PM
FILE MODE            OPTION          ADDRESS                    RESULT        PAGE
------------------------------------------------------------------------------------
1651 MEMORY TX                       G3 :    (202) 887-0689     OK           3/3
                                     G3 :       2129979880      OK           3/3




-------------------------------------------------------------------------------------
REASON FOR ERROR
      E-1) HANG UP OR LINE FAIL              E-2) BUSY
      E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
      E-5) MAIL SIZE OVER
```



**HOWREY** SIMON ARNOLD & WHITE  ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

DATE:   August 18, 2004
TO:

| | | | | | |
|---|---|---|---|---|---|
| 1. | NAME | Kenneth Brothers, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: | Washington, DC | FAX #: (202) 887-0689 | PHONE #: |
| 2. | NAME | Edward A. Meilman, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: | New York, NY | FAX #: (212) 997-9880 | PHONE #: |
| 3. | NAME | Gary Hoffman, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: | Washington, DC | FAX #: (202) 887-0689 | PHONE #: |
| 4. | NAME | | | |
| | CITY: | | FAX # | PHONE #: |
| 5. | NAME | | COMPANY: | |
| | CITY: | | FAX #: | PHONE #: |

FROM:   NAME:   Susan Crane for Matt Hocker

DIRECT DIAL NUMBER:   (650) 463-8124        USER ID:   4099

NUMBER OF PAGES, INCLUDING COVER:   3        CHARGE NUMBER:   06816.0060.000000

☒ ORIGINAL WILL FOLLOW VIA:

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ ORIGINAL WILL NOT FOLLOW

SUPPLEMENTAL MESSAGE:

Please see attached letter of this date from Matthew Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*1177 Avenue of the Americas • 41st Floor • New York, New York 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

August 10, 2004

**Via Facsimile: 650-463-8400**
**Confirmation By Mail**

Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025

    Re:   Synopsys v. Ricoh
          Our Ref.: R2180.0171

Dear Matt:

    Your letter concerning our meet and confer yesterday is inaccurate. I told you that we had no authority yet to accept service of a subpoena on behalf of KBSC and that I would try to contact Mr. Bershader about obtaining that authority. Since I explicitly told you that I did not know if I would be able to reach him before we spoke again, it should be readily apparent to everyone that I never told you not to send out a process server. In any event, a continued meet and confer today is now unnecessary in view of Judge Chen's Order of August 9, and hence we presume it will not proceed.

    In light of Judge Chen's Order of August 9, please confirm that you are withdrawing immediately the various subpoenas seeking the KBSC software and other related software you have served, including the one to the University of South Carolina and, if there are any, other third parties you may have served but not yet notified us about. Please copy us on any letters withdrawing those subpoenas to the University and any such other third parties. The withdrawal notice to Mr. Bershader, Dr. Davis and KESV can be sent to me.

    With respect to your demand letter to Mr. Brothers that the parties address tutorial-related issues this week, as you know, the tutorial is more than two months away, and will consist of an unsworn, "very plaintiff presentation" to the Court (7/14/04 transcript at page 4). We will provide further information in due course.

Sincerely,

Edward A. Meilman

EAM/hc

Matthew E. Hocker, Esq.
August 10, 2004
Page 2


cc:   Gary Hoffman, Esq.
      Kenneth Brothers, Esq.

# FAX TRANSMISSION

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY

*Legal Innovators*

**DATE:**            August 10, 2004

**CLIENT NO.:**    R2180.0171

**MESSAGE TO:**    Matthew E. Hocker, Esq.

**COMPANY:**    Howrey Simon Arnold & White, LLP

**FAX NUMBER:**    650-463-8400

**PHONE:**    650-463-8100

**FROM:**    Edward A. Meilman

**PHONE:**    (212) 896-5471

**PAGES (Including Cover Sheet):** _____    **HARD COPY TO FOLLOW:** __X__ YES    _____ NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile Department at 212-835-1454, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited.

1177 Avenue of the Americas   New York, New York  10036-2714   Tel 212-835-1400   Fax 212-997-9880



# D I C K S T E I N   S H A P I R O   M O R I N   &   O S H I N S K Y   L L P

*1177 Avenue of the Americas • 41st Floor • New York, New York 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

August 11, 2004

**Via fax - 650-463-8400**

Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025

   Re: Ricoh v. Aeroflex; Synopsys v. Ricoh
     Our Ref.: R2180.0171

Dear Matt:

   Frankly, we do not understand the intent, basis or urgency of the demands in your letter.  The Court made it very clear during the hearing that the presentation is a presentation by the plaintiff.  We intend to use one of Ricoh's experts in making the presentation.  In due course, in a timely manner sometime in September,  we will discuss the topics with of the presentation with you.

   In response to your letter of August 10, 2004 concerning the tutorial, please point out to us where Judge Jenkins' Order requires the parties to meet and confer on the inordinately early and extremely rushed schedule that you are now demanding.  If you cannot do so, we expect you to immediately withdraw your accusation that Ricoh is violating the Court's Order.

   As I pointed out yesterday, there is more than enough time for the parties to prepare and confer sufficiently in advance of the tutorial.  Should you still feel that there is some type of dispute at this time and a need for a meet and confer, then please explain why and provide us with a detailed agenda of the points you wish to discuss since we do not understand the purpose of the meeting.  After receiving that, we can appropriately address the points that you seek to raise.  In the absence of such a detailed presentation by you, there is no reason to hold the meet and confer before a mutually convenient date in mid-September.

        Very truly yours,

        Edward A. Meilman

EAM/hc

cc: Gary Hoffman, Esq.
  Kenneth Brothers, Esq.

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*http://www.dsmo.com*

117420 v1; 2$L_01!.DOC

D I C K S T E I N   S H A P I R O   M O R I N   &   O S H I N S K Y   LLP

*1177 Avenue of the Americas • 41st Floor • New York, New York 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

August 16, 2004

**BY FACSIMILE AND U.S. MAIL**
**650-463-8400**

Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025

      Re:   Ricoh v. Aeroflex; Synopsys v. Ricoh
            Our Ref.: R2180.0171

Dear Matt:

      Stating, in your letter of August 12, 2004, what arguments Mr. Mavrakakis may have made will not change the fact that the Court made it very clear during the hearing that the presentation is a presentation by the plaintiff. There will be a "neutral expert presentation" and the parties will have a timely meet and confer concerning the presentation, as the Court directed.

      The fact that your "clients are very uncomfortable moving forward [with the Court ordered claim construction briefing] without having a process by which they will have input and review of the content of the tutorial presentation" is not a valid reason to proceed with the inordinately early conference demanded in your letter, which was not transmitted until after 8 P.M. (EDT) last Friday night. In any event, there is a "process" in existence, namely, the Court ordered meet and confer.

      There is more than enough time for the parties to prepare and confer sufficiently in advance of the tutorial, if the process is begun in September. We will contact you to establish mutually convenient date to hold the meet and confer after Labor Day.  In the meantime, we suggest that you provide us with a detailed presentation of what you desire to include in the tutorial, so that we may consider it in advance.

                       Very truly yours,

                       Edward A. Meilman

EAM/hc

cc:   Gary Hoffman, Esq.
       Kenneth Brothers, Esq.

Matthew E. Hocker, Esq.
August 16, 2004
Page 2


Bcc:    Mr. Solomon Seyoum

# FAX TRANSMISSION

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY

*Legal Innovators*

**DATE:**          August 16, 2004

**CLIENT NO.:**    R2180.0171

**MESSAGE TO:**    Matthew E. Hocker, Esq.

**COMPANY:**       Howrey Simon Arnold & White, LLP

**FAX NUMBER:**    650-463-8400

**PHONE:**         650-463-8100

**FROM:**          Edward A. Meilman / *hc*

**PHONE:**         (212) 896-5471

**PAGES (Including Cover Sheet):** _3_   **HARD COPY TO FOLLOW:** ____ YES   _X_ NO

| SENT BY: | | DATE/TIME: | |
|----------|--|------------|--|
|          |  |            |  |

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile Department at 212-835-1454, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited.

1177 Avenue of the Americas   New York, New York  10036-2714   Tel 212-835-1400   Fax 212-997-9880



# DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

August 18, 2004

**BY FACSIMILE AND U.S. MAIL**
**650-463-8400**

Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025

Re:    *Ricoh v. Aeroflex; Synopsys v. Ricoh*
Our Ref.: R2180.0171

Dear Matt:

I understand that your letter of August 17, 2004, is written for the purpose of being an attachment to your inevitable letter to the Court to request reconsideration of its denials of your propositions concerning the tutorial but even so, you cannot change the facts that (a) the Court made it very clear during the hearing that the presentation is essentially a plaintiff's presentation, and (b) Ricoh has not refused to participate in a timely meet and confer concerning the presentation.

Your very selective misreading of the transcript ignores the following:

THE COURT: . . . There seems to be some misunderstanding. . . .And, normally, what I ask for . . . is that the patent at issue, . . . that you provide a tutorial just explaining how that product works. That's all. . . .  It's a very plaintiff presentation.                                                        (pages 3-4)

\* \* \* \* \*

MR. MAVRAKAKIS: ...So would that mean that we would split time and each side would have ---
THE COURT:  Why is there a need to split time?  You see, here's the issue:  it's not adversarial.                                                        (page 4)

\* \* \* \* \*

MR. MAVRAKAKIS:  And you're saying that should be done by the plaintiff and not defendant?
THE COURT:  That's normally how it's done.
                                                                (page 6)

You specifically tried to get the Court to prohibit an initial presentation prepared by and presented by Ricoh and it refused to do so.  Moreover, your present contentions even ignore what your partner proposed, after failing to convince the Court to order a single presentation:

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*www.DicksteinShapiro.com*

Matthew E. Hocker, Esq.
August 18, 2004
Page 2

THE COURT: . . . But if you want to put on something that establishes, in your view, how it works, so be it. . . .Normally, they [the parties] meet and confer and show each other what their respective side is going to put on.

(page 6)

\* \* \* \* \*

MR. MAVRAKAKIS: . . . And we're certainly willing to meet and confer with the other side and come to some sort of agreement as to a schedule for exchange our respective presentations, and at that time we could even meet and confer and try and see if maybe we can agree to one presentation.        (page 7)

We have already made it clear to you that after Labor Day, we intend to propose a date for the exchange.  If you want to "jump the gun" and propose the date now and also provide us with your proposed outline of topics and any details you desire to see in the presentation, we have done nothing to stop you.

As to an attempt to "see if maybe we can agree to one presentation", I have asked you for details about your proposal so that we may consider them in advance of the meet and confer, and thereby make any discussion more productive.  If anyone has "wasted over a week of time", as you allege, it is the Defendants which have done so.  Rather than continue to posture for the Court, I suggest that you send us those details.

Very truly yours,

Edward A. Meilman

EAM/hc

cc:    Gary Hoffman, Esq.
       Kenneth Brothers, Esq.

# DICKSTEIN  SHAPIRO  MORIN  & OSHINSKY  LLP

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*

August 19, 2004

**Via fax**

Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025

> Re:  Ricoh v. Aeroflex; Synopsys v. Ricoh
>       Our Ref.: R2180.0171

Dear Matt:

Dear Matt:

   It has been apparent that you are bound and determined to involve Judge Jenkins with a request to reconsider his directions about the tutorial no matter what we say. Rather than refute the facts that (a) the Court made it very clear during the hearing that the presentation is essentially a "plaintiff's presentation", and (b) Ricoh has not refused to participate in a timely meet and confer concerning the presentation, your letter of August 18, 2004 continues to misrepresent our position. While it is most likely not going to deter you, let me state it one more time.

   First, the Court told both sides at the hearing that the tutorial presentation is normally done by the plaintiff's expert:

> THE COURT: [N]ormally,. . . a tutorial just explaining how that product works .
> . . [is] a very plaintiff presentation.
>        (pages 3-4)
>                          * * * * *
> MR. MAVRAKAKIS: ...So would that mean that we would split time and each side would have —
> THE COURT: Why is there a need to split time? You see, here's the issue: it's not adversarial.                 (page 4)
>                          * * * * *
> MR. MAVRAKAKIS: And you're saying that should be done by the plaintiff and not defendant?
> THE COURT: That's normally how it's done.
>                                    (page 6)

The record is thus very clear that you specifically tried to get the Court to prohibit an initial presentation prepared by and presented by Ricoh and it refused to do so. Your

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*www.DicksteinShapiro.com*

118328 v1; 2J@W01!.DOC

Matthew E. Hocker, Esq.
August 19, 2004
Page 2

present position that Ricoh cannot follow the Court's direction about " normally how it's done", is disingenuous.

The Court told us to show you what we intend to present and to confer with you about such presentation and we intend to do so. However, we are presently preparing our claim construction brief and to paraphrase your statements in your letter, you "disappoint" me by your "sly suggestion" that we do so "when you know we will be busy with our brief."

Second, after failing to convince the Court to order a single presentation, you asked for permission to present your own expert:

> THE COURT: . . . But if you want to put on something that establishes, in your view, how it works, so be it....
> (page 6)

You told the Court that an exchange of presentations would be arranged and also that you would attempt to see if a single presentation could be arranged:

> MR. MAVRAKAKIS: . . . And we're certainly willing to meet and confer with the other side and come to some sort of agreement as to a schedule for exchange our respective presentations, and at that time we could even meet and confer and try and see if maybe we can agree to one presentation.          (page 7)

In light of this record, Ricoh intends to prepare a neutral expert presentation to be delivered by an individual of its own choosing and will show you a detailed outline of what we intend to present sufficiently in advance of the presentation to permit you to make timely objections. To the extent that you provide us with comments and suggestions, we will try to incorporate them into the presentation to the extent we believe it is appropriate.  As I told you before, we have no objection to your proposing the date for the exchange now and provide us with your proposed outline of topics and any details you desire to see in the presentation.

Turning to your proposal about making an attempt to "see if maybe we can agree to one presentation", while the Court issued no such mandate, we certainly are willing to try to accomplish that objective. To that end, I have asked you for details about your proposal so that we may consider them in advance of the meet and confer, and thereby make any discussion more productive. Once we are done with our Markman brief, we can review your proposal and at that time, it would be appropriate to have a meet and confer about the presentation (which can be after you have completed your Markman brief due on September 10, if you wish). Unfortunately, you have steadfastly refused to provide us with your proposed presentation.

Matthew E. Hocker, Esq.
August 19, 2004
Page 3


        Some of the comments in your letter propose that the expert making the
presentation should be someone who has not done any work for any of the parties.
While we do not agree that there is any such requirement in view of the Court's
comment that it is normally done by plaintiff's expert, in order that we may consider
the idea, we will need a list of all experts and consultants of Synopsys and the ASIC
Defendants for at least the last five years, as well as anyone consulted in any way in
connection with the litigations, as a prerequisite to such consideration.

        We still believe a meet and confer is premature and should be delayed until after
Labor Day (or after September 10 if that interferes with your brief preparation), and
note you proposed that the meet and confer continue during the week of September 20
in your letter of August 12, 2004. Nevertheless, we can be available to take you call
tomorrow although it would have to end no later than 12:30 P.M. (our time) or if that is
not feasible, on Monday as long as the call starts by 1 P.M. (our time).



                                        Very truly yours,


                                        Edward A. Meilman


EAM/hc/mgs

cc:     Gary Hoffman, Esq.
        Kenneth Brothers, Esq.



118326 v1: 2J@W01!.DOC

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

# FAX TRANSMISSION

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY

*Legal Innovators*

**DATE:**             August 19, 2004

**CLIENT NO.:**       R2180.0171

**MESSAGE TO:**       Matthew E. Hocker, Esq.

**COMPANY:**          Howrey Simon Arnold & White, LLP

**FAX NUMBER:**       650-463-8400

**PHONE:**            650-463-8100

**FROM:**             Edward A. Meilman

**PHONE:**            (212) 896-5471

**PAGES (Including Cover Sheet):** ___4___    **HARD COPY TO FOLLOW:** __X__ YES    _____ NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|
| | | | |

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile Department at 212-835-1454, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited.



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

August 19, 2004

DIRECT DIAL 650.463.8245
FILE 06816.0060

**BY FACSIMILE AND U.S. MAIL**

Edward Meilman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

> **RE:**   ***Synopsys, Inc v. Ricoh Company, Ltd.***
> **Case No. CV 03-02289 MJJ (EMC)**
> ***Ricoh Company, Ltd. v. Aeroflex, Inc.***
> **Case No. CV 03-04669 MJJ (EMC)**

Dear Ed:

I have your letter of today finally offering a time to meet and confer regarding the selection of an expert and the creation of the tutorial. We disagree with your interpretation of the hearing and the Court's Order, and for ten days have sought a time to meet and confer so that we are able to determine Ricoh's position on these two issues. We told you we wanted to address the issues well ahead of the time for filing the parties' briefs. In your letters over this period, you repeatedly refused to provide a time to meet and confer. Now that you have finally chosen a time to meet and confer, you complain it is near the time for filing Ricoh's brief. I hope you made the complaint in an attempt at humor.

Your letter, while again shifting your position and introducing new irrelevant issues, still does not identify Ricoh's position regarding the details of the neutral expert presentation, namely the process to create and present the tutorial. Your letters have offered a range of positions Ricoh may take. We are simply attempting to ascertain which one is Ricoh's actual position so that we are able to determine if we need to bring the matter to the Court for resolution. The following appear to be the primary positions you have taken on this subject, at least from what I have gleaned from your letters:

> 1.    Ricoh unilaterally will select Ricoh's expert to present the "neutral expert presentation." Ricoh unilaterally will work with its expert to create the "neutral expert presentation." Ricoh will consider Synopsys' and the Defendants' suggestions regarding the "neutral expert presentation," but Ricoh will determine the content of the presentation. Ricoh's position is based on its belief that Judge Jenkins ordered a "very plaintiff presentation." (*See* letters dated 8/11/04 and 8/16/04, Meilman to Hocker)

**HOWREY**
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

Edward Meilman, Esq.
August 19, 2004
Page 2

2.    Ricoh unilaterally will select Ricoh's expert to present the "neutral expert presentation." Ricoh unilaterally will work with its expert to create a presentation to the Court. Ricoh will disclose only an outline of the tutorial presentation to Synopsys and the Defendants sometime prior to the October 20th hearing to allow us to object. While we may provide Ricoh "comments and suggestions, [Ricoh] will try to incorporate them into the presentation to the extent [Ricoh] believe[s] it is appropriate." (*See* letter dated 8/19/04, Meilman to Hocker)

3.    Ricoh unilaterally will select Ricoh's expert to present the "neutral expert presentation." Ricoh will create its tutorial presentation and Synopsys and the Defendants will create their tutorial presentation. Synopsys and the Defendants must disclose their tutorial presentation to Ricoh for its "consideration." Ricoh will treat our presentation as comments and suggestions, and try to incorporate them into the presentation to the extent Ricoh believes is appropriate. Ricoh will then disclose only an outline of its tutorial presentation to Synopsys and the Defendants sometime prior to the October 20th hearing, to allow us to timely object. (*See* letter dated 8/16/04 and 8/19/04, Meilman to Hocker)

4.    Ricoh will create its tutorial presentation and Synopsys and the Defendants will create their tutorial presentation. The parties will exchange these presentations in mid-September, and then meet and confer to work out the details to make one presentation. If the parties cannot agree on the details of a neutral expert presentation, then the parties will each present their "adversary sort of issue-oriented presentation" with which Judge Jenkins said he did not have a problem. (7/14/2004 Hearing transcript, p. 7-8) (*See* letter dated 8/18/04, Meilman to Hocker)

We will call you at your proposed time of 10:00 a.m. PDT Monday morning (1:00 p.m. your time). On Friday, please let us know which of the above positions is Ricoh's true position so that we are able to make our meet and confer on Monday morning more productive.

Very truly yours,

Matthew E. Hocker

meh:sjc
cc:    Kenneth Brothers, Esq.
       Gary Hoffman, Esq.



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:**  August 19, 2004

**TO:**

1.  NAME:  Kenneth Brothers, Esq.          COMPANY:  Dickstein Shapiro Morin & Oshinsky
    CITY:  Washington, DC          FAX #:  (202) 887-0689          PHONE #:

2.  NAME:  Edward A. Meilman, Esq.          COMPANY:  Dickstein Shapiro Morin & Oshinsky
    CITY:  New York, NY          FAX #:  (212) 997-9880          PHONE #:

3.  NAME:  Gary Hoffman, Esq.          COMPANY:  Dickstein Shapiro Morin & Oshinsky
    CITY:  Washington, DC          FAX #:  (202) 887-0689          PHONE #:

4.  NAME:
    CITY:          FAX #          PHONE #:

5.  NAME:          COMPANY:
    CITY:          FAX #:          PHONE #:

**FROM:**  NAME:  Susan Crane for Matt Hocker

DIRECT DIAL NUMBER:  (650) 463-8124          USER ID:  4099

NUMBER OF PAGES, _INCLUDING_ COVER:  3          CHARGE NUMBER:  06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL     ☐ OVERNIGHT DELIVERY     ☐ HAND DELIVERY     ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

```
x  x  x  COMMUNICATION  RESULT  REPORT  ( AUG. 19. 2004  8:22PM )  x  x  x

                                                      FAX HEADER 1:
                                                      FAX HEADER 2:

TRANSMITTED/STORED : AUG. 19. 2004  8:18PM
FILE MODE        OPTION              ADDRESS                    RESULT        PAGE
-----------------------------------------------------------------------------------
1659 MEMORY TX                       G3  :   (202) 887-0689      OK           3/3
                                     G3  :      2129979880       OK           3/3



---------------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL              E-2) BUSY
E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:**  August 19, 2004

**TO:**

1.  **NAME:** Kenneth Brothers, Esq.          **COMPANY:** Dickstein Shapiro Morin & Oshinsky
    **CITY:** Washington, DC    **FAX #:** (202) 887-0689    **PHONE #:**

2.  **NAME:** Edward A. Meilman, Esq.         **COMPANY:** Dickstein Shapiro Morin & Oshinsky
    **CITY:** New York, NY    **FAX #:** (212) 997-9880    **PHONE #:**

3.  **NAME:** Gary Hoffman, Esq.              **COMPANY:** Dickstein Shapiro Morin & Oshinsky
    **CITY:** Washington, DC    **FAX #:** (202) 887-0689    **PHONE #:**

4.  **NAME:**
    **CITY:**    **FAX #**    **PHONE #:**

5.  **NAME:**          **COMPANY:**
    **CITY:**    **FAX #:**    **PHONE #:**

**FROM:**    **NAME:**  Susan Crane for Matt Hocker

    **DIRECT DIAL NUMBER:**  (650) 463-8124    **USER ID:**  4099

**NUMBER OF PAGES, INCLUDING COVER:** 3    **CHARGE NUMBER:**  06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.



# DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

August 20, 2004

**BY FACSIMILE**
**650-463-8400**

Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, 94025
CA

Re:    Ricoh v. Aeroflex
       Synopsys v. Ricoh
       Our Ref.: R2180.0171

Dear Matt:

Your letter of August 19, 2004 continues to mischaracterize Ricoh's position and the correspondence between us. Indeed, I am bemused by your request for a statement "so that we are able to make our meet and confer . . . more productive" at the same time you have refused to provide information about your proposal which I requested, time and time again, for precisely the same purpose.

You ask which of the positions stated in your letter is Ricoh's. The answer is none. What you have set forth is your attempt to "spin" in advance of asking the Court to reconsider its denial of your request about the tutorial.

Ricoh's position is, and always has been, as follows.

In accordance with the statements by the Court that the presentation is normally made only by the plaintiff and is simply to explain how the disclosed product (process) works, Ricoh will prepare and have its expert provide a neutral presentation to the Court. In the course of preparing the presentation, Ricoh will consider any matter that the Defendants (including Synopsys) desire to have included and for that reason have requested that Defendants send us a list (or detailed outline) of such items. Well in advance of the tutorial presentation, probably by the middle of September, Ricoh will provide the Defendants with a detailed outline of the presentation for their review and subsequently, Ricoh will have a meet and confer with the Defendants about what will be in the presentation. Since the Court has stated that it is a "very plaintiff's presentation," Ricoh understands this to mean that plaintiff will make the presentation.

Defendants have proposed that the parties attempt to select a neutral expert, independent of the parties, to make the presentation. However, Defendants have

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*www.DicksteinShapiro.com*

118514 v1; 2Y3201l.DOC

RECEIVED TIME   AUG. 20.  12:23PM

Matthew E. Hocker, Esq.
August 20, 2004
Page 2

refused to provide any details about their proposal despite several requests and in addition, have stated that they will not discuss their proposal during the time that the Defendants are engaged in the preparation of their Markman Brief.  They insist, however, that Ricoh must provide a detailed explanation about all of the possible parameters of the Defendants' proposal immediately even though Ricoh is currently engaged in preparing its Markman Brief.

Despite the Defendants refusal to provide the requested details about their proposal, Ricoh has tried to advance any discussion about the Defendants' proposal. In that connection, Ricoh has asked, in order to determine if an independent expert can be readily located, that Defendants provide a list of people they have indicated must be excluded if their proposal was adopted, namely all of the technical experts, consultants, and other persons who have been engaged or contacted by any of the Defendants (including Synopsys) for the any matters related to the litigation or otherwise engaged in any capacity by any Defendant (including Synopsys) during the past 5 years. Defendants have ignored this request.

Very truly yours,

Edward A. Meilman

EAM/hc

cc:   Gary Hoffman, Esq.
      Kenneth Brothers, Esq.

