1

2

3

4

5

6

7

8

9

10

**United States District Court**
For the Northern District of California

**FILED**

APR 0 7 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNOPSYS, INC., | No. C 03-2289 MJJ |
| Plaintiff, | No. C 03-4669 |
| v. | **CLAIM CONSTRUCTION ORDER** |
| RICOH CO., LTD., | |
| Defendant. | |
| _____/ | |
| RICOH CO., LTD., | |
| Plaintiff, | |
| v. | |
| AEROFLEX, INC., ET AL., | |
| Defendants. | |
| _____/ | |

**INTRODUCTION**

Before the Court is the parties' proposed construction of disputed terms contained in Plaintiff Ricoh Company, Ltd.'s ("Ricoh") patent. The suit involves an invention directed to a process for the design of application specific integrated circuits ("ASICs").

**United States District Court**
For the Northern District of California

1

**FACTUAL BACKGROUND**

2        This case concerns the alleged infringement of U.S. Patent Number 4,922,432 ("the '432

3 patent") entitled "Knowledge Based Method and Apparatus for Designing Integrated Circuits Using

4 Functional Specifications." The issue before the Court is the construction of ten disputed terms

5 contained in the patent.

6        The '432 patent, owned by Ricoh, claims methods for using a CAD design system to  design

7 an ASIC. "An [ASIC] is an integrated circuit chip designed to perform a specific function, as

8 distinguished from standard, general purpose integrated circuit chips, such as microprocessors,

9 memory chips, etc." '432 patent, col. 1:13-17. According to the '432 patent, the ASIC design

10 processes of prior art require the designer to consider the required objectives and tasks of the desired

11 ASIC and define the structural level design specification for that ASIC. This structural level design

12 specification must define the various hardware components and their required interconnections, as

13 well as a system controller for synchronizing the operations of those hardware components. This

14 process requires an ASIC designer to have an "extensive and all encompassing knowledge" of these

15 hardware components and their required interconnections. '432 patent, col. 1:28-31. There are only

16 a small number of very large scale integration technology (VLSI) designers who possess the highly

17 specialized skills needed to create structural level integrated circuit hardware descriptions.

18        The stated goal of the '432 patent's claimed invention is to enable the non-expert designer to

19 design ASICs. The '432 patent claims a method for enabling the use of higher level input

20 descriptions by allowing designers to describe ASIC specifications at a functional level. This

21 functional level description is done without specification of structure, implementing technology, or

22 architecture. This process involves taking architecture independent specifications and selecting

23 previously designed circuit components or structure used as building blocks for implementing an

24 ASIC. The process selects the optimum hardware cells to be included in the desired ASIC.

25 Following this method, a user who does not have expertise in VLSI design can write architecture

26 independent ASIC descriptions that ultimately can result in the automatic selection of hardware cells

27 to be used in the ASIC.

28        Claim 13 of the '432 Patent is at issue in this proceeding. Independent claim 13 describes a

2

1  process in which a designer describes an ASIC through an input specification using architecture
2  independent descriptions.  These architecture independent descriptions are used to select architecture
3  dependent hardware cells.  This process uses a library of definitions of the architecture independent,
4  functional descriptions, a library of available hardware cells, and a expert system knowledge base.
5  The expert system knowledge base contains a set of "rules" that embody the knowledge of VLSI
6  experts.  In order for each desired function to be performed by the ASIC, one of the definitions from
7  the library of definitions is specified.  The rules in the knowledge base are then applied to select
8  architecture dependent hardware cells from the library of available hardware cells.

9                                    **LEGAL STANDARD**

10         The construction of a patent claim is a matter of law for the Court.  *Markman v. Westview*
11  *Instruments, Inc.*, 517 U.S. 370, 372 (1996).  The Court must conduct an independent analysis of the
12  disputed claim terms.  It is insufficient for the Court to simply choose between the constructions
13  proposed by the adversarial parties.  *Exxon Chem. Patents v. Lubrizol Corp.*, 64 F.3d 1553, 1555
14  (Fed. Cir. 1995).  To determine the meaning of a patent claim, the Court considers three sources:  the
15  claims, the specification, and the prosecution history.  *Markman v. Westview Instruments, Inc.*, 52
16  F.3d 967, 979 (Fed. Cir. 1995) *(en banc), aff'd, Markman*, 517 U.S. 370.

17         The Court looks first to the words of the claims.  *Vitronics Corp. v. Conceptronic, Inc.*, 90
18  F.3d 1576, 1582 (Fed. Cir. 1996).  "Although words in a claim are generally given their ordinary and
19  customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner
20  other than their ordinary meaning, as long as the special definition of the term is clearly stated in the
21  patent specification or file history."  *Id.* (citation omitted).  "A technical term used in a patent
22  document is interpreted as having the meaning that it would be given by persons experienced in the
23  field of the invention, unless it is apparent from the patent and the prosecution history that the
24  inventor used the term with a different meaning."  *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78
25  F.3d 1575, 1578 (Fed. Cir. 1996).  The doctrine of claim differentiation creates the presumption that
26  limitations stated in dependent claims are not to be read into the independent claim from which they
27  depend because different language used in separate claims is presumed to indicate that the claims
28  have different meanings and scope.  *Tandon Corp. v. U.S. International Trade Com.*, 831 F.2d 1017,

**United States District Court**
For the Northern District of California

3

1  1023 (Fed. Cir. 1987).

2      Second, it is always necessary to review the specification to determine whether the inventor

3  has used any terms in a manner inconsistent with their ordinary meaning. *Vitronics*, 90 F.3d at 1582.

4  The specification can act as a dictionary when it expressly or impliedly defines terms used in the

5  claims. *Id.* Because the specification must contain a description of the invention that is clear and

6  complete enough to enable those of ordinary skill in the art to make and use it, the specification is

7  the single best guide to the meaning of a disputed term. *Id.* The written description part of the

8  specification itself does not delimit the right to exclude, however; that is the function and purpose of

9  claims. *Markman*, 52 F.3d at 980.

10     Third, the court may consider the prosecution history. *Vitronics*, 90 F.3d at 1582. "Although

11 the prosecution history can and should be used to understand the language used in the claims, it too

12 cannot enlarge, diminish, or vary the limitations in the claims." *Markman*, 52 F.3d at 980 (internal

13 quotation marks deleted) (citations omitted). However, a concession made or position taken to

14 establish patentability in view of prior art on which the examiner has relied, is a substantive position

15 on the technology for which a patent is sought, and will generally generate an estoppel. In contrast,

16 when claim changes or arguments are made in order to more particularly point out the applicant's

17 invention, the purpose is to impart precision, not to overcome prior art. Such prosecution is not

18 presumed to raise an estoppel, but is reviewed on its facts, with the guidance of precedent. *Pall*

19 *Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1995) (citations omitted).

