Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICOH COMPANY, LTD., | ) |
| Plaintiff, | ) |
| vs. | ) |
| AEROFLEX ET AL, | ) |
| Defendants. | ) **CASE NO. CV 03-4669 MJJ (EMC)** |
| | ) **CASE NO. CV 03-2289 MJJ (EMC)** |
| | ) |
| | ) **MANUAL FILING NOTIFICATION** |
| SYNOPSYS, INC., | ) |
| Plaintiff, | ) |
| vs. | ) |
| RICOH COMPANY, LTD., | ) |
| Defendant. | ) |

DSMDB.2042546.1

Regarding: Joint Letter to Magistrate Judge Edward M. Chen, dated February 9, 2006, and Exhibits 6-19 attached thereto.

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office.  If you are a participant in this case, this filing will be served in hard-copy shortly.  For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

[_] Voluminous Document (PDF file size larger than the e-filing system allows)

[_] Unable to Scan Documents

[_] Physical Object (description): _____

   _____

[_] Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media

[X] Item Under Seal

[_] Conformance with the Judicial Conference Privacy Policy (General Order 53).

[_] Other (description): _____

Dated: February 9, 2006                    Respectfully submitted,

                                           KENNETH W. BROTHERS
                                           GARY M. HOFFMAN
                                           EDWARD A. MEILMAN
                                           Dickstein Shapiro Morin & Oshinsky, LLP

                                           JEFFREY B. DEMAIN
                                           JONATHAN WEISSGLASS
                                           Altshuler, Berzon, Nussbaum, Rubin & Demain


                                           By:_____/s/_____
                                              Kenneth W. Brothers

                                           Attorneys for Ricoh Company, Ltd.

DSMDB.2042546.1

1   Gary M. Hoffman, pro hac vice
    Kenneth W. Brothers, pro hac vice
2   Eric Oliver, pro hac vice
3   Dickstein Shapiro Morin & Oshinsky LLP
    2101 L Street, NW
4   Washington, DC 20037-1526
    Phone: (202) 785-9700
5   Fax: (202) 887-0689

6
    Edward A. Meilman, pro hac vice
7   Dickstein Shapiro Morin & Oshinsky LLP
    1177 Avenue of the Americas
8   New York, New York 10036-2714
    Phone: (212) 835-1400
9   Fax: (212) 992-9880

10
    Jeffrey B. Demain, State Bar No. 126715
11  Jonathan Weissglass, State Bar No. 185008
    Altshuler, Berzon, Nussbaum, Rubin & Demain
12  177 Post Street, Suite 300
    San Francisco, California 94108
13  Phone: (415) 421-7151
14  Fax: (415) 362-8064

15  Attorneys for the Plaintiff Ricoh Company, Ltd.

16          IN THE UNITED STATES DISTRICT COURT
17           NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION
18
19  RICOH COMPANY, LTD.,                    )   Case No.
                                            )
20              Plaintiff,                  )   (D. Del Case No. 03-103 GMS)
                                            )
21         vs.                              )   PATENT INFRINGEMENT ACTION
                                            )
22  AEROFLEX INCORPORATED, AMI              )   NOTICE OF DEPOSITION OF
    SEMICONDUCTOR, INC., MATROX             )   SYNOPSYS, INCORPORATED
23  ELECTRONIC SYSTEMS, LTD., MATROX        )   PURSUANT TO FED. R. CIV. P. 30(b)(6)
    GRAPHICS INC., MATROX                   )   AND 45
24  INTERNATIONAL CORP. and MATROX          )
    TECH, INC.,                             )
25                                          )
                                            )
26              Defendants.                 )
                                            )
27  _____)

28

1

2    PLEASE TAKE NOTICE that Ricoh Company, Ltd., by and through its attorneys, will

3    take the depositions upon oral examination pursuant to Rule 30(b)(6) and Rule 45 of the Federal

4    Rules of Civil Procedure of the person(s) designated by Synopsys, Inc. ("Synopsys") as

5    knowledgeable regarding the subject areas listed below.  The deposition will take place at the

6    offices of Altshuler, Berzon, Nussbaum, Rubin & Demain, 177 Post Street, Suite 300, San

7    Francisco, California  94108, or at a place mutually agreed upon by the parties, commencing at

8    9:00 a.m. on November 4, 2003, or on a date mutually agreed upon by the parties, and will

9    continue from day to day until completed.

10    The deposition may be videotaped and will be made before an officer authorized to

11    administer an oath and will be recorded by stenographic means.

12

13   Dated: October 15, 2003                    Respectfully submitted,

14                                              Ricoh Company, Ltd.

15

16                                              By: _____
                                                Gary M. Hoffman
17                                              Kenneth W. Brothers
                                                Eric Oliver
18                                              DICKSTEIN SHAPIRO MORIN &
                                                OSHINSKY  LLP
19                                              2101 L Street NW
                                                Washington, D.C.  20037-1526
20                                              Telephone: (202) 785-9700
                                                Facsimile: (202) 887-0689
21

22                                              Edward A. Meilman
                                                DICKSTEIN SHAPIRO MORIN &
23                                              OSHINSKY  LLP
                                                1177 Avenue of the Americas
24                                              New York, New York  10036
                                                Telephone:  (212) 896-5471
25                                              Facsimile:  (212) 997-9880

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, California 94108
Phone: (415) 421-7151
Fax: (415) 362-8064

Attorneys for the Plaintiff

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A**

**DEFINITIONS**

a)  **Communication.**  The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

b)  **Document.**  The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data or data compilations.  A draft or non-identical copy is a separate document within the meaning of this term.

c)  **Synopsys, Inc.**  The term "Synopsys, Inc." as well as its abbreviated name (e.g., "Synopsys") or a pronoun referring to the foregoing means the Delaware corporation known as Synopsys, Inc and having place of business at 700 E. Middlefield Road, Mountain View, California, and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates.

d)  **Parties.**  The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates. Where the listed subject area is not related or limited to a specific named defendant, the listed subject area shall be construed as seeking knowledge and information concerning any and all of the defendants named in this action, including Aeroflex Incorporated, AMI Semiconductor, Inc., Matrox Electronic Systems Ltd., Matrox Graphics Inc., Matrox International Corp., and Matrox Tech, Inc.

e)  **Person.**  The term "person" is defined as any natural person or any business, legal or governmental entity or association.

f)  **Concerning.**  The term "concerning" means relating to, referring to, describing, evidencing or constituting.

g)  **All/Each.**  The terms "all" and "each" shall be construed as all and each.

h)  **And/Or.**  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of discovery all that might otherwise be construed to be outside of its scope.

i)  **Number.**  The use of the singular form of any word includes the plural and vice versa.

j)  **Sale/Sold/Offered for Sale.**  As used herein, "sale," "sold" and "offered for sale" shall include "license," "licensed" and "offered for license."

k)  **Patent-in-suit.**  As used herein, "patent-in-suit" or "'432 patent" refers to United States Letters Patent Number 4,922,432.

l)  **ASIC.**  As used herein, "ASIC" refers to any integrated circuit that is designed for a specific application, including but not limited to integrated circuits that are referred to or otherwise known by Synopsys as an "application specific integrated circuit" or "ASIC," and other integrated circuits designed to perform a desired function in a specific application, but not including standard, general purpose integrated circuits such as microprocessors and memory chips.

m) **ASIC Product.**  The term "ASIC Product" refers to any ASIC or integrated circuit product or item that is designed for a specific application, and/or a product or item that includes such an integrated circuit product that is manufactured by a computer aided design process including logic synthesis, used, sold, offered for sale, imported, or distributed by, on behalf of, or otherwise at the direction of defendant.

n)  **ASIC Design System.**  As used herein, "ASIC Design System" refers to any and all software, hardware, database library or other components making up or otherwise contributing to systems, modules, tools or products which have been sold, offered for sale, or distributed, provided, or made available by, or on behalf of, or otherwise at the direction of Synopsys on or after May 1, 1990 (unless another date is specifically identified in the listed subject area) for use in any part of a computer-aided design of any ASIC Product including logic synthesis (as defined

above).  ASIC Design Systems include but are not limited to the Synopsys software, hardware, database libraries or other components known as Design Compiler, Knowledge Consultant, Behavioral Compiler, Module Compiler, DesignWare Library/DesignWare Foundation Library, CoCentric System C Compiler, HDL Compiler Family, VHDL Compiler, HDL Compiler for Verilog, and DC Shell.  As used herein, ASIC Design System shall not include software, hardware, database libraries or other components that have not been sold, distributed, or provided directly or indirectly by or on behalf of Synopsys to or for defendants.

o)  **ASIC Method.**  As used herein, "ASIC Method" refers to any and all steps or other activities making up or otherwise contributing to methods and/or processes that use ASIC Design Systems in the computer-aided design including logic synthesis of any ASIC Product  (as defined above).

p)  **Limitations.**  Each listed subject area shall be construed independently and no listed subject area shall limit the scope of any other listed subject area.

q)  **Design.**  The term "design" as used herein refers to any and all acts of creation, development, translation, formulation, transformation, synthesis, or other realization of desired integrated circuit functionality in an ASIC (as defined above).

Pursuant to Fed. R. Civ. P. 30(b)(6), Synopsys shall produce to testify on its behalf one or more officers, directors, managing agents, or other persons, who are most qualified, knowledgeable and competent to testify as to all matters known or reasonable available to Synopsys with respect to the following listed subject areas:

## DEPOSITION TOPICS

1.    The marketing of any Synopsys ASIC Design System and/or the use thereof.

2.    Any relationship, including, but not limited to, any contractual, business, or financial relationship, between Synopsys and any and all defendants.

3.    Any product, including, but not limited to any software, Synopsys sold, licensed, leased, lent, gave, or otherwise (directly or indirectly) provided to any defendant.

4.    Any ASIC Design System Synopsys sold, licensed, leased, lent, gave, or otherwise (directly or indirectly) provided to any defendant.

5.    Any agreement or other arrangement granting rights in or otherwise concerning ASIC Design Systems and/or use thereof from Synopsys to any defendant (or from any defendant to Synopsys), including but not limited to contracts, licenses, purchase agreements, indemnification agreements, and hold-harmless agreements/covenants not to sue.

6.    The identity of the person or persons that participated in the design of Synopsys':
      a.   ASIC Design Systems,
      b.   Socrates system,
      c.   Behavioral Compiler,
      d.   CoCentric System C Compiler,
      e.   Module Compiler,
      f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
      g.   Design Compiler,
      h.   hardware cell selection components, software and processes used by Design Compiler, and
      i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

7.    The design, capabilities, features, functions, operation, and use of Synopsys':
      a.   ASIC Design Systems,
      b.   Socrates system,
      c.   Behavioral Compiler,
      d.   CoCentric System C Compiler,
      e.   Module Compiler,
      f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
      g.   Design Compiler,
      h.   hardware cell selection components, software and processes used by Design Compiler, and
      i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

8.    The identity of the person or persons that participated in the programming, or implementation of any Synopsys:
      a.   ASIC Design Systems,
      b.   Socrates system,

  c. Behavioral Compiler,
  d. CoCentric System C Compiler,
  e. Module Compiler,
  f. cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
  g. Design Compiler,
  h. hardware cell selection components, software and processes used by Design Compiler, and
  i. ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

9. The programming, or implementation of any Synopsys:
  a. ASIC Design Systems,
  b. Socrates system,
  c. Behavioral Compiler,
  d. CoCentric System C Compiler,
  e. Module Compiler,
  f. cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
  g. Design Compiler,
  h. hardware cell selection components, software and processes used by Design Compiler, and
  i. ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

10. The identity of the person or persons that wrote, or participated in the writing of manuals, user guides, technical papers, or training materials, describing the use of Synopsys':
  a. ASIC Design Systems,
  b. Socrates system,
  c. Behavioral Compiler,
  d. CoCentric System C Compiler,
  e. Module Compiler,
  f. cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
  g. Design Compiler,
  h. hardware cell selection components, software and processes used by Design Compiler, and
  i. ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

11. The manuals, user guides, technical papers, or training materials describing the use of Synopsys':
  a. ASIC Design Systems,
  b. Socrates system,

       c. Behavioral Compiler,
       d. CoCentric System C Compiler,
       e. Module Compiler,
       f. cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
       g. Design Compiler,
       h. hardware cell selection components, software and processes used by Design Compiler, and
       i. ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

12. The capabilities, features, functions, operation, and use of the output of Synopsys' ASIC Design Systems, including but not limited to the netlist output in an ASIC Method.

13. The identification of each individual from Synopsys (including their full name, address, telephone number, job title and description, and employer) who participated in any way in any discussions, communications, correspondence, or otherwise with any person from, or any agent representing International Chip Corporation or Knowledge Based Silicon Corporation referring, relating or regarding, directly or indirectly, the patent-in-suit.

14. Any discussions, communications, correspondence, or other contact by Synopsys with any person from, or any agent representing International Chip Corporation or Knowledge Based Silicon Corporation referring, relating or regarding, directly or indirectly, the patent-in-suit.

15. The identification of each individual from Synopsys (including their full name, address, telephone number, job title and description, and employer) who was aware of the patent-in-suit prior to January 20, 2003.

16. Any communications within Synopsys concerning the patent-in-suit.

17. The identification of all documents concerning all materials presented to any of Synopsys' personnel having managerial responsibility and all agendas or notes of meetings involving such personnel which refer to, mention or discuss the patent-in-suit or any possible infringement thereof.

18. Any communications between Synopsys and any defendant concerning the patent-in-suit.

19. Any communications between Synopsys and any person or entity other that the other defendants concerning the patent-in-suit.

20. The identification of each individual (including their full name, address, telephone number, job title and description, and employer) who has knowledge of the factual basis for Count V (Declaratory Judgment Barring Ricoh From Recovery Under the Doctrine of Laches) of Synopsys' Complaint filed May 15, 2003, in the United

1    States District Court of the Northern District of California, assigned Case No. C03
     02289.
2

3    21.    The factual basis for Count V (Declaratory Judgment Barring Ricoh From
            Recovery Under the Doctrine of Laches) of Synopsys' Complaint filed May 15,
4           2003, in the United States District Court of the Northern District of California,
            assigned Case No. C03 02289.
5

6    22.    The identification of each individual (including their full name, address, telephone
            number, job title and description, and employer) who has knowledge of the factual
7           basis for Count VI (Declaratory Judgment Barring Ricoh From Recovery Under the
            Doctrine of Equitable Estoppel) of Synopsys' Complaint filed May 15, 2003, in the
8           United States District Court of the Northern District of California, assigned Case
            No. C03 02289.
9

10   23.    The factual basis for Count VI (Declaratory Judgment Barring Ricoh From
            Recovery Under the Doctrine of Equitable Estoppel) of Synopsys' Complaint filed
11          May 15, 2003, in the United States District Court of the Northern District of
            California, assigned Case No. C03 02289.

12        Synopsys is requested to identify in writing the name, position, and employ of the

13   individuals(s) so designated and to set forth the matters on which that person will testify no later

14   than seven (7) days prior to the agreed upon deposition date.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
ATTORNEYS AT LAW
177 POST STREET, SUITE 300
SAN FRANCISCO, CALIFORNIA 94108

**PROOF OF SERVICE**

**CASE:**   *Ricoh Company, Ltd. v. Aeroflex Incorporated, et al.*

**CASE NO:**   U.S. District Court, N.D. Cal., No. _____
(transferred from D. Delaware, Case No. 03-103 GMS)

I am employed in the City and County of San Francisco, California.  I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108.  On October 16, 2003, I served the following document(s):

**Notice of Deposition of Synopsys, Incorporated,
Pursuant to Fed. R. Civ. P. 30(b)(6) and 45**

**Subpoena in a Civil Case to Synopsys, Inc.**

**Protective Order,** filed June 9, 2003

on the parties, through their attorneys of record, by placing true copies thereof in sealed envelopes addressed as shown below for service as designated below:

<u>By First Class Mail</u>:  I am readily familiar with the practice of Altshuler, Berzon for the collection and processing of correspondence for mailing with the United States Postal Service. I caused each such envelope, with first-class postage thereon fully prepaid, to be deposited in a recognized place of deposit of the U.S. Mail in San Francisco, California, for collection and mailing to the office of the addressee on the date shown herein.

| **ADDRESSEE** | **PARTY** |
|---|---|
| Robert W. Whetzel, Esq.<br>Richards, Layton & Finger<br>One Rodney Square<br>P.O. Box 551<br>Wilmington, DE 19899<br>(302) 658-6541 | Ricoh Company, Ltd. |
| George Pazuniak<br>Francis DiGiovanni<br>Connolly, Bove, Lodge & Hutz<br>The Nemours Building<br>1007 North Orange Street<br>P.O. Box 2207<br>Wilmington, DE 19899<br>(302) 658-9141 | Aeroflex Incorporated, AMI Semiconductor Inc., Matrox Electronic Systems Ltd., Matrox Graphics Inc., Matrox International Corp., Matrox Tech Inc., Aeroflex Incorporated |

///

ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
ATTORNEYS AT LAW
177 POST STREET, SUITE 300
SAN FRANCISCO, CALIFORNIA 94108

1

2    Robert Scott Saunders                    Aeroflex Incorporated
     Skadden, Arps, Slate, Meagher & Flom
3    One Rodney Square
     P.O. Box 636
4    Wilmington, DE 19899
     (302) 651-3000
5
6    Josy W. Ingersoll                        Matrox Electronic Systems Ltd.,
     John W. Shaw                             Matrox Graphics Inc., Matrox
7    Young, Conaway, Stargatt & Taylor        International Corp., Matrox
     The Brandywine Building                  Tech Inc.
8    1000 West Street, 17th Floor
     P.O. Box 391
9    Wilmington, DE 19899-0391
     (302) 571-6600
10
11   Christopher L. Kelley, Esq.              Deponent Synopsys, Inc.
     Erik K. Moller, Esq.
12   Teresa M. Corbin, Esq.
     Howrey Simon Arnold & White LLP
13   301 Ravenswood Avenue
     Menlo Park, CA 94025
14   (650) 463-8100
     (650) 463-8400 Facsimile
15

16       I declare under penalty of perjury under the laws of the State of California that the

17   foregoing is true and correct.  Executed this October 16, 2003, at San Francisco, California.

18                                            _____
                                             Jean Perley
19   F:\Ricoh\Ricoh v Aeroflex\Discovery\POS.10-16-03.jp.wpd

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE, Case No. _____ (D. Delaware Case No. 03-103 GMS)                    2

**Issued by the**
# UNITED STATES DISTRICT COURT

__Northern__    **DISTRICT OF**    __California__

Ricoh Company, Ltd.

        Plaintiff

Aeroflex Inc. et al.,

        Defendants

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER:[1]
(D. Del. Case No. 03-103-GMS transferred to N.DIST OF CALIFORNIA)

TO:  **Synopsys, Inc.**
    700 East Middlefield Road
    Mountain View, CA 94043

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. SEE ATTACHMENT A

| PLACE OF DEPOSITION: Altshuler, Berzon, Nussbaum, Rubin & Demain 177 Post Street, Suite 300, San Francisco, California 94108 | DATE AND TIME **November 4, 2003** **9:00 a.m.** |
|---|---|

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below:

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) _Attorney for Plaintiff_ | DATE Oct. 15, 2003 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Jeffrey B. Demain, Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300 San Francisco, California 94108 Phone: (415) 421-7151

---

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents, or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place

where that person resides, is employed or regularly transacts businesses in person, except that, subject to an provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expenses to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

1

## ATTACHMENT A

2

## DEFINITIONS

3

4      a)  **Communication.**  The term "communication" means the transmittal of information (in

5  the form of facts, ideas, inquiries or otherwise).

6      b)  **Document.**  The term "document" is defined to be synonymous in meaning and equal

7  in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without

8  limitation, electronic or computerized data or data compilations.  A draft or non-identical copy is a

9  separate document within the meaning of this term.

10      c)  **Synopsys, Inc.**  The term "Synopsys, Inc." as well as its abbreviated name (e.g.,

11  "Synopsys") or a pronoun referring to the foregoing means the Delaware corporation known as

12  Synopsys, Inc and having place of business at 700 E. Middlefield Road, Mountain View,

13  California, and, where applicable, its officers, directors, employees, agents, independent

14  contractors, partners, corporate parent, subsidiaries or affiliates.

15      d)  **Parties.**  The terms "plaintiff" and "defendant" as well a party's full or abbreviated

16  name or a pronoun referring to a party mean the party and, where applicable, its officers, directors,

17  employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates.

18  Where the listed subject area is not related or limited to a specific named defendant, the listed

19  subject area shall be construed as seeking knowledge and information concerning any and all of

20  the defendants named in this action, including Aeroflex Incorporated, AMI Semiconductor, Inc.,

21  Matrox Electronic Systems Ltd., Matrox Graphics Inc., Matrox International Corp., and Matrox

22  Tech, Inc.

23

24      e)  **Person.**  The term "person" is defined as any natural person or any business, legal or

25  governmental entity or association.

26      f)  **Concerning.**  The term "concerning" means relating to, referring to, describing,

27  evidencing or constituting.

28

g) **All/Each.** The terms "all" and "each" shall be construed as all and each.

h) **And/Or.** The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of discovery all that might otherwise be construed to be outside of its scope.

i) **Number.** The use of the singular form of any word includes the plural and vice versa.

j) **Sale/Sold/Offered for Sale.** As used herein, "sale," "sold" and "offered for sale" shall include "license," "licensed" and "offered for license."

k) **Patent-in-suit.** As used herein, "patent-in-suit" or "'432 patent" refers to United States Letters Patent Number 4,922,432.

l) **ASIC.** As used herein, "ASIC" refers to any integrated circuit that is designed for a specific application, including but not limited to integrated circuits that are referred to or otherwise known by Synopsys as an "application specific integrated circuit" or "ASIC," and other integrated circuits designed to perform a desired function in a specific application, but not including standard, general purpose integrated circuits such as microprocessors and memory chips.

m) **ASIC Product.** The term "ASIC Product" refers to any ASIC or integrated circuit product or item that is designed for a specific application, and/or a product or item that includes such an integrated circuit product that is manufactured by a computer aided design process including logic synthesis, used, sold, offered for sale, imported, or distributed by, on behalf of, or otherwise at the direction of defendant.

n) **ASIC Design System.** As used herein, "ASIC Design System" refers to any and all software, hardware, database library or other components making up or otherwise contributing to systems, modules, tools or products which have been sold, offered for sale, or distributed, provided, or made available by, or on behalf of, or otherwise at the direction of Synopsys on or after May 1, 1990 (unless another date is specifically identified in the listed subject area) for use in any part of a computer-aided design of any ASIC Product including logic synthesis (as defined

1   above).  ASIC Design Systems include but are not limited to the Synopsys software, hardware,

2   database libraries or other components known as Design Compiler, Knowledge Consultant,

3   Behavioral Compiler, Module Compiler, DesignWare Library/DesignWare Foundation Library,

4   CoCentric System C Compiler, HDL Compiler Family, VHDL Compiler, HDL Compiler for

5   Verilog, and DC Shell.  As used herein, ASIC Design System shall not include software,

6   hardware, database libraries or other components that have not been sold, distributed, or provided

7

8   directly or indirectly by or on behalf of Synopsys to or for defendants.

9       o)  **ASIC Method.**  As used herein, "ASIC Method" refers to any and all steps or other

10  activities making up or otherwise contributing to methods and/or processes that use ASIC Design

11  Systems in the computer-aided design including logic synthesis of any ASIC Product  (as defined

12  above).

13      p)  **Limitations.**  Each listed subject area shall be construed independently and no listed

14  subject area shall limit the scope of any other listed subject area.

15      q)  **Design.**  The term "design" as used herein refers to any and all acts of creation,

16  development, translation, formulation, transformation, synthesis, or other realization of desired

17  integrated circuit functionality in an ASIC (as defined above).

18

19

20      Pursuant to Fed. R. Civ. P. 30(b)(6), Synopsys shall produce to testify on its behalf one

21  or more officers, directors, managing agents, or other persons, who are most qualified,

22  knowledgeable and competent to testify as to all matters known or reasonable available to

23  Synopsys with respect to the following listed subject areas:

24

25                    **DEPOSITION TOPICS**

26

27      1.      The marketing of any Synopsys ASIC Design System and/or the use thereof.

28

2.    Any relationship, including, but not limited to, any contractual, business, or financial relationship, between Synopsys and any and all defendants.

3.    Any product, including, but not limited to any software, Synopsys sold, licensed, leased, lent, gave, or otherwise (directly or indirectly) provided to any defendant.

4.    Any ASIC Design System Synopsys sold, licensed, leased, lent, gave, or otherwise (directly or indirectly) provided to any defendant.

5.    Any agreement or other arrangement granting rights in or otherwise concerning ASIC Design Systems and/or use thereof from Synopsys to any defendant (or from any defendant to Synopsys), including but not limited to contracts, licenses, purchase agreements, indemnification agreements, and hold-harmless agreements/covenants not to sue.

6.    The identity of the person or persons that participated in the design of Synopsys':
       a.   ASIC Design Systems,
       b.   Socrates system,
       c.   Behavioral Compiler,
       d.   CoCentric System C Compiler,
       e.   Module Compiler,
       f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
       g.   Design Compiler,
       h.   hardware cell selection components, software and processes used by Design Compiler, and
       i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

7.    The design, capabilities, features, functions, operation, and use of Synopsys':
       a.   ASIC Design Systems,
       b.   Socrates system,
       c.   Behavioral Compiler,
       d.   CoCentric System C Compiler,
       e.   Module Compiler,
       f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
       g.   Design Compiler,
       h.   hardware cell selection components, software and processes used by Design Compiler, and
       i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

8.    The identity of the person or persons that participated in the programming, or implementation of any Synopsys:
       a.   ASIC Design Systems,
       b.   Socrates system,

           c.  Behavioral Compiler,
           d.  CoCentric System C Compiler,
           e.  Module Compiler,
           f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
           g.  Design Compiler,
           h.  hardware cell selection components, software and processes used by Design Compiler, and
           i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

9.      The programming, or implementation of any Synopsys:
           a.  ASIC Design Systems,
           b.  Socrates system,
           c.  Behavioral Compiler,
           d.  CoCentric System C Compiler,
           e.  Module Compiler,
           f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
           g.  Design Compiler,
           h.  hardware cell selection components, software and processes used by Design Compiler, and
           i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

10.     The identity of the person or persons that wrote, or participated in the writing of manuals, user guides, technical papers, or training materials, describing the use of Synopsys':
           a.  ASIC Design Systems,
           b.  Socrates system,
           c.  Behavioral Compiler,
           d.  CoCentric System C Compiler,
           e.  Module Compiler,
           f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
           g.  Design Compiler,
           h.  hardware cell selection components, software and processes used by Design Compiler, and
           i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

11.     The manuals, user guides, technical papers, or training materials describing the use of Synopsys':
           a.  ASIC Design Systems,
           b.  Socrates system,

c. Behavioral Compiler,
d. CoCentric System C Compiler,
e. Module Compiler,
f. cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
g. Design Compiler,
h. hardware cell selection components, software and processes used by Design Compiler, and
i. ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

12. The capabilities, features, functions, operation, and use of the output of Synopsys' ASIC Design Systems, including but not limited to the netlist output in an ASIC Method.

13. The identification of each individual from Synopsys (including their full name, address, telephone number, job title and description, and employer) who participated in any way in any discussions, communications, correspondence, or otherwise with any person from, or any agent representing International Chip Corporation or Knowledge Based Silicon Corporation referring, relating or regarding, directly or indirectly, the patent-in-suit.

14. Any discussions, communications, correspondence, or other contact by Synopsys with any person from, or any agent representing International Chip Corporation or Knowledge Based Silicon Corporation referring, relating or regarding, directly or indirectly, the patent-in-suit.

15. The identification of each individual from Synopsys (including their full name, address, telephone number, job title and description, and employer) who was aware of the patent-in-suit prior to January 20, 2003.

16. Any communications within Synopsys concerning the patent-in-suit.

17. The identification of all documents concerning all materials presented to any of Synopsys' personnel having managerial responsibility and all agendas or notes of meetings involving such personnel which refer to, mention or discuss the patent-in-suit or any possible infringement thereof.

18. Any communications between Synopsys and any defendant concerning the patent-in-suit.

19. Any communications between Synopsys and any person or entity other that the other defendants concerning the patent-in-suit.

20. The identification of each individual (including their full name, address, telephone number, job title and description, and employer) who has knowledge of the factual basis for Count V (Declaratory Judgment Barring Ricoh From Recovery Under the Doctrine of Laches) of Synopsys' Complaint filed May 15, 2003, in the United

1    States District Court of the Northern District of California, assigned Case No. C03
02289.

2

3    21.    The factual basis for Count V (Declaratory Judgment Barring Ricoh From
Recovery Under the Doctrine of Laches) of Synopsys' Complaint filed May 15,
2003, in the United States District Court of the Northern District of California,
4           assigned Case No. C03 02289.

5

6    22.    The identification of each individual (including their full name, address, telephone
number, job title and description, and employer) who has knowledge of the factual
basis for Count VI (Declaratory Judgment Barring Ricoh From Recovery Under the
7           Doctrine of Equitable Estoppel) of Synopsys' Complaint filed May 15, 2003, in the
United States District Court of the Northern District of California, assigned Case
8           No. C03 02289.

9    23.    The factual basis for Count VI (Declaratory Judgment Barring Ricoh From
Recovery Under the Doctrine of Equitable Estoppel) of Synopsys' Complaint filed
10          May 15, 2003, in the United States District Court of the Northern District of
California, assigned Case No. C03 02289.

11

12    Synopsys is requested to identify in writing the name, position, and employ of the

13    individuals(s) so designated and to set forth the matters on which that person will testify no later

14    than seven (7) days prior to the agreed upon deposition date.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Gary M. Hoffman, pro hac vice
   Kenneth W. Brothers, pro hac vice
2  Eric Oliver, pro hac vice
3  Dickstein Shapiro Morin & Oshinsky LLP
   2101 L Street, NW
4  Washington, DC  20037-1526
   Phone:  (202) 785-9700
5  Fax:  (202) 887-0689

6
   Edward A. Meilman, pro hac vice
7  Dickstein Shapiro Morin & Oshinsky LLP
   1177 Avenue of the Americas
8  New York, New York  10036-2714
   Phone:  (212) 835-1400
9  Fax:  (212) 992-9880

10
   Jeffrey B. Demain, State Bar No. 126715
11 Jonathan Weissglass, State Bar No. 185008
   Altshuler, Berzon, Nussbaum, Rubin & Demain
12 177 Post Street, Suite 300
   San Francisco, California  94108
13 Phone:  (415) 421-7151
   Fax:  (415) 362-8064
14

15 Attorneys for the Defendant Ricoh Company, Ltd.

16              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
17                  SAN FRANCISCO DIVISION

18 _____
                                    )
19                                  )
                                    )
20 SYNOPSYS, INC.,                  )  Case No. C03-02289 MJJ (Judge Jenkins),
                                    )
21         Plaintiff,               )  DECLARATORY JUDGMENT ACTION
                                    )
22    vs.                           )  NOTICE OF DEPOSITION OF
                                    )  SYNOPSYS, INC. PURSUANT TO
23 RICOH COMPANY, LTD,              )  FED.R.CIV.P. 30(b)(6)
                                    )
24         Defendant.               )
                                    )
25                                  )
                                    )
26                                  )
                                    )
27 _____)
                                    )
28

1
2
3
4
5
6
7
8
9

PLEASE TAKE NOTICE that Ricoh Company, Ltd., by and through its attorneys, will take the depositions upon oral examination pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure of the person(s) designated by Synopsys, Inc. ("Synopsys") as knowledgeable regarding the subject areas listed in Attachment A.  The deposition will take place at the offices of Altshuler, Berzon, Nussbaum, Rubin & Demain, 177 Post Street, Suite 300, San Francisco, California 94108, or at a place mutually agreed upon by the parties, commencing at 9:00 a.m. on December 17, 2003, or on a date mutually agreed upon by the parties, and will continue from day to day until completed.

10
11

The deposition may be videotaped and will be made before an officer authorized to administer an oath and will be recorded by stenographic means.

12
13
14
15

Dated: November 17, 2003

Respectfully submitted,

Ricoh Company, Ltd.

16
17

By: _____

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, California  94108
Phone:  (415) 421-7151
Fax:  (415) 362-8064

18
19
20
21
22
23
24

Gary M. Hoffman
Ken Brothers
Eric Oliver
DICKSTEIN SHAPIRO MORIN &
    OSHINSKY  LLP
2101 L Street NW
Washington, D.C.  20037-1526
Telephone: (202) 785-9700
Facsimile: (202) 887-0689

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Edward A. Meilman
DICKSTEIN SHAPIRO MORIN &
    OSHINSKY LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 896-5471
Facsimile: (212) 997-9880


Attorneys for Ricoh Company, Ltd.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

## DEFINITIONS

a) **Communication.** The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

b) **Document.** The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data or data compilations. A draft or non-identical copy is a separate document within the meaning of this term.

c) **Synopsys, Inc.** The term "Synopsys, Inc." as well as its abbreviated name (e.g., "Synopsys") or a pronoun referring to the foregoing means the Delaware corporation known as Synopsys, Inc and having place of business at 700 E. Middlefield Road, Mountain View, California, and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates.

d) **Parties.** The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, agents, independent contractors, partners, corporate parent, subsidiaries or affiliates. Where the listed subject area is not related or limited to a specific named defendant, the listed subject area shall be construed as seeking knowledge and information concerning any and all of the defendants named in this action, including Aeroflex Incorporated, AMI Semiconductor, Inc., Matrox Electronic Systems Ltd., Matrox Graphics Inc., Matrox International Corp., and Matrox Tech, Inc.

e) **Person.** The term "person" is defined as any natural person or any business, legal or governmental entity or association.

f) **Concerning.** The term "concerning" means relating to, referring to, describing, evidencing or constituting.

g) **All/Each.** The terms "all" and "each" shall be construed as all and each.

h) **And/Or.** The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of discovery all that might otherwise be construed to be outside of its scope.

i) **Number.** The use of the singular form of any word includes the plural and vice versa.

j) **Sale/Sold/Offered for Sale.** As used herein, "sale," "sold" and "offered for sale" shall include "license," "licensed" and "offered for license."

k) **Patent-in-suit.** As used herein, "patent-in-suit" or "'432 patent" refers to United States Letters Patent Number 4,922,432.

l) **ASIC.** As used herein, "ASIC" refers to any integrated circuit that is designed for a specific application, including but not limited to integrated circuits that are referred to or otherwise known by Synopsys as an "application specific integrated circuit" or "ASIC," and other integrated circuits designed to perform a desired function in a specific application, but not including standard, general purpose integrated circuits such as microprocessors and memory chips.

m) **ASIC Product.** The term "ASIC Product" refers to any ASIC or integrated circuit product or item that is designed for a specific application, and/or a product or item that includes such an integrated circuit product that is manufactured by a computer aided design process including logic synthesis, used, sold, offered for sale, imported, or distributed by, on behalf of, or otherwise at the direction of defendant.

n) **ASIC Design System.** As used herein, "ASIC Design System" refers to any and all software, hardware, database library or other components making up or otherwise contributing to systems, modules, tools or products which have been sold, offered for sale, or distributed, provided, or made available by, or on behalf of, or otherwise at the direction of Synopsys on or after May 1, 1990 (unless another date is specifically identified in the listed subject area) for use in any part of a computer-aided design of any ASIC Product including logic synthesis (as defined

above).  ASIC Design Systems include but are not limited to the Synopsys software, hardware, database libraries or other components known as Design Compiler, Knowledge Consultant, Behavioral Compiler, Module Compiler, DesignWare Library/DesignWare Foundation Library, CoCentric System C Compiler, HDL Compiler Family, VHDL Compiler, HDL Compiler for Verilog, and DC Shell.  As used herein, ASIC Design System shall not include software, hardware, database libraries or other components that have not been sold, distributed, or provided directly or indirectly by or on behalf of Synopsys to or for defendants.

      o)  **ASIC Method.**  As used herein, "ASIC Method" refers to any and all steps or other activities making up or otherwise contributing to methods and/or processes that use ASIC Design Systems in the computer-aided design including logic synthesis of any ASIC Product  (as defined above).

      p)  **Limitations.**  Each listed subject area shall be construed independently and no listed subject area shall limit the scope of any other listed subject area.

      q)  **Design.**  The term "design" as used herein refers to any and all acts of creation, development, translation, formulation, transformation, synthesis, or other realization of desired integrated circuit functionality in an ASIC (as defined above).


      Pursuant to Fed.R.Civ.P. 30(b)(6), Synopsys shall produce to testify on its behalf one or more officers, directors, managing agents, or other persons, who are most qualified, knowledgeable and competent to testify as to all matters known or reasonable available to Synopsys with respect to the following listed subject areas:


## DEPOSITION TOPICS


1.     The marketing of any Synopsys ASIC Design System and/or the use thereof.

2.   Any relationship, including, but not limited to, any contractual, business, or financial relationship, between Synopsys and any and all defendants.

3.   Any product, including, but not limited to any software, Synopsys sold, licensed, leased, lent, gave, or otherwise (directly or indirectly) provided to any defendant.

4.   Any ASIC Design System Synopsys sold, licensed, leased, lent, gave, or otherwise (directly or indirectly) provided to any defendant.

5.   Any agreement or other arrangement granting rights in or otherwise concerning ASIC Design Systems and/or use thereof from Synopsys to any defendant (or from any defendant to Synopsys), including but not limited to contracts, licenses, purchase agreements, indemnification agreements, and hold-harmless agreements/covenants not to sue.

6.   The identity of the person or persons that participated in the design of Synopsys':
     a.   ASIC Design Systems,
     b.   Socrates system,
     c.   Behavioral Compiler,
     d.   CoCentric System C Compiler,
     e.   Module Compiler,
     f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
     g.   Design Compiler,
     h.   hardware cell selection components, software and processes used by Design Compiler, and
     i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

7.   The design, capabilities, features, functions, operation, and use of Synopsys':
     a.   ASIC Design Systems,
     b.   Socrates system,
     c.   Behavioral Compiler,
     d.   CoCentric System C Compiler,
     e.   Module Compiler,
     f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
     g.   Design Compiler,
     h.   hardware cell selection components, software and processes used by Design Compiler, and
     i.   ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

8.   The identity of the person or persons that participated in the programming, or implementation of any Synopsys:
     a.   ASIC Design Systems,
     b.   Socrates system,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        c.  Behavioral Compiler,
        d.  CoCentric System C Compiler,
        e.  Module Compiler,
        f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
        g.  Design Compiler,
        h.  hardware cell selection components, software and processes used by Design Compiler, and
        i.  ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

9.     The programming, or implementation of any Synopsys:
        a.  ASIC Design Systems,
        b.  Socrates system,
        c.  Behavioral Compiler,
        d.  CoCentric System C Compiler,
        e.  Module Compiler,
        f.  cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
        g.  Design Compiler,
        h.  hardware cell selection components, software and processes used by Design Compiler, and
        i.  ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

10.    The identity of the person or persons that wrote, or participated in the writing of manuals, user guides, technical papers, or training materials, describing the use of Synopsys':
        a.  ASIC Design Systems,
        b.  Socrates system,
        c.  Behavioral Compiler,
        d.  CoCentric System C Compiler,
        e.  Module Compiler,
        f.  cell libraries (e.g., DesignWare Library and DesignWare Foundation Libraries),
        g.  Design Compiler,
        h.  hardware cell selection components, software and processes used by Design Compiler, and
        i.  ASIC Design System user interface, including (without limitation) the components, software and processes used to interface between the user (using such input as HDL, VHDL, Verilog, or any other form) and ASIC Design Systems.

11.    The manuals, user guides, technical papers, or training materials describing the use of Synopsys':
        a.  ASIC Design Systems,
        b.  Socrates system,

c.   Behavioral Compiler,
d.   CoCentric System C Compiler,
e.   Module Compiler,
f.   cell libraries (e.g., DesignWare Library and DesignWare Foundation
     Libraries),
g.   Design Compiler,
h.   hardware cell selection components, software and processes used by
     Design Compiler, and
i.   ASIC Design System user interface, including (without limitation) the
     components, software and processes used to interface between the user
     (using such input as HDL, VHDL, Verilog, or any other form) and
     ASIC Design Systems.

12.   The capabilities, features, functions, operation, and use of the output of Synopsys'
      ASIC Design Systems, including but not limited to the netlist output in an ASIC
      Method.

13.   The identification of each individual from Synopsys (including their full name,
      address, telephone number, job title and description, and employer) who
      participated in any way in any discussions, communications, correspondence, or
      otherwise with any person from, or any agent representing International Chip
      Corporation or Knowledge Based Silicon Corporation referring, relating or
      regarding, directly or indirectly, the patent-in-suit.

14.   Any discussions, communications, correspondence, or other contact by Synopsys
      with any person from, or any agent representing International Chip Corporation or
      Knowledge Based Silicon Corporation referring, relating or regarding, directly or
      indirectly, the patent-in-suit.

15.   The identification of each individual from Synopsys (including their full name,
      address, telephone number, job title and description, and employer) who was aware
      of the patent-in-suit prior to January 20, 2003.

16.   Any communications within Synopsys concerning the patent-in-suit.

17.   The identification of all documents concerning all materials presented to any of
      Synopsys' personnel having managerial responsibility and all agendas or notes of
      meetings involving such personnel which refer to, mention or discuss the patent-in-
      suit or any possible infringement thereof.

18.   Any communications between Synopsys and any defendant concerning the patent-
      in-suit.

19.   Any communications between Synopsys and any person or entity other that the
      other defendants concerning the patent-in-suit.

20.   The identification of each individual (including their full name, address, telephone
      number, job title and description, and employer) who has knowledge of the factual
      basis for Count V (Declaratory Judgment Barring Ricoh From Recovery Under the
      Doctrine of Laches) of Synopsys' Complaint filed May 15, 2003, in the United

1        States District Court of the Northern District of California, assigned Case No. C03
2        02289.

21.    The factual basis for Count V (Declaratory Judgment Barring Ricoh From Recovery Under the Doctrine of Laches) of Synopsys' Complaint filed May 15, 2003, in the United States District Court of the Northern District of California, assigned Case No. C03 02289.

22.    The identification of each individual (including their full name, address, telephone number, job title and description, and employer) who has knowledge of the factual basis for Count VI (Declaratory Judgment Barring Ricoh From Recovery Under the Doctrine of Equitable Estoppel) of Synopsys' Complaint filed May 15, 2003, in the United States District Court of the Northern District of California, assigned Case No. C03 02289.

23.    The factual basis for Count VI (Declaratory Judgment Barring Ricoh From Recovery Under the Doctrine of Equitable Estoppel) of Synopsys' Complaint filed May 15, 2003, in the United States District Court of the Northern District of California, assigned Case No. C03 02289.

Synopsys is requested to identify in writing the name, position, and employ of the individuals(s) so designated and to set forth the matters on which that person will testify no later than seven (7) days prior to the agreed upon deposition date.

1      **PROOF OF SERVICE**

2      **CASE:**      *Synopsys, Inc. v. Ricoh Company, Ltd.*

3      **CASE NO:**    U.S. District Court, N.D. Cal., No. C03-2289 MJJ

4            I am employed in the City and County of San Francisco, California. I am over the age
       of eighteen years and not a party to the within action; my business address is 177 Post Street,
5      Suite 300, San Francisco, California 94108. On November 13, 2003, I served the following
       document(s):

6
       NOTICE OF DEPOSITION OF SYNOPSYS, INC. PURSUANT TO FED.R.CIV.P. 30(b)(6)
7

8      on the parties, through their attorneys of record, by placing true copies thereof in sealed
       envelopes addressed as shown below for service as designated below:

9
       <u>By Messenger Service:</u> I caused each such envelope to be delivered to a courier employed by
10     **WESTERN MESSENGER,** with whom we have a direct billing account, who personally
       delivered each such envelope to the office of the address on the date last written below.

11
                        **ADDRESSEE**                         **PARTY**
12
                   Christopher L. Kelley, Esq.           Attorneys for Plaintiff
13                 Erik K. Moller, Esq.                  Synopsys, Inc.
                   Teresa M. Corbin, Esq.
14                 Howrey Simon Arnold & White LLP
                   301 Ravenswood Avenue
15                 Menlo Park, CA 94025
                   Facsimile: 650/463-8400
16

17           I declare under penalty of perjury under the laws of the State of California that the
       foregoing is true and correct. Executed this November 13, 2003, at San Francisco, California.
18

19                                                    _____
                                                           Edward Lin
20

21

22

23

24

25

26

27

28

       PROOF OF SERVICE
       *Synopsys, Inc. v. Ricoh Co., Ltd.*, N.D. Cal. Case No. C03-02289 MJJ

**Page 1**

[ 1]          UNITED STATES DISTRICT COURT

[ 2]          NORTHERN DISTRICT OF CALIFORNIA

[ 3]  BEFORE THE HONORABLE MARTIN J. JENKINS, JUDGE

[ 4]  SYNOPSYS, INC.,          )
                               )
[ 5]          PLAINTIFF,       )
                               )
[ 6]  VS                       )  NO. C 03-2289 MJJ
                               )
[ 7]  RICOH COMPANY, LTD.,     )  PAGES 1 - 68
                               )
[ 8]          DEFENDANT.       )
      _____  )

[ 9]

[10]          SAN FRANCISCO, CALIFORNIA
              TUESDAY, AUGUST 19, 2003

[11]

[12]          TRANSCRIPT OF PROCEEDINGS

      APPEARANCES:

[13]

      FOR PLAINTIFF:    HOWREY SIMON ARNOLD & WHITEY

[14]                    301 RAVENSWOOD AVENUE
                        MENLO PARK, CA 94025-3434

[15]

[16]          BY:  TERESA CORBIN, ERIK K. MOLLER AND
                   TONY KIM, ATTORNEY AT LAW

[17]  ALSO PRESENT:    ERIK OLIVER, SENIOR IP COUNSEL
                       SYNOPSYS, INC.

[18]                   700 E. MIDDLEFIELD ROAD
                       MOUNTAIN VIEW, CALIFORNIA 94043

[19]

      FOR DEFENDANT:    ALTSHULER, BERZON, NUSSBAUM, RUBIN

[20]                    & DEMAIN
                        177 POST STREET

[21]                    SUITE 300
                        SAN FRANCISCO, CALIFORNIA 94108

[22]

              BY:  JONATHAN WEISSGLASS, ESQ.

[23]  FURTHER APPEARANCES ON NEXT PAGE.

[24]  REPORTED BY:  KATHERINE POPE WYATT, CSR, RPR, RMR
                    OFFICIAL REPORTER, USDC

[25]                COMPUTERIZED TRANSCRIPTION BY ECLIPSE

**Page 2**

[ 1]  FURTHER APPEARANCES:

[ 2]  ALSO FOR DEFENDANT:

[ 3]  DICKSTEIN, SHAPIRO MORIN & OSHINSKY

[ 4]  2101 L STREET NW

[ 5]  WASHINGTON, D.C. 20037-1526

[ 6]  BY:  GARY M. HOFFMAN, ESQ.

[ 7]

[ 8]

[ 9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Page 3**

[ 1]  AUGUST 19, 2003                9:30 O'CLOCK A.M.

[ 2]

[ 3]          P R O C E E D I N G S

[ 4]      THE CLERK:  CALLING CIVIL MATTER NUMBER 03-2289,

[ 5]  SYNOPSYS, INC. VERSUS RICOH COMPANY, LIMITED.

[ 6]      PLEASE STEP FORWARD AND STATE YOUR APPEARANCES.

[ 7]      MS. CORBIN:  GOOD MORNING, YOUR HONOR.  TERESA

[ 8]  CORBIN FROM HOWREY, SIMON, ARNOLD & WHITE ON BEHALF OF

[ 9]  SYNOPSYS, INC.

[10]      WITH ME IN THE COURTROOM TODAY ARE MY ASSOCIATES

[11]  ERIK MOLLER AND TONY KIM.

[12]      AND ALSO IN THE COURTROOM IS ERIK OLIVER.  HE IS

[13]  SENIOR INTELLECTUAL PROPERTY COUNSEL FOR SYNOPSYS.

[14]      THE COURT:  GOOD MORNING.

[15]      MS. CORBIN:  THANK YOU.

[16]      MR. HOFFMAN:  GOOD MORNING, YOUR HONOR.  GARY

[17]  HOFFMAN FROM DICKSTEIN, SHAPIRO IN WASHINGTON, D.C., ON BEHALF

[18]  OF RICOH COMPANY, LIMITED.

[19]      AND WITH ME IS JONATHAN WEISSGLASS FROM HERE IN SAN

[20]  FRANCISCO.

[21]      THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

[22]  THAT WHAT IS PENDING BEFORE THE COURT IS THE DEFENDANT'S MOTION

[23]  TO DISMISS ON TWO GROUNDS, OSTENSIBLY.  ONE IS BECAUSE THE

[24]  COURT DOES NOT -- ACCORDING TO DEFENDANT, PLAINTIFF CANNOT

[25]  ESTABLISH THE COURT HAS -- IS ABLE TO, UNDER CALIFORNIA LAW AND

**Page 4**

[ 1]  THE STATUTE, EXERCISE PERSONAL JURISDICTION OVER -- OVER THE

[ 2]  DEFENDANT AND RICOH, LTD.

[ 3]      AND IN ANY EVENT, THAT THERE IS NO CASE OR

[ 4]  CONTROVERSY WITH RESPECT TO THE PLAINTIFF'S DEC. RELIEF ACTION

[ 5]  THAT ALLEGES -- SEEKS A DECLARATION OF NONINFRINGEMENT

[ 6]  INVALIDITY UNDER THE TESTS THAT ARE SET FORTH UNDER THE

[ 7]  ARROWHEAD AND AMOCO LINE OF CASES.  AND MOST SPECIFICALLY THERE

[ 8]  IS A -- QUITE A DEBATE IN THE PAPERS WITH RESPECT TO THE FED

[ 9]  CIRCUIT'S DECISION IN ARALAC.

[10]      THEN, NOT BRIEFED TOO SUBSTANTIALLY THERE ARE ALSO

[11]  ISSUES IN THE PAPERS RELATIVE TO REQUESTS FOR TRANSFER UNDER

[12]  1404, AND/OR STAY, AND ALSO DISCUSSED WITHIN THE CONTEXT OF THE

[13]  PLEADING IS THE FIRST-TO-FILE ISSUE.  IS THAT WHAT I HAVE

[14]  BEFORE ME?

[15]      MR. HOFFMAN:  YES, IT IS, YOUR HONOR.

[16]      THE COURT:  ALL RIGHT.  A FEW QUESTIONS.  AND FIRST

[17]  LET ME START.  I'VE READ AND CONSIDERED THE PAPERS.  IT STRIKES

[18]  ME THAT THERE ARE SOME FACTUAL DIFFERENCES ON THE PERSONAL

[19]  JURISDICTION ISSUE WHEN I LOOK AT THE LSI DECISION.  THERE'S

[20]  CERTAINLY SOME FACTUAL DIFFERENCES.  AND WE WILL TALK A LITTLE

[21]  BIT ABOUT THAT.

[22]      BUT THAT SEEMS TO ME TO BE THE CASE THAT IS MOST ON

[23]  POINT WITH RESPECT TO THE ISSUE OF PERSONAL JURISDICTION.

[24]      AS I READ THE PAPERS IT STRIKES ME THAT -- IT

[25]  DOESN'T STRIKE ME THAT THIS IS INCONSISTENT WITH FED CIRCUIT

**Page 5**

[1] DECISIONS, PARTICULARLY LSI, BECAUSE IT STRIKES ME WHAT THE

[2] COURT IS DOING THERE -- THE CIRCUIT DID THERE -- IS TO TAKE A

[3] LOOK AT THE RELATIONSHIP BETWEEN THE DISTRIBUTORS IN THE FORUM

[4] OPERATING AT THE BEHEST AND ON BEHALF OF THE PARENT

[5] CORPORATION, AND TO MAKE SOME DISCERNMENT AS TO WHETHER OR NOT

[6] THERE WAS SUBSTANTIAL AND CONTINUOUS ACTIVITIES, GIVEN THOSE

[7] ACTIVITIES.

[8]         AND THEY DON'T SPEAK TO THIS ISSUE.  BUT THEY DO

[9] IMPUTE THOSE ACTIVITIES TO THE PARENT.  AND THAT IS COMPLETELY

[10] CONSISTENT WITH 9TH CIRCUIT LAW ON THE VERY SAME QUESTION IN

[11] THE UNOCAL CASE AND THE CHAN CASE THAT IS CITED TO THE COURT.

[12]         SO IT STRIKES ME THAT REALLY WE JUST HAVE TO MEASURE

[13] THOSE FACTS IN THE RECORD THAT SEEK TO ESTABLISH THE

[14] RELATIONSHIP BETWEEN THE SUBSIDIARIES, THE SALES THAT ARE

[15] ENGAGED IN BY RICOH COMPANY, AND TO TRY TO GET SOME SENSE OF

[16] WHETHER OR NOT THERE IS A SUFFICIENT FACTUAL BASIS FOR

[17] IMPUTATION HERE ON THIS RECORD.

[18]         NOW, A COUPLE OF QUESTIONS IN THAT REGARD WHERE

[19] THERE ARE SOME FACTUAL DISTINCTIONS -- AND YOU RAISE THIS IN

[20] YOUR REPLY BRIEF, SO IT SHOULDN'T BE NEWS TO ANYONE -- IS I'M

[21] CURIOUS AS TO WHETHER OR NOT THE RECORD REFLECTS THAT THE

[22] SUBSIDIARIES IN THE REGIONAL OFFICE, I GUESS IN TUSTIN, THAT

[23] OVERSEES THESE SUBSIDIARIES, ARE DEDICATED TO OR SELL ONLY

[24] RICOH PRODUCTS.

[25]         DOES OUR RECORD REFLECT THAT?

**Page 6**

[1]         DO ANY OF THE SUBSIDIARIES SELL ANYTHING OTHER THAN

[2] RICOH PRODUCTS?  DOES OUR RECORD REFLECT THAT?

[3]         MS. CORBIN:  WOULD YOU LIKE ME TO RESPOND TO THAT,

[4] YOUR HONOR?

[5]         THE COURT:  YOU JUST SHOULD NOTE THIS FOR

[6] INCORPORATION IN YOUR ARGUMENTS TO ME.

[7]         MS. CORBIN:  OKAY.

[8]         THE COURT:  DOES THE RECORD REFLECT WHAT THE -- AND

[9] IS IT IMPORTANT THAT IT REFLECT -- THE TOTAL AMOUNT OF SALES

[10] DERIVED FROM THE SALES ACTIVITIES IN THE FORUM?

[11]         I NOTED YOU CITED TO SOME OF THE REQUIREMENTS UNDER

[12] SECTION 20, SOME OF THE GROSS SALES FIGURES.  AND THEY WERE

[13] BROKEN OUT FOR NORTH AND SOUTH AMERICA.  IS THAT AS GOOD AS IT

[14] GETS ON THIS RECORD IN TERMS OF -- AND WHAT SHOULD I

[15] EXTRAPOLATE FROM THAT WITH RESPECT TO DERIVED SALES IN THE

[16] FORUM?

[17]         DOES YOUR RECORD SPEAK TO THAT?

[18]         AND IF NOT, THEN HOW DOES THAT READ ON WHETHER OR

[19] NOT LSI IS REALLY GOOD LAW AND CONTROLLING ON THIS FACTUAL

[20] RECORD?

[21]         SO IF YOU COULD ADDRESS -- BOTH OF YOU -- THOSE

[22] PARTICULAR QUESTIONS, I THINK THAT WOULD BE HELPFUL.

[23]         IT ALSO STRIKES ME THAT I'M INTERESTED IN HEARING

[24] FROM THE DEFENDANT YOUR VIEW OF WHETHER CHAN OR UNOCAL, THAT

[25] LINE OF CASES, IS INCONSISTENT WITH ANYTHING TAUGHT BY THE FED

**Page 7**

[1] CIRCUIT, PARTICULARLY IN LIGHT OF LSI.

[2]         SO IF YOU COULD ANSWER THAT QUESTION, THAT WOULD BE

[3] HELPFUL TO ME.

[4]         THEN, TURNING TO THE SUBJECT MATTER JURISDICTION

[5] QUESTION, JUST A FEW THINGS.  IT DOESN'T STRIKE ME THAT THE

[6] DECLARATION OF -- I'M TRYING TO FIND IT NOW.

[7]         COVENANT NOT TO SUE ISSUE, IT DOESN'T STRIKE ME THAT

[8] THAT'S DISPOSITIVE HERE.  THE CASES THAT YOU HAVE CITED TO

[9] ME -- BUT IT'S CERTAINLY MIGHTILY IMPORTANT.  BUT THE CASES

[10] YOU'VE CITED TO ME WITH RESPECT TO THE ANALYSIS OF A COVENANT

[11] NOT TO SUE IN THE CONTEXT OF THE TWO PRONGS THAT HAVE TO BE

[12] ESTABLISHED UNDER FED CIRCUIT LAW BEFORE THERE IS A CASE OR

[13] CONTROVERSY, ALL STRIKE ME TO BE SIGNIFICANT AND DIFFERENT IN

[14] ONE RESPECT.

[15]         HERE, AT LEAST -- AND THERE'S A MIGHTY DEBATE ABOUT

[16] IT -- YOU HAVE CUSTOMERS WHO ARE BEING SUED IN THE DISTRICT OF

[17] DELAWARE FOR PATENT INFRINGEMENT.  AND CERTAINLY THERE'S A

[18] CONFLICT ON THE RECORD AS TO WHETHER OR NOT THOSE ALLEGED

[19] MANUFACTURERS IN ENGAGING AND USING THE DESIGN COMPILER ARE

[20] ENGAGING IN A PROCESS THAT IS DISTINCT -- ACTUALLY, THERE ISN'T

[21] A CONFLICT -- DISTINCT AND DIFFERENT FROM THE EXISTENCE OF THE

[22] DESIGN COMPILER ITSELF, WHICH IS WHY YOU RELY ON ARALAC, SORT

[23] OF A STEP REMOVED FROM THE PROCESS THAT WOULD ACTUALLY BE

[24] COVERED BY THE PATENT.

[25]         BUT IT STRIKES ME THAT TO THE EXTENT THAT YOU HAVE

**Page 8**

[1] IN THIS RECORD -- AND I'LL WALK THROUGH THAT AND TALK ABOUT

[2] THAT.  BUT TO THE EXTENT THAT YOU HAVE CURRENT LAWSUITS AGAINST

[3] CUSTOMERS, THE COVENANT NOT TO SUE CASES THAT HAVE DISPOSED OF

[4] THAT QUESTION SEEM TO ME TO BE FACTUALLY DIFFERENT, WHERE IN

[5] THOSE CASES YOU HAD A LAWSUIT BROUGHT BY -- AND AN ALLEGATION

[6] OF PATENT INFRINGEMENT COUNTERCLAIMS WHICH AROSE BASED ON THAT

[7] LAWSUIT, AND THEN A DETERMINATION BY THE PATENTEE AND AN

[8] EXPRESS PROMISE AND COVENANT NOT TO SUE.

[9]         AND I DON'T THINK, BY THE WAY, THAT THOSE CASES

[10] ADDRESS THE SPECIFIC LANGUAGE THAT HAS TO BE IN THE COVENANT.

[11] IT CAN ONLY STAND FOR THAT PROPOSITION.  SO I AM NOT -- I DON'T

[12] AGREE WITH YOU THAT THEY WOULD HAVE TO MAKE A STATEMENT FOR THE

[13] COVENANT TO BE VIABLE AND TO EXTINGUISH THE THREAT OF THE

[14] CONTROVERSY FOR STANDING PURPOSES THAT IT WOULD HAVE TO INCLUDE

[15] ORDINARY USE LANGUAGE.

[16]         I'M INTERESTED IN WHERE YOU DERIVE THAT FROM.  BUT,

[17] NEVERTHELESS, IT DOES STRIKE ME EVEN STILL THAT THE -- THAT THE

[18] ISSUE HERE IS NOT RESOLVED BY THE CASES YOU'VE CITED TO ME.

[19] AND WE STILL HAVE THIS OUTSTANDING ISSUE OF THE NEXUS OR

[20] RELATIONSHIP TO THE LAWSUITS AGAINST THE CUSTOMERS IN THE

[21] DISTRICT OF DELAWARE GOING FORWARD AT THE SAME TIME YOU HAVE

[22] THE EXISTENCE OF THIS COVENANT NOT TO SUE, ALL RELATED TO

[23] WHETHER OR NOT THERE REALLY IS SOME ASPECT OF CONTRIBUTORY

[24] INFRINGEMENT FROM THE SALES THAT WILL CONTINUE TO OCCUR,

[25] NOTWITHSTANDING YOUR PROMISE NOT TO SUE.

Page 9

[1]       AND WHETHER IN THE CONTEXT OF THOSE SALES THAT ARE

[2]  GOING FORWARD, THE PLAINTIFF HERE REALLY HAS AN INTEREST THAT

[3]  IS INFRINGED SUCH THAT THEY HAVE STANDING TO MAINTAIN THIS

[4]  ACTION.  THAT'S WHAT IT STRIKES ME AS COMING DOWN TO.

[5]       NOW, IN TRYING TO ISOLATE THAT, WE DO HAVE TO DEAL

[6]  WITH, I THINK, THE ARALAC CASE AND THAT LINE OF CASES.

[7]       AND I'VE READ IT, AND IT STRIKES ME THAT THERE ARE A

[8]  COUPLE OF THINGS THAT IT MIGHT BE HELPFUL TO ME TO HEAR FROM

[9]  YOU WITH RESPECT TO.

[10]      THERE'S CERTAINLY BEEN A COUPLE OF DISTRICT COURT

[11] DECISIONS THAT HAVE DEALT WITH ARALAC SINCE THAT OPINION WAS

[12] ISSUED.  AND THERE'S SOME INTERESTING LANGUAGE IN SOME OF THESE

[13] DISTRICT COURT OPINIONS THAT TIE INTO WHAT, AS A MATTER OF

[14] DEGREE, WHAT CONSTITUTES SUFFICIENT INTEREST, A SUFFICIENT

[15] STAKE IN THE INTEREST THAT ONE WOULD HAVE STANDING, AND SOME

[16] PIGEONHOLING OF THE TYPE OF PRODUCT INVOLVED AND THE SCOPE OF

[17] THE USES OF THE PRODUCT INVOLVED.

[18]      IT SEEMS TO ME AS A WAY OF DELINEATING WHETHER

[19] YOU'RE TALKING ABOUT A PURELY COMMERCIAL INTEREST WHICH THE

[20] PRODUCER OR MANUFACTURER OF WOULD NOT HAVE A RIGHT TO DICTATE

[21] SOMETHING AKIN TO CONDUCT THAT WOULD AFFECT THE PATENTEE'S

[22] MONOPOLY, PURELY COMMERCIAL INTEREST, VERSUS, FOR INSTANCE, IN

[23] THE ECI DECISION, WHERE YOU HAVE A PROCESS THAT IS CLEARLY A

[24] PREDICATE PROCESS TO WHAT IS CLAIMED IN THE PATENT.

[25]      BUT THE COURT'S EXPLICATION OF IT AND THE FINDING OF

Page 10

[1]  ARTICLE III STANDING FOCUSES ON THE NUMBER OF LIMITED USES OF

[2]  THAT PROCESS, THAT IS PART AND PARCEL OF THE STEPS PRACTICED OR

[3]  NEEDED TO BE PRACTICED FOR THE PATENT TO COVER IT, AND FINDS

[4]  AND LIMITS ARALAC IN THAT WAY.

[5]       AND I REALLY HAVEN'T HEARD OR SEEN IN THE PAPERS THE

[6]  DEFENDANT'S RESPONSES TO THAT CASE.  AND THAT MAY BE WHERE YOU

[7]  DERIVE YOUR ORDINARY USE LANGUAGE THAT YOU FEEL WOULD BE

[8]  PERTINENT IN THE COURT'S FINDING THAT, IN FACT, A COVENANT NOT

[9]  TO SUE WOULD BE DISPOSITIVE HERE.

[10]      BUT I THINK IF WE COULD TEASE THAT OUT IN THE CASE

[11] OR CONTROVERSY, LEGAL APPREHENSION ANALYSIS THAT WOULD BE

[12] HELPFUL TO ME.

[13]      SO THOSE ARE THE QUESTIONS THAT I HAVE.  I'M ALSO

[14] INTERESTED:  DO WE KNOW YET WHAT THE DISTRICT JUDGE IN DELAWARE

[15] IS DOING WITH THE PENDING MOTION TO TRANSFER THOSE CASES HERE

[16] TO THE NORTHERN DISTRICT, AS I UNDERSTAND IT?  DO WE KNOW

[17] ANYTHING ABOUT THAT?

[18]      I'D BE INTERESTED IN KNOWING WHERE THAT IS AT, IF

[19] YOU HAVE ANY SENSE OF THAT.  AND I LOOKED AT A LOT OF THE

[20] DECLARATIONS ON THE TRANSFER ISSUE.  THEY ARE FAIRLY GENERAL.

[21]      THAT'S ACTUALLY SORT OF ON -- BOTH THE BRIEFS ARE,

[22] TOO, AND IN TERMS OF THE FACTORS THE COURT LOOKS AT.

[23]      BUT FOR ME ON THOSE MOTIONS I WILL JUST TELL YOU I

[24] THINK THE MOST SIGNIFICANT ISSUE -- IN A PATENT CASE, YOU KNOW,

[25] ISSUES OF PRIOR ART AND EXPERTS AND THINGS OF THAT NATURE, I

Page 11

[1]  DON'T THINK, WEIGH SO HEAVILY IN THE BALANCE.

[2]       I THINK YOU FOLKS TRAVEL WITH RESPECT TO THOSE

[3]  ISSUES ALL THE TIME.  LOOKING AT THE ENTITIES INVOLVED IN THE

[4]  LAWSUIT IN DELAWARE, I THINK ONE IS OUT OF FLORIDA.  YOU KNOW,

[5]  I DON'T THINK THAT THE NEXUS OF THIS FORUM IS SO GREAT THAT A

[6]  MOTION TO TRANSFER HERE WOULD IN SOME WAY UNBURDEN THEM.

[7]       BUT IT DOES STRIKE ME THAT THERE IS AT LEAST SOME

[8]  INDICATION IN THE RECORD THAT -- AND YOU'LL HAVE TO PUT THIS IN

[9]  SOME PROSPECTIVE FOR ME -- BUT THE DESIGN COMPILER AND THE

[10] PREDECESSOR, THE DEVELOPMENT, THE HISTORICAL DEVELOPMENT OF

[11] THAT BEARS SOME NEXUS TO NORTHERN CALIFORNIA.

[12]      IT'S NOT AT ALL ELUCIDATED FOR ME TO A SUFFICIENT

[13] DEGREE TO GET MY ARMS AROUND IT TO SEE HOW THOSE PERSONS MAY

[14] WEIGH IN ON THE UNDERLYING FACTUAL ISSUES THAT WILL PERTAIN TO

[15] THE TRIAL OF THE LAWSUIT SO THAT I CAN GET SOME SENSE OF

[16] WHETHER OR NOT THOSE ARE PARTY WITNESSES OR NONPARTY WITNESSES,

[17] ALTHOUGH I THINK THERE'S ONE INDICATION THAT THERE'S A FAIRLY

[18] SIGNIFICANT INDIVIDUAL WITH RESPECT TO SALES WHO IS NO LONGER

[19] WITH THE -- WITH SYNOPSYS, I THINK.

[20]      SO, IF YOU COULD ANSWER THOSE QUESTIONS IN THE

[21] COURSE OF YOUR ARGUMENT.  WHY DON'T WE START WITH THE PLAINTIFF

[22] SINCE YOU HAVE THE BURDEN TO ESTABLISH THAT THERE'S

[23] JURISDICTION.  AND ALTHOUGH I KNOW IT'S YOUR MOTION, LET'S

[24] START WITH THEM, AND THEN WE WILL GO FORWARD, OKAY?

[25]      OH, YES.  I DIDN'T MENTION THE IDENTIFICATION

Page 12

[1]  AGREEMENTS.  IS THERE A REASON WHY YOU DIDN'T SUBMIT THEM TO

[2]  ME?  YOU DID DESCRIBE THEM GENERICALLY IN THE PAPERS.  I MEAN,

[3]  YOU COULD HAVE SUBMITTED THOSE UNDER SOME CONFIDENTIALITY

[4]  AGREEMENT UNDER SEAL IF YOU'RE CONCERNED ABOUT THOSE KINDS OF

[5]  THINGS.

[6]       AND IT STRIKES ME THAT IF YOU REALLY WANT ME TO

[7]  FULLY CONSIDER THAT, YOU GET THE BEST INFORMATION YOU CAN

[8]  BEFORE THE COURT.

[9]       OKAY.  OKAY.  HERE WE GO.

[10]      MS. CORBIN:  THANK YOU, YOUR HONOR.

[11]      IF I COULD JUST START BY EXPLAINING THE GENESIS OF

[12] THIS LAWSUIT FROM SYNOPSYS' PERSPECTIVE I THINK IT'S HELPFUL

[13] BECAUSE THE FACTS THAT I WOULD DISCUSS ARE RELEVANT TO A NUMBER

[14] OF THE ISSUES THAT YOUR HONOR RAISED.

[15]      FIRST OF ALL, SYNOPSYS IS THE INDUSTRY LEADER IN

[16] LOGIC SYNTHESIS SOFTWARE.  AND IT'S MOST IMPORTANT AND LEADING

[17] PRODUCT IS THE DESIGN COMPILER PRODUCT.  THAT IS ITS MOST

[18] WIDELY-USED PRODUCT.  AND IT REPRESENTS ABOUT 20 PERCENT OF THE

[19] REVENUE OF THE COMPANY, ABOUT $250 MILLION A YEAR.

[20]      ESSENTIALLY, IT IS THE CROWN JEWEL OF THE COMPANY.

[21] AND FROM SYNOPSYS' PERSPECTIVE THERE HAS BEEN A WHOLESALE

[22] ATTACK ON THAT PRODUCT BY RICOH THROUGH NOT ONLY THE DELAWARE

[23] SUIT AGAINST SIX OF ITS CUSTOMERS, BUT ALSO THROUGH A

[24] WIDESPREAD CAMPAIGN OF SENDING DEMAND LETTERS TO OTHER

[25] CUSTOMERS, AT LEAST TWO OF WHOM ARE LOCATED HERE IN THE

Page 13

[1] NORTHERN DISTRICT.

[2]     THE COURT: YES, I SAW THAT.

[3]     MS. CORBIN: THOSE BEING CHIP EXPRESS AND WINBOND.

[4]     THOSE CUSTOMERS -- AND WE DO HAVE -- WE DID BRING

[5] TODAY FOR YOUR HONOR, AND WE COULD MAKE THOSE AVAILABLE, THE

[6] INDEMNITY AGREEMENTS.

[7]     THE COURT: HAVE YOU SEEN THEM?

[8]     MR. HOFFMAN: NO, I HAVE NOT, YOUR HONOR.

[9]     THE COURT: IS THERE A PROBLEM WITH THAT?

[10]     MS. CORBIN: NO. IF WE COULD JUST HAVE A

[11] STIPULATION THAT THEY WOULD BE COVERED UNDER THE PROTECTIVE

[12] ORDER AT THE HIGHEST LEVEL THAT WOULD BE -- BECAUSE THOSE HAVE

[13] NOT BEEN PRODUCED IN THE LITIGATION YET. AND IN FACT, HERE WE

[14] HAVE NO PROTECTIVE ORDER FOR THIS CASE AT THIS TIME.

[15]     THE COURT: BUT YOU HAVE ONE IN THE DELAWARE CASE.

[16]     MS. CORBIN: WE DO HAVE ONE IN THE OTHER CASE.

[17]     MR. HOFFMAN: BE MORE THAN GLAD TO ACCEPT THEM UNDER

[18] THE DELAWARE PROTECTIVE ORDER.

[19]     THE COURT: ALL RIGHT. SO STIPULATED. OKAY.

[20]     MR. HOFFMAN: THANK YOU VERY MUCH.

[21]     MS. CORBIN: HERE WE HAVE, YOUR HONOR, THE END USER

[22] SOFTWARE LICENSE AGREEMENT BY SYNOPSYS WITH THREE OF THE

[23] DELAWARE DEFENDANTS: AMERICAN MICROSYSTEMS, INC., AEROFLEX

[24] UTMC, MICROELECTRONIC SYSTEMS, AND THEN, ALSO MATROX, LIMITED.

[25] AND FOUR OF THE DEFENDANTS ARE MATROX ENTITIES THAT ARE IN

Page 14

[1] DELAWARE. SO THAT ACCOUNTS FOR ALL OF THE CUSTOMERS IN THAT

[2] STATE.

[3]     THESE CUSTOMERS WHEN -- THESE CUSTOMERS AND OTHERS

[4] WHEN THEY HAVE RECEIVED THE DEMAND LETTERS, OR IN THIS CASE,

[5] THESE SIX CUSTOMERS IN THE DELAWARE SUIT WERE SUED WITHOUT EVER

[6] HAVING RECEIVED ANY DEMAND LETTER OF ANY KIND OR ANY NOTICE

[7] ABOUT THE PATENT OR CONCERN WITH RESPECT TO THEIR USE OF DESIGN

[8] COMPILER, HAVE COME FORWARD TO SYNOPSYS CITING THEIR INDEMNITY

[9] PROVISIONS AND WANTING TO BE COVERED, BECAUSE IN THE CONTEXT OF

[10] BOTH THE DELAWARE LAWSUIT AND ELSEWHERE, THROUGH THESE CUSTOMER

[11] LETTERS TO OTHER CUSTOMERS, INCLUDING THOSE IN CALIFORNIA, THE

[12] ONLY IDENTIFICATION OF HAVE ANY BASIS OF THE ALLEGATION OF

[13] INFRINGEMENT THAT'S BEEN MADE BY RICOH IS THE, THE USE OF

[14] DESIGN COMPILER BY THESE CUSTOMERS WHICH IS THE GENESIS OF

[15] BASIS OF THE INFRINGEMENT ALLEGATION.

[16]     THE COURT: DOES DESIGN COMPILER HAVE ANY OTHER USE,

[17] ASIDE FROM ITS BEING A VITAL ASPECT IN DESIGNING INTEGRATIVE

[18] CIRCUITS? DOES IT HAVE ANY OTHER USE?

[19]     MS. CORBIN: NO, YOUR HONOR. IT IS NOT -- AND I CAN

[20] GET TO THAT, THE ARALAC CASE. YOU KNOW, I THINK THE

[21] DISTINGUISHING FACTOR THERE WAS THAT THESE CASEIN FIBERS WERE

[22] DEEMED TO BE --

[23]     THE COURT REPORTER: CAN YOU SLOW DOWN A LITTLE BIT?

[24]     MS. CORBIN: OKAY.

[25]     THE DISTINGUISHING FACTOR ABOUT ARALAC IS THAT THERE

Page 15

[1] THE CASE INVOLVED CASEIN FIBERS, AND THOSE WERE DEEMED TO BE A

[2] STAPLE ARTICLE OF COMMERCE, MEANING THAT THERE WERE A MULTITUDE

[3] OF USES THAT OTHER, YOU KNOW, CUSTOMERS COULD MAKE OF THOSE.

[4]     AND IT WAS ONE OF THOSE CUSTOMERS WHO USED THOSE

[5] FIBERS IN THE PRODUCTION OF HATS THAT HAD BEEN SUED ON A METHOD

[6] PATENT.

[7]     AND THERE THE COURT WAS LOOKING AT THAT AS MERELY AN

[8] ECONOMIC INTEREST, BECAUSE IT WAS JUST ONE CUSTOMER, AT MOST,

[9] THAT DECLARATORY JUDGMENT PLAINTIFF STOOD TO LOSE A SMALL

[10] AMOUNT OF REVENUE FROM ONE CUSTOMER MAKING ONE USE OF ITS

[11] PRODUCT.

[12]     THAT HAS TO BE DISTINGUISHED. AND THINK YOUR

[13] HONOR'S CORRECT --

[14]     THE COURT: WOULD IT -- WOULD IT BE DISTINGUISHABLE

[15] IF THERE HAD BEEN MORE CUSTOMERS IN THAT CASE? SO IF THE

[16] AGGRAVATED REVENUE LOSS WAS MORE SIGNIFICANT, WOULD THAT BE A

[17] DISTINGUISHING FACTOR?

[18]     MS. CORBIN: I THINK WHEN YOU GET TO THE MAGNITUDE

[19] AND THE THREAT THAT THAT POSES TO THE COMPANY, ALTHOUGH YOU

[20] DON'T SEE THIS IN THE CASES, I THINK THAT THAT IS A FACTOR. I

[21] MEAN, HERE WE ARE TALKING ABOUT AN ECONOMIC THREAT TO THE

[22] VIABILITY OF SYNOPSYS, AND EVEN THOUGH DESIGN COMPILER IS

[23] REPRESENTING TWENTY PERCENT -- ITS THE BIGGEST PRODUCT

[24] REPRESENTING 20 PERCENT -- THERE ARE MANY OTHER PRODUCTS THAT

[25] SYNOPSYS MAKES THAT ARE MADE TO BE USED IN CONJUNCTION WITH

Page 16

[1] DESIGN COMPILER.

[2]     SO IF THE DESIGN COMPILER PRODUCT IS-- CAN NO LONGER

[3] BE MANUFACTURED OR USED OR IS DEEMED SOMEHOW TO BE INFRINGING,

[4] THE ORDINARY USE OF IT DEEMED TO BE INFRINGING, THIS METHOD

[5] PATENT, THEN A LARGE NUMBER OF OTHER PRODUCTS WILL ALSO BE

[6] IMPLICATED. AND THIS COULD JUST THREATEN ALTOGETHER THE

[7] ECONOMIC VIABILITY OF SYNOPSYS, BECAUSE IT WOULD BE A CASCADING

[8] EFFECT.

[9]     THE COURT: THAT SAME DECISION SAYS, THOUGH -- IT

[10] SAYS THAT -- IT SAYS:

[11]     "PLAINTIFF, YOUR CLIENT WOULD HAVE A RIGHT TO

[12]     PRODUCE FREELY -- TO HAVE THAT WHICH IT PRODUCES

[13]     FREELY BOUGHT AND SOLD, ABSENT RESTRAINT. BUT THE

[14]     SALE OF AN ARTICLE OF COMMERCE OF ORDINARY USE,

[15]     WITHOUT RELATION TO THE APPARATUS COVERED BY THE

[16]     PATENT, DOES NOT MAKE THE MANUFACTURER GUILTY OF

[17]     CONTRIBUTORY INFRINGEMENT."

[18]     MS. CORBIN: WELL, HERE, YOUR HONOR, I THINK THE

[19] CLAIMS ARE CLEAR THAT ALMOST THE ENTIRE PART OF THE METHOD

[20] STEPS DO INVOLVE THE DESIGN COMPILER. THE ACTIONS THAT WOULD

[21] BE TAKEN IN THE USE OF THE DESIGN COMPILER ONCE YOU HAD THE

[22] INPUT AND THE ACTIONS THAT ARE TAKEN THEREAFTER BY THE DESIGN

[23] COMPILER IN PRODUCING WHAT IS A NET LIST, WHICH IS THE END

[24] PRODUCT OF -- THE USING NET PRODUCT. A NET LIST --

[25]     THE COURT: IS IT YOUR VIEW -- IS IT YOUR VIEW THAT

Page 17

[1] DESIGN COMPILER AS A STANDALONE PRODUCT WOULD INFRINGE THE

[2] PATENT?

[3]     MS. CORBIN: YOUR HONOR, THE MANUALS FOR DESIGN

[4] COMPILER MAKE CLEAR THAT THE INPUTS TO THAT ARE BASICALLY

[5] HARDWARE DESCRIPTION LANGUAGE, TEXTUAL LANGUAGE. AND SO, YES,

[6] IT IS -- EVIDENTLY IT'S THAT, BECAUSE THAT IS THE ONLY TYPE OF

[7] INPUT ONE CAN MAKE.

[8]     AND IT'S CLEAR FROM THE SYNOPSYS DESIGN COMPILER

[9] MANUALS, AND THEY ARE, NEVERTHELESS, ACCUSING THE CUSTOMERS OF

[10] INFRINGING BASED ON THEIR USE OF DESIGN COMPILER, I WOULD SAY:

[11] YES.

[12]     THE COURT: IT'S LOADING THE SOFTWARE INTO -- IN THE

[13] PROCESS OF ULTIMATELY DESIGNING THE INTEGRATED CIRCUITS THAT I

[14] UNDERSTANDING THAT THE DEFENDANT'S POSITION IS THAT IS WHAT IS

[15] ACTUALLY COVERED UNDER THE PATENT.

[16]     NOW, I DON'T KNOW. NO ONE HAS ACTUALLY --

[17]     MS. CORBIN: RIGHT.

[18]     THE COURT: NO ONE HAS ACTUALLY DESCRIBED THE

[19] UNDERLYING STEPS THAT ARE TAUGHT IN THE PATENT SO THAT I COULD

[20] LOOK AT IT FROM THAT STANDPOINT AND MAKE SOME ANALYSIS.

[21]     MS. CORBIN: RIGHT.

[22]     THE COURT: WHAT I'M CITED TO ARE, YOU KNOW,

[23] DEPOSITION TESTIMONY, INTERROGATORY RESPONSES AND THINGS OF

[24] THAT NATURE.

[25]     MS. CORBIN: WELL, YOUR HONOR, ALL I KNOW IS THAT

Page 18

[1] WE -- BECAUSE WE'RE CONCERNED ABOUT THIS ISSUE AND WHAT WAS THE

[2] BASIS, AND SYNOPSYS WAS NOT NAMED AS A PARTY IN THE DELAWARE

[3] SUIT, AND THEY WERE TRYING TO GET TO THE BOTTOM OF THIS.

[4]     THE CUSTOMERS IN DELAWARE TOOK A 30 (B) (6)

[5] DEPOSITION, AND ASKING: WHAT WERE THE BASES? WHAT DID THEY

[6] REVIEW? WHAT DID THEY LOOK AT IN ASSESSING AND DETERMINING

[7] AFTER THEIR RULE 11 INVESTIGATION THAT THESE CUSTOMERS WERE

[8] SUING?

[9]     AND THE ONLY THING THAT THEY COULD COME FORWARD

[10] WITH, OR THAT THEY WERE WILLING TO COME FORWARD WITH, WAS JUST

[11] THE USE OF DESIGN COMPILER, AND THAT THEY HAD THE DESIGN

[12] COMPILER MANUALS.

[13]     AND AS I STATED, THOSE MANUALS MAKE CLEAR THAT IT'S

[14] HARDWARE DESCRIPTION LANGUAGE, TEXTUAL LANGUAGE THAT IS THE

[15] INPUT TO DESIGN COMPILER. THAT THAT -- AND EVIDENCE, I GUESS,

[16] PRESS RELEASES OF THE CUSTOMERS THAT THEY, IN FACT, DO USE

[17] DESIGN COMPILER WHICH FORMED THE BASIS.

[18]     THEIR INTERROGATORY RESPONSES IN THAT CASE ARE

[19] LIKEWISE, AND IN THE DEMAND LETTERS THAT THEY HAVE MADE TO

[20] CUSTOMERS THEY DON'T REFERENCE ANYTHING THAT MIGHT BE ON THE

[21] FRONT END. THEY JUST SAY:

[22]     "THE USE OF DESIGN COMPILER," AND IN ADDITION

[23] TO REFERENCING '432 AND THE '016 PATENT, WHICH I THINK IS A

[24] DISTINGUISHING POINT ABOUT THIS CASE BEING DIFFERENT FROM THAT

[25] ONE, BECAUSE THESE CUSTOMERS HAVE REASONABLE APPREHENSION OF

Page 19

[1] SUIT AS TO BOTH OF THOSE PATENTS, AND ONLY ONE OF THOSE PATENTS

[2] IS INVOLVED IN THE DELAWARE CASE.

[3]     SO, AGAIN -- AND ONE OF THOSE DELAWARE DEFENDANTS IS

[4] REPRESENTED BY ALAN MACPHERSON. AND RICOH'S COUNSEL IN

[5] DELAWARE HAD STATED TO HIM -- AND WE PUT -- SUBMITTED HIS

[6] DECLARATION, AS WELL -- THAT THE BASIS OF THE ALLEGATION WAS

[7] THE USE OF DESIGN COMPILER.

[8]     SO THROUGH A NUMBER OF EFFORTS NOW WE'VE TRIED TO

[9] DETERMINE WHAT, IF ANYTHING, IN ADDITION THERE IS, AND WE HAVE

[10] NOT BEEN ABLE TO COME UP WITH -- I MEAN, THEY HAVE NOT STATED

[11] THAT THERE IS ANYTHING OTHER THAN JUST THE USE OF DESIGN

[12] COMPILER.

[13]     THE COURT: ALL RIGHT.

[14]     MS. CORBIN: SO AT THIS POINT SYNOPSYS FOUND ITSELF

[15] IN A SITUATION WHERE IT IS OPERATING ITS BUSINESS UNDER A

[16] CLOUD. IT PERCEIVES THAT THERE'S A TERRIBLE THREAT TO THE

[17] VIABILITY OF THE COMPANY, PARTICULARLY TO ITS MOST IMPORTANT

[18] PRODUCT. AND THE CUSTOMERS ARE LIKEWISE UNDER THIS CLOUD. AND

[19] THAT WAS THE BASIS ON WHICH SYNOPSYS FELT THAT IT HAD TO BRING

[20] THIS SUIT.

[21]     AS IT RELATES TO THE SPECIFIC JURISDICTION, YOUR

[22] HONOR, I THINK THAT WE WERE CORRECT. I THINK WE

[23] PUT - THERE'S ONLY A NUMBER OF THINGS THAT WE COULD DO, HAVING

[24] HAD NO DISCOVERY YET ON THIS SUBJECT. BUT FROM THE WEB SITE

[25] PAGES THAT WE DID FIND, IT WAS CLEAR THAT RICOH CORPORATION --

Page 20

[1] I MEAN, IT IDENTIFIES THE PRODUCTS THAT IT SELLS ON THE WEB

[2] SITE. AND THERE'S ONLY AN IDENTIFICATION OF RICOH JAPAN, THE

[3] PARENT COMPANY'S PRODUCTS.

[4]     IN ADDITION, ALTHOUGH IT SAYS -- YOU KNOW, IT

[5] DOESN'T BREAK DOWN THE SALES. IT SAYS THERE ARE $3 BILLION

[6] WORTH OF SALES IN NORTH AND SOUTH AMERICA. WE KNOW -- I MEAN,

[7] THEY CHOSE TO HEADQUARTER THEIR REGIONAL SALES OFFICE, AND ALSO

[8] TO MAINTAIN A SALES NETWORK IN CALIFORNIA.

[9]     GIVEN THE SIZE OF THE CALIFORNIA ECONOMY, WE CAN'T

[10] SAY FOR CERTAIN WHAT PORTION THAT OF $3 BILLION IN SALES IS IN

[11] CALIFORNIA. BUT I THINK IT'S A FAIR INFERENCE, GIVEN THE SIZE

[12] OF THIS ECONOMY AND THE TYPES OF PRODUCTS THAT THEY SELL THAT

[13] IT'S SUBSTANTIAL.

[14]     THE COURT: SO WHAT WOULD I INFER? THAT IT'S

[15] SIZABLE? AND WOULD THAT MEAN? AS TO THE -- I THINK IT

[16] WAS ACTUALLY 2.9 BILLION, OR SOMEWHERE IN THAT RANGE. BUT AS

[17] TO THAT --

[18]     MS. CORBIN: WELL. --

[19]     THE COURT: -- AND HOW IT IMPACTS THE FORUM HERE.

[20]     MS. CORBIN: WELL, YOUR HONOR, ALL I CAN THINK OF IS

[21] THAT, YOU KNOW, WE KNOW THAT CALIFORNIA IS LIKE THE FIFTH OR

[22] SIXTH LARGEST ECONOMY IN THE WORLD. I MEAN, SO TAKING JUST A

[23] PROPORTIONATE BASIS OF $3 BILLION GETS YOU TO A VERY LARGE

[24] NUMBER.

[25]     AND SOME OF THESE CASES -- IT'S ESCAPING ME RIGHT

Page 21

[1] NOW WHICH ONE – FOUND SALES IN THE ORDER OF LIKE $70,000

[2] SIGNIFICANT ENOUGH FOR THERE TO BE A PURPOSEFUL AVAILMENT AND,

[3] YOU KNOW, INJECTION OF ITS GOODS INTO COMMERCE IN THE FORUM.

[4]      SO I THINK BY ANY COUNT –

[5]      THE COURT: LOOK, YOUR VIEW OF THAT TEST UNDER --

[6] FROM HANSON VERSUS DECRON (PHONETIC), AND SOME OF THOSE CASES,

[7] IS IT YOUR VIEW – IS THE PURPOSEFUL AVAILMENT TEST AND THE

[8] ACTIVITIES RELATION ASPECT OF IT HAVE TO FOCUS ON OR HAVE A

[9] NEXUS TO THE ACTUAL PRODUCT THAT IS THE SUBJECT OF THE SUIT?

[10]      MS. CORBIN: WELL, FOR GENERAL JURISDICTION, NO.

[11] AND I WOULD THINK THAT GENERAL JURISDICTION ANALYSIS WOULD BE

[12] DISPOSITIVE HERE, BOTH BASED ON LSI AND THEN ALSO THE MODESTO

[13] CITY SCHOOLS CASE, WHICH I THINK WE FALL SQUARELY WITHIN SORT

[14] OF THE FACT PATTERN THERE.

[15]      AND IN THAT CASE IT'S A HIGHER THRESHOLD, I THINK,

[16] THAN THE FEDERAL CIRCUIT STANDARD. BUT, NEVERTHELESS, WE EVEN

[17] MEET THAT STANDARD OF GENERAL AGENCY WHERE A SIGNIFICANT

[18] FUNCTION ESSENTIAL TO THE PARENT IS BEING CARRIED OUT BY RICOH

[19] CORPORATION BECAUSE BUT FOR RICOH –

[20]      THE COURT: THE FED CIRCUIT HAS TO RELY ON THAT SORT

[21] OF CONCEPTIONAL ANALYSIS, THOUGH, DOESN'T IT? IT DOESN'T COME

[22] OUT AND SPECIFICALLY SAY THAT. BUT IF YOU LOOK AT LSI –

[23]      MS. CORBIN: IT IS DEFINITELY IMPUTING -- YES, YOUR

[24] HONOR. IT'S DEFINITELY IMPUTING THE ACTIONS OF THE – IN THAT

[25] CASE IT WASN'T EVEN A WHOLLY-OWNED SUBSIDIARY, SO THERE WAS NO

Page 22

[1] CORPORATION RELATIONSHIP, BUT JUST A THIRD-PARTY DISTRIBUTOR.

[2]      BOTH OF THOSE FACTORS, I THINK, ARE HEIGHTENED IN

[3] OUR CASE; THE OTHER IMPORTANT FACTOR, I WOULD THINK, IS THAT

[4] THERE ARE EXECUTIVES WHO SERVE BOTH OF THESE ENTITIES, AND THEY

[5] ARE OFFICERS OF BOTH ENTITIES, RICOH CORP. IN THE UNITED

[6] STATES, AND RICOH JAPAN.

[7]      AND THEY ALSO SIT ON THE BOARDS, SO THERE'S A LOT OF

[8] OVERLAPPING ACTIVITY IN THAT REGARD. THE WEB PAGES FOR THE

[9] PARENT LINKED DIRECTLY TO RICOH CORP. AND STATE SPECIFICALLY

[10] THAT RICOH CORP. OVERSEES THE OPERATIONS IN THE AMERICAS.

[11]      THE OTHER THING – SO I WANT TO KEEP APART, BECAUSE

[12] I DON'T ANY IN THIS CASE WE NEED TO MAKE A SPECIFIC NEXUS

[13] BETWEEN THE ACTIVITIES IN THE FORUM. AND I HAVEN'T EVEN

[14] TOUCHED ON THOSE. I'M STAYING WITH THE GENERAL JURISDICTION.

[15]      SO I THINK THAT THE LSI AND MODESTO CITY SCHOOLS

[16] CASE WOULD ALLOW US TO IMPUTE RICOH CORPORATION ACTIVITIES TO

[17] RICOH.

[18]      NEVERTHELESS, I THINK THAT EVEN UNDER THE STREAM OF

[19] COMMERCE UNDER THE VIAM CASE – AND I DISAGREE THERE WITH

[20] RICOH'S POSITION. THIS STREAM OF COMMERCE WHICH DOESN'T NEATLY

[21] ANALYZE EITHER GENERAL OR SPECIFIC JURISDICTION FACTORS STATES

[22] THAT WHERE YOU PURPOSEFULLY INJECT AND AVAIL YOURSELF OF THE

[23] JURISDICTION AND YOU ENTER YOUR GOODS INTO THE STREAM OF

[24] COMMERCE, THAT, YOU KNOW, YOU CAN LOOK AT BOTH THINGS THAT ARE

[25] DIRECTLY TIED TO THE NEXUS OF THE LITIGATION AND THE GENERAL

Page 23

[1] INJECTION OF THE COMPANY INTO COMMERCE, THAT THERE THAT WOULD

[2] BE SUFFICIENT FOR JURISDICTION.

[3]      AND THE INAMED (PHONETIC) CASE – SO SETTING GENERAL

[4] JURISDICTION ASIDE, I THINK WE HAVE FOR SPECIFIC JURISDICTION

[5] THE OTHER THINGS. I THINK WOULD BE MORE TO CALL TO YOUR

[6] HONOR'S ATTENTION IS THAT WE HAVE THE DEMAND LETTERS.

[7]      NOW, INAMED DOES SAY DEMAND LETTERS STANDING ALONE

[8] ARE NOT ENOUGH. BUT IT DOES REFERENCE IT IF THERE ARE

[9] MULTIPLE –

[10]      THE COURT: SO YOU HAVE DEMAND LETTERS, BUT YOU

[11] DON'T HAVE ANY SPECIFIC SALES OF THE -- THAT RELATE TO THE

[12] PATENT-IN-SUIT IN A WAY THAT YOU COULD ESTABLISH BUT-FOR

[13] CAUSATION, DO YOU?

[14]      MS. CORBIN: RIGHT. BUT I DON'T THINK FEDERAL

[15] CIRCUIT'S APPLYING THE BUT-FOR CAUSE TEST. AND LET ME JUST –

[16] THE FACTORS THAT I WOULD SAY ARE RELEVANT ARE THEY HAVE THE

[17] DEMAND LETTERS.

[18]      INAMED DOES SAY THAT ONE – DEMAND LETTERS ALONE,

[19] BUT IF THERE'S MULTIPLE LETTERS MAY GET YOU FURTHER ALONG THAT

[20] ROAD.

[21]      AND AT LEAST WITH CHIP EXPRESS, WE KNOW – AND THOSE

[22] LOOK LIKE FORM LETTERS TO ME. THEY WENT OUT TWO MONTHS TO A

[23] DAY AFTER CHIP EXPRESS HAS ALREADY GOTTEN A SECOND LETTER. WE

[24] WOULD SUSPECT THAT OTHER CUSTOMERS HAVE GOTTEN A SECOND LETTER,

[25] AS WELL.

Page 24

[1]      BUT BEYOND THAT THERE IS ANOTHER ENTITY, YOUR HONOR,

[2] KBSC. IT WAS A CO-ASSIGNEE OF THE '432 PATENT. KBSC, WHILE IT

[3] WAS A CO-ASSIGNEE OF THE PATENT, ATTEMPTED TO LICENSE – TO GET

[4] SYNOPSYS TO LICENSE THAT FAMILY OF PATENTS, INCLUDING THE '432.

[5] AND THOSE MEETINGS AND NEGOTIATIONS TOOK PLACE IN CALIFORNIA.

[6]      SUBSEQUENTLY, RCL, THAT RICOH JAPAN BOUGHT KBS'

[7] INTEREST IN THE PATENT. AT THAT TIME KBS WAS RESIDENT HERE IN

[8] CALIFORNIA. SO ALTHOUGH WE HAVEN'T HAD ANY DISCOVERY, WE THINK

[9] THAT THOSE NEGOTIATIONS AND THAT TRANSACTION ALSO OCCURRED IN

[10] CALIFORNIA. SO THEY HAVE –

[11]      THE COURT: NOW, IS THAT PART OF MY RECORD? I

[12] MISSED THAT.

[13]      MS. CORBIN: ISN'T IT? WHICH EXHIBIT IS IT?

[14]      THE COURT: YOU CAN JUST CHECK.

[15]      MS. CORBIN: YES. OKAY. I'LL GIVE YOUR HONOR – I

[16] THINK –

[17]      THE COURT: OKAY. ALSO, TOO, I MEAN, I FIND IT

[18] CURIOUS THAT YOUR VIEW WITH RESPECT TO SPECIFIC JURISDICTION.

[19] LET ME GO BACK TO THE STREAM OF COMMERCE ISSUE.

[20]      AND PRINCIPALLY, THERE'S SOME LANGUAGE IN THE VIAM

[21] CORPORATION CASE THAT IS AT LEAST, SINCE THESE THINGS ARE VERY

[22] FACT INTENSIVE, THERE'S A CONCERN TO ME THAT THE COURT CITES

[23] FIRST TO THE – IT'S AKRO DECISION – IN TERMS OF PURPOSEFUL

[24] AVAILMENT.

[25]      AND IT INDICATES THAT IN THAT CASE THE COURT

Page 25

[1] ANALYZED THE ISSUE OF JURISDICTION BY ASKING WHETHER THE PATENT

[2] HOLDER PURPOSELY DIRECTED HIS ACTIVITIES AT RESIDENTS OF THE

[3] FORUM. AND IF SO, WHETHER LITIGATION RESULTED FROM ALLEGED

[4] INJURIES THAT ARRIVE OUT OF OR RELATE TO THOSE ACTIVITIES.

[5]     SO IT SEEMS THAT IT'S CERTAINLY ACTIVITY-RELATED

[6] WITHOUT ANY GLOSS IN TERMS OF THE SPECIFICITY OF ACTIVITY.

[7]     THEN, THE COURT SAYS FURTHERMORE, SPEAKING OF THE

[8] ITALIAN COMPANY, SPAUL (PHONETIC):

[9]     "IT DID NOT SIMPLY PLACE ITS PRODUCT IN THE

[10] STREAM OF COMMERCE, IT KNOWINGLY AND INTENTIONALLY

[11] EXPLOITED THE CALIFORNIA MARKET THROUGH AND

[12] EXCLUSIVE DISTRIBUTORSHIP THROUGH ADVERTISEMENT,

[13] THROUGH CLEAR CHANNELS PROVIDING REGULAR ADVICE IN

[14] CALIFORNIA, THROUGH THE EXCLUSIVE DISTRIBUTORSHIP

[15] WITH IO EXPORT, IT ADVERTISED AND SOLD AND PRESENTED

[16] SPAUL PRODUCTS, INCLUDING THE SUBJECT OF THE '386

[17] PATENT, THE PATENT-IN-SUIT."

[18]     THAT'S THE FACTUAL PREDICATE FROM WHICH – UPON

[19] WHICH THE COURT FOUND THAT THERE WAS A BASIS TO FIND PURPOSEFUL

[20] AVAILMENT CONSISTENT WITH HANSON VERSUS DECRON AND THOSE CASES

[21] OUT OF THE SUPREME COURT.

[22]     IS THAT THE RECORD HERE?

[23]     MS. CORBIN: WELL, YOUR HONOR, IT IS TRUE THAT THE

[24] FACTUAL – IN THAT CASE THAT THE PRODUCTS DID RELATE TO THE

[25] PATENT THAT WAS AT ISSUE. BUT I DON'T THINK THE COURT – I

Page 26

[1] MEAN, THOSE ARE THE FACTS. BUT I DON'T THINK THE COURT PLACED

[2] ANY PARTICULAR EMPHASIS ON THE FACT THAT THOSE PRODUCTS WERE

[3] COVERED BY THE PATENT.

[4]     IN FACT, IN VIAM THE COURT SPECIFICALLY STATED THAT

[5] THAT STREAM OF COMMERCE THEORY DID NOT FIT INTO THE RUBRIC OF

[6] SPECIFIC JURISDICTION, WHICH IS WHERE WE FIND THIS REQUIREMENT

[7] OF THE NEXUS OF THE PRODUCTS.

[8]     I DID, BECAUSE RICOH HAD ALLEGED THAT ALL THE CASES

[9] WITH STREAM OF COMMERCE BASICALLY HAVE THE SAME FACTUAL

[10] PATTERN, I DID ATTEMPT TO LOOK AT THAT ISSUE FURTHER.

[11]     AND IT TURNS OUT THAT MOST OF THE CASES THAT APPLY

[12] THERE ARE ACTUALLY LOOKING AT JURISDICTION OVER THE ALLEGED

[13] INFRINGING DEFENDANT, NOT IN THE DECLARATORY JUDGMENT SETTING.

[14]     THE COURT: OKAY.

[15]     MS. CORBIN: BUT THERE IS ONE CASE, I THINK, WE DID

[16] NOT CITE THAT WE DID BRING A COPY OF, IF YOUR HONOR WOULD LIKE.

[17] AND IT'S THE R & J TOOL VERSUS MANCHESTER TOOL COMPANY CASE.

[18] IT'S 2000 U.S. DISTRICT, THE LEXIS CITE, 6201. THAT WAS THE

[19] DISTRICT OF NEW HAMPSHIRE IN 2000.

[20]     IT, TOO, WAS A DJ ACTION. AND THERE, AGAIN, THAT

[21] WAS THE CASE WHERE THEY SAID $70,000 WORTH OF SALES WAS

[22] SUFFICIENT IN TERMS OF AMOUNT.

[23]     AND THE COURT DID NOT, AGAIN, PLACE ANY EMPHASIS

[24] WHATSOEVER ON WHETHER THE PRODUCTS THAT WERE COMING IN HAD

[25] NEXUS TO THE PATENT ITSELF THAT WAS AT ISSUE. AND IT WAS A

Page 27

[1] PATENT CASE.

[2]     SO I THINK THAT –

[3]     THE COURT: OKAY.

[4]     MS. CORBIN: – UNDER THE STREAM OF COMMERCE THEORY

[5] THIS NEXUS IS NOT REQUIRED.

[6]     BUT GOING BACK, AGAIN, TO THE FACTS THAT WE DO HAVE

[7] THAT WOULD CONNECT RICOH AND – IN THE U.S. AND RICOH JAPAN ARE

[8] BOTH LICENSEES OF SYNOPSYS, AS WELL.

[9]     THEY PURCHASED THE DESIGN COMPILER PRODUCT. WE HAVE

[10] EVIDENCE THAT WE COULD ALSO – WE'VE TURNED UP THAT WE COULD

[11] ALSO PASS TO YOUR HONOR.

[12]     THE COURT: WELL, AT SOME POINT THIS HAS TO STOP. I

[13] MEAN, AT SOME POINT THE RECORD CAN'T CONTINUE TO GROW IN

[14] CONTEXT OF THE ARGUMENT. IF IT WAS – IF YOU HAD IT YOU COULD

[15] HAVE MADE REQUESTS ADMINISTRATIVELY TO SUBMIT THIS, AND THEN I

[16] WOULD HAVE GIVEN COUNSEL THERE WHO BY NOW IS FIDGETING AROUND

[17] IN HIS SEAT, BECAUSE THE RECORD IS CHANGING AS WE GO FORWARD.

[18]     SO, I MEAN, YOU HAVE WHAT YOU HAVE BEFORE ME.

[19]     MS. CORBIN: OKAY.

[20]     THE COURT: OKAY. NOW, LEGAL AUTHORITY, YOU KNOW, I

[21] DON'T HAVE ANY PROBLEM WITH. AND I'LL GIVE THEM A CHANCE TO

[22] RESPOND TO THAT.

[23]     MS. CORBIN: BUT THE VIAM – SO GOING BACK, YOUR

[24] HONOR, TO THE VIAM CASE AND THE --

[25]     THE COURT: OKAY.

Page 28

[1]     MS. CORBIN: -- BECAUSE I DON'T THINK FOR THE STREAM

[2] OF COMMERCE CASE THERE HAS TO BE THIS NEXUS. I THINK YOU CAN

[3] COMBINE THE ACTIVITIES OF RICOH CORPORATION IN BRINGING THE

[4] RICOH JAPAN PRODUCTS HERE, TOGETHER WITH THE FACT THAT THEY ARE

[5] SENDING CUSTOMER LETTERS TO ENTITIES HERE IN CALIFORNIA, AND

[6] THE FACT THAT IT IS THOSE LETTERS THAT IS RAISING THE

[7] REASONABLE APPREHENSION OR CREATING THE REASONABLE APPREHENSION

[8] OF SUIT TO SAY THAT IN THIS CONTEXT IT WOULD BE FAIR AND

[9] REASONABLE AND DEFINITELY COMPORT DUE PROCESS TO EXERCISE

[10] JURISDICTION OVER THEM.

[11]     ON THE JUSTICIABILITY ISSUE, I THINK THE ARROWHEAD

[12] CASE, WHICH INTERESTINGLY WAS A PATENTED PROCESS THAT WAS

[13] INVOLVED THERE, LIKE SIMILAR TO THIS CASE, IS DISPOSITIVE OF

[14] THE CASE OR CONTROVERSY.

[15]     I THINK THERE ARROWHEAD MAKES CLEAR THAT IT DOESN'T

[16] REQUIRE AN EXPRESS CHARGE OF INFRINGEMENT; THAT REASONABLE

[17] APPREHENSION ON THE PART OF THE CUSTOMERS IS SUFFICIENT.

[18]     THE MINIBIA (PHONETIC) CASE, WHICH IS A FEDERAL

[19] CIRCUIT CASE FROM 2001, I THINK IS VERY SIMILAR TO OUR CASE,

[20] BECAUSE THERE YOU HAD A COVENANT NOT TO SUE THAT WAS EXTENDED

[21] TO THE MANUFACTURER, BUT THAT COVENANT WAS NOT EXTENDED TO THE

[22] CUSTOMERS.

[23]     AND THE COURT SAID THAT THAT WAS SUFFICIENT AND IT

[24] DID CREATE SUBJECT MATTER JURISDICTION FOR THE MANUFACTURER TO

[25] BRING ON ITS DJ ACTION.

Page 29

[ 1]          I THINK THE COMBINATION OF THIS DESIGN COMPILER

[ 2]  PRODUCT NOT BEING A STAPLE ARTICLE OF COMMERCE, AND THE FACT

[ 3]  THAT IT IS SUCH A BIG PRODUCT, ESSENTIALLY, YOU KNOW, GOING TO

[ 4]  THE HEART OF THE COMPANY AND THE ECONOMIC VIABILITY OF THE

[ 5]  COMPANY, COMBINED WITH THE FACT THAT THERE IS AN ACTUAL LEGAL

[ 6]  OBLIGATION TO DEFEND THE CUSTOMERS WHO HAVE BEEN – EITHER GOT

[ 7]  DEMAND LETTERS OR WHO HAVE BEEN SUED AND WHO HAVE EXERCISED

[ 8]  THEIRS RIGHTS UNDER THE INDEMNITY AGREEMENT DOES GET YOU OVER

[ 9]  THAT HURDLE ON THE JUSTICIABLE CONTROVERSY.

[10]          THE COURT:  OKAY.  AND DO YOU HAVE ANY SENSE – HAVE

[11]  YOU HEARD FROM THE DISTRICT COURT THERE AS TO THE TRANSFER

[12]  MOTION THAT'S PENDING, DO YOU KNOW?

[13]          MS. CORBIN:  THERE IS NO DATE, YET, YOUR HONOR.  AND

[14]  I BELIEVE ACTUALLY JUDGE SLEET (PHONETIC) IS ON VACATION

[15]  PRESENTLY.  AND THEIR LOCAL RULES PROVIDE THAT YOU HAVE TO

[16]  SUBMIT YOUR PAPERS, AND ONLY AFTER EVERYTHING IS DONE CAN YOU

[17]  ASK FOR A HEARING DATE.

[18]          SO I DON'T BELIEVE EVEN A HEARING DATE HAS BEEN

[19]  REQUESTED YET BECAUSE HE'S OUT, SO WE HAVE NO DATE AS YET.

[20]          THE COURT:  OKAY.  OKAY.

[21]          MS. CORBIN:  WOULD YOU LIKE ME TO ADDRESS THE

[22]  TRANSFER ISSUES?

[23]          THE COURT:  YES, THE BRIEFS ARE SORT OF LIGHT ON

[24]  THAT QUESTION.

[25]          MS. CORBIN:  THERE, I THINK THE COMBINATION OF THE

Page 30

[ 1]  KATZ (PHONETIC) CASE AND THE KODAKS (PHONETIC) CASE, WHICH

[ 2]  FIRMLY ESTABLISH THAT THE CUSTOMER SUIT EXCEPTION, SORT OF

[ 3]  TRUMPS THE FIRST-TO-FILE RULE WHERE THE MANUFACTURER BRINGS

[ 4]  SUIT IN ITS OWN FORUM, AS WE HAVE HERE.

[ 5]          AND I'VE STATED TO YOUR HONOR ALL THE BASES OF THE

[ 6]  ALLEGATIONS AND THE NEXUS TO SYNOPSYS IN TERMS OF THE

[ 7]  IMPORTANCE OF ITS PRODUCT.

[ 8]          I THINK THE IMPORTANT THING IS THAT IF WE GO

[ 9]  FORWARD IN THIS CASE AND WE RESOLVE THIS APPREHENSION WITH

[10]  RESPECT TO THESE TWO PATENTS, EITHER WE'RE GOING TO GO FORWARD

[11]  AND SYNOPSYS WILL PROVE THAT ORDINARY USE OF DESIGN COMPILER

[12]  DOES NOT INFRINGE THESE PRODUCTS, IN WHICH CASE THE DELAWARE

[13]  DEFENDANTS WOULD BE IMMUNIZED FROM LIABILITY.

[14]          OR SYNOPSYS WOULD LOSE HERE, AND IN THAT CONTEXT

[15]  HAVE TO TAKE A LICENSE FOR ITS PRODUCT WHICH, AGAIN, WOULD

[16]  IMMUNIZE UNDER THE DOCTRINE OF PATENT EXHAUSTION THOSE DELAWARE

[17]  DEFENDANTS.  AND I BELIEVE –

[18]          THE COURT:  BUT THOSE SAME ISSUES ARE CERTAINLY IN

[19]  CONTENTION BACK IN DELAWARE, RIGHT?

[20]          MS. CORBIN:  BUT THE '016 PATENT, YOUR HONOR, IS

[21]  NOT.  AND I THINK THAT'S IMPORTANT BECAUSE EVEN IF THAT CASE

[22]  WERE TO GO FORWARD WE WOULD STILL HAVE MULTIPLE CUSTOMERS,

[23]  INCLUDING CALIFORNIA CUSTOMERS, REMAINING WITH A REASONABLE

[24]  APPREHENSION OF SUIT ON THIS OTHER PATENT AND NOTHING ABOUT THE

[25]  PROSECUTION OF THE CLAIMS ON THE '432 PATENT AGAINST THOSE SIX

Page 31

[ 1]  DEFENDANTS WILL DO ANYTHING TO ALLEVIATE THAT.

[ 2]          AND THAT'S IMPORTANT.  AND I THINK IN THE KATZ CASE

[ 3]  THE OTHER THING THAT IS IMPORTANT, BECAUSE I DON'T KNOW WHAT

[ 4]  MR. HOFFMAN IS GOING TO SAY ABOUT IT, BUT KATZ MADE CLEAR THIS

[ 5]  CASE WOULD NOT HAVE TO RESOLVE ABSOLUTELY EVERY ISSUE.

[ 6]          THIS ISN'T A CASE WHERE THERE ARE OTHER TORT CLAIMS

[ 7]  OR SOME OTHER TYPE OTHER THAN STRAIGHTFORWARD PATENT

[ 8]  ALLEGATIONS IN THE DELAWARE SUIT.  THERE CAN BE NO DOUBT THAT

[ 9]  RESOLUTIONS OF THE ISSUES BEFORE THE COURT HERE ARE GOING TO

[10]  SERIOUSLY EITHER – OR TOTALLY ADVANCE THE PROSECUTION OF THE

[11]  CLAIMS AGAINST THE DELAWARE DEFENDANT OR RENDER THEM MOOT.

[12]          THE COURT:  A LOT FURTHER ALONG, THOUGH, HUH?

[13]          MS. CORBIN:  WELL, WE HAVE ENGAGED SO FAR ONLY IN

[14]  DISCOVERY, YOUR HONOR.  AND THE DISCOVERY THAT HAS BEEN TAKEN

[15]  OBVIOUSLY CAN BE USED – WOULD BE ABLE TO BE USED IN THIS CASE.

[16]  SO I DON'T FEEL AS IF, YOU KNOW – THERE IS A MARKMAN DATE, BUT

[17]  IF YOU LOOK AT THE LOCAL RULES AND FROM THE INSTITUTION OF THIS

[18]  CASE AND THE CONFERENCE THAT WE HAVE SET UP –

[19]          THE COURT:  IS THERE A POSSIBILITY OF SOME

[20]  INCONSISTENT FINDINGS WITH RESPECT TO THE METES AND BOUNDS OF

[21]  THE PATENT?

[22]          MS. CORBIN:  FOR THE '432 PATENT, YOUR HONOR?  WELL,

[23]  I MEAN, WE JUST – WE DON'T KNOW.  IF THE CASES WOULD GO

[24]  FORWARD SIMULTANEOUSLY, I WOULD THINK THAT WHATEVER THE FIRST

[25]  COURT DECIDES RELATIVE TO THIS WOULD NOT BE BINDING BUT

Page 32

[ 1]  PERSUASIVE ON THE OTHER COURT.

[ 2]          I THINK THAT THERE IS THAT MOTION PENDING BECAUSE

[ 3]  THOSE DELAWARE DEFENDANTS FEEL THAT THEY WOULD BE BETTER SERVED

[ 4]  TO BE HERE.  AND THAT GOES TO THE OTHER POINT ABOUT – I

[ 5]  BELIEVE THAT ON THESE PAPERS RICOH JUST HASN'T CARRIED ITS

[ 6]  BURDEN OF SHOWING THAT TRANSFER IS WARRANTED BECAUSE, YOU KNOW,

[ 7]  BASED ON EITHER THE CONVENIENCE OF THE PARTIES OR THE INTERESTS

[ 8]  OF JUSTICE I DON'T BELIEVE THAT THIS CASE CAN BE SAID TO BE

[ 9]  BETTER LITIGATED IN DELAWARE.

[10]          THE COURT:  OKAY.

[11]          MS. CORBIN:  THERE ARE NO ALLEGEDLY INFRINGING

[12]  ACTIVITIES IN DELAWARE, AND NONE OF THE PARTY WITNESSES OR

[13]  DOCUMENTS ARE IN DELAWARE.

[14]          YET, WE KNOW THAT A SUBSTANTIAL NUMBER OF SYNOPSYS

[15]  EMPLOYEES ARE GOING TO BE REQUIRED TO TESTIFY ABOUT THE DESIGN,

[16]  MANUFACTURE AND USE OF THE DESIGN COMPILER PRODUCT.

[17]          THE COURT:  WELL, YOU CERTAINLY HAVE – YOU

[18]  CERTAINLY HAVE THE – THE BENEFIT OF HAVING CHOSEN THIS FORUM.

[19]  AND YOU DON'T LIGHTLY SET ASIDE THAT ISSUE.  OF COURSE, IT HAS

[20]  TO BE LOOKED AT IN TERMS OF THE NEXUS OF THE CLAIM TO THE

[21]  FORUM, ALSO.

[22]          I DON'T KNOW THAT IN THE BALANCE, THOUGH, THAT

[23]  THAT'S A SIGNIFICANT FACTOR, THE FACT THAT YOU HAVE PARTY

[24]  WITNESSES THAT YOU HAVE CONTROL OVER AND COULD PRODUCE WEIGH SO

[25]  HEAVILY IN TERMS OF WHETHER IT GOES OR STAYS.

Page 33

[1]    MS. CORBIN:  WELL, I WOULD AGREE THERE, YOUR HONOR.

[2]    BUT LIKE WE DID MENTION AND YOUR HONOR SAID THAT YOU DIDN'T

[3]    FIND IT AS PERSUASIVE.  BUT THE DEFENDANTS FEEL THAT THEY ARE

[4]    GOING TO BE HAMPERED IN PUTTING ON THEIR DEFENSE, THEIR

[5]    VALIDITY DEFENSE, BECAUSE THERE ARE SEVERAL WITNESSES WE ARE

[6]    SERIOUSLY CONSIDERING BRINGING WHO, AS FACTUAL WITNESSES, NOT

[7]    AS EXPERTS, WOULD BE ABLE TO TESTIFY TO THESE EARLY LOGIC

[8]    SYNTHESIS SYSTEMS, SEVERAL OF WHICH WE HAVE FOCUSSED IN ON NOW

[9]    WHO WE BELIEVE ARE KEY REFERENCES TO PRIOR ART.

[10]    THE COURT:  THOSE ARE NONPARTIES.

[11]    MS. CORBIN:  AND THOSE ARE NONPARTY.  ONE OF THOSE

[12]    INDIVIDUALS IS THE PERSON I THINK YOUR HONOR HAD IN MIND, DR.

[13]    DAVID GREGORY.  HE WAS A FOUNDER OF SYNOPSYS.  HE'S NOW THE

[14]    PRESIDENT AND CEO OF RESHAPE, HERE IN MOUNTAIN VIEW.

[15]    HE DEVELOPED THE PRIOR ART SYSTEM KNOW AS SOCRATES.

[16]    THAT WAS THE BASIS OF THE DESIGN COMPILER AND MANY OTHER

[17]    SYNOPSYS PRODUCTS.

[18]    AND WE BELIEVE THAT KEY ALGORITHMS THAT HE DEVELOPED

[19]    BEFORE EVER COMING TO SYNOPSYS ARE GOING TO BE AT ISSUE IN THIS

[20]    CASE, AND THAT THE – YOU KNOW, THE KNOWLEDGE AND INFORMATION

[21]    ABOUT THOSE ALGORITHMS ARE GOING TO BE, IF NOT DISPOSITIVE,

[22]    HELP US IN SHOWING THAT THE PRIOR ART HERE INVALIDATES THIS

[23]    PATENT, AND THAT THE SYNOPSYS PRODUCT IS LIKE THE PRIOR ART,

[24]    THEREFORE, IT CAN'T BE INFRINGING.

[25]    WE HAVE A REASON TO BELIEVE THAT DR. GREGORY'S

Page 34

[1]    RECENT EVENTS – THERE'S A DISPUTE BETWEEN HIS COMPANY AND

[2]    SYNOPSYS NOW.  UNFORTUNATELY, THAT HASN'T BEEN ABLE TO BE

[3]    RESOLVED.  IT LOOKS LIKE IT'S GOING TO BE ESCALATED.  SO WE

[4]    WOULD NOT EXPECT THAT HE WOULD BE IN ANY MIND TO ASSIST US BY

[5]    TRAVELING TO DELAWARE.  AND OBVIOUSLY THE COURT COULD NOT GET

[6]    HIM TO COME.

[7]    THE OTHER INDIVIDUALS – THE OTHER MAJOR PIECES OF

[8]    ART ARE THE CATHEDRAL SYSTEM AND THE YORKTOWN SILICON COMPILER.

[9]    DR. JAN RABAEY, WAS THE PRINCIPAL ENGINEER FOR

[10]    THE CATHEDRAL SYSTEM.  AND DR. DI MICHELLI AT STANFORD AND DR.

[11]    ROBERT BRAYTON AT BERKELEY TOGETHER DESIGNED THE YORKTOWN

[12]    SILICON COMPILER.

[13]    WE FEEL THAT NOT BEING ABLE TO BRING THESE WITNESSES

[14]    AS FACT WITNESSES TO TESTIFY ABOUT THEIR DEVELOPMENT OF THESE

[15]    EARLY SYSTEMS AND THE TIMING OF IT, AND TO DISTINGUISH WHAT, IF

[16]    ANYTHING, NEW THERE IS IN THIS PATENT, WHICH WE BELIEVE THERE

[17]    IS NONE, WOULD BE PREJUDICIAL BOTH TO THE CUSTOMERS IN DELAWARE

[18]    AND TO SYNOPSYS HERE, YOUR HONOR.

[19]    THE COURT:  OKAY.  OKAY.

[20]    LET ME HEAR FROM DEFENSE.

[21]    MR. HOFFMAN:  GOOD MORNING, YOUR HONOR.  IF I CAN

[22]    START WITH SOME BACKGROUND INFORMATION ABOUT THE CASE IN

[23]    DELAWARE AS TO WHY IT WAS BROUGHT, WHY IT WAS BROUGHT THERE,

[24]    ALSO ANSWER SOME OF THE COURT'S QUESTIONS ABOUT WHAT IS

[25]    HAPPENING THERE, AND THEN PROCEED TO ANSWER, OR AT LEAST TRY TO

Page 35

[1]    RESPOND TO THE COURT'S QUESTIONS, I WOULD APPRECIATE IT.

[2]    RICOH COMPANY, LIMITED BROUGHT THE CASE IN DELAWARE

[3]    FOR SEVERAL REASONS.  NUMBER ONE:  THERE'S THREE BASIC

[4]    COMPANIES.  WHILE THERE'S SIX PARTIES, THERE'S THREE BASIC

[5]    COMPANIES.  ONE IS AMI.  ONE IS ARROWFLEX, AND THE OTHER ONES

[6]    ARE THE MATROX COMPANIES, GROUP OF COMPANIES.

[7]    AMI, ARROWFLEX AND ONE OF THE MATROX COMPANIES ARE

[8]    ALL INCORPORATED IN DELAWARE, OKAY?  ALL OF THEM ARE EAST COAST

[9]    BASED.  DELAWARE, AS THIS COURT, ARE BOTH AMONG THE MOST

[10]    EXPERIENCED COURTS IN THE COUNTRY IN DEALING WITH PATENT CASES.

[11]    THEREFORE, WE FELT THAT SINCE THEY ARE INCORPORATED

[12]    THERE AND SINCE THEY ARE EAST COAST BASED, THAT WAS THE BEST

[13]    PLACE TO BRING IT.

[14]    THE CASE WAS ALSO BROUGHT AGAINST THERE'S COMPANIES

[15]    BECAUSE WHAT'S INVOLVED HERE -- AND YOUR HONOR ASKED ABOUT THE

[16]    PATENT.  LET ME JUST READ THE VERY BEGINNING OF THE BASIC CLAIM

[17]    THAT IS IN ISSUE HERE IS CLAIM 13 IN THE '432 PATENT.  THAT'S

[18]    THE OTHER ONE WE'VE ASSERTED INFRINGEMENT OF.

[19]    IT SAYS:

[20]    "A COMPUTER-AIDED DESIGN PROCESS FOR DESIGNING

[21]    AN APPLICATION-SPECIFIC INTEGRATED CIRCUIT WHICH

[22]    WILL PERFORM A DESIRED FUNCTION COMPRISING" AND THEN

[23]    IT LISTS A NUMBER OF PROCESS STEPS.

[24]    SO THERE'S TWO THINGS BASICALLY INVOLVED.  NUMBER

[25]    ONE:  CARRYING OUT A CERTAIN SERIES OF PROCESS, INCLUDING

Page 36

[1]    INPUTTING INFORMATION, CERTAIN DESIGN INFORMATION, GOING

[2]    THROUGH A SERIES OF STEPS AND WINDING UP WITH A NET LIST FOR

[3]    DESIGNING AN APPLICATION-SPECIFIC INTEGRATED CIRCUIT, WHAT IS

[4]    GENERALLY REFERRED TO AS AN ASIC.

[5]    DESIGN COMPILER IS PART OF THAT.  HOWEVER, DESIGN

[6]    COMPILER CAN ALSO BE USED FOR PRODUCING OTHER TYPES OF

[7]    SEMICONDUCTOR LAYOFF, OR NET LISTS FOR OTHER PURPOSES OTHER

[8]    THAN ASIC'S, AT LEAST AS I UNDERSTAND – WE UNDERSTAND IT.

[9]    BUT THE ACTUAL DIRECT INFRINGERS OF THIS PATENT ARE

[10]    THE COMPANIES THAT WE'VE NAMED IN THE DELAWARE ACTION.

[11]    THEY ARE THE ONES THAT CARRY OUT WHAT WE ALLEGE IS

[12]    THE PROCESS OF AT LEAST CLAIM 13.  THERE MAY BE OTHER PROCESS

[13]    CLAIMS.  AS WE GET INTO DISCOVERY, WE WILL FIND OUT.

[14]    AND, YOUR HONOR, ONE THING JUST AS AN ASIDE FOR YOU

[15]    TO UNDERSTAND, SYNOPSYS IS ACTUALLY CONTROLLING THE CASE THERE.

[16]    THEY HAVE INDICATED THAT IN PAPERS AND BEFORE THE COURT AND IN

[17]    OTHER PAPERS.

[18]    I'M NOT SURE THAT THEY HAVE SAID IT HERE, BUT IN

[19]    ACTIONS IN DELAWARE.

[20]    IT'S THE SAME ATTORNEYS.  MS. CORBIN IS THE LEAD

[21]    COUNSEL IN THE DELAWARE CASE.

[22]    THE COURT:  RIGHT.  NO, I THINK THAT'S – THEY MAY

[23]    NOT AGREE WITH THE WORD "CONTROL," BUT THEY ARE CERTAINLY

[24]    INVOLVED.

[25]    MR. HOFFMAN:  OKAY.  WELL, ACTUALLY THE

Page 37

[1] INDEMNIFICATION AGREEMENT, NOW THAT WE'VE SEEN IT, ACTUALLY

[2] GIVES THEM THE RIGHT TO CONTROL IT.

[3]      THE COURT: YES.

[4]      MR. HOFFMAN: AND THERE IS NO INDEMNIFICATION UNLESS

[5] THEY CONTROL IT. THERE'S ALSO A LIMITATION ON THEIR LIABILITY.

[6] THEY ARE NOT FULLY LIABLE FOR ALL DAMAGES. AS WE SUSPECTED,

[7] THERE'S A LIMITATION UP TO THE AMOUNT THAT THE DEFENDANTS HAVE

[8] PAID TO SYNOPSYS FOR THE SOFTWARE, THE LICENSING FEE.

[9]      ANYWAY, THAT'S WHY WE BROUGHT THE CASE IN DELAWARE

[10] AGAINST THESE COMPANIES. THAT CASE IS ADVANCING THE -- IN

[11] CONNECTION WITH THE MOTION TO TRANSFER THAT THE DEFENDANTS

[12] FILED THERE, THEY HAD ASKED FOR ADDITIONAL TIME IN FILING THEIR

[13] REPLY BRIEF. THAT WAS JUST RECENTLY FILED.

[14]      JUDGE SLEET IS ON VACATION RIGHT NOW, IS DUE BACK --

[15] I THINK IT'S NEXT WEEK. I BELIEVE IT'S NEXT WEEK, YOUR HONOR.

[16]      CONSEQUENTLY, YOU KNOW, WE EXPECT THAT THAT MATTER

[17] WILL THEN BE TAKEN UP IN DELAWARE.

[18]      THE COURT: OKAY.

[19]      MR. HOFFMAN: THE DELAWARE COMPANIES -- I'M SORRY --

[20] THE COMPANIES THAT WE HAVE NAMED IN DELAWARE, THOUGH, ARE NOT

[21] SUBJECT TO JURISDICTION OUT HERE.

[22]      AND I RAISE THAT BECAUSE IT TIES IN WITH THE WHOLE

[23] TRANSFER ISSUE. NUMBER ONE: ONLY AMI IS REGISTERED TO DO

[24] BUSINESS IN THE STATE OF CALIFORNIA. THE PARTICULAR ARROWFLEX

[25] COMPANY THAT WE HAVE SUED IS NOT REGISTERED TO DO BUSINESS IN

Page 38

[1] CALIFORNIA.

[2]      NONE OF THE MATROX COMPANIES ARE REGISTERED TO DO

[3] BUSINESS. NONE OF THOSE -- WHILE THEY SUBMIT DECLARATIONS

[4] TALKING ABOUT DOING BUSINESS, NONE OF THEM ARE REGISTERED TO DO

[5] BUSINESS IN CALIFORNIA. SO THERE'S A REAL QUESTION OF WHAT

[6] THEY ARE DOING, IF ANYTHING, AT LEAST LAWFULLY DOING.

[7]      AND I PRESUME THAT WHEN YOU LOOK AT THOSE

[8] DECLARATIONS CAREFULLY THERE'S SOME FUDGING THAT I WOULD HOPE

[9] THEY ARE NOT VIOLATING CALIFORNIA LAW.

[10]      BUT THEY ARE NOT REGISTERED. THEY ARE NOT

[11] INCORPORATED HERE. THEY ARE NOT HEADQUARTERED HERE.

[12] CONSEQUENTLY, THEY COULD NOT HAVE BEEN SUED HERE. AMI POSSIBLY

[13] COULD HAVE, SINCE IT'S AT LEAST REGISTERED TO DO BUSINESS HERE,

[14] ALTHOUGH, QUITE CANDIDLY, IF IT WASN'T FOR THIS WHOLE ATTEMPT

[15] BY SYNOPSYS TO TRY TO SWITCH FORUMS, MY GUESS IS AMI WOULD HAVE

[16] SAID:

[17]      "WHY ARE WE BEING SUED IN CALIFORNIA? WE'RE

[18]      INCORPORATED IN DELAWARE. WE'RE HEADQUARTERED IN

[19]      ANOTHER STATE. THIS ISN'T THE PROPER FORUM."

[20]      THIS PARTICULAR AREA OF TECHNOLOGY, ELECTRONIC

[21] DESIGN AUTOMATION, ACTUALLY HAS SEVERAL CENTERS.

[22]      SOME ARE IN CALIFORNIA. SOME ARE AT

[23] CARNEGIE-MELLON. SOME ARE IN PRINCETON. THEY ARE SPREAD

[24] ACROSS THE COUNTRY.

[25]      THERE ARE PEOPLE, WITNESSES OR PEOPLE IN THIS AREA

Page 39

[1] OF TECHNOLOGY IN OTHER LOCATIONS THROUGHOUT THE COUNTRY.

[2]      DR. DI MICHELLI WHO --

[3]      THE COURT: SOUNDS LIKE A PRETTY STRONG ARGUMENT FOR

[4] A TRANSFER UNDER 1404.

[5]      MR. HOFFMAN: IT PROBABLY IS, YOUR HONOR, IF THE

[6] CASE IS NOT DISMISSED. AND I'LL GET BACK TO THE TRANSFER ISSUE

[7] IN THE CENTOCOR CASE, WHICH IS A 2002 CASE OUT OF THIS

[8] JURISDICTION, OUT OF THIS COURT.

[9]      BUT LET'S TALK ABOUT THE OTHER QUESTIONS RAISED BY

[10] THE COURT. YOU ASKED ABOUT WOULD THE DESIGN COMPILER ALONE

[11] INFRINGE. THE ANSWER IS: NO. STANDING ALONE IT DOESN'T

[12] INFRINGE. AND ALSO, IF IT'S USED FOR A PURPOSE OTHER THAN FOR

[13] DESIGNING ASIC'S. OKAY, IT WOULD NOT INFRINGE.

[14]      IF IT'S USED FOR DESIGNING OTHER TYPES OF PRODUCTS

[15] THERE WOULD BE NO INFRINGEMENT. IT IS THE PROCESS THAT'S

[16] UTILIZING DESIGN COMPILER. AND THAT'S AN IMPORTANT PART OF IT.

[17] WE DON'T DENY THAT. BUT IT'S THE PROCESS OF UTILIZING IT IN A

[18] CERTAIN WAY FOR DESIGNING ASIC'S THAT CONSTITUTES WHAT WE

[19] ALLEGE TO BE AN INFRINGEMENT OF AT LEAST CLAIM 13.

[20]      SYNOPSYS HAS RELIED ON A SERIES OF CASES, ALL

[21] PRE-2001. AND I MENTION THAT DATE BECAUSE THAT'S THE DATE OF

[22] THE DECISION BY THE FEDERAL CIRCUIT ON INTELLECTUAL PROPERTY

[23] DEVELOPMENT VERSUS TCI.

[24]      MS. CORBIN: I'M SURE, INADVERTENTLY REFERRED TO THE

[25] MINIBIA CASE IN 2001 AS A FEDERAL CIRCUIT CASE. I'M SURE SHE

Page 40

[1] JUST MISSPOKE. THAT'S ACTUALLY A DECISION OUT OF THE EASTERN

[2] DISTRICT OF PENNSYLVANIA.

[3]      THE COURT: RIGHT.

[4]      MR. HOFFMAN: THAT IS THE ONLY ONE THAT IS POST, OF

[5] CASES THEY HAVE RELIED UPON, FOR THE ISSUE OF WHEN YOU'RE SUING

[6] CUSTOMERS, AND THERE'S A COVENANT NOT TO SUE THE MANUFACTURER,

[7] WHETHER OR NOT THERE WOULD BE SUBJECT MATTER JURISDICTION.

[8]      THEIR OTHER CASES ARE PRE THE 2001 INTELLECTUAL

[9] PROPERTY --

[10]      THE COURT: DO YOU FIND IT TO BE INCONSISTENT WITH

[11] TCI AND THE CITE TO THAT DISTRICT COURT CASE?

[12]      MR. HOFFMAN: WELL, CAN I BRIEFLY DISCUSS TCI, THEN

[13] I'LL ADDRESS THE COURT'S QUESTION, IF I MAY GO INTO THE

[14] INTELLECTUAL PROPERTY DEVELOPMENT CASE FIRST.

[15]      THAT CASE IS ON ALL FOURS WITH WHAT IS INVOLVED

[16] HERE. IF THE COURT LOOKS AT 1341 TO 1342, IT TALKS ABOUT --

[17] IT'S VERY SPECIFICALLY -- THE SITUATION WHERE THERE'S A SUIT

[18] AGAINST THE MANUFACTURER, AN AGREEMENT, A COVENANT NOT TO SUE

[19] THE MANUFACTURER FOR THOSE ACTIVITIES. AND THE MANUFACTURER IS

[20] COMING IN AND SAYING:

[21]      "WELL, YEAH, BUT I HAVE A POTENTIAL

[22]      INDEMNIFICATION LIABILITY BECAUSE YOU'RE SUING MY

[23]      CUSTOMERS."

[24]      AND THE COURT PROCEEDED TO INDICATE, THE FEDERAL

[25] CIRCUIT, ALSO RELYING ON THE RESOLUTION OF SUPER SACK, SAID:

**Page 41**

[1]    "IT DOESN'T MATTER. THE MOTION TO DISMISS IS

[2]    STILL GRANTED."

[3]    THAT THE MANUFACTURER, TCI CALIFORNIA, INTERESTS ARE

[4]    AFFECTED BY -- IF TCI'S CALIFORNIA INTERESTS ARE AFFECTED BY A

[5]    DIFFERENT SUIT REGARDING THE 202, THAT TCI CALIFORNIA SHOULD

[6]    JOIN THAT ACTION AS A PARTY.

[7]         FOR EXAMPLE, PURSUANT TO FEDERAL RULE OF CIVIL

[8]    PROCEDURE 19 (A) (2) TWO LITTLE I, INDICATES THAT TCI

[9]    CALIFORNIA DOES NOT HAVE A REASONABLE APPREHENSION JUST BECAUSE

[10]   THE CUSTOMERS ARE BEING SUED, BECAUSE THERE WILL BE NO LAWSUIT

[11]   AGAINST THEM.

[12]        THE COURT: YES, BUT THE FACTUAL BACKDROP -- AND I

[13]   SAW THAT LANGUAGE THERE WHERE IT SAYS:

[14]        "A SUIT FILED AGAINST A DIFFERENT PARTY, EVEN

[15]        IF -- EVEN IF TCI CALIFORNIA POTENTIALLY REQUIRED TO

[16]        INDEMNITY THAT PARTY IS NOT A SUIT THAT TCI FACES

[17]        ITSELF."

[18]        AND THAT LANGUAGE COMES RIGHT AFTER WHAT YOU ARE

[19]   DISCUSSING

[20]        BUT IT STRIKES ME THAT THE COURT IS -- IT'S MAKING

[21]   THOSE STATEMENTS IN THE CONTEXT OF HAVING ALREADY FOUND THE

[22]   COVENANT NOT TO SUE IS SUFFICIENT TO EXTINGUISH THE ACTION.

[23]        MS. CORBIN: WELL, HERE, YOUR HONOR, WHAT WE'VE DONE

[24]   IS WE'VE INDICATED THAT WE WILL NOT SUE SYNOPSYS ON ANY PAST

[25]   ACTIVITIES, CURRENT ACTIVITIES OR ANY ACTIVITIES RELATING TO

**Page 42**

[1]    ANY OF THE PRODUCTS IT SELLS.

[2]         SO THE ISSUES, I THINK, THE COURT RAISED WHILE GOING

[3]    ON INTO THE FUTURE IF IT CONTINUES TO SELL DESIGN COMPILER,

[4]    DOESN'T THAT SUBJECT IT TO CONTRIBUTORY INFRINGEMENT CHARGES IN

[5]    THE FUTURE? AS TO DESIGN COMPILER, WE'VE AGREED WE'RE NOT

[6]    GOING TO SUE THEM.

[7]         NOW, IF THEY COME UP WITH PRODUCT A, B, C IN THE

[8]    FUTURE THAT WE KNOW NOTHING ABOUT OR DECIDE IN THE FUTURE TO

[9]    USE A NEW PRODUCT, X, Y, Z TO GO INTO THE BUSINESS OF DESIGNING

[10]   ASIC'S AND USING THE PROCESS, THAT MAY BE A WHOLE DIFFERENT

[11]   STORY WITH A WHOLE NEW PRODUCT.

[12]        BUT AS TO ANYTHING RELATING TO DESIGN COMPILER,

[13]   WE'VE INDICATED -- AND WE'VE GONE BEYOND JUST DESIGN

[14]   COMPILER -- WE'RE NOT GOING TO FILE ANY LAWSUIT AGAINST THEM.

[15]        THE COURT: BUT NOT WITHSTANDING THAT, THE PRESENCE

[16]   OF THE CURRENT LAWSUITS AGAINST THOSE ENTITIES IN DELAWARE

[17]   STILL REMAIN. AND THAT'S A FEATURE THAT ISN'T PRESENT IN TCI,

[18]   CORRECT?

[19]        MR. HOFFMAN: NO, ACTUALLY IN TCI WHAT THE COURT

[20]   SAID:

[21]        "EVEN IF -- TCI CALIFORNIA ALSO CONTENDS THAT

[22]        IT COULD BE REQUIRED TO INDEMNITY AN ENTITY THAT

[23]        POTENTIALLY COULD BE HELD LIABLE IN A DIFFERENT CASE

[24]        FOR INFRINGING THE PATENT."

[25]        THE COURT: RIGHT. THAT'S MORE OF A THEORETICAL

**Page 43**

[1]    CONSTRUCT ARGUMENT, AS OPPOSED TO THE FACTUAL RECORD THAT I

[2]    HAVE HERE, ISN'T IT?

[3]         MR. HOFFMAN: BUT IN THE INTELLECTUAL PROPERTY

[4]    DEVELOPMENT CASE IN THE TCI SITUATION, THE COURT IS SAYING --

[5]    AND I THINK THAT WAS -- AND I'D HAVE TO GO BACK, AGAIN, YOUR

[6]    HONOR. I APOLOGIZE.

[7]         BUT I THINK THERE WAS ACTUALLY ANOTHER LAWSUIT GOING

[8]    ON. THE COURT IS SAYING:

[9]         "EVEN IF THERE IS A LAWSUIT AGAINST THE

[10]        CUSTOMERS, EVEN IF THERE IS AN INDEMNIFICATION, THE

[11]        FACT THAT YOU'RE NOT GOING TO SUE TCI CALIFORNIA

[12]        MEANS THEY HAVE NO CAUSE OF ACTION."

[13]        WHAT THE COURT'S ALSO SAYING IS:

[14]        "IF THERE IS ANOTHER LAWSUIT, THEN REALLY WHAT

[15]        TCI CALIFORNIA SHOULD BE DOING" -- AND THIS IS OUT

[16]        OF THE FEDERAL CIRCUIT -- "IS GOING AND JOINING THAT

[17]        LAWSUIT."

[18]        SYNOPSYS IS INCORPORATED IN DELAWARE. THEY SEEK THE

[19]   BENEFITS OF DELAWARE. THEY HAVE -- WOULD BE SUBJECT TO

[20]   JURISDICTION IN DELAWARE. THEY GET THE BENEFITS OF THEIR COURT

[21]   SYSTEM, OF THEIR STATE LAW.

[22]        THEY COULD HAVE FILED THIS CASE IN DELAWARE. THEY

[23]   COULD HAVE GONE AHEAD AND SOUGHT TO INTERVENE IN DELAWARE. THE

[24]   ATTORNEYS ARE ALREADY PRESENT. THEY ARE ALREADY CONTROLLING

[25]   THAT LAWSUIT.

**Page 44**

[1]    THERE'S NO REASON -- IF THEY REALLY WANT TO SAY:

[2]    "HEY, WE WANT TO BE INVOLVED," LET THEM GO

[3]    JOIN THAT LAWSUIT. THEY DON'T HAVE TO FILE A SEPARATE LAWSUIT.

[4]    AND THAT CASE CANNOT BE TRANSFERRED HERE.

[5]         THE COURT: AND THAT'S NOT WITHSTANDING THE PRESENCE

[6]    OF OTHER LETTERS IN THE RECORD HERE SPECIFICALLY PUTTING

[7]    CUSTOMERS ON NOTICE HERE IN CALIFORNIA THAT, IN FACT, THEY MAY

[8]    ALSO BE SUBJECT TO SUIT.

[9]         MR. HOFFMAN: WELL --

[10]        THE COURT: AGAIN, IT'S A DIFFERENT FEATURE THAN

[11]   WHAT IS PRESENT IN TCI CABLEVISION.

[12]        MR. HOFFMAN: WELL, YOUR HONOR, IN CONNECTION WITH

[13]   THE LETTERS TO THE OTHER CUSTOMERS HERE --

[14]        THE COURT: WE'RE TALKING ABOUT REASONABLE

[15]   APPREHENSION.

[16]        MR. HOFFMAN: YES.

[17]        THE COURT: AND SOMETHING THAT OBVIATES THAT BY WAY

[18]   OF YOUR COVENANT NOT TO SUE.

[19]        MR. HOFFMAN: BUT EVEN SYNOPSYS IN DISCUSSING THE

[20]   LETTERS INTO CALIFORNIA, RECOGNIZE THAT SOMETHING MORE -- JUST

[21]   TAKING THAT IN A VACUUM AND PUTTING IT BY ITSELF -- THEY

[22]   RECOGNIZE THAT SOMETHING MORE IS NEEDED.

[23]        AND WHAT THEY GO TO IS THEY GO TO THE KBSC. AND

[24]   THEY SAY THE KBSC -- AND THIS IS IN THE PAPERS, YOUR HONOR.

[25]   THEY SAY THE KBSC 10 YEARS AGO -- AND I EMPHASIZE -- 10 YEARS

Page 45

[1] AGO SUPPOSEDLY WENT TO SYNOPSYS AND OFFERED THEM A LICENSE.

[2]        YOU HAVE TWO ISSUES. AND THEY ARGUE THAT'S THE

[3] SOMETHING MORE. NUMBER ONE, IT'S 10 YEARS AGO. HOW COULD ONE

[4] THING LEAD TO A REASONABLE APPREHENSION TODAY?

[5]        AND NUMBER TWO: IT'S A DIFFERENT PARTY. IT'S NOT

[6] RICOH. IT'S NOT RICOH COMPANY, LIMITED.

[7]        YES, WE ACQUIRED THEIR FIFTY PERCENT INTEREST IN THE

[8] PATENT. THAT IS CORRECT. THEY OWNED -- ORIGINALLY THEY OWNED

[9] FIFTY PERCENT AND RICOH OWNED FIFTY PERCENT. RICOH HAS

[10] ACQUIRED THE OTHER FIFTY PERCENT THAT KBSC HAD OWNED.

[11]        BUT THE ACTIVITY WAS 10 YEARS OLD, AND THAT'S WHAT

[12] THEY ARE RELYING ON AS THE OTHER ACTIVITY.

[13]        YOUR HONOR, LET ME GO TO THE ISSUE -- SEE IF I --

[14] SINCE WE'RE ON THE JURISDICTION -- I'M SORRY -- SUBJECT MATTER.

[15] LET ME JUST CHECK TO SEE IF I'VE ANSWERED --

[16]        THE COURT: YOU MIGHT WANT TO DISCUSS THE ARALAC

[17] CASE AND SOME OF THE DISTRICT COURT CASES THAT HAVE INTERPRETED

[18] IT. I DID ASK YOU TO SPEAK TO THAT. AND SINCE WE'RE HERE WE

[19] MIGHT AS WELL DO THAT.

[20]        MR. HOFFMAN: YES. IN THE ARALAC CASE, ONE OF THE

[21] POINTS IN THE ARALAC CASE IS WHAT WAS BEING SOLD DID NOT HAVE

[22] JUST ONE USE. IT COULD BE USED FOR OTHER PURPOSES.

[23]        THE COURT: RIGHT.

[24]        MR. HOFFMAN: THAT'S EXACTLY WHAT WE'RE TALKING

[25] ABOUT HERE. DESIGN COMPILER, AS I UNDERSTAND IT, CAN BE USED

Page 46

[1] FOR DESIGNING PRODUCTS OTHER THAN ASIC'S. IT'S NOT LIMITED TO

[2] DESIGNING ASIC'S. AND CONSEQUENTLY --

[3]        THE COURT: BUT EVEN THAT ARGUMENT DOESN'T ARGUE

[4] WHAT WAS PRESENT THERE IS THAT THAT PRODUCT WAS A FAIRLY

[5] GENERIC PRODUCT THAT HAD -- THAT CLEARLY HAD MULTIPLE USES.

[6] AND THAT'S THE FACTUAL RECORD IN WHICH THE CASE IS DECIDED.

[7]        MR. HOFFMAN: YES, YOUR HONOR. YOU ARE CORRECT.

[8]        THE COURT: SO I DON'T KNOW IF THAT NUANCE ARGUMENT

[9] CHANGES SUBSTANTIALLY THE HOLDING OF THE CASE AS IT HAS BEEN

[10] INTERPRETED BY OTHER DISTRICT COURTS GOING FORWARD. NOT TO SAY

[11] I DISAGREE WITH YOUR ULTIMATE CONCLUSION. IT'S TO SAY THE

[12] ANALYTICAL METHOD YOU USE TO GET THERE I'M NOT SURE I AGREE

[13] WITH.

[14]        MR. HOFFMAN: WELL, YOUR HONOR, IF YOU LOOK AT THE

[15] CASES -- AND TAKING THEM AS A GROUPING -- WHAT YOU GENERALLY

[16] FIND IS, NUMBER ONE, IT'S THE PRODUCT. IT'S A PATENT WITH A

[17] PRODUCT CLAIM.

[18]        THE COURT: YES.

[19]        MR. HOFFMAN: OKAY. WHERE IT SAYS:

[20]        "NOW THAT -- YOU KNOW, YOU HAVE A PRODUCT THAT

[21]        HAS ELEMENTS, A, B AND C IN IT. AND NOW I GO TO THE

[22]        CUSTOMER AND I SUE THEM FOR USING THE PRODUCT THAT

[23]        INFRINGES THE PRODUCT CLAIM."

[24]        SO THE MANUFACTURER IS A DIRECT INFRINGER. THAT'S

[25] NOT OUR SITUATION HERE. IT'S A PROCESS.

Page 47

[1]        THE COURT: OKAY.

[2]        MR. HOFFMAN: ALSO IN SEVERAL OF THE CASES RELIED

[3] UPON THERE IS A BASIS FOR, YOU KNOW, A MANUFACTURER TO SUE IF

[4] YOU'RE THREATENING CUSTOMERS. MOST OF THOSE CASES, THOUGH,

[5] DON'T INVOLVE WHERE THERE'S A SITUATION WHERE THERE'S A

[6] COVENANT NOT TO SUE THE MANUFACTURER, WHICH IS THE SITUATION

[7] HERE.

[8]        ALSO, YOUR HONOR, THOSE CASES THAT ARE BEING RELIED

[9] UPON OTHER THAN THE MINIBIA CASE -- AND I DID SAY I WOULD GET

[10] BACK TO THAT. AND I APOLOGIZE FOR NOT DOING IT YET. ALL THE

[11] OTHER CASES ARE PRIOR TO THE INTELLECTUAL PROPERTY DEVELOPMENT

[12] CASE. WHICH I THINK THE LANGUAGE OF THE FEDERAL CIRCUIT DOES

[13] INDICATE WHAT THE TEST IS AND WHAT IT SHOULD BE AND WHAT'S

[14] INVOLVED THERE, WHICH IS THAT WHERE THERE IS A COVENANT NOT TO

[15] SUE THE MANUFACTURER, EVEN IF THERE'S LAWSUITS AGAINST

[16] CUSTOMERS AND AN INDEMNIFICATION, THAT THE MANUFACTURER SHOULD

[17] GO JOIN THAT LAWSUIT.

[18]        AS FAR AS MINIBIA, THE EASTERN DISTRICT OF

[19] PENNSYLVANIA WHICH CAME OUT JUST SHORTLY AFTER THE INTELLECTUAL

[20] PROPERTY DEVELOPMENT CASE, YOUR HONOR, THE ONLY THING I GUESS I

[21] CAN SAY ABOUT THAT IS APPARENTLY THAT WAS THE THIRD TIME THE

[22] ISSUE WAS BEFORE THE COURT.

[23]        IT HAD BEEN BEFORE OTHER JUDGES PREVIOUS -- ANOTHER

[24] JUDGE PREVIOUSLY. AND THEN WAS TRANSFERRED TO A DIFFERENT

[25] JUDGE. I'M NOT QUITE SURE WHY THAT OCCURRED. IT'S NOT -- AT

Page 48

[1] LEAST IT WASN'T CLEAR IN THE RECORD THE WAY I READ IT.

[2]        AND I THINK YOU HAVE A SITUATION WHERE THE MOTION TO

[3] DISMISSED HAD ALREADY BEEN DENIED, AND THE JUDGE DECIDED HE WAS

[4] GOING TO CONTINUE TO DENY IT AND THE CASE WAS GOING TO GO

[5] FORWARD.

[6]        HE DOES POINT OUT A DISTINCTION. I APOLOGIZE. I

[7] CAN'T FIND A DISTINCTION. I CAN'T EXPLAIN THE CASE, YOUR

[8] HONOR, IN MINIBIA, OTHER THAN WHAT THE SITUATION WAS THAT THE

[9] COURT WAS CONFRONTED WITH.

[10]        THE COURT: THIS COURT CITES SUPER SACK, WHICH IS A

[11] CASE THAT TCI RELIES ON PRETTY HEAVILY --

[12]        MR. HOFFMAN: YES, IT DOES, YOUR HONOR.

[13]        THE COURT: -- ALSO, RIGHT? SO THE PREDICATE LINES

[14] OF REASONING IN BOTH CASES ARE THE SAME AND COME TO DIFFERENT

[15] CONCLUSIONS WITH RESPECT TO NOT ONLY THE COVENANT NOT TO SUE,

[16] BUT IN THE CONTEXT OF AN INDEMNIFICATION AGREEMENT ALSO

[17] PRESENT.

[18]        MR. HOFFMAN: MINIBIA DOES CITE SUPER SACK AND THE

[19] INTELLECTUAL PROPERTY DEVELOPMENT CASE AND DOES COME UP WITH A

[20] DIFFERENT -- DIFFERENT OUTCOME, YOUR HONOR.

[21]        HOWEVER, IT'S OUR POSITION THAT THE FEDERAL

[22] CIRCUIT --

[23]        THE COURT: AND I DID ASK YOU: OTHER THAN THE

[24] ULTIMATE RESOLUTION OF THE ISSUE BEFORE THE FED CIRCUIT IN

[25] MINIBIA COMES OUT DIFFERENT, IS THERE ANYTHING THAT YOU SEE IN

Page 49

[1] THE ANALYSIS OF MINIBIA THAT RUNS AFOUL OF ANY OF THE -- OF THE

[2] LEGAL PRECEDENTS THAT ARE SET FORTH IN TCI?

[3] MR. HOFFMAN: IF YOUR HONOR WILL BEAR WITH ME, LET

[4] ME GO GRAB A COPY OF IT. I DID NOT BRING ONE TO THE PODIUM.

[5] THE COURT: OKAY. I'LL JUST BE HONEST WITH YOU. I

[6] DON'T SEE -- AND I HAVE TO DECIDE WHICH I THINK IS MORE

[7] APPOSITE ON THE FACTS HERE -- BUT I DON'T SEE A FULL.

[8] EXPLICATION IN TCI OF THOSE CASES THAT STAND FOR THE

[9] PROPOSITION THAT YOU CAN FIND A CASE OR CONTROVERSY WHERE

[10] THERE'S THE EXISTENCE OF AN INDEMNIFICATION AGREEMENT.

[11] I DON'T SEE A FULL-BLOWN DISCUSSION OF THAT IN TCI,

[12] WHICH IS WHY I INITIALLY INDICATED TO YOU THAT I TOOK THOSE

[13] STATEMENTS IN THE CONTEXT OF THE CASE ITSELF, WHICH IS MOSTLY A

[14] DISCUSSION WITH RESPECT TO THE IMPACT OF A COVENANT NOT TO SUE.

[15] MR. HOFFMAN: YOUR HONOR, THERE'S NOT A FULL-BLOWN

[16] DISCUSSION, I AGREE WITH YOU. HOWEVER, THE COMMENTS ARE MADE.

[17] THE COURT'S ALSO INDICATING --

[18] THE COURT: OKAY.

[19] MR. HOFFMAN: -- GOING BACK TO THE SIMILAR

[20] RESOLUTION IN SUPER SACK WHERE IT INDICATES THE STATEMENT OF

[21] NONLIABILITY DIVESTED THE DISTRICT COURT OF ARTICLE III

[22] JURISDICTION, AND THEREFORE THE DISTRICT COURT PROPERLY GRANTED

[23] THE MOTION TO DISMISS

[24] IN MINIBIA, YOUR HONOR, WHILE THERE IS A REFERENCE

[25] TO THE INTELLECTUAL PROPERTY DEVELOPMENT CASE --

Page 50

[1] THE COURT: I MEAN, WHAT'S INTERESTING IS, YOU KNOW,

[2] AS I LOOK AT IT A LITTLE FURTHER, MINIBIA IS CITING TO FED

[3] CIRCUIT AUTHORITY ON THE QUESTION OF THE IMPACT ON CASE OR

[4] CONTROVERSY REQUIREMENT OF AN INDEMNIFICATION AGREEMENT. AND

[5] IT'S DISTINGUISHING PRIOR CIRCUIT COURT AUTHORITY, IN FACT, BP

[6] CHEMICALS ON THE GROUND THAT IN THAT RECORD THERE WAS EVIDENCE

[7] THAT ESTABLISHED THAT THE DEFENDANT HAD NOT THREATENED TO SUE.

[8] AND THAT IS WHY THE COURT FOCUSSED OR DIDN'T FOCUS

[9] AS MUCH ON THE INDEMNIFICATION AGREEMENT AS PRECLUDING A

[10] FINDING OF CASE OR CONTROVERSY FOR STANDING PURPOSES.

[11] BUT HERE THEY HAVE CITED TO ME -- YOU ARGUE WITH

[12] RESPECT TO WHAT THE UNDERLYING CONTROVERSY FOCUSES ON AND WHAT

[13] THE PURPOSE OF A DESIGN PROFILER (SIC) IS. BUT THERE CERTAINLY

[14] IS NO DISPUTE ON THE RECORD THAT THERE HAVE BEEN LETTERS SENT

[15] IN TO THE FORUM HERE WITH RESPECT TO POTENTIAL INFRINGEMENT OF

[16] THE '432 PATENT.

[17] HOW I WORK IT OUT IN TERMS OF WHAT IT ACTUALLY

[18] TEACHES IS SOMETHING DIFFERENT. BUT IT STRIKES ME THAT THIS

[19] CASE IS -- MINIBIA -- AT LEAST WITH RESPECT TO INDEMNIFICATION

[20] AGREEMENT, COUNTENANCES AND ACCOUNTS FOR FED CIRCUIT AUTHORITY

[21] ON THAT QUESTION, AND DISTINGUISHES THE FACTS FACTUALLY AND

[22] FINDS THAT THAT AGREEMENT IS ITSELF SUFFICIENT TO MEET THE

[23] CLAIM OR CONTROVERSY REQUIREMENT FOR PURPOSES OF JURISDICTION.

[24] MR. HOFFMAN: YOUR HONOR, I GUESS ON MINIBIA ITSELF

[25] I CANNOT --

Page 51

[1] THE COURT: OKAY.

[2] MR. HOFFMAN: I'M NOT SURE --

[3] THE COURT: I APPRECIATE THAT.

[4] MR. HOFFMAN: -- THE LIMITED AMOUNT THAT'S HERE THAT

[5] I CAN FIND A DISTINCTION.

[6] THE COURT: OKAY.

[7] MR. HOFFMAN: HOWEVER, IT IS OUR POSITION, AS I

[8] INDICATED, THAT THE TCI CASE WOULD BE CONTROLLING. I DO

[9] BELIEVE MINIBIA IS INCONSISTENT WITH IT. BUT THE COURT DOES

[10] MAKE REFERENCE TO IT --

[11] THE COURT: ALL RIGHT.

[12] MR. HOFFMAN: -- IN THAT CASE.

[13] THE COURT: ALL RIGHT.

[14] MR. HOFFMAN: YOUR HONOR, LET ME GO TO THE ISSUE OF

[15] JURISDICTION -- YES, PERSONAL JURISDICTION.

[16] THE COURT: RIGHT. AND YOU MIGHT ADD -- I THINK

[17] WE'RE GETTING FAIRLY CLOSE HERE. BUT I'D BE INTERESTED IF

[18] YOU -- IF IT IS YOUR POSITION THAT LEGALLY, THAT CITATION TO

[19] CASES LIKE CHAN AND UNOCAL, THE 9TH CIRCUIT, ARE INCONSISTENT

[20] WITH ANY OF THE CASES OUT OF THE FED CIRCUIT WITH RESPECT TO

[21] ESTABLISHING PERSONAL JURISDICTION, GENERAL JURISDICTION AND

[22] THE ANALYSIS WHERE YOU HAVE SUBSIDIARIES, DISTRIBUTORS,

[23] NONSUBSIDIARIES WHO ARE TAKING ACTIONS IN THE ALLEGED FORUM,

[24] AND FOR PURPOSES OF IMPUTATION.

[25] MR. HOFFMAN: I DON'T BELIEVE THAT THEY ARE

Page 52

[1] INCONSISTENT, YOUR HONOR.

[2] THE COURT: OKAY.

[3] MR. HOFFMAN: I BELIEVE THAT THE CASES ARE

[4] CONSISTENT.

[5] THE COURT: OKAY.

[6] MR. HOFFMAN: LET ME ADDRESS, THOUGH, ONE OF THE

[7] CASES THAT SYNOPSYS HAS RAISED, AND THE COURT HAS ALSO MADE

[8] REFERENCE TO: THE LSI CASE.

[9] WHAT SYNOPSYS HAS INDICATED IS THAT THE PATENT OWNER

[10] THERE, HUBBLE (PHONETIC), THE DEFENDANT IN THE CASE, HAD SALES

[11] THROUGH DISTRIBUTORS, AND THAT THIS CASE IS CLOSER BECAUSE

[12] THESE WERE SALES THROUGH A SUBSIDIARY COMPANY.

[13] THE COURT: RIGHT.

[14] MR. HOFFMAN: ACTUALLY, IN THE LSI CASE -- AND LET

[15] ME GET THE CORRECT PAGE OF THIS, YOUR HONOR.

[16] IT'S ON THE LAST PAGE OF THE DECISION. YES. IT'S AT

[17] 1375, YOUR HONOR.

[18] IT SAYS:

[19] "BASED ON HUBBLE'S MILLIONS OF DOLLARS OF SALES

[20] OF LIGHTING PRODUCTS IN OHIO OVER THE PAST SEVERAL

[21] YEARS, AND ITS BROAD DISTRIBUTORSHIP NETWORK IN

[22] OHIO, IT HAD SALES DIRECTLY ITSELF, AND IT ALSO HAD

[23] DISTRIBUTORS."

[24] THIS IS NOT SALES THROUGH DISTRIBUTORS. THAT'S

[25] DIFFERENT HERE.

**Page 53**

[1] WHAT SYNOPSYS IS INDICATING IS THAT LSI WAS SALES

[2] THROUGH DISTRIBUTORS. THAT'S INCORRECT, YOUR HONOR, ON THE

[3] FACTS OF THAT CASE.

[4] AND IN THAT CASE, QUITE APPROPRIATELY, THE COURT

[5] HELD THAT THERE WAS PERSONAL JURISDICTION. THERE WAS OBVIOUSLY

[6] CONTINUING GENERAL CONTACTS WITH THE STATE THROUGH THE REGULAR

[7] SALES OF MILLIONS OF DOLLARS OF PRODUCTS BY THE PATENT OWNER IN

[8] THE STATE OF OHIO.

[9] YOUR HONOR, THE TEST FOR JURISDICTION -- THERE'S THE

[10] GENERAL JURISDICTION AND SPECIFIC JURISDICTION, AS THE COURT

[11] HAS INDICATED AND AS SET FORTH IN THE PAPERS.

[12] WHAT THEIR ARGUMENT IS -- WHAT SYNOPSYS' ARGUMENT IS

[13] IS TWO DIFFERENT THINGS. ONE IS A GENERAL AGENCY ARGUMENT.

[14] AND THAT THAT IS SUFFICIENT BECAUSE RICOH CORPORATION, WHICH IS

[15] ACTUALLY HEADQUARTERED IN NEW JERSEY, IS THE EXCLUSIVE AGENT

[16] FOR RICOH COMPANY, LIMITED.

[17] HOWEVER, YOUR HONOR, IF YOU'D LOOK AT THE ANNUAL

[18] REPORT THAT WAS ACTUALLY ATTACHED AS AN EXHIBIT TO SYNOPSYS'

[19] PAPERS, IT INDICATES IN RICOH'S GLOBAL NETWORK ON SOUNDS --

[20] THE COURT: WHAT PAGE?

[21] MR. HOFFMAN: THIS WOULD BE --

[22] THE COURT: THIS IS EXHIBIT F, RIGHT?

[23] MR. HOFFMAN: I BELIEVE IT IS, YOUR HONOR, FOUR

[24] PAGES FROM THE BACK.

[25] THE COURT: OKAY.

**Page 54**

[1] MR. HOFFMAN: OKAY. PAGE 54. I SEE A PAGE NUMBER

[2] NOW.

[3] YOU'LL SEE THAT IN THE AMERICAS THERE'S -- IN THE

[4] UNITED STATES FOR PRODUCTION THERE'S A MANUFACTURING COMPANY.

[5] RICOH ELECTRONICS, WHICH ALSO SELLS PRODUCTS THAT IT

[6] MANUFACTURES.

[7] AND FOR SALES AND OTHERS, THERE'S ACTUALLY -- IN THE

[8] SECOND COLUMN IT LISTS SIX DIFFERENT COMPANIES IN THE UNITED

[9] STATES THAT SELL PRODUCTS.

[10] NOW, HOW MUCH IS SOLD IN CALIFORNIA? I DON'T KNOW,

[11] YOUR HONOR.

[12] THERE IS IN THIS RECORD NO ADDITIONAL BREAKDOWN

[13] BEYOND THE GENERAL FIGURES THAT WERE PROVIDED BY SYNOPSYS IN

[14] THIS RECORD.

[15] HOWEVER, IT IS CLEAR ON THE FACTS THAT ARE HERE THAT

[16] RICOH CORPORATION IS NOT THE EXCLUSIVE AGENT. IF RICOH

[17] CORPORATION DID NOT MAKE THE SALES FIRST, WELL ANY OF THE

[18] OTHER COMPANIES COULD MAKE SALES OF PRODUCTS FROM RICOH

[19] COMPANY, LIMITED.

[20] THE MODESTO CASE, THE OTHER CASES THAT ARE REFERRED

[21] TO ALL INDICATE, TALK ABOUT A -- THE EXCLUSIVE AGENT, WHERE

[22] THERE IS ONE SPECIFIC COMPANY THAT HAS THE SALES. IN FACT, IF

[23] YOUR HONOR LOOKS AT THE CHAN CASE -- AND THIS IS AT 1406 -- WE

[24] AGREE -- THIS IS THE COURT:

[25] "WE AGREE THAT WHENEVER DISCOVERER, REDETTERI

**Page 55**

[1] (PHONETIC) USED SOCIETY EXPEDITIONS AS HIS GENERAL

[2] AGENT IN WASHINGTON IS A QUESTION OF FACT. THE

[3] COURT DID NOT REACH THIS QUESTION OF FACT."

[4] SO IT IS A QUESTION OF FACT YOU NEED TO LOOK AT.

[5] BUT THE ISSUE IS: IS THERE A GENERAL AGENT WHO

[6] CONDUCTS THE BUSINESS? AND THERE IS NO SINGLE AGENT HERE.

[7] WHAT SYNOPSYS IS, IN ESSENCE, SAYING:

[8] "WELL, ANY SUBSIDIARY THAT MAY SELL ANY

[9] PRODUCTS FROM" --

[10] THE COURT: THESE ARE NOT SHELLS, RIGHT? THESE ARE

[11] ACTIVE ENTITIES THAT ARE ONGOING AND PURVEYING AND MARKETING

[12] AND SALES OF PRODUCTS.

[13] MR. HOFFMAN: ABSOLUTELY, YOUR HONOR, ALL SIX OF

[14] THEM. AND ALL SEVEN, IF YOU INCLUDE THE RICOH ELECTRONICS.

[15] AND THEY ARE ALL OPERATING IN THE UNITED STATES.

[16] SO I GUESS THE ARGUMENT IS WHILE THEY ARE SAYING:

[17] "WELL, IT'S ONLY RICOH CORPORATION THAT'S THE

[18] GENERAL AGENT," OKAY, BECAUSE THEY ARE EXCLUSIVE,

[19] WHICH IS INCONSISTENT WITH THE FACTS THAT THEY SUBMITTED, WHAT

[20] IT WOULD BE IS, I GUESS, ALL SEVEN WOULD BE THE EXCLUSIVE

[21] AGENT?

[22] THE COURT: WELL, I THINK THEIR ARGUMENT WOULD BE

[23] THE FACT THAT THEY ARE ACTING AT THE BEHEST OF THE PARENT, AND

[24] THAT, IN FACT, THESE ACTIVITIES ARE THE -- YOU KNOW, WHAT

[25] UNOCAL AND THOSE CASES FOCUS ON, AT LEAST: ARE THESE THE TYPE

**Page 56**

[1] OF ACTIVITIES THAT IF THESE SUBSIDIARIES WERE NOT ENGAGING IN

[2] THE PARENT WOULD HAVE TO DO SO ITSELF?

[3] MR. HOFFMAN: ON THIS RECORD --

[4] THE COURT: WHICH IS THE DUE PROCESS COMPONENT, THE

[5] CONTACTS COMPONENT WHICH THE COURT -- AND YOU RIGHTFULLY FOCUS

[6] THE COURT ON.

[7] AND WE DON'T KNOW, BECAUSE I ASKED WHEN I CAME OUT,

[8] BECAUSE ONE OF THE FEATURES THAT YOU SEE IN THESE CASES IS, YOU

[9] KNOW, THE QUID PRO QUO ASPECT OF IT.

[10] WHAT IS IT THAT THE COMPANY IS DERIVING AS A BENEFIT

[11] FROM ITS ACTIVITIES? AND I'VE BEEN ASKED TO MAKE AN INFERENCE

[12] HERE AS TO WHAT -- AND TO PARSE THAT, THE SUMS THAT ARE SET

[13] FORTH IN THE ANNUAL REPORT AND FIGURE -- EXHIBIT F.

[14] BUT I'M NOT SURE ON THIS RECORD.

[15] MR. HOFFMAN: YOUR HONOR, ON THIS RECORD THERE IS NO

[16] INDICATION AS TO WHAT ELSE WOULD HAPPEN, EXCEPT INFERENCES.

[17] HOWEVER, BECAUSE THERE ARE A NUMBER -- IT IS CLEAR

[18] ON THIS RECORD THAT THERE IS AT LEAST SIX OTHER SALES COMPANIES

[19] IN THE UNITED STATES AND ANOTHER MANUFACTURING COMPANY.

[20] THE COURT: HOW MANY REGIONAL ENTITIES DOES IT HAVE?

[21] MR. HOFFMAN: I'M NOT SURE, YOUR HONOR. I BELIEVE

[22] ALL OF THOSE SIX OPERATE ON A NATIONAL BASIS - QUOTE:

[23] "NATIONAL BASIS."

[24] THERE MAY BE SOME STATES THEY DON'T SELL IN. I

[25] DON'T KNOW, YOUR HONOR.

Page 57

[1]         THE COURT:  ALL RIGHT.

[2]         MR. HOFFMAN:  I KNOW LANIER AND SAVIN OPERATE

[3]  COUNTRY-WIDE.  THEIR PRODUCTS ARE COUNTRY-WIDE.

[4]         THE COURT:  OKAY.  OKAY.

[5]         MR. HOFFMAN:  HOWEVER, THE ARGUMENT THAT SYNOPSYS IS

[6]  RAISING BASICALLY WOULD LEAD TO A POSITION THAT ANY SUBSIDIARY

[7]  THAT'S AN OPERATING SUBSIDIARY -- THAT EVERY SUBSIDIARY THEN IS

[8]  THE GENERAL AGENT FOR PURPOSES OF JURISDICTION.

[9]         AND I DON'T THINK THAT'S WHERE MODESTO OR UNOCAL OR

[10]  CHAN TAKES US.  WHAT THEY ARE TALKING ABOUT IS WHERE THERE'S A

[11]  SINGLE COMPANY THAT IS OPERATING OUT THERE AS THE AGENT,

[12]  CARRYING ON THE U.S. ACTIVITIES.  AND THAT'S NOT THE SITUATION

[13]  HERE

[14]         THE SECOND ISSUE, YOUR HONOR, THAT THEY ARE --

[15]         THE COURT:  OF COURSE, YOU KNOW I SUSPECT YOU COULD

[16]  TAKE THAT THE OTHER WAY AND SAY THAT IF A PARENT WANTS TO DO

[17]  BUSINESS AND IT SETS UP A NUMBER OF DIFFERENT ENTITIES TO

[18]  TRANSACT ITS BUSINESS IT COULD ALWAYS SHIELD ITSELF FROM HAVING

[19]  TO SUBMIT TO JURISDICTION IN THE FORUM, IF THERE WAS SUFFICIENT

[20]  CONTACTS THROUGH THOSE SUBSIDIARIES TO ESTABLISH A

[21]  CONSTITUTIONAL BASIS FOR IT.

[22]         MR. HOFFMAN:  WELL, YOUR HONOR, NOT NECESSARILY.

[23]  AND THAT TAKES ME TO THE NEXT ISSUE THAT THEY ARE TALKING

[24]  ABOUT:  THE STREAM OF COMMERCE ISSUE, OKAY?  WHICH I THINK THE

[25]  COURT, IF I UNDERSTOOD THE COURT'S COMMENTS CORRECTLY, IS

Page 58

[1]  CORRECT THAT ON STREAM OF COMMERCE AND THE VIAM CASE WHICH THEY

[2]  REFER TO, IS CONSISTENT WITH IT IN ITS COMMENTS, THAT ON THE

[3]  STREAM OF COMMERCE IT HAS TO RELATE TO PARTICULAR ACTIVITY

[4]  THAT'S INVOLVED HERE.

[5]         SO IF A PARENT COMPANY IS SAYING:

[6]         "LISTEN, I'M GOING TO OPERATE THROUGH

[7]         SUBSIDIARIES," BUT PUTS THE PRODUCT INTO THE STREAM

[8]  OF COMMERCE WHICH THEN CAUSES AN INJURY TO SOMEONE, THAT WOULD

[9]  NOT BE SHIELDING ITSELF, BECAUSE THE CLAIM ARISES OUT OF THOSE

[10]  PRODUCTS PUT INTO THE STREAM OF COMMERCE.

[11]         THAT'S VERY DIFFERENT FROM THE PRESENT SITUATION.

[12]         IN THE STREAM OF COMMERCE CASES, AND VIAM

[13]  SPECIFICALLY TALKS ABOUT -- IN FACT, LET ME GET YOU THAT QUOTE,

[14]  YOUR HONOR.

[15]         THE COURT:  OH, I THINK I MAY HAVE ALREADY READ IT

[16]  INTO THE RECORD.

[17]         MR. HOFFMAN:  YOU MAY HAVE.  I'M NOT SURE IF IT'S

[18]  EXACTLY THE PART THAT I WAS GOING TO REFER TO.

[19]         "THERE IS SUFFICIENT CONNECTION BETWEEN THE

[20]         ACTIVITY IN THE LITIGATION TO SATISFY THIS PRONG OF

[21]         THE INTERNATIONAL SHOE DUE PROCESS TEST."

[22]         THAT'S WHAT VIAM IS ALL ABOUT.  THAT IS WHAT THE

[23]  STREAM OF COMMERCE --

[24]         THE COURT:  WHAT IS THE ACTIVITY?

[25]         MR. HOFFMAN:  THE ACTIVITY IS THE ACTIVITY THAT'S

Page 59

[1]  CAUSING THE INJURY.  THE ACTIVITY IS THE ACTIVITY OF EITHER

[2]  THREATENING COMPANIES WITH INFRINGEMENT OF THE PARTICULAR

[3]  PRODUCT, SUING COMPANIES IN THE LOCATION WITH THE PARTICULAR

[4]  PRODUCT OR SELLING THE PARTICULAR PRODUCT.

[5]         WE DON'T SELL THIS PRODUCT IN -- WE DON'T SELL THIS

[6]  PRODUCT ANYWHERE IN THE UNITED STATES.

[7]         THE COURT:  AND DO YOU DISTINGUISH THAT FROM THE

[8]  BUT-FOR TEST FOR SPECIFIC JURISDICTION THAT THE 9TH CIRCUIT HAS

[9]  ESPOUSED?

[10]         MR. HOFFMAN:  NO, I THINK IT'S EXACTLY THE SAME

[11]  TEST.  I THINK THAT IS WHAT VIAM IS DOING IS A BUT-FOR TEST.

[12]         THE COURT:  OKAY.

[13]         MR. HOFFMAN:  I THINK THE FEDERAL CIRCUIT IS

[14]  FOLLOWING THAT.  I READ THAT CASE DIFFERENTLY THAN WHAT

[15]  SYNOPSYS READS IT AS.

[16]         THE COURT:  OKAY.  I THINK YOU'VE ANSWERED MOST OF

[17]  MY QUESTIONS.  IF YOU --

[18]         MR. HOFFMAN:  WELL, IF I CAN JUST REFER TO ONE MORE

[19]  CASE, YOUR HONOR.

[20]         THE COURT:  SURE.

[21]         MR. HOFFMAN:  IF YOU'LL BEAR WITH ME.  THANK YOU.

[22]         THE CENTOCOR CASE.  THIS GOES BACK TO SOMETHING WE

[23]  KIND OF STARTED OFF WITH ON THE TRANSFER ISSUE.

[24]         THE COURT:  RIGHT.

[25]         MR. HOFFMAN:  BUT I HAD SAID I WOULD GET TO CENTOCOR

Page 60

[1]  LATER.

[2]         AND THIS IS CENTOCOR VERSUS MENIMMUNE, THAT IS IN

[3]  THE RECORD.

[4]         IT TALKS ABOUT THE FIRST TO FILE.  AND IT TALKS

[5]  ABOUT A SITUATION -- AND THIS IS AT -- ON THE LAST PAGE.  I'M

[6]  SORRY.  ON PAGES THREE AND FOUR OF THE DECISION, IT TALKS ABOUT

[7]  EXACTLY THE SAME TYPE OF SITUATION AS HERE.  WHERE THERE IS

[8]  ANOTHER LAWSUIT THERE MAY BE DIFFERENT PARTIES, BUT THEY ARE

[9]  SIMILAR PARTIES, SAME BASIC ISSUES THAT THAT FIRST LAWSUIT

[10]  SHOULD STILL CONTROL.

[11]         YOUR HONOR, THE DELAWARE CASE IS THE ONLY PLACE

[12]  WHERE WE CAN GO AFTER AND PROVE THAT THE USE OF THE ACTUAL

[13]  PROCESS IS WHAT'S INFRINGING.  OTHERWISE, HERE THE MOST WE CAN

[14]  TRY IS A HYPOTHETICAL CASE FIRST, WHICH WE HAVE NO CLAIM

[15]  AGAINST SYNOPSYS.

[16]         SECOND, WE'D HAVE TO SAY IF SYNOPSYS -- IF THE

[17]  DESIGN COMPILER IS USED IN A CERTAIN WAY, AND IF IT IS USED TO

[18]  DESIGN ASIC'S, THEN THERE WOULD BE AN ISSUE OF INFRINGEMENT.

[19]         AND THEN, THE ISSUE OF DAMAGES, SINCE OUR DAMAGES

[20]  ARE BASED ON THE SALE OF THE ASIC'S MADE BY THAT PROCESS, AND

[21]  THOSE SALES ARE NOT HERE, WE CAN'T EVEN GET A MEASURE OF

[22]  DAMAGES HERE.

[23]         THEY SAY:

[24]         "WELL, IF WE GRANT THEM A LICENSE."

[25]         WELL, THAT'S GREAT.  WE HAVE NO OBLIGATION TO GRANT

Page 61

[ 1] THEM A LICENSE. OBVIOUSLY, IF THE MONEY IS ENOUGH, MAYBE WE

[ 2] WOULD. MAYBE WE WOULDN'T. OUR THEORY IS WE WANT TO GO AFTER

[ 3] THE PEOPLE WHO ARE USING THE PRODUCT ON ASIC'S.

[ 4]        THE COURT: I DON'T THINK THE LICENSE ISSUE RAISES

[ 5] ITS HEAD AT THE END OF THE DAY.

[ 6]        MR. HOFFMAN: OKAY. THANK YOU, YOUR HONOR.

[ 7]        THE COURT: ALL RIGHT. THANK YOU.

[ 8]        MS. CORBIN: YOUR HONOR, COULD I JUST ADDRESS A FEW

[ 9] POINTS –

[10]        THE COURT: VERY QUICKLY.

[11]        MS. CORBIN: – FOR CLARIFICATION?

[12]        FIRST, WITH REGARD TO THAT CENTOCOR CASE, WHICH IS

[13] THE LAST THING HE MENTIONED, I WOULD JUST MENTION TO THE COURT

[14] THAT THAT CASE IS EASILY DISTINGUISHED BECAUSE IT WAS NOT A

[15] CUSTOMER SUIT, SO IT DIDN'T FALL INTO THE CUSTOMER SUIT

[16] EXCEPTION.

[17]        FURTHERMORE, ANYTHING THAT IT ARGUED WITH RESPECT TO

[18] PERSONAL JURISDICTION WAS DICTA, BECAUSE THAT CASE WAS ACTUALLY

[19] DISMISSED BECAUSE THERE WAS NO ACTUAL CONTROVERSY.

[20]        JUST TO CORRECT – AND I DO APOLOGIZE. THAT MINIBIA

[21] CASE IS ACTUALLY A DISTRICT OF D.C. CASE, AND MY NOTES WERE TOO

[22] CLOSE TOGETHER. I GOT THAT WRONG.

[23]        I STILL THINK THAT IT MAKES CLEAR THAT IT FOLLOWED

[24] ARROWHEAD. AND THAT ARROWHEAD, WITHOUT EVEN AN INDEMNITY,

[25] THOUGHT THAT REASONABLE APPREHENSION OF SUIT ON BEHALF OF A

Page 62

[ 1] CUSTOMER WAS SUFFICIENT TO ESTABLISH SUBJECT MATTER

[ 2] JURISDICTION. I THINK THAT REMAINS THE FEDERAL CIRCUIT LAW.

[ 3]        WITH RESPECT TO THE LSI CASE, YOUR HONOR, I WOULD

[ 4] JUST CLARIFY, BECAUSE I THINK – PROBABLY UNINTENTIONALLY –

[ 5] BUT I THINK IT'S BEEN MISCONSTRUED. THE QUOTE THAT MR. HOFFMAN

[ 6] MADE TO YOUR HONOR WAS FROM PAGE SEVEN OF THE CASE WHERE IT

[ 7] SAID THAT:

[ 8]        "BASED ON HUBBLE'S MILLIONS OF DOLLARS IN

[ 9]        SALES OF LIGHTING PRODUCTS IN OHIO OVER THE PAST

[10]        SEVERAL YEARS AND ITS BROAD DISTRIBUTORSHIP NETWORK

[11]        IN OHIO, WE FIND THAT HUBBLE MAINTAINS CONTINUOUS

[12]        AND SYSTEMATIC CONTACTS WITH OHIO."

[13]        BUT ON PAGE TWO, YOUR HONOR, UNDER THE BACKGROUND

[14] SECTION IT MAKES CLEAR HERE THAT HUBBLE ITSELF EMPLOYS MULTIPLE

[15] DISTRIBUTORS IN OHIO, AND NETS SEVERALS OF MILLIONS OF DOLLARS

[16] PER YEAR FROM SALES IN OHIO, BUT HUBBLE ITSELF DOES NOT SELL

[17] ANY OF ITS OWN PRODUCTS IN OHIO.

[18]        SO IT IS NOT TRUE THAT IN LSI THAT THE PARTY WAS

[19] SELLING THEIR OWN PRODUCTS, AND THEN ALSO HAVING DISTRIBUTORS

[20] SELL THEIR OWN PRODUCTS.

[21]        THE COURT: NO, I DIDN'T READ THE CASE THAT WAY, AND

[22] I DIDN'T HEAR THE ARGUMENT THAT WAY. MAYBE IT'S BECAUSE I'M

[23] FAMILIAR WITH THE FACTS OF THE CASE –

[24]        MS. CORBIN: OH, OKAY.

[25]        THE COURT: – BUT I DIDN'T HEAR THE ARGUMENT THAT

Page 63

[ 1] WAY.

[ 2]        MS. CORBIN: AND, FINALLY, YOUR HONOR --

[ 3]        THE COURT: IT'S CLEAR TO ME THAT ON THAT RECORD

[ 4] THAT HUBBLE WAS NOT SELLING PRODUCTS IN THE FORUM. IT WAS THE

[ 5] WIDE RANGE OF DISTRIBUTOR AGREEMENTS AND THOSE INDIVIDUALS THAT

[ 6] WERE SELLING THE PRODUCT.

[ 7]        MS. CORBIN: AND IN THAT REGARD, YOUR HONOR, I

[ 8] THINK --

[ 9]        THE COURT: AND NOT THE INFRINGEMENTS PRODUCTS.

[10]        MS. CORBIN: – OF THE SEVEN COMPANIES THAT MR.

[11] HOFFMAN REFERENCED FOR YOU, RICOH INNOVATIONS IS ALSO LOCATED

[12] IN CALIFORNIA.

[13]        THE COURT: RIGHT.

[14]        MS. CORBIN: ANY BUSINESS IT'S TRANSACTING IS BEING

[15] DONE HERE.

[16]        RICOH ELECTRONICS IS ALSO LOCATED IN CALIFORNIA.

[17] AND I THINK THAT THE WEB SITE MAKES CLEAR THAT RICOH

[18] CORPORATION IS OVERSEEING ALL THE SALES ACTIVITY FOR RICOH

[19] JAPAN IN THE UNITED STATES.

[20]        IF THE COURT LOOKS FURTHER AT THE OTHER COMPANIES

[21] THAT ARE LISTED HERE, ONE OF THEM IS IN LATIN AMERICA, SO IT'S

[22] DOUBTFUL THAT IT'S SELLING PRODUCT IN CALIFORNIA.

[23]        ONE IS RICOH FINANCE CORPORATION, WHICH LOOKING AT

[24] THE WEB SITE DOESN'T SELL ANY PRODUCTS.

[25]        AND THE OTHER TWO, SAVIN CORPORATION AND LANIER

Page 64

[ 1] WORLDWIDE ARE SELLING THEIR OWN BRANDS, NOT THE RICOH PARENT

[ 2] BRANDS.

[ 3]        ON THE TRANSFER ISSUE I WOULD JUST SAY THE BURDEN OF

[ 4] PROOF IS ON RICOH HERE. THEY HAVE MADE SHORT SHRIFT OF THIS

[ 5] ARGUMENT IN THEIR PAPERS. HE CAN WAVE HIS HANDS NOW HERE AND

[ 6] SAY THAT THERE ARE A NUMBER OF WITNESSES ALL OVER THE COUNTRY

[ 7] WHO HAVE KNOWLEDGE WITH RESPECT TO X, Y OR Z, BUT THE FACT

[ 8] REMAINS HE HASN'T IDENTIFIED ANY SPECIFIC PARTIES, WITNESSES

[ 9] AND THE SUBJECT OF THEIR TESTIMONY, WHICH IT WAS HIS BURDEN TO

[10] DO.

[11]        WITH RESPECT TO THE DELAWARE DEFENDANTS, IN ADDITION

[12] TO AMI BEING REGISTERED TO DO BUSINESS IN CALIFORNIA, ARROWFLEX

[13] OWNS UTMC. IT'S ARROWFLEX UTMC WHICH IS THE SUBSIDIARY THAT

[14] DOES THE DESIGN WORK THAT IS ACCUSED.

[15]        THAT ENTITY IS REGISTERED TO DO BUSINESS IN

[16] CALIFORNIA, AS WELL. AND THERE'S NO EVIDENCE THAT THESE, AS

[17] STATED BY MR. HOFFMAN, THAT THE DELAWARE DEFENDANTS ARE NOT

[18] SUBJECT TO JURISDICTION HERE.

[19]        IN ANY EVENT, THEY ARE WANTING TO BE TRANSFERRED

[20] HERE AND BELIEVE THAT IT IS IN THE INTEREST OF JUSTICE AND IN

[21] FAIRNESS THAT THE CASE SHOULD BE TRIED HERE BECAUSE OF THE

[22] OTHER THIRD-PARTY WITNESSES, PARTICULARLY, THAT THEY BELIEVE

[23] THEY NEED TO PROVE THEIR CASE.

[24]        THE COURT: WHAT IS THE DECISION YOU CITED TO, R & J

[25] VERSUS --

Page 65

[1]        MS. CORBIN: IT'S R & J TOOL, INC., YOUR HONOR, AND

[2]    I HAVE A COPY HERE. I CAN JUST --

[3]        THE COURT: AND HAVE YOU HAD A CHANCE TO READ THIS

[4]    DECISION?

[5]        MR. HOFFMAN: NO, I HAVE NOT, YOUR HONOR.

[6]        THE COURT: SO YOU WANT ME TO CONSIDER THIS,

[7]    CORRECT?

[8]        MS. CORBIN: I WOULD LIKE YOU TO, YOUR HONOR. I

[9]    THINK THAT BECAUSE IT'S THE ONLY OTHER DJ --

[10]        THE COURT: THIS IS A NEW --

[11]        MS. CORBIN: THE CASE --

[12]        THE COURT: -- CASE --

[13]        MS. CORBIN: -- ARISING IN THE DJ CONTEXT TALKING

[14]    ABOUT STREAM OF COMMERCE. AND, AGAIN, I THINK THE ONLY POINT

[15]    IS THAT THE COURT DOES NOT MAKE IT A REQUIREMENT THAT THE

[16]    ACTIVITIES IN THE VENUE HAVE TO BE AFFILIATED WITH THE PATENT

[17]    OR ASSOCIATED WITH THE CAUSE OF ACTION.

[18]        THE COURT: RIGHT. SO, YOU KNOW, HERE'S WHAT I

[19]    THINK WOULD BE FAIR IS TO GIVE YOU AN OPPORTUNITY -- NO MORE

[20]    THAN FOUR PAGES. YOU CAN TELL ME WHAT IT IS THAT --

[21]        MR. HOFFMAN: THANK YOU.

[22]        THE COURT: -- YOU THINK ABOUT THIS AUTHORITY AS IT

[23]    RELATES TO THE ARGUMENTS YOU MADE. I THINK ESSENTIALLY THAT

[24]    THE STREAM OF COMMERCE ANALYSIS REALLY OVERLAPS COMPLETELY WITH

[25]    THE BUT-FOR REQUIRING SPECIFIC JURISDICTION AS ESPOUSED IN THE

Page 66

[1]    NINTH CIRCUIT.

[2]        AND YOU CAN JUST TELL ME WHAT YOUR VIEW OF THAT IS,

[3]    AND YOU CAN HAVE THAT TO ME BY CLOSE OF BUSINESS FRIDAY.

[4]        MR. HOFFMAN: THAT WILL BE FINE.

[5]        THE COURT: I'LL READ THE CASE YOU RELY ON, AND THEN

[6]    THE RECORD WILL BE CLOSED AND THE COURT WILL ISSUE AN ORDER.

[7]        MS. CORBIN: AND IN CLOSING, YOUR HONOR, I WILL JUST

[8]    SAY THAT THIS IS NOT THE CASE -- I MEAN, WE HAVE RICOH

[9]    CORPORATION SELLING SUBSTANTIAL NUMBER OF ITS PRODUCTS IN

[10]    CALIFORNIA THREATENING SUIT AGAINST CUSTOMERS, INCLUDING THOSE

[11]    IN CALIFORNIA, AND AIMING AT THE VERY HEART OF SYNOPSYS, A

[12]    COMPANY THAT'S LOCATED RIGHT HERE IN THE NORTHERN DISTRICT.

[13]        IT'S AVAILED ITSELF OF THE UNITED STATES PATENT LAWS

[14]    TO GAIN A PATENT. AND TO SAY THAT THERE'S NO PERSONAL

[15]    JURISDICTION, AND THERE'S NOTHING THAT SYNOPSYS IN ITS

[16]    INTERESTS OR THE STATE OF CALIFORNIA IN PROTECTING THE

[17]    COMPANIES THAT DO BUSINESS HERE --

[18]        THE COURT: LET ME ASK YOU THIS: DO YOU THINK THAT

[19]    IF YOU SPEAK LAST AND SUMMARIZE THAT MAKES YOUR POSITION MORE

[20]    PERSUASIVE? BECAUSE THESE ARE ALL ARGUMENTS THAT YOU'VE MADE

[21]    TO ME ALREADY.

[22]        MS. CORBIN: OKAY. WELL, THANK YOU, YOUR HONOR.

[23]        THE COURT: YOU STARTED BY THAT. AND I REALLY

[24]    APPRECIATE IT. AND I GAVE YOU MORE TIME BECAUSE I THINK THERE

[25]    ARE SOME COMPLICATED ISSUES HERE. SO WE TOOK MORE TIME WITH IT

Page 67

[1]    THIS MORNING TO HEAR YOU OUT.

[2]        BUT I THINK THE ARGUMENT YOU'RE MAKING AT THE END IS

[3]    A CLOSING SUMMATION OF SORTS. AND I'VE FOLLOWED YOUR POSITION

[4]    AND I READ THE PAPERS, SO I APPRECIATE IT.

[5]        MS. CORBIN: I APPRECIATE THE TIME. THANK YOU.

[6]        MR. HOFFMAN: YOUR HONOR, THERE'S ONE POINT I DID

[7]    FORGET TO MAKE. I APOLOGIZE. AND THEN, I JUST HAVE A QUESTION

[8]    FOR THE COURT.

[9]        THE COURT: SURE.

[10]        MR. HOFFMAN: THE ONE POINT, YOUR HONOR, AS FAR AS

[11]    THE ISSUE OF WITNESSES, IN THE DISCOVERY IN DELAWARE WE ASKED

[12]    IN ONE OF THE INTERROGATORIES FOR THE DEFENDANTS THERE TO

[13]    IDENTIFY THOSE PEOPLE HAVING INFORMATION ABOUT THEIR

[14]    ALLEGATIONS OF INVALIDITY NONINFRINGEMENT.

[15]        THEY IDENTIFIED THREE PEOPLE: TWO IN JAPAN AND ONE

[16]    IN SOUTH CAROLINA.

[17]        THE COURT: YES.

[18]        MR. HOFFMAN: YOUR HONOR, WE HAVE A SCHEDULING

[19]    CONFERENCE BEFORE THE COURT IN SEPTEMBER, LATE SEPTEMBER, I

[20]    BELIEVE IT IS. AND UNDER THAT SCHEDULING CONFERENCE WE'RE

[21]    SUPPOSED TO BE MEETING -- ACTUALLY, I THINK IT'S NEXT WEEK.

[22]        THE COURT: NO, WHY DON'T YOU -- LET'S SUSPEND --

[23]        MR. HOFFMAN: OKAY.

[24]        THE COURT: -- THE MEET AND CONFER AS A PREDICATE TO

[25]    FILING THE JOINT STATEMENTS IN THE MATTER. AND WHAT I'LL DO IS

Page 68

[1]    IF THE CASE GETS DISMISSED, OBVIOUSLY THAT WILL TAKE CARE OF

[2]    THAT. IF IT DOESN'T GET DISMISSED AND STAYS HERE, I'LL GIVE

[3]    YOU A NEW DATE WITHIN SEVERAL WEEKS, FAIRLY CLOSE IN TIME TO

[4]    THAT DATE BUT ENOUGH TIME TO ALLOW YOU TO PUT TOGETHER

[5]    MATERIALS THAT WILL HELP ME IN THE PLANNING AND ORCHESTRATION

[6]    OF THE PRETRIAL ORDER IN THE CASE, OKAY?

[7]        MR. HOFFMAN: THANK YOU VERY MUCH.

[8]        THE COURT: SO IT'S JUST STAYED, OKAY?

[9]        MR. HOFFMAN: OKAY. THANK YOU FOR YOUR TIME, YOUR

[10]    HONOR.

[11]        MS. CORBIN: THANK YOU.

[12]        (THEREUPON, THIS HEARING WAS CONCLUDED.)

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 69

[ 1]             CERTIFICATE OF REPORTER

[ 2]          I, KATHERINE POPE WYATT, THE UNDERSIGNED, HEREBY

[ 3]   CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A

[ 4]   CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED

[ 5]   BY ME INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE

[ 6]   AND TRUE RECORD OF SAID PROCEEDINGS.

[ 7]          I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR

[ 8]   ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING

[ 9]   PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE

[10]   OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

[11]          THE FEE CHARGED AND THE PAGE FORMAT FOR THE

[12]   TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL

[13]   CONFERENCE.

[14]          FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN

[15]   CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

[16]          IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS

[17]   19TH DAY OF SEPTEMBER, 2003.

[18]

[19]

[20]

[21]

[22]

[23]   _____

[24]   _____

[25]

Pages 1-36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARTIN J. JENKINS, JUDGE

RICOH COMPANY, LTD.,

COPY

                    Plaintiff,

vs                                    Case No. C-03-4669 MJJ

AEROFLEX INCORPORATED, AMI
SEMICONDUCTOR, INC., MATROX
ELECTRONIC SYSTEMS, LTD.,
MATROX GRAPHICS, INC., MATROX
INTERNATIONAL CORP., and
MATROX TECH, INC.,

                    Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TUESDAY, DECEMBER 9, 2003 · 10:13 A.M.

APPEARANCES:

For the Plaintiff:    DICKSTEIN, SHAPIRO MORIN & OSHINKSY
                      2101 L Street NW
                      Washington, DC 20037-1526
                      202 429-2184
                      BY:  KENNETH W. BROTHERS
                           Attorney at Law

                appearances continued next page

Reported by:          JEANNE BISHOP, California CSR 2421
                      450 Golden Gate Avenue, 16-6780
                      San Francisco, California 94102
                      415 487-1754
(Proceedings recorded by mechanical stenography,
transcript produced by realtime computer translation.)

---

2

APPEARANCES:

For the Plaintiff:    ALTSHULER, BERZON, NUSSBAUM,
                      RUBIN & DEMAIN
                      177 Post Street, Suite 300
                      San Francisco, California 94108
                      415 421-7151
                      BY:  JONATHAN WEISSGLASS
                           Attorney at Law

For the Defendant:    HOWREY SIMON ARNOLD & WHITE
                      301 Ravenswood Avenue
                      Menlo Park, California 94025-3434
                      650 463-8100
                      BY:  THOMAS C. MAVRAKAKIS
                           ERIK K. MOLLER
                           Attorneys at Law

Also present:         ERIK OLIVER
                      Senior IP Counsel
                      TED W. CHAN
                      Senior Director, IP
                      Synopsys, Incorporated
                      700 East Middlefield Road
                      Mountain View, California 94043

---

3

TUESDAY, DECEMBER 9, 2003                         10:13 A.M.

PROCEEDINGS

THE CLERK:  Civil matter No. 03-4669, Ricoh Company versus Aeroflex, Incorporated.

Please state your appearance.

MR. MAVRAKAKIS:  Good morning, Your Honor.

Tom Mavrakakis on behalf of the defendants.  With me, I have Erik Moller.

And also in the courtroom are Erik Oliver and Ted Chan from Synopsys.

MR. BROTHERS:  Good morning.

Ken Brothers with Dickstein, Shapiro, Morin & Oshinsky.

With me is John Weissglass --

THE COURT:  You can continue.  Go ahead.

MR. BROTHERS:  With me is John Weissglass of the Altshuler Berzon firm.

THE COURT:  Okay.  The motion that the Court has before it was the initially -- Synopsys's motion for a stay and the rejoinder -- that was also a motion -- I believe that's right -- is that right?

MR. MAVRAKAKIS:  Actually, it's the defendant's motion to --

THE COURT:  Excuse me.  The defendant.

MR. MAVRAKAKIS:  Aeroflex.

---

4

THE COURT:  -- Aeroflex.  Sorry --

And then there's a motion to consolidate that came in the context of the briefing on this question.

Let me tell you why I brought you in.

There are some shifting sands here that don't make good sense to me, to be quite honest with you.

I should start by saying that I'm -- I'm -- I'm concerned about what really are the operative underlying facts that support the action against the -- I'll say Aeroflex defendants and how those are -- notwithstanding the fact that it involves at least Claim '3 -- claims of process -- how those are distinctly different than what may give rise to a -- the infringement issues that are involved in the Synopsys/Ricoh action.

There is a dispute in this record as to whether there is an infringement claim involved in this action.

It seems to me that there is, that they do allege and seek a declaration of non-infringement and patent invalidity.

Now, I don't know what facts embolden that request for injunctive relief.

But I disagree -- I don't think that I can read and do read cases like ATP versus QuadComm (phonetic) to set forth a general proposition with respect to patents that claim a process -- it strikes me that that's not the

9

```
 1  Design Compiler constitutes -- or reads on the process claim
 2  that you assert --
 3       MR. BROTHERS:  Oh, it is -- oh, it is when --
 4       THE COURT:  Are there others?
 5       MR. BROTHERS:  Well, I -- I'm sorry --
 6       THE COURT:  Are there other --
 7       MR. BROTHERS:  Well, let --
 8       THE COURT:  -- independent architectural --
 9  independent architectural actors that can also suffice to -- when utilized
10  and selected by the ASIC defendants also work with Design
11  Compiler to constitute infringement?
12       MR. BROTHERS:  Well, it -- to be certain this is
13  going to turn ultimately on the Markman construction of what
14  architecture-independent action and condition comprises.
15       We believe that a netlist does not constitute
16  something that falls within Claim 2 of the patent.
17       There are others.
18       For example, something called a "structure RTL,"
19  which is a Register Transfer Level.
20       We do not believe that that is an
21  architecture-independent action and condition.
22       So, if the ASIC defendants elected to use either a
23  netlist or structural RTL in their design of what goes into
24  these ASICs, they are not violating the patent.
25       They are using Design Compiler, but because they,
```

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

10

```
 1  the ASIC defendants --
 2       THE COURT:  Well, let me just stop right there.
 3       MR. BROTHERS:  Sure.
 4       THE COURT:  Let me -- let me have a sense of -- of
 5  how you view the non-infringement action and what may be in
 6  play there.
 7       MR. MAVRAKAKIS:  Sure.  The non-infringement
 8  declaratory judgment action, Your Honor, was based on the
 9  suit that was brought in Delaware and the letters that were
10  sent to Synopsys's customers here in California.
11       And if you look at those letters, and what's at
12  issue in the Delaware action, what we have here is a claim
13  for non-infringement of its logic synthesis products.
14       Now, if you go to the web site you'll see that there
15  are only a few.
16       But clearly, in the context of looking at the
17  letters and the controversy before this Court, the only thing
18  implicated is Design Compiler and the products that are used
19  with it.
20       Now, my colleague here mentioned HDL.
21       THE COURT:  He disputes that in part based on a
22  construction that he is hoping to obtain from the Court with
23  respect to the elements of the -- of the patent.
24       MR. MAVRAKAKIS:  Well, let me just explain that, the
25  technical part, for you -- for you a little bit.
```

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

11

```
 1       HDL compiler gets sold with Design Compiler.  It's a
 2  necessary part of Design Compiler.  Really, what he's saying
 3  is that there are four potential inputs to Design Compiler,
 4  and three of them can infringe.
 5       Well, if the fourth input cannot be capable of
 6  infringing, then the issue is resolved.
 7       I mean, the customers don't get the source code.
 8  They can't change the capabilities of the Design Compiler.
 9       Either it's capable of infringing or it's not
10  capable of infringing.  Additional steps are not going to
11  make it infringing.
12       And if you look here at the record, we asked these
13  questions, Your Honor --
14       THE COURT:  Yeah.  I -- I read that.
15       MR. MAVRAKAKIS:  Okay.
16       THE COURT:  That's part of the shifting sands.
17  Really, what it comes down to, is understanding the
18  technology.
19       MR. MAVRAKAKIS:  I was just going to address those
20  specific process steps, and specifically, in their
21  interrogatory response, they say, those process steps are
22  performed by the defendants using Design Compiler.
23       And that's Moller Exhibit C.
24       MR. BROTHERS:  Your Honor, there's no question that
25  Design Compiler is -- provides the framework for the -- what
```

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

12

```
 1  we contend are the independent actions by the ASIC defendants
 2  in infringing.
 3       It is similar to --
 4       THE COURT:  Are you -- are you -- would you be
 5  precluded now -- that's a very broad term, because it strikes
 6  me that there -- there will be issues of discovery --
 7  obtaining some backdrop as to how these
 8  architectural-independent actors are selected, that then will
 9  come into play to determine post-claims construction whether
10  or not there is infringement or not.
11       Why isn't that all viable if it's -- with respect to
12  the -- as a matter of liability and invalidity, why isn't
13  that all viable in the Synopsys/Ricoh action?
14       MR. BROTHERS:  There are three reasons, Your Honor.
15       First, because the ASIC defendants cannot be held
16  liable for infringement in a D.J. action.
17       All of the same issues are going to be in play.  As
18  Your Honor has pointed out, there will be discovery of the
19  ASIC defendants in the D.J. action, because, as pled by
20  Synopsys, all of their products -- it's not limited, as
21  counsel has stated in paragraph 18 -- it's -- all of their
22  products are placed at issue.
23       Now, they may seek to narrow that at some point.
24       Whereas, by contrast, we have claims against six
25  specific ASIC defendants.  And the issue will be much
```

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

13

1  narrower and much tighter focus on what these six ASIC
2  defendants do, as opposed to any potential use.
3       THE COURT:  But there is overlap.
4       MR. BROTHERS:  Sorry?
5       THE COURT:  There is overlap, right?
6       MR. BROTHERS:  Oh, there is - sure.  There is
7  overlap, which is why we contend that the issues ought -- the
8  two cases should be joined for consolidation.
9       Your Honor saw that when the ASIC defendants moved
10 for a stay in Delaware, or in the alternative for a transfer,
11 they repeatedly said, "If the Delaware court doesn't stay it,
12 transfer it here for consolidation."  And that's what we
13 think the logical process should be.
14      I should note that in Delaware the parties
15 identified a trial to take ten trial days.
16      In the proposed case management order here, the
17 Synopsys case, the parties agreed on eight trial days.  So,
18 there's a two-day difference.  And we think since there is
19 substantial overlap, that two-day difference is attributable
20 to damages.
21      There is -- since there's going to be discovery of
22 the ASIC defendants in the declaratory judgment action, it
23 makes sense to proceed with consolidated action in which
24 Ricoh presents its claims of infringement, and then the
25 defendants proceed with either their claims of

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

14

1  non-infringement or trying to invalidate the patent.
2       THE COURT:  Let me ask you, do the ASIC defendants
3  have a -- since it looks to me like - in terms of
4  representations of one of half -- it's both, do the ASIC
5  defendants have a different view of the claims construction
6  issues than Synopsys, so that, for instance, if this Court
7  issues a claim construction order -- if it were to grant your
8  motion for a stay, would it then -- because it's not going to
9  completely resolve the liability questions; there are still
10 some issues that may have to be resolved -- particularly with
11 respect to -- to the damages, and there may even be
12 infringement issues that have to be resolved -- would the
13 ASIC defendants be standing before this Court needs anew?
14 this Court needs to conduct claims construction anew?
15      MR. MAVRAKAKIS:  No, because the ASIC defendants
16 have said that they are willing to be bound -- and they will
17 be judicially estopped.  They are represented by the same
18 counsel.
19      They don't add anything to the process that this
20 Court's going to go through under the local rules, all the
21 way up through claim construction, and at that point both the
22 ASIC defendants and Synopsys think that this case is going to
23 be ripe for summary judgment on the issues of infringement
24 and validity, if not both.
25      Now, so, of course, the -- being willing to -- when

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

15

1  we get to the end of the Synopsys declaratory judgment
2  action, should you stay the case against these defendants,
3  defendants will be bound by the validity determination,
4  because they are represented by the same counsel which -- we
5  are going to bring up the same prior art, Your Honor.  We are
6  going to file the same invalidity contentions on behalf of
7  the ASIC defendants and Synopsys.
8       That's why the ASIC defendants in considering
9  whether they were going to agree to be bound, they had to
10 think about it, and before I could make that statement in my
11 brief I had to -- you know, to discuss it with my clients and
12 make them understand that they are giving up something.  They
13 are not -- they wouldn't be parties to this Synopsys action,
14 but really, they are just giving up that argument that they
15 won't be bound, because they are not parties, and they are
16 willing to bound by the validity issues.
17      So, if Ricoh prevails on validity, then they will be
18 bound by this determination.
19      If Synopsys prevails, obviously the case is over
20 under the Supreme Court's decision in --
21      THE COURT:  But it might --
22      MR. MAVRAKAKIS:  -- on infringement, if the Court
23 determines that --
24      THE COURT:  -- not be.  What if there -- what if
25 there are independent architectural design selections that

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

16

1  are not in play -- not in play in the Synopsys/Ricoh suit?
2  Then the Court would have to deal with those; wouldn't it?
3       MR. MAVRAKAKIS:  Well, Your Honor --
4       THE COURT:  I am not saying that it's not an economy
5  of scale savings if I stay the action.  I am just saying,
6  isn't that a fact?
7       MR. MAVRAKAKIS:  It depends on --
8       THE COURT:  We are talking about the situation now
9  where the patent has been held valid or not, or that hasn't
10 been proved to be invalid, and that the ordinary use of
11 Design Compiler does not infringe, right?
12      If that infringement is based on some of the steps
13 that he is not pointing out -- in other words, some of the
14 steps four, five and six, or I think five and six -- if
15 Design Compiler is incapable of performing those steps, it
16 doesn't matter what the additional acts are.  There won't be
17 any infringement.
18      Now, is there some small possibility that with
19 respect to the input portion that the defendants use some
20 other software that may -- you know, create an additional
21 infringement issue?  Yes.
22      But if you narrow it down, you see here it's -- it's
23 a very slim possibility.  And are you willing to make
24 discovery of -- give discovery by the ASIC defendants, even
25 if the Court stayed this action in the Ricoh versus Synopsys

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

17

1  action?

2      MR. MAVRAKAKIS:  Well, I was going to address that

3  issue.

4      I think that Synopsys has a whole applications

5  group, and the issue here with respect to the -- to these

6  defendants is the ordinary use of Synopsys's Design Compiler.

7      And they don't have any basis for saying that there

8  is anything else.  There's none in the deposition that we

9  took of Mr. Ishijima.  There's none in their interrogatory

10  responses.  So, we are really talking about a fishing

11  expedition.  And the threshold issue

12      THE COURT:  Well, now you are arguing your discovery

13  motion.

14      MR. MAVRAKAKIS:  Hmm?

15      THE COURT:  Now you are arguing your discovery

16  motion.

17      MR. MAVRAKAKIS:  Right.  And when -- what I -- what

18  I -- and I don't want to get off on a tangent here, Your

19  Honor.  But what I'm saying, really the threshold issue is

20  whether Design Compiler can infringe.

21      And for most of the case -- most of the iterations

22  of possibilities here, that's going to resolve the case.

23      Now, if the ordinary use of Design Compiler is found

24  to infringe -- I mean, this is 20 percent of Synopsys's

25  revenue -- they are not going to let their customers hang out

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

18

1  to dry.  They are going to have to find some resolution with

2  Kieko (phonetic).

3      THE COURT:  That's your licensing --

4      MR. MAVRAKAKIS:  Right.

5      THE COURT:  -- component?

6      MR. BROTHERS:  Your Honor, I smile, because when --

7  my -- my -- my friend here says that the issue is whether

8  Design Compiler infringes, that's the issue in this case,

9  that's the issue that Ricoh is alleging against the ASIC

10  defendants.

11      And under -- under Ricoh's theory, each of the

12  steps -- each of the claims is set forth in Claim 3 at

13  significant points.  We believe that those are independent

14  actions.

15      Now, I gave you an example of Claim 2.  I can give

16  you more examples from -- Claims 3, there was reference to

17  whether the specific compiler, the VEI compiler, was shipped

18  with Design Compiler.

19      It is shipped; but again, it is the option of the

20  defendants, the ASIC defendants.

21      THE COURT:  So, you don't disagree, though.  Those

22  products go in tandem.

23      MR. BROTHERS:  Well, sure.  They are both Synopsys

24  products.  I -- I understand that.  Let me give you an

25  example with respect to Claim 3, which is storing data,

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

19

1  designing a set of available integrated circuit hardware

2  sales for performing -- performing actions in additions

3  stored.

4      There is the option to store this.  Libraries can be

5  used.  They can have the choice to use Synopsys's libraries

6  or they can use libraries that are made and produced by third

7  parties.  For example, the foundries, the -- the places that

8  actually make these computer chips, frequently have their

9  own libraries.

10      And from the information -- limited information --

11  because we have been stonewalled on discovery by the ASIC

12  defendants -- the limited information we have, we believe

13  these foundries make these libraries readily available.

14      In fact, we have information that some of the ASIC

15  defendants -- I believe it's AMIS -- has created its

16  own libraries and then provides them to Synopsys for

17  distribution to other customers of Synopsys.

18      But they are -- my point is that there are a number

19  of libraries that can be used that are not specific to

20  Design Compiler, some of which may, may not, be -- constitute

21  infringement; others which may.

22      Now, we don't -- we haven't been able to get access

23  to any of that information, as the Court has seen in the

24  discovery motions.

25      My underlying point, however, is --

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

20

1      THE COURT:  It moves us -- you know, it moves us

2  off, I think, the more central point, which is, as you filed

3  this action how you envision infringement occurring.  And

4  that strikes me that it's more consistent with the universe

5  of -- of products -- some of which are mailed or used in

6  tandem, some of which may -- not all of which implicate a

7  process for use with the Design Compiler --

8      MR. BROTHERS:  That process

9      THE COURT:  -- and --

10      MR. BROTHERS:  -- Focuses on --

11      THE COURT:  -- and some of which may not actually

12  infringe.

13      MR. BROTHERS:  That's right.

14      And that's -- the process has to focus in on what

15  the ASIC defendants do.

16      It is theoretically possible in the declaratory

17  judgment action to have a declaratory judgment finding that

18  there are some uses of Design Compiler that do not infringe

19  the '432 patent.

20      And there are some uses of Design Compiler that do

21  infringe the '432 patent.

22      THE COURT:  That's going to take us a long way

23  toward discerning the liability of the ASIC defendants; isn't

24  it?

25      MR. BROTHERS:  No.  Because the -- the question of

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

21

```
 1   whether the ASIC defendants infringe the '432 patent turn on
 2   what they specifically do.
 3           I can stand here right now and tell you there are
 4   uses of Design Compiler that do not infringe the '432 patent,
 5   and there are those that we believe do.
 6           Now, I -- I am prepared to address the ASIC
 7   defendants' contentions of what was said or not said at the
 8   Ishijima deposition and what was not -
 9           THE COURT:  I don't think that resolves it.  One of
10   the things -- to be quite candid -- that I was thinking about
11   last night as I read through this is that some of this is a
12   question of what discovery may disclose.
13           MR. BROTHERS:  That's right.
14           THE COURT:  And I have real concerns, to be quite
15   honest with you, with -- with making a determination that
16   would stay the action at this juncture without knowing that
17   and being able to -- in my view, read on discovery on the
18   issues of -- of -- of prejudice and -  and hardship.
19           Those factors in the context of the cases that --
20   that talk about -- and make a distinction on those facts with
21   respect to process patents.
22           I don't read the cases as -- as broadly as you do.
23           I do think it's a fairly fact-specific
24   determination.
25           But quite candidly, I don't know that I really
```

22

```
 1   comprehend the burgeoning factual scenarios that may occur
 2   sufficiently to make that determination at this juncture.
 3           My inclination is to deny the motion.
 4           You do have a discovery issue that I know that
 5   Synopsys believes that there may be some real -- it may be
 6   very burdensome to comply with, amongst other objections that
 7   you have.
 8           But it strikes me that -- that the better way to
 9   deal with this is -- is for me to keep those issues,
10   streamline this, make that determination -- I can deal with
11   that scope issue as a matter of discovery, see where we are
12   with respect to setting up the claims constructions issues;
13   which you -- you'll -- you'll discern that I actually allow
14   discovery pretty much solely related to claims construction,
15   and then broader discovery on the back end once you know how
16   I actually have interpreted the elements of the claim.
17           That strikes me as probably a better point at which
18   to -- notwithstanding what - what the Judge did in Delaware
19   or what I said here, I don't know that those issues have --
20   in either the motion to dismiss that you put before me or in
21   the motion to transfer are dispositively decided.
22           So, it strikes me that that may be a better way to
23   deal with the question.  And it may be at that juncture, once
24   I have settled some of the issues in claims construction, to
25   see exactly where we are.
```

23

```
 1           A stay may not make much sense then; consolidation
 2   may make good sense then.
 3           It may be that I can see my way through the issues
 4   with respect to the liability of the ASIC defendants at that
 5   juncture where it doesn't make sense now.
 6           Let's brief up the motion for summary judgment.
 7   Discovery has put into play what is really going to be at
 8   issue from the Court's resolution of that motion.
 9           You can look through to see potentially what the
10   liability of the ASIC defendants might be in the case, and it
11   will resolve based on some economy of scale, even though both
12   actions have proceeded parallel.
13           MR. MAVRAKAKIS:  I have a question, Your Honor.
14           Just so I understand what -- what Your Honor's
15   saying how would proceed; are you saying that we would
16   proceed with limited discovery just to get up to the claim
17   construction?
18           THE COURT:  I normally just allow discovery on
19   claims construction issues.
20           MR. MAVRAKAKIS:  Because really, that's -- that's --
21   that's our hardship here because --
22           THE COURT:  I know that.  That's why I spoke to
23   that.
24           MR. MAVRAKAKIS:  Right.
25           So, I mean, if -- if the ASIC defendants are not
```

24

```
 1   going to have to participate in the broad overreaching
 2   discovery that we don't believe is necessary --
 3           THE COURT:  Well, I don't know that.  I don't know
 4   that, because I'm -- my inclination is not to stay this
 5   action, but it -- it is to have a view toward discovery that
 6   focuses on claim construction.
 7           You tell me that's a hardship.
 8           Now, you know, I can't weigh -- until I actually get
 9   in and see what you're talking about  -
10           MR. MAVRAKAKIS:  But --
11           THE COURT:  -- I've gotten a view -- they want to
12   conduct some pretty broad-based discovery with respect to
13   choices that are made and mechanisms utilized.
14           MR. MAVRAKAKIS:  Could I try and explain why I don't
15   think that's at all necessary in this action, Your Honor?
16           Again, and this -- this tells you why this case is
17   very different from the process cases they are relying on.
18           Here, we have source code that is used on a
19   computer -- on computers to perform the method.
20           So, yes, there are input -- obviously, inputs need
21   to be given to the process.  But the process and the
22   capabilities of the software and whether it performs those
23   steps is set in stone in the source code.
24           THE COURT:  Umm-hmm.
25           MR. MAVRAKAKIS:  -- in other words, so, --
```

25

```
 1        THE COURT:  Which is confidential --
 2        MR. MAVRAKAKIS:  Right.  Highly confidential.  It's
 3   the crown jewels of the company.
 4        Synopsys is a software company.  And its source code
 5   is its most important asset.
 6        Now -- so, if that source code -- if the process
 7   that --
 8        THE COURT:  Is it triggered by the input?  Does the
 9   operation of the source code relative to the input --
10   ultimately relates in -- results in -- in what the Design
11   Compiler helps to design?  That is, the ultimate, I suspect,
12   integrated circuit, whatever it does, is that triggered by
13   the input?
14        Is it affected by the input?
15        MR. MAVRAKAKIS:  No.  Synopsys's Design Compiler,
16   for instance, can accept four types of input.  And if all
17   four types of those inputs cannot be considered, you know,
18   actions and conditions as recited by the claim, then the
19   defendants then -- then the ASIC defendants don't infringe.
20        And again --
21        THE COURT:  As -- from -- from that point to the use
22   of -- I think you said by other foundries that have other
23   design input selections that can be utilized.
24        MR. MAVRAKAKIS:  Well, that's the data from which
25   the -- the process draws from in order to make the design.
```

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

26

```
 1        Now, if -- the data is not used --
 2        THE COURT:  But that's the -- the -- does the
 3   discovery fight on the discovery motion -- isn't it -- isn't
 4   that the fight in the discovery motion?
 5        MR. MAVRAKAKIS:  Well, the -- the particular
 6   discovery on that motion, I'm not sure.
 7        THE COURT:  Well, ultimate -
 8        MR. MAVRAKAKIS:  Ultimately.
 9        THE COURT:  -- that's where the hardship will come
10   from.
11        MR. MAVRAKAKIS:  Right.  That's the hardship, in
12   having to do all this discovery, which really doesn't matter,
13   because in the end, source code -- Synopsys's source code
14   sets the process for how those foundry databases, in a sense,
15   are used.
16        THE COURT:  And absent the provision of that
17   discovery, you wouldn't be making a motion for a stay, right?
18        MR. MAVRAKAKIS:  You mean, the discovery on the
19   specifics of what the ASIC defendants do?  Yes.  The hardship
20   that I'm relying here -- on here is for -- the ASIC
21   defendants is the fact that they have to participate in a
22   case with broad discovery, and they don't add anything to it.
23        Synopsys and Ricoh can go through the local rules,
24   same counsel as ASIC defendants, and after claim construction
25   is done this, case will be ripe for summary judgment motions
```

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

27

```
 1   on both the issues of infringement and validity.
 2        And then, in the very small possibility that there
 3   is some other act that defendants might make can be relevant,
 4   that could be tried at that time.
 5        That's a very small possibility.
 6        And the reason for it, if I take you through -- you
 7   know, if you go through the flow chart, could get there,
 8   first you have to find the patent's valid.  Then you have to
 9   find that Design Compiler doesn't infringe or a reason for
10   which these additional steps can bring it into infringement.
11        Now, if you find Design Compiler's ordinary use
12   doesn't infringe because of some of the steps that they can't
13   change, then that's the end of the case.
14        Now, if you find Design Compiler infringes in
15   its ordinary use, then Synopsys is going to have to make some
16   deal with Ricoh.
17        In any case, these defendants will be saved the
18   hardship of going through discovery.
19        Now, my colleague here says that, "Well, it doesn't
20   matter, if Synopsys is paying the bill."
21        But it does matter.  These are small companies.
22        And we believe that's why they were sued.
23        These companies will be disrupted.  They'll have to
24   produce documents.  They'll have to respond to
25   interrogatories, which requires their time, you know, very --
```

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

28

```
 1   of executives and their in-house counsel.  They'll he have to
 2   provide -- you know --
 3        THE COURT:  I --
 4        MR. MAVRAKAKIS:  -- people for deposition.
 5        THE COURT:  Okay.
 6        MR. BROTHERS:  Your Honor --
 7        THE COURT:  Last point.
 8        MR. BROTHERS:  Okay.
 9        THE COURT:  I am going to rule.
10        MR. BROTHERS:  We have to re argue -- counsel has
11   just reargued the reasons why there should be a stay.
12        Your questions with respect to source code, though,
13   seem to me to focus on the infringement allegations here.
14   The source code is the parameters of what the Design Compiler
15   does.
16        The patent does not allege -- the '432 patent,
17   Ricoh's allegations, does not allege that the source code
18   standing alone fringes the '432 patent.
19        It requires the independent inputs.
20        Now, the -- the argument that how this case --
21        THE COURT:  And he argues that the independent
22   inputs are, in some respects, a function of the relationship
23   to the source code itself; and there may be some other
24   independent selections that could be found to be
25   non-infringing and some that may be found to be infringing.
```

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

29

1    But the resolution of those issues in the
2  Synopsys/Ricoh case will take us a great way toward
3  discerning whether or not there needs to be some independent
4  litigation on ones that have not been construed and
5  determined as a matter of Rule 56 in Synopsys/Ricoh action.
6    MR. BROTHERS:  As defendants have conceded -- this
7  is on, I think, page 7 of their reply brief, there will be a
8  trial on infringement -- with -- in this action if the stay
9  is granted.
10    What these defendants are trying to do is turn the
11  process on its head and say, "Well, let's just have -- a
12  trial on the affirmative defense of invalidity first, and
13  then this general issue as to -- there is just possible
14  infringing use of Design Compiler, when, as we've already
15  discussed. There may be; there may not be."
16    I would reference Your Honor to *American Academy of
17  Sciences versus Novell*, case of out of this district in 1992;
18  similar case; a software in which input was being provided by
19  the banks.  And it was consented that that input constituted
20  infringement, and Novell, the maker of the software, said,
21  "No, you ought to stay that part of the case and transfer it
22  over to Utah where there's declaratory action judgment
23  proceeding."
24    And the Court said, "No.  It should stay here,
25  because the direct infringement claims are against Bank of

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

30

1  America and the other banks" -- banks that were at issue.
2    Here, we have both cases consolidated in the same
3  court, and it seems to me --
4    THE COURT:  Yeah.  Both cases existing in the same
5  court.
6    MR. BROTHERS:  Sure.  Sure.
7    THE COURT:  You haven't --
8    MR. BROTHERS:  I'm sorry.
9    -- both cases existing in the same court.  You have
10  our motion for consolidation.
11    Your Honor --
12    THE COURT:  Well --
13    MR. BROTHERS:  -- made a couple of references -- if
14  I can just ask for clarification.
15    When Your Honor was saying you were inclined to deny
16  the stay motion to streamline discovery, there is currently
17  scheduled, I think, the case management conference for
18  February 10th.  We have asked to move that up.  Counsel
19  has informed us that they are available the first two weeks
20  of January.  We'd like to get going and get that streamlined
21  and established.  We have motions scheduled already for -- I
22  believe, it's January 6th.
23    THE COURT:  What is this -- I'll give you five more
24  minutes.
25    What is this motion for summary judgment that you

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

31

1  filed?  What --
2    MR. MAVRAKAKIS:  I can -- I can address that. Your
3  Honor.
4    And this -- just points out that -- you know, we
5  have six separate entities here.
6    There are two Matrox entities that only -- and --
7  and we would have filed a motion to dismiss as a matter of
8  law, but a recent case came out -- case came out from the
9  Federal Circuit which says information is not a product, and
10  a process has to be -- a process has to be one of
11  manufacture.
12    And this patent is clearly not either of those.  And
13  these two Matrox defendants use Design Compiler in Canada.
14    So, as a matter of law, there is -- you know, they
15  don't want to be in this case anymore.  And they join in the
16  motion to stay.  If it doesn't -- if it is granted, or if it
17  gets granted.  They just don't see any reason there needs to
18  be a patent infringement litigation pending against them,
19  since the law, as the Federal Circuit has made clear, said
20  they shouldn't be in it.
21    MR. BROTHERS:  On the motion for summary judgment,
22  it was accompanied by a declaration from one of the corporate
23  representatives of these two Canadian companies that was on
24  the very issues that we had sought discovery on and have
25  received none.

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

32

1    It is a very fact-intensive question as to what it
2  is they do, where it is they do it.  There's an entity that
3  they have in the United States --
4    THE COURT:  So, you are seeking a Rule 56 (f)
5  continuance to get that discovery?
6    MR. BROTHERS:  We have not yet, but we will if -- if
7  required.  We will file a Rule 56.
8    THE COURT:  Well, I am going to tell you -- don't
9  bring me a Rule 56 motion that has request for discovery
10  where the discovery would be relevant to the issue you want
11  me to stay as a matter of law.  I am not hearing it.  So, you
12  better get together on that.
13    MR. BROTHERS:  I --
14    MR. MAVRAKAKIS:  I think, Your Honor, that really
15  there was a declaration just to give the Court the context --
16    THE COURT:  Well, I don't want to argue the motion.
17  I want to know -- so early in the life of the case, I
18  wondered what it was about.
19    MR. MAVRAKAKIS:  It's because -- it's because the
20  patent -- the patent is dealing with a process that -- where
21  you get information.  There's no dispute about that.  You get
22  a plan on how to make a chip --
23    THE COURT:  Right.
24    MR. MAVRAKAKIS:  That's not a process for making the
25  chip.  And under the *Halsey* (phonetic) case in the Fed

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

33

1  Circuit as a matter of law they don't have any case against
2  these defendants because they practice Design Compiler in
3  Canada.  I mean, you know -- so, they want to take the
4  deposition of the guy to ask him if it's true in his
5  declaration that all the processes are performed in Canada.
6  I mean --
7        THE COURT:  I don't know.  I mean --
8        MR. MAVRAKAKIS:  Yeah.
9        THE COURT:  That's why judges don't get ahead of the
10 lawyers on questions like that.
11       MR. MAVRAKAKIS:  But there's no need for --
12       THE COURT:  Gives you a reasonable amount of
13 discovery in the case so that no one walks in here and says,
14 "You know, Judge, there is this dangling participle out
15 there.  If we got the discovery, it would be relevant to the
16 question you have."
17       MR. MAVRAKAKIS:  We could show that that 56 (f)
18 motion does not rise to the requirements in the Ninth
19 Circuit.
20       MR. BROTHERS:  Your Honor, we'll confer and see --
21       THE COURT:  Meet and confer on it before, and send
22 me a letter that -- by the -- what's the third Friday in
23 December?
24       MR. BROTHERS:  Well, our Rule 56 (f) response would
25 be due next Tuesday, I believe.

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

34

1        THE COURT:  Well, send me a letter that -- you need
2  to meet and confer before then.
3        If the motion is going to go forward, just is send
4  me a letter that you met and conferred on it and why it is
5  you believe that that motion needs to go forward.
6        And I'll evaluate it and tell you whether or not the
7  motion is going to go forward.  And I will also look to see
8  if I can get you in earlier than January.
9        And, you know, I've told you what my inclination is,
10 but I'll take a look at that.  I haven't read through the
11 patent as well myself.  Let me take a look at the patent
12 itself, too, before I ultimately resolve the question on the
13 stay motion.
14       I would not be inclined to consolidate at this time
15 for the very same reasons I articulated.  I don't know enough
16 about the case to make that determination at this juncture.
17 I will decide the stay issue.
18       MR. BROTHERS:  Would it be appropriate to defer the
19 resolution of the pending summary judgment motion of these
20 two defendants until Your Honor decides whether or not if the
21 case is --
22       THE COURT:  No.  I want you -- because it's not
23 going to change -- it's not going to change the issue that
24 you dispute.
25       I want you to get on that and resolve that.

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

35

1        MR. BROTHERS:  Thank you, Your Honor.
2        THE COURT:  All right.  Matter submitted.
3        MR. MAVRAKAKIS:  Thank you.
4        THE COURT:  Okay.  Thank you.
5        (The proceedings were concluded at 10:55 a.m.)

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

36

1        R E P O R T E R ' S   C E R T I F I C A T E
2
3        I, JEANNE BISHOP, the undersigned, duly authorized
4  to report and transcribe proceedings in the United States
5  District Court pursuant to Title 28, Section 753 of the
6  Federal Civil Judicial Procedure and Rules do hereby certify:
7        That I am a Certified Shorthand Reporter in the
8  State of California, Certificate No. 2421;
9        That I attended the proceedings at the time and
10 place stated herein;
11       That pursuant to my duties as such, said proceedings
12 were reported by me and transcribed with computer-aided
13 translation into typewriting;
14       That the foregoing transcript, Pages 1-36, is a
15 full, complete, and true record of said proceedings.
16 Date:  December 23, 2003

                                    JEANNE BISHOP
17                                  California CSR No. 2421

JEANNE BISHOP, OFFICIAL COURT REPORTER, USDC 415 487-1754

1   Gary M. Hoffman (*Pro Hac Vice*)
   Kenneth W. Brothers (*Pro Hac Vice*)
2   Eric Oliver (*Pro Hac Vice*)
   DICKSTEIN SHAPIRO MORIN
3     & OSHINSKY, LLP
   2101 L Street, NW
4   Washington, DC 20037-1526
   Phone (202) 785-9700
5   Fax (202) 887-0689

6   Edward A. Meilman (*Pro Hac Vice*)
   DICKSTEIN SHAPIRO MORIN
7     & OSHINSKY, LLP
   1177 Avenue of the Americas
8   New York, NY 10036-2714
   Phone (212) 835-1400
9   Fax (212) 997-9880

10   Jeffrey B. Demain, State Bar No. 126715
   Jonathan Weissglass, State Bar No. 185008
11   ALTSHULER, BERZON, NUSSBAUM, RUBIN
   & DEMAIN
12   177 Post Street, Suite 300
   San Francisco, California 94108
13   Phone (415) 421-7151
   Fax (415) 362-8064

14

15   Attorneys for Ricoh Company, Ltd.

Teresa M. Corbin (SBN 132360)
Christopher Kelley (SBN 166608)
HOWREY LLP
301 Ravenswood Avenue
Menlo Park, California 94025
Telephone: (650) 463-8100
Facsimile: (650) 463-8400

Attorneys for ASIC Defendants and Synopsys, Inc.

16       UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF CALIFORNIA
17         SAN FRANCISCO DIVISION

18

19   RICOH COMPANY, LTD,
       Plaintiff,
20     vs.
21   AEROFLEX ET AL.,
       Defendants
22

23   SYNOPSYS, INC.,
       Plaintiff,
24     vs.
   RICOH COMPANY, LTD.,
25   Defendant.

Case No. C- 03-04669 MJJ (EMC)
Case No. C-03-02289 MJJ (EMC)

COMBINED JOINT CASE
MANAGEMENT CONFERENCE
STATEMENT AND PROPOSED ORDER

Date:     June 14, 2005
Time:     2:00 p.m.
Courtroom: 11

26

27

28

1

1    Pursuant to FRCP 26(f) and L.R. 16-9, Ricoh Company, Ltd. and Aeroflex, Inc. et al. in Case

2    No. C-03-04669, and Synopsys, Inc. and Ricoh Company, Ltd. in Case No. C-03-02289, jointly and

3    collectively submit this Joint Case Management Conference Statement and Proposed Order.

4                                    **DESCRIPTION OF THE CASE**

5    **1.  A brief description of the events underlying the action:**

6                    **a.  Ricoh's Description**

7        The Court is already acquainted with the events underlying this action, as set forth in this

8    Court's order of September 22, 2003, the Case Management Conference Statement and Proposed Order,

9    dated April 26, 2004, and the Claim Construction issued by the Court on April 7, 2005.

10       **Ricoh's claims against the ASIC Defendants.**  In January 2003, Ricoh Company,

11   Ltd.("Ricoh") sued several designers and manufacturers of computer chips in the District of Delaware

12   (C.A. No. 03-103-GMS) for patent infringement, alleging that those Defendants, Aeroflex, Inc. et al

13   (hereinafter the "ASIC Defendants"), were using the steps recited in the process claims of Ricoh's

14   4,922,432 patent ("'432 patent"). The '432 patent describes a highly advanced technical process used in

15   designing and producing certain types of computer chips called ASICs.  In carrying out their

16   infringement of the patented process, the ASIC Defendants use software supplied by Synopsys, Inc.

17   ("Synopsys"), and perhaps other suppliers, as part of their process in producing ASICs that they sell.

18   Ricoh has never accused Synopsys itself of infringing the '432 patent and has stated that it will not bring

19   any action for infringement of the '432 patent against Synopsys with respect to Synopsys' past or

20   current software products.  Further information about the infringing activities of the ASIC Defendants

21   has been set out in Ricoh's preliminary infringement contentions, served on March 12, 2004.

22       Contrary to the ASIC Defendants' representations, the activities that infringe certain of the

23   process claims of the '432 patent involve more than the "ordinary use" of a Synopsys product named

24   Design Compiler.  Indeed, the ASIC Defendants refuse to represent (even in the absence of discovery) in

25   this submission that they have not changed that which Synopsys calls the "ordinary use" of Design

26   Compiler, and thus effectively are telling the Court that they are not doing what Synopsys calls

27   "ordinary use".  Ricoh is seeking in its Complaint damages based upon the ASIC Defendants' revenue

28   derived from their use of the patented process, including the sale of the ASICs made utilizing this

1   process. The ASIC Defendants are obligated to defend against Ricoh's infringement claims without

2   limitation to particular equipment they may employ when so acting. On August 29, 2003, the Delaware

3   court granted the ASIC Defendants' motion to transfer that action to this Court. On December 11, 2003,

4   this Court denied the ASIC Defendants motion to stay, finding that "Ricoh has a 'separate interest' in

5   litigating against Defendants in the first-filed action."

6           Resorting to hyperbole, Synopsys and the ASIC defendants claim that they are "totally in the

7   dark" as to the issues in this case. Ricoh's Amended Preliminary Infringement Contentions, which were

8   prepared consistent with the guidelines articulated by Magistrate Judge Chen regarding both the

9   infringement and invalidity contentions, demonstrate explicitly how Ricoh is reading each ASIC

10  Defendants' usage of Synopsys products in the design and production of ASICs. With respect to the

11  "storing in an expert system knowledge base" limitation, for example, the Amended Preliminary

12  Infringement Contention (PIC) states: "This element is met when the ASIC Designer stores, installs or

13  loads HDL Compiler, Design Compiler, and Synthesis Libraries in computer memory of a computer

14  system." The "expert system knowledge base" referenced in the claim element is therefore found in the

15  HDL Compiler, Design Compiler, and Synthesis Library components of the Synopsys products. Even if

16  it were somehow required to do so to prove infringement, it is only because of Synopsys' own

17  deficiencies in the relevant discovery that Ricoh cannot further pinpoint which module(s) in these

18  components contains the "expert system knowledge base."

19          Regarding the limitation "applying to the specified definition of the action or condition to be

20  performed, a set of cell selection rules," the PICs specifically identify:

21          both HDL Compiler and Design Compiler as they are used in conjunction with the Synthesis
            Libraries, cell selection rules are applied to the synthetic operators ("specified definitions of the
22          action[s] or conditions[s]") to perform the selection of the implementations ("selection of
            hardware cells") that perform the desired functions of the proposed ASIC.
23

24          This passage clearly identifies the manner in which Ricoh is reading the claim limitation on

25  the ASIC Defendants' use of Synopsys products. To the extent that Ricoh was unable to further define

26  the precise module or subcomponent that may be responsible for performing this claim limitation is a

27

28

3

1  direct result of the failure by Synopsys and the ASIC Defendants to adequately produce the relevant

2  discovery.[1]

3      **The Declaratory Judgment Action.**  Although Synopsys chose not to try to intervene in the

4  Delaware case, it had indemnified the ASIC Defendants; Synopsys' attorneys assumed control of the

5  defense and have filed multiple declaratory judgment counterclaims against Ricoh.  After months of

6  litigating the Delaware case, Synopsys filed a declaratory judgment action in this Court with respect to

7  the '432 patent and another patent (the 5,197,016 patent ("016 patent")) that Ricoh did not assert in the

8  Delaware case.  Ricoh has never accused Synopsys itself of infringing the '432 patent or the '016 patent

9  and has issued a written commitment that it will not bring any action for infringement of the '432 patent

10 or the '016 patent against Synopsys with respect to Synopsys' past or current software products.  Ricoh

11 has advised others of the availability of a license under the '016 patent but has not threatened anyone

12 with infringement of that patent.  On September 22, 2003, this Court denied Ricoh's motion to dismiss

13 Synopsys' declaratory judgment action.

14     **Discovery in late 2003 and early 2004.**  In late 2003 and early 2004, this case was marked

15 by constant bickering between counsel and multiple delays.  For example, when Ricoh moved to amend

16 its complaint in early 2004, the motion was opposed by the ASIC Defendants, even though they

17 admitted there was no prejudice in the amendment.  At an April 6, 2004 hearing on the ASIC

18 Defendants' opposition to Ricoh's motion to amend the complaint, this Court expressed its frustration at

19 counsel for the ASIC Defendants for continually delaying the proceedings:

20         It struck me from day one in this case, and I don't know what is going on, motions to strike,
        invalidity contentions, I mean, it's just ridiculous.  And it's not the way this case is going to

21         get litigated.  And I'm going to tell you now . . . I don't have the resources, and no one else
        around here does, to deal with a case where you want to take it upon yourself to not discuss

22         matters that you can resolve without the Court's intervention.

23 (April 6, 2004 Tr. at 3.)

24

25

26

27  _____

28  [1] Amazingly, the ASIC Defendants also fault Ricoh with not issuing a Preliminary Infringement
Contention applicable to software about which the ASIC Defendants have refused, and continue to
refuse, to reveal whether or not they use.

1    Pursuant to the instructions of Magistrate Judge Chen, on April 23, 2004, the parties

2 submitted their respective discovery plans detailing how each side believed discovery should proceed.

3 Ricoh's discovery plan (attached as Exhibit 1) detailed a wide range of areas where the ASIC

4 Defendants and Synopsys had refused to participate in discovery. For example:

5       • The ASIC Defendants and Synopsys have not produced all of the documents
6          identified in their initial disclosures.

7       • The ASIC Defendants and Synopsys have not produced the source code for all of the
8          software identified in Ricoh's preliminary infringement charts.

9       • Although the ASIC Defendants and Synopsys agreed to produce all documents (other
10         than e-mails) by April 30, 2004, they did not do so, and have produced no documents
11         since May 4, 2004. There remains pending a large volume of documents that have
12         never been produced by Synopsys and the ASIC Defendants.

13      • The ASIC Defendants and Synopsys have objected to a wide range of Ricoh's
14         discovery requests, for example, refusing to produce documents regarding all of the
15         processes and products that Ricoh contends infringe the '432 patent or disclosing the
16         process they actually practice.

17      • The ASIC Defendants have refused to produce many documents that include source
18         code, inputs, cell libraries and related documentation that is vital to Ricoh's
19         infringement claims.

20    **The discovery stay.** During the May 4, 2004 Case Management Conference, this Court

21 stated that there should be a stay of discovery related to the merits (e.g., infringement and invalidity).

22 On May 13, 2004, Magistrate Judge Chen issued an Order reaffirming the stay of all discovery not

23 related to claim construction. Consequently, the dates for all actions in this case, other than those related

24 to the Markman process, were suspended pending the Court's claim construction ruling.

25    The parties nonetheless proceeded with certain depositions in Japan during the discovery

26 stay, and Synopsys permitted Ricoh's experts to have periodic access to some of Synopsys' source code

27 during the discovery stay. Synopsys does not deny withholding access to the source code of many of the

28 products (e.g., Module Compiler, Physical Compiler, etc.) at issue in this case, and it produced only the

5

1    source code for its Design Compiler product (and its corresponding user interface and compiler

2    components). Synopsys unilaterally decided what it considered to be the "Synopsys Logic Synthesis

3    Product" that would be produced. (See footnote 5). Synopsys has produced a single modified version

4    of the Synopsys Logic Synthesis Product even though up a dozen or more versions have been used by

5    the ASIC Defendants to infringe the '432 patent. Ricoh has explicitly placed at issue many other

6    products beyond Synopsys' unilateral product definition; however, Synopsys refuses to permit Ricoh

7    access to that source code or other documentation.

8    Synopsys has made discovery of its Design Compiler source code difficult by refusing to turn

9    over the source code in the manner in which it was kept and insisting it be examined only at

10    inconvenient Synopsys locations under the constant monitoring of Synopsys personnel and under the

11    strict procedures limiting availability and access, using "custom software" Synopsys wrote for that

12    purpose.[2] While Synopsys several times mentions that it made the code "available" for 34 or 46 weeks,

13    it fails to reveal that the source code had over 21 million lines of code that incorporated tens of

14    thousands of source files, many of which were not humanly readable. Months into Ricoh's review,

15    Synopsys admitted that of the tens of thousands of source code files provided, many were for products

16    not at issue in the case and thus irrelevant. Synopsys initially required Ricoh to use a workstation

17    computer that was at least five orders of magnitude slower than an ordinary personal computer. That

18    workstation suffered multiple outages, each requiring the scheduling of a service call with an off-site

19    Synopsys technician with attendant losses in inspection time. The workstation ultimately experienced a

20    catastrophic failure and it took several months for Ricoh to convince Synopsys to permit Ricoh to buy a

21    higher speed computer workstation for use in connection with code inspection after Synopsys decided to

22    change the inspection site from Maryland to California.

---

25    [2] Synopsys has only now admitted that it has not provided a typical environment in which the source
26    code would operate. Instead, it created, at its own expense and initiative, custom software for Ricoh's
experts to use when accessing the code, when in fact, the source code must have been initially accessible
in its native environment. This new and unique software has not worked, which explains some of the
27    problems detailed in the main text that Ricoh encountered. Likewise, Ricoh has not been using Design
Compiler for 17 years – indeed, Design Compiler has not existed in its present form for even a fraction
28    of that time – and Ricoh's use of Design Compiler as a customer is no substitute for a proper inspection
of the closely-guarded source code by experts.

6

1    There has been virtually no merits discovery for more than 13 months.

2    **The Markman briefing, hearing and claim construction ruling.** Between March and

3    August 2004, the parties exchanged claim constructions and filed Markman briefs. Between October

4    2004 and January 2005, the Court conducted several hearings related to claim construction. On April 7,

5    2005, the Court issued its Order construing the claims.

6    **Stipulation narrowing the claims at issue.** During the stay period, in June and July 2004,

7    the parties negotiated and the Court entered a Stipulated Order that had the effect of dismissing all

8    claims and counterclaims except those relating Ricoh's allegations that the ASIC Defendants infringe

9    claims 13-17 of the '432 patent. All other claims relating to the '432 patent, and all issues relating to the

10    '016 patent, were dismissed by Court Order in the *Ricoh v. Aeroflex* litigation on July 8, 2004. A similar

11    stipulation and order was entered in the *Synopsys v. Ricoh* litigation on July 7, 2004, making those two

12    cases congruent with respect to the patent claims at issue.

13    **Consolidation vs. stay and/or bifurcation.** A threshold issue is whether the earlier-filed

14    *Ricoh v. Aeroflex* infringement action should be consolidated with the later-filed *Synopsys v. Ricoh*

15    declaratory judgment action. There are no patent infringement claims or counterclaims in the

16    declaratory judgment action. The declaratory judgment claims in the *Synopsys v. Ricoh* litigation are

17    identical in scope and language to the declaratory judgment counterclaims in this litigation. Ricoh

18    believes that consolidation is appropriate, with Ricoh, the first filer and patent owner, as the plaintiff.

19    Synopsys and the ASIC Defendants claim that they will consent to consolidation if Ricoh

20    blindly waives any right to proceed with its infringement claims based upon how the ASIC Defendants

21    input specifications into Design Compiler. In a stunning admission of how little their attorneys know

22    about their own client's business, counsel for the ASIC Defendants write (at p. 13) that "it is most

23    probable that the customer defendants use the same forms of input to Design Compiler that the vast

24    majority of Synopsys' customers use–Verilog and VHDL . . . ." The fact that the attorneys for the ASIC

25    Defendants do not know what kinds of inputs their clients use, while simultaneously conditioning their

26    consent for consolidation upon an uninformed demand for a stipulation to that effect, is stunning. It

27    would most irresponsible for Ricoh to even consider such an informed request.

28

7

1  Thus, Synopsys and the ASIC Defendants effectively oppose consolidation and refuse to

2  participate in setting a schedule for discovery on Ricoh's infringement claims. Synopsys and the ASIC

3  Defendants instead propose breaking up the dispute before this Court into tiny segments, each of which

4  to be handled as if it were a separate case: a trial on their affirmative defenses first, then a trial on the

5  infringement merits, then separate damages trials.[3] The ASIC Defendants claim that they will be bound

6  by a validity ruling but leave unresolved all other issues <u>including Ricoh's infringement claims and all</u>

7  <u>damage issues</u>. Thus, the ASIC defendants want to narrowly define the accused products and then try

8  only their affirmative defenses while ignoring the merits. With respect to the narrow scope of the

9  products, there are two fundamental problems: first, they do not want to try all of the products that

10  Ricoh has accused of infringement. Second, of their self-defined Synopsys Logic Synthesis Product that

11  there were at least 12 major revisions of the Design Compiler source code during the infringement

12  period before the first-filed case began, but the ASIC defendants propose limiting the possibility of

13  infringement to only one, the "2003.12 source code release," which they have arbitrarily chosen from

14  the releases after the first-filed case was begun and even though Synopsys has produced manuals which

15  related to a different release (2002.05; see footnote 19 infra).[4] Synopsys and the ASIC Defendants also

16  propose bifurcating damages with respect to each of the seven defendants, implying that multiple

17  additional trials will become necessary. Ricoh opposes such bifurcation as unnecessary and wasteful of

18  this Court's resources. While there may be separate calculations for each group of defendants, as there

19  are in any multiple defendant action, Ricoh believes that the Court should approach damages in a

20  consistent manner regardless of the identity of the defendant under consideration.

21  Synopsys and the ASIC Defendants also announce their intention to renew the stay motion,

22  which has already been denied by both the Delaware court and this Court. In December 2003, this Court

23

24

---

25  [3] It seems incongruous that the ASIC defendants would oppose consolidation and propose that the cases

26  be bifurcated in that the ASIC defendants could find themselves liable beyond any indemnification provisions provided by Synopsys. The ASIC defendants, however, have ceded complete control of this

27  litigation, so it appears their separate interests are not being independently addressed.

28  [4] Therefore, Synopsys desire to resolve Ricoh's infringement claim by selecting one particular version of one self-designated product, Design Compiler, without regard to any other version of Design Compiler or any product beyond Design Compiler.

1  ruled that "Ricoh has a 'separate interest' in litigating against the [ASIC] Defendants in the first-filed

2  action." The ASIC Defendants do not identify why that "separate interest" finding is no longer

3  applicable. As shown below, the ASIC defendants have refused to respond to discovery regarding their

4  infringing activities. They refuse to represent (even in the absence of discovery) in this submission that

5  they have not changed that which Synopsys calls the "ordinary use" of Design Compiler, and have

6  conceded that they have done so. Thus, the ASIC Defendants effectively have told this Court that the

7  case against them will continue even should Synopsys prevail, ending its obligation to defend them (see

8  footnote 5 infra) and leaving the ASIC Defendants to their own devices.

9       Synopsys and the ASIC Defendants propose the stay of Ricoh's infringement action begun in

10  January 2003 remain in effect until a decision is rendered sometime after their proposed May 2006 trial

11  against Synopsys in the second-filed case, at which time discovery could begin again, resulting in a trial

12  in, perhaps 2008 (assuming that there are no issues that are sought to be appealed). There is no valid

13  reason for a stay.[5] Ricoh, in its first filed action, is entitled to have a resolution to its outstanding

14  conflict with the ASIC defendants within a reasonable time.

15       Finally, Synopsys and the ASIC Defendants claim that they want to file an additional

16  summary judgment motions, even though both sides agree that the deadline should be after close of fact

17  discovery. For example, they claim an intent to renew a prior motion for partial summary judgment that

18  some, but not all, of the ASIC Defendants had filed under 35 U.S.C. 271(g). When that earlier 271(g)

19  motion was made, Ricoh asked for discovery pursuant to Fed.R.Civ.P. 56(f) since the ASIC Defendants

20  had mostly refused to produce discovery designed to reveal what they actually did. An extremely

21  limited deposition of a Matrox defendant revealed that contrary to representations found in Matrox

22  declarations, activities had been conducted within the United States. After that discovery, the ASIC

23  Defendants hastily withdrew their pending motion for partial summary judgment. Ricoh disagrees with

24  the statement by Synopsys and the ASIC Defendants that any attempt to renew that motion will be

25

26

27  [5] The argument proffered by Synopsys' and the ASIC defendants to litigate the Synopsys DJ action first
and then, and only then, commence the ASIC defendant litigation is unreasonable and akin to a
defendant in a patent infringement action arguing that the action should be litigated element by element,
28  where litigation one element does not commence until the litigation has been completed on a prior
element.

9

1   limited to expert issues; instead, Ricoh will require additional discovery on the "proximate relationship"

2   between the '432 patented invention and the ASICs produced by the ASIC Defendants.  That

3   relationship is best seen in claim 14 of the '432 patent.  This Court noted (at footnote 4, page 8 of the

4   Markman Order) that at least a portion of the invention (i.e., generation of mask data) was required to

5   produce an integrated circuit and was a distinct process apart from the design steps (as recited in claim

6   13) that culminated in the generation of a netlist.  This fact shows that the claimed process, at least as

7   recited in claim 14, is in a "proximate relationship" to the production of ASICs.  While the ASIC

8   Defendants would like to assert that there is no relationship between the '432 patent and the manufacture

9   of ASICs, Ricoh maintains that neither the patent, nor the claim construction, nor the facts, support the

10  defendants' argument.  In any event, even with this proposed partial summary judgment motion, the

11  ASIC Defendants effectively concede that the case against them would still continue.

12          The dispositive motion cut off proposed by the parties is rapidly approaching (both are

13  during the first quarter of next year).  There is no good reason to consider permit piecemeal motions of a

14  dispositive nature before that time.

15          **Final infringement contentions.**  Ricoh understood the Court's May 2004 discovery stay to

16  suspend all obligations imposed by the court's scheduling orders and the local rules until a new schedule

17  was established after the claim construction ruling was issued.  After the claim construction ruling was

18  issued on April 7, 2005, lead counsel for the parties spoke by telephone on April 21, 2005, and Ricoh's

19  counsel understood the parties to agree that all dates and obligations were suspended until a new

20  schedule was established.  Since merits discovery had been stayed at that time for about 11 months (now

21  about 13 months), and because the ASIC Defendants and Synopsys have not provided all of the

22  documents and source code for the products identified in Ricoh's preliminary infringement charts, Ricoh

23  believes that it should obtain discovery and have time to analyze it prior to the submission of its final

24  infringement contentions.  If the ASIC defendants and Synopsys had not withheld discovery and if

25  discovery had not been stayed, then Ricoh would have obtained discovery needed for it to proceed with

26  presenting its final infringement contentions.

27          On May 31, 2005, however, counsel for the ASIC Defendants and Synopsys served what

28  purported to be the final invalidity contentions of Synopsys and the ASIC Defendants, with a footnote

Case Nos. C-03-04669 MJJ (EMC) and  C-03-02289 MJJ (EMC)
Combined Joint Case Management Conference Statement and Proposed Order
DM_US\8213634.v1

1  asserting that Ricoh did not timely present its final infringement contentions "and its opportunity to do

2  so has passed."[6]  This position by the ASIC Defendants and Synopsys came as a surprise to Ricoh,

3  because it is inconsistent with the suspension of all due dates other than those relating to the Markman

4  process, inconsistent with the agreement between counsel that new dates for presenting such charts

5  needed to be set in the schedule, and because counsel for the ASIC Defendants and Synopsys never

6  informed Ricoh of their apparent belief to the contrary, either before or after the purported date for the

7  final infringement contentions.  In a telephone conference on June 2, 2005, counsel for the ASIC

8  Defendants and Synopsys maintained their position but said that they would consider extending the time

9  for Ricoh to submit its final infringement contentions to 30 days after the CMC hearing.  As noted

10  above, however, Ricoh has been denied discovery on most of the products and source code identified in

11  Ricoh's preliminary infringement contentions and the ASIC Defendants and Synopsys continue to

12  withhold documents because of the stay of discovery and suspension of the due dates for the past 13

13  months.  Ricoh should have a fair opportunity to receive and analyze such discovery prior to the

14  submission of its final infringement contentions.  Therefore, Synopsys' and the ASIC defendants'

15  proposal of Ricoh's submission of the contentions 30 days after the CMC is inappropriate.  If discovery

16  is limited or not permitted until after such contentions are filed, as suggested, it will inevitably lead to

17  unnecessarily burdening the Court with numerous vigorously contested motions to amend the

18  contentions.  Ricoh believes it is more appropriate to provide the final infringement contentions in

19  accordance with the time schedule noted below.

20  **b.  Description of Synopsys and the ASIC Defendants**

21  Although this case has been pending for more than two years, the Court has issued its claim

22  construction ruling, and three of Ricoh's experts have had 46 weeks of access to the source code for the

23  Synopsys Logic Synthesis Product[7] (although they have only utilized 34 weeks), Synopsys and the

24

25

---

26  [6] Counsel for Ricoh did not receive any communication from the counsel for Synopsys and the ASIC

27  defendants inquiring whether Ricoh intentionally failed to provide the final infringement contentions.

28  [7]  The "Synopsys Logic Synthesis Product" is defined in Paragraph 18 of Synopsys' Amended
Complaint For Declaratory Judgment as "Design Compiler® software, HDL Compiler™ for Verilog,
VHDL Compiler® and DesignWare Foundation libraries . . ."

11

1   customer defendants are still totally in the dark with respect to how Ricoh reads any of the elements of

2   the claims at issue on the Synopsys Logic Synthesis Product.[8]  For example, Ricoh has never articulated

3   in its Amended Preliminary Infringement Contentions, or elsewhere, where it finds an "expert system,"

4   "knowledge base" or a "set of cell selection rules" in the Synopsys Logic Synthesis Product.[9]  As a

5   result, Synopsys still finds itself in the compromised commercial position of not being able to clear the

6   cloud over its most important product and to quickly establish that the ordinary use of the Synopsys

7   Logic Synthesis Product does not infringe Ricoh's '432 patent.

8          Once Synopsys establishes that the ordinary use of its product does not infringe the '432

9   patent it will be relieved of any indemnity obligation to its customers and will be free of the cloud over

10  its business.[10]  If Ricoh fails to show that all of the non-input related claim elements[11] are present in the

11  Synopsys Logic Synthesis Product, the customers would also be in a position to have their case

12

13

14  [8] Despite the fact that the Court entered a stay of discovery, in the interests of disposing of this case as

15  soon as possible, Synopsys has made its source code for the Synopsys Logic Synthesis Products
    available to Ricoh's experts for 46 weeks.  Synopsys did not merely turn over the source code in the

16  manner in which it was kept, which it was entitled to do, but instead, at its own expense, wrote custom
    software for the source code produced to ensure that Ricoh's experts would be able to compile it.  It took

17  the equivalent of one full time engineer over 30 days to get the system up and running.  In addition to
    the source code and custom software listed above, which is all Synopsys committed to provide,

18  Synopsys also produced the source code for Presto, Physical Compiler, and Module Compiler, as well as
    the standard target technology libraries, link libraries, and symbol libraries.  Therefore, all subsequent

19  use of the term "Synopsys Logic Synthesis Product" in this statement will also include these items.
    Thus, even if the Court deems it appropriate to include these other Synopsys products in the customer

20  suit, Ricoh has had nearly a year of access to the source code for these products as well.  Recently,
    Ricoh requested that they be permitted to increase the number of experts with access to the source code

21  from three to five and Synopsys readily agreed that they could do so.  In addition to the source code,
    Synopsys produced the product manuals for the Synopsys Logic Synthesis Product.

22
    [9] The descriptions provided in Ricoh's section of this Statement simply serve to demonstrate the

23  inadequacy and vagueness of Ricoh's position.  Ricoh simply repeatedly points at the grouping of the
    HDL Compiler, Design Compiler, and Synthesis Library components as fulfilling each claim element.

24  These generalized contentions do not satisfy Ricoh's burden of showing where each claim element is
    found in the accused instrumentality.

25
    [10] The Synopsys Logic Synthesis Product accepts only certain types of input.  If the ordinary use of the

26  Synopsys Logic Synthesis Product, including those specific input types, do not infringe, Synopsys is
    relieved of its indemnity obligations to its customers.

27

28  [11] Non-input related claim elements include for example: "expert system," "knowledge base," and the
    "selecting" step.

1    dismissed because the only accused instrumentality requires use of the Synopsys Logic Synthesis

2    Product. In other words, Ricoh vaguely alleges that it is the customer defendants' input together with

3    the Synopsys Logic Synthesis Product that infringes its '432 Patent claims. Since Ricoh must show that

4    each element of its asserted claims are infringed, it is indisputable that if the non-input claim elements

5    are not found in the Synopsys Logic Synthesis Product, then the customer defendants do not infringe

6    regardless of the nature of their input.

7

8           Ricoh vaguely alleges that there are activities by the customer defendants that involve more than

the "ordinary use" of Design Compiler. In fact, Ricoh incredibly states that the customer defendants

9    have conceded that they are not doing what Synopsys calls "ordinary use." It is telling that Ricoh does

10   not point to **anything** to support this completely false assertion, because there is simply no support for it

11   either in the record or in fact. In fact, it is most probable that the customer defendants use the same

12   forms of input to Design Compiler that the vast majority of Synopsys' customers use–Verilog and

13   VHDL–and they may be willing to stipulate to that fact if Ricoh will identify those inputs as the ones

14   that it believes infringe the '432 patent. If Ricoh is saying that the customer defendants' input of

15   Verilog or VHDL infringes the '432 patent, then that is the "ordinary use" of Design Compiler, and trial

16   of the Declaratory Judgment case should resolve both cases.

17          If Ricoh truly alleges that there is some other activity that the customer defendants do that

18   involves more than the "ordinary use" of Design Compiler, neither Synopsys nor the customer

19   defendants can adequately respond to this allegation since Ricoh has provided no specifics as to this

20   "more than ordinary use." More than two years into this case, it is time for Ricoh to provide detailed

21   contentions of what it believes the customer defendants do that infringes the '432 patent. If there

22   actually is "more than ordinary use" of Design Compiler by the customer defendants that Ricoh can

23   articulate, Synopsys and the customer defendants believe that the customer suit should be stayed

24   pending the outcome of the Declaratory Judgment trial. Synopsys' Declaratory Judgment suit should

25   proceed to trial with all due haste. Synopsys has set forth a time frame for the trial of the Declaratory

26   Judgment case. The Customer Defendants have already agreed and reiterate here that they will be

27   bound by any adjudication respecting the validity of the patents as well as any finding that the ordinary

28   use of the Synopsys Logic Synthesis Product infringes the '432 patent. The trial of the declaratory

13

1    judgment case will therefore, either eliminate the need for a trial of the Customer case at all, or

2    substantially narrow the issues for trial. [12]

3            Synopsys and the Customer Defendants identify below several key issues that they believe

4    must be addressed in order to provide a proper framework for determining 1) whether the customer case

5    should be stayed, 2) and if not stayed, whether the cases should be consolidated, 3) whether damages

6    issues should be bifurcated, and 4) the proper scope of discovery in either case.

7            **Claim Construction Ruling.**  The Customer Defendants would like to renew their summary

8    judgment motion of noninfringement of the '432 Patent under 35 U.S.C. Section 271(g).  In its claim

9    construction ruling, the Court determined that the "computer aided design process" described in Claim

10   13 of the '432 Patent "does not include a manufacturing process for ASICs."  Resolution of this issue

11   will narrow the issues in the case, eliminate parties, narrow the relevant discovery and enhance the

12   potential for settlement which is frustrated at this moment by the parties' differing positions on whether

13   the relevant economic measure for damages is the revenue on ASIC sales or merely software licensing

14   fees.

15           Contrary to Ricoh's suggestion, the 271(g) motion will **not** require voluminous additional

16   discovery from the customer defendants on the "proximate relationship" between the '432 patented

17   invention and the ASICs produced.  All that will be required is expert opinion.  Ricoh is simply

18   attempting to conduct yet another fishing expedition to collect damages-related information from the

19   customer defendants.

20           If the Section 271(g) claims are eliminated from the case, the foreign defendants can

21   move to be dismissed from the case and relevant discovery will exclude, among other things, any

22   manufacturing processes, any design processes not taking place in the United States, and discovery

23   related to the ASIC products themselves (except perhaps as it relates to damages, which relevance is

24   also disputed by Synopsys and the Customer Defendants).

25

26

27

28   [12] With guidance from the Court, the customer defendants are willing to provide limited discovery
     sufficient to show the types of input they have used in connection with the Synopsys Logic Synthesis
     Product in designing ASICs.

14

1      **Final Infringement Contentions.** Ricoh has not served any Final Infringement Contentions.

2 Since the date provided for serving such final contentions has passed, pursuant to the Local Rules, Ricoh

3 would now be foreclosed from revising its infringement contentions absent a showing of good cause and

4 an order of the Court. Synopsys and the Customer Defendants served timely Final Invalidity

5 Contentions on May 31, 2005.

6      Ricoh asserts that it understood the Court's stay of discovery to include a suspension of

7 the parties' Local Rules obligations. This was never Synopsys' or the Customer Defendants'

8 understanding. There is no Court order or other statement of the Court at any hearing, of which

9 Synopsys and the Customer Defendants are aware, and Ricoh has pointed to none, that indicates a

10 suspension of the Local Rules requirements was contemplated. Moreover, Ricoh has blatantly

11 mischaracterized the conversation between counsel on April 21, 2005. Not only was there no agreement

12 that dates for presenting final contentions were suspended and needed to be set in the schedule, that

13 issue was never discussed at all. Rather, there was a query and a confirmation that the stay entered by

14 the Court was continuing until the status conference. The entire purpose of the call was to determine

15 whether the parties should jointly request that a status conference be scheduled. Ricoh's counsel never

16 raised the Local Rules or the final contentions at all and never informed Synopsys' counsel that Ricoh

17 understood the Local Rules obligations to be suspended as part of the stay. Ricoh's counsel certainly

18 never asked Synopsys' and the Customer Defendants' counsel to agree to suspend the Local Rules

19 obligations and, in any event, that is not something that Synopsys' and the Customer Defendants'

20 counsel understands can be done by agreement of the parties without approval from the Court.

21      Synopsys and the Customer Defendants have been prejudiced by Ricoh's failure to

22 provide adequate infringement contentions because it is those contentions which should provide the

23 framework within which the Court considers the issues of stay, consolidation and the scope of discovery

24 and their absence has had the effect of delaying the case yet again. Given that Ricoh has represented

25 that it was its belief that the Local Rules obligations were suspended, Synopsys and the Customer

26 Defendants urge the Court to set a deadline for the submission of Ricoh's Final Infringement

27 contentions as early as possible but in no event later than 30 days from the date of the Status

28

15

1   Conference.[13]  Synopsys and the Customer Defendants should then have an additional 20 days to

2   provide their Final Invalidity Contentions.[14]  The court should set another status conference as soon as

3   possible after submission of the parties' final contentions to address the schedule and other issues

4   herein.[15]  Once the Final Contentions are submitted, neither side should be able to amend absent a

5   showing of good cause and order of the Court.

6
        Synopsys requests that the court provide guidance with respect to the detail required for the final

7   contentions.  Ricoh's Preliminary Infringement Contentions were utterly inadequate.  Defendants were

8   forced to file a motion to seek more detailed infringement contentions.  At two separate hearings on May

9   27 and June 16, 2004, and by order dated June 17, 2005, Judge Chen made clear that the amended

10  preliminary infringement contentions were to include as much information as Ricoh currently knew

11  about its infringement contentions, that they needed to provide information specific to each defendant on

12  a product by product basis and that there needed to be an identification of where in each accused product

13  they found each element of the asserted claims.  Ricoh's last amended Preliminary Infringement

14  Contentions did not provide that information.  For example, Ricoh's Amended Preliminary Contentions

15  did not specify what in the accused products constitutes:

16       • the "expert system knowledge base,"

17       • the "set of rules for selecting," or

18       • "architecture independent actions and conditions."

19  Rather, Ricoh stated identical contentions for each defendant stating "[defendant] infringes claim 13 by

20  performing a process . . . in which [it] describes input specifications (using User Interfaces) and

21  synthesizes such specifications using the combination of Design Compiler, HDL Compiler, and the

22  Synthesis Libraries."

23

24
    _____

25  [13] The Local Rules provided Ricoh with 30 days after the claim construction ruling to submit its final
26  contentions.

27  [14] The Local Rules provide the alleged infringer 50 days after the claim construction to submit its final
    contentions.
28
    [15] The stay entered by the Court should remain in place until the final contentions of the parties are
    submitted and the Court holds the next status conference.

1    Ricoh is a Synopsys customer and has used the Design Compiler Product for approximately

2    17 years, so it should be very familiar with its functions, features and the types of input it will accept.

3    Now, having the benefit of the Court's claim construction ruling, 34 weeks of access to the source code

4    for the Synopsys Logic Synthesis Product, and many more weeks than that to review the product

5    manuals, Ricoh's Final Infringement Contentions should set forth with specificity where it is alleging

6    each element of each asserted claim is met in the accused products or combination of products, and

7    specifically how it is reading the non-input claim elements on the Synopsys Logic Synthesis Product

8    source code.

9    Synopsys and the Customer Defendants know that the Synopsys Logic Synthesis Product

10    does not include the required elements.  They believe the case is ripe for bringing summary judgment

11    motions with respect to some of these terms as soon as possible to achieve an early disposition of this

12    case.  Synopsys would like to discuss at the status conference whether the Court will entertain summary

13    judgment motions at this juncture.

14    **The Customer Defendants' Case Should Be Limited to Synopsys' Logic Synthesis Software.**

15    In Ricoh's portion of this statement entitled "Ricoh's claims against the ASIC Defendants," it twice

16    makes reference to the fact that it believes this case is potentially about logic synthesis software

17    provided by suppliers other than Synopsys.  Ricoh states "In carrying out their infringement of the

18    patented process, the ASIC Defendants use software supplied by Synopsys, *and perhaps other suppliers,*

19    *as part of their process in producing ASICs that they sell.*"  Ricoh also states that "The ASIC Defendants

20    are obligated to defend against Ricoh's infringement claims *without limitation to particular equipment*

21    *they may employ* when so acting."

22    Synopsys and the Customer Defendants request that the Court limit the discovery and the issues

23    to be tried in this case to the Customer Defendants' use of Synopsys' products.  In other words, all non-

24    input claim elements must be met by Synopsys' products, not the logic synthesis products of any of its

25    competitors.  At the outset of the case, when the Customer Defendants asked on what basis they had

26    been sued, they were told that they were sued because they used Synopsys' Design Compiler product.

27    Ricoh's Preliminary Infringement Contentions reference Synopsys' products only.  It appears from

28    discovery taken prior to the stay, that Ricoh's pre-filing "analysis" was limited to a review of the

17

1    capabilities of the Synopsys Design Compiler product and evidence that Ricoh believed indicated that

2    each of the defendants utilize Design Compiler. No analysis of competing software tools was done, and

3    there is no basis for the suggestion in Ricoh's description of the case that its scope ought to be expanded

4    to include other software products beyond the Synopsys Logic Synthesis Product. The case has been

5    pending for more than two years, the claim construction is in place, and all the parties have indicated

6    that they do not intend to join any additional parties. Since the customers would not have source code

7    for any logic synthesis software they use, and no other logic synthesis software suppliers are parties to

8    this case, the discovery in this case and the issues to be tried should be limited to design in connection

9    with the Synopsys Logic Synthesis Product.

10        **Source Code Production and Proposed Stipulations re Same.** Contrary to Ricoh's suggestion

11    that there has been virtually no merits discovery for more than 13 months, Synopsys has made its source

12    code (and custom software to ensure Ricoh's experts could compile the code) available now for over 46

13    weeks.[16] This produced source code includes each and every item requested by Ricoh herein: Design

14    Compiler, HDL Compiler for Verilog, VHDL Compiler, Design Ware Foundation libraries (also known

15    as Design Compiler Basic Library, DesignWare Building Block IP, and synthetic libraries), Presto,

16    Physical Compiler, and Module Compiler.[17] In addition, Synopsys provided the standard target

17    technology libraries, link libraries, and symbol libraries that are provided to customers, who usually

18    replace them with their own.[18] Synopsys provided the source code for the Physical Compiler and

19    Module Compiler which allowed Ricoh to review these products. During the source code discovery to

20

21    _____

22    [16] Ricoh complains that it has only had "periodic access" to the source code. Yet, other than the time

23    when a new machine had to be purchased and configured because of an unexpected system failure
      (which occurred on August 26, 2004, the day before the intial review period was due to expire, with

24    Synopsys offering to procure an upgraded machine on August 31, 2004 – 5 days later, not the "several
      months" Ricoh has concocted), Ricoh has had continuous access to the source code for more than a year.

25    However, Ricoh has not done **any** review of the source code since March 4, 2005, and does not plan to
      recommence its review until July 11, 2005, because of the purported unavailability of its expert.

26
      [17] Synopsys does not have a product called Design Ware Expert Libraries, and therefore did not provide
27    it.

28    [18] Design libraries may be created automatically during an intermediate step as part of the input process.
      Therefore, Synopsys has no such libraries to provide, though Ricoh can generate them if it wishes.

18

1    date, Ricoh never requested a license key to run the Physical Compiler or Module Compiler products

2    included with the production and one was not originally provided. Synopsys is willing to install license

3    keys for those products—additionally Synopsys can install sample scripts and physical libraries not

4    normally shipped to customers to aid in running Physical Compiler—prior to Ricoh's recommencement

5    of its source code review on July 11, 2005.

6        Synopsys made two versions of the code available: 1) the earliest version of the code that it had

7    in its possession (version 2.0 from the period around 1990 or 1991) and the most recent version of the

8    code that it had at the time it began the production (version 2003.12).  Synopsys provided Ricoh with a

9    printer and 5000 sheets of paper so that it could print any portions of the code it wished.  Synopsys also

10    indicated that it would provide the history on any particular portions or modules of the code that Ricoh

11    requested.  Ricoh made no such requests.  Furthermore, Synopsys offered to answer any questions that

12    Ricoh had about the code, if they provided them in writing.  Ricoh did not submit any such questions.

13    In addition to the source code, Synopsys has also produced the product User Manuals.[19]

14        Ricoh asserts herein that Synopsys has not provided all of the source code for the products

15    identified in its preliminary infringement charts.  It is unclear what Ricoh means by "all of the source

16    code."  If Ricoh is not referring to the source code for the products that Synopsys has already provided,

17    as addressed above, perhaps Ricoh is referring to the different releases of the software.  Since 1997,[20] on

18    average there have been at least two major releases of the Synopsys Logic Synthesis Product per year

19    and several more minor releases.  At a minimum, there were at least 18 major releases of the Synopsys

20    Logic Synthesis Product during the potential damage period.  Since it takes approximately 30 days on

21    the part of a full time equivalent engineer to provide each buildable version of the software, it is not

22    practicable or reasonable to expect that Synopsys will produce source code for every major release of

23    the product from 1997 to the present.  It is also unimaginable how long the trial would take or the

------

[19] In order to comply with Ricoh's request, Synopsys produced the 2002.05 version of the User
Manuals, which were the current manuals at the time of production.  During the meet and confer
regarding this Joint Statement, Synopsys' counsel agreed to produce the 2003.12 version of the manuals
as well.

[20] This assumes that Ricoh can claim damages for 6 years prior to the filing of its suit against the
Customer Defendants in February 2003.

1    verdict forms would have to be if Ricoh is required to prove infringement of every major release of the

2    Synopsys Logic Synthesis Product, let alone if the minor releases are also considered.  In order to

3    narrow the issues for trial and the scope of discovery, Synopsys and the Customer Defendants propose

4    that they enter a stipulation that the infringement liability for the entire damage period be based upon the

5    2003.12 source code release.[21]

6        **Synopsys Supports Consolidation of the Liability Cases if Ricoh Agrees that its**

7    **Infringement Allegations are Based Upon Verilog or VHDL Input and No Third Party Products**

8    **are Included.**  The customer defendants are willing to investigate entering into a stipulation that they

9    provide input to Design Compiler in the form of Verilog or VHDL descriptions, as do the vast majority

10   of Synopsys' customers, if Ricoh will agree that this is the form of input it believes infringes the '432

11   patent, and will also agree that it will not pursue any infringement theories that include a non-Synopsys

12   synthesis software (i.e., any third party software that performs similar or the same functions to Design

13   Compiler).  In that case, Synopsys supports consolidation of the liability phase of the cases, with the

14   much simplified discovery it would entail.[22]  However, if Ricoh continues to allege that the customer

15   defendants do more than the "ordinary use" of Design Compiler or that infringement may be based upon

16   the use of software other than Design Compiler, Synopsys is opposed to consolidation.  Synopsys wants

17   and is entitled to the earliest possible adjudication of whether the ordinary use of the Synopsys Logic

18   Synthesis Product infringes.  If it does not, Synopsys will be free of the cloud confronting its business,

19   free of its indemnity obligations to the Customer Defendants and to all of its customers with respect to

20   infringement allegations by Ricoh.  To the extent any issues remain, Synopsys will withdraw from its

21   involvement in and control of the Customer Defendants suit.

22        Although there is identity of the patent claims at issue in the two suits, they may not be

---

25   [21] Synopsys acknowledges that the oldest version of the source code produced (version 2.0) has
26   segments that no longer exist in the source code and did not exist in the 2003.12 release version.  That is
     why Synopsys communicated that it would provide the history with respect to specific segments or
27   modules of the code at Ricoh's request, but no such requests have been made.

28   [22] Synopsys and the customer defendants believe that the liability phase of the cases could be
     consolidated under these circumstances.  However, as discussed in more detail below, Synopsys and the
     customer defendants suggest that the trial is bifurcated into separate liability and damages phases.

1    coextensive in a number of other respects. First, although it has never identified anything other than the

2    ordinary use of Design Compiler, in its description of the case, Ricoh contends "the activities that

3    infringe certain of the process claims of the '432 patent involve more than the 'ordinary use' of a

4    Synopsys product called Design Compiler." Second, as stated above, as of yet, it is not clear that the

5    Customer Defendants' case is limited to the Synopsys product as opposed to including also logic

6    synthesis products of its competitors. Third, given the ambiguities of Ricoh's preliminary infringement

7    contentions it is theoretically possible that Ricoh is focused on something that the Customer Defendants

8    do in providing input, for example using an additional software product or graphical user interface, that

9    would translate a flowchart into an RTL specification that could then be input into Design Compiler.[23]

10        If the Court consolidates the two cases, Synopsys believes that the Court should bifurcate the

11    issues of liability and damages.[24] While the question of liability does involve some issues that are

12    common to each of the defendants in Ricoh's case against the customers, and to the declaratory

13    judgment Synopsys seeks, the question of damages is complicated, does not involve Synopsys, and

14    should be reserved for a separate trial. The question of damages is complicated and particular to each of

15    the Defendants, and, will require specific inquiry into each product alleged to have been designed using

16    the infringing process. Ricoh contends that it is entitled to a portion of the revenue stream from each

17    such product. The Customer Defendants expect to contend that the ASIC products designed using the

18    allegedly infringing process could have been designed using non-infringing alternative techniques and

19    that Ricoh's recovery must, therefore, be limited to the difference in cost of the two design techniques.

20    Proving or disproving each of these damages theories will require delving into the particulars of each

21    design alleged to have been produced by the infringing method, and will be quite time consuming.

22

23

24

25
_____

26    [23] This last point would be obviated if Ricoh would unambiguously state that its infringement theory is
27    related to the input of Verilog or VHDL descriptions by the Customer Defendants to Design Compiler.

28    [24] The Customer Defendants request that with the exception of limited discovery sufficient to show the
types of input the customers have used in conjunction with Synopsys' product when designing ASICs,
the damages discovery should be stayed.

21

1  **2.  Principal factual and legal issues in dispute.**

2  **a.  Ricoh's Description**

3  *Ricoh's statement of disputed factual issues:*

4  a.    Whether the ASIC Defendants, or someone on their behalf, practice the process disclosed

5  in the '432 patent.

6  b.    Whether the ASIC Defendants infringe the '432 patent.

7  c.    The amount of damages to be awarded to Ricoh.

8  d.    Whether the ASIC Defendants acted willfully in infringing the '432 patent.

9  *Ricoh's statement of disputed legal issues:*

10  e.    Whether ASIC Defendants can prove by clear and convincing evidence that the '432

11  patent is not valid.

12  f.    Whether the ASIC Defendants can prove their affirmative defenses of estoppel and laches

13  that would preclude Ricoh from enforcing its '432 patent against them, or limit Ricoh's right to damages.

14  **b.  Description of Synopsys and the ASIC Defendants**

15  Defendants agree that the issues identified in b – f are presented in this case.  Additional factual

16  issues are in dispute:

17  g.    Whether the '432 patent is invalid.

18  h.    Whether Ricoh is barred, under a theory of laches or estoppel, from enforcing its '432

19  patent against some or all of the allegedly infringing activities.

20  i.    Whether the actions that Ricoh identifies as the basis of its infringement allegations are

21  anything other than ordinary steps involved in use of the Synopsys Logic Synthesis Product, and

22  whether that ordinary use of the Synopsys Logic synthesis Product infringes the '432 patent.

23  j.    Whether this action should be stayed pending resolution of the *Synopsys, Inc. v. Ricoh*

24  *Company, Ltd.* Declaratory Judgment action.

25  Additionally, the following legal issue is presented in this case:

26  k.    Whether the design activities claimed in the asserted method claims of Ricoh's '432

27  patent can serve as the basis of an allegation of infringement under 35 U.S.C. § 271(g).

28

22

3. **The other factual issues which remain unresolved:**

        **a.  Ricoh's Description**

Ricoh believes that the principal issues are set forth above in Ricoh's description.

        **b.  Description of Synopsys and the ASIC Defendants**

Synopsys and the Customer Defendants believe that there are none.

    **4.  Parties which have not been served:**

None.

On April 6, 2004, this Court granted Ricoh's motion to amend its Complaint to, *inter alia*, add as a party Aeroflex Colorado, and counsel for Aeroflex agreed to accept service for all Defendants on April 12, 2004.  The Amended Complaint was filed and served on April 12, 2004.

    **5.  The additional parties which the parties intend to join and the intended time frame for such joinder:**

None.

    **6.  The following parties consent to assignment of this case to the United States Magistrate Judge for trial:**

Neither party consents to assignment to a Magistrate Judge for trial.

## ALTERNATIVE DISPUTE RESOLUTION

    **7.  The parties have not filed a Stipulation and Proposed Order Selecting an ADR process and the ADR process to which the parties jointly (or separately) request referral:**

        **a.  Ricoh's Position**

During the pendency of this litigation, Ricoh and Synopsys have occasionally discussed settlement of Ricoh's infringement claims against the ASIC Defendants, but the ASIC Defendants have not engaged in any negotiations with Ricoh.  As noted above, in July 2004, all of the parties were able to enter into a stipulation to narrow the scope of Synopsys' declaratory judgment claims to be congruent with Ricoh's theory that the ASIC Defendants are infringing claims 13-17 of the '432 patent.  Ricoh has invited the ASIC Defendants to negotiate with respect to a license, but the ASIC Defendants have refused.  Ricoh is willing to enter into ADR with the ASIC Defendants.  Ricoh is also willing to have

1    Synopsys participate in such an ADR.  Ricoh believes that conducting an ADR at this time may be

2    fruitful since the Court recently has issued its claim construction ruling.  Ricoh would prefer either

3    having a settlement conference with the Court (Judge Jenkins), or if the Court is unavailable, then a

4    mediation by a knowledgeable patent attorney, who also may be qualified to serve as an early neutral

5    evaluator.

### b.  Description of Synopsys and the ASIC Defendants

7        The Customer Defendants do not believe that there is any purpose to settlement negotiations

8    between them and Ricoh.  Settlement of this case is most likely if there is a global settlement negotiated

9    between Ricoh and Synopsys.  Synopsys disputes the fact as stated by Ricoh that "the parties have

10   occasionally discussed settlement, but have not engaged in negotiations."  To the contrary, at Synopsys'

11   urging there have been a total of four settlement meetings between Synopsys and Ricoh, three in Tokyo

12   and one in San Francisco.  The second meeting resulted in the significant narrowing of the case and

13   amended pleadings that took place in July 2004.  At the third and fourth meetings, Synopsys made

14   specific cash and non-cash offers of settlement, but the parties were unable to agree.  Following the

15   receipt of the Court's claim construction ruling, by letter dated April 24, 2005, Synopsys made another

16   offer of settlement, which was rejected by Ricoh in a letter dated May 2, 2005.  Ricoh's response made

17   it obvious that the parties are still at an impasse.

18       Until Ricoh provides its Final Infringement Contentions and details at a minimum how it is

19   reading the non-input claim elements of its asserted claims on the Synopsys Logic Synthesis Product

20   source code, the Customer Defendants and Synopsys do not believe that an ADR procedure will be

21   productive.  Once such contentions have been provided, Synopsys and the Customer Defendants request

22   referral to the Court's ENE ADR process, preferably with a knowledgeable patent attorney.

### DISCLOSURES

24   **8.  The parties certify that they have made the following disclosures:**

### a.  Ricoh's Position

26       In May 2003, Ricoh served its initial disclosures in the Delaware action and produced

27   documents identified therein.

28

24

1    The ASIC Defendants also served an initial disclosure in May 2003, later admitted that the

2    disclosure was "inartfully drafted," and after Ricoh filed a motion to compel, the ASIC Defendants

3    belatedly amended their disclosure in January 2004. The ASIC Defendants have refused to adequately

4    identify many of the individuals in the disclosure, and Ricoh has been unable to locate or contact

5    approximately ten of the individuals listed.

6    With respect to document production, Ricoh believes that the ASIC Defendants have still not

7    produced all of the documents identified by the categories of their initial disclosures.

8    **b. Position of Synopsys and the ASIC Defendants**

9    The Defendants served an initial disclosure statement on May 30, 2003, and an amended version

10    of their initial disclosure statement on January 20, 2004. Defendants have produced documents

11    described in their amended initial disclosure statement, including prior art that they believe demonstrates

12    the invalidity of the patent and manuals describing Synopsys' Design Compiler product that demonstrate

13    that Design Compiler does not practice Ricoh's patents.

14    **DISCOVERY**

15    **9. The parties have presented the following discovery plans:**

16    On March 24, 2004, Magistrate Judge Chen ordered that parties to submit a discovery plan

17    by no later than April 23, 2004. A copy of Ricoh's discovery plan is attached as Exhibit 1, and a copy

18    of the Defendants' discovery plan is attached as Exhibit 2. These discovery plans summarize the

19    discovery disputes immediately before the stay of discovery on May 4, 2004.

20    **a. Ricoh's Position.[25]**

21    In 2003, Synopsys threatened Ricoh that, if Ricoh continued to press its patent claims against

22    the ASIC Defendants, Synopsys would order its counsel (who also represent the ASIC Defendants) to

23    fight on every issue and make the litigation as expensive as possible. Synopsys specifically stated that it

24    would not produce evidence until ordered to do so by the Court. Before discovery was stayed in May

25

26

27

28

---

[25] Ricoh's comments do not address the responsiveness of Aeroflex Colorado Springs as it was added
shortly before the discovery stay went into effect.

1   2004, Synopsys followed through on that threat.  The Court's irritation at such tactics was noted during

2   the hearing on April 6, 2004.

3          Attempting to manage the refusal by Synopsys and the ASIC Defendants to participate in

4   discovery, in April 2004, Magistrate Judge Chen required that the parties submit a discovery plan.  Each

5   of the parties submitted their discovery plans on April 23, 2004, and they are attached as Exhibits 1 and

6   2.  During the June 2, 2005 conference between counsel, Ricoh attempted to discuss and resolve these

7   discovery issues, but counsel for the ASIC Defendants and Synopsys declined to discuss any of these

8   discovery issues.  Thus, the ASIC Defendants and Synopsys are still refusing to comply with their

9   obligations and provide discovery (document, source code, etc.) and to make matters worse, propose an

10  abnormally early October 2005 fact discovery cut-off date.  Ricoh believes that a prompt resolution of

11  these discovery issues is essential to meeting the aggressive discovery schedule proposed by the parties.

12         **Areas of agreement.**  As set forth in the discovery plan submitted by Synopsys and the

13  ASIC Defendants on April 23, 2004 (and attached as Exhibit 2), the parties had substantial areas of

14  agreement regarding the production of documents and a process for scheduling depositions.  The Court

15  should use those areas of agreement as a starting point.  Ricoh requests that Synopsys and the ASIC

16  Defendants immediately complete their production of documents by June 30, 2005, and proceed with

17  depositions on Ricoh's long-standing Rule 30(b)(6) notices in August through November.

18         Ricoh's proposed schedule is based upon the assumption that discovery will be cooperative.

19  The Court should strongly advise counsel that it will not tolerate the prolonged delays, gamesmanship

20  and incessant motions practice that marked the first stage of discovery.

21         **Areas of disagreement.**  Although Synopsys and the ASIC Defendants concede that

22  discovery should be reopened, at least on a limited basis (*see, e.g.,* footnote 12), it opposes a general

23  reopening of discovery on the merits.  Ricoh believes that the Court should reject out of hand the efforts

24  of Synopsys and the ASIC Defendants to impose a series of additional stays on discovery, and should

25  instead put this case on a path for trial on all issues.

26         With respect to the difference in the parties' April 2004 discovery plans, the following is a

27  summary of Ricoh's understanding of the discovery disputes as they were frozen in time in May 2004:

28

26

1

(i)    **Production of Documents**

2

(a) **General Production of Documents**

3

The parties had agreed in principle that all non-privileged documents (other than e-mails)

4

required to be produced pursuant to Rule 26(a) or responsive to document requests should be produced

5

by no later than April 30, 2004.

6

There are no disputed issues with respect to the scope of Ricoh's document production.

7

The ASIC Defendants and Synopsys failed to produce all of their documents by April 30,

8

2004. The documents that they have refused to produce generally fall into the following categories,

9

each of which have been the subject of numerous letters and meet and confer sessions:

10

(1) Documents in the possession of ASIC Defendants Matrox Graphics and Matrox

11

Electronics relating to the design and manufacture of ASICs. These had defendants contended that they

12

should not be obligated to produce such documents unless and until the Court denied their Rule 12(c)

13

motion for judgment on the pleadings, which the Court denied by Order on April 22, 2004.

14

Nevertheless, at a meet and confer on April 23, 2004, counsel for the ASIC Defendants refused to

15

commit to withdraw this objection and produce the relevant and responsive documents that they are

16

withholding. No further justification for the withholding of these documents has ever been identified.

17

(2) Synopsys and the ASIC Defendants have limited the scope of their document production

18

to what they call "Design Compiler products." Ricoh's preliminary infringement contentions

19

specifically name additional Synopsys software products that Ricoh contends the ASIC Defendants

20

employ while those defendants practice the process described in the '432 patent. Ricoh contends that

21

Synopsys and the ASIC Defendants should provide discovery with respect to all of the products listed in

22

Ricoh's preliminary infringement contentions, but Synopsys and the ASIC Defendants have refused.[26]

23

24

25

[26] Synopsys has made similar objections and limitations in its interrogatory responses. Ricoh believes that the resolution of this issue as it relates to the document production should be equally applicable to

26

the interrogatory responses. The afternoon this CMC was to be filed, Synopsys advised Ricoh that Synopsys may be willing to provide Ricoh access to the "keys" to some but not all of the additional

27

products at issue. Although Synopsys has not identified which versions or the other limitations to this offer, the fact that the offer was made after more than a year and a half after Ricoh first requested this

28

code, shows some progress. It also illustrates why additional discovery is needed, because Synopsys and the ASIC Defendants have yet to produce the underlying manuals, user documents, design

27

The differences are set forth in the following table:

| Ricoh Contention re Products at Issue | Synopsys Contention re Products at Issue |
|---|---|
| Design Compiler[27] | Design Compiler |
| HDL Compiler for Verilog | HDL Compiler for Verilog |
| VHDL Compiler | VHDL Compiler |
| Design Ware Foundation libraries | Design Ware Foundation libraries |
| Presto | |
| Physical Compiler | |
| Module Compiler | |
| Design Compiler Basic Library[28] | |
| DesignWare Expert Libraries | |
| DesignWare Building Block IP | |
| target technology libraries | |
| Design libraries | |
| link libraries | |
| symbol libraries | |
| synthetic libraries | |

(3) The ASIC Defendants have refused to provide documents with respect to any RTL inputs (see earlier question), logic synthesis methods or products other than the Synopsys Design Compiler products. Ricoh contends that it has placed at issue the ASIC Defendants' infringement of the '432 patent without limiting the infringement claim to the use of Design Compiler.

(4) The ASIC Defendants have not identified the ASICs they have actually designed and manufactured using either Synopsys products or otherwise. At one point in early 2004, they said that there were 63 separate ASICs that allegedly were designed and manufactured with Synopsys' Design Compiler products; however, only a few of those ASICs have been actually identified to Ricoh. Ricoh suspects that the number has increased in the past year.

(5) The ASIC Defendants' objections to the discovery requests are unreasonable. For example, they object to the definitions of the terms "ASIC Design," "ASIC Product", and "ASIC Method" as vague, overly broad, unduly burdensome and not reasonably calculated to lead to the

---

documents and the details of the actual use by the ASIC Defendants .

[27] This term includes all variations of Design Compiler, including DC Ultra, DC Ultra Opt, DC Expert, DC Expert Plus, and DC Pro.

[28] This component is also known as the "Standard Library."

28

1   discovery of admissible information, and incorporate the objection by reference into every response they

2   make. However, counsel for all parties had agreed that the terms "ASIC Design," "ASIC Product", and

3   "ASIC Method" were limited to methods and products made by a process involving computer assisted

4   design with logic synthesis. The ASIC Defendants have said that their production of documents are

5   "subject to" these objections, without disclosing whether they are actually withholding documents based

6   upon these and other objections.

7           (6) The parties cannot agree on when discovery with respect to sales and damages should

8   commence. Ricoh requests that the ASIC Defendants produce the requested sales and financial

9   documents by July 15, 2005.

10          (7) Aeroflex has produced a number of CD's that Ricoh cannot read or access.

11                          **(b) Production of Synopsys' source code**

12          Synopsys has produced some of its source code for occasional periods at a secure Synopsys

13   facility. However, Synopsys has refused to produce the source code for all of the products listed in

14   Ricoh's preliminary infringement contentions and alleged by Ricoh as being employed by the ASIC

15   Defendants in carrying out the infringing process. As noted in footnote 26, the afternoon this CMC was

16   to be filed, Synopsys proposed to provide Ricoh with the "keys" to have access to additional source

17   code. Until Ricoh's experts are able to determine the versions of that code and actually evaluate it,

18   Ricoh cannot determine the scope of this offer. However, there are still additional version of code that

19   Synopsys and the ASIC Defendants have never produced. In addition, Ricoh requested, and on June 3,

20   2005, Synopsys agreed, that the number of experts permitted to review Synopsys' source code be

21   increased from three to five.

22                    **(c) Production of documents pursuant to Rule 33(d)**

23          As of May 2004, the parties were at an impasse with respect to the ASIC Defendants'

24   production of documents pursuant to Fed. R. Civ. P. 33(d). On May 30, 2003, Ricoh served 10

25   interrogatories upon the ASIC Defendants. In response, the ASIC Defendants objected but often

26   generally promised to produce documents pursuant to Rule 33(d). However, none of the ASIC

27   Defendants specifically identified those documents by either title or bates number, and Ricoh believes

28   that in most instances no responsive documents have been produced.

1

### (d) Production of emails

2     The parties had agreed that production of e-mails should be completed by no later than May

3 31, 2004, but no emails were ever produced. Ricoh believes that these documents should be produced

4 by no later than July 15, 2005. There may be unresolved issues with respect to other forms of electronic

5 discovery.

6

### (e) Production of privilege logs

7     In 2004, the parties were at an impasse with respect to the date for production of privilege

8 logs. Ricoh proposes that privilege logs be exchanged by July 15, 2005.

9     In April 2004, the parties were also at an impasse with respect to Ricoh's proposal that

10 communications between Ricoh and its trial counsel not be logged. Ricoh believes that there is no

11 purpose in providing a log of those communications, which relate both to Ricoh's pre-filing

12 investigation as well as its preparation and filing of the complaint. In 2004, Synopsys and the ASIC

13 Defendants insisted that all pre-filing communications between Ricoh and its trial counsel be logged.

14 Ricoh believes that there remains an outstanding issue with respect to communications between

15 Synopsys and the ASIC defendants, which have not been produced or logged.

16

### (f) Resolution of document discovery issues

17     The parties were unable to agree on a schedule or a process for resolving their document

18 discovery disputes. Ricoh proposes that, consistent with Magistrate Judge Chen's directives, the parties

19 work together, with the Court's assistance as appropriate, to resolve all objections with respect to

20 documents that the parties are seeking pursuant to the currently outstanding discovery requests, by no

21 later than June 30, 2005, and produce by July 15, 2005 all documents that have been the subject of

22 objections but that have not specifically been ordered by the Court not to be produced.

23

### (ii) Responses to Requests for Admission

24     Ricoh has responded to all outstanding requests for admissions, and Ricoh is not aware of

25 any outstanding issues with respect to its responses.

26     In 2004, the parties were at an impasse, however, with respect to the ASIC Defendants'

27 responses. For example:

28     (1) The ASIC Defendants have objected to and limited their responses to many of the

30

1  requests. Some of the requests include objections over issues that that have been resolved. For

2  example, requests 9-19 related to whether the ASIC Defendants performs certain actions relating to chip

3  design. The ASIC Defendants have objected to the term "ASIC method as being incomprehensible...so

4  broad as to be meaningless" in the objections to these requests. This objection is made even though the

5  parties had previously come to an understanding regarding certain terms, including the term "ASIC

6  method."

7  　　　　(2) The ASIC Defendants have objected to Requests 9-19 as calling for a claim interpretation

8  and a question of law, when in fact it calls for a question of fact. For example, Request No. 17 seeks an

9  admission of whether the "Defendant performs an ASIC Method that includes generating from a netlist

10  mask data required to produce an integrated circuit having a desired function." No substantive

11  responses have been provided.

12  　　　　(3) Some of the Matrox defendants should amend their responses to Request No. 20, which

13  asks whether "The Court has personal jurisdiction over defendant." Matrox Tech has denied that the

14  court (at the time of the response, a Delaware District Court presided over this case) had personal

15  jurisdiction. However by their own admission, Matrox Tech is a company organized under the laws of

16  Delaware. All defendants acceded the personal jurisdiction of this Court as part of the desire to have

17  this case transferred from Delaware to California. Therefore, if true, the Matrox defendants should

18  supplement their response to Request 20 and remove this lingering issue.

19  　　　　　　　　(iii)　　Rule 30(b)(6) depositions

20  　　　　　　　　　　(a) Rule 30(b)(6) discovery of Ricoh

21  　　　　There are no outstanding issues with respect to Ricoh's Rule 30(b)(6) witnesses. Ricoh has

22  responded to every Rule 30(b)(6) deposition notice from either Synopsys or the ASIC Defendants. On

23  July 15, 2003, Ricoh produced a corporate witness in response to the ASIC Defendants' Rule 30(b)(6)

24  notice. During the week of May 30, 2004, Ricoh produced additional corporate designees for

25  depositions in Japan.

26  　　　　　　　　　(b) Ricoh's Rule 30(b)(6) notices to the ASIC Defendants

27  　　　　The parties were at an impasse with respect to scheduling and taking the corporate

28  depositions of the ASIC Defendants pursuant to Ricoh's September 25, 2003 Rule 30(b)(6) notices. The

31

1   ASIC Defendants have stated that they may produce twenty (20) or more different corporate designees

2   in response to Ricoh's long-pending Rule 30(b)(6) notices.  Ricoh requests that all Rule 30(b)(6)

3   depositions of the ASIC Defendants be completed within three months of the completion of their

4   document production, so follow-up individual depositions may be completed in time for the expert

5   reports.

6          During the hearing on March 24, 2004, Magistrate Judge Chen instructed the parties to

7   identify actual deposition dates "at least by category if not by witness."  The burden is on the ASIC

8   Defendants to identify those dates.  They refused to do so.

9          In particular, on September 25, 2003, Ricoh served identical Rule 30(b)(6) notices upon each

10  of the ASIC Defendants as parties in the *Ricoh v. Aeroflex* litigation.  None of the ASIC Defendants ever

11  have proffered *any* dates for *any* of the 30(b)(6) topics.

12         Ricoh proposes that the ASIC Defendants identify by June 30, 2005 the names of all

13  corporate witnesses, and that the parties cooperate in scheduling the depositions of those witnesses

14  starting in August, after the document production has been accomplished, with completion of the

15  depositions in October.  Requiring the ASIC Defendants to identify witnesses, topics and deposition

16  dates is consistent with this Court's instructions during the March 24, 2004 hearing and this Court's

17  Standing Order, and is the most effective way to schedule and complete these corporate depositions.

18                      **(c)  Ricoh's Rule 30(b)(6) notices to Synopsys**

19         Ricoh has pending a Rule 30(b)(6) deposition notice to Synopsys that has yet to be

20  scheduled.  The parties agree that document discovery should be resolved prior to going forward with

21  depositions.

22                      **(iv)     Fact Depositions**

23         In addition to taking Rule 30(b)(6) depositions, Synopsys and the ASIC Defendants have

24  already taken several other depositions, including Dr. James Davis, Mr. Brian Bershader, Dr. Tom

25  Rhyne, Mr. Yamada, and Dr. Kobayashi.  Some of these witnesses also were corporate designees of

26  Ricoh.

27

28

32

1    Ricoh proposes that the parties cooperate in scheduling other fact depositions starting in

2    August (after document production is completed) to the end of fact discovery at locations that are

3    convenient for the witnesses and mutually agreeable to the parties.

4                              (v)    **Total Deposition Time**

5    With respect to the number of hours for deposition, counsel for all of the parties had agreed

6    before the ASIC Defendants case was transferred from Delaware, that each side would have 240 hours

7    of deposition testimony from fact witnesses.  Ricoh has to take depositions of seven ASIC Defendants

8    plus Synopsys, while they have only one opposing party to depose.  Ricoh believes that such a

9    modification of the Federal Rules of Civil Procedure is useful here, and there is no reason to deviate

10    from this prior agreement of counsel. There is no question that additional deposition time is needed;

11    since this agreement was established, the ASIC Defendants have identified over thirty (30) people who

12    have relevant factual information in their initial disclosure; another party has been added (Aeroflex

13    Colorado Springs, Inc.); and the ASIC Defendants have indicated that they may produce as many as

14    twenty (20) corporate witnesses in response to Ricoh's Rule 30(b)(6) deposition notice to each

15    defendant. Despite the additional party and many witnesses, Ricoh is willing to abide by the prior

16    agreement of counsel.

17    With respect to Synopsys' proposal that depositions needing translations "should be treated as 30

18    minutes against this time limit," Ricoh notes that, in Delaware, the 240 hours of total deposition time

19    was arrived at as a compromise.  Then, as now, counsel for Synopsys was proposing 160 hours of total

20    deposition time per side, but also that each hour of depositions of non-English speaking witnesses be

21    counted only 30 minutes against the total.  Ricoh pointed out that this proposal would effectively give

22    the other side almost double the amount of deposition time as Ricoh, as most of Ricoh's witnesses are

23    native Japanese speakers.  Rather than adopting the 30 minute proposal, the 240 hour figure was

24    accepted as a compromise.  Ricoh does not agree that the depositions of non-English speaking witnesses

25    should effectively last two days each as a matter of right, but, as the parties have agreed with respect to

26    any witness, Ricoh willing to consider requests for more than a full deposition day of non-English

27    speaking witnesses on a case-by-case basis.

28

1

**b. Position of Synopsys and the ASIC Defendants**

2    Ricoh's description of the case and its discovery statement above include multiple unjustified

3  and inaccurate assertions that Synopsys and the Customer Defendants have refused to participate in

4  discovery which Synopsys and the Customer Defendants dispute but will not address here.  The fact is

5  that Synopsys and the Customer defendants see Ricoh as wanting to engage in a wide-ranging fishing

6  expedition at their expense all without ever defining in any meaningful sense what this case is about.

7  Synopsys and the Customer Defendants are looking to the Court to assist the parties in framing the case

8  and thereby defining the relevant discovery before discovery is reopened so that the discovery process

9  can move forward in a reasonable and expeditious manner.  As stated above, given the Court's claim

10  construction ruling and depending upon the Court's view of some of the issues presented herein,

11  Synopsys and the Customer Defendants do not believe that discovery regarding manufacturing

12  processes, any design processes not taking place in the United States, any discovery related to design

13  using logic synthesis software other than that of Synopsys, and discovery related to the ASICs products

14  themselves (except perhaps as it relates to damages, which relevance is also disputed by Synopsys and

15  the Customer Defendants) is relevant.  Once the parties have provided their final contentions and the

16  Court has provided guidance with respect to the issues raised herein, the parties should exchange revised

17  discovery plans.

18    In addition, the Defendants believe that a modification of the deposition time is appropriate

19  in this matter, and believe that a total of 160 hours of deposition time is ample modification from the

20  limits on deposition testimony set in the Federal Rules of Civil Procedure to obtain the discovery

21  necessary in this litigation.  Also, because many of Ricoh's witnesses will likely require a translator,

22  each hour of deposition testimony requiring translation should be treated as 30 minutes against this time

23  limit.  Furthermore, since the parties have stipulated that testimony taken in this action will be

24  admissible in *Synopsys, Inc. v. Ricoh Company, Ltd.*, Case No. CV 03-02289 MJJ (EMC), and vice

25  versa, the total time for deposition testimony in the two actions combined should not exceed this limit.

26  The Defendants are not advocating that the Court give Synopsys 160 hours and grant them an additional

27  160 hours.

28

34

1

2
**PROPOSED SCHEDULE**

3
**10. A proposed schedule is provided below**

4
**a. Ricoh's Position**

5
Ricoh asserted an infringement claim with respect to the '432 patent, and agrees that it

6
should be treated as the party claiming infringement of that patent. In July 2004, the parties harmonized

7
the matters in dispute in the two cases, so the declaratory judgment counterclaims in *Ricoh v. Synopsys*

8
are identical in scope with the declaratory judgment claims in *Synopsys v. Ricoh*. The two actions

9
should be consolidated and Ricoh should be treated as the plaintiff.

10
Because all discovery has been stayed by the Court and will remain stayed until this Court

11
lifts the stay, Ricoh submits that the calculation of dates under the Patent Local Rules based on the date

12
of the Claim Construction Ruling ("CCR") is not appropriate. The Patent Local Rules contemplate that

13
all fact discovery will proceed during the claim construction process but in this case, the Court directed

14
that discovery should be "focused" on claim construction issues in December 2003, and in May 2004,

15
the Court imposed an absolute discovery stay on all issues of liability and damages. Absent such a stay,

16
Ricoh would have had the benefit of at least 13 months of discovery to this point.

17
Ricoh's proposed schedule allots six months for merits discovery prior to the exchange of

18
final infringement contentions and expert reports. This is an aggressive schedule that depends upon

19
Synopsys and the ASIC Defendants cooperatively engaging in discovery, and avoiding the type of

20
conduct condemned by the Court on April 6, 2004. The proposed schedule obligates the ASIC

21
Defendants and Synopsys to promptly produce all documents that should have been produced pursuant

22
to the May 2003 initial disclosures (suitably updated), as well as all documents responsive to Ricoh's

23
discovery requests, and then establishes subsequent dates based upon that date. The dates proposed

24
below are based on the latter proposal and assume the stay will be lifted the day after the June 14, 2005

25
status hearing and that the ASIC Defendants and Synopsys produce all initial disclosure documents,

26
documents responsive to Ricoh's discovery requests, and the source code for the identified products by

27
the end of June, 2005.

28

35

1    Synopsys and the ASIC Defendants proposed schedule reinforces their inappropriate

2   insistence that Synopsys's later filed declaratory judgment action should somehow take priority over

3   Ricoh's first filed patent infringement action.  This prejudice inculcates every aspect of their proposal,

4   and illuminates their desire to litigate incrementally each of the substantive patent infringement issues.

5   Synopsys' schedule also reinforces its attempt to exclusively and impermissively focus the litigation to

6   matters that Synopsys want to litigate, which are only a biased subset of issues in Ricoh's infringement

7   lawsuit.

8    Disregarding Ricoh's interest in resolving both the patent infringement and declaratory

9   lawsuits, Synopsys has provided a schedule for resolution of its declaratory judgment lawsuit, but has

10   not provided a similar schedule for the ASIC defendants in the patent infringement lawsuit.  Instead,

11   Synopsys desires to waste the Court's resources by first attempting to resolve a limited number of the

12   pending issues of the patent infringement suit.  Then when the first "segment" of the lawsuit is

13   completed, Synopsys and the ASIC defendants urge that the Court and parties repeat the case scheduling

14   process by submitting new discovery plans and holding an additional case management conference.  Not

15   only does this perpetually delay Ricoh's infringement claims, but this attempt to piecemeal the issues is

16   intended to prevent Ricoh from ever obtaining an injunction against the actual infringers.  The ASIC

17   defendants do not even provide a proposed case management schedule, but instead suggest that any

18   schedule is dependant upon the resolution of the later filed declaratory judgment lawsuit and want

19   guidance from the court and how to proceed.  The suggestion that Synopsys has the supreme privilege of

20   the earliest possible adjudication is inconsistent with the first rule of the Federal Rules of Civil

21   Procedure to "secure a just, speedy and inexpensive determination of every action."

22    Synopsys has indicated is agreeable to a shortened discover period (until October 2005), but

23   has not agreed to provide *any* of the requested discovery by that date.  Throughout this litigation,

24   Synopsys has unilaterally defined what information it will provide (which is narrower than the issues in

25   Ricoh's lawsuit).  Of the information that Synopsys has agreed to produce, it has done so at its own pace

26   and response information is still outstanding.  Now, Synopsys seeks an accelerated case management

27   schedule which will mostly likely result in Ricoh not receiving all of the information it is rightfully

28

36

1 | entitled to receive during the discovery time period with a reasonable time to analyze the information

2 | and have the opportunity to follow up on an issue that arise from the information.

3 | **b. Position of Synopsys and the ASIC Defendants**

4 | If the customer suit is not limited to Verilog and VHDL inputs, Synopsys and the Customer

5 | Defendants seek a stay of the action against the Customer Defendants to allow the underlying dispute to

6 | be resolved in the *Synopsys, Inc. v. Ricoh Company, Ltd.* declaratory judgment action. As stated above,

7 | once Synopsys establishes that the ordinary use of the Synopsys Logic Synthesis Product does not

8 | infringe the '432 patent, the case against the Customer Defendants should be resolved as well. Since

9 | Ricoh must show that each element of its asserted claims are infringed, it is indisputable that if the non-

10 | input claim elements are not found in the Synopsys Logic Synthesis Product, then the customer

11 | defendants do not infringe regardless of the nature of their input.

12 | Synopsys has set forth a time frame for the trial of the Declaratory Judgment case alone or the

13 | consolidated liability trial based upon VHDL and Verilog inputs. If the customer case is not so limited

14 | and the request for a stay is denied, Defendants believe that trial of the suit against the Customer

15 | Defendants should be bifurcated, into separate trials on liability and damages (which would include the

16 | question of whether infringement was willful or not) for the reasons stated above. Synopsys also

17 | opposes consolidation of the cases. Synopsys and the Customer Defendants do not believe they can

18 | submit a schedule for the Customer Defendants' case at this time since any such schedule is dependent

19 | upon the resolution of the many issues presented herein. If Ricoh is permitted the unreasonable, wide-

20 | ranging discovery it seeks, Ricoh's proposed discovery cut-off is unworkable as there will be at least

21 | three months of document discovery before depositions start and will 240 hours of depositions for each

22 | side, seventy days of deposition thereafter. Once the parties submit their final contentions and new

23 | discovery plans, the Court should hold another status conference and the parties could provide their

24 | scheduling proposals then based on the guidance provided by the Court on June 14.

25

26

27

28

Case Nos. C-03-04669 MJJ (EMC) and C-03-02289 MJJ (EMC)
Combined Joint Case Management Conference Statement and Proposed Order
DM_US\8213634.v1

c.  **The Parties' Proposed Schedules**

| Event | Ricoh's Proposed Dates | Synopsys' Proposed Dates |
|---|---|---|
| Claim Construction Ruling ("CCR") | April 7, 2005 | April 7, 2005 |
| Reopening of discovery | June 15, 2005 | -- |
| ASIC Defendants and Synopsys produce all initial disclosure documents, documents responsive to Ricoh's discovery requests and source code for the identified products | June 30, 2005 | -- |
| Deadline to disclose reliance upon opinion of counsel and produce related documents | June 30, 2005 | -- |
| Final Infringement Contentions | December 15, 2005 | -- |
| Final Invalidity Contentions | January 13, 2006 | -- |
| Fact discovery cut-off | January 20, 2006 | October 7, 2005 |
| Submission of expert reports by party with the burden of proof | January 20, 2006 | -- |
| Submission of responsive expert reports | February 17, 2006 | November 4, 2005 |
| Rebuttal Expert Reports | March 10, 2006 | December 2, 2005 |
| Expert discovery cut-off | March 24, 2006 | December 21, 2005 |
| Dispositive motion cut-off | March 31, 2006 | January 17, 2006 |
| Dispositive Motions Oppositions Due | April 17, 2006 | January 31, 2006 |
| Dispositive Motions Replies Due | April 24, 2006 | February 7, 2006 |
| Dispositive motion hearing date | To be set by the Court on or after May 8, 2006 | February 21, 2006 |
| File motions in limine | April 14, 2006 | March 7, 2006 |
| File oppositions to motions in limine | May 5, 2006 | March 21, 2006 |
| File Joint Proposed Final Pre-trial Order | May 26, 2006 | April 7, 2006 |
| Pre-trial Conference | To be scheduled by Court | April 17, 2006 |
| Trial Date | June 2006 | May 1, 2006 |

## CLAIM CONSTRUCTION HEARING

The Court issued its ruling on April 7, 2005.

## TRIAL

**11. The parties request a trial date as follows**

a.  **Ricoh's Position**

Ricoh has proposed that trial begin June 2006.

b.  **Position of Synopsys and the ASIC Defendants**

Synopsys proposes that trial of its declaratory judgment action begin on May 1, 2006.

38

1  **12. The parties expect that the trial will last for the following number of days**

2                              a.  **Ricoh's Position**

3          Ten trial days.

4                              b.  **Position of Synopsys and the ASIC Defendants**

5          Synopsys believes that its declaratory judgment action can be tried in eight trial days.

6          Synopsys and the Customer Defendants believe that, if the Customer Defendant action is not

7  stayed, and the action is consolidated with the Synopsys case, the questions of liability, including

8  infringement and validity, should be tried first.  This trial could be completed in approximately twelve

9  days.  If liability is established, a separate trial can be scheduled to determine damages.  Defendants

10  believe that such a trial would require approximately two weeks.

11

12  Dated:  June 8, 2005                    DICKSTEIN SHAPIRO MORIN & OSHINSKY

13

14

15                              By:  /s/ Gary M. Hoffman
                                      Gary M. Hoffman
16                                    Kenneth W. Brothers
                                      Edward A. Meilman
17                                    Eric Oliver

18                                    Attorneys for Ricoh Company, Ltd.

19

20  Dated: June 8, 2005                     HOWREY LLP

21

22                              By:  /s/ Teresa M. Corbin
                                      Teresa M. Corbin
23                                    Christopher Kelley
                                      Attorneys for Plaintiff Synopsys and ASIC
24                                    Defendants

25

26

27

28

1

2                                    **CASE MANAGEMENT ORDER**

3          The Case Management Statement and Proposed Order is hereby adopted by the Court as the

4    Case Management Order for the case and the parties are ordered to comply with this order.  In addition

5    the Court orders:

6

7

8

9

10

11

12

13

14    Dated:  _____                    _____

15                                                         HON. MARTIN J. JENKINS

16

17

18

19

20

21

22

23

24

25

26

27

28

Case Nos. C-03-04669 MJJ (EMC) and  C-03-02289 MJJ (EMC)
Combined Joint Case Management Conference Statement and Proposed Order
DM_US\8213634.v1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10–K
## ANNUAL REPORT
### PURSUANT TO SECTIONS 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

---

**(Mark One)**

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
**For the year ended October 31, 2005**
**OR**

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
**For the transition period from          to**
**Commission File Number 0–19807**

---

# SYNOPSYS, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **56–1546236** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**700 East Middlefield Road, Mountain View, California 94043**
(Address of principal executive offices, including zip code)
**(650) 584–5000**
(Registrant's telephone number, including area code)

---

Securities Registered Pursuant to Section 12(b) of the Act: **None**
Securities Registered Pursuant to Section 12(g) of the Act:
**Common Stock, $0.01 par value**
**(Title of Class)**
**Preferred Share Purchase Rights**
**(Title of Class)**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☒

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12b–2 of the Act). Yes ☒ No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non–voting common equity held by non–affiliates computed by reference to the price at which the common equity was last sold as of the last business day of the Registrant's most recently completed second fiscal quarter was approximately $1,925,478,600. Aggregate market value excludes an aggregate of 26,614,376 shares of common stock held by officers and directors and by each person known by the Registrant to own 5% or more of the outstanding common stock on such date. Exclusion of shares held by any of these persons should not be construed to indicate that such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of the Registrant, or that such person is controlled by or under common control with the Registrant.

On December 31, 2005, 144,372,085 shares of the Registrant's Common Stock, $0.01 par value, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**
None.

**SYNOPSYS, INC.**
**ANNUAL REPORT ON FORM 10–K**
**Year ended October 31, 2005**
**TABLE OF CONTENTS**

| | | Page No. |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 2. | Properties | 10 |
| Item 3. | Legal Proceedings | 11 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 12 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 15 |
| Item 6. | Selected Financial Data | 16 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 46 |
| Item 8. | Financial Statements and Supplementary Data | 50 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 87 |
| Item 9A. | Controls and Procedures | 87 |
| Item 9B. | Other Information | 91 |
| **PART III** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 91 |
| Item 11. | Executive Compensation | 94 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 97 |
| Item 13. | Certain Relationships and Related Transactions | 99 |
| Item 14. | Principal Accountant Fees and Services | 100 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 100 |
| SIGNATURES | | 105 |

i

**PART I**

*This Annual Report on Form 10−K, particularly in Item 1. "Business" and Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations," includes forward−looking statements within the meaning of Section 27A of the Securities Act of 1933 (the Securities Act) and Section 21E of the Securities Exchange Act of 1934 (the Exchange Act). These statements include, but are not limited to, statements concerning: our business, product and platform strategies, expectations regarding previous and future acquisitions; completion of development of our unfinished products, or further development or integration of our existing products; continuation of current industry trends towards vendor consolidation; expectations regarding our license mix; expectations regarding future revenue; expectations regarding customer interest in more highly integrated tools and design flows; expectations of the success of our intellectual property and design for manufacturing initiatives; expectations regarding revenue seasonality; expectations regarding the likely outcome of the Internal Revenue Service's proposed net tax deficiencies for fiscal years 2000 and 2001 or other outstanding litigation; expectations that our cash, cash equivalents and short−term investments and cash generated from operations will satisfy our business requirements for the next 12 months; and our expectations of our future liquidity requirements. Our actual results could differ materially from those projected in the forward−looking statements as a result of a number of factors, risks and uncertainties discussed in this Form 10−K, especially under the caption "Factors that May Affect Future Results," in Item 7 in this Form 10−K. The words "may," "will," "could," "would," "anticipate," "expect," "intend," "believe," "continue," or the negatives of these terms, or other comparable terminology and similar expressions identify these forward−looking statements. The information included herein is given as of the filing date of this Form 10−K with the Securities and Exchange Commission (SEC) and future events or circumstances could differ significantly from these forward−looking statements. Accordingly, we caution readers not to place undue reliance on these statements.*

**Item 1.**          *Business*

**Introduction**

Synopsys, Inc. (Synopsys) is a world leader in electronic design automation (EDA) software and related services for semiconductor design. We deliver technology−leading semiconductor design and verification software platforms and integrated circuit (IC) manufacturing software products to the global electronics market, enabling the development and production of complex systems−on−chips (SoCs). In addition, we provide intellectual property (IP) and design services to simplify the design process, and accelerate time−to−market for our customers. We also provide software and services that help customers prepare their designs for manufacturing.

We incorporated in 1986 in North Carolina and reincorporated in Delaware in 1987. Our headquarters are located at 700 East Middlefield Road, Mountain View, California 94043, and our telephone number there is (650) 584−5000. We have more than 60 offices throughout North America, Europe, Japan and Asia.

Our Annual Reports on Form 10−K, Quarterly Reports on Form 10−Q, Proxy Statements relating to our annual meetings of stockholders, Current Reports on Form 8−K and amendments to these reports, as well as filings made by our executive officers and directors, are available on our Internet website *(www.synopsys.com)*. We post these reports to our website as soon as practicable after we file them with, or furnish them to, the SEC. The contents of our website are not part of this Form 10−K.

1

**The Role of EDA in the Electronics Industry**

Technology advances in the semiconductor industry have steadily increased the feature density, speed, power efficiency and functional capacity of semiconductors (also referred to as integrated circuits, ICs or chips).

- Since the early 1960s, steadily decreasing feature widths (the widths of the wires imprinted on the chip that form the transistors) and other developments have enabled IC manufacturers to follow "Moore's law," approximately doubling every two years the number of transistors that can be placed on a chip.
- Chips have become more power efficient to address demand for smaller and more powerful handheld devices such as cell phones, digital cameras, music players and personal digital assistants.
- Increasingly, single Systems−on−a−Chip (SoCs) can handle functions formerly performed by multiple ICs attached to a printed circuit board.

Combined, these advances in semiconductor technology have enabled the development of lower cost, higher performance computers, wireless communications networks, hand held devices, Internet routers and a wealth of other electronic devices. Each advance, however, has introduced new challenges for all participants in semiconductor production, from designers and manufacturers to equipment manufacturers and EDA software suppliers, such as Synopsys.

These technological challenges have been accompanied by unprecedented business challenges stemming from the semiconductor downturn in 2000−2002, increased globalization leading customers to source their products in lower cost areas, and consumer demand for cheaper and more advanced products.

**The IC Design Process**

EDA software enables designers to create complex semiconductors. In simplified form, the IC design process consists of the steps described below.

*System Design.*    In system design, the designer describes the chip's desired functions in very basic terms using a specialized high−level computer language, typically $C^{++}$ or System C. This phase yields a relatively high level behavioral model of the chip.

*Register Transfer Level (RTL) Design.*    RTL design is the process of capturing the intended design functionality created at the system level using a specialized high level computer language, typically Verilog or VHDL.

*Logic Design.*    Logic design, or "synthesis," programs convert the RTL code into a logical diagram of the chip, and produce a data file known as a netlist describing the various groups of transistors, or gates, to be built on the chip.

*Functional Verification.*    At the RTL level of IC design, the designer uses functional verification tools such as RTL simulators and testbench automation and other verification tools to verify that the design will function as intended. The increasing size and complexity of today's ICs and SoCs have vastly increased the time and effort required to verify chip designs, with verification estimated to consume 60% to 70% of total design time. As a result, designers are demanding solutions that can handle increasing complexity at ever higher speeds, and that can reduce verification risk (i.e., find design bugs before designs are taken into production).

*Physical Design.*    In the physical design stage, the designer plans the physical location of all of the transistors and each of the wires connecting them with "place and route" products. The designer first determines the location on the chip die for each block of the chip, as well as the location for each transistor within each block, a process known as "placement." In many designs, placement is performed in

2

conjunction with logic synthesis, a process known as "physical synthesis." After placement the designer adds the connections between the transistors, a process known as "routing." With increasing gate counts and design complexity, seamless correlation among physical design and other tools is becoming increasingly important.

*Physical Verification.*    Before sending the chip design files to a manufacturer for fabrication, the designer must perform a series of further verification steps, checking to make sure that the final design complies with the specific requirements of the fabrication facility that will manufacture the chip.

*Design for Manufacturing.*    The design is then translated to a series of photomasks, or physical representations of the design. IC manufacturers use photomasks to produce the silicon wafer containing individual ICs. As IC wire or "feature" sizes shrink, this translation is becoming more and more difficult. These challenges are exacerbated because in advanced designs the feature widths can be smaller than the wavelength of the light used in the manufacturing process, requiring advanced software tools and techniques such as optical proximity correction to alter the mask to ensure the desired features can still be produced. Technology computer–aided design, or TCAD, tools are also used to model individual features or "devices" within the design to help ensure manufacturability. Finally, various yield enhancement tools and technologies are employed at this stage to increase the number of usable ICs contained on each silicon wafer.

*Intellectual Property Reuse.*    As IC designs continue to grow in size and complexity, designers have found that inserting "pre–designed and pre–verified" design blocks into the design can be an effective way to help reduce overall design cost and cycle time by reducing the number of chip elements that must be designed and comprehensively verified. Usually such IP blocks represent functions that can be used in multiple applications and ICs, including microprocessors, digital signal processors, or connectivity IP that support such protocols as USB, PCI Express or Ethernet.

**Strategy**

With increasing chip complexity, designers are finding it more and more difficult to complete each of the steps described above sequentially, and must repeat some steps, such as verification, multiple times before finishing the design. Each such iteration can add significant costs and makes it more difficult for the designer to meet time–to–market goals. Synopsys addresses these difficulties by integrating our point tools into product platforms, enabling significantly improved correlation and interoperability as the design moves from one step to the next.

In addition, smaller and smaller chip feature sizes require designers to take manufacturing issues into account earlier in the production process than ever before. Synopsys has invested heavily in design for manufacturing tools and technologies that help ensure designs are still able to be manufactured after delivery to the fabrication facility at an acceptable yield.

Finally, designers are under increasing pressure to release their products commercially more quickly than ever before as a result of accelerating global competition. We address this issue by making available a large portfolio of high quality, pre–verified standards–based and other IP, which designers can use to complete their design faster and with greater confidence.

**Products and Services**

Our products and services are managed by our four principal business units, the Implementation, Verification, Silicon Engineering and Solutions groups.

3

***Implementation Group***

Our Implementation Group is responsible for our Galaxy Design platform, which provides our customers a single, integrated IC design solution which includes industry–leading individual products and incorporates common libraries and consistent timing, delay calculation and constraints throughout the design process. The platform uses our open Milkyway database and allows designers the flexibility to integrate internally developed and third–party tools. With this advanced functionality, common foundation and flexibility, our Galaxy Design platform helps reduce design times, decrease integration costs and minimize the risks inherent in advanced, complex IC designs.

The following are the Galaxy Design platform's principal products and solutions:

- *IC Compiler* physical design solution, which unifies previously separate IC design operations by providing concurrent physical synthesis, clock–tree synthesis, routing, yield optimization and sign–off correlation and delivering significant improvements in design performance and productivity.
- *Design Compiler*® logic synthesis product used by a broad range of IC design companies to optimize their designs for performance and area.
- *Physical Compiler*® physical synthesis product, which unites logic synthesis and placement functionality and addresses critical timing problems encountered in designing advanced ICs and SoCs.
- *Apollo*™ physical design product used for the placement and routing of a chip.
- *Astro*™ advanced physical design system, which enables optimization, placement and routing while concurrently accounting for physical effects.
- *PrimeTime*®/*PrimeTime*® *SI* timing analysis products that measure and analyze the speed at which a design will operate when it is fabricated. The PrimeTime SI tool analyzes the effect of cross–talk and noise on timing, an increasingly important issue at chip geometries below 180 nanometers.
- *Formality*® formal verification sign–off solution, which compares two versions of a design to determine if they are equivalent.
- *Star–RCXT*™ extraction solution for analyzing IC layout data and determining key electrical characteristics of a chip, such as capacitance and resistance.
- *Hercules*™ physical verification product family, which performs hierarchical design–rule checking, electrical rule checking, and layout versus schematic verification.

The Implementation Group also develops and markets products that perform a number of other important design functions, including power management, chip testing and IC floor planning.

***Verification Group***

Our Verification Group is responsible for our Discovery Verification platform, which combines our simulation and verification products and design–for–verification methodologies, and provides a consistent control environment to help significantly improve the speed, breadth and accuracy of our customers' verification efforts.

The following are the Discovery Verification platform's principal products and solutions:

- *VCS*® comprehensive RTL verification solution, which includes technologies that support model development, testbench creation, coverage feedback and debugging techniques.

4

- *Vera*® testbench generator, which automates the creation of testbenches, custom models that provide simulation inputs and respond to simulated outputs from the design during verification. Automating this process significantly improves verification quality.
- *NanoSim*® FastSPICE circuit simulation product for analog, mixed signal and digital IC verification, which offers high performance and capacity for pre–and–post–layout full–chip circuit simulation, timing and power analysis.
- *HSIM*® hierarchical FastSPICE circuit simulation product for analog, mixed–signal and digital IC verification, which offers pre and post–layout full–chip circuit simulation and memory verification.
- *HSPICE*® circuit simulator, which offers high–accuracy, transistor–level circuit simulation, thereby enabling designers to better predict the timing, power consumption, functionality and analog performance of their designs.
- *Verification IP* reusable IP designed to test specific functions and adherence to industry protocols in an IC design, which we believe is becoming increasingly important to more quickly achieving verification sign–off.
- *Discovery AMS* mixed–signal verification solution which is based on the VCS, NanoSim and HSPICE simulators.
    The Verification Group also develops and markets tools that perform system level design, design rule checking and hybrid formal verification, specialized functions that designers often require during verification.

***Silicon Engineering Group***

    Our Silicon Engineering Group develops and markets our design for manufacturing (DFM) and analog and mixed–signal IC design and verification products and initiatives, including those included in the Discovery Verification platform. Our DFM offerings include the following:

- *Technology–CAD or TCAD* products, which precisely model individual structures or devices within an IC design to improve manufacturability at small geometries. We see TCAD tools as increasingly important to help customers shorten the time to ramp up their production yields, and therefore reduce their manufacturing costs.
- *Proteus OPC/InPhase* optical proximity correction (OPC) products which embed and verify corrective features in an IC design and masks to improve manufacturing results for subwavelength feature width design. OPC products change mask features to compensate for distortions caused by optical diffraction and resist process effects.
- *Phase Shift Masking Technologies* consist of mask design techniques that use optical interference to improve depth–of–field and resolution in subwavelength photolithography for designs at 90 nanometers and below.
- SiVL® *(Silicon versus Layout)* layout verification product that verifies the layout of a subwavelength IC against the silicon it is intended to produce by simulating lithographic process effects, including optical, resist and etch effects.
- *CATS*® mask data preparation product that takes a final IC design and "fractures" it into the physical features that will be included in the photomasks to be used in manufacturing.
- *Virtual Stepper*® mask qualification product, which checks mask quality and analyzes mask defects, helping to separate true defects from nuisance defects.

5

As part of our strategy to enhance our DFM offerings, we acquired HPL Technologies, Inc., a leader in yield management software and test chip solutions, in December 2005.

**Solutions Group**

Synopsys' Solutions Group includes our portfolio of IP products and components and our Professional Services Group.

*Intellectual Property Products.* Responding to the demands of designers seeking solutions to reduce their design risk and time–to–market, Synopsys offers a large portfolio of standards–based and other IP, including:

- *DesignWare Foundation Library* is an extensive library of basic chip elements (for example, adders and multipliers) which Design Compiler incorporates into the design during the logic synthesis stage.
- *DesignWare Verification Library* is our library of popular chip function models used to create testbenches for the verification process.
- *DesignWare Cores* are pre–designed and pre–verified digital and mixed–signal logic blocks that implement many of the most important industry connectivity protocol standards, including USB (1.1, 2.0 and On–The–Go), PCI (PCI, PCI–X and PCI Express), Serial ATA, Ethernet and JPEG. We believe we offer the industry's most complete PCI Express portfolio.

*Professional Services.* We provide an extensive portfolio of consulting services covering all critical phases of the SoC development process. Our design services are tightly aligned with our EDA tools and IP products to accelerate the learning curve and deploy advanced methodologies. We offer customers a variety of engagement models, from on–site design assistance to help our customers design, verify and/or test their chips and improve their design processes, to full turnkey development and training.

**Customer Service and Technical Support**

A high level of customer service and support is critical to the adoption and successful use of our products. We provide technical support for our products through both field– and corporate–based application engineering groups. Customers who purchase Technology Subscription Licenses (TSLs) receive software maintenance services bundled with their license fee. Customers who purchase term licenses and perpetual licenses may purchase these services separately. See *Product Sales and Licensing Agreements* below.

Software maintenance services include minor product enhancements, bug fixes and access to our technical support center for primary support. Software maintenance also includes access to SolvNet®, our web–based support solution that gives customers access to Synopsys' complete design knowledge database. Updated daily, SolvNet includes documentation, design tips and answers to user questions. Customers can also engage, for additional charges, our worldwide network of product experts, or applications consultants, for additional support needs.

**Customer Education Services**

We offer training workshops designed to increase customer design productivity while using our products. Workshops cover Synopsys products and methodologies used in our design and verification flows, as well as specialized modules addressing system design, logic design, physical design, simulation and test. We offer regularly scheduled workshops in Mountain View, California; Austin, Texas; Marlboro, Massachusetts; Bangalore and Hyderabad, India; Reading, England; Rungis, France; Munich, Germany;

6

Tokyo and Osaka, Japan; Seoul, Korea and other locations. We also schedule on−site workshops worldwide at our customers' facilities or other locations.

**Product Warranties**

We generally warrant our products to be free from defects in media and to substantially conform to material specifications for a period of 90 days. We also typically provide our customers limited indemnities with respect to claims that their use of our design and verification software products infringe on United States patents, copyrights, trademarks or trade secrets. We have not experienced material warranty or indemnity claims to date, although we are currently defending some of our customers against claims that their use of one of our products infringes a patent held by a Japanese electronics company.

**Support for Industry Standards**

We actively create and support standards that will help our customers increase productivity, improve interoperability of tools from different vendors, and solve design problems. Standards in the EDA industry can be established by formal accredited organizations, by licensing made available to all, or through open source licensing.

Synopsys' products support many formal standards, including the most commonly used hardware description languages, VHDL, Verilog HDL, SystemVerilog and SystemC, as well as numerous industry standard data formats for the exchange of data between our tools, other EDA vendor's products and applications customers develop internally.

Synopsys is a member of more than 25 industry standards organizations including Design and Reuse, Fabless Semiconductor Association, European Electronic Chips & Systems design Initiative (ECSI), Mobile Industry Processor Interface (MIPI), and Virtual Socket Interface Alliance (VSIA). In addition, we are a board member and/or strongly active participant in major EDA standards and interoperability organizations, including Accellera, the EDA Consortium, the Institute of Electrical and Electronics Engineers (IEEE), Structure for Packaging, Integrating and Re−using IP within Tool−flows (SPIRIT), the Silicon Integration Initiative (Si2) and the Open SystemC Initiative (OSCI).

Synopsys' TAP−in[SM] program provides interface standards to all companies through an open source licensing model. Synopsys manages changes and enhancements that come from the community of licensees. Synopsys, other EDA companies and EDA customers use these standards to facilitate interoperability of their tools. The standards offered through our TAP−in program include our Liberty™ format for library modeling, SDC for design constraints, SAIF for switching activity, our OpenVera® language for hardware verification, and Open MAST for electromechanical design modeling. Synopsys' common database, Milkyway, is available for tool integration by EDA vendors through our MAP−in[SM] program. Finally, Synopsys provides access to EDA vendors of its own tools to help identify, facilitate and help develop optimal joint flows and solutions for our mutual customers through the in−Sync program.

Synopsys' products are written mainly in the C and C[++] languages and utilize industry standards for graphical user interfaces. Our products generally run on Sun Solaris, RedHat Enterprise Linux, and SUSE Linux Enterprise operating systems and on the most widely used microprocessors including Sun SPARC, Intel Xeon, and AMD AMD64.

**Sales, Distribution and Backlog**

We market our products and services primarily through direct sales in the United States and principal foreign markets. We typically distribute our products and documentation to customers electronically, but provide physical media (i.e. CD−ROMs) when requested by the customer.

We maintain sales/support centers throughout the United States. Outside the United States, we maintain sales/support offices in Canada, Denmark, Finland, France, Germany, Hong Kong, India, Israel,

7

Italy, Japan, the Netherlands, the People's Republic of China, Singapore, South Korea, Sweden, Taiwan and the United Kingdom. Our foreign headquarters is located in Dublin, Ireland. Our offices are further described under Part I, Item 2. *Properties*.

In very limited circumstances, we have used distributors to assist us in the sale of certain products in specified markets. See Note 12 of our *Notes to Consolidated Financial Statements* in Part II, Item 8. *Financial Statements and Supplementary Data* for additional information about one of our former distributors.

In fiscal 2005, 2004 and 2003, an aggregate of 49%, 45% and 45%, respectively, of Synopsys' total revenue was derived from sales outside of the United States. Additional information relating to domestic and foreign operations, including revenue and long–lived assets by geographic area, is contained in Note 10 of our *Notes to Consolidated Financial Statements* in Part II, Item 8. *Financial Statements and Supplementary Data* and is incorporated by reference here. Information relating to risks associated with foreign operations are described in Part II, Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations—Factors That May Affect Future Results—Stagnation of foreign economies, foreign exchange rate fluctuations or other international issues could adversely affect our performance* and is incorporated by reference here.

Historically, our orders and revenue have been lowest in our first quarter and highest in our fourth quarter, with a material decline between the fourth quarter of one fiscal year and the first quarter of the next fiscal year, although the timing of major license renewals can alter this trend. Under our previous license model, revenue seasonality resulted principally from the decline in the amount of upfront orders from the fourth quarter of one fiscal year to the first quarter of the next fiscal year. However, as a result of the shift in our license model, as more fully described in Part II, Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations*, we experienced significantly less revenue seasonality during fiscal 2005 and we expect revenue seasonality to be minimal in the foreseeable future.

Synopsys' aggregate backlog was approximately $1.92 billion on October 31, 2005, representing an approximately 25% increase from backlog of $1.53 billion on October 31, 2004. Aggregate backlog includes deferred revenue, operational backlog and financial backlog. Deferred revenue represents that portion of orders for software products, license maintenance and other services which have been delivered and billed to the customer but on which the revenue has not yet been recognized. Operational backlog consists of orders for software products and maintenance that have not been shipped and orders for consulting services that have not yet been delivered and accepted. Financial backlog consists of future installments not yet due and payable under existing time–based licenses and maintenance contracts.

We have not historically experienced material order cancellations.

The following table summarizes the revenue attributable to our five product groups as a percentage of total revenue for the last three fiscal years. We include revenue from companies or products we have acquired during the periods covered from the acquisition date through the end of the relevant periods. For presentation purposes, we allocate maintenance revenue, which represented approximately 14%, 16% and 19% of our total revenue in fiscal 2005, 2004 and 2003, respectively, to the products to which those support services related.

| | FY 2005 | FY 2004 | FY 2003 |
|---|---|---|---|
| Galaxy Design platform | 56% | 62% | 65% |
| Discovery Verification platform | 22% | 21% | 20% |
| IP | 7% | 6% | 6% |
| Design for Manufacturing | 10% | 7% | 5% |
| Professional Services & Other | 5% | 4% | 4% |
| Total | 100% | 100% | 100% |

8

Revenue derived from Intel Corporation and its subsidiaries in the aggregate accounted for approximately 13%, 11% and 10% of our total revenue for the fiscal 2005, 2004 and 2003, respectively.

**Research and Development**

Our future performance depends in large part on our ability to further integrate our design and verification platforms, and to expand our design for manufacturing and IP product offerings. Research and development on existing and new products is primarily conducted within each product group. In addition, an Advanced Technology Group within Synopsys' Silicon Engineering Group explores new technologies and maintains strong research relationships outside Synopsys with both industry and academia.

During fiscal 2005, 2004 and 2003, research and development expenses, excluding capitalized software development costs, were $317.0 million, $285.3 million and $285.9 million, respectively. Synopsys' capitalized software development costs were approximately $3.0 million, $2.7 million, and $2.6 million in fiscal 2005, 2004 and 2003, respectively.

**Competition**

The EDA industry is highly competitive. We compete against other EDA vendors and against our customers' own design tools and internal design capabilities. In general, we compete principally on technology leadership, product quality and features (including ease−of−use), time−to−results, post−sale support, interoperability with our own and other vendors' products, price and payment terms.

Our competitors include companies that offer a broad range of products and services, such as Cadence Design Systems, Inc. and Mentor Graphics Corporation, and companies that offer products focused on one or more discrete phases of the IC design process, such as Magma Design Automation, Inc. In recent years, we have increasingly competed on the basis of payment terms and price. In certain situations, in order to win business we must offer substantial discounts on our products due to competitive factors. In other situations, we may lose potential business to a competitor offering a lower price.

**Product Sales and Licensing Agreements**

We typically license our software to customers under non−exclusive license agreements that transfer title to the media only and restrict use of our software to specified purposes within specified geographical areas. The majority of our licenses are network licenses that allow a number of individual users to access the software on a defined network, including, in some cases, regional or global networks. License fees depend on the type of license, product mix and number of copies of each product licensed.

In certain cases, we provide our customers the right to "re−mix" a portion of the software they initially license for other specified Synopsys products. For example, a customer may use our front−end design products for a portion of the license term and then exchange such products for back−end placement software for the remainder of the term in order to complete the customer's IC design. This practice helps assure the customer's access to the complete design flow needed to design its product. The customer's re−mix of product, when so provided under the customer agreement, does not alter the timing of recognition of the license fees paid by the customer, which is governed by our revenue recognition policies. The ability to offer this right to customers often gives us an advantage over competitors who offer a narrower range of products, because customers can obtain more of their design flow from a single vendor and because customers then have an opportunity to try additional Synopsys tools before licensing them separately. At the same time, because in such cases the customer need not obtain a new license and pay an additional license fee for the use of the additional products, the use of these arrangements could result in reduced revenue compared to licensing the individual products separately without re−mix rights.

9

We currently offer our software products under various license types, including renewable TSLs, term licenses and perpetual licenses. For a full discussion of these licenses, see Part II, Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies* and *Results of Operations—Revenue Background.*

With respect to our DesignWare Core intellectual property products, we typically license those products to our customers under nonexclusive license agreements that provide usage rights for specific applications. Fees under these licenses are typically charged on a per design basis plus, in some cases, royalties.

Finally, our professional services teams typically operate under consulting agreements with our customers with statements of work specific to each project.

**Proprietary Rights**

Synopsys primarily relies upon a combination of copyright, patent, trademark and trade secret laws and license and nondisclosure agreements to establish and protect its proprietary rights. Our source code is protected both as a trade secret and as an unpublished copyrighted work. However, third parties may develop similar technology independently. In addition, effective copyright and trade secret protection may be unavailable or limited in certain foreign countries. We currently hold United States and foreign patents on some of the technologies included in our products and will continue to pursue additional patents in the future.

Under our customer agreements and other license agreements, in many cases we offer to indemnify our customer if the licensed products infringe on a third party's intellectual property rights. As a result, we are from time to time subject to claims that our products infringe on these third party rights. For example, we are currently defending some of our customers against claims that their use of one of our products infringes on a patent held by a Japanese electronics company. We believe this claim is without merit and will continue to vigorously pursue this defense.

**Employees**

As of October 31, 2005, Synopsys had 4,756 employees, with 2,873 based in North America and 1,883 based outside of North America.

**Acquisitions in Fiscal 2005**

During fiscal 2005, we acquired (i) ISE, expanding our TCAD software offerings, (ii) Nassda Corporation (Nassda), which broadens our offering of transistor–level circuit simulation tools, particularly in the area of mixed–signal and memory designs, and (iii) certain assets of LEDA Design, a developer of mixed–signal intellectual property (IP), which will help us meet increasing customer demand for IP solutions. See Note 3 of our *Notes to Consolidated Financial Statements* in Part II, Item 8. *Financial Statements and Supplementary Data* for additional information regarding these acquisitions.

**Item 2.** *Properties*

**United States Facilities**

Synopsys' principal offices are located in four adjacent buildings in Mountain View, California, which together provide approximately 400,000 square feet of available space. This space is leased through February 2015. Synopsys occupies approximately 200,000 square feet of space in two adjacent buildings in Sunnyvale, California under lease through April 2007, and approximately 72,000 square feet of space in a third building in Sunnyvale under lease through April 2007. We use these buildings for administrative, marketing, research and development, sales and support activities.

10

We own two buildings totaling approximately 230,000 square feet on approximately 43 acres of land in Hillsboro, Oregon, one of which is currently vacant. The other is used for administrative, marketing, research and development and support activities. In addition, we lease approximately 80,000 square feet of space in Marlboro, Massachusetts for sales and support, research and development and customer education activities. This facility is leased through January 2009.

Synopsys owns a third building in Sunnyvale, California with approximately 120,000 square feet, which is leased to a third party through April 2009. Synopsys also owns 34 acres of undeveloped land in San Jose, California and 13 acres of undeveloped land in Marlboro, Massachusetts.

Synopsys currently leases 32 other offices throughout the United States, primarily for sales and support activities.

**International Facilities**

Synopsys leases approximately 45,000 square feet in Dublin, Ireland for its foreign headquarters and for research and development purposes. This space is leased through April 2026. In addition, Synopsys leases foreign sales and service offices in Canada, Denmark, Finland, France, Germany, Hong Kong, India, Israel, Italy, Japan, the Netherlands, the People's Republic of China, Singapore, South Korea, Sweden, Taiwan and the United Kingdom. We also lease research and development facilities in Armenia, Canada, France, Germany, India, the Netherlands, the People's Republic of China, South Korea, Taiwan and the United Kingdom.

As a result of acquisitions, we have assumed leases in a number of foreign and domestic locations. Following each acquisition, where feasible, we consolidate the acquired company's employees and operations into our existing local sites. In such cases, we generally seek to sublease the assumed space or negotiate with the landlord to terminate the underlying lease.

We believe our properties are adequately maintained and suitable for their intended use and that our facilities have adequate capacity for our current needs.

**Item 3.**

*Legal Proceedings*

On August 25, 2004, a class action complaint entitled *Kanekal v. Synopsys, Inc., et al.*, No. C–04–3580, was filed in federal district court for the Northern District of California against Synopsys and certain of our officers alleging violations of the Exchange Act. The complaint purported to be a class action lawsuit brought on behalf of persons who acquired Synopsys stock during the period of December 3, 2003 through August 18, 2004. The complaint alleged that the individual defendants caused Synopsys to make false and misleading statements about Synopsys' business, forecasts, and financial performance, and that certain Synopsys officers or employees sold portions of their stock holdings while in the possession of adverse, non–public information. The complaint did not specify the amount of damages sought. In November 2004, the Court appointed a lead plaintiff in the case. In January 2005, the lead plaintiff, the Wu Group, filed an amended complaint. Synopsys filed a motion to dismiss the amended complaint and a motion for sanctions in March 2005. In August 2005, the Court granted our motion to dismiss, but denied the motion for sanctions, and allowed the plaintiff 30 days to amend their complaint. The parties stipulated to a dismissal with prejudice with each side bearing its own fees and costs, and in September 2005, the case was dismissed.

In connection with our December 1, 2004 announcement that we had signed agreements to acquire Nassda Corporation (Nassda) and to settle all outstanding litigation between the two companies, a class action complaint entitled *Robert Israel v. Nassda Corporation, et. al*., No. 4705695, was filed in the Court of Chancery of the State of Delaware naming Nassda, its directors and Synopsys as defendants. The complaint purported to be a class action lawsuit brought on behalf of shareholders of Nassda, other than

11

the defendant directors and their affiliates, who allegedly would be injured or threatened with injury if the proposed acquisition of Nassda by Synopsys proceeded forward on the terms announced. A class action complaint alleging substantially the same facts was also filed in California Superior Court. The purported class actions sought to enjoin the transaction or, alternatively, unspecified damages. In May 2005, Synopsys completed its acquisition of Nassda. In October, 2005, the Chancery Court approved a settlement of the Delaware action by which Synopsys would pay an aggregate of $0.15 per share to each former shareholder of Nassda (other than the defendant directors and their affiliates), for a total of approximately $1.8 million, and would pay certain fees and expenses of plaintiff's counsel. In December 2005, the plaintiffs in the Delaware action dismissed their complaint with prejudice and Synopsys paid the agreed–upon amounts. The California action was also dismissed with prejudice in December 2005, with each party bearing its own costs.

    On May 31, 2005, we received a Notice of Proposed Adjustment from the Internal Revenue Service (IRS) asserting a very large net increase to our U.S. taxable income arising from the audit of fiscal 2000 and 2001. On June 8, 2005, we received a Revenue Agent's Report (RAR) in which the IRS proposed to assess a net tax deficiency for fiscal years 2000 and 2001 of approximately $476.8 million, plus interest. Interest accrues on the amount of any deficiency finally determined until paid, and compounds daily at the federal underpayment rate, which adjusts quarterly. A higher underpayment rate of interest may be charged as a result of the issuance of the RAR. On July 13, 2005, we filed a protest to the proposed deficiency with the IRS, which will cause the matter to be referred to the Appeals Office of the IRS. We strongly believe the proposed IRS adjustments and resulting proposed deficiency are inconsistent with applicable tax laws, and that we thus have meritorious defenses to these proposals. See Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations Overview—Income Tax Rate—IRS Revenue Agent's Report* for a further discussion of this matter.

**Item 4.**    *Submission of Matters to a Vote of Security Holders*

    No matters were submitted for a vote of security holders during the fourth quarter of fiscal 2005.

**Executive Officers of the Registrant**

    The executive officers of Synopsys and their ages as of December 31, 2005, were:

| Name | Age | Position |
|---|---|---|
| Aart J. de Geus | 51 | Chief Executive Officer and Chairman of the Board of Directors |
| Chi–Foon Chan | 56 | President and Chief Operating Officer |
| Vicki L. Andrews | 50 | Senior Vice President, Worldwide Sales |
| Raul Camposano | 50 | Senior Vice President, Chief Technology Officer and General Manager, Silicon Engineering Group |
| John Chilton | 48 | Senior Vice President and General Manager, Solutions Group |
| Janet S. Collinson | 45 | Senior Vice President, Human Resources and Facilities |
| Antun Domic | 54 | Senior Vice President and General Manager, Implementation Group |
| Manoj Gandhi | 45 | Senior Vice President and General Manager, Verification Group |
| Jay N. Greenberg | 58 | Senior Vice President, Marketing |
| Deirdre Hanford | 43 | Senior Vice President, Worldwide Application Services |
| Rex S. Jackson | 45 | Senior Vice President, Acting Chief Financial Officer, General Counsel and Corporate Secretary |

*Dr. Aart J. de Geus* co–founded Synopsys and currently serves as Chairman of the Board of Directors and Chief Executive Officer. Since the inception of Synopsys in December 1986, he has held a variety of positions, including Senior Vice President of Engineering and Senior Vice President of Marketing. From 1986 to 1992, Dr. de Geus served as Chairman of the Board. He served as President from 1992 to 1998. Dr. de Geus has served as Chief Executive Officer since January 1994 and has held the additional title of Chairman of the Board since February 1998. He has served as a Director since 1986. From 1982 to 1986 Dr. de Geus was employed by General Electric Corporation, where he was the Manager of the Advanced Computer–Aided Engineering Group. Dr. de Geus holds an M.S.E.E. from the Swiss Federal Institute of Technology in Lausanne, Switzerland and a Ph.D. in electrical engineering from Southern Methodist University.

*Dr. Chi–Foon Chan* has served as Chief Operating Officer since April 1997 and as President and a Director of Synopsys since February 1998. From September 1996 to February 1998 he served as Executive Vice President, Office of the President. From February 1994 until April 1997 he served as Senior Vice President, Design Tools Group, and from October 1996 until April 1997 as Acting Senior Vice President, Design Re–Use Group. In addition, he has held the titles of Vice President of Application Engineering and Services, Vice President, Engineering and General Manager, DesignWare Operations and Senior Vice President, Worldwide Field Organization. Dr. Chan joined Synopsys in May 1990. From March 1987 to May 1990, Dr. Chan was employed by NEC Electronics, where his last position was General Manager, Microprocessor Division. From 1977 to 1987, Dr. Chan held a number of senior engineering positions at Intel Corporation. Dr. Chan holds an M.S. and a Ph.D. in computer engineering from Case Western Reserve University.

*Vicki L. Andrews* joined Synopsys in May 1993 and currently serves as Senior Vice President, Worldwide Sales. Before holding that position, she served in a number of senior sales roles at Synopsys, including Vice President, Global and Strategic Sales, Vice President, North America Sales and Director, Western United States Sales. She has more than 18 years of experience in the EDA industry. Ms. Andrews holds a B.S. in biology and chemistry from the University of Miami.

*Dr. Raul Camposano* has served as Senior Vice President, Chief Technology Officer and General Manager, Silicon Engineering Group since July 2004. Prior to that time, he was Senior Vice President and Chief Technology Officer from September 2000 to July 2004, and Senior Vice President, General Manager of the Design Tools Group from 1997 through September 2000. Prior to joining Synopsys in 1994, he directed the Design Technology Institute at the German National Research Center for Computer Science (GMD) and was a professor in the Department of Computer Science at the University of Paderborn, Germany. Between 1986 and 1991, Dr. Camposano worked at the IBM T.J. Watson Research Center. He was also a member of the research staff at the Computer Science Research Laboratory at the University of Karlsruhe. Dr. Camposano received a B.S.E.E. degree in 1977 and a diploma in electrical engineering in 1978 from the University of Chile and a Ph.D. in computer science from the University of Karlsruhe in 1981.

*John Chilton* has served as Senior Vice President and General Manager of the Solutions Group of Synopsys since August 2003. Prior to that time, he was Senior Vice President and General Manager of the IP and Design Services Business Unit from 2001 to August 2003. From 1997 to 2001, Mr. Chilton served as Vice President and General Manager of the Design Reuse Business Unit. Mr. Chilton received an M.S.E.E. from the University of Southern California and a B.S.E.E. from University of California at Los Angeles.

*Janet S. Collinson* has served as Senior Vice President, Human Resources and Facilities since August 2003. From September 1999 to August 2003 she was Vice President, Real Estate and Facilities. Prior to that time she served as Director of Facilities from January 1997 to September 1999. Ms. Collinson received a B.S. in Human Resources from California State University, Fresno.

13

*Dr. Antun Domic* has served as Senior Vice President and General Manager of the Implementation Group since August 2003. Prior to that, Dr. Domic was Vice President and General Manager of the Nanometer Analysis and Test Group from 1999 to August 2003. Dr. Domic joined Synopsys in April 1997, having previously worked at Cadence Design Systems and Digital Equipment Corporation. Dr. Domic has a B.S. in Mathematics and Electrical Engineering from the University of Chile in Santiago, Chile, and a Ph.D. in Mathematics from the Massachusetts Institute of Technology.

*Manoj Gandhi* has served as Senior Vice President and General Manager, Verification Group since August 2000. Prior to that he was Vice President and General Manager of the Verification Tools Group from July 1999 to August 2000. Prior to that time, he was Vice President of Engineering from December 1997 until July 1999. He holds a B.S. in Computer Science and Engineering from the Indian Institute of Technology, Kharagpur and an M.S. in Computer Science from the University of Massachusetts, Amherst.

*Jay N. Greenberg* joined Synopsys in November 2004 as Senior Vice President, Marketing. From March 2003 until joining Synopsys, Mr. Greenberg was President of Green Mountain Solutions, a consulting firm that he also founded. From March 1999 to March 2003 Mr. Greenberg was employed by Taiwan Semiconductor Manufacturing Company, Ltd. (TSMC), where he held the positions of Vice President of Business Development and Vice President of Strategic Marketing. Mr. Greenberg served as Vice President and Senior Partner at Thomas Group, Inc., a consulting firm, from 1987 through 1998. Mr. Greenberg has also held executive, management and technical positions at Memorex, Amdahl and EDS. Mr. Greenberg holds a B.A. from the University of the Pacific in Stockton, California.

*Deirdre Hanford* has served as Senior Vice President of Worldwide Applications Services since December 2002. Prior to that time, she was Senior Vice President, Business and Market Development of Synopsys from September 1999 to December 2002. From October 1998 until September 1999, she served as Vice President, Sales for Professional Services and prior to that as Vice President, Corporate Applications Engineering from April 1996 to September 1999. Ms. Hanford received a B.S.E.E. from Brown University and an M.S.E.E. from University of California at Berkeley. Ms. Hanford sits on the American Electronics Association's national board of directors.

*Rex S. Jackson* joined Synopsys in February 2003 as Vice President, General Counsel and Corporate Secretary. In May 2005, Mr. Jackson was appointed as Acting Chief Financial Officer and in June 2005 he was appointed Senior Vice President. Prior to joining Synopsys, Mr. Jackson was an investment director with Redleaf Group, Inc., an early stage venture capital firm, from April 2000 through December 2001, and President and CEO of Atlantes Services, Inc., a Redleaf portfolio company, from December 2001 through January 2003. Prior to joining Redleaf, from August 1998 to April 2000, Mr. Jackson was Vice President and General Counsel of AdForce, Inc., a provider of ad management and delivery services on the Internet. Prior to joining AdForce, Mr. Jackson served as Vice President, Business Development and General Counsel of Read–Rite Corporation, a manufacturer of thin film recording heads for the disk and tape drive industries from 1996 to 1998, and as Vice President and General Counsel from 1992 to 1996. Mr. Jackson holds an A.B. degree from Duke University and a J.D. degree from Stanford University.

Mr. Jackson is a member of the Board of Directors of Dijji Corporation, a mobile media company.

There are no family relationships among any Synopsys executive officers or directors.

14

**PART II**

Item 5.    *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

**Common Stock Market Price**

Our common stock trades on the Nasdaq National Market under the symbol "SNPS." The following table sets forth for the periods indicated the high and low closing sale prices of our common stock, as reported by the Nasdaq National Market.

| | Quarter Ended | | | |
| | January 31, | April 30, | July 31, | October 31, |
|---|---|---|---|---|
| **2005:** | | | | |
| High | $ 19.55 | $ 18.80 | $ 18.80 | $ 19.18 |
| Low | $ 16.49 | $ 16.44 | $ 16.61 | $ 16.98 |
| **2004:** | | | | |
| High | $ 37.36 | $ 36.35 | $ 30.50 | $ 21.28 |
| Low | $ 28.90 | $ 26.73 | $ 23.91 | $ 14.65 |

As of October 31, 2005, there were approximately 545 shareholders of record. To date, Synopsys has paid no cash dividends on its capital stock and has no current intention to do so. Synopsys' credit facility contains financial covenants requiring us to maintain certain specified levels of cash and cash equivalents. Such provisions could have the effect of preventing us from paying dividends in the future.

**Stock Repurchase Program**

Synopsys maintains a $500 million stock repurchase program originally approved by Synopsys' Board of Directors in July 2001 and renewed in December 2002, December 2003 and December 2004. Funds are available until expended or until the program is suspended by the Chief Financial Officer or the Board of Directors. Synopsys did not repurchase any shares of common stock under the program during the fiscal quarter ended October 31, 2005 and, as of such date, an aggregate of approximately $436.6 million remained authorized for future purchases.

The remaining information required by Item 5 is set forth in *Selected Unaudited Quarterly Data* contained in Part II, Item 8. *Financial Statements and Supplementary Data*, incorporated by reference here.

15

**Item 6.**    *Selected Financial Data*

| | Fiscal Year Ended October 31(1) | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| | (in thousands, except per share data) | | | | |
| Revenue(2) | $ 991,931 | $ 1,092,104 | $ 1,176,983 | $ 906,534 | $ 680,350 |
| (Loss) income before income taxes and extraordinary items(3) | (7,789) | 91,592 | 218,989 | (288,940) | 83,533 |
| Provision (benefit) for income taxes | 7,689 | 17,255 | 69,265 | (88,947) | 26,731 |
| Net (loss) income | (15,478) | 74,337 | 149,724 | (199,993) | 56,802 |
| Net (loss) income per share(4): | | | | | |
| Basic | (0.11) | 0.48 | 0.99 | (1.50) | 0.47 |
| Diluted | (0.11) | 0.46 | 0.95 | (1.50) | 0.44 |
| Working capital | 130,799 | 171,878 | 434,247 | 151,946 | 254,962 |
| Total assets | 2,141,476 | 2,092,187 | 2,307,353 | 1,978,714 | 1,128,907 |
| Long–term debt | 7,265 | 7,443 | 7,219 | 6,547 | 73 |
| Stockholders' equity | 1,218,936 | 1,265,049 | 1,433,410 | 1,113,481 | 485,656 |

(1)    Synopsys has a fiscal year that ends on the Saturday nearest October 31. Fiscal 2005, 2004, 2003 and 2002 were 52–week years, while fiscal 2001 was a 53–week year. For presentation purposes, the consolidated financial statements refer to the calendar month end.

(2)    Includes results of operations from acquired businesses. See Note 3 of our Notes to consolidated Financial Statements in Part II, Item 8. *Financial Statements and Supplementary Data,* incorporated by reference here.

(3)    Includes charges of $5.7 million, $1.6 million, $19.8 million, and $87.7 million for fiscal 2005, 2004, 2003 and 2002, respectively, for in–process research and development. Fiscal 2002 includes merger–related and other costs of $33.5 million and insurance premium costs of $335.8 million related to our acquisition of Avant! Corporation in fiscal 2002.

(4)    Per share data for all periods presented have been adjusted to reflect Synopsys' two–for–one stock split completed on September 23, 2003.

16

**Item 7.**      *Management's Discussion and Analysis of Financial Condition and Results of Operations*

**Overview**

The following summary of our financial condition and results of operations is qualified in its entirety by the more complete discussion contained in this Item 7 and by the risk factors set forth below under the caption entitled "Factors that May Affect Future Results." Please also see the cautionary language at the beginning of Part 1 of this Annual Report on Form 10–K regarding forward–looking statements.

*Synopsys' Business*

Synopsys, Inc. (Synopsys) is a world leader in electronic design automation (EDA) software and related services for semiconductor design. We deliver technology–leading semiconductor design and verification software platforms and integrated circuit (IC) manufacturing software products to the global electronics market, enabling the development and production of complex systems–on–chips (SoCs). In addition, we provide intellectual property (IP) and design services to simplify the design process, and accelerate time–to–market for our customers. We also provide software and services that help customers prepare their designs for manufacturing.

*Business Environment*

We generate substantially all of our revenue from the semiconductor and electronics industries. Our customers typically fund purchases of our software and services largely out of their research and development (R&D) budgets. As a result, our customers' business outlook and willingness to invest in new, and increasingly complex, chip designs heavily influence our business.

Beginning in late calendar 2000, the semiconductor industry experienced its steepest and longest downturn of the past 20 years. Semiconductor industry sales dropped approximately 46% from late 2000 to early 2002 and then recovered slowly into 2003. Throughout this period, our customers took many steps to reduce their expenses, including constraining R&D and EDA expenditures, reducing the number of design engineers they employed, cutting back on their design starts, purchasing from fewer suppliers and requiring more favorable pricing, payment and license terms from those suppliers, as well as pursuing consolidation within their own industry. Further, during this downturn, many semiconductor design companies failed or were acquired and the pace of investment in new companies declined.

Historically, growth in semiconductor sales has been followed by growth in semiconductor R&D spending, which in turn has led to subsequent growth in EDA expenditures. However, although the Semiconductor Industry Association (SIA) reported semiconductor industry growth of approximately 18% in 2003 and 29% in 2004, and we believe R&D spending among large semiconductor companies increased approximately 10% from 2003 to 2004, EDA spending in 2003 and 2004 did not, in fact, track this upturn.

We believe this occurred for a number of reasons. First, in light of the severity of the 2000–2002 downturn, we believe customers' intense focus on expense reduction continued even after the downturn ended, and that, as a result, they now generally approach spending more conservatively. Second, the consumer electronics market, in which product price is a primary competitive factor, has been a key driver of the semiconductor industry's recovery. This price pressure has placed pressure on product development costs and R&D spending. Third, increased globalization has placed significant pressure on end user product prices and, as a result, product development costs. Finally, we believe our customers became more cautious about their own business outlook in mid–calendar 2004 due to a number of factors, including lack of visibility into their own future results, unexpected inventory buildup in the semiconductor supply chain and concerns about the industry's growth prospects in 2005. These factors have caused our customers to continue to seek to control costs, including by limiting their EDA spending.

17

Following the third quarter of fiscal 2004, we re–evaluated the factors discussed above and the reduced customer demand for upfront licenses, which have shorter payment terms than time–based licenses and which had accounted for approximately 26% of our license orders from August 2000 through the third quarter of fiscal 2004. This reduced demand for upfront licenses materially and adversely affected both our bookings revenue and operating cash flow for the third quarter and full–year fiscal 2004. Recognizing our customers' increased preference for conserving cash by paying for their licenses over time rather than upfront, effective in the fourth quarter of fiscal 2004 we shifted our target license mix to consist almost entirely of time–based licenses, in which customers typically pay the license fee ratably over the term of the license. As a result, upfront licenses represented approximately 5% of our license orders in the five quarters since this shift.

We believe this model shift meets our customers' needs, improves the predictability of our business and helps us preserve the value of our technology by reducing the need to book a given license or licenses at the end of a quarter to generate current quarter revenue. However, this shift negatively impacted our revenue, earnings and cash flow from operations over the last five quarters and, as a result, revenue and earnings for the full–year fiscal 2005 were below the levels in full–year fiscal 2004.

Over the long term, EDA spending growth will continue to depend on growth in semiconductor R&D spending and on continued growth in the overall semiconductor market. The SIA has forecasted modest growth in semiconductor revenues in 2006 and we believe semiconductor R&D spending will grow similarly during 2006. However, we cannot currently predict whether this outlook will contribute to higher R&D spending and/or to higher EDA spending. If EDA spending increases, we believe we are well–positioned to capitalize on such increases. Further, recognizing that our customers will continue to spend cautiously and aggressively contain costs, we are intensely focused on improving our customers' overall economics of design by providing more fully–integrated design solutions and offering customers the opportunity to consolidate their EDA spending with us.

We are under no obligation (and expressly disclaim any such obligation) to update or alter any of the information contained in this Overview, whether as a result of new information, future events or otherwise, except to the extent required by law.

*Fiscal 2005 Product Developments*

During fiscal 2005, we announced or introduced a number of new products and product developments, including:

- General availability of our IC Compiler physical design solution, which unifies previously separate IC design operations by providing concurrent physical synthesis, clock–tree synthesis, routing, yield optimization and sign–off correlation and delivering significant improvements in design performance and productivity.
- Announcement of our PrimeRail comprehensive solution for timing, signal integrity and power network sign–off.
- Addition of VCS Assertion IP library and native test bench support, helping engineers find more design bugs faster and achieve up to five times faster verification performance.
- Availability of new TCAD tools from our acquisition of ISE Integrated Systems Engineering AG in November 2004 and our Sentaurus tool suite which embeds a comprehensive set of core TCAD products for multi–dimensional process, device and system simulation into a powerful user interface.
- Availability of enhanced analog and mixed–signal offerings through our acquisition of Nassda Corporation in May 2005.

18

*Fiscal 2005 Financial Performance Summary*

- Revenue was $991.9 million, down 9% from $1,092.1 million in fiscal 2004, primarily reflecting our fourth quarter fiscal 2004 license model shift, which significantly reduced upfront license and related maintenance revenue in fiscal 2005.
- Time–based license revenue increased 12% from $663.2 million in fiscal 2004 to $743.7 million in fiscal 2005, primarily reflecting the continued phase–in of our license model shift as time–based orders booked in prior periods contribute revenue to current and future periods.
- Upfront license revenue declined 72% from $216.0 million in fiscal 2004 to $60.5 million in fiscal 2005, reflecting our model–driven de–emphasis on upfront license bookings.
- We derived approximately 8% of our software license revenue from upfront licenses and 92% from time–based licenses in fiscal 2005, versus approximately 25% and 75%, respectively, in fiscal 2004, reflecting our license model shift.
- Maintenance revenue declined by 20% from $170.1 million in fiscal 2004 to $136.3 million in fiscal 2005, primarily as a result of the shift to a more ratable license model (which reduces new maintenance orders since maintenance is included with the license fee in time–based licenses and not reported separately), and, to a lesser extent, by non–renewal of maintenance by certain existing perpetual license customers.
- Professional service and other revenue, at $51.4 million, increased 20% from $42.8 million in fiscal 2004 due to the timing of customer acceptance of services performed under ongoing contracts and continued full utilization of our services capacity.
- Net loss was $(15.5) million compared to net income of $74.3 million in fiscal 2004, primarily due to decreased upfront license revenue resulting from our license model transition, increased research and development expenses caused by our fiscal 2005 acquisitions of ISE Integrated Systems Engineering AG (ISE) and Nassda Corporation, and increased sales commissions driven by higher shipments and other business performance–related compensation, partially offset by a $33 million litigation settlement gain in connection with the Nassda acquisition.
- Net cash provided by operations in fiscal 2005 increased slightly to $269.2 million from $264.0 million in fiscal 2004, primarily as a result of collections on increased bookings, the absence of fiscal 2004 payments relating to the termination of the Monolithic Systems, Inc. acquisition, and reduced taxes paid as a result of the net loss for the year, partially offset by increased payments relating to our information technology infrastructure.
- We repurchased approximately 5.1 million shares of our common stock at an average price of $17.20 per share for approximately $88.4 million.

*Fiscal 2005 Acquisitions*

During fiscal 2005, we acquired (i) ISE, expanding our TCAD software offerings, (ii) Nassda Corporation (Nassda), which broadens our offering of transistor–level circuit simulation tools, particularly in the area of mixed–signal and memory designs, and (iii) certain assets of LEDA Design, a developer of mixed–signal intellectual property (IP), which will help Synopsys meet increasing customer demand for IP solutions.

**Critical Accounting Policies**

We base the discussion and analysis of our financial condition and results of operations upon our audited consolidated financial statements, which we prepare in accordance with accounting principles

19

generally accepted in the United States of America. In preparing these financial statements, we must make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosure of contingent assets and liabilities. On an on–going basis, we evaluate our estimates based on historical experience and various other assumptions we believe are reasonable under the circumstances. Our actual results may differ from these estimates.

The accounting policies that most frequently require us to make estimates and judgments, and therefore are critical to understanding our results of operations, are:

- Revenue recognition;
- Valuation of intangible assets and goodwill; and
- Income taxes.

*Revenue Recognition.*   Synopsys recognizes revenue from software licenses and maintenance and service revenue. Software license revenue consists of fees associated with the licensing of Synopsys software. Maintenance and service revenue consists of maintenance fees associated with perpetual and term licenses and professional service fees.

Synopsys has designed and implemented revenue recognition policies in accordance with Statement of Position (SOP) 97–2, *Software Revenue Recognition*, as amended by SOP 98–9, *Modification of SOP 97–2, Software Revenue Recognition, With Respect to Certain Transactions.*

With respect to software licenses, Synopsys utilizes three license types:

- *Technology Subscription Licenses (TSLs)* are for a finite term, and generally provide the customer limited rights to receive, or to exchange certain quantities of licensed software for, unspecified future technology. We bundle and do not charge separately for post–contract customer support (maintenance or PCS) for the term of the license.
- *Term licenses* are also for a finite term, but do not provide the customer any rights to receive, or to exchange licensed software for unspecified future technology. Customers purchase maintenance separately for the first year and may renew annually for the balance of the term. The annual maintenance fee is typically calculated as a percentage of the net license fee.
- *Perpetual licenses* continue as long as the customer renews maintenance, plus an additional 20 years. Perpetual licenses do not provide the customer any rights to receive, or to exchange licensed software for, unspecified future technology. Customers purchase maintenance separately for the first year and may renew annually.

For the three software license types, we recognize revenue as follows:

- *Technology Subscription Licenses.*   Synopsys typically recognizes revenue from TSL license fees (which include bundled maintenance) ratably over the term of the license period, or, if later, as customer installments become due and payable. All TSLs are reported as "time–based licenses."
- *Term Licenses.*   Synopsys recognizes the term license fee in full if, upon shipment of the software, payment terms require the customer to pay at least 75% of the term license fee within one year from shipment and all other revenue recognition criteria are met. Such term licenses are reported as "upfront licenses." For term licenses where less than 75% of the term license fee is due within one year from shipment, Synopsys recognizes revenue as customer installments become due and payable. Due and payable term licenses are reported as "time–based licenses."
- *Perpetual Licenses.*   Synopsys recognizes the perpetual license fee in full if, upon shipment of the software, payment terms require the customer to pay at least 75% of the perpetual license fee within one year from shipment and all other revenue recognition criteria are met. Such perpetual

20

licenses are reported as upfront licenses. For perpetual licenses in which less than 75% of the license fee is payable within one year from shipment, we recognize the revenue as customer installments become due and payable. Such perpetual licenses are reported as time–based licenses.

Synopsys allocates revenue on software transactions (referred to as "arrangements") involving multiple elements to each element based on the relative fair values of the elements. Our determination of fair value of each element in multiple element arrangements is based on vendor–specific objective evidence (VSOE). We limit our assessment of VSOE for each element to the price charged when the same element is sold separately.

We have analyzed all of the elements included in our multiple–element arrangements and have determined that we have sufficient VSOE to allocate revenue to the maintenance components of our perpetual and term license products and to consulting. Accordingly, assuming all other revenue recognition criteria are met, we recognize revenue from perpetual and term licenses upon delivery using the residual method in accordance with SOP 98–9, we recognize revenue from maintenance ratably over the maintenance term, and we recognize revenue from consulting services as the related services are performed and accepted.

Synopsys makes significant judgments related to revenue recognition. Specifically, in connection with each transaction involving our products, we must evaluate whether: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred, (iii) its fee is fixed or determinable, and (iv) collectibility is probable. We apply these criteria as discussed below.

- *Persuasive Evidence of an Arrangement Exists.* Prior to recognizing revenue on an arrangement, our customary practice is to have a written contract, signed by both the customer and Synopsys or a purchase order from those customers that have previously negotiated a standard end–user license arrangement or volume purchase agreement.

- *Delivery Has Occurred.* We deliver software to our customers physically or electronically. For physical deliveries, the standard transfer terms are typically FOB shipping point. For electronic deliveries, delivery occurs when we provide the customer access codes, or "keys," that allow the customer to take immediate possession of the software on its hardware.

- *The Fee is Fixed or Determinable.* Our determination that an arrangement fee is fixed or determinable depends principally on the arrangement's payment terms. Our standard payment terms require 75% or more of the arrangement fee to be paid within one year. Where these terms apply, we regard the fee as fixed or determinable, and recognize revenue upon delivery (assuming all other revenue recognition criteria are met). If the payment terms do not meet this standard, which we refer to as "extended payment terms," we do not consider the fee to be fixed or determinable and generally recognize revenue when customer installments are due and payable. In the case of a TSL, we recognize revenue ratably even if the fee is fixed or determinable, due to the fact that maintenance services are included with the software license and due to guidelines relating to arrangements that include rights to receive unspecified future technology.

- *Collectibility is Probable.* To recognize revenue, we must judge collectibility of the arrangement fees, which we do on a customer–by–customer basis pursuant to our credit review policy. We typically sell to customers with whom we have a history of successful collection. For a new customer or where an existing customer substantially expands its commitments to us, we evaluate the customer's financial position and ability to pay and typically assign a credit limit based on that review. We increase the credit limit only after we have established a successful collection history with the customer. If we determine at any time that collectibility is not probable based upon its credit review process or the customer's payment history, we recognize revenue on a cash–collected basis.

21

We recognize maintenance and service revenue as follows:

- *Maintenance Fees Associated with Perpetual and Term Licenses.* Synopsys recognizes revenue from maintenance associated with perpetual and term licenses ratably over the maintenance term.
- *Professional Service Fees.* Synopsys recognizes revenue from consulting and training services as services are performed and accepted.

*Valuation of Intangible Assets and Goodwill.* We evaluate our intangible assets for indications of impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Intangible assets consist of purchased technology, contract rights intangibles, customer–installed base/relationships, trademarks and trade names, covenants not to compete, customer backlog, and other intangibles. Factors that could trigger an impairment review include significant under–performance relative to expected historical or projected future operating results, significant changes in the manner of our use of the acquired assets or the strategy for our overall business or significant negative industry or economic trends. If this evaluation indicates that the value of the intangible asset may be impaired, we make an assessment of the recoverability of the net carrying value of the asset over its remaining useful life. If this assessment indicates that the intangible asset is not recoverable, based on the estimated undiscounted future cash flows of the technology over the remaining amortization period, we reduce the net carrying value of the related intangible asset to fair value and may adjust the remaining amortization period. Any such impairment charge could be significant and could have a material adverse effect on our reported financial statements. We did not record any impairment charges on our intangible assets during fiscal 2005. As of October 31, 2005, the carrying amount of our intangible assets, net was $142.5 million.

We operate in one operating segment. We evaluate aggregate goodwill on a quarterly basis for indications of impairment based on our fair value as determined by our market capitalization in accordance with Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets* (SFAS 142). In addition, we evaluate goodwill for indications of impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors that could trigger an impairment review include significant under–performance relative to expected historical or projected future operating results, significant changes in the manner of our use of the acquired assets or the strategy for our overall business or significant negative industry or economic trends. If this evaluation indicates that the value of the goodwill may be impaired, we assess the impairment of the goodwill using the two–step method prescribed by SFAS 142. Any such impairment charge could be significant and could have a material adverse effect on our reported financial statements. We did not record any impairment charges on our goodwill during fiscal 2005. As of October 31, 2005, the carrying amount of our goodwill was $729.0 million.

*Income Taxes.* We make certain estimates and judgments in the calculation of tax liabilities and the determination of net deferred tax assets, which arise from temporary differences between tax and financial statement recognition methods. Significant changes to these estimates may result in an increase or decrease to our tax provision in a subsequent period.

Statement of Financial Accounting Standards No. 109, *Accounting for Income Taxes* (SFAS 109), also requires that the deferred tax assets be reduced by a valuation allowance, if based on the weight of available evidence, it is more likely than not that some portion or all of the recorded deferred tax assets will not be realized in future periods. In evaluating our ability to recover our deferred tax assets, in full or in part, we consider all available positive and negative evidence, including our past operating results, the existence of cumulative losses in the most recent fiscal years and our forecast of future taxable income on a jurisdiction by jurisdiction basis. In determining future taxable income, we are responsible for assumptions utilized including the amount of state, federal and international pre–tax operating income, the reversal of temporary differences and the implementation of feasible and prudent tax planning strategies. These

assumptions require significant judgment about the forecasts of future taxable income and are consistent with the plans and estimates we are using to manage the underlying businesses. We believe that the deferred tax assets recorded on our balance sheet will ultimately be realized. However, should there be a change in our ability to recover all or part of the deferred tax assets, an adjustment to the deferred tax asset valuation allowance would be recorded as a charge to earnings in the period such determination is made.

In addition, the calculation of tax liabilities involves the inherent uncertainty associated with the application of complex tax laws. We are also subject to examination by various taxing authorities. We believe we have adequately provided in our financial statements for additional taxes that we estimate may be required to be paid as a result of such examinations. If it is ultimately determined that payment of these amounts is unnecessary, the liability would be reversed and the tax benefit would be recognized in the period in which it is determined that the liability is no longer necessary. If an ultimate tax assessment exceeds our estimate of tax liabilities, an additional charge to expense will result. See *Income Tax Rate*, below, and *Note 8* of our *Notes to Consolidated Financial Statements* for a discussion of a Notice of Proposed Adjustment from the Internal Revenue Service (IRS) we received in May 2005 asserting a very large net increase to our U.S. taxable income arising from the audit of fiscal years 2000 and 2001.

**Results of Operations**

*Revenue Background*

We generate our revenue from the sale of software licenses, maintenance and professional services. Under current accounting rules and policies applicable to different kinds of license arrangements, we recognize revenue from orders we receive for software licenses and services at varying times. In general, we recognize revenue on a time–based software license order or TBL, over the license term, and on an upfront term or perpetual software license order at the time the license is shipped. Substantially all of our current time–based licenses are technology subscription licenses, or TSLs, with an average license term of approximately three years. Maintenance orders generally generate revenue ratably over the maintenance period (generally, one year). Professional service orders generally generate revenue upon completion and customer acceptance of contractually agreed milestones. A more complete description of our revenue recognition policy can be found above under *Critical Accounting Policies*.

Our revenue in any fiscal quarter is equal to the sum of our time–based license, upfront license, maintenance and professional service revenue for such period. We derive time–based license revenue in any quarter almost entirely from TSL orders received and delivered in prior quarters. We derive upfront license revenue directly from upfront license orders booked and shipped during the quarter. We derive maintenance revenue in any quarter largely from maintenance orders received in prior quarters since our maintenance orders generally yield revenue ratably over a term of one year. We also derive professional service revenue almost entirely from orders received in prior quarters, since we recognize revenue from professional services when those services are delivered and accepted, not when they are booked. We derive upfront license revenue directly from upfront license orders booked and shipped during the quarter.

Our license revenue is very sensitive to the mix of time–based and upfront licenses delivered during the quarter. A TSL order typically yields lower current quarter revenue but contributes to revenue in future periods. For example, a $120,000 order for a three–year TSL shipped on the last day of a quarter typically generates no revenue in that quarter, but $10,000 in each of the twelve succeeding quarters. Conversely, upfront licenses generate higher current quarter revenue but no future revenue (e.g., a $120,000 order for an upfront license generates $120,000 in revenue in the quarter the product is shipped, but no future revenue). TSLs also result in a shift of maintenance revenue to time–based license since maintenance is included in TSLs, while maintenance on upfront orders is charged and reported separately.

23

*License Order Mix*

The percentage of upfront licenses we book is driven by a number of factors, including the level of overall license orders, customer demand, preferred customer payment terms and customer–requested ship dates. Prior to August 2000, substantially all of our license revenue was upfront. Beginning in August 2000, when we introduced TSLs, we shifted our target license order mix to approximately 75% TSLs and 25% upfront licenses, based on our expectations of total orders and our assessment of the demand for upfront licenses. We substantially maintained this mix from this date through fiscal 2003. However, as a result of reduced customer demand for upfront licenses as described above in "Business Environment," we shifted to an almost completely time–based license model in the fourth quarter of fiscal 2004. Our actual license order mix for the last nine fiscal quarters is set forth below.

| | Q4–2005 | Q3–2005 | Q2–2005 | Q1–2005 | Q4–2004 | Q3–2004 | Q2–2004 | Q1–2004 | Q4–2003 |
|---|---|---|---|---|---|---|---|---|---|
| Time–based licenses | 96% | 92% | 94% | 97% | 93% | 80% | 58% | 43% | 67% |
| Upfront licenses | 4% | 8% | 6% | 3% | 7% | 20% | 42% | 57% | 33% |

In certain cases, our time–based and upfront term license agreements provide the customer the right to "re–mix" a portion of the software initially licensed for other Synopsys specified products. The customer's re–mix of product, when allowed under the license arrangement, does not alter the timing of recognition of the license fees paid by the customer. Because in such cases the customer does not need to obtain a new license and pay additional license fees to use the additional products, these arrangements could result in reduced revenue compared to licensing the individual products separately. However, we believe providing our customers re–mix rights can also assist in broader adoption of our products.

*Total Revenue*

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2004 to 2005 | | 2003 to 2004 | |
| | | | | (dollars in millions) | | | |
| | $991.9 | $ 1,092.1 | $ 1,177.0 | $ (100.2) | (9)% | $ (84.9) | (7)% |

The decrease in total revenue for fiscal 2005 compared to fiscal 2004 was due primarily to our license model shift begun in the fourth quarter of fiscal 2004, which significantly reduced both upfront license fees and maintenance revenue in fiscal 2005. The decrease in total revenue for fiscal 2004 compared to fiscal 2003 was due primarily to (i) a lower level of orders than expected in fiscal 2004, (ii) our shift in the fourth quarter to an almost completely ratable license model and (iii) lower maintenance revenue.

*Time–Based License Revenue*

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2004 to 2005 | | 2003 to 2004 | |
| | | | | (dollars in millions) | | | |
| | $ 743.7 | $ 663.2 | $ 618.0 | $ 80.5 | 12% | $ 45.2 | 7% |
| Percentage of total revenue | 75% | 61% | 53% | | | | |

The increase in time–based license revenue in fiscal 2005 compared to fiscal 2004 was primarily due to our fourth quarter fiscal 2004 license model shift under which previously booked orders continue to contribute to revenue in later periods. The increase in time–based revenue in fiscal 2004 compared to fiscal 2003 was primarily due to the continued phase–in of our initial August 2000 ratable license model shift and to the full–year revenue contribution in fiscal 2004 from a strong level of time–based license orders received during fiscal 2003.

24

*Upfront License Revenue*

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2004 to 2005 | | 2003 to 2004 | |
| | | | | (dollars in millions) | | | |
| | $ 60.5 | $ 216.0 | $ 298.3 | $ (155.5) | (72)% | $ (82.3) | (28)% |
| Percentage of total revenue | 6% | 20% | 25% | | | | |

The decrease in upfront license revenue, in both percentage and absolute dollar terms, for fiscal 2005 compared to fiscal 2004 was primarily due to the fact that we shipped a substantially higher–than–average percentage of orders as upfront licenses in the second and third quarters of fiscal 2004 and subsequently shifted to a higher ratable license mix in the fourth quarter of fiscal 2004. The decrease in upfront revenue for fiscal 2004 compared to fiscal 2003 was primarily due to the shift to a higher ratable license model in the fourth quarter of fiscal 2004 and to lower–than–expected upfront orders in dollar terms in the third quarter of fiscal 2004 when compared to fiscal 2003.

Unfilled upfront license orders were approximately $4.5 million at October 31, 2005 compared to $5.3 million as of October 31, 2004. Unfilled upfront license orders represent non–cancelable license orders we have received from our customers but have not shipped as of the end of the applicable fiscal period. We generally ship our software products promptly after acceptance of customer orders. However, a number of factors can affect the timing of product shipments and, as a result, timing of revenue recognition, including: the delivery dates requested by customers, the effect of the related license revenue on our business plan, and our operational capacity to fulfill upfront software license orders at the end of a quarter.

*Maintenance and Service Revenue*

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2004 to 2005 | | 2003 to 2004 | |
| | | | | (dollars in millions) | | | |
| Maintenance revenue | $ 136.3 | $ 170.1 | $ 220.1 | $ (33.8) | (20)% | $ (50.0) | (23)% |
| Professional service and other revenue | 51.4 | 42.8 | 40.6 | 8.6 | 20% | (2.2) | (5)% |
| Total maintenance and service revenue | $ 187.7 | $ 212.9 | $ 260.7 | $ (25.2) | (12)% | $ (47.8) | (18)% |
| Percentage of total revenue | 19% | 19% | 22% | | | | |

Our maintenance revenue has declined due to (i) our continued shift towards TSLs, which include maintenance with the license fee and thus generate no separately recognized maintenance revenue, (ii) generally lower maintenance rates on perpetual license transactions above $2 million, and (iii) to a lesser extent, non–renewal of maintenance by certain customers on perpetual or other upfront licenses. With our license model shift, we, expect progressively more of our maintenance revenue to be included in TSL revenue, and therefore for our separately recognized maintenance revenue to continue to decline. In addition, some customers may choose in the future not to renew maintenance on upfront licenses for economic or other factors, which would also adversely affect future maintenance revenue.

Professional service and other revenue increased in fiscal 2005 compared to fiscal 2004 and 2003 due to timing of customer acceptance of services performed under ongoing contracts.

25

**Events Affecting Cost of Revenues and Operating Expenses**

*Temporary Shutdown of Operations.*  As a cost saving measure, we temporarily shut down operations in North America for three days during the first quarters of fiscal 2005 and 2004, respectively, and four days during the third quarters of fiscal 2004 and 2003, respectively, resulting in savings of approximately $4.4 million in fiscal 2005, $7.6 million in fiscal 2004 and $4.8 million in fiscal 2003. The savings in fiscal 2005, 2004 and 2003 relate primarily to salaries and benefits and are reflected in our consolidated financial statements as follows:

|  | Year Ended October 31, | | |
|---|---|---|---|
|  | **2005** | **2004** | **2003** |
|  | (in thousands) | | |
| Cost of revenue | $    856 | $  1,421 | $    874 |
| Research and development | 1,889 | 3,236 | 1,899 |
| Sales and marketing | 1,169 | 2,038 | 1,344 |
| General and administrative | 514 | 948 | 678 |
| Total Savings | $  4,428 | $  7,643 | $  4,795 |

*Workforce Reduction.*  During the fourth quarter of fiscal 2004 and the first quarter of fiscal 2003, we reduced expenses by decreasing the number of employees in most departments in domestic and foreign locations. This workforce reduction affected approximately 84 employees in fiscal 2004 (50 employees in the U.S. and 34 employees outside the U.S.), and 200 employees in fiscal 2003 (130 employees in the U.S. and 70 employees outside the U.S.), resulting in charges of approximately $6.6 million in fiscal 2004 and $4.4 million in fiscal 2003. The charges in each fiscal year relate primarily to severance and other special termination benefits and are included in our consolidated financial statements as follows:

|  | Year Ended October 31, | | |
|---|---|---|---|
|  | **2005** | **2004** | **2003** |
|  | (in thousands) | | |
| Cost of revenue | $ — | $    483 | $  1,167 |
| Research and development | — | 4,457 | 1,388 |
| Sales and marketing | — | 1,230 | 1,239 |
| General and administrative | — | 460 | 630 |
| Total Charge | $ — | $  6,630 | $  4,424 |

*Workforce Realignment.*  During the fourth quarter of fiscal 2003 and effective in the first quarter of fiscal 2004, we realigned our operations to focus resources on more strategic areas of investment and to become more operationally efficient. This realignment affected most departments and resulted in termination of employment of a total of 140 employees in the United States and 100 employees outside the United States. Charges for severance and other termination benefits totaling $14.9 million were reflected in our consolidated financial statements for fiscal 2003 as follows:

|  | Year Ended October 31, | | |
|---|---|---|---|
|  | **2005** | **2004** | **2003** |
|  | (in thousands) | | |
| Cost of revenue | $ — | $ — | $  2,569 |
| Research and development | — | — | 6,270 |
| Sales and marketing | — | — | 4,847 |
| General and administrative | — | — | 1,170 |
| Total Charge | $ — | $ — | $  14,856 |

26

*Certain Option Expenses.* Subsequent to the fourth quarter of fiscal 2005, we discovered an error in our option grant process related to the documentation of grant dates. This error was solely with respect to grants to non–executive officer employees. The impact of this error on our first through third quarter income statement was approximately $3.1 million. We booked in the fourth quarter $3.6 million as follows: $0.5 million in cost of goods sold, $1.3 million in research and development expense, $0.9 million in sales and marketing expense and $0.9 million in general and administrative expense. Our results of operations for the fourth quarter and full fiscal year 2005 contained in our earnings release dated November 30, 2005 did not include this expense as we did not believe at that time the error would result in an adjustment to our operating results. With the error corrected, we expect we will incur no additional expenses relating to this error.

*Functional Allocation of Operating Expenses*

Historically, we allocate certain human resource programs, information technology and facility expenses among our functional income statement categories based on headcount within each functional area. Annually, upon a significant change in headcount (as in the case of a workforce reduction, realignment or acquisition), or as a result of other business–related factors, management reviews the allocation methodology and the expenses included in the allocation pool. We conducted such a review following our workforce realignment in fiscal 2004, the ISE acquisition completed in the first quarter of fiscal 2005 and the Nassda acquisition completed in the third quarter of fiscal 2005. The resulting expense allocations may contribute significantly to fluctuations in individual operating expenses from period to period.

*Cost of Revenue*

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2004 to 2005 | | 2003 to 2004 | |
| | | | | (dollars in millions) | | | |
| Cost of license revenue | $ 101.9 | $ 87.7 | $ 77.9 | $ 14.2 | 16% | $ 9.8 | 13% |
| Cost of maintenance and service revenue | 70.7 | 66.8 | 69.5 | 3.9 | 6% | (2.7) | (4)% |
| Amortization of intangible assets and deferred stock compensation | 81.8 | 102.6 | 92.9 | (20.8) | (20)% | 9.7 | 10% |
| Total | 254.4 | 257.1 | 240.3 | $ (2.7) | (1)% | 16.8 | 7% |
| Percentage of total revenue | 26% | 24% | 20% | | | | |

We divide cost of revenue into three categories: (i) cost of license revenue, (ii) cost of maintenance and service revenue and (iii) amortization costs. In April 2005 we revised our methodology for allocating and reporting cost of revenue externally to better align costs of revenue with the appropriate revenue categories. We have reclassified cost of revenue for fiscal 2003 and 2004 to conform to this new allocation methodology. In addition, we have segregated expenses directly associated with providing consulting and training from costs of revenue associated with internal functions which provide license delivery and post–customer contract support services. Management then allocates these consulting and training costs between cost of license revenue and cost of maintenance and service revenue based on the proportion of license revenue and maintenance and service revenue reported during the quarter. In general, our total cost of revenue is relatively fixed and does not fluctuate significantly with changes in revenue or license mix.

*Cost of license revenue.* Cost of license revenue includes costs associated with the sale and licensing of our software products, both time–based and upfront. Cost of license revenue includes the allocated cost

27

of employee salary and benefits for providing software delivery, including software production costs, product packaging, amortization of capitalized software development costs related to Synopsys products, documentation and royalties payable to third party vendors.

   *Cost of maintenance and service revenue.* Cost of maintenance and service revenue includes employee salary and benefits for consulting professionals and associated costs to maintain the related infrastructure necessary to manage a services and training organization. Further, cost of maintenance and service revenue includes allocated costs of employee salary and benefits for providing customer services, such as hot–line and on–site support, production employees and documentation of maintenance updates.

   *Amortization costs.* Amortization of intangible assets and deferred stock compensation includes the amortization of the contract rights intangible associated with certain executory contracts, core/developed technology, trademarks, trade names, customer relationships, covenants not to compete and other intangibles related to acquisitions completed during fiscal 2003, 2004 and 2005. We amortize intangible assets on a straight–line basis over their useful lives, which range from two to ten years. Deferred stock compensation represents the intrinsic value of unvested stock options assumed in connection with prior and current year acquisitions. We amortize the deferred stock compensation over the options' remaining vesting period of one to four years. Generally, amortization of deferred stock compensation will decrease over time as the assumed stock options vest, although employee terminations affect the exact timing and amount of future amortization of deferred stock compensation.

   The decrease in total cost of revenue in fiscal 2005 compared to fiscal 2004 was primarily due to: (i) net reduction of $20.8 million in amortization expense in core/developed technology caused by completion of amortization from fiscal 2002 acquisitions, primarily the acquisition of Avant! Corporation, and (ii) the reduction in royalty expense of $1.3 million primarily resulting from an accrual of $1.0 million recorded in fiscal 2004 for a potential payment that was determined not required to be paid. This decrease was partially offset by an increase of: (i) $14.0 million in compensation and employee benefits as a result of (a) our increased investment in professional services personnel and (b) higher variable compensation associated with our higher–than–expected business performance; (ii) $1.2 million in compensation due to former ISE employees based on achievement of certain sales and employee retention milestones; and (iii) $3.2 million in additional human resources, information technology and facilities costs allocated to this line item compared to fiscal 2004. See "*Functional Allocation of Operating Expenses,*" above. Total cost of revenue as a percentage of total revenue increased due to lower revenue during 2005 as compared to the revenue in fiscal 2004 and the fact that a large portion of our expenses are fixed.

   The increase in total cost of revenue in fiscal 2004 compared to fiscal 2003 was primarily due to: (i) an increase in amortization of $9.7 million of core/developed technology recorded as a result of our acquisitions completed in fiscal 2003 and 2004; (ii) an increase of $9.1 million in field support personnel costs due to targeted hiring in the customer support function; and (iii) $3.6 million in additional human resources, information technology and facilities costs allocated to this line item compared to fiscal 2003. See "*Functional Allocation of Operating Expenses,*" above. This increase was partially offset by a decrease of: (i) $1.1 million in expenses relating to consulting services; (ii) $2.6 million in employee expenses as discussed above under *Workforce Realignment*; and (iii) $1.1 million higher royalty expenses in fiscal 2004 compared to fiscal 2003. Total cost of revenue as a percentage of total revenue increased due to lower revenue during 2004 and increased amortization of intangible assets and deferred stock compensation from acquisitions in fiscal 2003.

**Operating Expenses**

*Research and Development*

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2004 to 2005** | | **2003 to 2004** | |
| | | | | (dollars in millions) | | | |
| | $ 317.0 | $ 285.3 | $ 285.9 | $ 31.7 | 11% | $ (0.6) | —% |
| Percentage of total revenue | 32% | 26% | 24% | | | | |

The increase in research and development expense in fiscal 2005 compared to fiscal 2004 was primarily due to: (i) an increase of $30.9 million in research and development personnel and related costs primarily as a result of the ISE and Nassda acquisitions, including $5.3 million in compensation due to former ISE employees now employed by Synopsys based upon achievement of certain sales and employee retention milestones; and (ii) an increase of $4.7 million in human resources, information technology and facilities costs allocated to this line item compared to fiscal 2004 as a result of increased headcount. This increase was partially offset by a decrease of $2.7 million in contractor costs as many former contractors in lower–cost regions were converted to employees.

Research and development expense in fiscal 2004 compared to fiscal 2003 remained relatively constant as a result of the following offsetting factors: (i) a $2.2 million reduction in depreciation expense allocated to this line item as a result of decreased capital spending and lower replacement costs in fiscal 2004 compared to fiscal 2003; (ii) severance packages totaling $1.4 million associated with our workforce reduction during fiscal 2003 which were not incurred during fiscal 2004; (iii) a $1.6 million decrease in consulting services in fiscal 2004 compared to fiscal 2003; (iv) a $4.5 million decrease in North America human resources, information technology and facilities costs allocated to research and development expenses in fiscal 2004 as a result of the decrease in research and development headcount as a percentage of total headcount; and (v) an increase of $10.1 million in fiscal 2004 research and development personnel and related costs as a result of increased investment in research and development activities.

*Sales and Marketing*

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2004 to 2005** | | **2003 to 2004** | |
| | | | | (dollars in millions) | | | |
| | $ 331.4 | $ 302.4 | $ 310.7 | $ 29.0 | 10% | $ (8.3) | (3)% |
| Percentage of total revenue | 33% | 28% | 26% | | | | |

The increase in sales and marketing expense in fiscal 2005 compared to fiscal 2004 was primarily due to: (i) an increase of $27.8 million in variable compensation driven by increased shipments, higher commission rates applied to shipments beginning in fiscal 2005 and increased business performance–related compensation; (ii) an increase of $4.6 million in sales and marketing personnel and related costs due to increased headcount and acquisitions during the fiscal year; and (iii) an increase of $4.6 million in severance–related costs associated with a workforce reduction executed during the third and fourth quarters of fiscal 2005. These increases were partially offset by decreases of: (i) $4.2 million as a result of a reduction in expenses for sales conferences and related meetings; (ii) $1.6 million in human resources, information technology and facilities corporate allocated costs allocated to this line item compared to fiscal 2004; (iii) $1.2 million related to reduced depreciation to this line item as a result of reduced headcount; and (iv) $1.0 million related to reduced travel expenses.

The decrease in sales and marketing expense in fiscal 2004 compared to fiscal 2003 was primarily due to: (i) a reduction of $4.0 million in variable compensation, driven by reduced orders and shipments in fiscal 2004; (ii) a reduction of $3.0 million in sales and marketing personnel and related costs as a result of

29

decreased headcount due to previous workforce reductions and realignments; and (iii) $4.8 million recorded in the fourth quarter of fiscal 2003 as a result of our realignment of operations as discussed above under *Workforce Realignment*. This decrease was partially offset by increases of: (i) $4.4 million in human resources, information technology and facilities costs allocated to sales and marketing expenses as a result of the increase in sales and marketing headcount as a percentage of total headcount, and (ii) $1.2 million related to expanded marketing efforts and charges associated with the cancellation of certain sales employee–related functions.

*General and Administrative*

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2004 to 2005 | | 2003 to 2004 | |
| | | | | (dollars in millions) | | | |
| Percentage of total revenue | $ 102.9 | $ 121.5 | $ 90.0 | $ (18.6) | (15)% | $ 31.5 | 35% |
| | 10% | 11% | 8% | | | | |

Fiscal 2004 general and administrative expenses were higher than fiscal 2005 primarily due to: (i) the $10 million merger termination fee paid to Monolithic System Technology, Inc. (MoSys) in April 2004 in connection with termination of an acquisition agreement; (ii) $5.4 million in professional service fees primarily related to litigation associated with the MoSys termination incurred in 2004; (iii) $1.7 million in professional services fees incurred in connection with the proposed acquisition of MoSys expensed in the second quarter of fiscal 2004; (iv) a decrease of $3.2 million in bad debt reserve in fiscal 2005 due to lower than anticipated billings and successful collection efforts; (v) a decrease of $1.9 million in facilities costs in fiscal 2005 due to closure of certain facilities; and (vi) a decrease of $6.3 million in human resources, information technology and facilities costs allocated to this line item in fiscal 2005. Lower fiscal 2005 expenses were partially offset by an increase of (i) $3.5 million in employee compensation in fiscal 2005 due to increased headcount; (ii) $2.2 million in depreciation due to increased equipment and assets; and (iii) $2.7 million in consulting costs primarily related to market and internal business process analyses. See "*Functional Allocation of Operating Expenses,*" above.

The increase in general and administrative expense in fiscal 2004 compared to fiscal 2003 was primarily due to: (i) the $10.0 million termination fee paid to MoSys and professional service fees of $7.1 million relating to that transaction and the subsequent litigation in fiscal 2004; (ii) an increase of $5.0 million in professional service fees in fiscal 2004 relating to other litigation matters; (iii) $4.7 million in facilities costs primarily related to planned facilities consolidation in fiscal 2004; (iv) a loss of $1.1 million related to the sublease of a portion of our Ireland headquarters facility in fiscal 2004; and (v) a $3.5 million increase in depreciation due to increased capital spending in information technology. These increases were partially offset by a decrease of $3.5 million in human resources, information technology and facilities costs allocated to this line item. See "*Functional Allocation of Operating Expenses,*" above.

*In–Process Research and Development*

In–process research and development (IPRD) is comprised of in–process technologies of (i) $5.7 million associated with the acquisition of ISE in fiscal 2005; (ii) $1.6 million associated with an acquisition in fiscal 2004 considered immaterial for financial statement purposes; (iii) $18.3 million associated with our acquisition of Numerical Technologies, Inc. (Numerical) described below; and (iv) $1.6 million associated with an acquisition considered immaterial for financial statement purposes in fiscal 2003. At the date of each acquisition, the projects associated with the IPRD efforts had not yet reached technological feasibility and the research and development in process had no alternative future uses. Accordingly, these amounts were charged to expense on the respective acquisition date of each of the acquired companies.

30

*Valuation of IPRD.*   The value assigned to acquired in–process technology is determined by identifying products under research in areas for which technological feasibility had not been established as of the acquisition date. The value of in–process technology is then divided into two classifications: (i) developed technology (completed) and (ii) in–process technology (to–be–completed), giving explicit consideration to the value created by the research and development efforts of the acquired business prior to the date of acquisition and to be created by Synopsys after the acquisition. These value creation efforts were estimated by considering the following major factors: (i) time–based data, (ii) cost–based data and (iii) complexity–based data.

The value of the in–process technology was determined using a discounted cash flow model similar to the income approach, focusing on the income producing capabilities of the in–process technologies. Under this approach, the value is determined by estimating the revenue contribution generated by each of the identified products within the classification divisions. Revenue estimates were based on (i) individual product revenues, (ii) anticipated growth rates, (iii) anticipated product development and introduction schedules, (iv) product sales cycles, and (v) the estimated life of a product's underlying technology. From the revenue estimates, operating expense estimates, including costs of sales, general and administrative, sales and marketing, income taxes and a use charge for contributory assets, were deducted to arrive at operating income. We estimated revenue growth rates for each product and gave consideration to relevant market sizes and growth factors, expected industry trends, the anticipated nature and timing of new product introductions by us and our competitors, individual product sales cycles and the estimated life of each product's underlying technology. Operating expense estimates reflect Synopsys' historical expense ratios. Additionally, these projects will require continued research and development after they have reached a state of technological and commercial feasibility. The resulting operating income stream was discounted to reflect its present value at the date of acquisition.

The rate used to discount the net cash flows from purchased in–process technology is our weighted–average cost of capital, taking into account our required rates of return from investments in various areas of the enterprise and reflecting the inherent uncertainties in future revenue estimates from technology investments including the uncertainty surrounding the successful development of the acquired in–process technology, the useful life of such technology, the profitability levels of such technology, if any, and the uncertainty of technological advances, all of which are unknown at this time.

*ISE.*   On November 2, 2004, we acquired ISE, a world–leading provider of TCAD (Technology Computer–Aided Design) software and related services. The IPRD expense related to the ISE acquisition was $5.7 million. ISE had one IPRD project—FLOOPS, a next generation process simulator. We incurred a minimal amount in IPRD related to this project which led to the introduction of our Sentaurus product in the fourth quarter of fiscal 2005. This project is considered to be complete except for ongoing maintenance, future product enhancements and new features related to this core product. Expenditures to complete ISE's acquired in–process technologies approximated the original estimates.

*Numerical.*   On March 1, 2003, we acquired Numerical, which specialized in subwavelength lithography–enabling solutions. The IPRD expense related to the Numerical acquisition was $18.3 million. Numerical had five IPRD projects—Phase Shift Masking (PSM), Subwavelength Software, Equipment Software, Cadabra and Computer Aided Transcription System (CATS)—representing 25%, 7%, 6%, 5% and 57%, respectively, of the total IPRD value. These projects were expected to be completed shortly following the merger. PSM, Subwavelength Software and CATS software were completed in fiscal 2003. Our Cadabra® product was released in the first quarter of fiscal 2004. The Equipment Software project consists of in–process technology for multiple products. These products were either completed in fiscal 2003, discontinued, or were integrated with other Synopsys products during fiscal 2004. Expenditures to complete Numerical's acquired in–process technologies approximated the original estimates.

31

*Amortization of Intangible Assets and Deferred Stock Compensation.*   Amortization of intangible assets and deferred stock compensation includes the amortization of the contract rights intangible associated with certain executory contracts, core/developed technology, trademarks, trade names, customer relationships, covenants not to compete and other intangibles acquired in business combinations completed during fiscal 2003, 2004 and 2005. We amortize intangible assets on a straight–line basis over their useful lives, which range from three to ten years. Deferred stock compensation represents the intrinsic value of unvested stock options assumed in connection with prior year acquisitions. We amortize deferred stock compensation on a straight–line basis over the options' remaining vesting period of one to four years. Generally, amortization of deferred stock compensation will decrease over time as the assumed stock options vest, although employee terminations affect the exact timing and amount of future amortization of deferred stock compensation. Amortization expense for these assets is included in the consolidated statements of operations as follows:

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2004 to 2005** | | **2003 to 2004** | |
| | | | | (dollars in millions) | | | |
| Included in cost of revenue | $  81.8 | $  102.6 | $  92.9 | $  (20.8) | (20)% | $  9.7 | 10% |
| Included in operating expenses | 33.5 | 34.9 | 35.3 | (1.4) | (4)% | (0.4) | (1)% |
| Total | $  115.3 | $  137.5 | $  128.2 | $  (22.2) | (16)% | $  9.3 | 7% |
| Percentage of total revenue | 12% | 13% | 11% | | | | |

The decrease in amortization of intangible assets and deferred compensation in fiscal 2005 compared to fiscal 2004 is driven by completion of the amortization of the intangible assets related to core/developed technology from fiscal 2002 acquisitions, primarily the acquisition of Avant!, and by the declining amounts of amortization related to deferred compensation recorded in prior year acquisitions, partially offset by amortization charges from the ISE and Nassda acquisitions.

The increase in amortization of intangible assets and deferred compensation in fiscal 2004 compared to fiscal 2003 is primarily due to additional amortization of assets acquired in the Numerical acquisition in the second quarter of fiscal 2003, partially offset by the declining amounts of amortization related to deferred compensation recorded in prior year acquisitions.

See Note 4 to our *Consolidated Financial Statements* for a schedule of future amortization amounts.

*Impairment of Intangible Assets.*   There were no material impairment charges related to intangible assets during fiscal 2005, 2004 and 2003.

*Expensing of Stock Awards.*   In December 2004, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards No. 123 (revised 2004), *Share–Based Payment* (SFAS 123R), which will be effective in the first quarter of fiscal 2006. SFAS 123R will result in our recognition of substantial compensation expense relating to our employee stock options and employee stock purchase plans. Synopsys currently uses the intrinsic value method to measure compensation expense for stock–based awards to its employees. Under this standard, we generally have not recognized any compensation expense related to stock option grants we issue under our stock option plans or related to the discounts we provide under our employee stock purchase plans. Under the new rules, we will be required to adopt a fair–value–based method for measuring the compensation expense related to employee stock awards, which will lead to substantial additional compensation expense and therefore will have a material adverse effect on our reported results of operations. Note 2 to our *Consolidated Financial Statements* provides our pro forma net income and earnings per share as if we had used a fair–value–based method similar to the methods required under SFAS 123R to measure the compensation expense for employee stock awards during fiscal years 2005, 2004 and 2003.

32

**Other Income (Expense), Net**

| | Year Ended October 31, | | | $ Change | % Change | | $ Change | % Change |
|---|---|---|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2004 to 2005** | | | **2003 to 2004** | |
| | | | | (dollars in millions) | | | | |
| Interest income, net | $ 9.5 | $ 6.0 | $ 3.5 | $ 3.5 | 58% | | $ 2.5 | 71% |
| Gain (loss) on sale of investments, net of investment write-downs | (3.7) | (1.7) | 16.5 | (2.0) | (118)% | | (18.2) | (110)% |
| Foreign currency exchange gain | 2.5 | 0.3 | 1.4 | 2.2 | 733% | | (1.1) | 79% |
| Correction of an error in accounting for certain hedging transactions | 3.0 | — | — | 3.0 | 100% | | — | — |
| Other | 33.9 | (2.3) | 2.7 | 36.2 | 1574% | | (5.0) | (185)% |
| Total | $ 45.2 | $ 2.3 | $ 24.1 | $ 42.9 | 1865% | | $ (21.8) | (90)% |

In the first quarter of fiscal 2005, we reevaluated our interpretation of certain provisions of Statement of Financial Accounting Standards No. 133, as amended, *Accounting for Derivatives and Hedging Activities* (SFAS 133), resulting in the discovery of an error in the application of the standard to certain prior year foreign currency hedge transactions. The effect of the error was not material in any prior period and did not impact the economics of our hedging program. To correct the error, we reclassified the remaining $3.0 million related to the disallowed hedges from accumulated other comprehensive loss to other income in the year ended October 31, 2005.

The increase in other income (expense) in fiscal 2005 compared to fiscal 2004 is primarily due to (i) the $33 million gain from the litigation settlement relating to the Nassda acquisition; and (ii) the reclassification of $3.0 million from accumulated other comprehensive income to other income. This increase is primarily offset by $4.5 million write-down of certain investments.

See Notes 3 and 9 to *Consolidated Financial Statements.*

The decrease in other income (expense) in fiscal 2004 compared to fiscal 2003 was primarily due to reduced investment gains and reduced rental income.

**Income Tax Rate**

*Income Taxes.* The relative proportions of our domestic and foreign revenue and income directly affect our effective tax rate. We are also subject to changing tax laws in the multiple jurisdictions in which we operate. As of October 31, 2005, current deferred tax assets, net of current deferred tax liabilities, totaled $195.5 million. Non-current deferred tax assets, net of non-current deferred tax liabilities, totaled $82.4 million. We believe it is more likely than not that our results of future operations will generate sufficient taxable income to utilize our net deferred tax assets. We consider future taxable income and ongoing prudent and feasible tax planning strategies in assessing the need for any valuation allowance, and if we determine we would not be able to realize all or part of our net deferred tax assets in the future, we would charge to income an adjustment to the deferred tax assets in the period we make that determination.

We provide for U.S. income taxes on the earnings of our foreign subsidiaries unless they are considered permanently invested outside of the U.S. As of October 31, 2005, there was no cumulative amount of earnings upon which U.S. income taxes have not been provided.

*IRS Revenue Agent's Report.* On May 31, 2005, we received a Notice of Proposed Adjustment from the Internal Revenue Service (IRS) asserting a very large net increase to our U.S. taxable income arising

33

from the audit of fiscal years 2000 and 2001. On June 8, 2005, we received a Revenue Agent's Report (RAR) in which the IRS proposed to assess a net tax deficiency for fiscal years 2000 and 2001 of approximately $476.8 million, plus interest. Interest accrues on the amount of any deficiency finally determined until paid, and compounds daily at the federal underpayment rate, which adjusts quarterly. A higher underpayment rate of interest may be charged as a result of the issuance of the RAR.

This proposed adjustment primarily relates to transfer pricing transactions between Synopsys and a wholly–owned foreign subsidiary. The proposed adjustment for fiscal 2000 and 2001 is the total amount relating to these transactions asserted under the IRS theories. On July 13, 2005, we filed a protest to the proposed deficiency with the IRS, which will cause the matter to be referred to the Appeals Office of the IRS. Resolution of this matter could take a considerable time, possibly years.

We strongly believe the proposed IRS adjustments and resulting proposed deficiency are inconsistent with applicable tax laws, and that we thus have meritorious defenses to these proposals. Accordingly, we will continue to challenge these proposed adjustments vigorously. While we believe the IRS' asserted adjustments are not supported by applicable law, we believe it is probable that we will be required to make additional payments in order to resolve this matter. However, based on our analysis to date, we believe we have adequately provided for this matter. If we are required to pay a significant amount of additional U.S. taxes and applicable interest in excess of our provision for this matter, our results of operations and financial condition could be materially and adversely affected.

*Repatriation of Foreign Earnings.*   The American Jobs Creation Act of 2004 (the Act) provides for a special one–time elective dividends received deduction on the repatriation of certain foreign earnings to a U.S. taxpayer equal to 85% of the eligible distribution. During the fourth quarter of 2005, we repatriated $360 million, of which $172.5 million qualified for the special one–time elective dividends received deduction and $187.5 million constituted earnings that do not qualify under the Act, previously taxed income and return of capital. We recorded tax expense of $11.2 million related to the repatriation of $360 million. During the fourth quarter of 2005, our chief executive officer approved a domestic reinvestment plan (DRIP) to invest up to $185 million in foreign earnings in qualified investments pursuant to the Act. As required by the Act, the reinvestment plan was ratified by the Board of Directors in the first quarter of fiscal 2006. We satisfied the DRIP reinvestment requirements during fiscal 2005.

*Tax Reserves.*   We may establish reserves for tax contingencies based on the probable outcome of tax positions taken for financial statement purposes compared to positions taken on the tax returns. In fiscal 2005, we released tax contingency reserves totaling $34.0 million related to previously acquired companies as a result of expiration of the applicable statute of limitation. These released liabilities were recorded against acquisition goodwill with no effect on our net loss in fiscal 2005. We continuously review our tax contingency reserves to ensure that they are appropriately stated. Such review includes consideration of tax controversy factors such as periods covered by the cause of action, the degree of probability of an unfavorable outcome, our ability to estimate the liability, the timing of the liability and how it will impact our other tax attributes. At October 31, 2005, we believe that we have adequately provided for our tax–related liabilities.

**Liquidity and Capital Resources**

Our sources of cash, cash equivalents and short–term investments are funds generated from our business operations and funds that may be drawn down under our credit facility.

As of October 31, 2005, cash, cash equivalents and short–term investments were $586.5 million, compared to $579.0 million as of October 31, 2004.

Cash provided by operations is in part dependent upon the payment terms on our license agreements. Payment terms for time–based licenses are generally extended, with the license fee typically paid quarterly

34

in even increments over the term of the license. Conversely, for an upfront license, customers pay a substantial portion of the license fee within the first year. Accordingly, we generally receive cash from time–based licenses, the primary component of our business under our almost fully ratable license model, later than from upfront licenses.

Cash provided by operations was $269.2 million for the year ended October 31, 2005 compared to $264.0 million for the same period in fiscal 2004. This increase largely resulted from (i) an increase in deferred revenue of $62.8 million due to the change in our licenses from upfront to time–based licenses during the last quarter of fiscal 2004; (ii) the payment of $15.4 million for the MoSys acquisition agreement termination fee and associated litigation made in fiscal 2004 but not in 2005; and (iii) lower disbursements for income taxes and value added taxes paid of approximately $24.9 million and $7.5 million, respectively. This increase was offset by: (i) increased disbursements of $23.3 million associated with prepaid maintenance contracts for our information technology infrastructure as compared to the prior fiscal year; and (ii) $49.2 million reduction in cash used to satisfy accounts payable in fiscal 2005.

Accounts receivable, net of allowances, decreased $32.0 million, or 24%, to $100.2 million as of October 31, 2005 from $132.3 million as of October 31, 2004. Days sales outstanding (DSO), calculated based on revenue for the most recent quarter and accounts receivable as of the balance sheet date, decreased to 36 days as of October 31, 2005 from 53 days as of October 31, 2004. The decrease in DSO and accounts receivable is attributable to lower billings for the fiscal year due to greater concentration of TSLs in our more ratable license model since cash is collected over a longer period of time for TSLs than upfront licenses.

Cash provided by operations was $264.0 million in fiscal 2004 compared to $391.5 million in fiscal 2003. The decrease in cash from operations was driven in part by lower orders and reported revenues in fiscal 2004, as well as by increased use of operating cash as follows: (i) cash disbursements for foreign income taxes of approximately $44.7 million; (ii) payment of $15.4 million for the MoSys acquisition agreement termination fee and associated litigation costs; (iii) disbursements associated with our fiscal 2003 workforce realignment of approximately $14.9 million; (iv) payments of international value added taxes of approximately $7.5 million; and (v) increased prepaid maintenance contract expenses for our design and information systems electronic infrastructure. These uses of cash were partially offset by income tax refunds of $28.6 million.

Accounts receivable, net of allowances, decreased $68.7 million, or 34%, to $132.3 million as of October 31, 2004 from $201.0 million as of October 31, 2003. Days sales outstanding (DSO), calculated based on revenue for the most recent quarter and accounts receivable as of the balance sheet date, decreased to 53 days as of October 31, 2004 from 58 days as of October 31, 2003. The decrease in accounts receivable and DSO was attributable to a $100.7 million reduction in new billings caused by lower orders during fiscal 2004 and longer customer payment terms compared to fiscal 2003, partially offset by a $39.0 million decrease in collections compared to the prior fiscal year.

Cash used in investing activities was $171.5 million for the year ended October 31, 2005 compared to $172.0 million for the same period in fiscal 2004. Cash used in investing activities remained relatively constant as we offset the increase of $114.4 million of cash used in acquisitions by a corresponding reduction in cash used in net purchases of short term and long term investments.

Cash used in investing activities was $172.0 million in fiscal 2004 compared to $258.3 million in fiscal 2003. The decrease of $86.3 million is primarily due to a substantial decrease of cash used for acquisitions and decreased proceeds from the sale of long–term investments.

Cash used in financing activities was $39.8 million for the year ended October 31, 2005 compared to $266.6 million provided by financing activities in fiscal 2004. The decrease of $226.8 million in cash used was due to a decrease of $334.9 million in cash used to repurchase shares of our common stock in the open

35

market compared to the year ended October 31, 2004 and decreased proceeds of $108.1 million from the issuance of our common stock pursuant to our employee stock plans compared to fiscal 2004.

Cash used in financing activities was $266.6 million in fiscal 2004 compared to cash provided by financing activities of $74.2 million in fiscal 2003. The decrease of $340.8 million is primarily due to a decrease in proceeds of $178.2 million from the sale of shares pursuant to our employee equity incentive plans during fiscal 2004 and increased purchases of our common stock in the open market of $162.6 million during fiscal 2004.

The American Jobs Creation Act of 2004 (the Act) provides for a special one–time elective dividends received deduction on the repatriation of certain foreign earnings to a U.S. taxpayer equal to 85% of the eligible distribution. During the fourth quarter of 2005, we repatriated $360 million, of which $172.5 million qualified for the special one–time elective dividends received deduction and $187.5 million constituted earnings that do not qualify under the Act, previously taxed income and return of capital. We recorded tax expense of $11.2 million related to the repatriation of $360 million. During the fourth quarter of 2005, our chief executive officer approved a domestic reinvestment plan (DRIP) to invest up to $185 million in foreign earnings in qualified investments pursuant to the Act. As required by the Act, the reinvestment plan was ratified by the Board of Directors in the first quarter of fiscal 2006. We satisfied the DRIP reinvestment requirements during fiscal 2005.

We hold our cash, cash equivalents and short–term investments in the United States and in foreign accounts, primarily in Ireland, Bermuda, and Japan. As of October 31, 2005, we held an aggregate of $486.8 million in cash, cash equivalents and short–term investments in the United States and an aggregate of $99.7 million in foreign accounts. Funds in foreign accounts are generated from revenue outside North America. With the exception of Japan and the repatriated funds described above, we currently maintain a policy under APB 23, *Accounting for Income Taxes—Special Areas*, of permanently reinvesting such funds outside of the United States.

In April 2004, we entered into a three–year senior unsecured revolving credit facility. This facility contains financial covenants requiring us to maintain a minimum leverage ratio and specified levels of cash, as well as other non–financial covenants. The facility terminates on April 28, 2007. Borrowings under the facility bear interest at the greater of the administrative agent's prime rate or the Federal funds rate plus 0.50%; however, we have the option to pay interest based on the outstanding amount at Eurodollar rates plus a spread between 0.80% and 1.125% based on a pricing grid tied to a financial covenant. In addition, commitment fees are payable on the facility at rates between 0.20% and 0.25% per annum based on a pricing grid tied to a financial covenant. In April, 2004, we borrowed and repaid $200 million under the credit facility. On May 3, 2005, we borrowed $75.0 million under this credit facility in connection with the acquisition of Nassda. We repaid this amount in full as of May 27, 2005. As of October 31, 2005, we had no outstanding borrowings under this credit facility and we were in compliance with all covenants.

We believe that our current cash, cash equivalents, short–term investments and cash generated from operations will satisfy our business requirements for at least the next twelve months.

36

**Contractual Obligations and Off Balance Sheet Arrangements**

The following table summarizes our contractual obligations as of October 31, 2005.

| | Total | Fiscal 2006 | Fiscal 2007/ Fiscal 2008 (in thousands) | Fiscal 2009/ Fiscal 2010 | Thereafter |
|---|---|---|---|---|---|
| Long–Term Debt(1) | $ 1,631 | $ 1,138 | $ 493 | $ — | $ — |
| Lease Obligations: | | | | | |
| Capital Lease | 1,491 | 973 | 488 | 30 | — |
| Operating Lease(2) | 209,560 | 33,660 | 51,874 | 39,731 | 84,295 |
| Purchase Obligations(3) | 9,551 | 6,250 | 3,301 | — | — |
| Total Commitments | 222,233 | 42,021 | 56,156 | 39,761 | 84,295 |
| Other long–term liabilities on Balance Sheet(4) | 6,694 | | 4,885 | | 1,809 |
| Total | $ 228,927 | $ 42,021 | $ 61,041 | $ 39,761 | $ 86,104 |

(1)     This commitment relates to the fees associated with the revolving credit facility. Additional information is provided in Note 5 of our *Consolidated Financial Statements*.

(2)     Additional information is provided in Note 6 of our *Consolidated Financial Statements*.

(3)     Purchase obligations represent an estimate of all open purchase orders and contractual obligations in the ordinary course of business for which we have not received the goods or services as of October 31, 2005. Although open purchase orders are considered enforceable and legally binding, the terms generally allow us the option to cancel, reschedule and adjust our requirements based on our business needs prior to the delivery of goods or performance of services.

(4)     Includes (a) approximately $4.9 million in promissory notes payable in September 2007 issued in connection with an acquisition in September 2002 and (b) a bond payable in September 2023 to the city of San Jose for participating in a development project for land owned by us. Additional information is provided in Note 5 of our *Consolidated Financial Statements*. Certain long–term liabilities reflected on our balance sheet, such as unearned revenue, are not presented in this table because they do not require cash settlement in the future.

We are committed to making an additional payment of $2.1 million related to the bond payable in Note (4) above. In connection with our acquisitions completed prior to October 31, 2005, we may be obligated to pay up to an aggregate of $11.3 million in cash during the next 12 months and an additional $15.6 million in cash during the two years following the next 12 months if certain performance and milestone goals are achieved in full. Because these commitments are contingent on certain performance and milestone goals being achieved in full, these amounts are not reflected in the table above. We closed our acquisition of HPL Technologies, Inc. (HPL) on December 7, 2005 and are committed to make cash expenditures in fiscal 2006. See Note 14 of our *Consolidated Financial Statements*. These amounts are not reflected in the table above.

The expected timing of payments of the obligations discussed above is estimated based on current information. Timing of payment and actual amounts paid may be different depending on the time of receipt of goods or services or changes to agreed–upon amounts for some obligations. Amounts disclosed as contingent or milestone–based obligations depend on the achievement of the milestones or the occurrence of the contingent events and can vary significantly.

**Related Party Transactions**

For information regarding related party transactions, see Note 12 of the Notes to *Consolidated Financial Statements* included in *Item 8. Financial Statements and Supplementary Data* and *Item 13. Certain Relationships and Related Transactions* included in this Annual Report on Form 10–K and incorporated by reference here.

**Effect of New Accounting Pronouncements**

Please see Note 13 to *Consolidated Financial Statements* for a description of the effect of new accounting pronouncements on Synopsys.

**Pre–approvals of Non–Audit Services by Audit Committee**

Pursuant to Section 10A(i)(3) of the Exchange Act, during the fourth quarter of fiscal 2005, the Audit Committee pre–approved the following non–audit services to be performed by KPMG LLP, our independent auditors:

1. International tax compliance services relating to certain foreign subsidiaries;
2. Due diligence services relating to proposed acquisitions; and
3. International tax services relating to the repatriation of cash pursuant to the American Jobs Creation Act of 2004.

**Factors That May Affect Future Results**

*Our reported results of operations will be materially and adversely affected by our adoption of SFAS 123R.*

Statement of Financial Accounting Standards No. 123 (revised 2004), *Share–Based Payment* (SFAS 123R), which will be effective in our first quarter of fiscal 2006, will result in our recognition of substantial compensation expense relating to our employee stock options and employee stock purchase plans. We currently use the intrinsic value method to measure compensation expense for stock–based awards to our employees. Under this standard, we generally have not recognized any compensation expense related to stock option grants we issue under our stock option plans or the discounts we provide under our employee stock purchase plans. Under the new rules, we will be required to adopt a fair value–based method for measuring the compensation expense related to employee stock awards, which will lead to substantial additional compensation expense and will have a material adverse effect on our reported results of operations. *Note 2* to *Consolidated Financial Statements* in this report provides our pro forma net income and earnings per share as if we had used a fair value–based method similar to the methods required under SFAS 123R to measure the compensation expense for employee stock awards during the periods presented.

*Weakness, budgetary caution or consolidation in the semiconductor and electronics industries may continue to negatively impact our business.*

We believe that EDA industry growth has been adversely affected by many factors, including ongoing efforts by semiconductor companies to control their spending, uncertainty regarding the long term growth rate of the semiconductor industry, excess EDA tool capacity at many customers and increased competition in the EDA industry itself. If these factors persist or semiconductor industry growth does not occur (or if we do not benefit from any such increases), our business, operating results and financial condition will be materially and adversely affected.

We also believe that, over the long term, growth in EDA spending will continue to depend on growth in semiconductor R&D spending and continued growth in the overall semiconductor market. However, we

38

cannot predict the timing or magnitude of growth in semiconductor revenues, R&D spending or spending on EDA products, nor whether we will benefit from any such increases should they occur. For example, although the semiconductor industry grew by 18% in 2003 and 29% in 2004 and we estimate that R&D spending among large semiconductor companies increased approximately 10% from 2003 to 2004, EDA industry revenue during this period did not track these growth levels.

*Competition in the EDA industry may have a material adverse effect on our business and operating results.*

We compete with other EDA vendors that offer a broad range of products and services, primarily Cadence Design Systems, Inc. and Mentor Graphics Corporation, and with EDA vendors that offer products focused on one or more discrete phases of the IC design process, such as Magma Design Automation, Inc, We also compete with customers' internally developed design tools and capabilities. If we fail to compete effectively, our business will be materially and adversely affected.

We compete principally on technology leadership, product quality and features (including ease–of–use), time–to–results, post–sale support, interoperability with our own and other vendors' products, price and payment terms. Additional competitive challenges include the following:

- Customers require a mix of price and tool performance that suits their needs; in some cases this may lead them to choose vendors based on price more than performance. In certain situations we may offer substantial discounts on our products to meet pricing set by the competition. If, as we expect, customers begin to consolidate their purchases with fewer vendors, some EDA suppliers may pursue a deep discount strategy. As a result, prices for our products may decline and/or we may lose potential business to lower price competitors. In either case, our business, operating results and financial condition could be materially and adversely affected.

- Technology in the EDA industry evolves rapidly. Accordingly, we must correctly anticipate and lead critical developments, innovate rapidly and efficiently, improve our existing products, and successfully develop or acquire new products. If we fail to do so, our business will be materially and adversely affected.

- To compete effectively, we believe we must offer products that provide both a high level of integration into a comprehensive platform and a high level of individual product performance. Doing both requires significant engineering and development work. We can provide no assurance that we will be able to continue offering complete design flows in configurations our customers will find more attractive than our competitors' offerings or that our efforts to balance the interests of integration versus individual product performance will be successful.

- Our major initiatives face intense competition and in some cases address emerging markets. We have invested significant resources into further development of our Galaxy Design Platform, integration of our Discovery Verification Platform and enhancement of its System Verilog and other advanced features and development of our Design for Manufacturing and IP portfolios, and have acquired companies that focus on these areas. It is difficult for us to predict the success of these initiatives and acquisitions. If we fail to expand revenue from our new initiatives at the desired rate, our business, results of operations and financial condition would be materially and adversely affected.

- Payment terms are also an important competitive factor and are aggressively negotiated by our customers. During the second half of fiscal 2003 and continuing through 2004 and 2005, payment terms on time–based licenses lengthened compared to prior periods, negatively affecting our cash flow from operations.

39

*The decline in new IC design starts, industry consolidation and other potentially long−term trends may adversely affect the EDA industry, including demand for our products and services.*

The increasing complexity of SoCs and ICs, and customers' concerns about managing cost and risk have also led to the following potentially long−term negative trends:

- The number of starts of new IC designs has declined since 2000. New IC design starts are a key driver of demand for EDA software.
- A number of mergers in the semiconductor and electronics industries have occurred, and more are likely. Mergers can reduce the aggregate level of purchases of EDA software and services, and in some cases, increase customers' bargaining power in negotiations with their suppliers, including Synopsys.
- Due to factors such as increased globalization, cost controls among customers appear to have become more permanent, adversely impacting our customers' EDA spending.
- Industry changes, plus the cost and complexity of IC design, may be leading some companies in these industries to limit their design activity in general, to focus only on one discrete phase of the design process while outsourcing other aspects of the design, or using Field Programmable Gate Arrays (FPGAs), an alternative chip technology.

These trends, if sustained, could have a material adverse effect on the EDA industry, including the demand for our products and services, which in turn would materially and adversely affect our financial condition and results of operations.

*We have received a Revenue Agent's Report from the Internal Revenue Service claiming a significant increase in our U.S. taxable income. An adverse outcome of this examination or any future examinations involving similar claims could have a material adverse effect on our results of operations and financial condition.*

Our operations are subject to income and transaction taxes in the United States and in multiple foreign jurisdictions and to review or audit by IRS and state, local and foreign tax authorities. In connection with an IRS audit of our United States federal income tax returns for fiscal years 2000 and 2001, on May 31, 2005 we received a Notice of Proposed Adjustment in which the IRS claimed a very large increase to our U.S. taxable income. On June 8, 2005, we received a Revenue Agent's Report in which the IRS proposed to assess a net tax deficiency for fiscal years 2000 and 2001 of approximately $476.8 million, plus interest. This proposed adjustment primarily relates to transfer pricing transactions between Synopsys and a wholly−owned foreign subsidiary. We have filed a protest to the proposed deficiency with the IRS, which will cause the matter to be referred to the Appeals Office of the IRS. Resolution of this matter could take a considerable time, possibly years.

We strongly believe the proposed IRS adjustments and resulting proposed deficiency are inconsistent with applicable tax laws, and that we thus have meritorious defenses to these proposals. Accordingly, we will continue to challenge these proposed adjustments vigorously. While we believe the IRS' asserted adjustments are not supported by applicable law, we believe it is probable we will be required to make additional payments in order to resolve this matter. However, based on our analysis to date, we believe we have adequately provided for this matter. If we are required to pay a significant amount of additional U.S. taxes and applicable interest in excess of our provision for this matter, our results of operations and financial condition would be materially and adversely affected.

40

*The failure to meet the semiconductor industry's demands for advancing EDA technology and continued cost reductions may adversely affect our financial results.*

SoC and IC functionality continues to increase while feature widths decrease, substantially increasing the complexity, cost and risk of IC design and manufacturing. To address greater complexity, semiconductor designers and manufacturers demand continuous innovation from EDA suppliers. At the same time, as a result of pricing pressure on their own products, we believe customers and potential customers are also seeking to buy more products from fewer suppliers and at reduced overall prices in an effort to reduce overall cost and risk. In order to succeed in this environment, we must successfully meet our customers' technology requirements, while also striving to reduce their overall costs and our own operating costs. Failure to manage these conflicting demands successfully would materially and adversely affect our financial condition and results of operations.

*Our revenue and earnings fluctuate, which could cause our financial results to not meet expectations and our stock price to decline.*

Many factors affect our revenue and earnings, including customer demand, license mix, the timing of revenue recognition on products and services sold and committed expense levels, making it difficult to predict revenue and earnings for any given fiscal period. Accordingly, stockholders should not view our historical results as necessarily indicative of our future performance. If our financial results or targets do not meet investor and analyst expectations, our stock price could decline.

Some of the specific factors that could affect our revenue and earnings in a particular quarter or over several fiscal periods include, but are not limited to:

- We base our operating expenses in part on our expectations for future revenue and generally must commit to expense levels in advance of revenue being recognized. Since only a small portion of our expenses varies with revenue, any revenue shortfall typically causes a direct reduction in net income.
- Beginning in the fourth quarter of fiscal 2004, we shifted our target license mix to consist almost entirely of time–based licenses. Time–based licenses yield significantly less current period revenue and more future period revenue than upfront licenses. The license mix shift decreased revenue and earnings for fiscal 2005.
- Our revenue and earnings targets over a number of fiscal periods assume a certain level of orders and a certain mix between upfront and time–based licenses. The amount of orders received and changes in the mix due to factors such as the level of overall license orders, customer demand, preferred customer payment terms and requested customer ship dates could have a material adverse effect on our revenue and earnings. For example, if we ship more upfront licenses than expected during any given fiscal period, our revenue and earnings for that period could be above our targets even if orders are below target; conversely, if we ship fewer upfront licenses than expected our revenue and earnings for that period could fall below our targets even if orders meet or even exceed our target. Similarly, if we receive a lower–than–expected level of TBL orders during a given period, our revenue in future periods could be negatively affected.
- We may be required to implement a number of cost control measures in order to meet our externally–communicated financial targets, any of which could fail to result in the anticipated cost savings or could adversely affect our business.
- The market for EDA products is dynamic and depends on a number of factors including consumer demand for our customers' products, customer R&D and EDA tool budgets, pricing, our competitors' product offerings and customer design starts. It is difficult to predict in advance the effect of these and other factors on our customer's demand for our products on a medium or long term basis. As a result, actual future customer purchases could differ materially from our forecasts

41

which, in turn could cause our actual revenue to be materially different than our publicly–disclosed targets.

- Certain of our upfront and time–based license agreements provide the right to re–mix a portion of the software initially subject to the license for other Synopsys products. For example, a customer may use our front–end design products for a portion of the term of its license and then re–mix such products for back–end placement software for the remainder of the term in order to complete the customer's IC design. While this practice helps assure the customer's access to the complete design flow needed to manufacture its product, use of these arrangements could result in reduced revenue compared to licensing the individual tools separately.

- In the past, we have regularly received a significant proportion of our orders for a given quarter in the last one or two weeks of the quarter. The delay of one or more orders, particularly an upfront order, could have a material adverse effect on our bookings, revenue and earnings for that quarter.

- Our customers spend a great deal of time reviewing and testing our products, either alone or against competing products, before making a purchase decision. Accordingly, our customers' evaluation and purchase cycles may not match our fiscal quarters. Further, sales of our products and services may be delayed if customers delay project approval or project starts because of budgetary constraints or their budget cycles.

*Businesses we have acquired or that we may acquire in the future may not perform as we project.*

We have acquired a number of companies or their assets in recent years, including four in fiscal 2005, six transactions during fiscal 2004 and three transactions in fiscal 2003, and, as part of our efforts to expand our product and services offerings, we expect to acquire additional companies in the future.

In addition to direct costs, acquisitions pose a number of risks, including:

- Potential dilution of our earnings per share;
- Problems in integrating the acquired products with our products;
- Difficulties in retaining key employees and integrating them into our company;
- Challenges in ensuring acquired products meet our quality standards;
- Failure to realize expected synergies or cost savings;
- Failure of acquired products to achieve projected sales;
- Drain on management time for acquisition–related activities;
- Delays caused by regulatory scrutiny;
- Adverse effects on customer buying patterns or relationships; and
- Assumption of unknown liabilities.

While we review proposed acquisitions carefully and strive to negotiate terms that are favorable to us, we can provide no assurance that any acquisition will positively affect our future performance. Furthermore, if we later determine we cannot use or sell an acquired product or technology, we could be required to write down the goodwill and intangible assets associated with such product or technology; these write–downs, if significant, could have a material adverse effect on our results of operations.

*A failure to timely recruit and retain key employees would have a material adverse effect on our business.*

To be successful, we must attract and retain key technical, sales and managerial employees, including those who join Synopsys in connection with acquisitions. There are a limited number of qualified EDA and

42

IC design engineers, and competition for these individuals is intense. Our employees are often recruited aggressively by our competitors and our customers. Any failure to recruit and retain key technical, sales and managerial employees would have a material adverse effect on our business, results of operations and financial condition.

We issue stock options and maintain employee stock purchase plans as a key component of our overall compensation. There is growing pressure on public companies from stockholders, who must approve any increases in our stock option pool, generally to reduce our overhang or amount of outstanding and unexercised stock options. In addition, the implementation of new accounting rules that require us to recognize on our income statement compensation expense from employee stock options and our employee stock purchase plan beginning with the first quarter of fiscal 2006, which we expect will increase pressure to limit future option grants. These factors may make it more difficult for Synopsys to grant attractive equity–based packages in the future, which could adversely impact our ability to attract and retain key employees.

*Stagnation of foreign economies, foreign exchange rate fluctuations and the increasingly global nature of our operations could adversely affect our performance.*

During fiscal 2005 and 2004, we derived 49% and 45%, respectively, of our revenue from outside the United States; going forward, we expect our overall orders and revenue targets will continue to depend on substantial contributions from outside the United States. Foreign sales are vulnerable to regional or worldwide economic, political and health conditions, including the effects of international political conflict, hostilities and natural disasters. Further, any stagnation of foreign economies could adversely affect our performance by reducing the amount of revenue derived from outside the United States.

Our operating results are also affected by fluctuations in foreign currency exchange rates. Our results of operations can be adversely affected when the U.S. dollar weakens relative to other currencies, including the Euro, the Japanese yen and the Canadian dollar, as a result of the conversion of expenses of our foreign operations denominated in foreign currencies into the dollar. Exchange rates are subject to significant and rapid fluctuations, and therefore we cannot predict the prospective impact of exchange rate fluctuations on our business, results of operations and financial condition. While we hedge certain foreign currency exposures of our business, we can provide no assurance that our hedging transactions will be effective.

In addition, we have expanded our non–U.S. operations significantly in the past several years. While the increased international presence of our business creates the potential for cost reductions locally and higher international sales, this strategy also requires us to recruit and retain qualified technical and managerial employees, manage multiple, remote locations performing complex software development projects and ensure intellectual property protection outside of the United States. The failure to effectively manage our global operations would have a material adverse effect on our business and results of operations.

*Customer payment defaults could adversely affect our financial condition and results of operations.*

Our backlog consists principally of customer payment obligations not yet due that are attributable to software we have already delivered. These customer obligations are typically not cancelable, but will not yield the expected revenue and cash flow if the customer defaults and fails to pay amounts owed. In these cases, we will generally take legal action to recover amounts owed. Moreover, existing customers may seek to renegotiate pre–existing contractual commitments due to adverse changes in their own businesses. Though we have not, to date, experienced a material level of defaults, any material payment default by our customers or significant reductions in existing contractual commitments could have a material adverse effect on our financial condition and results of operations.

43

*A failure to protect our proprietary technology would have a material adverse effect on our business, results of operations and financial condition.*

Our success depends in part upon protecting our proprietary technology. To protect this technology, we rely on agreements with customers, employees and others and on intellectual property laws worldwide. We can provide no assurance that these agreements will not be breached, that we would have adequate remedies for any breach or that our trade secrets will not otherwise become known or be independently developed by competitors. Moreover, certain foreign countries do not currently provide effective legal protection for intellectual property; our ability to prevent the unauthorized use of our products in those countries is therefore limited. We have a policy of aggressively pursuing action against companies or individuals that wrongfully appropriate or use our products and technologies. However, there can be no assurance that these actions will be successful. If we do not obtain or maintain appropriate patent, copyright or trade secret protection, for any reason, or cannot fully defend our intellectual property rights in certain jurisdictions, our business, financial condition and results of operations would be materially and adversely affected. In addition, intellectual property litigation is lengthy and expensive and legal fees related to such litigation may reduce our net income.

*From time to time we are subject to claims that our products infringe on third party intellectual property rights.*

Under our customer agreements and other license agreements, we agree in many cases to indemnify our customers if our products infringe on a third party's intellectual property rights. As a result, we are from time to time subject to claims that our products infringe on these third party rights. For example, we are currently defending some of our customers against claims that their use of one of our products infringes on a patent held by a Japanese electronics company. We believe this claim is without merit and will continue to vigorously pursue this defense.

These types of claims can, however, result in costly and time–consuming litigation, require us to enter into royalty arrangements, subject us to damages or injunctions restricting our sale of products, require us to refund license fees to our customers or to forgo future payments or require us to redesign certain of our products, any one of which could materially and adversely affect our business, results of operations and financial condition.

*We are subject to changes in financial accounting standards, which may adversely affect our reported financial results or the way we conduct business.*

Accounting policies affecting software revenue recognition have been the subject of frequent interpretations, significantly affecting the way we license our products. Future changes in financial accounting standards, including pronouncements relating to revenue recognition, may have a significant effect on our reported results, including reporting of transactions completed before the effective date of the changes.

*Our business is subject to evolving corporate governance and public disclosure regulations that have increased both our costs and the risk of noncompliance, which could have an adverse effect on our stock price.*

Because our common stock is publicly traded on the Nasdaq stock market, we are subject to rules and regulations promulgated by a number of governmental and self–regulated organizations, including the SEC, Nasdaq and the Public Company Accounting Oversight Board, which monitors the accounting practices of public companies. Many of these regulations have only recently been enacted, and continue to evolve, making compliance more difficult and uncertain. In addition, our efforts to comply with these new regulations have resulted in, and are likely to continue to result in, increased general and administrative expenses and a diversion of management time and attention from revenue–generating activities to compliance activities.

44

In particular, Section 404 of Sarbanes–Oxley Act of 2002 and related regulations require us to include a management assessment of our internal controls over financial reporting and auditor attestation of that assessment in our annual reports. This effort has required, and will continue to require in the future, the commitment of significant financial and managerial resources. This annual report on Form 10–K discloses a material weakness in internal control over financial reporting. Although we believe that our ongoing review of our internal controls will enable us to provide favorable assessments of our internal controls and for our external auditors to provide their annual attestations in future SEC filings, as required by Section 404, we can give no assurance that these efforts will be completed on a timely and successful basis. Any failure to complete a favorable assessment and obtain our auditors' attestation could have a material adverse effect on our stock price.

*Product errors or defects could expose us to liability and harm our reputation.*

Despite extensive testing prior to releasing our products, software products frequently contain errors or defects, especially when first introduced, when new versions are released or when integrated with technologies developed by acquired companies. Product errors could affect the performance or interoperability of our products, could delay the development or release of new products or new versions of products and could adversely affect market acceptance or perception of our products. In addition, allegations of IC manufacturability issues resulting from use of our IP products could, even if untrue, adversely affect our reputation and our customers' willingness to license IP products from us. Any such errors or delays in releasing new products or new versions of products or allegations of unsatisfactory performance could cause us to lose revenue or market share, increase our service costs, subject us to liability for damages and divert our resources from other tasks, any one of which could materially and adversely affect our business, results of operations and financial condition.

45

**Item 7A.**   *Quantitative and Qualitative Disclosures About Market Risk*

*Interest Rate Risk.*   Our exposure to market risk for changes in interest rates relates primarily to our short–term investment portfolio. The primary objective of our investment activities is to preserve the principal while at the same time maximizing yields without significantly increasing the risk. To achieve this objective, we maintain our portfolio of cash equivalents and investments in a mix of tax–exempt and taxable instruments that meet high credit quality standards, as specified in our investment policy. None of our investments are held for trading purposes. Our policy also limits the amount of credit exposure to any one issue, issuer and type of instrument.

The following table presents the carrying value and related weighted–average total return for our investment portfolio as of October 31, 2005:

|  | Carrying Value | Weighted Average Total Return |
|---|---|---|
|  | (in thousands) |  |
| Money Market Funds (U.S.) | 300,439 | 2.33% |
| Short–term Investments (U.S.) | $ 182,070 | 2.30% |
| Cash Deposits and Money Market Funds (International) | 89,077 | 2.11% |
| Total interest bearing instruments | $ 571,586 | 2.29% |

As of October 31, 2005, the stated maturities of our current short–term investments are $41.6 million within one year, $20.8 million within one to five years, $10.8 million within five to ten years and $108.9 million after ten years. However, we consider these investments to be short–term in nature because, in accordance with our investment policy, the weighted–average expected duration of our total invested funds does not exceed one year and the investments are available for short–term obligations and other uses including acquisitions. These investments are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of accumulated other comprehensive income, net of tax.

The following table presents the amounts of our cash equivalents and investments as of October 31, 2005 that are subject to interest rate risk by calendar year of expected duration and average interest rates:

|  | Year Ended December 31, | | | | | | | Fair |
|---|---|---|---|---|---|---|---|---|
|  | 2005 | 2006 | 2007 | 2008 | 2009 | Total | | Value |
|  | (in thousands) | | | | | | | |
| Cash equivalents (variable rate) | $ 389,516 | — | — | — | — | $ 389,516 | | $ 389,516 |
| Average interest rate | 2.38% | | | | | | | |
| Short–term investments (variable rate) | $ 106,328 | $ 5,660 | — | — | — | $ 111,988 | | $ 111,988 |
| Average interest rate | 2.68% | 3.07% | | | | | | |
| Short–term investments (fixed rate) | $ 9,004 | $ 33,642 | $ 9,266 | $ 18,170 | — | $ 70,082 | | $ 70,082 |
| Average interest rate | 2.96% | 2.99% | 3.14% | 3.24% | — | | | |

46

In comparison, the following table presents the amounts of our cash equivalents and investments as of October 31, 2004 that were subject to interest rate risk by calendar year of expected duration and average interest rates:

| | Year Ended December 31, | | | | | | |
| | 2004 | 2005 | 2006 | 2007 | 2008 | Total | Fair Value |
|---|---|---|---|---|---|---|---|
| | (in thousands) | | | | | | |
| Cash equivalents (variable rate) | $  285,618 | — | — | — | — | $  285,618 | $  285,618 |
| Average interest rate | 1.34% | | | | | | |
| Short–term investments (variable rate) | $  32,808 | $  8,600 | $  1,851 | $  6,275 | — | $  49,534 | $  49,534 |
| Average interest rate | 1.79% | 1.61% | 1.88% | 1.99% | | | |
| Short–term investments (fixed rate) | $  1,997 | $  89,487 | $  62,273 | $  29,028 | — | $  182,785 | $  182,785 |
| Average interest rate | 1.74% | 2.05% | 1.95% | 2.13% | | | |

In April 2004, Synopsys entered into a three–year, $250.0 million senior unsecured revolving credit facility. This facility contains financial covenants requiring that we maintain a minimum leverage ratio and specified levels of cash, as well as other non–financial covenants. The facility terminates on April 28, 2007. Borrowings under the facility bear interest at the greater of the administrative agent's prime rate or the federal funds rate plus 0.50%; however, we have the option to pay interest based on the outstanding amount at Eurodollar rates plus a spread between 0.80% and 1.125% based on a pricing grid tied to a financial covenant. In addition, commitment fees are payable on the facility at rates between 0.20% and 0.25% per annum based on a pricing grid tied to a financial covenant. In April 2004 and May 2005, we borrowed and repaid $200.0 and $75.0 million, respectively, under the credit facility. As of October 31, 2005 and 2004, we had no outstanding borrowings under this credit facility and were in compliance with all covenants.

*Foreign Currency Risk.*    The functional currency of each of Synopsys' active foreign subsidiaries is the foreign subsidiary's local currency, except for our principal Irish and Swiss subsidiaries whose functional currencies are the U.S. dollar. We engage in a program to minimize the effect of changes in the exchange rate between a given functional currency (i.e. the yen in the case of our Japanese subsidiary) and the corresponding non–functional currency transactions (i.e. receivables denominated in the U.S. in the case of our Japanese subsidiary). We hedge the following types of non–functional–currency–denominated balances and transactions: (i) certain assets and liabilities, (ii) shipments forecasted to occur within approximately one month, (iii) future billings and revenue on previously shipped orders, and (iv) certain future intercompany invoices denominated in the Euro. A description of the accounting under our hedging programs is included in Note 2 to our *Notes to Consolidated Financial Statements*.

47

The following table provides information about our foreign currency contracts as of October 31, 2005:

| Forward Contract Values: | Amount in U.S. Dollars (in thousands) | Weighted Average Contract Rate |
|---|---|---|
| Japanese yen | $ 66,403 | 114.86 |
| Euro | 60,284 | 0.82175 |
| Canadian dollar | 12,020 | 1.18676 |
| British pound sterling | 8,633 | 0.56503 |
| Taiwan dollar | 4,876 | 33.66 |
| Israeli shekel | 3,699 | 4.6341 |
| Chinese renminbi | 2,314 | 8.06 |
| Korean Won | 1,865 | 1055.5 |
| India Rupee | 1,401 | 45.37 |
| Singapore dollar | 1,143 | 1.6915 |
| Swedish Korna | 747 | 7.935 |
| Swiss Franc | 499 | 1.28484 |
| | $ 163,884 | |

The following table provides information about our foreign currency contracts as of October 31, 2004:

| Forward Contract Values: | Amount in U.S. Dollars (in thousands) | Weighted Average Contract Rate |
|---|---|---|
| Japanese yen | $ 25,034 | 106.47 |
| Euro | 15,217 | 0.7839 |
| Canadian dollar | 14,137 | 1.226 |
| British pound sterling | 1,965 | 0.54613 |
| Israeli shekel | 1,736 | 4.45165 |
| Singapore dollar | 2,007 | 1.66085 |
| Taiwan dollar | 508 | 33.605 |
| Chinese renminbi | 3,912 | 8.246 |
| India Rupee | 1,116 | 45.74 |
| | $ 65,632 | |

The amounts shown in the tables include the balances and transactions described above. The maximum original duration of the currency contracts shown is 16 months in the case of our Euro forward contracts and one month in the case of contracts for other currencies. Due to the short–term nature of these contracts, the contract rates approximate fair value as of October 31, 2005 and 2004.

The success of our hedging activities depends upon the accuracy of our estimates of various balances and transactions denominated in non–functional currencies. To the extent our estimates are correct, gains and losses on our foreign currency contracts will be offset by corresponding losses and gains on the underlying transactions.

For example, if the Euro were to depreciate by 10% prior to the settlement of the Euro forward contracts listed in the table above, the fair value of the contracts would decrease by approximately $6.0 million, and we would be required to pay approximately $6.0 million to the counterparty upon contract

48

maturity. At the same time, the U.S. dollar value of our Euro–based expenses would decline, resulting in a gain and positive cash flow of approximately $6.0 million that would offset the loss and negative cash flow on the maturing forward contracts.

Net unrealized loss of approximately $0.6 million and gain of $9.6 million, net of tax are included in accumulated other comprehensive income on our consolidated balance sheet as of October 31, 2005 and October 31, 2004, respectively. Net cash outflows on maturing forward contracts during the three months ended October 31, 2005 were $2.9 million.

If our estimates of our balances and transactions prove inaccurate, we will not be completely hedged, and we will record a gain or loss, depending upon the nature and extent of such inaccuracy.

In the first quarter of fiscal 2005, Synopsys reevaluated its interpretation of certain provisions of SFAS 133, resulting in the discovery of an error in the application of the standard to certain prior year foreign currency hedge transactions. The effect of the error was not material in any prior period and did not impact the economics of Synopsys' hedging program. To correct the error, Synopsys reclassified the remaining $3.0 million related to the disallowed hedges from accumulated other comprehensive income to other income in the three months ended January 31, 2005.

Foreign currency contracts entered into in connection with our hedging activities contain credit risk in that the counterparty may be unable to meet the terms of the agreements. We have limited these agreements to major financial institutions to reduce this credit risk. Furthermore, we monitor the potential risk of loss with any one financial institution. We do not enter into forward contracts for speculative purposes.

*Equity Risk.*   Our strategic investment portfolio as of October 31, 2005 consists of approximately $8.0 million of minority equity investments in publicly traded and in privately held companies compared to approximately $12.8 million as of October 31, 2004. The securities of publicly traded companies are generally classified as available–for–sale securities accounted for under Statement of Financial Accounting Standards No. 115, *Accounting for Certain Investments in Debt and Equity Securities,* and are reported at fair value, with unrealized gains or losses, net of tax, recorded as a component of other comprehensive income in stockholders' equity. The cost basis of securities sold is based on the specific identification method. The securities of privately held companies are reported at the lower of cost or fair value. During fiscal 2005 and 2004, we reduced the value of our strategic investment portfolio by $4.5 million and $3.5 million, respectively.

49

Item 8.    *Financial Statements and Supplementary Data*

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Synopsys, Inc.:

We have audited the accompanying consolidated balance sheets of Synopsys, Inc. and subsidiaries as of October 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity and comprehensive income (loss) and cash flows for each of the years in the three–year period ended October 31, 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Synopsys, Inc. and subsidiaries as of October 31, 2005 and 2004, and the results of their operations and their cash flows for each of the years in the three–year period ended October 31, 2005, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the internal control over financial reporting of Synopsys, Inc. as of October 31, 2005, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated January 12, 2006, expressed an unqualified opinion on managements assessment of, and an adverse opinion on the effective operation of, internal control over financial reporting.

/s/ KPMG LLP

Mountain View, California
January 12, 2006

50

**SYNOPSYS, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except par value amounts)**

| | October 31, | |
| | 2005 | 2004 |
| --- | --- | --- |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 404,436 | $ 346,709 |
| Short–term investments | 182,070 | 232,320 |
| Total cash, cash equivalents and short–term investments | 586,506 | 579,029 |
| Accounts receivable, net | 100,178 | 132,258 |
| Deferred income taxes | 195,501 | 125,601 |
| Income taxes receivable | 48,370 | 46,583 |
| Prepaid expenses and other current assets | 16,924 | 29,562 |
| Total current assets | 947,479 | 913,033 |
| Property and equipment, net | 170,195 | 178,155 |
| Long–term investments | 8,092 | 12,831 |
| Goodwill, net | 728,979 | 593,706 |
| Intangible assets, net | 142,519 | 198,069 |
| Long–term deferred income taxes | 82,384 | 146,360 |
| Other assets | 61,828 | 50,033 |
| Total assets | $ 2,141,476 | $ 2,092,187 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $ 231,359 | $ 184,146 |
| Accrued income taxes | 169,632 | 188,096 |
| Deferred revenue | 415,689 | 368,913 |
| Total current liabilities | 816,680 | 741,155 |
| Deferred compensation and other liabilities | 63,841 | 51,794 |
| Long–term deferred revenue | 42,019 | 34,189 |
| Stockholders' equity: | | |
| Preferred stock, $0.01 per value; 4,000,000 shares authorized; none outstanding | — | — |
| Common stock, $0.01 par value; 400,000 shares authorized; 145,897 and 147,378 shares outstanding, respectively | 1,459 | 1,474 |
| Capital in excess of par value | 1,263,952 | 1,240,568 |
| Retained earnings | 171,108 | 202,146 |
| Treasury stock, at cost; 11,259 and 9,759 shares, respectively | (199,482) | (175,762) |
| Deferred stock compensation | (2,100) | (2,732) |
| Accumulated other comprehensive loss | (16,001) | (645) |
| Total stockholders' equity | 1,218,936 | 1,265,049 |
| Total liabilities and stockholders' equity | $ 2,141,476 | $ 2,092,187 |

See accompanying notes to consolidated financial statements.

51

**SYNOPSYS, INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

**(In thousands, except per share amounts)**

| | Year Ended October 31, | | |
|---|---|---|---|
| | **2005** | **2004** | **2003** |
| Revenue: | | | |
| Time–based license | $ 743,723 | $ 663,244 | $ 618,024 |
| Upfront license | 60,466 | 215,955 | 298,280 |
| Maintenance and Service | 187,742 | 212,905 | 260,679 |
| Total revenue | 991,931 | 1,092,104 | 1,176,983 |
| Cost of revenue: | | | |
| License | 101,910 | 87,705 | 77,983 |
| Maintenance and Service | 70,691 | 66,782 | 69,478 |
| Amortization of intangible assets and deferred stock compensation | 81,786 | 102,572 | 92,856 |
| Total cost of revenue | 254,387 | 257,059 | 240,317 |
| Gross margin | 737,544 | 835,045 | 936,666 |
| Operating expenses: | | | |
| Research and development | 316,992 | 285,281 | 285,880 |
| Sales and marketing | 331,404 | 302,372 | 310,692 |
| General and administrative | 102,940 | 121,547 | 90,021 |
| In–process research and development | 5,700 | 1,638 | 19,850 |
| Amortization of intangible assets and deferred stock compensation | 33,492 | 34,891 | 35,318 |
| Total operating expenses | 790,528 | 745,729 | 741,761 |
| Operating (loss) income | (52,984) | 89,316 | 194,905 |
| Other income, net | 45,195 | 2,276 | 24,084 |
| (Loss) income before provision for income taxes | (7,789) | 91,592 | 218,989 |
| Provision for income taxes | 7,689 | 17,255 | 69,265 |
| Net (loss) income | $ (15,478) | $ 74,337 | $ 149,724 |
| Net (loss) income per share: | | | |
| Basic | $ (0.11) | $ 0.48 | $ 0.99 |
| Diluted | $ (0.11) | $ 0.46 | $ 0.95 |
| Shares used in computing per share amounts: | | | |
| Basic | 144,970 | 154,439 | 151,251 |
| Diluted | 144,970 | 159,991 | 158,326 |

See accompanying notes to consolidated financial statements.

**SYNOPSYS, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**AND COMPREHENSIVE INCOME (LOSS)**
**(In thousands)**

| | Common Stock | | Capital in Excess of Par Value | Retained Earnings | Treasury Stock | Deferred Stock Compensation | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| Balance at October 31, 2002 | 147,124 | $ 1,470 | $ 1,038,651 | $ 198,863 | $ (116,499 ) | $ (8,858 ) | $ (146 ) | $ 1,113,481 |
| Components of comprehensive income: | | | | | | | | |
| Net income | — | — | — | 149,724 | — | — | | 149,724 |
| Unrealized gain (loss) on investments, net of tax of $2,370 | — | — | — | — | — | — | 3,663 | |
| Deferred gain (loss) on cash flow hedges, net of tax of $12,426 | — | — | — | — | — | — | 19,204 | |
| Reclassification adjustment on unrealized gains on investments, net of tax of $7,546 | — | — | — | — | — | — | (11,644) | |
| Reclassification on deferred gains on cash flow hedges, net of tax of $4,115 | — | — | — | — | — | — | (6,359) | — |
| Foreign currency translation adjustment | — | — | — | — | — | — | 4,635 | — |
| Accumulated other comprehensive income | — | — | — | — | — | — | 9,499 | 9,499 |
| Total comprehensive income | | | | | | | 159,223 | 159,223 |
| Amortization of deferred stock compensation, net of forfeitures | — | — | (1,888) | — | — | 6,884 | — | 4,996 |
| Acquisition of treasury stock | (9,407) | (94) | 94 | — | (260,746) | — | — | (260,746) |
| Stock options assumed in connection with acquisitions | — | — | 21,696 | — | — | (5,196) | — | 16,500 |
| Stock issued under stock option and stock purchase plans | 18,120 | 184 | 74,840 | (96,608) | 356,512 | — | — | 334,928 |
| Tax benefits associated with exercise of stock options | — | — | 65,028 | — | — | — | — | 65,028 |
| Balance at October 31, 2003 | 155,837 | $ 1,560 | $ 1,198,421 | $ 251,979 | $ (20,733 ) | $ (7,170 ) | $ 9,353 | $ 1,433,410 |

53

**SYNOPSYS, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**AND COMPREHENSIVE INCOME (LOSS) (Continued)**
**(In thousands)**

| | Common Stock | | Capital in Excess of Par Value | Retained Earnings | Treasury Stock | Deferred Stock Compensation | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| **Balance at October 31, 2003** | 155,837 | $ 1,560 | $ 1,198,421 | $ 251,979 | $ (20,733 ) | $ (7,170 ) | $ 9,353 | $ 1,433,410 |
| Components of comprehensive income: | | | | | | | | |
| Net income | — | — | — | 74,337 | — | — | 74,337 | 74,337 |
| Unrealized gain (loss) on investments, net of tax of $139 | — | — | — | — | — | — | 295 | — |
| Deferred gain (loss) on cash flow hedges, net of tax of $1,270 | — | — | — | — | — | — | (2,699) | — |
| Reclassification adjustment on deferred gains on cash flow hedges, net of tax of $2,972 | — | — | — | — | — | — | (7,078) | — |
| Foreign currency translation adjustment | — | — | — | — | — | — | (516) | — |
| Accumulated other comprehensive (loss) | | | | | | | (9,998) | (9,998) |
| Total comprehensive income | | | | | | | 64,339 | 64,339 |
| Amortization of deferred stock compensation, net of forfeitures | — | — | (1,083) | | | 4,438 | — | 3,355 |
| Acquisition of treasury stock | (16,916) | (161) | 161 | — | (423,303) | — | — | (423,303) |
| Stock issued under stock option and stock purchase plans | 8,457 | 75 | 12,537 | (124,170) | 268,274 | — | — | 156,716 |
| Tax benefits associated with exercise of stock options | — | — | 30,532 | | — | — | — | 30,532 |
| **Balance at October 31, 2004** | 147,378 | $ 1,474 | $ 1,240,568 | $ 202,146 | $ (175,762 ) | $ (2,732 ) | $ (645 ) | $ 1,265,049 |

54

**SYNOPSYS, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**AND COMPREHENSIVE INCOME (LOSS) (Continued)**
**(In thousands)**

| | Common Stock | | Capital in Excess of Par Value | Retained Earnings | Treasury Stock | Deferred Stock Compensation | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| **Balance at October 31, 2004** | 147,378 | $ 1,474 | $ 1,240,568 | $ 202,146 | $ (175,762 ) | $ (2,732 ) | $ (645 ) | $ 1,265,049 |
| Components of comprehensive income: | | | | | | | | |
| Net loss | — | — | — | (15,478) | — | — | (15,478) | (15,478) |
| Unrealized gain (loss) on investments, net of tax benefit (expense) of $542 | — | — | — | — | — | — | (693) | — |
| Deferred gain (loss) on cash flow hedges, net of tax benefit (expense) of $(1,185) | — | — | — | — | — | — | (2,108) | — |
| Reclassification adjustment on deferred (gains) losses of cash flow hedges , net of tax benefit (expense) of $(3,501) | | | | | | | (6,226) | |
| Correction of an error in accounting for certain hedging transactions, net of tax benefit of $1,150 | — | — | — | — | — | — | (1,808) | — |
| Foreign currency translation adjustment | — | — | — | — | — | — | (4,521) | — |
| Accumulated other comprehensive income (loss) | | | | | | | (15,356) | (15,356) |
| Total comprehensive income | | | — | | | — | (30,834) | (30,834) |
| Deferred Stock Compensation | | | 1,490 | | | (1,490) | | |
| Stock options assumed in connection with acquistion of Nassda | | | 12,141 | | | | | 12,141 |
| Amortization of deferred stock compensation, net of forfeitures | — | — | 3,304 | — | — | 2,872 | — | 6,176 |
| Acquisition of treasury stock | (5,140) | (51) | 51 | — | (88,386) | — | — | (88,386) |
| Stock issued under stock option and stock purchase plans | 3,659 | 36 | 223 | (15,560) | 64,666 | (750) | — | 48,615 |
| Tax benefits associated with exercise of stock options | — | — | 6,175 | — | — | — | — | 6,175 |
| **Balance at October 31, 2005** | 145,897 | $ 1,459 | $ 1,263,952 | $ 171,108 | $ (199,482 ) | $ (2,100 ) | $ (16,001 ) | $ 1,218,936 |

See accompanying notes to consolidated financial statements.

55

SYNOPSYS, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

(In thousands)

| | Year Ended October 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| Cash flow from operating activities: | | | |
| Net (loss) income | $ (15,478) | $ 74,337 | $ 149,724 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Amortization and depreciation | 175,057 | 192,774 | 184,110 |
| Provision for doubtful accounts | (4,094) | (927) | (1,577) |
| Write–down of long term investments | 3,582 | 2,983 | 4,525 |
| Gain (loss) on sale of investments | 502 | (833) | (22,366) |
| Write–down of intangible assets | — | 675 | — |
| Deferred income taxes | (14,647) | (50,855) | (30,503) |
| Net change in deferred gains and losses on cash flow hedges | (15,982) | (14,019) | 18,107 |
| In–process research and development | 5,700 | 1,638 | 19,850 |
| Tax benefit associated with stock options | 6,175 | 30,532 | 65,028 |
| Net changes in operating assets and liabilities net of acquired assets and liabilities: | | | |
| Accounts receivable | 56,842 | 70,511 | 7,183 |
| Prepaid expenses and other current assets | 11,268 | 15,281 | 66,289 |
| Other assets | (11,616) | (11,318) | (9,055) |
| Accounts payable and accrued liabilities | 22,336 | (26,906) | (30,115) |
| Accrued income taxes | (7,851) | (13,829) | (44,510) |
| Deferred revenue | 45,125 | (17,721) | 5,226 |
| Deferred compensation and other liabilities | 12,271 | 11,714 | 9,618 |
| Net cash provided by operating activities | 269,190 | 264,037 | 391,534 |
| Cash flows from investing activities: | | | |
| Proceeds from sales and maturities of short–term investments | 422,523 | 992,300 | 253,828 |
| Purchases of short–term investments | (372,984) | (1,050,524) | (325,386) |
| Proceeds from sales of long–term investments | — | 412 | 34,951 |
| Purchases of long–term investments | — | (6,339) | (1,213) |
| Purchases of property and equipment | (43,563) | (45,005) | (50,148) |
| Cash paid for acquisitions, net of cash received | (174,498) | (60,138) | (167,744) |
| Capitalization of software development costs | (2,953) | (2,739) | (2,616) |
| Net cash used in investing activities | (171,475) | (172,033) | (258,328) |
| Cash flows from financing activities: | | | |
| Proceeds from credit facility | 75,000 | 200,000 | — |
| Payments on credit facility | (75,000) | (200,000) | — |
| Issuances of common stock | 48,615 | 156,716 | 334,928 |
| Purchases of treasury stock | (88,386) | (423,303) | (260,746) |
| Net cash (used in) provided by financing activities | (39,771) | (266,587) | 74,182 |
| Effect of exchange rate changes on cash and cash equivalents | (217) | (3,016) | 4,340 |
| Net increase (decrease) in cash and cash equivalents | 57,727 | (177,599) | 211,728 |
| Cash and cash equivalents, beginning of year | 346,709 | 524,308 | 312,580 |
| Cash and cash equivalents, end of year | $ 404,436 | $ 346,709 | $ 524,308 |
| Supplemental Disclosure of Cash Flow Information: | | | |
| Cash paid during the year for: | | | |
| Income taxes | $ 21,003 | $ 45,867 | $ 36,055 |

See accompanying notes to consolidated financial statements.

56

SYNOPSYS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1.  Description of Business**

Synopsys, Inc. (the Company) is a provider of electronic design automation (EDA) software for semiconductor design. The Company delivers technology−leading semiconductor design and verification platforms to global electronics companies enabling development of complex systems−on−chips (SoCs). Synopsys also provides intellectual property and design services to simplify the design process and to accelerate time to market for its customers.

**Note 2.  Summary of Significant Accounting Policies**

*Fiscal Year End.*   The Company's fiscal year ends on the Saturday nearest October 31. All fiscal years presented were 52−week years. For presentation purposes, the consolidated financial statements and notes refer to the calendar month end.

*Principles of Consolidation.*   The consolidated financial statements include the accounts of the Company and all of its subsidiaries. All significant intercompany accounts and transactions have been eliminated.

*Stock Split.*   On September 23, 2003, the Company completed a two−for−one stock split in the form of a stock dividend. All common share and per share data for all periods presented have been adjusted to reflect the stock split.

*Basis of Presentation:*   Certain prior year amounts have been reclassified to conform to the current year presentation. In the first quarter of fiscal 2005 the Company revised its methodology for allocating and reporting cost of revenue. The Company has classified cost of revenue of fiscal 2003 and 2004 to conform to the fiscal 2005 methodology.

*Foreign Currency Translation.*   The functional currency of each of the Company's foreign subsidiaries is the foreign subsidiary's local currency except for the Company's principal Irish and Swiss subsidiaries, whose functional currency is the United States (U.S.) dollar. Assets and liabilities that are not denominated in the functional currency are remeasured into the functional currency with any related gain or loss recorded in earnings. Such gains or losses have not been material for any period presented. The Company translates assets and liabilities of its foreign operations except its principal Irish and Swiss subsidiaries into the functional currency at exchange rates in effect at the balance sheet date. The Company translates income and expense items of its foreign operations into U.S. dollars at average exchange rates for the period. Accumulated net translation adjustments are reported in stockholders' equity, net of tax, as a component of accumulated other comprehensive income (loss).

*Use of Estimates.*   To prepare financial statements in conformity with generally accepted accounting principles accepted in the United States of America, management must make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

*Fair Values of Financial Instruments.*   The fair value of the Company's cash, short−term investments, accounts receivable, accounts payable and foreign currency contracts, approximates the carrying amount, due to their short weighted average maturities. Long−term marketable equity investments are valued based on quoted market prices. Non−marketable equity securities are valued at cost. The Company performs periodic impairment analysis over these non−marketable equity securities.

57

*Cash Equivalents and Short–Term Investments.*   The Company classifies investments with original maturities of three months or less when acquired as cash equivalents. All of the Company's cash equivalents and short–term investments are classified as available–for–sale and are reported at fair value, with unrealized gains and losses included in stockholders' equity as a component of accumulated other comprehensive income (loss), net of tax. Those unrealized gains or losses deemed other than temporary are reflected in investment income, net. The cost of securities sold is based on the specific identification method and realized gains and losses are included in other income, net. The Company has cash equivalents and investments with various high quality institutions and, by policy, limits the amount of credit exposure to any one institution.

*Concentration of Credit Risk.*   The Company sells its products worldwide primarily to customers in the global electronics market. The Company performs on–going credit evaluations of its customers' financial condition and does not require collateral. The Company establishes reserves for potential credit losses and such losses have been within management's expectations and have not been material in any year presented.

*Allowance for Doubtful Accounts.*   Trade accounts receivable are recorded at the invoiced amount and do not bear interest. We maintain allowances for doubtful accounts to reduce the Company's receivables to their estimated net realizable value. The Company provides a general reserve on all accounts receivable based on a review of accounts and a 15 quarter average of write offs, net of recoveries. Such losses have been within management's expectations and have not been material in any year presented. The following table provides a rollforward of the changes in the allowance for doubtful accounts.

| Fiscal Year | Balance at Beginning of Period | Reductions credited to expense | Write–offs(1) | Balance at End of Period |
|---|---|---|---|---|
| | | (in thousands) | | |
| 2005 | $  7,113 | $ (4,094 ) | $      984 | $ 4,003 |
| 2004 | $  8,295 | $   (927 ) | $   (255 ) | $ 7,113 |
| 2003 | $ 11,565 | $ (1,577 ) | $ (1,693 ) | $ 8,295 |

(1)    Accounts written off, net of recoveries

*Income Taxes.*   The Company accounts for income taxes using the asset and liability method as prescribed by Statement of Financial Accounting Standards No. 109, *Accounting for Income Taxes* (SFAS 109). Under the asset and liability method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

*Property and Equipment.*   Property and equipment is recorded at cost less accumulated depreciation and amortization. Assets are depreciated using the straight–line method over their estimated useful lives ranging from three to five years and not to exceed 30 years for buildings. Leasehold improvements are amortized using the straight–line method over the remaining term of the lease or the economic useful life of the asset, whichever is shorter. Amortization and depreciation expense was $52.7 million in 2005, $53.0 million in 2004 and $52.9 million in 2003. The cost of repairs and maintenance is charged to operations as incurred and was $17.4 million, $16.1 million and $15.1 million in fiscal 2005, 2004 and 2003, respectively. The Company evaluates the recoverability of its property, equipment and intangible assets on at least an annual basis in accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the*

*Impairment or Disposal of Long−Lived Assets* (SFAS 144), and record an impairment charge against income as appropriate. A detail of property and equipment is as follows:

|  | October 31, | |
|  | 2005 | 2004 |
| --- | ---: | ---: |
|  | (in thousands) | |
| Computer and other equipment | $  351,253 | $  336,815 |
| Buildings | 21,821 | 21,821 |
| Furniture and fixtures | 29,936 | 28,925 |
| Land | 42,754 | 42,754 |
| Leasehold improvements | 71,217 | 70,628 |
|  | 516,981 | 500,943 |
| Less accumulated depreciation and amortization | (346,786) | (322,788) |
| Total property and equipment, net | $  170,195 | $  178,155 |

*Software Development Costs.* Capitalization of software development costs begins upon the establishment of technological feasibility, which is generally the completion of a working prototype and ends upon general release of the product. Capitalized software development costs were approximately $3.0 million, $2.7 million and $2.6 million in fiscal 2005, 2004 and 2003, respectively. Amortization of software development costs is computed based on the straight−line method over the software's estimated economic life of approximately two years. The Company recorded software amortization costs of $2.7 million, $2.3 million and $1.6 million in fiscal 2005, 2004 and 2003, respectively.

*Goodwill, Intangible Assets and Deferred Stock Compensation.* Goodwill represents the excess of the aggregate purchase price over the fair value of the tangible and identifiable intangible assets acquired by the Company. The goodwill recorded as a result of the business combinations in the years presented is not deductible for tax purposes. The Company evaluates aggregate goodwill on a quarterly basis for indications of impairment based on our fair value as determined by its market capitalization in accordance with Statement of Financial Accounting Standards No. 142 (SFAS 142), *Goodwill and Other Intangible Assets*. If this evaluation indicates that the value of the goodwill may be impaired, the Company assesses the impairment of the goodwill using the two−step method prescribed by SFAS 142. Any such impairment charge could be significant and could have a material adverse effect on the Company's reported financial statements. The Company did not record any impairment charges on its goodwill during fiscal 2005. As of October 31, 2005, the carrying amount of our goodwill was $729.0 million.

Intangible assets consist of purchased technology, contract rights intangibles, customer installed base/relationships, trademarks and tradenames, covenants not to compete, customer backlog, capitalized software and other intangibles. Intangible assets are amortized on a straight−line basis over their estimated useful lives which range from two to ten years. Amortization of intangible assets was $116.1 million, $136.4 million and $124.8 million in fiscal 2005, 2004 and 2003, respectively. The Company evaluates its intangible assets for indications of impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. If this evaluation indicates that the value of the intangible asset may be impaired, the Company makes an assessment of the recoverability of the net carrying value of the asset over its remaining useful life. If this assessment indicates that the intangible asset is not recoverable, based on the estimated undiscounted future cash flows of the technology over the remaining amortization period, the Company reduces the net carrying value of the related intangible asset to fair value and may adjust the remaining amortization period.

Deferred stock compensation represents the intrinsic value of unvested stock options assumed in connection with acquisitions as well as the value of restricted stock issued to members of the Board of Directors. The deferred stock compensation is amortized on a straight−line basis over the remaining

vesting period of one to four years. Amortization of deferred stock compensation net of forfeitures was approximately $2.0 million, $3.4 million, and $5.0 million in fiscal 2005, 2004 and 2003, respectively.

*Accounts Payable and Accrued Liabilities.*   Accounts payable and accrued liabilities consist of:

| | October 31, | |
|---|---|---|
| | 2005 | 2004 |
| | (in thousands) | |
| Payroll and related benefits | $ 157,915 | $ 117,664 |
| Acquisition related costs | 6,616 | 3,011 |
| Other accrued liabilities | 54,772 | 51,193 |
| Accounts payable | 12,056 | 12,278 |
| Total accounts payable and accrued liabilities | $ 231,359 | $ 184,146 |

*Deferred Compensation Plan.*   The Company maintains the Synopsys Deferred Compensation Plan (the "Plan"), which permits certain employees to defer up to 50% of their annual cash base compensation and up to 100% of their annual cash variable compensation. Distributions from the Plan are generally payable upon cessation of employment over five to 15 years or as a lump sum payment at the option of the employee. Since the inception of the Plan, the Company has not made any matching or discretionary contributions to the Plan. There are no Plan provisions that provide for any guarantees or minimum return on investments. Undistributed amounts under the Plan are subject to the claims of the Company's creditors. As of October 31, 2005 and 2004, the invested amounts under the Plan total $54.0 million and $41.8 million, respectively, and are recorded as long–term other assets on the Company's balance sheet. As of October 31, 2005 and 2004, the Company has recorded $56.5 million and $44.2 million, respectively, as a long–term liability to recognize undistributed amounts due to employees.

*Synopsys 401(k) Plan.*   The Company maintains various retirement plans for its eligible U.S. and non–U.S. employees. Total contributions to these plans are charged to operations and were $10.2 million, $8.4 million and $6.6 million in fiscal 2005, 2004 and 2003, respectively. For employees in the U.S., the Company maintains the Synopsys 401(k) Savings and Success Sharing Plan (the "401k Plan"). As allowed under Section 401(k) of the Internal Revenue Code, the 401k Plan allows tax deferred salary deductions by eligible employees. The Company's Deferred Compensation Plans Committee administers the 401k Plan. Participants in the 401k Plan may make salary deferrals of up to 30% of eligible annual salary, limited by the maximum dollar amount allowed by the Internal Revenue Code. The Company makes a matching contribution equal to 40% of employee deferrals, up to a maximum of $1,500 per participant per year. Effective January 1, 2003, participants who have reached the age of fifty before the close of the 401k Plan year may be eligible to make catch–up salary deferral contributions, limited by the maximum dollar amount allowed by the Internal Revenue Code. Catch–up contributions are not eligible for matching contributions.

*Other Comprehensive Income (Loss).*   The Company records comprehensive income in accordance with Statement of Financial Accounting Standards No. 130, *Reporting Comprehensive Income (Loss)*, which establishes standards for reporting and displaying comprehensive income (loss) and its components in the financial statements. Comprehensive income (loss), as defined, includes all changes in equity during a period from non–owner sources, such as accumulated net translation adjustments, unrealized gains on certain foreign currency forward contracts that qualify as cash flow hedges and reclassification adjustments related to unrealized gains on investments. Reclassification adjustments decrease other comprehensive income for gains on the sale of available–for–sale securities realized during the current year and are included in other comprehensive income (loss) as unrealized holding gains in the period in which such unrealized gains arose.

Accumulated other comprehensive (loss) income consists of the following:

|  | October 31, | |
|  | 2005 | 2004 |
|  | (in thousands) | |
| Unrealized gain (loss) on investments | $ (250) | $ 443 |
| Deferred gain (loss) on cash flow hedges | (592) | 9,550 |
| Foreign currency translation adjustment | (15,159) | (10,638) |
|  | $ (16,001) | $ (645) |

    *Revenue Recognition.* The Company recognizes revenue from software licenses and maintenance and service revenue. Software license revenue includes fees associated with the licensing of the Company's software. Maintenance and service revenue includes maintenance fees associated with perpetual and term licenses and professional service fees.

    The Company has designed and implemented revenue recognition policies in accordance with Statement of Position (SOP) 97–2, *Software Revenue Recognition*, as amended by SOP 98–9, *Modification of SOP 97–2, Software Revenue Recognition, With Respect to Certain Transactions.*

    With respect to software licenses, the Company utilizes license types:

- *Technology Subscription Licenses (TSLs)* are for a finite term, and generally provide the customer limited rights to receive, or to exchange certain quantities of licensed software for, unspecified future technology. The Company bundles and does not charge separately for post−contract customer support (maintenance or PCS) for the term of the license.

- *Term licenses* are also for a finite term, but do not provide the customer any rights to receive, or to exchange licensed software for unspecified future technology. Customers purchase maintenance separately for the first year and may renew annually for the balance of the term. The annual maintenance fee is typically calculated as a percentage of the net license fee.

- *Perpetual licenses* continue as long as the customer renews maintenance, plus an additional 20 years. Perpetual licenses do not provide the customer any rights to receive, or to exchange licensed software for, unspecified future technology. Customers purchase maintenance separately for the first year and may renew annually.

    For the three software license types, the Company recognizes revenue as follows:

- *Technology Subscription Licenses.* The Company typically recognizes revenue from TSL license fees (which include bundled maintenance) ratably over the term of the license period. However, where extended payment terms (i.e. where less than 75% of the TSL license fees are due within one year from shipment) are offered under the license arrangement, the Company recognizes revenue from TSL license fees in an amount equal to the lesser of the ratable portion of the entire fee or customer installments as they become due and payable.

- *Term Licenses.* The Company recognizes the term license in full if, upon shipment of the software, payment terms require the customer to pay at least 75% of the term license fee within one year from shipment and all other revenue recognition criteria are met. For term licenses where less than 75% of the term license fee is due within one year from shipment, the Company recognizes revenue as customer installments become due and payable.

- *Perpetual Licenses.* The Company recognizes the perpetual license fee in full if, upon shipment of the software, payment terms require the customer to pay at least 75% of the perpetual license fee within one year from shipment and all other revenue recognition criteria are met. For perpetual

licenses in which less than 75% of the license fee is payable within one year from shipment, the Company recognizes the revenue as customer installments become due and payable.

The Company allocates revenue on software transactions (referred to as "arrangements") involving multiple elements to each element based on the relative fair values of the elements. The Company's determination of fair value of each element in multiple element arrangements is based on vendor–specific objective evidence (VSOE). The Company limits its assessment of VSOE for each element to the price charged when the same element is sold separately.

The Company has analyzed all of the elements included in its multiple–element arrangements and has determined that it has sufficient VSOE to allocate revenue to the maintenance components of its perpetual and term license products and to consulting. Accordingly, assuming all other revenue recognition criteria are met, the Company recognizes revenue from perpetual and term licenses upon delivery using the residual method in accordance with SOP 98–9, the Company recognizes revenue from maintenance ratably over the maintenance term and the Company recognizes revenue from consulting services as the related services are performed and accepted.

The Company makes significant judgments related to revenue recognition. Specifically, in connection with each transaction involving its products, the Company must evaluate whether: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred, (iii) its fee is fixed or determinable, and (iv) collectibility is probable. The Company applies these criteria as discussed below.

- *Persuasive Evidence of an Arrangement Exists.*   Prior to recognizing revenue on an arrangement, the Company's customary practice is to have a written contract, signed by both the customer and the Company, or a purchase order from those customers that have previously negotiated a standard end–user license arrangement or volume purchase agreement.

- *Delivery Has Occurred.*   The Company delivers software to its customers physically or electronically. For physical deliveries, the standard transfer terms are typically FOB shipping point. For electronic deliveries, delivery occurs when the Company provides the customer access codes, or "keys," that allow the customer to take immediate possession of the software on its hardware.

- *The Fee is Fixed or Determinable.*   The Company's determination that an arrangement fee is fixed or determinable depends principally on the arrangement's payment terms. The Company's standard payment terms require 75% or more of the arrangement fee to be paid within one year. Where these terms apply, the Company regards the fee as fixed or determinable, and the Company recognizes revenue upon delivery (assuming all other revenue recognition criteria are met). If the payment terms do not meet this standard, which the Company refers to as "extended payment terms," the Company does not consider the fee to be fixed or determinable and generally recognizes revenue when customer installments are due and payable. In the case of a TSL, the Company recognizes revenue ratably even if the fee is fixed or determinable, due to the fact that maintenance services are included with the software licenses and due to application of other revenue accounting guidelines relating to arrangements that include rights to receive unspecified future technology.

- *Collectibility is Probable.*   To recognize revenue, the Company must judge collectibility of the arrangement fees, which it does on a customer–by–customer basis pursuant to its credit review policy. The Company typically sells to customers with whom it has a history of successful collection. For a new customer or where an existing customer substantially expands its commitments to us, the Company evaluates the customer's financial position and ability to pay and typically assigns a credit limit based on that review. The Company increases the credit limit only after it has established a successful collection history with the customer. If the Company determines at any time that collectibility is not probable based upon its credit review process or the customer's payment history, the Company recognizes revenue on a cash–collected basis.

62

The Company recognizes maintenance and service revenue as follows:

- *Maintenance Fees Associated with Perpetual and Term Licenses.*  The Company recognizes revenue from maintenance associated with perpetual and term licenses ratably over the maintenance term.
- *Professional Service Fees.*  The Company recognizes revenue from consulting and training services as services are performed and accepted.

    *Net Income (Loss) Per Share.*  The Company computes basic net income (loss) per share using the weighted–average number of common shares outstanding during the period. The Company computes diluted net income (loss) per share using the weighted–average number of common shares and dilutive stock options outstanding during the period; the number of weighted–average dilutive stock options outstanding is computed using the treasury stock method. Due to the net loss incurred for fiscal 2005, the effect of employee stock options is anti–dilutive in that period.

    The table below reconciles the weighted–average common shares used to calculate basic net income per share with the weighted–average common shares used to calculate diluted net income per share.

| | Year Ended October 31, | | |
|---|---|---|---|
| | **2005** | **2004** | **2003** |
| | | (in thousands) | |
| Weighted–average common shares for basic net income (loss) per share | 144,970 | 154,439 | 151,251 |
| Weighted–average dilutive stock options outstanding under the treasury stock method | — | 5,552 | 7,075 |
| Weighted–average common shares for diluted net income (loss) per share | 144,970 | 159,991 | 158,326 |

    The effect of dilutive employee stock options excludes approximately 27.1 million, 10.8 million and 12.0 million stock options for fiscal 2005, 2004 and 2003, respectively, which were anti–dilutive for net income per share calculations. No stock options were considered dilutive for the fiscal year ended 2005 as a result of the Company's net loss for the period. Although these options are currently not included in the net income (loss) per share calculation, they could be dilutive when the Company reports future earnings.

    *Stock–Based Compensation.*  As permitted by Statement of Financial Accounting Standards No. 123 (SFAS 123), *Accounting for Stock–Based Compensation*, the Company has elected to use the intrinsic value method prescribed by Accounting Principles Board Opinion No. 25 (APB 25), *Accounting for Stock Issued to Employees*, to measure compensation expense for stock–based awards to employees. Accordingly, the Company generally recognizes no compensation expense with respect to stock–based awards to employees as awards are issued with exercise prices equal to the fair value of the common stock on the grant date. The Company has determined pro forma information regarding net income and net income (loss) per share as if the Company had accounted for employee stock awards under the fair value method as required by SFAS No. 123, as amended. The Company has revised its fiscal year 2004 SFAS 123 pro forma stock compensation disclosure based on the discovery of an error in accounting for a modification of its ESPP awards. The error resulted in a $4.7 million increase to the stock compensation expense determined under the fair value based method, and a respective increase to proforma net loss in fiscal 2004. The fair value of these stock–based awards to employees was estimated using the Black–Scholes option pricing model,

63

assuming no expected dividends and using the following weighted–average assumptions:

| | Year Ended October 31, | | |
|---|---|---|---|
| | **2005** | **2004** | **2003** |
| **Stock Options** | | | |
| Expected life (in years) | 4.61 | 5.00 | 5.10 |
| Risk–free interest rate | 3.9% | 3.4% | 2.9% |
| Volatility | 50.16% | 53.9% | 57.8% |
| Weighted average estimated fair value | $ 6.63 | $ 11.79 | $ 13.06 |
| **ESPP** | | | |
| Expected life (in years) | 1.25 | 1.25 | 1.25 |
| Risk–free interest rate | 2.99% | 1.7% | 1.3% |
| Volatility | 48.53% | 53.6% | 58.6% |
| Weighted average estimated fair value | $ 6.78 | $ 11.32 | $ 6.16 |

For pro forma purposes, the estimated fair value of the Company's stock–based awards to employees is amortized over the options' vesting period of four years and the ESPP's two–year offering period. The Company's pro forma net income and net (loss) income per share data under SFAS No. 123 are as follows:

| | Year Ended October 31, | | |
|---|---|---|---|
| | **2005** | **2004** | **2003** |
| | (in thousands, except per share amounts) | | |
| Net (loss) income as reported | $ (15,478) | $ 74,337 | $ 149,724 |
| Stock–based employee compensation expense included in net (loss) income net of tax | 4,213 | 3,355 | 4,996 |
| Stock–based employee compensation expense determined under the fair value based method for all awards, net of tax | (86,213) | (83,510) | (99,522) |
| Pro forma net (loss) income under SFAS 123 | $ (97,478) | $ (5,818) | $ 55,198 |
| Net (loss) income per share—basic | | | |
| As reported under APB 25 | $ (0.11) | $ 0.48 | $ 0.99 |
| Pro forma under SFAS 123 | $ (0.67) | $ (0.04) | $ 0.36 |
| Net (loss) income per share—diluted | | | |
| As reported under APB 25 | $ (0.11) | $ 0.46 | $ 0.95 |
| Pro forma under SFAS 123 | $ (0.67) | $ (0.04) | $ 0.35 |

*Foreign Currency Contracts.*   The Company operates internationally and is exposed to potentially adverse movements in currency exchange rates. The Company enters into foreign currency forward contracts to reduce its exposure to foreign currency rate changes on non–functional currency denominated forecasted transactions and certain balance sheet positions. These foreign currency contracts are carried at fair value on the balance sheet in accounts payable and accrued liabilities, and are denominated primarily in the Euro and the Japanese yen.

Foreign currency forward contracts related to certain balance sheet positions, primarily non–functional currency denominated assets (such as accounts receivable) and liabilities (such as accounts payable), generally have a duration of approximately one month. Gains and losses from the forward contracts and the associated premium/discount are recorded each period in other income (expense) in the consolidated statements of operations.

Foreign currency forward contracts related to forecasted non–functional currency denominated transactions, including shipments forecast to occur within approximately one–month, billings and future revenue on previously shipped orders and forecasts of certain intercompany expenses, are designated as

64

cash flow hedges under Statement of Financial Accounting Standards No. 133, *Accounting for Derivatives and Hedging*, as amended (SFAS 133), with gains and losses recorded net of tax, as a component of other comprehensive income in stockholders' equity and reclassified into revenue or operating expense, depending upon the type of transaction hedged, at the time the forecasted transactions affect net income (loss). The maximum original duration of foreign currency forward contracts is 16 months in the case of Euro forward contracts and the maximum original duration for forward contracts of other currencies is approximately one month. Rolling one month contracts are used to hedge exposures of up to approximately 2.7 years.

To receive hedge accounting treatment, all hedging relationships are formally documented at the inception of the hedge and the hedges must be highly effective in offsetting changes to future cash flows on hedged transactions. The Company evaluates hedging effectiveness prospectively and retrospectively and records gains and losses from the measurement of hedging ineffectiveness and the premium and discount on foreign currency forward contracts, not included in the effectiveness evaluation or measurement of ineffectiveness, in other income (expense) in the consolidated statements of operations. If a hedged transaction is deemed no longer to be probable of occurring, the related hedge gains and losses are reclassified into net income (loss) in the current period. No gains and losses were reclassified into net income (loss) during the years ended October 31, 2005, 2004 or 2003 as a result of the discontinuance of cash flow hedges due to the underlying transactions becoming not probable of occurring.

The net gain (loss) recognized in other income (expense) for cash flow hedges due to hedge ineffectiveness was an insignificant amount in the fiscal years ended October 31, 2005, 2004 and 2003.

The net discount received (or premium paid) recognized in other income (expense) for cash flow hedges was $(1.5) million, $0, and $2.2 million in the fiscal years ended October 31, 2005, 2004, and 2003.

The Company estimates that as of October 31, 2005, $0.4 million of existing gain/(loss) will be reclassified from other comprehensive income (loss) into net income (loss) within the next 12 months.

In the first quarter of fiscal 2005, the Company reevaluated its interpretation of certain provisions of SFAS 133, resulting in the discovery of an error in the application of the standard to certain prior year foreign currency hedge transactions. The effect of the error was not material in any prior period and did not impact the economics of the Company's hedging program. To correct the error, the Company reclassified the remaining $3.0 million related to the disallowed hedges from accumulated other comprehensive income (loss) to other income in the three months ended January 31, 2005. The net income (loss) impact of gains and losses on foreign currency forward contracts, net of foreign currency remeasurement gains and losses, was immaterial for the fiscal years ended October 31, 2005, 2004 and 2003.

*Warranties.* The Company typically warrants its products to be free from defects in media and to substantially conform to material specifications for a period of 90 days. The Company also indemnifies its customers from third party claims of intellectual property infringement relating to the use of its products and is currently defending some of its customers against claims that their use of one of its products infringes a patent held by a Japanese electronics company. The Company is unable to estimate the potential impact of these guarantees on the future results of operations. To date, the Company has not been required to pay any material warranty claims.

65

**Note 3.**  Business Combinations and Divestitures

   *Purchase Combinations.*  During the fiscal years presented, the Company made a number of purchase acquisitions. For each acquisition, the excess of the purchase price over the estimated value of the net tangible assets acquired was allocated to various intangible assets, consisting primarily of developed technology, customer– and contract–related assets, other intangible assets and goodwill. The values assigned to developed technologies related to each acquisition were based upon future discounted cash flows related to the existing products' projected income streams. The amounts allocated to purchased in–process research and developments were determined through established valuation techniques in the high–technology industry and were expensed upon acquisition because technological feasibility had not been established and no future alternative uses existed. The Company evaluates aggregate goodwill on a quarterly basis for indications of impairment based on its fair value as determined by its market capitalization in accordance with Statement of Financial Accounting Standards No. 142, *Goodwill and Other Intangible Assets* (SFAS 142). If this evaluation indicates that the value of the goodwill may be impaired, the Company assesses the impairment of the goodwill using the two–step method prescribed by SFAS 142. Any such impairment charge could be significant and could have a material adverse effect on the Company's reported financial statements. The Company did not record any impairment charges on its goodwill during fiscal 2005. As of October 31, 2005, the carrying amount of the Company's goodwill was $729.0 million.

   Pro forma results of operations are presented only for material acquisitions. The consolidated financial statements include the operating results of each business from the date of acquisition.

*Fiscal 2005 Acquisitions*

**Acquisition of Nassda Corporation (Nassda)**

   The Company acquired Nassda on May 11, 2005.

   *Reasons for the Acquisition.*  The Company believed Nassda's full–chip circuit simulation and analysis software would broaden its offerings of transistor–level circuit simulation tools, particularly in the area of mixed–signal and memory design. The Company does not consider the Nassda acquisition material to its results of operations and therefore is not presenting pro forma statements of operations for the period ended October 31, 2005.

   *Purchase Price.*  The Company acquired all the outstanding shares of Nassda for total cash consideration of $200.2 million, or $7.00 per share. In addition, as required by the merger agreement, certain Nassda officers, directors and employees who were defendants in certain preexisting litigation between Synopsys and Nassda made settlement payments to Synopsys in the aggregate amount of $61.6 million.

   Net of the settlement payments described above, the Company paid $138.6 million in cash to the former shareholders of Nassda. However, in accordance with *EITF 04–01, Accounting for Preexisting Relationships between the Parties to a Business Combination,* the Company must separately value the settlement of the previously existing Nassda litigation and the business combination. Therefore, the Company determined the fair value of the settlement to be $33 million. The Company recorded this amount as other non–operating income. The Company valued the net assets acquired from Nassda in the business combination at $196.9 million. The total purchase price includes $13.2 million in acquisition–related costs and $12.1 million in vested stock options assumed. During the fourth quarter of fiscal 2005, the Company reduced the estimate of acquisition–related costs and the corresponding goodwill by $4.8 million based on terminated distributor agreements being settled without termination payments as originally anticipated.

66

Acquisition–related costs of $13.2 million consist primarily of professional service fees of $11.0 million, which include legal, tax and accounting fees; a $1.8 million class action settlement which was required to be settled prior to the closing of the acquisition, plus $0.5 million in associated legal costs; approximately $1.0 million in severance costs for employee termination, and other directly related charges. As of October 31, 2005, the Company had paid $9.7 million of the acquisition–related costs, including $8.4 million in professional services fees and $1.0 million in severance–related costs. The $3.4 million balance remaining at October 31, 2005 primarily relates to the class action settlement paid in December 2005 and to facilities closure costs, contract terminations and legal and tax–related services.

The Company has allocated the total purchase consideration to the assets and liabilities acquired, including identifiable intangible assets, based on their respective fair values at the acquisition date, resulting in goodwill of approximately $92.4 million. The following table summarizes the allocation of the purchase price to the fair value of the assets and liabilities acquired.

|  | (in thousands) |
|---|---|
| Assets acquired | |
| Cash, cash equivalents and short–term investments | $    93,240 |
| Accounts receivable, net | 13,632 |
| Identifiable intangible assets | 30,400 |
| Goodwill | 92,409 |
| Deferred tax assets—short term | 9,425 |
| Deferred tax assets—long term | 271 |
| Other assets | 98 |
| Total assets acquired | 239,475 |
| Liabilities assumed | |
| Accounts payable and accrued liabilities | 4,434 |
| Deferred tax liabilities | 16,516 |
| Income taxes payable | 14,729 |
| Deferred revenue | 6,858 |
| Total liabilities acquired | 42,537 |
| Total allocated purchase price | $  196,938 |

*Goodwill and Intangible Assets.*  Goodwill, representing the excess of the purchase price over the fair value of tangible and identifiable intangible assets acquired in the merger, will not be amortized and is not deductible for tax purposes. The portion of the purchase price allocated to identifiable intangible assets is as follows:

| Intangible Asset | (in thousands) | Estimated Useful Life (years) |
|---|---|---|
| Core/developed technology | $    15,700 | 5 |
| Customer contracts | 7,300 | 5 |
| Contract rights | 5,900 | 3 |
| Non–compete agreements | 1,500 | 3 |

The Company included amortization of the core/developed technology in cost of revenue and amortization of other intangible assets in operating expenses in its statements of operations for the year ended October 31, 2005.

**Acquisition of ISE Integrated Systems Engineering AG (ISE)**

The Company acquired ISE on November 2, 2004.

*Reasons for the Acquisition.*  ISE's Technology Computer Aided Design (TCAD) software performs process simulation and device and circuit simulation, helping semiconductor manufacturers shorten the

67

time needed to design chips and to test those designs prior to actual manufacturing. In approving the merger agreement, Synopsys' Board considered a number of factors, including its opinions that (i) the merger of ISE's TCAD organization with Synopsys' own TCAD business would permit the introduction of a consolidated TCAD platform that addresses the challenges posed by future technologies while maintaining continuity with existing software, and (ii) the merger would enable Synopsys to help further reduce its customers' costs and manufacturing risks as they create smaller, faster and more power-efficient chips. The Company does not consider the ISE acquisition material to its results of operations, and therefore is not presenting pro forma statements of operations for the year ended October 31, 2005.

*Purchase Price.*    The Company paid $100.0 million in cash on November 2, 2004 to the former shareholders of ISE. The total purchase consideration consisted of:

|  | (in thousands) |
| --- | --- |
| Cash paid | $  100,000 |
| Acquisition-related costs | 2,581 |
| Holdback payable | 5,000 |
| Total purchase price | $  107,581 |

Under the acquisition agreement, the Company has also agreed to pay up to $20 million over three years to certain former shareholders and option holders of ISE now employed by Synopsys based upon achievement of certain sales and employee retention milestones. Any amounts payable under this arrangement will be accrued as compensation expense over the remaining expected service period when and if management deems it probable such amounts will be earned by the applicable milestone dates. As of October 31, 2005, the Company had accrued $7.0 million under the agreement for probable achievement against the first-year milestones; this amount was paid in November 2005 this amount was paid.

Acquisition-related costs of $2.6 million consist primarily of legal, tax and accounting fees of $1.3 million, approximately $1.1 million of estimated facilities closure costs and other directly related charges. As of October 31, 2005, the Company had paid $1.5 million of the acquisition-related costs, including $1.0 million in professional services fees and $0.2 million in facilities closure costs. The $1.0 million balance remaining at October 31, 2005 primarily relates to facilities closure costs, contract terminations and tax-related services.

The Company has allocated the total purchase consideration to the assets and liabilities acquired, including identifiable intangible assets, based on their respective fair values at the acquisition date, resulting in goodwill of approximately $72.9 million. The following table summarizes the allocation of the purchase price to the fair value of the assets and liabilities acquired.

|  | (in thousands) |
|---|---|
| Assets acquired | |
| Cash, cash equivalents and short–term investments | $    10,527 |
| Accounts receivable | 6,983 |
| Prepaid expenses and other current assets | 557 |
| Identifiable intangible assets | 25,700 |
| Goodwill | 72,907 |
| Other assets | 902 |
| Total assets acquired | 117,576 |
| Liabilities assumed | |
| Accounts payable and accrued liabilities | 9,860 |
| Deferred revenue | 2,622 |
| Deferred tax liabilities | 3,213 |
| Total liabilities acquired | 15,695 |
| Net assets acquired | 101,881 |
| In–process research and development | 5,700 |
| Total purchase price | $  107,581 |

*Goodwill and Intangible Assets.*    Goodwill, representing the excess of the purchase price over the fair value of tangible and identifiable intangible assets acquired in the merger, will not be amortized and is not deductible for tax purposes. The portion of the purchase price allocated to identifiable intangible assets is as follows:

| Intangible Asset | (in thousands) | Estimated Useful Life (years) |
|---|---|---|
| Core/developed technology | $    19,100 | 2–5 |
| Customer contracts | 6,100 | 5 |
| Non–compete agreements | 500 | 3 |

The Company included amortization of the core/developed technology in cost of revenue and amortization of other intangible assets in operating expenses in its statement of operations for the year ended October 31, 2005.

The in–process research and development (IPRD) expense related to the ISE acquisition was $5.7 million. ISE had one IPRD project—FLOOPS, a next generation process simulator. The Company incurred a minimal amount in IPRD related to this project which led to the introduction of the Sentaurus product in the fourth quarter of fiscal 2005. This project is considered to be complete except for ongoing maintenance, future product enhancements and new features related to this core product. Expenditures to complete ISE's acquired in–process technologies approximated the original estimates.

During fiscal 2005, the Company completed two additional asset acquisitions during fiscal 2005 for aggregate consideration of $3.0 million. These acquisitions are not considered material, individually or in the aggregate, to the Company's consolidated balance sheet and results of operations.

*Fiscal 2004 Acquisitions*

In February 2004, the Company completed the acquisition of all the outstanding shares of Accelerant Networks, Inc. (Accelerant) for total consideration of $23.8 million, and the acquisition of the technology

69

assets of Analog Design Automation, Inc. (ADA) for total consideration of $12.2 million. The Company acquired Accelerant in order to enhance Synopsys' standards–based IP solutions. The Company acquired the assets of ADA in order to enhance the Company's analog and mixed signal offerings.

    In October 2004, the Company completed the acquisition of Cascade Semiconductor Solutions, Inc. (Cascade) for total upfront consideration of $15.8 million and contingent consideration of up to $10.0 million to be paid upon the achievement of certain performance milestones over the three years following the acquisition. Contingent consideration totaling $2.1 million was paid during the fourth quarter of fiscal 2005 and has been allocated to goodwill. The Company acquired Cascade, an IP provider, in order to augment Synopsys' offerings of PCI Express products. Included in the total consideration for the Accelerant and Cascade acquisitions are aggregate acquisition costs of $4.3 million, consisting primarily of legal and accounting fees and other directly related charges. As of October 31, 2005 the Company has paid substantially all the costs related to these acquisitions.

    In fiscal 2004, the Company completed one additional acquisition and two additional asset acquisition transactions for aggregate consideration of $12.3 million in upfront payments and acquisition–related costs and contingent consideration of up to $5 million to be paid based on the achievement of certain milestones. In process research and development expenses associated with these acquisitions totaled $1.6 million for fiscal 2004. The Company does not consider these acquisition transactions to be material, individually or in the aggregate, to the Company's balance sheet or results of operations. As of October 31, 2005, the Company has paid substantially all the costs related to these acquisitions.

    The results of operations from these acquisitions are included in the accompanying consolidated statements of operations from the date of each respective transaction through October 31, 2005.

    The Company allocated the total aggregate purchase consideration for these transactions to the assets and liabilities acquired, including identifiable intangible assets, based on their respective fair values at the acquisition dates, resulting in aggregate goodwill of $24.5 million. Aggregate identifiable intangible assets as a result of these acquisitions, consisting primarily of purchased technology and other intangibles, are $44.8 million, and are being amortized over three to five years. Goodwill, representing the excess of the purchase consideration over the fair value of tangible and identifiable intangible assets acquired in the acquisitions, will not be amortized and is not deductible for tax purposes. The Company includes the amortization of purchased technology in cost of revenue in its statements of operations.

*Fiscal 2003 Acquisitions*

    *Numerical Technologies, Inc. (Numerical).*   On March 1, 2003, the Company completed its acquisition of Numerical. The Company acquired Numerical in order to combine Numerical's subwavelength, lithography–enabling solutions with the Company's leading integrated circuit (IC) design solutions and thereby help reduce costs and manufacturing risk for the Company's customers.

    *Purchase Price.*   The Company paid Numerical common stockholders $7.00 in cash in exchange for each share of Numerical common stock owned as of the merger date, or approximately $240.2 million. The total purchase consideration consisted of:

|  | (in thousands) |
| --- | --- |
| Cash paid for Numerical common stock | $    240,214 |
| Acquisition–related costs | 10,044 |
| Fair value of options to purchase Synopsys common stock issued, less $5.2 million representing the portion of the intrinsic value of Numerical's unvested options applicable to the remaining vesting period | 16,500 |
|  | $    266,758 |

70

Acquisition–related costs of $10.0 million consisted primarily of legal and accounting fees of $2.7 million and other directly related charges, including $5.2 million in restructuring costs and $1.6 million in directors and officers liability insurance costs incurred to cover Numerical's former officers and Board of Directors as required by the merger agreement. As of October 31, 2005, there are substantially no remaining accrued or unpaid acquisition–related costs related to this acquisition.

The following table summarizes the allocation of the purchase price for Numerical and the estimated amortization period for the acquired intangibles:

|  | (in thousands) |
|---|---:|
| Cash, cash equivalents and short–term investments | $ 79,461 |
| Accounts receivable | 4,904 |
| Prepaid expenses and other current assets | 3,368 |
| Identifiable intangible assets: |  |
| Core/developed technology(1) | 22,580 |
| Customer relationships(2) | 20,120 |
| Customer backlog(1) | 4,870 |
| Goodwill | 140,102 |
| Other assets | 5,584 |
| Total assets acquired | 280,989 |
| Accounts payable and accrued liabilities | 8,163 |
| Deferred revenue | 3,627 |
| Deferred tax liabilities | 20,691 |
| Total liabilities assumed | 32,481 |
| Net assets acquired | 248,508 |
| In–process research and development | 18,250 |
| Purchase price | $ 266,758 |

(1)    Estimated useful life is 3 years.
(2)    Estimated useful life is 6 years.

During fiscal 2003, the Company completed two additional acquisitions for aggregate consideration consisting of $8.8 million in upfront payments and acquisition expenses and contingent consideration totaling $3.5 million based on the achievement of certain milestones as outlined in the acquisition agreements. In–process research and development expenses associated with these acquisitions totaled $1.6 million for fiscal 2003. These acquisitions are not considered material, individually or in the aggregate, to the Company's balance sheet and results of operations. As of October 31, 2005 there are substantially no remaining accrued or unpaid acquisition related costs related to these acquisitions. The total consideration of $3.5 million was paid in full and allocated to goodwill.

71

**Note 4.  Goodwill and Other Intangible Assets, Net**

Goodwill consists of the following:

|  | (in thousands) |
|---|---|
| Balance at October 31, 2003 | $  550,732 |
| Additions(1) | 43,649 |
| Other adjustments | (675) |
| Balance at October 31, 2004 | $  593,706 |
| Additions(2) | 169,142 |
| Other adjustments(3) | (33,869) |
| Balance at October 31, 2005 | $  728,979 |

(1)    During fiscal year 2004, additions represent an increase of goodwill of $17.4 million as a result of an adjustment to the deferred tax assets recorded upon the acquisition of Avant!, goodwill acquired in the acquisitions of Accelerant and Cascade of $17.4 million and $6.9 million, respectively, contingent consideration earned and paid of $1.7 million related to and immaterial acquisition and amounts related to foreign currency fluctuations for goodwill not denominated in U.S. dollars.

(2)    During fiscal year 2005, additions represent goodwill acquired in acquisitions of ISE and Nassda of $72.9 million and $92.4 million, respectively, and contingent consideration earned and paid of $1.7 million and $2.1 million related to an immaterial acquisition and the acquisition of Cascade, respectively.

(3)    During the fiscal year 2005, Synopsys reduced goodwill primarily related to tax reserves for Avant! no longer probable due to expiration of the federal statute of limitations for claims.

Intangible assets as of October 31, 2004 consisted of the following:

|  | Gross Assets | Accumulated Amortization | Net Assets |
|---|---|---|---|
|  |  | (in thousands) |  |
| Contract rights intangible | $  59,970 | $  47,468 | $  12,502 |
| Core/developed technology | 279,110 | 188,023 | 91,087 |
| Covenant not to compete | 10,744 | 5,866 | 4,878 |
| Customer contracts | 123,540 | 47,579 | 75,961 |
| Trademark and tradename | 18,007 | 14,420 | 3,587 |
| Other intangibles | 5,993 | 397 | 5,596 |
| Capitalized software and development costs | 7,635 | 4,590 | 3,045 |
| Total intangible assets(1) | $  504,999 | $  308,343 | $  196,656 |

(1)    Total intangible assets do not include $1.4 million related to foreign currency fluctuations for intangible assets which are not denominated in U.S. dollars.

72

Intangible assets as of October 31, 2005 consisted of the following:

| | Gross Assets | Accumulated Amortization | Net Assets |
|---|---|---|---|
| | | (in thousands) | |
| Contract rights intangible | $ 65,870 | $ 60,528 | $ 5,342 |
| Core/developed technology | 314,975 | 256,413 | 58,562 |
| Covenant not to compete | 12,744 | 9,074 | 3,670 |
| Customer contracts | 136,940 | 70,125 | 66,815 |
| Trademark and tradename | 18,007 | 17,965 | 42 |
| Other intangibles | 7,883 | 3,051 | 4,832 |
| Capitalized software development costs | 10,587 | 7,331 | 3,256 |
| Total intangible assets | $ 567,006 | $ 424,487 | $ 142,519 |

Total amortization expense related to intangible assets is set forth in the table below:

| | Year Ended October 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| | | (in thousands) | |
| Contract rights intangible | $ 13,059 | $ 20,806 | $ 19,448 |
| Core/developed technology | 68,390 | 83,666 | 75,639 |
| Covenant not to compete | 3,208 | 2,536 | 2,382 |
| Customer contracts | 22,547 | 20,801 | 19,659 |
| Trademark and tradename | 3,544 | 6,002 | 5,960 |
| Other intangibles | 2,654 | 307 | 90 |
| Capitalized software and development costs | 2,742 | 2,319 | 1,598 |
| Total amortization expense | $ 116,144 | $ 136,437 | $ 124,776 |

The following table presents the estimated future amortization of intangible assets:

| Fiscal Year | (in thousands) |
|---|---|
| 2006 | $ 55,419 |
| 2007 | 44,431 |
| 2008 | 27,147 |
| 2009 | 11,465 |
| 2010 | 4,057 |
| Total estimated future amortization of other intangible assets | $ 142,519 |

73

**Note 5. Financial Instruments**

*Cash, Cash Equivalents and Investments.* Short–term investments have been classified as available–for–sale securities and are detailed as follows:

| | Cost | Gross Unrealized Gains | Gross Unrealized Losses Less Than 12 Months | Gross Unrealized Losses 12 Months or Longer | Estimated Fair Value |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Balance at October 31, 2005** | | | | | |
| Classified as current assets: | | | | | |
| Non interest bearing Cash | | | | | |
| (U.S. & Int'l) | $ 14,920 | $ — | $ — | $ — | $ 14,920 |
| Money market funds (U.S.) | 300,439 | — | — | — | 300,439 |
| Cash Deposits and Money market Funds (International) | 89,077 | — | — | — | 89,077 |
| Corporate Bonds | — | — | — | — | — |
| Municipal obligations | 182,365 | 6 | (83) | (218) | 182,070 |
| | 586,801 | 6 | (83) | (218) | 586,506 |
| Classified as non–current assets: | | | | | |
| Equity securities | 8,409 | — | (317) | | 8,092 |
| Total | $ 595,209 | $ 6 | $ (400) | $ (218) | $ 594,598 |

| | Cost | Gross Unrealized Gains | Gross Unrealized Losses Less Than 12 Months | Gross Unrealized Losses 12 Months or Longer | Estimated Fair Value |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Balance at October 31, 2004** | | | | | |
| Classified as current assets: | | | | | |
| Non interest bearing Cash | | | | | |
| (U.S. & Int'l) | $ 61,091 | $ — | $ — | $ — | $ 61,091 |
| Money market funds (U.S.) | 38,827 | — | — | — | 38,827 |
| Cash Deposits and Money market Funds | | | | | |
| (International) | 230,880 | — | — | — | 230,880 |
| United States Treasury and Federal agencies. | 72,543 | 3 | (43) | — | 72,503 |
| Corporate Bonds | 27,052 | 17 | (17) | — | 27,052 |
| Municipal obligations | 145,923 | 168 | (215) | — | 145,876 |
| Other | 2,800 | — | — | — | 2,800 |
| | 579,116 | 188 | (275) | | 579,029 |
| Classified as non–current assets: | | | | | |
| Equity securities | 13,667 | — | (836) | — | 12,831 |
| Total | $ 592,783 | $ 188 | $ (1,111) | $ — | $ 591,860 |

As of October 31, 2005, the stated maturities of the Company's current investments are $41.6 million within one year, $20.8 million within one to five years, $10.8 million within five to ten years and $108.9 million after ten years. These investments are classified as available–for–sale and are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of accumulated other comprehensive income, net of tax. Realized gains and losses on sales of short–term investments have not been material in any period presented.

*Strategic Investments.* The Company's strategic investment portfolio consists of minority equity investments in publicly traded companies and investments in privately held companies. The securities of

74

publicly traded companies are classified as available–for–sale securities accounted for under Statement of Financial Accounting Standards No. 115 (SFAS 115), *Accounting for Certain Investments in Debt and Equity Securities*, and are reported at fair value, with unrealized gains or losses, net of tax, recorded as a component of other comprehensive income in stockholders' equity. The cost basis of securities sold is based on the specific identification method. These securities of privately held companies are reported at cost. As of October 31, 2005, the carrying value of the Company's strategic investments was $8.1 million.

During the years ended October 31, 2005, 2004 and 2003 the Company determined that certain strategic investments with an aggregate value of $6.5 million, $3.5 million and $7.1 million, respectively, were impaired and that the impairment was other than temporary. Accordingly, the Company recorded charges of approximately $4.5 million, $3.0 million and $4.5 million during fiscal 2005, 2004 and 2003, respectively, to write down the carrying value of these investments.

*Debt.* As of October 31, 2005, and 2004, the Company's debt totaled $7.3 million and $7.4 million, respectively, and consisted primarily of notes related to acquisitions payable in 2007 and notes to secure bonds related to certain property taxes. In connection with the notes to secure bonds, in the ordinary course of business, tax liens have been imposed upon certain land owned by the Company by a governmental agency. To date, the Company has made all applicable payments against these notes.

*Foreign Currency Contracts.* The maximum original duration of the foreign currency forward contracts is 16 months, however for the majority of the currencies, the forward contracts are one month in duration. Due to the short–term nature of these contracts, the contract rates approximate fair value as of October 31, 2005 and 2004.

In April 2004, Synopsys entered into a three–year, $250.0 million senior unsecured revolving credit facility. This facility contains financial covenants requiring that the Company maintain a minimum leverage ratio and specified levels of cash, as well as other non–financial covenants. The facility terminates on April 28, 2007. Borrowings under the facility bear interest at the greater of the administrative agent's prime rate or the Federal funds rate plus 0.50%; however, the Company has the option to pay interest based on the outstanding amount at euro dollar rates plus a spread between 0.80% and 1.125% based on a pricing grid tied to a financial covenant. In addition, commitment fees are payable on the facility at rates between 0.20% and 0.25% per annum based on a pricing grid tied to a financial covenant. In April 2004 and May 2005, the Company borrowed and repaid $200.0 and $75.0 million, respectively, under the credit facility. As of October 31, 2005, the Company had no outstanding borrowings under the credit facility and was in compliance with all covenants.

## Note 6.   Commitments and Contingencies
**Lease Commitments**

The Company leases certain of its domestic and foreign facilities and certain office equipment under non–cancelable lease agreements. The facilities generally require the Company to pay property taxes, insurance, maintenance and repair costs. Rent expense was $36.2 million, $35.5 million and $35.1 million in fiscal 2005, 2004 and 2003, respectively. The Company has the option to extend or renew most of its leases which may increase the future minimum lease commitments. In October 2003, the Company entered into a sublease agreement pursuant to which the Company subleases to a third party a portion of its office space which the Company owns in Sunnyvale, California. The sublease agreement terminates in February 2009. The Company receives monthly sublease payments of $150,000.

75

Future minimum lease payments on all operating leases, net of sublease income, as of October 31, 2005 are as follows:

|  | Minimum Lease Payments | Lease Income | Net |
|---|---|---|---|
|  | | (in thousands) | |
| Fiscal Year | | | |
| 2006 | $ 33,660 | $ 2,615 | $ 31,045 |
| 2007 | 28,577 | 2,148 | 26,429 |
| 2008 | 23,297 | 2,046 | 21,251 |
| 2009 | 20,671 | 1,015 | 19,656 |
| 2010 | 19,060 | — | 19,060 |
| Thereafter | 84,295 | — | 84,295 |
| Total minimum payments required | $ 209,560 | $ 7,824 | $ 201,736 |

**Legal Proceedings**

On August 25, 2004, a class action complaint entitled *Kanekal v. Synopsys, Inc., et al.*, No. C–04–3580, was filed in federal district court for the Northern District of California against the Company and certain of its officers alleging violations of the Securities Exchange Act of 1934. The complaint purported to be a class action lawsuit brought on behalf of persons who acquired the Company's stock during the period of December 3, 2003 through August 18, 2004. The complaint alleged that the individual defendants caused the Company' to make false and misleading statements about Synopsys' business, forecasts, and financial performance, and that certain Synopsys officers or employees sold portions of their stock holdings while in the possession of adverse, non–public information. The complaint did not specify the amount of damages sought. In November 2004, the Court appointed a lead plaintiff in the case. In January 2005, the lead plaintiff, the Wu Group, filed an amended complaint. The Company filed a motion to dismiss the amended complaint and a motion for sanctions in March 2005. In August 2005, the Court granted the Company's motion to dismiss, but denied the motion for sanctions, and allowed the plaintiff 30 days to amend the complaint. The parties stipulated to a dismissal with prejudice with each side bearing its own fees and costs, and in September 2005, the case was dismissed.

In connection with the Company's December 1, 2004 announcement that it had signed agreements to acquire Nassda Corporation (Nassda) and to settle all outstanding litigation between the two companies, a class action complaint entitled *Robert Israel v. Nassda Corporation, et. al.*, No. 4705695, was filed in the Court of Chancery of the State of Delaware naming Nassda, its directors and the Company as defendants. The complaint purported to be a class action lawsuit brought on behalf of shareholders of Nassda, other than the defendant directors and their affiliates, who allegedly would be injured or threatened with injury if the proposed acquisition of Nassda by the Company proceeded forward on the terms announced. A class action complaint alleging substantially the same facts was also filed in California Superior Court. The purported class actions sought to enjoin the transaction or, alternatively, unspecified damages. In May 2005, the Company completed its acquisition of Nassda. In October, 2005, the Chancery Court approved a settlement of the Delaware action by which the Company would pay an aggregate of $0.15 per share to each former shareholder of Nassda (other than the defendant directors and their affiliates), for a total of approximately $1.8 million, and would pay certain fees and expenses of plaintiff's counsel. In December 2005, the plaintiffs in the Delaware action dismissed their complaint with prejudice and the Company paid the agreed–upon amounts. The California action was also dismissed with prejudice in December 2005, with each side bearing its own costs.

76

**Note 7.  Stockholders' Equity**

*Stock Repurchase Programs.*  In July 2001, the Company's Board of Directors authorized a stock repurchase program under which Synopsys' common stock with a market value up to $500 million may be acquired in the open market. This stock repurchase program replaced all prior repurchase programs authorized by the Board. The Company uses all common shares repurchased for ongoing stock issuances such as existing employee stock option plans, existing stock purchase plans and acquisitions. The July 2001 stock repurchase program has been renewed by the Company's Board of Directors annually through December 2004. In each renewal the Board of Directors replenished the amount of the program up to $500 million. During fiscal 2005, 2004 and 2003, the Company purchased approximately 5.1 million shares at an average price of $17.20 per share, approximately 16.9 million shares at an average price of $25.02 per share, and approximately 9.4 million shares at an average price of $27.72 per share, respectively.

*Preferred Shares Rights Plan.*  The Company has adopted a number of provisions that could have anti–takeover effects, including a Preferred Shares Rights Plan. In addition, the Board of Directors has the authority, without further action by its stockholders, to fix the rights and preferences and issue shares of authorized but undesignated shares of Preferred Stock. This provision and other provisions of the Company's Restated Certificate of Incorporation and Bylaws and the Delaware General Corporation Law may have the effect of deterring hostile takeovers or delaying or preventing changes in control or management of the Company, including transactions in which the stockholders of the Company might otherwise receive a premium for their shares over then current market prices. The preferred share rights expire on October 24, 2007.

*Employee Stock Purchase Plan.*  Under the Company's Employee Stock Purchase Plan and International Employee Stock Purchase Plan (collectively, the ESPP), employees are granted the right to purchase shares of common stock at a price per share that is 85% of the lesser of the fair market value of the shares at (i) the beginning of a rolling two–year offering period or (ii) the end of each semi–annual purchase period, subject to a plan limit on the number of shares that may be purchased in a purchase period. During fiscal 2005, 2004, and 2003 the Company issued an aggregate of 2,107,599, 1,898,402, and 1,536,574 shares, respectively, under the ESPP at average per share prices of $13.49, $15.51, and $17.35, respectively. As of October 31, 2005, 7,828,034 shares of common stock were reserved for future issuance under the ESPP. On May 23, 2005, the stockholders approved two amendments to the ESPP to increase (1) the number of shares issuable under the Purchase Plan by 4.0 million shares and (2) the aggregate number of shares of common stock purchasable on a worldwide basis by all participants on any one semi–annual purchase date from 1.0 million shares of common stock to 2.0 million shares. As a result, a total of 21.7 million shares have been authorized for issuance pursuant to the ESPP as of October 31, 2005.

*Stock Option Plans.*  Under the Company's 1992 Stock Option Plan (the 1992 Plan), 38,866,356 shares of common stock have been authorized for issuance. Pursuant to the 1992 Plan, the Board of Directors (the Board) may grant either incentive or non–qualified stock options to purchase shares of common stock to employees and consultants, excluding non–employee directors at not less than 100% of the fair market value of those shares on the grant date. Stock options granted under the 1992 Plan generally vest over a period of four years and expire seven to ten years from the date of grant. As of October 31, 2005, 8,176,116 stock options remain outstanding and 6,758,621 shares of common stock are reserved for future grants under this plan.

Under the Company's 1998 Non–Statutory Stock Option Plan (the 1998 Plan), 50,295,546 shares of common stock have been authorized for issuance. Pursuant to the 1998 Plan, the Board may grant non–qualified stock options to employees and consultants, excluding executive officers. Exercisability, option price and other terms are determined by the Board but the option price shall not be less than 100% of the fair market value of those shares on the grant date. Stock options granted under the 1998 Plan generally vest over a period of four years and expire seven to ten years from the date of grant. As of

77

October 31, 2005, 24,049,124 stock options remain outstanding and 4,056,942 shares of common stock were reserved for future grants under this plan.

Under the Company's 2005 Assumed Stock Option Plan (formerly, the Nassda Corporation 2001 Stock Option Plan), an aggregate of 3,594,565 shares of common stock have been authorized for issuance. Pursuant to the 2005 Plan, the Compensation Committee of the Board or its designee can grant non–qualified stock options to employees or consultants of the Company who either were (i) not employed by the Company or any of its subsidiaries on May 11, 2005 or (ii) providing services to Nassda Corporation (or any subsidiary corporation thereof) prior to May 11, 2005. Exercisability, option price and other terms are determined by the Board but the option price shall not be less than 100% of the fair market value of those shares on the grant date. Stock options granted under the 2005 Plan generally vest over a period of four years and expire seven to ten years from the date of grant. As of October 31, 2005, 784,952 stock options remain outstanding and 2,504,642 shares of common stock were reserved for future grant under this plan.

On May 23, 2005, stockholders approved the 2005 Non–Employee Directors Equity Incentive Plan (the Directors Plan) and the reservation of 300,000 shares of common stock for issuance thereunder. The Directors Plan provides for annual equity awards to non–employee directors in the form of either stock options or restricted stock. On May 23, 2005, the Company issued non–employee directors an aggregate of 42,060 shares of restricted stock with an aggregate value of approximately $0.75 million on the date of grant, which was recorded as deferred compensation and will be amortized over the vesting period of three years. Under certain circumstances, restricted stock may be forfeited back to the Company. The Company's forfeiture rights lapse over a three year period. At October 31, 2005, 36,210 shares were subject to future forfeitures. As of October 31, 2005, 257,940 shares of common stock were reserved for future grant under the Directors Plan. An aggregate of 1,277,660 stock options remain outstanding under the Company's 1994 Non–Employee Directors Stock Option Plan, which expired as to future grants in October 2004.

In March 2005, the Board of Directors approved an option exchange program under which outstanding employee stock options (other than options held by executive officers) with exercise prices of $25.00 or greater per share could be exchanged for a lesser number of options granted at current fair market value and with a new vesting period. The Board adopted this program due to the fact that the exercise prices of a large number of outstanding employee stock options were significantly below the Company's stock price and thus did not provide adequate employee incentive. The Company's stockholders approved the program in May 2005. As a result, on June 23, 2005, the Company accepted for cancellation options to purchase 7.3 million shares of common stock and in exchange granted to eligible employees options to purchase 3.8 million shares of the Company's common stock at an exercise price of $17.16 per share, except for options to purchase approximately 22,000 shares which were issued with an exercise price of $18.06 due to regional laws regarding the pricing of stock option grants. As a result of the exchange, the Company will use variable accounting for all options eligible for the exchange under the provisions of APB 25 and related interpretations until adoption of SFAS 123R in the first quarter of fiscal 2006. Total compensation expense recorded with respect to these options for the fiscal year ended October 31, 2005 was $0.6 million.

The Company has assumed certain option plans in connection with business combinations. Generally, the options granted under these plans have terms similar to the Company's own options. The exercise prices of such options have been adjusted to reflect the relative exchange ratios.

78

Additional information concerning stock option activity under all plans is as follows:

| | Available for Grant | Options Outstanding | Weighted–Average Exercise Price |
|---|---|---|---|
| | | (in thousands) | |
| Outstanding at October 31, 2002 | 16,682 | 55,960 | $ 20.70 |
| Granted | (4,185) | 4,518 | $ 25.06 |
| Options assumed in acquisitions | — | 2,115 | $ 24.74 |
| Exercised | — | (16,573) | $ 18.60 |
| Canceled | 3,162 | (3,901) | $ 24.02 |
| Outstanding at October 31, 2003 | 15,659 | 42,119 | $ 21.89 |
| Granted | (4,948) | 5,143 | $ 23.79 |
| Exercised | — | (6,559) | $ 19.41 |
| Canceled | 1,878 | (2,175) | $ 24.45 |
| Outstanding at October 31, 2004 | 12,589 | 38,528 | $ 22.42 |
| Granted(1) | (8,279) | 8,279 | $ 17.41 |
| Options assumed in acquisitions | 2,297 | 1,993 | $ 16.30 |
| Retired | (3,036) | | |
| Exercised | — | (1,511) | $ 13.37 |
| Canceled(2) | 9,441 | (10,798) | $ 27.22 |
| Outstanding at October 31, 2005 | 13,012 | 36,491 | $ 19.92 |
| Options exercisable at October 31: | | | |
| 2003 | | 25,942 | $ 21.65 |
| 2004 | | 28,026 | $ 22.06 |
| 2005 | | 26,360 | $ 20.60 |

(1) Includes an aggregate of 3.8 million shares issued in connection with the option exchange.
(2) Includes an aggregate of 7.3 million shares canceled in connection with the option exchange.

The following table summarizes information about stock options outstanding as of October 31, 2005:

| | Options Outstanding | | | Exercisable Options | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted–Average Remaining Contractual Life (In Years) | Weighted–Average Exercise Price | Number Exercisable | Weighted–Average Exercise Price |
| | (in thousands) | | | (in thousands) | |
| $0.001 – $9.95 | 721 | 5.07 | $ 6.83 | 679 | $ 6.67 |
| $10.24 – $14.83 | 1,747 | 6.52 | $ 14.11 | 1,057 | $ 13.87 |
| $15.06 – $16.13 | 4,972 | 5.08 | $ 16.06 | 4,253 | $ 16.08 |
| $16.19 – $17.16 | 4,797 | 5.88 | $ 17.07 | 1,104 | $ 16.90 |
| $17.20 – $18.70 | 5,831 | 5.82 | $ 17.93 | 2,328 | $ 17.99 |
| $18.72 – $21.19 | 6,116 | 4.74 | $ 19.71 | 5,676 | $ 19.68 |
| $21.23 – $24.57 | 5,726 | 5.39 | $ 22.57 | 5,335 | $ 22.57 |
| $24.70 – $27.93 | 3,641 | 5.76 | $ 25.73 | 3,317 | $ 25.74 |
| $28.06 – $29.88 | 1,888 | 5.58 | $ 29.01 | 1,718 | $ 28.97 |
| $30.00 – $54.58 | 1,052 | 6.70 | $ 31.28 | 893 | $ 31.05 |
| $0.001 – $54.58 | 36,491 | 5.50 | $ 19.92 | 26,360 | $ 20.60 |

79

**Note 8.  Income Taxes**

The Company is entitled to a deduction for federal and state tax purposes with respect to employees' stock option activity. The net reduction in taxes otherwise payable arising from that deduction has been credited to additional paid–in capital.

The components of the Company's total (loss) income before provision for income taxes are as follows:

|  | Year Ended October 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | (in thousands) | | |
| United States | $ (75,336) | $ (71,569) | $ 35,651 |
| Foreign | 67,547 | 163,161 | 183,338 |
|  | $ (7,789) | $ 91,592 | $ 218,989 |

The components of the provision (benefit) for income taxes were as follows:

|  | Year Ended October 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | (in thousands) | | |
| Current: | | | |
| Federal | $ 10,109 | $ 23,549 | $ (13,355) |
| State | 563 | 304 | 117 |
| Foreign | 13,133 | 13,725 | 47,978 |
|  | 23,805 | 37,578 | 34,740 |
| Deferred: | | | |
| Federal | (20,879) | (43,274) | (9,228) |
| State | (4,088) | (7,022) | (1,312) |
| Foreign | 2,675 | (559) | (19,963) |
|  | (22,292) | (50,855) | (30,503) |
| Charge equivalent to the federal and state tax benefit related to employee stock options | 6,176 | 30,532 | 65,028 |
| Provision (benefit) for income taxes | $ 7,689 | $ 17,255 | $ 69,265 |

The provision (benefit) for income taxes differs from the amount obtained by applying the statutory federal income tax rate to (loss) income before provision for income taxes as follows:

|  | Year Ended October 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  | (in thousands) | | |
| Statutory federal tax | $ (2,726) | $ 32,057 | $ 76,646 |
| State tax, net of federal effect | (2,846) | (2,170) | 6,909 |
| Tax credits | (2,465) | — | (4,020) |
| Tax benefit from extraterritorial income exclusion | (247) | — | — |
| Tax exempt income | (1,134) | (1,206) | (1,265) |
| Foreign tax (less than) in excess of U.S. statutory tax | (1,234) | (12,536) | (16,479) |
| Repatriation costs | 16,217 | — | — |
| In–process research and development expenses | 1,995 | 573 | 6,948 |
| Other | 129 | 537 | 526 |
|  | $ 7,689 | $ 17,255 | $ 69,265 |

80

Net deferred tax assets of $277.9 million and $272.0 million were recorded as of October 31, 2005 and 2004, respectively. The net deferred tax asset of $277.9 million for fiscal 2005 includes the tax effects of acquired companies. The tax effects of temporary differences and carryforwards which give rise to significant portions of the deferred tax assets and liabilities were as follows:

| | October 31, | |
| --- | --- | --- |
| | **2005** | **2004** |
| | *(in thousands)* | |
| Net deferred tax assets: | | |
| Deferred tax assets: | | |
| Current: | | |
| Net operating loss and tax credit carryovers | $    49,208 | $        — |
| Deferred revenue | 113,376 | 97,870 |
| Reserves and other expenses not currently deductible | 32,505 | 32,747 |
| Other | 2,350 | 17 |
| | 197,439 | 130,634 |
| Non−current: | | |
| Net operating loss and tax credit carryovers | 78,836 | 166,124 |
| Deferred compensation | 19,531 | 15,904 |
| Depreciation and amortization | 6,499 | 9,378 |
| Other | 6,851 | 5,777 |
| | 111,717 | 197,183 |
| Total deferred tax assets | 309,156 | 327,817 |
| Deferred tax liabilities: | | |
| Current: | | |
| Unrealized foreign exchange gains | 949 | 5,033 |
| Other | 989 | — |
| Non−current: | 1,938 | 5,033 |
| Unrealized gain on securities investments | 346 | 307 |
| Net capitalized software development costs | 1,266 | 917 |
| Intangible assets | 26,468 | 49,156 |
| Other | 1,253 | 443 |
| | 29,333 | 50,283 |
| Total deferred tax liabilities | 31,271 | 55,856 |
| Net deferred tax assets | $  277,885 | $  271,961 |

As of October 31, 2005, the Company believes it is more likely than not that the results of future operations will generate sufficient taxable income to realize the deferred tax assets.

*IRS Revenue Agent's Report.*   On May 31, 2005, the Company received a Notice of Proposed Adjustment from the Internal Revenue Service (IRS) asserting a very large net increase to its U.S. taxable income arising from the audit of fiscal years 2000 and 2001. On June 8, 2005, the Company received a Revenue Agent's Report (RAR) in which the IRS proposed to assess a net tax deficiency for fiscal years 2000 and 2001 of approximately $476.8 million, plus interest. Interest accrues on the amount of any deficiency finally determined until paid, and compounds daily at the federal underpayment rate, which adjusts quarterly. A higher underpayment rate of interest may be charged as a result of the issuance of the RAR.

This proposed adjustment primarily relates to transfer pricing transactions between the Company and a wholly−owned foreign subsidiary. The proposed adjustment for fiscal years 2000 and 2001 is the total amount relating to these transactions asserted under the IRS theories. On July 13, 2005, the Company filed

81

a protest to the proposed deficiency with the IRS, which will cause the matter to be referred to the Appeals Office of the IRS. Resolution of this matter could take a considerable time, possibly years.

The Company strongly believes the proposed IRS adjustments and resulting proposed deficiency are inconsistent with applicable tax laws, and that the Company thus has meritorious defenses to these proposals. Accordingly, the Company will continue to challenge these proposed adjustments vigorously. While it believes the IRS' asserted adjustments are not supported by applicable law, the Company believes it is probable the Company will be required to make additional payments in order to resolve this matter. However, based on the Company's analysis to date, the Company believes it has adequately provided for this matter. If the Company is required to pay a significant amount of additional U.S. taxes and applicable interest in excess of its provision for this matter, its results of operations and financial condition could be materially and adversely affected.

*Tax loss carry forwards and tax credits.* The Company has federal tax loss carryforwards of approximately $12.9 million as of October 31, 2005. The loss carryforwards will expire in 2008 through 2024. The Company has state net operating loss carryforwards tax benefits of $3.5 million as of October 31, 2005. State net operating loss carryforward periods range from 5 to 20 years. Any losses not utilized within a specified state's carryforward period will expire. As of October 31, 2005, the Company classified a portion of the tax loss carryforwards, federal foreign tax credits and federal and California research and development credits as non–current because the prospect of utilization of all of these deferred tax assets in the relevant jurisdiction is not expected in the next twelve months. Because of the change in ownership provisions of the Internal Revenue Code, a portion of the Company's loss carryforwards may be subject to annual limitations. The annual limitation may result in the expiration of the net operating loss before utilization. Management believes that all net operating losses will be utilized, and a valuation allowance is not necessary. The tax benefit of federal net operating losses attributable to employee stock options is credited directly to stockholders' equity.

The Company has federal foreign tax credits of $58.3 million. The foreign tax credits expire on various dates from 2008 through 2014. The Company has federal and California research and development credits of $25.1 million and $19.5 million, respectively. If not utilized, the federal research and development credits will begin to expire on various dates in 2006 through 2024. The California research and development credits do not expire. In addition, the Company has $3.6 million of federal alternative minimum tax credits which have no expiration date. The provision of income taxes includes a tax expense of $2.2 million arising from various state and foreign taxes which was treated as a discrete event allocable to the first quarter of year ended October 31, 2005.

The Company provides for U.S. income taxes on the earnings of its foreign subsidiaries unless they are considered permanently invested outside of the U.S. As of October 31, 2005, there was no cumulative amount of earnings upon which U.S. income taxes have not been provided.

*Repatriation of foreign earnings.* The American Jobs Creation Act of 2004 (the Act) provides for a special one–time elective dividends received deduction on the repatriation of certain foreign earnings to a U.S. taxpayer equal to 85% of the eligible distribution. During the fourth quarter of 2005, the Company repatriated $360.0 million, of which $172.5 million qualified for the special one–time elective dividends received deduction and $187.5 million constituted earnings that do not qualify under the Act, previously taxed income and return of capital. The Company recorded tax expense of $11.2 million related to the repatriation of $360 million. During the fourth quarter of 2005, the Company's chief executive officer approved a domestic reinvestment plan (DRIP) to invest up to $185.0 million in foreign earnings in qualified investments pursuant to the Act. As required by the Act, the reinvestment plan was ratified by the Board of Directors in the first quarter of fiscal 2006. The Company satisfied the DRIP reinvestment requirements during fiscal 2005.

82

*Tax reserves.*  The Company may establish reserves for tax contingencies based on the probable outcome of tax positions taken for financial statement purposes compared to positions taken on the tax returns. In fiscal 2005, the Company released tax contingency reserves totaling $34.0 million related to previously acquired companies as a result of the expiration of the applicable statute of limitation. These released liabilities were recorded against acquisition goodwill with no effect on the Company's net loss in fiscal 2005. The Company continuously reviews its tax–contingency reserves to ensure that they are appropriately stated. Such review includes consideration of tax controversy factors such as periods covered by the cause of action, the degree of probability of an unfavorable outcome, the Company's ability to estimate the liability, the timing of the liability and how it will impact the Company's other tax attributes. At October 31, 2005, the Company believes that it has adequately provided for its tax–related liabilities.

**Note 9.  Other Income, Net**

Other income (expense), net consists of the following:

| | Year Ended October 31, | | |
|---|---|---|---|
| | **2005** | **2004** | **2003** |
| | (in thousands) | | |
| Interest income, net | $  9,543 | $  5,975 | $  3,533 |
| (Loss) Gain on sales of investments, net of investment write–downs | (3,771) | (1,694) | 16,536 |
| Foreign currency exchange gain | 2,537 | 281 | 1,350 |
| Correction of an error in accounting for certain hedging transactions | 2,958 | — | — |
| Other, net(1) | 33,928 | (2,286) | 2,665 |
| Total other income, net | $  45,195 | $  2,276 | $  24,084 |

(1)    Includes $33 million for the Nassda litigation settlement. See Note 3.

In the first quarter of fiscal 2005, the Company reevaluated its interpretation of certain provisions of Statement of Financial Accounting Standards No. 133, *Accounting for Derivatives and Hedging* (SFAS 133), resulting in the discovery of an error in the application of the standard to certain prior year foreign currency hedge transactions. The effect of the error was not material in any prior period and did not impact the economics of the Company's hedging program. To correct the error, the Company has reclassified the remaining $3.0 million related to the disallowed hedges from accumulated other comprehensive loss to other income in the year ended October 31, 2005.

**Note 10.  Segment Disclosure**

Statement of Financial Accounting Standards No. 131 (SFAS 131), *Disclosures about Segments of an Enterprise and Related Information*, requires disclosures of certain information regarding operating segments, products and services, geographic areas of operation and major customers. SFAS 131 reporting is based upon the "management approach," i.e., how management organizes the Company's operating segments for which separate financial information is (i) available and (ii) evaluated regularly by the Chief Operating Decision Maker (CODM) in deciding how to allocate resources and in assessing performance. Synopsys' CODMs are the Company's Chief Executive Officer and Chief Operating Officer.

The Company provides software products and consulting services in the electronic design automation software industry. The Company operates in a single segment. In making operating decisions, the CODMs primarily consider consolidated financial information, accompanied by disaggregated information about revenues by geographic region. Specifically, the CODMs consider where individual "seats" or licenses to the Company's products are used in allocating revenue to particular geographic areas. Revenue is defined as revenues from external customers. Goodwill is not allocated since the Company operates in one reportable operating segment.

83

Revenue and property and equipment, net related to operations in the United States and other geographic areas were:

|  | Year Ended October 31, | | |
|  | 2005 | 2004 | 2003 |
|  | (in thousands) | | |
| Revenue: | | | |
| United States | $ 507,191 | $ 597,845 | $ 651,971 |
| Europe | 157,468 | 170,221 | 184,116 |
| Japan | 166,666 | 178,260 | 217,111 |
| Other | 160,606 | 145,778 | 123,785 |
| Consolidated | $ 991,931 | $ 1,092,104 | $ 1,176,983 |

|  | October 31, | |
|  | 2005 | 2004 |
|  | (in thousands) | |
| Property and Equipment, net: | | |
| United States | $ 146,885 | $ 153,604 |
| Other | 23,310 | 24,551 |
| Consolidated | $ 170,195 | $ 178,155 |

Geographic revenue data for multi–region, multi–product transactions reflect internal allocations and is therefore subject to certain assumptions and to the Company's methodology.

For management reporting purposes, the Company organizes its products and services into five distinct groups: Galaxy Design Platform, Discovery Verification Platform, Intellectual Property (IP), Design for Manufacturing and Professional Services & Other. The following table summarizes the revenue attributable to these groups as a percentage of total revenue for the fiscal years presented. The Company includes revenue from companies or products the Company has acquired during a period from the acquisition date through the end of the relevant periods. For presentation purposes, the Company allocates maintenance, which represented approximately 14% of its total revenue and approximately 73% of our total services revenue for fiscal 2005, to the products to which those support services relate.

|  | Year Ended October 31, | | |
|  | 2005 | 2004 | 2003 |
|  | (in thousands) | | |
| Revenue: | | | |
| Galaxy Design Platform | $ 553,399 | $ 675,448 | $ 765,688 |
| Discovery Verification Platform | 215,925 | 225,469 | 245,914 |
| IP | 72,118 | 70,684 | 74,096 |
| Design for Manufacturing | 101,575 | 81,646 | 52,093 |
| Professional Services & Other | 48,914 | 38,857 | 39,192 |
| Consolidated | $ 991,931 | $ 1,092,104 | $ 1,176,983 |

One customer, Intel Corporation and its subsidiaries in the aggregate, accounted for more than ten percent of the Company's consolidated revenue in fiscal 2005, 2004 and 2003.

**Note 11.   Termination of Agreement to Acquire Monolithic System Technology, Inc.**

On February 23, 2004, the Company entered into a definitive agreement to acquire Monolithic System Technology, Inc. (MoSys) in a cash and stock transaction valued at approximately $453 million.

On April 16, 2004, the Company exercised the right to terminate the merger agreement and paid MoSys a $10.0 million termination fee. The Company has included the termination fee in general and administrative expense in the statement of operations for fiscal 2004. On April 23, 2004, MoSys filed a complaint in Delaware Chancery Court against Synopsys and Mountain Acquisition Corp., a wholly owned subsidiary of the Company, alleging that the Company improperly exercised its termination right.

On July 9, 2004, the Company and MoSys announced a settlement under which the suit was dismissed without further liability or payments to one another.

**Note 12.   Related Party and Other Transactions**

Revenues derived from Intel Corporation and its subsidiaries in the aggregate accounted for approximately 13%, 11% and 10% of the Company's total revenue for the fiscal 2005, 2004 and 2003, respectively. Andy D. Bryant, Intel Corporation's Executive Vice President and Chief Financial and Enterprise Services Officer, also served on the Company's Board of Directors from January 1999 to May 2005. Management believes all transactions between the two parties were carried out on an arm's length basis. Accounts receivable amounts recorded from Intel were insignificant as of October 31, 2005, 2004 and 2003, respectively.

The Company had a joint venture with Davan Tech Co., Ltd, of Korea (Davan Tech) whereby Davan Tech acted as a non–exclusive distributor for the Company subject to certain conditions as defined in the distribution agreement. As of October 31, 2003, the Company owned approximately 10% of Davan Tech, and accounted for the investment under the cost basis. During fiscal 2003, the Company recognized revenues totaling $3.9 million, from Davan Tech. Accounts receivable included $0.9 million of receivable from Davan Tech as of October 31, 2003. In December 2003, the Company terminated its distribution agreement with Davan Tech and in March 2004 the Company sold its ownership interest in Davantech.

The Company maintains a System–on–a–Chip Venture Fund (the Fund) authorized by the Company's Board of Directors which invests in companies that will facilitate building SoCs. The Fund is administered by an investment advisory board consisting of senior Company officers, including the Company's Chief Executive Officer and Chief Operating Officer, and Dr. A. Richard Newton, a member of the Company's Board. Among other investments, the Fund has invested an aggregate of approximately $1 million in a private company that develops SoC test systems. At the times of the investments, SmartForest Ventures, a venture capital firm of which Company director Deborah Coleman serves as a general partner, owned in excess of 10% of the outstanding shares of such company. Ms. Coleman did not participate in any of the Fund's investment decisions.

During fiscal 2005, 2004 and 2003, director Richard Newton, provided consulting services to the Company and was paid $180,000 annually. Under the Company's agreement with Dr. Newton, Dr. Newton provides advice, at the Company's request, concerning long–term technology strategy and industry development issues as well as assistance in identifying opportunities for partnerships with academia.

**Note 13.   Effect of New Accounting Pronouncements**

In November 2005, the Financial Accounting Standards Board (FASB) issued FASB Staff Position (FSP) Nos. FAS 115–1 and FAS 124–1, *The Meaning of Other–Than–Temporary Impairment and Its Application to Certain Investments*. This FSP addresses the determination as to when an investment is considered impaired, whether that impairment is other than temporary, and the measurement of an impairment loss. This FSP also includes accounting considerations subsequent to the recognition of other–than–temporary impairments. The adoption of this FSP is not expected to have a material effect on the Company's consolidated financial position, results of operations or cash flows. The guidance in this FSP will be applied to reporting periods beginning after December 15, 2005.

In June 2005, the FASB issued Statement of Financial Accounting Standards No. 154, *Accounting Changes and Error Corrections* (SFAS 154), which changes the requirements for the accounting for and reporting of a change in accounting principle. Previously, most voluntary changes in accounting principles required recognition via a cumulative effect adjustment within net income of the period of the change. SFAS 154 requires retrospective application to prior periods' financial statements, unless it is impracticable to determine either the period–specific effects or the cumulative effect of the change. SFAS 154 is effective for accounting changes made in fiscal years beginning after December 15, 2005; however, SFAS 154 does not change the transition provisions of any existing accounting pronouncements.

In March 2005, the FASB published FASB Interpretation No. 47, *Accounting for Conditional Asset Retirement Obligations*, which clarifies that the term, "conditional asset retirement obligation," as used in Statement of Financial Accounting Standards No. 143, *Accounting for Asset Retirement Obligations*, refers to a legal obligation to perform an asset retirement activity in which the timing and (or) method of settlement are conditional on a future event that may or may not be within the control of the entity. The uncertainty about the timing and (or) method of settlement of a conditional asset retirement obligation should be factored into the measurement of the liability when sufficient information exists. The interpretation also clarifies when an entity would have sufficient information to reasonably estimate the fair value of an asset retirement obligation. This interpretation is effective no later than the end of the Company's fiscal 2006. The adoption of this Interpretation is not expected to have a material effect on the Company's consolidated financial position, results of operations or cash flows.

In December 2004, the FASB issued Statement of Financial Accounting Standards No. 123 (revised 2004), *Share–Based Payment* (SFAS 123R), which, Synopsys will be required to follow beginning in its first quarter of fiscal 2006. SFAS 123R will result in the recognition of substantial compensation expense relating to the Company's employee stock options and employee stock purchase plans. As noted in Note 2, currently the Company generally does not recognize any compensation expense related to stock option grants the Company issues under its stock option plans or related to the discounts the Company provides under its employee stock purchase plans. Under the new rules, the Company will be required to adopt a fair–value–based method for measuring the compensation expense related to employee stock awards. The resulting additional compensation expense will have a material adverse effect on the Company's reported results of operations. SFAS 123R eliminates the ability to account for share–based compensation transactions using the intrinsic value method under APB 25 and generally would require instead that such transactions be accounted for using a fair–value–based method. The Company will recognize stock–based compensation expense on all awards on a straight–line basis over the requisite service period using the modified prospective method. In January 2005, the SEC issued SAB No. 107, which provides supplemental implementation guidance for SFAS 123R. SFAS 123R will be effective for the Company beginning in the first quarter of fiscal 2006.

In December 2004, the FASB issued Statement of Financial Accounting Standards No.153, *Exchanges of Nonmonetary Assets* (SFAS 153), an amendment of Accounting Principles Board Opinion No. 29. SFAS 153 addresses the measurement of exchanges of nonmonetary assets and redefines the scope of transactions that should be measured based on the fair value of the assets exchanged. SFAS 153 is effective for the Company for nonmonetary asset exchanges beginning in the first quarter of fiscal 2006. The adoption of SFAS 153 is not expected to have a material effect on the Company's consolidated financial position, results of operations or cash flows.

**Note 14.  Subsequent Events**

On December 7, 2005, the Company closed its acquisition of HPL Technologies, Inc. (HPL) in an all–cash transaction for a purchase price of $0.30 per share. HPL is a leader in yield management software and test chip solutions and the acquisition is a part of the Company's strategy to enhance its DFM offerings.

86

On December 22, 2005, the Company announced that Brian M. Beattie will be appointed as Chief Financial Officer (Principal Financial Officer) of the Company, effective January 16, 2006.

**Selected Unaudited Quarterly Financial Data**

The table below includes certain unaudited financial information for the last four fiscal quarters.

| | Quarter Ended | | | |
| | January 31, | April 30, | July 31, | October 31(1) |
|---|---|---|---|---|
| | (in thousands, except per share and market price data) | | | |
| **2005:** | | | | |
| Revenue | $ 241,304 | $ 244,339 | $ 251,450 | $ 254,838 |
| Gross margin | 171,329 | 174,616 | 192,085 | 199,514 |
| Income (loss) before income taxes | (19,154) | (19,006) | 29,584 | 787 |
| Net income (loss) | (14,325) | (4,972) | 17,294 | (13,475) |
| Net (loss) income per share | | | | |
| Basic | $ (0.10) | $ (0.03) | $ 0.12 | $ (0.09) |
| Diluted | $ (0.10) | $ (0.03) | $ 0.12 | $ (0.09) |
| **2004:** | | | | |
| Revenue | $ 285,264 | $ 294,604 | $ 281,681 | $ 230,555 |
| Gross margin | 224,142 | 229,706 | 217,363 | 163,834 |
| Income (loss) before income taxes | 43,609 | 38,500 | 43,050 | (33,567) |
| Net income (loss) | 32,152 | 28,739 | 41,828 | (28,382) |
| Net (loss) income per share | | | | |
| Basic | $ 0.21 | $ 0.19 | $ 0.27 | $ (0.19) |
| Diluted | $ 0.19 | $ 0.18 | $ 0.26 | $ (0.19) |

(1)     Subsequent to the fourth quarter of fiscal 2005, we discovered an error in our option grant process related to the documentation of grant dates. This error was solely with respect to grants to non−executive officer employees. The impact of this error on our first through third quarter income statement was approximately $3.1 million. We booked in the fourth quarter $3.6 million as follows: $0.5 million in cost of goods sold, $1.3 million in research and development expense, $0.9 million in sales and marketing expense and $0.9 million in general and administrative expense. Our results of operations for the fourth quarter and full fiscal year 2005 contained in our earnings release dated November 30, 2005 did not include this expense as we did not believe at that time the error would result in an adjustment to our operating results. With the error corrected, we expect we will incur no additional expenses relating to this error.

m 9.          *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

Not applicable.

m 9A.          *Controls and Procedures*

(a)  *Management's Report on Internal Control Over Financial Reporting.*   Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a−15(f) and 15d−15(f) under the Exchange Act) for Synopsys. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

Under the supervision and with the participation of our management, including our chief executive officer and acting chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of October 31, 2005. In making

87

this assessment, our management used the framework established in *Internal Control–Integrated Framework* issued by The Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. Management identified a material weakness in our internal control over financial reporting as of October 31, 2005 related to our accounting for income taxes. Specifically, our processes and procedures did not include adequate management oversight and review of our income tax accounting practices. As a result of the aforementioned material weakness, certain of our income tax accounting calculations and reserves contained errors which were, in aggregate, material. Specifically, (i) we did not appropriately consider the impact of existing tax reserves on the calculation of tax expense related to our repatriation of foreign earnings under the American Jobs Creation Act of 2004, thus overstating income tax expense and the related tax liability and (ii) upon expiration of the Federal statute of limitations, we did not reduce an existing tax reserve established upon consummation of a 2002 business combination, thus overstating tax reserves and goodwill as of October 31, 2005. These errors were corrected prior to the issuance of our 2005 consolidated financial statements.

Because of the material weakness described above, management has concluded Synopsys did not maintain effective internal control over financial reporting as of October 31, 2005, based on criteria established in *Internal Control—Integrated Framework* issued by the COSO.

KPMG LLP, our independent registered public accounting firm, has issued an auditors' report on management's assessment of our internal control over financial reporting as of October 31, 2005, which report appears below.

(b)  *Changes in Internal Controls.*   There were no changes in Synopsys' internal controls over financial reporting during the three months ended October 31, 2005 that have materially affected, or are reasonably likely to materially affect, Synopsys' internal control over financial reporting.

We are taking the following actions to remediate the material weakness described above: (i) implementing additional recurring review procedures to help ensure compliance with Statement of Financial Accounting Standards (SFAS) No. 109, *Accounting for Income Taxes*, SFAS No. 5, *Accounting for Contingencies*, and other applicable rules and regulations with respect to tax matters; (ii) establishing additional procedures to help identify and address tax accounting issues in a more timely and comprehensive manner; and (iii) reorganizing and augmenting our tax department to improve communication. Actions (i) and (ii) will be in place in connection with the preparation of our first quarter financial statements and action (iii) is being implemented and will be completed as soon as practicable.

(c)  *Evaluation of Disclosure Controls and Procedures.*   As of October 31, 2005 (the "Evaluation Date"), Synopsys carried out an evaluation under the supervision and with the participation of Synopsys' management, including the Chief Executive Officer and Acting Chief Financial Officer, of the effectiveness of the design and operation of Synopsys' disclosure controls and procedures (as such term is defined in Rules 13a–15(e) and 15d–15(e) under the Exchange Act). There are inherent limitations to the effectiveness of any system of disclosure controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable, not absolute, assurance of achieving their control objectives. However, our Chief Executive Officer and Acting Chief Financial Officer have concluded that, as of the Evaluation Date, Synopsys' disclosure controls and procedures were ineffective as of the end of the period covered by this report due to the material weakness identified in Management's Report on Internal Control Over Financial Reporting, above.

88

**(d)** *Report of Independent Registered Public Accounting Firm*

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders
Synopsys, Inc.:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting (Item 9A(a)), that Synopsys, Inc. (the "Company") did not maintain effective internal control over financial reporting as of October 31, 2005, because of the effect of a material weakness identified in management's assessment, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The Company identified a material weakness in the Company's internal control over financial reporting as of October 31, 2005, related to the Company's accounting for income taxes. Specifically, the Company's processes and procedures did not include adequate management oversight and review of the Company's income tax accounting practices. As a result of the aforementioned material weakness, certain of the Company's income tax accounting calculations and reserves contained errors which were, in aggregate, material. Specifically, (i) the Company did not appropriately consider the impact of existing tax reserves on the calculation of tax expense related to the Company's repatriation of foreign earnings under the American Jobs Creation Act of 2004, thus overstating income tax expense and the related tax liability and (ii) upon expiration of the Federal statute of limitations, the Company did not

89

reduce an existing tax reserve established upon consummation of a 2002 business combination, thus overstating tax reserves and goodwill as of October 31, 2005.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Synopsys, Inc. and subsidiaries as of October 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity and comprehensive income (loss), and cash flows for each of the years in the three–year period ended October 31, 2005. The aforementioned material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the fiscal 2005 consolidated financial statements, and this report does not affect our report dated January 12, 2006, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, management's assessment that Synopsys, Inc. did not maintain effective internal control over financial reporting as of October 31, 2005, is fairly stated, in all material respects, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also, in our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, Synopsys, Inc. has not maintained effective internal control over financial reporting as of October 31, 2005, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

/s/ KPMG LLP
Mountain View, California
January 12, 2006

90

**Item 9B.**     *Other Information*
None.

**PART III**

**Item 10.**     *Directors and Executive Officers of the Registrant*

**Directors and Executive Officers**

Set forth below are the names of the members of our Board of Directors and certain information furnished by them including principal occupations, certain other directorships held by them, and their ages as of December 31, 2005. Each director's term of office as a director is until the next annual meeting of stockholders and until his or her successor is elected and qualified. There are no arrangements pursuant to which our directors were selected.

| Name | Age | Year First Elected Director |
|---|---|---|
| Aart J. de Geus | 51 | 1986 |
| Chi–Foon Chan | 56 | 1998 |
| Bruce R. Chizen | 50 | 2001 |
| Deborah A. Coleman | 52 | 1995 |
| A. Richard Newton | 54 | 1987; 1995 |
| Sasson Somekh | 59 | 1999 |
| Roy Vallee | 53 | 2003 |
| Steven C. Walske | 53 | 1991 |

*Bruce R. Chizen* has been a member of our Board since April 2001. Mr. Chizen has served as Chief Executive Officer of Adobe Systems Incorporated, a provider of graphic design, publishing and imaging software for Web and print production, since December 2000 and served as President from April 2000 to January 2005. He joined Adobe Systems in August 1994 as Vice President and General Manager, Consumer Products Division and in December 1997 became Senior Vice President and General Manager, Graphics Products Division. In August 1998, Mr. Chizen was promoted to Executive Vice President, Products and Marketing. From November 1992 to February 1994, he was Vice President and General Manager, Claris Clear Choice for Claris Corp., a wholly–owned subsidiary of Apple Computer. He is a director of Adobe Systems.

*Deborah A. Coleman* has been a member of our Board since November 1995. Ms. Coleman is a General Partner of SmartForest Ventures, a venture capital firm, which she co–founded in June 2000. Ms. Coleman was Chairman of the Board of Merix Corporation, a manufacturer of printed circuit boards, from May 1994, when it was spun off from Tektronix, Inc., until September 2001. She also served as Chief Executive Officer of Merix from May 1994 to September 1999 and as President from March 1997 to September 1999. Ms. Coleman joined Merix from Tektronix, a diversified electronics corporation, where she served as Vice President of Materials Operations, responsible for worldwide procurement, distribution, component engineering and component manufacturing operations. Prior to joining Tektronix in November 1992, Ms. Coleman was with Apple Computer, Inc. for eleven years, where she held several executive positions, including Chief Financial Officer, Vice President, Information Systems and Technology and Vice President of Operations. She holds an M.B.A. from Stanford University. Ms. Coleman serves on the Boards of Directors of Applied Materials, Inc., a manufacturer of semiconductor fabrication equipment, Kryptiq Corp., a secure–messaging provider of medical information flows, Teja Technologies, Inc., an embedded system software company and NeoPad, Inc., a fabricator of custom chemical mechanical polishing pads for semiconductor manufacturing.

91

*Dr. A. Richard Newton* has been a member of our Board since January 1995. Previously, Dr. Newton was a Director from January 1987 to June 1991. Dr. Newton has been a Professor of Electrical Engineering and Computer Sciences at the University of California at Berkeley since 1979 and is currently Dean of the College of Engineering. From July 1999 to June 2000, Dr. Newton was Chair of the Electrical Engineering and Computer Sciences Department. From 1988 to 2002, Dr. Newton was a Venture Partner with Mayfield Fund, a venture capital partnership, where he contributed to the evaluation and development of over two dozen new companies. He is currently a Venture Partner with Tallwood Venture Capital. Dr. Newton is a fellow of the IEEE and a member of the National Academy of Engineering.

*Dr. Sasson Somekh* has been a member of our Board since January 1999. Dr. Somekh joined Novellus Systems, Inc., a manufacturer of semiconductor fabrication equipment, as its President in January 2004. Previously, Dr. Somekh served as a member of the board of directors of Applied Materials, Inc. from April 2003 until December 2003, and as an Executive Vice President of Applied Materials from November 2000 until August 2003. Dr. Somekh served as a Senior Vice President of Applied Materials from December 1993 to November 2000 and as a Group Vice President from 1990 to 1993. Dr. Somekh is a director of Nanosys, Inc., a privately–held developer of nano–enabled systems for use in energy, defense, electronics, healthcare and information technology applications.

*Roy Vallee* has been a member of our Board since February 2003. Mr. Vallee is Chief Executive Officer and Chairman of the Board of Avnet, Inc., a global semiconductor products and electronics distributor, positions he has held since June 1998. Previously, he was its Vice Chairman of the Board from November 1992 until June 1998, and also its President and Chief Operating Officer from March 1992 until June 1998. Mr. Vallee currently serves on the board of directors of Teradyne, Inc., an automated testing company for the electronics, communications and software industries. He is also Chairman of the Executive Committee of the Global Technology Distribution Council.

*Steven C. Walske* has been a member of our Board since December 1991. Mr. Walske has been Managing Director of Myriad Investments, LLC, a private equity firm specializing in investments in software companies, since June 2000. Previously, Mr. Walske served as Chief Business Strategist of Parametric Technology Corporation from June 2000 until June 2005, as Chairman, Chief Executive Officer and a Director or Parametric from August 1994 until June 2000, and as President, Chief Executive Officer and a Director of Parametric from December 1986 to August 1994.

**Background of Officers, including Directors who are Employees of Synopsys**

Information with respect to executive officers and employee directors of Synopsys is included under Part I, Item 4. *Submission of Matters to a Vote of Security Holders—Executive Officers of the Registrant*, and is incorporated by reference here.

There are no family relationships among any of our executive officers, directors or persons nominated to become directors.

**Identification of Audit Committee and Financial Expert**

Synopsys' Audit Committee is comprised of directors Ms. Coleman, Dr. Somekh and Mr. Vallee. All of such members satisfy the independence criteria of the National Association of Securities Dealers, Inc. for serving on an audit committee. SEC regulations require Synopsys to disclose whether its Board of Directors has determined that a director qualifying as a "financial expert" serves on the Synopsys' Audit Committee. Synopsys' Board of Directors has determined that both Ms. Coleman and Mr. Vallee qualify as financial experts within the meaning of such regulations.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires our directors, executive officers and greater than ten percent beneficial owners of our stock to file reports of ownership and changes in ownership with the SEC. Directors, executive officers and greater than ten percent stockholders are required by SEC regulations to furnish Synopsys with copies of all Section 16(a) reports they file.

Based solely on its review of the copies of the Forms 3, 4 and 5 filed by or received from its reporting persons (or written representations received from such persons), Synopsys believes that each of its directors, executive officers and greater than ten percent beneficial owners of its stock during fiscal 2005 complied with all filing requirements applicable to such persons.

**Adoption of Code of Ethics**

Synopsys has adopted a Code of Ethics and Business Conduct (the Code) applicable to all of its Board members, employees and executive officers, including its Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer) and Vice President, Controller and Treasurer (Principal Accounting Officer). Synopsys has made the Code available on its website at *www.synopsys.com/corporate/governance*.

Synopsys intends to satisfy the public disclosure requirements regarding (i) any amendments to the Code, or (ii) any waivers under the Code given to Synopsys' Chief Executive Officer, Chief Financial Officer and Vice President, Controller and Treasurer by posting such information on its website at *www.synopsys.com/corporate/governance*. There were no amendments to the Code or waivers granted thereunder relating to the Chief Executive Officer, Chief Financial Officer or Vice President, Controller and Treasurer during fiscal 2005.

93

**Item 11.** *Executive Compensation*

**Named Executive Officer Compensation**

The following table sets forth the compensation earned during fiscal 2005 by (1) our Chief Executive Officer and (2) each of our other four most highly compensated executive officers whose compensation earned during fiscal 2005 exceeded $100,000 for services rendered in all capacities to us during the last three fiscal years. We collectively refer to these five individuals as our "named executive officers."

### Summary Compensation Table

| Name and Position | Year | Annual Compensation($) | | Long–Term Compensation Awards; Securities Underlying Options (#) | All Other Compensation ($)(2) |
| | | Salary($) | Incentive Compensation ($)(1) | | |
|---|---|---|---|---|---|
| Aart J. de Geus | 2005 | $ 420,000 | $ 1,100,000 | 140,000 | $ 2,760 |
| Chief Executive Officer and | 2004 | 414,615(3) | 498,000 | 47,800 | $ 3,070 |
| Chairman of the Board | 2003 | 400,000 | 605,000 | 104,600 | 2,362 |
| Chi–Foon Chan | 2005 | $ 420,000 | $ 820,000 | 100,000 | $ 5,112 |
| President and Chief Operating | 2004 | 414,615(3) | 402,000 | 39,900 | 4,853 |
| Officer | 2003 | 400,000 | 605,000 | 100,850 | 3,128 |
| Vicki L. Andrews | 2005 | $ 350,000 | $ 600,000(5) | 60,000 | $ 10,374 |
| Senior Vice President, | 2004 | 319,230(4) | 268,000(5) | 38,300 | 9,752 |
| Worldwide Sales | 2003 | 300,000 | 390,716(5) | 61,150 | 9,579 |
| Antun Domic | 2005 | $ 370,000 | $ 350,000 | 75,000 | $ 3,405 |
| Senior Vice President and | 2004 | 359,230(3) | 246,000 | 39,450 | 3,336 |
| General Manager, | 2003 | 330,000 | 320,000 | 48,350 | 2,981 |
| Implementation Group | | | | | |
| Raul Camposano | 2005 | $ 350,000 | $ 330,000 | 55,000 | $ 3,174 |
| Senior Vice President and | 2004 | 350,000 | 188,833(6) | 21,000 | 2,670 |
| General Manager, | 2003 | 350,000 | 235,000 | 28,800 | 2,524 |
| Silicon Engineering Group | | | | | |

(1)   Represents bonuses and/or commissions paid pursuant to compensation plans approved by the Compensation Committee.
(2)   Amounts in this column reflect group term life insurance (GTL) premiums paid, Synopsys 401(k) matching contributions and, in the case of Ms. Andrews only, a car allowance. Fiscal 2005 amounts are as follows: Dr. de Geus: $1,260 in GTL and $1,500 in 401(k) contributions; Dr. Chan: $3,612 in GTL and $1,500 in 401(k) contributions; Dr. Domic: $1,905 in GTL and $1,500 in 401(k) contributions; Ms. Andrews: $1,674 in GTL, $1,500 in 401(k) contributions and $7,200 in car allowance; and Dr. Camposano: $1,674 in GTL and $1,500 in 401(k) contributions.
(3)   Reflects a change in base salary approved by our Compensation Committee in December 2003 and effective February 2004. Fiscal 2004 base salaries for such executive officers were: Dr. de Geus, $420,000; Dr. Chan, $420,000; and Dr. Domic, $370,000.
(4)   Reflects an increase in base salary to $350,000 approved by our Compensation Committee in May 2004.
(5)   Comprised of bonus and commissions earned during the year.
(6)   Comprised of $185,500 regular bonus and $3,333 patent bonus.

The following table sets forth information regarding individual grants of options during fiscal 2005 to the named executive officers.

| | Individual Grants | | | | Potential Realizable Value At Assumed Annual Rates Of Stock Price Appreciation For Option Term($)(3) | |
| Name | Number of Securities Underlying Options Granted(1) | Percent of Total Options Granted to Employees(2) | Exercise Prices ($/Share) Prices ($/Share) | Expiration Date | 5% | 10% |
|---|---|---|---|---|---|---|
| Aart J. de Geus | 140,000 | 3.10% | $ 18.55 | 12/17/11 | $ 1,057,240 | $ 2,463,818 |
| Chi–Foon Chan | 100,000 | 2.21% | $ 18.55 | 12/17/11 | $ 755,171 | $ 1,759,870 |
| Vicki L. Andrews | 60,000 | 1.33% | $ 18.55 | 12/17/11 | $ 453,103 | $ 1,055,922 |
| Antun Domic | 75,000 | 1.66% | $ 18.55 | 12/17/11 | $ 566,378 | $ 1,319,903 |
| Raul Camposano | 55,000 | 1.22% | $ 18.55 | 12/17/11 | $ 415,344 | $ 967,929 |

(1)    3/48ths of the options become exercisable three months after the grant date followed by 45 equal monthly installments, assuming continued service to Synopsys, subject to acceleration under certain circumstances involving a change in control of Synopsys. Each option has a maximum term of seven years, subject to earlier termination upon the optionee's cessation of service.

(2)    Based on a total of approximately 4.5 million shares subject to options granted to employees under Synopsys' option plans during fiscal 2005 and excluding an aggregate of approximately 3.8 million options granted in connection with our option exchange program. See Note 7 of our *Notes to Consolidated Financial Statements*. Our executive officers did not participate in the option exchange program.

(3)    In accordance with the rules of the SEC, the columns referring to potential realizable value show the gains or "option spreads" that would exist for the options granted based on the assumed rates of annual compound stock price appreciation of 5% and 10% from the date the option was granted over the full option term. These estimated rates do not represent our estimate or projection of future common stock prices or of the gains that may actually be realized by the optionee.

The following table provides the specified information concerning exercises of options to purchase our common stock and the value of unexercised options held by our named executive officers as of October 31, 2005.

| | | | Number of Securities Underlying Unexercised Options at October 31, 2005 | | Value of In–the–Money Options at October 31, 2005(2) | |
| Name | Shares Acquired On Exercise | Value Realized(1) | Exercisable/ | Unexercisable | Exercisable/ | Unexercisable |
|---|---|---|---|---|---|---|
| Aart J. de Geus | 240,000 | $ 147,690 | 3,155,858 | 191,942 | $ 2,170,133 | $ 8,867 |
| Chi–Foon Chan | N/A | N/A | 2,050,849 | 152,395 | $ 759,367 | $ 6,333 |
| Vicki L. Andrews | N/A | N/A | 379,697 | 103,753 | $ 101,200 | $ 3,800 |
| Antun Domic | N/A | N/A | 344,753 | 107,014 | $ 55,526 | $ 4,750 |
| Raul Camposano | N/A | N/A | 536,894 | 69,656 | $ 25,967 | $ 3,483 |

(1)    Market value at exercise less exercise price.

(2)    Market value of underlying securities as of the last trading day of fiscal 2005 ($18.63) minus the exercise price

**Director Compensation**

Non–employee directors receive a combination of cash and stock as compensation for Board service. Such directors receive an annual retainer of $125,000. In addition, Audit Committee members receive $2,000 ($4,000 in the case of the Chair) for each Audit Committee meeting attended, up to a maximum of four meetings per year.

Non–employee directors also receive equity compensation under Synopsys' 2005 Non–Employee Directors Equity Incentive Plan (the Directors Plan). The Directors Plan provides for automatic grants to each non–employee member of our Board upon their initial appointment or election and upon their reelection each year. The award price per share is 100% of the fair market value of our common stock on the grant date. New non–employee directors receive a stock option for 30,000 shares, vesting in equal annual installments on the date preceding each of the first four annual meetings of stockholders following the grant date, assuming continued Board service through each vesting date. Continuing Board members receive either (1) an option grant (with the number of shares determined so that the aggregate "fair value" of the option, calculated using the option pricing model used to estimate the value of compensatory stock options in our financial statements, would equal the annual cash retainer then paid to non–employee Board members) or (2) a restricted stock grant (with the number of shares subject to the award determined so that the fair market value of the restricted stock grant on the date of grant would equal the annual cash retainer then paid to non–employee Board members). The option grant or restricted stock vests in a series of 36 successive equal monthly installments from the grant date, assuming continued Board membership through each vesting date. The Board elected to receive restricted stock for the 2005 grant and, as a result, in May 2005 Synopsys issued an aggregate of 7,010 shares of restricted stock to each non–employee director under the Directors Plan. The Directors Plan expires in May 2007.

**Change of Control Agreements and Named Executive Officer Employment Contracts**

*1992 Stock Option Plan*

Under our 1992 Stock Option Plan (the 1992 Plan), if we are acquired or in the event of a change in control, including an acquisition of Synopsys by merger or asset sale, each outstanding option under the 1992 Plan will automatically become exercisable in full, unless the option is assumed by the successor corporation, or parent thereof, or replaced by a comparable option to purchase shares of the capital stock of the successor corporation or parent thereof. In addition, in the event of a successful hostile tender offer for more than 50% of our outstanding shares of common stock or a change in the majority of our Board as a result of a contested election for membership on our Board, the administrator of the 1992 Plan has the authority to accelerate vesting of outstanding options or shares purchased under the 1992 Plan.

*2005 Non–Employee Directors Equity Incentive Plan*

In the event of a corporate transaction, as such term is defined in the Directors Plan, each outstanding stock option and restricted stock award will automatically accelerate in full unless the stock option or our reacquisition rights with respect to the restricted stock award are assumed by or assigned to the successor corporation or its parent corporation. In the event of a change in control, as such term is defined in the 2005 Directors Plan, each stock award under the 2005 Directors Plan will automatically vest as to all shares subject to the stock award immediately prior to the effective date of the change in control.

*1994 Non–Employee Directors Stock Option Plan*

Our 1994 Non–Employee Directors Stock Option Plan (the 1994 Plan) was the predecessor to the Directors Plan. The 1994 Plan expired in October 2004. An aggregate of 1,277,660 options remain outstanding under such plan and are held by non–employee directors. Under the 1994 Plan, in the event of

96

a change of control or corporate transaction, as such terms are defined in the plan, all outstanding options become fully vested and exercisable as of the date of such change of control or corporate transaction.

**Employment Agreements**

We have entered into employment agreements, effective October 1, 1997, with our Chairman and Chief Executive Officer and our President and Chief Operating Officer. Each employment agreement provides that if such officer is terminated involuntarily other than for cause within 24 months of a change of control, (a) such officer will be paid an amount equal to two times the sum of such officer's annual base pay plus his target cash bonus, and the cash value such officer's health benefits for an 18–month period, and (b) all stock options held by such officer will immediately vest in full. If the officer is terminated involuntarily other than for cause in any other situation, the officer will receive a cash payment equal to the sum of the officer's annual base pay for one year plus the target cash bonus for such year and cash value of the executive's health benefits for 12 months. The terms "involuntary termination," "cause" and "change of control" are defined in the employment agreements, which have been filed with the SEC.

**Item 12.**    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

**Ownership of the Company's Securities**

The following table sets forth certain information with respect to the beneficial ownership of Synopsys' common stock as of December 31, 2005 by (1) each person known by Synopsys to beneficially own more than five percent of Synopsys' common stock outstanding on that date, (2) each Synopsys director, (3) each of the named executive officers and (4) all of Synopsys' directors and executive officers as a group.

| Name of Beneficial Owner(1) | Shares of Common Stock Beneficially Owned | |
| --- | --- | --- |
| | Number | Percentage Ownership |
| Entities affiliated with OppenheimerFunds, Inc. 6803 South Tucson Way Centennial, CO 80112–3924 | 11,891,194(2) | 8.24% |
| Entities affiliated with J. & W. Seligman & Co. Incorporated 100 Park Avenue, 8th Floor New York, NY 10017 | 11,137,519(3) | 7.71% |
| Vicki L. Andrews | 410,281(4) | * |
| Raul Camposano | 576,778(5) | * |
| Chi–Foon Chan | 2,178,280(6) | 1.49% |
| Bruce R. Chizen | 195,342(7) | * |
| Deborah A. Coleman | 160,410(8) | * |
| Aart J. de Geus | 3,826,522(9) | 2.59% |
| Antun Domic | 367,051(10) | * |
| A. Richard Newton | 205,842(11) | * |
| Sasson Somekh | 303,091(12) | * |
| Roy Vallee | 132,342(13) | * |
| Steven C. Walske | 194,210(14) | * |
| All directors and executive officers as a group (17 persons) | 9,564,889(15) | 6.25% |

*          Less than 1%

(1)        Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Except as indicated by footnote, and subject to

97

community property laws where applicable, we believe, based on information furnished by such persons and from Forms 13F, 13G and 13D filed with the SEC, that the persons named in the table above have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them as of December 31, 2005. Percentage of beneficial ownership is based on 144,372,085 shares of common stock outstanding as of December 31, 2005, adjusted as required by SEC rules. In computing the number of shares beneficially owned by a person or group and the percentage ownership of that person, shares of common stock issuable pursuant to options held by that person that are currently exercisable or exercisable by that person or group within 60 days of December 31, 2005 are deemed to be beneficially owned. Such shares, however, are not deemed outstanding for the purposes of computing the percentage ownership of any other person.

(2)     Based solely on a Form 13F filed with the SEC on October 11, 2005, reporting beneficial ownership as of September 30, 2005. OppenheimerFunds, Inc. has shared voting power with respect to these shares, and shares investment power with respect to these shares with Oppenheimer Institutional Asset Management and Oppenheimer Private Investments. The shares are beneficially owned as follows:

(3)     Based solely on a Form 13F filed with the SEC on November 9, 2005, reporting beneficial ownership as of September 30, 2005. J. & W. Seligman & Co. Incorporated has shared voting and investment power with respect to these shares. The shares are beneficially owned as follows:

(4)     Includes options to purchase 401,887 shares exercisable by Ms. Andrews within 60 days of December 31, 2005.

(5)     Includes options to purchase 548,495 shares exercisable by Dr. Camposano within 60 days December 31, 2005.

(6)     Includes options to purchase 2,082,195 shares exercisable by Dr. Chan within 60 days of December 31, 2005.

(7)     Includes options to purchase 188,332 shares exercisable by Mr. Chizen within 60 days December 31, 2005.

(8)     Includes options to purchase 150,000 shares exercisable by Ms. Coleman within 60 days of December 31, 2005.

(9)     Includes options to purchase 3,193,143 shares exercisable by Dr. de Geus within 60 days of December 31, 2005 and excludes 22,000 shares beneficially owned by Dr. de Geus' wife.

(10)   Includes options to purchase 364,051 shares exercisable by Dr. Domic within 60 days of December 31, 2005.

(11)   Includes options to purchase 196,832 shares exercisable by Dr. Newton within 60 days of December 31, 2005.

(12)   Includes options to purchase 271,666 shares exercisable by Dr. Somekh within 60 days of December 31, 2005.

(13)   Includes options to purchase 123,332 shares exercisable by Mr. Vallee within 60 days of December 31, 2005.

(14)   Includes options to purchase 150,000 shares exercisable by Mr. Walske within 60 days of December 31, 2005.

(15)   Includes options to purchase 8,648,495 shares exercisable by directors and executive officers within 60 days of December 31, 2005.

**Stockholder Approval of Stock Plans**

The following table provides information regarding our equity compensation plans as of October 31, 2005. The material terms of these plans are described in Note 7 of our Notes to *Consolidated Financial Statements,* which descriptions are incorporated by reference here.

| Plan Category | Number of Shares to be Issued Upon Exercise of Outstanding Options (a) | Weighted–Average Exercise Price of Outstanding Options (b) | Number of Shares Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Shares Reflected in Column(a)) (c) |
|---|---|---|---|
| | (in thousands, except price per share amounts) | | |
| Equity Compensation Plans Approved by Stockholders(1) | 9,454 | $ 22.32 | 14,845 |
| Equity Compensation Plans Not Approved by Stockholders(2) | 24,150 | $ 19.37 | 6,253 |
| Total | 33,604(3) | $ 20.20 | 21,098(4) |

(1)     Synopsys' stockholder approved equity compensation plans include the 1992 Plan, the 2005 Directors Plan, the 1994 Directors Plan and the Employee Stock Purchase Plans.

(2)     Synopsys' only non–stockholder approved equity compensation plans are the 1998 Plan and the 2005 Assumed Stock Option Plan.

(3)     Does not include information for outstanding options assumed in connection with acquisitions. As of October 31, 2005, a total of 2.9 million shares of our common stock were issuable upon exercise of such outstanding options.

(4)     Comprised of (i) 6.7 million shares remaining available for issuance under the 1992 Plan, (ii) 4.1 million shares remaining available for issuance under the 1998 Plan, (iii) 258,000 shares remaining available for issuance under the 2005 Directors Plan, (iv) 7.8 million shares remaining available for issuance under the Employee Stock Purchase Plans as of October 31, 2005 and (v) 2.2 million shares remaining available for issuance under the 2005 Assumed Stock Option Plan. No shares remain available for grant under the 1994 Directors Plan, which expired in October 2004.

**Item 13.**     *Certain Relationships and Related Transactions*

During fiscal 2005, Dr. Newton provided consulting services to us, for which he was paid $180,000. Under our agreement, Dr. Newton provides advice, at our request, concerning long–term technology strategy and industry development issues, as well as assistance in identifying opportunities for partnerships with academia.

Revenues derived from Intel Corporation and its subsidiaries in the aggregate accounted for approximately 13%, 11% and 10% of our fiscal 2005, 2004 and 2003 revenues, respectively. Andy D. Bryant, Intel's Executive Vice President and Chief Financial and Enterprise Services Officer, served on our Board of Directors from January 1999 to May 2005. Management believes all transactions between the two parties were carried out on an arm's length basis. Accounts receivable amounts recorded from Intel were insignificant as of October 31, 2005, 2004 and 2003, respectively.

We have entered into indemnification agreements with our executive officers and directors for the indemnification of, and advancement of expenses to, these persons to the fullest extent permitted by Delaware law. We also intend to execute these agreements with out future directors and executive officers. Please see Item 11, *Executive Compensation—Change of Control Agreements and Named Executive Officer Employment Contracts* for a description of our employment and change of control agreements.

99

**Item 14.** *Principal Accountant Fees and Services*

**Fees of KPMG LLP**

The following table presents fees for professional audit services rendered by KPMG LLP for the audit of Synopsys' annual financial statements for fiscal 2005 and 2004, and fees billed for all other services rendered by KPMG LLP.

| | Year Ended October 31, | |
| --- | --- | --- |
| | **2005** | **2004** |
| | (in thousands) | |
| Audit fees | $ 3,913 | $ 2,668 |
| Audit related fees(1) | 291 | 344 |
| Tax fees(2) | 12 | 152 |
| All other fees | — | — |
| Total fees | $ 4,216 | $ 3,164 |

(1)     Consists of fees for due diligence services.
(2)     Consists of fees for international tax planning services and advice.

**Audit Committee Pre–Approval Policy**

As required by Section 10A(i)(1) of the Exchange Act, all non–audit services to be performed by Synopsys' principal accountants must be approved in advance by the Audit Committee of the Board of Directors, subject to certain exceptions relating to non–audit services accounting for less than five percent of the total fees paid to its principal accountants which are subsequently ratified by the Audit Committee (the De Minimus Exception). In addition, pursuant to Section 10A(i)(3) of the Exchange Act, the Audit Committee has established procedures by which the Chairperson of the Audit Committee may pre–approve such services provided the Chairperson report the details of the services to the full Audit Committee at its next regularly scheduled meeting. None of the non–audit services described above were performed pursuant to the De Minimus Exception during fiscal 2005 or 2004.

**PART IV**

**Item 15.** *Exhibits and Financial Statement Schedules*

(a)     The following documents are filed as part of this Annual Report on Form 10–K:

(1)     Financial Statements

The following documents are included as Part II, Item 8. of this Annual Report on Form 10–K:

| | Page |
| --- | --- |
| Report of Independent Registered Public Accounting Firm | 50 |
| Consolidated Balance Sheets | 51 |
| Consolidated Statements of Operations | 52 |
| Consolidated Statements of Stockholders' Equity and Comprehensive Income (Loss) | 53 |
| Consolidated Statements of Cash Flows | 56 |
| Notes to Consolidated Financial Statements | 57 |

(2)     Financial Statement Schedules

None.

(3)    Exhibits
    See Item 15(b) below.
(b)    Exhibits

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation(1) |
| 3.2 | Restated Bylaws of Synopsys, Inc.(2) |
| 4.1 | Amended and Restated Preferred Shares Rights Agreement dated April 7, 2000(3) |
| 4.3 | Specimen Common Stock Certificate(4) |
| 10.1 | Form of Indemnification Agreement for directors and executive officers(5) |
| 10.2 | Director's and Officer's Insurance and Company Reimbursement Policy(4) |
| 10.3 | Lease Agreement, dated August 17, 1990, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1977 (John Arrillaga Separate Property Trust), as amended, and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1977 (Richard T. Peery Separate Property Trust), as amended(4) |
| 10.5 | Synopsys Deferred Compensation Plan as Restated Effective August 1, 2002(6)(14) |
| 10.6 | Settlement Agreement, dated July 8, 2004, by and among the Company, Mountain Acquisition Sub, Inc. and Monolithic System Technology, Inc.(7) |
| 10.7 | Lease Agreement, dated June 16, 1992, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1977 (John Arrillaga Separate Property Trust), as amended, and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1977 (Richard T. Peery Separate Property Trust), as amended(8) |
| 10.8 | Lease Agreement, dated June 23, 1993, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1977 (John Arrillaga Separate Property Trust), as amended, and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1977 (Richard T. Peery Separate Property Trust), as amended(9) |
| 10.9 | Lease Agreement, August 24, 1995, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1977 (John Arrillaga Separate Property Trust), as amended, and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1977 (Richard T. Peery Separate Property Trust), as amended(10) |
| 10.10 | Amendment No. 6 to Lease, dated July 18, 2001, to Lease Agreement dated August 17, 1990, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1997 (John Arrillaga Survivor's Trust), and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1997 (Richard T. Peery Separate Property Trust), as amended(11)(12) |
| 10.11 | Amendment No. 4 to Lease, dated July 18, 2001, to Lease Agreement dated June 16, 1992, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1997 (John Arrillaga Survivor's Trust), and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1997 (Richard T. Peery Separate Property Trust), as amended(11)(12) |

101

| 10.12 | Amendment No. 3 to Lease, dated July 18, 2001, to Lease Agreement dated June 23, 1993, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1997 (John Arrillaga Survivor's Trust), and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1997 (Richard T. Peery Separate Property Trust), as amended(11)(12) |
| 10.13 | Amendment No. 1 to Lease, dated July 18, 2001, to Lease Agreement dated August 24, 1995, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1997 (John Arrillaga Survivor's Trust), and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1997 (Richard T. Peery Separate Property Trust), as amended(11)(12) |
| 10.14 | Lease dated January 2, 1996 between the Company and Tarigo–Paul, a California Limited Partnership(13) |
| 10.15 | 1992 Stock Option Plan, as amended and restated(14)(15) |
| 10.16 | Employee Stock Purchase Program, as amended(14)(16) |
| 10.17 | International Employee Stock Purchase Plan, as amended(14)(16) |
| 10.18 | Synopsys deferred compensation plan dated November 14, 2005(14)(17) |
| 10.19 | 1994 Non–Employee Directors Stock Option Plan, as amended and restated(14)(18) |
| 10.20 | Form of Executive Employment Agreement dated October 1, 1997(14)(19) |
| 10.21 | Schedule of Executive Employment Agreements(11) |
| 10.22 | 1998 Nonstatutory Stock Option Plan(14)(20) |
| 10.23 | Settlement Agreement and General Release by and among Cadence Design Systems, Inc., Joseph Costello, Avant! Corporation LLC, Gerald Hsu, Eric Cheng, Mitsuru Igusa and the Company. effective as of November 13, 2002(21) |
| 10.24 | Consulting Services Agreement between the Company and A. Richard Newton dated November 1, 2001(14)(22) |
| 10.25 | Amended and Restated Credit Agreement, dated April 28, 2004, among the Company, Bank of America, N.A., as Syndication Agent, certain lenders and JPMorgan Chase Bank, as Administrative Agent(6) |
| 10.27 | Form of Stock Option Agreement under 1992 Stock Option Plan(14)(23) |
| 10.28 | Director Compensation Arrangements(14) |
| 10.29 | FY 2004 Recognition Bonus Plan(14)(24) |
| 10.30 | FY 2004 Individual Compensation Plan for Senior Vice President, Worldwide Sales(14)(24) |
| 10.31 | 2005 Non–Employee Director Equity Incentive Plan(14)(16) |
| 10.32 | Synopsys Executive Incentive Plan adopted April 20, 2005(5)(14) |
| 10.33 | FY05 Individual Compensation Plan for Principal Sales Officer dated April 20, 2005(14)(25) |
| 10.34 | Synopsys, Inc. 2005 Assumed Stock Option Plan(14)(26) |
| 10.35 | Executive Operating Plan Incentive(14)(27) |
| 21.1 | Subsidiaries of the Company |
| 23.1 | Consent of KPMG LLP, Independent Registered Public Accounting Firm |
| 24.1 | Power of Attorney (see page 106) |

31.1          Certification of Chief Executive Officer furnished pursuant to Rule 13a–14(a) or Rule 15d–14(a) of the Exchange Act

31.2          Certification of Chief Financial Officer furnished pursuant to Rule 13a–14(a) or Rule 15d–14(a) of the Exchange Act

32.1          Certification of Chief Executive Officer and Chief Financial Officer furnished pursuant to Rule 13a–14(b) or Rule 15d–14(b) of the Exchange Act and Section 1350 of Chapter 63 of Title 18 of the United States Code

---

(1)      Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended July 31, 2003.

(2)      Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended April 3, 1999.

(3)      Incorporated by reference from exhibit to Amendment No. 2 to the Company's Registration Statement on Form 8–A (Commission File No. 000–19807) filed with the Securities and Exchange Commission on April 10, 2000.

(4)      Incorporated by reference from exhibit to the Company's Registration Statement on Form S–1 (File No. 33–45138) which became effective February 24, 1992.

(5)      Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended April 30, 2005.

(6)      Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended April 30, 2004.

(7)      Incorporated by reference to exhibit to the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on July 15, 2004.

(8)      Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended September 30, 1992.

(9)      Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended September 30, 1993.

(10)    Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended September 30, 1995.

(11)    Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended October 31, 2002.

(12)    Confidential Treatment granted for certain portions of this document.

(13)    Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended March 31, 1996.

(14)    Compensatory plan or agreement in which an executive officer or director participates.

(15)    Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended October 31, 2001.

(16)    Incorporated by reference from exhibit to the Registration Statement on Form S–8 (File No. 333–125224) of Synopsys, Inc. filed with the Securities and Exchange Commission on May 25, 2005.

103

(17)  Incorporated by reference from exhibit to the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on November 16, 2005.

(18)  Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended July 31, 2003.

(19)  Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended January 3, 1998.

(20)  Incorporated by reference from exhibit to the Company's Registration Statement on Form S–8 (File No. 333–90643) filed with the Securities and Exchange Commission on November 9, 1999.

(21)  Incorporated by reference exhibit to the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on November 19, 2002.

(22)  Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended April 30, 2002.

(23) Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on January 12, 2005.

(24)  Incorporated by reference from the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on January 11, 2005.

(25)  Incorporated by reference from the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on May 27, 2005.

(26)  Incorporated by reference from the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on September 12, 2005.

(27)  Incorporated by reference from the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on December 12, 2005.

(c)    Financial Statement Schedules
       None.

**SIGNATURES**

Pursuant to the requirements of section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in Mountain View, State of California, on this 12th day of January 2006.

SYNOPSYS, INC.

By:   /s/ AART J. DE GEUS _____

Aart J. de Geus
*Chief Executive Officer and Chairman of the*
*Board of Directors*
*(Principal Executive Officer)*


By:   /s/ REX S. JACKSON _____

Rex S. Jackson
*Senior Vice President, Acting Chief Financial*
*Officer, General Counsel and Secretary*
*(Principal Financial Officer)*


By:   /s/ GEOFFREY E. SLOMA _____

Geoffrey E. Sloma
*Vice President, Corporate Controller and Treasurer*
*(Principal Accounting Officer)*


105

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Aart J. de Geus and Rex S. Jackson, and each of them, as his true and lawful attorneys–in–fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post–effective amendments) to this Annual Report on Form 10–K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys–in–fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys–in–fact and agents, or any of them, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
|---|---|---|
| /s/ AART J. DE GEUS<br>Aart J. de Geus | Chief Executive Officer<br>(Principal Executive Officer)<br>and Chairman of the Board of Directors | January 12, 2006 |
| /s/ CHI–FOON CHAN<br>Chi–Foon Chan | President, Chief Operating Officer and Director | January 12, 2006 |
| /s/ BRUCE R. CHIZEN<br>Bruce R. Chizen | Director | January 12, 2006 |
| /s/ DEBORAH A. COLEMAN<br>Deborah A. Coleman | Director | January 12, 2006 |
| /s/ A. RICHARD NEWTON<br>A. Richard Newton | Director | January 12, 2006 |
| /s/ SASSON SOMEKH<br>Sasson Somekh | Director | January 12, 2006 |
| /s/ STEVEN C. WALSKE<br>Steven C. Walske | Director | January 12, 2006 |
| /s/ ROY VALLEE<br>Roy Vallee | Director | January 12, 2006 |

106

# EXHIBIT INDEX

| Exhibit Number | Exhibit Description |
| --- | --- |
| 3.1 | Amended and Restated Certificate of Incorporation(1) |
| 3.2 | Restated Bylaws of Synopsys, Inc.(2) |
| 4.1 | Amended and Restated Preferred Shares Rights Agreement dated April 7, 2000(3) |
| 4.3 | Specimen Common Stock Certificate(4) |
| 10.1 | Form of Indemnification Agreement for directors and executive officers(5) |
| 10.2 | Director's and Officer's Insurance and Company Reimbursement Policy(4) |
| 10.3 | Lease Agreement, dated August 17, 1990, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1977 (John Arrillaga Separate Property Trust), as amended, and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1977 (Richard T. Peery Separate Property Trust), as amended(4) |
| 10.5 | Synopsys Deferred Compensation Plan as Restated Effective August 1, 2002(6)(14) |
| 10.6 | Settlement Agreement, dated July 8, 2004, by and among the Company, Mountain Acquisition Sub, Inc. and Monolithic System Technology, Inc.(7) |
| 10.7 | Lease Agreement, dated June 16, 1992, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1977 (John Arrillaga Separate Property Trust), as amended, and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1977 (Richard T. Peery Separate Property Trust), as amended(8) |
| 10.8 | Lease Agreement, dated June 23, 1993, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1977 (John Arrillaga Separate Property Trust), as amended, and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1977 (Richard T. Peery Separate Property Trust), as amended(9) |
| 10.9 | Lease Agreement, August 24, 1995, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1977 (John Arrillaga Separate Property Trust), as amended, and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1977 (Richard T. Peery Separate Property Trust), as amended(10) |
| 10.10 | Amendment No. 6 to Lease, dated July 18, 2001, to Lease Agreement dated August 17, 1990, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1997 (John Arrillaga Survivor's Trust), and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1997 (Richard T. Peery Separate Property Trust), as amended(11)(12) |
| 10.11 | Amendment No. 4 to Lease, dated July 18, 2001, to Lease Agreement dated June 16, 1992, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1997 (John Arrillaga Survivor's Trust), and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1997 (Richard T. Peery Separate Property Trust), as amended(11)(12) |
| 10.12 | Amendment No. 3 to Lease, dated July 18, 2001, to Lease Agreement dated June 23, 1993, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1997 (John Arrillaga Survivor's Trust), and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1997 (Richard T. Peery Separate Property Trust), as amended(11)(12) |
| 10.13 | Amendment No. 1 to Lease, dated July 18, 2001, to Lease Agreement dated August 24, 1995, between the Company and John Arrillaga, Trustee, or his successor trustee, UTA dated July 20, 1997 (John Arrillaga Survivor's Trust), and Richard T. Peery, Trustee, or his successor trustee, UTA dated July 20, 1997 (Richard T. Peery Separate Property Trust), as amended(11)(12) |

| | |
|---|---|
| 10.14 | Lease dated January 2, 1996 between the Company and Tarigo–Paul, a California Limited Partnership(13) |
| 10.15 | 1992 Stock Option Plan, as amended and restated(14)(15) |
| 10.16 | Employee Stock Purchase Program, as amended(14)(16) |
| 10.17 | International Employee Stock Purchase Plan, as amended(14)(16) |
| 10.18 | Synopsys deferred compensation plan dated November 14, 2005 (14)(17) |
| 10.19 | 1994 Non–Employee Directors Stock Option Plan, as amended and restated(14)(18) |
| 10.20 | Form of Executive Employment Agreement dated October 1, 1997(14)(19) |
| 10.21 | Schedule of Executive Employment Agreements(11) |
| 10.22 | 1998 Nonstatutory Stock Option Plan(14)(20) |
| 10.23 | Settlement Agreement and General Release by and among Cadence Design Systems, Inc., Joseph Costello, Avant! Corporation LLC, Gerald Hsu, Eric Cheng, Mitsuru Igusa and the Company. effective as of November 13, 2002(21) |
| 10.24 | Consulting Services Agreement between the Company and A. Richard Newton dated November 1, 2001(14)(22) |
| 10.25 | Amended and Restated Credit Agreement, dated April 28, 2004, among the Company, Bank of America, N.A., as Syndication Agent, certain lenders and JPMorgan Chase Bank, as Administrative Agent(6) |
| 10.27 | Form of Stock Option Agreement under 1992 Stock Option Plan(14)(23) |
| 10.28 | Director Compensation Arrangements(14) |
| 10.29 | FY 2004 Recognition Bonus Plan(14)(24) |
| 10.30 | FY 2004 Individual Compensation Plan for Senior Vice President, Worldwide Sales(14)(24) |
| 10.31 | 2005 Non–Employee Director Equity Incentive Plan(14)(16) |
| 10.32 | Synopsys Executive Incentive Plan adopted April 20, 2005(5)(14) |
| 10.33 | FY05 Individual Compensation Plan for Principal Sales Officer dated April 20, 2005(14)(25) |
| 10.34 | Synopsys, Inc. 2005 Assumed Stock Option Plan(14)(26) |
| 10.35 | Executive Operating Plan Incentive(14)(27) |
| 21.1 | Subsidiaries of the Company |
| 23.1 | Consent of KPMG LLP, Independent Registered Public Accounting Firm |
| 24.1 | Power of Attorney (see page 106) |
| 31.1 | Certification of Chief Executive Officer furnished pursuant to Rule 13a–14(a) or Rule 15d–14(a) of the Exchange Act |
| 31.2 | Certification of Chief Financial Officer furnished pursuant to Rule 13a–14(a) or Rule 15d–14(a) of the Exchange Act |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer furnished pursuant to Rule 13a–14(b) or Rule 15d–14(b) of the Exchange Act and Section 1350 of Chapter 63 of Title 18 of the United States Code |

(1)    Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended July 31, 2003.

(2)    Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended April 3, 1999.

(3)    Incorporated by reference from exhibit to Amendment No. 2 to the Company's Registration Statement on Form 8–A (Commission File No. 000–19807) filed with the Securities and Exchange Commission on April 10, 2000.

(4)    Incorporated by reference from exhibit to the Company's Registration Statement on Form S–1 (File No. 33–45138) which became effective February 24, 1992.

(5)    Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended April 30, 2005.

(6)    Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended April 30, 2004.

(7)    Incorporated by reference to exhibit to the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on July 15, 2004.

(8)    Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended September 30, 1992.

(9)    Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended September 30, 1993.

(10)   Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended September 30, 1995.

(11)   Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended October 31, 2002.

(12)   Confidential Treatment granted for certain portions of this document.

(13)   Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended March 31, 1996.

(14)   Compensatory plan or agreement in which an executive officer or director participates.

(15)   Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) for the fiscal year ended October 31, 2001.

(16)   Incorporated by reference from exhibit to the Registration Statement on Form S–8 (File No. 333–125224) of Synopsys, Inc. filed with the Securities and Exchange Commission on May 25, 2005.

(17)   Incorporated by reference from exhibit to the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on November 16, 2005.

(18)   Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended July 31, 2003.

(19)   Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended January 3, 1998.

(20)   Incorporated by reference from exhibit to the Company's Registration Statement on Form S–8 (File No. 333–90643) filed with the Securities and Exchange Commission on November 9, 1999.

(21)   Incorporated by reference exhibit to the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on November 19, 2002.

(22)   Incorporated by reference from exhibit to the Company's Quarterly Report on Form 10–Q (Commission File No. 000–19807) for the quarterly period ended April 30, 2002.

(23)   Incorporated by reference from exhibit to the Company's Annual Report on Form 10–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on January 12, 2005.

(24) Incorporated by reference from the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on January 11, 2005.

(25) Incorporated by reference from the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on May 27, 2005.

(26) Incorporated by reference from the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on September 12, 2005.

(27) Incorporated by reference from the Company's Current Report on Form 8–K (Commission File No. 000–19807) filed with the Securities and Exchange Commission on December 12, 2005.

Exhibit 10.28

**Synopsys, Inc. Director Compensation Arrangements**

- Cash:

- Annual retainer: $125,000 per year.

- Per meeting fees for Audit Committee members only, up to a maximum of four meetings per year:

- $2,000 per Audit Committee meeting for regular members

- $4,000 per Audit Committee meeting attended for the Chairperson

- Equity: pursuant to the 2005 Non–Employee Directors Equity Incentive Plan (the Directors Plan), in fiscal 2005, each director is eligible to receive equity compensation as follows:

- Any new director receives an option for 30,000 shares, vesting in equal annual installments on the date preceding each of the first four annual meetings of stockholders following the grant date, assuming continued service.

- Each continuing director who is reelected at an annual meeting of stockholders receives either (1) an option grant (with the number of shares determined so that the aggregate "fair value" of the option, calculated using the option pricing model used to estimate the value of compensatory stock options in our financial statements, would equal the annual cash retainer then paid to non–employee Board members) or (2) a restricted stock grant (with the number of shares subject to the award determined so that the fair market value of the restricted stock grant on the date of grant would equal the annual cash retainer then paid to non–employee Board members). The option grant or restricted stock vests in a series of 36 successive equal monthly installments from the grant date, assuming continued service/

- The Board elected to receive restricted stock for the 2005 grant and in May 2005 Synopsys issued an aggregate of 7,010 shares of restricted stock to each non–employee director under the Directors Plan.

EXHIBIT 21.1

**Subsidiaries of Synopsys, Inc.**

| Name | Jurisdiction of Incorporation |
|---|---|
| Accelerant Networks, Inc. | California |
| Angel HiTech Limited | Bermuda |
| Avant! China Holdings, Ltd. | Bermuda |
| Avant! Corporation GmbH | Germany |
| Avant! Corporation Limited | United Kingdom |
| Avant! Europe Manufacturing Ltd. | Ireland |
| Avant! Global Technologies Ltd. | Ireland |
| Avant! International Distribution Ltd. | Ireland |
| Avant! Korea Co., Ltd. | Korea |
| Avant! LLC | Delaware |
| Avant! Microelectronics (Shanghai) Company Limited | China |
| Avant! Software (Israel) Ltd. | Israel |
| Avant! Taiwan Holdings, Ltd. | Bermuda |
| Avant! UK Ltd. | United Kingdom |
| Avant! Worldwide Holdings, Ltd. | Bermuda |
| Avanticorp Hong Kong Limited | Hong Kong |
| Cascade Semiconductor Solutions, Inc. | Oregon |
| Compass Design Automation International, B.V. | The Netherlands |
| Integrated Systems Engineering (Shanghai) Co., Ltd. | China |
| Maude Avenue Land Corporation | Delaware |
| Nassda Corporation | Delaware |
| Nassda Europe | France |
| Nassda GmbH | Germany |
| Nassda International Corporation | California |
| Nassda International UK Limited | United Kingdom |
| Nihon Synopsys Co., Ltd. | Japan |
| Progressant Technologies, Inc. | California |
| Synopsys (India) EDA Software Private Limited | India |
| Synopsys (India) Private Limited | India |
| Synopsys (Northern Europe) Limited | United Kingdom |
| Synopsys (Singapore) Pte. Limited | Singapore |
| Synopsys Armenia CJSC | Armenia |
| Synopsys Canada Holdings ULC | Canada |
| Synopsys Canada Holdings, Inc. | Delaware |
| Synopsys Canada ULC | Canada |
| Synopsys Denmark ApS | Denmark |
| Synopsys Finland OY (Smartech) | Finland |
| Synopsys Global Holdings Limited | Bermuda |
| Synopsys GmbH | Germany |
| Synopsys Holding Company | Delaware |
| Synopsys International Inc. (FSC) | Barbados |
| Synopsys International Limited | Ireland |
| Synopsys International Old Limited | Ireland |
| Synopsys International Services, Inc. | Delaware |
| Synopsys Ireland Limited | Ireland |
| Synopsys Israel Limited | Israel |
| Synopsys Italia s.r.l. | Italy |
| Synopsys Korea, Inc. | Korea |
| Synopsys Merger Holdings, LLC | Delaware |
| Synopsys Netherlands BV | The Netherlands |
| Synopsys SARL | France |
| Synopsys Scandinavia AB | Sweden |
| Synopsys Switzerland LLC | Switzerland |
| Synopsys Taiwan Limited | Taiwan |
| Synopsys Technology (Beijing) Company Limited | China |

EXHIBIT 23.1

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors
Synopsys, Inc.:

We consent to the incorporation by reference in the registration statements (Nos. 333–84517 and 333–68011) on Form S–3 and (Nos. 333–116222, 333–45056, 333–38810, 333–32130, 333–90643, 333–84279, 333–77597, 333–56170, 333–63216, 333–71056, 333–50947, 333–77000, 333–97317, 333–97319, 333–99651, 333–100155, 333–103418, 333–103635, 333–103636, 333–106149, 333–108507, 333–77127, 333–68883, 333–60783, 333–50947, 333–45181, 333–42069, 333–22663, 333–75638, 333–125224 and 333–125225) on Form S–8 of Synopsys, Inc. of our reports dated January 12, 2006, relating to the consolidated balance sheets of Synopsys, Inc. and subsidiaries as of October 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity and comprehensive income (loss) and cash flows for each of the years in the three–year period ended October 31, 2005, management's assessment of the effectiveness of internal control over financial reporting as of October 31, 2005, and the effectiveness of internal control over financial reporting as of October 31, 2005, appearing elsewhere in this Form 10–K.

Our report dated January 12, 2006, on management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting as of October 31, 2005, expresses our opinion that Synopsys, Inc. did not maintain effective internal control over financial reporting as of October 31, 2005, because of the effect of a material weakness on the achievement of objectives of the control criteria and contains an explanatory paragraph that states that the Company's processes and procedures did not include adequate management oversight and review of the Company's income tax accounting practices.

/s/ KPMG LLP

Mountain View, California
January 12, 2006

EXHIBIT 31.1

## CERTIFICATION

I, Aart J. de Geus, certify that:

1.    I have reviewed this Annual Report on Form 10–K of Synopsys, Inc.;

2.        Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report;

3.        Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.        The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.        The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: January 12, 2006

/s/ Aart J. de Geus
Aart J. de Geus
Chief Executive Officer
(Principal Executive Officer)

EXHIBIT 31.2

## CERTIFICATION

I, Rex S. Jackson, certify that:

1.          I have reviewed this Annual Report on Form 10–K of Synopsys, Inc.;

2.          Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report;

3.          Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.          The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

     (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)          Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)          Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.          The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)          All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)          Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: January 12, 2006

/s/ Rex S. Jackson
Rex S. Jackson  Senior
Vice President, Acting Chief Financial
Officer, General Counsel and Secretary
 (Principal Financial Officer)

EXHIBIT 32.1

**Certification Pursuant to Section 906 of the Sarbanes–Oxley Act of 2002
(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to the requirement set forth in Rule 13a–14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350, Chapter 63 of Title 18 of the United States Code (18 U.S.C.—§1350), each of Aart J. de Geus, Chief Executive Officer of Synopsys, Inc., a Delaware corporation (the "Company"), and Rex S. Jackson, Acting Chief Financial Officer of the Company, does hereby certify, to such officer's knowledge, that:

The Annual Report on Form 10–K for the fiscal year ended October 31, 2005 (the "Form 10–K") to which this Certification is attached as Exhibit 32.1 fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act. The information contained in the Form 10–K fairly presents, in all material respects, the financial condition and results of operations of the Company.

**IN WITNESS WHEREOF**, the undersigned have set their hands hereto as of the 12th day of January 2006.

/s/ Aart J. de Geus
_____
Aart J. de Geus
Chief Executive Officer


/s/ Rex S. Jackson
_____
Rex S.Jackson
Senior Vice President, Acting Chief Financial
Officer, General Counsel and Secretary

The foregoing certification is being furnished solely pursuant to Section 906 of the Sarbanes–Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code) and is not deemed filed with the Securities and Exchange Commission as part of the Form 10–K or as a separate disclosure document and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10–K), irrespective of any general incorporation language contained in such filing.

Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers(*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
2101 L Street, NW
Washington, DC  20037-1526
Phone (202) 785-9700
Fax (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY, LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Phone (212) 835-1400
Fax (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Phone  (415) 421-7151
Fax (415) 362-8064

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RICOH COMPANY, LTD.,

    Plaintiff,

  vs.

AEROFLEX ET AL,

    Defendants.

**CASE NO. CV 03-4669 MJJ (EMC)**
**CASE NO. CV 03-2289 MJJ (EMC)**

**MANUAL FILING NOTIFICATION**

SYNOPSYS, INC.,

    Plaintiff,

  vs.

RICOH COMPANY, LTD.,

    Defendant.

Regarding: Joint Letter to Magistrate Judge Edward M. Chen, dated February 9, 2006, and Exhibits 6-19 attached thereto.

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office.  If you are a participant in this case, this filing will be served in hard-copy shortly.  For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

[_] Voluminous Document (PDF file size larger than the e-filing system allows)

[_] Unable to Scan Documents

[_] Physical Object (description): _____

    _____

[_] Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media

[X] Item Under Seal

[_] Conformance with the Judicial Conference Privacy Policy (General Order 53).

[_] Other (description): _____

Dated: February 9, 2006                    Respectfully submitted,

                                           KENNETH W. BROTHERS
                                           GARY M. HOFFMAN
                                           EDWARD A. MEILMAN
                                           Dickstein Shapiro Morin & Oshinsky, LLP

                                           JEFFREY B. DEMAIN
                                           JONATHAN WEISSGLASS
                                           Altshuler, Berzon, Nussbaum, Rubin & Demain


                                           By:_____/s/_____
                                                Kenneth W. Brothers

                                           Attorneys for Ricoh Company, Ltd.



# FORM 10−K

## AMIS HOLDINGS INC − AMIS

**Filed: March 24, 2004 (period: December 31, 2003)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART I

**Item 1.** Business
**Item 2.** Properties
**Item 3.** Legal Proceedings
**Item 4.** Submission of Matters to a Vote of Security Holders

## PART II

**Item 5.** Market for Registrant s Common Equity, Related Stockholder Matters and Issuer Purchases of E
**Item 6.** Selected Financial Data
**Item 7.** Management s Discussion and Analysis of Financial Condition and Results of Operations
**Item 7A.** Quantitative and Qualitative Disclosures About Market Risk
**Item 8.** Financial Statements and Supplementary Data
**Item 9.** Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
**Item 9A.** Controls and Procedures

## PART III

**Item 10.** Directors and Executive Officers of the Registrant
**Item 11.** Executive Compensation
**Item 12.** Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matt
**Item 13.** Certain Relationships and Related Transactions
**Item 14.** Principal Accountant Fees and Services

## PART IV

**Item 15.** Exhibits, Financial Statement Schedules and Reports on Form 8-K
SIGNATURES
EX-3.1 (Articles of Incorporation)

EX-3.2 (By-laws)

EX-10.6 (Material contracts)

EX-10.8 (Material contracts)

EX-23.1 (Consents of experts and counsel)

EX-31.1

EX-31.2

EX-32.1

EX-32.2

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C. 20549

# Form 10-K

### FOR ANNUAL AND TRANSITION REPORTS PURSUANT TO SECTIONS 13

### OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

☑    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Fiscal Year ended December 31, 2003

Commission File Number 0-50397

# AMIS Holdings, Inc.

*(Exact name of Registrant as Specified in Its Charter)*

| | |
|---|---|
| **Delaware** | **51-0309588** |
| *(State of incorporation)* | *(I.R.S. Employer Identification Number)* |
| **2300 Buckskin Road** | **83201** |
| **Pocatello, ID** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**(Registrant's telephone number, including area code)**

**(208) 233-4690**

Securities registered pursuant to Section 12(b) of the Act:

**None**

Securities registered pursuant to Section 12(g) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common stock, $0.01 par value | Nasdaq National Market |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    Yes ☐    No ☑

State the aggregate market value of the voting and non-voting common equity held by nonaffiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter. Not applicable.

The number of shares of the registrant's common stock outstanding as of March 4, 2004 was 82,255,539.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement relating to the registrant's 2004 Annual Meeting of Stockholders to be held on or about June 10, 2004 are incorporated by reference into Part III of this report.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| PART I. |  | 2 |
| Item 1. | BUSINESS | 2 |
| Item 2. | PROPERTIES | 14 |
| Item 3. | LEGAL PROCEEDINGS | 14 |
| Item 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 15 |
| PART II. |  | 15 |
| Item 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 15 |
| Item 6. | SELECTED FINANCIAL DATA | 15 |
| Item 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 18 |
| Item 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 42 |
| Item 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 43 |
| Item 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 84 |
| Item 9A. | CONTROLS AND PROCEDURES | 84 |
| PART III. |  | 84 |
| Item 10. | DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 84 |
| Item 11. | EXECUTIVE COMPENSATION | 85 |
| Item 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 85 |
| Item 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 85 |
| Item 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 85 |
| PART IV. |  | 85 |
| Item 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K | 85 |
| SIGNATURES |  | 87 |
| EXHIBIT 3.1 |  |  |
| EXHIBIT 3.2 |  |  |
| EXHIBIT 10.6 |  |  |
| EXHIBIT 10.8 |  |  |
| EXHIBIT 23.1 |  |  |
| EXHIBIT 31.1 |  |  |
| EXHIBIT 31.2 |  |  |
| EXHIBIT 32.1 |  |  |
| EXHIBIT 32.2 |  |  |

1

Table of Contents

PART I

Item 1.    *Business*

## DISCLOSURE REGARDING FORWARD–LOOKING STATEMENTS

*This annual report on Form 10–K contains forward–looking statements. In some cases, you can identify forward–looking statements by terminology such as "may," "will," "should," "expects," "plans," "target," "anticipates," "believes," "estimates," "predicts," "potential," "continues" or the negative of these terms or other comparable terminology. These statements are only predictions and speak only as of their dates. These forward–looking statements are based largely on our current expectations and are subject to a number of risks and uncertainties, including those identified under "Factors that May Affect Our Business and Future Results" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and other risks and uncertainties indicated from time to time in our filings with the U.S. Securities and Exchange Commission (SEC). Actual results could differ materially from these forward–looking statements. Factors that could cause or contribute to such differences include general economic and political uncertainty, conditions in the semiconductor industry, changes in the conditions affecting our target markets, manufacturing underutilization, fluctuations in customer demand, raw material costs, exchange rates, timing and success of new products, competitive conditions in the semiconductor industry and risks associated with international operations. In light of these risks and uncertainties, there can be no assurance that the matters referred to in the forward–looking statements contained in this annual report will in fact occur.*

### Overview

We are a leader in the design and manufacture of customer specific integrated analog mixed signal semiconductor products. We focus on the automotive, medical and industrial markets, which have many products with significant real world, or analog, interface requirements. Integrated mixed signal semiconductor products are an essential part of any electronic system that interacts with the real world. Integrated mixed signal products interpret and manage analog inputs such as light, heat, pressure, power and radio waves so that these inputs can be processed by digital control circuitry and used to drive devices such as motor controllers or industrial switches or to communicate with an external system. Integrated mixed signal products combine analog and digital semiconductor functionality on a single integrated circuit to perform complex functions, such as monitoring human heart rates, as well as simpler tasks, such as determining air pressure in tire pressure gauges. We focus on developing our integrated mixed signal semiconductor products based on our customers' specifications and requirements incorporating their proprietary intellectual property. We work closely with each customer to integrate their industry–specific intellectual property into a custom semiconductor product that they use to differentiate their products in the marketplace. We add value to our customers' products by providing significant mixed signal design expertise, an extensive analog and mixed signal intellectual property portfolio and systems–level design expertise. We support our customers' long product lifecycles and manufacturing requirements with our proven proprietary process technologies and our flexible manufacturing model.

We are a holding company and conduct all our business operations through AMI Semiconductor, Inc., our wholly owned subsidiary, and its subsidiaries. We were incorporated in Delaware in 1988. Our headquarters are located in Pocatello, Idaho, and we have wafer fabrication facilities in Pocatello, Idaho and Oudenaarde, Belgium.

Our predecessor company was founded in Santa Clara, California in 1966 as American Microsystems, Inc. to design and manufacture analog and mixed signal integrated circuits. American Microsystems was taken public in the late 1960s. In the 1980s, American Microsystems shifted its focus to the design and manufacture of mixed signal and digital custom integrated circuits and in 1985 American Microsystems entered the digital conversion ASIC business when it completed its first significant conversion project. Our predecessor was acquired by Gould Inc. in 1982, which in turn was acquired by a company now known as Nippon Mining Holdings Inc. (Nippon Mining) in 1988. Between 1988 and 2000 our predecessor operated at various times as subsidiary and a division of Nippon Mining. In 2000 the division was spun out into a

2

Table of Contents

subsidiary, and in December 2000 the subsidiary, Nippon Mining and new investors engaged in a recapitalization transaction pursuant to which the subsidiary was renamed AMI Semiconductor, Inc. and became our wholly owned subsidiary. In June 2002 we acquired the Mixed Signal Business of Alcatel Microelectronics.

Our website is located at *www.amis.com*. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments to these reports are available free of charge on our website as soon as reasonably practicable after such material has been filed with, or furnished to, the SEC.

## Industry

Semiconductors are critical components that serve as a fundamental building block in a broad array of products. Over time, semiconductor suppliers have continuously offered more feature-rich, lower cost products. As a result, semiconductors have played an important role in enabling and enhancing computing, communications and consumer electronic applications. As technology continues to penetrate most aspects of daily life, semiconductors are increasingly playing an important role in many other economic sectors, including the automotive, medical and industrial markets. Semiconductors have penetrated these real world applications, in part, due to their ability to monitor, sense, control and communicate between digital and analog environments. For example, in the automotive sector, semiconductors are used to enhance vehicle performance and safety as well as provide real time diagnostic information. In the medical sector, semiconductors are used to improve the quality of medical imaging and patient treatment and diagnostics as well as enable high performance implantable and portable devices such as pacemakers, glucose monitors and hearing aids. In the industrial sector, semiconductors are used to augment the performance of a broad range of products, including security systems, home appliances and automation equipment. According to Gartner Dataquest, the semiconductor content of electronic systems used in automotive, medical and industrial products is expected to represent 14.7% of the total cost of those systems in 2006, up from 11.2% in 2002. The semiconductor industry is estimated by Gartner Dataquest to have generated revenue of $177 billion in 2003 of which the automotive, medical and industrial end markets represent $26.9 billion, or 15.2%.

## Our Solution

We design and manufacture customer specific integrated mixed signal products for a broad range of markets, with focus on our target automotive, medical and industrial markets. Our integrated mixed signal products are characterized by high quality and reliability, low power consumption and high levels of integration and functionality. We have a detailed systems-level understanding of our customers' businesses, and we often work as an extension of our customers' research and development teams to design and manufacture differentiated integrated mixed signal products for specific end markets. Our systems architects and integrated mixed signal engineers utilize our extensive library of semiconductor building block circuit designs, design tools and methodologies, along with our proprietary process technologies, to quickly integrate multiple, customer-specified functions into cost-effective solutions.

Our products have long lifecycles and revenue streams, with an average life of five to seven years. We believe we are the sole-source provider for most of the integrated mixed signal products we provide to our customers.

Key benefits of our integrated mixed signal solutions are:

• *Enabling Our Customers to Differentiate Their Products.* Our products are the result of close collaboration with our customers and our thorough knowledge of our customers' end markets. Together with our customers, we work to design their intellectual property into our semiconductor components to facilitate the differentiation of their products in the marketplace. We have an extensive intellectual property portfolio and over 30 years of experience in building complex, customer specific highly integrated mixed signal solutions. With approximately 220 design engineers as of December 31, 2003, we have developed an extensive library of integrated circuit designs optimized for our customers' end use applications. We provide products that are feature-rich, power efficient, high performance and lower cost than our customers' internally developed solutions or solutions built with standard semiconductors.

3

Table of Contents

- *Improving Time−to−Market for Our Customers.* We enable our customers to get to market quickly. We help our customers take advantage of our design expertise, proven process technology, intellectual property and flexible manufacturing facilities to create differentiated products quickly. By leveraging our core competencies, we eliminate the need for our customers to maintain large internal design teams, to design basic circuit blocks, to acquire expertise in integrating these blocks and to de−bug processes in their own fabs. As a result, we can deliver to our customers a wide variety of high quality products with capabilities that they would generally be unable to provide internally on a timely basis.

- *Integrating Systems−Level Functionality into Our Products.* We utilize our systems architects and their end market experience to optimize our product designs to meet our customers' needs. These systems architects work with our customers to define the feature set, create design specifications and identify discrete building block circuit designs to be integrated into comprehensive integrated mixed signal solutions we build for our customers. The ability to integrate these building blocks quickly and efficiently permits our customers to achieve the desired system functionality using our integrated mixed signal products while maximizing performance and cost−effectiveness and minimizing time−to−market.

- *Leveraging Proprietary Proven Process and Manufacturing Technology.* Our wide ranging base of proprietary integrated mixed signal manufacturing technologies, including precision analog and high voltage technologies, enables us to maximize our product performance by matching the optimal technologies with our customers' end use applications. Furthermore, we have developed advanced logistics and infrastructure to enable us to switch process technologies used in our fabrication facilities quickly and efficiently, which allows us to serve a broad array of customers with a wide variety of process technology needs. Finally, we focus on manufacturing integrated mixed signal and digital semiconductors with long lifecycles utilizing established and proven process technologies, thereby reducing technology risk for our customers.

- *Committing to Customers for the Long Term.* We spend the required time and allocate sufficient design resources to our customers to help them get through the long product development and qualification process in the automotive, medical and industrial markets. We also support our customers' manufacturing needs throughout their products' lifecycle. Many of our largest customers by revenue have conducted business with us for over 10 years.

**The AMI Semiconductor Strategy**

Our objective is to be the leading provider of integrated mixed signal semiconductors. Key elements of our strategy include:

- *Leveraging Our Integrated Mixed Signal Capabilities and Systems−Level Knowledge to Further Penetrate Our Target Markets.* We intend to leverage our investment in our intellectual property, design platform and manufacturing process to continue helping our customers develop new products for the automotive, medical and industrial markets. We have built significant integrated mixed signal engineering, process technology and intellectual property capabilities. In addition, we possess a systems−level understanding of our customers' businesses. We are positioned to address the challenges facing our customer base with higher functionality, smaller form factor, lower power, improved price for performance and faster time−to−market products. We are continuing to build new mixed signal and system−on−chip building blocks and process technologies to keep our customers at the leading edge of product functionality. We use our base of technologies and manufacturing capabilities to help customers in our target markets deliver differentiated products and to establish our company as a key supplier and partner for our customers.

- *Driving Market Share Through Our Focus on Targeted End Markets and Customers.* We intend to continue to build and leverage close customer relationships to maintain our position as a leading provider of customer specific integrated mixed signal products for our target markets. By focusing on the automotive, medical and industrial markets, we develop a better understanding of the unique component solution requirements of our customers. Many of our customers depend on us for components that are fundamental to their products and use our engineering and design capabilities as

4

Table of Contents

an extension of their research and development teams. We believe we are a sole source provider for approximately 85% of the products we sell.

- *Developing and Broadening Our Customer Relationships by Providing Mixed Signal Foundry Services and Structured Digital Products.* In addition to our integrated mixed signal products, we provide mixed signal foundry services and structured digital products to our customer base. Our mixed signal foundry services allow us to develop relationships with existing foundry customers that may develop into integrated mixed signal customers over time. In addition, our mixed signal foundry services allow us to enhance utilization of our existing facilities, process technology and intellectual property. Our structured digital products represent a next generation approach to traditional custom digital semiconductor products and programmable logic conversions. This product offering enables our customers to benefit from faster time−to−market and reduced engineering and production costs. In combination, these businesses enable us to: (i) offer a more complete product and services offering to our target market customers; (ii) cross−sell various products and services to our customers; and (iii) participate in other end markets such as computing and communications.

- *Winning New Business by Offering Long−Term Support over the Complete Design and Production Lifecycle.* We support our customers through the long lead time often associated with the design and qualification of custom semiconductors. We assure customers that sell products with long lifecycles of a dependable source for their critical semiconductor components by retaining processes, technologies and products in manufacturing as long as business demand remains at reasonable levels. Supporting our customers during both development and production, over a wide range of production volumes, differentiates us from our competition, enables us to maintain attractive pricing over the lifecycle of our products and helps us obtain new business.

- *Pursuing Growth Through Targeted Acquisitions.* We intend to evaluate acquisition opportunities that we believe will increase our market share in our target markets, improve our portfolio of intellectual property or strengthen our customer base. We believe that the semiconductor industry is undergoing a period of product rationalization and consolidation. Further, we believe that time−to−market and economic pressures are leading certain of our customers and competitors to seek to divest their captive or non−strategic businesses. We have participated in this consolidation by acquiring the Mixed Signal Business of Alcatel Microelectronics in June 2002.

**Products and Services** .

Our products and services are organized into three business segments: integrated mixed signal products, mixed signal foundry services and structured digital products. For financial information concerning our segments, see note 18 to our consolidated financial statements included in this annual report. The foundation of our business is based on our mixed signal engineering and system level design expertise, extensive library of proprietary mixed signal building blocks, proven process technologies, flexible manufacturing model and structured digital products platform. We provide our customers a range of products and services including design and manufacturing of complex integrated mixed signal products, building blocks to complement our customers' intellectual property, manufacturing services for customer−designed silicon products and cost optimization platforms and products. While most of our customers initially use one of our products or services, many are attracted to us because of the breadth of our offering and the ability to utilize different parts of our business over time. We help our customers differentiate their products by embedding their intellectual property in silicon and delivering products with expanded functionality and better cost for performance.

### Integrated Mixed Signal Products (53.1% of 2003 revenue)

We design and manufacture complex customer specific integrated mixed signal products for a variety of markets. We work closely with our customers throughout the design period, typically lasting from six to 24 months, thereby establishing long−term working relationships. Our design libraries and design software enable us and our customers to design highly integrated mixed signal products more efficiently and accelerate time−to−market by providing a common platform on which both system designers and circuit designers can

Table of Contents

collaborate. Our integrated mixed signal products combine analog and digital functions on a single chip to form a customer defined system–level solution. We focus on integrating the following three main building block interfaces to the real world:

*Sensor Interfaces.* Sensors transform real-world stimuli such as temperature and pressure into analog electrical signals. The proliferation of sensors and the requirement to interface with those sensors have expanded the market for integrated mixed signal products. Our integrated mixed signal sensor interfaces enable our customers to create products that are small in size and consume less power, which are attractive attributes for sensors in the automotive, medical and industrial markets. In the automotive field, we have worked with large automotive customers to provide sensor interfaces for angular position sensing used in applications such as steer–by–wire or throttle position sensing. In the medical diagnostics field, we have worked with customers in the medical end market to develop integrated mixed signal solutions for high volume applications, such as blood glucose monitoring, internal temperature measurement and body fat measurement.

*Controls.* Most equipment in the automotive, medical and industrial markets operates in high voltage environments. Digital semiconductors usually operate in low voltage environments. Our integrated mixed signal high voltage control products can amplify, condition and regulate analog signal inputs and outputs ranging from five to 100 volts. Utilizing our proprietary design techniques and proprietary high voltage manufacturing processes, we can create cost–effective, energy efficient single chip solutions for high voltage systems. High voltage control applications include headlamp drivers and motor control for positioning of headlamp systems for automotive suppliers, as well as arc fault detection and circuit control for industrial suppliers.

*Communication Products.* Low data rate wireless functionality enables digital messages to be sent over moderate distances using a low power connection. Low data rate solutions are widely used in the automotive, medical and industrial markets. These markets are not addressed by the relatively high cost, high power consumption, high data rate wireless products such as those used in wireless phones. Our products are optimized for low cost and low power and are used by industrial and automotive end market customers in applications such as wireless home security and keyless entry. One of our products in development is a blood sugar monitor for diabetics that is embedded under the skin to measure blood sugar levels and communicates wirelessly to a display on a wristwatch. We also offer wired communication products for such applications as in–vehicle control and industrial networking.

*Mixed Signal Foundry Services (25.6% of 2003 revenue)*

We provide mixed signal semiconductor manufacturing services primarily to electronic systems manufacturers and semiconductor companies that have completed their own designs but do not have their own fabrication facilities or have otherwise chosen to outsource to us. In 2003, over 90% of our foundry services revenue came from the manufacture of mixed signal products. We target the mixed signal products market for automotive, medical and industrial applications characterized by small to medium volume production runs not targeted by our larger competitors. Furthermore, we focus on customers and target markets that leverage our mixed signal technology and manufacturing expertise. We manufacture semiconductors with long lifecycles that utilize established process technologies, thereby reducing technology risk for our customers. Typical applications serviced by our mixed signal manufacturing business include implantable medical devices and sensing circuits for military and high voltage consumer and communications devices. We are a leading supplier of semiconductors for the cardiac rhythm management market.

We believe we are typically the sole–source provider of a particular device for our foundry customers. We also leverage our long–term relationships with foundry customers to sell them our integrated mixed signal products and design services and to expand our mixed signal and custom digital intellectual property portfolio.

*Structured Digital Products (21.3% of 2003 revenue)*

To address the rising costs associated with digital semiconductor design and manufacturing, we work with customers to convert programmable logic integrated circuits and field programmable gate arrays, or FPGAs, into highly cost–effective structured digital products. We offer customers our proprietary architecture,

6

Table of Contents

processes and manufacturing expertise to enable higher performance and efficiency in the conversion process and the final structured digital product. We focus on moderate to high volume products with intermediate degrees of design complexity. We have been an innovator in the digital conversion market since 1985 and have created many methodologies and software tools, including our proprietary NETRANS® software, that have enabled us to develop a leading position in this market. Structured digital products are used in a wide variety of applications, including communications infrastructure, medical imaging, automotive and high-density disk storage, and can vary in complexity.

Customers often would like to obtain the higher performance and lower price of products customized for their system, but instead settle, at least initially, for higher priced programmable logic integrated circuits or FPGAs that enable faster time-to-market. Once these products reach production volumes, however, conversion to a custom product for the balance of the product life can reduce costs considerably while improving performance. While FPGAs offer greater flexibility and faster time-to-market since they can be configured by the customer on site rather than customized in a fab, our structured digital products offer lower per unit cost, higher levels of integration, greater processing speed and lower power consumption.

Our XPressArray $^{TM}$ product platform became commercially available in 2003. Our XPressArray $^{TM}$ product platform allows our customers to convert FPGAs into cost-effective structured digital products with higher performance and efficiency using our proprietary architecture, design software, processes and manufacturing expertise. We have specifically focused our design efforts and intellectual property in the XPressArray $^{TM}$ product platform to enable rapid and accurate conversion from an FPGA to our product so that it will perform seamlessly in a system initially designed with an FPGA.

We use Taiwan Semiconductor Manufacturing Company's 0.18 micron leading-edge process technology to manufacture elements common to each XPressArray $^{TM}$ product. Custom functionality is achieved using our internal, low-cost 0.35 micron and 0.25 micron technologies to create the final circuit connections. This unique hybrid manufacturing approach enables a product that has very fast time-to-market because of our flexible internal manufacturing capabilities and low cost because we are able to use significantly fewer expensive semiconductor photomasks when compared to a typical custom digital product. We believe our XPressArray $^{TM}$ product platform will provide our customers with significant reductions in development time and low engineering costs while decreasing their semiconductor unit costs considerably.

**Customers and Applications**

The following table sets forth our principal end markets, the percentage of revenue for 2003 in each end market and some specific applications for our products during 2003:

| End Markets | Automotive | Industrial | Communications | Medical | Military | Computing, Consumer and Other |
|---|---|---|---|---|---|---|
| Percentage of revenue for 2003 | 24.8% | 20.7% | 21.7% | 12.8% | 8.2% | 11.8% |
| Applications | Digital compass Engine management Headlight controls | Industrial networking Circuit protection Wireless security | Broadband analog Wireless base stations Switches Routers | Medical imaging Pacemakers Blood glucose monitor | Cockpit displays Missile guidance Infrared imaging | Printers Power management Storage systems |

In 2003, our 30 largest customers accounted for 63.6% of our revenue. Our only customer representing more than 5% of our revenue for that period was STMicroelectronics at 7.8%. In June 2004, the take-or-pay contract that is in place with STMicroelectronics will expire (as discussed in Management's Discussion and Analysis of Financial Condition and Results of Operations) and we expect STMicroelectronics to decrease as a percentage of our total revenue at that point. While no single customer made up 5% or more of our historical revenue in 2002 or 2001, our 30 largest customers accounted for 61.2% and 58.3%, respectively, of our historical revenue in 2002 and 2001.

Table of Contents

Sales

We sell our products through direct sales personnel, independent sales representatives and licensed distributors worldwide.

We believe that maintaining a technically competent and highly focused group of direct sales personnel is the most efficient way to serve our current customers and to develop and expand our markets and customer base worldwide. Our direct sales organization includes regional sales managers, field application engineers, account managers and manufacturers representatives. Our direct sales personnel are divided geographically throughout North America, Europe and the Asia Pacific region to provide localized technical support. We have strategically located our sales and technical support offices near concentrations of major customers. As of December 31, 2003, we had 51 direct sales personnel, of which 27 people covered North America, 21 covered Europe and three covered the Asia Pacific region.

We use our independent sales representatives network to service primarily integrated mixed signal and structured digital products customers and distribute our products primarily in North America and the Asia Pacific region, and for a small percentage of our sales, in Europe. Our direct sales personnel support independent sales representatives by regularly calling on existing and prospective customers. Our mixed signal foundry services direct sales personnel call on the customer generally without use of the independent sales representatives. During 2003, 2002 and 2001 we derived approximately 50.5%, 68.4% and 90.9%, respectively, of our historical revenue from independent sales representatives. Independent sales representatives in North America do not offer other products that compete directly with our products. Our agreements with our independent sales representatives are usually terminable by either party on relatively short notice. Typically in North America, orders flow from the customer to one of our independent sales representatives; in Europe, customers tend to order directly from us. Our independent sales representatives do not normally carry any product inventory.

We sell our products through authorized distributors only upon the customer's request. During 2003, 2002 and 2001 only 2.1%, 3.2% and 4.9%, respectively, of our historical revenue were derived from authorized distributors. Similar to our contracts with independent sales representatives, our agreements with our authorized distributors are usually terminable by either party on relatively short notice.

Research and Development

Our research and development efforts focus on design methodology, intellectual property and process technology for integrated mixed signal and structured digital products. We have continued to improve our manufacturing processes, design software and design libraries. We also work closely with our major customers in many research and development activities, including joint intellectual property development, to increase the likelihood that our products will be more easily designed into our customers' products and consequently achieve rapid and lasting market acceptance. Areas of focus in intellectual property development include developing our library of microcontroller, motor control, data conversion, wireless and low power building blocks.

We enhance our research and development efforts through our affiliations with the academic institutions or the teaching staff in the United States at Idaho State University, Montana State University, the University of Idaho, Boise State University, Brigham Young University and the University of Utah. We retain ownership or exclusive rights to any intellectual property created under contract with these institutions. We maintain all rights to information disclosed by us to these institutions. We own or have license rights to intellectual property created under contract with these institutions. We have a research contract with Interuniversity MicroElectronics Center, or IMEC, a large European independent microelectronics research center that gives us non−exclusive rights to use certain jointly−developed technologies. We also have collaborations programs in Europe such as with the University of Leuven, University of Gent, and the Research Institute in Laussanne.

Our historical expenditures for research and development for 2003, 2002 and 2001 were $70.3 million, $52.1 million and $42.1 million, respectively, representing 15.5%, 15.1% and 12.9% of revenue in each of the respective periods.

8

Table of Contents

**Intellectual Property**

We rely on a combination of patent, copyright, maskwork rights, trademark and trade secret laws and contractual restrictions to establish the proprietary aspects of our business and technology across all three of our principal product and services groups. As of December 31, 2003, we held 73 U.S. patents and 117 foreign patents. We also had over 50 patent applications in progress. The patents are based primarily on circuit design and process techniques. Our patents have a typical duration of 20 years from application date. At the end of 2004, approximately 21% of the patents we currently have in place will be expiring. We do not expect this to have a material impact on our results, as these technologies are not revenue producing and we will be able to continue using the technologies associated with these patents. There can be no assurance that pending patent applications or other applications that may be filed will result in issued patents or that any issued patents will survive challenges to their validity. However, we believe that the loss of any one of our patents would not materially affect our business. We have licensed our design libraries and software to selected customers to design products that are then manufactured by us. We may also license technology from third parties to incorporate into our design libraries.

As part of the MSB acquisition, we acquired a perpetual fully paid license from STMicroelectronics for certain Complimentary Metal Oxide Semiconductor, or CMOS, and Bipolar Complimentary Metal Oxide Semiconductor, or BiCMOS, mixed signal process technology down to 0.35 micron, as well as other intellectual property. CMOS and BiCMOS are two of the most common methods used to manufacture semiconductors. We also have an agreement with Hitachi relating to technology assistance for our development of process technology down to 0.22 micron. This agreement terminates in October 2004.

The semiconductor industry is characterized by frequent litigation regarding patent and other intellectual property rights. As is typical in the semiconductor industry, we have from time to time received communications from third parties asserting rights under patents that cover certain of our technologies and alleging infringement of certain intellectual property rights of others. We expect to receive similar communications in the future. In the event that any third party had a valid claim against us or our customers, we could be required to:

• discontinue using certain process technologies which could cause us to stop manufacturing certain semiconductors;

• pay substantial monetary damages;

• seek to develop non–infringing technologies, which may not be feasible; or

• seek to acquire licenses to the infringed technology which may not be available on commercially reasonable terms, if at all.

In the event that any third party causes us or any of our customers to discontinue using certain process technologies, we believe that such an outcome would not have a long term material and adverse effect, as we could design around such technologies. In any event, the process technologies we use are widely employed throughout our competitive landscape, and thus any such discontinuance would not only impact us, but would also affect our competitors.

We were named as a defendant in a complaint filed on January 21, 2003, by Ricoh Company, Ltd. in the U.S. District Court for the Northern District of California alleging infringement of a patent owned by Ricoh. See "Item 3. Legal Proceedings" for a more complete description of the Ricoh claim.

**Manufacturing**

We typically initiate production of our products only after we receive orders from our customers. As a result, we generally do not carry significant levels of finished goods inventory.

9

Table of Contents

The production of our semiconductor products is a complex process that can be broadly divided into three primary stages:

- fabricating the semiconductor circuit on a wafer, which is a round, flat piece of silicon on which one to several thousand semiconductor circuits can be built;

- packaging the semiconductor circuit by slicing the wafer into individual semiconductor circuits, or die and placing these die into a package for insertion onto a printed circuit board; and

- testing the packaged semiconductor circuit.

We manufacture wafers at our 5–inch fab and an 8–inch fab located in Pocatello, Idaho and our 4–inch fab and a 6–inch fab located in Oudenaarde, Belgium. Our wafer fabrication technology is based on CMOS, BiCMOS and high voltage processes.

Our integrated mixed signal products customers and mixed signal foundry customers do not typically require us to maintain process technologies below 0.35 micron. As a result, our capital expenditure requirements are often less as a percentage of revenue than purely digital semiconductor companies which invest in higher cost process technologies below 0.35 micron. We purchase 0.18 micron CMOS wafers from TSMC which we use in our XPressArray [TM] product platform. Our XPressArray [TM] products are initially processed in an advanced 0.18 micron digital CMOS process at TSMC and then completed with our own 0.35 micron or 0.25 micron process in our own fab. This process combination gives our XPressArray [TM] products 0.18 micron performance without incurring the capital expenditure needed to maintain our own 0.18 micron fab. In the future, we intend to either process mixed signal devices below 0.18 micron internally or seek an external source for technology of such geometry.

Fabricated wafers are transferred to packaging facilities. We perform wafer and packaged die testing at our facilities in Manila, Pocatello and Oudenaarde and we also use subcontractors. A significant portion of our testing is performed at our 85,600 square foot facility in Manila, which was established in 1980 and is equipped with a variety of testers and auto handling equipment that complement the variety of packages and circuits that we manufacture. We also outsource back–end packaging and testing to a number of subcontractors in Asia. The table below sets forth information with respect to our wafer fabrication facilities, products and technologies:

| Location | Products/Functions | Installed Annual Equipment Capacity | Wafer Diameter |
|---|---|---|---|
| Pocatello | CMOS Wafers, 1 micron and above, 2 to 3 metal levels | 170,000 | 5" |
| | CMOS Wafers, 0.6 micron to 1 micron, 2 to 3 metal levels | 110,000 | 5" |
| Pocatello | CMOS Wafers, 0.35 micron to 0.8 micron, 2 to 5 metal levels | 57,000(1) | 8" |
| Oudenaarde | BiCMOS Wafers, 1 micron, 2 metal levels | 153,000 | 4" |
| Oudenaarde | BiCMOS Wafers, 0.35 micron to 1 micron, 2 to 5 metal levels | 116,000(2) | 6"(3) |

(1)    By adding additional equipment, production capacity at our 8–inch fab could be increased to 225,000 wafers per year.

(2)    By adding additional equipment, production capacity at our 6–inch fab could be increased to 175,000 wafers per year.

(3)    The equipment at our 6–inch fab can be scaled to 8–inch wafers.

Our manufacturing processes use many raw materials, including silicon wafers, copper lead frames, molding compounds, ceramic packages and various chemicals and gases. We obtain raw materials and

Table of Contents

supplies from a large number of sources. Although supplies of raw materials are currently adequate, shortages could occur in various essential materials due to interruption of supply or increased demand in the industry.

Our manufacturing groups also go through stringent certifications to support our focus on our target markets of automotive, medical and industrial. These markets have very demanding requirements for quality and reliability. The following standards require third party auditing to receive certification. We were the first semiconductor company to independently certify to the MIL−PRF−38535 QML standard. In 2002 we became the first pure−play custom integrated circuit manufacturer to attain certification to the telecom TL9000 R3 standard. We became an ISO9000 certified company in 1994, received the QS9000 automotive certification in 1997, a STACK supplier certification in 2000, and earned several government sponsored Quality Awards. Our current certification achievements include the ISO/ TS16949:2002 worldwide automotive standard and the ISO14001:1996 Environmental standard.

### Backlog

Backlog is typically recorded only upon receipt of a written purchase order from a customer. Reported backlog represents products scheduled to be delivered within six months. Backlog is influenced by several factors including market demand, pricing, customer order patterns and changes in product lead times. Backlog may fluctuate from booking to time of delivery to reflect changes in customer needs or industry conditions. Once manufacturing has commenced, orders generally are not cancelable. In addition, because customers already have invested significant time working with us (typically from six to 24 months before production of a custom semiconductor) and have incurred the non−recurring engineering fee in full before production begins, customers generally have given careful consideration to the orders they place, and generally do not cancel orders. However, there is no guarantee that backlog will ultimately be realized as revenue. Backlog was $128.4 million as of December 31, 2003 and $97.7 million as of December 31, 2002.

Backlog should not be taken as an indicator of our anticipated revenue for any particular future period. Line items recorded in backlog may not result in revenue within six months for several reasons, including: (a) certain customer orders within backlog may not be able to be recognized as revenue within six months (i.e., we, for various reasons, may be unable to ship the product within the specified time frame promised); (b) certain customer order delivery dates may be delayed to a subsequent period by our customers; and (c) certain customer orders may even be cancelled at our customers' request. These items have often been offset, and exceeded by, both (a) new customer orders that are booked subsequent to the backlog reporting date and delivered to the customer within six months and (b) customer orders with anticipated delivery dates outside six months and subsequently shipped sooner than originally anticipated. The amount of revenue recognized in excess of backlog during any six−month period varies and depends greatly on overall capacity in the semiconductor industry and capacity in our manufacturing facilities. We do not routinely monitor the extent of backlog cancelled, pushed out for later delivery or accelerated for earlier delivery.

### Financial Information About Geographic Areas

For financial information about geographic areas, see note 18 to our consolidated financial statements. For risks relating to our foreign operations, see "Factors that May Affect Our Business and Future Results" in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### Competition

We compete in highly competitive markets. Although no one company competes with us in all of our product lines, we face significant competition for products in each of our three business areas from domestic, as well as international, companies. Some of these companies have substantially greater financial, technical, marketing and management resources than we have.

Our integrated mixed signal product competitors include larger diversified semiconductor suppliers, such as STMicroelectronics and Texas Instruments, and smaller end market focused suppliers, such as Elmos and Zarlink. In providing mixed signal foundry services, we principally compete with the internal manufacturing capabilities of our customers. Altera and Xilinx are our principal competitors for our structured digital

11

Table of Contents

products. In addition, companies such as Maxim, Microchip, Linear Technology, LSI Logic and IBM have skills and base capabilities similar to ours but we do not generally compete with these companies on a direct basis.

We compete with other customer specific semiconductor solutions providers based on design experience, manufacturing capability, depth and quality of mixed signal intellectual property, the ability to service customer needs from the design phase to the shipping of a completed product, length of design cycle, longevity of technology support and sales and technical support personnel. We compete with programmable digital logic product suppliers on the basis of chip size, performance and production costs. Our ability to compete successfully depends on internal and external variables, both within and outside of our control. These variables include, but are not limited to, the timeliness with which we can develop new products and technologies, product performance and quality, manufacturing yields and availability, customer service, pricing, industry trends and general economic trends.

## Employees

Our worldwide workforce consisted of 2,569 employees (full– and part–time) as of December 31, 2003, of which 1,152 were located in the United States, 913 were located in Europe and 504 were located in Asia. None of our employees in the United States or Asia are represented by collective bargaining arrangements. The employees located in Belgium are represented by unions and have collective bargaining arrangements at the national, industry and company levels.

## Environmental Matters

Our operations are subject to numerous environmental, health and safety laws and regulations that prohibit or restrict the discharge of pollutants into the environment and regulate employee exposure to hazardous substances in the workplace. Failure to comply with these laws or our environmental permits could subject us to material costs and liabilities, including costs to clean up contamination caused by our operations. In addition, future changes to environmental laws could require us to incur significant additional expense or restrict our operations.

Some environmental laws hold current or previous owners or operators of real property liable for the costs of cleaning up contamination, even if these owners or operators did not know of and were not responsible for such contamination. These environmental laws also impose liability on any person who arranges for the disposal or treatment of hazardous substances, regardless of whether the affected site is owned or operated by such person. Third parties may also make claims against owners or operators of properties for personal inquiries and property damage associated with releases of hazardous or toxic substances.

We are required pursuant to an order issued by the California Regional Water Quality Control Board to clean up trichloroethylene contaminated groundwater at our former manufacturing facility located in Santa Clara, California. We are currently pumping and treating the contaminated groundwater and, based on the results of our clean-up efforts to date, do not expect to be required to implement any other remedial measures. We estimate that the annual cost of operating the groundwater treatment system will be approximately $0.2 million in 2004 and each of the two succeeding years and have a remaining accrual of approximately $0.5 million as of December 31, 2003 for this remediation project. Nippon Mining Holdings Inc. (formerly known as Japan Energy Corporation) and its subsidiary agreed to indemnify us for certain existing environmental exposures and to pay certain existing liabilities as part of our recapitalization in December 2000. However, there are no guarantees that Nippon Mining or the other indemnifying party will have the ability to fulfill their obligations in the future. Unexpected costs that we may incur with respect to environmental matters may result in additional loss contingencies.

12

Table of Contents

**Executive Officers**

The following table sets forth certain information with respect to our executive officers as of March 4, 2004.

| Name | Age | Title |
|------|-----|-------|
| **Executive Officers** | | |
| Christine King | 54 | President and Chief Executive Officer |
| Walter Mattheus | 56 | Chief Operating Officer |
| Michael Salvati | 51 | Chief Financial Officer |
| Jon Stoner | 47 | Senior Vice President and Chief Technology Officer |
| Charlie Lesko | 45 | Senior Vice President, Sales & Marketing |

*Christine King, President, Chief Executive Officer and Director.* Ms. King joined us in September 2001 as President, Chief Executive Officer and a director. From September 2000 to September 2001 Ms. King served as Vice President of Semiconductor Products for IBM Microelectronics. From September 1998 to September 2000 Ms. King was Vice President of the Networking Technology Business Unit for IBM. Ms. King also served as Vice President of Marketing and Field Engineering at IBM from June 1995 to September 1998 and Manager of ASIC Products at IBM from March 1992 to June 1995. While at IBM, Ms. King launched the company's ASIC and networking businesses. Ms. King holds a B.S. degree in electrical engineering from Fairleigh Dickinson University. Ms. King serves on the board of Analog Devices, Inc., a semiconductor company.

*Walter Mattheus, Chief Operating Officer.* Mr. Mattheus joined us in June 2002 following the MSB acquisition as Chief Operating Officer, Managing Director of AMI Semiconductor Belgium BVBA and Managing Director of AMI Semiconductor Leasing BVBA. Mr. Mattheus began his career at Alcatel Microelectronics in June 1983. At Alcatel Microelectronics, Mr. Mattheus served as General Manager and Chief Operating Officer since 1995. Mr. Mattheus began his career with Bell Telephone Manufacturing Company which later became Alcatel Bell. Mr. Mattheus currently serves as a Director at the Chamber of Commerce of East-Flanders, Belgium. Mr. Mattheus holds a masters degree and a doctorate in electrical engineering from the University of Leuven.

*Michael Salvati, Chief Financial Officer.* Mr. Salvati has been acting as our Chief Financial Officer since February 2004. Mr. Salvati worked as a consultant for us since November 2003. Mr. Salvati has been a principal at Oakridge Consulting since 2000, where he provides financial consulting and interim management services for various companies. During this time, Mr. Salvati has also served at Global Exchange Services as Chief Financial Officer from November 2002 to August 2003. Prior to founding Oakridge Consulting, Mr. Salvati served as Chief Operating Officer at National Financial Partners from 1998 to 2000. Mr. Salvati has over 25 years of financial and business experience, including as a partner at KPMG LLP and Chief Financial Officer of Culligan Water Technologies, Inc. Mr. Salvati holds both a B.S. in Microbiology and M.S. in Accounting from the University of Illinois in Champaign~Urbana.

*Jon Stoner, Senior Vice President and Chief Technology Officer.* Mr. Stoner joined us in 1980. Prior to his current position, Mr. Stoner held various research and development positions, including Senior Vice President, Technology and Product Development, Director of Standard Products, Director of Technology Planning and New Business Development and Director of Process Technology. Mr. Stoner serves as a member of the Advisory Council to the Idaho State Board of Education for Engineering Education, is a member of Idaho's Experimental Program for Stimulation of Competitive Research committee and is a volunteer member of the Boise State Engineering Advisory Board. Mr. Stoner holds a B.A. degree in chemistry from the University of Montana and a M.S. degree in physics from Idaho State University.

*Charlie Lesko, Senior Vice President, Sales and Marketing.* Mr. Lesko joined us in 2003 from Broadcom Corporation where he was Vice President of North American Sales from July 2002 to May 2003. Mr. Lesko has an extensive sales and marketing background in the semiconductor industry. Prior to working

Table of Contents

with Broadcom Corporation, Mr. Lesko was Vice President of Worldwide Sales for Axcelis Technologies from July 2000 to July 2002. Prior to joining Axcelis, Mr. Lesko held various management positions at Teradyne, Inc. from July 1990 to July 2000. Mr. Lesko holds an M.B.A. in Finance from the University of Dallas. He earned a B.E. degree in Engineering at State University of New York–Stony Brook.

### Item 2.    *Properties*

In the United States, our corporate and manufacturing headquarters and warehouse operations are located in 443,000 square feet of space built on 33 acres of land owned by us in Pocatello, Idaho. We also lease an engineering and research center in Pocatello.

In Europe, our manufacturing and other facilities are located in 15,601 square meters on 44,000 square meters owned by us in Oudenaarde, Belgium.

In Manila, the Philippines, we lease approximately 85,600 square feet of light manufacturing and warehouse space. The lease will expire on November 20, 2006 and we are currently evaluating alternatives for when the lease expires. Sort, test and administration functions are housed in this facility.

We also lease space in many locations throughout the United States for regional sales offices, field design centers and remote engineering and development operations.

Outside the United States, we lease space for regional offices in Europe and Asia. The leased space is for sales, marketing, administrative offices or design engineering and related support space.

### Item 3.    *Legal Proceedings*

We were named as a defendant in a complaint filed on January 21, 2003, by Ricoh Company, Ltd. in the U.S. District Court for the District of Delaware alleging infringement of a patent owned by Ricoh. Ricoh is seeking an injunction and damages in an unspecified amount relating to such alleged infringement. The case was transferred to the U.S. District Court for the Northern District of Delaware on August 29, 2003 and was subsequently transferred to the U.S. District Court for the Northern District of California. The patents relate to certain methodologies for the automated design of custom semiconductors. The allegations are premised, at least in part, on the use of software we licensed from Synopsys. Synopsys has agreed to assume the sole and exclusive control of our defense relating to our use of the Synopsys software pursuant to the indemnity provisions of the Synopsys software license agreement, subject to the exceptions and limitations contained in the agreement. Synopsys will bear the cost of the defense as long as it is controlling the defense. However, it is possible that we may become aware of circumstances, or circumstances may develop, that result in our defense falling outside the scope of the indemnity provisions of the Synopsys software license agreement, in which case we would resume control of our defense and bear its cost, or share the cost of the defense with Synopsys and any other similarly situated parties. Based on information available to us to date, our belief is that the asserted claims against us are without merit or, if meritorious, that we will be indemnified (with respect to damages) for such claims by Synopsys and resolution of this matter will not have a material adverse effect on our future financial results or financial condition. However, if Ricoh is successful, we could be subject to an injunction or substantial damages or we could be required to obtain a license from Ricoh, if available.

From time to time we are a party to various litigation matters incidental to the conduct of our business. There is no pending or threatened legal proceeding to which we are a party that, in the opinion of management, is likely to have a material adverse effect on our future financial results or financial condition.

Table of Contents

Item 4.    *Submission of Matters to a Vote of Security Holders*

No matters were submitted to a vote of our stockholders during the fourth quarter of 2003.

PART II

Item 5.    *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

Our common stock is traded on the Nasdaq National Market under the symbol "AMIS." Public trading of the common stock began on September 24, 2003. Prior to that, there was no public market for our common stock. The following table sets forth, for the periods indicated, the high and low bid price per share of our common stock as quoted on the Nasdaq National Market.

|  | High | Low |
|---|---|---|
| **2003** |  |  |
| Fourth Quarter | $ 21.80 | $ 16.42 |
| Third Quarter | $ 21.85 | $ 19.37 |

As of March 4, 2004 there were approximately 3,569 stockholders of record of our common stock.

**Dividend Policy**

We have never paid cash dividends on our common stock. We currently intend to retain earnings to finance future growth, and therefore do not anticipate paying cash dividends in the foreseeable future. Our senior credit facilities prohibit us from paying cash dividends on our equity securities, except in limited circumstances. See note 9 to our consolidated financial statements for a more complete description of limitations on our ability to pay dividends.

Item 6.    *Selected Financial Data*

The following selected historical financial data for the years ended December 31, 2003, 2002 and 2001 and as of December 31, 2003 and 2002 were derived from our consolidated financial statements included elsewhere in this annual report. The selected historical financial data for the years ended December 31, 2000 and 1999 and as of December 31, 2001, 2000 and 1999 were derived from our combined/consolidated financial statements, which are not included in this annual report. When comparing the 2003 consolidated financial position and operating results to prior periods, you should note that the initial public offering of our common stock and the issuance of our senior subordinated notes during 2003 had a significant impact on our financial position and operating results. When comparing the 2003 and 2002 consolidated financial position and operating results to prior periods, you should note that the MSB acquisition in June 2002 had a significant impact on our 2003 and 2002 financial position and operating results. From 1999 until our recapitalization on December 21, 2000, our activities were conducted as part of Nippon Mining Holdings Inc.'s (formerly Japan Energy Corporation) overall operations. As such, the combined/consolidated financial statements for those periods contain various allocations for costs and expenses attributable to services provided by Nippon Mining Holdings Inc. Therefore, the combined/consolidated statements of operations may not be indicative of the results of operations that would have occurred if we had operated on a stand–alone basis. You should read the following tables in conjunction with other information contained under "Management's Discussion and Analysis of Financial Condition and Results of Operations," our consolidated financial statements and related notes and other financial information contained elsewhere in this annual report.

15

Table of Contents

Historical results are not necessarily indicative of the results to be expected in the future.

|  | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | 2003 | 2002 | 2001 | 2000 | 1999 |
|  | (In millions, except per share information) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $454.2 | $345.3 | $326.5 | $382.2 | $278.9 |
| Gross profit | 198.2 | 130.3 | 140.1 | 179.5 | 121.3 |
| Operating expenses: | | | | | |
| Research and development | 70.3 | 52.1 | 42.1 | 37.4 | 39.8 |
| Marketing and selling | 37.8 | 35.0 | 35.4 | 39.2 | 31.7 |
| General and administrative | 26.8 | 25.0 | 25.6 | 19.9 | 19.6 |
| Restructuring and impairment charges(1) | 21.7 | 0.6 | 5.0 | — | — |
| Nonrecurring charges(2) | 11.4 | — | — | — | — |
| Recapitalization and related expenses(3) | — | — | — | 18.4 | — |
| Total operating expenses | 168.0 | 112.7 | 108.1 | 114.9 | 91.1 |
| Operating income | 30.2 | 17.6 | 32.0 | 64.6 | 30.2 |
| Other income (expense): | | | | | |
| Interest expense, net | (22.5) | (11.5) | (14.2) | (5.9) | (7.4) |
| Other income (expense), net | (16.2) | 0.2 | 0.5 | 1.9 | (0.8) |
| Income (loss) before income taxes | (8.5) | 6.3 | 18.3 | 60.6 | 22.0 |
| Provision (benefit) for income taxes | (8.1) | 1.2 | 5.6 | 27.0 | 10.9 |
| Net income (loss) | (0.4) | 5.1 | 12.7 | 33.6 | 11.1 |
| Preferred stock dividend | 46.3 | 62.5 | 47.6 | 1.2 | — |
| Net income (loss) attributable to common stockholders | $ (46.7) | $ (57.4) | $ (34.9) | $ 32.4 | $ 11.1 |
| Basic and diluted loss per common share(4) | $ (0.84) | $ (1.24) | $ (0.76) | — | — |
| Weighted average number of common shares used to compute net loss per common share(4) | 55.4 | 46.4 | 46.1 | — | — |

16

Table of Contents

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000 | 1999 |
| | (In millions, except share numbers) | | | | |
| **Balance Sheet Data:** | | | | | |
| Cash | $119.1 | $ 62.2 | $ 28.7 | $ 20.1 | $ 3.3 |
| Accounts receivable, net | 73.6 | 66.0 | 36.2 | 50.9 | 43.1 |
| Inventories | 45.6 | 39.4 | 26.0 | 41.7 | 24.4 |
| Restricted cash | 4.2 | 4.2 | 4.2 | — | — |
| Total assets | 550.1 | 502.5 | 384.3 | 427.6 | 291.7 |
| Long–term liabilities | 0.4 | 3.1 | 3.4 | 3.5 | 10.1 |
| Long–term debt, including current portion(5) | 254.7 | 160.1 | 173.3 | 175.0 | — |
| Series A Senior Redeemable Preferred Stock, 20,000,000 authorized, 0, 17,901,722, 17,893,954 and 17,870,100 shares issued and outstanding at December 31, 2003, 2002, 2001 and 2000, respectively | — | 233.7 | 204.2 | 178.7 | — |
| Series B Junior Redeemable Convertible Preferred Stock, 20,000,000 authorized, 0, 14,317,788, 14,313,538 and 14,296,084 shares issued and outstanding at December 31, 2003, 2002, 2001 and 2000, respectively | — | 190.5 | 164.9 | 143.0 | — |
| Series C Senior Redeemable Preferred Stock, 75,000 authorized, 0 and 75,000 issued and outstanding at December 31, 2003 and 2002, respectively | — | 79.3 | — | — | — |
| Total stockholders' equity (deficit) and divisional equity(6) | 205.0 | (240.4) | (189.2) | (153.5) | 207.5 |

(1)    Our restructuring and impairment charge in 2001 relates to the termination of certain management and other employees as well as costs related to the closure of certain of our administrative and sales offices. The restructuring and impairment charge in 2002 relates primarily to the termination, following the MSB acquisition, of certain persons employed by us prior to the MSB acquisition. These were eliminated as a result of the cost reduction program implemented in connection with the acquisition. Severance costs related to the termination of MSB employees as part of the cost reduction program are not part of the restructuring and impairment charge for 2002 as such costs are part of the purchase price of the MSB acquisition. In 2003, our restructuring and impairment charges relate to the termination of certain employees, termination of services with certain sales representative firms and the non–cash write–off of the value of a non–competition provision of an agreement. See further discussion in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

(2)    In connection with our September 2003 initial public offering, we recorded nonrecurring charges of $11.4 million. This amount includes a one–time payment of $8.5 million associated with amendments to our advisory agreements, which also provided for the termination of future scheduled annual fees payable under advisory agreements, and compensation expense of $2.9 million related to the redemption of options to purchase our Series A and Series B Preferred Stock.

(3)    In connection with our December 2000 recapitalization, we incurred transaction fees and expenses of $18.4 million, excluding capitalizable debt issuance costs.

(4)    Loss per common share is not a meaningful measure for any periods presented other than the years ended December 31, 2003, 2002 and 2001 due to our capital structure discussed in footnote 5 below and, as such, is not presented for any other period.

(5)    From January 1, 1998 through July 29, 2000, we operated as American Microsystems, Inc., a division of a subsidiary of Nippon Mining Holdings Inc. (Nippon Mining). As such, we did not have separate legal status or existence. No long–term debt was outstanding to third parties. From July 29, 2000 to

Table of Contents

December 21, 2000, we operated as a wholly-owned subsidiary of the parent. Long-term debt for that period reflects amounts due to the parent under notes payable. Effective December 21, 2000, we issued notes payable to third parties for a total of $175.0 million with a term of six years.

(6)    For the period from January 1, 1998 through July 29, 2000, as discussed in footnote 5 above, we operated as a division of the parent. Therefore, during that period we had divisional equity rather than stockholders' equity.

Item 7.    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

*The following discussion should be read in conjunction with, and is qualified in its entirety by reference to, the attached consolidated financial statements. Except for the historical information contained herein, the discussions in this section contain forward-looking statements that involve risks and uncertainties. Actual results could differ materially from those discussed below.*

**Overview**

We are a leader in the design and manufacture of customer specific integrated analog mixed signal semiconductor products. We focus on the automotive, medical and industrial markets, which have many products with significant real world, or analog, interface requirements. We have organized our business into three operating segments: integrated mixed signal products, mixed signal foundry services and structured digital products. Integrated mixed signal products combine analog and digital functions on a single chip to form a customer defined system-level solution. We also provide outsourced mixed signal foundry services for other semiconductor designers and manufacturers. Mixed signal foundry services provide us with an opportunity to further penetrate our target markets with our products and increase the utilization of our fabrication facilities. Structured digital products, which involve the conversion of higher cost programmable digital logic integrated circuits into lower cost digital custom integrated circuits which provide us with growth opportunities and digital design expertise which we use to support the design of system solutions for customers in our target markets.

When evaluating our business, we generally look at financial measures such as revenue and operating income. We also use internal tracking measures, such as three-year revenue from design wins and the capacity utilization of our fabrication facilities. Our three-year design win revenue has increased in 2003 when compared with 2002. We are seeing the rewards of our focus on winning designs that will strengthen our financial position going in to the future. We are also seeing our capacity utilization increase. This is a measure of the degree to which our manufacturing assets are being used, thus sharing the fixed costs of these items across multiple products. As this number increases, our facilities become more efficient and a correlating result is that our gross profit margin increases. We anticipate that our capacity utilization will continue to increase in the foreseeable future. However, if at some point our capacity utilization begins to decrease (as is normal during an industry downturn), then our gross margins could be negatively affected.

In June 2002, we acquired the mixed signal business of Alcatel Microelectronics NV from STMicroelectronics NV. We refer to this as the MSB acquisition. The MSB acquisition increased our analog and mixed signal engineering team, enhanced our relationships with major European customers, provided us with additional high voltage and wireless technologies that enable us to offer new types of custom integrated circuits to our end markets and provided us with two fabs in Oudenaarde, Belgium. As part of the MSB acquisition, we entered into a supply agreement with STMicroelectronics on a take-or-pay basis under which STMicroelectronics is required to purchase a minimum of €50 million (or approximately $63.0 million, assuming an exchange rate of €1.00 to $1.26) of products from us during the two-year period ending June 26, 2004. Since the inception of this agreement, we have recognized €35.4 million ($44.6 million assuming an exchange rate of €1.00 to $1.26) from STMicroelectronics under this agreement. The results of operations for 2003 include MSB for the entire period whereas the results of operations for 2002 includes MSB for only the second half of 2002.

As part of the MSB acquisition, we prepared and approved a plan of restructuring in connection with the integration of MSB into our operations and included the costs of those restructuring activities in the purchase

18

Table of Contents

price pursuant to EITF No. 95−3, "Recognition of Liabilities in Connection with a Purchase Business Combination." The restructuring costs that were accrued and included in the purchase price primarily include costs associated with relocating and combining MSB's testing facilities with our existing facilities. The majority of these costs relate to employee severance. As of December 31, 2003, we had terminated 42 employees as part of this transfer of the testing facilities. This relocation was completed during 2003. Additional costs, which were substantially paid in 2002, represent employee severance for 79 MSB employees that had duplicative responsibilities as those of our employees and were terminated as part of our plan.

Following is a rollforward of the restructuring accrual from June 26, 2002 to December 31, 2003 (in thousands):

|  | Restructuring Accrual at June 26, 2002 | Paid in 2002 | Restructuring Accrual at December 31, 2002 | Paid in 2003 | Restructuring Accrual at December 31, 2003 |
|---|---|---|---|---|---|
| Employee severance costs | $3,700 | $(1,500) | $2,200 | $(2,200) | $ — |
| Transfer of ownership taxes | 800 | (800) | — | — | — |
| Other | 100 | (100) | — | — | — |
| Total | $4,600 | $ 2,400 | $2,200 | $(2,200) | $ — |

## Critical Accounting Policies

The preparation of our financial statements in conformity with accounting principles generally accepted in the United States requires our management to make estimates and judgments that affect our reported amounts of assets and liabilities, revenue and expenses and related disclosures. We have identified revenue recognition, inventories, property, plant and equipment, intangible assets, goodwill, income taxes and stock options as areas involving critical accounting policies and the most significant judgments and estimates.

We evaluate our estimates and judgments on an ongoing basis. We base our estimates on historical experience and on assumptions that we believe to be reasonable under the circumstances. Our experience and assumptions form the basis for our judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may vary from what we anticipate and different assumptions or estimates about the future could change our reported results. We believe the following accounting policies are the most critical to us, in that they are important to the portrayal of our financial statements and they require the most difficult, subjective or complex judgments in the preparation of our financial statements.

### Revenue Recognition

Several criteria must be met before we can recognize revenue from our products and revenue relating to engineering design and product development. We must apply our judgment in determining when revenue recognition criteria are met.

We recognize revenue from products sold directly to end customers when persuasive evidence of an arrangement exists, the price is fixed and determinable, shipment is made and collectibility is reasonably assured. In certain situations, we ship products through freight forwarders where title does not pass until product is shipped from the freight forwarder. In other situations, by contract, title does not pass until the product is received by the customer. In both cases, revenue and related gross profit are not recognized until title passes to the customer. Estimates of product returns and allowances, based on actual historical experience, are recorded at the time revenue is recognized and are deducted from revenue.

Revenue from contracts to perform engineering design and product development are recognized as milestones are achieved, which approximates the percentage−of−completion method. Costs associated with such contracts are expensed as incurred. A typical milestone billing structure is 40% at the start of the project, 40% at the creation of the reticle set and 20% upon delivery of the prototypes.

Table of Contents

Since up to 40% of revenue is billed and recognized at the start of the design development work and, therefore, could result in the acceleration of revenue recognition, we analyze those billings and the status of in–process design development projects at the end of each reporting period in order to determine that the milestone billings approximate percentage–of–completion on an aggregate basis. We compare each project's stage with the total level of effort required to complete the project, which we believe is representative of the cost–to–cost method of determining percentage–of–completion. Based on this analysis, the relatively short–term nature of our design development process and the billing and recognition of 20% of the project revenue after design development work is complete (which effectively defers 20% of the revenue recognition to the end of the contract), we believe our milestone method approximates the percentage–of–completion method in all material respects.

Our engineering design and product development contracts generally involve pre–determined amounts of revenue. We review each contract that is still in process at the end of each reporting period and estimate the cost of each activity yet to be performed under that contract. This cost determination involves our judgment and the uncertainties inherent in the design and development of integrated circuits. If we determine that our costs associated with a particular development contract exceed the revenue associated with such contract, we estimate the amount of the loss and establish a corresponding reserve.

*Inventories*

We initiate production of a majority of our semiconductors once we have received an order from a customer. Based on forecasted demand from specific customers, we may build up to two weeks of finished goods inventory. As a result, we generally do not carry a significant inventory of finished goods. However, we purchase and maintain raw materials at sufficient levels to meet lead times based on forecasted demand. If forecasted demand exceeds actual demand, we may need to provide an allowance for excess or obsolete quantities on hand. We provide an allowance for inventories on hand that are in excess of six months of forecasted demand. Forecasted demand is determined based on historical sales or inventory usage, expected future sales or using backlog and other projections and the nature of the inventories. We also review other inventories for indicators of impairment and provide an allowance as deemed necessary. We also provide an allowance for obsolete inventory, which is written off at the time of disposal.

We state inventories at the lower of cost (using the first–in, first–out method) or market.

*Property, Plant and Equipment and Intangible Assets*

We regularly evaluate the carrying amounts of long–lived assets, including property, plant and equipment and intangible assets, as well as the related amortization periods, to determine whether adjustments to these amounts or to the useful lives are required based on current circumstances or events. The evaluation, which involves significant management judgment, is based on various analyses including cash flow and profitability projections. To the extent such projections indicate that future undiscounted cash flows are not sufficient to recover the carrying amounts of the related long–lived assets, the carrying amount of the underlying assets will be reduced, with the reduction charged to expense so that the carrying amount is equal to fair value, primarily determined based on future discounted cash flows. To the extent such evaluation indicates that the useful lives of property, plant and equipment are different than originally estimated, the amount of future depreciation expense is modified such that the remaining net book value is depreciated over the revised remaining useful life. We entered into a non–compete agreement with Nippon Mining and its subsidiary in connection with our December 21, 2000 recapitalization. According to this agreement, each of Nippon Mining and its subsidiary agreed to not engage in the custom semiconductor business anywhere in the world through December 2005. In our review of the carrying value of intangible assets, we reached a determination that the carrying value of the non–compete had been impaired based primarily on a change in Nippon Mining's and its subsidiary's business focus and related capabilities such that they did not intend to focus on custom semiconductors. Effective June 26, 2003, we released Nippon Mining and its subsidiary from the non–compete agreement and we recorded an impairment charge of $20.0 million related to the non–cash write–off of the remaining value of the non–compete provision of this agreement.

20

Table of Contents

*Goodwill*

Under the guidelines of Financial Accounting Standards (FAS) 142, "Goodwill and Other Intangible Assets," we assess goodwill at least annually for impairment using fair value measurement techniques. Specifically, goodwill impairment is determined using a two–step process. The first step is to identify potential impairment by comparing the fair value of a reporting unit to which the goodwill is assigned with the unit's net book value (or carrying amount), including goodwill. If the fair value of the reporting unit exceeds its carrying amount, there is no deemed impairment of goodwill and the second step of the impairment test is unnecessary. However, if the carrying amount of the reporting unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of goodwill impairment loss, if any. The second step compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. That is, the fair value of the reporting unit is allocated to all of the assets and liabilities of that unit (including any unrecognized intangible assets) as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid to acquire the reporting unit. We completed the first step of the annual impairment test in 2003 and determined that the fair value of our reporting units exceeded their carrying values including goodwill; therefore, no impairment charge was taken and there was no need to proceed to the second step of the goodwill impairment test.

Determining the fair value of a reporting unit under the first step of the goodwill impairment test and determining the fair value of individual assets and liabilities of a reporting unit (including unrecognized intangible assets) under the second step of the goodwill impairment test is judgmental in nature and often involves the use of significant estimates and assumptions. These estimates and assumptions could have a significant impact on whether an impairment charge is recognized, including the magnitude of any such charge. To assist in the process of determining goodwill impairment, we may obtain appraisals from independent valuation firms. In addition to the use of independent valuation firms, we perform internal valuation analyses and consider other market information that is publicly available. Estimates of fair value are primarily determined using discounted cash flows and market comparisons of recent transactions. These approaches use significant estimates and assumptions including the amount and timing of projected future cash flows, discount rates reflecting the risk inherent in the future cash flows, perpetual growth rates, determination of appropriate market comparables and the determination of whether a premium or discount should be applied to these comparables.

*Income Taxes*

Income taxes are recorded based on the liability method, which requires recognition of deferred tax assets and liabilities based on differences between financial reporting and tax bases of assets and liabilities measured using enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. A valuation allowance is recorded to reduce our deferred tax asset to an amount we determine is more likely than not to be realized, based on our analyses of past operating results, future reversals of existing taxable temporary differences and projected taxable income, including tax strategies available to generate future taxable income. Our analyses of future taxable income are subject to a wide range of variables, many of which involve our estimates and therefore our deferred tax asset may not be ultimately realized. Under the "change of ownership" provisions of the Internal Revenue Code, utilization of our net operating loss carryforwards may be subject to an annual limitation.

*Stock Options*

We have elected to follow the intrinsic value–based method prescribed by Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB 25) and related interpretations in accounting for employee stock options rather than adopting the alternative fair value accounting provided under SFAS No. 123, "Accounting for Stock–Based Compensation." Therefore, we do not record any compensation expense for stock options we grant to our employees where the exercise price equals the fair

21

Table of Contents

market value of the stock on the date of grant and the exercise price, number of shares eligible for issuance under the options and vesting period are fixed. Deferred stock–based compensation is recorded when stock options are granted to employees at exercise prices less than the estimated fair value of the underlying common stock on the grant date. Historically, we generally determined the estimated fair value of our common stock based on independent valuations. We recorded deferred stock–based compensation of approximately $519,000 in 2003, prior to our initial public offering. We comply with the disclosure requirements of SFAS No. 123 and SFAS No. 148, which require that we disclose our pro forma net income or loss and net income or loss per common share as if we had expensed the fair value of the options in determining net income or loss. In calculating such fair value, there are certain assumptions that we use, as disclosed in note 14 to our consolidated financial statements, included herein.

Certain of our options that we issued in 2000 included options to purchase shares of our Series A Preferred Stock and Series B Preferred Stock. Under the terms of these options, the exercise prices changed in conjunction with changes in the accreted value of the related Preferred Stock. We recorded and adjusted compensation expense each reporting period, as required under APB 25, for the intrinsic value generated by the change in the exercise price. During the third quarter of 2003, all options to purchase preferred stock were redeemed, with accrued amounts due being paid in October 2003. This redemption resulted in an additional charge to compensation expense of approximately $2.9 million during the third quarter of 2003.

### Quarterly Results

The following table sets forth the unaudited historical revenue by operating segment and total gross profit by quarter, which data has been derived from our unaudited interim financial statements:

|  | 2003 | | | | 2002 | | | |
|  | Q4 | Q3 | Q2 | Q1 | Q4 | Q3 | Q2 | Q1 |
|  | (In millions, except percentages) | | | | | | | |
| Revenue: | | | | | | | | |
| Integrated mixed signal products | $ 62.3 | $ 61.8 | $ 60.5 | $ 56.8 | $ 58.6 | $ 56.3 | $26.5 | $25.8 |
| Mixed signal foundry services | 32.3 | 30.8 | 27.0 | 26.0 | 25.0 | 26.5 | 21.9 | 19.7 |
| Structured digital products | 31.0 | 24.8 | 20.9 | 20.0 | 18.9 | 21.5 | 21.1 | 23.5 |
| Total | $125.6 | $117.4 | $108.4 | $102.8 | $102.5 | $104.3 | $69.5 | $69.0 |
| Gross profit | $ 56.9 | $ 51.5 | $ 47.5 | $ 42.3 | $ 37.1 | $ 42.0 | $26.0 | $25.2 |
| Gross margin | 45.3% | 43.9% | 43.8% | 41.1% | 36.2% | 40.3% | 37.4% | 36.5% |

Prior to the MSB acquisition, substantially all of our historical revenue was denominated in U.S. dollars. Following the MSB acquisition, approximately 27% of our revenue in the second half of 2002 and 36% in 2003 was denominated in euros. The semiconductor industry is cyclical in nature. Our product sales track the general market conditions seen throughout the semiconductor industry.

Revenue for the second half of 2002 increased primarily due to the inclusion of MSB in our results. Revenue during 2003 benefited from the MSB acquisition, improvements in the overall semiconductor market and market share gain.

### Year Ended December 31, 2003 Compared With Year Ended December 31, 2002

#### Revenue

Revenue in 2003 increased 31.5% to $454.2 million from $345.3 million in 2002. This increase is partially due to the inclusion of MSB's results for the entire year in 2003 compared to only the second half of 2002. In 2003, we also benefited from the revitalization of the economy as well as our increased focus on sales and marketing efforts. We saw the most significant growth in the communications, automotive, medical and industrial end markets.

Table of Contents

According to Gartner Dataquest, the semiconductor industry grew 13.6% and the application specific integrated circuit segment of the semiconductor industry grew by 1.9% from 2002 to 2003. For both application specific integrated circuits, and application specific standard products, the market grew by 10.6% in 2003. Our revenues grew by 31.3% over this same period, and we gained significant market share. Most of this gain was due to the significant increase in our capability as a result of the MSB acquisition.

Integrated mixed signal sales of $241.4 million increased 44.4% over 2002 sales of $167.2 million. This increase is primarily due to the inclusion of MSB's results for the entire year in 2003 compared to only the second half of 2002. In 2003, we saw steady growth across all end markets for this segment. In to the future, we expect this segment to show steady growth and continue to provide the backbone of our business.

Mixed signal foundry services revenue grew to $116.1 million, an increase of 24.7% over 2002 sales of $93.1 million. Growth was due to increased unit sales in the medical and computing end markets and strong sales to STMicroelectronics, which is related to the take–or–pay agreement put in place at the time of the MSB acquisition. MSB's results were included for the entire period in 2003 compared to only the second half in 2002. As this take–or–pay expires, we expect overall mixed signal foundry revenue to decrease slightly as a percentage of total company revenue.

Structured digital products revenue was $96.7 million, an increase of 13.8% over 2002 sales of $85.0 million. Increased revenue from the communications and military end markets, as well as revenue from our XPressArray [TM] products, helped to increase the structured digital products sales in 2003. As XPressArray [TM] as well as other communications end market products continue to show strength, we expect structured digital products to increase as a percentage of total company revenue in 2004.

Our 2003 revenue, as a percentage of total revenue, from North America, Europe and Asia was 40.9%, 40.7% and 18.4%, respectively, compared with 55.5%, 24.5% and 20.0%, respectively, in 2002. This shift in revenue toward Europe is primarily due to the MSB acquisition. We expect the geographic mix of our revenue to remain stable through 2004.

*Gross Profit*

Cost of revenue consists primarily of purchased materials, labor and overhead (including depreciation) associated with the design and manufacture of products sold. Costs related to non–recurring engineering fees are included in cost of revenue to the extent that they are reimbursed by our customers under a development arrangement. Costs associated with unfunded non–recurring engineering are classified as research and development because we typically retain ownership of the proprietary rights to intellectual property that has been developed in connection with non–recurring engineering work. Gross profit increased to $198.2 million, or 43.6% as a percentage of revenue, in 2003 from $130.3 million, or 37.7% as a percentage of revenue, in 2002. The increase in gross profit percentage is a result of our continued cost reduction efforts, increased utilization of our fabrication facilities and shifts in the mix of the products we sold. During 2003, a greater percentage of integrated mixed signal products were sold. This helped to increase our overall gross margin. We also sold more high margin structured digital products, including XPressArray [TM] and high margin defense products, which improved the margin in 2003.

*Operating Expenses*

Research and development expenses consist primarily of activities related to process engineering, cost of design tools, investments in development libraries, technology license agreements and product development activities. Research and development expenses increased to $70.3 million, or 15.5% of revenue, in 2003 from $52.1 million, or 15.1% of revenue, in 2002. This increase is primarily attributable to expenses related to increased design wins and the associated non–customer funded expenses, as well as the inclusion of MSB's results for the entire period in 2003 compared to only the second half of 2002. In 2004, we expect research and development expenses to remain at approximately 15% of revenue.

Marketing and selling expenses consist primarily of commissions to sales representatives, salaries and commissions of sales and marketing personnel and advertising and communication costs. Marketing and

23

Table of Contents

selling expenses increased to $37.8 million, or 8.3% of revenue, in 2003 compared to $35.0 million, or 10.1% of revenue, in 2002. This increase is due to costs associated with higher sales levels and the inclusion of MSB's results for the entire period in 2003 compared to only the second half of 2002.

General and administrative expenses consist primarily of salaries of our administrative staff, professional and advisory fees for various consulting projects and amortization of intangible assets. General and administrative expenses increased to $26.8 million, or 5.9% of revenue, in 2003 compared to $25.0 million, or 7.2% of revenue, in 2002. This increase in general and administrative expenses is primarily due to the inclusion of MSB's results for the entire year in 2003 compared with only the second half 2002. Other factors that affected general and administrative expenses during 2003 include the elimination of amortization on the non-compete agreement, which was written off at the end of the second quarter 2003, as discussed below. This decrease was partially offset by increases in professional fees associated with various consulting projects. In 2004, we expect selling, general and administrative expenses, combined, to decrease to approximately 12% of revenue by the end of the year.

*Restructuring and Impairment Charges*

In the second quarter of 2003, we recorded a non-cash impairment charge of $20.0 million related to the write off of the unamortized balance of an intangible asset that had no remaining value. We entered into a non-compete agreement with Nippon Mining and its subsidiary that was our former parent in connection with our December 21, 2000 recapitalization pursuant to which they agreed to not engage in the custom semiconductor business anywhere in the world through December 2005. In our second quarter review of the carrying value of intangible assets, we reached a determination that the carrying value of the non-compete had been impaired based primarily on a change in Nippon Mining's and our former parent's business focus and related capabilities such that they did not intend to focus on custom semiconductors. Effective June 26, 2003, we released Nippon Mining and our former parent from the non-compete agreement and we expensed the $20.0 million remaining unamortized balance of the agreement as of the effective date.

In the fourth quarter of 2003, we recorded restructuring charges of $1.7 million. This amount was primarily related to employee severance as a result of employee terminations and the termination of services with certain sales representative firms.

For a summary of the restructuring accrual relating to the 2003, 2002 and 2001 plans, see the table under "Liquidity and Capital Resources" below.

*Nonrecurring Charges*

In September 2003, we recorded nonrecurring charges of $11.4 million. This amount includes a one-time payment of $8.5 million associated with amendments to our advisory agreements as well as compensation expense of $2.9 million related to the redemption of options to purchase our Series A and Series B Preferred Stock. The advisory agreements were in place prior to our initial public offering and provided for Citigroup Venture Capital (CVC) and Francisco Partners to provide financial, advisory and consulting services to us. In conjunction with our IPO, we terminated the advisory agreement and the associated future scheduled annual fees.

*Operating Income*

Operating income increased approximately $12.6 million to approximately $30.2 million for 2003 compared with operating income of $17.6 million for 2002. The components affecting the changes in operating income are discussed above.

Integrated mixed signal products operating income increased approximately $16.4 million to $28.3 million from $11.9 million in 2003 compared to 2002. This increase is attributable to increased revenue, including an increase in customer funded development projects, as well as the inclusion of MSB's results for the entire year in 2003 versus the second half in 2002.

24

Table of Contents

Mixed signal foundry services operating income increased approximately $12.6 million to $19.5 million in 2003 from $6.9 million in 2002. This increase is attributable to increased revenue and resulting higher gross margin, as well as the inclusion of MSB's results for all of 2003 compared to only the second half in 2002.

Structured digital products operating income increased approximately $16.1 million to $15.5 million in 2003 from $(0.6) million in 2002. This increase is attributable to higher margin revenue coming from the communications and military end markets and to cost reduction efforts.

These increases are offset by the Restructuring, Impairment and Nonrecurring Charges which are not allocated to our segments.

*Net Interest Expense*

Net interest expense for 2003 increased $11.0 million over the same period in 2002 to $22.5 million from $11.5 million. The higher interest expense was primarily attributable to the increased debt levels associated with our senior subordinated notes (see further discussion in "Liquidity and Capital Resources") issued in January 2003.

*Net Other Expense*

Net other expense for 2003 increased to $16.2 million from $0.1 million of income in 2002. This increase is primarily due to the $7.9 million non-cash write-off of deferred financing fees, the $7.5 million premium paid in conjunction with the redemption of $70.0 million of our senior subordinated notes and $0.8 million relating to the settlement of hedging transactions. These expenses all related to the various debt transactions that occurred during 2003. We do not expect these types of expenses to be frequent in our ongoing business.

*Income Taxes*

Our income tax benefit was $8.1 million on a pre-tax loss of $8.5 million for 2003 compared with income tax expense of $1.2 million on pre-tax income of $6.3 million in 2002. The fact that we operate in multiple tax jurisdictions is the primary reason that the 2003 income tax benefit represents such a large portion of the 2003 pre-tax loss. During 2003 we recorded pre-tax losses in certain jurisdictions with higher statutory tax rates while in other lower tax jurisdictions we recorded pre-tax income. Furthermore, in certain foreign jurisdictions we consider the income to be permanently invested in the foreign entities; therefore, no additional U.S. income tax provision has been recorded on the income from these lower tax jurisdictions. Because the jurisdictions with pre-tax losses were recording tax benefits at a relatively high statutory rate and the jurisdictions with pre-tax income were recording tax expense at lower statutory rates, the resulting 2003 tax benefit comprises an unusually large percentage of the 2003 pre-tax loss.

As of December 31, 2003, we had deferred tax assets of $47.6 million (net of deferred tax liabilities of $40.3 million and a valuation allowance of $50.2 million). In reaching a conclusion regarding the amount of valuation allowance we believe is necessary to reduce the net deferred tax asset to an amount that is expected to be realized, we considered the following factors: (i) past operating results, (ii) future reversals of existing taxable temporary differences and (iii) the likelihood of future taxable income exclusive of reversing temporary differences and carryforwards based on projected pre-tax operating results. We will continue to evaluate the need to increase or decrease the valuation allowance on our deferred tax assets based on the anticipated pre-tax operating results of future periods. Under the "change of ownership" provisions of the Internal Revenue Code, utilization of our net operating loss carryforwards may be subject to an annual limitation.

*Backlog*

Our six-month backlog was $128.4 million as of December 31, 2003 compared to backlog of $97.7 million as of December 31, 2002. Backlog is typically recorded only upon receipt of a written purchase order from a customer. Reported backlog represents products scheduled to be delivered within six months. Backlog is influenced by several factors including market demand, pricing, customer order patterns and changes in

25

Table of Contents

product lead times. Backlog may fluctuate from booking to time of delivery to reflect changes in customer needs or industry conditions. Once manufacturing has commenced, orders generally are not cancelable. In addition, because customers already have invested significant time working with us (typically from six to 24 months before production of a custom semiconductor) and have incurred the non-recurring engineering fee in full before production begins, they generally have given careful consideration to the orders they place, and generally do not cancel orders. However, there is no guarantee that backlog will ultimately be realized as revenue.

Backlog should not be taken as an indicator of our anticipated revenue for any particular future period. Line items recorded in backlog may not result in revenue within six months for several reasons, including: (a) certain customer orders within backlog may not be able to be recognized as revenue within six months (i.e., we, for various reasons, may be unable to ship the product within the specified time frame promised); (b) certain customer order delivery dates may be delayed to a subsequent period by our customers; and (c) certain customer orders may even be cancelled at our customers' request. These items have often been offset, and exceeded by, both (a) new customer orders that are booked subsequent to the backlog reporting date and delivered to the customer within six months and (b) customer orders with anticipated delivery dates outside six months and subsequently shipped sooner than originally anticipated. The amount of revenue recognized in excess of backlog during any six-month period varies and depends greatly on overall capacity in the semiconductor industry and capacity in our manufacturing facilities. We do not routinely monitor the extent of backlog cancelled, pushed out for later delivery or accelerated for earlier delivery.

**Year Ended December 31, 2002 Compared With Year Ended December 31, 2001**

*Revenue*

Revenue for 2002 increased 5.8% to $345.3 million from $326.5 million in 2001. Excluding the MSB acquisition, revenue decreased by $53.4 million primarily due to the continued overall semiconductor industry downturn. This was offset by an increase in revenue of $72.2 million from the inclusion of MSB's results following the acquisition.

According to Gartner Dataquest, the semiconductor industry grew 1.9% and the application specific integrated circuit segment of the semiconductor industry declined by 4.0% from 2001 to 2002. While our decline in revenue, excluding MSB's revenue, was greater than the overall decline in the industry during 2002, we believe that difference relates to a lag in our results versus the industry's results. While the industry sales volumes declined appreciably beginning in the fourth quarter of 2000, we did not see the full effect of the industry downturn on our results until the third quarter of 2001. As a result of this lag, we believe that to fully understand our operating results as compared to the industry, a comparison for the two-year period of 2000 to 2002 is more meaningful. During this period the semiconductor industry declined 29.9% and the application specific integrated circuit segment of the semiconductor industry declined 31.2% according to Gartner Dataquest. Excluding MSB's revenue, our revenue during the same period declined 28.5% indicating a slight gain in market share. The MSB acquisition further enhanced our market share position.

Revenue from the sale of our integrated mixed signal products increased by 79.0% to $167.2 million in 2002 from $93.4 million in 2001. This increase was primarily a result of the inclusion of MSB's results following the acquisition, which contributed $58.1 million in revenue during the second half of 2002, and the commencement of production of new products for two large customers during the same period.

Revenue from the sale of our structured digital products decreased 39.2% to $85.0 million in 2002 from $139.8 million in 2001. The communications market was experiencing a severe downturn, which was primarily responsible for this decline in revenue.

Revenue from the sale of our mixed signal foundry services decreased 0.2% to $93.1 million in 2002 from $93.3 million in 2001. Of the 2002 amount, $12.5 million relates to the STMicroelectronics supply agreement and back end services agreement. Excluding this additional revenue, revenue from the sale of foundry services declined 13.6% as a result of the industry conditions described above.

26

Table of Contents

Revenue from our North American market decreased in 2002 when compared to 2001. However, our European and Asian markets experienced an increase between these periods. Geographically, 55.5%, 24.5% and 20.0% of our revenue were derived from North America, Europe and Asia, respectively, in 2002 compared with 83.5%, 6.6% and 9.9%, respectively, in 2001. The growth in Europe was due to the MSB acquisition and the growth in Asia was due to an increasing trend among our customers to use contract manufacturers in Asia. These contract manufacturers purchase the products on behalf of our end customers. We believe that in future periods an increasing portion of our revenue will be derived from markets outside of North America. As a result of the MSB acquisition, the percentage of our revenue in the European market increased to approximately 36% in the second half of 2002.

### Gross Profit

Gross profit decreased to $130.3 million in 2002 from $140.1 million in 2001. Gross profit as a percentage of revenue was 37.7% in 2002 compared to 42.8% in 2001. The decrease in gross profit percentage is primarily a result of the MSB acquisition. MSB's products typically have lower gross profit percentages than those of our historical business due to MSB's lower sales prices. In the second half of 2002, the gross profit percentage on products associated with the MSB acquisition was 27% compared to 40.6% for products associated with our historical business prior to the MSB acquisition. Gross profit percentage was further depressed by lower factory utilization in 2002 compared to 2001 as a result of the semiconductor industry downturn. In general, our selling prices remained stable during these periods.

### Operating Expenses

As a percentage of revenue, research and development expenses increased to 15.1% in 2002 from 12.9% in 2001. Research and development expenses were $52.1 million in 2002 compared with $42.1 million in 2001. The increase in research and development expenses resulting from the MSB acquisition was approximately $6.6 million in 2002 and equated to approximately 9.1% of MSB's revenue.

Marketing and selling expenses, as a percentage of revenue, decreased to 10.1% in 2002 compared with 10.8% for 2001. Marketing and selling expenses were $35.0 million in 2002 compared with $35.4 million in 2001. A $3.8 million increase in marketing and selling expenses associated with the MSB acquisition was offset by cost reduction efforts in Europe and the United States.

As a percentage of revenue, general and administrative expenses decreased slightly to 7.2% in 2002 compared with 7.8% in 2001. General and administrative expenses were $25.0 million in 2002 and $25.6 million in 2001. Contributing to the $0.6 million decrease from 2001 to 2002 is a $1.9 million decrease in goodwill amortization resulting from the adoption of SFAS No. 142. A $3.0 million increase in general and administrative expenses associated with the MSB acquisition was partially offset by cost reduction efforts in Europe and the United States. General and administrative expenses also included $2.0 million relating to advisory fees paid to Francisco Partners and CVC and $8.1 million relating to amortization of a non-compete provision of an agreement.

### Restructuring and Impairment Charges

Restructuring expense of $0.9 million, consisting primarily of severance costs, occurred in 2002 concurrent with the MSB acquisition. Severance costs were determined by estimating the amount that would have to be paid out to each terminated employee. Of this amount, $0.2 million was paid in 2002. During 2002, $0.3 million of the 2001 accrual was reversed as original estimates were revised. As of December 31, 2002, $4.2 million of the total $5.0 million restructuring charges recorded in 2001 had been paid. The remaining $0.5 million from the 2001 restructuring plan is included in the December 2002 restructuring accrual balance. Of this $0.5 million, $0.2 million relates to severance costs, which were substantially paid in the first six months of 2003 and $0.3 million relates to lease termination costs which are expected to be paid over the lease terms, the longest of which ends in July 2005. The restructuring charges were recorded after adoption and approval of an exit plan in compliance with the provisions of Emerging Issues Task Force (EITF) Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an

27

Table of Contents

Activity (Including Certain Costs Incurred in a Restructuring)." In the future, we may need to further restructure our business and incur further restructuring charges.

For a summary of the restructuring accrual relating to the 2003, 2002 and 2001 plans, see the table under "Liquidity and Capital Resources" below.

*Net Interest Expense*

Net interest expense for 2002 decreased $2.7 million, or 18.9%, over the same period in 2001. The lower interest expense was primarily attributable to the decrease in our outstanding debt to $160.1 million at December 31, 2002 compared with $173.3 million at December 31, 2001 as well as a decrease in average interest rates.

*Income Taxes*

Income tax expense was $1.2 million (18.6% effective rate) in 2002 compared with $5.6 million (30.8% effective rate) in 2001. The decrease in income tax expense from 2001 to 2002 is primarily due to a decrease in pre–tax income. In addition, income tax expense and the effective tax rate decreased in 2002 because the income of certain foreign subsidiaries is subject to income taxes at lower statutory tax rates as compared to the U.S. statutory tax rate. No additional provision for U.S. income taxes has been recorded related to the foreign earnings because we consider these amounts to be permanently invested in the foreign entities.

As of December 31, 2002, we had deferred tax assets of $28.4 million (net of deferred tax liabilities of $38.2 million and a valuation allowance of $43.2 million). In reaching a conclusion regarding the amount of valuation allowance we believe is necessary to reduce the net deferred tax asset to an amount that is expected to be realized, management considered the following factors: (i) past operating results, (ii) future reversals of existing taxable temporary differences and (iii) the likelihood of future taxable income exclusive of reversing temporary differences and carryforwards based on projected pre–tax operating results. We will continue to evaluate the need to increase or decrease the valuation allowance on our deferred tax asset based on the anticipated pre–tax results of the coming year.

**Liquidity and Capital Resources**

On September 26, 2003, we completed our initial public offering of 25,145,000 shares of common stock at a price to the public of $20 per share. Net of total offering expenses, we raised approximately $470.3 million in proceeds. We used the net proceeds of the offering, together with the borrowings under our new $125.0 million senior term loan, to redeem all of our outstanding shares of preferred stock for approximately $465.2 million, and to repay in full our original senior term loan for approximately $39.9 million. Additionally, we redeemed a portion of our senior subordinated notes (see discussion below) and paid the related premium for a total of approximately $77.5 million and redeemed options to purchase shares of preferred stock for approximately $4.2 million.

On January 29, 2003, AMI Semiconductor issued and sold $200.0 million aggregate principal amount of 10 3/4% senior subordinated notes due 2013. The senior subordinated notes are guaranteed by us and our existing and future domestic restricted subsidiaries. We cannot redeem the notes before February 1, 2008 except that, until February 1, 2006, we can choose to redeem up to an aggregate of 35% of the original principal amount of the notes, or $70.0 million, at a redemption price of 110.75% of the principal amount of any notes we redeem with funds raised in certain equity offerings or received as a capital contribution from AMIS Holdings. In connection with our IPO, we redeemed $70.0 million principal amount of notes, for an aggregate payment of $77.5 million plus accrued interest. As of December 31, 2003, we had total debt of $254.7 million.

Our principal capital requirements are to fund working capital needs, meet required debt payments, including debt service payments on the senior subordinated notes and the senior credit facilities as amended, complete planned maintenance of equipment and to equip our fabrication facilities. We anticipate that operating cash flow, together with available borrowings under our revolving credit facility, will be sufficient to

28

Table of Contents

meet working capital, interest payment requirements on our debt obligations and capital expenditures for at least the next twelve months. Although we believe these resources may also meet our liquidity needs beyond that period, the adequacy of these resources will depend on our growth, semiconductor industry conditions and the capital expenditures to support capacity and technology improvements.

We generated $70.7 million in cash from operating activities in 2003 compared to $81.1 million in cash from operating activities in 2002. This decrease occurred because of a decrease in net income offset by the non-cash write-off of the value of a non-compete provision of an agreement of $20.0 million and deferred financing costs of $7.9 million and changes in working capital balances due to normal fluctuations in the timing of cash receipts and payments.

Significant uses of cash can be divided into investing activities and financing activities. During 2003 and 2002, we invested in capital equipment in the amounts of $26.6 million and $22.0 million, respectively. See "Capital Expenditures" below. Additionally, in 2002 we paid approximately $85.4 million for the MSB acquisition.

During 2003, we generated net cash from financing activities of $2.0 million. During this period we raised $470.3 million, net of offering expenses, through our initial public offering, issued the senior subordinated notes for $200.0 million in cash, entered into a new senior term loan for $125.0 million, repaid $160.1 million on an existing term loan, paid $546.0 million to redeem our Series A, Series B and Series C Preferred Stock and $4.2 million to redeem outstanding preferred stock options, paid $11.4 million in debt issuance costs related to the senior subordinated notes and the new senior term loan and redeemed a portion of our senior subordinated notes and paid the related premium for $77.5 million. During 2002, we generated $58.4 million of cash from financing activities. During this time period, we issued 75,000 shares of Series C Preferred Stock for $75.0 million. The offsetting payments in 2002 were payments on our senior credit facilities including the remittance of "Excess Cash Flow" as required by the credit agreement and a prepayment of $5.0 million.

For a description of the senior credit facilities and the senior subordinated notes, see note 9 of the accompanying consolidated financial statements.

As part of the MSB acquisition, we entered into a supply agreement with STMicroelectronics on a take-or-pay basis under which STMicroelectronics is required to purchase a minimum of €50 million (approximately $63.0 million, assuming an exchange rate of €1 to $1.26) of products from us during the two-year period ending June 26, 2004.

*Capital Expenditures*

During 2003, we spent $26.6 million for capital expenditures compared with $22.0 million during 2002. Capital expenditures for 2004 are expected to be approximately 6% to 7% of revenue. These capital expenditures will primarily be used for equipment replacement, yield improvement in our wafer fabrication facilities and expanding our eight-inch fabrication facility capacity. Our annual capital expenditures are limited by the terms of the senior credit facilities. We believe we have adequate capacity under the senior credit facilities to make planned capital expenditures.

*Restructuring and Impairment Charges*

During 2003, we recorded $1.7 million of restructuring costs related to the termination of certain management and other employees as well as the services of certain sales representative firms in the United States. This amount includes $0.7 million related to the accelerated vesting on certain options making them immediately exercisable upon termination, as discussed in note 14 to our consolidated financial statements. As of December 31, 2003, approximately $0.4 million had been paid, with the balance paid in early 2004. Restructuring expense of $0.9 million, consisting primarily of severance costs, was recorded in 2002 concurrent with the MSB acquisition. This amount was paid during 2003. Additionally, during 2001, we recorded restructuring expenses of $5.0 million. As of December 31, 2003, approximately $4.5 million of the total $5.0 million of 2001 restructuring charges had been paid and during 2002, $0.3 million of the 2001 accrual was reversed as original estimates were revised. The remaining $0.2 million from the 2001 restructuring plan is

29

Table of Contents

included in the December 2003 restructuring accrual balance. This amount is primarily related to lease termination costs, which are expected to be paid over the lease terms, the last of which ends in July 2005. The restructuring charges were taken after adoption and approval of an exit plan in compliance with the provisions of FAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" for 2003 and Emerging Issues Task Force (EITF) Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring)" for 2002 and 2001. In the future, we may need to further restructure our business, and as a result, we could incur further restructuring charges.

Following is a summary of the restructuring accrual relating to the 2003, 2002 and 2001 plans (in millions):

|  | Severance Costs | Lease Termination Costs | Legal Fees and Other Costs | Write-down of Fixed Assets | Total |
|---|---|---|---|---|---|
| 2001 Expense | $ 3.6 | $ 0.5 | $ 0.5 | $ 0.3 | $ 5.0 |
| Paid in 2001 | (2.7) | (0.2) | (0.1) | (0.3)* | (3.3) |
| Balance at December 31, 2001 | 1.0 | 0.4 | 0.3 | — | 1.7 |
| 2002 Expense | 0.9 | — | — | — | 0.9 |
| Paid in 2002 | (1.0) | (0.1) | (0.0) | — | (1.1) |
| Reserve Reversal | (0.0) | 0.0 | (0.3) | — | (0.3) |
| Balance at December 31, 2002 | 0.9 | 0.3 | — | — | 1.2 |
| 2003 Expense | 1.7 | — | — | — | 1.7 |
| Paid in 2003 | (1.9)** | (0.1) | — | — | (2.0) |
| Balance at December 31, 2003 | $ 0.7 | $ 0.2 | $ — | $ — | $ 0.9 |

\*  Non-cash

\*\*  $0.7 million non-cash

In connection with the MSB acquisition, we initiated a plan to reduce operating expenses. The plan called for the elimination of approximately $47 million in expenses over a one-year period, commencing with actions in the third quarter of 2002 to generate savings in the following quarter. The $47 million expense reduction plan consisted of approximately $35 million in manufacturing costs ($27 million in wafer fabrication costs and $8 million in test/assembly costs) and approximately $12 million in selling, general, and administrative costs. Specific actions identified in our plan included headcount reductions, including savings generated from transferring backend test operations from our Belgium facility to our Philippines facility, which is now complete; materials savings including negotiated volume discounts for silicon and reduction in materials consumption (generated by comparing and adopting best practices between U.S. and Belgium operations); and savings in subcontracting, sales commissions, miscellaneous manufacturing overhead and administrative savings. We completed our cost reduction program by the end of the second quarter of 2003, as planned.

**Contractual Obligations and Contingent Liabilities and Commitments**

Other than operating leases for certain equipment and real estate, purchase agreements for certain chemicals, raw materials and services at fixed prices, or similar instruments, we have no significant off-balance sheet transactions and we are not a guarantor of any other entities' debt or other financial obligations. The

following table presents a summary of our contractual obligations and payments, by period, as of December 31, 2003.

### Cash Payments Due by Period (in millions)

|  | Total | 1 Year | 2–3 Years | 4–5 Years | After 5 Years |
|---|---|---|---|---|---|
| Senior term loan | $ 124.7 | $ 1.3 | $ 2.5 | $ 120.9 | $ — |
| Senior subordinated notes | 130.0 | — | — | — | 130.0 |
| Total long–term debt | 254.7 | 1.3 | 2.5 | 120.9 | 130.0 |
| Operating leases | 13.6 | 6.0 | 4.4 | 1.9 | 1.3 |
| Other long–term obligations, net | 0.4 | — | 0.4 | — | — |
| Total contractual cash obligations | $ 268.7 | $ 7.3 | $ 7.3 | $ 122.8 | $ 131.3 |

During 2003, we and AMI Semiconductor, Inc., our wholly owned subsidiary, entered into new senior secured credit facilities consisting of a $125.0 million term loan and executed an increase of the revolving credit facility, the amount available is now $90.0 million. The term loan requires a principal payment of $312,500, together with accrued and unpaid interest, on the last day of March, June, September and December, with the balance due on September 26, 2008. The revolving credit facility ($20.0 million of which may be in the form of letters of credit) is available for working capital and general corporate purposes. As of December 31, 2003, no amount was drawn on the revolving credit facility.

In 1999, Nippon Mining entered into an agreement with a major semiconductor manufacturer pursuant to which the semiconductor manufacturer provides certain technology and related technological assistance to us. We agreed to reimburse Nippon Mining for the amounts due under the agreement, which is denominated in yen, totaling approximately ¥ 1,000,000,000 (or $9.5 million) over a five–year period. Under the recapitalization agreement, Nippon Mining's subsidiary agreed to pay one–half of the remaining outstanding obligation to this major semiconductor manufacturer. As of December 21, 2000, the effective date of the recapitalization agreement, the obligation totaled approximately ¥ 775,000,000, or approximately $6.8 million using an estimated exchange rate of approximately $0.00875/¥. Consequently, we recorded a contra–liability of approximately $3.4 million, representing the portion of the obligation that Nippon Mining's subsidiary agreed to pay.

As of December 31, 2003, the remaining obligation, which is scheduled to be paid in 2004, was approximately ¥ 100,000,000, or approximately $0.9 million using an estimated exchange rate of approximately $0.00935/¥. The contra–liability as of December 31, 2003 was approximately $1.1 million, representing one–half of the liability remaining and one–half of those items paid by us, but not yet invoiced to Nippon Mining's subsidiary during 2003.

Also, in conjunction with the recapitalization agreement, Nippon Mining's subsidiary agreed to indemnify us for any property tax, foreign tax and sales and use tax obligations outstanding at December 21, 2000 (totaling approximately $6,343,000). As of December 31, 2003, we had remaining accruals of approximately $275,000 in accrued expenses and a corresponding receivable of $1,729,000 representing remaining accruals and those items paid by us, but not yet invoiced to Nippon Mining's subsidiary, during 2003. As of December 31, 2002, we had remaining accruals of approximately $1,729,000 for these obligations in taxes payable and accrued expenses in the accompanying consolidated balance sheet and had recorded an offsetting receivable from affiliate for this amount.

From time to time, we are party to various litigation matters incidental to the conduct of our business. There is no pending or threatened legal proceeding to which we are a party that, in the opinion of management, is likely to have a material adverse effect on our future financial results or financial condition.

Currently, we are a "primary responsible party" for environmental remediation and cleanup at our former corporate headquarters in Santa Clara, California (a liability for which we are able to seek indemnification from our former parent). Costs incurred by us related to this liability include implementation of the clean–up

Table of Contents

plan, operations and maintenance of remediation systems and other project management costs. Our estimate of the remaining cost to fulfill our obligations under the remediation effort, as determined in consultation with our environmental consultants and the governing regulatory agency, is $0.5 million. We expect to pay $0.2 million per year over the next three years and have recorded a liability, as well as a receivable owing from our former parent, for $0.5 million. Due to the inherent uncertainties surrounding a contingency of this nature, there exists a reasonable possibility that such estimates could change in the near term.

### Recent Accounting Pronouncements

We have reviewed all recently issued accounting standards, which have not yet been adopted, in order to determine their potential effect, if any, on our results of operations or financial position. Based on that review, we do not currently believe that any of these recent accounting pronouncements will have a significant effect on our current or future financial position, results of operations, cash flows or disclosures.

### Factors that May Affect our Business and Future Results

The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may also adversely affect our business.

### Risks Relating to Our Company and the Semiconductor Industry

#### *The cyclical nature of the semiconductor industry may limit our ability to maintain or increase revenue and profit levels.*

The semiconductor industry is cyclical and our ability to respond to downturns is limited. The semiconductor industry experienced the effects of a significant downturn that began in late 2000 and ended in 2003. Our business was impacted by this downturn. Our financial performance was negatively affected by various factors, including general reductions in inventory levels by customers and excess production capacity. We cannot predict when another downturn will begin or to what extent business conditions will change in the future.

During industry downturns or otherwise, we may need to record impairment or restructuring charges. In 2003, we incurred a non–cash impairment charge of $20.0 million related to the write–off of a non–compete provision of an agreement with Nippon Mining and its subsidiary and $1.7 million in restructuring charges related to employee severance and the termination of relationships with certain sales representative firms. In 2002, we incurred a net non–cash restructuring charge of $0.6 million consisting primarily of severance costs that occurred concurrently with the MSB acquisition. In 2001, we incurred a restructuring charge of $5.0 million related to our effort to manage costs by reducing our worldwide workforce and consolidating operations. In the future, we may need to record additional impairment charges or further restructure our business and incur additional restructuring charges.

#### *Due to our relatively fixed cost structure, our margins will be adversely affected if we experience a significant decline in customer orders.*

We make significant decisions, including determining the levels of business that we will seek and accept, production schedules, component procurement commitments, personnel needs and other resource requirements, based on our estimates of customer requirements. The short–term nature of commitments by many of our customers and the possibility of rapid changes in demand for their products reduces our ability to accurately estimate future customer requirements. On occasion, customers may require rapid increases in production, which can challenge our resources, reduce margins or harm our relationships with our customers. We may not have sufficient capacity at any given time to meet our customers' demands. Conversely, downturns in the semiconductor industry, such as the downturn that commenced late in 2000 and ended in 2003, can and have caused our customers to significantly reduce the amount of products ordered from us. Significant rapid reductions in customer orders have caused our wafer fabrication capacity to be under–utilized. Because many of our costs and operating expenses are relatively fixed, a reduction in customer

32

Table of Contents

demand has an adverse effect on our gross margins and operating income. Reduction of customer demand also causes a decrease in our backlog. There is also a higher risk that our trade receivables will be uncollectible during industry downturns.

### *A significant portion of our revenue comes from a relatively limited number of customers and devices.*

If we lose major customers or if customers cease to place orders for our high volume devices, our financial results will be adversely affected. While we served more than 490 customers in 2003, sales to our 16 largest customers represented 50.0% of our revenue during this period. The identities of our principal customers have varied from year to year and our principal customers may not continue to purchase products and services from us at current levels, or at all. In addition, while we sold over 1,350 different products in the 2003, the 41 top selling devices represented 50.0% of our revenue during this period. The devices generating the greatest revenue have varied from year to year and our customers may not continue to place orders for such devices from us at current levels, or at all. Significant reductions in sales to any of these customers, the loss of major customers or the curtailment of orders for our high volume devices within a short period of time would adversely affect our business.

### *Our customers may cancel their orders, change production quantities or delay production.*

We generally do not obtain firm, long−term purchase commitments from our customers. Customers may cancel their orders, change production quantities or delay production for a number of reasons. Cancellations, reductions or delays by a significant customer or by a group of customers, which we have experienced as a result of the recent downturn in the semiconductor industry, have adversely affected and may continue to adversely affect our results of operations. In addition, while we do not obtain long−term purchase commitments, we generally agree to the pricing of a particular product for the entire lifecycle of the product, which can extend over a number of years. If we underestimate our costs when determining the pricing, our margins and results of operations will be adversely affected.

### *We depend on our key personnel.*

Our success depends to a large extent upon the continued services of our chief executive officer, Christine King, and our other key executives, managers and skilled personnel, particularly our analog and mixed signal engineers. Generally our employees are not bound by employment or non−competition agreements and we cannot assure you that we will retain our key executives and employees. We may or may not be able to continue to attract, retain and motivate qualified personnel necessary for our business. Loss of the services of, or failure to recruit, skilled personnel could be significantly detrimental to our product development programs or otherwise have a material adverse effect on our business.

### *We depend on successful technological advances for growth.*

Our industry is subject to rapid technological change as customers and competitors create new and innovative products and technologies. We may not be able to access leading edge process technologies or to license or otherwise obtain essential intellectual property required by our customers. If we are unable to continue manufacturing technologically advanced products on a cost−effective basis, our business would be adversely affected.

### *We depend on growth in the end markets that use our products.*

Our continued success will depend in large part on the growth of various industries that use semiconductors, including our target automotive, medical and industrial markets, as well as the communications, military and computing markets, and on general economic growth. Factors affecting these markets as a whole could seriously harm our customers and, as a result, harm us. These factors include:

• recessionary periods or periods of reduced growth in our customers' markets;

• the inability of our customers to adapt to rapidly changing technology and evolving industry standards;

Table of Contents

• the potential that our customers' products may become obsolete or the failure of our customers' products to gain widespread commercial acceptance; and

• the possibility of reduced consumer demand for our customers' products.

The declining average selling price of communications equipment places significant pressure on the prices of the components that are used in this equipment. If the average selling prices of communications equipment continue to decrease, the pricing pressure on components we produce may reduce our revenue and our gross profit margin.

**Our industry is highly competitive.**

The semiconductor industry is highly competitive and includes hundreds of companies, a number of which have achieved substantial market share. Current and prospective customers for our custom products evaluate our capabilities against the merits of our direct competitors, as well as the merits of continuing to use standard or semi-standard products. Some of our competitors have substantially greater market share, manufacturing, financial, research and development and marketing resources than we do. We also compete with emerging companies that are attempting to sell their products in specialized markets. We expect to experience continuing competitive pressures in our markets from existing competitors and new entrants. Our ability to compete successfully depends on a number of other factors, including the following:

• our ability to offer cost-effective products on a timely basis using our technologies;

• our ability to accurately identify emerging technological trends and demand for product features and performance characteristics;

• product introductions by our competitors;

• our ability to adopt or adapt to emerging industry standards;

• the number and nature of our competitors in a given market; and

• general market and economic conditions.

Many of these factors are outside of our control. In addition, in recent years, many participants in the industry have substantially expanded their manufacturing capacity. If overall demand for semiconductors should decrease, as it has done recently, this increased capacity could result in substantial pricing pressure, which could adversely affect our operating results. Because our products are typically designed for a specific customer and are not commodity products, we did not decrease our prices as significantly as many other companies in the semiconductor industry to try to maintain or increase customer orders during the downturn in the semiconductor industry from 2000 through 2003. However, we cannot assure you that we will not face increased pricing pressure in the future.

**We may incur costs to engage in future acquisitions of companies or technologies and the anticipated benefits of those acquisitions may never be realized.**

In June 2002 we completed the MSB acquisition and in September 2002 we purchased the Micro Power Products Division of Microsemi Corporation. We may in the future make additional acquisitions of complementary companies or technologies. Any future acquisitions would be accompanied by risks, including the following:

• potential inability to maximize our financial or strategic position, which could result in impairment charges if the acquired company or assets are later worth less than the amount paid for them in the acquisition;

• difficulties in assimilating the operations and products of an acquired business or in realizing projected efficiencies, cost savings and revenue synergies;

• entry into markets or countries in which we may have limited or no experience;

Table of Contents

• potential increases in our indebtedness and contingent liabilities and potential unknown liabilities associated with any such acquisition;

• diversion of management's attention due to transition or integration issues;

• difficulties in managing multiple geographic locations;

• cultural impediments that could prevent establishment of good employee relations, difficulties in retaining key personnel of the acquired business and potential litigation from terminated employees; and

• difficulties in maintaining uniform standards, controls and procedures and information systems.

We cannot guarantee that we will be able to successfully integrate any company or technologies that we might acquire in the future and our failure to do so could harm our business. The benefits of an acquisition may take considerable time to develop and we cannot guarantee that any acquisition will in fact produce the intended benefits.

In addition, our senior credit facilities and our senior subordinated notes may prohibit us from making acquisitions that we may otherwise wish to pursue.

**Risks Relating to Our International Operations**

*We expect international sales and operations, which expose us to various political and economic risks, to comprise a growing portion of our business.*

With the MSB acquisition, our exposure to risks associated with international sales and operations has increased significantly. As a percentage of total revenue, our historical revenue outside of North America was approximately 59%, 44% and 17% in 2003, 2002 and 2001, respectively. We expect sales to customers located in Europe and Asia to comprise an increasing portion of our business. Our manufacturing operations are located in the United States and Belgium, our test facilities and outsourced primary packagers are located in Asia and we maintain design centers in Germany and the Czech Republic and sales offices in other locations in Europe and Asia. International sales and operations are subject to a variety of risks, including:

• greater difficulty in staffing and managing foreign operations;

• greater risk of uncollectible accounts;

• longer collection cycles;

• logistical and communications challenges;

• potential adverse changes in laws and regulatory practices, including export license requirements, trade barriers, tariffs and tax laws;

• changes in labor conditions;

• burdens and costs of compliance with a variety of foreign laws;

• political and economic instability;

• increases in duties and taxation;

• greater difficulty in protecting intellectual property; and

• general economic and political conditions in these foreign markets.

In 1997 and 1998, business conditions in Asia were severely affected by banking and currency issues. While these conditions have stabilized since 1999, many countries in Asia have recently been affected by the occurrence of severe acute respiratory syndrome, or SARS, which could hamper our operations and have an adverse effect on our business in the affected countries. The continuance or worsening of adverse business and financial conditions in Asia would likely affect our operating results. As a percentage of total revenue, our historical revenue in Asia was approximately 18% in 2003, 20% in 2002 and 10% in 2001.

35

Table of Contents

*We are subject to risks associated with currency fluctuations.*

A significant portion of our revenue and costs are denominated in foreign currencies, including the euro and, to a lesser extent, the Philippine Peso and the Japanese Yen. Following the MSB acquisition, approximately 27% of our revenue in the second half of 2002 and 36% in 2003 was denominated in euros. As a result, changes in the exchange rates of these foreign currencies to the U.S. dollar will affect our revenue, cost of revenue and operating margins and could result in exchange losses. The impact of future exchange rate fluctuations on our results of operations cannot be accurately predicted. In the future, we may engage in exchange rate hedging activities in an effort to mitigate the impact of exchange rate fluctuations. However, we cannot assure you that any hedging transactions we may enter into will be effective or will not result in foreign exchange hedging losses.

*Our exposure to foreign labor laws due to our operational presence in Europe.*

We had 913 employees in Europe as of December 31, 2003, most of whom were in Belgium. The employees located in Belgium are represented by unions and have collective bargaining arrangements at the national, industry and company levels. In connection with any future reductions in work force we may implement, we would be required to, among other things, negotiate with these unions and make severance payments to employees upon their termination. In addition, these unions may implement work stoppages or delays in the event they do not consent to severance packages proposed for future reductions in work force or for any other reason. Furthermore, our substantial operations in Europe subject us to compliance with labor laws and customs that are generally more employee favorable than in the United States. As a result, it may not be possible for us to quickly or affordably implement workforce reductions in Europe.

**Risks Relating to Manufacturing**

*Our success depends on high utilization of our manufacturing capacity.*

An important factor in our success is the extent to which we are able to utilize the available capacity in our fabrication and test facilities. Utilization rates can be negatively affected by periods of industry over-capacity, low levels of customer orders, operating inefficiencies, mechanical failures and disruption of operations due to expansion or relocation of operations and fire or other natural disasters. In addition, when the agreement with STMicroelectronics terminates in June 2004 or if STMicroelectronics fails to meet its take-or-pay obligation under the agreement, utilization of our fabs could decline. Because many of our costs are fixed, a reduction in capacity utilization, together with other factors such as yield and product mix, could adversely affect our operating results. The downturn in the semiconductor industry from 2000 to 2003 resulted in a decline in the capacity utilization at our wafer fabrication facilities. If we enter another downturn, our wafer fabrication capacity may be under-utilized again and our inability to quickly reduce fixed costs, such as depreciation and other fixed operating expenses necessary to operate our wafer manufacturing facilities, would harm our operating results.

*We could be adversely affected by manufacturing interruptions and reduced yields.*

The fabrication of our integrated circuits is a highly complex and precise process, requiring production in a tightly controlled, clean room environment. Minute impurities, difficulties in the fabrication process, defects in the masks used to print circuits on a wafer or other factors can cause a substantial percentage of wafers to be rejected or numerous die on each wafer to be nonfunctional. We may experience problems in achieving acceptable yields in the manufacture of semiconductors, particularly in connection with the production of a new product, the adoption of a new manufacturing process or any expansion of our manufacturing capacity and related transitions. The interruption of manufacturing, including power interruptions or the failure to achieve acceptable manufacturing yields at any of our wafer fabrication facilities, would adversely affect our business.

36

Table of Contents

*We are dependent on successful alliance and outsourcing relationships.*

We have formed alliances with other wafer fabrication foundries to supplement capacity and gain access to more advanced digital process technologies. If we experience problems with our alliance partners, we may face a shortage of finished products available for sale. We believe that in the future we will increasingly rely upon outsourced wafer manufacturing to supplement our capacity and technology. If our alliance partners, or any other foundries with which we form an alliance, experience wafer yield problems or delivery delays, which are common in our industry, or are unable to produce silicon wafers that meet our specifications with acceptable yields, our operating results could be adversely affected.

*We rely on packaging subcontractors.*

Most of our products are assembled in packages prior to shipment. The packaging of semiconductors is a complex process requiring, among other things, a high degree of technical skill and advanced equipment. We outsource our semiconductor packaging to subcontractors, most of which are located in Southeast Asia. In particular, we rely heavily on a single packager for packaging. We depend on these subcontractors to package our devices with acceptable quality and yield levels. If our semiconductor packagers experience problems in packaging our semiconductor devices or experience prolonged quality or yield problems, our operating results would be adversely affected.

*We depend on successful parts and materials procurement for our manufacturing processes.*

We use a wide range of parts and materials in the production of our semiconductors, including silicon, processing chemicals, processing gases, precious metals and electronic and mechanical components. We procure materials and electronic and mechanical components from domestic and foreign sources and original equipment manufacturers. However, there is no assurance that, if we have difficulty in supply due to an unforeseen catastrophe, worldwide shortage or other reason, alternative suppliers will be available or that these suppliers will provide materials or electronic or mechanical components in a timely manner or on favorable terms. If we cannot obtain adequate materials in a timely manner or on favorable terms, our business and financial results would be adversely affected.

*We may need to raise additional capital that may not be available.*

Semiconductor companies that maintain their own fabrication facilities have substantial capital requirements. We made capital expenditures of $26.6 million in 2003, $22.0 million in 2002 and $20.7 million in 2001. These expenditures were used to replace equipment and expand our test and design capabilities. In the future, we intend to continue to make capital investments to support business growth and achieve manufacturing cost reductions and improved yields. We may seek additional financing to fund further expansion of our wafer fabrication capacity or to fund other projects. The timing and amount of such capital requirements cannot be precisely determined at this time and will depend on a number of factors, including demand for products, product mix, changes in semiconductor industry conditions and competitive factors. Additional financing may not be available when needed or, if available, may not be available on satisfactory terms.

*Our ability to compete successfully and achieve future growth will depend, in part, on our ability to protect our proprietary technology, as well as our ability to operate without infringing the proprietary rights of others.*

As of December 31, 2003, we held 73 U.S. patents and 117 foreign patents. We also had over 50 patent applications in progress. At the end of 2004, approximately 21% of the patents we currently have in place will be expiring. We do not expect this to have a material impact on our results, as these technologies are not revenue producing and we will be able to continue using the technologies associated with these patents. We intend to continue to file patent applications when appropriate to protect our proprietary technologies. The process of seeking patent protection takes a long time and is expensive. We cannot assure you that patents will issue from pending or future applications or that, if patents issue, they will not be challenged, invalidated or circumvented, or that the rights granted under the patents will provide us with meaningful protection or any

Table of Contents

commercial advantage. In addition, we cannot assure you that other countries in which we market our services will protect our intellectual property rights to the same extent as the United States.

Our ability to compete successfully depends on our ability to operate without infringing the proprietary rights of others. We have no means of knowing what patent applications have been filed in the United States until they are published. In January 2003, Ricoh Company, Ltd. filed in the U.S. District Court for the District of Delaware a complaint against us and other parties alleging infringement of a patent owned by Ricoh. The case was transferred to the U.S. District Court for the Northern District of Delaware in August 2003 and was subsequently transferred to the U.S. District Court for the Northern District of California. Ricoh is seeking an injunction and damages in an unspecified amount relating to such alleged infringement. The patents relate to certain methodologies for the automated design of custom semiconductors. Based on information available to us to date, our belief is that the asserted claims are without merit or, if meritorious, that we will be indemnified (with respect to damages) for these claims by Synopsys, Inc. and resolution of this matter will not have a material adverse effect on our future financial results or financial condition.

In addition, the semiconductor industry is characterized by frequent litigation regarding patent and other intellectual property rights. As is typical in the semiconductor industry, we have from time to time received communications from third parties asserting rights under patents that cover certain of our technologies and alleging infringement of certain intellectual property rights of others. We expect to receive similar communications in the future. In the event that any third party had a valid claim against us or our customers, we could be required to:

- discontinue using certain process technologies which could cause us to stop manufacturing certain semiconductors;

- pay substantial monetary damages;

- seek to develop non-infringing technologies, which may not be feasible; or

- seek to acquire licenses to the infringed technology which may not be available on commercially reasonable terms, if at all.

In the event that any third party causes us or any of our customers to discontinue using certain process technologies, such an outcome could have an adverse effect on us as we would be required to design around such technologies, which could be costly and time consuming.

Litigation, which could result in substantial costs to us and diversion of our resources, may also be necessary to enforce our patents or other intellectual property rights or to defend us against claimed infringement of the rights of others. If we fail to obtain a necessary license or if litigation relating to patent infringement or any other intellectual property matter occurs, our business could be adversely affected.

*We could incur material costs to comply with environmental laws.*

Increasingly stringent environmental regulations restrict the amount and types of pollutants that can be released into the environment from our operations. We have incurred and will in the future incur costs, including capital expenditures, to comply with these regulations. Significant regulatory changes or increased public attention to the impact of semiconductor operations on the environment may result in more stringent regulations, further increasing our costs or requiring changes in the way we make our products. For example, Belgium is expected to enact national legislation regulating emissions of greenhouse gases, such as carbon dioxide. However, because we cannot predict the scope or timing of such requirements, we are unable to evaluate the ultimate cost of compliance with this legislation.

In addition, because we use hazardous and other regulated materials in our manufacturing processes, we are subject to risks of accidental spills or other sources of contamination, which could result in injury to the environment, personal injury claims and civil and criminal fines, any of which could be material to our cash flow or earnings. For example, we currently are remediating contamination at one of our former manufacturing sites pursuant to a government order. The discovery of additional contamination at this site or other sites where we currently have or historically have had operations could result in material cleanup costs.

38

Table of Contents

**Risks Relating to Our Substantial Debt**

*Our substantial consolidated indebtedness could adversely affect our financial health and the value of your investment in our common stock.*

AMI Semiconductor, our wholly owned subsidiary through which we conduct all our business operations, has a substantial amount of indebtedness, most of which is guaranteed by us. We are a holding company with no business operations and no significant assets other than our ownership of AMI Semiconductor's capital stock. As of December 31, 2003, our long-term consolidated indebtedness was approximately $254.7 million and our total consolidated debt as a percentage of total capitalization was 55%. Subject to the restrictions in the senior credit facilities and the senior subordinated notes, we and our subsidiaries may incur certain additional indebtedness from time to time.

Our substantial consolidated indebtedness could have important consequences to you. For example, our substantial indebtedness:

• will require our operating subsidiaries to dedicate a substantial portion of cash flow from operations to payments in respect of indebtedness, thereby reducing the availability of cash flow to fund working capital, capital expenditures, research and development efforts and other general corporate purposes;

• could increase the amount of our consolidated interest expense because some of our borrowings are at variable rates of interest, which, if interest rates increase, could result in higher interest expense;

• will increase our vulnerability to adverse general economic or industry conditions;

• could limit our flexibility in planning for, or reacting to, changes in our business or the industry in which we operate;

• could restrict us from making strategic acquisitions, introducing new technologies or exploiting business opportunities;

• could place us at a competitive disadvantage compared to our competitors that have less debt; and

• could limit, along with the financial and other restrictive covenants in our indebtedness, among other things, our ability to borrow additional funds or dispose of assets.

*To service our consolidated indebtedness, we will require a significant amount of cash.*

Our ability to generate cash depends on many factors beyond our control. Our ability to make payments on our consolidated indebtedness and to fund working capital requirements, capital expenditures and research and development efforts will depend on our ability to generate cash in the future. Our historical financial results have been, and we expect our future financial results will be, subject to substantial fluctuation based upon a wide variety of factors, many of which are not within our control. These factors include:

• the cyclical nature of both the semiconductor industry and the markets for our products;

• fluctuations in manufacturing yields;

• the timing of introduction of new products;

• the timing of customer orders;

• changes in the mix of products sold and the end markets into which they are sold;

• the extent of utilization of manufacturing capacity;

• the length of the lifecycle of the semiconductors we are manufacturing;

• availability of supplies and raw materials;

• price competition and other competitive factors; and

• work stoppages, especially at our fabs in Belgium.

39

Table of Contents

Unfavorable changes in any of these factors could harm our operating results and our ability to generate cash to service our indebtedness. If we are unable to service our debt using our operating cash flow, we will be required to pursue one or more alternative strategies, such as selling assets, refinancing or restructuring our indebtedness or selling equity, each of which could adversely affect the market price of our common stock. However, we cannot assure you that any alternative strategies will be feasible at the time or prove adequate. Also, certain of these strategies would require the consent of our senior secured lenders.

### *Restrictions imposed by the senior credit facilities and the senior subordinated notes limit our ability to take certain actions.*

We cannot assure you that the operating and financial restrictions and covenants in our debt instruments, including the senior credit facilities and the senior subordinated notes, will not adversely affect our ability to finance our future operations or capital needs or engage in other business activities that may be in our interest. The senior credit facility requires us to maintain certain financial ratios which become more restrictive over time. Our ability to comply with these ratios may be affected by events beyond our control. In 2002, the lenders under our senior credit facility and we agreed to certain amendments, including changes to our financial covenants and restrictions on our capital expenditures. We also sought and obtained certain waivers and consents under our senior credit facilities. We may be required to seek waivers or consents in the future. We cannot be sure that these waivers or consents will be granted. A breach of any of the covenants or our inability to comply with the required financial ratios could result in a default under our senior credit facilities. In the event of any default under the senior credit facilities, the lenders under our senior credit facilities will not be required to lend any additional amounts to us and could elect to declare all outstanding borrowings, together with accrued interest and other fees, to be due and payable, and require us to apply all of our available cash to repay these borrowings. If we are unable to repay any such borrowings when due, the lenders could proceed against their collateral, which consists of substantially all of our assets, including 65% of the outstanding stock of certain of our foreign subsidiaries. If the indebtedness under our senior credit facilities were to be accelerated, there can be no assurance that our assets would be sufficient to repay such indebtedness in full.

In addition, the indenture governing the senior subordinated notes contains covenants that, among other things, limit our ability to incur additional indebtedness, pay dividends on our capital stock or redeem, repurchase or retire our capital stock or subordinated indebtedness, make investments, engage in transactions with affiliates, sell assets, including capital stock of subsidiaries, and consolidate, merge or transfer assets.

### Risks Related to our Common Stock

### *The price of our common stock may be volatile and subject to wide fluctuations.*

The market price of the securities of technology companies has been especially volatile. Thus, the market price of our common stock may be subject to wide fluctuations. If our revenue does not increase or increases less than we anticipate, or if operating or capital expenditures exceed our estimates and cannot be adjusted accordingly, or if some other event adversely affects us, the market price of our common stock could decline. In addition, if the market for semiconductor–related stocks or the stock market in general experiences a loss in investor confidence or otherwise falls, the market price of our common stock could fall for reasons unrelated to our business, results of operations or financial condition. The market price of our common stock also might decline in reaction to events that affect other companies in our industry, even if these events do not directly affect us. In the past, companies that have experienced volatility in the market price of their stock have been the subject of securities class action litigation. If we were to become the subject of securities class action litigation, it could result in substantial costs and a diversion of management's attention and resources.

### *We may experience significant period–to–period quarterly and annual fluctuations in our revenue and operating results, which may result in volatility in our stock price.*

We may experience significant period–to–period fluctuations in our sales and operating results in the future due to a number of factors and any such variations may cause our stock price to fluctuate. It is likely

40

Table of Contents

that in some future period our operating results will be below the expectations of securities analysts or investors. If this occurs, our stock price could drop significantly.

A number of factors, in addition to those cited in other risk factors, may contribute to fluctuations in our sales and operating results, including:

• the timing and volume of orders from our customers;

• the rate of acceptance of our products by our customers, including the acceptance of design wins;

• the demand for and lifecycles of equipment incorporating our products;

• the rate of adoption of integrated mixed signal products in the end markets we target;

• deferrals of customer orders in anticipation of new products or product enhancements from us or our competitors or other providers of integrated circuits;

• changes in product mix; and

• the rate at which new markets emerge for products we are currently developing or for which our design expertise can be utilized to develop products for these new markets.

*We are a holding company that depends on dividends from our subsidiaries to meet our cash requirements and we do not anticipate paying any dividends on our common stock in the foreseeable future.*

We are a holding company with no business operations. Our only significant asset is the outstanding capital stock of AMI Semiconductor, our wholly owned subsidiary through which we conduct all our business operations, and certain other assets. We will not be able to pay cash dividends on our common stock without receiving dividends or other distributions from AMI Semiconductor. Furthermore, AMI Semiconductor is restricted by the senior credit facilities and the senior subordinated notes from paying dividends or making distributions to us. In any event, we currently expect that our earnings and cash flow will be retained for use in our operations and to service our debt obligations. Even if we determined to pay a dividend on or make a distribution in respect of our common stock, we cannot assure you that our subsidiaries will generate sufficient cash flow to pay a dividend or distribute funds to us or that applicable state law and contractual restrictions will permit such dividends or distributions.

*Our principal stockholders exert substantial influence over us and may exercise their control in a manner adverse to your interests.*

As of December 31, 2003, Francisco Partners, Citigroup Venture Capital Equity Partners, or CVC, and Nippon Mining together beneficially owned 53,499,753 shares, or approximately 65.3%, of our outstanding common stock. These stockholders are party to a shareholders' agreement, pursuant to which these stockholders have the power to direct our affairs and will be able to determine the outcome of all matters required to be submitted to stockholders for approval, including the election of a majority of our directors, any merger, consolidation or sale of all or substantially all of our assets and amendment of our certificate of incorporation. Because a limited number of persons control us, transactions could be difficult or impossible to complete without the support of those persons. It is possible that these persons will exercise control over us in a manner adverse to your interests.

*Delaware law and provisions of our charter documents could discourage potential acquisition proposals and could delay, deter or prevent a change in control.*

The anti-takeover provisions of Delaware law impose various impediments to the ability of a third party to acquire control of us, even if a change in control would be beneficial to our existing stockholders. Additionally, provisions of our amended and restated certificate of incorporation and by-laws could deter, delay or prevent a third party from acquiring us, even if doing so would benefit our stockholders. These provisions include:

• a requirement that special meetings of stockholders may be called only by our board of directors, the chairman of the board (if any), the president or the secretary;

41

Table of Contents

• advance notice requirements for stockholder proposals and nominations; and

• the authority of the board to issue, without stockholder approval, preferred stock with such terms as the board may determine.

**Item 7A.       *Quantitative and Qualitative Disclosures About Market Risk***

Market risk represents the risk of changes in value of a financial instrument, derivative or non−derivative, caused by fluctuations in interest rates, foreign exchange rates and equity prices. Changes in these factors could cause fluctuations in the results of our operations and cash flows. In the ordinary course of business, we are exposed to foreign currency and interest rate risks. These risks primarily relate to the sale of products and services to foreign customers and changes in interest rates on our long−term debt.

The majority of our revenue in 2002 and 2001 was denominated in U.S. dollars. Additionally, the majority of our operating costs were denominated in U.S. dollars for those periods. Therefore, foreign currency fluctuations did not materially impact our financial results in those periods. However, MSB's operations were only consolidated with ours for six months of 2002; therefore, our 2002 operating results were not affected as greatly by transactions denominated in foreign currencies as they were in 2003 when a substantial portion of our annual sales and operating costs were denominated in euros.

Additionally, we have foreign currency exposure arising from the translation or remeasurement of our foreign subsidiaries' financial statements into U.S. dollars. The primary currencies to which we are exposed to fluctuations include the Euro, the Japanese Yen and the Philippine Peso. If the U.S. dollar increases in value against these foreign currencies, the value in U.S. dollars of the assets and liabilities originally recorded in these foreign currencies will decrease. Conversely, if the U.S. dollar decreases in value against these foreign currencies, the value in U.S. dollars of the assets and liabilities originally recorded in these foreign currencies will increase. Thus, increases and decreases in the value of the U.S. dollar relative to these foreign currencies have a direct impact on the value in U.S. dollars of our foreign currency denominated assets and liabilities, even if the value of these items has not changed in their original currency. As of December 31, 2003, approximately 68% of our consolidated net assets were attributable to subsidiaries that prepare their financial statements in foreign currencies. As such, a 10% change in the U.S. dollar exchange rates in effect as of December 31, 2003 would cause a change in consolidated net assets of approximately $9 million.

We currently do not hedge our foreign currency exchange rate exposure.

Our exposure to interest rate risk consists of floating rate debt based on the London Interbank Offered Rate (LIBOR) plus an adjustable margin under our credit agreement. A change of 10% in the interest rate would cause a change of approximately $0.5 million in interest expense.

In January 2003, we issued $200.0 million of fixed rate 10 3/4% Senior Subordinated Notes. As of December 31, 2003, $130 million of this issuance was outstanding. Because our interest rate is fixed, changes in market interest rates do not impact our interest expense.

Table of Contents

Item 8.    *Financial Statements and Supplementary Data*

### INDEX TO FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Report of Independent Auditors | 44 |
| Consolidated Balance Sheets | 45 |
| Consolidated Statements of Operations | 46 |
| Consolidated Statements of Stockholders' Equity (Deficit) and Comprehensive Income | 47 |
| Consolidated Statements of Cash Flows | 48 |
| Notes to Consolidated Financial Statements | 49 |

Table of Contents

## REPORT OF INDEPENDENT AUDITORS

The Board of Directors

AMIS Holdings, Inc.

We have audited the accompanying consolidated balance sheets of AMIS Holdings, Inc. and subsidiaries as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity (deficit) and comprehensive income, and cash flows for each of the three years in the period ended December 31, 2003. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of AMIS Holdings, Inc. and subsidiaries at December 31, 2003 and 2002, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2002, the Company adopted Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets."

/s/ ERNST & YOUNG LLP

ERNST & YOUNG LLP

Salt Lake City, Utah

February 6, 2004

44

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | 2003 | 2002 |
|  | (In thousands, except share and per share data) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 119,063 | $ 62,184 |
| Accounts receivable, less allowances of $4,000 and $4,791 at December 31, 2003 and 2002, respectively | 73,585 | 65,994 |
| Inventories | 45,599 | 39,361 |
| Receivable from affiliate | 1,909 | 1,909 |
| Deferred tax assets | 8,987 | 9,077 |
| Research and development grant receivable | 6,734 | 6,513 |
| Prepaid expenses | 11,724 | 8,543 |
| Other current assets | 410 | 6,031 |
| Total current assets | 268,011 | 199,612 |
| Property, plant and equipment, net | 205,909 | 222,507 |
| Deferred financing costs, net | 8,324 | 6,188 |
| Goodwill, net | 1,211 | 1,211 |
| Other intangibles, net | 9,718 | 36,662 |
| Deferred tax assets | 38,627 | 19,369 |
| Prepaid pension asset | 13,103 | 11,847 |
| Restricted cash | 4,200 | 4,200 |
| Other | 985 | 864 |
| Total assets | $ 550,088 | $ 502,460 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Accounts payable | $ 34,753 | $ 29,643 |
| Accrued expenses | 24,973 | 23,780 |
| Accrued employee compensation | 29,212 | 21,329 |
| Income taxes payable | 1,088 | 1,391 |
| Current portion of long-term debt | 1,250 | 8,708 |
| Total current liabilities | 91,276 | 84,851 |
| Long-term debt, less current portion | 253,437 | 151,392 |
| Other long-term liabilities | 360 | 3,088 |
| Total liabilities | 345,073 | 239,331 |
| Commitments and contingencies | | |
| Series A Senior Redeemable Preferred Stock, 20,000,000 shares authorized, 0 and 17,901,722 shares issued and outstanding at December 31, 2003 and 2002, respectively | — | 233,671 |
| Series B Junior Redeemable Convertible Preferred Stock, 20,000,000 shares authorized, 0 and 14,317,788 shares issued and outstanding at December 31, 2003 and 2002, respectively | — | 190,498 |
| Series C Senior Redeemable Preferred Stock, 0 and 75,000 shares authorized, issued and outstanding at December 31, 2003 and 2002, respectively | — | 79,337 |
| Stockholders' Equity (Deficit) | | |
| Common stock, $0.01 par value, 150,000,000 and 133,333,333 shares authorized, 81,956,422 and 46,651,721 shares issued and outstanding as of December 31, 2003 and December 31, 2002, respectively | 820 | 467 |
| Additional paid-in capital | 510,691 | 38,901 |
| Stockholder notes receivable | — | (5,570) |
| Accumulated deficit | (323,021) | (276,278) |
| Deferred compensation | (475) | — |
| Accumulated other comprehensive income | 17,000 | 2,103 |
| Total stockholders' equity (deficit) | 205,015 | (240,377) |
| Total liabilities and stockholders' equity (deficit) | $ 550,088 | $ 502,460 |

See accompanying notes.

45

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (In thousands, except per share data) | | |
| Revenue | $454,152 | $345,322 | $326,510 |
| Cost of revenue | 255,959 | 214,964 | 186,400 |
| | 198,193 | 130,358 | 140,110 |
| Operating expenses: | | | |
| Research and development | 70,256 | 52,140 | 42,112 |
| Marketing and selling | 37,801 | 35,002 | 35,373 |
| General and administrative | 26,779 | 24,961 | 25,566 |
| Restructuring and impairment charges | 21,741 | 648 | 4,983 |
| Nonrecurring charges | 11,401 | — | — |
| | 167,978 | 112,751 | 108,034 |
| Operating income | 30,215 | 17,607 | 32,076 |
| Other income (expense): | | | |
| Interest expense | (23,930) | (12,541) | (15,401) |
| Interest income | 1,452 | 1,062 | 1,241 |
| Other income (expense), net | (16,196) | 147 | 407 |
| | (38,674) | (11,332) | (13,753) |
| Income (loss) before income taxes | (8,459) | 6,275 | 18,323 |
| Provision (benefit) for income taxes | (8,043) | 1,165 | 5,642 |
| Net income (loss) | (416) | 5,110 | 12,681 |
| Preferred stock dividend | (46,327) | (62,502) | (47,578) |
| Net loss attributable to common stockholders | $ (46,743) | $ (57,392) | $ (34,897) |
| Basic and diluted net loss per common share | $ (0.84) | $ (1.24) | $ (0.76) |
| Weighted average number of shares used in calculating basic and diluted net loss per common share | 55,427 | 46,407 | 46,072 |

See accompanying notes.

46

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT) AND

COMPREHENSIVE INCOME

| | Common Stock | | Additional Paid-in Capital | Stockholder Notes Receivable | Accumulated Deficit | Deferred Compensation | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| | | | | | (In thousands) | | | |
| Balance at January 1, 2001 | 46,030 | $460 | $ 35,280 | $(5,005) | $(183,989) | $ — | $ (260) | $(153,514) |
| Comprehensive income: | | | | | | | | |
| Net income | — | — | — | — | 12,681 | — | — | 12,681 |
| Unrealized derivative loss | — | — | — | — | — | — | (726) | (726) |
| Foreign currency translation adjustment | — | — | — | — | — | — | 98 | 98 |
| Total comprehensive income | — | — | — | — | 12,681 | — | (628) | 12,053 |
| Interest on stockholder notes receivable | — | — | — | (523) | — | — | — | (523) |
| Stock repurchase | (40) | — | (31) | 210 | — | — | — | 179 |
| Exercise of stock options | 111 | 1 | 87 | — | — | — | — | 88 |
| Issuance of common stock | 64 | 1 | 49 | — | — | — | — | 50 |
| Accretion of dividends on Series A Senior Redeemable and Series B Junior Redeemable Convertible Preferred Stock | — | — | — | — | (47,578) | — | — | (47,578) |
| Balance at December 31, 2001 | 46,165 | 462 | 35,385 | (5,318) | (218,886) | — | (888) | (189,245) |
| Comprehensive income: | | | | | | | | |
| Net income | — | — | — | — | 5,110 | — | — | 5,110 |
| Unrealized derivative gain | — | — | — | — | — | — | 98 | 98 |
| Foreign currency translation adjustment | — | — | — | — | — | — | 2,893 | 2,893 |
| Total comprehensive income | — | — | — | — | 5,110 | — | 2,991 | 8,101 |
| Warrants issued in conjunction with the Series C Senior Redeemable Preferred Stock | — | — | 3,165 | — | (3,165) | — | — | — |
| Interest on stockholder notes receivable | — | — | — | (252) | — | — | — | (252) |
| Exercise of stock options | 487 | 5 | 351 | — | — | — | — | 356 |
| Accretion of dividends on Series A Senior Redeemable, Series B Junior Redeemable Convertible and Series C Senior Redeemable Preferred Stock | — | — | — | — | (59,337) | — | — | (59,337) |
| Balance at December 31, 2002 | 46,652 | 467 | 38,901 | (5,570) | (276,278) | — | 2,103 | (240,377) |
| Comprehensive income: | | | | | | | | |
| Net loss | — | — | — | — | (416) | — | — | (416) |
| | — | — | — | — | | — | 628 | 628 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unrealized derivative gain | | | | | | | |
| Foreign currency translation adjustment | --- | — | — | — | ---- | — | 14,269 | 14,269 |
| Total comprehensive income | — | — | — | — | (416) | — | 14,897 | 14,481 |
| Exercise of stock options | 1,060 | 11 | 684 | — | — | — | — | 695 |
| Accretion of dividends on Series A Senior Redeemable, Series B Junior Redeemable Convertible and Series C Senior Redeemable Preferred Stock | — | — | — | — | (46,327) | — | — | (46,327) |
| Net exercise of warrants | 9,099 | 91 | (91) | — | --- | — | — | — |
| Issuance of shares from initial public offering | 25,145 | 251 | 470,025 | — | — | — | — | 470,276 |
| Stock compensation on acceleration of stock option vesting | — | — | 653 | — | --- | — | — | 653 |
| Interest on stockholder notes receivable | --- | --- | — | (250) | --- | — | — | (250) |
| Deferred compensation | — | --- | 519 | — | — | (519) | — | — |
| Amortization of deferred compensation | --- | — | — | — | --- | 44 | — | 44 |
| Proceeds from stockholder notes receivable | — | — | --- | 5,820 | — | — | — | 5,820 |
| Balance at December 31, 2003 | 81,956 | $820 | $510,691 | $ --- | $(323,021) | $(475) | $17,000 | $ 205,015 |

See accompanying notes.

47

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2002 | 2001 |
| | (In thousands) | | |
| **Cash flows from operating activities** | | | |
| Net income (loss) | $ (416) | $ 5,110 | $ 12,681 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization | 44,753 | 46,953 | 44,096 |
| Amortization of deferred financing costs | 1,282 | 1,315 | 1,072 |
| Stock compensation expense | 3,880 | 532 | 777 |
| Accrued restructuring charges | 692 | 387 | 1,683 |
| Impairment of long-term asset | 20,028 | — | — |
| Provision for (benefit from) deferred income taxes | (19,061) | 823 | 4,453 |
| Write-off of deferred financing charges and loss on settlement of derivative | 8,704 | — | — |
| Loss on retirement of property, plant and equipment | 536 | 288 | 866 |
| Income statement impact of change in value of derivatives | (24) | (248) | 248 |
| Interest on stockholder notes receivable | (250) | (252) | (523) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (1,654) | (9,648) | 14,764 |
| Inventories | (2,339) | 7,493 | 15,629 |
| Prepaid expenses and other assets | 6,483 | 1,060 | (2,423) |
| Receivable from/payable to affiliates | — | 4,307 | (14,203) |
| Accounts payable | 3,561 | 10,079 | (24,968) |
| Accrued expenses and other liabilities | 446 | 3,917 | (2,567) |
| Accrued employee compensation | 4,051 | 8,959 | (9,011) |
| Net cash provided by operating activities | 70,672 | 81,075 | 42,574 |
| **Cash flows from investing activities** | | | |
| Purchases of property, plant and equipment | (26,553) | (21,987) | (20,720) |
| Proceeds from sale of property, plant and equipment | 275 | — | — |
| Purchase of businesses | — | (85,438) | — |
| Changes in other assets | (245) | — | — |
| Designation of restricted cash | — | — | (4,200) |
| Net cash used in investing activities | (26,523) | (107,425) | (24,920) |
| **Cash flows from financing activities** | | | |
| Payments on long-term debt | (230,413) | (13,150) | (1,750) |
| Issuance of common and preferred stock | 470,276 | 75,000 | 250 |
| Proceeds from Senior Term Loan | 125,000 | — | — |
| Redemption of preferred stock | (550,244) | — | — |
| Payments on related-party debt | — | — | (6,000) |
| Payments on long-term payables | (1,401) | (1,759) | (1,830) |
| Proceeds from senior subordinated notes | 200,000 | — | — |
| Stock repurchase, net of stockholder note receivable | — | — | (122) |
| Exercise of stock options for common and preferred stock | 939 | 454 | 270 |
| Deferred financing costs | (11,356) | (2,170) | — |
| Payment to settle derivatives | (788) | — | — |
| Net cash provided by (used in) financing activities | 2,013 | 58,375 | (9,182) |
| Effect of exchange rate changes on cash and cash equivalents | 10,717 | 1,509 | 98 |
| Net increase in cash and cash equivalents | 56,879 | 33,534 | 8,570 |
| Cash and cash equivalents at beginning of year | 62,184 | 28,650 | 20,080 |
| Cash and cash equivalents at end of year | $ 119,063 | $ 62,184 | $ 28,650 |
| **Supplementary cash flow information** | | | |
| Cash paid for interest | $ 16,721 | $ 11,314 | $ 14,776 |
| Cash paid for income taxes (including $8,707 paid to our former parent under tax sharing agreement in 2001) | $ 9,257 | $ 2,455 | $ 9,213 |
| Stock repurchase in exchange for stockholder note receivable | $ — | $ — | $ (210) |
| Unrealized derivative gain (loss), net of income taxes | $ — | $ 98 | $ (726) |

See accompanying notes.

48

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

December 31, 2003

1.    Business and Organization

*Business*

AMIS Holdings, Inc. and its subsidiaries (the Company) are primarily engaged in designing, manufacturing and marketing semi-custom and custom integrated circuits worldwide.

*Organization, Recapitalization and Basis of Presentation*

During 1997, American Microsystems, Inc. (AMI) operated as a subsidiary of Nippon Mining Holdings, Inc. (Nippon Mining). Effective January 1, 1998, AMI merged with Gould Electronics Inc. (GEI), another subsidiary of Nippon Mining, to form a new entity, which became the parent of AMI (the Parent), and was headquartered in Eastlake, Ohio and was a subsidiary of Nippon Mining. AMI and GEI continued to conduct business as American Microsystems, Inc. and Gould Electronics Inc., respectively, and operated as separate business units of the Parent.

Effective July 29, 2000, AMI Spinco, Inc. (Spinco), a newly formed entity, and the Parent entered into a separation agreement (the Separation Agreement) whereby substantially all of the assets and liabilities of AMI and its related operating entities were transferred by the Parent to Spinco in exchange for all of the Series A Preferred Stock of Spinco (see further discussion of the Preferred Stock in Note 14). For the period from July 29, 2000 through December 21, 2000, Spinco operated as a subsidiary of the Parent.

On December 21, 2000, Spinco was recapitalized and certain related transactions were effected (the Recapitalization) pursuant to an agreement (the Recapitalization Agreement) among Spinco, the Parent, certain affiliates of Spinco and the Parent, an affiliate of Citicorp Venture Capital Ltd. (CVC) and an affiliate of Francisco Partners, L.P. (FP). In connection with the Recapitalization, Spinco became a wholly owned operating subsidiary of AMIS Holdings, Inc. (AMIS Holdings) and Spinco was renamed AMI Semiconductor, Inc. (AMIS).

The Recapitalization was effected through the following transactions:

* AMIS Holdings was capitalized with three tranches of capital stock: 46,030,334 shares of common stock; 17,870,100 shares of Series A Senior Redeemable Preferred Stock; and 14,296,084 shares of Series B Junior Redeemable Convertible Preferred Stock.

* The Parent's ownership in Spinco was converted into the following securities of AMIS Holdings: (i) 45,077,001 shares of common stock, (ii) 17,500,000 shares of Series A Senior Redeemable Preferred Stock, and (iii) 14,000,000 shares of Series B Junior Redeemable Convertible Preferred Stock. The Parent was also issued a warrant to purchase an additional 4,603,032 shares of common stock.

* Current and former executives' ownership in Spinco was converted into the following securities of AMIS Holdings: (i) 953,333 shares of common stock, (ii) 370,100 shares of Series A Senior Redeemable Preferred Stock, and (iii) 296,084 shares of Series B Junior Redeemable Convertible Preferred Stock.

* CVC and FP each acquired the following securities of AMIS Holdings directly from the Parent: (i) 17,837,613 shares of common stock, (ii) 6,925,000 shares of Series A Senior Redeemable Preferred Stock, and (iii) 5,540,000 shares of Series B Junior Redeemable Convertible Preferred Stock in exchange for $138,500,000 in cash. Another third-party investment fund acquired the following securities of AMIS Holdings directly from the Parent: (i) 386,374 shares of common stock, (ii) 150,000 shares of Series A Senior Redeemable Preferred Stock, and (iii) 120,000 shares of

49

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Series B Junior Redeemable Convertible Preferred Stock in exchange for $3,000,000 in cash. The aggregate consideration paid by these third parties to the Parent was $280,000,000 in cash.

· AMIS Holdings obtained $175,000,000 in bank debt and used the proceeds for the following: (i) redemption of outstanding Spinco Series B and C Preferred Stock and common stock warrants for total consideration of approximately $6,500,000; (ii) repayment of $72,200,000 of Spinco intercompany debt payable to the Parent; (iii) payment of $40,500,000 to the Parent for a non–compete agreement; (iv) payment of $29,200,000 to the Parent in satisfaction of the remaining liquidation preference on the Spinco Series A Preferred Stock; and (v) payment of Recapitalization related transaction expenses of approximately $24,856,000.

· The Parent agreed to indemnify the Company for certain existing environmental contingencies and to pay certain existing liabilities of the Company. The estimated amount of these obligations at December 21, 2000 was approximately $11,232,000.

As a result of the foregoing transactions, CVC and FP each held approximately 38.8%, the Parent held approximately 19.6% and the remaining stockholders, including certain current and former executive officers, held approximately 2.8% of each class of capital stock of AMIS Holdings immediately subsequent to the Recapitalization.

On September 26, 2003, the Company completed its initial public offering (the "IPO") of 25,145,000 shares of common stock at a price to the public of $20 per share. Net of total offering expenses, the proceeds to the Company were approximately $470,300,000. The Company used the proceeds from the IPO, together with the borrowings under a new $125,000,000 Senior Term Loan, to redeem all of its outstanding shares of preferred stock and options to purchase shares of such preferred stock, redeem 35% of the Senior Subordinated Notes and repay an existing Senior Term Loan. (See further discussion below.) The Company also settled all outstanding stockholder loans.

*Principles of Consolidation*

The consolidated financial statements include the accounts of AMIS Holdings and its subsidiaries. All significant intercompany transactions and accounts have been eliminated. Unrealized gains on intercompany transfers of inventory are eliminated and are recognized only upon sales to third parties.

*Reclassifications*

Certain prior year amounts shown have been reclassified to conform to the current year presentation.

*Reverse Stock Split*

On September 4, 2003, the Company's Board of Directors and stockholders effected a one–for–three reverse split of the Company's outstanding common stock. All share and per share amounts have been retroactively restated in the accompanying consolidated financial statements and notes for all periods presented.

2.    Significant Accounting Policies

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements and the accompanying notes. Actual results may differ from those estimates.

50

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Revenue Recognition*

The Company generally recognizes revenue from products sold directly to end customers when persuasive evidence of an arrangement exists, the price is fixed and determinable, shipment is made and collectibility is reasonably assured. However, in certain situations, the Company ships products through freight forwarders where title does not pass until product is shipped from the freight forwarder. In other situations, by contract, title does not pass until the customer receives the product. In both cases, revenue and related costs are not recognized until title passes to the customer. Estimates of product returns and allowances, based on actual historical experience, the Company's knowledge of potential quality issues and customer feedback, are recorded at the time revenue is recognized and are deducted from revenues. Revenue from contracts to perform engineering design and product development is generally recognized as milestones are achieved, which approximates the percentage-of-completion method. (See Note 10 for further discussion.)

Shipping and handling costs are expensed as incurred and included in cost of sales.

*Research and Development Expense*

Research and development costs are expensed as incurred. Certain specifically defined fundamental and prototype research projects, executed by AMIS-B (see below) in collaboration with other research centers, are partly funded by research and development grants provided by the IWT (Flemish Institute for the enhancement of scientific technologic research in the industry) and the European Commission (the "Authorities"). Such grants are recorded as a reduction to research and development expense as costs are incurred and when it is reasonably assured that all conditions under the grant agreement will be met. Management regularly evaluates whether it is reasonably assured that such conditions will be met.

*Capitalized Software Development Costs for Internal Use*

In accordance with the provisions of Statement of Position (SOP) No. 98-1, "Accounting for the Costs of Software Developed or Obtained for Internal Use," the Company capitalizes internal and external costs to develop or obtain internal use software during the application development stage. Costs incurred during the preliminary project stage are expensed as incurred, as are training and maintenance costs. The Company capitalized approximately $465,000, $10,372,000 and $2,603,000 relating to software costs in 2003, 2002 and 2001, respectively. Amortization is computed using the straight-line method over the estimated useful life of the assets, which has been determined to be three years.

*Concentrations of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of trade receivables. The Company's customers include, but are not limited to, other U.S. and foreign semiconductor manufacturers and manufacturers of computer systems, automobiles, and medical, industrial and telecommunications equipment. Management believes that any significant risk of accounting loss is reduced due to the diversity of its products and end customers. The Company performs ongoing credit evaluations of its customers' respective financial condition and requires collateral, such as prepayments or letters of credit, when deemed necessary. The Company monitors the need for an allowance for doubtful accounts based on historical losses, economic conditions and expected collections of accounts receivable. No one customer accounted for greater than 10% of revenue for the years ended December 31, 2003, 2002, or 2001.

The Company's foreign operations include design and fabrication facilities in Belgium (AMI Semiconductor Belgium BVBA or AMIS-B), product sort and test operations in the Philippines (AMI Semiconductor Philippines, Inc. or AMIS-P) and sales operations and/or product design centers in Germany, the Czech Republic, Hong Kong and Japan.

51

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents. Cash equivalents are stated at cost, which approximates fair value.

*Inventories*

Inventories are stated at the lower of cost (using the first–in, first–out method) or market. The Company provides an allowance for inventories on hand that are in excess of six months of forecasted demand. Forecasted demand is determined based on historical sales or inventory usage, expected future sales or inventory usage using backlog and other projections, and the nature of the inventories. The Company also reviews other inventories for indicators of impairment and provides an allowance as deemed necessary.

The Company also provides an allowance for obsolete inventories, which are written off when disposed of.

*Property, Plant and Equipment*

Property, plant and equipment are stated at cost, including capitalized interest. Any assets acquired as part of the purchase of all or a portion of another company's operations are stated at their relative fair values at the date of acquisition. Depreciation and amortization are computed using the straight–line method over the estimated useful lives of the assets ranging from three to thirty years. Repair and maintenance costs are expensed as incurred.

*Restricted Cash*

Restricted cash is comprised of an escrow account, which was created to provide for the duties and obligations associated with an employment agreement between the Company and its Chief Executive Officer.

*Other Intangibles*

Other intangibles are recorded at the lower of cost or their net realizable value and are being amortized on a straight–line basis over six months to fifteen years.

The following table summarizes the gross carrying amount and accumulated amortization for each major class of intangible assets as of December 31 based on the Company's reassessment of previously recognized intangible assets and their estimated remaining useful lives in conjunction with the adoption of SFAS No. 142 (see below) (in thousands):

|  | 2003 | | 2002 | | |
|  | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization | Useful Life |
|---|---|---|---|---|---|
| Licenses | $68,635 | $59,161 | $ 68,358 | $56,121 | 0.5 to 15 years |
| Non–compete agreement | — | — | 40,500 | 16,422 | 5 years |
| Patents | 770 | 770 | 770 | 732 | 5 years |
| Contracts | 325 | 81 | 325 | 16 | 5 years |
| Total amortizable intangible assets | $69,730 | $60,012 | $109,953 | $73,291 | |

Amortization expense relating to other intangibles, excluding deferred financing costs, was approximately $7,162,000, $10,994,000 and $10,576,000 for the years ended December 31, 2003, 2002 and 2001, respectively. These amounts are allocated between research and development and general and administrative expenses in the accompanying statements of operations, depending on the nature and use of the intangible asset.

52

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The scheduled amortization expense for the next five years is as follows (in thousands): 2004 — $2,427; 2005 — $942; 2006 — $857; 2007 — $833; and 2008 — $784.

### Impairment of Long–Lived Assets

The Company regularly evaluates the carrying amounts of long–lived assets, including its property, plant and equipment and other intangible assets, as well as the related depreciation and amortization periods, to determine whether adjustments to these amounts or to the useful lives are required based on current circumstances or events. The evaluation, which involves significant judgment by management, is based on various analyses including cash flow and profitability projections. To the extent such projections indicate that future undiscounted cash flows are not sufficient to recover the carrying amounts of the related long–lived assets, the carrying amount of the underlying assets will be reduced, with the reduction charged to expense so that the carrying amount is equal to fair value, primarily determined based on future discounted cash flows.

In conjunction with the Recapitalization Agreement, the Company entered into a non–competition agreement with Nippon Mining and its subsidiary (our former Parent). According to this agreement, each of Nippon Mining and its subsidiary agreed to not engage in the custom semiconductor business anywhere in the world through December 2005. During 2003, the Company reached a determination that the carrying value of the non–compete had been impaired based primarily on a change in Nippon Mining's and its subsidiary's business focus and related capabilities such that they did not intend to focus on custom semiconductors. Effective June 26, 2003, the Company released Nippon Mining and its subsidiary from the non–compete agreement and expensed the $20,028,000 remaining unamortized balance of the agreement, which is included as part of the 2003 Restructuring and impairment charges on the accompanying consolidated statements of operations.

### Deferred Financing Costs

Deferred financing costs relate to fees incurred to obtain and amend bank term loans and revolving credit facilities and fees incurred in connection with senior subordinated notes issued in January 2003 (see Note 9). These costs are being amortized to interest expense over the respective lives of the debt issues on a straight–line basis, which approximates the effective interest method. Amortization expense was approximately $1,282,000, $1,315,000 and $1,072,000 for the years ended December 31, 2003, 2002 and 2001, respectively. As explained below, during 2003, the Company repaid the original term loan and a portion of the senior subordinated notes. In connection with this repayment, the Company expensed approximately $7,884,000 of unamortized deferred financing costs, which are included as part of the 2003 Other income (expense) charges on the accompanying consolidated statements of operations.

### Goodwill

Effective January 1, 2002, the Company adopted Statement of Financial Accounting Standards (SFAS) No. 142, "Goodwill and Other Intangible Assets." In accordance with the guidelines of this accounting principle, goodwill and intangible assets with indefinite lives are no longer amortized, but are assessed for impairment on at least an annual basis. The Company completed Step 1 (determining and comparing the fair value of the Company's reporting units to their carrying values) of the annual impairment test. The fair value of the Company's reporting units exceeds their carrying values including goodwill; therefore, no impairment of the Company's goodwill exists and Step 2 does not need to be completed for 2003. As of December 31, 2003 and 2002, the Company's gross goodwill balance is approximately $23,033,000, with accumulated amortization of approximately $21,822,000.

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Provided below is a reconciliation of previously reported financial statement information to adjusted amounts that reflect the elimination of goodwill amortization for the years ended December 31 (in thousands except per share data):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net loss attributable to common stockholders: |  |  |  |
| As reported | $(46,743) | $(57,392) | $(34,897) |
| Add back: Goodwill amortization | — | — | 1,872 |
| Adjusted net loss attributable to common stockholders | $(46,743) | $(57,392) | $(33,025) |
| Adjusted basic and diluted loss per common share | $ (0.84) | $ (1.24) | $ (0.72) |
| Weighted average number of common shares outstanding | 55,427 | 46,407 | 46,072 |

*Foreign Currency*

The U.S. dollar is the functional currency for AMIS–P. Remeasurement adjustments that result from the process of remeasuring this entity's financial statements into U.S. dollars are included in other income (expense) and have not been significant for the years ended December 31, 2003, 2002 and 2001.

The local currencies are the functional currencies for the Company's fabrication facilities, sales operations and/or product design centers in Belgium, Germany, Czech Republic, Hong Kong and Japan. Cumulative translation adjustments that result from the process of translating these entities' financial statements into U.S. dollars are included as a component of comprehensive income and total approximately $17,000,000 and $2,103,000 as of December 31, 2003 and 2002, respectively.

*Income Taxes*

Income taxes are recorded based on the liability method, which requires recognition of deferred tax assets and liabilities based on differences between financial reporting and tax bases of assets and liabilities measured using enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. A valuation allowance is recorded to reduce the deferred tax asset to an amount that is determined to be more likely than not to be realized, based on an analyses of past operating results, future reversals of existing taxable temporary differences and projected taxable income, including tax strategies available to generate future taxable income. The Company's analyses of future taxable income are subject to a wide range of variables, many of which involve management's estimates and therefore the deferred tax asset may not be ultimately realized.

*Stock Options*

The Company has elected to follow the intrinsic value–based method prescribed by Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," (APB 25) and related interpretations in accounting for its employee stock options rather than adopting the alternative fair value accounting provided for under SFAS No. 123, "Accounting for Stock–Based Compensation" (SFAS 123).

Stock compensation expense for options and/or warrants granted to non–employees has been determined in accordance with SFAS 123 and the Emerging Issues Task Force consensus on Issue No. 96–18, "Accounting for Equity Instruments that are Issued to Other than Employees for Acquiring, or in Conjunction with Selling Goods or Services" (EITF 96–18). The fair value of options or warrants granted to non–employees is periodically re–measured as the underlying options or warrants vest.

On December 31, 2002, the FASB issued SFAS No. 148, "Accounting for Stock–Based Compensation — Transition and Disclosure." SFAS No. 148 amends SFAS No. 123, "Accounting for Stock–Based

54

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Compensation," to provide alternative methods of transition to SFAS No. 123's fair value method of accounting for stock–based employee compensation. SFAS No. 148 also amends the disclosure provisions of SFAS No. 123 and APB Opinion No. 28, "Interim Financial Reporting," to require disclosure in the summary of significant accounting policies of the effects of an entity's accounting policy with respect to stock–based employee compensation on reported net income and earnings per share in annual and interim financial statements. While SFAS No. 148 does not amend SFAS No. 123 to require companies to account for employee stock options using the fair value method, the disclosure provisions of SFAS No. 148 are applicable to all companies with stock–based employee compensation, regardless of whether they account for that compensation using the fair value method of SFAS No. 123 or the intrinsic value method of APB Opinion No. 25, "Accounting for Stock Issued to Employees."

The following table provides pro forma information for the years ended December 31 that illustrates the net income (loss), net loss attributable to common stockholders (in thousands, except per share data), and net loss per common share as if the fair value method had been adopted under SFAS No. 123.

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net income (loss) as reported | $ (416) | $ 5,110 | $ 12,681 |
| Less: Stock compensation expense determined under the fair value method, net of related tax effects | (301) | (383) | (489) |
| Add: Compensation expense associated with accelerated stock options, net of related tax effects | 385 | — | — |
| Amortization of deferred compensation, net of related tax effects | 26 | — | — |
| Pro forma net income (loss) | (306) | 4,727 | 12,192 |
| Preferred stock dividend as reported | (46,327) | (62,502) | (47,578) |
| Pro forma net loss attributable to common stockholders | $ (46,633) | $ (57,775) | $ (35,386) |
| Net loss per common share: |  |  |  |
| Basic and diluted as reported | $ (0.84) | $ (1.24) | $ (0.76) |
| Pro forma basic and diluted | $ (0.84) | $ (1.24) | $ (0.77) |

The weighted–average fair value of options granted during the years ended December 31, 2003, 2002 and 2001 was $2.16, $0.09 and $0.12, respectively. The fair value of these options was estimated at the date of grant using the Black Scholes Value option pricing model subsequent to the IPO in 2003 and the Minimum Value option pricing model prior to the IPO. The following weighted–average assumptions were used for 2003, 2002 and 2001, respectively: risk–free interest rates of 2.07%, 2.88% and 4.37%, dividend yield of 0%, a weighted–average expected life of the options of 2.5 years and a volatility factor of 8% for 2003 and 0% for 2002 and 2001.

The Black–Scholes option valuation model was developed for use in estimating the fair value of traded options that have no vesting restrictions and that are fully transferable. In addition, option valuation models require the input of highly subjective assumptions including expected stock price volatility. Because AMIS' stock options have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect their fair value, in management's opinion, the existing models do not necessarily provide a reliable measure of the fair value of stock options.

For purposes of pro forma disclosures, the estimated fair value of the options is amortized on a straight–line basis over the options' vesting period. Because the effect of SFAS 123 is prospective, the impact on pro forma net income and earnings per share may not be representative of compensation expense in future years.

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Earnings Per Share*

Options to purchase 4,865,119; 5,491,034 and 5,126,102 shares of common stock and warrants to purchase 4,674,735; 13,787,883 and 4,603,032 shares of common stock were outstanding as of December 31, 2003, 2002 and 2001, respectively, but were not included in the computation of diluted earnings per share as the effect would be antidilutive because of the net loss attributable to common stockholders recorded during 2003, 2002 and 2001.

*Derivatives*

In 1998, the Financial Accounting Standards Board (FASB) issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," which was subsequently amended by SFAS No. 137, "Accounting for Derivative Financial Instruments and Hedging Activities — Deferral of the Effective Date of SFAS No. 133," and SFAS No. 138, "Accounting for Certain Derivative Instruments and Certain Hedging Activities." SFAS No. 133 establishes accounting and reporting standards requiring that every derivative instrument, including certain derivative instruments embedded in other contracts, be recorded in the balance sheet as either an asset or liability and measured at its fair value. The statement also requires that changes in the derivative's fair value be recognized in earnings unless specific hedge accounting criteria are met. The Company has followed the guidance of SFAS No. 133 in accounting for its derivative instruments entered into in June 2001. (See Note 15 for further discussion.)

*Recent Accounting Pronouncements*

The Company has reviewed all recently issued accounting standards, which have not yet been adopted, in order to determine their potential effect, if any, on the results of operations of financial position of the Company. Based on that review, the Company does not currently believe that any of these recent accounting pronouncements will have a significant effect on its current or future financial position, results of operations, cash flows or disclosures.

3.  **Purchase of the Mixed Signal Business of Alcatel Microelectronics from STMicroelectronics**

On June 26, 2002, the Company acquired the assets and assumed certain liabilities of the mixed signal business (MSB) of Alcatel Microelectronics NV from STMicroelectronics NV (the MSB acquisition) in a purchase that closed concurrently with STMicroelectronics' purchase of 100% of the capital stock of Alcatel Microelectronics NV from Alcatel S.A. The results of MSB have been consolidated with the Company since the date of acquisition. The Company used existing cash along with the proceeds from the issuance of $75,000,000 of Series C Preferred Stock to finance the purchase price.

Following is a summary of the MSB purchase price (in thousands):

| | |
|---|---|
| Cash paid to STMicroelectronics | $  68,300 |
| Acquisition related expenses | 11,200 |
| Restructuring accrual | 4,600 |
| Operating liabilities assumed (including accounts payable of approximately $8,300, accrued compensation of approximately $7,100 and other accrued expenses of approximately $3,700) | 19,100 |
| Total purchase price | $103,200 |

The foregoing purchase price includes the allocation of certain operating liabilities between MSB and STMicroelectronics. Additionally, as part of the MSB acquisition, the Company prepared and approved a plan of restructuring in connection with the integration of MSB into the Company and included the costs of those

56

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

restructuring activities in the purchase price pursuant to EITF No. 95-3, "Recognition of Liabilities in Connection with a Purchase Business Combination." The restructuring costs that have been accrued and included in the purchase price primarily include costs associated with relocating and combining MSB's testing facilities with the Company's existing facilities. The majority of these costs relate to employee severance. As of December 31, 2003, the Company had terminated 42 employees as part of this transfer of the testing facilities. This relocation was substantially completed during 2003. Additional costs, which were substantially paid in 2002, represent employee severance for 79 MSB employees that had duplicative responsibilities as those of the Company's employees and were terminated as part of the Company's plan.

Following is a rollforward of the restructuring accrual from acquisition date to December 31, 2003 (in thousands):

|  | Restructuring Accrual at June 26, 2002 | Paid in 2002 | Restructuring Accrual at December 31, 2002 | Paid in 2003 | Restructuring Accrued at December 31, 2003 |
|---|---|---|---|---|---|
| Employee severance costs | $3,700 | $(1,500) | $2,200 | $(2,200) | $  — |
| Transfer of ownership taxes | 800 | (800) | — | — | — |
| Other | 100 | (100) | --- | — | --- |
| Total | $4,600 | $ 2,400 | $2,200 | $(2,200) | $  — |

Following is a summary of the allocation of the MSB purchase price (in thousands):

| | |
|---|---|
| Trade accounts receivable | $  18,300 |
| Inventory | 19,500 |
| Prepaid and other assets | 13,200 |
| Deferred pension asset | 11,600 |
| Property, plant and equipment | 32,300 |
| Intangible assets | 8,300 |
| Total purchase price allocated | $103,200 |

The foregoing allocation is based on the fair values of the assets acquired, including valuations of intangible assets completed by the Company's independent financial consulting firm, LECG, LLC, and the final allocation of certain trade receivables between MSB and STMicroelectronics. The intangible assets acquired through the MSB acquisition consist of licensed technology and a contract. The contract was amortized over six months, the life of the contract, and the licensed technology is being amortized over 15 years.

Unaudited pro forma information as if MSB had been acquired on January 1, 2001 is as follows for the years ended December 31 (rounded, in thousands, except per share data). The pro forma information is not necessarily indicative of the results of operations had the acquisition actually occurred on the assumed acquisition date.

|  | 2002 | 2001 |
|---|---|---|
| Revenue | $ 400,400 | $ 460,700 |
| Net income | 1,400 | 9,300 |
| Net loss attributable to common stockholders | (61,100) | (38,300) |
| Loss per share attributable to common stockholders: |  |  |
| Basic and diluted | (1.32) | (0.83) |

57

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

4.    Inventories

Inventories consist of the following as of December 31 (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| Raw materials | $  5,307 | $  7,368 |
| Work–in–process | 27,213 | 23,657 |
| Finished goods | 13,079 | 8,336 |
|  | $45,599 | $39,361 |

5.    Property, Plant and Equipment

Property, plant and equipment consists of the following as of December 31 (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| Land and buildings | $  63,094 | $  63,415 |
| Machinery and equipment | 386,004 | 379,631 |
| Construction–in–progress | 12,326 | 2,185 |
|  | 461,424 | 445,231 |
| Less accumulated depreciation | (255,515) | (222,724) |
|  | $ 205,909 | $ 222,507 |

Depreciation expense related to property, plant and equipment was approximately $37,657,000, $35,959,000 and $31,648,000 for the years ended December 31, 2003, 2002 and 2001, respectively.

6.    Accrued Expenses and Other Long–Term Liabilities

Accrued expenses consist of the following as of December 31 (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| Reserve for restructuring charges | $    856 | $  3,183 |
| Reserve for product development project losses | 6,281 | 4,660 |
| Research and development grant payable | 3,596 | 2,984 |
| Preferred stock dividend payable | — | 2,805 |
| Property, sales and use and other taxes | 1,736 | 2,442 |
| Employee medical insurance reserve | 1,000 | 1,766 |
| Accrued sales representatives' commissions | 884 | 1,107 |
| Interest payable | 6,045 | 162 |
| Other | 4,575 | 4,671 |
|  | $24,973 | $23,780 |

58

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Other long-term liabilities consist of the following as of December 31 (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| Unrealized loss on derivatives | $ — | $ 1,064 |
| Liability for purchase of developed technology |  | 1,484 |
| Other long-term liabilities | 360 | 540 |
|  | $ 360 | $ 3,088 |

**7. Commitments**

The Company leases certain facilities and equipment under noncancelable operating lease arrangements, some of which include various renewal options and escalation clauses. During the years ended December 31, 2003, 2002 and 2001, rental expense under such arrangements was approximately $6,650,000, $2,509,000 and $3,266,000, respectively.

Approximate future minimum annual rental commitments at December 31, 2003 are as follows: 2004 — $6,003,000; 2005 — $2,791,000; 2006 — $1,582,000; 2007 — $1,155,000; and 2008 — $741,000.

In order to achieve more favorable pricing and ensure delivery when demanded, the Company contracts for certain chemicals, raw materials, and services at fixed prices but not fixed quantities. These contracts are renegotiated on either a quarterly or annual basis. As no fixed quantities are required and terms are less than one year, no reportable commitment is deemed to exist for these contracts.

From time to time, the Company enters into contracts with customers in which the Company provides some indemnification to the customer in the event of claims of patent or other intellectual property infringement resulting from the customer's use of the Company's technology. Such provisions are customary in the semiconductor industry and do not reflect an assessment by the Company of the likelihood of a claim. The Company has not recorded a liability for potential obligations under these indemnification provisions and would not record such a liability unless the Company believed that the likelihood of a material obligation was probable.

**8. Transactions with Related Parties**

Pursuant to the terms of the Recapitalization Agreement, the Company entered into advisory agreements with affiliates of Citigroup Venture Capital Equity Partners, L.P. (CVC) and Francisco Partners, L.P. (Francisco Partners) (the Sponsors) pursuant to which the Sponsors may provide financial, advisory and consulting services to the Company. For 2002 and 2001, expenses totaling $2,000,000 were recorded related to these advisory agreements. For 2003, expenses totaling approximately $1,500,000 were recorded related to these advisory agreements. During September 2003, the Company entered into amendments to these advisory agreements whereby the annual advisory fees payable under these agreements ceased. The amendments called for a one-time payment of $8,500,000 for investment banking and financial advisory services, which was paid in September 2003 and is included in nonrecurring charges in the accompanying statements of operations.

In 1999, Nippon Mining entered into an agreement with a major semiconductor manufacturer pursuant to which the semiconductor manufacturer provides certain technology and related technological assistance to the Company. The Company agreed to reimburse Nippon Mining for the amounts due under the agreement, which is denominated in yen, totaling approximately ¥1,000,000,000 (or $9,515,000) over a five-year period. Under the Recapitalization Agreement, Nippon Mining's subsidiary agreed to pay one-half of the remaining outstanding obligation to this major semiconductor manufacturer. As of December 21, 2000, the effective date of the Recapitalization Agreement, the obligation totaled approximately ¥775,000,000, or $6,778,000 using an

59

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

estimated exchange rate of approximately $0.00875/¥. Consequently, the Company recorded a contra-liability of $3,389,000, representing the portion of the obligation that Nippon Mining's subsidiary agreed to pay.

As of December 31, 2003, the remaining obligation, which is scheduled to be paid in 2004, was approximately ¥100,000,000, or $935,000 using an estimated exchange rate of approximately $0.00935/¥. The contra-liability as of December 31, 2003 was $1,100,000, representing one-half of the liability remaining and one-half of those items paid by the Company, but not yet invoiced to Nippon Mining's subsidiary during 2003.

Also, in conjunction with the Recapitalization Agreement, Nippon Mining's subsidiary agreed to indemnify the Company for any property tax, foreign tax and sales and use tax obligations outstanding at December 21, 2000 (totaling approximately $6,343,000). As of December 31, 2003, the Company had remaining accruals of approximately $275,000 in accrued expenses and a corresponding receivable of $1,729,000 representing remaining accruals and those items paid by the Company, but not yet invoiced to Nippon Mining's subsidiary, during 2003. As of December 31, 2002, the Company had remaining accruals of approximately $1,729,000 for these obligations in taxes payable and accrued expenses in the accompanying consolidated balance sheet and had recorded an offsetting receivable from affiliate for this amount.

Certain retention and incentive plans were instituted as part of the Recapitalization. In accordance with these plans, $2,838,000 was paid out to certain executives of the Company in 2001 and 2000. Such amounts were reimbursed by Nippon Mining's subsidiary in accordance with the Recapitalization Agreement.

9.    Long-Term Debt

In conjunction with the Recapitalization Agreement entered into in December 2000, AMI Semiconductor, Inc., the Company's wholly owned subsidiary, obtained $250,000,000 of Senior Secured Credit Facilities consisting of a $75,000,000 Revolving Credit Facility and a $175,000,000 Term Loan. At December 31, 2002 approximately $160,100,000 was outstanding under the Term Loan. The Company used proceeds from the issuance of the Senior Subordinated Notes (see discussion below) to pay approximately $111,800,000 on the Term Loan in January 2003 and proceeds from the IPO and the new Term Loan (see discussion below) to pay the balance outstanding under the Term Loan of approximately $39,900,000 in September 2003.

On September 26, 2003, the Company and AMIS entered into amended and restated Senior Secured Credit Facilities (the Facilities) consisting of a $125,000,000 Term Loan and an extension of the Revolving Credit Facility, discussed above, increasing the amount available to $90,000,000. The new Term Loan requires a principal payment of $312,500, together with accrued and unpaid interest, on the last day of March, June, September and December, with the balance due on September 26, 2008. The Revolving Credit Facility ($20,000,000 of which may be in the form of letters of credit) is available for working capital and general corporate purposes. As of December 31, 2003, no amount was drawn on the Revolving Credit Facility.

The interest rate on the new Term Loan at December 31, 2003 was 3.64%. The interest rate on the original Term Loan at December 31, 2002 was 5.2% with an effective rate of 6.5% after considering the impact of certain hedging arrangements. As discussed in Note 15, no hedging arrangements existed as of December 31, 2003.

The Facilities require the Company to maintain a consolidated interest coverage ratio and a maximum senior leverage ratio and contain certain other nonfinancial covenants, all as defined within the credit agreement, as amended. The Facilities also generally restrict payment of dividends to parties outside of the consolidated entity. The Company was in compliance with these covenants as of December 31, 2003.

The Facilities are unconditionally guaranteed by AMIS Holdings and each existing domestic subsidiary and by each subsequently acquired or organized domestic subsidiary. The Facilities are secured by substantially all of the assets of the domestic subsidiaries including but not limited to: (a) a first-priority pledge of (i) all the capital stock of AMI Semiconductor, and (ii) all the capital stock of any subsidiary

60

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

guarantor, and (b) perfected first–priority security interests in substantially all tangible and intangible assets of AMI Semiconductor and each guarantor.

On January 29, 2003, AMIS issued $200,000,000 aggregate principal amount of 10 3/4% Senior Subordinated Notes maturing on February 1, 2013 (Senior Subordinated Notes). The proceeds were used to repay approximately $111,800,000 of the original Term Loan and redeem the Series C Preferred Stock for a total, including cumulative dividends, of approximately $80,764,000. Interest on the Senior Subordinated Notes is payable semi–annually on February 1 and August 1 of each year, commencing August 1, 2003.

AMIS cannot redeem the Senior Subordinated Notes before February 1, 2008 except that, until February 1, 2006 AMIS can choose to redeem up to an aggregate of 35% of the sum of the original principal amount of the Senior Subordinated Notes and the original principal amount of any other Senior Subordinated Notes issued under the same indenture, with money AMIS raises in certain equity offerings or receives as a capital contribution from the Company, as long as: (i) AMIS pays the holders of the Senior Subordinated Notes a redemption price of 110.75% of the principal amount of the Senior Subordinated Notes it redeems, plus accrued interest to the date of redemption; (ii) at least 65% of the original aggregate principal amount of the Senior Subordinated Notes and such other Senior Subordinated Notes issued remains outstanding after each such redemption; and (iii) AMIS redeems the Senior Subordinated Notes within 90 days of completing the equity offering or receiving the capital contribution. On or after February 1, 2008, AMIS can redeem some or all of the Senior Subordinated Notes at certain specified prices, plus accrued interest to the date of redemption.

On November 1, 2003, the Company used proceeds from the IPO and the new Term Loan to redeem 35% of the Senior Subordinated Notes for $77,525,000, plus accrued interest to the date of redemption. This amount includes the aforementioned premium of 10.75% of the principal amount, which was charged to expense in 2003. In connection with the repayment of the Senior Subordinated Notes, the Company wrote off approximately $2,773,000 of deferred financing costs. The premium and write–off of the deferred financing costs were charged to Other income (expense) in 2003 on the accompanying consolidated statements of operations. As of December 31, 2003, the remaining balance of the Senior Subordinated Notes of $130,000,000 had a fair market value of approximately $154,700,000.

If AMIS experiences a Change of Control (as such term is defined in the indenture governing the Senior Subordinated Notes), subject to certain conditions, AMIS must give holders of the Senior Subordinated Notes an opportunity to sell to AMIS the Senior Subordinated Notes at a purchase price of 101% of the principal amount of the Senior Subordinated Notes, plus accrued interest.

The payment of the principal, premium and interest on the Senior Subordinated Notes is fully and unconditionally guaranteed on a senior subordinated basis by the Company and AMIS' existing and future domestic restricted subsidiaries that have outstanding or incur certain indebtedness. The guarantee by the Company and AMIS' domestic restricted subsidiaries is subordinated to all of the Company's existing and future Senior Indebtedness (as such term is defined in the indenture governing the Senior Subordinated Notes) and the existing and future Senior Indebtedness of AMIS' domestic restricted subsidiaries, including their guaranty of AMIS' obligations under the Facilities.

The indenture governing the Senior Subordinated Notes contains covenants that, among other things, (i) limit AMIS' ability and certain of its subsidiaries' ability to incur additional indebtedness; (ii) pay dividends on AMIS' capital stock or redeem, repurchase or retire AMIS' capital stock or subordinated indebtedness; (iii) make investments; (iv) engage in transactions with affiliates; (v) sell assets, including capital stock of subsidiaries; and (vi) consolidate, merge or transfer assets.

The Senior Subordinated Notes are unsecured and subordinated to existing and future Senior Indebtedness (as such term is defined in the indenture governing the Senior Subordinated Notes) of AMIS. The

61

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Senior Subordinated Notes will rank *pari passu* in right of payment with any future senior subordinated indebtedness AMIS might issue and rank senior to any other subordinated indebtedness AMIS might issue.

In connection with the issuance of the Senior Subordinated Notes, the Company paid underwriting fees and other transaction costs of approximately $7,800,000 that were capitalized and are being amortized over the term of the notes. In connection with the new Term Loan, the Company paid underwriting fees and other transaction costs of approximately $3,600,000 that were capitalized and are being amortized over the term of the loan. In connection with the repayment of the original Term Loan, the Company expensed approximately $3,700,000 of unamortized deferred financing costs in February 2003 and approximately $1,400,000 in September 2003, which were charged to Other income (expense) in 2003 on the accompanying consolidated statements of operations.

**10.    Customer–Funded Product Development Activities**

Customer–funded product development activities are accounted for as contracts. The Company evaluates individual contracts and, where appropriate, records an accrual for any contracts that individually are expected to result in an overall loss. Revenue earned and costs incurred on product development contracts for the years ended December 31, 2003, 2002 and 2001, are as follows: 2003 — $34,645,000 and $25,840,000, respectively 2002 — $30,495,000 and $23,557,000, respectively; and 2001 — $26,059,000 and $20,677,000, respectively.

**11.    Provision for Income Taxes**

The provision for income taxes for the years ended December 31 is as follows (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Federal: | | | |
| Current | $ 11 | $ 10 | $ (306) |
| Deferred | (12,522) | (202) | 4,316 |
| | (12,511) | (192) | 4,010 |
| State: | | | |
| Current | 2 | 1 | (53) |
| Deferred | (2,147) | (34) | 740 |
| | (2,145) | (33) | 687 |
| Foreign: | | | |
| Current | 11,372 | 331 | 1,548 |
| Deferred | (4,759) | 1,059 | (603) |
| | 6,613 | 1,390 | 945 |
| Total | $ (8,043) | $ 1,165 | $ 5,642 |

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The provision (benefit) for income taxes differs from the amount computed by applying the federal statutory income tax rate of 35% for the following years ended December 31 as follows (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Federal tax at statutory rate | $(2,960) | $ 2,196 | $ 6,413 |
| State taxes (net of federal benefit) | (508) | 376 | 1,099 |
| Foreign taxes, net of federal impact | (6,259) | (1,564) | 719 |
| Nondeductible goodwill amortization | — | — | 768 |
| Change in valuation allowance | 1,869 | — | (3,728) |
| Other, net | 185 | 157 | 371 |
| Total | $(8,043) | $ 1,165 | $ 5,642 |
| Effective tax rate | (95.1)% | 18.6% | 30.8% |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and liabilities are as follows as of December 31 (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| Deferred tax assets: |  |  |
| Foreign research and development investment deduction | $ 10,827 | $ 4,448 |
| Reserves not currently deductible | 7,945 | 6,274 |
| Intangible asset basis difference | 78,078 | 74,731 |
| Net operating loss carryforwards | 37,578 | 20,869 |
| Tax credit carryforwards | 2,409 | — |
| Inventory valuation | 968 | — |
| Other | 401 | 3,484 |
| Total deferred tax assets | 138,206 | 109,806 |
| Deferred tax liabilities: |  |  |
| Tax in excess of book depreciation | (33,420) | (30,352) |
| Inventory valuation | — | (1,645) |
| Prepaid pension asset | (4,430) | (4,759) |
| Other | (2,496) | (1,404) |
| Total deferred tax liabilities | (40,346) | (38,160) |
|  | 97,860 | 71,646 |
| Valuation allowance | (50,246) | (43,200) |
| Net deferred tax assets | $ 47,614 | $ 28,446 |

Pretax income from foreign operations was approximately $31,395,000 for 2003, $7,199,000 for 2002, and $552,000 for 2001. As of December 31, 2003, unremitted pretax earnings of certain foreign subsidiaries in the amount of approximately $54,000,000 is considered by the Company to be permanently invested outside the U.S. and, accordingly, U.S. income taxes have not been provided on this amount.

The separation of AMI from the Parent on July 29, 2000 was effected as a taxable transaction. Accordingly, the assets and liabilities of AMI were revalued for tax purposes to their fair value at July 29,

63

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

2000. The increase in the tax basis of the assets as a result of this transaction gave rise to an increase in the Company's deferred tax assets of approximately $159,192,000. A valuation allowance of $78,450,000 was established to reduce the deferred tax asset to an amount that is more likely than not to be realized. This net increase was credited to additional paid–in capital as of July 29, 2000 in connection with this transaction.

The December 21, 2000 Recapitalization was treated as an asset acquisition for tax purposes; therefore, the assets and liabilities of Spinco were restated for tax purposes to their fair value at December 21, 2000. The decrease in the tax basis of the assets as a result of the Recapitalization caused a decrease in the Company's deferred tax assets of $60,723,000. The valuation allowance also decreased by $31,522,000. The reduction in the deferred tax assets, net of the valuation allowance, as of December 21, 2000, was offset against equity, in connection with the Recapitalization.

As of December 31, 2003, 2002 and 2001, the Company prepared an analysis of projected future taxable income, including tax strategies available to generate future taxable income. Based on that analysis, the Company believes its valuation allowance reduces the net deferred tax asset to an amount that will more likely than not be realized.

In 2003, 2002 and 2001, the Company generated approximately $90,764,000 of state and federal net operating loss carryforwards. If not used, it is expected that the majority of these carryforwards will begin to expire in 2021. In 2002, the Company generated approximately $4,300,000 of foreign net operating loss carryforwards. Under the "change of ownership" provisions of the Internal Revenue Code utilization of the Company's net operating loss carryforwards are subject to an annual limitation. Approximately $365,000 of these foreign net operating loss carryforwards remain as of December 31, 2003. The tax credit carryforwards include federal and state research and development and state investment tax credits, which begin expiring in 2015.

12.    Employee Benefit Plans

*Retirement Plan — AMIS–P*

AMIS–P has a noncontributory defined benefit retirement plan (the Plan) for the benefit of all permanent employees in the Philippines. The Plan provides employees with a lump–sum retirement benefit equivalent to one month's salary per year of service based on the final monthly gross salary before retirement. Total benefit obligations under the Plan and contributions to the Plan are not material to the consolidated financial statements.

*Defined Contribution Plan — AMIS Holdings*

As of January 1, 2001, substantially all United States employees are eligible to participate in a 401(k) plan sponsored by AMIS Holdings. This plan requires the Company to match 50% of employee contributions, as defined, up to 6% of the employee's annual salary. For the years ended December 31, 2003, 2002 and 2001, employer contributions totaled approximately $1,660,000, $1,531,000, and $1,643,000, respectively.

*Defined Contribution Plan — AMIS–B*

Certain Belgian employees are eligible to participate in a defined contribution plan sponsored by AMIS–B. Under the terms of the plan, AMIS–B is required to contribute amounts based on each respective employee's pay grade. For the years ended December 31, 2003 and 2002, employer contributions totaled approximately $592,000 and $237,000.

64

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Defined Benefit Plan — AMIS--B*

Certain Belgian employees are also eligible to participate in a defined benefit retirement plan. The benefits of this plan are for all professional employees who are at least 20 years old and have an employment agreement for an indefinite period of time. The prepaid pension asset recorded on the accompanying 2003 and 2002 balance sheets represents the amount of the net assets in the pension fund in excess of the post–retirement obligation.

The following disclosures regarding this pension plan are based upon an actuarial valuation prepared for the period from June 26, 2002 to December 31, 2002 and for the year ended December 31, 2003 (in thousands):

| | Year Ended December 31, 2003 | Period from June 26, 2002 to December 31, 2002 |
|---|---|---|
| **Change in benefit obligation:** | | |
| Benefit obligation at beginning of period | $ 15,950 | $ 14,801 |
| Service cost | 1,889 | 876 |
| Interest cost | 1,035 | 446 |
| Benefits, administrative expenses and premiums paid | (403) | — |
| Actuarial gain | (140) | (1,142) |
| Foreign currency translation loss | 3,585 | 969 |
| Benefit obligation at end of period | 21,916 | 15,950 |
| **Change in plan assets:** | | |
| Fair value of plan assets at beginning of period | $ 28,479 | $ 26,450 |
| Actual return on plan assets | 949 | 299 |
| Benefits, administrative expenses and premiums paid | (403) | — |
| Foreign currency translation gain | 5,970 | 1,730 |
| Fair value of plan assets at end of period | 34,995 | 28,479 |
| Excess of plan assets over benefit obligation | 13,079 | 12,529 |
| Unrecognized net actuarial gain (loss) | 21 | (644) |
| Foreign currency translation gain (loss) | 3 | (38) |
| Prepaid pension asset | $ 13,103 | $ 11,847 |
| **Components of net periodic benefit cost:** | | |
| Service cost | $ 1,889 | $ 876 |
| Interest cost | 1,035 | 446 |
| Expected return on plan assets | (1,847) | (797) |
| Net periodic pension cost | $ 1,077 | $ 525 |
| **Weighted average assumptions:** | | |
| Discount rate | 6.00% | 6.00% |
| Expected return on plan assets | 6.00% | 6.00% |
| Compensation rate increase | 5.00% | 5.00% |

65

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Collective Bargaining Agreements*

As of December 31, 2003, the employees located in Belgium, representing 36% of the Company's worldwide labor force, are represented by unions and have collective bargaining arrangements at the national, industry and company levels.

### 13.    Contingencies

The Company is subject to various claims and legal proceedings covering matters that arise in the ordinary course of its business activities. Management believes any liability that may ultimately result from the resolution of these matters will not have a material adverse effect on the Company's consolidated financial position, operating results, or cash flows.

In addition, the Company is a "primary responsible party" to an environmental remediation and cleanup at its former corporate headquarters in Santa Clara, California (see discussion below regarding indemnification by Nippon Mining's subsidiary). Costs incurred by the Company include implementation of the clean-up plan, operations and maintenance of remediation systems, and other project management costs. Management's estimate of the remaining cost to fulfill its obligations under the remediation effort, as determined in consultation with its environmental consultants and the governing regulatory agency, is $540,000. The Company has accrued $540,000 at December 31, 2003 and $720,000 at December 31, 2002. The short-term portion of this accrual, or $180,000, is included in accrued expenses and the long-term portion, or $360,000 is included in other long-term liabilities within the accompanying consolidated balance sheets. Due to the inherent uncertainties surrounding a contingency of this nature, there exists a reasonable possibility that such estimates could change in the near term.

In conjunction with the Recapitalization Agreement, Nippon Mining's subsidiary agreed to indemnify the Company for any obligation relating to this environmental issue. In accordance with Statement of Position (SOP) No. 96-1, "Environmental Remediation Liabilities," because amounts to be paid by the Company and reimbursed by Nippon Mining's subsidiary are not fixed and determinable, the Company has not offset the receivable from Nippon Mining's subsidiary against the estimated liability on the consolidated balance sheets. Therefore, a receivable from Nippon Mining's subsidiary is recorded for $540,000 and $720,000 on the accompanying consolidated balance sheets as of December 31, 2003 and 2002, respectively, related to this matter.

### 14.    Stockholders' Equity (Deficit)

*Common and Preferred Stock*

In accordance with the Recapitalization Agreement dated December 21, 2000, the Company issued 46,030,334 shares of its 133,333,333 authorized shares of common stock, 17,870,107 shares of its 20,000,000 authorized shares of Series A Senior Redeemable Preferred Stock (Senior Preferred Stock) and 14,296,086 shares of its 20,000,000 authorized shares of Series B Junior Redeemable Convertible Preferred Stock (Junior Preferred Stock). As discussed in Note 1, during 2003 the Company used the proceeds from the IPO, together with the borrowings under a new $125,000,000 Senior Term Loan, to redeem all of its outstanding shares of Senior Preferred Stock, Junior Preferred Stock, options to purchase shares of such preferred stock and associated cumulative dividends for approximately $469,480,000, net of stockholder notes receivable.

The Senior Preferred Stock holders and Junior Preferred Stock holders were entitled to cumulative quarterly dividends when, as and if declared by the Board of Directors in an amount per share equal to 13.5% and 14.5%, respectively, of the accreted value per annum. The accreted value was $10 per share plus the amount of any cumulative unpaid dividends. As of December 31, 2002, cumulative unpaid dividends for totaled approximately $103,648,000.

66

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In order to fund a portion of the MSB acquisition described in Note 3, the Company issued 75,000 shares of Series C Senior Redeemable Preferred Stock (Series C Preferred Stock) on June 26, 2002 resulting in net proceeds to the Company of $75,000,000. The Series C Preferred Stock was entitled to quarterly cash dividends when, as and if declared by the Board of Directors. Such dividends were cumulative, whether or not earned or declared, and accrued at an annual compounding rate of 12.0%, and 16.0% after December 27, 2002, because the Series C Preferred Stock had not been redeemed by December 26, 2002. As of December 31, 2002 cumulative unpaid dividends totaled approximately $4,513,000. As discussed in Note 9, during 2003, the Company used proceeds from the Senior Subordinated Notes to redeem the Series C Preferred Stock for a total, including cumulative dividends, of approximately $80,764,000.

The Company grants stock options pursuant to its Amended and Restated 2000 Equity Incentive Plan, which was originally adopted by Spinco on July 29, 2000. In general, options granted vest over three and a half to four years. In 2003, the Board of Directors amended and restated the 2000 Equity Incentive Plan and revised the share reserve such that it shall not exceed in the aggregate 11,853,635 shares of common stock, plus an annual increase on the first day of each fiscal year during the term of the Plan beginning January 1, 2005 through January 1, 2010, in each case in an amount equal to the lesser of (i) 1,829,300 shares, (ii) 2.5% of the number of shares of common stock outstanding on such date, or (iii) an amount determined by the Board.

Effective September 20, 2000, certain key executives (with Board approval) executed early exercise stock purchase agreements with Spinco to exercise options granted to them during 2000 in exchange for full recourse notes. The notes bore interest at an annual rate of 7% and payment of principal and interest was due September 20, 2005. The notes and all unpaid interest were fully secured by the underlying stock and the Company had full recourse against the borrowers in the event of default. In connection with this arrangement, the following shares were issued: 953,333 shares of common stock, 370,100 shares of Senior Preferred Shares and 296,084 shares of Junior Preferred Shares. In connection with the redemption of the Senior Preferred Shares and Junior Preferred Shares in 2003, all notes were repaid by offsetting the amounts paid for the redemption by the full amount of the notes.

In conjunction with the recapitalization in December 2000, outstanding options to purchase common stock of Spinco were converted to options to purchase a unit consisting of the following shares of AMIS Holdings: (a) two–thirds of a share of common stock, (b) .2588164 shares of Series A Senior Preferred Stock and (c) .2070531 shares of Series B Junior Preferred Stock. As discussed above, using proceeds from the IPO and the new Term Loan, all options for preferred stock were redeemed during September 2003. As part of this redemption, the Company recognized compensation expense of approximately $2,901,000 during the third quarter of 2003, which is included in nonrecurring charges on the accompanying statement of operations.

Under the guidance of Financial Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation — An Interpretation of APB Opinion 25," to the extent that the exercise price of the original options, as compared to the fair value of the underlying stock at the time of the Recapitalization, is consistent with the relationship of the exercise price of the replacement options to the fair value of the underlying stock, a new measurement date does not exist and no compensation expense is required to be recorded at the time of the Recapitalization. However, under the terms of the replacement options, the exercise price of the Senior and Junior Preferred Stock portions of the units increases as dividends accrete on the underlying Senior and Junior Preferred Stock. As such, these components of the unit are variable. Therefore, compensation expense is measured and recorded each period based upon the incremental change in the exercise price of these components. For the years ended December 31, 2003, 2002 and 2001, the Company has recorded approximately $282,000, $532,000 and $527,000, respectively as compensation expense with regard to these components.

In 2001, the Company awarded 32,051 shares of common stock, 11,360 shares of Senior Preferred Stock and 9,025 shares of Junior Preferred Stock to the interim chief executive officer for a total of $250,000, which

67

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

represented the fair value of such shares, as determined by the Board of Directors, at the date of grant. Compensation expense was recorded for this stock award. Additionally, the Company sold 32,051 shares of common stock, 11,146 shares of Senior Preferred Stock and 8,843 shares of Junior Preferred Stock to this same individual for $250,000. The number of Preferred Shares changed between the two issuances while the values of the transactions remained the same because of dividend accretion on the Preferred Shares prior to the sale of stock.

A certain member of the Company's Board of Directors was granted an option to purchase 26,667 shares of AMIS Holdings common stock upon joining the Board. The options granted to this member of the Board have an exercise price equal to $0.78 per share, which was the fair market value of the common stock on the date of grant. These options vest over a four-year period at a rate of 25% of the total shares granted on the first anniversary of the date of grant, and ratably over the next 36 months, so long as this member of the Board remains the Company's director or consultant. This member of the Board was also granted the right to exercise these options before vesting and acted on that right in 2001. If this member of the Board were to cease acting as a director, the Company has the right to redeem the shares underlying the unvested options at the original exercise price of $0.78 per share.

In conjunction with the IPO, the Company re-evaluated its prior estimates of the fair value of its common stock. As a result, the Company determined that certain options issued during 2003 were issued with exercise prices that were less than the deemed fair value of the Company's common stock. As a result, deferred stock-based compensation of approximately $519,000 was recorded. The deferred stock-based compensation has been recorded as a component of stockholders' equity and is being recognized over the vesting period of the underlying stock options using the straight-line method under FIN 28 "Accounting for Stock Appreciation Rights and Other Variable Stock Options or Award Plans."

During 2003, as part of the restructuring plan, the vesting on certain options was accelerated making them immediately exercisable upon termination of employment. In accordance with FASB Interpretation No. 44, "Accounting for Certain Transactions involving Stock Compensation, an interpretation of APB Opinion No. 25", the Company expensed approximately $653,000 which is included in Restructuring and impairment charges on the accompanying consolidated statements of operations.

68

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

A summary of option activity under the Plan from inception to December 31, for both option units and common stock options is as follows:

| | Number of Common Shares | Number of Senior Preferred Shares | Number of Junior Preferred Shares | Weighted Average Exercise Price | | | Weighted-average Remaining Contractual Life |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Common Shares | Senior Preferred Shares | Junior Preferred Shares | |
| Balance at January 1, 2001 | 1,803,100 | 700,008 | 560,006 | $ 0.54 | $ 6.76 | $ 6.76 | 9.75 years |
| Options granted | 4,097,823 | — | — | 0.78 | — | — | |
| Options exercised | (110,363) | (16,870) | (12,009) | 0.63 | 7.01 | 6.98 | |
| Options canceled | (664,458) | (106,641) | (85,200) | 0.69 | 6.76 | 7.07 | |
| Balance at December 31, 2001 | 5,126,102 | 576,497 | 462,797 | 0.72 | 7.70 | 7.78 | 8.60 years |
| Options granted | 1,218,300 | — | — | 0.78 | — | — | |
| Options exercised | (486,922) | (7,775) | (4,250) | 0.72 | 8.01 | 8.18 | |
| Options canceled | (367,493) | (44,194) | (35,412) | 0.75 | 8.13 | 8.24 | |
| Balance at December 31, 2002 | 5,489,987 | 524,528 | 423,135 | 0.72 | 8.80 | 8.97 | 8.27 years |
| Options granted | 682,065 | — | — | 10.58 | — | — | |
| Options exercised | (1,060,231) | (15,662) | (10,146) | .66 | 9.35 | 9.59 | |
| Options canceled | (246,702) | (18,068) | (14,859) | .82 | 9.20 | 9.41 | |
| Options redeemed | — | (490,798) | (398,130) | — | 9.72 | 9.98 | |
| Balance at December 31, 2003 | 4,865,119 | — | — | $ 2.11 | $ — | $ — | 7.75 years |

The following table summarizes exercisable options as of December 31, 2003, 2002 and 2001:

| | Exercisable Shares |
| --- | --- |
| **December 31, 2003:** | |
| Common Stock | 2,549,871 |
| **December 31, 2002:** | |
| Common Stock | 2,150,113 |
| Senior Preferred Stock | 376,334 |
| Junior Preferred Stock | 304,627 |
| **December 31, 2001:** | |
| Common Stock | 1,024,962 |
| Senior Preferred Stock | 276,142 |
| Junior Preferred Stock | 221,680 |

69

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following information relates to common stock options outstanding and exercisable as of December 31, 2003:

| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Contractual Life | Weighted–Average Exercise Price | Number Exercisable | Weighted–Average Exercise Price |
|---|---|---|---|---|---|
| $0.53 | 766,878 | 6.03 | $ 0.53 | 732,451 | $ 0.53 |
| $0.78 | 3,545,167 | 7.82 | $ 0.78 | 1,817,112 | $ 0.78 |
| $3.96 | 247,041 | 9.58 | $ 3.96 | — | $ — |
| $19.95–$20.00 | 306,033 | 9.75 | $19.99 | 308 | $19.95 |
| $0.53–$20.00 | 4,865,119 | 7.75 | $ 2.11 | 2,549,871 | $ 0.71 |

The Company has 4,377,761 options for common stock available for grant as of December 31, 2003. The Company has reserved shares of common stock for issuance for all outstanding options and options available for grant.

During 2003, the Company adopted the Amended and Restated Employee Stock Purchase Plan and reserved 2,308,827 shares. This plan will provide employees the opportunity to purchase common stock of the Company through payroll deductions. Under this Employee Stock Purchase Plan, the Company's employees, subject to certain restrictions, may purchase shares of common stock at the lesser of 85% of fair market value at either the enrollment date or the exercise date. The plan consists of overlapping offering periods of 18 months, divided into three purchase periods of six months each. As of December 31, 2003, no shares had been granted from this plan.

## Warrants

In conjunction with the Recapitalization Agreement, AMIS Holdings issued a warrant to Nippon Mining's subsidiary to purchase 4,603,032 shares of common stock for an initial exercise price of $19.41 per share. The warrants, which became exercisable upon the initial public offering in 2003, expire on December 31, 2010. At December 31, 2003 and 2002, AMIS Holdings had 4,603,032 shares of its authorized, unissued common shares reserved for issuance pursuant to the warrant obligation.

In connection with the issuance of the Series C Preferred Stock, the Company issued warrants to purchase an aggregate of 4,220,979 shares of common stock at an exercise price of $0.03 per share. The number of warrants increased to 9,184,851 on December 27, 2002, since the Company had not redeemed the Series C Preferred Stock prior to December 26, 2002. The number of shares subject to the warrants and the exercise price are subject to customary anti–dilution adjustments. The warrants are immediately exercisable and expire on June 26, 2012. During October 2003, 9,113,148 of these warrants were net exercised by reducing the number of shares issued to the holders by the number of shares having a fair market value equal to the exercise price. Net of the shares surrendered, 9,099,223 common shares were issued in exchange for the exercise of these warrants. As of December 31, 2003, warrants representing 71,703 shares of common stock remain outstanding and shares have been reserved for this issuance.

The relative fair value of the warrants of approximately $3,200,000 (as determined using the Black–Scholes model and the following assumptions: volatility: 60%; dividend yield: 0%; expected life: 10 years; and risk–free interest rate: 4.5%) has been reflected as a preferential dividend and has been deducted in determining the net loss attributable to common stockholders in the accompanying statement of operations for the year ended December 31, 2002.

70

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

15.    Derivatives and Hedging

The Company paid a variable rate of interest under its original Term Loan. Under the terms of the Credit Agreement for the original Term Loan, the Company was required to enter into agreements to effectively "fix" the interest rate on one half of the outstanding balance of its Term Loan. On June 21, 2001, the Company entered into certain derivative instruments with major banks in order to manage its exposure to interest rate fluctuations. Such instruments were designated and qualified as cash flow hedges in accordance with SFAS No. 133.

Two such instruments were interest rate swap agreements that effectively converted interest rate exposure from variable rates to fixed rates of interest. During the quarter ended March 29, 2003 in conjunction with the Company's repayment of a portion of the Term Loan one of these swap agreements was settled. The Company was required to pay approximately $365,000 to settle the instrument before its scheduled maturity in June 2003. This amount is recorded as other expense in the accompanying consolidated statements of operations. The remaining swap agreement matured during the quarter ended June 28, 2003. At December 31, 2002, the aggregate notional principal amount of these agreements was $42,000,000. Under the swap agreements, the Company paid fixed rates of interest of 4.5% and 4.7% and received a floating rate of interest based on the three month LIBOR. The difference between amounts to be paid or received on the interest rate swap agreements was recorded as an increase or reduction of interest expense.

The Company also entered into an interest rate cap agreement and an interest rate floor agreement on June 21, 2001 for a notional amount of $45,500,000. Both agreements were settled during the three months ended March 29, 2003 in conjunction with the Company's repayment of a portion of the Term Loan. The interest rate cap agreement granted the Company the right to limit the LIBOR rate it would have paid on its variable rate debt to a maximum of 7.25%. The interest rate floor agreement restricted the Company from paying a LIBOR rate of less than 3.15% on its variable rate debt. The Company paid approximately $423,000 to settle the agreements. This is recorded as other expense in the accompanying consolidated statements of operations.

The fair value of the interest rate swap and cap and floor agreements as of December 31, 2002 totaled approximately $(1,064,000) and is recorded in other long–term liabilities on the accompanying consolidated balance sheet. Accumulated other comprehensive loss related to unrealized derivatives losses total $(1,064,000) or $(628,000), net of taxes as of December 31, 2002 and $(1,231,000) or $(726,000), net of taxes as of December 31, 2001.

16.    Restructuring and Impairment Charges

The Company entered into a non–compete agreement with Nippon Mining and its subsidiary in conjunction with the December 21, 2000 Recapitalization pursuant to which each of Nippon Mining and its subsidiary agreed to not engage in the custom semiconductor business anywhere in the world through December 2005. In connection with the Company's 2003 review of the carrying value of its intangible assets, the Company reached a determination that the carrying value of the non–compete had been impaired based primarily on a change in Nippon Mining's and its subsidiary's business focus and related capabilities. Effective June 26, 2003, the Company released each of Nippon Mining and its subsidiary from all of its obligations under the non–compete agreement. Therefore, the Company wrote off the remaining unamortized balance of this non–compete agreement of approximately $20,028,000 as of the effective date. This amount is included in impairment charges in the accompanying statement of operations.

Pursuant to FASB Statement 146, "Accounting for Costs Associated with Exit or Disposal Activities," in 2003, and EITF Issue No. 94–3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)," in 2002 and 2001, senior management and the Board of Directors approved plans to restructure certain of the Company's operations.

71

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The 2003 plan involves the termination of certain management and other employees as well as certain sales representative firms in the United States. Internal sales employees will replace these sales representative firms. In total, 32 employees, from various departments within the Company, were terminated as part of this program. All terminated employees and sales representative firms were notified in the period in which the charge was recorded. Expenses related to the plan totaled approximately $1,713,000, which includes $653,000 related to the accelerated vesting on certain options making them immediately exercisable upon termination, as discussed in Note 14. As of December 31, 2003, approximately $377,000 had been paid out, with the balance paid in early 2004.

The 2002 plan involved the curtailment of redundant functions between the U.S. and Belgian entities resulting from the MSB acquisition discussed in Note 3. In total 90 people employed by the Company prior to the MSB acquisition were terminated in connection with this restructuring program. The Company recorded related restructuring expense of approximately $457,000, all of which had been paid as of December 31, 2003. Additionally, relationships with certain sales representative firms in Europe were terminated because their duties were transferred to MSB. The expense associated with these terminations was approximately $478,000, all of which has been paid out at December 31, 2003.

The 2001 plan involved the closure of certain offices and the termination of certain management and other employees. The objectives of the plan were to increase the competitiveness of the Company and manage costs during the semiconductor industry downturn that began in 2000. In total, 265 employees were terminated as part of this program. Such terminations affected virtually all departments within the Company's business. All terminated employees were notified in the period in which the charge was recorded.

Expenses relating to the plan totaled approximately $4,983,000 during the year ended December 31, 2001 and were comprised of approximately $3,643,000 for termination benefits and other related costs and approximately $1,340,000 for lease termination, other office closure costs, legal fees and other costs. Such other office closure costs relate primarily to a loss on the sale of a significant portion of the assets of the Dresden, Germany office, which was sold to a third party in October 2001. The assets were sold for approximately $456,000. The Company realized a loss of approximately $331,000 on the sale of these assets. The Company also closed certain offices in California, Texas and North Carolina and accrued its remaining lease obligations related to these facilities.

As of December 31, 2003, approximately $4,493,000 of the 2001 restructuring expenses had been paid or the fixed assets had been written off. The remaining accrual for the 2001 plan, which represents lease termination and other costs of approximately $164,000, is included in accrued expenses on the accompanying balance sheet as of December 31, 2003. The remaining lease termination costs will be paid over the remaining lease terms, which end in July 2005. During 2002, approximately $287,000 of the 2001 restructuring accrual was reversed because certain estimates were revised.

72

Table of Contents

· AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Following is a summary of the restructuring accrual relating to the 2003, 2002 and 2001 plans (in thousands):

| | Severance Costs | Lease Termination Costs | Legal Fees and Other Costs | Write-Down of Fixed Assets | Total |
|---|---|---|---|---|---|
| 2001 Expense | $ 3,643 | $ 546 | $ 463 | $ 331 | $ 4,983 |
| Paid in 2001 | (2,690) | (165) | (114) | (331)* | (3,300) |
| Balance at December 31, 2001 | 953 | 381 | 349 | — | 1,683 |
| 2002 Expense | 935 | — | — | — | 935 |
| Paid in 2002 | (968) | (161) | (19) | — | (1,148) |
| Reserve Reversal | (32) | 75 | (330) | — | (287) |
| Balance at December 31, 2002 | 888 | 295 | — | — | 1,183 |
| 2003 Expense | 1,713 | — | — | — | 1,713 |
| 2003 Paid | (1,909)** | (131) | — | — | (2,040) |
| Balance at December 31, 2003 | $ · 692 | $ 164 | $ — | $ — | $ 856 |

\*   Non-cash

\*\*  $653 non-cash

### 17.   Purchase of the Micro Power Products Division of Microsemi Corporation

On September 29, 2002, the Company acquired the Micro Power Products Division of Microsemi Corporation for approximately $1,500,000 in cash. The Company received approximately $300,000 of fixed assets and approximately $900,000 of contracts and licenses. Goodwill of approximately $300,000 was also recorded. The value of the contracts and licenses was determined based upon an independent appraisal by the Company's independent financial consulting firm, LECG, LLC. The contracts and licenses are being amortized over approximately 5 to 8 years. This acquisition provided the Company with additional mixed signal ASIC engineers and customer relationships in the medical device manufacturing industry.

### 18.   Operating Segments and Geographic Information

The Company designs, develops, manufactures and sells custom and semi–custom integrated circuits of high complexity. The Company focuses on selling its integrated circuits primarily to original equipment manufacturers in the automotive, medical and industrial markets through worldwide direct sales, commissioned representatives and distributors.

In order to better focus its business, the Company reorganized its product families into three business units beginning in 2002, each of which is a reportable segment. The segments represent management's view of the Company's business lines and are based on the financial information used by management to monitor the business. In addition, each segment comprises product families with similar requirements for design, development and marketing. The Company has three reportable segments:

**Integrated Mixed Signal Products:** designs, manufactures and markets system–level integrated mixed signal products using the Company's proprietary wafer fabrication process technologies and the expertise of the Company's analog and mixed signal engineers. The Company applies its mixed signal expertise primarily for sensors, high voltage outputs and wireless or radio frequency communication.

**Mixed Signal Foundry Services:** provides semiconductor manufacturing services primarily to original equipment manufacturers, or OEMs, and fabless semiconductor companies. The mixed signal foundry services

73

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

segment focuses on manufacturing customized mixed signal semiconductors with long lifecycles and established process technologies that are also characterized by small to medium volume production runs.

Structured Digital Products: designs, manufactures and markets structured digital products both through digital conversion semiconductors, which involve the conversion of higher cost, semi–standard programmable digital logic integrated circuits into lower cost digital semiconductors, and medium complexity prime digital semiconductors, which are customized solutions developed directly from customer specifications rather than from a pre–existing semi–standard integrated circuits.

The accounting policies of the segments are the same as those described in the summary of significant accounting policies. Management evaluates performance based on income or loss from operations before interest, nonrecurring gains and losses, foreign exchange gains and losses and income taxes.

The Company's wafer manufacturing facilities fabricate integrated circuits for all business units as necessary and their operating costs are reflected in the segments' cost of revenues on the basis of product costs. Financial information, other than revenues, was not tracked by segment prior to 2002; accordingly, for periods prior to 2002, segment information is presented for revenues only. Because operating segments are defined by the products they design and sell, they do not make sales to each other. Management does not report assets, or track expenditures on long–lived assets by operating segments.

Information about segments (in thousands):

| | Integrated Mixed Signal Products | Mixed Signal Foundry Services | Structured Digital Products | Total |
|---|---|---|---|---|
| Year ended December 31, 2003: | | | | |
| Net revenue from external customers | $241,359 | $116,104 | $ 96,689 | $454,152 |
| Segment operating income | 28,312 | 19,512 | 15,533 | 63,357 |
| Year ended December 31, 2002: | | | | |
| Net revenue from external customers | $167,196 | $ 93,095 | $ 85,031 | $345,322 |
| Segment operating income (loss) | 11,942 | 6,902 | (589) | 18,255 |
| Year ended December 31, 2001: | | | | |
| Net revenue from external customers | 93,345 | 93,324 | 139,841 | 326,510 |

Reconciliation of segment information to financial statements (in thousands):

| | 2003 | 2002 |
|---|---|---|
| Total income for reportable segments | $ 63,357 | $ 18,255 |
| Unallocated amounts: | | |
| Restructuring and impairment charges | (21,741) | (648) |
| Nonrecurring charges | (11,401) | — |
| Operating income | $ 30,215 | $ 17,607 |

There are intercompany sales and transfers recorded between geographical subsidiaries. Major operations outside the United States include fabrication facilities, sales offices and technology centers in Europe and Asia–Pacific, as well as subcontract assembly and test operations in the Asia–Pacific region. Foreign operations are subject to risks of economic and political instability and foreign currency exchange rate fluctuations.

Transfers between geographic areas are accounted for at amounts that are generally above cost and consistent with the rules and regulations of governing tax authorities. Such transfers are eliminated in the consolidated financial statements. Although assets are tracked by geographical locations, they are not reported separately for internal decision–making purposes.

74

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Geographic information about revenue based on shipments to customers by region is as follows for the years ended December 31 (in thousands):

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| Geographic information: | | | |
| Revenue(1): | | | |
| North America | $ 185,930 | $ 191,840 | $ 272,670 |
| Europe | 184,567 | 84,532 | 21,692 |
| Asia–Pacific | 83,655 | 68,950 | 32,148 |
| Total | $ 454,152 | $ 345,322 | $ 326,510 |

Geographic information about long–lived assets associated with particular regions is as follows as of December 31 (in thousands):

|  | 2003 | 2002 |
|---|---|---|
| Long–lived assets(2): | | |
| United States | $ 160,099 | $ 177,315 |
| Europe | 29,843 | 36,559 |
| All other | 15,967 | 8,633 |
| Total | $ 205,909 | $ 222,507 |

(1)   Revenue is attributed to geographic regions based on the shipments to customers located in those regions.

(2)   Represents those material long–lived assets that can be associated with a particular geographic area.

U.S. export sales were approximately $92,956,000, $116,157,000 and $63,301,000 for the years ended December 31, 2003, 2002 and 2001, respectively. Levels of sales varied by country in all periods. Thailand accounted for 16% of total export sales during 2003. No one foreign country accounted for greater than 10% of total export sales in 2002 or 2001.

19.   Condensed Consolidating Financial Statements

The Senior Term Loan is fully and unconditionally guaranteed by AMIS Holdings and each existing domestic subsidiary and by each subsequently acquired or organized domestic subsidiary on a joint and several basis. Similarly, AMIS Holdings and each existing domestic subsidiary fully and unconditionally guarantee the Senior Subordinated Notes issued on January 29, 2003 (the "Notes") on a joint and several basis. The Company's foreign subsidiaries do not provide guarantees for the Senior Term Loan or the Notes. Below are condensed consolidating balance sheets, statements of operations and statements of cash flows of AMIS Holdings, Inc. as of December 31, 2003 and 2002 and for each of the three years in the period ended December 31, 2003, reflecting the financial position, results of operations and cash flows of those entities that guarantee the Senior Term Loan and the Notes and those that do not.

Table of Contents

## AMIS HOLDINGS, INC. AND SUBSIDIARIES

### CONDENSED CONSOLIDATING BALANCE SHEET

#### December 31, 2003

| | Consolidated | Eliminations | AMIS Holdings, Inc. | AMI Semiconductor, Inc. | AMI Acquisition LLC | AMI Acquisition II LLC | Non–Guarantor Subsidiaries |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| **ASSETS** | | | | | | | |
| **Current assets:** | | | | | | | |
| Cash and cash equivalents | $ 119,063 | $ — | $ 10,407 | $ 49,446 | $ — | $ — | $ 59,210 |
| Accounts receivable, net | 73,585 | — | — | 33,474 | — | — | 40,111 |
| Intercompany accounts receivable | — | (16,150) | 696 | 13,420 | — | 118 | 1,916 |
| Inventories | 45,599 | — | — | 23,860 | — | — | 21,739 |
| Receivable from affiliate | 1,909 | — | — | 1,909 | — | — | — |
| Deferred tax assets | 8,987 | — | — | 4,163 | — | — | 4,824 |
| Prepaid expenses and other current assets | 18,868 | (51) | — | 7,778 | — | — | 11,141 |
| Total current assets | 268,011 | (16,201) | 11,103 | 134,050 | — | 118 | 138,941 |
| Property, plant and equipment, net | 205,909 | — | — | 168,322 | — | — | 37,587 |
| Investment in subsidiaries | — | (542,701) | 278,619 | 144,505 | 113,283 | 6,294 | — |
| Deferred financing costs, net | 8,324 | — | — | 8,324 | — | — | — |
| Goodwill and other intangibles, net | 10,929 | — | — | 3,628 | — | — | 7,301 |
| Deferred tax assets | 38,627 | — | 5,534 | 33,737 | — | — | (644) |
| Pension asset | 13,103 | — | — | — | — | — | 13,103 |
| Restricted cash | 4,200 | — | 4,200 | — | — | — | — |
| Other | 985 | — | — | 685 | — | — | 300 |
| Total assets | $ 550,088 | $ (558,902) | $ 299,456 | $ 493,251 | $ 113,283 | $ 6,412 | $ 196,588 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | | |
| **Current liabilities:** | | | | | | | |
| Accounts payable | $ 34,753 | $ — | $ — | $ 14,752 | $ — | $ — | $ 20,001 |
| Intercompany accounts payable | — | (16,171) | 94,680 | (78,509) | — | — | — |
| Accrued expenses | 24,973 | (270) | — | 14,783 | — | — | 10,460 |
| Accrued employee compensation | 29,212 | — | — | 8,553 | — | — | 20,659 |
| Taxes payable | 1,088 | — | — | 6 | — | — | 1,082 |
| Current portion of long–term debt | 1,250 | — | — | 1,250 | — | — | — |
| Total current liabilities | 91,276 | (16,441) | 94,680 | (39,165) | — | — | 52,202 |
| Other long–term liabilities | 360 | — | — | 360 | — | — | — |
| Long–term debt | 253,437 | — | — | 253,437 | — | — | — |
| Total liabilities | 345,073 | (16,441) | 94,680 | 214,632 | — | — | 52,202 |
| **Stockholders' Equity (Deficit)** | | | | | | | |
| Common stock | 820 | (3,717) | 820 | — | — | — | 3,717 |
| Additional paid–in capital | 510,691 | (387,952) | 510,691 | 229,561 | 71,357 | 4,062 | 82,972 |
| Retained earnings (accumulated deficit) | (323,021) | (101,732) | (323,260) | 32,058 | 27,838 | 1,566 | 40,509 |
| Deferred Compensation | (475) | — | (475) | — | — | — | — |
| Accumulated other comprehensive income | 17,000 | (49,060) | 17,000 | 17,000 | 14,088 | 784 | 17,188 |
| Total stockholders' equity (deficit) | 205,015 | (542,461) | 204,776 | 278,619 | 113,283 | 6,412 | 144,386 |
| Total liabilities and stockholders' equity (deficit) | $ 550,088 | $ (558,902) | $ 299,456 | $ 493,251 | $ 113,283 | $ 6,412 | $ 196,588 |

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS

Year Ended December 31, 2003

| | Consolidated | Eliminations | AMIS Holdings, Inc. | AMI Semiconductor, Inc. | AMI Acquisition LLC | AMI Acquisition II LLC | Non–Guarantor Subsidiaries |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| Revenue | $ 454,152 | $ (30,671) | $ — | $ 273,990 | $ — | $ — | $ 210,833 |
| Cost of revenue | 255,959 | (24,701) | — | 144,983 | — | — | 135,677 |
| | 198,193 | (5,970) | — | 129,007 | — | — | 75,156 |
| Operating expenses: | | | | | | | |
| Research and development | 70,256 | (2,070) | — | 48,140 | — | — | 24,186 |
| Marketing and selling | 37,801 | (4,014) | — | 26,865 | — | — | 14,950 |
| General and administrative | 26,779 | (47) | 1,838 | 19,052 | — | — | 5,936 |
| Restructuring and impairment charges | 21,741 | — | — | 21,749 | — | — | (8) |
| Nonrecurring charges | 11,401 | — | 8,500 | 2,901 | — | — | — |
| | 167,978 | (6,131) | 10,338 | 118,707 | — | — | 45,064 |
| Operating income (loss) | 30,215 | 161 | (10,338) | 10,300 | — | — | 30,092 |
| Other income (expense): | | | | | | | |
| Interest income (expense), net | (22,478) | (15) | 261 | (23,453) | — | 14 | 715 |
| Other income (expense), net | (16,196) | (146) | 4 | (16,641) | (3) | — | 590 |
| Equity earnings in subsidiaries | — | (53,846) | 5,525 | 24,795 | 22,288 | 1,238 | — |
| | (38,674) | (54,007) | 5,790 | (15,299) | 22,285 | 1,252 | 1,305 |
| Income (loss) before income taxes | (8,459) | (53,846) | (4,548) | (4,999) | 22,285 | 1,252 | 31,397 |
| Provision (benefit) for income taxes | (8,043) | — | (4,132) | (10,524) | — | — | 6,613 |
| Net income (loss) | $ (416) | $ (53,846) | $ (416) | $ 5,525 | $ 22,285 | $ 1,252 | $ 24,784 |

77

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS

Year Ended in December 31, 2003

| | Consolidated | Eliminations | AMIS Holdings, Inc. | AMI Semiconductor, Inc. | AMI Acquisition LLC | AMI Acquisition II LLC | Non–Guarantor Subsidiaries |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| Cash flows provided by operating activities | $ 70,672 | $ — | $ 6,762 | $ 28,074 | $ — | $ — | $ 35,836 |
| Cash flows from investing activities: | | | | | | | |
| Purchases of property, plant, and equipment | (26,553) | — | — | (14,210) | — | — | (12,343) |
| Other | 30 | — | — | 30 | — | — | — |
| Investment in subsidiaries | — | — | 80,764 | (80,764) | — | — | — |
| Cash provided by (used in) investing activities | (26,523) | — | 80,764 | (94,944) | — | — | (12,343) |
| Cash flows from financing activities: | | | | | | | |
| Payments on long–term debt | (230,413) | — | — | (230,413) | — | — | — |
| Issuance of common stock | 470,276 | — | 470,276 | — | — | — | — |
| Proceeds from Senior Term Loan | 125,000 | — | — | 125,000 | — | — | — |
| Redemption of Preferred Stock | (550,244) | — | (550,244) | — | — | — | — |
| Payments on long–term payables | (1,401) | — | — | (1,401) | — | — | — |
| Proceeds from senior subordinated notes | 200,000 | — | — | 200,000 | — | — | — |
| Exercise of stock options for common and preferred stock | 939 | — | 939 | — | — | — | — |
| Deferred financing costs | (11,356) | — | — | (11,356) | — | — | — |
| Payment to settle derivatives | (788) | — | — | (788) | — | — | — |
| Cash provided by (used in) financing activities | 2,013 | — | (79,029) | 81,042 | — | — | — |
| Effect of exchange rate changes on cash and cash equivalents | 10,717 | — | — | — | — | — | 10,717 |
| Net change in cash and cash equivalents | 56,879 | — | 8,497 | 14,172 | — | — | 34,210 |
| Cash and cash equivalents at beginning of period | 62,184 | — | 1,910 | 35,274 | — | — | 25,000 |
| Cash and cash equivalents at end of period | $ 119,063 | $ — | $ 10,407 | $ 49,446 | $ — | $ — | $ 59,210 |

78

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATING BALANCE SHEET

December 31, 2002

| | Consolidated | Eliminations | AMIS Holdings, Inc. | AMI Semiconductor, Inc. | AMI Acquisition LLC | AMI Acquisition II LLC | Non–Guarantor Subsidiaries |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| **ASSETS** | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ 62,184 | $ — | $ 1,910 | $ 35,274 | $ — | $ — | $ 25,000 |
| Accounts receivable, net | 65,994 | | | 32,860 | | | 33,134 |
| Intercompany accounts receivable | — | (11,024) | | 10,920 | | 104 | |
| Inventories | 39,361 | 10 | — | 19,290 | | | 20,061 |
| Receivable from affiliate | 1,909 | — | — | 1,909 | | | — |
| Deferred tax assets | 9,077 | — | — | 2,258 | — | | 6,819 |
| Prepaid expenses and other current assets | 21,087 | 69 | 250 | 5,908 | | — | 14,860 |
| Total current assets | 199,612 | (10,945) | 2,160 | 108,419 | — | 104 | 99,874 |
| Property, plant and equipment, net | 222,507 | | — | 183,597 | — | | 38,910 |
| Investment in subsidiaries | — | (443,449) | 257,019 | 103,978 | 78,112 | 4,340 | |
| Deferred financing costs, net | 6,188 | — | — | 6,188 | — | — | |
| Goodwill and other intangibles, net | 37,873 | — | — | 29,931 | — | — | 7,942 |
| Deferred tax assets | 19,369 | — | 1,402 | 25,541 | — | — | (7,574) |
| Pension asset | 11,847 | — | — | — | — | — | 11,847 |
| Restricted cash | 4,200 | — | 4,200 | — | — | — | — |
| Other | 864 | — | — | 540 | — | — | 324 |
| Total assets | $ 502,460 | $ (454,394) | $ 264,781 | $ 458,194 | $ 78,112 | $ 4,444 | $ 151,323 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | | | |
| Current liabilities: | | | | | | | |
| Accounts payable | $ 29,643 | $ — | $ — | $ 11,881 | $ — | $ — | $ 17,762 |
| Intercompany accounts payable | — | (10,917) | 263 | 10,030 | | | 624 |
| Accrued expenses | 23,780 | (268) | 2,805 | 11,395 | — | — | 9,848 |
| Accrued employee compensation | 21,329 | — | — | 4,722 | — | — | 16,607 |
| Taxes payable | 1,391 | — | — | (41) | — | — | 1,432 |
| Current portion of long–term debt | 8,708 | — | — | 8,708 | — | — | — |
| Total current liabilities | 84,851 | (11,185) | 3,068 | 46,695 | — | — | 46,273 |
| Other long–term liabilities | 3,088 | — | — | 3,088 | — | — | — |
| Long–term debt | 151,392 | — | — | 151,392 | — | — | — |
| Total liabilities | 239,331 | (11,185) | 3,068 | 201,175 | — | — | 46,273 |
| Series A Senior Redeemable Preferred Stock | 233,671 | — | 233,671 | — | — | — | — |
| Series B Junior Redeemable Convertible Preferred Stock | 190,498 | — | 190,498 | | | | |
| Series C Senior Redeemable Preferred Stock | 79,337 | — | 79,337 | — | — | — | |
| Stockholders' Equity (Deficit) | | | | | | | |
| Common stock | 467 | (3,717) | 467 | — | — | — | 3,717 |
| Additional paid–in capital | 38,901 | (387,952) | 38,901 | 229,561 | 71,357 | 4,062 | 82,972 |
| Stockholder notes receivable | (5,570) | — | (5,570) | | | | |
| Retained earnings (accumulated deficit) | (276,278) | (47,886) | (276,517) | 26,532 | 5,553 | 315 | 15,725 |
| Accumulated other comprehensive loss | 2,103 | (3,654) | 926 | 926 | 1,202 | 67 | 2,636 |
| Total stockholders' equity (deficit) | (240,377) | (443,209) | (241,793) | 257,019 | 78,112 | 4,444 | 105,050 |
| Total liabilities and stockholders' equity (deficit) | $ 502,460 | $ (454,394) | $ 264,781 | $ 458,194 | $ 78,112 | $ 4,444 | $ 151,323 |

79

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS

Year Ended December 31, 2002

| | Consolidated | Eliminations | AMIS Holdings, Inc. | AMI Semiconductor, Inc. | AMI Acquisition LLC | AMI Acquisition II LLC | Non–Guarantor Subsidiaries |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| Revenue | $ 345,322 | $ (9,790) | $ — | $ 250,941 | $ — | $ — | $ 104,171 |
| Cost of revenue | 214,964 | (9,091) | — | 145,867 | — | — | 78,188 |
| | 130,358 | (699) | — | 105,074 | — | — | 25,983 |
| Operating expenses: | | | | | | | |
| Research and development | 52,140 | (593) | — | 44,667 | — | — | 8,066 |
| Marketing and selling | 35,002 | — | — | 27,463 | — | — | 7,539 |
| General and administrative | 24,961 | (106) | 2,284 | 19,674 | — | — | 3,109 |
| Restructuring and impairment charges | 648 | — | — | 302 | — | — | 346 |
| | 112,751 | (699) | 2,284 | 92,106 | — | — | 19,060 |
| Operating income (loss) | 17,607 | — | (2,284) | 12,968 | — | — | 6,923 |
| Other income (expense): | | | | | | | |
| Interest income (expense), net | (11,479) | (56) | 265 | (12,035) | — | 6 | 341 |
| Other income (expense), net | 147 | 57 | 62 | 94 | — | — | (66) |
| Equity earnings in subsidiaries | — | (17,948) | 6,268 | 5,818 | 5,553 | 309 | — |
| | (11,332) | (17,947) | 6,595 | (6,123) | 5,553 | 315 | 275 |
| Income (loss) before income taxes | 6,275 | (17,947) | 4,311 | 6,845 | 5,553 | 315 | 7,198 |
| Provision (benefit) for income taxes | 1,165 | — | (799) | 577 | — | — | 1,387 |
| Net income (loss) | $ 5,110 | $ (17,947) | $ 5,110 | $ 6,268 | $ 5,553 | $ 315 | $ 5,811 |

80

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS

Year Ended in December 31, 2002

| | Consolidated | Eliminations | AMIS Holdings, Inc. | AMI Semiconductor, Inc. | AMI Acquisition LLC | AMI Acquisition II LLC | Non–Guarantor Subsidiaries |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| Cash flows provided by (used in) operating activities | $ 81,075 | $ 103 | $ (4,768) | $ 75,229 | $ — | $ (98) | $ 10,609 |
| Cash flows from investing activities: | | | | | | | |
| Purchases of property, plant, and equipment | (21,987) | — | — | (18,118) | — | — | (3,869) |
| Purchase of businesses | (85,438) | — | — | (85,438) | — | — | — |
| Investment in subsidiaries | — | — | (69,296) | 59,044 | — | 98 | 10,154 |
| Cash provided by (used in) investing activities | (107,425) | — | (69,296) | (44,512) | — | 98 | 6,285 |
| Cash flows from financing activities: | | | | | | | |
| Payments on long-term debt | (13,150) | — | — | (13,150) | — | — | — |
| Issuance of common and preferred stock | 75,000 | (103) | 75,000 | — | — | — | 103 |
| Payments on long-term payables | (1,759) | — | — | (1,759) | — | — | — |
| Deferred financing costs | (2,170) | — | — | (2,170) | — | — | — |
| Exercise of stock options for common and preferred stock | 454 | — | 454 | — | — | — | — |
| Cash provided by (used in) financing activities | 58,375 | (103) | 75,454 | (17,079) | — | — | 103 |
| Effect of exchange rate changes on cash and cash equivalents | 1,509 | — | — | — | — | — | 1,509 |
| Net change in cash and cash equivalents | 33,534 | — | 1,390 | 13,638 | — | — | 18,506 |
| Cash and cash equivalents at beginning of period | 28,650 | — | 520 | 21,636 | — | — | 6,494 |
| Cash and cash equivalents at end of period | $ 62,184 | $ — | $ 1,910 | $ 35,274 | $ — | $ — | $ 25,000 |

81

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATING STATEMENT OF OPERATIONS

Year Ended December 31, 2001

| | Consolidated | Eliminations | AMIS Holdings, Inc. | AMI Semiconductor, Inc. | Non–Guarantor Subsidiaries |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Revenue | $326,510 | $ (7,867) | $ — | $304,762 | $29,615 |
| Cost of revenue | 186,400 | (7,867) | — | 172,013 | 22,254 |
| | 140,110 | — | — | 132,749 | 7,361 |
| Operating expenses: | | | | | |
| Research and development | 42,112 | — | — | 40,620 | 1,492 |
| Marketing and selling | 35,373 | — | — | 31,896 | 3,477 |
| General and administrative | 25,566 | — | 1,999 | 22,504 | 1,063 |
| Restructuring and impairment charges | 4,983 | — | — | 4,007 | 976 |
| | 108,034 | — | 1,999 | 99,027 | 7,008 |
| Operating income (loss) | 32,076 | — | (1,999) | 33,722 | 353 |
| Other income (expense): | | | | | |
| Interest income (expense), net | (14,160) | — | 535 | (14,917) | 222 |
| Other income (expense), net | 407 | — | — | 430 | (23) |
| Equity earnings in subsidiaries | — | (13,152) | 13,545 | (393) | — |
| | (13,753) | (13,152) | 14,080 | (14,880) | 199 |
| Income (loss) before income taxes | 18,323 | (13,152) | 12,081 | 18,842 | 552 |
| Provision (benefit) for income taxes | 5,642 | — | (600) | 5,297 | 945 |
| Net income (loss) | $  12,681 | $(13,152) | $12,681 | $  13,545 | $    (393) |

82

Table of Contents

AMIS HOLDINGS, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS

Year Ended December 31, 2001

| | Consolidated | Eliminations | AMIS Holdings, Inc. | AMI Semiconductor, Inc. | Non-Guarantor Subsidiaries |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Cash flows provided by operating activities | $ 42,574 | $ 101 | $ 4,322 | $ 34,505 | $ 3,646 |
| Cash flows from investing activities: | | | | | |
| Purchases of property, plant, and equipment | (20,720) | — | — | (18,983) | (1,737) |
| Designation of restricted cash | (4,200) | — | (4,200) | — | — |
| Cash used in investing activities | (24,920) | — | (4,200) | (18,983) | (1,737) |
| Cash used in financing activities: | | | | | |
| Payments on long-term debt | (1,750) | — | — | (1,750) | — |
| Payments on related-party debt/advances from parent | (6,000) | — | — | (6,000) | — |
| Payments on long-term payables | (1,830) | — | — | (1,830) | — |
| Stock repurchase, net of stockholder note receivable | (122) | — | (122) | — | — |
| Exercise of stock options for common and preferred stock | 270 | — | 270 | — | — |
| Issuance of common and preferred stock | 250 | (4) | 250 | — | 4 |
| Cash (used in) provided by financing activities | (9,182) | (4) | 398 | (9,580) | 4 |
| Effect of exchange rate changes on cash and cash equivalents | 98 | (97) | — | 98 | 97 |
| Net change in cash and cash equivalents | 8,570 | — | 520 | 6,040 | 2,010 |
| Cash and cash equivalents at beginning of period | 20,080 | — | — | 15,596 | 4,484 |
| Cash and cash equivalents at end of period | $ 28,650 | $ — | $ 520 | $ 21,636 | $ 6,494 |

83

Table of Contents

20.    Quarterly Financial Data (unaudited)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Year | | | | | |
| | | 2003(1) | | | 2002(1) | | | |
| | Q1 | Q2(2) | Q3(3) | Q4(4) | Q1 | Q2 | Q3 | Q4 |
| | | | | (In millions, except loss per share) | | | | |
| Revenue | $ 102.8 | $ 108.4 | $ 117.4 | $ 125.6 | $ 69.0 | $ 69.5 | $ 104.3 | $ 102.5 |
| Gross profit | $ 42.3 | $ 47.5 | $ 51.5 | $ 56.9 | $ 25.2 | $ 26.0 | $ 42.0 | $ 37.1 |
| Net income (loss) | $ 1.8 | $ (7.3) | $ 1.7 | $ 3.4 | $ (1.1) | $ (2.5) | $ 5.7 | $ 3.0 |
| Preferred stock dividend | $ (15.8) | $ (15.4) | $ (15.1) | — | $ (12.7) | $ (16.8) | $ (16.0) | $ (17.0) |
| Net income (loss) attributable to common stockholders | $ (14.0) | $ (22.6) | $ (13.5) | $ 3.4 | $ (13.8) | $ (19.3) | $ (10.3) | $ (14.0) |
| Basic net income (loss) per common share | $ (0.30) | $ (0.48) | $ (0.28) | $ 0.04 | $ (0.30) | $ (0.42) | $ (0.22) | $ (0.30) |
| Diluted net income (loss) per common share | $ (0.30) | $ (0.48) | $ (0.28) | $ 0.04 | $ (0.30) | $ (0.42) | $ (0.22) | $ (0.30) |
| Weighted average number of common shares used to compute basic net income (loss) per common share | 46.7 | 46.7 | 48.0 | 79.1 | 46.2 | 46.3 | 46.5 | 46.6 |
| Weighted average number of common shares used to compute diluted net income (loss) per common share | 46.7 | 46.7 | 48.0 | 86.3 | 46.2 | 46.3 | 46.5 | 46.6 |

(1)    Each quarter represents 13 weeks.

(2)    In the second quarter of 2003, the Company recorded an impairment charge of $20 million related to the write-off of the remaining balance of a non-compete agreement, which was deemed by the Company to have no remaining value.

(3)    During the third quarter of 2003, the Company recorded nonrecurring charges of $8.5 million related to amendments to investment banking and financial advisory services arrangements, and for compensation expense of $2.9 million related to the redemption of options on preferred stock.

(4)    During the fourth quarter of 2003, the Company recorded restructuring charges of $1.7 million related to the termination of certain management and other employees as well as certain sales representatives in the United States. The Company also recorded other expenses of $7.5 million during the fourth quarter of 2003 for a premium paid in connection with the early redemption of a portion of the Senior Subordinated Notes.

84

Table of Contents

Item 9.    *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

Not applicable.


Item 9A.    *Controls and Procedures*

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our "disclosure controls and procedures" (as defined in Rule 13a–15(e) or 15d–15(e) under the Securities Exchange Act) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely making known to them material information relating to us and our consolidated subsidiaries required to be disclosed in our reports filed or submitted under the Exchange Act. There has been no change in our internal control over financial reporting during the quarter ended December 31, 2003 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

PART III


Item 10.    *Directors and Executive Officers of the Registrant*

The information required by this item with respect to directors and executive officers is incorporated by reference to our proxy statement for the 2004 annual meeting of stockholders, which will be filed on or before April 29, 2004.

We have adopted a code of business conduct and ethics applicable to our Directors, officers (including our principal executive officer, principal financial officer and controller) and employees, known as the Code of Ethics. The Code of Ethics is available on our website at www.amis.com. In the event that we amend or waive certain provisions of the Code of Ethics applicable to our principal executive officer, principal financial officer or controller, we intend to disclose the same on our website.

85

Table of Contents

Item 11.    *Executive Compensation*

The information required by this item is incorporated by reference to our 2004 proxy statement.


Item 12.    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

The information required by this item is incorporated by reference to our 2004 proxy statement.


Item 13.    *Certain Relationships and Related Transactions*

The information required by this item is incorporated by reference to our 2004 proxy statement.


Item 14.    *Principal Accountant Fees and Services*

The information required by this item is incorporated by reference to our 2004 proxy statement.

PART IV


Item 15.    *Exhibits, Financial Statement Schedules and Reports on Form 8–K*

(a) The following documents are filed as part of this report:

(1) *Financial Statements.* See the "Index to Financial Statements" in Item 8.

(2) *Exhibits.*

| Exhibit No. | Document |
|---|---|
| 3.1 | Restated Certificate of Incorporation of AMIS Holdings, Inc. |
| 3.2 | Amended and Restated By–Laws of AMIS Holdings, Inc. |
| 4.1 | Indenture dated as of January 29, 2003 among AMI Semiconductor, Inc., AMIS Holdings, Inc., AMI Acquisition LLC, AMI Acquisition II LLC and J.P. Morgan Trust Company, N.A.* |
| 4.2 | Form of Certificate of Common Stock, par value $0.01 per share, of AMIS Holdings, Inc. ** |
| 10.1 | Credit Agreement dated as of December 21, 2000 among the Company, AMIS Holdings, Inc. (formerly named AMI Holdings, Inc.), the lenders party thereto and Credit Suisse First Boston Corporation, as Collateral Agent and Administrative Agent (the "Credit Agreement")* |
| 10.2 | Global Assignment and Acceptance and Amendment dated as of February 20, 2001 relating to the Credit Agreement* |
| 10.3 | Amendment No. 2, Waiver and Agreement dated as of February 6, 2002, relating to the Credit Agreement* |
| 10.4 | Amendment No. 3, Waiver and Agreement dated as of May 2, 2002, relating to the Credit Agreement* |
| 10.5 | Amendment No. 4, Waiver and Agreement dated as of September 6, 2002, relating to the Credit Agreement* |
| 10.6 | Amended and Restated Credit Agreement among AMI Semiconductor, Inc., AMIS Holdings, Inc., the lenders party thereto and Credit Suisse First Boston, as Administrative Agent and Collateral Agent |
| 10.7 | Amended and Restated Employment Agreement dated as of August 15, 2001 by and between AMIS Holdings, Inc. and Christine King** |
| 10.8 | Amended and Restated Shareholders' Agreement among AMIS Holdings, Inc. and the holders named therein |
| 10.9 | Supply Agreement between STMicroelectronics, NV and AMI Semiconductor Belgium BVBA dated June 26, 2002* |
| 10.10 | Form of warrant held by Merchant Capital, Inc. to purchase shares of common stock of AMIS Holdings, Inc.* |

86

Table of Contents

| Exhibit No. | Document |
|---|---|
| 10.11 | Form of warrant held by Nippon Mining Holdings, Inc. (formerly Japan Energy Electronic Materials, Inc.) to purchase shares of common stock of AMIS Holdings, Inc.* |
| 10.12 | Agreement dated May 8, 2002 between AMI Semiconductor Belgium BVBA, AMI Semiconductor, Inc. and STMicroelectronics NV for the acquisition of the business of the Mixed Signal Division of Alcatel Microelectronics* |
| 10.13 | Advisory Agreement dated December 21, 2000 by and between AMI Holdings, Inc., AMI Spinco Inc. and Francisco Partners GP, LLC* |
| 10.14 | Advisory Agreement dated December 21, 2000 by and between AMI Holdings, Inc., AMI Spinco, Inc. and TBW LLC* |
| 10.15 | Amended and Restated AMIS Holdings, Inc. 2000 Equity Incentive Plan*** |
| 10.16 | Form of Indemnification Agreement for directors and executive officers of AMIS Holdings, Inc.** |
| 10.17 | Appendix to the Minutes of the General Shareholders' Meeting regarding the Appointment of Mr. Walter Mattheus in the Office of Compensated Director of AMI Semiconductor Belgium BVBA dated June 26, 2002* |
| 10.18 | Assignment and Assumption Agreement dated June 26, 2002 between STMicroelectronics NV and AMI Semiconductor, Inc.; Assignment and Assumption Agreement dated June 26, 2002 between Alcatel Microelectronics NV and AMI Semiconductor, Inc.* |
| 10.19 | AMIS Holdings, Inc. 2003 Employee Stock Purchase Plan*** |
| 10.20 | Form of Amendment No. 1 to the Advisory Agreement filed as Exhibit 10.13** |
| 10.21 | Form of Amendment No. 1 to the Advisory Agreement filed as Exhibit 10.14** |
| 21.1 | Direct and Indirect Subsidiaries of AMIS Holdings, Inc.* |
| 23.1 | Consent of Ernst & Young LLP, independent auditors |
| 31.1 | Certification of Principal Executive Officer Pursuant to Section 302 of the Sarbanes–Oxley Act of 2003 |
| 31.2 | Certification of Principal Financial Officer Pursuant to Section 302 of the Sarbanes–Oxley Act of 2003 |
| 32.1 | Certification of Principal Executive Officer Pursuant to Section 906 of Sarbanes–Oxley Act of 2003 |
| 32.2 | Certification of Principal Financial Officer Pursuant to Section 906 of Sarbanes–Oxley Act of 2003 |

\*   Incorporated by reference to our registration statement on Form S–4 (No. 333–103070).

\*\*   Incorporated by reference to our registration statement on Form S–1 (No. 333–108028).

\*\*\*   Incorporated by reference to our registration statement on Form S–8 (No. 333–111856).

(b) *Reports of Form 8–K.*

On October 20, 2003 the Company filed a report on Form 8–K, on item 9, announcing increased penetration into real world applications for the automotive market.

On October 28, 2003 the Company filed a report on Form 8–K, on items 7 and 12, announcing the Company's results for its quarter ended September 27, 2003.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

AMIS HOLDINGS, INC.

By:                              /s/ MICHAEL SALVATI

_____

Michael Salvati
*Chief Financial Officer*

Date: March 23, 2004

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Christine King and Michael Salvati, jointly and severally, his or her attorneys−in−fact, each with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Report on Form 10−K, and to file the same, with exhibits thereto and other documents in connection therewith with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys−in−fact, or his or her substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, the following persons on behalf of the registrant and in the capacities and on the dates indicated have signed this report below.

| Signature | Title | Date |
|---|---|---|
| /s/ CHRISTINE KING<br>_____<br>Christine King | President and Chief Executive Officer (Principal Executive Officer) | March 23, 2004 |
| /s/ MICHAEL SALVATI<br>_____<br>Michael Salvati | Chief Financial Officer (Principal Financial and Accounting Officer) | March 23, 2004 |
| /s/ DIPANJAN DEB<br>_____<br>Dipanjan Deb | Director | March 23, 2004 |
| /s/ COLIN SLADE<br>_____<br>Colin Slade | Director | March 23, 2004 |
| /s/ DAVID M. RICKEY<br>_____<br>David M. Rickey | Director | March 23, 2004 |
| /s/ GREGORY L. WILLIAMS<br>_____<br>Gregory L. Williams | Director | March 23, 2004 |
| /s/ PAUL C. SCHORR IV<br>_____<br>Paul C. Schorr IV | Director | March 23, 2004 |
| /s/ TOMOHIRO SHIBATA<br>_____<br>Tomohiro Shibata | Director | March 23, 2004 |
| /s/ DAVID STANTON<br>_____<br>David Stanton | Director | March 23, 2004 |
| /s/ JAMES A. URRY<br>_____<br>James A. Urry | Director | March 23, 2004 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARTIN J. JENKINS, JUDGE

SYNOPSYS, INC.,                    )
                                   )    **◻ COPY**
            PLAINTIFF,             )
                                   )
  VS.                              )    NO. C 03-2289 MJJ
                                   )
RICOH COMPANY, LTD.,               )    PAGES 1 - 68
                                   )
            DEFENDANT.             )
_____   )

                    SAN FRANCISCO, CALIFORNIA
                    TUESDAY, AUGUST 19, 2003


              TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:          HOWREY SIMON ARNOLD & WHITEY
                        301 RAVENSWOOD AVENUE
                        MENLO PARK, CA 94025-3434

                        BY:  TERESA CORBIN, ERIK K. MOLLER AND
                             TONY KIM, ATTORNEY AT LAW

ALSO PRESENT:           ERIK OLIVER, SENIOR IP COUNSEL
                        SYNOPSYS, INC.
                        700 E. MIDDLEFIELD ROAD
                        MOUNTAIN VIEW, CALIFORNIA 94043

FOR DEFENDANT:          ALTSHUER, BERZON, NUSSBAUM, RUBIN
                        & DEMAIN
                        177 POST STREET
                        SUITE 300
                        SAN FRANCISCO, CALIFORNIA 94108

                        BY:  JONNATHAN WEISSGLASS, ESQ.
FURTHER APPEARANCES ON NEXT PAGE.

REPORTED BY:  KATHERINE POPE WYATT, CSR, RPR, RMR
              OFFICIAL REPORTER, USDC
              COMPUTERIZED TRANSCRIPTION BY ECLIPSE

```
 1    FURTHER APPEARANCES:

 2    ALSO FOR DEFENDANT:

 3    DICKSTEIN, SHAPIRO MORIN & OSHINSKY

 4    2101 L STREET NW

 5    WASHINGTON, D.C. 20037-1526

 6    BY:  GARY M. HOFFMAN, ESQ.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    INDEMNIFICATION AGREEMENT, NOW THAT WE'VE SEEN IT, ACTUALLY

2    GIVES THEM THE RIGHT TO CONTROL IT.

3            **THE COURT:**  YES.

4        **MR. HOFFMAN:**  AND THERE IS NO INDEMNIFICATION UNLESS

5    THEY CONTROL IT.  THERE'S ALSO A LIMITATION ON THEIR LIABILITY.

6    THEY ARE NOT FULLY LIABLE FOR ALL DAMAGES.  AS WE SUSPECTED,

7    THERE'S A LIMITATION UP TO THE AMOUNT THAT THE DEFENDANTS HAVE

8    PAID TO SYNOPSYS FOR THE SOFTWARE, THE LICENSING FEE.

9            ANYWAY, THAT'S WHY WE BROUGHT THE CASE IN DELAWARE

10   AGAINST THESE COMPANIES.  THAT CASE IS ADVANCING THE -- IN

11   CONNECTION WITH THE MOTION TO TRANSFER THAT THE DEFENDANTS

12   FILED THERE, THEY HAD ASKED FOR ADDITIONAL TIME IN FILING THEIR

13   REPLY BRIEF.  THAT WAS JUST RECENTLY FILED.

14           JUDGE SLEET IS ON VACATION RIGHT NOW, IS DUE BACK --

15   I THINK IT'S NEXT WEEK.  I BELIEVE IT'S NEXT WEEK, YOUR HONOR.

16           CONSEQUENTLY, YOU KNOW, WE EXPECT THAT THAT MATTER

17   WILL THEN BE TAKEN UP IN DELAWARE.

18           **THE COURT:**  OKAY.

19       **MR. HOFFMAN:**  THE DELAWARE COMPANIES -- I'M SORRY --

20   THE COMPANIES THAT WE HAVE NAMED IN DELAWARE, THOUGH, ARE NOT

21   SUBJECT TO JURISDICTION OUT HERE.

22           AND I RAISE THAT BECAUSE IT TIES IN WITH THE WHOLE

23   TRANSFER ISSUE.  NUMBER ONE:  ONLY AMI IS REGISTERED TO DO

24   BUSINESS IN THE STATE OF CALIFORNIA.  THE PARTICULAR ARROWFLEX

25   COMPANY THAT WE HAVE SUED IS NOT REGISTERED TO DO BUSINESS IN

1   CALIFORNIA.

2          NONE OF THE MATROX COMPANIES ARE REGISTERED TO DO

3   BUSINESS.  NONE OF THOSE -- WHILE THEY SUBMIT DECLARATIONS

4   TALKING ABOUT DOING BUSINESS, NONE OF THEM ARE REGISTERED TO DO

5   BUSINESS IN CALIFORNIA.  SO THERE'S A REAL QUESTION OF WHAT

6   THEY ARE DOING, IF ANYTHING, AT LEAST LAWFULLY DOING.

7          AND I PRESUME THAT WHEN YOU LOOK AT THOSE

8   DECLARATIONS CAREFULLY THERE'S SOME FUDGING THAT I WOULD HOPE

9   THEY ARE NOT VIOLATING CALIFORNIA LAW.

10         BUT THEY ARE NOT REGISTERED.  THEY ARE NOT

11  INCORPORATED HERE.  THEY ARE NOT HEADQUARTERED HERE.

12  CONSEQUENTLY, THEY COULD NOT HAVE BEEN SUED HERE.  AMI POSSIBLY

13  COULD HAVE, SINCE IT'S AT LEAST REGISTERED TO DO BUSINESS HERE,

14  ALTHOUGH, QUITE CANDIDLY, IF IT WASN'T FOR THIS WHOLE ATTEMPT

15  BY SYNOPSYS TO TRY TO SWITCH FORUMS, MY GUESS IS AMI WOULD HAVE

16  SAID:

17             "WHY ARE WE BEING SUED IN CALIFORNIA?  WE'RE

18             INCORPORATED IN DELAWARE.  WE'RE HEADQUARTERED IN

19             ANOTHER STATE.  THIS ISN'T THE PROPER FORUM."

20             THIS PARTICULAR AREA OF TECHNOLOGY, ELECTRONIC

21             DESIGN AUTOMATION, ACTUALLY HAS SEVERAL CENTERS.

22             SOME ARE IN CALIFORNIA.  SOME ARE AT

23  CARNEGIE-MELLON.  SOME ARE IN PRINCETON.  THEY ARE SPREAD

24  ACROSS THE COUNTRY.

25             THERE ARE PEOPLE, WITNESSES OR PEOPLE IN THIS AREA

```
1    OF TECHNOLOGY IN OTHER LOCATIONS THROUGHOUT THE COUNTRY.

2            DR. DI MICHELLI WHO --

3            THE COURT:  SOUNDS LIKE A PRETTY STRONG ARGUMENT FOR

4    A TRANSFER UNDER 1404.

5            MR. HOFFMAN:  IT PROBABLY IS, YOUR HONOR, IF THE

6    CASE IS NOT DISMISSED.  AND I'LL GET BACK TO THE TRANSFER ISSUE

7    IN THE CENTOCOR CASE, WHICH IS A 2002 CASE OUT OF THIS

8    JURISDICTION, OUT OF THIS COURT.

9            BUT LET'S TALK ABOUT THE OTHER QUESTIONS RAISED BY

10   THE COURT.  YOU ASKED ABOUT WOULD THE DESIGN COMPILER ALONE

11   INFRINGE.  THE ANSWER IS:  NO.  STANDING ALONE IT DOESN'T

12   INFRINGE.  AND ALSO, IF IT'S USED FOR A PURPOSE OTHER THAN FOR

13   DESIGNING ASIC'S, OKAY, IT WOULD NOT INFRINGE.

14           IF IT'S USED FOR DESIGNING OTHER TYPES OF PRODUCTS

15   THERE WOULD BE NO INFRINGEMENT.  IT IS THE PROCESS THAT'S

16   UTILIZING DESIGN COMPILER.  AND THAT'S AN IMPORTANT PART OF IT.

17   WE DON'T DENY THAT.  BUT IT'S THE PROCESS OF UTILIZING IT IN A

18   CERTAIN WAY FOR DESIGNING ASIC'S THAT CONSTITUTES WHAT WE

19   ALLEGE TO BE AN INFRINGEMENT OF AT LEAST CLAIM 13.

20           SYNOPSYS HAS RELIED ON A SERIES OF CASES, ALL

21   PRE-2001.  AND I MENTION THAT DATE BECAUSE THAT'S THE DATE OF

22   THE DECISION BY THE FEDERAL CIRCUIT ON INTELLECTUAL PROPERTY

23   DEVELOPMENT VERSUS TCI.

24           MS. CORBIN. I'M SURE, INADVERTENTLY REFERRED TO THE

25   MINIBIA CASE IN 2001 AS A FEDERAL CIRCUIT CASE.  I'M SURE SHE
```

1  JUST MISSPOKE.  THAT'S ACTUALLY A DECISION OUT OF THE EASTERN

2  DISTRICT OF PENNSYLVANIA.

3          THE COURT:  RIGHT.

4          MR. HOFFMAN:  THAT IS THE ONLY ONE THAT IS POST, OF

5  CASES THEY HAVE RELIED UPON, FOR THE ISSUE OF WHEN YOU'RE SUING

6  CUSTOMERS, AND THERE'S A COVENANT NOT TO SUE THE MANUFACTURER,

7  WHETHER OR NOT THERE WOULD BE SUBJECT MATTER JURISDICTION.

8          THEIR OTHER CASES ARE PRE THE 2001 INTELLECTUAL

9  PROPERTY --

10          THE COURT:  DO YOU FIND IT TO BE INCONSISTENT WITH

11  TCI AND THE CITE TO THAT DISTRICT COURT CASE?

12          MR. HOFFMAN:  WELL, CAN I BRIEFLY DISCUSS TCI, THEN

13  I'LL ADDRESS THE COURT'S QUESTION, IF I MAY GO INTO THE

14  INTELLECTUAL PROPERTY DEVELOPMENT CASE FIRST.

15          THAT CASES IS ON ALL FOURS WITH WHAT IS INVOLVED

16  HERE.  IF THE COURT LOOKS AT 1341 TO 1342, IT TALKS ABOUT --

17  IT'S VERY SPECIFICALLY -- THE SITUATION WHERE THERE'S A SUIT

18  AGAINST THE MANUFACTURER, AN AGREEMENT, A COVENANT NOT TO SUE

19  THE MANUFACTURER FOR THOSE ACTIVITIES.  AND THE MANUFACTURER IS

20  COMING IN AND SAYING:

21              "WELL, YEAH, BUT I HAVE A POTENTIAL

22              INDEMNIFICATION LIABILITY BECAUSE YOU'RE SUING MY

23              CUSTOMERS."

24          AND THE COURT PROCEEDED TO INDICATE, THE FEDERAL

25  CIRCUIT, ALSO RELYING ON THE RESOLUTION OF SUPER SACK, SAID:

1              "IT DOESN'T MATTER.  THE MOTION TO DISMISS IS

2         STILL GRANTED."

3         THAT THE MANUFACTURER, TCI CALIFORNIA, INTERESTS ARE

4    AFFECTED BY -- IF TCI'S CALIFORNIA INTERESTS ARE AFFECTED BY A

5    DIFFERENT SUIT REGARDING THE 202, THAT TCI CALIFORNIA SHOULD

6    JOIN THAT ACTION AS A PARTY.

7         FOR EXAMPLE, PURSUANT TO FEDERAL RULE OF CIVIL

8    PROCEDURE 19 (A) (2) TWO LITTLE I, INDICATES THAT TCI

9    CALIFORNIA DOES NOT HAVE A REASONABLE APPREHENSION JUST BECAUSE

10   THE CUSTOMERS ARE BEING SUED, BECAUSE THERE WILL BE NO LAWSUIT

11   AGAINST THEM.

12        **THE COURT:**  YES, BUT THE FACTUAL BACKDROP -- AND I

13   SAW THAT LANGUAGE THERE WHERE IT SAYS:

14             "A SUIT FILED AGAINST A DIFFERENT PARTY, EVEN

15        IF -- EVEN IF TCI CALIFORNIA POTENTIALLY REQUIRED TO

16        INDEMNITY THAT PARTY IS NOT A SUIT THAT TCI FACES

17        ITSELF."

18        AND THAT LANGUAGE COMES RIGHT AFTER WHAT YOU ARE

19   DISCUSSING.

20        BUT IT STRIKES ME THAT THE COURT IS -- IT'S MAKING

21   THOSE STATEMENTS IN THE CONTEXT OF HAVING ALREADY FOUND THE

22   COVENANT NOT TO SUE IS SUFFICIENT TO EXTINGUISH THE ACTION.

23        **MS. CORBIN:**  WELL, HERE, YOUR HONOR, WHAT WE'VE DONE

24   IS WE'VE INDICATED THAT WE WILL NOT SUE SYNOPSYS ON ANY PAST

25   ACTIVITIES, CURRENT ACTIVITIES OR ANY ACTIVITIES RELATING TO

1    ANY OF THE PRODUCTS IT SELLS.

2           SO THE ISSUES, I THINK, THE COURT RAISED WHILE GOING

3    ON INTO THE FUTURE IF IT CONTINUES TO SELL DESIGN COMPILER,

4    DOESN'T THAT SUBJECT IT TO CONTRIBUTORY INFRINGEMENT CHARGES IN

5    THE FUTURE?  AS TO DESIGN COMPILER, WE'VE AGREED WE'RE NOT

6    GOING TO SUE THEM.

7           NOW, IF THEY COME UP WITH PRODUCT A, B, C IN THE

8    FUTURE THAT WE KNOW NOTHING ABOUT OR DECIDE IN THE FUTURE TO

9    USE A NEW PRODUCT, X, Y, Z TO GO INTO THE BUSINESS OF DESIGNING

10   ASIC'S AND USING THE PROCESS, THAT MAY BE A WHOLE DIFFERENT

11   STORY WITH A WHOLE NEW PRODUCT.

12          BUT AS TO ANYTHING RELATING TO DESIGN COMPILER,

13   WE'VE INDICATED -- AND WE'VE GONE BEYOND JUST DESIGN

14   COMPILER -- WE'RE NOT GOING TO FILE ANY LAWSUIT AGAINST THEM.

15          THE COURT:  BUT NOT WITHSTANDING THAT, THE PRESENCE

16   OF THE CURRENT LAWSUITS AGAINST THOSE ENTITIES IN DELAWARE

17   STILL REMAIN.  AND THAT'S A FEATURE THAT ISN'T PRESENT IN TCI,

18   CORRECT?

19          MR. HOFFMAN:  NO, ACTUALLY IN TCI WHAT THE COURT

20   SAID:

21              "EVEN IF -- TCI CALIFORNIA ALSO CONTENDS THAT

22          IT COULD BE REQUIRED TO INDEMNIFY AN ENTITY THAT

23          POTENTIALLY COULD BE HELD LIABLE IN A DIFFERENT CASE

24          FOR INFRINGING THE PATENT."

25          THE COURT:  RIGHT.  THAT'S MORE OF A THEORETICAL

# HOWREY LLP

525 Market Street
Suite 3600
San Francisco, CA 94105-2708
T 415.848.4900
F 415.848.4999
www.howrey.com

September 15, 2005

**VIA PDF**

Kenneth W. Brothers, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street NW
Washington, DC 20037-1526

> **RE:** **Synopsys, Inc. v. Ricoh Company, Ltd.**
> **Ricoh Company, Ltd. v. Aeroflex, Incorporated, et al.**

Dear Ken:

I write in response to your letter of August 24, 2005, regarding Ricoh's Rule 30(b)(6) deposition notices to Synopsys and the Customer Defendants. As you know, the Court has limited each party's total available deposition time to 240 hours. Our records indicate that based on the depositions taken to date, Ricoh has 207 hours available of the original 240 hours. Please be aware that our agreement to provide witnesses as discussed below is limited to Ricoh's remaining 207 hours of deposition time.

As we have discussed and agreed on multiple occasions during our meet and confer sessions, we intend to offer the Synopsys and the Customer Defendants 30b(6) witnesses only one time. To the extent Ricoh chooses to proceed with depositions prior to receiving and thoroughly reviewing the production documents, it does so with the understanding and agreement that the witnesses will not be offered again. We request that you acknowledge this in writing prior to proceeding with the depositions.

## I.    Ricoh's Rule 30(b)(6) Deposition Notices to Synopsys

As an initial matter, Ricoh's August 9, 2005 30(b)(6) deposition notice seeks deposition testimony on many topics and subjects that are duplicative to those sought in Ricoh's October 16, 2003 30(b)(6) deposition notice. Synopsys will not allow multiple depositions on the same topics.

Moreover, Synopsys objected, *inter alia*, to the deposition topics listed in both Ricoh's October 16, 2003 and August 9, 2005 30(b)(6) notices as being overbroad. As we have repeatedly stated, because Ricoh's deposition topics are so broad, in many instances no one witness is able to address the information sought in the individual deposition topics.

Additionally, Ricoh has used different definitions in its 2003 and 2005 30(b)(6) deposition notices. Synopsys refers Ricoh to its supplemental objections to Ricoh's

**HOWREY**<sub>LLP</sub>

Kenneth W. Brothers, Esq.
September 15, 2005
Page 2

October 16, 2003 30(b)(6) notice (served on September 15, 2005) and to its objections to Ricoh's August 9, 2005 30(b)(6) notice (served on August 26, 2005). These objections identify the definitions used to designate witnesses and will be the definitions that the Synopsys witnesses will use for the deposition topics.

**A.     Ricoh's October 16, 2003 30(b)(6) Notice to Synopsys**

We continue to disagree with your mischaracterization regarding the past preparation of Synopsys' witnesses. As the record reflects, Ricoh has previously only asserted that *one* of Synopsys' designated 30(b)(6) witnesses, Ms. Deirdre Hanford, was not adequately prepared – a point that Synopsys vehemently contests.[1] Messrs. Gregory, Moore and Kranen were made available for specific topics based on their knowledge and were deposed with no prior complaints from Ricoh until now.

**1.     Topics for which deponents were not previously offered**

Synopsys designates Mario Dorio (re Matrox), Wade Tiedeman (re AMI) and Kelly O'Brien (re Aeroflex) for topic 4 to testify regarding any Design Compiler, HDL Compiler for Verilog, VHDL Compiler, DesignWare Foundation Library, Module Compiler and Physical Compiler product (hereinafter the "products-in-suit") sold, licensed, leased, lent, gave or otherwise (directly or indirectly) provided by Synopsys to the Customer Defendants. Synopsys also designates Mario Dorio (re Matrox), Wade Tiedeman (re AMI) and Kelly O'Brien (re Aeroflex) for topic 5 regarding any agreement from Synopsys to the Customer Defendants regarding contracts, licenses, purchase agreements, indemnification agreements and hold-harmless agreement/covenants not to sue for the products-in-suit.

Synopsys will not provide a witness for topics 6-11 sub-topics (c) and (d) because the Behavioral Compiler and CoCentric System C Compiler products have not been accused of infringement and are not properly part of the subject matter of this litigation. *See* Synopsys' objections and responses to Ricoh's 30(b)(6) notice, served on November 19, 2003. Because Module Compiler is now one of the products-in-suit, Synopsys will provide a witness for topics 6-11 (e) related to Module Compiler. We note, however, that none of the Customer Defendants have a license key to use Module Compiler. As such, please let us know if you would still like to proceed with a deposition on this topic.

---

[1] For the record again, Ms. Hanford was prepared and designated for topics 6-11 sub-topics (b) related to the "Socrates system," which was not defined in the notice. As previously explained, Synopsys never offered or sold a product called "Socrates." Instead, Socrates was a logic synthesis tool developed at GE. *See* M. Hocker's 4/15/04 letter to Magistrate Judge Chen. Because Synopsys' first products, Logic Compiler and Design Compiler, trace their heritage, at least in part, through Socrates, we interpreted Ricoh's requested sub-topic (b) to refer to these earliest Synopsys products – about which Ms. Hanford was more than prepared for and testified about on January 27, 2004. Thus, Ricoh's complaint regarding Ms. Hanford stems from its own inability to define clear topics for which it sought deposition testimony. *See also* M. Hocker's 3/18/04 letter to K. Brothers.

**HOWREY** LLP

As shown in the table below, Synopsys designates Karen Pieper for topic 1G in the 2005 notice. We interpret topic 12 from the 2003 notice to be related to the netlist output by Design Compiler. We object to the portion of this request regarding the use of the netlist as being irrelevant to the subject matter of this litigation, unless this generically refers to the netlist being used to generate GDSII files.

Regarding topics 15-19, to the extent there are any non-privileged communications on these topics, Synopsys designates Ted Chan. If Synopsys discovers that there are no non-privileged communications on these topics, we will notify you in advance of Mr. Chan's deposition date, which as shown in the table below is November 21, 2005.

### 2.    Topics for which Deponents were Previously Designated and/or Deposed

Regarding topics 1-3, subject to the objections identified above and included in Synopsys' supplemental objections to Ricoh's 30(b)(6) notice of deposition of Synopsys, Synopsys designates Mario Dorio (re Matrox), Wade Tiedeman (re AMI) and Kelly O'Brien (re Aeroflex) to the extent these topics relate to the products-in-suit supplied to Synopsys' customers.

Synopsys has designated witnesses identified in the chart below to testify regarding topics 6-11 sub-topics a and f-g for the post-1993 timeframe. Messrs. Gregory and Moore will not be made available for further deposition. [2]

Likewise, Mr. Kranen was fully prepared to testify about topics 13-14 and 20-23 when he was deposed on December 10, 2003. Your letter of August 24, 2005 made no showing pursuant to Rule 30(d)(2) that Mr. Kranen was not adequately prepared. As such, Synopsys will not allow any further deposition on these topics.

---

[2] Synopsys has repeatedly explained that Messrs. Gregory and Moore are not informed about the operation of the current versions of Synopsys products because both left the company years ago to pursue other interests. *See* M. Hocker's 4/15/04 letter to Magistrate Judge Chen. (Mr. Moore returned to Synopsys as an employee in June 2003, but then left again in May 2004.) They were, however, direct participants in Synopsys' development of its first products, which is why Synopsys designated Messrs. Gregory and Moore to testify on its behalf with regard to the products covered in Ricoh's 2003 notice for topics 6-11, subtopics (a), (b), (g), (h), and (i), but only for versions of Synopsys products up through 1993.

Prior to their depositions, Synopsys repeatedly informed Ricoh that Messrs. Gregory and Moore are extremely busy individuals and offered these witnesses only once for deposition. *See* 4/13/04 letter from M. Hocker to E. Oliver. During their depositions, however, Mr. Eric Oliver of your firm wasted significant time asking questions outside the scope of witnesses' designations. Mr. Oliver then decided to adjourn Mr. Gregory's deposition in spite of Mr. Hocker's vigorous objection that we would close the deposition and not bring Mr. Gregory back if he decided to end the deposition before completing his questions. *See* Gregory transcript at 233:6-25. Thus, because these witnesses were already made available to testify about the design, features, programming, implementation and preparation of manuals describing the products covered by sub-topics a, b and g-i, for the pre-1993 timeframe, these witnesses will not be made available for further deposition.

**HOWREY** LLP

### B.    Ricoh's August 9, 2005 30(b)(6) Notice to Synopsys

The deposition topics in Ricoh's August 9, 2005 30(b)(6) notice to Synopsys seek testimony regarding "the development of (from conception to present, including revisions and modifications thereto)" Synopsys' source code for the various products-in-suit.  As we have repeatedly stated, such testimony is more appropriately sought in the form of interrogatories.

To the extent Ricoh seeks deposition testimony about specific parts of Synopsys' source code, please identify the particular C and/or H source code files for which it seeks testimony prior to the witnesses depositions.[3]  Such identification is absolutely necessary because it is impossible to prepare any witness to testify about all of the source code.  For example, the rules based optimization (RBO) source code contains approximately two million lines of code, and the algorithmic based optimization (ABO) source code contains approximately 350,000 lines of code.

If Ricoh refuses to identify specific C and/or H source code files and proceeds to examine the witnesses about specific parts of the code, the Synopsys witnesses designated in the chart below will not be subject to later argument from Ricoh that they were not adequately prepared.  Moreover, these witnesses are offered subject to Synopsys' objections served on August 26, 2005 as well as September 15, 2005.

### C.    Summary of Witnesses Designated in Response to Ricoh's October 16, 2003 and August 9, 2005 30(b)(6) Notice to Synopsys

| 10/16/03 TOPIC | 8/9/05 TOPIC | WITNESS | PROPOSED DATE |
|---|---|---|---|
| 1-5 | | Wade Tiedeman (re AMI) Mario Dorio (re Matrox) Kelly O'Brien (re Aeroflex) | TBD (looking at week of November 14) |
| 15 - 19 | | Ted Chan | November 21 |
| 6-11 sub-topic (a) re Presto version of HDL Compiler, and 12 (except regarding the use of the netlist output) | 1A, 1B (re Presto version of HDL Compiler), and 1G | Karen Pieper | October 14 |

---

[3] Ricoh has had access to Synopsys' source code since May 10, 2004, which is more than sufficient time for Ricoh to have identified the specific parts of the code it is interested in.

**HOWREY** LLP

| 6-11 sub-topics (e) and (f) | 1C, 1D, 1E (re synthetic library implementation selection), 2A (re synthetic libraries), 2B (re synthetic libraries/GTECH), 3B, 3K and 3O | David Tran | October 18 |
|---|---|---|---|
| | 1F, 3A, 3C and 3G | Peter Zepter | November 9 |
| 6-11 sub-topic (g) | IF, 3D, 3E, 3H, 3M, 3N and 7 | Janet Olson | November 2 |
| 6-11 sub-topic (a) re pre-Presto HDL Compiler | 1B (re pre-Presto HDL Compiler), 1E (re target technology libraries), 3F, 3I, 3J, 4A, 4B and 4C | Jay Adams | October 27 |
| | 2A (re technology libraries) and 2B (re synthetic libraries) | Shir-Shen Chang | October 21 |
| | 5A, 5B and 5C | Rick Rudell | November 4 |
| | 6A, 6B, 6C and 6D | Russ Segal | October 25 |

It is our understanding that each designated witness will be made available for one day of testimony unless extraordinary circumstances require that the witness be available for two consecutive days. Please let me know if this differs with your understanding.

## II.    Ricoh's Rule 30(b)(6) Deposition Notices to the Customer Defendants

In working to identify witnesses for topics 1-11, we realized that there are a large number of witnesses and they are the same witnesses who would have to be designated for the remainder of the topics. We are unwilling to make these witnesses available for deposition twice. As a result, we are working diligently to provide you with a complete list of witnesses by topic for each company. You can then advise us whether you believe you will need more than one day for any witness and we can then schedule accordingly.

We look forward to working with you to complete these depositions.

Very truly yours,

*Teresa M. Corbin* /pb

Teresa M. Corbin

FOCUS – 10 of 54 DOCUMENTS

**GOODRICH CORPORATION, a New York corporation, Plaintiff, v. EMHART INDUSTRIES, INC., a Connecticut corporation, et al., Defendants.**

**NO. EDCV 04–00759–VAP (SSx), [consolidated with Case No. EDCV 04–00079–VAP (SSx)]**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2005 U.S. Dist. LEXIS 25160*

**October 6, 2005, Decided
October 6, 2005, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Goodrich Corp. v. Emhart Indus., 2005 U.S. Dist. LEXIS 25158 (C.D. Cal., Oct. 12, 2005)*

**PRIOR HISTORY:** *City of Rialto v. United States DOD, 2005 U.S. Dist. LEXIS 25179 (C.D. Cal., Sept. 23, 2005)*

**COUNSEL:** [*1] For Goodrich Corporation, a New York corporation, Plaintiff: Denise G Fellers, Elizabeth A Klein, Jeffrey D Dintzer, Julianne B Cramer, Gibson Dunn & Crutcher, Los Angeles, CA.

For Emhart Industries Inc, a Connecticut corporation, Defendant: Gary A Sloboda, Henry Lerner, James L Meeder, Robert David Wyatt, Allen Matkins Leck Gamble and Mallory, San Francisco, CA.

For Kwikset Corporation, a Delaware corporation, Kwikset Locks Inc, a California corporation, Defendants: Henry Lerner, James L Meeder, Robert David Wyatt, Allen Matkins Leck Gamble and Mallory, San Francisco, CA.

**JUDGES:** SUZANNE H. SEGAL, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** SUZANNE H. SEGAL

**OPINION:**

**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART GOODRICH CORPORATION'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ANSWER TO INTERROGATORY NO. 25 (DOCKET NO. 106)**

**I. INTRODUCTION**

This is an action arising out of certain operations on a 160-acre parcel of land in Rialto, California by a corporation known as the West Coast Loading Corporation (a predecessor of the named defendant, Emhart Industries, Inc. ("Emhart")). On August 15, 2005, Plaintiff Goodrich Corporation ("Goodrich") filed a motion [*2] entitled "Motion to Compel Production of Documents and Answer to Interrogatory No. 25" (the "Motion"). In support of the Motion, the parties submitted a Joint Stipulation, pursuant to Central District of California Local *Rule 37*. The parties also filed declarations and exhibits in support of their positions as stated in the Joint Stipulation. On September 6, 2005, Goodrich filed a Supplemental Memorandum in support of the Motion. The Court held a hearing on September 26, 2005. For the reasons stated below, the Motion is GRANTED IN PART and DENIED IN PART.

**II. DISCOVERY REQUESTS IN DISPUTE**

**A. Goodrich's Contentions**

On April 20, 2005, Goodrich served its Fourth Demand for Production of Documents upon Emhart. (Declaration of Kimberly Gilchrist ("Gilchrist Dec."), Exh. A). These requests pertained to a November 1998 "buyout" Agreement that was executed in settlement of litigation between Black and Decker, Inc. and certain London insurers. The discovery requests sought drafts of the Agreement, diligence performed by the parties prior to the execution of the Agreement, communications reflecting negotiations leading up to the agreement, and related documents. (Jt. Stip. [*3] at 1). Goodrich con-

tends that the requested documents are relevant to the "successor liability" issue presented by this litigation. (Jt. Stip. at 2). Specifically, Goodrich contends that Emhart, by acquiring Kwikset Locks, Inc. ("KLI") and West Coast Loading Corporation ("WCLC"), became liable for any contamination caused by these entities under the successor liability doctrine. Emhart disputes this contention.

Goodrich asserts that documents pertaining to the 1998 Agreement are relevant to establishing the value of KLI and WCLC insurance policies, which the 1998 Agreement allegedly discharged and extinguished. (Jt. Stip. at 2). Goodrich brings this Motion because Emhart has objected to the discovery requests and refused to produce any documents in response.

Goodrich has divided its discovery requests into several categories. The first group, request for production nos. 215, 217, 218, 219, 220, 243, 244, seeks documents "relating to any insurance policies naming KLI or WCLC as an insured and any documents relating to the transfer, discharge or release of any such policies." (Jt. Stip. at 20). Goodrich notes that Emhart has acknowledged that the excess insurance policies of KLI were [*4] discharged and released to Emhart in a "confidential" buyout agreement in November 1998. (Jt. Stip. at 26). Goodrich points out that Judges Phillips and Walters have issued orders or made statements requiring that Defendants disclose to Plaintiff "evidence of insurance coverage, including identities of insurance carriers, policy instruments, reservation of rights or denial letters and any other non–privileged communications." (Jt. Stip. at 26; Gilchrist Dec., Exh. I). Goodrich argues that any insurance policies or documents relating to the transfer, discharge or release of such policies are "clearly relevant." (Jt. Stip. at 27).

The second group of requests, request nos. 216, 227, 231, 232, and 236, seeks documents "relating to the decision to enter into the November 1998 Agreement; drafts of the agreement, [and] communications regarding the agreement." (Jt. Stip. at 29). According to Goodrich, Emhart's counsel has represented that, by virtue of the 1998 Agreement, Black and Decker extinguished insurance policies naming KLI and WCLC. (Jt. Stip. at 33; Gilchrist Dec., Exh. L). Goodrich argues that, in order for Black and Decker to extinguish the policies of KLI and WCLC, Black and [*5] Decker had to have been "in privity" with Emhart. (Jt. Stip. at 33). Furthermore, if Emhart were paid to extinguish the policies of KLI and WCLC, Goodrich contends this would provide evidence in support of its claim that Emhart is a successor to the liabilities of KLI and WCLC. (Jt. Stip. at 34).

The third group of requests, nos. 221, 222, 223, 224, 225, 226, 229, 230, 233, 234, 235, 237, and 238, seeks documents "relating to diligence undertaken by or on behalf of the Emhart entities prior to entering into the November 1998 Agreement." (Jt. Stip. at 34). Goodrich argues that Emhart, in declarations to the Court, asserted that the 1998 Agreement "discharged and released" insurance policies naming KLI as an insured. (Jt. Stip. at 44). The Agreement, however, does not indicate such a release. (Id.). Goodrich seeks the documentation relating to the diligence performed by the parties prior to the execution of the Agreement to further explain the implications of the Agreement. (Jt. Stip. at 45–6).

The fourth group of requests, nos. 245, 246, 247, 248, 249, 250, 251, 252, 253, 254, 255, and 256, seeks documents "relating to litigation between [the] Emhart entities and insurance carriers. [*6] " (Jt. Stip. at 47). Goodrich argues that evidence of litigation between an Emhart entity and any insurance company that resulted in the extinction of the policies of KLI or WCLC would also be "prime evidence" of Emhart's successor liability to KLI's and WCLC's liabilities. (Jt. Stip. at 58).

The fifth group of requests, nos. 239 and 240, seeks "documents relating to payments received by [the] Emhart entities pursuant to the November 1998 Agreement." (Jt. Stip. at 59). These requests, according to Goodrich, would require the production of evidence showing that Emhart "cashed out" the liabilities of KLI, including KLI's liabilities resulting from its operations at the 160–acre parcel. (Jt. Stip. at 60). If Emhart cashed out KLI's excess insurance policies, then Emhart may have extinguished the rights of third party beneficiaries such as Goodrich and the City of Rialto to make claims against those policies. (Jt. Stip. at 60). Goodrich further contends that the purported cashout of Emhart is evidence of successorship or evidence of a fraudulent conveyance, either of which would make Emhart liable for KLI's actions under a de facto merger theory. (Jt. Stip. at 61).

Finally, Goodrich [*7] seeks to compel a further response to Interrogatory No. 25. This interrogatory seeks the identities of all individuals involved "in any way" in the 1998 Agreement. According to Goodrich, at the July 20, 2005 meet and confer, Goodrich offered to narrow this interrogatory to seek only the identity of those persons known to Emhart who worked at the Black and Decker Corporation, Black & Decker (U.S.), Inc., or Emhart, who were involved in any way in the November 1998 Agreement. Goodrich seeks this information in order to determine if those individuals should be deposed. (Jt. Stip. at 63).

### B. Emhart's Contentions

Emhart raises several objections in response to the discovery requests, but its primary contention is that the requested documents, if they exist, are irrelevant to the

subject matter of the present lawsuit. Emhart further contends that there are no documents that "refer or relate to [WCLC's or KLI's] operations at the 160-acre property" within the universe of documents that "relate to" the 1998 Agreement. (Jt. Stip. at 7; Meeder Dec., Exh. C at 13–14).

Emhart submitted the declaration of Gary Duvall, an attorney for Black and Decker, in support of its Opposition. Mr. [*8] Duvall declares that, at the time the November 1998 agreement was negotiated, neither the lawyers nor the principals of Black and Decker (1) were aware of the 160-acre Rialto site; (2) were aware that an entity named West Cost Loading Corporation (which was merged out of existence in 1957) ever operated at that site; (3) were aware that Kwikset Locks, Inc. (which was dissolved in 1958) ever had title to the 160-acre Rialto site or that between 1952 and 1957 WCLC was KLI's subsidiary; (4) were aware of the existence of any insurance policies covering WCLC's operations at the 160-acre Rialto site; or (5) are aware of any document that relates to the 1998 Agreement that refers to or names (a) WCLC, (b) KLI, (c) the 160-acre Rialto site, or (d) any WCLC or KLI insurance policy that might provide coverage for liabilities allegedly created by WCLC during its operations at the 160-acre Rialto site. (Duvall Dec. at 13–14; Meeder Dec., Exh. C at 14).

According to Emhart, because the lawyers and principals were "unaware" of the 160-acre site and insurance policies covering WCLC operations and KLI, it is impossible that there are relevant documents in existence that are responsive to the requests [*9] at issue. Emhart asserts that any agreement (or documents relating to an agreement) between Black and Decker and Emhart, which permits Black and Decker to release Emhart's insurance carriers, would not bear any relevance to the issue of whether Emhart is the corporate successor of KLI. (Jt. Stip. at 18).

Emhart also asserted in its objections that any responsive documents, if they are relevant, are privileged. (Jt. Stip. at 20–64). However, Goodrich has unequivocally stated that it is not interested in privileged documents and seeks only non-privileged, responsive documents.

Regarding the first group of requests, Emhart contends that *Rule 26 (a) (1) (D)* only provides for the disclosure of "any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment." (Jt. Stip. at 28). As Emhart has provided all known insurance policies in its possession, custody and control that "might" relate to the claims brought against it, Emhart contends that it has fulfilled all of its discovery obligations in this regard. (Jt. Stip. [*10] at 29).

For the remainder of the requests and in response to the specific arguments set forth by Goodrich, Emhart referred the Court back to the original arguments by Emhart contained in Section 1.B(1) — (3) and Section II. B of the Joint Stipulation.

### III. GOODRICH HAS DEMONSTRATED THE RELEVANCE OF SOME, NOT ALL, OF THE REQUESTED DOCUMENTS AND THEREFORE THE MOTION TO COMPEL IS GRANTED IN PART AND DENIED IN PART

Under *Federal Rule of Civil Procedure 26(b)(1)*, each party has the right to discover nonprivileged information "relevant to the claim or defense of any party." *Rule 26(b)(1)* also permits the court, for "good cause," to order discovery of information relevant to the subject matter involved in the action. Relevance is broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party. *Waddell & Reed Fin., Inc. v. Torchmark Corp., 222 F.R.D. 450, 452 (D. Kan. 2004)*. A request for discovery should be allowed unless it is clear that the information sought can have no possible bearing on the claim [*11] or defense of any party. Id.

The commentary to the changes in *Rule 26*, enacted in December 2000, clarifies that the amendment to the scope of discovery provisions of *Rule 26(b)(1)* "is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery," so that if there is "an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." *Thompson v. Department of Housing and Urban Dev., 199 F.R.D. 168, 171 (D. Md. 2001)*(quoting *Commentary to Rule Changes, Court Rules, 192 F.R.D. 340, 389 (2000))*. In determining whether information sought is relevant, the commentators observed:

> [A] variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product could be properly discoverable under the revised [*12] standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of

admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.

*Id. at 172* (quoting Court *Rules, 192 F.R.D. at 389*).

Goodrich alleges that Emhart may be liable for some or all of the claims arising out of the operations on the 160-acre land as a "successor" of KLI and WCLC. Emhart denies that successor liability exists. Goodrich argues that its discovery requests are relevant to its claims that Emhart may be liable as a successor to KLI and WCLC. This Court agrees that some, if not all, of the discovery requests seek relevant information.

Emhart argues that, because Black and Decker's principals and lawyers were "unaware" of the Rialto site at the time of the November 1998 Agreement, none of the documents [*13] pertaining to that Agreement can possibly contain relevant information. This argument construes relevancy, for purposes of discovery, too narrowly. The fact that Black and Decker's principals and lawyers were "unaware" of the Rialto site at the time that the 1998 Agreement was entered into does not result in the conclusion that the referenced documents are irrelevant. Goodrich has alleged claims against Emhart, KLI, and WCLC. These requests seek documents to further explain the relationships that existed between these entities. Those relationships are relevant to the "claims and defenses" of the parties to this action.

Other courts, in examining similar relevance questions, have permitted discovery into underlying insurance policies (and related documents), even when the policies and documents were not directly related to the specific claims at issue. For example, in *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., Ltd., 2003 U.S. Dist. LEXIS 1027, 2003 WL 145419 (N.D. Ill. 2003)*, an insurance company sought a declaratory judgment to determine the extent of its liability after September 11, 2001. The defendants (leaseholders at the World Trade Center) served a subpoena [*14] on an insurance industry trade association, a non-party, seeking documents regarding the meaning of certain terms used in the insurance policies contested in the primary action. The subpoenaed documents were not directly relevant to the claims and defenses of the parties, but were found relevant as "extrinsic evidence" to determine ambiguities in the policy terms. (*2003 U.S. Dist. LEXIS 1027, [WL] at *3*). Here, the

requested documents, if they exist, may serve as either extrinsic or direct evidence to explain the connections between WCLC, KLI and Emhart.

Emhart's suggestion, that the language of *Rule 26(a)(1)(D)* limits discovery to only those insurance policies in Emhart's possession, custody and control that "might" be related to the claims brought against it, does not find support in the commentaries to that rule. As noted in *Simon v. G.D. Searle, 816 F.2d 397 (8th Cir. 1987)*, the enactment of *Rule 26(b)(2)* n1 was not intended to change existing law governing discovery of insurance-related information. *Simon, 816 F.2d at 404*. Rather, the general relevancy standard embodied in *Rule 26(b)(1)* "remains applicable to insurance documents other than [policies]." Id. Thus, [*15] insurance documents that are not discoverable under *Rule 26(a)(1)(D)* remain discoverable under the relevancy standard of *Rule 26(b)(1)*. n2

> n1 Former *Rule 26(b)(2)* contained the same language regarding insurance agreements that is now contained in *Rule 26(a)(1)(D)*.

> n2 Although the Simon decision was discussing the relevancy standard as it existed in the former version of *Rule 26(b)(1)*, the same conclusion, i.e., that *Rule 26(a)(1)(D)* does not bar discovery of other insurance documents under *Rule 26(b)(1)*, is equally applicable under the new version of the rule.

Thus, as to the first, second, third and fifth categories of requests, described above, the Motion to Compel is GRANTED. Emhart shall provide supplemental responses and documents to Goodrich within thirty days of the date of this Order. If, after a reasonable search, Emhart concludes that no responsive documents exist, Emhart must so declare in a supplemental response. If documents exist but are privileged, Emhart must identify those documents [*16] in a supplemental privilege log.

The Court DENIES the Motion as it concerns the fourth category of requests seeking all documents "relating to litigation between [the] Emhart entities and insurance carriers." The Court agrees that these requests are overbroad. These requests could arguably encompass documents that have no bearing whatsoever on the claims in the current litigation. Moreover, to the extent that Emhart or the related entities engaged in litigation with their carriers, many of the sought after documents would be matters of public record. There is no showing by Goodrich that the burden for Goodrich to obtain these documents would be any greater than the burden imposed on Emhart to produce them. "It is well established that discovery need not be required of documents of public record which are

equally accessible to all parties." *Securities and Exchange Commission v. Samuel H. Sloan & Co., 369 F. Supp. 994, 995 (S.D.N.Y. 1973).* As such, the Motion as to the fourth category of requests is DENIED.

The Court GRANTS the Motion as to Interrogatory No. 25, as limited by Goodrich in the Joint Stipulation. (See Jt. Stip. at 63). The identity of the individuals [*17] who were involved in the November 1998 Agreement is clearly discoverable information. Emhart shall provide a verified, supplemental interrogatory response within thirty days of the date of this Order.

## IV. CONCLUSION

For the reasons stated above, Goodrich's Motion to Compel Production of Documents and Answer to Interrogatory No. 25 is GRANTED IN PART and DENIED IN PART. Emhart shall serve supplemental responses and produce documents within thirty days of the date of this Order, as described above.

IT IS SO ORDERED.

DATED: October 6, 2005.

SUZANNE H. SEGAL

UNITED STATES MAGISTRATE JUDGE