1  Teresa M. Corbin (SBN 132360)
   Denise M. De Mory (SBN 168076)
2  Jaclyn C. Fink (SBN 217913)
   HOWREY LLP
3  525 Market Street, Suite 3600
   San Francisco, California  94105
4  Telephone:  (415) 848-4900
   Facsimile:  (415) 848-4999
5
   Attorneys for Plaintiff SYNOPSYS, INC.
6  and for Defendants AEROFLEX INCORPORATED,
   AEROFLEX COLORADO SPRINGS, INC., AMI
7  SEMICONDUCTOR, INC., MATROX
   ELECTRONIC SYSTEMS, LTD.,
8  MATROX GRAPHICS, INC.,
   MATROX INTERNATIONAL CORP.,
9   and MATROX TECH, INC.

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13  RICOH COMPANY, LTD.,                    Case No.   C03-04669 MJJ (EMC)

14          Plaintiff,                      **DEFENDANTS' MEMORANDUM OF
                                            POINTS AND AUTHORITIES IN
15     vs.                                  OPPOSITION TO RICOH'S MOTION FOR
                                            SANCTIONS FOR DEFENDANTS'
16  AEROFLEX INCORPORATED, et al.,          VIOLATION OF JUDGE JENKINS' CMC
                                            ORDER REGARDING IDENTIFICATION
17          Defendants.                     OF PRODUCTS AT ISSUE**

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................... 1

II.   FACTS ...................................................................................................................... 2

    A.   The July 2005 Case Management Conferences ............................................... 2

        1.   The Court First Required Ricoh To Identify The Types Of Libraries In Which It Is Interested, And Then Required The Customer Defendants To Identify The Libraries And Inputs They Use. ............................................................................................. 3

        2.   After The Library And Input Declarations Were Provided, The Court Required The Customer Defendants To Identify Products That Met Certain Specified Criteria ..................................... 5

    B.   Aeroflex Did Not Violate Any Court Orders Or Commit A Fraud On the Court............................................................................................... 8

    C.   AMI Did Not Disobey A Court Order........................................................... 14

    D.   Ricoh Does Not Even Make Any Allegations Against Matrox, But Improperly And Outrageously Requests That It Be Sanctioned................... 17

    E.   Ricoh, Its Infringement Contentions, And What It Claimed to Need ........... 17

III.   ARGUMENT............................................................................................................ 18

IV.   CONCLUSION........................................................................................................ 20

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

i

## I.    INTRODUCTION

Ricoh's sanctions motion is frivolous, and its increasingly desperate litigation strategy is transparent.  Its sanctions motion is filled with conjecture and speculation, and no evidence of any alleged discovery abuses, fraud or willful disobedience of a Court Order.  The motion is built on an increasingly tenuous series of "it appears" and "it seems" and "there might be" statements, culminating in a request for sanctions against the Matrox entities, even though Ricoh concedes that it has not even completed its investigation or the depositions of the Matrox entities.  Ricoh's accusations are serious, but made without any substantive support.  Ricoh's strategy is to litigate its allegations of discovery abuses, not the merits of the case.  Ricoh's strategy has unnecessarily and outrageously increased the cost of this litigation.  Not only should the Court deny this Motion, but it should take affirmative action to manage this case going forward to eliminate Ricoh's abuse of process.

Prior to filing this motion, Ricoh's counsel was informed in many instances of the baseless nature of its claims, or just simply failed to inquire about underlying facts.  For example, in an Aeroflex deposition, Ricoh's attorney left the deposition before it was completed with a "firm conviction" that Aeroflex was hiding something simply because the Aeroflex witness identified some ASICs that were not on the product declaration.  That attorney, however, never asked a single question about why these products were omitted before forming his "firm conviction."  However, later in the day, another Ricoh attorney learned that the ASICs that Ricoh alleges were willfully omitted from the Aeroflex declarations were  either synthesized using something other than the Synopsys tools at issue, or were synthesized in the late 1980's, or *were not synthesized at all*, and thus are not at issue in this litigation.  Ricoh threatened sanctions immediately after the deposition notwithstanding the fact that this testimony was known to one Ricoh lawyer and specifically pointed out to the attorney who left the deposition.  Indeed, even in its motion, Ricoh does not even inform the Court of these facts that conclusively refute any wrong-doing by Aeroflex.

Each of Ricoh's various concerns is addressed at great unnecessary expense to the Customer Defendants below.  Although the blow-by-blow story is long, the determinative facts are quite simple:

1.    Ricoh concedes that the "scope of discovery" going forward from the July 2005 Case Management Conference was to be governed by the product and library declarations to be served in July and August of 2005.

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

1

2. Ricoh received declarations in July and August of 2005, which on their face indicate what information they include relating to products synthesized by the named party using Design Compiler from 1997 to the present.

3. Although there is no written order from the Case Management Conferences, shortly after the Conferences, Ricoh expressly acknowledged in writing to this Court that it understood the declarations at issue in this motion would govern the scope of discovery going forward, and, in its own words, would include:

> "a complete and accurate list of all commercial ASICs synthesized using Design Compiler by defendants from February 1997 to the present."

8/30/05 Joint Letter to Judge Chen at 7. Thus, to be included in the product declaration, all of the following criteria had to be met:

a. The product was a commercial ASIC;

b. The product was synthesized using Design Compiler;

c. The product was synthesized by the named defendant; and

d. The product was synthesized during the damages period, or from 1997 to the present.

4. The Customer Defendants have made their best efforts to make sure that all the products included on the product declarations, and the corresponding library and input declarations, meet this criteria.

5. At the time of filing of its motion, Ricoh either: (1) knew that omitted products or libraries did not meet these criteria but omitted those facts from its motion; or (2) simply failed to ask why certain products were or were not on the declarations, opting instead to burden the Court, the Customer Defendants, and Synopsys with this frivolous motion.

On the basis of these five facts alone, Ricoh's motion must be denied.

Turning to the specific allegations, with the exception of AMI, Ricoh does not even identify chips or information that it claims are missing from the allegedly "willfully false" declarations. Ricoh's conjecture with regard to Aeroflex and Matrox is directly refuted in detail below. With regard to AMI, Ricoh does point to three things that were allegedly omitted from the declarations: (1) chips that were synthesized by Flextronics; (2) chips that were synthesized by related – but separate corporate entities – in Europe and elsewhere and then sold by AMI in the United States; and (3) products synthesized by two AMI Business Units. In each instance, however, the chips that Ricoh claims were inappropriately omitted from the product declarations did not meet the criteria for

HOWREY LLP

Case No. C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

-2-

1  inclusion because they were not synthesized by AMI, and thus were not within the agreed scope of

2  discovery.[1]  Although Ricoh previously acknowledged in Court filings that chips not synthesized by a

3  related party were not at issue, Ricoh now disingenuously moves for sanctions on this basis.  In any

4  event, in view of Ricoh's increasingly acrimonious posture and threats of sanctions, AMI has already

5  indicated that although they believe these products are outside the scope of the case, until the issue is

6  resolved, AMI is investigating and collecting documents and data relating to these chips but will seek a

7  protective order before production.

