June 30, 2006

Judge Edward M. Chen
United States Magistrate Judge
U.S. District Court
450 Golden Gate Avenue
San Francisco, CA  94012

> Re:   **Synopsys v. Ricoh Company, Inc. Ltd.**
>       **Case No.:  C03-2289 MJJ (EMC)**
>       *Ricoh Company, Ltd. V. Aeroflex, Inc., et al.*
>       **Case No.:  C03-4669 MJJ (EMC)**

Dear Judge Chen:

At the Court-ordered meet and confer on Monday, June 26, 2006, the parties spoke for over seven and a half hours in chambers about the issues raised in the Defendants' pending motion to compel.  They continued their discussion telephonically on Tuesday and Wednesday. The parties made tremendous progress, and on almost all issues, the parties have been able to reach resolution, as spelled out in the concurrently-filed Stipulation and [Proposed] Order Resolving Portions of Defendants' Motion to Compel and Ricoh's Motion to Quash.  However, on the issues relating to the KBSC documents as well as the adequacy of Ricoh's document collection efforts, the parties remain at an impasse relating to the relief to which Defendants are entitled and which will efficiently end this dispute and avoid further trips to the courthouse.  The parties therefore request a ruling from the Court.

Defendants' position:

Defendants request that the Court (i) order that Ricoh provide Defendants with supervised access to the storage facility in which the KBSC documents are kept and make reasonable access to the KBSC documents in South Carolina available so Defendants can efficiently and with finality verify that all responsive KBSC documents have been produced, and (ii) order that Ricoh provide specific, verifiable details regarding its document collection efforts.

**The KBSC Documents**

Ricoh and its counsel have previously denied, sometimes repeatedly, the existence of certain documents that eventually showed up and were produced.  *See* Reply at 4:10-6:6

Hon. Edward M. Chen
June 30, 2006
Page 2

(documenting Ricoh's changing story regarding the Texas Instruments documents). Quite unfortunately, history has repeated itself over the past week as to the KBSC documents that are likely the most relevant documents in the case to Defendants.

Ricoh has made many different representations regarding the KBSC documents: (1) that neither it nor its counsel has possession, custody or control of the documents; (2) that the KBSC documents were produced in response to subpoenas; (3) that the documents are in the warehouse, but Ricoh and counsel have no idea what is in the warehouse, and so on. Each of these stories has been demonstrated to be false. Now, at the meet and confer on Monday, Ricoh's counsel disclosed for the first time that Ricoh has, at the offices of Dickstein Shapiro, custody of approximately 23,000 pages of *unproduced* documents that were taken from the KBSC warehouse in 2003. Moreover, Ricoh's counsel detailed description of what document collection and review it now claims took place in 2003 conclusively demonstrates that its search was not adequate and that its prior representations, including the representations of its counsel, were highly misleading or false.

At the meet and confer on Monday, Mr. Brothers informed counsel of the following facts. Mr. Christopher Monsey, now on active duty in Iraq, but currently listed on Dickstein Shapiro's website as Staff Counsel, went to South Carolina with Dr. Kobayashi. Mr. Monsey stayed in the common area of Dr. Kobayashi's condominium complex while Dr. Kobayashi went in and searched for documents. Dr. Kobayashi delivered something less than a box of documents that were sent to Dickstein Shapiro. It is unclear, which, if any, of these documents were produced.

Mr. Monsey also went to Mountain View, California and met with Mr. Bershader for several days. Neither Mr. Monsey or Mr. Bershader personally went to the storage facility; instead they sent Mr. Bershader's part time assistant to the warehouse. She returned with approximately 20 boxes (although they may not all have been full) and, after a brief review in Mountain View by Mr. Monsey, these twenty boxes were shipped to Dickstein Shapiro.

At Dickstein Shapiro's Washington offices, Dickstein Shapiro attorneys, including Mr. Monsey and Mr. Weinstein, reviewed the twenty boxes of material from KBSC's warehouse and the material from Dr. Kobayashi's condominium. This review consisted of two parts — an initial "broad-brush" relevance review (which netted approximately 25,000 pages of documents, which Dickstein Shapiro had imaged and placed on a computer server) and a subsequent, more refined relevance review. This latter review netted the fewer than 2,000 pages of KBSC documents that were ultimately produced to Defendants. Although Dickstein Shapiro returned to KBSC the original documents obtained from KBSC (which contain an unknown number of documents in excess of the 25,000 pages retained electronically on the Dickstein Shapiro server), it still retains in electronic form the full 25,000 pages of KBSC documents from the initial review on its server (including the 23,000 unproduced documents), and has an index of these documents.

This recent recitation of what happened regarding the KBSC documents appears to vary, quite considerably, from what was explained to the Court in Ricoh's opposition to this motion.

In particular, in his declaration in opposition to the Motion, Mr. Brothers declared as follows:

> To the best of Ricoh's understanding, most of the KBSC documents are located in a locked KBSC storage facility in Mountain View, California, and have been for years. Ricoh understands that a few KBSC documents may also have been stored in a South Carolina condominium to which Dr. Kobayashi has access. Neither Ricoh nor its counsel has access to either of those facilities. *Access to those documents is controlled by KBSC's officers*, all of whom have been deposed in this action.
>
> Ricoh understands that, in 2003, Dr. Kobayashi and another KBSC officer named Brian Bershader, in response to defendants' subpoenas, reviewed and selected documents that they considered to be potentially responsive. *Ricoh's counsel did not participate in the review and selection of those documents.* Instead, *Dr. Kobayashi and Mr. Bershader reviewed and selected documents that they considered to be responsive to the subpoenas*, then delivered them to Ricoh's counsel for processing and production to defendants. . . . *The KBSC documents that had been sent to Ricoh's counsel were all returned to KBSC. . . . .*

(Brothers Decl., ¶¶ 14-15 (emphasis added).)

Given the version of events revealed during the meet and confer, the highlighted sentences in Mr. Brothers' testimony are either false, or at the very least, very deceptive, as described below.

> If Mr. Monsey was able to accompany Dr. Kobayashi to his condominium and review the KBSC boxes in Mountain View without legal process,[1] how can it be true that "[a]ccess to those documents is controlled by KBSC's officers"? If Dickstein Shapiro attorneys reviewed the KBSC documents for relevance — twice — how can it be true that "Ricoh's counsel did not participate in the review and selection of those documents" or that "Dr. Kobayashi and Mr. Bershader reviewed and selected documents that they considered to be responsive to the

---

[1] Ricoh may continue to maintain that the documents were produced by KBSC under subpoena issued by Defendants. But, as detailed in Defendants' Reply Brief, there was no outstanding subpoena as to which Plaintiff had not interposed objections that it later claimed tolled its obligation to produce documents well after the KBSC documents had been produced. Reply Br. at 18:6-19:1, Thus, the facts show that the documents were produced by Ricoh, voluntarily and using Ricoh's own filter as to relevance — they are therefore under Ricoh's control.

subpoenas"?  If Mr. Bershader's assistant is the only one who went
to the warehouse, how can it be true that "Mr. Bershader reviewed
and selected documents that [he] considered to be responsive to the
subpoenas"?  If Dickstein Shapiro still maintains 23,000 pages of
KBSC documents on its server, how can it be true that "[t]he
KBSC documents that had been sent to Ricoh's counsel were all
returned to KBSC"?  And, in the end, how can it be true that Ricoh
does not have control over the KBSC documents — documents
gathered by Ricoh's attorneys on their own initiative, reviewed by
Ricoh's attorneys, and produced *on behalf of Ricoh*?  It cannot.

Beyond Defendants' concerns about what they have been told in the past, which are
legitimate, justified and concrete, the foregoing facts illustrate that, at a minimum, an adequate
search was not conducted (regardless of the intent of Ricoh or its counsel).  Sending an assistant
with no historical context or information about the case into the warehouse when counsel was
available and present to conduct the search is not a reasonable search.  Moreover, passively
allowing Dr. Kobayashi, who has been and continues to be paid millions by Ricoh, to search for
and deliver less than a box of documents while counsel stood waiting in the common area was
not a reasonable search.

The Federal Rules and the case law support Defendants' concerns regarding the adequacy
of Ricoh's counsel efforts.  Rule 26(g)(2) of the Federal Rules of Civil Procedure "requires an
attorney to sign all discovery requests, responses and objections. The purpose of this Rule is to
create "an affirmative duty to engage in pretrial discovery in a responsible manner."  Fed. R. Civ.
P. 26(g)(2), Advisory Committee Notes to 1983 Amendments.  A discovery response signed by
an attorney "certifies that the lawyer has made a reasonable effort to assure that the client has
provided all the information and documents available to him that are responsive to the discovery
demand."  *Id.*

"An attorney has made a 'reasonable inquiry' if the 'investigation undertaken by the
attorney and the conclusions drawn therefrom are reasonable under the circumstances. . . .
Ultimately, what is reasonable is a matter for the court to decide on the totality of the
circumstances.'"  *Qinby v. WestLB AG,* No. 04 Civ. 7406 (WHP) (HBP), 2005 U.S. Dist. LEXIS
35583, at *10 (S.D.N.Y. Dec. 15, 2005).  For example, in *Metropolitan Opera Assn, Inc. v. Local
100, Hotel Employees & Rest. Employees Union,* the district court held that counsel for a party
had not made a reasonable inquiry within the meaning of Rule 26(g) where they, among other
things, "delegated document production to a layperson who (at least until July 2001) did not even
understand himself (and was not instructed by counsel) that a document included a draft or other
non-identical copy, a computer file and an e-mail" and "never inquired about the contents of the
Union's document storage facility."  212 F.R.D. 178, 222-23 (S.D.N.Y. 2003).  In *Tec-Air, Inc. v.
Nippondenso Mfg. USA, Inc.,* which is on all fours with this case, the district court concluded
that the plaintiff in a patent infringement case had "failed to make a reasonable inquiry to ensure
that responses during discovery were correct" because it "should have realized that a careful
search of the documents in the Tec-Air warehouse was required due to the poor conditions in

which they were stored for so many years." No. 91 C 4488, 1994 U.S. Dist. LEXIS 2026, at *27 (N.D. Ill. Feb. 23, 1994). Furthermore, the plaintiff had "failed in its obligation to make a careful search when only one person was assigned to determine which documents were relevant and which were not" and made "only a cursory inspection was used to determine whether an entire box contained any relevant documents." *Id.,* at *27-28.

The significance of this most recent document-related revelation cannot be minimized. The KBSC documents, as explained in the moving papers, are some of the most relevant documents in this case. (*See* Motion at 3:4-4:3; 15:6-16:4.) For example, the KBSC documents may well include information that demonstrates the sale of the KBSC system prior to January 13, 1987, thereby invalidating the '432 patent due to the on-sale bar. They may well contain documents that demonstrate that other people beyond Dr. Kobayashi and Mr. Shindo contributed to the conception of the '432 patent, thereby invalidating the patent due to misjoinder of inventors. They likely will also include other documents relating to ICC's relationship to Paradyne, which may support an on-sale bar defense and/or a defense of inequitable conduct.