**HOWREY** LLP
HOWREY
SIMON
ARNOLD
& WHITE
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

August 23, 2004

DIRECT DIAL 650.463.8245
FILE 06816.0060

**BY FACSIMILE AND REGULAR MAIL**

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky, LLP
2101 L Street, N.W.
Washington, DC 20037-1526

Re:     ***Ricoh Co., Ltd v. Aeroflex, et al***
        **Case No. CV 03-04669 MJJ (EMC)**
        ***Synopsys v. Ricoh Co., Ltd.***
        **Case No. CV 03-02289 MJJ (EMC)**

Dear Mr. Hoffman:

This letter is to confirm our understanding reached following today's telephonic meet and confer.

As Ricoh will now commit to providing a detailed outline of its proposed tutorial presentation including the points it intends to make and identification of the support for each point, we have for the time being agreed not to bring this matter to Judge Jenkins for resolution. We agreed to make a mutual exchange of proposed tutorials on or about September 15. You further agreed to check with your people and provide us with a firm deadline for the exchange, in writing, this week. In any event, the exchange date would not be delayed more than one or two days after September 15. We also agreed to begin the meet and confer process on September 22 to see if the parties could agree as to the content of the presentation. Once again, you will check with your people and provide us with a firm deadline, in writing, this week.

While agreeing that a further meet and confer process in September is needed to work out the content of the presentation and who would make the presentation to the Court, we both reiterated our basic positions as they stand now.

Our position is that we believe both parties must agree on the content of the presentation, and that Ricoh alone will not make this determination. Further, if there is a lone presenter, it should not be Ricoh's paid expert. We believe the Judge Jenkins' Order contemplated an adversarial, issue-oriented presentation. If Ricoh and Synopsys and the Defendants cannot come to an agreement as to the content of the presentation and we find your chosen expert, whom you have yet to disclose to us, will not adequately present our view of the patented invention, then we will have no choice but to demand that a portion of the neutral expert presentation be by an expert of our choosing on the subject matter we determine appropriate.



Gary M. Hoffman, Esq.
August 23, 2004
Page 2

You stated that your position is as stated in Mr. Meilman's letter of August 20, 2004. The only point of that position you were willing to discuss further at this time was the consideration of a neutral expert. We discussed the possibility of setting a date for exchange of a list of each party's proposed neutral expert presenters, however, Mr. Meilman said Ricoh would not agree to a date for such an exchange.

On another issue, we confirmed with you receipt of my letter to Ms. Allen notifying Ricoh that its request to allow its proposed consultant, Donald Soderman of Santa Clara, California, access to our clients' confidential information was deficient. Ricoh's request failed to disclose the information as directed by the Protective Orders. (*See* August 12 letter Hocker to Allen). Mr. Hoffman said he was aware of my letter and would contact Ms. Allen. Mr. Hoffman further confirmed that Dr. Soderman has not had, and will not have, access to confidential materials from Synopsys or the Defendants until the issue is resolved. Thank you for confirming receipt of my letter and we reiterate that Dr. Soderman should not have access to our clients' confidential materials until all of the required information is disclosed and we have 10 days from that disclosure to investigate the issues and make an objection, if necessary.

We look forward to your prompt response confirming September 15 as the exchange date of the detailed outlines of the presentations, and one week later, September 22, as the day to meet and confer on forming one neutral expert presentation.

Very truly yours,

Matthew E. Hocker

meh:sjc
cc:    Edward Meilman, Esq.

DM_US\8054108.v1



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:** August 23, 2004

**TO:**

1. **NAME:** Gary Hoffman, Esq.          **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** Washington, DC     **FAX #:** (202) 887-0689     **PHONE #:**

2. **NAME:** Edward A. Meilman, Esq.          **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** New York, NY     **FAX #:** (212) 997-9880     **PHONE #:**

**FROM:**    **NAME:** Susan Crane for Matt Hocker

**DIRECT DIAL NUMBER:** (650) 463-8124     **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 3     **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew E. Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

```
*  *  *   COMMUNICATION  RESULT  REPORT  ( AUG. 23. 2004   7:16PM )  *  *  *

                                                        FAX HEADER 1:
                                                        FAX HEADER 2:
TRANSMITTED/STORED : AUG. 23. 2004  7:11PM
FILE MODE        OPTION              ADDRESS                RESULT        PAGE
-------------------------------------------------------------------------------
1667 MEMORY TX                 G3  :   (202) 887-0689        OK          3/3
                               G3  :      2129979880         OK          3/3




-------------------------------------------------------------------------------
REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL              E-2) BUSY
  E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
  E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:** August 23, 2004

**TO:**

1. **NAME:** Gary Hoffman, Esq.        **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** Washington, DC        **FAX #:** (202) 887-0689        **PHONE #:**

2. **NAME:** Edward A. Meilman, Esq.        **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** New York, NY        **FAX #:** (212) 997-9880        **PHONE #:**

**FROM:**    **NAME:** Susan Crane for Matt Hocker

**DIRECT DIAL NUMBER:** (650) 463-8124        **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 3        **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew E. Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

D I C K S T E I N   S H A P I R O   M O R I N   *&*   O S H I N S K Y   LLP

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*

*Writer's Direct Dial: (202) 828-2228*
*E-Mail Address: HoffmanG@dsmo.com*

August 24, 2004

**BY FACSIMILE AND U.S. MAIL**
<u>(650) 463-8400</u>
Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025

Re:     *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
        Our Ref.: R2180.0171

Dear Matthew:

        We have received your letter of last night, August 23, 2004.  Unfortunately, your letter significantly misrepresents many aspects of our telephone conversation.

        First, Ricoh has always been committed to providing the Defendants and Synopsys with a detailed outline of its proposed tutorial presentation.  We have previously told you that in writing and this commitment was reiterated during our telephone conference yesterday.  Consequently, your indication that it is only "now" that Ricoh is making such commitment is flatly wrong and nothing more that posturing.  Further, we never discussed whether the outline would contain an identification of the support for each point nor whether the ASIC Defendants and Synopsys should or should not take any matter to the Court at this time for "resolution" and your decision to take or not to take such matter to the Court is obviously in your discretion and clearly not dependant upon the fact that we have always been committed to providing a detailed outline of the proposed tutorial presentation.

        Second, you made a commitment for the first time for a mutual exchange of proposed tutorials and answered our prior request to propose a date.  We discussed on or about September 15, but indicated that if it was necessary for this date to slide a few days we would let you know several days in advance.  However, since you ask for a date certain, we said we would check and get back to you.  Due to the religious holidays that week, after speaking with people, we will need to set Monday, September 20, 2004, as the fixed date for a mutual exchange of proposed tutorials.  This exchange can either take place by both of us agreeing to fax the tutorials to each other at 7:00 p.m. (ET) on September 20 or alternatively, each of us sending the proposed tutorials by overnight courier so that they are received on the morning of September 21.

        Third, we agreed that we should try to have the meet and confer on or about September 22.  After checking, due to some scheduling issues with other matters,  we propose that we set this meet and confer for September 24 at 1:00 p.m. (ET) and we will

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*www.DicksteinShapiro.com*

Matthew E. Hocker, Esq.
August 24, 2004
Page 2

be glad to initiate the call if you tell us who will be on the line and which numbers to call you at.

Fourth, you stated, and the fourth paragraph of your letter reconfirms, that it is the position of the ASIC Defendants and Synopsys that the presentation should be "an adversarial, issue-oriented presentation." We immediately challenged your position and pointed out that that position is directly contrary to the Court's statements during the hearing. We once again call your attention to the Court's statement on page 4 of the transcript where Judge Jenkins said "It's not adversarial."

Fifth, as to the expert presentation, we explained to you that, because of the large number of people that have been engaged and or contacted and or consulted for Synopsys and/or the ASIC Defendants and/or Ricoh, we believe that it will be difficult, if not impossible, to obtain an expert who is truly independent of the parties. However, we requested you to either send us a list of proposed names or a list of all the people that you have consulted with or otherwise engaged in any manner (see our prior letter of August 20, 2004), but during our conference call you indicated that you would not do so. We see no logic for Ricoh to propose a date for a mutual exchange until we receive such information from you since there is no logical reason for us to spend the time to contact a large number of potential experts only to find out that you have already engaged and consulted with them; hence we requested a list of all of the people you have contacted or engaged as experts or consultants or for information and all the people who have consulted for any of the ASIC Defendants or Synopsys during the past 5 years.

Next, in connection with the fourth paragraph of your letter you make the comment about demanding "that a portion of the neutral expert presentation be by an expert of [Synopsys' and ASIC defendants'] choosing on the subject matter we deem appropriate." Once again your position is contrary to the Court's comments and Order.

If you are continuing to insist that you be able to take positions inconsistent with the Court's comments during the hearing with the Court and the Court's Order, then you obviously will need to seek the Court's permission to do so. Clearly, we cannot prevent you from asking the Court for reconsideration of its Order, nor have we in any way reached any agreement that precludes the ASIC defendants and Synopsys from seeking any modification of the Court's Order or positions stated during the hearing that we had with the Court.

With respect to the penultimate paragraph of your letter, the issue of any objections that you have to Dr. Soderman will be addressed in a separate letter.

Matthew E. Hocker, Esq.
August 24, 2004
Page 3


However, in the interim we affirm that Dr. Soderman has not been given any access to
confidential materials from Synopsys or the ASIC defendants that have been provided
to us in this litigation.

Very truly yours,

Gary M. Hoffman

GMH/cz

cc:     Edward Meilman, Esq.
        Kenneth Brothers, Esq.

# FAX TRANSMISSION

**DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY**
LLP

**DATE:**          August 24, 2004

**CLIENT NO.:**    R2180.0171

**MESSAGE TO:**    Matthew E. Hocker, Esq.

**COMPANY:**       Howrey Simon Arnold & White, LLP

**FAX NUMBER:**    650-463-8400

**PHONE:**

**FROM:**          Gary M. Hoffman          **TIMEKEEPER NO.:**     0161

**PHONE:**         202-828-2228

**PAGES (Including Cover Sheet):**    4    **HARD COPY TO FOLLOW:**    x   YES    _____  NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile
Department at 202-861-9106, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information
that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any
dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated

2101 L Street NW   Washington, DC   20037-1526   Tel 202-785-9700   Fax 202-887-0689



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

August 31, 2004

*VIA FACSIMILE AND U.S. MAIL*

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky, LLP
2101 L Street NW
Washington, D.C.  20037

> RE:  **Ricoh Company, Ltd. v. Aeroflex, Inc., et al.**
> **Case No. CV 03-04669 MJJ (EMC)**
> **Synopsys, Inc. v. Ricoh Company, Ltd.**
> **Case No. C 03-04669 MJJ (EMC)**

Dear Mr. Hoffman:

I have your letter of August 24 in which you make numerous misstatements and mischaracterizations regarding our meet and confer on August 23.

First, over the course of our correspondence Ricoh has fluctuated dramatically from "a very plaintiff presentation," where we had no role, to a position more reflective of the hearing before Judge Jenkins and his Order directing the parties to meet and confer regarding a "neutral expert presentation." The main points of Ricoh's various positions were recorded in my letter to Mr. Meilman written prior to our meet and confer, asking him to please choose a position so that we might determine if we needed to bring the matter to the Court for resolution. (*See* letter Hocker to Meilman, August 19, 2004). The correspondence alone exposes Ricoh's sliding positions and lack of commitment. Your statements to the contrary in your letter, to use your phase, are "wrong and nothing more than posturing."

Second, in the August 23 meet and confer, we began with an exchange date of September 10, which later in the call you softened to be "sometime between the tenth and the fifteenth." Finally, you changed again to September 15, but not more than a day or so beyond that. Now in writing, you commit Ricoh to an exchange on September 20. Using your final choice of exchange dates, we should send our proposed outlines of the tutorials to each other by fax at 7:00 p.m. E.D.T. on September 20, 2004. Please also forward your proposal by overnight courier for delivery on the morning of September 21 if it includes supporting documents, diagrams or other details that may be lost or distorted by the facsimile process. We will then have a meet and confer conference on September 24 as you suggest, but please move the start time back one hour to 11:00 a.m. (PDT).

Third, regarding Judge Jenkins' statement in conclusion to Mr. Mavrakaksis that:

> . . . No one has ever turned this into an adversary sort of issue oriented presentation, but if that is what you want to do, I do not have a problem with it.

All I want to do is get a better understanding so you do not have to spend an hour or two in your presentation at claims construction hearing showing me your view of how it works. (7.14.04 Reporter's Transcript of Telephonic Proceedings 8:19-25)

Judge Jenkins' conclusion on the issue seems clear to us, and we do not understand your taking quotes out of context to support a view contrary to Judge Jenkins' Order for a balanced, albeit adversarial or issue-oriented, "neutral expert presentation."

Fourth, while you take the better part of a page to say it in your letter–we understand Ricoh will not set a date to exchange a list of names of experts in an attempt to select a neutral expert to make the "neutral expert presentation." Your attempt to cloud this simple issue with unfounded statements and ridiculous demands is disappointing.

Finally, we expect that any disputes about specific points in the parties' proposed presentations will be brought out in the meet and confer after the exchange of detailed tutorial outlines.[1] At that late date, however, by refusing to engage in the process to select a neutral expert, Ricoh will have very likely foreclosed the possibility of bringing such an expert up to speed in time for the neutral expert presentation. If it appears that Ricoh's paid, and as yet undisclosed, expert will not adequately present Synopsys' and the Defendants' points during the "neutral expert presentation," we will be forced to take the steps necessary to have an expert of our choosing present these points.

Very truly yours,

Matthew E. Hocker

meh:sjc

cc:    Edward A. Meilman, Esq.

---

[1] Since you did not object to the portion of my confirming letter drawn from our discussion that the detailed outline will include each point the party intends to make and the support for each point, I take it that you have not reconsidered Ricoh's position on this issue since our conference and that Ricoh will produce such a detailed outline for exchange on September 20.



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:** August 31, 2004

**TO:**

1. **NAME:** Gary Hoffman, Esq.        **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** Washington, DC    **FAX #:** (202) 887-0689    **PHONE #:**

2. **NAME:** Edward A. Meilman, Esq.    **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** New York, NY    **FAX #:** (212) 997-9880    **PHONE #:**

**FROM:**    **NAME:**    Susan Crane for Matt Hocker

**DIRECT DIAL NUMBER:** (650) 463-8124    **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 3    **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL    ☐ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew E. Hocker.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

```
x  x  x  COMMUNICATION RESULT REPORT ( AUG. 31. 2004  4:44PM )  x  x  x

                                                        FAX HEADER 1:
                                                        FAX HEADER 2:

TRANSMITTED/STORED : AUG. 31. 2004  4:39PM
FILE MODE        OPTION            ADDRESS                  RESULT      PAGE
--------------------------------------------------------------------------------
1701 MEMORY TX                 G3  :    (202) 887-0689       OK         3/3
                               G3  :      2129979880         OK         3/3
```

```
--------------------------------------------------------------------------------
REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL          E-2) BUSY
  E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION
  E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

### FACSIMILE COVER SHEET

**DATE:** August 31, 2004

**TO:**

1. **NAME:** Gary Hoffman, Esq.     **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** Washington, DC     **FAX #:** (202) 887-0689     **PHONE #:**

2. **NAME:** Edward A. Meilman, Esq.     **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** New York, NY     **FAX #:** (212) 997-9880     **PHONE #:**

**FROM:**     **NAME:** Susan Crane for Matt Hocker

**DIRECT DIAL NUMBER:** (650) 463-8124     **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 3     **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

   ☒ REGULAR MAIL     ☐ OVERNIGHT DELIVERY     ☐ HAND DELIVERY     ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Matthew E. Hocker.

*THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

# DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*

Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

September 2, 2004

**BY FACSIMILE AND U.S. MAIL**
**(650) 463-8400**

Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025

      Re:    *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
           <u>Our Ref.: R2180.0171</u>

Dear Matt:

      We have received your letter of last night, August 31, 2004. Unfortunately, your letter significantly misrepresents aspects of Ricoh's position. At this point, we see no purpose in trying to reiterate our position to you since it has been consistent and is clearly set out in our prior letter of August 24.

      From your letter, we understand that you want to make the exchange of the outlines of the tutorials by fax to each other at 7:00 p.m. (ET) on September 20 with a follow up of sending the proposed tutorials by overnight courier so that they are received on the morning of September 21. This is acceptable to us.

      Next, we agree that the meet and confer regarding the tutorial will be on September 24 at 2:00 p.m. (ET) and we will be glad to initiate the call if you tell us who will be on the line and which numbers to call you at.

      With respect to the issue of trying to select a neutral expert, you have misrepresented out position, which we have clearly set out in our prior letter. If you seriously want to explore such an approach, then we again request that you to either send us a list of any proposed names that you have if you so desire or a list of all the people that you have consulted with or otherwise engaged in any manner as set out in our August 24 letter.

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*www.DicksteinShapiro.com*

1817304 V1; 12Y8_01!.DOC

Matthew E. Hocker, Esq.
September 2, 2004
Page 2


   With respect to footnote 1 of your letter, we do not understand what point you are trying to make. We have stated before that the parties will exchange detailed outlines with supporting information from the file history for presentation in the tutorial. If you disagree with this, please let us know immediately.


        Very truly yours,


        Gary M. Hoffman

GMH/cz

cc: Edward Meilman, Esq.
  Kenneth Brothers, Esq.

# FAX TRANSMISSION

**DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP**

**DATE:** September 2, 2004

**CLIENT NO.:** R2180.0171

**MESSAGE TO:** Matthew E. Hocker, Esq.

**COMPANY:** Howrey Simon Arnold & White, LLP

**FAX NUMBER:** 650-463-8400

**PHONE:**

**FROM:** Gary M. Hoffman          **TIMEKEEPER NO.:** 0161

**PHONE:** 202-828-2228

**PAGES (Including Cover Sheet):** 3     **HARD COPY TO FOLLOW:** __x__ YES     _____ NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile Department at 202-861-9106, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated

1814103 v1; 12VRR01I.DOC

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 572-2656
E-Mail Address: AllenD@dsmo.com

September 20, 2004

**VIA FACSIMILE AND U.S. MAIL**
Matthew E. Hocker, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA 94025

Re:     *Synopsys Inc. v. Ricoh Company, Ltd*
        *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
        Our Ref.: R2180.0171

Dear Matthew:

As we agreed, attached is Ricoh's outline of the tutorial presentation for the Markman proceedings.

Sincerely,

DeAnna Allen

Enclosure

cc:     Thomas C. Mavrakakis, Esq. (w/enclosure)
        Christopher Kelley, Esq. (w/enclosure)

1177 Avenue of the Americas • New York, NY 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.DicksteinShapiro.com

September 20, 2004
6:55 pm EDT

I.  Introduction

  A. Dr. Donald A. Soderman

  B. **[VISUAL]** Background

    1. Education

    2. Work Experience

    3. Experience in ASIC Industry

II.  ASICs

  A. **[VISUAL]** ASIC- as described in the '432 patent is a specialized integrated circuit chip "designed to perform a specific function."[1]

  B. **[VISUAL]** Non-ASIC "standard, general purpose integrated circuit chips, such as microprocessors, memory chips, etc."[2]

  C. **[VISUAL]** Many products common in today's market use ASICs.

  D. **[VISUAL]** ASICs have many advantages over general purpose ICs including that ASICs are smaller, have lower cost and have higher performance.

III.  Evolution of ASIC

  A. Around 1980, ASICs were simple circuits that very few people were using and even fewer were designing.

  B. **[VISUAL]** "In the design process, the VLSI design engineer will consider the particular objectives to be accomplished and tasks to be performed by the integrated circuit and will create structural level design specifications which define the various hardware components required to perform the desired function, as well as the interconnection requirements between these components."[3]

  C. **[VISUAL]** Structural level hardware descriptions are descriptions of the architecture or structure (e.g., logic gates, flip flops, etc.) of the circuit desired to be produced as an ASIC, and an example of such a description can be seen from Fig. 1b of the '432 patent.[4] Frequently this done by implicit or explicit selection of gates.

  D. **[VISUAL]** In the late 1980's advances in very large scale integrated (VLSI) circuits allowed more highly complex circuits to be integrated on a single chip.  This led to the use of ASICs in rapidly expanding list of specific applications, at a faster

1

September 20, 2004
6:55 pm EDT

design rate, in larger quantities.[5]  This led to the need to resolve the following PROBLEMS:

1.  **[VISUAL]**  "There is only a small number of VLSI designers who possess the highly specialized skills needed to create structural level integrated circuit hardware descriptions."[6]

2.  **[VISUAL]**  Even with then existing CAD tools that facilitate parts of the process (i.e., layout design), "the design process is time consuming."[7]  For example, using such CAD tools, the manufacture of an ASIC for a video camera could require 9 months to a year for design, and an additional 3 or more months for production.  At times, the design portion of the process could take longer than a year and sometimes nearly the life cycle of the ASIC.  (The life cycle of any particular ASIC was often only a few years.)

3.  **[VISUAL]**  "[T]he probability of error is also high because of human involvements"[8] and the cost even greater.  Designer's working at the structural level commonly made errors in their design specifications, such as choosing the wrong hardware components for a schematic or drawing the wrong wire connections between hardware components in a schematic.  An error in the original design, for example, could require months of redesign effort.  Errors often were not detected until product testing, after which the manufacturing team needed to find the error, make the design change, release new mask sets, and produce new wafers.

IV.     Overview of Manufacturing

A.      **[VISUAL]**  The manufacturing process is made up of two parts: design and production.

B.      **[VISUAL]**  In prior art ASIC design, designers commonly created structural descriptions of the circuit desired to be produced.  The individual circuit components described in the structural descriptions (Fig. 1b), however, are not individually assembled and placed on the ASIC.  Instead, the component circuitry is built-up in layers of complex patterns of semiconductor material (e.g., silicon dioxide, polysilicon, metal, etc.).

C.      **[VISUAL]**  From the structural description, ASIC designers would create a physical description (known as a "layout") needed to directly produce the ASIC.[9]  An exemplary layout representation is shown in Fig. 1c of the '432 patent.  The layout representation provides the physical ("geometrical") data needed to produce the ASIC.  In particular, the layout is made up of a series of "mask" layers or levels.  Each "mask" stencils a pattern for a given layer of the ASIC.  When taken together,

2

September 20, 2004
6:55 pm EDT

the different circuit patterns (or mask levels) make up the circuitry of the desired ASIC. (The data describing the layout representation is known as "mask data" because it describes the different mask levels used in producing the ASIC.)

D.    Production of the ASIC:

1.    **[VISUAL]** In the production of ASICs, as with other integrated circuit chips, a piece of semiconductor material is provided as a base or initial layer (known as a "substrate") on which other semiconductor material is then deposited. Typically, the base semiconductor material is silicon. The piece of semiconductor material, silicon for example purposes, is typically in the form of a thinly sliced "wafer".

2.    **[VISUAL]** A netlist comprising data describing structural ASIC components is directly used to create the layout for the mask data from which mask level patterns are created. As part of ASIC production, each of the mask level patterns generated from the netlist is transferred to the wafer. Each mask level pattern corresponds to one layer for the components that comprise the ASIC. To produce the ASIC as designed, the silicon wafer is covered with a first layer of material that does not conduct electricity (for example "silicon dioxide"). In order to build a first layer for the ASIC components, light-sensitive material (known as "photoresist") is placed over the silicon dioxide. A first mask level is placed over the wafer and light (typically ultraviolet light) is transmitted through the pattern in the mask level to the photoresist on the wafer. The photoresist is chemically responsive to the light so that selected areas corresponding to the mask level pattern are formed in the photoresist.

3.    **[VISUAL]** A process known as "etching" is applied to the photoresist. Etching transfers the mask level pattern in the photoresist so that a corresponding pattern of selected areas are formed in the layer of silicon dioxide below. Based on the pattern formed in the oxide, a layer of semiconductor material for the ASIC components is produced on the ASIC.

4.    **[VISUAL]** In order to produce a next layer for the ASIC components, the previous, patterned layer of oxide is removed and replaced with a new, unpatterned oxide layer. A layer of polysilicon and a new layer of photoresist are applied. Using a second mask level pattern, the process repeats the steps of transferring the mask level pattern to the photoresist layer and then to the oxide layer to create corresponding selected areas. A second layer of semiconductor material for the ASIC components corresponding to the second mask level is

3

September 20, 2004
6:55 pm EDT

then produced based on the oxide layer pattern.  Each
subsequent layer of semiconductor material for the
ASIC components is produced in a similar manner using
the successive mask levels generated from the mask data
and netlist.

V.       Process Patented in '432 Patent

  A.    Advantages:

    1.    **[VISUAL]** The patented process simplifies the process
          of designing and producing ASICs and makes the
          process quicker, less expensive and more reliable.
          Using the invention, a designer is able to define the
          ASIC using architectural independent functional
          descriptions (e.g., functional HDLs (Behavioral level
          descriptions or Functional RTL), and functional
          graphical representations) as contrasted to structural
          (architecturally dependent) components (e.g., structural
          schematics, structural flowcharts, structural netlists,
          structural RTL, and Boolean Equations).  The invention
          uses the architecture independent functional
          representations and "generates therefrom the detailed
          information needed for directly producing an application
          specific integrated circuit (ASIC) to carry out those
          specific functions."[10]

    2.    **[VISUAL]** The patented process, "for the first time,
          opens the possibility for the design and production of
          ASICs by designers, engineers and technicians who may
          not possess the specialized expert knowledge of a highly
          skilled VLSI design engineer."[11]

  B.    Process:

    1.    Describing Actions and Conditions-

      a.    **[VISUAL]** A designer prepares a description
            (known as a "specification") of the function or
            behavior of the ASIC (or portion) that is to be
            produced.  The input description "can be defined
            in a suitable manner" or format.[12]

      b.    **[VISUAL]** A graphical example of the
            functional input description is a flowchart.  The
            patent also states that the same specification can
            be provided in a textual format, such as in a list
            form that provides a listing of statements
            describing the desired functions to be performed
            by the ASIC.

      c.    **[VISUAL]** In accordance with the patented
            process, the designer need not be familiar with
            the hardware components or other structure that

4

September 20, 2004
6:55 pm EDT

is to be included in the ASIC. Thus, the input description or specification does <u>not</u> have to specify the structure or architectural components that are to be included in the ASIC to be produced. The input specification is thus referred to as "architecture independent."

d.    **[VISUAL]** The description of architecture independent functions are made up of the operations or "actions" to be performed by (or within) the ASIC and the "conditions" under which such actions are to be performed. The architecture independent specifications do not specify or imply the specific structure to be designed.