20     Ordinarily, the Court should not rely on expert testimony to assist in claim construction,

21 because the public is entitled to rely on the public record of the patentee's claim (as contained in the

22 patent claim, the specification, and the prosecution history) to ascertain the scope of the claimed

23 invention. *Vitronics*, 90 F.3d at 1583. "[W]here the public record unambiguously describes the

24 scope of the patented invention, reliance on any extrinsic evidence is improper." *Id.* Extrinsic

25 evidence should be used only if needed to assist in determining the meaning or scope of technical

26 terms in the claims, and may not be used to vary or contradict the terms of the claims. *Id.* (quoting

27 *Pall Corp.*, 66 F.3d at 1216); *Markman*, 52 F.3d at 981.

28     The Court is free to consult technical treatises and dictionaries at any time, however, in order

**United States District Court**
For the Northern District of California

4

to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents. *Vitronics*, 90 F.3d at 1584 n.6. The Court also has the discretion to admit and rely upon prior art proffered by one of the parties, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record. *Id.* at 1584. Referring to prior art may make it unnecessary to rely on expert testimony, because prior art may be indicative of what all those skilled in the art generally believe a certain term means. *Id.* Unlike expert testimony, these sources are accessible to the public prior to litigation to aid in determining the scope of an invention. *Id.*

Disputed claim terms are construed consistently across all claims within a patent. *Southwall Techs., Inc. V. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995). Where patents-in-suit share the same disclosures, common terms are construed consistently across all claims in both patents. *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1311 (Fed. Cir. 2001) (*overruled on other grounds*).

"The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)." *Markman*, 50 F.3d at 985 (citation omitted). "Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Id.* at 986.

## DISPUTED CLAIM TERMS

The following is a list of ten terms identified by the parties in the October 21, 2004 Joint Submission of Terms, Phrases, and Clauses for Claims Construction:

1) **A computer-aided design process for designing**

2) **architecture independent actions and conditions**

3) **a set of definitions of architecture independent actions and conditions**

4) **describing . . . a series of architecture independent actions and conditions**

5) **expert system knowledge base**

6) **a set of cell selection rules**

5

United States District Court

For the Northern District of California

1  7) **selecting from said stored data for each of the specified definitions a corresponding**

2  **integrated circuit hardware cell**

3  8) **said step of selecting a hardware cell comprising applying to the specified definition of the**

4  **action or condition to be performed**

5  9) **specifying for each described action and condition of the series one of said stored definitions**

6  10) **a netlist defining the hardware cells which are needed to perform the desired function of**

7  **the integrated circuit**

8                                                          **ANALYSIS**

9  **A.      *A computer-aided design process for designing***

10       Ricoh contends that the term means "during manufacture of a desired application specific

11  integrated circuit (ASIC) chip . . . a process of designing the desired ASIC using a computer."

12  Aeroflex Inc. and Synopsys, Inc. ("Aeroflex") state that the term means "a process that uses a

13  computer for designing, as distinguished from a computer-aided manufacturing process, which uses a

14  computer to direct and control the manufacturing process." In essence, the parties' fundamental

15  disagreement revolves around whether the computer-aided design process described in claim 13 also

16  encompasses the ASIC manufacturing process.

17       Ricoh bases it proposed construction on the text of the patent specification. Specifically,

18  Ricoh directs the Court to language in the specification that states that "the present invention, for the

19  first time, opens the possibility for *the design and production* of ASICs by designers, engineers and

20  technicians who may not possess the specialized expert knowledge of a highly skilled VLSI design

21  engineer." '432 patent, col. 2:15-20 (emphasis added). Ricoh also emphasizes that the present

22  invention produces a "physical chip layout level description [that] provides the mask data needed for

23  fabricating the chip." '432 patent, col. 1:42-44; *see also* '432 patent, col. 3:68 - 4:4 ("FIG. 1c

24  illustrates a physical layout level representation of an integrated circuit design, which provides the

25  detailed mask data necessary to actually manufacture the devices and conductors which together

26  comprise integrated circuit.").

27       Aeroflex argues that Ricoh's proposed construction is contrary to the '432 patent's claims

28

United States District Court
For the Northern District of California

and specifications.[1] Specifically, Aeroflex focuses on the claim language that provides that the invention is a "computer-aided design process for designing . . . ." '432 patent, col. 16:34. Aeroflex also directs the Court to specification language that states the invention "relates to the design of integrated circuits, and more particularly relates to a computer-aided method . . . for designing integrated circuits."[2] '432 patent, col. 1:9-12.

Ricoh's proposed definition is problematic because it clearly attempts to blur the line between the process of designing integrated circuits and the process of manufacturing integrated circuits. Nothing in the claim language supports Ricoh's attempt to broaden the claims to include a manufacturing process for a desired ASIC. Rather, the claim language describes a "computer-aided design process for designing an [ASIC] . . . ." '432 patent, col. 16:34-35. Likewise, the specification consistently describes a design, rather than a manufacturing, process. In fact, the term "manufacture" does not appear in the claim or specification language.[3] While the "netlist" may be required to "produce the particular [ASIC]," *see* '432 patent, col. 2:44-49, that does not compel the conclusion that the '432 patent's design process is inherently a part of the manufacturing process of the actual ASIC chips. Given the Court's "focus . . . on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean," *Markman*, 50 F.3d at 985, the Court finds that the "computer-aided design process" described in claim 13 does not include a

---

[1]Aeroflex also argues that Ricoh's proposed construction is contrary to statements made in the '432 patent's file history. Specifically, the April 1989 Amendment provides: "The present invention is a computer-aided design . . . method whereby the use can design application specific integrated circuits . . . ." (April 1989 Amendment at 8).

[2]Aeroflex also argues that its proposed construction is more consistent with the '432 patent's title: "Knowledge Based Method and Apparatus For *Designing* Integrated Circuits Using Functional Specifications" (emphasis added).