8       In the over 150 hours of deposition it has taken, Ricoh has asked very few substantive

9  questions about the 5,000,000 pages of documents and 3,000,000 pages of e-mail it insisted be

10 produced.  Instead of focusing on the facts at issue in this case, its entire strategy appears to be

11 predicated on turning this action into a discovery abuse case – even though there is nothing in the

12 record to support that view.  This strategy has resulted in an egregious waste of party and Court

13 resources, and does not advance resolution on the merits, or facilitate compromise, in any manner.  The

14 Court needs to intervene to halt Ricoh's abuse of process in its tracks by denying Ricoh's motion and

15 discouraging such motions in the future.

16 **II.    FACTS**

17      **A.    The July 2005 Case Management Conferences**

18      In May of 2004, a discovery stay was entered staying discovery pending completion of the

19 claim construction process.  The Court issued its claim construction ruling on April 7, 2005, and

20

21 _____

22 [1] Moreover, AMI has not endeavored to hide anything.  In an abundance of caution amidst Ricoh's sanctions threats regarding the Aeroflex depositions, counsel for AMI made Ricoh aware of the Flextronics asset purchase and the European chips prior to the AMI deposition even though the chips, in AMI's view, fall outside the Court ordered scope of the case.

23 Declaration of Denise M. De Mory in Opposition to Motion for Sanctions ("De Mory Decl."), Exh. 1.  It appears that this forthrightness was the unfortunate trigger for this motion.  Indeed, counsel suspects that Ricoh will make much of this letter

24 and a subsequent letter regarding the timing for production of documents relating to these products, sent in response to Ricoh's insistence that discovery go forward on these chips.  Ricoh will likely misconstrue the letters to suggest that AMI

25 or its counsel knew that the Flextronics and European products were relevant.  The Court should reject any such argument. First, the letters on their face specifically indicate that they are being sent to inform Ricoh of facts without any

26 representation that the products described in the letters give rise to liability.  Second, to the extent any confusion was created at all by virtue of these letters it is because they were written by the undersigned, who was not counsel of record nor

27 present during the Case Management Conferences, or involved in any of the letter writing or briefing immediately thereafter that made the "scope of discovery" as well as the parties mutual understanding of the "scope of discovery" clear.

28 Ricoh's counsel who filed the motion, however, was directly involved in these proceedings.

1  thereafter ordered a Case Management Conference to occur in mid-June. The conference, however,

2  was postponed by the Court until mid-July.[2]

3      The Case Management Conference Statement itself makes clear that there were two competing

4  interests heading into the Conference: Synopsys and the Customer Defendants were pushing for

5  Ricoh's Final Infringement Contentions, and Ricoh was pushing back claiming it did not have enough

6  information. *See, e.g.,* De Mory Decl., Exhibit 2 (06/08/05 CMC Statement). In view of the

7  competing interests, the parties and the Court expended great effort in ascertaining the information

8  Ricoh claimed to need to proceed with its case, and, as Ricoh indicates in its motion, to define the

9  scope of discovery going forward. As Ricoh says: "[t]he purpose behind the Court's Order to produce

10 these sworn declarations was to identify the ASIC products at issue in Ricoh's infringement action.

11 Discovery would then commence based upon the content of those declarations." Ricoh Motion at 6.

12      The first portion of the Case Management Conference occurred on July 13, 2005; no court

13 reporter was present. There are, however, contemporaneous documents written by both sides, which

14 although they are not consistent in all details, evidence actions both sides were to take after the

15 Conference.

16      **1.    The Court First Required Ricoh To Identify The Types Of Libraries In**

17          **Which It Is Interested, And Then Required The Customer Defendants To**

18          **Identify The Libraries And Inputs They Use.**

19      At the July 13, 2005 Conference, the Court required each of the parties to perform certain tasks

20 by specified deadlines. Because there was confusion at the Case Management Conference about the

21 libraries in which Ricoh was interested, Ricoh was ordered to provide a list of libraries as well as the

22 definitions of those libraries in advance of any required disclosure by the Customer Defendants. De

23

24

25  [2] Based on the assumption that the stay would be lifted in June, and prior to any meet and confer regarding the scope of

26 discovery – which ultimately expanded well beyond the Customer Defendants expectations, the Customer Defendants estimated the time frame to substantially complete document production would be the end of August. Ricoh repeatedly

27 points to this estimate to suggest that the Customer Defendants have dragged their feet on document production even though Ricoh knows, and has been repeatedly informed, that this estimate was based on a set of events transpiring that did

28 not occur as expected.

HOWREY LLP

Case No. C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)        -3-
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

1   Mory Decl., Exh. 3 (July 18, 2005 Allen letter).[3]   Ricoh provided its letter on July 18, 2005, stating as

2   follows:

3           In accordance with Judge Jenkins' directive provided at the July 13, 2005 Case
        Management Conference, we provide (i) the following list of the "the types of libraries

4       we are seeking to have fully identified in the list to be provided by each ASIC Defendant.

5           . . .

6           Ricoh is seeking discovery related to the *above list of libraries* as provided by Synopsys,
        as well as any additions to, modifications to, substitutions/replacements for any of the

7       foregoing libraries made by the ASIC Defendants (e.g., such as by use of DesignWare
        Developer). [footnote omitted] (emphasis added)

8
            As directed by Judge Jenkins, by 11 A.M. Pacific Time on Thursday, July 21, 2005, you
9       are to provide us, for each ASIC defendants, the list of libraries that each has used.

10  *Id.*

11          In response to Ricoh's letter defining the libraries, the Customer Defendants were to serve two

12  things on July 21, 2005:  (1) a list of the libraries identified by Ricoh that had been used by each

13  Customer Defendant to design ASICs using the Synopsys tools at issue (which, at the time, and even

14  now, were not well defined by Ricoh) (hereinafter the "library declarations") and (2) a declaration

15  describing the type of inputs that each of the Customer Defendants had used with the Synopsys tools

16  (hereinafter the "input declarations").   Notwithstanding the very short time period provided, the

17  Customer Defendants complied with the Court's directive to the best of their ability.  Brothers Decl.,

18  Exhs. 6, 8, 11, 20, 25-27, 31-32 (July Cust. Def. Decls.).

19          Notwithstanding the Customer Defendants' efforts, and the fact that Ricoh has made no

20  specific allegations of anything missing from the library or input declarations, in its Motion Ricoh

21  brazenly alleges that Aeroflex and/or its counsel committed a fraud on the Court with regard to the

22  library declarations, that, thereafter allegedly affected the product declarations.  In particular, Ricoh

23  alleges that "Defendants' counsel *instructed their clients to artificially limit their search for and*

24

25  _____

26  [3] It is also evident based on the correspondence and meet and confers extending for several months after the Case
    Management Conference that the terminology used by Ricoh was not consistent with the manner in which the Customer

27  Defendants or Synopsys used terms.  Notwithstanding the confusion, the Customer Defendants provided Declarations that
    address to the fullest extent possible Ricoh's expressed interests, and supplemented the declarations as issues became more

28  clear.