There is also a strong possibility that the KBSC documents contain documents relevant to the ownership of the patent. In particular, the University of South Carolina recently produced a number of agreements between the University and ICC. In each of these agreements, although ICC/KBSC funded Dr. Kobayashi's research, the ownership rights to any patents related to that research were retained by the University. See Exhibit 1 (collection of agreements). The University also indicated that there were three agreements with ICC/KBSC relating to Dr. Kobayashi's research during the period that the KBSC system in the '432 patent was conceived, but that it no longer has copies of these agreements. See Exhibit 2 (letter from SC). If these agreements contained similar provisions to the other research agreements with ICC/KBSC, then it is highly likely that the University, and not ICC, actually owns the rights to the '432 patent.[2]

In short, this motion is not based on mere speculation that other documents *may* exist. In addition to the above documents, other documents certainly exist, including Dr. Kobayashi's lab notebooks, which Dr. Kobayashi indicated were turned over to counsel. The question is whether these documents are contained in the 21 KBSC boxes, elsewhere in the KBSC warehouse, or in South Carolina.[3] Whatever is or was contained in the 20 boxes reviewed by Dickstein Shapiro, Ricoh and its counsel presumably know the contents but are not saying. As to the rest of the

---

[2] There is little doubt that the research that led to the conception of the KBSC system was conducted at the University of South Carolina funded in part by ICC. Dr. Kobayashi published a paper at the AM86 conference entitled "A Knowledge-Based Approach to VLSI CAD" that contains a number of drawings very similar to those included in the '432 specification. This paper indicates that it is being published as part of Dr. Kobayashi's work at the University, but indicates that the research was supported, in part, by funding from ICC.

[3] It is notable that the only produced documents that pre-date the filing of the patent application bear the KBSC bates number – not the RCL bates number. Ricoh has only produced document after the date of the patent application, and thus, KBSC is apparently the only source of these pre-critical date documents.

warehouse, or Dr. Kobayashi's condominium, it is not clear that anyone knows what is in there.[4]
It is time for Defendants to learn what Ricoh knows.

  To resolve this issue, at the meet and confer, Ricoh offered to have someone go to the
KBSC warehouse, verify that the twenty boxes reviewed by Dickstein Shapiro are still intact,
and state under oath that those twenty boxes are the only documents in the KBSC warehouse that
relate in any way to the KBSC corporate entity (known also as ICC), or if other documents are
found, produce what it deems relevant.  It also offered to conduct another relevance review of the
25,000 pages of KBSC documents it has in its possession and produce anything it decides is
relevant.

  Although Defendants initially indicated that this proposal would be acceptable at the
Monday meet and confer, after reviewing the facts and especially the declaration testimony of
Ken Brothers, Defendants realized that a declaration would not adequately ensure that all
relevant KBSC documents would have been produced, and that the issue of documents still
maintained in South Carolina had inadvertently not been fully discussed.  In the interest of
efficiency and finality, Defendants notified Ricoh on Tuesday that it was rejecting Ricoh's
proposal,[5] and counter-proposed that Ricoh make the warehouse and its contents available to
Defendants for inspection (under the supervision of Ricoh's counsel).

  In particular, Defendants have proposed the following terms relating to the inspection:
Defendants would send an attorney and a paralegal to the KBSC warehouse.  Defendants'
counsel will review the contents of the warehouse in the presence of Ricoh's attorney.
Defendants will not take any documents from the warehouse, but will only flag the documents
that it thinks are relevant and segregate the boxes that contain the flagged documents.  Ricoh can
then facilitate the copying of those documents (which will occur at Defendants' expense), and
undertake a specific review to withhold any documents believed to be privileged, provided that
the withheld documents are logged.[6]  Assuming that the volume of documents in the warehouse
is consistent with the testimony of Mr. Bershader, Defendants believe that their review of the
documents in the warehouse will take no more than two days.  Because the South Carolina

---

[4] Even though Mr. Brothers previously asserted that Ricoh and its counsel had no idea what was in the warehouse,
Mr. Brothers indicated during the meet and confer that he had repeatedly been assured by Mr. Bershader that
"whatever" was sent to Ricoh in care of Dickstein Shapiro (which Mr. Bershader did NOT participate in collecting
and even though Mr. Bershader testified it had been years since he'd been to the warehouse) comprises all the
KBSC-related documents in the warehouse.  Defendants, however, are not prepared to accept this representation
in view of what has transpired, and in view of Mr. Bershader's clear lack of knowledge based even on Mr. Brothers'
most recent retelling of the events surrounding the collection.

[5] Ricoh too has continued to back away from agreements reached on Monday, and Defendants have continued to
negotiate with Ricoh in good faith to address its continued concerns.

[6] Defendants agree that, although counsel may have seen a document later claimed to be privileged, such viewing
will not constitute a waiver of any alleged privilege.

documents are located in Dr. Kobayashi's condominium, Defendants proposed that a Dickstein Shapiro attorney retrieve those and make them available for inspection.

Defendants' proposal eliminates any burden on Ricoh to review the documents in the KBSC warehouse for relevance, eliminates the possibility that there would be an inadvertent waiver of privilege, and will bring closure to the issues and concerns Defendants have about the manner in which Ricoh has conducted its document collection and production.

Ricoh has rejected this proposal on the basis that it would impose an undue burden on Ricoh. Specifically, Ricoh estimates that Defendants' proposal would cost $10,000 in attorney time and travel time, especially given at present Ricoh that at present has no intention of sending a lawyer to search either site (thereby reinforcing Defendants' concerns about the inadequacy of any declaration or the search). Ricoh indicated that Mr. Bershader is going to search the warehouse, and Defendants proposed that Ricoh allow a Howrey paralegal to accompany Mr. Bershader. Ricoh refused, and stated that it would not allow Defendants to search the warehouse without supervision by a Dickstein Shapiro attorney, thus requiring a cross-country trip, even though it was pointed out that Ricoh has local counsel, as required by the Court, who could readily oversee a document review in the Bay Area under the terms set forth above without the need for travel.[7]

Given this impasse, Defendants now seek a Court order requiring that an inspection of the KBSC warehouse occur. Without this inspection, there is no way for Defendants to verify that, *this* time, Ricoh will be entirely forthcoming with the necessary and relevant information in the most efficient manner possible. By allowing Defendants' counsel access to the warehouse and its contents, the Court will ensure that Defendants are not prejudiced by an overly narrow reading of relevance and are able to make their own determination as to relevance. Certainly, the contents of these documents are too valuable to the defense of this case, and the history of this case is littered with too many troublesome statements, for Defendants to simply accept that Ricoh has produced all the KBSC documents at this point. Moreover, the requested relief is clearly something within the Court's power to order under Rule 26(g), and is not nearly as extraordinary as Ricoh argues given the scope of the Federal Rules of Civil Procedure.

---

[7] At least in meet and confer, Ricoh appears to have dropped its argument that it lacks control over the KBSC documents. Based upon the "instructions" of Mr. Brothers, Mr. Bershader is scheduled to visit the warehouse prior to the filing of this joint letter to review the contents of the warehouse and submit a declaration containing his findings. Ricoh cannot seriously contend that Mr. Bershader and the KBSC documents are not under its control when it is able to get such a rapid and unquestioning response from Mr. Bershader. What the instructions were, however, completely unclear during the meet and confer call (i.e., whether Mr. Bershader will open every box, or simply look for KBSC labels) and do not include a search of South Carolina, or any effort to ascertain what else is in the 20 boxes beyond what was imaged by Dickstein Shapiro.

**The Search of Ricoh's Corporate Files**

Similarly, given the "drip-drip-drip" nature of Ricoh's document production, and its tendency to produce or even identify the existence of key documents only when absolutely pressed for them, Defendants continue to question that the document search and review conducted by Ricoh and its attorneys for this case was adequate. Ricoh has thus far refused to give specific, verifiable details of its document search (i.e., names, dates, and places); rather it has given general statements such as Mr. Brothers' declaration that "it contacted a large number of Ricoh employees who Ricoh reasonably considered m[a]y have knowledge of or possession of relevant documents." (Brothers Decl., ¶ 13.) Who is the "it" — Ricoh? Dickstein Shapiro? How large is a "large number" — ten? Fifty? One hundred? More? Who did Ricoh consider "may have knowledge of or possession of relevant documents"? These are the questions that Defendants believe Ricoh should be required to answer in a declaration spelling out, in specific and verifiable detail, its document search efforts.

Ricoh will argue that such a declaration would be unduly burdensome, and provide Defendants with little benefit in return. This argument is simply incorrect. Ricoh presumably already has memoranda or interview notes from which it can readily piece together a list of the people interviewed, the places searched, and when these searches took place. Beyond the documents already mentioned in the motion to compel, Defendants cannot point to specific documents that it knows exists but have not been produced. However, Ricoh has failed to produce any documents relating to the invention contained in the '432 patent dated prior to 1988. These documents likely exist somewhere within Ricoh; Defendants presume that Ricoh simply has not looked in the proper location. Armed with a detailed list of Ricoh's search, Defendants may well be able to determine other places that Ricoh could search for these missing documents.

Once again, Rule 26(g) imposes an affirmative duty on Ricoh's counsel "to engage in pretrial discovery in a responsible manner." This includes the duty to take reasonable steps to identify all sources of relevant information and to collect documents from those sources. "[A] reasonable inquiry into the factual basis of [a party's] discovery responses . . . require[s], at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the [party] potentially possessing responsive information, and to account for the collection and subsequent production of the information to [the opposing party]." *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 554-56 (N.D. Cal. 1987). In recognition of this duty and to assure that a party has actually made a "reasonable inquiry," district courts have ordered one party to provide the other party "with declarations or affidavits detailing the nature of his 'reasonable inquiry' to locate responsive documents, and such declarations must address the inquiry he made on a request-by-request basis." *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 190 (C.D. Cal. 2006).

<u>**Ricoh's Position**</u>

The stipulation and proposed order reflects that the parties made substantial progress in resolving the issues in the pending motions. Defendants' portion of the joint letter, however,

does not reveal that the resolved issues included both the KBSC issue and the Ricoh document issue. Ricoh is surprised that defendants are now forcing these issues upon the Court.

**The Parties Had Already Agreed To An Action Plan Regarding The KBSC Documents**

During the day-long meet and confer on Monday, June 26, counsel for the parties negotiated and agreed upon a procedure for resolving the KBSC document issue.[8] Counsel for Ricoh (and Dr. Kobayashi and Mr. Bershader) provided a detailed explanation of the KBSC document collection process that was done on behalf of KBSC, and explained how KBSC had already reviewed and produced all relevant documents. The parties specifically agreed that Ricoh would once again ask third party KBSC whether all documents relating to the '432 patent had been made available to Dickstein Shapiro. The parties agreed that a KBSC officer would submit a declaration to this effect. Upon confirmation that all such KBSC documents has been made available to Dickstein Shapiro – and we have been advised by KBSC officer Brian Bershader that, in fact, all such KBSC documents had been made available to Dickstein Shapiro – the parties agreed that Dickstein Shapiro would undertake still another review[9] of the 23,273 pages of documents that it had previously copied from the KBSC originals to determine if there were any additional relevant, responsive non-privileged documents, and if so, promptly produce them. The parties further agreed that, if there are additional KBSC documents that had not been made available to Dickstein Shapiro (contrary to everything that KBSC has represented), we would promptly review and produce any relevant, responsive non-privileged documents. Thus, at the end of the meet and confer on Monday, the KBSC document issue had been resolved by mutual agreement.