2.    Storing in a Knowledge Base-

a.    **[VISUAL]** The patented process uses a storehouse or database of knowledge (known as a "knowledge base") to serve as a base for reference in designing an ASIC. In particular, in accordance with the '432 patent, the knowledge held by experts in VLSI design is obtained and stored in the knowledge base.[13] The expert knowledge is stored in the knowledge base using "rules."[14]

b.    **[VISUAL]** "Rules" are prescribed guides or accepted procedures. In the context of the '432 patent, the rules are used to apply the expert knowledge captured from VLSI designers to automatically design an ASIC. The "rules" can take any of a variety of formats. In the preferred embodiment, for example, the rules can be represented using an "IF-THEN" format.[15] Other formats are possible, such as pattern-match or other antecedent-consequent format.

3.    Storing a Set of Definitions-

a.    **[VISUAL]** The functional input specification is translated or "mapped" to an intermediate form to facilitate use by any system used to perform the process. In particular, the desired functions (in the form of "architecture independent actions and conditions") are associated with (or "mapped") to a set of definitions of the architecture independent actions and conditions.[16]

b.    **[VISUAL]** In the '432 patent specification, an exemplary embodiment uses definitions in the

5

September 20, 2004
6:55 pm EDT

form of code words ("referred to as "macros") representative of a desired function.[17]

c.    **[VISUAL]**  The set of definitions are typically stored in a library.  In the exemplary embodiment disclosed in the '432 patent, the definitions are stored as "macros" in a "macro library."[18]  Examples of "macros" can be seen from Table 1 of the '432 patent.[19]

4.    Storing Hardware Cells-

a.    **[VISUAL]**  The hardware components to be used in the design of the ASIC to be produced are referred to as "hardware cells."  The hardware cells are basic circuit components (e.g., logic gates, transistors, etc.) that have been previously designed by VLSI engineers, having various functional and technical specifications.[20]  A set of available hardware cells that can be used in the design of the ASIC is stored in a "hardware cell library."[21]

5.    Operation of the Patented Process

a.    **[VISUAL]**  The process starts with a user describing a series of architecture independent functional actions and conditions to be performed by the ASIC to be produced.



b.    **[VISUAL]**  Definitions are then specified from the library of definitions for the desired actions and conditions as described by the user.

c.    **[VISUAL]**  Hardware cells capable of performing the desired actions and conditions are selected from the hardware cell library by applying the expert knowledge encoded in the rules stored in the expert system knowledge base.

d.    **[VISUAL]**  A listing of the hardware cells as selected are listed, together with a listing of the connections between such cells, in what is known as a "netlist."

e.    **[VISUAL]**  The netlist is transformed into a layout of hardware cells that is used to produce the mask data that is directly used for the production of the desired ASIC.

f.    **[VISUAL]**  The process also involves the generation of signal lines carrying data signals (known as "data paths").[22]  This generation of "data paths" can be performed, like the selection

6

September 20, 2004
6:55 pm EDT

of hardware cells, through the application of expert rules stored in a knowledge base to the selected cells.[23]

g.     **[VISUAL]** The process further involves the generation of control signals (known as "control paths") between the hardware cells.[24]

h.     **[VISUAL]** Performing the inventive process effectively replaces the need for an expert circuit designer who was, before the invention, required to apply the designer's expertise to the design process to create structural and layout representations of the design.

i.     **[VISUAL]** Without the burden of designing the specific structure and layout, even the design engineers who do not have the specialized knowledge of VLSI design could successfully design ASICs faster and more accurately.

---

[1] '432 Patent at 1:13-17.
[2] '432 Patent at 1:13-17.
[3] '432 Patent at 1:19-29.
[4] '432 Patent at 1:19-29; and 3:59-65.
[5] '432 Patent at 1:45-51.
[6] '432 Patent at 1:63-66.
[7] '432 Patent at 1:66 to 2:1.
[8] '432 Patent at 1:66 to 2:1.
[9] '432 Patent at 1:38-44.
[10] '432 Patent at 2:6-14.
[11] '432 Patent at 2:14-20.
[12] '432 Patent at 2:21-24.
[13] '432 Patent at 5:6-8.
[14] '432 Patent at 8:65 to 9:5.
[15] '432 Patent at 11:1-14.
[16] '432 Patent at 9:8-18; and 13:2-31.
[17] '432 Patent at 5:20-22.
[18] '432 Patent at 5:20-22.
[19] '432 Patent at 5:20-22.
[20] '432 Patent at 5:15-20.
[21] '432 Patent at 4:68 to 5:3.
[22] '432 Patent at 2:39-40; and 6:28-54.
[23] '432 Patent at 4:63 to 5:13; and 13:55-56.
[24] '432 Patent at 2:36-44; and 4:63 to 5:13.

7

# FAX TRANSMISSION

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY LLP

**DATE:**              September 20, 2004

**CLIENT NO.:**        R2180.0171

**MESSAGE TO:**   Matthew E. Hocker

**CC:**           Thomas C. Mavrakakis

                  Christopher L. Kelley

**COMPANY:**      Howrey Simon Arnold & White LLP

**FAX NUMBER:**   (650) 463-8400

**PHONE:**        (650) 463-8100

**FROM:**         DeAnna Allen

**PHONE:**        (202) 572-2656

**PAGES (Including Cover Sheet):**    9    **HARD COPY TO FOLLOW:**    X   YES    _____ NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile Department at 202-861-9106, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

THOMAS C. MAVRAKAKIS
PARTNER
650.463.8169
mavrakakist@howrey.com

September 20, 2004

*VIA FACSIMILE AND FEDERAL EXPRESS*

Kenneth W. Brothers, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037-15226

      *RE:    Synopsys, Inc. v. Ricoh Company, Ltd.*
              *Ricoh Company, Ltd. v. Aeroflex, Incorporated, et al.*

Dear Mr. Brothers:

I am writing to follow-up on the issues between the parties regarding the claim construction tutorial scheduled for October 20, 2004.

Synopsys and Defendants do not believe that any alleged expert hired by Ricoh and directed by your firm will present a neutral view of the '432 patent or any related background information at the tutorial. If Ricoh continues to insist that its expert make any presentation at the tutorial, Synopsys and Defendants will make their own presentation using their own expert.

It is our understanding that the latest proposal is that the parties exchange, by facsimile, preliminary proposed outlines for their respective presentations today. Synopsys and Defendants provide the attached outline of preliminary proposed points for facilitating the parties' meet and confer regarding the substance of the tutorial.

Finally, Synopsys and Defendants believe that the EDA Consortium's video "EDA – Where Electronics Begins" would be helpful to the Court and therefore, plan on showing that video to the Court at the tutorial. The web address http://www.edac.org/ is where that video can be viewed online.

Very truly yours,

Thomas C. Mavrakakis

tcm:sjc

cc:    Edward M. Meilman, Esq.

DM_US\8060136.v1

**Synopsys' and Defendants' Preliminary Proposed Points For The Tutorial**

- '432 patent's invention is directed to a computer-aided design system and method for designing application specific integrated circuits, which are commonly known by the acronym ASIC;
- An integrated circuit is comprised of the necessary devices and their interconnections necessary to create a complete circuit all on one silicon substrate;
- There are two types of integrated circuits "application specific" and "general purpose";
- The '432 patent is directed to using computers to design ASICs as opposed to standard general purpose integrated circuits;
- The '432 patent is not directed to designing microprocessors, memory chips, or other general purpose chips;
- A remote car alarm and keyless entry transmitter for cars would be an example of things that use an ASIC;
- The processors in a cell phone would be examples of general purpose integrated circuits;
- FIG. 2 shows the knowledge-based silicon compiler is used to generate a netlist from a flowchart;
- FIG. 2 also shows that other computer-aided design software tools not described in the '432 patent are used to generate mask data from a netlist;
- FIG. 5 shows the input flowchart created using the flowchart editor program by representing the sequence of actions (rectangles) and decisions (diamonds) and then specifying a macro (e.g., add or compare) for each of those actions and conditions;
- The flowchart editor program achieves the '432 patent's goal of eliminating the need for using highly skilled VLSI designers to design ASICs;
- Writing HDL requires highly skilled VLSI designers to design ASICs;
- Hardware description languages have been used by highly skilled VLSI designers for describing hardware designs since the mid-1970s;
- Conventional software programs use predefined step-by-step procedures (or algorithms) to solve problems;
- Expert system software such as described in the '432 patent are substantially different from conventional software and use a knowledge base containing rules in a particular field, and a separate inference engine software program for selectively applying the rules in the knowledge base to solve the problem;
- FIG. 15 shows a netlist having hardware cells, a system controller, and control and data paths for interconnecting them;
- One example computer-aided design tool needed for generating mask data is known as "placing," which enables a designer to plan the location of the circuit blocks in the design;
- FIG. 1c pictorially illustrates mask data;
- The software programs for implementing the '432 patent's methods are illustrated in FIG. 3;

- TABLE 1 in the '432 patent shows the stored actions and conditions that are available and may be specified in the flowchart;
- The '432 patent sets forth the four types of information that are stored for each hardware cell and that is necessary for mapping corresponding hardware cells to the macros specified in the flowchart, generating the netlist, and generating mask data;
- The '432 patent uses a rule-based expert system for mapping corresponding hardware cells to the macros specified in the flowchart;
- The '432 patent uses IF-THEN rules having both an antecedent (IF) and a consequent (THEN) portions;
- The inference strategy for the inference engine is described in the '432 patent;
- Describing the sequence of operations is the first step performed by the designer using the flowchart editor to define the flowchart input;
- The rectangles represent the actions, the diamonds represent the conditions, and the lines with arrows represent the transitions between them and together the rectangles, diamonds, and lines with arrows represent the series of actions and conditions for the ASIC to be designed;
- Specifying one macro in the macro library for each rectangle and diamond is the second step performed by the designer using the flowchart editor to define the flowchart input;
- For each specified macro in the flowchart, the rule-based expert system's inference engine selectively applies rules in the knowledge base to map each macro to a corresponding hardware cell description and this is illustrated in FIG.4 and FIG. 11;
- The example rules in the '432 patent show that a system controller hardware cell must be generated for the netlist and this is illustrated in FIG. 12;
- The example rules in the '432 patent show that control and data paths must be generated for the netlist and this is illustrated in FIG. 13;
- The example rules in the '432 patent show that eliminating unnecessary selected hardware cells must be done for generating a netlist and this is illustrated in FIG. 15;
- The '432 patent only has 10 example rules and it would take at least 500 or more rules to have an operational system;
- The '432 patent does not describe software for generating mask data but merely suggests using other unidentified computer-aided software design tools;
- Mask data represents the various layers that form the devices and interconnections of the ASIC design;
- The mask data is the information that is eventually used by photomask manufacturers to make the set of 20 or more photomasks (or masks) that are used in the manufacturing processes for the ASIC;
- The '432 patent does not describe any processes for manufacturing photomasks or ASICs;
- The manufacturing processes such as chemical vapor deposition, physical vapor deposition, ion implant, chemical mechanical polishing, etc. form the devices and interconnections of the ASIC.

2

# HOWREY
### HOWREY SIMON ARNOLD & WHITE LLP
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:** September 20, 2004

**TO:**

| | | | | |
|---|---|---|---|---|
| 1. | NAME: | Kenneth Brothers, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: | Washington, DC | FAX #: (202) 887-0689 | PHONE #: |

| | | | | |
|---|---|---|---|---|
| 2. | NAME: | Edward A. Meilman, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: | New York, NY | FAX #: (212) 997-9880 | PHONE #: |

**FROM:**

NAME: Susan Crane for Tom Mavrakakis

DIRECT DIAL NUMBER: (650) 463-8124    USER ID: 4099

NUMBER OF PAGES, _INCLUDING_ COVER: 4    CHARGE NUMBER: 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☐ REGULAR MAIL    ☒ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER: _____

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

```
*  *  *  COMMUNICATION RESULT REPORT ( SEP. 20. 2004  4:23PM )  *  *  *

                                                          FAX HEADER 1:
                                                          FAX HEADER 2:

TRANSMITTED/STORED : SEP. 20. 2004  4:17PM
FILE MODE        OPTION              ADDRESS                    RESULT      PAGE
--------------------------------------------------------------------------------
1763 MEMORY TX                      G3  :   (202) 887-0689      OK          4/4
                                    G3  :      2129979880       OK          4/4



--------------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                      E-2) BUSY
E-3) NO ANSWER                                 E-4) NO FACSIMILE CONNECTION
E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

### FACSIMILE COVER SHEET

**DATE:** September 20, 2004

**TO:**

| | | |
|---|---|---|
| 1. **NAME:** Kenneth Brothers, Esq. | **COMPANY:** Dickstein Shapiro Morin & Oshinsky |
| **CITY:** Washington, DC | **FAX #:** (202) 887-0689 | **PHONE #:** |
| 2. **NAME:** Edward A. Meilman, Esq. | **COMPANY:** Dickstein Shapiro Morin & Oshinsky |
| **CITY:** New York, NY | **FAX #:** (212) 997-9880 | **PHONE #:** |

**FROM:**   **NAME:** Susan Crane for Tom Mavrakakis

**DIRECT DIAL NUMBER:** (650) 463-8124    **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 4    **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☐ REGULAR MAIL    ☒ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER: _____

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*

*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

September 21, 2004

**BY FACSIMILE AND U.S. MAIL**
**(650) 463-8400**

Thomas C. Mavrakakis, Esq.
Howrey Simon Arnold & White, LLP
301 Ravenswood Avenue
Menlo Park, CA  94025

Re:  *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
     Our Ref.: R2180.0171

Dear Mr. Mavrakakis:

You have now twice ignored our specific request (in our letters of August 24 and September 2) that you propose names of possible neutral experts "if you seriously want to explore such an approach". It is obvious that you have no desire to even attempt to find a "neutral expert".

We have also noted that your letter of September 20, 2004 rejects any tutorial by an expert designated by Ricoh before receiving either the designation of the expert to present that tutorial or the outline of the presentation. Such a premature rejection is inconsistent with the Court's direction to have a good faith meet and confer.

We further note that while you intend to "make [your] own presentation using [your] own expert", you have failed to identify that expert.

Very truly yours,

*[signature]*

Edward A. Meilman

cc:  Gary Hoffman, Esq.
     Kenneth Brothers, Esq.

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*www.DicksteinShapiro.com*

121716 v1; 2LWZ01!.DOC

# FAX TRANSMISSION

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY

*Legal Innovators*

**DATE:**           September 21, 2004

**CLIENT NO.:**     R2180.0171

**MESSAGE TO:**     Thomas C. Mavrakakis, Esq.

**COMPANY:**        Howrey Simon Arnold & White, LLP

**FAX NUMBER:**     650-463-8400

**PHONE:**          650-463-8100

**FROM:**           Edward A. Meilman

**PHONE:**          (212) 896-5471

**PAGES (Including Cover Sheet):** ___2___   **HARD COPY TO FOLLOW:** __X__ YES  _____ NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|
| | | | |

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile Department at 212-835-1454, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited.

121724 v1; 2D



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

**THOMAS C. MAVRAKAKIS**
PARTNER
650.463.8169
mavrakakist@howrey.com

September 22, 2004

*BY FACSIMILE AND U.S. MAIL*

Edward Meilman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

      *RE:*    *Synopsys, Inc v. Ricoh Company, Ltd.*
               *Case No. CV 03-02289 MJJ (EMC)*
               *Ricoh Company, Ltd. v. Aeroflex, Inc.*
               *Case No. CV 03-04669 MJJ (EMC)*

Dear Mr. Meilman:

      I am writing in response to your letter of yesterday regarding the tutorial. Your letter ignores the fact that we have been asking Ricoh to meet and confer on a "process" for the parties to proceed to prepare a neutral presentation since August 9, 2004. Ricoh's refusal to meet and confer on this process (including the selection of a neutral expert) for nearly seven weeks has severely diminished the possibility of having one neutral tutorial. Without an agreement on a process for selecting a neutral expert, we see no reason to provide you with a list of potential experts. Of course, if Ricoh wishes to meet and confer on the process for selecting, we remain available to participate in such a meet and confer.

      Next, Ricoh's outline of proposed points for the tutorial is far from "neutral" and demonstrates that Ricoh is improperly attempting to present expert testimony on the claim construction, validity, and infringement issues in this case under the guise of a "tutorial." While we remain willing to meet and confer on the process by which the parties can prepare a neutral tutorial, with less than a month before the tutorial and given that Ricoh is intent on presenting "arguments" at the tutorial we believe that the parties should prepare to present their own separate tutorials.

      I remain available to meet and confer on these issues on the afternoon of Friday, September 24, 2004.

                    Very truly yours,

                    Thomas C. Mavrakakis

tcm:sjc
cc:    Kenneth Brothers, Esq.



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:** September 22, 2004

**TO:**

1.  **NAME:** Kenneth Brothers, Esq.    **COMPANY:** Dickstein Shapiro Morin & Oshinsky
    **CITY:** Washington, DC    **FAX #:** (202) 887-0689    **PHONE #:**

2.  **NAME:** Edward A. Meilman, Esq.    **COMPANY:** Dickstein Shapiro Morin & Oshinsky
    **CITY:** New York, NY    **FAX #:** (212) 997-9880    **PHONE #:**

**FROM:**    **NAME:** Susan Crane for Tom Mavrakakis

**DIRECT DIAL NUMBER:** (650) 463-8124    **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 2    **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☐ REGULAR MAIL    ☒ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

```
x  x  x  COMMUNICATION RESULT REPORT ( SEP. 22. 2004  4:46PM ) x  x  x
                                                          FAX HEADER 1:
                                                          FAX HEADER 2:
TRANSMITTED/STORED : SEP. 22. 2004  4:42PM
FILE MODE         OPTION           ADDRESS                 RESULT      PAGE
-------------------------------------------------------------------------
1788 MEMORY TX                     G3  :    (202) 887-0689    OK        2/2
                                   G3  :       2129979880     OK        2/2



---------------------------------------------------------------------------
REASON FOR ERROR
    E-1) HANG UP OR LINE FAIL              E-2) BUSY
    E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
    E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

**FACSIMILE COVER SHEET**

| | | | |
|---|---|---|---|
| *DATE:* | September 22, 2004 | | |

*TO:*

1. *NAME:* Kenneth Brothers, Esq.     *COMPANY:* Dickstein Shapiro Morin & Oshinsky
   *CITY:* Washington, DC     *FAX #:* (202) 887-0689     *PHONE #:* _____

2. *NAME:* Edward A. Meilman, Esq.     *COMPANY:* Dickstein Shapiro Morin & Oshinsky
   *CITY:* New York, NY     *FAX #:* (212) 997-9880     *PHONE #:* _____

*FROM:*     *NAME:* Susan Crane for Tom Mavrakakis

*DIRECT DIAL NUMBER:* (650) 463-8124     *USER ID:* 4099

*NUMBER OF PAGES, INCLUDING COVER:* 2     *CHARGE NUMBER:* 06816.0060.000000

☒ *ORIGINAL WILL FOLLOW VIA:*

☐ *REGULAR MAIL*    ☒ *OVERNIGHT DELIVERY* ·    ☐ *HAND DELIVERY*    ☐ *OTHER:* _____

☐ *ORIGINAL WILL NOT FOLLOW*

*SUPPLEMENTAL MESSAGE:*

Please see attached letter of this date from Thomas C. Mavrakakis.

*THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*



# DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*

*Writer's Direct Dial: (212) 896-5471*
*E-Mail Address: MeilmanE@dsmo.com*

September 23, 2004

**BY FACSIMILE AND U.S. MAIL**
**650-463-8400**

Thomas C. Mavrakakis, Esq.
Partner
Howrey Simon Arnold & White, LLP
750 Bering Drive
Houston, TX 77057-2198

     Re:   *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*
           Our Ref.: R2180.0171

Dear Mr. Mavrakakis:

     Your letter of September 22, 2004 makes it clear that you have never had any intention to follow the Court's instruction to have a "neutral" tutorial presentation. To say that it is now too late to find a neutral expert after you have ignored for weeks our repeated specific requests that you propose names of possible people "if you seriously want to explore such an approach" makes that conclusion unavoidable.

     We made it clear that we would work with you on a neutral expert presentation long before our first specific request (in our letter of August 24, 2004) for a name proposal. You have refused to work with us in this regard. Nevertheless, we remain willing to do so but that requires your cooperation. We disagree with your contention that there is need for a second expert to present an additional tutorial, a contention which is inconsistent with the comments by the Court during the June 14, hearing.

     Judge Jenkins said that he expected both sides to show the other what they desired to be presented. We told you the name of our expert and gave you a very detailed, neutral, non-argumentative, presentation of what would be the tutorial. As the Court indicated on hearing transcript page 4, the presentation is to provide an explanation of how the patent works without arguments or references to the accused products. While the Court indicated that it is a "very plaintiff presentation", the outline of the tutorial that we sent to you has been prepared so as to be very neutral.

     In return, you have refused to identify your expert and have given us a set of bare bones bullet points, with many of the points being clearly highly biased and argumentative, even despite their lack of detail.

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*www.DicksteinShapiro.com*

Thomas C. Mavrakakis, Esq.
September 23, 2004
Page 2


     We note that in the tutorial material that you sent to us you failed include any supporting citations contrary to the agreement that had been reached.  We also find that a significant percentage of your points have already been included in the outline that we sent to you, and are thus redundant.  However, your material is also filled with arguments and comments about the prior art and the accused products which the Court stated to be inappropriate for the tutorial.  With respect to your bullet points that are not highly biased or argumentative, to the extent that those matters are not already covered in the detailed outline, we are willing to incorporate them into the tutorial.

     We are prepared to listen and consider whatever you choose to identify as "arguments".  You should also be prepared to do the same instead of hiding behind the skimpy disclosure you have made to date.  In order to comply with the Court's direction, therefore, you need to not only identify your expert but also provide details of your proposed presentation.  That should be done today in order to the meet and confer tomorrow productive.

     From your letter, however, it appears that you may no longer be willing to proceed with our conference call on Friday, September 24.  If this is correct, please let us know.  Otherwise we will call you at the arranged time.


Very truly yours,

Edward A. Meilman


cc:   Gary Hoffman, Esq.
     Kenneth Brothers, Esq.



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

Thomas C. Mavrakakis
Partner
650.463.8169
mavrakakist@howrey.com

September 23, 2004

**BY FACSIMILE AND U.S. MAIL**

Edward Meilman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036-2714

      **RE:**    ***Synopsys, Inc v. Ricoh Company, Ltd.***
              ***Case No. CV 03-02289 MJJ (EMC)***
              ***Ricoh Company, Ltd. v. Aeroflex, Inc.***
              ***Case No. CV 03-04669 MJJ (EMC)***

Dear Mr. Meilman:

      I have your letter today but it is not responsive to the issues raised in my letter to which it purports to respond.

      We disagree with the mischaracterizations in your letter of our efforts to meet and confer and our proposed points for the tutorial.

      With regard to choosing a neutral expert, without a prior agreement on the process for how the expert will be agreed to by the parties, we will not share a list of potential experts with Ricoh so that it can simply arbitrarily reject them. We remain available to meet and confer with Ricoh on the process of choosing a neutral expert.

      With regard to the substance of the tutorial, your proposal seeks to provide the court with expert testimony supporting Ricoh's constructions as well as its infringement and validity positions. If necessary, we will seek relief from the Court to prevent Ricoh from presenting such expert testimony at the tutorial. In any event, we remain willing to meet and confer with Ricoh in an effort to create a neutral tutorial acceptable to both sides.

      Finally, I am available after 1:00 p.m. my time tomorrow for a meet and confer. Please let me know when after that time tomorrow you would like to have a meet and confer on any of these issues.

                        Very truly yours,

                        Thomas C. Mavrakakis

tcm:sjc
cc:   Kenneth Brothers, Esq.