[3]In its reply, Ricoh focuses solely on the specification language that states "the present invention, for the first time, opens the possibility for the design *and production* of ASICs by designers, engineers and technicians who may not possess the specialized expert knowledge of a highly skilled VLSI design engineer." '432 patent, col. 2:15-20 (emphasis added). However, this language, standing alone, does little to persuade the Court that the present invention was intended to encompass the ASIC manufacturing process. Rather, a fair reading of this language is that the present invention simply opened up the "possibility" that non-experts could produce or manufacture ASICs at some point in the future, but not that the present invention currently encompassed such a process.

1 manufacturing process for ASICs.[4]

2      Given these considerations, the clearest reading of "A computer-aided design process for

3 designing" is *a process that uses a computer to direct and control the design of an ASIC chip.*

4      **B.    *architecture independent actions and conditions***

5      Ricoh contends that the term means "functional or behavioral aspects of a portion of a circuit

6 (or circuit segment) that does not imply any set architecture, structure or implementing technology."

7 Aeroflex states that the term means "the logical steps and decisions that are represented as rectangles

8 and diamonds in the flowchart; where register-transfer level (RTL, as defined in Darringer et al.)

9 descriptions are excluded." Thus, the parties disagreement focuses on whether claim 13 limits input

10 specifications for the proposed ASIC to data in a flowchart format.

11      Ricoh admits that Fig. 1a illustrates an embodiment that utilizes a flowchart representation.

12 However, Ricoh argues that Aeroflex's definition impermissibly attempts to limit the scope of the

13 claimed invention to the preferred embodiment of the '432 patent.  Ricoh contends that a broader

14 interpretation of "architecture independent actions and conditions" is supported by the patent

15 specification:

16      The architecture independent functional specifications can be defined in a suitable
       manner, *such as in list form* or preferably in a flowchart form.  The flowchart is a
17      highly effective means of describing a sequence of logical operations, and is well
       understood by software and hardware designers of varying levels of expertise and
18      training. From the flowchart (*or other functional specifications*), the system and
       method of the present invention translates the architecture independent functional
19      specifications into an architecture specific structural level definition of an
       integrated circuit, which can be used directly to produce the ASIC.
20
   '432 patent, col. 2:21-34 (emphasis added).[5]  Ricoh also relies on specification language stating that
21
   "the present invention . . . enables a user to define the functional requirements for a desired target
22
   integrated circuit, using an easily understood architecture independent functional level representation
23
   . . . ." '432 patent, col. 2:6-11.  Ricoh also notes that patent claim 11, not patent claim 13,
24

25      [4]This conclusion is also bolstered by the language in claim 14. Claim 14 describes "[a] process
   as defined in claim 13, including generating from the netlist the mask data required to produce an
26 integrated circuit having the desired function." '432 patent, col. 16:66-68. This language clarifies that
   the generation of the netlist (the final step in claim 13) and the production of the integrated circuit are
27 two distinct processes.

28      [5]Ricoh argues that a "list form" input specification is a preferred embodiment of the '432 patent.
   However, this argument does not find any support in the patent specification.

8

specifically references a flowchart format and recites "having boxes representing architecture independent actions" and "diamonds representing architecture independent conditions." '432 patent, col. 16:10-12.  Ricoh argues that this demonstrates that if the patentee intended the use of "architecture independent" in claim 13 to be restricted to a flowchart format, the patentee would have used the same or similar limiting language as used in claim 11.

Aeroflex responds that the '432 patent's file history conclusively demonstrates that claim 13 requires a sequence of logical steps and decisions in a flowchart format.[6] *See* April 1989 Amendment at 11; October 1989 Examiner Interview Summary; November 1989 Amendment at 7. Aeroflex contends that the Examiner Interview Summary explicitly states that the examiner and the applicant reached an agreement on application term 20 (patent claim 13).  Specifically, the Examiner Interview Summary form shows that the examiner checked the box providing: "Agreement was reached with respect to some or all of the claims in question." (October 1989 Interview Summary). The summary form identifies application claim 20 (patent claim 13) as one of the claims discussed, and states that the following agreement was reached: "It is agreed that the features 'flowchart editor' and 'expert system for translating the flowchart into a netlist defining the necessary hardware cells of the integrated circuit' are patentable [sic] distinct from the reference list above." Aeroflex argues that this language demonstrates that an agreement was reached and that the features "flowchart editor" and "expert system for translating the flowchart into a netlist" were the examiner's only basis for allowing all of the claims including patent claim 13.  Furthermore, Aeroflex contends that the file history demonstrates that all register-transfer level descriptions were explicitly excluded from the claimed invention.

Ricoh responds that the October Interview summary, at best, is ambiguous and inconclusive. Ricoh states that while the Interview summary clearly identified the claims discussed in the interview, it specifically left undefined which claims were subject to any agreement reached because the form indicated that an agreement was reached as "to some or all of the claims." Thus, Ricoh

---

[6] Aeroflex's reliance on the specification language to support its argument is not well taken. Aeroflex cites almost exclusively to language from the preferred embodiment. *See* '432 patent, col. 3:50-59; 4:5-22, 4:35-38, 7:12-23. However, in construing disputed claim terms, a limitation cannot be imported from the preferred embodiment into the claims themselves. *Markman*, 52 F.3d at 980.

1  concludes that the only thing evidently agreed upon was that the features of a "flowchart editor" and

2  an "expert system" were distinct over prior art, and any claims containing those features would be

3  understood by both parties to be patentable over the cited prior art.  Ricoh contends that this

4  understanding is supported in the November 1989 Amendment, in which the patentee stated as

5  follows:

6  > During the interview, the Examiner carefully reconsidered the prior art and
   > applicants' claims, and upon reconsideration agreed that certain features as
7  > defined in applicants' claims, such as the "flowchart editor" and the "expert
   > system for translating the flowchart into a netlist defining the necessary hardware
8  > cells of the integrated circuit" patentably distinguish applicants' invention over
   > the prior art of record, including Darringer et al. 4,703,435.  Thus, it was agreed
9  > that Claim 18 [patent claim 11] in its present form, for example, patently defines
   > applicants' invention over the prior art of record.
10

11  November 1989 Amendment at 7.  Ricoh argues that the patentee could have made a similar

12  statement with respect to application claim 20 (patent claim 13).  Furthermore, Ricoh argues that

13  Aeroflex's attempt to exclude register-level transfer descriptions from the claimed invention

14  improperly distorts the file history.