1   *collection of data*." Motion at 2 (emphasis added). To support its contention, Ricoh relies on a

2   privileged, but inadvertently produced e-mail that is the subject of Aeroflex's currently pending *ex*

3   *parte* application. As set forth in the *ex parte* papers, Aeroflex believes that Ricoh breached its ethical

4   obligations as well as spirit, if not the letter, of the Stipulated Protective Order by relying on the e-mail

5   in the first instance.

6       Aside from the issue Ricoh's improper use of an inadvertently produced privileged

7   communication, Ricoh's contentions about the e-mail are demonstrably false. First, the very first

8   library declaration *includes* libraries that Ricoh claims counsel instructed Aeroflex not to search for.

9   The July 21, 2005 Coco Declaration (Brother Decl., Exh. 11) – submitted to Ricoh just days after the

10  allegedly fraudulent scheme was commenced – includes "Aeroflex libraries" as well as .db files – the

11  very types of files Ricoh alleges counsel instructed Aeroflex to exclude from their search and data

12  collection. Moreover, at the time the allegedly fraudulent communication was made, Ricoh had not yet

13  provided its list of libraries. Thus, Aeroflex was under no obligation to take any action. Ricoh did not

14  provide workable list of libraries it considered relevant until July 18, 2005. It is nothing short of

15  preposterous to assert that Ms. Fink's failure to anticipate. or even a misinterpretation of, everything

16  that would be on a list of definitions before she received it from Ricoh is evidence that she was

17  perpetrating a fraud on the court. When Ricoh's delivered its list of libraries, the libraries were duly

18  identified and ultimately produced. The e-mail, at most evidences confusion, not any deliberate ploy

19  to deprive Ricoh of discovery.

20      **2.      After The Library And Input Declarations Were Provided, The Court**

21      **Required The Customer Defendants To Identify Products That Met**

22      **Certain Specified Criteria**

23      A telephonic continuation of the Case Management commenced the day after the library and

24  input declarations were served. It is what occurred at that conference that is the primary dispute in this

25  Motion. Ricoh's sanctions motion again omits most of the relevant facts – including most significantly

26

27

28

1  – exactly what the Customer Defendants agreed to, or were ordered to do.[4]   Specifically,

2  notwithstanding what Ricoh says now, there was a complete meeting of the minds at the time of the

3  Conferences regarding exactly what was to be included in the Declarations – and that was exactly what

4  was included.

5         As a preliminary matter, it is noteworthy that although Ricoh filed a "motion for sanctions" for

6  violation of a "Court Order," Ricoh never really comes right out and says exactly what the terms of the

7  violated order were (or, for that matter, never identifies how the changes to the declarations violated

8  that order, or what the alleged missing information is).  Now, Ricoh makes the following claims about

9  the alleged order:

10        Page 1:  "the ASIC defendants have failed to comply with the Court's instructions at the July
          15, 2005 Case Management Conference for providing declarations identifying the ASIC
11        products;"

12        Page 1:  "Whether the Defendants have failed to comply with Judge Jenkins' instructions
          during the July 14, 2005 Case Management Conference that the scope of discovery would be
13        defined by declarations that Defendants research, prepare and serve under penalty of perjury no
          later than August 12, 2005 identifying Defendants' ASIC products and the related technical
14        libraries *that Ricoh is accusing of infringement*;"[5] (emphasis added).

15        Page 2 & 6:  "Those declarations, the Court instructed, were to set forth all of the Defendants'
          commercial ASICs designed using the identified Synopsys products, to identify all the
16        technical libraries that each Defendant had used in conjunction with any of the Synopsys
          products, and to identify all of the ASIC chips that each Defendant had designed using those
17        Synopsys products."

18        Based on this language, even these statements of what was required are inconsistent ranging

19  from "identifying Defendants' ASIC products and the related technical libraries that Ricoh is accusing

20  of infringement" to identifying "all of the ASIC chips that each Defendant had designed using" the

21

22
_____

23  [4] It is the Customer Defendants position that the declarations in this motion came into existence because the Customer
    Defendants offered to do declarations in an effort to streamline discovery, i.e., to show that there were limited inputs and
24  libraries used such that the scope of discovery could be limited.  No one disputes that Judge Jenkins directed the
    declarations to be complete and signed under penalty of perjury, but the Customer Defendants seriously doubt that Judge
    Jenkins could possibly have intended what has occurred here – and in particular that Ricoh would devote what appears to
25  millions of dollars in resources solely to try to prove up "sanctionable" conduct instead of focusing on proving its
    infringement contentions.

26
    [5] Defendants can not help but continue to note the irony of the need for Defendants themselves to identify what the
27  Plaintiff, Ricoh, "is accusing of infringement." Although the Customer Defendants did fully comply with the Court's
    orders, the Customer Defendants still believe that Ricoh's inability to identify the products at issue evidences a failure to
28  adequately investigate its claims before filing suit.

1   Synopsys products. The Court, however, need not rely on either Ricoh's recollection, or on Ricoh's

2   vague and disparate statements of the Court's Order, because there is contemporaneous documents

3   evidencing what was required including the declarations themselves, the parties' joint letter to Judge

4   Chen dated August 30, 2006, and the meet and confer transcript.

5        First, Ricoh has known since the Declarations were served exactly what was included in the

6   Declarations. Although Ricoh has griped about alleged inconsistencies in the Declarations, and  about

7   products it asserts should have been included in the Declarations,  Ricoh has never taken issue with the

8   stated scope of the Declarations. On their face, the declarations each set forth the precise parameters of

9   what is included in the declarations. For the "product" declarations, the Customer Defendants included

10  all commercial ASICs that had been synthesized by them using Design Compiler from 1997 to the

11  present. *See e.g.,* Brothers Decl., Exh. 2 (8/12/05 Smith Product Declaration) at ¶ 9; Exh. 8 (7/20/05

12  Smith Input Declaration) at ¶ 15; Exh. 6 (7/20/05 Smith Library Declaration) at ¶ 13; Exh. 10 (8/12/05

13  Coco Product Declaration) at ¶ 17; Exh. 11 (7/21/05 Coco Library Declaration) at ¶ 18; Exh. 17

14  (8/15/05 Chiappini Product Declaration) at ¶ 24; Exh. 31 (7/21/05 Chiappini Input Declaration) at ¶ 38;