In reliance upon this agreement, the undersigned immediately requested Brian Bershader, a KBSC officer and its U.S. representative, to inspect personally the KBSC storage facility and execute a declaration stating what he had found. He was specifically asked to determine whether there were any additional KBSC documents that related in any way to the '432 patent or the subject matter of this litigation. Although he was not obligated to do so, on Thursday, June 29, Mr. Bershader completed his inspection, and executed the attached declaration. Mr. Bershader's declaration states:

1.    I went to the KBSC storage locker in California today. The locker is small, having a size of approximately five feet by ten feet.[10]

---

[8] Defendants' portion of the joint letter makes a number of inaccurate assertions regarding the KBSC document collection process; these are addressed in greater detail below.

[9] While Dickstein Shapiro maintains its position that a proper review was already done of the KBSC documents on behalf of KBSC, it made this offer in the spirit of compromise to seek to resolve this issue with the defendants.

[10] This is the "warehouse" that the defendants refer to in their portion of this letter.

2.      The locker contained 26 boxes of material which had been returned to KBSC
        from the law firm of Dickstein Shapiro Morin & Oshinsky, LLP.  These boxes
        were in the same condition as when they had been received from the law firm,
        that is, they were still sealed and had not been opened since their receipt.  I did
        not open these boxes.

3.      The locker also contained some furniture and 23 additional boxes.  I opened these
        boxes and examined their contents.  Some contained personal belongings (e.g.,
        clothing) which Dr. Kobayashi had shipped to me when he vacated his apartment
        in South Carolina a few years ago.  The other boxes contained KBSC documents
        such as office leases.  I examined the material in all of these boxes, and verified
        that they contained no KBSC documents or material concerning the patent in suit
        in any way nor the technology described in that patent.

Mr. Bershader's declaration confirms that all relevant KBSC documents had been identified by
KBSC's officers and provided to Dickstein Shapiro.  As defendants had agreed on Monday, there
is no need for any additional inspection of the KBSC storage facility.

        As the undersigned advised defendants' counsel on Monday, June 26, once the KBSC
documents were shipped to Dickstein Shapiro, they were quickly reviewed for relevance, and all
remotely potentially relevant documents (about 23,000 pages) were copied.  Those 23,000 pages
were then subjected to a more detailed review since KBSC had insisted upon the immediate
return of its documents.  Eventually, about 2000 pages of KBSC documents were produced.
During the meet and confer, the undersigned described the other documents that were copied but
not produced, including a large volume of computer code that post-dated the issuance of the
patent (and which defendants agreed on June 26 was not relevant), and various correspondence
and unrelated agreements from the mid-1990s and later.  The original KBSC documents,
including documents separately obtained from Dr. Kobayashi in South Carolina (which is why
there were more than the 20 boxes that originally came from that storage facility), were then sent
by Dickstein Shapiro to KBSC's California site and placed in the storage locker, where they
remain unopened to this day.

        Thus, there are no KBSC documents in existence that have not been reviewed, and the
relevant responsive non-privileged documents have been produced.  Although it is submitted that
no further actions should be necessary, as the parties agreed on Monday, Dickstein Shapiro
would undertake another review of the 23,000 pages of documents that had been copied in the
initial potential relevance screen to ensure that there were no other documents that should be
produced.  This was and is a more than sensible way to resolve the matter.

        After the meet and confer, however, defendants' counsel abruptly rejected the agreed-
upon compromise, and instead demanded to have access to all of the original documents in
KBSC's commercial storage facility, even though those files also contain irrelevant documents,
personal materials of KBSC officers, and privileged documents; and despite the fact that all
relevant documents had already been reviewed by counsel.  There simply is no need to conduct

such the expensive and draconian review that defendants now propose.  The appropriate solution for this Court is to instruct the parties to adhere to what the parties had already negotiated and agreed to, and to not embark on the expensive and unnecessary process that defendants now advocate.  This should be the end of the matter.

**Defendants' New KBSC Proposal Is Based Upon A Faulty Premise And Is Unworkable**

Even if the Court is prepared to give further consideration to defendants' new proposal, it should be rejected because it is premised upon multiple incorrect facts, is unnecessary and unduly burdensome, and is unworkable, for the following reasons:

1.     During the meet and confer, the parties did not resolve the issue of whether the KBSC documents were in Ricoh's control.  Ricoh maintains that the KBSC documents are not in Ricoh's possession, custody or control.  Defendants apparently concede that the documents are not in Ricoh's possession or custody, but argue that they are in Ricoh's control because Ricoh's counsel can telephone KBSC's U.S. representative and ask him to voluntarily check on the documents.  There is a significant difference between a voluntary act by a party's attorney, however, and the coercive power of a party over a non-party that corresponds to control.  KBSC is not a party to this litigation.  Ricoh owns only a minority share (25%) of KBSC stock, and Ricoh does not appoint any officers and does not share any offices or have any of the other indicia of control.  Of course, until 2001 KBSC was a 50% co-owner of the '432 patent, and the two companies had a business relationship.  KBSC agreed that its officers and the company would be represented by Dickstein Shapiro in conjunction with the collection of documents, the response to the subpoenas, and depositions of the corporate officers.  Because Ricoh and KBSC have had a business relationship and share the same counsel, however, it does not mean that KBSC's documents are in Ricoh's control.  Unlike *Bank of New York v. Meridien Biao Bank,* 171 F.R.D. 135, 146-49 (S.D.N.Y. 1997), where documents were in the possession of an assignee with a financial interest in the litigation, the KBSC documents are held by a third party with no financial interest in the case.  Because KBSC does not have a "substantial interest" in the case (as required by *BNY)*, and because the documents were the subject of multiple third party subpoenas from defendants, there is no "unjust result" by holding that Ricoh does not "control" KBSC.[11]  *Id.* at 148, citing cases.

2.     The entire premise of Defendants' motion to compel (and this joint letter) hangs on whether Ricoh "controls" the KBSC documents; the fact is that KBSC has always controlled access to its documents.  The statement in paragraph 14 of the Brothers declaration that defendants claim is false – "[n]either Ricoh nor its counsel has access to either of those facilities.  Access to those documents is controlled by KBSC's officers" – is completely true.  Dickstein Shapiro attorneys never went into the storage facility or into Dr. Kobayashi's apartment; instead,

---

[11] Ricoh suspects that the reason why defendants really are pressing the point is because defendants are attempting to obtain an order equating KBSC with Ricoh, then later arguing that knowledge that certain KBSC witnesses may have had should be imputed to Ricoh.

the KBSC officers identified the universe of documents relating to the '432 patent.[12]  Thus, the statement in paragraph 15 of the Brothers declaration –  "Ricoh's counsel did not participate in the review and selection of those documents**.**  Instead, Dr. Kobayashi and Mr. Bershader reviewed and selected documents that they considered to be responsive to the subpoenas, then delivered them to Ricoh's counsel for processing and production to defendants." – is also true.

3.     KBSC voluntarily agreed to let Dickstein Shapiro review the documents that KBSC's officers had identified as having any potential relevance to the '432 patent because KBSC and Ricoh knew that the KBSC documents would be subpoenaed.  The documents were produced between September 2003 and April 2004.  Although defendants now argue that the documents were not produced pursuant to their subpoenas, they only point to a single letter objecting to a non-KBSC subpoena to support this claim.  In fact, KBSC's counsel (the Dickstein Shapiro firm) agreed to produce relevant, responsive non-privileged documents and did so.[13]

4.     During the meet and confer on June 26, 2006, the undersigned described in detail the nature of the KBSC documents that were reviewed by Dickstein Shapiro.  For example, we explained that many of the documents were not relevant because they post-dated the issuance of the patent.  Defendants' counsel agreed during the meet and confer that documents that were dated after 1990 likely were not relevant to the '432 patent, and the undersigned explained that many of the documents not selected for copying were from the 1990s, such as bank statements, cancelled checks, contracts from the 1990s, and other documents that related to other work by KBSC that did not relate to the subject matter of the litigation.  The undersigned summarized the categories of documents, and defendants' counsel generally agreed that the documents did not appear to be relevant.  Nevertheless, the undersigned , without waiving its position that no further action should be necessary, agreed to conduct another review of the KBSC documents that had been reviewed and copied by Dickstein Shapiro, and defendants' counsel agreed that would be sufficient.   Defendants have made no showing why this agreement should not be followed.

5.     Between September 2003 and May 2004, defendants deposed all of the KBSC-related witnesses (Dr. Kobayashi, Dr. Davis and Brian Bershader), and were advised of these facts regarding the document collection and review.  For example, they knew that a large number of boxes of documents had been proved by KBSC to Dickstein Shapiro, and knew the number of pages that had been produced.  Defendants have learned nothing new with respect to the KBSC

---

[12] Defendants' request that they be permitted to inspect the documents in Dr. Kobayashi's condominium is also impossible; Dr. Kobayashi no longer owns that condominium.  The documents that were there are now in the KBSC storage facility, having already been reviewed for relevance.

[13] Counsel for defendants represent eight different parties, as well as numerous non-parties, yet they repeatedly have insisted that requests to one party do not read on or obligate another party to respond.  Simply stated, if defendants believed that KBSC's document production was insufficient, they should have enforced the subpoenas against KBSC, not moved to compel against Ricoh.

documents since then.  There is no reason (other than defendants' inaction or strategic delay) for them to raise the issue now.  This strongly suggests that defendants' claim of outrage and "need" for these documents at this late date after the close of discovery is manufactured.[14]

6.      The case law does not support defendants' request[15].  For example, defendants quote *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 554-56 (N.D. Cal. 1987), to support their argument for another inspection.  Defendants carefully omit the next sentence, however, that states that if a party "contends he has provided plaintiff with all documents responsive to a particular discovery request, he may submit a declaration under oath, similar to a Rule 26(g) verification, as to each specific request he contends he has fully responded to."  Such a declaration was provided both in conjunction with the opposition to the motion, as well as with this joint letter.  No further response is necessary.

7.      Defendants have not explained why they should obtain a review of KBSC's privileged documents.  That is a bell that cannot be unrung.  This dispute is not an instance of KBSC disregarding a prior court order compelling production, nor is there any evidence of what the KBSC documents that allegedly have not been produced would contain.  Defendants speculate as to what they will find if they get access, but can point to no testimony from Kobayashi, Bershader, Davis or any Ricoh witness to support their speculation.  They have no support from anyone who is not being paid by them.  There is only speculation, and in light of the fact that there are no additional responsive documents, such speculation should be disregarded.[16]

In sum, because all of the KBSC documents have already been reviewed and the relevant responsive non-privileged documents produced, there is no need to embark on the cumbersome process defendants now seek.  We estimate it would cost more than $10,000 in time and travel costs to comply with defendants' new proposal.  It is not necessary, especially because the

---

[14] Defendants claim that a further search of the KBSC documents is necessary because Ricoh has not produced any documents that pre-date the filing of the patent.  On the evening of July 29, we conducted a brief search of our records and found that Ricoh has produced hundreds of pages of documents that pre-date the January 13, 1988 filing date.