**HOWREY** LLP
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:** September 23, 2004

**TO:**

| | | | |
|---|---|---|---|
| 1. | NAME: Kenneth Brothers, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: Washington, DC | FAX #: (202) 887-0689 | PHONE #: |

| | | | |
|---|---|---|---|
| 2. | NAME: Edward A. Meilman, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: New York, NY | FAX #: (212) 997-9880 | PHONE #: |

**FROM:**  NAME: Susan Crane for Tom Mavrakakis

DIRECT DIAL NUMBER: (650) 463-8124   USER ID: 4099

NUMBER OF PAGES, _INCLUDING_ COVER: 2   CHARGE NUMBER: 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL   ☒ OVERNIGHT DELIVERY   ☐ HAND DELIVERY   ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.

```
*  *  *  COMMUNICATION RESULT REPORT ( SEP. 23. 2004  4:06PM )  *  *  *
```

FAX HEADER 1:
FAX HEADER 2:

TRANSMITTED/STORED : SEP. 23. 2004  4:02PM
FILE MODE         OPTION              ADDRESS                      RESULT    PAGE
--------------------------------------------------------------------------------
1795 MEMORY TX                        G3  :     (202) 887-0689      OK        2/2
                                      G3  :        2129979880       OK        2/2

--------------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL             E-2) BUSY
E-3) NO ANSWER                        E-4) NO FACSIMILE CONNECTION
E-5) MAIL SIZE OVER



**HOWREY**
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

---

| | | | |
|---|---|---|---|
| **DATE:** | September 23, 2004 | | |
| **TO:** | | | |
| 1. **NAME:** | Kenneth Brothers, Esq. | **COMPANY:** | Dickstein Shapiro Morin & Oshinsky |
| **CITY:** | Washington, DC | **FAX #:** (202) 887-0689 | **PHONE #:** |
| 2. **NAME:** | Edward A. Meilman, Esq. | **COMPANY:** | Dickstein Shapiro Morin & Oshinsky |
| **CITY:** | New York, NY | **FAX #:** (212) 997-9880 | **PHONE #:** |

**FROM:**    **NAME:**    Susan Crane for Tom Mavrakakis

**DIRECT DIAL NUMBER:** (650) 463-8124          **USER ID:** 4099

**NUMBER OF PAGES, INCLUDING COVER:** 2          **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL    ☒ OVERNIGHT DELIVERY    ☐ HAND DELIVERY    ☐ OTHER: _____

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

2101 L Street NW • Washington, DC 20037-1526
Tel (202) 785-9700 • Fax (202) 887-0689
Writer's Direct Dial: (202) 828-2228
E-Mail Address: HoffmanG@dsmo.com

September 24, 2004

**BY FACSIMILE and US Mail**
(650) 463-8400

Tom Mavrakakis, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Ave.
Menlo Park, CA  94025

Re:      Ricoh v. Aeroflex et al.

Dear Tom:

We have received your letter of September 23 addressed to Ed Meilman.

The letter is full of significant misrepresentations and false accusations and additional threats.  However, we will not take the time to respond to them.

In spite of our prior agreement and our repeated reminders, it is clear that the defendants and Synopsys are refusing to provide a detailed outline and to identify the witness that you are proposing to use if the Court decides to allow you to make any additional presentation on October 20.

With respect to the time of a meet and confer today, you through Matt Hocker had requested that it occur at 2 pm (Eastern time, 11 am Pacific time) and we had agreed to accommodate that request.  However, you now seek to change the time to later in the day.  As you presumably are aware, early this evening is the beginning of the most holy of the Jewish holidays and as you would expect, I must leave the office early this afternoon.  Consequently, while we are available for the conference call at the previously agreed upon time of 2 pm Eastern time, this call cannot be postponed until 4 pm today.

If you can not do it today, then we also are available between 2 and 4 pm on September 27 and between 4 and 5 pm on September 28.

1177 Avenue of the Americas • New York, NY 10036-2714
Tel (212) 835-1400 • Fax (212) 997-9880
www.DicksteinShapiro.com

1826837 v1; 135LH01!.DOC
RECEIVED TIME   SEP. 24.   6:53AM

Tom Mavrakakis, Esq.
September 24, 2004
Page 2


    Please immediately let us know as to whether you want to proceed with the call today at the time you had previously requested or alternatively please let us know which of the above alternative times you desire.

                Sincerely,

                Gary M. Hoffman

cc:    Edward Meilman, Esq.
       Kenneth Brothers, Esq.

# FAX TRANSMISSION

DICKSTEIN
SHAPIRO
MORIN &
OSHINSKY
LLP

**DATE:**            September 24, 2004

**CLIENT NO.:**

**MESSAGE TO:**   Tom Mavrakakis, Esq.

**COMPANY:**      Howrey Simon Arnold & White LLP

**FAX NUMBER:**   650-463-8400

**PHONE:**

**FROM:**         Gary M. Hoffman, Esq.          **TIMEKEEPER NO.:**

**PHONE:**        202-828-2228

**PAGES (Including Cover Sheet):** __3__   **HARD COPY TO FOLLOW:** ✓ YES ____ NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile
Department at 202-861-9106, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information
that is privileged, confidential and exempt from disclosure under applicable law.  You are hereby notified that any
dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated

**HOWREY** LLP
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

THOMAS C. MAVRAKAKIS
PARTNER
650.463.8169
mavrakakist@howrey.com

September 24, 2004

*BY FACSIMILE AND U.S. MAIL*

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037

> RE: *Synopsys, Inc v. Ricoh Company, Ltd.*
> *Case No. CV 03-02289 MJJ (EMC)*
> *Ricoh Company, Ltd. v. Aeroflex, Inc.*
> *Case No. CV 03-04669 MJJ (EMC)*

Dear Mr. Hoffman:

In light of your unavailability because of the Jewish Holiday, we agree to schedule the meet and confer as suggested by you on Tuesday, September 28, 2004 at 4:30 p.m. (1:30 p.m. PDT).

Unlike Ricoh, we hope to agree to a process for choosing a neutral expert and come to an agreement on such an expert. If that is not possible we will bring this issue to the Court's attention and seek clarification from the Court on our proposed use of Dr. Kowalski for our tutorial and to respond to any expert testimony on claim construction improperly presented by Ricoh at the tutorial. Please provide us with any proposal Ricoh may have for choosing and using a neutral expert before that time so that we may consider it.

We propose the following process for choosing and using a neutral expert for the tutorial: (1) at Tuesday's meet and confer each side proposes a list of up to four (4) potential neutral experts; (2) neither party may have had or have any *ex parte* contact or communications with any of these proposed experts with respect to the issues in these litigations; (3) neither party may use any of these proposed experts for any other purpose for the remainder of these litigations; (4) there must be agreement between the parties on the neutral expert to be used , all of the visuals to be used and a script of what will be said by that neutral expert at the tutorial; (5) each side may bring their own expert to the tutorial to address any questions from Judge Jenkins at the tutorial. Please let us know whether you will agree to this process and we will be prepared at Tuesday's meet and confer to propose a list of potential neutral experts for the tutorial.



Finally, please let us know what your position is on showing the EDA consortium's video (identified in my letter earlier this week) at the tutorial.

Very truly yours,

Thomas C. Mavrakakis

tcm:sjc
cc:    Edward Meilman, Esq.



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

---

*DATE:*    September 24, 2004

*TO:*

1.  *NAME:*  Gary M. Hoffman, Esq.                *COMPANY:*  Dickstein Shapiro Morin & Oshinsky

    *CITY:*  Washington, DC        *FAX #:*  (202) 887-0689        *PHONE #:*

2.  *NAME:*  Edward A. Meilman, Esq.              *COMPANY:*  Dickstein Shapiro Morin & Oshinsky

    *CITY:*  New York, NY          *FAX #:*  (212) 997-9880        *PHONE #:*


*FROM:*   *NAME:*        Susan Crane for Tom Mavrakakis

          *DIRECT DIAL NUMBER:*  (650) 463-8124        *USER ID:*  4099

*NUMBER OF PAGES, INCLUDING COVER:*  3        *CHARGE NUMBER:*  06816.0060.000000

☒ *ORIGINAL WILL FOLLOW VIA:*

   ☒ *REGULAR MAIL*    ☒ *OVERNIGHT DELIVERY*    ☐ *HAND DELIVERY*    ☐ *OTHER:*

☐ *ORIGINAL WILL NOT FOLLOW*

*SUPPLEMENTAL MESSAGE:*

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

```
*  *  *  COMMUNICATION RESULT REPORT ( SEP. 24. 2004 12:13PM )  *  *  *
```

```
                                                        FAX HEADER 1:
                                                        FAX HEADER 2:

TRANSMITTED/STORED : SEP. 24. 2004 12:10PM
FILE MODE          OPTION              ADDRESS                      RESULT      PAGE
--------------------------------------------------------------------------------
1799 MEMORY TX                         G3  :  (202) 887-0689        OK          3/3
                                       G3  :     2129979880         OK          3/3
```

```
---------------------------------------------------------------------------------
REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL              E-2) BUSY
  E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
  E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

### FACSIMILE COVER SHEET

**DATE:** September 24, 2004

**TO:**

1. **NAME:** Gary M. Hoffman, Esq.      **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** Washington, DC      **FAX #:** (202) 887-0689      **PHONE #:**

2. **NAME:** Edward A. Meilman, Esq.      **COMPANY:** Dickstein Shapiro Morin & Oshinsky
   **CITY:** New York, NY      **FAX #:** (212) 997-9880      **PHONE #:**

**FROM:**      **NAME:** Susan Crane for Tom Mavrakakis

**DIRECT DIAL NUMBER:** (650) 463-8124      **USER ID:** 4099

**NUMBER OF PAGES, _INCLUDING_ COVER:** 3      **CHARGE NUMBER:** 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL      ☒ OVERNIGHT DELIVERY      ☐ HAND DELIVERY      ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*Writer's Direct Dial: (202) 828-2228*
*E-Mail Address: HoffmanG@dsmo.com*

September 27, 2004

**BY FACSIMILE and US Mail**

Tom Mavrakakis, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Ave.
Menlo Park, CA 94025

Re:     Ricoh v. Aeroflex et al.

Dear Tom:

        We appreciate your accommodating the fact that I had to leave early on Friday, September 24, 2000, due to my religious holiday. It was unfortunate that you were unavailable at our originally scheduled time of 2:00 p.m. (ET) on Friday at which time I would have been available for the telephone conference call. However, as the two of us have now agreed, the call is rescheduled for Tuesday, September 28 at 4:30 p.m. (ET). I will call you at that time.

        With respect to the second paragraph of your letter, we have repeatedly expressed to you that there was no need for such a selection or process especially in view of the Court's comments during the hearing. However, we have asked you for many weeks to provide us with a list of your proposed "neutral experts" and indicated a willingness to consider and discuss the matter with you. Unfortunately, only on the afternoon of September 24, did we finally receive your comments regarding a process, although we still have not received any proposed names. In general, the proposed process generally appears to be an acceptable approach for exploring the possibility of using a neutral expert. We told you several weeks ago what we considered to be disqualified individuals from being a possible mutually acceptable "neutral expert" for tutorial purposes. The following is a reiteration in somewhat more detail. Any expert in order to be "neutral" must be someone that has not had any contact with any party in this litigation nor a counsel for any such party. Likewise, any such potential expert must not have already been contacted by any other person on behalf of any of the parties, either directly or indirectly, regarding any aspect of the present litigation. Next, any such potential neutral expert must not currently be an employee or a consultant or in any other manner engaged currently or during the last five years by any of the parties in the litigation, or any licensee or customers of any of the parties in the litigation. Next, none of the parties nor any of their licensees may employ or otherwise engage any of the proposed experts for any other purpose for the remainder of the litigation. The two of us obviously can further discuss this matter during our telephone conference call on Tuesday.

        While we did not get your proposal about the "process" until the end of last week and question the need for the proposed process in the first instance, we have

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*www.DicksteinShapiro.com*

1627768 v1; 136BC01!.DOC

September 27, 2004
Page 2

nevertheless been trying to identify individuals who would not be disqualified from being the neutral expert since we defined that parameter. We have not yet been successful in identifying anyone who would meet the criteria. We are prepared to evaluate anyone you nominate as quickly as possible.

Assuming the parties cannot agree on a "neutral expert", then we should discuss your objections to the tutorial that we sent to you and afterwards we are willing to identify those portions of your proposal tutorial to which we object and to provide a list of those portions that we are willing to incorporate into the tutorial.

With respect the EDA consortium video, please let us know what role Synopsys had (either directly or indirectly) in the preparation of this video. In addition, please let us know if we can obtain a copy of the video in a format that we can take excerpts from the video for use in a tutorial.

Very truly yours,

Gary M. Hoffman

GMH/ncz
cc:    Edward Meilman, Esq.

# FAX TRANSMISSION

**DICKSTEIN SHAPIRO MORIN & OSHINSKY** LLP

**DATE:** September 27, 2004

**CLIENT NO.:** R2180.0171

**MESSAGE TO:** Tom Mavrakakis, Esq.

**COMPANY:** Howrey Simon Arnold & White LLP

**FAX NUMBER:** 650-463-8400

**PHONE:**

**FROM:** Gary M. Hoffman, Esq.          **TIMEKEEPER NO.:**

**PHONE:** 202-828-2228

**PAGES (Including Cover Sheet):** 3    **HARD COPY TO FOLLOW:** _x_ YES _____ NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile Department at 202-861-9106, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated



301 Ravenswood Avenue
Menlo Park, CA 94025-3434
Phone 650.463.8100
Fax 650.463.8400
A Limited Liability Partnership

**Thomas C. Mavrakakis**
Partner
650.463.8169
mavrakakist@howrey.com

September 28, 2004

*BY FACSIMILE AND U.S. MAIL*

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037

> **RE:**   *Synopsys, Inc v. Ricoh Company, Ltd.*
> *Case No. CV 03-02289 MJJ (EMC)*
> *Ricoh Company, Ltd. v. Aeroflex, Inc.*
> *Case No. CV 03-04669 MJJ (EMC)*

Dear Mr. Hoffman:

I am writing to follow up on the issues discussed in our meet and confer regarding the upcoming tutorial scheduled for October 20, 2004.

We agreed that if Synopsys and the Defendants propose potential neutral experts for the tutorial that both parties maintain any reasonable objections to those proposed experts. Ricoh also agreed that any proposed neutral expert by Synopsys and Defendants could not be used by Ricoh for any other purpose for the remainder of the litigations between the parties. Based on this agreement, Synopsys and Defendants identify Rev. Michael C. McFarland, S.J., President of The College of the Holy Cross, and Professor Jan M. Rabaey, U.C. Berkeley.

During the meet and confer, you rejected the process that I had suggested for creating a "neutral" tutorial. Specifically, Ricoh refuses to agree with the proposal that the content of the tutorial presentation including the script of what is said by any expert at the tutorial must be agreed to by all parties. You also confirmed that your position is that Ricoh will unilaterally determine the final content of the tutorial presentation including the script of what is said by the expert at the tutorial.



    Synopsys and Defendants believe that their agreement to the content of the tutorial presentation including the script of what is said by the expert is essential for a neutral tutorial. Unless Ricoh changes its position on this process, therefore, we will seek relief from the Court that precludes Ricoh from presenting expert testimony on claim construction at the tutorial.

Very truly yours,

Thomas C. Mavrakakis

tcm:sjc
cc:    Edward Meilman, Esq.

**HOWREY** LLP
HOWREY SIMON ARNOLD & WHITE
ATTORNEYS AT LAW

301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

*DATE:* September 28, 2004

*TO:*

1. *NAME:* Gary M. Hoffman, Esq.    *COMPANY:* Dickstein Shapiro Morin & Oshinsky

   *CITY:* Washington, DC    *FAX #:* (202) 887-0689    *PHONE #:*

2. *NAME:* Edward A. Meilman, Esq.    *COMPANY:* Dickstein Shapiro Morin & Oshinsky

   *CITY:* New York, NY    *FAX #:* (212) 997-9880    *PHONE #:*

*FROM:*    *NAME:* Susan Crane for Tom Mavrakakis

   *DIRECT DIAL NUMBER:* (650) 463-8124    *USER ID:* 4099

*NUMBER OF PAGES, INCLUDING COVER:* 3    *CHARGE NUMBER:* 06816.0060.000000

☒ *ORIGINAL WILL FOLLOW VIA:*

   ☒ *REGULAR MAIL*    ☐ *OVERNIGHT DELIVERY*    ☐ *HAND DELIVERY*    ☐ *OTHER:*

☐ *ORIGINAL WILL NOT FOLLOW*

*SUPPLEMENTAL MESSAGE:*

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

*IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.*

```
* * *  COMMUNICATION  RESULT  REPORT ( SEP. 28. 2004  5:43PM ) * * *

                                                              FAX HEADER 1:
                                                              FAX HEADER 2:

TRANSMITTED/STORED : SEP. 28. 2004  5:38PM
FILE MODE          OPTION              ADDRESS              RESULT      PAGE
----------------------------------------------------------------------------
1827 MEMORY TX                      G3  :   (202) 887-0689   OK         3/3
                                    G3  :      2129979880     OK         3/3
```