15      Initially, the Court finds that the specification language supports Ricoh's arguments.  While

16  the flowchart format input specification is the single embodiment of the '432 patent, the

17  specification explicitly contemplated alternative input descriptions.  *See* '432 patent, col. 2:21-24;

18  2:27-28.  "[I]t is improper to read limitations from a preferred embodiment described in the

19  specification – even if it is the only embodiment – into the claims absent a clear indication in the

20  intrinsic record that the patentee intended the claims to be so limited."  *Liebel-Flarshiem Co. v.*

21  *Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).  Given the explicit patent language, the Court

22  finds that the specification language does not support the conclusion that the input specification of

23  the claimed invention is limited to a flowchart format.

24      Furthermore, the Court is not persuaded that the prosecution history unmistakably

25  demonstrates that the input specification of the claimed invention is limited to the designer's use of a

26  flowchart format.  As noted by Ricoh, the October Interview Summary specifically left undefined

27  which claims were subject to any agreement between the patentee and the examiner.  Thus, contrary

28  to Aeroflex's

10

United States District Court

For the Northern District of California

1    argument, this case is distinguishable from cases such as *Spring Window Fashions LP v. Novo*

2    *Industries, L.P.*, 323 F.3d 989 (Fed Cir. 2003), in which the court held that a reasonable competitor

3    could rely on unequivocal statements of disclaimer made during the prosecution history. Here, the

4    statements made during the prosecution history upon which Aeroflex attempts to rely, are at best,

5    ambiguous.

6        In addition, while the patentee and the examiner evidently agreed that the features of a

7    "flowchart editor" and an "expert system" were distinct over prior art, there is no indication that

8    those terms necessarily applied to application term 20 (patent claim 13). Moreover, the fact that

9    those terms were not included in the final version of patent claim 13 suggests just the opposite. "To

10   be given effect, a disclaimer must be 'clear and unmistakable.'" *Sunrace Roots Enter. Co. v. SRAM*

11   *Corp.*, 336 F.3d 1298, 1306 (Fed. Cir. 2003) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d

12   1314, 1325 (Fed. Cir. 2003)). While Aeroflex's interpretation of the October Interview summary

13   may be reasonable, the law requires much more. Accordingly, "because the statements in the

14   prosecution history are subject to multiple reasonable interpretations, they do not constitute a clear

15   and unmistakable departure from the ordinary meaning of the [claim term at issue]." *Golight, Inc. v.*

16   *Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1332 (Fed. Cir. 2004).

17       Aeroflex's argument pertaining to the file history of register-transfer level descriptions is

18   more persuasive. The file history demonstrates that the patentee amended the patent claims to

19   include the phrase "architecture independent," and distinguished the claimed invention from prior art

20   partially on that basis. *See* November 1989 Amendment at 7. The patentee stated that the

21   "specifications used by Darringer et al. are not truly at an <u>architecture independent</u> level, but rather

22   are at a lower level which is indeed <u>hardware architecture dependent</u> and defines the system at a

23   'register-transfer' level description." *Id.* Similarly, in the April 1989 Amendment, the patentee

24   stated that "a very clear distinction between Darringer and the present invention is that the input to

25   the Darringer system is in the form of a register transfer level flowchart control language . . . . [and]

26   input to the present invention is in the form of an architecture independent functional specification."

27   *Id.* Based on this language, Aeroflex argues that Ricoh disclaimed the "register-transfer" level

28   descriptions described in the Darringer prior art from the scope of its claimed invention. Ricoh

1  responds that the patentee's use of the term "register-transfer level" was merely a shorthand

2  reference used to denote the "structural" RTL-type, as opposed to "functional" RTL-type, of input

3  systems prevalent at the time.

4      In order to make this determination, the Court must examine the Darringer 4,704,435 Patent

5  ("the '435 patent") and how closely it reads upon the present invention.  The '435 patent specifically

6  defines a register-transfer level description and the subsequent translation or transformation steps

7  described in that patent do not alter this explicit definition.[7]  '435 patent, col. 5:27-38.  The Court

8  finds no relevant distinction between the RTL described in the '435 patent and the RTL specifically

9  disclaimed by Ricoh in the April and November 1989 Amendments.  Furthermore, an examination of

10  the '432 patent's public record fails to provide any support for Ricoh's distinction between

11  "structural" and "functional" RTL-type input systems.  Given these findings, Ricoh's attempt to limit

12  the patentee's disclaimer to only "structural" level RTL-type input systems is unpersuasive.  *See*

13  *Kumar v. Ovonic Battery Co.*, Inc., 351 F.3d 1364, 1368 (Fed. Cir. 2003) (adopting definition of

14  term in cited prior art which is intrinsic evidence).  Accordingly, the prosecution history indicates

15  that the patentee expressly disclaimed all register-transfer level descriptions.

16      Given these considerations, the Court defines "architecture independent actions and

17  conditions" as *functional or behavioral aspects of a portion of a circuit (or circuit segment) that*

18  *does not imply a set architecture, structure, or implementing technology, but excludes the use of*

19  *register-transfer level descriptions as taught in Darringer.*

20      **C.    *a set of definitions of architecture independent actions and conditions***

21      Ricoh contends that the term means "a library of definitions of the different architecture

22  independent actions and conditions that can be selected for use in the desired ASIC."  In contrast,

23  Aeroflex proposes that the term means "a set of named descriptions defining the functionality and

24  arguments for the available logical steps and decisions that may be specified in the flowchart where

25

26  [7]"[T]he process of this invention begins at step 100 with a register-transfer level description e.g. of the type shown in Fig. 4.  The description consists of two parts: a specification of the inputs, outputs and latches of the chip to be synthesized; and a flowchart-like specification of control, describing for a single clock cycle of the machine how the chip outputs and latches are set according to the values of the chip inputs and previous values of the latches.  At step 102 in FIG 2., the register-transfer level description undergoes a simple translation to an initial implementation of AND/OR logic.  '435 patent, col. 5:27-38.

*United States District Court*
For the Northern District of California

1  register-transfer level (RTL, as defined in Darringer et al.) descriptions are excluded."