15  Exh. 25 (7/21/05 Chiappini Library Declaration) at ¶ 32; Exh. 20 (8/16/05 Boisvert Product

16  Declaration) at ¶ 27; Exh. 32 (7/21/05 Boisvert Input Declaration) at ¶39; and Exh. 27 (7/21/05

17  Boisvert Library Declaration) at ¶ 34.

18       Second, shortly after receiving the Declarations, Ricoh affirmed that the scope of the

19  Declarations was proper. Specifically, in a joint letter to Judge Chen dated August 30, 2005, in a

20  section labeled "II. Resolved Discovery Disputes" under sub-heading "B. A list of the ASIC

21  Defendants' ASIC products and identification of the technology libraries used," Ricoh reserved the

22  right to challenge the declarations as to specific contents, but specifically acknowledged that scope of

23  the declarations, as served, was proper. De Mory Decl., Exh. 4 (8/30/05 Joint Letter to Judge Chen) at

24  7. Ricoh stated its understanding that the declarations were represented to include "a complete and

25  accurate list of all commercial ASICs synthesized using Design Compiler ***by defendants*** from

26  February 1997 to the present." *Id.* (*emphasis added*). On the prior page, the Customer Defendants

27  confirmed that Ricoh's understanding of the contents of the declarations: "[d]uring the July 22, 2005

28  teleconference hearing, the Customer Defendants agreed to provide a list of commercial product for

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE                -7-

1  which **Design Compiler was used by the named Customer Defendants for logic synthesis**." *Id.* at 6

2  (*emphasis added*).[6]

3      Thus, the agreed scope of the declarations, and the criteria for inclusion on the declarations

4  was:

5      1.    The product was a commercial ASIC;

6      2.    The product was synthesized using Design Compiler;

7      3.    The product was synthesized by the named defendant; and

8      4.    The product was synthesized during the damages period, or from 1997 to the present.

9

10  In accordance with these criteria and consistent with everyone's understanding of the Court's directive,

11  Matrox International, Inc., the US sales arm for the various Matrox entities, did not provide any

12  product, library, or input declarations because it does not do synthesis, but all of the other named

13  parties did serve declarations.

14      **B.    Aeroflex Did Not Violate Any Court Orders Or Commit A Fraud On the Court**

15      The Aeroflex 30(b)(6) depositions occurred first, and immediately Ricoh stated its intention to

16  move for sanctions.[7]  Although Ricoh claimed that it could not do its infringement contentions until it

17  had three hours per product with 30(b)(6) witnesses and 8 million pages of documents, it spent almost

18  no time trying to learn what Aeroflex actually does or questioning about technical documents.  Instead,

19  it spent almost the entire 30 hours it had with the top three managers and engineers at Aeroflex trying

20  to conjure up a record to allege discovery abuses.

21

---

22  [6] In addition to this joint letter, there are many other places where the Customer Defendants reiterate exactly what is being

23  included in the Declarations, and what is not, and where Ricoh confirms its understanding.  See, e.g., De Mory Decl., Exh. 5, 9/12/05 Meet and Confer Transcript, Tape 1 at 42; 52 (Mr. Brothers:  "Stepping back the bigger picture is what we are going to be produced in the course of discovery and our view was anything that was being used by the ASIC defendants [in] [sic] the process of designing the ASIC products at issue, the commercial implementations as been defined in the

24  August 15th and 16th declarations.").

25  [7] In hind-sight either Ricoh's counsels' cynicism, or long-standing plan to attempt to prove its case using sanctions motions, now appears evident in the meet and confer transcripts and correspondence as early as September.  In one

26  exchange, Ricoh's counsel expresses concern about the semantics of the declarations because the declarations indicate that they include a list of the libraries they use.  Ricoh's counsel's concern was that they didn't also say "we don't use anything

27  else and that this is all."  De Mory Decl., Exh. 5.  And, in September, Ricoh repeatedly emphasized that the declarations were "ordered to be complete," apparently attempting to create a record at this early date to support its strategy.  It is this

28  approach that has prevented this case from moving forward in any meaningful way, and will prevent pre-trial resolution.

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)          -8-
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

After the Aeroflex depositions, Ricoh made *exactly* the same accusations it makes now. Although Aeroflex was already at that point frustrated by the accusations, Aeroflex and its counsel invested substantial resources investigating and attempting to lay Ricoh's concerns to rest. Ricoh's filings omit any mention of either this effort, or of facts and testimony that flatly contradict Ricoh's allegations in its motion.

Immediately after its receipt of a letter from Ricoh stating that it was preparing a motion for sanctions (but failed to state anything specific in support of that threat), counsel requested additional information to evaluate Ricoh's claims. De Mory Decl., Ex. 6 (1/24/06 De Mory Letter to Brothers). The January 24, 2006 letter requested, for example, that Ricoh provide additional information as follows:

With regard to your contention that "[f]or example, Mr. Milliken admitted that the declarations did not include many application specific integrated circuits that were sold to more than one customer, even though the design of the chip did not change," please:

1. Identify the allegedly missing products

2. Identify the testimony in which Mr. Milliken allegedly admitted that the declarations did not contain many application specific integrated circuits.

With regard to your contention that: "Mr. Kerwin indicated that if an Application Specific Integrated Circuit was sold as a Standard Product by Aeroflex to more than one customer that Aeroflex did not list the product as an ASIC even though it was designed using Design Compiler.

1. Identify any such alleged ASICs that were not listed.

2. Identify the testimony in which Mr. Kerwin indicated that the products you describe were allegedly not listed.

Ricoh immediately shot back that "[y]ou[r] [sic] demand for page line cites is little more than a stalling tactic." De Mory Decl., Exh. 7. (1/25/06 Brothers to De Mory). Other than by reference to Milliken Exhibit 148, the Aeroflex "Short Form" discussed below, Ricoh did not and has not yet identified the allegedly missing ASICs that give rise to its broad allegations of fraud.

Ricoh did however, identify the following testimony as the "basis" for its claims: (1) Milliken pages 38-43, wherein Mr. Milliken allegedly identified ASICs on Ex. 148 that were missing from the declaration; (2) Ms. Fink's promise to supplement the Coco Declaration because it was allegedly "incomplete and erroneous" at Coco page 96; (3) Mr. Coco's inability to answer questions regarding

1   why products were removed from the declarations at pages 95-96; (4) Mr. Kerwin's indication that the

2   JW02 reused synthesis from the JW01 at Kerwin pages 123-124; and (5) Mr. Kerwin and Mr.

3   Milliken's definitional distinctions between ASICs and ASSPs, even though the Court did not make

4   this distinction, at Kerwin pages 170-181 and Milliken pages 35-36.  Although the page cites vary a

5   little,[8] Ricoh makes the same allegations here plus an additional allegation (6) that "[a]ll three

6   witnesses testified that Aeroflex had received revenue associated with a significant number of ASICs

7   that were not listed on the declaration or that were not supposedly commercial products, relying again

8   on Coco pages 95-97, and on new pages:  Kerwin pages 104-106 and 129-120, and Milliken 45-59, 51-

9   60, and 70-79.