[15] Defendants' argument that *Tec-Air, Inc. v. Nippondenso Mfg. USA, Inc.* "is on all fours with this case" completely misrepresents the facts and holding of that case.  1994 U.S. Dist. LEXIS 2026.  The documents at issue in *Tec-Air* were a huge volume of documents, collected over a period of years from plaintiff's *own* warehouse – the court held that under those circumstances, it was unreasonable for a single attorney to conduct the review, especially given the demonstrated deficiencies in the search.  *Id*. at *2-13.  Here, Dickstein Shapiro attorneys do not have direct access to the original documents of *third party* KBSC, the universe of potential relevant documents is much smaller (a storage locker rather than a warehouse), and no deficiencies have been shown in Ricoh's search of the documents.

[16] Defendants have refused to permit Dickstein Shapiro to access original documents, even when we have shown that defendants failed to produce huge volumes of responsive documents.  Defendants have made no showing that they should now have this right.

relevant responsive non-privileged documents were produced years ago. The inquiry should end there. As a further compromise, however, the parties agreed that KBSC verify that all KBSC documents had been collected and reviewed – which has been done – and that Dickstein Shapiro conduct still another review of the 23,000 pages in our possession. Although we now believe that the Court would be justified in letting things lie as they now are, we leave it to the discretion of the Court of whether such an additional review is required.

**Ricoh has fully accounted for the search of its corporate files**

During the meet and confer on June 28, the undersigned explained in detail the multiple separate comprehensive searches between 2002 and 2006 of Ricoh's corporate files. Every specific question that was asked by defendants' counsel – whether it was about the TI files, or the Oka files, or anything else – was answered in full. At the end of the day, defendants' counsel said that they had no other questions about Ricoh's search for and production of documents. On June 28, defendants' counsel said that they did not intend to raise this issue in this joint letter. Now, however, they have thrown in this issue as a "me too" even though there were and are no further questions. Ricoh does not understand why Defendants have included this issue in this joint letter, other than to make more work for Ricoh's counsel, and to invade the work product and attorney-client privileges. The fact is, even if Ricoh were to provide the requested accounting, it is not reasonable calculated to lead to any additional evidence.

The Federal Rules require a reasonable search to be made, but the rules do not require that every location in the company be searched. Instead, as we have explained to the Court and to opposing counsel, Ricoh diligently searched the locations where its employees and counsel reasonably expected to find relevant documents. As required by the case law and this Court's order of June 23, 2006, once a challenge has been raised, Ricoh responded with a declaration detailing its search and certifying that all relevant responsive documents have been produced. In fact, Ricoh's explanation of its search in the Brothers declaration and during the meet and confer is far more detailed than required by this Court. Defendants repeatedly have deposed Ricoh's' corporate witnesses on the search for and collection of documents. There is no evidence – *none* – that there are any documents being withheld by Ricoh.[17]

With respect to the TI documents, Ricoh's position is explained in its opposition to the motion to compel, and was again explained in during the meet and confer. The TI negotiation documents initially were withheld pursuant to the settlement privilege, and indeed, many documents were labeled as such. Thus, Mr. Takada's testimony that the documents were privileged was based upon Ricoh's good faith belief. After defendants raised the issue, however,

---

[17] By contrast, defendants failed to produce millions of pages of documents that were produced only after Ricoh filed a motion for sanctions due to defendants' failure to comply with a Court Order. As the court is aware, after dogged pursuit by Ricoh, defendants have had to repeatedly correct their inaccurate declarations, resulting in the number of accused products more than tripling. Perhaps defendants are attempting to "balance the scale" by their motion. But in the absence of any evidence, and in light of Ricoh's declarations, the motion should be rejected.

Ricoh voluntarily agreed to produce them.

The undue burden upon Ricoh to comply with defendants' request is enormous. Defendants are asking Ricoh to document every conversation with every employee, every file cabinet opened, every computer file or tape analyzed, over a four year period. Ricoh estimates that it would take more than 400 man-hours to comply with the request. In the absence of any basis to do so, and especially since defendants were prepared to drop this request as late as the day before yesterday, June 28, this Court should reject the motion.

Ricoh has performed a reasonable inquiry in its search of the KBSC documents in fulfillment of its obligations. Nevertheless, Defendants are reneging on a carefully negotiated compromise agreement that addresses all of their purported concerns. Defendants' unfounded requests for access to the KBSC storage facility and for an exhaustive accounting of its search are not reasonably calculated to lead to the discovery of admissible evidence and are unduly burdensome on Ricoh. Defendants' requests should be denied.

Defendants' reply:

In light of Mr. Bershader's declaration, the need for a full review by Defendants of the KBSC storage space is evident. As with the carefully-crafted Brothers Declaration — a declaration that contains statements that, if not outright false, are highly misleading — the Bershader Declaration (generated after Ricoh had received Defendants' portion of this joint letter) is worded with lawyerly precision. While creating the impression that the only relevant documents are contained in what is now described as 26 sealed boxes previously reviewed by Dickstein Shapiro,[18] it actually does not say that. Rather, it says that none of the 23 additional boxes contain "***KBSC*** documents or material concerning the patent in suit in any way nor the technology described in that patent." (Bershader Decl., ¶ 3.) Leaving aside the question of whether Mr. Bershader, a layperson, is qualified to determine whether material is relevant, he leaves open the distinct possibility that there are documents in the storage locker that contain ***non-KBSC*** documents or material concerning the patent in suit or the technology described in that patent. Indeed, this would not be surprising, given that all boxes that were previously in Dr. Kobayashi's South Carolina condominium are now in the warehouse (see supra, note 12),[19] and those boxes may contain documents that could be characterized as, for instance, University of South Carolina documents or Kobayashi documents.

---

[18] This is, once again, a changed story. Ricoh claims that the 26 sealed boxes comprise 20 boxes originally from the KBSC storage locker, and apparently 6 boxes from Dr. Kobayashi's condominium. (*See supra*.) Yet on Monday, counsel stated that Dr. Kobayashi provided less than one box of documents. This is the exact type of discrepancy that requires an actual review of the storage facility and the documents contained therein.

[19] Given that Dr. Kobayashi's condominium is no longer owned by him and that all of the contents from that condominium are now in the storage locker, Defendants agree that there is no need to search the condominium.

Moreover, the 26 sealed boxes likely contain anywhere from 39,000 pages (if the boxes are, on average, half full) to 78,000 pages (if they are completely full).  Dickstein Shapiro has only 23,000 pages of imaged documents, meaning that there could be, unreviewed, more than twice these number of pages in the sealed boxes.  Because Mr. Bershader did not open and review the sealed boxes, there is no indication of what Dickstein Shapiro did not copy out of these boxes.  Defendants are entitled to know what else exists in these sealed boxes beyond the 23,000 pages Dickstein Shapiro has in its possession.

Given the failure of even Mr. Bershader's declaration to put to rest precisely what documents are in the storage facility and whether everything relevant has been produced,[20] the quickest and easiest (and likely the most inexpensive) way to resolve this issue is to allow Defendants' counsel to inspect the storage facility and its contents as outlined above.

As to the issue of control over these documents, the ability of Ricoh and its counsel to gain the cooperation of Mr. Bershader on such quick notice conclusively shows control.  If, as Ricoh states above, Mr. Bershader was under no obligation to check the storage locker, yet he did anyway based upon the request of Ricoh's counsel, that suffices to establish control.  As the Court noted in its Order, "the word control does not require that the party have legal ownership or actual physical possession of the documents at issue; rather documents are considered to be under a party's control when that party has the right, authority, or ***practical ability to obtain the documents from a non-party to the action***."  6/23/06 Order (emphasis added), *quoting Bank of New York v. Meridien Biao Bank Tanzania*, 171 F.R.D. 135, 146 (S.D.N.Y. 1997).  Ricoh attempts to distinguish the *Bank of New York* case from which this Court took the above statement.  This is pointless — the statement is one of general law, and is derived from the many cases cited in *Bank of New York*.

Indeed, the statements Ricoh makes above further demonstrates the control Ricoh has over the documents.  Notably, "KBSC ***voluntarily*** agreed to let Dickstein Shapiro review the documents that KBSC's officers had identified as having any potential relevance to the '432 patent because KBSC and Ricoh knew that the KBSC documents ***would be*** subpoenaed."  *See supra* (emphasis added).  In other words, as Defendants pointed out in their Motion, Reply, and above, there was no subpoena for the KBSC documents outstanding at the point they were reviewed and produced, and KBSC voluntarily agreed to provide Ricoh and its counsel access to these documents so Ricoh could produce them.  Nothing more need be shown to demonstrate Ricoh's control over these documents.

Finally, as to Ricoh's document production efforts, what Defendants are attempting to do is to prevent any more surprises such as the TI documents.  Ricoh's witness and Ricoh's counsel stated affirmatively multiple times that such documents did not exist.  (*See* Reply at 4:10-6:15).

---

[20] The sheer volume suggests that other relevant documents exist — of the 49 boxes in the storage facility, containing, conservatively, 49,000 to 98,000 pages (i.e., one-third to one-half full on average), fewer than 2,000 pages have been produced.  This small number is highly unlikely to be the only relevant documents in these boxes.

There was *never* a statement made until well after the documents were produced that Ricoh was simply withholding all of the TI documents based on the so-called "settlement privilege."  In light of the false (or, again, highly misleading) representations on the TI documents, the false (or highly misleading) representations on the KBSC documents, and the hiding-the-ball games that have led to the horribly belated discovery of, for instance, the Takada memorandum on the Shindo meeting and the Hoffman letter to Shindo, Defendants believe they are entitled to some closure on the rest of Ricoh's document production through a detailed description of the collection efforts — a description which contains verifiable detail (in case further questions arise).

Respectfully submitted,

By: _____/s/_____

Denise M. DeMory
Counsel for SYNOPSYS, INC. and
Customer Defendants AEROFLEX
INCORPORATED, AEROFLEX
COLORADO SPRINGS, AMI
SEMICONDUCTOR, INC., MATROX
ELECTRONIC SYSTEMS, LTD.,
MATROX GRAPHICS, INC., MATROX
INTERNATIONAL CORP., and MATROX
TECH, INC.