```
--------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                    E-2) BUSY
E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION
E-5) MAIL SIZE OVER
```



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

---

### FACSIMILE COVER SHEET

**DATE:**      September 28, 2004

**TO:**
1.   **NAME:**  Gary M. Hoffman, Esq.          **COMPANY:** Dickstein Shapiro Morin & Oshinsky
     **CITY:**  Washington, DC      **FAX #:** (202) 887-0689      **PHONE #:**

2.   **NAME:**  Edward A. Meilman, Esq.        **COMPANY:** Dickstein Shapiro Morin & Oshinsky
     **CITY:**  New York, NY      **FAX #:** (212) 997-9880      **PHONE #:**

**FROM:**   **NAME:**   Susan Crane for Tom Mavrakakis

     **DIRECT DIAL NUMBER:**  (650) 463-8124      **USER ID:**   4099

**NUMBER OF PAGES, INCLUDING COVER:**  3      **CHARGE NUMBER:**   06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

     ☒ *REGULAR MAIL*    ☐ *OVERNIGHT DELIVERY*    ☐ *HAND DELIVERY*    ☐ *OTHER:*

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

*THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

D I C K S T E I N   S H A P I R O   M O R I N   &   O S H I N S K Y   L L P

*2101 L Street NW • Washington, DC 20037-1526*
*Tel (202) 785-9700 • Fax (202) 887-0689*
*Writer's Direct Dial: (202) 828-2228*
*E-Mail Address: HoffmanG@dsmo.com*

October 1, 2004

**BY FACSIMILE and US Mail**

Tom Mavrakakis, Esq.
Howrey Simon Arnold & White LLP
301 Ravenswood Ave.
Menlo Park, CA 94025

Re:     <u>Ricoh v. Aeroflex et al.</u>

Dear Tom:

      I have your letter of September 28, 2004. It is in part incomplete and in part inaccurate. I will therefore reiterate some of the points discussed and agreements reached.

      First, as discussed in our meet and confer of September 28, 2004, we agreed on a process for trying to locate a potential independent expert for the upcoming Markman tutorial before Judge Jenkins. I told you, and it bears repeating here, that Ricoh does not agree that Judge Jenkins has required an independent, mutually-selected expert for the tutorial or that such a mutually-selected expert is needed. Judge Jenkins explicitly stated that the tutorial is a "very plaintiff presentation." Nevertheless, we will consider identified experts who at a minimum meet the criteria stated in my letter of September 27, 2004. Also, any person who does or has done business with, or whose work is or has been sponsored by any of the parties or their licensees would not be a neutral independent expert. In the event that Synopsys/ASIC Defendants or Ricoh (each individually a "party" and collectively "the parties") proposes an independent expert as a potential neutral expert for the tutorial, the parties have agreed to the following:

- No party shall approach or otherwise engage in any contact or discussions with the identified expert except as mutually agreed to in advance and in writing by the parties.

- Once identified, neither party shall engage or otherwise have discussions with the expert in connection with the present litigation matters for any reason or purpose other than to serve as a mutually selected, independent neutral expert at the Markman tutorial. However, nothing stated herein shall effect or otherwise limit a party's right to engage or have discussions with a proposed expert where, prior to the expert's identification as a potential independent expert at the tutorial, the party had contacted the expert in connection with the present litigation matters. If a party wants to

*1177 Avenue of the Americas • New York, NY 10036-2714*
*Tel (212) 835-1400 • Fax (212) 997-9880*
*www.DicksteinShapiro.com*

Tom Mavrakakis, Esq.
October 1, 2004
Page 2

have such future discussions with such expert then evidence of such
prior contact shall, on request, be provided to the other party.

- No party shall waive any right to make reasonable objections on the
  basis of the proposed expert's qualifications, neutrality, or on any
  other basis, regardless of whether the objecting party (or another
  party) identified the expert as a potential independent neutral
  expert.

- No party shall rely in any manner on the use or procurement of (or
  on the failure to use or procure) an independent neutral expert in
  order to delay, alter or otherwise modify the scheduled Markman
  tutorial and hearing dates of October 20, and 29, respectively.

You have identified Rev. McFarland and Professor Rabaey as potential
neutral experts. Neither meet the agreed upon criteria for an independent neutral
expert. Regarding Rev. McFarland, not only did you list him in your initial disclosures,
but we previously contacted him in connection with this litigation . Regarding
Professor Rabaey, he is a professor at the University of California at Berkeley and
receives support from Synopsys as part of the Synopsys University Program. In fact,
Synopsys has previously quoted Professor Rabaey's statement acknowledging the
importance of Synopsys' support in advancing the research and education programs in
his department (i.e., at the Berkeley Wireless Research Center). Consequently, neither
of these people satisfy the agreed upon criteria.

At the September 28 meet and confer, we disagreed with your proposal that
Synopsys and the ASIC Defendants have unfettered veto power over everything Ricoh
may wish to present at the tutorial. On the other hand, I did ask you to identify any
matter in our detailed proposal that you considered improper or inaccurate and offered
to do the same with your bullet point outline proposal. In particular, I extended an
offer to simultaneously exchange markups of the September 20, 2004 tutorial outline
drafts. During our conference call on Tuesday, September 28, you had indicated that
you would get back to us within 30 minutes on this proposal; it is now three (3) days
later and we still have not heard back from you on the proposal.

We are disappointed that you have refused to cooperate in the formulation of
the tutorial presentation. Nevertheless, our offer still remains open.

Very truly yours,

Gary M. Hoffman

GMH/dda
cc:   Janna Whitte
      Edward Meilman, Esq.

# FAX TRANSMISSION

**DICKSTEIN SHAPIRO MORIN & OSHINSKY** LLP

**DATE:** October 1, 2004

**CLIENT NO.:** R2180.0171

**MESSAGE TO:** Thomas C. Mavrakakis

**cc:** Janna White

**COMPANY:** Howrey Simon Arnold & White LLP

**FAX NUMBER:** (650) 463-8400

**PHONE:** (650) 463-8100

**FROM:** Gary M. Hoffman

**PHONE:** (202) 572-2656

**PAGES (Including Cover Sheet):** ___3___   **HARD COPY TO FOLLOW:** __X__ YES   _____ NO

| SENT BY: | | DATE/TIME: | |
|---|---|---|---|

**MESSAGE:**

If your receipt of this transmission is in error, please notify this firm immediately by collect call to our Facsimile Department at 202-861-9106, and send the original transmission to us by return mail at the address below.

This transmission is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated

1744453 v2; 11#1102I.DOC



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE 650.463.8100
FAX 650.463.8400
A LIMITED LIABILITY PARTNERSHIP

THOMAS C. MAVRAKAKIS
PARTNER
650.463.8169
mavrakakist@howrey.com

October 1, 2004

*BY FACSIMILE AND U.S. MAIL*

Gary M. Hoffman, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037

RE:  ***Synopsys, Inc v. Ricoh Company, Ltd.***
***Case No. CV 03-02289 MJJ (EMC)***
***Ricoh Company, Ltd. v. Aeroflex, Inc.***
***Case No. CV 03-04669 MJJ (EMC)***

Dear Mr. Hoffman:

I am writing in response to your letter and voicemail today regarding the tutorial. You seem to have misunderstood my letter of September 28, 2004.

Ricoh's position that it will unilaterally determine the final content of the tutorial presentation including the script of what is said by the expert at the tutorial is not reasonable and not acceptable to Synopsys and Defendants. Synopsys and Defendants believe that their agreement to the final content of the tutorial presentation including the script of what is said by the expert is <u>essential</u> for a neutral tutorial. We do not understand how you could legitimately believe that there is any need for any further meet and confer given this basic disagreement between the parties.

We will seek an order from the Court that precludes Ricoh from presenting expert testimony on claim construction at the tutorial and that allows Synopsys and Defendants equal time on October 20, 2004 to make their own presentation at the tutorial. Please let me know on Monday, October 4, 2004 whether Ricoh will agree to a shortened briefing schedule so that the Court may resolve this issue before the end of next week.

Very truly yours,

Thomas C. Mavrakakis

tcm:sjc
cc:  Edward Meilman, Esq.

AMSTERDAM    BRUSSELS    CHICAGO    HOUSTON    IRVINE    LONDON    LOS ANGELES    MENLO PARK    SAN FRANCISCO    WASHINGTON, DC



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 • FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:** October 1, 2004

**TO:**

| | | | | |
|---|---|---|---|---|
| 1. | NAME: | Gary M. Hoffman, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: | Washington, DC | FAX #: (202) 887-0689 | PHONE #: |

| | | | | |
|---|---|---|---|---|
| 2. | NAME: | Edward A. Meilman, Esq. | COMPANY: | Dickstein Shapiro Morin & Oshinsky |
| | CITY: | New York, NY | FAX #: (212) 997-9880 | PHONE #: |

**FROM:**  NAME: Susan Crane for Tom Mavrakakis

DIRECT DIAL NUMBER: (650) 463-8124    USER ID: 4099

NUMBER OF PAGES, INCLUDING COVER: 2    CHARGE NUMBER: 06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL  ☐ OVERNIGHT DELIVERY  ☐ HAND DELIVERY  ☐ OTHER: _____

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

*IF THERE ARE ANY QUESTIONS OR PROBLEMS WITH THE TRANSMISSION OF THIS FACSIMILE, PLEASE CALL 650.463.8103.*

x x x COMMUNICATION RESULT REPORT ( OCT. 1. 2004  5:54PM ) x x x

FAX HEADER 1:
FAX HEADER 2:

TRANSMITTED/STORED : OCT. 1. 2004  5:50PM

| FILE MODE | OPTION | ADDRESS | | RESULT | PAGE |
|-----------|--------|---------|---|--------|------|
| 1844 MEMORY TX | | G3 : | (202) 887-0689 | OK | 2/2 |
| | | G3 : | 2129979880 | OK | 2/2 |

--------------------------------------------------------------------------
REASON FOR ERROR
E-1) HANG UP OR LINE FAIL                    E-2) BUSY
E-3) NO ANSWER                               E-4) NO FACSIMILE CONNECTION
E-5) MAIL SIZE OVER



301 RAVENSWOOD AVENUE
MENLO PARK, CA 94025-3434
PHONE: 650.463.8100 ● FAX: 650.463.8400

## FACSIMILE COVER SHEET

**DATE:**  October 1, 2004

**TO:**
1.  **NAME:**  Gary M. Hoffman, Esq.          **COMPANY:**  Dickstein Shapiro Morin & Oshinsky
    **CITY:**  Washington, DC          **FAX #:**  (202) 887-0689          **PHONE #:**

2.  **NAME:**  Edward A. Meilman, Esq.          **COMPANY:**  Dickstein Shapiro Morin & Oshinsky
    **CITY:**  New York, NY          **FAX #:**  (212) 997-9880          **PHONE #:**

**FROM:**     **NAME:**  Susan Crane for Tom Mavrakakis

**DIRECT DIAL NUMBER:**  (650) 463-8124          **USER ID:**  4099

**NUMBER OF PAGES, INCLUDING COVER:**  2          **CHARGE NUMBER:**  06816.0060.000000

☒ **ORIGINAL WILL FOLLOW VIA:**

☒ REGULAR MAIL     ☐ OVERNIGHT DELIVERY     ☐ HAND DELIVERY     ☐ OTHER:

☐ **ORIGINAL WILL NOT FOLLOW**

**SUPPLEMENTAL MESSAGE:**

Please see attached letter of this date from Thomas C. Mavrakakis.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

1  Gary M. Hoffman (*Pro Hac Vice*)
2  Kenneth W. Brothers (*Pro Hac Vice*)
   Eric Oliver (*Pro Hac Vice*)
3  DICKSTEIN SHAPIRO MORIN
    & OSHINSKY LLP
4  2101 L Street, NW
   Washington, DC  20037-1526
5  Phone (202) 785-9700
   Fax (202) 887-0689
6  Edward A. Meilman (*Pro Hac Vice*)
7  DICKSTEIN SHAPIRO MORIN
    & OSHINSKY LLP
8  1177 Avenue of the Americas
   New York, New York  10036-2714
9  Phone (212) 835-1400
   Fax (212) 997-9880
10  Jeffrey B. Demain, State Bar No. 126715
    Jonathan Weissglass, State Bar No. 185008
11  ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
    177 Post Street, Suite 300
12  San Francisco, California  94108
    Phone (415) 421-7151
13  Fax (415) 362-8064

14  Attorneys for Ricoh Company, Ltd.

15            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
16              SAN FRANCISCO DIVISION

17  RICOH COMPANY, LTD.,                )    **CASE NO. C-03-4669-MJJ (EMC)**
                                        )
18              Plaintiff,              )
                                        )
19        vs.                           )
                                        )
20  AEROFLEX INCORPORATED, et al.,      )
                                        )
21              Defendants.             )
                                        )
22  _____ )
    SYNOPSYS, INC.,                     )    **CASE NO. C-03-2289-MJJ (EMC)**
23                                      )
                Plaintiff,              )
24                                      )    **RICOH'S CLAIM CONSTRUCTION**
          vs.                           )    **OPENING BRIEF**
25                                      )
    RICOH COMPANY, LTD.,                )    **Date:  October 20, 2004**
26                                      )    **Time:  2:30 p.m.**
                Defendant.              )    **Courtroom:  11**
27  _____ )

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iv

I.        INTRODUCTION ..........................................................................1

II.       PROCEDURAL BACKGROUND ...................................................2

III.      FACTUAL BACKGROUND............................................................2

IV.       LEGAL STANDARD .....................................................................7

V.        ANALYSIS ....................................................................................9

          A.    Claim 13:  Preamble.............................................................. 9

                1.    Ricoh's Construction ................................................ 10

                2.    Defendants' Construction ......................................... 11

                      a.    "computer-aided design process" ..................... 12

                      b.    "ASIC" ............................................................. 13

          B.    Claim 13:  Element [1]........................................................ 14

                1.    Ricoh's Construction ................................................ 14

                2.    Defendants' Construction ......................................... 17

                      a.    "actions and conditions" ................................... 17

                      b.    "architecture independent"................................ 18

    c.  "a set of definitions of architecture independent actions and conditions" ...................................... 22

    d.  "storing" ....................................................................... 22

  C.  Claim 13: Element [2] ........................................................... 23

    1.  Ricoh's Construction ........................................... 24

    2.  Defendants' Construction ..................................... 25

  D.  Claim 13: Element [3] ........................................................... 26

    1.  Ricoh's Construction ........................................... 27

    2.  Defendants' Construction ..................................... 29

      a.  "expert system" .......................................... 29

      b.  "knowledge base" ...................................... 31

      c.  "a set of rules for selecting hardware cells to perform the actions and conditions" ................................. 31

  E.  Claim 13: Element [4] ........................................................... 32

    1.  Ricoh's Construction ........................................... 32

    2.  Defendants' Construction ..................................... 34

  F.  Claim 13: Element [5] ........................................................... 37

    1.  Ricoh's Construction ........................................... 37

2.    Defendants' Construction ............................................................ 39

G.    Claim 13: Element [6]............................................................................ 40

1.    Ricoh's Construction ................................................................... 41

2.    Defendants' Construction ............................................................ 45

H.    Claim 14.................................................................................................. 47

1.    Ricoh's Construction ................................................................... 47

2.    Defendants' Construction ............................................................ 48

I.    Claim 15.................................................................................................. 48

1.    Ricoh's Construction ................................................................... 49

2.    Defendants' Construction ............................................................ 49

J.    Claim 16.................................................................................................. 50

1.    Ricoh's Construction ................................................................... 50

2.    Defendants' Construction ............................................................ 51

K.    Claim 17.................................................................................................. 51

1.    Ricoh's Construction ................................................................... 51

2.    Defendants' Construction ............................................................ 52

VI.         CONCLUSION .................................................................................................53

# TABLE OF AUTHORITIES

Page

Cases:

Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547 (Fed. Cir. 1997),
    abrogated on other grounds by Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448
    (Fed. Cir. 1998) .......................................................................................... 36-37

Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327 (Fed. Cir. 2004) ..................................8, 21

Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995),
    aff'd, 517 U.S. 370 (1996) .......................................................................7, 8, 9, 37

Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) ......................................................7

Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314 (Fed. Cir. 2003)........................................8, 21

Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211 (Fed. Cir. 1995)............................................8

SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107 (Fed. Cir. 1985) ...................... passim

Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565 (Fed. Cir. 1991)..............19

Sunrace Roots Enter. Co. v. SRAM Corp., 336 F.3d 1298 (Fed. Cir. 2003)............................8, 21

Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313 (Fed. Cir. 2002)....................................7, 34

Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002),
    cert. denied, 538 U.S. 1058 (2003) ...................................................................... passim

Union Oil Co. v. Atl. Richfield Co., 208 F.3d 989 (Fed. Cir. 2000) .............................................19

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996) ................................ passim

ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576 (Fed. Cir. 1988)................................29

Zimmer, Inc. v. Howmedica Osteonics Corp., No. 03-1428, 2004 U.S. App. LEXIS
    10598 (Fed. Cir. May 26, 2004) .......................................................................... passim

Other Authorities:

IBM Dictionary of Computing.....................................................................................................23

IEEE Standard Dictionary of Electrical and Electronics Terms, Fourth Edition (1988)...............11

Merriam-Webster's Ninth New Collegiate Dictionary (1987) ............................................ passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

# I.       INTRODUCTION

3

4       Now before the Court in this matter is the claim construction of claims 13-17 of

5   U.S. Patent No. 4,922,432 ("the '432 patent") (RCL002929-54) (attached as Exhibit No. 1).[1]

    Claims 13-17 are directed to a process for the design and production of application specific

6   integrated circuits ("ASICs").

7       This matter is centered around the infringement of the '432 patent by Aeroflex, Inc.

8   and Aeroflex Colorado Springs, Inc. (collectively "Aeroflex"); AMI Semiconductor, Inc.; and

9   Matrox Graphics, Inc., Matrox Tech, Inc., Matrox Electronic Systems, Ltd., and Matrox

10  International Corp. (collectively "Matrox"); all of these parties are referred to as "the ASIC

11  Defendants."  Ricoh Company, Ltd. ("Ricoh") alleges that the ASIC Defendants infringe claims

12  13-17 of the '432 patent based primarily on their use of certain software products provided by

13  Synopsys, Inc. ("Synopsys") and the ASIC Defendants' own independent decisions relating to

14  the design and manufacture of ASICs.  (For simplification, the ASIC Defendants and Synopsys

    will be collectively referred to herein as "Defendants.")

15      Ricoh proposes a construction of claims 13-17 of the '432 patent that is based on the

16  ordinary and customary meaning of the claim language consistent with the public record of the

17  '432 patent (i.e., claims, specification, and file history).  The public record of the '432 patent is

18  unambiguous in describing the scope of claims 13-17, and thus, there is no need to consider or

19  rely on extrinsic evidence to properly construe the claims.

20      Defendants, on the other hand, propose to narrowly confine the scope of the claims in

21  a manner that is inconsistent with the well-established law of claim construction.  They

22  repeatedly propose constructions that would restrict the claims to exemplary embodiments

23  detailed in the '432 patent, or that would impose new limitations on the claims that appear

24  framed simply to support their non-infringement theories for use later at trial.  As shown below,

25

26  ───────────────

27  [1] All of the exhibits referred to herein are attached to the Declaration of Eric Oliver in Support of
    Ricoh's Claim Construction Opening Brief, which is filed simultaneously herewith.

28

1    these positions are inconsistent with the public record of the '432 patent and the application of

2    the relevant law.

3    **II.     PROCEDURAL BACKGROUND**

5            By the Order dated July 22, 2004, the Court has explicitly indicated that no extrinsic

6    evidence should be introduced or relied on for this claim construction proceeding.  See Vitronics

7    Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996) (attached as Exhibit C1)

8    ("[W]here the public record unambiguously describes the scope of the patented invention,

9    reliance on any extrinsic evidence is improper.").  Nevertheless, Defendants' positions (as set

10   forth in Exhibit A of the Joint Claim Construction And Prehearing Statement filed July 16, 2004

11   ("JCC Statement") (JCC Statement Exhibit A attached as Exhibit No. 2)) are heavily dependent

12   on extrinsic evidence, particularly the Declaration of their expert Dr. Thaddeus J. Kowalski.

13   Although Defendants repeatedly attempt to inject extrinsic evidence into their claim construction

14   arguments, this effort is inconsistent with the Court's clear direction as well as Vitronics.  In this

15   brief, Ricoh has not attempted to address Defendants' extrinsic evidence.  Ricoh maintains that

16   the Court need not ever consider such extrinsic evidence because the public record in this case is

17   unambiguous with respect to the claim language of claims 13-17 of the '432 patent.

18
19   **III.    FACTUAL BACKGROUND[2]**

20           The '432 patent's subject matter was the joint conception of Mr. Hideaki Kobayashi

21   of International Chip Corporation ("ICC") and Mr. Masahiro Shindo of Ricoh.  The patent was

22   filed in 1988 and issued in 1990.  During this period, the patent was jointly owned by Ricoh and

23   ICC.  Ultimately, ICC was renamed Knowledge Based Silicon Corporation ("KBSC").  In 2001,

24
25
26   _____
     [2] Should the Court deem it necessary, Ricoh is prepared to provide a Declaration or other
27   evidence supporting any facts provided in this Factual Background Section.
28

1  KBSC assigned its legal interest in the '432 patent to Ricoh, making Ricoh the sole owner of the

2  patent.

3        Ricoh conducts global-scale activities including development, production, marketing,

4  after-sales service, and recycling of office equipment, including copiers and printers, information

5  technology equipment, optical devices, and other electronic equipment in regions around the

6  world.  As part of these activities, Ricoh manufactures ASICs for use in a variety of products.

7  Ricoh's involvement in ASIC manufacturing is what in large part led to its joint effort with ICC

8  to develop an improved process for designing and producing ASICs.  The innovative nature of

9  Ricoh and ICC's efforts was recognized by the United States Patent and Trademark Office,

10  prompting the issuance of the '432 patent.

11        The ASIC design process at issue here is used as part of the overall process of

12  manufacturing ASICs.  ASICs are used in products for a variety of applications, such as in

13  consumer products (e.g., cell phones, digital cameras, and other video equipment),

14  communications and electronic data processing products, industrial products (e.g., in applications

15  involving electrical noise, and high voltage applications), aerospace and defense products,

16  medical imaging products, automotive products, and many other products that require integrated

17  circuits designed to perform a specific function.

18        At the beginning of the manufacturing process, ASICs are often created by a design

19  team, in which each designer (or each group of designers) designs a designated section of the

20  ASIC.  This effort involves the designer describing tasks that the ASIC is to perform.  Often, the

21  designer's description is called a "specification."  When produced, the ASIC described in the

22  specification is made up of a multitude of interconnected hardware cells used to perform the

23  functions required of the ASIC.  The process of selecting these hardware cells based on the

24  designer's specification is called "synthesis."  The '432 patent is directed to an improved process

25  for synthesizing ASICs.

26        Historically, as part of the design phase of the manufacturing process, highly skilled

27  design engineers, having specialized knowledge of very large scale integration ("VLSI"), would

28

create structural level design specifications that defined the various hardware components required to perform the desired functions of the ASIC. These types of design specifications can be referred to as "architecture dependent" design specifications because they set out a definite structure that is used in the specification itself. The creation of these architecture dependent design specifications required extensive knowledge of the various hardware components that were to make up the ASIC, as well as details of the implementation (e.g., interconnection requirements, signal level compatibility, timing compatibility, and physical layout of hardware components). Describing ASICs at the structural level not only was time-consuming and expensive, but provided limited flexibility in the design process and required a designer who has specialized VLSI knowledge. These shortcomings were incompatible with the rising commercial demand for more complex ASICs having increased numbers of components and faster time to market requirements.

One way of meeting some of these rising market demands was to simplify the design phase of the process so that those without specialized skill in VLSI design could more readily design the ASICs. In accomplishing this, the patentee recognized that it was important both to raise the level of abstraction of the ASIC input specifications and to develop computer aided design ("CAD") systems for receiving such input specifications and selecting hardware cells to be used in the ASICs. Specifically, the process needed to be one where the input specification did not require traditional, architecture dependent descriptions (e.g., structural flowcharts, Boolean equations, etc.).[3] The associated CAD system needed to be one that could receive the desired higher level input descriptions and that could synthesize these descriptions to architecture dependent hardware cells to lead to the production of the ASIC.

---

[3] "Structural flowcharts" describe the flow of information between structures in a circuit. "Boolean equations" describe a logical combinatorial system (as Boolean algebra) that represents symbolically relationships (as those implied by the logical operators AND, OR, and NOT) between entities (as sets, propositions, or on-off computer circuit elements, etc.).

The invention recited in claims 1-20 of the '432 patent is the culmination of the patentee's efforts to meet these needs.  It enables the use of higher level input descriptions by allowing designers to describe ASIC specifications at a functional level.  This functional level is done without specification of structure, implementing technology or architecture (i.e., an "architecture independent" level).  The unique process also provides a novel process of taking such architecture independent specifications and selecting previously designed circuit components or structure used as building blocks for implementing in an ASIC (i.e., "hardware cells").  The process selects the optimum hardware cells to be included in the desired ASIC.  In this way, even a user who does not have expertise in VLSI design can write architecture independent ASIC descriptions that ultimately can result in the automatic selection of hardware cells to be used in the ASIC.

The utilization of various aspects of the innovative process of the '432 patent has simplified and sped up the process of manufacturing ASICs.  The '432 patent's novel method not only has opened up the process to designers who do not have the expertise in VLSI design, but also has led to a more efficient, cost-effective, and flexible process for the design and production of the ASICs.

The claims at issue in this proceeding are claims 13-17.  As will be described in more detail below, independent claim 13 is directed to a process in which a designer describes an ASIC through an input specification using architecture independent descriptions.  These architecture independent descriptions are used to select architecture dependent hardware cells.  This process uses a library of definitions of the architecture independent, functional descriptions, a library of available hardware cells, and a storehouse of expert know-how or knowledge (referred to as a "knowledge base," which is a database embodying the knowledge of VLSI experts in the form of "rules").  In particular, for each desired function to be performed by the ASIC, one of the definitions from the library of definitions is specified.  The rules in the knowledge base are then applied to select architecture dependent hardware cells from the library of available hardware cells.

Dependent claims 14-17 are directed to the same design process recited in claim 13. Dependent claim 14, however, adds a process step of generating mask data used to produce the ASIC designed using the process. Dependent claim 15 adds a process step of generating signal lines for carrying data ("data paths") between hardware cells selected for use in the designed ASIC. Dependent claim 16 clarifies that the step added by claim 15 is performed using rules in a knowledge base. Dependent claim 17 adds a step of generating signal lines for carrying control signals to hardware cells selected for use in the designed ASIC.

Because claims 1-12 and 18-20 contain significant limitations not found in the broader claims 13-17, Ricoh has not asserted them in its infringement action against the ASIC Defendants. Although not at issue here, claims 1-12 and 18-20 are summarized as follows for the convenience of the Court.

Claims 1-8 are directed to a computer-aided design system that enumerates exemplary tools that can be used to perform an ASIC design process similar to that described above. The claims provide, for example, a macro library defining architecture independent functions that may be desired in the ASIC to be produced, a cell library defining available hardware cells that can be used in the ASIC to be produced, and an expert system that includes a knowledge base containing rules for selecting hardware cells and an inference engine for selecting cells based on rules in the knowledge base. Claims 9-12 are also directed to a computer-aided design system similar to that described in claims 1-8. Claims 9-12, however, restrict the system to use of a flowchart editor that can be used to create a flowchart representation of the architecture independent functions desired in the ASIC to be produced. Claims 18-20 are directed to a design process for designing ASICs similar to that in claims 13-17. Claims 18-20, however, restrict the claim process to use of a flowchart description of the architecture independent functions desired in the ASIC to be produced.

1

IV.      **LEGAL STANDARD**

2          The construction of a patent claim is a matter of law for the Court.  <u>Markman v.</u>

3  <u>Westview Instruments, Inc.</u>, 517 U.S. 370, 372 (1996) (attached as Exhibit C2).  To determine

4  the meaning of a patent claim, the Court considers three sources:  the claims, the specification,

5  and the prosecution history.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979

6  (Fed. Cir. 1995) (en banc) (attached as Exhibit C3), <u>aff'd</u>, 517 U.S. 370 (1996).

7          First, the Court looks at the words of the claims.  <u>Vitronics</u>, 90 F.3d at 1582.  "[T]he

8  analytical focus must begin and remain centered on the language of the claims themselves, for it

9  is that language that the patentee chose to use to particularly point[ ] out and distinctly claim[ ]