2        It appears that the parties real dispute centers, once again, around the term "architecture

3  independent actions and conditions." This phrase should be construed as explained *supra*. It does

4  not appear that the Court needs to construe "a set of definitions," as this term should be given its

5  ordinary and customary meaning. To the extent that "a set of definitions" needs to be construed by

6  the Court, Aeroflex's Responsive Brief is unhelpful because it never addresses Ricoh's proposed

7  construction. It appears that Aeroflex's use of the terms "named descriptions" and "arguments"

8  intends to encompass the "macros" shown in Table 1 of the '432 patent. *See* '432 patent, col. 7:29-

9  49. Given Aeroflex's lack of analysis of this term, the Court cannot accept Aeroflex's definition as it

10  has not presented a basis for narrowing the claim term. Ricoh's use of the term "library" is

11  supported by the patent's intrinsic evidence. *See* '432 patent, col. 2:20-22. Thus, the Court

12  construes "a set of definitions of architecture independent actions and conditions" as *a library of*

13  *definitions of the different architecture independent actions and conditions that can be selected for*

14  *use in the desired ASIC.*

15        **D.**    *describing . . . a series of architecture independent actions and conditions*

16        Ricoh contends that the term means "a user describing an input specification containing the

17  desired functions to be performed by the desired ASIC." Aeroflex states that the term means "the

18  designer represents a sequence of logical steps (rectangles) and decisions (diamonds), and the

19  transitions (lines with arrows) between them in a flowchart format that excludes any register-transfer

20  level (RTL, as defined in Darringer et al.) descriptions.

21        Once again, it appears that the parties real dispute centers around the term "architecture

22  independent actions and conditions." This phrase should be construed as explained *supra* and is not

23  limited to the use of a "flowchart format." To the extent that the terms "describing" and "series"

24  need to be defined, they should be given their ordinary and customary meaning. "Describe" is

25  defined as "to represent or give an account in words." Merriam-Webster's Ninth New Collegiate

26  Dictionary (1987). The parties have not provided the Court with the ordinary meaning of the term

27  "series."

28        Aeroflex argues that Ricoh's proposed construction is contrary to the claim language because

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  it merely requires an input specification "containing the desired functions," and thus eliminates the

2  requirement that the designer must describe "a series." Aeroflex contends that such a definition

3  contradicts the actual words in the claim (i.e., "describing . . . a series) and is also contrary to the

4  requirement in the patent's specification that the designer must "describ[e] a sequence of logical

5  operations." '432 patent, col. 2:24-25. Ricoh does not address this argument. Accordingly, the

6  Court defines "describing . . . a series of architecture independent actions and conditions" as

7  *describing an input specification containing a series of desired functions to be performed by the*

8  *desired ASIC.*

9  **E.    *expert system knowledge base***

10  Ricoh contends that the term means "a database used to store expert knowledge of highly

11  skilled VLSI designers." Aeroflex defines "expert system" and "knowledge base" separately.

12  Aeroflex states that "expert system" should be defined as "software that solves problems through

13  selective application of the rules in the knowledge base by an inference engine, as distinguished from

14  conventional software, which uses a predefined step-by-step procedure (algorithm) to solve

15  problems." Aeroflex asserts that a knowledge base is a "portion of the expert system software

16  having a set of rules, each rule having an antecedent portion (e.g. IF) and a consequent portion (e.g.,

17  THEN), and embodying the knowledge of expert designers for application specific integrated

18  circuits."

19  Ricoh's proposed construction relies heavily on the '432 patent's specification. Specifically,

20  the specification states that "[t]he knowledge base 35 contains ASIC design expert knowledge

21  required for data path synthesis and cell selection." '432 patent, col. 5:6-8. "Using a rule based

22  expert system with a knowledge base 35 extracted from expert ASIC designers, the KBSC system

23  selects from the cell library 34 the optimum cell for carrying out the desired function." '432 patent,

24  col. 5:25-29. Based on these passages, Ricoh argues that an "expert system knowledge base" is a

25  collection of data that represents knowledge obtained from experts in ASIC design.

26  Aeroflex dismisses Ricoh's proposed construction as overly simplistic. Aeroflex argues that

27  a person of ordinary skill in the art in 1988 would have known that two distinct approaches existed

28  for selecting hardware cells: 1) rule-based expert system software; and 2) conventional algorithmic

United States District Court
For the Northern District of California

1  software. Aeroflex further contends that a person of ordinary skill in the art would have understood

2  that rule-based expert system software must contain an inference engine, a knowledge base, and a

3  working memory, which enable the inference engine to selectively apply the rules stored in the

4  knowledge base to what is stored in the working memory (as distinguished from conventional

5  algorithmic software, which uses a predefined step-by-step procedure). To support its argument,

6  Aeroflex cites to a technical dictionary entitled "Artificial Intelligence Terminology" that states: "An

7  expert system will generally consist of a rule base, an inference engine and a user interface (which

8  will generally provide an explanation facility)." Aeroflex also cites the Court to the Dunn Patent

9  4,656,603 ("the '603 patent"). The '603 patent speaks in general terms regarding the distinction

10  between the two types of software and states that since rule-based expert systems "often must make

11  conclusions based on incomplete or uncertain information, they differ substantially from

12  conventional computer programs which solve problems in accordance with pre-defined algorithms

13  and complete data sets." '603 patent, col. 1:44-49.

14       Aeroflex also argues that the distinction between the rule-based expert system approach and

15  the conventional algorithmic approach is evident from the prior art that the patentee distinguished in

16  the patent's file history. In the November 1989 Amendment, the patentee added the following

17  language to application claim 5 (patent claim 1): "said cell selection means comprising an expert

18  system including a knowledge base containing rules for selecting hardware cells from said cell

19  library and inference engine means for selecting appropriate hardware cells from said cell library in

20  accordance with the rules of said knowledge base." November 1989 Amendment at 2. The patentee

21  stated that application claim 5 (patent claim 1) was amended to "clearly distinguish it over the cited

22  prior art by more clearly defining the expert system aspects of applicant's invention including the

23  provision of a knowledge base containing rules for selecting hardware cells, inference engine means

24  for selecting appropriate hardware cells, and netlist generator means for generating a netlist defining

25  the hardware . . . ." November 1989 Amendment at 8. Although this amendment applied only to

26  application claim 5 (patent claim 1), the patentee also amended application claim 20 (patent claim

27  13) to include "applying . . . a set of cell selection rules stored in said expert system knowledge base .

28  . . ." The patentee explained that this language was added to "emphasize the expert system aspects

United States District Court

For the Northern District of California

of applicants' method." November 1989 Amendment at 9. Thus, Aeroflex is essentially arguing that the description of an expert system in patent claim 1 (including an inference engine) should also be read to encompass the expert system described in patent claim 13.

Ricoh responds that the patentee's statement in the November 1989 Amendment only further proves its point. Ricoh argues that this statement does not establish that an "expert system" had become an element of claim 13, but merely confirmed the patentee intent to claim certain aspects (i.e., the claimed "expert system knowledge base") of an expert system - not an expert system itself.[8] Moreover, Ricoh argues that even if the Court finds that the patentee intended to encompass both an "expert system" and a "knowledge base," there is nothing in the claim language, specification, or prosecution history that requires that an expert system contain an inference engine and a working memory.