10          Aeroflex responded to these allegations.  On January 25, 2006, counsel participated in a

11  lengthy meet and confer conference in which counsel pointed out the problems with Ricoh's conjecture

12  about what was allegedly missing.  De Mory Decl., ¶ 9.  With the exception of a legitimate dispute

13  about whether or not the JW02 is a "commercial product or a prototype," counsel informed Ricoh's

14  counsel based on an additional investigation, that nothing was missing.  *Id.*  Moreover, counsel

15  informed Ricoh's counsel that the transcripts themselves made clear that Ricoh was wrong in its

16  suspicions.  *Id.*, Exh.  8 (2/3/06 De Mory to Brothers).  For example, Ricoh's counsel was pointed to

17  Milliken testimony starting at page 285, but Ricoh omitted this information from its motion.

18          Turning to the specific allegations, Ricoh questioned Mr. Milliken about the Aeroflex "Short

19  Form," located on the Aeroflex website and forthrightly identified by Mr. Milliken on the record

20  during the deposition.[9]  Mr. Milliken testified that the "Short Form" is the document that lists all the

21  chips that Aeroflex sells.  Thereafter, Ricoh printed the Short Form during the course of the deposition,

22  and questioned Mr. Milliken about it.  Ricoh's counsel, Ken Brothers, asked Mr. Milliken to identify

23  both Standard Products as well as other forms of ASICs listed on the Short Form.  Brothers Exh. 16

24  (Milliken at 47:16-48:6).  Mr. Millken identified a series of chips, plus a section describing the

25  ───────────────────

26  [8] In its motion, Ricoh also cites Coco pages 94 and 97-98 on issue (2); and Kerwin pages 20-21 and Milliken 27-29 on
    issue 5. This testimony is substantively the same as the testimony cited in the January 25, 2006 letter.

27  [9] Identifying the complete list of Aeroflex products for Ricoh's counsel is rather inconsistent with a deliberate ploy to hide
28  information!

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)                    -10-
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

1  Aeroflex libraries and design services.  Id. at 48:7-49:1.  Notably, however, before he left the

2  deposition for the day, Mr. Brothers *never* asked Mr. Milliken why these products were omitted from

3  the product declarations.  Notwithstanding Mr. Brothers' intentional or inadvertent failure to ask the

4  critical questions, Mr. Brothers immediately thereafter sent his letter accusing Aeroflex, and counsel,

5  of sanctionable conduct, because in his own words, he left the deposition with a "firm conviction" that

6  Aeroflex was hiding something.

7       Worse yet:  his associate did follow-up, later in the day.  During the follow-up, to the extent

8  clearly asked,[10] Mr. Milliken was able to explain in detail the reason why all the identified Short Form

9  products except the UT 6915 and Summit products were not included on the product declaration.  See

10 Brothers Exh. 16 at 285-297.  Mr. Milliken testified that some were not included because they were not

11 designed using Design Compiler, that some were designed using schematic capture, that some were

12 designed in 1986 or 87 before Aeroflex even had access to Design Compiler.  Counsel pointed out

13 these facts to Ricoh before it filed its motion.  De Mory Decl., ¶ 9 and Exh. 8.  Nevertheless, Ricoh

14 filed the motion, and neglected to mention a word of this testimony in it.

15      With regard to (2), Ms. Fink's promise to supplement the Coco Declaration because it was

16 allegedly "incomplete and erroneous" at Coco page 96; and (3) Mr. Coco's inability to answer

17 questions regarding why products were removed from the declarations at pages 95-96, all of this too

18 has been explained to Ricoh, in a letter to Mr. Brothers dated February 3, 2006.  *Id.*  In any event, the

19 underlying allegations (in essence, that Coco could not remember all of the particulars of why he

20 removed each product, after having  gathered information from many different engineers about many

21 different products), even if true, would not constitute sanctionable conduct. Ms. Fink explained during

22 the deposition, and Ms. De Mory has explained repeatedly thereafter, that the reason for removal for

23 four products is because they had been incorrectly recorded.  De Mory Decl., ¶ 9, Exh. 8.  The

24 products, however, were properly removed, as each of them lacks at least one of the criteria for

25

26 ─────────────

27 [10] With regard to two microcontrollers, Ricoh asked no follow-up questions to ascertain why those products, designed with
    Design Compiler, were omitted from the declaration, likely just so it could file this motion.  If Ricoh had questioned
28 further, it would have learned that the products were not included because they did not meet the criteria for inclusion.

1   inclusion. Admittedly, Mr. Coco could not recall the details, got confused, and began speculating.

2   This, however, is not evidence of some deliberate ploy, and the declaration has since been corrected.[11]

3        With regard to category (4), Mr. Kerwin's testimony that the JW02 reused synthesis from the

4   JW01 at Kerwin pages 123-124, the dispute here is a legitimate one. Aeroflex alleges the JW02 is still

5   a prototype, and not a commercial product. Ricoh alleges (based on sales information available to

6   Ricoh only because it was produced by Aeroflex) that sufficient numbers have been sold to make it a

7   commercial product. Even if the Court finds that this product should be added to the declaration, there

8   was no effort to hide anything and no harm to Ricoh. The financials relating to the product were

9   produced. In addition, the JW02 was not synthesized during the damages period; rather, it re-used the

10   JW01 synthesis. Ricoh already has all the documents relating to the JW01 design. Thus, Ricoh has

11   the financial and technical information relating to the JW02.

12        With regard to category (5), Mr. Kerwin's and Mr. Milliken's alleged definitional distinctions

13   between ASICs and ASSPs (Kerwin pages 170-181 and Milliken pages 35-36), the deponents'

14   different understanding of an industry term is a thin thread on which to base a conclusion that "firm

15   conviction" that Aeroflex was deliberately hiding something. Ricoh directly asserts in its motion at

16   page 11, lines 9-11 that: "[a]s a result of these witnesses' use of this constricted definition, they

17   excluded from their declarations a number of other ASICs that Aeroflex has designed, manufactured

18   and sold." Ricoh apparently bases this conclusion on Mr. Brothers' general and exhaustive (and

19   wasteful) questioning of Mr. Milliken about the definition of a "commercial product" without

20   reference to the product declaration.