By: _____/s/_____

Kenneth W. Brothers
Counsel for RICOH COMPANY, LTD



**South Carolina**
**RESEARCH INSTITUTE**

AN AFFILIATE OF THE UNIVERSITY OF SOUTH CAROLINA

MARSHA R. TORR
EXECUTIVE DIRECTOR

April 9, 1998

Jinya Katsube, Senior Managing Director
ZUKEN Incorporated
Shin-Yokahama Bldg., 3-1-1
Shin-Yokohama, Kouhoku-ku
Yokohama, 222, JAPAN

RE: Research Agreement between ZUKEN and SCRI

Dear Mr. Katsube:

The South Carolina Research Institute, affiliated with the University of South Carolina, is
pleased to enclose two (2) copies of the referenced agreement for your signature.

| | |
|---|---|
| Principal Investigator: | Hideaki Kobayashi, Ph.D.<br>Department of Electrical and Computer Engineering |
| Proposal Title: | **Developing a University Program for Retraining<br>ASIC Design Engineers** |
| Proposed Budget: | $48,000 |
| Proposed Duration: | January 1, 1998 - December 31, 1998 |

Please return one fully-executed copy of the agreement to Steve Etheredge, Office of
Sponsored Programs & Research, 901 Sumter Street, 5th Floor, Columbia, South Carolina
29208 USA. The other copy should be retained for your files.

The South Carolina Research Institute looks forward to working with your company on
this project.

Sincerely,

Marsha R. Torr
Executive Director

Enclosure

# RESEARCH AGREEMENT

This Agreement is by and between the South Carolina Research Institute, a non-profit corporation organized under the laws of the State of South Carolina, with offices at 110 Osborne, University of South Carolina, Columbia, South Carolina 29208, hereinafter referred to as SCRI, and ZUKEN Incorporated, a for-profit firm with offices at Shin-Yokohama Bldg., 3-1-1, Shin-Yokohama, Kouhoku-Ku, Yokohama, 222, Japan, hereinafter referred to as Sponsor:

Whereas, SCRI has an active research program concerning ASIC design;

Whereas, Sponsor is also interested in that research and wishes to encourage and assist in supporting certain aspects of the research;

Whereas, SCRI and Sponsor wish to combine their mutual interest in this research;

Therefore, SCRI and Sponsor agree to the terms stated below.

## 1. Scope of Work
The Scope of Work shall be as described in the research proposal entitled "Developing a University Program for Retraining ASIC Design Engineers" and dated March 27, 1998, hereinafter referred to as Proposal and incorporated into this Agreement as Attachment I.

Based on an addendum to an underlying agreement between SCRI and USC, this project will be performed by Dr. Hideaki Kobayashi, Principal Investigator, in the Department of Electrical and Computer Engineering, University of South Carolina.

## 2. Best Efforts
As an independent agent, SCRI will apply its best efforts to complete the research described in the Scope of Work statement. Commonly accepted professional standards of workmanship will be followed.

## 3. Key Personnel
The project director will be Dr. Hideaki Kobayashi who may select and supervise other project staff as needed. No other person will be substituted for the project director except with Sponsor's approval. Sponsor may exercise Termination provision of this Agreement if a satisfactory substitute is not identified.

## 4. Direction of Research
Direction of the research will rest with the SCRI. It is agreed that SCRI, through its project director, will maintain continuing communication with a designated liaison for the Sponsor. The frequency and nature of these communications will be mutually defined by SCRI's project director and Sponsor's liaison person.

1

## 5. Funding and Payment

Sponsor will provide funding in the amount of $48,000 (US Dollars) to be applied generally in keeping with the estimated budget shown in the Proposal. Payment of $4,000 per month for 12 months will be made by the Sponsor during the period of performance not to exceed a total of $48,000. Payments will be made in US Dollars to the South Carolina Research Institute via wire transfer to Account Number 707027397 at NationsBank (Bank Routing Number 053904483), 1301 Gervais Street, Columbia, South Carolina 29201 USA.

## 6. Project Period

The Agreement will be effective for 12 months beginning January 1, 1998 and ending December 31, 1998. This period may be amended by mutual written agreement by authorized representatives of SCRI and Sponsor.

## 7. Inventions and/or Discoveries

All rights and title to SCRI inventions and/or discoveries made during the course of this project shall belong to SCRI and shall be subject to the terms and conditions of this Agreement. SCRI shall grant sponsor first option to negotiate a world wide, royalty-bearing license, including the rights to sublicense, to make, have made, use and sell products incorporating such invention.

In the event Sponsor elects to exercise the license option, Sponsor must notify SCRI of its intentions in writing no later than sixty (60) days after SCRI discloses discovery to Sponsor. The license will include reasonable terms and conditions, including reasonable royalties, as the parties mutually agree in a separate document.

This Agreement shall not be construed as implying that either party shall have the right to use background intellectual property of the other in connection with the Agreement except as otherwise provided in Article 8 below. Background intellectual property means property and the legal right of either or both parties developed before or independent of this Agreement including inventions, patent applications, patents, copyrights, trademarks, mask works, trade secrets and any information embodying proprietary data such as technical data and computer software.

## 8. Proprietary Information

For purposes of this Agreement, Proprietary Information refers to information of any kind which is disclosed by Sponsor to SCRI and which, by appropriate marking, is identified as confidential and proprietary at the time of disclosure.

The Sponsor and SCRI agree that all Proprietary Information communicated by Sponsor and accepted by SCRI in connection with this Agreement shall be kept confidential by SCRI as provided herein unless specific written permission is obtained from Sponsor. SCRI agrees to make Proprietary Information available only to those employees and students who require access to it in the performance of this Agreement and to inform them of the confidential nature of such information. SCRI shall exert reasonable efforts, no less than the protection given its own confidential information, to maintain such information in confidence.

It is agreed by Sponsor and SCRI that the above obligations of confidentiality shall not attach to information which:

2

(a) is publicly available prior to the date of the Agreement or becomes publicly available thereafter through no wrongful act of SCRI;

(b) was independently known prior to the date of disclosure or becomes known to SCRI thereafter from a third party having a bona fide right to disclose the information;

(c) is independently developed by SCRI;

(d) SCRI is obligated to produce pursuant to an order of a court of competent jurisdiction or a valid administrative or Congressional subpoena, provided that SCRI (1) promptly notifies Sponsor and (2) cooperates reasonably with the Sponsor's efforts to contest or limit the scope of such order.

When the Proprietary Information is no longer required for the purposes of this Agreement, SCRI shall return it or dispose of it as directed by Sponsor. SCRI's obligations of confidentiality with respect to proprietary Information provided under this Agreement will expire five (5) years after the date of this Agreement.

## 9. *Publication*

Sponsor recognizes that under SCRI policy, the results of the project must be publishable and agrees that researchers engaged in the project shall be permitted to present at symposia, national or regional professional meetings and to publish in journals, theses or dissertations, or otherwise of their own choosing, methods and results of project, provided, however, that Sponsor shall have been furnished copies of any proposed publications or presentations at least 60 days in advance of the submission of such proposed publication or presentation to a journal, editor, or other third party. Sponsor shall have 45 days, after receipt of said copies, to object in writing to such proposed presentation or proposed publication either because there is patentable subject matter which needs protection and/or there is Confidential Information of Sponsor contained in the proposed publication or presentation. In the event that sponsor makes such objection, the parties shall negotiate an acceptable version, and the researcher(s) shall refrain from making such publication or presentation for a maximum of 90 days from date of receipt of such objection in order for SCRI to file patent application(s) with the United States Patent and Trademark Office and/or foreign patent office(s) directed to the patentable subject matter contained in the proposed publication or presentation.

## 10. *Information and Data*

The Sponsor may use all information and data developed by SCRI under this Agreement, except as otherwise specified herein, in any manner without further license from or payment to the SCRI.

## 11. *Liability*

SCRI and/or USC shall carry such workers' compensation, employer's liability, comprehensive general liability, and other insurance sufficient in amount to cover the performance of its obligations hereunder. Upon reasonable request of Sponsor, SCRI and/or USC shall furnish Sponsor with a certificate or certificates of insurance evidencing that appropriate insurance coverages are in full force and effect.

## 12. *Use of Names*

SCRI and Sponsor each agree that they will not use the name, trademark, or other identifier of the other for any advertising, promotion, or other commercially related purpose except with advance written approval. Such approval shall not be unreasonably withheld.

## 13. *Assignment*

Unless otherwise indicated elsewhere in this Agreement, neither party to this Agreement may assign nor transfer any rights or obligations arising from this Agreement without the prior written consent of

3

the other party.

14. *Notices*
Unless otherwise indicated elsewhere in this Agreement, all notices and communications in connection with this Agreement will be addressed to the following:

**South Carolina Research Institute**          **ZUKEN Incorporated**

Name:  R. Steven Etheredge          Name:    Ikuo Nakamura

Title:    Sponsored Program Administrator          Title:    General Manager
                                                                                        CAE Business Department

Address:    University of South Carolina          Address:  Shin-Yokohama Bldg., 3-1-1
                      110 Osborne Building                                    Shin-Yokohama, Kouhoku-ku
                      Columbia, SC  29208  USA                          Yokohama, 222, JAPAN
                      (803) 777-5458                                          (81) 45-473-9131
                      (803) 777-5457 (fax)                                  (81) 45-473-8771  (fax)

15.  *Termination*
Either SCRI or Sponsor may terminate this Agreement by giving thirty (30) days written notice to the other.  In the event of such termination, SCRI will cease further obligation of project funds and will take all reasonable steps to cancel or otherwise reduce outstanding obligations.  Sponsor will be obligated to pay actual costs and firm commitments to the date of termination not to exceed the total amount of this contract.

16. *Amendments*
Any amendment to this Agreement must be in writing and signed by authorized representatives of SCRI and Sponsor.

17. *Entire Agreement*
This Agreement constitutes the entire understanding between the Sponsor and the SCRI, and any previous discussion, negotiations, agreements or the like are superseded by this Agreement.

Agreement of SCRI and Sponsor to the terms stated above is indicated by signatures below.

**South Carolina Research Institute**          **ZUKEN Incorporated**

Marsha R. Torr          Jinya Katsube
Executive Director          Senior Managing Director

Date:          Date: 5/12/98

4



**South Carolina RESEARCH INSTITUTE** _____

AN AFFILIATE OF THE UNIVERSITY OF SOUTH CAROLINA

April 23, 1999

Jinya Katsube, Senior Managing Director
ZUKEN Incorporated
Shin-Yokahama Bldg., 3-1-1
Shin-Yokohama, Kouhoku-ku
Yokohama, 222, JAPAN

RE: Research Agreement between ZUKEN and SCRI

Dear Mr. Katsube:

The South Carolina Research Institute, affiliated with the University of South Carolina, is pleased to enclose two (2) copies of the referenced agreement for your signature.

| | |
|---|---|
| Principal Investigator: | **Hideaki Kobayashi, Ph.D.**<br>Department of Electrical and Computer Engineering |
| Proposal Title: | **Developing a University Program for Re-Training ASIC Design Engineers - Year 2** |
| Proposed Budget: | $50,000 |
| Proposed Duration: | January 1, 1999 - December 31, 1999 |

Please return one fully-executed copy of the agreement to Steve Etheredge, Office of Sponsored Programs & Research, 901 Sumter Street, 5th Floor, Columbia, South Carolina 29208 USA. The other copy should be retained for your files.