10  the subject matter which the patentee regards as his invention."  <u>Tex. Digital Sys., Inc. v.</u>

11  <u>Telegenix, Inc.</u>, 308 F.3d 1193, 1201-02 (Fed. Cir. 2002) (attached as Exhibit C4) (internal

12  quotation marks and citations omitted) (alterations in original), <u>cert. denied</u>, 538 U.S. 1058

13  (2003).  Thus, there is a "heavy presumption" that claim terms bear their ordinary meaning, as

14  understood by persons skilled in the relevant art.  <u>Id.</u> at 1202; <u>see also</u> <u>Teleflex, Inc. v. Ficosa</u>

15  <u>N. Am. Corp.</u>, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (attached as Exhibit C5).

16          Second, it is always necessary to review the specification to determine if the

17  presumption of the ordinary meaning is rebutted.  <u>Tex. Digital Sys.</u>, 308 F.3d at 1204.  The

18  presumption is only rebutted in situations where the inventor:  (1) acting as his or her own

19  lexicographer, has clearly set forth an "explicit definition" of the term that is different from its

20  ordinary meaning; or (2) has disavowed or disclaimed scope of coverage by using words of

21  "manifest exclusion or restriction."  <u>Id.</u>

22              But if the meaning of the words themselves would not have been
23          understood to persons of skill in the art to be limited only to the examples
            or embodiments described in the specification, reading the words in such a
24          confined way would mandate the wrong result and would violate our
            proscription of not reading limitations from the specification into the
25          claims.

26  <u>Id.</u> at 1205; <u>see also</u> <u>Teleflex</u>, 299 F.3d at 1326 ("limitations from the specification are not to be

27  read into the claims").

28

1    Third, the Court may consider the prosecution history of the patent, if in evidence.

2    Vitronics, 90 F.3d at 1582. "Although the prosecution history can and should be used to

3    understand the language used in the claims, it . . . cannot enlarge, diminish, or vary the

4    limitations in the claims." Markman, 52 F.3d at 980 (internal quotation marks and citations

5    omitted); see also Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1332 (Fed. Cir. 2004)

6    (attached as Exhibit C6) ("Because the statements in the prosecution history are subject to

7    multiple reasonable interpretations, they do not constitute a clear and unmistakable departure

8    from the ordinary meaning of the [claim term at issue]."); Sunrace Roots Enter. Co. v. SRAM

9    Corp., 336 F.3d 1298, 1306 (Fed. Cir. 2003) (attached as Exhibit C7) ("To be given effect, such

10    a disclaimer must be 'clear and unmistakable.'" (quoting Omega Eng'g, Inc. v. Raytek Corp.,

11    334 F.3d 1314, 1325 (Fed. Cir. 2003))) (attached as Exhibit C8).

12    Ordinarily, the Court should not rely on expert testimony to assist in claim

13    construction, because the public is entitled to rely on the public record of the patentee's claim (as

14    contained in the patent claim, the specification, and the prosecution history) to ascertain the

15    scope of the claimed invention. Vitronics, 90 F.3d at 1583. "[W]here the public record

16    unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence

17    is improper." Id. Extrinsic evidence should be used only if needed to assist in determining the

18    meaning or scope of technical terms in the claims, and may not be used to vary or contradict the

19    terms of the claims. Id. (quoting Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216

20    (Fed. Cir. 1995) (attached as Exhibit C9)); Markman, 52 F.3d at 981. However, the Court is free

21    to consult reference materials, such as dictionaries, for assistance in determining the ordinary

22    meaning of a claim term and such sources are not considered extrinsic evidence. Tex. Digital

23    Sys., 308 F.3d at 1202-03. Further, the intrinsic record must be consulted to determine which

24    definition is most consistent with the use of the word by the inventor. Id. at 1203. "If more than

25    one dictionary definition is consistent with the use of the word[] in the intrinsic record, the claim

26    term[] may be construed to encompass all such consistent meanings." Id. Any claim

27    interpretation, however, that would exclude a preferred embodiment is "'rarely, if ever, correct.'"

28

Zimmer, Inc. v. Howmedica Osteonics Corp., No. 03-1428, 2004 U.S. App. LEXIS 10598, at *11 (Fed. Cir. May 26, 2004) (attached as Exhibit C10) (quoting Vitronics, 90 F.3d at 1583).

The Court also has the discretion to admit and rely on prior art proffered by one of the parties, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record. Vitronics, 90 F.3d at 1584. Referring to prior art may make it unnecessary to rely on expert testimony, because prior art may be indicative of what those skilled in the art generally believe a certain term means. Id. Unlike expert testimony, these sources are accessible to the public prior to litigation to aid in determining the scope of an invention. Id.

Finally, "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)." Markman, 52 F.3d at 985. "Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." Id. at 986.

## V.    ANALYSIS

### A.    Claim 13:  Preamble

| Claim Language | Ricoh's Construction | Defendants' Construction[4] |
|---|---|---|
| 13. A computer-aided design process for designing an application specific integrated circuit which will perform a desired function comprising | During manufacture of a desired application specific integrated circuit (ASIC) chip that is designed to perform a specific purpose, a process of designing the desired ASIC using a computer, the process comprising:<br><br>("application specific integrated circuit (ASIC)"= an integrated | A. "A computer-aided design process for designing" -- a process that uses a computer for designing, as distinguished from a computer-aided manufacturing process, which uses a computer to direct and control the manufacturing process.<br><br>B. "application specific integrated circuit" -- an interconnected |

---

[4] As stated above, for simplification, the ASIC Defendants and Synopsys will be collectively referred to herein as "Defendants."

| Claim Language | Ricoh's Construction | Defendants' Construction[4] |
|---|---|---|
| | circuit chip designed to perform a specific function.) | miniaturized electronic circuit on a single piece of semiconductor material designed to perform a specific function, as distinguished from standard, general purpose integrated circuits, such as microprocessors, memory chips, etc. |

### 1.    Ricoh's Construction

This preamble portion of the claim is directed to a process that is part of the manufacture of an "application specific integrated circuit (ASIC)" chip.  The term "application specific integrated circuit (ASIC)" should be defined as:  "an integrated circuit chip designed to perform a specific function."  Ricoh's definition is consistent with the definition of "ASIC" expressly provided in the '432 patent specification:

> An application specific integrated circuit (ASIC) is an integrated circuit chip designed to perform a specific function, as distinguished from standard, general purpose integrated circuit chips, such as microprocessors, memory chips, etc.

'432 patent at 1:13-17.[5]  Ricoh's proffered definition is consistent with the ordinary meaning of the term.  Any presumption that the term should be given a different "ordinary" meaning is overcome by the explicit definition of the term as provided in the '432 patent specification.  <u>Tex. Digital Sys.</u>, 308 F.3d at 1204 ("Indeed, the intrinsic record may show that the specification uses the words in a manner clearly inconsistent with the ordinary meaning reflected, for example, in a dictionary definition.  In such a case, the inconsistent dictionary definition must be rejected.").

This claim is directed to a process that is used as part of an overall process of manufacturing ASIC chips.  As explained in the '432 patent specification, "the present invention, for the first time, opens the possibility for <u>the design and production</u> of ASICs by designers,

---

[5] All text of the '432 patent, as quoted herein, includes the corrections listed in the Certificate of Correction issued January 14, 1992 (RCL002951-54).

1    engineers and technicians who may not possess the specialized expert knowledge of a highly

2    skilled VLSI design engineer." '432 patent at 2:15-20 (emphasis added).[6]  From the patentee's

3    own Summary of the Invention, it is clear that the inventive "design process" is part of the

4    manufacture of ASIC chips.

5            Along with the ordinary meaning, the term "computer-aided design," as one would

6    expect from the words themselves, should be defined as:  "[t]he use of computers to aid in design

7    layout and analysis" (from the IEEE Standard Dictionary of Electrical and Electronics Terms,

8    Fourth Edition 180 (1988) (RCL011382-88 at RCL011384) (attached as Exhibit No. 3).

9    Consequently, the proper definition of this preamble of the claim in light of the '432 patent

10   specification, together with the ordinary meaning of the claim term, as discussed above, should

11   be interpreted as:  "During manufacture of a desired application specific integrated circuit

12   (ASIC) chip that is designed to perform a specific purpose, a process of designing the desired

13   ASIC using a computer . . . ."

14           For at least these reasons, Ricoh's proposed construction should be adopted.

15

16           **2.    Defendants' Construction**

17           Defendants focus their proposed construction of the preamble, as set forth in Exhibit

18   A of the JCC Statement, on the terms "computer-aided design process" and "ASIC."  As the first

19   of many of the same assailments on the doctrine of claim construction, Defendants' proposed

20   ───────────────

21   [6] Other portions of the '432 patent specification support this proposition.  See, e.g., '432 patent
     Abstract ("The present invention provides a computer-aided design system and method for
22   designing an application specific integrated circuit which enables a user to define architecture
     independent functional specifications for the integrated circuit and which translates the
23   architecture independent functional specifications into the detailed information needed for
     directly producing the integrated circuit."); 5:13-46 ("The KBSC system employs a hierarchal
24   cell selection ASIC design approach, . . . . Referring again to FIG. 3, the cells selected . . . are all
     utilized by the PSCS program 30 to generate the netlist 15. . . . The netlist provides all the
25   necessary information required to produce the integrated circuit.  Computer-aided design systems
     for cell placement and routing are commercially available which will receive netlist data as input
26   and will lay out the respective cells in the chip, generate the necessary routing, and produce mask
     data which can be directly used by a chip foundry in the fabrication of integrated circuits.").
27

28

1  construction attempts to introduce limitations into the construction of these terms without basis

2  from any of the three intrinsic sources (i.e., claims, specification, and prosecution history) of the

3  public record.

a.          "computer-aided design process"

6          Defendants' construction of "computer-aided design process," for example, seeks to

7  add a limitation distinguishing the claim "from a computer-aided manufacturing process, which

8  uses a computer to direct and control the manufacturing process." [7]  Beyond the determinative

9  fact that nothing in the public record is cited[8]– or can be found – that provides a basis for

10  imposing such a limitation on the claim, Defendants' proposed limitation hardly proves its point

11  (i.e., a "design" process is distinguished from a "manufacturing" process).  Even if there was any

12  evidence that skilled artisans in the field may use the term "computer-aided manufacturing" to

13  refer to the use of a "computer to direct and control the manufacturing process," this would not

14  suggest that a "computer-aided design" process is excluded from the claimed manufacturing

15  process as argued by Defendants.  Nothing in the public record indicates intent by the patentee

16  (or any other estoppel operative) to exclude from the scope of the claims the overall

17  manufacturing process.  To the contrary, the patentee's "Summary" section of the '432 patent

18  clearly shows that the patentee contemplated the role of its invention in the manufacturing

19  process (i.e., design and production of chips):  "the present invention, for the first time, opens the

20  possibility for the design and production of ASICs by designers, engineers and technicians who

21  may not possess the specialized expert knowledge of a highly skilled VLSI design engineer."

22  '432 patent at 2:15-20 (emphasis added).

24  [7] JCC Statement, Exhibit A, at 1 (clause "A").

25  [8] Defendants chiefly rely on extrinsic evidence  to support their position and as intrinsic evidence

26  cite only to column 1, lines 9-12 of the '432 patent.  JCC Statement, Exhibit A, at 1.  This
   citation, however, must be viewed in light of other parts of the '432 specification that disclose

27  the design and production of ASICS.  See Section V.A.1, supra pp. 10-11.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**b.     "ASIC"**

With respect to Defendants' proposed construction of the term "ASIC," the parties appear to be largely in agreement,[9] except for the proposed language that would otherwise limit the claim term "ASIC" to "an interconnected miniaturized electronic circuit on a single piece of semiconductor material."[10]  This language does not appear in the public record of the '432 patent, nor do Defendants cite any dictionary or treatise in the JCC Statement as the possible source.[11]  There is no reason to further limit the ordinary meaning of the term "ASIC" beyond that provided in the '432 patent (as discussed above); therefore, Ricoh's proposal for the definition of the term "ASIC" should be adopted by the Court.

For at least the reasons given above, Defendants' proposed construction of the preamble is improper and Ricoh's proposed construction should be adopted.

---

[9] Ricoh does not oppose Defendants' incorporation of the phrase "as distinguished from standard, general purpose integrated circuits, such as microprocessors, memory chips, etc." JCC Statement, Exhibit A, at 2 (clause "B").  Such language is not necessary, however, as the exclusion should be understood or otherwise implicit in Ricoh's definitional language: "designed to perform a specific function."  General purpose circuits are, by definition, not designed to perform a "specific" function, but are designed to have general or wide-ranging applicability.

[10] JCC Statement, Exhibit A, at 2 (clause "B").

[11] This is another example of Defendants' reliance on extrinsic evidence, particularly the Declaration of Kowalski.  As noted above, see Section II, supra p. 2, the Court specifically prohibited such reliance in these proceedings.  Furthermore, the Court need not consider such extrinsic evidence because the public record in this case is unambiguous with respect to this claim language (as is true for all of the claim terms and phrases of claims 13-17 of the '432 patent).  Vitronics, 90 F.3d at 1583 ("[W]here the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.").

1
2

**B.     Claim 13:  Element [1]**

3
4

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| [1] storing a set of definitions of architecture independent actions and conditions; | Placing in computer memory a library of definitions of the different architecture independent actions and conditions that can be selected for use in the desired ASIC, where the architecture independent actions and conditions do not imply any structure or implementing technology.<br><br>("architecture independent action and condition"= functional or behavioral aspects of a portion of a circuit (or circuit segment) that does not imply any set architecture, structure or implementing technology.) | C.[12] "actions and conditions"-- are the logical steps and decisions that are represented as rectangles and diamonds in the flowchart; collectively logical operations.<br><br>D. "architecture independent" -- not including (i.e., excluding) a register transfer level (RTL) description or any other description that is hardware architecture dependent.  An RTL description consists of: 1) defining the inputs, outputs, and any registers of the proposed ASIC; and, 2) describing for a single clock cycle of the ASIC how the ASIC outputs and any registers are set according to the values of the ASIC inputs and the previous values of the registers; an RTL description defines any control needed for the ASIC.<br><br>E. "a set of definitions of architecture independent actions and conditions" -- a set of named descriptions defining the functionality and arguments for the available logical steps and decisions that may be specified in the flowchart; and excluding a register transfer level description. |

**1.     Ricoh's Construction**

        This claim element [1] is directed to an action of placing in computer memory a

library of definitions.  The phrase "architecture independent action and condition" is defined as:

---

[12] Defendants disagree with Ricoh's definition of "storing" (i.e., "placing in computer memory")
for claim 13, element 1 (as well as elements 2 and 3).  JCC Statement, Exhibit A, at 3 n.3.
Defendants define "storing" as  "[s]toring means placing on any storage device 'that is accessible
by the processor for the computer system.'"  See Section V.B.2.d, infra pp. 22-23.

1  "functional or behavioral aspects of a portion of a circuit (or circuit segment) that does not imply

2  any set architecture, structure or implementing technology."  Ricoh's definition can be

3  ascertained from (and is supported by) the '432 patent.  The '432 patent explains that users of the

4  inventive process are able "to define the functional requirements for a desired target integrated

5  circuit."  '432 patent at 2:6-14.  These requirements may be specified, in accordance with the

6  invention, at an architecture independent functional level that is "easily understood."  Id.  This

7  level of specification, the '432 patent further explains, "can be defined in a suitable manner, such

8  as in list form or preferably in a flowchart format."  Id. at 2:21-24; see also id. at claim 2

9  ("2. The system as defined in claim 1 wherein said input specification means comprises means

10  for receiving user input of a list defining the series of actions and conditions.").

11      Fig. 1a of the '432 patent, for example, illustrates an embodiment that utilizes a

12  flowchart representation.[13]  This exemplary representation is described in the '432 patent at

13  3:50-55 ("FIG. 1a shows a functional (or behavioral) architecture independent representation in

14  the form of a flowchart.").  As illustrated and described, the representation describes the intended

15  functions or behavior of at least a portion of the ASIC to be produced without reference to (or

16  implication of) any structure to be used in the ASIC.

17      To the extent it is proper to dissect the phrase "architecture independent actions and

18  conditions" into individual word components,[14] then even under such an analysis, Ricoh's

19  proposed definition is consistent with the ordinary meaning of the claim phrase.  As reflected in

20  Merriam-Webster's Ninth New Collegiate Dictionary (1987) (RCL011389-407) (attached as

21

22

23  [13] As discussed in more detail below, see, e.g., Section V.B.2.a, infra pp. 17-18); Section V.E.1,
    infra pp. 32-33, claims 13-17 are not limited to a "flowchart representation."  The claims broadly

24  read on (and the '432 patent supports) the use of both textual (e.g., list form) and graphical (e.g.,
    flowchart) input descriptions.

25  [14] Defendants' proposed construction is also improper because it attempts to interpret the
    individual terms "actions and conditions" and "architecture independent" in isolation, whereas

26  the patentee specifically used the terms together as a single phrase "architecture independent

27  actions and conditions."

28

Exhibit No. 4), the individual claim terms can be defined as follows: "architecture": "a unifying or coherent form or structure" (101, at RCL011393); "independent": "not dependent[;] . . . not requiring or relying on something else" (612, at RCL011394); "action": "a thing done" (54, at RCL011391); and "condition": "something essential to the appearance or occurrence of something else" (273, at RCL011405A).

Based on the definition of the term as ascertained from the '432 patent itself, as well as the ordinary meaning of the individual terms, the phrase "architecture independent action and condition" is properly defined as "functional or behavioral aspects of a portion of a circuit (or circuit segment) that does not imply any set architecture, structure or implementing technology."

Using the proper definition of "architecture independent action and condition," the claim element [1] should be defined as: "Placing in computer memory a library of definitions of the different architecture independent actions and conditions that can be selected for use in the desired ASIC, where the architecture independent actions and conditions do not imply any structure or implementing technology."

This definition of claim element [1] is supported by the '432 patent specification. In the context of an exemplary embodiment, the '432 patent specification describes the set of definitions (called "macros" for the illustrated embodiment) in a library 23 (Figs. 3 and 4). These definitions are used to "defin[e] various actions which can be specified in the flowchart." '432 patent at 5:20-22. For that embodiment, the '432 patent shows exemplary definitions at Table 1 (id. at 7:29-49). Each of the listed examples of definitions (e.g., "ADD (A, B, C)") has a corresponding description of an architecture independent action or condition (e.g., "C = A + B") that can be performed by the ASIC to be produced. In order to read on at least this embodiment of the invention, this claim element [1] must be construed as noted above. Zimmer, 2004 U.S. App. LEXIS 10598, at *11 (A claim construction that would exclude a preferred embodiment disclosed in the specification is "'rarely, if ever, correct.'" (quoting Vitronics, 90 F.3d at 1583)).

Thus, the proper construction of claim element [1], as consistent with the '432 patent specification and the ordinary meaning of the claim terms, should be as Ricoh has set out above.

## 2.    Defendants' Construction

Defendants propose a forced construction that imposes on the claim specific details of one preferred embodiment disclosed in the '432 patent and argues the existence of sweeping estoppels allegedly made during the prosecution history of the '432 patent.

### a.    "actions and conditions"

Defendants' proposed construction, for example, seeks to limit the term "actions and conditions" to "the logical steps and decisions that are represented as rectangles and diamonds in the flowchart; collectively logical operations."[15]  By restricting the claim to use of a "flowchart" input, Defendants are attempting to limit the claim scope to the details described in connection with one of the preferred embodiments of the '432 patent.  This interpretation is improper because it would exclude the disclosed preferred embodiment dealing with a "list form" of architecture independent functional specification.[16]  As noted above, any interpretation that would exclude a preferred embodiment is "'rarely, if ever, correct.'"  Zimmer, 2004 U.S. App. LEXIS 10598, at *11 (quoting Vitronics, 90 F.3d at 1583).  However, even if the specification described only one embodiment – which it does not – directed to the flowchart input specification, that embodiment would not limit the scope of the claim term.  SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (attached as Exhibit C11) ("That a specification describes only one embodiment does not require that each claim be limited to that one embodiment."); see also Tex. Digital Sys., 308 F.3d at 1204.

Moreover, patent claim 11 (originally appearing in the '432 patent application as application claim 18) specifically recites "having boxes representing architecture independent actions" and "diamonds representing architecture independent conditions."  Such descriptive language does not appear in patent claim 13.  It should be evident that, if the patentee intended to

---

[15] JCC Statement, Exhibit A, at 3 (clause "C").

[16] See, e.g., '432 patent at 2:21-24.

limit its use of the term "actions and conditions" to the use of specific geometrical shapes such as "rectangles" or "diamonds," the patentee would have used the same or similar limiting language as used in patent claim 11, or at the very least, added the term "flowchart" to patent claim 13, as patentee had done for patent claim 18.

For at least these reasons, Defendants' proposed construction is improper.

### b.    "architecture independent"

Defendants similarly attempt to impose a sweeping category of technology as a limitation of claim scope based on an alleged disclaimer during the '432 patent prosecution history (RCL000001-265) (attached as Exhibit No. 5). In particular, Defendants propose that the claim term "architecture independent" be defined to exclude a "register transfer level (RTL)"-type description, apparently based on a comment by the patentee made during prosecution. See '432 patent prosecution history, Amendment dated April 20, 1989 (Paper No. 6) at 9 (Ex. 5, RCL000207-23 at RCL000215). Defendants appear to define an "RTL"-type description based on characteristics described in U.S. Patent No. 4,703,435 (Darringer et al.) (RCL008592-607) (attached as Exhibit No. 6).[17]

At the outset, Ricoh notes that Defendants are attempting to build into these claim construction proceedings technical arguments that are nothing more than non-infringement arguments having no bearing on the construction of the claim terms. Whether or not an "architecture independent action and condition," for example, covers an RTL-type input

---

[17] Darringer et al. specifically states: "As pointed out above, the process of this invention begins at step 100 with a register-transfer level description e.g. of the type shown in FIG. 4. The description consists of two parts: a specification of the inputs, outputs and latches of the chip to be synthesized; and a flowchart-like specification of control, describing for a single clock cycle of the machine how the chip outputs and latches are set according to the values of the chip inputs and previous values of the latches. At step 102 in FIG. 2, the register-transfer level description undergoes a simple translation to an initial implementation of AND/OR logic. This AND/OR level is produced by merely replacing specification language constructs with their equivalent AND/OR implementations in a well known manner." Id. at 5:27-41.

1   description is more about the <u>application</u> of a claim term to an accused device (i.e., the

2   determination of infringement) than it is about the <u>interpretation</u> of that claim term (i.e., claim

3   construction).  For this reason alone, Defendants' proposed construction is improper.[18]  <u>SRI Int'l</u>,

4   775 F.2d at 1118 ("A claim is construed in the light of the claim language, the other claims, the

5   prior art, the prosecution history, and the specification, *not* in light of the accused device.

6   Contrary to what MEI's counsel wrote the district court, claims are not construed 'to cover' or

7   'not to cover' the accused device.  That procedure would make infringement a matter of judicial

8   whim.  It is only *after* the claims have been *construed without reference to the accused device*

9   that the claims, as so construed, are applied to the accused device to determine infringement.").[19]

10          Moreover, accepting the definition proposed by Defendants would exclude one of the

11  exemplary implementations of the patented invention, as explicitly disclosed in the '432 patent.

12  The '432 patent, for example, discloses a specific implementation of an architecture independent

13  functional specification in Fig. 10 of the '432 patent.  This exemplary specification can easily be

14  characterized as a description that falls within the category of descriptions <u>excluded</u> by

15  Defendants' proposed construction (i.e., a "description [that] consists of:  1) defining the inputs,

16  outputs, and any registers of the proposed ASIC; and, 2) describing for a single clock cycle of

17  the ASIC how the ASIC outputs and any registers are set according to the values of the ASIC

18  inputs and the previous values of the registers").[20]  Defendants' construction would thus <u>exclude</u>

19

20

21  [18] However, if there were a "clear disclaimer" or "clear disavowal" of the scope, then it would be
    proper.

22
23  [19] <u>See also</u> <u>Union Oil Co. v. Atl. Richfield Co.</u>, 208 F.3d 989, 995 (Fed. Cir. 2000) (attached as
    Exhibit C12) ("'In claim construction the words of the claims are construed <u>independent of the</u>
24  <u>accused product</u>, in light of the specification, the prosecution history, and the prior art. . . . [T]he
    construction of claims is simply a way of elaborating the normally terse claim language[ ] in
25  order to understand and explain, but not to change, the scope of the claims.'" (quoting <u>Scripps</u>
    <u>Clinic & Research Found. v. Genentech, Inc.</u>, 927 F.2d 1565, 1580 (Fed. Cir. 1991) (attached as
26  Exhibit C13)) (emphasis added) (alterations in original).

27  [20] JCC Statement, Exhibit A, at 4 (clause "D").

28

1  a preferred embodiment of the '432 patent.  Such a construction is "'rarely, if ever, correct.'"

2  Zimmer, 2004 U.S. App. LEXIS 10598, at *11 (quoting Vitronics, 90 F.3d at 1583).

3          Nevertheless, to the extent the Court deems it appropriate, Ricoh submits the

4  following comments.  During prosecution of the '432 patent, the patentee distinguished the

5  invention over Darringer et al., asserting that the prior art used an input in the form of a register

6  transfer language (RTL)-level flowchart.  The patentee explained:  "In order for a designer to

7  utilize the Darringer system, he/she must possess a sophisticated understanding of the

8  complexities of the circuit logic itself and therefore have the specialized expert knowledge of a

9  highly skilled VLSI design engineer."  Amendment dated April 20, 1989 (Paper No. 6) at 9

10  (Ex. 5, RCL000215).

11          The present invention as defined by process claim 13 involves providing a functional,

12  structurally independent input description.  In contrast, Darringer et al. discloses using a

13  structurally dependent RTL-level input to describe the behavior of the chip that is to be designed.

14  The "RTL-level" used in Darringer et al. (as well as other prior art references cited in the

15  '432 patent prosecution history) requires the input of a "basic" or "primitive Boolean"-type

16  specification of register inputs, outputs, and timing between registers during a single clock cycle

17  of the chip operation.  See, e.g., Darringer et al. at 5:27-35.  Darringer et al. states that this type

18  of RTL-level input is simply translated (in well-known manner) into an initial implementation of

19  AND/OR logic by replacing input RTL constructs with their equivalent AND/OR

20  implementations.  Id. at 5:35-47.

21          The requirement of specifying the individual inputs, outputs, and registers for a single

22  clock cycle, together with the fact that the specification can be so easily (and directly) translated

23  into AND/OR logic, indicates that the RTL-level input is a more basic "structural" input.

24  Although it can be used to describe the functional aspects of a desired chip, it does not do so in a

25  purely higher level functional manner that allows higher level concepts such as addition,

26  multiplication, etc. (or other manner that is free of basic Boolean specifications).  The

27

28

1  "structural" RTL-type description utilized in <u>Darringer et al.</u> therefore is <u>not</u> "architecture

2  independent."

3          Ricoh notes that VHDL and Verilog are hardware description languages ("HDLs")

4  used in the field of the invention that have been referred to as "RTL-type" languages.  These

5  HDLs, however, allow a designer to describe desired operations or functionality of a proposed

6  design <u>without</u> regard to structural details (such as required by <u>Darringer et al.</u>).  Representation

7  exclusively in Boolean terms is thus <u>not</u> required.  This type of "RTL-level" is considered to be

8  "functional RTL" as contrasted to the "basic" or "primitive RTL" of <u>Darringer et al.</u>

9  For any estoppel attributed to the patentee's arguments distinguishing the claimed invention over

10  an "RTL"-type input description, it should be made clear that the patentee used the term "RTL"

11  in referring to <u>Darringer et al.</u> (and other prior art systems) that had "basic" or "primitive RTL"

12  type of inputs, which were not covered by the '432 patent claims.  The patentee did <u>not</u> disclaim

13  coverage, however, of systems that used "functional RTL" type of inputs (e.g., VHDL/Verilog-

14  based systems) that were architecture independent.  Thus, to the extent it is necessary to clarify

15  what is excluded from the proper interpretation of the term "architecture independent actions and

16  conditions," the exclusion should be limited to "basic" or "primitive RTL-type descriptions" and

17  <u>not</u> the entire category of "RTL" descriptions, as contended by Defendants.  The patentee is

18  presumed to have the full scope of coverage afforded the ordinary meaning of the claim terms

19  unless "the inventor has disavowed or disclaimed scope of coverage, by using words or

20  expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."

21  <u>Tex. Digital Sys.</u>, 308 F.3d at 1204.  No such "manifest exclusion" or "clear disavowal" of the

22  scope proposed by Defendants is present here.  At best, any disclaimer is far from the "clear and