Initially, the Court finds no support for Ricoh's argument that "expert system" is simply an adjective modifying the noun "knowledge base." The patentee explicitly stated that claim 13 was "amended to emphasize the expert system aspects of applicant's method." November 1989 Amendment at 9. Therefore, the Court finds that "expert system" was an element of claim 13.

Next, the Court finds that Aeroflex's assertion that a person of ordinary skill in the art would have understood that rule-based expert system software must contain an inference engine, a knowledge base, and a working memory is simply not supported by the intrinsic evidence. As noted by Ricoh, claims one through nine of the '432 patent specifically claim an inference engine, while claim 13 does not make such a claim. Aeroflex's attempt to have the Court read the description of an expert system from patent claim 1 onto the expert system described in patent claim 13 is unpersuasive. Additionally, the technical dictionary definition provided by Aeroflex states that an inference engine is "generally" an element of an expert system. Given the qualified language of the definition, in combination with the fact that claim 13 makes no mention of an "inference engine," the Court finds the technical dictionary definition unhelpful in this context. Finally, Aeroflex's reference to the '603 patent is ultimately unhelpful, as the '603 patent describes an intentional expert

---

[8]In other words, Ricoh is arguing that the term "expert system" is grammatically read as an adjective or other modifier for the noun "knowledge base."

United States District Court

For the Northern District of California

1  system, as opposed to a knowledge-based expert system, and makes no mention of an inference

2  engine. '603 patent, col. 5:53-56. Given these considerations, the Court defines "expert system" and

3  "knowledge base" separately. "Expert system" should be defined as *software that solves problems*

4  *through selective application of rules in the knowledge base.* "Knowledge base" should be defined

5  as a *portion of an expert system software having a set of rules and embodying expert knowledge of*

6  *highly skilled VLSI designers.*

7       **F.    *a set of cell selection rules***

8       Ricoh contends that the disputed term is defined as "a plurality of rules for selecting among

9  the hardware cells from the hardware cell library, wherein the rules comprise the expert knowledge

10  of highly skilled designers formulated as prescribed procedures." Aeroflex contends that the term is

11  properly defined as "a set of rules embodying the knowledge of expert designers for application

12  specific integrated circuits, each rule having an antecedent portion (e.g. IF) and a consequent portion

13  (e.g., THEN), which enables the expert system to map the specified stored definitions for each

14  logical step and decision represented in the flowchart to a corresponding stored hardware cell

15  description."

16      Aeroflex states that its proposed construction is consistent with contemporaneous technical

17  dictionaries, treatises, and the prior art. *See* Ex. 15 at 74-75, Ex. 17 at 10-11, Ex. 14 at 10, 53, Ex.

18  18 at 8, Ex. 20 at 14-15, Ex. 21 at 269. "The two parts of a rule are a premise and a conclusion, a

19  situation and an action, or an antecedent and a consequent. These statements are written in an IF-

20  THEN format." Ex. 15 at 74, Louis E. Frenzel Jr., *Understanding Expert Systems.* The technical

21  dictionary provided by Aeroflex defines "rule" as follows: "(If-Then Rule). A conditional statement

22  of two parts." Ex. 21, Paul Harmon, *Expert Systems: Tools & Applications.* Aeroflex also argues

23  that the patent's specification requires that the "rules" not only embody expert knowledge, but that

24  the expert knowledge also be used for mapping the specified definitions in the flowchart to the

25  hardware cell descriptions. Aeroflex Responsive Brief at 48; *see* '432 patent, col. 8:21-23; 8:34-37.

26      Ricoh contends that the general usage dictionary definition of "rule" should apply. Also,

27  while Ricoh admits that the preferred embodiment of the '432 patent disclosed that "rules" could be

28  in the format of "an antecedent portion (IF) and a consequent portion (THEN)," it also asserts that

17

1  nothing in the public record justifies restriction of the claimed "rules" to the exemplary format

2  disclosed as the preferred embodiment.  Richo additionally contends that the '432 patent states

3  specific rules in the specification that are not stated in the if/then format.  *See* '432 patent, col. 12:31-

4  35.  Moreover, Ricoh also disagrees with Aeroflex's inclusion of the following requirement:

5  "embodying the knowledge of expert designers for application specific circuits."  Ricoh argues that

6  to the extent Aeroflex is attempting to create a distinction between the knowledge of designers for

7  ASICs and the knowledge of designers skilled in VLSI design, the claim should be construed broadly

8  to include either skill.  *See, e.g.*, '432 patent, col. 2:58-61 ("The KBSC utilizes a knowledge based

9  expert system, with a knowledge base extracted from expert ASIC designers with a high level of

10  expertise in VLSI design . . ."); col. 4:8-11 ("In the KBSC system of the present invention, however,

11  integrated circuits can be designed at a functional level because the expertise in VLSI design is

12  provided and applied by the invention.")

13      Based on Aeroflex's citation to the technical dictionary, it appears that "rule" as used in the

14  '432 patent would have had a particular meaning to one of ordinary skill in the art.  Therefore, to the

15  extent Ricoh's definition relies on a general dictionary definition, it must be rejected.  *See*

16  *Vanderlande Industries Nederland BV v. I.T.C.*, 366 F.3d 1311, 1321 (Fed. Cir. 2004).  The technical

17  dictionary definition offered by Aeroflex demonstrates that the ordinary meaning of "rules" when

18  used to refer to rules that are contained in the knowledge base of a rule-based expert system must

19  include an "IF-THEN" component.  The Court is not persuaded that column 12, lines 31 to 35 of the

20  '432 patent state "rules" as that term is understood in the patent.  Rather, lines 31 to 35 appear to be

21  discussing other actions that a user could take if additional rules were present.

22      However, the Court finds little support for Aeroflex's argument that claim 13 requires that

23  the rules stored in the knowledge base of the rule-based expert system embody the expert knowledge

24  for mapping the specified definitions in the flowchart to the hardware cell descriptions.  Certainly,

25  the plain language of claim 13 does not dictate that the "rules" encompass the "mapping" function.

26  Moreover, while the patent's specification does suggest that the rules might play such a role in the

27  preferred embodiment, *see* '432 patent, col. 8:34-37, such a conclusion is not compelled from the

28  specification language.  In any event, the Court should not "limit[] the claimed invention to preferred

18

1    embodiments or specific examples in the specification." *Ekchian v. Home Depot, Inc.*, 104 F.3d

2    1299, 1303 (Fed. Cir. 1997).