21        But the very testimony on which Ricoh relies shows that Ricoh's assertion of improper

22   exclusion based on the definitional issues is patently false. Mr. Brothers and Ricoh know this. For

23

24   [11] Ricoh makes much ado about that fact that products were removed and added, but back in September counsel for the

25   Customer Defendants explained to Ricoh that products would be removed form one or more of the declarations. De Mory Decl., Exh. 5 at 88. The first set of declarations was done quickly on the schedule set by the Court. Thereafter, counsel

26   personally interviewed over 85 engineers at 12 different locations for the Customer Defendants to ascertain whether products were improperly included, or in some instances, excluded. In the case of Aeroflex, some products were added and

27   some removed. In the case of AMI, on the other hand, counsel learned during interviews that AMI synthesized BIST, and as explained below, thereafter a substantial number of products were added to the AMI declaration. Again these

28   modifications evidence good faith, not bad faith.

HOWREY LLP

Case No. C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

-12-

example, when Mr. Brothers finally got around to questioning about the declaration, 50 pages into the deposition, he asked: "So is it fair to say, using your definition of a product that didn't have any restrictions on the sale of it, none of the products in your group would be commercial products?" Mr. Milliken answered: "That is correct." Mr. Brothers then asked "Are there any products from your group on the [product declaration]?" Mr. Milliken answered yes, and then identified *thirty-one products* from his group that did not fall within his definition of commercial, but were included in the product declaration. Brothers 16, Milliken at 51-52. The testimony continues in the same vein, with Mr. Milliken explaining his understanding of the term "commercial" as Aeroflex uses it, but in each instance explaining that the declaration included things he would not consider to be commercial in a marketing sense.

Indeed, Mr. Brothers knew at the deposition that products were not excluded because they did not fit one of Mr. Milliken's definitions of commercial. Mr. Milliken actually admitted in response to a question from Mr. Brothers that not a single product included on the declaration met Mr. Milliken's marketing definition of commercial. Milliken at 60:10-18. If this definition had been applied, the declaration would not have included any products at all. Rather, Mr. Milliken confirmed that the definition of "commercial" that was applied when products were being included on the list was not the more restrictive definition of "commercial" in the marketing sense in customary usage at Aeroflex. Milliken at 59:17-60:4.

Finally, Ricoh states in allegation (6) that "[a]ll three witnesses testified that Aeroflex had received revenue associated with a significant number of ASICs that were not listed on the declaration or that were not supposedly commercial products," relying again on Coco pages 95-97, and on new pages: Kerwin pages 104-106 and 129-130, and Milliken 45-59, 51-60, and 70-79. There is nothing new here. The reference to Coco relates, once again, to his initial confusion regarding the reason certain products were excluded from the list; there is no admission regarding additional ASICs or revenue. The Kerwin testimony again relates to the JW02 and some non-recurring engineering revenue that was booked for a product that has not yet been commercially sold; finally, the Milliken testimony is discussed above with regard to issue (5), and clearly establishes that Aeroflex did not exclude products on the grounds that Ricoh claims.

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)    -13-
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

### C.    AMI Did Not Disobey A Court Order

Ricoh's primary complaint about the AMI declarations is that they allegedly failed to include the following: (1) "any products designed by AMI's Flextronics subsidiary;" or (2) products designed outside the United States; and (3) products from two of the five business units of AMI.  What Ricoh fails to understand, however, because it did not question further, is that all three of these complaints are related and boil down to the same issue:  none of the products in these categories were synthesized by the named party, AMI Semiconductor, Inc.  Each of these alleged allegations is addressed in turn.

(1)  "AMI's Flextronics subsidiary."  AMI Semiconductor in fact has no Flextronics subsidiary.  Rather, on or about September 9, 2005, AMI and certain subsidiaries closed an asset purchase transaction with Flextronics, Inc. and certain of its subsidiaries (hereinafter the "Flextronics asset acquisition").  Smith Decl., ¶ 2.  As a result of the Flextronics asset acquisition, AMI now sells in the Untied States a limited number of products that were Synthesized by Flextronics using Design Compiler.  *Id.*  The products at issue are products that were synthesized by Flextronics – not AMI, and thus, were appropriately excluded from the product declaration.

(2) "Products designed outside the United States."  The facts relating to this allegation are inextricably linked to the Flextronics asset acquisition as well as two other asset acquisitions, the STMicroelectronics asset acquisition and the Dspfactory asset acquisition.  In or about June of 2002, AMI and certain of its subsidiaries, acquired the assets of the mixed signal business of Alcatel Microelectronics NV from STMicroelectronics NV.  Smith Decl., ¶ 4.  A number of legally separate but related European entities were created at or around the time of the STMicroelectronics acquisition.  At or around the time of the Flextronics acquisition, a separate but related entity was formed in Israel, and certain assets of Flextronics were transferred to it as well as a separate but related entity in the Netherlands.  Smith Decl. ¶ 2.  In or about November of 2004, AMI and certain subsidiaries entered into an agreement with Dspfactory and certain of its subsidiaries wherein certain assets were purchased and a subsidiary was acquired.  The acquired entity was Dspfactory S.A., subsequently renamed AMI Semiconductor Switzerland S.A., is located in Switzerland.  Smith Decl., ¶ 3.  It is either the pre-existing entities or the newly formed but separate entities that did the synthesis at issue in category (2).  Accordingly, for all of these products, the synthesis was not done by AMI, the named party.  Each of

1    the separate European entities, through additional separate legal entities, is ultimately a wholly owned

2    subsidiary of AMI.  Smith Decl., ¶ 5.

3        (3) "Products from two of the five business units of AMI."   AMI uses the term Business Unit

4    to refer to a grouping of products or services that use the same technology and are targeted to a specific

5    market segment.   Smith Decl., ¶ 7.  A Business Unit is not a corporate entity, and in fact, AMI

6    Business Units extend across corporate boundaries.  *Id.*  Products from two Business Units were not

7    included in the Smith Product Declaration.  Smith Decl., ¶ 8.  In the first instance the Business Unit at

8    issue is comprised exclusively of assets acquired from Flextronics.  Thus, its products were excluded

9    as described above because they were synthesized by Flextronics – not AMI.  The products from the

10   other Business Unit were excluded because, based on available information, this newly formed

11   Business Unit has no chips in production.  Smith Decl., ¶ 8.

12       In sum, the products excluded from the AMI product declaration were not synthesized by AMI.

13       It is also notable that Ricoh's claim that it first learned of the Flextronics and non-US designed

14   products in the Smith deposition is also not true.  Notwithstanding the proper exclusion of these

15   products from the product declaration, in view of the sanctions threats that Ricoh was already making

16   regarding Aeroflex, in an abundance of caution, defense counsel specifically informed Ricoh of the

17   existence of these products prior to the Smith deposition even though documents reflecting corporate

18   structure and public documents relating to the acquisitions were available to Ricoh.  Ricoh failed to

19   mention this fact in its Motion.