The South Carolina Research Institute looks forward to continuing work with your company on this project.

Sincerely,

Ardis M. Savory
Assistant Secretary to the Board

Enclosure

517 BYRNES BULDING, 901 SUMTER STREET • COLUMBIA, SOUTH CAROLINA 29208
803/777-5587 • FAX 803/777-4136 • E-MAIL: RBELL@GWM.SC.EDU

AN AFFIRMATIVE ACTION / EQUAL OPPORTUNITY INSTITUTION

# RESEARCH AGREEMENT

This Agreement is by and between the South Carolina Research Institute, a non-profit corporation organized under the laws of the State of South Carolina, with offices at 901 Sumter Street, Suite 517, Columbia, South Carolina 29208, hereinafter referred to as SCRI, and ZUKEN Incorporated, a for-profit firm with offices at Shin-Yokohama Bldg., 3-1-1, Shin-Yokohama, Kouhoku-Ku, Yokohama, 222, Japan, hereinafter referred to as Sponsor:

Whereas, SCRI has an active research program concerning ASIC design;

Whereas, Sponsor is also interested in that research and wishes to encourage and assist in supporting certain aspects of the research;

Whereas, SCRI and Sponsor wish to combine their mutual interest in this research;

Therefore, SCRI and Sponsor agree to the terms stated below.

## 1. *Scope of Work*
The Scope of Work shall be as described in the research proposal entitled "Developing a University Program for Re-Training ASIC Design Engineers - Year 2" and dated April 23, 1999, hereinafter referred to as Proposal and incorporated into this Agreement as Attachment I.

Based on an addendum to an underlying agreement between SCRI and USC, this project will be performed by Dr. Hideaki Kobayashi, Principal Investigator, in the Department of Electrical and Computer Engineering, University of South Carolina.

## 2. *Best Efforts*
As an independent agent, SCRI will apply its best efforts to complete the research described in the Scope of Work statement. Commonly accepted professional standards of workmanship will be followed.

## 3. *Key Personnel*
The project director will be Dr. Hideaki Kobayashi who may select and supervise other project staff as needed. No other person will be substituted for the project director except with Sponsor's approval. Sponsor may exercise Termination provision of this Agreement if a satisfactory substitute is not identified.

## 4. *Direction of Research*
Direction of the research will rest with the SCRI. It is agreed that SCRI, through its project director, will maintain continuing communication with a designated liaison for the Sponsor. The frequency and nature of these communications will be mutually defined by SCRI's project director and Sponsor's liaison person.

1

### 5. *Funding and Payment*
Sponsor will provide funding in the amount of $50,000 (US Dollars) to be applied generally in keeping with the estimated budget shown in the Proposal. Payments of $12,500 per quarter (3 months) for 12 months will be made by the Sponsor during the period of performance not to exceed a total of $50,000. Payments will be made in US Dollars to the South Carolina Research Institute via wire transfer to Account Number 707027397 at NationsBank (Bank Routing Number 053904483), 1301 Gervais Street, Columbia, South Carolina 29201 USA.

### 6. *Project Period*
The Agreement will be effective for 12 months beginning January 1, 1999 and ending December 31, 1999. This period may be amended by mutual written agreement by authorized representatives of SCRI and Sponsor.

### 7. *Inventions and/or Discoveries*
All rights and title to SCRI inventions and/or discoveries made during the course of this project shall belong to SCRI and shall be subject to the terms and conditions of this Agreement. SCRI shall grant sponsor first option to negotiate a world wide, royalty-bearing license, including the rights to sublicense, to make, have made, use and sell products incorporating such invention.

In the event Sponsor elects to exercise the license option, Sponsor must notify SCRI of its intentions in writing no later than sixty (60) days after SCRI discloses discovery to Sponsor. The license will include reasonable terms and conditions, including reasonable royalties, as the parties mutually agree in a separate document.

This Agreement shall not be construed as implying that either party shall have the right to use background intellectual property of the other in connection with the Agreement except as otherwise provided in Article 8 below. Background intellectual property means property and the legal right of either or both parties developed before or independent of this Agreement including inventions, patent applications, patents, copyrights, trademarks, mask works, trade secrets and any information embodying proprietary data such as technical data and computer software.

### 8. *Proprietary Information*
For purposes of this Agreement, Proprietary Information refers to information of any kind which is disclosed by Sponsor to SCRI and which, by appropriate marking, is identified as confidential and proprietary at the time of disclosure.

The Sponsor and SCRI agree that all Proprietary Information communicated by Sponsor and accepted by SCRI in connection with this Agreement shall be kept confidential by SCRI as provided herein unless specific written permission is obtained from Sponsor. SCRI agrees to make Proprietary Information available only to those employees and students who require access to it in the performance of this Agreement and to inform them of the confidential nature of such information. SCRI shall exert reasonable efforts, no less than the protection given its own confidential information, to maintain such information in confidence.

It is agreed by Sponsor and SCRI that the above obligations of confidentiality shall not attach to information which:

> (a) is publicly available prior to the date of the Agreement or becomes publicly available thereafter through no wrongful act of SCRI;
> (b) was independently known prior to the date of disclosure or becomes known to SCRI thereafter from a third party having a bona fide right to disclose the information;

2

(c) is independently developed by SCRI;

(d) SCRI is obligated to produce pursuant to an order of a court of competent jurisdiction or a valid administrative or Congressional subpoena, provided that SCRI (1) promptly notifies Sponsor and (2) cooperates reasonably with the Sponsor's efforts to contest or limit the scope of such order.

When the Proprietary Information is no longer required for the purposes of this Agreement, SCRI shall return it or dispose of it as directed by Sponsor. SCRI's obligations of confidentially with respect to proprietary Information provided under this Agreement will expire five (5) years after the date of this Agreement.

## 9. *Publication*

Sponsor recognizes that under SCRI policy, the results of the project must be publishable and agrees that researchers engaged in the project shall be permitted to present at symposia, national or regional professional meetings and to publish in journals, theses or dissertations, or otherwise of their own choosing, methods and results of project, provided, however, that Sponsor shall have been furnished copies of any proposed publications or presentations at least 60 days in advance of the submission of such proposed publication or presentation to a journal, editor, or other third party. Sponsor shall have 45 days, after receipt of said copies, to object in writing to such proposed presentation or proposed publication either because there is patentable subject matter which needs protection and/or there is Confidential Information of Sponsor contained in the proposed publication or presentation. In the event that sponsor makes such objection, the parties shall negotiate an acceptable version, and the researcher(s) shall refrain from making such publication or presentation for a maximum of 90 days from date of receipt of such objection in order for SCRI to file patent application(s) with the United States Patent and Trademark Office and/or foreign patent office(s) directed to the patentable subject matter contained in the proposed publication or presentation.

## 10. *Information and Data*

The Sponsor may use all information and data developed by SCRI under this Agreement, except as otherwise specified herein, in any manner without further license from or payment to the SCRI.

## 11. *Liability*

SCRI and/or USC shall carry such workers' compensation, employer's liability, comprehensive general liability, and other insurance sufficient in amount to cover the performance of its obligations hereunder. Upon reasonable request of Sponsor, SCRI and/or USC shall furnish Sponsor with a certificate or certificates of insurance evidencing that appropriate insurance coverages are in full force and effect.

## 12. *Use of Names*

SCRI and Sponsor each agree that they will not use the name, trademark, or other identifier of the other for any advertising, promotion, or other commercially related purpose except with advance written approval. Such approval shall not be unreasonably withheld.

## 13. *Assignment*

Unless otherwise indicated elsewhere in this Agreement, neither party to this Agreement may assign nor transfer any rights or obligations arising from this Agreement without the prior written consent of the other party.

## 14. *Notices*

Unless otherwise indicated elsewhere in this Agreement, all notices and communications in connection with this Agreement will be addressed to the following:

3

| South Carolina Research Institute | ZUKEN Incorporated |
|---|---|
| Name:  R. Steven Etheredge | Name:    Ikuo Nakamura |
| Title:    Sponsored Program Administrator | Title:    General Manager<br>CAE Business Department |
| Address:    University of South Carolina<br>901 Sumter Street<br>Columbia, SC  29208  USA<br>(803) 777-7093<br>(803) 777-4136 (fax) | Address:  Shin-Yokohama Bldg., 3-1-1<br>Shin-Yokohama, Kouhoku-ku<br>Yokohama, 222, JAPAN<br>(81) 45-473-9131<br>(81) 45-473-8771  (fax) |

## 15.  *Termination*
Either SCRI or Sponsor may terminate this Agreement by giving thirty (30) days written notice to the other.  In the event of such termination, SCRI will cease further obligation of project funds and will take all reasonable steps to cancel or otherwise reduce outstanding obligations.  Sponsor will be obligated to pay actual costs and firm commitments to the date of termination not to exceed the total amount of this contract.

## 16.  *Amendments*
Any amendment to this Agreement must be in writing and signed by authorized representatives of SCRI and Sponsor.

## 17.  *Entire Agreement*
This Agreement constitutes the entire understanding between the Sponsor and the SCRI, and any previous discussion, negotiations, agreements or the like are superseded by this Agreement.

Agreement of SCRI and Sponsor to the terms stated above is indicated by signatures below.


South Carolina Research Institute                    ZUKEN Incorporated


Ardis M. Savory                                            Jinya Katsube
Assistant Secretary to the Board                    Senior Managing Director

Date:  April 23, 1999                                    Date:  May 24 99

4



# RESEARCH AGREEMENT

This Agreement is by and between the South Carolina Research Institute, a non-profit corporation organized under the laws of the State of South Carolina, with offices at 901 Sumter Street, Suite 517, Columbia, South Carolina 29208, hereinafter referred to as SCRI, and CMK Circuit Technology Center Corporation, a for-profit firm with offices at 1106 Fujikubo, Miyoshi-Machi, Iruma-gun, Saitama 354-8580, Japan, hereinafter referred to as Sponsor:

Whereas, SCRI has an active research program concerning HDL-based design;

Whereas, Sponsor is also interested in that research and wishes to encourage and assist in supporting certain aspects of the research;

Whereas, SCRI and Sponsor wish to combine their mutual interest in this research;

Therefore, SCRI and Sponsor agree to the terms stated below.

### 1. Scope of Work
The Scope of Work shall be as described in the research proposal entitled "A Long-Term Training Program for VLSI System Engineers," hereinafter referred to as Proposal and incorporated into this Agreement as Attachment I.

Based on an addendum to an underlying agreement between SCRI and USC, this project will be performed by Dr. Hideaki Kobayashi, Principal Investigator, in the Department of Computer Science and Engineering, College of Engineering and Information Technology, University of South Carolina.

### 2. Best Efforts
As an independent agent, SCRI will apply its best efforts to complete the research described in the Scope of Work statement. Commonly accepted professional standards of workmanship will be followed.

### 3. Key Personnel
The project director will be Dr. Hideaki Kobayashi who may select and supervise other project staff as needed. No other person will be substituted for the project director except with Sponsor's approval. Sponsor may exercise Termination provision of this Agreement if a satisfactory substitute is not identified.