23  unmistakable" disavowal needed to limit the scope of the claim.  <u>Sunrace</u>, 336 F.3d at 1306 ("To

24  be given effect, such a disclaimer must be 'clear and unmistakable.'" (quoting <u>Omega</u>, 334 F.3d

25  at 1325)).  Indeed, "[b]ecause the statements in the prosecution history are subject to multiple

26  reasonable interpretations, they do not constitute a clear and unmistakable departure from the

27  ordinary meaning of the [claim term at issue]."  <u>Golight</u>, 355 F.3d at 1332.

28

c.     **"a set of definitions of architecture independent actions and conditions"**

Taking into account their definitions of "actions and conditions" and "architecture independent," Defendants define claim element [1] to be:  "a set of named descriptions defining the functionality and arguments for the available logical steps and decisions that may be specified in the flowchart; and excluding a register transfer level description."[21]  In addition to the incorporation of improper definitions of the terms "actions and conditions" and "architecture independent," as discussed above, the proposed interpretation of this claim element is improper because it attempts to limit the scope of the claim element to one of the preferred embodiments disclosed in the '432 patent.

Ricoh cannot be certain, but Defendants' use of the terms "named descriptions" and "arguments" appears to be intended by Defendants to encompass the "macros" shown in Table 1 of the '432 patent (at 7:29-49) and described at 7:24-28.  While Defendants' description may (arguably) be accurate in describing <u>the preferred embodiment</u> disclosed in the '432 patent, nothing in the description or anything else in the '432 patent claims, specification, or prosecution history compels the conclusion that the preferred embodiment is the outer limit on the scope of claim element [1].  <u>SRI Int'l</u>, 775 F.2d at 1121 n.14 ("That a specification describes only one embodiment does not require that each claim be limited to that one embodiment."); <u>see also</u> <u>Tex. Digital Sys.</u>, 308 F.3d at 1204.

For this reason alone, Defendants' proposed construction is improper and should not be adopted.

d.     **"storing"**

Although no contrary construction was formally proposed, Defendants appear to "disagree with Ricoh's definition of 'storing' on this [claim] step."  JCC Statement, Exhibit A, at

---

[21] JCC Statement, Exhibit A, at 5 (clause "E").

3 n.3.  Defendants state:  "Storing means placing on any storage device 'that is accessible by the processor for the computer system.'  IBM Dictionary of Computing at 654 (Attachment 16, DEF083932-DEF084703)."  Id.  (This quoted language provided by Defendants, however, appears nowhere at page 654 of the IBM Dictionary of Computing.)  It is not clear where any controversy exists in this regard, as each of the dictionary entries for the term "storing" as they appear in the cited IBM Dictionary of Computing at 654 (DEF084598) (attached as Exhibit No. 7) is consistent with Ricoh's proposed definition of "placing in computer memory":  "storing (1) The action of placing data into a storage device.  (2) To place data into a storage device. (3) To retain data in a storage device."  A similar definition is provided in Merriam-Webster's Ninth New Collegiate Dictionary 1162 (1987):  "store":  "to place or leave in a location (as a warehouse, library, or computer memory) for preservation or later use or disposal" (RCL011411-13 at RCL011413) (attached as Exhibit No. 8) (emphasis added).

As the only evidence cited by Defendants against Ricoh's proposed language is consistent with Ricoh's proposed construction, Ricoh's definition of "storing" (i.e., placing in computer memory) should be adopted for claim element [1], as well as for claims elements [2] and [3].

For at least the reasons given above, Defendants' proposed construction of claim element [1] is improper and Ricoh's proposed construction should be adopted.

## C.    Claim 13:  Element [2]

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| [2] storing data describing a set of available integrated circuit hardware cells for performing the actions and conditions defined in the stored set; | Placing in computer memory a library of cell information that describe hardware cells capable of performing the different architecture independent actions and conditions placed in the library of definitions.<br><br>("hardware cells"= previously designed circuit components or structure that have specific | F. "hardware cells" -- logic blocks for which the functional level (e.g., register transfer level), logic level (e.g., flip flop and gate level), circuit level (e.g., transistor level), and layout level (e.g., geometrical mask level) descriptions are all defined.<br><br>G. "data describing a set of available integrated circuit |

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| | physical and functional characteristics used as building blocks for implementing an ASIC to be manufactured.) | hardware cells for performing the actions and conditions defined in the stored set" -- a set of named integrated circuit hardware cells that includes at least one hardware cell for each stored definition that may be specified for the available logical steps and decisions; where each named hardware cell has corresponding descriptions at the functional level (e.g., register transfer level), logic level (e.g., flip-flop and gate level), circuit level (e.g., transistor level), and layout level (e.g., geometrical mask level) that are all defined. |

### 1.    Ricoh's Construction

This claim element [2] is directed to a process of placing in computer memory a library of cell information. As a preliminary matter, it is noted that the term "hardware cells" is defined as: "previously designed circuit components or structure that have specific physical and functional characteristics used as building blocks for implementing an ASIC to be manufactured." As described in the '432 patent, the "hardware cells" are "needed to achieve the functional specifications [of the ASIC to be produced]." '432 patent at 2:34-36.

As claimed, data describing the available "hardware cells" is stored. In this regard, the '432 patent specifies that the "hardware cells" are "selected from a cell library of previously designed hardware cells of various functions and technical specifications." '432 patent at 2:36-39. These hardware cells are included in "an architecture specific structural level definition of an integrated circuit, which can be used directly to produce the ASIC." Id. at 2:27-34. In explaining the utility of the "hardware cells" and the storage of the cells in a "cell library," the '432 patent states:

> The KBSC system employs a hierarchal cell selection ASIC design
> approach, as is illustrated in FIG. 4. Rather than generating every required
> hardware cell from scratch, the system draws upon a cell library 34 of
> previously designed, tested and proven hardware cells of various types and

of various functional capabilities with a given type. . . . For each macro function in the macro library 23 there may be several hardware cells in the cell library 34 of differing geometry and characteristics capable of performing the specified function.

Id. at 5:14-25.

From a plain reading of the claim language in light of these teachings of the '432 patent, it is apparent that the proper interpretation of claim element [2] should be: "Placing in computer memory a library of cell information that describe hardware cells capable of performing the different architecture independent actions and conditions placed in the library of definitions," where the term "hardware cells" should be defined as "previously designed circuit components or structure that have specific physical and functional characteristics used as building blocks for implementing an ASIC to be manufactured."

For at least these reasons, Ricoh's proposed construction should be adopted.

### 2.    Defendants' Construction[22]

As with the previous claim element [1], Defendants attempt to improperly impose on claim element [2] specific details from a preferred embodiment disclosed in the '432 patent. Defendants, for example, include in their proposed definition of the term "hardware cells" all of the different types of information described in the '432 patent as being stored for the cells of cell library 34. '432 patent at 9:24-34. Nowhere in this description (or any other portion of the '432 patent, nor in its prosecution history) is there any indication that these four types of information must be included in the cell library recited in claim 13 of the '432 patent. To the extent the preferred embodiment imposes any requirement at all, it is that the cell library contains "previously designed hardware cells of various functions and technical specifications." Id. at 2:36-39. As noted previously, "[t]hat a specification describes only one embodiment does not require that each claim be limited to that one embodiment." SRI Int'l, 775 F.2d at 1121 n.14; see

---

[22] To the extent applicable, Ricoh incorporates its arguments previously set forth above with respect to Defendants' proposed definition of "storing." See Section V.B.2.d, supra pp. 22-23.

also <u>Tex. Digital Sys.</u>, 308 F.3d at 1204.  Defendants' proposed construction should not be

adopted for this reason alone.

Defendants go further, however, in attempting to narrowly construe claim element [2]

to be:  "a set of <u>named</u> integrated circuit hardware cells that includes <u>at least one hardware cell</u>

<u>for each stored definition</u> that may be specified for the available logical steps and decisions,

. . . ."[23]  First, Defendants introduce the limitation that the hardware cells are "named" cells.

This limitation appears to be directed to one of the exemplary attributes listed in the '432 patent

for the preferred embodiment.  <u>See</u> '432 patent at 9:35-51 (including the "cell name" attribute at

9:36).  As with the definition of "hardware cells," nothing in the '432 patent itself nor in its

prosecution history compels a finding that the "cell name" is a required feature of any

embodiment of claim element [2].

Second, Defendants introduce a requirement of the claim that there is "at least one

hardware cell for each stored definition."  This attempt to restrict the claims is even more

specious because there is no disclosure whatsoever in the '432 patent that supports this

requirement of the cell library.  As the claim language, the specification, and even the

prosecution history are completely devoid of any requirement that there is "at least one hardware

cell for each stored definition," Defendants' proposed construction should not be adopted on this

basis alone.

For at least the reasons given above, Defendants' proposed construction of claim

element [2] is improper and Ricoh's proposed construction should be adopted.

### D.    Claim 13:  Element [3]

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| [3] storing in an expert system knowledge base a set of rules for | Placing in an expert system knowledge base, that uses a | H. "expert system" -- software executing on a computer system |

---

[23] JCC Statement, Exhibit A, at 6 (clause "G") (emphasis added).

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| selecting hardware cells to perform the actions and conditions; | computer memory, a plurality of rules for selecting among the hardware cells placed in the hardware cell library, wherein the rules comprise the expert knowledge of highly skilled VLSI designers formulated as prescribed procedures.<br><br>("expert system knowledge base"= database used to store expert knowledge of highly skilled VLSI designers.)<br><br>("rules"= the expert knowledge of highly skilled VLSI designers formulated as prescribed procedures.) | that attempts to embody the knowledge of a human expert in a particular field and then uses that knowledge to simulate the reasoning of such an expert to solve problems in that field. This system is comprised of a knowledge base containing rules, working memory containing the problem description, and an inference engine. It solves problems through the selective application of the rules in the knowledge base to the problem description, as distinguished from conventional software, which uses a predefined step-by-step procedure (algorithm) to solve problems.<br><br>I. "Knowledge base" -- the portion of the expert system containing a set of rules embodying the expert knowledge for the particular field.<br><br>J. "a set of rules for selecting hardware cells to perform the actions and conditions" -- a set of rules, each having an antecedent portion (IF) and a consequent portion (THEN), embodying the knowledge of expert designers for application specific integrated circuits, which enables the expert system to map the specified stored definitions for each logical step and decision represented in the flowchart to a corresponding stored hardware cell description. |

### 1.    Ricoh's Construction

This claim element is directed to a process step of placing in a database rules for selecting hardware cells. As part of the definition, the term "expert system knowledge base" refers to a "database used to store expert knowledge of highly skilled VLSI designers." This definition is derived from the express teachings of the '432 patent. The '432 patent

specification, for example, describes an expert system knowledge base used in an exemplary embodiment:

> The knowledge base 35 contains ASIC design expert knowledge required for data path synthesis and cell selection. . . .
>
> . . . . Using a rule based expert system with a knowledge base 35 extracted from expert ASIC designers, the KBSC system selects from the cell library 34 the optimum cell for carrying out the desired function.

'432 patent at 5:6-29.  The illustrated "knowledge base" contains information in the form of rules.  See, e.g., id. at 8:65-9:5 ("The knowledge base of Cell Selector 32 contains information (rules) . . . . The above information is stored in the knowledge base 35 as rules.").  In the '432 patent, "[t]he rules are stored in a database."  Id. at 11:30-32.

It is apparent from these passages that an "expert system knowledge base" is a collection of data that represents knowledge obtained from experts in ASIC design.  Such a collection of data must be maintained in a "database used to store expert knowledge of highly skilled VLSI designers."

Furthermore, as part of the interpretation of this claim element, the term "rules" should be defined as:  "the expert knowledge of highly skilled VLSI designers formulated as prescribed procedures."  This definition is derived primarily from the teachings of the '432 patent, as summarized above, in conjunction with the ordinary meaning of the term "rules" (i.e., "a prescribed guide for conduct or action[;] . . . an accepted procedure, custom, or habit," Merriam-Webster's Ninth New Collegiate Dictionary 1030 (1987) (RCL011389-407 at RCL011405) (attached as Exhibit No. 4)).

With the proper definitions of the terms "expert system knowledge base" and "rules," the proper construction of this claim element [3] should be:  "Placing in an expert system knowledge base, that uses a computer memory, a plurality of rules for selecting among the hardware cells placed in the hardware cell library, wherein the rules comprise the expert knowledge of highly skilled VLSI designers formulated as prescribed procedures."

For at least these reasons, Ricoh's proposed construction should be adopted.

2.        **Defendants' Construction**[24]

Defendants continue their endeavor to carve out non-infringement arguments and theories through crafty definitions of claim terms.  Here, Defendants go so far as to rewrite the claim term "expert system knowledge base" into two separate terms:  "expert system" and "knowledge base" for interpretation in isolation.  Defendants' construction is improper on its face.

a.        **"expert system"**

First, a plain, grammatical reading of the claim language shows that claim element [3] clearly recites the term "expert system" as an adjective or other modifier for the noun "knowledge base."  As a modifier, the term "expert system" does not impute its own limitations on the overall process claimed, but rather on the "knowledge base" itself.  See ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1580-81 (Fed. Cir. 1988) (attached as Exhibit C14) (finding that claim term "low current density" that grammatically modified claim term "electrodes" has meaning as a limitation of the claimed electrodes, not as a limitation of the claimed system).

Second, the position of Defendants is also inconsistent with the teachings of the '432 patent.  The '432 patent makes it clear that the rules or knowledge of the system is stored in the "knowledge base," not in a system known as an "expert system."  See, e.g., '432 patent at 5:6-8 ("The knowledge base 35 contains ASIC design expert knowledge required for data path synthesis and cell selection."); 8:29-30 ("The cell selector uses a knowledge base extracted from VLSI design experts to make the cell selection."); 8:65-66 ("The knowledge base of Cell Selector 32 contains information (rules) relating to: . . . ."); 9:4-5 ("The above information is stored in the knowledge base 35 as rules.").  The term "expert system knowledge base" thus is

---

[24] To the extent applicable, Ricoh incorporates its arguments previously set forth above with respect to the term "storing."  See Section V.B.2.d, supra pp. 22-23.

intended to capture the features of a "knowledge base" that may be used in an expert system, but not intended to capture an "expert system" that uses a "knowledge base."

Third, Ricoh's proposed construction is further apparent from the prosecution history, where patent claims 9 and 13 (corresponding to application claims 15 and 20, respectively) were simultaneously amended and subsequently allowed on the next Office Action. Amendment dated November 20, 1989 (Paper No. 9) at 2-5 (Ex. 5, RCL000229-37 at RCL000230-33). Patent claim 9 was amended to explicitly claim "an expert system including a knowledge base containing rules." Id. at 3 (RCL000231). Patent claim 13, however, was amended (at the same time) to merely refer to an "expert system knowledge base." Id. at 4 (RCL000232). If the patentee had intended to encompass both an "expert system" and a "knowledge base" for the process of patent claim 13, the patentee would have used the same language as was added to patent claim 9.

The Court therefore should not construe the term "expert system" as a separate limitation on the overall process of claim 13.

Even if the Court must somehow find that the claim term "expert system knowledge base" requires the presence of both an "expert system" and a "knowledge base," nothing in the claim language, the specification, or the prosecution history mandates that the "expert system" contain specific elements such as a "working memory" or an "inference engine,"[25] as proposed by Defendants.[26]  As with the previous claim elements, Defendants are forcing a restriction of the claims to a preferred embodiment of the '432 patent. Such a restriction is improper. SRI Int'l, 775 F.2d at 1121 n.14; see also Tex. Digital Sys., 308 F.3d at 1204. Defendants' proposed construction should not be adopted.

---

[25] JCC Statement, Exhibit A, at 7 (clause "H").

[26] Here again, Defendants can only rely on extrinsic evidence (particularly the Declaration of Kowalski) in hopes of imputing these additional limitations in the claim. Moreover, Defendants apparently seek to have these particular requirements included in the Court's interpretation of the term "expert system" solely for the purpose of fashioning some type of non-infringement theory (e.g., based on an alleged lack of an "inference engine") at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.    "knowledge base"

To the extent that Defendants' proposed construction is <u>not</u> read to incorporate any requirements or restrictions on the presence of an "expert system" having a "working memory" and an "inference engine," it appears that Defendants' proposed definition of "knowledge base" is substantially consistent with that proposed by Ricoh. There is no significant basis therefore to contest the adoption of Ricoh's proposed construction of the term "expert system knowledge base" to mean:  "database used to store expert knowledge of highly skilled VLSI designers."

### c.    "a set of rules for selecting hardware cells to perform the actions and conditions"

Defendants again offer a construction of claim language that is intended to limit the claims to a preferred embodiment of the '432 patent. Defendants, for example, assert that the claimed "rules" must each have the format of "an antecedent portion (IF) and a consequent portion (THEN)."[27] This format was disclosed in the '432 patent in connection with a preferred embodiment of the invention. <u>See, e.g.</u>, '432 patent at 11:1-14. Even though this format was the only format specifically disclosed as an embodiment of the claimed "rules," nothing in the public record justifies restriction of the claimed "rules" to the exemplary format disclosed as the preferred embodiment. <u>See</u> <u>SRI Int'l</u>, 775 F.2d at 1121 n.14; <u>Tex. Digital Sys.</u>, 308 F.3d at 1204. Defendants' proposed construction should not be adopted for this reason alone.

Defendants then seek to impose the additional requirement:  "embodying the knowledge of expert designers <u>for application specific integrated circuits</u>."[28] To the extent that Defendants perceive a distinction between the knowledge of designers for ASICs and the knowledge of designers skilled in VLSI design, this claim should be construed broadly to include <u>either</u> skill level. Such an interpretation is evident from the '432 patent specification, as it

---

[27] JCC Statement, Exhibit A, at 8-9 (clause "J").

[28] JCC Statement, Exhibit A, at 8-9 (clause "J") (emphasis added).

discloses the knowledge of the system being extracted from both ASIC designers and VLSI designers. See, e.g., '432 patent at 2:58-61 ("The KBSC utilizes a knowledge based expert system, with a knowledge base extracted from expert ASIC designers with a high level of expertise in VLSI design . . . ."); 4:8-11 ("In the KBSC system of the present invention, however, integrated circuits can be designed at a functional level because the expertise in VLSI design is provided and applied by the invention."); 5:6-8 ("The knowledge base 35 contains ASIC design expert knowledge required for data path synthesis and cell selection."); 5:25-29 ("Using a rule based expert system with a knowledge base 35 extracted from expert ASIC designers, the KBSC system selects from the cell library 34 the optimum cell for carrying out the desired function.").

For at least the reasons given above, Defendants' proposed construction of claim element [3] is improper and Ricoh's proposed construction should be adopted.

### E.    Claim 13:  Element [4]

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| [4] describing for a proposed application specific integrated circuit a series of architecture independent actions and conditions; | A user describing an input specification containing the desired functions to be performed by the desired ASIC. | K. "describing for a proposed application specific integrated circuit a series of architecture independent actions and conditions" -- the designer represents a sequence of logical steps (rectangles) and decisions (diamonds), and the transitions (lines with arrows) between them in a flowchart format for a proposed application specific integrated circuit. |

### 1.    Ricoh's Construction

This claim element is directed to the input of a description of the desired functions to be performed by the ASIC to be produced.  Ricoh incorporates the definitions (and the bases

therefor) as set forth above for the terms "application specific integrated circuit (ASIC)"[29] and "architecture independent actions and conditions."[30] Ricoh notes that the plain and ordinary meaning of the term "describe" is: "1: to represent or give an account of in words <∼ a picture> 2: to represent by a figure, model, or picture: DELINEATE." Merriam-Webster's Ninth New Collegiate Dictionary 343 (1987) (RCL011389-407 at RCL011398) (attached as Exhibit No. 4). It is noted, however, that the use of the term "describe" or "describing" has no specialized technical meaning, and thus, there is no reason to assign any specific definition in order to properly construe claim element [4]. In light of the previously construed terms "application specific integrated circuit (ASIC)" and "architecture independent actions and conditions," the proper interpretation of claim element [4] should be: "A user describing an input specification containing the desired functions to be performed by the desired ASIC."

Ricoh's interpretation is consistent with the disclosure in the '432 patent. The '432 patent teaches that the claimed process "enables a user to define the functional requirements for a desired target integrated circuit, using an easily understood architecture independent functional level representation." '432 patent at 2:6-15. As taught in the '432 patent, the format of the input description may be in any suitable form, including textual or graphical:

> The architecture independent functional specifications of the desired ASIC can be defined in a suitable manner, such as in list form or preferably in a flowchart format. The flowchart is a highly effective means of describing a sequence of logical operations, and is well understood by software and hardware designers of varying levels of expertise and training. From the flowchart (or other functional specifications), the system and method of the present invention translates the architecture independent functional specifications into an architecture specific structural level definition of an integrated circuit, which can be used directly to produce the ASIC.

Id. at 2:21-34 (emphasis added).

For at least these reasons, Ricoh's proposed construction should be adopted.

---

[29] See Section V.A.1, supra pp. 10-11.

[30] See Section V.B.1, supra pp. 14-16.

### 2.    Defendants' Construction

As with each of the previous elements, Defendants assert a claim construction that blatantly restricts claim element [4] to the details of an input device described in the preferred embodiment of the '432 patent. In particular, Defendants' proposed construction attempts to limit the "describing" step to representations using "rectangles," "diamonds," and "lines with arrows" in a "flowchart format."[31] As noted previously, however, examples and embodiments in the specification should not be read to limit the scope of a claim term. <u>Tex. Digital Sys.</u>, 308 F.3d at 1204 ("But if the meaning of the words themselves would not have been understood to persons of skill in the art to be limited only to the examples or embodiments described in the specification, reading the words in such a confined way would mandate the wrong result and would violate our proscription of not reading limitations from the specification into the claims."); <u>see also</u> <u>Teleflex</u>, 299 F.3d at 1326 ("limitations from the specification are not to be read into the claims"). Defendants seek to go even further than what the Federal Circuit disallowed, since Defendants propose an interpretation that would limit the claim to just one of the embodiments disclosed in the '432 patent. Defendants' proposed construction should be deemed improper on that basis alone.

Moreover, as noted above,[32] patent claim 11 particularly points out the patentee's invention using "boxes," "diamonds," and "lines with arrows" for use in a "flowchart format." If the patentee intended to limit patent claim 13 to the same scope (i.e., flowchart format), the patentee would have used the same claim language, or at the very least, added the term "flowchart" to patent claim 13, as patentee had done for patent claim 18.

Defendants cited (JCC Statement, Exhibit A, at 11) the Examiner Interview Summary Record (mailed October 19, 1989 (Paper No. 8) (Ex. 5, RCL000228)) that appears in the prosecution history for support of their position. Placed in its proper context, the Summary

---

[31] JCC Statement, Exhibit A, at 11 (clause "K").

[32] <u>See</u> Section V.B.2.a, <u>supra</u> pp.17-18.

1    Record does not serve as a basis for importing implicit limitations into the scope of claim 13 of

2    the '432 patent.

3        The Summary Record was issued in order to document (from the examiner's

4    perspective) an interview conducted between the attorney prosecuting the '432 patent application

5    and the examiner examining the application.  The examiner stated in the Summary Record that

6    application claims 1, 5, 15, 18, 20, and 27 were discussed and indicated an agreement was

7    believed to have been reached as to some or all the claims.

8        In particular, the examiner agreed that certain features of the '432 patent invention are

9    considered patentable over the prior art discussed at the interview, i.e., U.S. Patent No. 4,703,435

10   (Darringer et al.).  The features identified by the examiner were:  "flowchart editor" and "expert

11   system for translating the flowchart into a netlist defining the necessary hardware cells of the

12   integrated circuit."  The examiner further stated:  "Thus, applicant's attorney will amend the

13   claims to include these features."

14       The Summary Record proves nothing more than that the examiner believed that the

15   outstanding rejection of the then-pending application claims could be overcome if the

16   enumerated features were added to the rejected application claims.  Apparently, it was the

17   examiner's perception that the rejected claims would be amended to include the enumerated

18   features.  There is no statement or other indication, however, that the examiner deemed such an

19   amendment to be the only way to overcome the rejection of the application claims.  Nor is there

20   any indication in the Summary Record (or the prosecution history as a whole) that the patentee's

21   attorney considered the examiner's statement a requirement that must be followed if the patentee

22   was to obtain a patent on application claims 1, 5, 15, 18, 20, and 27.  This conclusion is readily

23   apparent from the fact that patent application claim 20, which became patent claim 13, was not

24   amended to add such features.

25       The Summary Record thus cannot be deemed an agreement between the examiner

26   and the patentee (through its attorney) to incorporate the enumerated features into all of the then-

27   pending claims.  Instead, it must be viewed for what it is – simply an indication that the examiner

28

would need no further discussion or persuasion to remove the rejection of any claim that was amended to incorporate at least those features.

Ricoh's proposed construction is consistent with the events that occurred subsequent to the issuance of the Summary Record. In the Amendment dated November 20, 1989 (Paper No. 9) (Ex. 5, RCL000229-37), for example, the patentee did not amend <u>any</u> of the claims to incorporate all of the enumerated features. Indeed, the patentee canceled application claim 1. With respect to claims 5, 15, 20, and 27, the patentee amended the claims to incorporate certain features previously recited in dependent claims, and provided arguments why the amended claims should be considered patentable over the prior art.

If the Summary Record was intended to be a binding agreement, the patentee would have merely added the enumerated features to ensure allowance (or at least withdrawal of the rejection) of claim 1. Moreover, the patentee would have made essentially the same amendments to application claims 5, 15, 20, and 27 and <u>never</u> attempted to distinguish the claims over the prior art. The patentee, for example, could have simply stated that the amended claims included the features discussed during the interview, and thus, as (allegedly) agreed in the interview, are patentable over the prior art. Indeed, the patentee had done just that for claim 18; the patentee merely referred to the substance of the interview and provided no substantive discussion.

In contradistinction, with application claims 5, 15, 20, and 27, the patentee chose to explore the varied scope of claims that could be obtained beyond the mere coverage afforded by the enumerated features. By varying the scope of amendments to these claims and arguing the distinctive points individually, the patentee sought (and obtained) a varying degree of protection beyond that originally proposed by the examiner during the interview (which was represented by application claim 18). The patentee was <u>not</u> limited by the characterization of the claimed subject matter provided by the examiner in the Summary Record. <u>Eastman Kodak Co. v. Goodyear Tire & Rubber Co.</u>, 114 F.3d 1547, 1556 (Fed. Cir. 1997),[33] (attached as Exhibit C15)

---

[33] In <u>Eastman Kodak</u>, the court stated the following. "During the 1993 reexamination, the

1  abrogated on other grounds by Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448 (Fed. Cir. 1998)

2  (en banc) (attached as Exhibit C16).  It would thus be improper to read into patent claim 13 any

3  of the features stated in the Examiner Interview Summary Record.

4          For at least the reasons given above, Defendants' proposed construction of claim

5  element [4] is improper and Ricoh's proposed construction should be adopted.

6

7      **F.      Claim 13:  Element [5]**

8

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| [5] specifying for each described action and condition of the series one of said stored definitions which corresponds to the desired action or condition to be performed; and | Specifying for each desired function to be performed by the desired ASIC one of the definitions of the architecture independent actions and conditions stored in the library of definitions that is associated with the desired function.<br><br>("specifying"= mapping or associating a desired function to be performed by the manufactured ASIC with a definition from the library of definitions.) | L. "specifying for each described action and condition of the series one of said stored definitions" -- the designer assigns one definition from the set of stored definitions for each of the described logical steps and decisions represented in the flowchart.<br><br>M. "which corresponds to the desired action or condition to be performed" -- each specified definition must correspond to the intended step or decision to be performed. |