3         Furthermore, Ricoh correctly states that the definition should not make a distinction between

4    the knowledge of designers for ASICs and the knowledge of designers skilled in VLSI design. The

5    specification clearly contemplated that both sets of knowledge would be included in the knowledge

6    base. *See* '432 patent, col. 2:58-61; col. 4:8-11. Furthermore, Aeroflex's attempt to include the

7    following language in the definition - "for each logical step and decision represented in the

8    flowchart" - should be rejected for the reasons discussed *supra*. Accordingly, the Court construes "a

9    set of cell selection rules" as *a set of rules embodying the expert knowledge of highly skilled VLSI*

10   *designers, each rule having an antecedent portion (e.g., IF) and a consequent portion (e.g. THEN)*.

11       **G.**    *selecting from said stored data for each of the specified definitions a corresponding*

12             *integrated circuit hardware cell*

13        Ricoh contends that the term means "selecting from the plurality of hardware cells in the

14   hardware cell library a hardware cell for performing the desired function of the desired ASIC."

15   Aeroflex contends that the term means "mapping the specified stored definitions for each logical step

16   and decision represented in the flowchart to a corresponding stored hardware cell description."

17        Ricoh's argues that this term simply refers to the process of selecting hardware cells from

18   those stored in the hardware cell library that can be used to implement the desired functions of the

19   ASIC to be produced. In support of its argument, Ricoh cites the specification language stating that

20   "[t]he Cell Selector 32 is a knowledge based system for selecting a set of optimum cells from the cell

21   library to implement a VLSI system." '432 patent, col. 8:21-23.

22        Aeroflex argues that its proposed construction is supported by the language in claim 13,

23   which according to Aeroflex, "dictates that mapping the specified definitions to the stored hardware

24   cell descriptions must be performed by a rule-based expert system and not conventional software."

25   Aeroflex Responsive Brief at 41:3-6. Aeroflex relies upon the following specification language to

26   support its argument: "To design a VLSI system from a flowchart description of a user application, it

27   is necessary to match the functions in a flowchart with cells from a cell library. This mapping needs

28   the use of artificial techniques because the cell selection process is complicated and is done on the

1   basis of a number of design parameters and constraints." '432 patent, col. 8:31-31-37.

2       Although it is a close question, Aeroflex's argument is ultimately more compelling. As

3   discussed above, the patent file history demonstrates that the patentee distinguished the present

4   invention based on the rule-based expert system's ability "to accomplish a task of selection of cells

5   from the cell library." April 1989 Amendment at 10. This amendment strongly suggests that the

6   mapping of the specified definitions to the stored hardware cells must be performed by a rule-based

7   system. *See* Aeroflex Responsive Brief at 42. Ricoh's proposed language does not include a

8   reference to a "rule-based system." Aeroflex's use of the word "mapping" is supported by the

9   specification language '432 patent, col. 8:34; col. 9:53. Furthermore, at the claims construction

10  hearing, Ricoh's counsel stated that he had no objection to the use of the term "mapping" in this

11  context. However, Aeroflex's inclusion of the phrase "for each logical step and decision represented

12  in the flowchart" is improper because it attempts to limit the claim to the preferred embodiment of

13  the flowchart input specification, as discussed *supra*. Therefore, the Court construes "selecting from

14  said stored data for each of the specified definitions a corresponding integrated circuit hardware cell"

15  as *mapping the specified stored function to a corresponding stored hardware cell.*

16      **H.    said step of selecting a hardware cell comprising applying to the specified
            definition of the action or condition to be performed**

17

18      Ricoh argues that the term is defined as "selecting from the plurality of hardware cells in the

19  hardware cell library a hardware cell . . . through application of the rules; and generating a netlist that

20  identifies the hardware cells needed to perform the function of the desired ASIC." Aeroflex

21  contends that the term should be defined as "the mapping of the specified definitions to the stored

22  hardware cell descriptions must be performed by applying to the specified definitions in the

23  flowchart a set of cell selection rules stored in an expert system knowledge base."

24      The parties proposed constructions are not substantially different. As discussed above,

25  Aeroflex's attempt to restrict the term to "definitions in the flowchart" is incorrect. However,

26  Aeroflex's proposed use of the term "expert system knowledge base" also seems incorrect because it

27  is unnecessary here; the term does not require a definition that specifies the location where the cell

28  selection rules are found. Similarly, Ricoh's inclusion of "generating a netlist that identifies the

1    hardware cells needed to perform the function of the desired ASIC" seems unnecessary here; such a
2    definition would function to incorporate a separate step of the claim not covered by the current term.
3    Accordingly, the Court defines the term as *the mapping of the specified definitions to the stored*
4    *hardware cell descriptions by applying to the specified definitions a set of cell selection rules.*

5    **I.    *specifying for each described action and condition of the series one of said stored***
         ***definitions***
6

7    Ricoh proposes that this term be construed as "specifying for each desired function to be
8    performed by the desired ASIC one of the definitions of the architecture independent actions and
9    conditions stored in the library of definitions that is associated with the desired function." Aeroflex
10   contends that the proper construction of the term is "the designer assigns one definition from a set of
11   stored definitions to each of the logical steps and decisions represented in the flowchart." The
12   parties dispute centers around whether the "specifying" step must be performed manually by a user,
13   or whether the assignment of macros can be done automatically.

14   Ricoh admits that the patent discloses a "manual mapping" embodiment. '432 patent, col.
15   7:24-25 ("Edit actions allows the designer to assign actions to each box."). However, Ricoh argues
16   that the construction of the claim should not be limited merely because it is the only embodiment
17   disclosed. *See Liebel-Flarsheim Co.,* 358 F.3d at 913. Furthermore, Ricoh contends that the patent
18   describes macros being "mapped" automatically through the application of rules. *See* '432 patent,
19   col. 9:14-18. Ricoh argues that if col. 9:14-18 is read in context, the passage shows that the quoted
20   rules are to be applied "during this stage," which refers to the "first step of cell list generation."
21   Accordingly, Ricoh contends that this passage does not apply to a statelist in which the "macros"
22   have already been assigned to the desired actions.