20       AMI also suspects Ricoh will try to misconstrue the letters notifying Ricoh of these products to

21   create a misimpression that counsel for AMI knew that these products should have been included on

22   the product declaration.  The writer of said letters was not in attendance at the Case Management

23   Conferences in July, or even in involved in the case until early September of 2005;  to the extent that

24   the letters evidence any confusion about the exact metes and bounds of what was to be included in or

25   excluded from the declarations, it is for this reason.  Ricoh's counsel in contrast participated in drafting

26   the joint submission memorializing the metes and bounds of what was to be disclosed in the

27   declarations, and participated in the Case Management Conferences.

28       The first letter from counsel informs Ricoh that Flextronics and European products, described

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)    -15-
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

1   above, *may* need to be added to the AMI product declaration, but states that "AMI reserves all rights to

2   assert that it should have no liability with regard to either sales of chips synthesized by Flextronics

3   Semiconductor prior to the asset acquisition, or any liability with regard to chips synthesized by other

4   non-party entities in Europe."   The letter further offers Ricoh the opportunity to agree that the products

5   were beyond the scope of Ricoh's claims as follows:  "if you agree that chips synthesized by either

6   Flextronics Semiconductor prior to the asset acquisition, or chips synthesized by other non-party

7   entities in Europe are outside the scope of your claims, please let us know immediately so that we can

8   avoid what could potentially be an expensive investigation and production."

9       It was after sending this letter, and <u>not</u> as a result of what it learned in deposition, that a meet

10  and confer was commenced.  Indeed, the meet and confer was scheduled before the first day of

11  deposition was even complete.  De Mory Decl., Exh. 1.  The meet and confer was exclusively for the

12  following purposes: (1) ascertaining whether or not additional discovery could be avoided; (2) whether

13  o the parties could agree to a reasonable schedule if the additional discovery could not be avoided; and

14  (3) whether or not AMI would need to seek a protective order.  De Mory Decl., Exh. 9.  Instead of

15  responding to Ms. De Mory's February 21, 2006 letter, and without <u>ever</u> mentioning the Smith

16  testimony in the meet and confer context or a letter, Ricoh filed its sanctions motion on the day it

17  received the letter.

18      Even if the Court finds that certain products should have been identified earlier, there is still no

19  evidence of bad faith or willful misconduct and at most a three to four month delay in producing

20  documents relating to these products.  If the Court were to conclude that AMI improperly overlooked

21  these products, it should do so in the context of a case in which AMI alone has produced over a million

22  documents, and the Synopsys and the Customer Defendants combined have produced 8,000,000 pages

23  of documents (excluding source code and other electronic information, which themselves number well

24  into the hundreds of thousands of pages).  Counsel has traveled to twelve locations (some more than

25  once), interviewed over 85 witnesses in person, and many more telephonically to collect these

26  8,000,000 pages.  Counsel processed, reviewed, and produced these documents in an approximately

27  three-month time period.  Thus, even if the facts relating to these additional products had been

28  temporarily overlooked, a temporary omission of this nature should not rise to the level of to

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)                    -16-
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

1   sanctionable conduct.[12]

2        Finally, Ricoh also alleges that AMI added products to the declaration.  AMI fails to see why

3   this is troublesome to Ricoh, or why adding or subtracting products should be sanctionable.  In the

4   interests of completeness, the 150 products that were added were products that include a built-in self

5   test ("BIST").  After serving the initial product declaration, counsel learned that AMI also synthesizes

6   BISTs.  A BIST is included on a chip when certain memory is included on the chip, but adds zero

7   functionality to the chip.  Even though AMI believes it should have little or no liability for BIST

8   synthesis, it added an additional 150 or so products to its declaration because they include synthesized

9   BISTs.  Again, AMI was not trying to hide anything, but instead being forthright as it learned new

10  facts.

11       **D.**      **Ricoh Does Not Even Make Any Allegations Against Matrox, But Improperly And**

12               **Outrageously Requests That It Be Sanctioned**

13       Ricoh has not even alleged a violation of any sort with regard to Matrox, yet sweeps it into this

14  Motion, and demands monetary sanctions and additional declarations from its officers.  Matrox will

15  address Ricoh's factual allegations against it if and when it actually makes any.

16       The contrast between Matrox and AMI is worth noting, however.  Ricoh individually sued

17  three Matrox entities in Canada that do synthesis, and then separately sued the US entity.  Thus, if

18  Ricoh had been interested in synthesis done by separate non-US AMI entities, it could have also sued

19  those entities, but did not.

20       **E.**      **Ricoh, Its Infringement Contentions, And What It Claimed to Need**

21       As the Court is well aware, Synopsys and the Customer Defendants have long been frustrated

22  by Ricoh's failure to provide meaningful infringement contentions.  Synopsys and the Customer

23  Defendants have pushed on the one hand for detailed product-by-product contentions identifying

24

25  _____

26  [12] Similarly, Ricoh makes repeated allegations about the revised declarations being sent late.  Ricoh's counsel knows why this happened – the undersigned counsel discussed it with Mr. Brothers many times!  Counsel was busy and processing

27  documents and information as quickly as possible and continually prioritizing and reprioritizing to get Ricoh what it needed in an orderly and timely fashion.  Sometimes it was possible to get Ricoh information weeks before depositions; sometimes

28  it was days.  There was no grand ploy to hide anything on this front either.

1   specific inputs and source code, and Ricoh has pushed back claiming to need not just the inputs,

2   outputs, libraries, and the Synopsys code used for each ASIC, but also a plethora of materials that have

3   been the subject of litigation, including all e-mails relating to the ASICs and Synopsys products,

4   SolvNet documentation, marketing documents, manuals, release notes, document relating to third party

5   synthesis tools, costs savings documents, financials, manufacturing related documents, patent

6   applications, tests or studies relating to designing ASIC; the list goes on and on.  *See, e.g.,* De Mory

7   Decl., Exh. 4.

8          Notwithstanding their belief that the only documents that will prove to be  relevant to the

9   claims and the inputs, outputs, and the code, the Customer Defendants and Synopsys have 8,000,000

10  pages of documents produced to date and appeared for over 150 hours of depositions.  Through these

11  depositions, and reinforced by virtue of this motion, it has become abundantly clear that Ricoh is not

12  intent upon discovering information for its contentions, but rather simply hopes to set enough traps and

13  paper the record enough to convince the Court that it should be relieved of obligation to prove its case.

14  Here, and for the remainder of the case, the Court should reject Ricoh's strategy and force them to

15  come forward with evidence to support its case, particularly given the extreme amount of party and

16  Court resources Ricoh has callously wasted.

17  **III.    ARGUMENT**

18         Ricoh's motion must be denied because it is based on entirely false premises.  The limited

19  authority it cites cannot cure this deficiency, and in any event, its authority is wholly distinguishable.

20         For example, Ricoh relies on *Wright v. Maritime Overseas Corp.*, 96 F.R.D. 686, 687-688

21  (N.D. Cal. 1993).  But in *Wrigh*t, the Court found as follows before awarding sanctions:

22         In the instant case, plaintiff has failed to appear for five depositions. He has not complied with
        Magistrate Brennan's January 27, 1983, Order. He cannot be located. Despite proper and lawful
23      demand, plaintiff has refused to provide any verified discovery responses whatsoever. In short,
        plaintiff has exhibited disregard for the litigation he commenced and the orderly processes of
24      this Court. Consequently, the Court finds that plaintiff has demonstrated the requisite
        willfulness and fault. The Court further finds that no lesser sanction would be effective or
25      suitable in the premises. The Court, therefore, grants defendant's motion and dismisses this
        action with prejudice.
26
        Ricoh's other cited cases are in accord, but even Ricoh's allegations at face value fail to rise to
27
28  the level of conduct set forth in *Wright*, and other cases cited by Ricoh.  Indeed, as set forth in detail

                                                                              -18-

above:

1. Ricoh has not even set forth with specificity the details of the Order it claims was violated;

2. Ricoh has not set forth with specificity what it claims is missing from the declarations, opting instead to rely on surmised contentions and supposition;

3. In any event, Ricoh is wrong. The Customer Defendant included in the declarations exactly what they were supposed as evidenced by Ricoh's own contemporaneous documentation of what was to be included:

   "a complete and accurate list of all commercial ASICs synthesized using Design Compiler by defendants from February 1997 to the present;"

4. The products omitted from the declarations failed to meet one or more of the following criteria;

5. Ricoh concedes that the "scope of discovery" going forward from the July 2005 Case Management Conference was to be governed by the product and library declarations to be served in July and August of 2005.

6. Ricoh received declarations in July and August of 2005, which on their face indicate what they include information relating to products synthesized by the named party using Design Compiler from 1997 to the present.

7. Although there is no written order from the Case Management Conferences, shortly after the Conferences, Ricoh expressly acknowledged in writing to this Court that it understood the declarations at issue in this motion would govern the scope of discovery going forward, and, in its own words, would include:

   "a complete and accurate list of all commercial ASICs synthesized using Design Compiler by defendants from February 1997 to the present."

   8/30/05 Joint Letter to Judge Chen at 7. Thus, to be included in the product declaration, all of the following criteria had to be met:

   e. The product was a commercial ASIC;

   f. The product was synthesized using Design Compiler;

   g. The product was synthesized by the named defendant; and

   h. The product was synthesized during the damages period, or from 1997 to the present.

8. The Customer Defendants have made their best efforts to make sure that all the products included on the product declarations, and the corresponding library and input declarations, meet this criteria.

9. Finally, even if something had been omitted, there is no evidence of any willful disobedience of a Court order, fraud, improper instructions of counsel, or any other ploy, plan or scheme to hide information form Ricoh; and

10. Ricoh's entire argument is contrived based on its willful decision to ignore contrary facts long known to it, or willful failure to fully investigate the facts. Indeed, in the case

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

-19-

1    of the Matrox entities, Ricoh has requested sanctions even though it fully concedes its
2    investigation is not complete.

3         Specifically, with regard to Aeroflex, Ricoh filed its motion knowing full well that its
4    allegations were unfounded.  Ricoh knew that Mr. Milliken and Mr. Kerwin did not exclude products
5    from the declarations based on a limited definition of "commercial", but instead included products that
6    failed to meet the limited definition that Mr. Brothers unnecessarily fixated on during the depositions.
7    Moreover, Aeroflex did not improperly exclude ASICs or products on which revenue was realized.
8    Indeed, Mr. Milliken testified in detail that the Short Form ASICs at issue here did not meet the criteria
9    to be included in the declarations.  Indeed, in some instances, Ricoh was informed that the ASICs were
10   not even synthesized, but filed this motion in any event.  There is nothing to the allegations against
11   Aeroflex.

12        With regard to AMI, the story is somewhat different, but the result is the same.  With regard to
13   AMI, Ricoh opted not to investigate the facts, opting instead to file this motion.  The AMI ASICs at
14   issue in this motion were excluded from the declaration because they did not meet at least one of the
15   criteria for inclusion:  they were not synthesized by AMI.  And, in any event, there is no evidence of
16   bad faith because AMI is already investigating the products.  Given the agreed and order limits
17   regarding the scope of the case, AMI will seek a protective order against disclosure, but is moving
18   forward in the event discovery is ordered.

19        With regard to Matrox, there is no story – not even in Ricoh's motion.  Ricoh filed a motion for
20   sanctions against the Matrox entities with no basis whatsoever.  No matter what it tries to trump up on
21   reply (which should not be permitted), the fact remains that Ricoh and its counsel were willing to file a
22   motion for sanctions and waste substantial resources with admittedly no basis at all.  If anyone is
23   acting in bad faith here, it is Ricoh for filing this motion, for its litigation tactics, and for once again
24   squandering valuable Court and party resources.

25   **IV.    CONCLUSION**

26        For the foregoing reasons, Ricoh's Motion should be denied.  It was not only frivolous when
27   filed, but was known by Ricoh to be frivolous, or filed without any effort to investigate the facts.  This
28   entire exercised has been a terrible waste of resources, and Ricoh should be admonished for filing this

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)          -20-
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE

1    Motion and pursing this strategy.

2    Dated:  March 14, 2006                          Respectfully submitted,

3                                                     HOWREY LLP

4                                                     By:  _____*/s/Denise M. De Mory*_____
                                                              Denise M. De Mory
5                                                     Attorneys for Plaintiff
                                                      SYNOPSYS, INC. and for Defendants
6                                                     AEROFLEX INCORPORATED, AEROFLEX
                                                      COLORADO SPRINGS, INC., AMI
7                                                     SEMICONDUCTOR, INC., MATROX
                                                      ELECTRONIC SYSTEMS, LTD., MATROX
8                                                     GRAPHICS, INC., MATROX
                                                      INTERNATIONAL CORP., and MATROX
9                                                     TECH, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

Case No.  C03-04669 MJJ (EMC)/C03-02289 MJJ (EMC)          -21-
DEFTS' MEMO OF P'S & A'S IN OPP TO RICOH'S MOTION FOR
SANCTIONS FOR DEFTS' VIOLATION OF JUDGE JENKINS' CMC
ORDER RE IDENTIFICATION OF PRODUCTS AT ISSUE