### 4. Direction of Research
Direction of the research will rest with the SCRI. It is agreed that SCRI, through its project director, will maintain continuing communication with a designated liaison for the Sponsor. The frequency and nature of these communications will be mutually defined by SCRI's project director and Sponsor's liaison person.

1

## 5. *Funding and Payment*

Sponsor will provide funding in the amount of $210,000 (US Dollars) to be applied generally in keeping with the estimated budget shown in the Proposal. The initial payment of $35,000 US is due by July 1, 2000, with additional payments of $35,000 US payable on January 1, 2001, July 1, 2001, January 1, 2002, July 1, 2002, and January 1, 2003. Payments will be made in US Dollars to the South Carolina Research Institute via wire transfer to Account Number 323300707 at Wachovia Bank, NA (Bank Routing Number 053900225), 1426 Main Street, Columbia, South Carolina 29201 USA.

## 6. *Project Period*

The Agreement will be effective for 36 months beginning July 1, 2000, and ending June 30, 2003. This period may be amended by mutual written agreement by authorized representatives of SCRI and Sponsor.

## 7. *Inventions and/or Discoveries*

All rights and title to SCRI inventions and/or discoveries made during the course of this project shall belong to SCRI and shall be subject to the terms and conditions of this Agreement. SCRI shall grant sponsor first option to negotiate a world wide, royalty-bearing license, including the rights to sublicense (subject to approval of SCRI), to make, have made, use and sell products incorporating such invention.

In the event Sponsor elects to exercise the license option, Sponsor must notify SCRI of its intentions in writing no later than sixty (60) days after SCRI discloses discovery to Sponsor. The license will include reasonable terms and conditions, including reasonable royalties, as the parties mutually agree in a separate document.

This Agreement shall not be construed as implying that either party shall have the right to use background intellectual property of the other in connection with the Agreement except as otherwise provided in Article 8 below. Background intellectual property means property and the legal right of either or both parties developed before or independent of this Agreement including inventions, patent applications, patents, copyrights, trademarks, mask works, trade secrets and any information embodying proprietary data such as technical data and computer software.

## 8. *Proprietary Information*

For purposes of this Agreement, Proprietary Information refers to information of any kind which is disclosed by Sponsor to SCRI and which, by appropriate marking, is identified as confidential and proprietary at the time of disclosure.

The Sponsor and SCRI agree that all Proprietary Information communicated by Sponsor and accepted by SCRI in connection with this Agreement shall be kept confidential by SCRI as provided herein unless specific written permission is obtained from Sponsor. SCRI agrees to make Proprietary Information available only to those employees and students who require access to it in the performance of this Agreement and to inform them of the confidential nature of such information. SCRI shall exert reasonable efforts, no less than the protection given its own confidential information, to maintain such information in confidence.

It is agreed by Sponsor and SCRI that the above obligations of confidentiality shall not attach to information which:

    (a) is publicly available prior to the date of the Agreement or becomes publicly available

2

thereafter through no wrongful act of SCRI;

(b) was independently known prior to the date of disclosure or becomes known to SCRI thereafter from a third party having a bona fide right to disclose the information;

(c) is independently developed by SCRI;

(d) SCRI is obligated to produce pursuant to an order of a court of competent jurisdiction or a valid administrative or Congressional subpoena, provided that SCRI (1) promptly notifies Sponsor and (2) cooperates reasonably with the Sponsor's efforts to contest or limit the scope of such order.

When the Proprietary Information is no longer required for the purposes of this Agreement, SCRI shall return it or dispose of it as directed by Sponsor. SCRI's obligations of confidentially with respect to proprietary Information provided under this Agreement will expire five (5) years after the date of this Agreement.

## 9. *Publication*
Sponsor recognizes that under SCRI policy, the results of the project must be publishable and agrees that researchers engaged in the project shall be permitted to present at symposia, national or regional professional meetings and to publish in journals, theses or dissertations, or otherwise of their own choosing, methods and results of project, provided, however, that Sponsor shall have been furnished copies of any proposed publications or presentations at least 60 days in advance of the submission of such proposed publication or presentation to a journal, editor, or other third party. Sponsor shall have 45 days, after receipt of said copies, to object in writing to such proposed presentation or proposed publication either because there is patentable subject matter which needs protection and/or there is Confidential Information of Sponsor contained in the proposed publication or presentation. In the event that sponsor makes such objection, the parties shall negotiate an acceptable version, and the researcher(s) shall refrain from making such publication or presentation for a maximum of 90 days from date of receipt of such objection in order for SCRI to file patent application(s) with the United States Patent and Trademark Office and/or foreign patent office(s) directed to the patentable subject matter contained in the proposed publication or presentation.

## 10. *Information and Data*
The Sponsor may use all information and data developed and delivered by SCRI under this Agreement, except as otherwise specified herein, in any manner without further license from or payment to the SCRI.

## 11. *Liability*
SCRI shall carry such workers' compensation, employer's liability, comprehensive general liability, and other insurance sufficient in amount to cover the performance of its obligations hereunder. Upon reasonable request of Sponsor, SCRI shall furnish Sponsor with a certificate or certificates of insurance evidencing that appropriate insurance coverages are in full force and effect.

## 12. *Use of Names*
SCRI and Sponsor each agree that they will not use the name, trademark, or other identifier of the other for any advertising, promotion, or other commercially related purpose except with advance written approval. Such approval shall not be unreasonably withheld.

13. *Assignment*
Unless otherwise indicated elsewhere in this Agreement, neither party to this Agreement may assign nor transfer any rights or obligations arising from this Agreement without the prior written consent of the other party.

14. *Notices*
Unless otherwise indicated elsewhere in this Agreement, all notices and communications in connection with this Agreement will be addressed to the following:

| South Carolina Research Institute | CMK Circuit Technology Center Corporation |
|---|---|
| Name:  R. Steven Etheredge | Name:    Minoru Sugita |
| Title:   Sponsored Program Administrator | Title:     General Manager |
| Address:   University of South Carolina<br>901 Sumter Street<br>Columbia, SC  29208  USA<br>(803) 777-7093<br>(803) 777-4136 (fax) | Address:  1106 Fujikubo, Miyoshi-Machi<br>Iruma-gun<br>Saitama 354-8580 Japan<br>81-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<br>81-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 (fax) |

15. *Termination*
Either SCRI or Sponsor may terminate this Agreement by giving thirty (30) days written notice to the other.  In the event of such termination, SCRI will cease further obligation of project funds and will take all reasonable steps to cancel or otherwise reduce outstanding obligations.  Sponsor will be obligated to pay actual costs and firm commitments to the date of termination not to exceed the total amount of this contract.

16. *Amendments*
Any amendment to this Agreement must be in writing and signed by authorized representatives of SCRI and Sponsor.

17. *Entire Agreement*
This Agreement constitutes the entire understanding between the Sponsor and the SCRI, and any previous discussion, negotiations, agreements or the like are superseded by this Agreement.

Agreement of SCRI and Sponsor to the terms stated above is indicated by signatures below.

| South Carolina Research Institute | CMK Circuit Technology Center Corporation |
|---|---|
| R.M. Bell<br>Director | Yasuhiko Makishima<br>President |
| Date:  5/16/00 | Date:  6/6/00 |

4

# RESEARCH AGREEMENT

This Agreement is by and between the South Carolina Research Institute, a non-profit corporation organized under the laws of the State of South Carolina, with offices at 901 Sumter Street, Suite 517, Columbia, South Carolina 29208, hereinafter referred to as SCRI, and CMK Circuit Technology Center Corporation, a for-profit firm with offices at 1106 Fujikubo, Miyoshi-Machi, Iruma-gun, Saitama 354-8580, Japan, hereinafter referred to as Sponsor:

Whereas, SCRI has an active research program concerning HDL-based design;

Whereas, Sponsor is also interested in that research and wishes to encourage and assist in supporting certain aspects of the research;

Whereas, SCRI and Sponsor wish to combine their mutual interest in this research;

Therefore, SCRI and Sponsor agree to the terms stated below.

### 1. *Scope of Work*
The Scope of Work shall be as described in the research proposal entitled "Quantifying Design Productivity: An HDL-based Design Experiment" and dated October 26, 1999, hereinafter referred to as Proposal and incorporated into this Agreement as Attachment I.

Based on an addendum to an underlying agreement between SCRI and USC, this project will be performed by Dr. Hideaki Kobayashi, Principal Investigator, in the Department of Electrical and Computer Engineering and Information Technology, University of South Carolina.

### 2. *Best Efforts*
As an independent agent, SCRI will apply its best efforts to complete the research described in the Scope of Work statement. Commonly accepted professional standards of workmanship will be followed.

### 3. *Key Personnel*
The project director will be Dr. Hideaki Kobayashi who may select and supervise other project staff as needed. No other person will be substituted for the project director except with Sponsor's approval. Sponsor may exercise Termination provision of this Agreement if a satisfactory substitute is not identified.

### 4. *Direction of Research*
Direction of the research will rest with the SCRI. It is agreed that SCRI, through its project director, will maintain continuing communication with a designated liaison for the Sponsor. The frequency and nature of these communications will be mutually defined by SCRI's project director and Sponsor's liaison person.

1

### 5. *Funding and Payment*

Sponsor will provide funding in the amount of $35,000 (US Dollars) to be applied generally in keeping with the estimated budget shown in the Proposal. Payment of $17,500 is due by January 1, 2000, with the balance of $17,500 payable by March 31, 2000. Payments will be made in US Dollars to the South Carolina Research Institute via wire transfer to Account Number 707027397 at Bank of America (Bank Routing Number 053904483), 1301 Gervais Street, Columbia, South Carolina 29201 USA.

### 6. *Project Period*

The Agreement will be effective for 6 months beginning January 1, 2000, and ending June 30, 2000. This period may be amended by mutual written agreement by authorized representatives of SCRI and Sponsor.

### 7. *Inventions and/or Discoveries*

All rights and title to SCRI inventions and/or discoveries made during the course of this project shall belong to SCRI and shall be subject to the terms and conditions of this Agreement. SCRI shall grant sponsor first option to negotiate a world wide, royalty-bearing license, including the rights to sublicense (subject to approval of SCRI), to make, have made, use and sell products incorporating such invention.

In the event Sponsor elects to exercise the license option, Sponsor must notify SCRI of its intentions in writing no later than sixty (60) days after SCRI discloses discovery to Sponsor. The license will include reasonable terms and conditions, including reasonable royalties, as the parties mutually agree in a separate document.

This Agreement shall not be construed as implying that either party shall have the right to use background intellectual property of the other in connection with the Agreement except as otherwise provided in Article 8 below. Background intellectual property means property and the legal right of either or both parties developed before or independent of this Agreement including inventions, patent applications, patents, copyrights, trademarks, mask works, trade secrets and any information embodying proprietary data such as technical data and computer software.

### 8. *Proprietary Information*

For purposes of this Agreement, Proprietary Information refers to information of any kind which is disclosed by Sponsor to SCRI and which, by appropriate marking, is identified as confidential and proprietary at the time of disclosure.

The Sponsor and SCRI agree that all Proprietary Information communicated by Sponsor and accepted by SCRI in connection with this Agreement shall be kept confidential by SCRI as provided herein unless specific written permission is obtained from Sponsor. SCRI agrees to make Proprietary Information available only to those employees and students who require access to it in the performance of this Agreement and to inform them of the confidential nature of such information. SCRI shall exert reasonable efforts, no less than the protection given its own confidential information, to maintain such information in confidence.

It is agreed by Sponsor and SCRI that the above obligations of confidentiality shall not attach to information which:

> (a) is publicly available prior to the date of the Agreement or becomes publicly available thereafter through no wrongful act of SCRI;
> (b) was independently known prior to the date of disclosure or becomes known to SCRI thereafter from a third party having a bona fide right to disclose the information;
> (c) is independently developed by SCRI;

2

(d) SCRI is obligated to produce pursuant to an order of a court of competent jurisdiction or a valid administrative or Congressional subpoena, provided that SCRI (1) promptly notifies Sponsor and (2) cooperates reasonably with the Sponsor's efforts to contest or limit the scope of such order.

When the Proprietary Information is no longer required for the purposes of this Agreement, SCRI shall return it or dispose of it as directed by Sponsor. SCRI's obligations of confidentially with respect to proprietary Information provided under this Agreement will expire five (5) years after the date of this Agreement.

## 9. *Publication*

Sponsor recognizes that under SCRI policy, the results of the project must be publishable and agrees that researchers engaged in the project shall be permitted to present at symposia, national or regional professional meetings and to publish in journals, theses or dissertations, or otherwise of their own choosing, methods and results of project, provided, however, that Sponsor shall have been furnished copies of any proposed publications or presentations at least 60 days in advance of the submission of such proposed publication or presentation to a journal, editor, or other third party. Sponsor shall have 45 days, after receipt of said copies, to object in writing to such proposed presentation or proposed publication either because there is patentable subject matter which needs protection and/or there is Confidential Information of Sponsor contained in the proposed publication or presentation. In the event that sponsor makes such objection, the parties shall negotiate an acceptable version, and the researcher(s) shall refrain from making such publication or presentation for a maximum of 90 days from date of receipt of such objection in order for SCRI to file patent application(s) with the United States Patent and Trademark Office and/or foreign patent office(s) directed to the patentable subject matter contained in the proposed publication or presentation.

## 10. *Information and Data*

The Sponsor may use all information and data developed and delivered by SCRI under this Agreement, except as otherwise specified herein, in any manner without further license from or payment to the SCRI.

## 11. *Liability*

SCRI shall carry such workers' compensation, employer's liability, comprehensive general liability, and other insurance sufficient in amount to cover the performance of its obligations hereunder. Upon reasonable request of Sponsor, SCRI shall furnish Sponsor with a certificate or certificates of insurance evidencing that appropriate insurance coverages are in full force and effect.

## 12. *Use of Names*

SCRI and Sponsor each agree that they will not use the name, trademark, or other identifier of the other for any advertising, promotion, or other commercially related purpose except with advance written approval. Such approval shall not be unreasonably withheld.

## 13. *Assignment*

Unless otherwise indicated elsewhere in this Agreement, neither party to this Agreement may assign nor transfer any rights or obligations arising from this Agreement without the prior written consent of the other party.

## 14. *Notices*

Unless otherwise indicated elsewhere in this Agreement, all notices and communications in connection with this Agreement will be addressed to the following:

3

| South Carolina Research Institute | | CMK Circuit Technology Center Corporation | |
|---|---|---|---|
| Name: | R. Steven Etheredge | Name: | Moinoru Sugita |
| Title: | Sponsored Program Administrator | Title: | General Manager |
| Address: | University of South Carolina 901 Sumter Street Columbia, SC 29208 USA (803) 777-7093 (803) 777-4136 (fax) | Address: | 1106 Fujikubo, Miyoshi-Machi Iruma-gun Saitama 354-8580 Japan 81-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 81-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 (fax) |

### 15. Termination
Either SCRI or Sponsor may terminate this Agreement by giving thirty (30) days written notice to the other. In the event of such termination, SCRI will cease further obligation of project funds and will take all reasonable steps to cancel or otherwise reduce outstanding obligations. Sponsor will be obligated to pay actual costs and firm commitments to the date of termination not to exceed the total amount of this contract.

### 16. Amendments
Any amendment to this Agreement must be in writing and signed by authorized representatives of SCRI and Sponsor.

### 17. Entire Agreement
This Agreement constitutes the entire understanding between the Sponsor and the SCRI, and any previous discussion, negotiations, agreements or the like are superseded by this Agreement.

Agreement of SCRI and Sponsor to the terms stated above is indicated by signatures below.

**South Carolina Research Institute**

R.M. Bell
Director

Date: 12/8/99

**CMK Circuit Technology Center Corporation**

Hideo Machida
President

Date:

4

# RESEARCH AGREEMENT

## AMENDMENT NUMBER ONE

The agreement by and between the South Carolina Research Institute, a non-profit corporation organized under the laws of the State of South Carolina, with offices at 110 Osborne, University of South Carolina, Columbia, South Carolina 29208, hereinafter referred to as SCRI, and CMK Circuit Technology Center Corporation, a for-profit firm with offices at 1106 Fujikubo, Miyoshi-machi, Iruma-gun, Saitama 354-8580, Japan, hereinafter referred to as Sponser, is hereby amended as follows:

**6.  *Project Period***
The Agreement will be effective for 12 months beginning January 1, 2000 and ending December 31, 2000. This period may be amended by mutual written agreement by authorized representatives of SCRI and Sponser.

Except as amended herein, all other terms and conditions of this Agreement remain unchanged.

Agreement of SCRI and Sponser to the terms stated above is indicated by the signatures below.


South Carolina Research Institute                CMK Circuit Technology Center Corporation

*Minoru, Sugita*  9/15/00

Stanley Fowler                                   Minoru Sugita
Executive Director                               General Manager



UNIVERSITY OF
SOUTH CAROLINA

June 6, 2006

OFFICE OF THE GENERAL COUNSEL

Henry Su, Esq.
Howrey, L.L.P.
525 Market Street
Ste. 3600
San Francisco, CA 94105-2708

Re:     Subpoena in a Civil Case
        Synopsis, Inc. v. Ricoh Company, Ltd.

Dear Henry:

Enclosed herewith in response to the referenced subpoena, dated May 16, 2006, are the following materials: copies of Faculty Manuals and University IP Policies in effect during the period 1983-1990 (RFP Nos. 4 and 5); copy of a license agreement between the University and Research Design Associates, Inc. (RFP Nos. 6 and 7); copies of four (4) research agreements in which Dr. Hideaki Kobayashi is identified as the Principal Investigator (RFP No. 3).

According to the University's records, there were three (3) research contracts between International Chip Corporation and the USC Research & Development Foundation (RFP No. 12). The records identify these agreements as follows:

1. FY  1985-1986  "Chip Architectures"  Hideaki Kobayashi, PI  $30,357.00

2. FY  1987-1988  "International Chip"  Hideaki Kobayashi, PI  $58,500.00

3. FY  1989-1990  "International Chip"  Hideaki Kobayashi, PI  $41,415.00

The foregoing projects were conducted under the Master Agreement between the University and the USC Research & Development Foundation. However, the University has not maintained copies of the research agreements.

AN AFFIRMATIVE ACTION / EQUAL OPPORTUNITY INSTITUTION

Sincerely,

George W. Lampl, III
Associate General Counsel

Enclosures

gwl

cc: Dr. Duncan A. Buell (w/ Enclosures)

University of South Carolina Policies and Procedures

| | |
|---|---|
| **SECTION** Academic Affairs | **NUMBER** ACAF 1.33 |
| **SUBJECT** Patent and Copyright Policy | **DATE** January 6, 1989 |

Policy for: __X__ all campuses _____ specific campus: _____

Procedure for: _____ all campuses __X__ specific campus: __Columbia__

Authorized by __Arthur K. Smith__
(name)

Issued by: __Provost's Office__
(office)

I. Policy
  A. The University has established procedures for reporting and protecting discoveries with patent potential.
    1. This policy applies to all students (undergraduate, graduate, postgraduate), part-time and full-time faculty and staff, all other agents and employees of the University and all other individuals who have made substantial use of the resources of the University.
    2. This policy explicitly excludes any University claim to a discovery resulting from work not substantially supported by the University.

  B. The University has established procedures for determining ownership, use, distribution and rights to income generated by educational, literary and media materials (regardless of medium used) produced by University faculty or departments.

  C. Nothing herein will conflict with any agreement between the University and an outside agency.

II. Procedure
  Procedures are outlined in detail in the Faculty Manual.

From the Original in
THE SOUTH CAROLINIANA LIBRARY
Permission is Required for
Duplication or Publication

1  Gary M. Hoffman (*Pro Hac Vice*)
   Kenneth W. Brothers(*Pro Hac Vice*)
2  DICKSTEIN SHAPIRO MORIN
    & OSHINSKY, LLP
3  2101 L. Street, NW
   Washington, DC  20037-1526
4  Phone (202) 785-9700
   Fax (202) 887-0689
5
   Edward A. Meilman (*Pro Hac Vice*)
6  DICKSTEIN SHAPIRO MORIN
    & OSHINSKY, LLP
7  1177 Avenue of the Americas
   New York, New York  10036-2714
8  Phone (212) 835-1400
   Fax (212) 997-9880
9
   Jeffrey B. Demain, State Bar No. 126715
10 Jonathan Weissglass, State Bar No. 185008
   ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
11 177 Post Street, Suite 300
   San Francisco, California  94108
12 Phone (415) 421-7151
   Fax (415) 362-8064
13
14 Attorneys for Plaintiff

15              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
16

17

18 RICOH COMPANY, LTD.,                    )
19              Plaintiff,                 )
                                           )
20     vs.                                 )
                                           )   CASE NO. CV 03-4669-MJJ (EMC)
21 AEROFLEX INCORPORATED, et al.,          )
                                           )
22              Defendants.                )
                                           )
23                                         )
                                           )
24                                         )

25

26

27

28

BRIAN BERSHADER declares that

1. I went to the KBSC storage locker in California today. The locker is small, having a size of approximately five feet by ten feet.

2. The locker contained 26 boxes of material which had been returned to KBSC from the law firm of Dickstein Shapiro Morin & Oshinsky, L.L.P. These boxes were in the same condition as when they had been received from the law firm, that is, they were still sealed and had not been opened since their receipt. I did not open these boxes.

3. The locker also contained some furniture and 23 additional boxes. I opened these boxes and examined their contents. Some contained personal belongings (e.g., clothing) which Dr. Kobayashi had shipped to me when he vacated his apartment in South Carolina a few years ago. The other boxes contained KBSC documents such as office leases. I examined the material in all of these boxes, and verified that they contained no KBSC documents or material concerning the patent in suit in any way nor the technology described in that patent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed at Mountain View, California on June 29, 2006.

Brian Bershader