18

19      **1.      Ricoh's Construction**

20          This claim element is directed to the mapping or associating of one of the definitions

21  of architecture independent actions and conditions defined in the "storing a set of definitions"

22  _____

23  examiner's Reexamination Interview Summary Form stated that this claim language meant 'not

24  exceeding the initial crystallization temperature during further crystallization and after

25  condensation.'  To the extent that the examiner's certificate purports to ascribe meaning not

26  found in the claim language, this court must not permit prosecution history evidence to 'enlarge,

27  diminish, or vary' the meaning of claim language.  The claim language does not mention 'initial

28  crystallization' as distinct from 'further crystallization.'  Nor did the 1993 reexamination require

any changes in claim language." Id. (quoting Markman, 52 F.3d at 980).

1    step (claim element [1]) to an input function described in the claimed "describing" step (claim

2    element [4]).  Ricoh incorporates the definition (and the bases therefor) for the term "architecture

3    independent actions and conditions," as set forth above.[34]  As part of the proper interpretation of

4    this claim element [5], the term "specifying," to be consistent with the teachings of the

5    '432 patent, should be defined as:  "mapping or associating a desired function to be performed

6    by the manufactured ASIC with a definition from the library of definitions."

7              The '432 patent, for example, describes that the invention performs the acts of

8    selecting optimum hardware cells based on functional descriptions "as specified by the macros

9    assigned to each action."  '432 patent at 8:23-26 (emphasis added).[35]  In the exemplary

10   embodiment, the macros may be "mapped" to actions manually through user commands.  Id. at

11   7:24-25 ("Edit actions allows the designer to assign actions to each box.").  The macros also may

12   be "mapped" automatically through application of rules.  Id. at 9:14-18 ("Rules of the following

13   type are applied during this stage. . . . map actions to macros." (emphasis added)); see also id. at

14   13:5-7 ("The macro instruction associated with state21 moves the value in the register sum to

15   cv." (emphasis added)); 13:28-31 ("The macros associated with the states shown in FIG. 10

16   correspond to those defined in Table 1 above and define the particular actions which are to be

17   performed at the respective states." (emphasis added)).

18            In order to be consistent with the teachings of the invention, including the description

19   of the preferred embodiments in the '432 patent, the claim element [5] should be defined as:

20   "Specifying for each desired function to be performed by the desired ASIC one of the definitions

21   of the architecture independent actions and conditions stored in the library of definitions that is

22   associated with the desired function," where the term "specifying" should be defined as

23

24

25   [34] See Section V.B.1, supra pp. 14-16.

26   [35] As noted above, see Section V.B.1, supra pp. 16, the term "macros" is used in the '432 patent
     in its description of an embodiment of the claimed "definitions of architecture independent
27   actions and conditions."

28

"mapping or associating a desired function to be performed by the manufactured ASIC with a definition from the library of definitions."

  For at least these reasons, Ricoh's proposed construction should be adopted.

### 2. Defendants' Construction

  Consistent with their overall strategy of seeking to read additional detailed limitations into the claims, Defendants seek to construe this claim element [5] so that it is limited to a manual operation performed by the user.  JCC Statement, Exhibit A, at 13 (clause "L") ("'specifying for each described action and condition . . .'– the designer assigns one definition from the set . . .").  Defendants thus hope to limit the construction to detailed aspects of a specific embodiment disclosed in the '432 patent in which a user assigns macros to each box of an input flowchart.  See '432 patent at 7:24-26.

  Defendants' proposed construction is improper because it ignores the basic rules of claim construction.  First, as noted previously, limiting the construction of a claim to a preferred embodiment merely because it is the only embodiment disclosed, as attempted by Defendants, is improper.  SRI Int'l, 775 F.2d at 1121 n.14 ("That a specification describes only one embodiment does not require that each claim be limited to that one embodiment."); see also Tex. Digital Sys., 308 F.3d at 1204.  Second, Defendants' construction is particularly improper here because it would exclude a preferred embodiment disclosed in the specification in which the assignment of the macros is done automatically.[36]  Such a construction is "'rarely, if ever, correct.'"  Zimmer, 2004 U.S. App. LEXIS 10598, at *11 (quoting Vitronics, 90 F.3d at 1583).

  For at least the reasons given above, Defendants' proposed construction of claim element [5] is improper and Ricoh's proposed construction should be adopted.

---

[36] As noted above, see Section V.F.1, supra p. 38, the '432 patent discloses both a manual and an automatic operation for assigning macros to desired functions of the ASIC to be produced.  See, e.g., '432 patent at 9:14-18; 13:5-7; 13:28-31.

G.    Claim 13:  Element [6]

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| [6] selecting from said stored data for each of the specified definitions a corresponding integrated circuit hardware cell for performing the desired function of the application specific integrated circuit, said step of selecting a hardware cell comprising applying to the specified definition of the action or condition to be performed, a set of cell selection rules stored in said expert system knowledge base and generating for the selected integrated circuit hardware cells, a netlist defining the hardware cells which are needed to perform the desired function of the integrated circuit and the interconnection requirements therefor. | Selecting from the plurality of hardware cells in the hardware cell library a hardware cell for performing the desired function of the desired ASIC through application of the rules; and generating a netlist that identifies the hardware cells needed to perform the function of the desired ASIC and the necessary parameters for connecting the respective inputs and outputs of each hardware cell, the netlist is passed to the next subsequent step in the process for manufacturing the desired ASIC.<br><br>("netlist"= a description of the hardware components (and their interconnections) needed to manufacture the ASIC as used by subsequent processes, e.g., mask development, foundry, etc.) | N. "selecting from said stored data for each of the specified definitions a corresponding integrated circuit hardware cell for performing the desired function of the application specific integrated circuit" -- mapping the specified stored definitions for each logical step and decision represented in the flowchart to a corresponding stored hardware cell description.<br><br>O. "said step of selecting a hardware cell comprising applying to the specified definition of the action or condition to be performed, a set of cell selection rules stored in said expert system knowledge base" -- the mapping of the specified definitions to the stored hardware cell descriptions must be performed by an expert system having an inference engine for selectively applying a set of rules, each rule having an antecedent portion (IF) and a consequent portion (THEN), embodying the knowledge of expert designers for application specific integrated circuits, which enables the expert system to map the specified stored definitions for each logical step and decision represented in the flowchart to a corresponding stored hardware cell description.<br><br>P. "Netlist" -- a structural description that includes a custom controller type hardware cell and all other hardware cells required to implement the application specific integrated circuit's operations and any necessary interconnections including the necessary control and data path information for connecting the hardware cells and the controller. |

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| | | Q. "generating for the selected integrated circuit hardware cells, a netlist defining the hardware cells which are needed to perform the desired function of the integrated circuit" -- producing a list of the needed hardware cells by eliminating any mapped hardware cells that are redundant or otherwise unnecessary and producing a custom controller type hardware cell for providing the needed control for those other hardware cells and |
| | | R. "generating …interconnection requirements therefor" -- producing the necessary structural control paths and data paths for the needed hardware cells and the custom controller. |

1.    **Ricoh's Construction**

This claim element is directed to the step of selecting a hardware cell for performing a desired function of the ASIC to be produced. Ricoh incorporates the definitions (and the bases therefor) for the terms "hardware cell" and "rules," as set forth above.[37] First, the term "netlist" should be defined as: "a description of the hardware components (and their interconnections) needed to manufacture the ASIC as used by subsequent processes, e.g., mask development, foundry, etc."

Ricoh's definition of "netlist" is supported by the '432 patent specification. The '432 patent, for example, teaches: "The list of hardware cells and their interconnection requirements may be represented in the form of a netlist." '432 patent at 2:42-44. The '432 patent further teaches:

---

[37] See Section V.C.1, supra pp. 24-25 and Section V.D.1, supra pp. 27-28, respectively.

> The netlist is a list which identifies each block in the circuit and the interconnections between the respective inputs and outputs of each block. <u>The netlist provides all the necessary information required to produce the integrated circuit.</u>

<u>Id.</u> at 5:35-40 (emphasis added).[38]

Consistent with the teachings of the '432 patent, the proper definition of the term "netlist" should be: "a description of the hardware components (and their interconnections) needed to manufacture the ASIC as used by subsequent processes, e.g., mask development, foundry, etc."

Claim element [6] initially recites the "selecting" step as: "selecting from said stored data for each of the specified definitions a corresponding integrated circuit hardware cell for performing the desired function of the application specific integrated circuit." Given the proper interpretation of claim element [2] ("storing data describing a set of available integrated circuit hardware cells") as discussed above,[39] this initial clause simply refers to the process step of selecting hardware cells from those stored in the hardware cell library that can be used to implement the desired functions of the ASIC to be produced. As an illustration, for example, the '432 patent describes a preferred embodiment which uses a Cell Selector "for selecting a set of optimum cells from the cell library 34 to implement a VLSI system." '432 patent at 8:21-23.

The remaining clause of claim element [6] more specifically describes the "selecting" step as having the substeps of "applying" a set of cell selection rules and "generating" a netlist:

> said step of selecting a hardware cell comprising[:]  [(1)] <u>applying</u> . . . a set of cell selection rules . . . and [(2)] <u>generating</u> . . . a netlist defining the hardware cells which are needed to perform the desired function of the integrated circuit and the interconnection requirements therefor.

'432 patent at 16:56-65 (emphasis added).

---

[38] <u>See also</u> <u>id.</u> at 5:40-46 ("Computer-aided design systems for cell placement and routing are commercially available which will receive netlist data as input and will lay out the respective cells in the chip, generate the necessary routing, and produce <u>mask data which can be directly used by a chip foundry in the fabrication of integrated circuits</u>." (emphasis added)).

[39] <u>See</u> Section V.C.1, <u>supra</u> pp. 24-25.

1    As illustrated in an exemplary embodiment of the '432 patent, the "applying" substep

2    can be seen from the description:

3        The knowledge base of Cell Selector 32 contains information (<u>rules</u>) relating to:

4        (1) selection of macros

5        (2) merging two macros

6        (3) mapping of macros to cells

        (4) merging two cells

7        (5) error diagnostics

8        The above information is stored in the knowledge base 35 as rules.

9
                        Cell List Generation
10
11        FIG. 9 shows the cell list generation steps. . . . Rules of the following type are <u>applied</u> during this stage.

12        map arguments to data paths

13        map actions to macros

        connect these blocks

14        Rules also provide for optimization and error diagnostics at this level.

15        The cell selector maps the blocks to cells selected from the cell library 34. It selects an optimum cell for a block.  This involves the formulation
16        of <u>rules</u> for selecting appropriate cells from the cell library.

17    '432 patent at 8:65 to 9:24 (emphasis added).

18    The '432 patent further describes an exemplary implementation of an embodiment of

19    the invention (beginning at column 12, line 36), which involves the design and production of an

20    ASIC for use as a vending machine controller.  The '432 patent describes the application of a

21    variety of rules to the "macros" to achieve an optimum set of hardware components and their

22    corresponding connections ("interconnections") as used to implement the desired functions of

23    the ASIC:

24        The PSCS program 30 maps each of the macros used in the flowchart of FIG. 10 to the corresponding hardware components results in the
25        generation of the hardware blocks shown in FIG. 12.  In generating the illustrated blocks, the PSCS program 30 <u>relied upon rules 1 and 2</u> of the
26        above listed example rules.

27

28

1

FIG. 13 illustrates the <u>interconnection</u> of the blocks of FIG. 12 with
data paths and control paths.  Rule 3 was used by the data/control path
synthesizer program 31 in mapping the data and control paths.

2

FIG. 14 shows the result of <u>optimizing</u> the circuit by applying rule 4 to
eliminate redundant registers.  As a result of <u>application of this rule</u>, the
registers R2, R3, R7, R8, and R9 in FIG. 13 were removed.  FIG. 15
shows the block diagram after further optimization in which redundant
comparators are consolidated.  This <u>optimization</u> is achieved in the PSCS
program 30 by <u>application of rule 5</u>.

3

4

5

6

'432 patent at 13:48-66 (emphasis added).

7

The '432 patent, through its description of an embodiment and exemplary

8

implementation of the invention, illustrates some preferred operations of the "applying" substep

9

in the context of selection of hardware cells.  The completion of the "applying" substep results in

10

the performance of the "generating" substep, which may be best seen from the description of the

11

vending machine controller implementation in the '432 patent:

12

Having now defined the system controller block, the other necessary
hardware blocks and the data and control paths for the integrated circuit,
the PSCS program 30 now <u>generates a netlist</u> 15 defining these <u>hardware
components and their interconnection requirements</u>. From this netlist the
mask data for producing the integrated circuit can be directly produced
using available VLSI CAD tools.

13

14

15

16

'432 patent at 13:67 to 14:6 (emphasis added).

17

From the proper interpretation of the term "netlist" and the plain reading of the

18

'432 patent specification, as discussed above, the proper definition of claim element [6] should

19

be:

20

Selecting from the plurality of hardware cells in the hardware cell library a
hardware cell for performing the desired function of the desired ASIC
through application of the rules; and generating a netlist that identifies the
hardware cells needed to perform the function of the desired ASIC and the
necessary parameters for connecting the respective inputs and outputs of
each hardware cell, the netlist is passed to the next subsequent step in the
process for manufacturing the desired ASIC.

21

22

23

24

For at least these reasons, Ricoh's proposed construction should be adopted.

25

26

27

28

2.    **Defendants' Construction**

As a preliminary matter, Defendants' construction improperly rewrites the claim language to include an additional independent step:  "generating for the selected integrated circuit hardware cells, . . . ."[40]  That Defendants' construction is in error is distinctly evident from a plain reading of the claim language itself.  Claim 13, as amended to its final form and issued, includes the "generating" substep as part of the "selecting" step (claim element [6]).  A plain reading of the "generating" substep in context shows an intent by the patentee to list the substeps comprising the "selecting" step as including both "applying" <u>and</u> "generating" substeps. Additionally, it is noted that the last two claim elements (i.e., the "specifying" step (claim element [5]) and the "selecting" step (claim element [6])) are separated by a semicolon and the conjunction "and."  Traditionally in patent claim drafting, and consistently for all claims in the '432 patent, this format (i.e., " ; and") is used after the penultimate claim element of any claim listing more than one claim element.  Thus, from a plain reading of the "selecting" step (claim element [6]), consistent with the traditional rules of patent claim drafting, the Court can only conclude that the "generating" substep has always been intended to be a substep forming a part of the "selecting" step.[41]

Defendants' proposed construction of the phrase "selecting from said stored data . . . of the application specific integrated circuit"[42] is improper primarily for its adoption of previous proposed constructions that attempt to limit the claim to one of the preferred embodiments disclosed in the '432 patent (i.e., the use of a flowchart input specification).  Ricoh's position in opposition was provided in detail above.[43]  For at least the reasons set forth previously, Defendants' proposed construction is improper.

---

[40] JCC Statement, Exhibit A, at 19 (clause "Q").

[41] The only rationale Ricoh can imagine for Defendants' hollow attempt to separate the "generating" substep is Defendants' belief that doing so will support some non-infringement theory later at trial.

[42] <u>See</u> JCC Statement, Exhibit A, at 16 (clause "N").

[43] <u>See, e.g.</u>, Section V.B.2.a, <u>supra</u> pp. 17-18; V.E.2, <u>supra</u> pp. 34-37.

Defendants' proposed construction of the phrase "said step of selecting a hardware cell . . . in said expert system knowledge base"[44] is improper primarily for its adoption of previous proposed constructions that attempt to limit the claim to one of the preferred embodiments disclosed in the '432 patent (i.e., the use of an expert system and rules having an IF-THEN format).  Ricoh's position in opposition to such improper contentions was provided in detail above.[45]  For at least the reasons set forth previously, Defendants' proposed construction is improper.

Defendants' construction of the term "netlist" to mean "a structural description that includes a custom controller . . . [as well as] the necessary control and data path information for connecting the hardware cells and the controller"[46] is improper.  From this definition, it is evident that Defendants are (again) attempting to restrict the definition of a claim term to the details of a preferred embodiment disclosed in the '432 patent.  In a preferred embodiment, for example, the '432 patent describes the use of netlist 15 that "includes a custom generated system controller, all other hardware cells required to implement the necessary operations, and interconnection information for connecting the hardware cells and the system controller." '432 patent at 4:39-43.[47]

Defendants' construction is thus improper because it attempts to limit the construction to a preferred embodiment merely because it is (allegedly) the only embodiment disclosed.  SRI Int'l, 775 F.2d at 1121 n.14 ("That a specification describes only one embodiment does not require that each claim be limited to that one embodiment.");

---

[44] See JCC Statement, Exhibit A, at 16-17 (clause "O").

[45] See, e.g., Section V.E.2, supra pp. 34-37.

[46] See JCC Statement, Exhibit A, at 19 (clause "P").

[47] See also id. at 5:31-36 ("Referring again to FIG. 3, the cells selected by the cell selector 32, the controller information generated by the controller generator 33 and the data and control paths generated by the data/control path synthesizer 31 are all utilized by the PSCS program 30 to generate the netlist 15.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

see also Tex. Digital Sys., 308 F.3d at 1204. Defendants' construction is also improper because it adds limitations (e.g., "custom controller" and "control and data path") to the claim that are expressly recited in other claims.[48] See SRI Int'l, 775 F.2d at 1122.

　　　　For at least these reasons, Defendants' proposed construction of claim element [6] is improper and Ricoh's proposed construction should be adopted.

**H.    Claim 14**

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| 14. A process as defined in claim 13, including generating from the netlist the mask data required to produce an integrated circuit having the desired function. | The process of claim 13, including producing from the netlist of hardware cells to be included in the designed ASIC mask data which can be directly used by a chip foundry in the fabrication of the ASIC. | S. "generating from the netlist the mask data required to produce an integrated circuit having the desired function" -- producing, from the structural netlist, the detailed layout level geometrical information required for manufacturing the set of photomasks that are used by the processes that directly manufacture the application specific integrated circuit. |

**1.    Ricoh's Construction**

　　　　Claim 14 is directed to the generation of mask data used to produce the ASIC to be manufactured. Ricoh incorporates the definitions (and bases therefor) discussed above with respect to claim 13. In connection with the manufacture of chips, the '432 patent describes use of a "physical chip layout level description which describes the actual topological characteristics of the integrated circuit chip." '432 patent at 1:38-42. The '432 patent teaches that "[t]his

---

[48] See, e.g., '432 patent claim 10 ("The system as defined in claim 9 additionally including control generator means for generating a controller and control paths for the hardware cells selected by said cell selection means."); claim 15 ("A process as defined in claim 13 including the further step of generating data paths for the selected integrated circuit hardware cells."); claim 17 ("A process as defined in claim 16 including the further step of generating control paths for the selected integrated circuit hardware cells.").

physical chip layout level description provides the mask data needed for fabricating the chip." Id. at 1:42-44; see also id. at Fig. 1c & 3:68 to 4:4 ("FIG. 1c illustrates a physical layout level representation of an integrated circuit design, which provides the detailed mask data necessary to actually manufacture the devices and conductors which together comprise integrated circuit.").

In accordance with a preferred embodiment, the '432 patent teaches the use of computer-aided design systems "which will receive netlist data as input and will lay out the respective cells in the chip, generate the necessary routing, and produce mask data which can be directly used by a chip foundry in the fabrication of integrated circuits." '432 patent at 5:40-46.

Ricoh's definition of this claim (i.e., "producing from the netlist of hardware cells to be included in the designed ASIC mask data which can be directly used by a chip foundry in the fabrication of the ASIC") is therefore consistent with the '432 patent specification.

For at least these reasons, Ricoh's proposed construction should be adopted.

### 2. Defendants' Construction

Defendants' proposed construction of claim 14 is improper primarily for its adoption of previous proposed constructions that attempt to limit the definition of the term "netlist." Ricoh's position in opposition was provided in detail above.[49]

For at least the reasons set forth previously, Defendants' proposed construction of claim 14 is improper and Ricoh's proposed construction should be adopted.

### I. Claim 15

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| 15. A process as defined in claim 13 including the further step of generating data paths for the selected integrated circuit | The process of claim 13, including producing signal lines for carrying data to the hardware cells. | T. "generating data paths for the selected integrated circuit hardware cells" -- producing the necessary structural descriptions of the data paths for the mapped |

---

[49] See, e.g., Section V.G.2, supra pp. 45-47.

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| hardware cells. | | hardware cells. |

### 1.     Ricoh's Construction

Claim 15 is directed to the step of producing data signal lines between the hardware cells selected for implementation in the ASIC to be produced.  Ricoh incorporates the definitions (and bases therefor) discussed above with respect to claim 13.  In particular, this claim should be defined as:  "producing signal lines for carrying data to the hardware cells."

Ricoh's definition is supported by the '432 patent specification.  The '432 patent teaches that "[t]he system also generates data paths among the selected hardware cells." '432 patent at 2:39-40.  The '432 patent further states, with respect to the hardware blocks shown in Fig. 1b, "lines interconnecting the blocks represent paths for the flow of data or control signals between the blocks."  Id. at 3:60-65.  Other illustrations of the data paths can be found in the '432 patent, for example, in Fig. 13 (showing the interconnections between the hardware blocks selected in Fig. 12).  Consistent with these teachings of the '432 patent, claim 15 is properly defined as noted above.

For at least these reasons, Ricoh's proposed construction should be adopted.

### 2.     Defendants' Construction

Defendants' proposed construction defines claim 15 as the step of:  "producing the necessary structural descriptions of the data paths for the mapped hardware cells."  To the extent that this definition intends to imply that the term "structural descriptions" does not cover the "signal lines for carrying data to the hardware cells," as set forth in Ricoh's proposed construction, Defendants' construction is improper.  As noted above, the '432 patent specification clearly shows that the "data paths" described in the preferred embodiments of the '432 patent include at least the signal lines carrying data between hardware cells.  Thus, to the extent that the use of the term "structural descriptions" in Defendants' construction seeks to

1   exclude coverage of one of the preferred embodiments of the '432 patent, Defendants'

2   construction is improper.  Zimmer, 2004 U.S. App. LEXIS 10598, at *11.

3          For at least the reasons given above, Defendants' proposed construction of claim 15 is

4   improper and Ricoh's proposed construction should be adopted.

5

6          **J.     Claim 16**

7

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| 16. A process as defined in claim 15 wherein said step of generating data paths comprises applying to the selected cells a set of data path rules stored in a knowledge base and generating the data paths therefrom. | The process of claim 15, wherein the step of producing signal lines for carrying data comprises applying rules, which are placed in computer memory, to produce the signal lines for carrying data to the hardware cells. | U. "said step of generating data paths comprises applying to the selected cells a set of data path rules stored in a knowledge base and generating the data paths therefrom" -- the generating step must be performed by at least an expert system having an inference engine for selectively applying a set of rules, each having an antecedent portion (IF) and a consequent portion (THEN), embodying the knowledge of expert designers for application specific integrated circuits, which enables the expert system to produce the necessary data paths for the mapped hardware cells. |

18          **1.     Ricoh's Construction**

19

20         Claim 16 is directed to the generation of data paths by applying rules stored in a

21  knowledge base.  Ricoh incorporates the definitions (and bases therefor) discussed above with

22  respect to claims 13 and 15.  In a preferred embodiment, the '432 patent specification describes

23  the use of "a data and control path synthesizer module 31, which is a knowledge based system

24  for data and control path synthesis."  '432 patent at 4:64-66.  The knowledge based system

25  applies rules to map or generate the data and control paths.  Id. at 13:55-58 ("FIG. 13 illustrates

26  the interconnection of the blocks of FIG. 12 with data paths and control paths.  Rule 3 was used

27  by the data/control path synthesizer program 31 in mapping the data and control paths.").

28

The '432 patent thus supports Ricoh's contention that claim 16 should be defined as: "applying rules, which are placed in computer memory, to produce the signal lines for carrying data to the hardware cells."

For at least these reasons, Ricoh's proposed construction should be adopted.

## 2.    Defendants' Construction

Defendants' proposed construction of claim 16 is improper primarily for its adoption of previous proposed constructions that attempt to limit the claim to the details of one of the preferred embodiments disclosed in the '432 patent (i.e., the use of an expert system and rules having an IF-THEN format).  Ricoh's position in opposition was provided in detail above.[50]

For at least the reasons given above, Defendants' proposed construction of claim 16 is improper and Ricoh's proposed construction should be adopted.

## K.    Claim 17

| Claim Language | Ricoh's Construction | Defendants' Construction |
|---|---|---|
| 17. A process as defined in claim 16 including the further step of generating control paths for the selected integrated circuit hardware cells. | The process of claim 16, including producing signal lines for carrying control signals to the hardware cells. | V. "generating control paths for the selected integrated circuit hardware cells" -- producing the necessary structural descriptions of the control paths for the selected hardware cells. |

## 1.    Ricoh's Construction

Claim 17 is directed to the step of producing control signal lines for control of the hardware cells selected for implementation in the ASIC to be produced.  Ricoh incorporates the definitions (and bases therefor) discussed above with respect to claims 13, 15, and 16.  In

---

[50] See, e.g., Section V.E.2, supra pp. 34-37.

particular, this claim element is defined as: "producing signal lines for carrying control signals to the hardware cells."

Ricoh's definition is consistent with (and supported by) the '432 patent specification. The '432 patent teaches that "the present invention generates a system controller and control paths for the selected integrated circuit hardware cells." '432 patent at 2:40-42. As noted above, with respect to claim 15,[51] the '432 patent further states, with respect to the hardware blocks shown in Fig. 1b, "lines interconnecting the blocks represent paths for the flow of data or control signals between the blocks." Id. at 3:60-65. Consistent with these teachings of the '432 patent, claim 17 should be properly defined as noted above.

For at least these reasons, Ricoh's proposed construction should be adopted.

### 2.    Defendants' Construction

Much like their proposed construction of claim 15, Defendants' proposed construction of claim 17 uses the term "structural descriptions."[52] To the extent that the use of this term is intended to exclude the "signal lines for carrying control signals to the hardware cells," as set forth in Ricoh's proposed construction, Defendants' construction is improper. As noted above, with respect to claim 15,[53] the '432 patent specification clearly shows that the "control paths" described in the preferred embodiments of the '432 patent include at least the control signal lines to the hardware cells. Thus, to the extent that the use of the term "structural descriptions" in Defendants' construction seeks to exclude coverage of one of the preferred embodiments of the '432 patent, Defendants' construction is improper. Zimmer, 2004 U.S. App. LEXIS 10598, at *11.

---

[51] See Section V.I.1, supra p. 49.

[52] See JCC Statement, Exhibit A, at 23 (clause "V").

[53] See Section V.I.1, supra p. 49.

For at least the reasons given above, Defendants' proposed construction of claim 17 is improper and Ricoh's proposed construction should be adopted.

## VI.    CONCLUSION

Based on the analysis above, Ricoh respectfully requests that the Court adopt the foregoing constructions of claims 13-17 of the '432 patent as proposed by Ricoh.

Dated: August 27, 2004                    Ricoh Company, Ltd.

By:   ___/s/ Gary Hoffman_____
Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM,
   RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers (*Pro Hac Vice*)
Eric Oliver (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
   & OSHINSKY LLP
2101 L Street NW
Washington, D.C.  20037-1526
Telephone: (202) 785-9700
Facsimile: (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
   & OSHINSKY LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 896-5471
Facsimile: (212) 997-9880

Attorneys for Ricoh Company, Ltd.