23   Aeroflex disagrees with Ricoh's proposed construction. First, Aeroflex argues that the
24   prepositional phrase "for each described action and condition of the series" refers only to the fact that
25   the "specifying" step is performed for each action and condition in the described series resulting
26   from the previous "describing" step. Thus, Aeroflex concludes that the claim language for this
27   "specifying" step requires that "the designer assigns one stored definition for each logical step and
28   decision described in the flowchart." Second, Aeroflex argues that other claims demonstrate that for

United States District Court
For the Northern District of California

21

United States District Court

For the Northern District of California

1  each action and condition described, this step requires the designer to specify one stored definition

2  (from a macro library) and that this "specifying" step and the previous "describing" step together are

3  the steps that define the input specification for the claimed invention's method.  Third, Aeroflex

4  argues that Ricoh's proposed construction impermissibly attempts to replace the phrase "for each

5  described action and condition" with the phrase "for each desired function to be performed by the

6  desired ASIC."  Finally, Aeroflex argues that the '432 patent does not contain an automated

7  "mapping" embodiment.

8      The Court finds that Aeroflex's attempt to limit the "specifying" step to encompass only a

9  user manually assigning a single definition to each action and condition is too narrow of a

10  construction.  The plain language of the claim simply does not support this construction, and the

11  Court should not "limit[] the claimed invention to preferred embodiments or specific examples in the

12  specification."  *Ekchian*, 104 F.3d at 1303.  Moreover, while Aeroflex is correct that claim 1 and

13  claim 9 require the designer to "specify" one stored definition for each action and condition

14  described, this contention alone does not suggest that the Court should juxtapose these claims onto

15  claim 13.  Claim 13 simply does not contain similar language.[9]

16      Additionally Ricoh's attempt to replace the phrase "for each described action and condition"

17  with the phrase "for each desired function to be performed by the desired ASIC" is permissible.

18  Throughout the specification, each "action and condition" is referenced as a "function."  *See* '432

19  patent, col. 2:21-30.  Therefore, the Court construes "specifying for each described action and

20  condition of the series one of said stored definitions" as *specifying for each desired functional*

21  *specification to be performed by the desired ASIC one of the definitions from the set of stored*

22  *definitions.*

23  **J.    a netlist defining the hardware cells which are needed to perform the desired**
      **function of the integrated circuit**

24

25      Ricoh contends that the term means "a description of the hardware components (and their

26  interconnections) needed to manufacture the ASIC as used by subsequent processes, e.g., mask

27

28      [9]Aeroflex's proposed construction is also flawed because of its inclusion of the phrase "logical
   steps and decisions represented in the flowchart."  *See* discussion *supra*.

development, foundry, etc." Aeroflex states that the term means "producing a list of the needed hardware cells by eliminating any mapped hardware cells that are redundant or otherwise unnecessary, producing a custom controller type hardware cell for providing the needed control for those other hardware cells, and producing the necessary structural control paths and data paths for the needed hardware cells and the custom controller." '432 patent, col. 5:38-46.

Ricoh's proposed construction also relies heavily upon language in the specification. Specifically, Ricoh notes that the specification states that "[t]he list of hardware cells and their interconnection requirements may be represented in the form of a netlist. From the netlist it is possible using either known manual techniques or existing VLSI CAD layout systems to generate the detailed chip level geometrical information (e.g. mask data) required to produce the particular application specific integrated circuit in chip form." '432 patent, col. 2:42-49. The specification also states that "[t]he netlist provides all the necessary information required to produce the integrated circuit. Computer-aided design systems for cell placement and routing are commercially available which will receive netlist data as input and will lay out the respective cells in the chip, generate the necessary routing, and produce mask data which can be directly used by the chip foundry in the fabrication of integrated circuits."

Aeroflex also relies heavily upon the patent's specification to support its proposed construction. Aeroflex initially argues that the claim language "generating for the selected . . . hardware cells, a netlist defining the hardware cells which are needed to perform the desired function of the integrated circuit" requires that this step eliminate any selected hardware cells that are not needed. *See* '432 patent, col. 13:59-66. Aeroflex also contends that the patent's specification defines the "interconnection requirements" for the necessary hardware cells defined in the netlist as "data and control paths." *See* '432 patent, col. 5:30-35. Finally, Aeroflex contends that a system controller must be generated for the netlist. In support of its argument, Aeroflex cites language from the preferred embodiment that states "[t]he netlist includes a custom generated system controller, all other hardware cells required to implement the necessary operations, and interconnection information for connecting the hardware cells and the system controller." '432 patent, col. 4:39-43. Additionally, Aeroflex asserts that the requirement that a controller be generated is also supported by

23

United States District Court

For the Northern District of California

1  the patent's file history. Specifically, Aeroflex argues that the file history limits the input

2  specification to exclude register-transfer level descriptions that would define the control for the

3  hardware cells of the ASIC, and thus a controller must be generated to provide necessary control for

4  the ASIC.

5       The Court agrees with Ricoh that Aeroflex's arguments regarding "eliminating any mapped

6  hardware cells that are redundant or otherwise unnecessary" and "producing a custom controller type

7  hardware cell for providing the needed control for those other hardware cells" bear no relationship to

8  a plain reading of claim 13. Additionally, contrary to Aeroflex's assertion, a review of the patent file

9  history does not reveal that a controller must be generated in claim 13. Furthermore, while claim 10

10 expressly includes the generation of a controller, claim 13 includes no such language. *See* '432

11 patent, col. 16:1-4 ("The system as defined in claim 9 additionally including control generator means

12 for generating a controller and control paths for the hardware cells selected by said cell section

13 means.").

14      The Court also finds that claim 13 does not restrict the interconnection requirements of the

15 hardware cells to "data and control paths." To be certain, "data and control paths" are the types of

16 interconnections disclosed in the patent's preferred embodiment. But, the Court should not "limit[]

17 the claimed invention to preferred embodiments or specific examples in the specification." *Ekchian*,

18 104 F.3d at 1303. Moreover, while claim 15 expressly includes the generation of control paths,

19 claim 13 includes no such language. *See* '432 patent, col. 17:1-3 ("A process as defined in claim 13

20 including the further step of generating data paths for the selected integrated circuit hardware

21 cells."). For these reasons, the Court agrees with Ricoh's proposed construction of the term. The

22 Court defines "a netlist defining the hardware cells which are needed to perform the desired function

23 of the integrated circuit" *as a description of the hardware components (and their interconnections)*

24 *needed to manufacture the ASIC as used by subsequent processes, e.g., mask development, foundry,*

25 *etc.*

26 ///

27 ///

28 ///

24

1

**CONCLUSION**

Based on the analysis above, the Court adopts the foregoing constructions of the disputed claim terms.

**IT IS SO ORDERED.**

Dated: April __7__, 2005

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE