

1   Teresa M. Corbin (SBN 132360)
    Denise M. De Mory (SBN 168076)
2   Jaclyn C. Fink (SBN 217913)
    HOWREY LLP
3   525 Market Street, Suite 3600
    San Francisco, California 94105
4   Telephone: (415) 848-4900
    Facsimile: (415) 848-4999

5

    Attorneys for Plaintiff SYNOPSYS and
6   Defendants AEROFLEX INCORPORATED,
    AEROFLEX COLORADO SPRINGS, INC.,
7   AMI SEMICONDUCTOR, INC., MATROX
    ELECTRONIC SYSTEMS, LTD., MATROX
8   GRAPHICS INC., MATROX
    INTERNATIONAL CORP., and MATROX
9   TECH, INC.

10            UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

12            SAN FRANCISCO DIVISION

| | |
|---|---|
| 13  RICOH COMPANY, LTD., | Case No. C03-4669 MJJ (EMC) |
| 14       Plaintiff, | Case No. C03-2289 MJJ (EMC) |
| 15     vs. | **SUPPLEMENTAL DECLARATION OF DENISE M. DE MORY** |
| 16  AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX | **IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT** |
| 17  ELECTRONIC SYSTEMS LTD., MATROX GRAPHICS INC., MATROX | |
| 18  INTERNATIONAL CORP., MATROX TECH, INC., AND AEROFLEX COLORADO | |
| 19  SPRINGS, INC., | |
| 20       Defendants. | |
| 21 | |
|   SYNOPSYS, INC., | |
| 22 | |
|        Plaintiff, | |
| 23 | |
|      vs. | |
| 24 | |
|   RICOH COMPANY, LTD., | |
| 25 | |
|        Defendant. | |
| 26 | |

27

28

**HOWREY LLP**

Case No. C03-4669 MJJ (EMC)/C03-2289 MJJ (EMC)
SUPP. DE MORY DECL. ISO MSJ
DM_US\8379169.v1

1    I, Denise M. De Mory, declare as follows:

2    1.    I am a partner at the law firm of Howrey LLP, counsel for Aeroflex Incorporated,

3    Aeroflex Colorado Springs, AMI Semiconductor, Inc., Matrox Electronic Systems, Ltd., Matrox

4    Graphics Inc., Matrox International Corp., and Matrox Tech, Inc. and Synopsys, Inc. (collectively, the

5    "Defendants") in this action. The following declaration is based on my personal knowledge. If called

6    upon to testify, I could and would competently testify to the matters set forth below.

7    2.    The web pages in Exhibits 77-79 were all retrieved from Internet Archive at

8    www.archive.org by undersigned counsel. Internet Archive is a well-known searchable library of

9    archived web pages. Exhibits 77 and 78 are archived web pages from AMI's October 28, 1996

10   website. Exhibit 79 is an archived web page of UTMC's (i.e. Aeroflex's) November 21, 1996 website.

11

12   3.    Attached as Exhibit 92 is a true and correct copy of the August 1986 Table of Contents

13   of IEEE Design and test Computers journal;

14   4.    Attached as Exhibit 93 is a true and correct copy of documents bates labeled KBSC

15   00002884 together with a translations and certification; [FILED UNDER SEAL]

16   5.    Attached as Exhibit 94 is a true and correct copy of Ricoh Co. Ltd.'s Supplemental

17   Privilege Log; [FILED UNDER SEAL]

18   6.    Attached as Exhibit 95 is a true and correct copy of the August 16, 2006 Deposition

19   Transcript of Joseph Colaianni; [FILED UNDER SEAL]

20   7.    Attached as Exhibit 96 is a true and correct copy of the Amended Answer and

21   Counterclaims of Defendant Aeroflex Incorporated to Amended Complaint for patent Infringement

22   dated April 7, 2006;

23   8.    Attached as Exhibit 97 is a true and correct copy of Defendants' Notice of Deposition

24   of Ricoh Company, Ltd. Pursuant to Fed. R. Civ. P. 30(b)(6) dated March 2, 2006;

25   9.    Attached as Exhibit 98 is a true and correct copy of the Customer Defendants' First Set

26   of Request for Admissions;

27   10.    Attached as Exhibit 99 is a true and correct copy of Electronic News webpage new

28   article titled "Avant! Shakes Up Front End Design – Jupiter CAE software – Product Announcement"

1    11.    Attached as Exhibit 100 is a true and correct copy of the May 26, 2006 email from J.

2    Soccol to K. Brothers, et al. with attached letter and Federal Express air bill and delivery confirmation;

3    12.    Attached as Exhibit 101 is a true and correct copy of webpage print out from cameo

4    library;

5    13.    Attached as Exhibit 102 is a true and correct copy of Exhibit 15 to Synopsys and

6    Customer Defendants' Final Invalidity Contentions;

7    14.    Attached as Exhibit 103 is a true and correct copy of Hearing Transcript from

8    December 15, 2004;

9    15.    Attached as Exhibit 104 is a true and correct copy of Webster's Ninth New Collegiate

10    Dictionary page 334

11    16.    Attached as Exhibit 105 is a true and correct copy of Webster's Ninth New Collegiate

12    Dictionary page 688

13    17.    Attached as Exhibit 106 is a true and correct copy of the June 7, 2006 Deposition

14    Transcript of David Chiappini. [FILED UNDER SEAL]

15    Executed this 21st day of August, 2006, at San Francisco, California.

16    I declare under penalty of perjury under the laws of the United States of America that the

17    foregoing is true and correct.

18

19    _____
                    /s/
20                  Denise M. De Mory

21

22

23

24

25

26

27

28

HOWREY LLP

Case No.  C03-4669 MJJ (EMC)/C03-2289 MJJ (EMC)
SUPP. DE MORY DECL. ISO MSJ
DM_US\8379169.v1

# IEEE
# Design&Te
## of Compu

## IEEE COMPUTER SOCIETY
### EXECUTIVE COMMITTEE

President: Roy L. Russo
IBM T.J. Watson Research Crt.,
Route 134
PO Box 218
Yorktown Heights, NY 10598
(914) 945-3085

Vice Presidents
Publication (1st VP): J.T. Cain
Technical Activities (2nd VP): John D. Musa
Conferences and Tutorials: James H. Aylor
Educational Activities: Glen G. Langdon, Jr.
Membership and Information: Ming T. Liu
Area Activities: H. Troy Nagle, Jr.
Standards: Helen M. Wood

Treasurer: Joseph E. Urban
Secretary: Fletcher J. Buckley
Junior Past President: Martha Sloan*
IEEE Division Directors:
Martha Sloan, Ronald G. Hoelzeman
Executive Director: T. Michael Elliott*
*Ex-officio member, Board of Governors

### BOARD OF GOVERNORS

| Term Ending 1986 | Term Ending 1987 |
|---|---|
| Dennis R. Allison | Barry W. Boehm |
| Kenneth R. Anderson | Paul L. Borrill |
| P. Bruce Berra | Glen G. Langdon, Jr. |
| Fletcher J. Buckley | Duncan H. Lawrie |
| Richard G. Jaeger | Susan L. Rosenbaum |
| Ming T. Liu | Bruce Shriver |
| Michael C. Mulder | Harold S. Stone |
| Hillel Ofek | Wing N. Toy |
| Edward W. Thomas | Helen M. Wood |
| Joseph E. Urban | Akihiko Yamada |
| Oscar N. Garcia* | |

### PUBLICATIONS BOARD

| | |
|---|---|
| Dharma P. Agrawal | W.K. King |
| Vishwani D. Agrawal | Duncan H. Lawrie |
| Dennis Allison | Jack Lipovski |
| Bill D. Carroll | Ming T. Liu |
| Michael Evangelist | Michael C. Mulder |
| James J. Farrell III | Theo Pavlidis |
| Tse-Yung Feng | David Pessel |
| Lansing Hatfield | C.V. Ramamoorthy |
| Ronald G. Hoelzeman | Bruce D. Shriver |
| Sam Horvitz | Steve Tanimoto |
| Richard C. Jaeger | |
| J.T. Cain, Vice President for Publications | |

### SENIOR STAFF

Executive Director: T. Michael Elliott
IEEE Computer Society
1730 Massachusetts Ave., NW
Washington, DC 20036-1903
(202) 371-0101

Editor and Publisher: True Seaborn
Director Computer Society Press:
Chris G. Stockton
Director, Conferences:
William R. Hasenbauer
Director, Tutorials:
Marilee A. Camilleri
Director, Finance:
Mary Ellen Curtin

Next Governing Board Meeting:
Hotel Adolph
Dallas, Texas
November 7, 1986, 8:30 a.m.—5 p.m.



## THE INSTITUTE OF ELECTRICAL
## AND ELECTRONICS ENGINEERS, INC.

President: Bruno O. Weinschel
President-Elect: Henry L. Bachman
Executive Vice President: Emerson W. Pugh
Secretary: Merrill W. Buckley, Jr.

## August 1986

## THEME FEATURES

### Guest Editor's Introduction
Rudy García                                                                 13

### A New Parallel Test Approach for Large Memories
Thirumalai Sridhar                                                          15
Using parallel signature analyzers can reduce test time
without compromising test quality. The article analyzes the
test time, quality, and silicon area penalty of one such
approach.

### Integrating an Electron-Beam System into VLSI
### Fault Diagnosis
Teruo Tamama and Norio Kuji                                                 23
Comparing color-coded device connection maps to electron-
beam scans can accurately test VLSI devices. One system
has accurately tested chips with 75,000 gates.

### Achieving Accurate Timing Measurements on
### TTL/CMOS Devices
Dennis Petrich                                                             33
Test systems often return different timing measurements—as
much as 100 percent divergence—on the same devices.
Correlation tables can create dependable results.

### SMART and FAST: Test Generation for VLSI
### Scan-Design Circuits
M. Abramovici, J.J. Kulikowski, P.R. Menon, and
D.T. Miller                                                                43
Test generation for single stuck-at faults is a classic
problem. The Lamp2 Test Generation system, plus new
generation algorithms, has demonstrated reasonable runtimes—
even for large systems.

### Test Considerations for Gate Oxide Shorts in
### CMOS ICs
Jerry M. Soden and Charles F. Hawkins                                      56
Complete detection of CMOS failure mechanisms requires
measuring the $I_{DD}$ current after each test vector
is applied to the IC. The article offers a fast, sensitive
method for taking this measurement.

Circulation: IEEE Design & Test of Computers (ISSN 0740-7475) is published bimonthly by the IEEE
Computer Society. IEEE Headquarters, 345 East 47th St., New York, NY 10017; IEEE Computer
Society West Coast Office, 10662 Los Vaqueros Circle, Los Alamitos, CA 90720. Annual subscription:
$14.00 in addition to any IEEE group or society dues; nonmembers, $110.00. Single copy prices: members,
$7.50; nonmembers, $15.00. This magazine is also available in microfiche form.
Undelivered copies: Send to 10662 Los Vaqueros Circle, Los Alamitos, CA 90720.
Postmaster: Send address changes to IEEE Design & Test of Computers, IEEE Service Center, 445 Hoes
Lane, Piscataway, NJ 08854. Second-class postage rates paid at New York, New York, and at additional
mailing offices.
Copyright and reprint permissions: Abstracting is permitted with credit to the source. Libraries are permit-
ted to photocopy beyond the limits of US copyright law for private use of patrons: (1) those post-1977
articles that carry a code at the bottom of the first page, provided the per-copy fee indicated in the code is
paid through the Copyright Clearance Center, 29 Congress Street, Salem, MA 01970. Instructors are



While unit manufacturing costs have steadily dropped in chip production, testing costs have remained high. A new breed of microcomputer-based testing equipment, such as the Logue-McDonald System 323i, aims to bring down test costs and reduce overall chip prices. For more details, see page 11.

Cover photo courtesy of Logue-McDonald

Cover design by Alexander Torres

Volume 3 Number 4 (ISSN 0740-7475)

CONFERENCES                                  68

KP 86
Automation Technology & Systems
Fault Tolerant Test Workshop

DEPARTMENTS
Editor-in-Chief's Message                     6
Test Technology TC Newsletter                 9
D & T Scene                                  10
ITC Advance Program                         32A
Standards                                    65
New Products—Design                          72
New Products—Test                            73
Book Reviews                                 76
Calendar                                     78
Call for Papers                              79
Education                                    79
Classified Ads                               79
Advertiser/Product Index                     80

Change of address form                       80
Subscription form                            80
Reader Service Card                         80A

Coming in October:
Design for Testability

EDITORIAL BOARD

Editor-in-chief: Vishwani Agrawal
AT&T Bell Labs, Rm. 3B-421, 600 Mountain Ave., Murray Hill, NJ 07974;
(201) 582-4342
To submit an article, send five copies to the editor-in-chief.

Technical Areas:
Physical Design: Steve Kang
Coordinated Science Lab, University of Illinois, 1101 W. Springfield Ave., Urbana, IL 61801;
(217) 244-0577

Synthesis and Verification: Donald E. Thomas
Carnegie Mellon University, ECE Dept., 5000 Forbes Ave.,
Pittsburgh, PA 15213-3890; (412) 268-3545

Built-in Self-Test: Richard M. Sedmak
Self-Test Services, 6 Lindenwood Terrace, Ambler, PA 19002; (215) 628-9700

Test Generation/Evaluation: Edward J. McCluskey
Computer Systems Laboratory, Stanford University, Stanford, CA 94305; (415) 723-1258

Manufacturing Test: Jack Arabian
Digital Equipment Corp., 100 Minuteman Rd., Andover, MA 01810; (617) 689-1789

Design for Testability: Melvin Ray Mercer
Dept. of EE, University of Texas, Austin, TX 78712-1084; (512) 471-1804

Tutorials: Leon Maissel
IBM G57/707, PO Box 390, Poughkeepsie, NY 12602; (914) 435-7834

Computer-Aided Engineering: Sanford S. Hirschhorn
GTE Laboratories, Inc., 40 Sylvan Rd., Waltham, MA 02254; (617) 466-2904

Short Papers: Sharad C. Seth
Dept. of Computer Science, University of Nebraska, Lincoln, NE 68588; (402) 472-5003

International:
Far East: Akihiko Yamada
NEC Corp., MS MNT2500, 4-12-35 Shiba-ura, Minato-ku, Tokyo
108, Japan; (03) 456-7721

Far East: Hideo Fujiwara
Dept. of Electronics & Communications, Meiji University, 1-1-1 Higashi-mita, Tama-ku,
Kawasaki 214, Japan; (44) 911-8181 x248

Europe: H. Gordon Adshead
ICL, Wenlock Way, West Gorton, Manchester M12 5DR, United Kingdom
(44) 061-223-1301 x2568; Telex, 22971 ICLMANS

Europe: Mariagiovanna Sami
Politecnico di Milano, Dipartimento di Elettronica, Piazza Leonardo Da Vinci 32 20133 Milano, Italy
(39) 02-23672417; Telex 333467 POLIMI I

Departments:
D & T Scene: Marc Harrison
AT&T Information Systems, Rm. 2K-218, Crawfords Corner Rd., Holmdel, NJ 07733;
(201) 949-1779

New Products—Design: J. Daniel Nash
Raytheon Co., Missile Systems Division, Hartwell Rd., Bedford, MA 01730; (617) 270-1619

New Products—Test: Conrad Zagwyn
International Test Conference, 295 Valley St., Pembroke, MA 02359; (617) 294-1275

D & T Research: Alberto Sangiovanni-Vincentelli
Dept. of EE & CS, Cory Hall, Rm. 401G, UC Berkeley, Berkeley, CA 94720; (415) 642-4882

D & T Standards: Harold Carter
Air Force Inst. of Technology, Wright-Patterson AFB, AFIT/ENG, Dayton, OH 45433;
(513) 255-6913

Roundtable: Charles Radke
IBM 47A, Route 52, Hopewell Junction, NY 12533; (914) 894-6687

Conferences: Jerry Werner
MCC, 3430 Research Blvd., Echelon Bldg. #1, Suite 200,
Austin, TX 78759; (512) 343-0860

Book Reviews: Robert E. Anderson
Gen Rad, Inc., 510 Cottonwood Dr., Milpitas, CA 95035; (408) 946-6960

Members-at-Large:
Kenneth Anderson
Siemens RTL, 105 College Rd. East, Princeton, NJ 08540; (609) 734-6550

Gordon G. Padwick
Teradyne, Inc., 2255 Calle Sol, Woodland Hills, CA 91364; (818) 888-6850

MAGAZINE ADVISORY COMMITTEE
Dennis R. Allison (chair), Dharma Agrawal, Vishwani Agrawal, James J. Farrell III,
Lansing Hatfield, Michael G. Mulder, David L. Peuto, Victor D. Sharpe

STAFF
Editor and Publisher: True Seaborn
Membership/Circulation Manager

Managing Editor: Christine Chalmers
Assistant Editor: Galen Grimes

Production Supervisor: David Sunday

Permitted to photocopy isolated articles for noncommercial classroom use without fee. For other copying, reprint, or republication permission, write to Editor, IEEE Design & Test of Computers, 10662 Los Vaqueros Circle, Los Alamitos, CA 90720. All rights reserved. Copyright © 1986 by the Institute of Electrical and Electronics Engineers, Inc.
Editorial: Unless otherwise stated, bylined articles, as well as products and services offered in New Products and other departments, reflect the author's or firm's opinion; inclusion in this publication does not necessarily constitute endorsement by the IEEE or the Computer Society.

1   Teresa M. Corbin (SBN 132360)
    Denise M. De Mory (SBN 168076)
2   Jaclyn Fink (SBN 217913)
    HOWREY LLP
3   525 Market Street, Suite 3600
    San Francisco, California  94105
4   Telephone:  (415) 848-4900
    Facsimile:  (415) 848-4999
5
    Attorneys for Plaintiffs
6   AEROFLEX, INC.,
    AMI SEMICONDUCTOR, INC.,
7   MATROX ELECTRONIC SYSTEMS, LTD.,
    MATROX GRAPHICS INC.,
8   MATROX INTERNATIONAL CORP.,
    MATROX TECH, INC. and
9   AEROFLEX COLORADO SPRINGS, INC.

10                      UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12                         SAN FRANCISCO DIVISION

13

14   RICOH COMPANY, LTD.,                    Case No. CV 03-04669 MJJ (EMC)

15              Plaintiff,                   **AMENDED ANSWER AND
                                             COUNTERCLAIMS OF DEFENDANT
16         vs.                               AEROFLEX INCORPORATED TO
                                             AMENDED COMPLAINT FOR PATENT
17   AEROFLEX INCORPORATED, AMI              INFRINGEMENT**
     SEMICONDUCTOR, INC., MATROX
18   ELECTRONIC SYSTEMS, LTD., MATROX
     GRAPHICS INC., MATROX
19   INTERNATIONAL CORP., MATROX TECH,
     INC., and AEROFLEX COLORADO SPRINGS,
20   INC.,

21              Defendants.

22

23         Defendant Aeroflex Incorporated ("Aeroflex") for its Amended Answer to the Amended

24   Complaint and for its Counterclaims, hereby responds to the numbered paragraphs of the Amended

25   Complaint filed by Ricoh Company, Ltd. ("Ricoh"), and in doing so denies the allegations of the

26   Amended Complaint except as specifically stated:

27

28

HOWREY LLP

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US\8232044 v.1

**PARTIES**

1.     Upon information and belief, Aeroflex admits that plaintiff Ricoh is a corporation organized under the laws of Japan and maintains its principal place of business at 3 -6 1-chome, Nakamagome, Tokyo, Japan.

2.     Aeroflex admits that Aeroflex is a corporation organized under the laws of the State of Delaware, and maintains its principal place of business at 35 S. Service Road, Plainview, NY 11803. Aeroflex admits that Aeroflex has consented to the jurisdiction of Court for this action.  Except as expressly admitted, Aeroflex denies the allegations of Paragraph 2 of the Amended Complaint.

3.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 3, and on that basis, denies those allegations.

4.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 4, and on that basis, denies those allegations.

5.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 5 of the Amended Complaint.

6.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 6, and on that basis, denies those allegations.

7.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 7, and on that basis, denies those allegations.

8.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 8, and on that basis, denies those allegations.

**JURISDICTION**

9.     Aeroflex admits that plaintiff's claim purports to arise under the patent laws of the United States, Title 35, and more particularly under 35 U.S.C. §§ 271 *et. seq.*  Except as expressly admitted, Aeroflex denies the allegations of Paragraph 9 of the Amended Complaint.

10.     Aeroflex admits that the Court has subject matter jurisdiction over the allegations of patent infringement in the Amended Complaint pursuant to 28 U.S.C. §§ 1338(a) and 1331.  Except as expressly admitted, Aeroflex denies the allegations of Paragraph 10 of the Amended Complaint.

HOWREY LLP

-2-

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US\8232044.v1

11. Aeroflex admits that the Court has personal jurisdiction over Aeroflex. Except as expressly denied, Aeroflex denies the allegations of Paragraph 11 of the Amended Complaint.

**VENUE**

12. Aeroflex admits that venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Except as expressly admitted, Aeroflex denies the allegations of Paragraph 12 of the Amended Complaint.

**FACTUAL BACKGROUND**

13. Aeroflex admits that United States Patent No. 4,922,432 ("the '432 Patent") entitled "Knowledge Based Method and Apparatus for Designing Integrated Circuits using Functional Specifications," issued on May 1, 1990. Aeroflex admits that the '432 Patent names Hideaki Kobayashi and Masahiro Shindo as inventors. Aeroflex further admits that a copy of the '432 Patent is attached to the Amended Complaint as Exhibit 1. Except as expressly admitted, Aeroflex denies the allegations of Paragraph 13 of the Amended Complaint.

14. Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 14, and on that basis, denies those allegations.

15. Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 15, and on that basis, denies those allegations.

**PATENT INFRINGEMENT**

**COUNT 1**

16. Aeroflex repeats its responses to the allegations in Paragraphs 1 through 15 of the Amended Complaint.

17. Aeroflex denies each and every allegation in Paragraph 17 of the Amended Complaint.

18. Aeroflex denies each and every allegation in Paragraph 18 of the Amended Complaint.

19. Aeroflex denies each and every allegation in Paragraph 19 of the Amended Complaint.

20 Aeroflex denies each and every allegation in Paragraph 20 of the Amended Complaint..

21. Aeroflex denies each and every allegation in Paragraph 21 of the Amended Complaint.

HOWREY LLP

-3-

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US:8322044_v1

<b><u>COUNT 2</u></b>

22.     Aeroflex repeats its responses to the allegations in Paragraphs 1 through 15 of the Amended Complaint.

23.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 23, and on that basis, denies those allegations.

24.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 24, and on that basis, denies those allegations.

25.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 25, and on that basis, denies those allegations.

26.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 26, and on that basis, denies those allegations.

27.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 27, and on that basis, denies those allegations.

<b><u>COUNT 3</u></b>

28.     Aeroflex repeats its responses to the allegations in Paragraphs 1 through 15 of the Amended Complaint.

29.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 29, and on that basis, denies those allegations.

30.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 30, and on that basis, denies those allegations.

31.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 31, and on that basis, denies those allegations.

32.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 32, and on that basis, denies those allegations.

33.     Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 33, and on that basis, denies those allegations.

HOWREY LLP

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US\8272044.v1

-4-

**COUNT 4**

1

2      34.    Aeroflex repeats its responses to the allegations in Paragraphs 1 through 15 of the

3 Amended Complaint.

4      35.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

5 Paragraph 35, and on that basis, denies those allegations.

6      36.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

7 Paragraph 36, and on that basis, denies those allegations.

8      37.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

9 Paragraph 37, and on that basis, denies those allegations.

10     38.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

11 Paragraph 38, and on that basis, denies those allegations.

12     39.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

13 Paragraph 39, and on that basis, denies those allegations.

**COUNT 5**

14

15     40.    Aeroflex repeats its responses to the allegations in Paragraphs 1 through 15 of the

16 Amended Complaint.

17     41.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

18 Paragraph 41, and on that basis, denies those allegations.

19     42.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

20 Paragraph 42, and on that basis, denies those allegations.

21     43.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

22 Paragraph 43, and on that basis, denies those allegations.

23     44.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

24 Paragraph 44, and on that basis, denies those allegations.

25     45.    Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of

26 Paragraph 45, and on that basis, denies those allegations.

27

28

HOWREY LLP

-5-

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US\8273044 v1

## COUNT 6

46.   Aeroflex repeats its responses to the allegations in Paragraphs 1 through 15 of the Amended Complaint.

47.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 47, and on that basis, denies those allegations.

48.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 48, and on that basis, denies those allegations.

49.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 49, and on that basis, denies those allegations.

50.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 50, and on that basis, denies those allegations..

51.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 51, and on that basis, denies those allegations.

## COUNT 7

52.   Aeroflex repeats its responses to the allegations in Paragraphs 1 through 15 of the Amended Complaint.

53.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 53, and on that basis, denies those allegations.

54.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 54, and on that basis, denies those allegations.

55.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 55, and on that basis, denies those allegations.

56.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 56, and on that basis, denies those allegations.

57.   Aeroflex lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 57, and on that basis, denies those allegations.

## DEFENSES

In further response to the Amended Complaint, Defendant Aeroflex asserts the following:

HOWREY LLP

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US\8232044.1

-6-

1

**FIRST AFFIRMATIVE DEFENSE: INVALIDITY**

2          58.     The '432 Patent is invalid for failure to meet the requirements specified in Title 35 of

3    the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and 112 for one or

4    more of the following reasons: (a) the inventor named in the '432 Patent did not invent or discover any

5    new useful process, machine, manufacture, or composition of matter, or any new and useful

6    improvement thereof within the meaning of 35 U.S.C. § 101; (b) the subject matter claimed in the '432

7    Patent was known or used by others in this country, or patented or described in a printed publication in

8    this or a foreign country, before it was invented by the inventors named in the '432 Patent, as

9    prohibited by 35 U.S.C. § 102(a); (c) the subject matter claimed in the '432 Patent was patented or

10   described in a printed publication in this or a foreign country or was in public use or on sale in this

11   country, more than one year prior to the filing of the application which resulted in the '432 Patent in

12   the United States, as prohibited by 35 U.S.C. § 102(b); (d) the subject matter claimed in the '432

13   Patent was described in a United States patent based on an application filed in the United States or

14   described in an application published prior to its invention by the inventors named in the '432 Patent,

15   as prohibited by 35 U.S.C. § 102(e); (e) the inventor named in the '432 Patent did not invent the

16   subject matter; (f) the subject matter claimed in the '432 Patent was invented in this country by another

17   inventor, who did not abandon, suppress or conceal it, before its invention by the inventors named in

18   the '432 Patent, as prohibited by 35 U.S.C. § 102(g); (g) the subject matter claimed in the '432 Patent

19   would have been obvious, in view of the prior art, to a person having ordinary skill in the art at the

20   time the invention was made under 35 U.S.C. § 103; and/or (h) the claims of the '432 Patent are

21   invalid for failing to comply with 35 U.S.C. § 112, in that (i) the specification fails to contain a written

22   description of the subject matter claimed in the '432 Patent and the manner and process of making and

23   using it; (ii) the claims fail to particularly point out and distinctly claim a patentable invention, (iii) the

24   claims are indefinite, (iv) the specification fails to enable one skilled in the art to practice the claimed

25   invention, and/or (v) the specification fails to set forth the best mode contemplated by the named

26   inventors for carrying out the alleged invention. Defendant reserves the right to amend this defense

27   further, as additional information is developed through discovery or otherwise.

28

HOWREY LLP

-7-

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US\8227944.v1

1    **SECOND AFFIRMATIVE DEFENSE: NONINFRINGEMENT**

2        59.    Aeroflex has not used within the United Sates any processes that infringe any valid

3    claim of the '432 Patent, either directly, indirectly, contributorily or otherwise, and has not induced

4    others to infringe any valid claim of the '432 Patent.

5        60.    Aeroflex has not offered to sell, sold, and/or imported within the United States any

6    product made by a process that infringes any valid claim of the '432 Patent, either directly, indirectly,

7    contributorily, or otherwise, and has not induced others to infringe any valid claim of the '432 Patent.

8    **THIRD AFFIRMATIVE DEFENSE: LACHES**

9        61.    Between 1991 and 2001 Plaintiff Ricoh and Knowledge Based Silicon Corporation

10    ("KBS") were co-assignees of the '432 patent.  Pursuant to agreement, Ricoh paid the maintenance

11    fees for the '432 patent. On information and belief, Ricoh and KBS coordinated all activities related to

12    the '432 patent.

13        62.    In or about 1991, KBS unsuccessfully tried to persuade Synopsys, Inc. ("Synopsys"), to

14    license the '432 Patent. KBS subsequently abandoned those efforts, and instead developed and

15    marketed products that were interoperable with Synopsys' Design Compiler product.  Towards this

16    end, KBS acquired a license to Design Compiler and received assistance from Synopsys to make its

17    products interoperable with the Design Compiler software.  At no point during these cooperative

18    efforts did KBS make any allegation that Synopsys' Design Compiler software, or any other Synopsys

19    product, was infringing the '432 Patent.

20        63.    Aeroflex purchased the Design Compiler software from Synopsys.

21        64.    Plaintiff is barred from recovery of damages by reason of laches.

22    **FOURTH AFFIRMATIVE DEFENSE: IMPLIED LICENSE**

23        65.    Plaintiff is barred from obtaining any relief sought in the Am ended Complaint by

24    reason of the existence of an implied license to practice the claims of the '432 Patent between Plaintiff

25    and Synopsys.  Plaintiff s action against Aeroflex is barred by the doctrine of patent exhaustion.

26    **FIFTH AFFIRMATIVE DEFENSE: PROSECUTION HISTORY ESTOPPEL**

27        66.    By reason of the arguments presented during the prosecution of the applications for the

28    '432 Patent in the United States Patent and Trademark Office, Ricoh is estopped from construing the

HOWREY LLP

Case No. CV 03-04669 MJJ (EMC)                                                -8-
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement

1  claimed inventions of such patent (or any equivalent thereof) as applying to any product made, used,

2  sold, or offered for sale by Aeroflex Incorporated.

3  **SIXTH AFFIRMATIVE DEFENSE: AUTHORIZATION AND CONSENT**

4       67.    Ricoh's claims are barred in whole or in part by operation of 28 U.S.C. § 1498.

5  **RESERVATION OF AFFIRMATIVE DEFENSES**

6       68.    With discovery still ongoing, Aeroflex has yet to complete its investigation. Aeroflex

7  reserves the right to assert any other defenses that discovery may reveal, including unclean hands or

8  inequitable conduct.

9  **COUNTERCLAIMS**

10      Counterplaintiff Aeroflex, Inc. ("Aeroflex"), for its counterclaims against Counterdefendant

11  Ricoh Company, Ltd. ("Ricoh"), alleges as follows:

12  **PARTIES**

13       69.    Aeroflex is a corporation organized under the laws of Delaware, having its principal

14  place of business at 35 S. Service Road, Plainview, NY 11803.

15       70.    Upon information and belief, Ricoh is a corporation organized under the laws of Japan,

16  having its principal place of business at 3 -6 1-chome, Nakamagome, Tokyo, Japan.

17  **JURISDICTION AND VENUE**

18       71.    Counts 1 through 2 of the counterclaims are based upon the Patent Laws of the United

19  States, Title 35 of the United States Code, §1 *et seq.* The Court has jurisdiction over the counterclaims

20  pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

21       72.    Ricoh has submitted to the personal jurisdiction of this Court, because suit was filed in

22  this district by Counterdefendant Ricoh.

23       73.    Venue is proper in this district pursuant to 28 U.S.C. § 1391, because suit was filed in

24  this district by Counterdefendant Ricoh.

25       74.    There is an actual justifiable case or controversy between Aeroflex and Ricoh, in this

26  district, arising under the Patent Laws, 35 U.S.C. § 1 *et seq.* This case or controversy arises by virtue

27  of Ricoh's filing of this suit which purports to allege that Aeroflex infringes U.S. Patent No. 4,922,432

28

HOWREY LLP

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US\8232044.v1

-9-

1  ("the '432 Patent") and Aeroflex's Answer thereto, which asserts the invalidity and noninfringement of

2  the '432 Patent.

3                          **COUNT 1**

4              **DECLARATORY JUDGMENT OF INVALIDITY**

5        75.    Aeroflex incorporates by reference Paragraphs 1-74 into this count as though fully set

6  forth herein.

7        76.    The '432 Patent, entitled "Knowledge Based Method and Apparatus for Designing

8  Integrated Circuits using Functional Specifications" issued on May 1, 1990.  Ricoh purports to be the

9  owner of the '432 Patent.

10       77.    Ricoh has sued Aeroflex in the present action, alleging infringement of the '432 Patent.

11       78.    Based on Paragraph 58 above, which is specifically incorporated by reference into this

12  Paragraph, the '432 Patent is invalid.

13       79.    Aeroflex requests declaratory judgment that the '432 Patent is invalid.

14                          **COUNT 2**

15           **DECLARATORY JUDGMENT OF NONINFRINGEMENT**

16       80.    Aeroflex incorporates by reference Paragraphs 1-79 into this count as though fully set

17  forth herein.

18       81.    Based on Paragraphs 59 and 60 above, which are specifically incorporated by reference

19  into this Paragraph, the '432 Patent is not infringed by Aeroflex.

20       82.    Aeroflex requests declaratory judgment that Aeroflex has not infringed the '432 Patent.

21              **RESERVATION OF COUNTERCLAIMS**

22       83.    Aeroflex reserves the right to assert any other counterclaims that discovery may reveal,

23  including, but not limited to, claims arising out of false or misleading statements to the public and/or

24  customers.

25                      **PRAYER FOR RELIEF**

26       WHEREFORE, Aeroflex respectfully prays for the following relief:

27       A.     that this Court deny and all relief requested by Plaintiff in its Amended Complaint and

28              any relief whatsoever, and that the Amended Complaint be dismissed with prejudice;

HOWREY LLP

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement

1   B.   that this Court declare the '432 Patent invalid;

2   C.   that this Court declare the '432 Patent unenforceable;

3   D.   that this Court declare that Aeroflex has not infringed any valid claim of the '432

4        Patent;

5   E.   that this Court declare the case to be exceptional pursuant to 35 U.S.C. § 285 and that

6        costs of his action and attorneys' fees be awarded to Aeroflex;

7   F.   that this Court grant such other and further relief to Aeroflex as this Court may deem

8        just and equitable and as the Court deems appropriate.

9                          **DEMAND FOR JURY TRIAL**

10       Defendant Aeroflex hereby demands trial by jury in this action.

11  Dated: April 7, 2006                    Respectfully submitted,

12                                          HOWREY LLP

13

14                                          By:  _____/s/Denise M. De Mory_____
                                                     Denise M. De Mory
15                                          Attorneys for Defendants
                                            AEROFLEX, INC., MATROX TECH
16                                          SEMICONDUCTOR, INC., MATROX
                                            ELECTRONIC SYSTEMS, LTD.,
17                                          MATROX GRAPHICS INC., MATROX
                                            INTERNATIONAL CORP., MATROX
18                                          TECH, INC. AND
                                            AEROFLEX COLORADO SPRINGS,
19                                          INC.

20

21

22

23

24

25

26

27

28

Case No. CV 03-04669 MJJ (EMC)
Amended Answer And Counterclaims Of Defendant Aeroflex
Incorporated To Amended Complaint For Patent Infringement
DM_US\8323044 v1

-11-

1 | Teresa M. Corbin (SBN 132360)
Denise M. De Mory (SBN 168076)
2 | Karin Kramer (SBN 87346)
Jaclyn C. Fink (SBN 217913)
3 | HOWREY LLP
525 Market Street, Suite 3600
4 | San Francisco, California 94105
Telephone: (415) 848-4900
5 | Facsimile: (415) 848-4999

6 | Attorneys for Defendants
AEROFLEX, INC., AMI
7 | SEMICONDUCTOR, INC., MATROX
ELECTRONIC SYSTEMS LTD.,
8 | MATROX GRAPHICS INC., MATROX
INTERNATIONAL CORP., MATROX
9 | TECH, INC., and AEROFLEX COLORADO
SPRINGS, INC.

10 |

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14 |

| | |
|---|---|
| 15 RICOH COMPANY, LTD., | Case No. C03-04669 MJJ (EMC) |
| 16 | Case No. C03-02289 MJJ (EMC) |
| 17 Plaintiff, | **NOTICE OF DEPOSITION OF RICOH** |
| vs. | **COMPANY, LTD.PURSUANT TO FED. R.** |
| 18 | **CIV. P. 30(b)(6)** |
| AEROFLEX INCORPORATED, et al., | |
| 19 | |
| Defendant. | |
| 20 | |
| 21 RICOH COMPANY, LTD., | |
| 22 Plaintiff, | |
| 23 vs. | |
| 24 AEROFLEX INCORPORATED, et al., | |
| 25 Defendant. | |

26 |

27 | PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30(b), Defendants

28 | AEROFLEX, INC., AMI SEICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS, LTD.,

HOWREY LLP

C03-4669 MJJ
NOTICE OF DEPOSITION OF RICOH CMPANY,
LTD.PURSUANT TO FED. R. CIV. P. 30(b)(6)
DM_US\8241118.2

1  MATROS GRAPHICS, INC. MATROX INTERNATIONAL CORP. and MATROX TECH, INC., by
2  and through its attorneys of record, will take the deposition upon oral examination of the person or
3  persons designated by RICOH COMPANY, LTD. ("Ricoh") as most knowledgeable regarding the
4  subject areas listed below. The deposition will commence on April 25, 2006, or on a date mutually
5  agreed upon by the parties, at 9:00 a.m. at the offices of Howrey LLP, 525 Market Street, Suite 3600,
6  San Francisco, California, and will continue from day to day until completed.

7      The oral examination may be videotaped and transcribed stenographically, and will take place
8  before an officer who is duly authorized to administer oaths.

9      Pursuant to Fed. R. Civ. P. 30(b)(6), Ricoh shall produce to testify on its behalf one or more
10 officers, directors, managing agents, or other persons who are most qualified, knowledgeable, and
11 competent to testify as to all matters known or reasonably available to Ricoh with respect to the
12 following topics:

13      1.   Agreements, negotiations, and/or discussions with third parties related to
14           authorizing any use or transfer of the Kobayashi Patent at issue in this litigation,
             United States Patent Number 4,922,432 ("the Patent"), including but not limited
15           to licensing arrangements and royalties or other compensation related to such
             arrangements, and including situations in which a license or other transfer was
16           offered by Ricoh but refused or declined by the third party.

17      2.   Royalties or other compensation paid by Ricoh to others for the creation and/or
18           design of ASICs and masks.

19      3.   Ricoh's licensing policies or practices.

20      4.   The value of the Patent.

        5.   The value of products embodying the technology of the Patent.
21
        6.   Litigation, whether threatened or actual, related to the Patent and the results of
22           such litigation or litigation threats, including settlements and/or other
             compensation.
23
        7.   Efforts by Ricoh to obtain public or private funding at any time since filing the
24           application for the Patent.

25      8.   Any and all marketing and sales efforts by Ricoh and/or discussions of market
             potential that relate in any way to the Patent.
26
        9.   Costs to create the Patent.
27
        10.  Sales of Ricoh products practicing the Patent.
28
        11.  Licenses associated with products practicing the Patent.

12.  Sales of other companies' products embodying the Patent.

13.  Demand for products practicing the patent and comparisons of such demand versus demand for competing products not using the teachings of the Patent.

14.  Non-infringing alternatives for the processes outlined in the Patent.

15.  Ricoh's capacity to create the products that Ricoh contends infringe the Patent and were created by Defendants in this litigation.

16.  All impacts on Ricoh of the alleged infringement.

17.  The commercial success of the Patent or products embodying the Patent.

18.  The organizational structure of Ricoh.

19.  All damages Ricoh believes it has suffered as a result of the infringement alleged in this litigation, as well as Ricoh's method or methods for accounting for and calculating such damages.

20.  Whether Ricoh intends to claim lost profits and if so, the basis of its claim, the amount of profits it believes it lost, and all facts related thereto.

21.  Whether Ricoh intends to claim it is entitled to a reasonable royalty and if so, Ricoh's position with respect to each of the fifteen factors for determining a reasonable royalty set forth in *Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), modified and aff'd, 446 F. 2d 295 (2d Cir. 1971).

22.  Ricoh's first awareness of products that Ricoh contends satisfy the limitations of the Patent.

23.  Ricoh's knowledge, including but not limited to first knowledge, of defendants' alleged infringement of the Patent and all efforts by Ricoh to learn of or investigate the alleged infringement.

Dated:  March 2, 2006                          HOWREY LLP


                                               By:
                                                  Denise M. De Mory
                                                  Attorneys for Defendants
                                                  AEROFLEX, INC., AMI
                                                  SEMICONDUCTOR, INC., MATROX
                                                  ELECTRONIC SYSTEMS LTD.,
                                                  MATROX GRAPHICS INC., MATROX
                                                  INTERNATIONAL CORP., MATROX
                                                  TECH, INC.,

1

**PROOF OF SERVICE**

2

     I am employed in the County of San Francisco, State of California. I am over the age of 18 and
3  not a party to the within action. My business address is 525 Market Street, Suite 3600, San Francisco,
California 94105.

4

     On _March 2, 2006 I served on the interested parties in said action the within:
5

**NOTICE OF DEPOSITION OF RICOH COMPANY, LTD.PURSUANT TO FED. R.**
6  **CIV. P. 30(b)(6)**

7  by causing said document to be sent by Electronic Mail on March 2, 2006 to the email addresses
indicated for the parties listed below and by placing a true copy thereof in a sealed envelope(s)
8  addressed as stated below and causing such envelope(s) to be delivered as follows:

9  Gary M. Hoffman, Esq.                                   Jeffrey Demain, Esq.
   HoffmanG@dsmo.com                                       jdemain@altshulerberzon.com
10 Dickstein Shapiro Morin & Oshinsky, LLP                 Altshuler, Berzon, Nussbaum, Rubin & Demain
   2101 L Street, N.W.                                     177 Post Street, Suite 300
11 Washington, DC 20037-1526                               San Francisco, CA 94108

12 Facsimile No.: (202) 887-0689                           Facsimile No.: (415) 362-8064

13 Edward A. Meilman, Esq.
   MeilmanE@dsmo.com
14 Dickstein Shapiro Morin & Oshinsky, LLP
   1177 Avenue of the Americas
15 New York, NY 10036-2714

16 Facsimile No.: (212) 896-5471

17 [X]   (OVERNIGHT DELIVERY) on March 2, 2006 by depositing in a box or other facility
         regularly maintained by Federal Express, an express service carrier, or delivering to a courier or
18       driver authorized by said express service carrier to receive documents, a true copy of the
         foregoing document in sealed envelopes or packages designated by the express service carrier,
19       addressed as stated above, with fees for overnight delivery paid or provided for and causing
         such envelope(s) to be delivered by said express service carrier on.
20

     I declare under penalty of perjury that I am employed in the office of a member of the bar of
21 this Court at whose direction the service was made and that the foregoing is true and correct.

22      Executed on March 2, 2006, at San Francisco, California.

23

24     Peter L. Kasenenko                          _Peter L. Kasenenko_
     (Type or print name)                              (Signature)

25

26

27

28

1  Teresa M. Corbin (SBN 132360)
   Denise M. De Mory (SBN 168076)
2  Ethan B. Andelman (SBN 209101)
   Jaclyn C. Fink (SBN 217913)
3  HOWREY LLP
   525 Market Street, Suite 3600
4  San Francisco, California 94105
   Telephone: (415) 848-4900
5  Facsimile: (415) 848-4999

6
   Attorneys for Plaintiff SYNOPSYS, INC.
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11  SYNOPSYS, INC.,                        Case No. C-03-2289 MJJ
                                           Case No. C-03-4669 MJJ
12            Plaintiff,
                                           PATENT INFRINGEMENT ACTION
13       vs.
                                           **THE CUSTOMER DEFENDANT'S FIRST
14  RICOH COMPANY, LTD.,                   SET OF REQUESTS FOR ADMISSIONS**

15            Defendant.

16
    RICOH COMPANY, LTD.,
17
              Plaintiff,
18
         vs.
19
    AEROFLEX INCORPORATED, et al.,
20
              Defendant.
21

22  PROPOUNDING PARTIES:   Aeroflex, Inc., Aeroflex Colorado Springs, Inc., AMI Semiconductor

23  Inc., Matrox Graphics, Inc., Matrox Electronics Systems, Ltd. Matrox International Corporation, and

24  Matrox Tech, Inc. ("The Customer Defendants")

25  RESPONDING PARTY:      Defendant Ricoh Company, Ltd.

26  SET NUMBER:            One (1)

27       The Customer Defendants hereby request that defendant Ricoh Company, Ltd. ("Ricoh")

28  answer the following requests for admission separately, fully, and under oath, pursuant to Rule 36 of

1 | Federal Rules of Civil Procedure, within thirty days of service. Ricoh is required to supplement its

2 | responses to these requests in accordance with Federal Rules of Civil Procedure 26(e).

3 | **I.    DEFINITIONS**

4 |        A.      The terms "Ricoh," "you," and "your" mean, without limitation, Ricoh Company Ltd.,

5 | its past and present parents, subsidiaries, affiliates, predecessors, unincorporated divisions, officers,

6 | attorneys or agents, representatives, employees, consultants and all persons acting or purporting to act

7 | on its behalf.

8 |        B.      The terms "Synopsys" and "Plaintiff" refer, without limitation, to Synopsys, Inc., all

9 | subsidiaries, affiliates, predecessors, unincorporated divisions and all its officers, employees, attorneys,

10 | agents, representatives and all persons acting or purporting to act on its behalf.

11 |        C.      The term "Customer Defendants" refers to the defendants in the Ricoh v. Aeroflex et al.

12 | case.

13 |        D.      The term "'432 patent" means United States Patent Number 4,922,432, entitled

14 | "Knowledge Based Method and Apparatus For Designing Integrated Circuits Using Functional

15 | Specifications."

16 |        E.      The term "Synopsys products-in-suit" means Design Complier used in conjunction with

17 | either VHDL Compiler or HDL Compiler for Verilog.

18 |        F.      The term "ordinary use" as used herein is a reference to "ordinary use" as described on

19 | page 2 in Ricoh's section of the June 8, 2005 Joint Case Management Conference statement.

20 | **II.    REQUESTS FOR ADMISSION**

21 | **REQUEST FOR ADMISSION NO. 1**:

22 |        Admit that on or before January 1, 1995 Ricoh used any version of Synopsys' Design Compiler

23 | product that existed on or before January 1, 1995 for logic synthesis of ASICs.

24 | **REQUEST FOR ADMISSION NO. 2**:

25 |        Admit that on or before January 1, 1995 Ricoh used any version of Synopsys' Design Compiler

26 | product that existed on or before January 1, 1995 to design ASICs.

27 |

28 |

Case Nos. C03-02289 MJJ & C-03-4669 MJJ          -2-
THE CUSTOMER DEFENDANTS' FIRST SET OF
REQUESTS FOR ADMISSION

1 **REQUEST FOR ADMISSION NO. 3**:

2      Admit that on or before January 1, 1995 Ricoh used any version of Synopsys' HDL Compiler

3 for Verilog product that existed on or before January 1, 1995 for logic synthesis of ASICs.

4 **REQUEST FOR ADMISSION NO. 4**:

5      Admit that on or before January 1, 1995 Ricoh used any version of Synopsys' HDL Compiler

6 for Verilog product that existed on or before January 1, 1995 to design ASICs.

7 **REQUEST FOR ADMISSION NO. 5**:

8      Admit that on or before January 1, 1995 Ricoh used any version of Synopsys' VHDL Compiler

9 product that existed on or before January 1, 1995 for logic synthesis of ASICs.

10 **REQUEST FOR ADMISSION NO. 6**:

11      Admit that on or before January 1, 1995 Ricoh used any version of Synopsys' VHDL Compiler

12 product that existed on or before January 1, 1995 to design ASICs.

13 **REQUEST FOR ADMISSION NO. 7**:

14      Admit that Ricoh was aware on or before January 1, 1997 that Synopsys had licensed any

15 version of Synopsys' Design Compiler product that existed on or before January 1, 1997 to companies

16 other than Ricoh.

17 **REQUEST FOR ADMISSION NO. 8**:

18      Admit that Ricoh was aware on or before January 1, 1997 that Synopsys had licensed any

19 version of Synopsys' HDL Compiler for Verilog product that existed on or before January 1, 1997 to

20 companies other than Ricoh.

21 **REQUEST FOR ADMISSION NO. 9**:

22      Admit that Ricoh was aware on or before January 1, 1997 that Synopsys had licensed any

23 version of Synopsys' VHDL Compiler product that existed on or before January 1, 1997 to companies

24 other than Ricoh.

25 **REQUEST FOR ADMISSION NO. 10**:

26      Admit that Ricoh based its allegations that Matrox Graphics infringes the '432 patent at least in

27 part on information Ricoh obtained from Synopsys as part of Ricoh's licensing relationship with

28 Synopsys.

1 **REQUEST FOR ADMISSION NO. 11**:

2      Admit that Ricoh based its allegations that Matrox Electronic Systems infringes the '432 patent

3 at least in part on information Ricoh obtained from Synopsys as part of Ricoh's licensing relationship

4 with Synopsys.

5 **REQUEST FOR ADMISSION NO. 12**:

6      Admit that Ricoh based its allegations that Matrox Tech infringes the '432 patent at least in part

7 on information Ricoh obtained from Synopsys as part of Ricoh's licensing relationship with Synopsys.

8 **REQUEST FOR ADMISSION NO. 13**:

9      Admit that Ricoh based its allegations that Matrox International infringes the '432 patent at

10 least in part on information Ricoh obtained from Synopsys as part of Ricoh's licensing relationship

11 with Synopsys.

12 **REQUEST FOR ADMISSION NO. 14**:

13      Admit that Ricoh based its allegations that Aeroflex, Inc. infringes the '432 patent at least in

14 part on information Ricoh obtained from Synopsys as part of Ricoh's licensing relationship with

15 Synopsys.

16 **REQUEST FOR ADMISSION NO. 15**:

17      Admit that Ricoh based its allegations that Aeroflex Colorado Springs infringes the '432 patent

18 at least in part on information Ricoh obtained from Synopsys as part of Ricoh's licensing relationship

19 with Synopsys.

20 **REQUEST FOR ADMISSION NO. 16**:

21      Admit that Ricoh has unconditionally agreed not to sue Synopsys for infringement as to any

22 claim of the '432 patent.

23 **REQUEST FOR ADMISSION NO. 17**:

24      Admit that for more than 10 years, Ricoh has been using either VHDL or Verilog as input to

25 any version of the Synopsys products-in-suit.

26

27

28

1    **REQUEST FOR ADMISSION NO. 18**:

2        Admit that for more than 10 years, Ricoh has used register-transfer level descriptions, as

3 described in U.S. Patent No. 4,703,435 at Col. 5:27-34, as input to any version of the Synopsys

4 products-in-suit.

5    **REQUEST FOR ADMISSION NO. 19**:

6        Admit that for more than 10 years, Ricoh has used RTL as input to any version of the Synopsys

7 products-in-suit.

8    **REQUEST FOR ADMISSION NO. 20**:

9        Admit that for more than 10 years, Ricoh has used register-transfer level descriptions, as

10 described in U.S. Patent No. 4,703,435 at Col. 5:27-34, as input to any version of Synopsys' VHDL

11 Compiler product.

12    **REQUEST FOR ADMISSION NO. 21**:

13        Admit that for more than 10 years, Ricoh has used RTL as input to any version of Synopsys'

14 HDL Compiler for Verilog product.

15    **REQUEST FOR ADMISSION NO. 22**:

16        Admit that the inputs for the accused ASICs that the Customer Defendants have produced in

17 this litigation are either VHDL or Verilog.

18    **REQUEST FOR ADMISSION NO. 23**:

19        Admit that the Verilog inputs for the accused ASICs that the Customer Defendants have

20 produced in this litigation are register transfer level descriptions.

21    **REQUEST FOR ADMISSION NO. 24**:

22        Admit that the VHDL inputs for the accused ASICs that the Customer Defendants have

23 produced in this litigation are register transfer level descriptions.

24    **REQUEST FOR ADMISSION NO. 25**:

25        Admit that the Verilog inputs for the accused ASICs that the Customer Defendants have

26 produced in this litigation are register-transfer level descriptions, as described in U.S. Patent No.

27 4,703,435 at Col. 5:27-34.

28

1  **REQUEST FOR ADMISSION NO. 26**:

2      Admit that the VHDL inputs for the accused ASICs that the Customer Defendants have

3  produced in this litigation are register-transfer level descriptions, as described in U.S. Patent No.

4  4,703,435 at Col. 5:27-34.

5  **REQUEST FOR ADMISSION NO. 27**:

6      Admit that generic operators are not examples of synthetic operators.

7  **REQUEST FOR ADMISSION NO. 28**:

8      Admit that HDL arithmetic operators are not "architecture independent actions" as set forth in

9  Claim 13 of U.S. Patent No. 4,922,432.

10  **REQUEST FOR ADMISSION NO. 29**:

11      Admit that HDL arithmetic operators are not "architecture independent . . . conditions" as set

12  forth in Claim 13 of U.S. Patent No. 4,922,432.

13  **REQUEST FOR ADMISSION NO. 30**:

14      Admit that synthetic operators are not "architecture independent . . . conditions" as set forth in

15  Claim 13 of U.S. Patent No. 4,922,432.

16  **REQUEST FOR ADMISSION NO. 31**:

17      Admit that synthetic modules are not "architecture independent . . . conditions" as set forth in

18  Claim 13 of U.S. Patent No. 4,922,432.

19  **REQUEST FOR ADMISSION NO. 32**:

20      Admit that generic operators are not "architecture independent actions" as set forth in Claim 13

21  of U.S. Patent No. 4,922,432.

22  **REQUEST FOR ADMISSION NO. 33**:

23      Admit that generic operators are not "architecture independent . . . conditions" as set forth in

24  Claim 13 of U.S. Patent No. 4,922,432.

25  **REQUEST FOR ADMISSION NO. 34**:

26      Admit that "if" statements are not "architecture independent . . . actions" as set forth in Claim

27  13 of U.S. Patent No. 4,922,432.

28

1  **REQUEST FOR ADMISSION NO. 35**:

2      Admit that "case" statements are not "architecture independent actions" as set forth in Claim 13

3  of U.S. Patent No. 4,922,432.

4  **REQUEST FOR ADMISSION NO. 36**:

5      Admit that "wait" statements are not "architecture independent actions" as set forth in Claim 13

6  of U.S. Patent No. 4,922,432.

7  **REQUEST FOR ADMISSION NO. 37**:

8      Admit that "always" statements are not "architecture independent . . . conditions" as set forth in

9  Claim 13 of U.S. Patent No. 4,922,432.

10  **REQUEST FOR ADMISSION NO. 38**:

11      Admit that finite state machines are not "architecture independent actions" as set forth in Claim

12  13 of U.S. Patent No. 4,922,432.

13  **REQUEST FOR ADMISSION NO. 39**:

14      Admit that finite state machines are not "architecture independent . . . conditions" as set forth in

15  Claim 13 of U.S. Patent No. 4,922,432.

16  **REQUEST FOR ADMISSION NO. 40**:

17      Admit that HDL arithmetic operators are not "definitions of architecture independent actions"

18  as set forth in Claim 13 of U.S. Patent No. 4,922,432.

19  **REQUEST FOR ADMISSION NO. 41**:

20      Admit that HDL arithmetic operators are not "architecture independent . . . conditions" as set

21  forth in Claim 13 of U.S. Patent No. 4,922,432.

22  **REQUEST FOR ADMISSION NO. 42**:

23      Admit that synthetic operators are not "definitions of architecture independent . . . conditions"

24  as set forth in Claim 13 of U.S. Patent No. 4,922,432.

25  **REQUEST FOR ADMISSION NO. 43**:

26      Admit that synthetic modules are not "definitions of architecture independent . . . conditions"

27  as set forth in Claim 13 of U.S. Patent No. 4,922,432.

28

1    **REQUEST FOR ADMISSION NO. 44**:

2        Admit that generic operators are not "definitions of architecture independent actions" as set

3    forth in Claim 13 of U.S. Patent No. 4,922,432.

4    **REQUEST FOR ADMISSION NO. 45**:

5        Admit that generic operators are not "definitions of architecture independent . . . conditions" as

6    set forth in Claim 13 of U.S. Patent No. 4,922,432.

7    **REQUEST FOR ADMISSION NO. 46**:

8        Admit that an "if" statement is not a "definition of an architecture independent action" as set

9    forth in Claim 13 of U.S. Patent No. 4,922,432.

10   **REQUEST FOR ADMISSION NO. 47**:

11       Admit that a "case" statement is not a "definition of an architecture independent action" as set

12   forth in Claim 13 of U.S. Patent No. 4,922,432.

13   **REQUEST FOR ADMISSION NO. 48**:

14       Admit that "wait" statements are not "definitions of architecture independent actions" as set

15   forth in Claim 13 of U.S. Patent No. 4,922,432.

16   **REQUEST FOR ADMISSION NO. 49**:

17       Admit that "always" statements are not "definitions of architecture independent . . . conditions"

18   as set forth in Claim 13 of U.S. Patent No. 4,922,432.

19   **REQUEST FOR ADMISSION NO. 50**:

20       Admit that arithmetic operators are not stored in "a library of definitions of the different

21   architecture independent actions and conditions that can be selected for use in the desired ASIC," as

22   shown on page 13 of the Court's claim construction.

23   **REQUEST FOR ADMISSION NO. 51**:

24       Admit that synthetic operators, such as ADD_UNS_OP, as stored in synthetic libraries, do not

25   constitute "a library of definitions of the different architecture independent actions and conditions that

26   can be selected for use in the desired ASIC," as shown on page 13 of the Court's claim construction.

27

28

1   **REQUEST FOR ADMISSION NO. 52**:

2      Admit that synthetic modules, such as DW01_ADD, as stored in synthetic libraries, do not

3 constitute "a library of definitions of the different architecture independent actions and conditions that

4 can be selected for use in the desired ASIC," as shown on page 13 of the Court's claim construction.

5   **REQUEST FOR ADMISSION NO. 53**:

6      Admit that placing generic operators, such as MUX_OP, SELECT_OP, DP_OP, SEQGEN,

7 FFGEN, LOGDB, in memory does not constitute storing "a library of definitions of the different

8 architecture independent actions and conditions that can be selected for use in the desired ASIC," as

9 shown on page 13 of the Court's claim construction.

10   **REQUEST FOR ADMISSION NO. 54**:

11      Admit that creating an implementation table in computer memory does not constitute storing "a

12 library of definitions of the different architecture independent actions and conditions that can be

13 selected for use in the desired ASIC," as shown on page 13 of the Court's claim construction.

14   **REQUEST FOR ADMISSION NO. 55**:

15      Admit that in V-2003.12-SP1, actions and conditions are never stored together in "a library of

16 definitions of the different architecture independent actions and conditions that can be selected for use

17 in the desired ASIC," as shown on page 13 of the Court's claim construction.

18   **REQUEST FOR ADMISSION NO. 56**:

19      Admit that the "library of definitions of the different architecture independent actions and

20 conditions that can be selected for use in the desired ASIC" identified in Ricoh's Final Infringement

21 Contentions does not exist in its entirety prior to a design being read into the Design Compiler System.

22   **REQUEST FOR ADMISSION NO. 57**:

23      Admit that both actions and conditions must be contained in a single library to constitute "a

24 library of definitions of the different architecture independent actions and conditions that can be

25 selected for use in the desired ASIC," as shown on page 13 of the Court's claim construction.

26   **REQUEST FOR ADMISSION NO. 58**:

27      Admit that the implementation table, in any version of the Synopsys products-in-suit, is created

28 only after a design is read into the Design Compiler System.

1   **REQUEST FOR ADMISSION NO. 59**:

2       Admit that the generic operators, in any version of the Synopsys products-in-suit, are loaded

3   into memory only when the Design Compiler System is executed.

4   **REQUEST FOR ADMISSION NO. 60**:

5       Admit that in Claim 13 of U.S. Patent 4,922,432 "a set of definitions of architecture

6   independent actions and conditions" must be stored prior to "describing for a proposed application

7   specific integrated circuit a series of architecture independent actions and conditions."

8   **REQUEST FOR ADMISSION NO. 61**:

9       Admit that in Claim 13 of U.S. Patent 4,922,432 "a set of definitions of architecture

10   independent actions and conditions" must be stored prior to "specifying for each described action and

11   condition of the series one of said stored definitions which corresponds to the desired action or

12   condition to be performed."

13   **REQUEST FOR ADMISSION NO. 62**:

14       Admit that in Claim 13 of U.S. Patent 4,922,432 the "a set of definitions of architecture

15   independent actions and conditions" must be stored prior to "selecting from said stored data for each of

16   the specified definitions a corresponding integrated circuit hardware cell comprising applying to the

17   specified definition of the action or condition to be performed, a set of cell selection rules stored in

18   said expert system knowledge base."

19   **REQUEST FOR ADMISSION NO. 63**:

20       Admit that a "rule," as described in claim 13 of U.S. Patent No. 4,922,432 must include both an

21   antecedent portion and a consequent portion.

22   **REQUEST FOR ADMISSION NO. 64**:

23       Admit that you claim that any IF-THEN statement is "rule" as defined in the Court's April 7,

24   2006 Claim Construction Order.

25   **REQUEST FOR ADMISSION NO. 65**:

26       Admit that if the consequent portion of one or more rules is not applied to a design during logic

27   synthesis, then there has been "selective application" of the rules.

28   **REQUEST FOR ADMISSION NO. 66**:

1         Admit that if the "THEN" portion of one or more rules is not applied to a design during logic

2    synthesis, then there has been "selective application" of the rules.

3    **REQUEST FOR ADMISSION NO. 67:**

4         Admit that if the antecedent portions of every rule in an expert system knowledge base is tested

5    during logic synthesis of an ASIC design, then there is not "selective application" of the rules.

6    **REQUEST FOR ADMISSION NO. 68:**

7         Admit that the antecedent portion of every "SOT trick" is tested or "tried" during logic

8    synthesis of an ASIC design.

9    **REQUEST FOR ADMISSION NO. 69:**

10         Admit that the antecedent portion of every "SDN trick" is tested or "tried" during logic

11    synthesis of an ASIC design.

12    **REQUEST FOR ADMISSION NO. 70:**

13         Admit that every "SOT trick" and "SDN trick" is attempted during logic synthesis of an ASIC

14    design.

15    **REQUEST FOR ADMISSION NO. 71:**

16         Admit that if the "IF" condition of every SOT trick is tested during logic synthesis, then the

17    SOT tricks are not selectively applied.

18    **REQUEST FOR ADMISSION NO. 72:**

19         Admit that if the "IF" condition of every SDN trick is tested during logic synthesis, then the

20    SDN tricks are not selectively applied.

21    **REQUEST FOR ADMISSION NO. 73:**

22         Admit that if the "IF" condition of every SOT and SDN trick is tested during logic synthesis,

23    then the SOT and SDN tricks are not selectively applied.

24    **REQUEST FOR ADMISSION NO. 74:**

25         Admit that Ricoh claims that the "expert knowledge of highly skilled VLSI designers," as

26    shown on page 17 of the claim construction order, embodied in the Design Compiler System originated

27    in the Socrates system.

28    **REQUEST FOR ADMISSION NO. 75:**

1    Admit that the Socrates system predated the filing of the patent application that became U.S.

2  Patent No. 4,922,432.

3  **REQUEST FOR ADMISSION NO. 76**:

4    Admit that Ricoh cannot identify any "rules" in the Socrates system that continue to be used in

5  the Design Compiler System.

6  **REQUEST FOR ADMISSION NO. 77**:

7    Admit that if "architecture independent actions and conditions" are explicitly included in the

8  input specification for the design of an ASIC, they are not "described," as that term is defined on page

9  13 of the claim construction order.

10  **REQUEST FOR ADMISSION NO. 78**:

11    Admit that if arithmetic operators are explicitly included in the input specification for the

12  design of an ASIC, they are not "described," as that term is defined on page 13 of the claim

13  construction order.

14  **REQUEST FOR ADMISSION NO. 79**:

15    Admit that if "if" statements are explicitly included in the input specification for the design of

16  an ASIC, they are not "described," as that term is defined in the Court's April 7, 2005 Claim

17  Construction Order.

18  **REQUEST FOR ADMISSION NO. 80**:

19    Admit that if "case" statements are explicitly included in the input specification for the design

20  of an ASIC, they are not "described," as that term is defined in the Court's April 7, 2005 Claim

21  Construction Order.

22  **REQUEST FOR ADMISSION NO. 81**:

23    Admit that if "wait" statements are explicitly included in the input specification for the design

24  of an ASIC, they are not "described," as that term is defined in the Court's April 7, 2005 Claim

25  Construction Order.

26  **REQUEST FOR ADMISSION NO. 82**:

27

28

1    Admit that if "always" statements are explicitly included in the input specification for the

2 design of an ASIC, they are not "described," as that term is defined in the Court's April 7, 2005 Claim

3 Construction Order.

4 **REQUEST FOR ADMISSION NO. 83**:

5    Admit that the HDL Compilers commands "analyze" and "elaborate" must be used to satisfy

6 the step of "specifying for each described action and condition of the series one of said stored

7 definitions which corresponds to the desired action or condition to be performed" Claim 13 of U.S.

8 Patent No. 4,922,432.

9 **REQUEST FOR ADMISSION NO. 84**:

10    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

11 Compiler are applied to arithmetic operators.

12 **REQUEST FOR ADMISSION NO. 85**:

13    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

14 Compiler are applied to synthetic operators.

15 **REQUEST FOR ADMISSION NO. 86**:

16    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

17 Compiler are applied to synthetic modules.

18 **REQUEST FOR ADMISSION NO. 87**:

19    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

20 Compiler are applied to generic operators.

21 **REQUEST FOR ADMISSION NO. 88**:

22    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

23 Compiler are applied to "if" statements.

24 **REQUEST FOR ADMISSION NO. 89**:

25    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

26 Compiler are applied to "case" statements.

27 **REQUEST FOR ADMISSION NO. 90**:

28

1    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

2  Compiler are applied to "wait" statements.

3  **REQUEST FOR ADMISSION NO. 91**:

4    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

5  Compiler are applied to "always" statements.

6  **REQUEST FOR ADMISSION NO. 92**:

7    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

8  Compiler are applied to finite state machines.

9  **REQUEST FOR ADMISSION NO. 93**:

10    Admit that "SOT tricks" and "SDN tricks" in the V-2003.12-SP1 version of Design Compiler

11  are only applied to cells that have already been mapped to a technology library.

12  **REQUEST FOR ADMISSION NO. 94**:

13    Admit that neither "SOT tricks" nor "SDN tricks" in the V-2003.12-SP1 version of Design

14  Compiler are applied to the input HDL description.

15  **REQUEST FOR ADMISSION NO. 95**:

16    Admit that a netlist output from Design Compiler must contain all of "the hardware cells which

17  are needed to perform the desired function of the integrated circuit and the interconnection

18  requirements therefor" to meet the last element of Claim 13 of U.S. Patent No. 4,922,432.

19  **REQUEST FOR ADMISSION NO. 96**:

20    Admit that netlist output from Design Compiler which does not contain all of "the hardware

21  cells which are needed to perform the desired function of the integrated circuit and the interconnection

22  requirements therefor" does not satisfy the last element from claim 13 of U.S. Patent No. 4,922,432.

23  **REQUEST FOR ADMISSION NO. 97**:

24    Admit that the netlist output from Design Compiler for a mixed signal ASIC would only

25  include hardware cells for the digital portions of the ASIC.

26  **REQUEST FOR ADMISSION NO. 98**:

27    Admit that the netlist output from Design Compiler is changed in the place and route process.

28  **REQUEST FOR ADMISSION NO. 99**:

1        Admit that the netlist output from Design Compiler is not directly used to generate GDSII files.

2    **REQUEST FOR ADMISSION NO. 100**:

3        Admit that the netlist output from the place and route process is directly used to generate

4    GDSII files.

5    **REQUEST FOR ADMISSION NO. 101**:

6        Admit that you do not claim that any Customer Defendant's use of the Design Compiler

7    System is anything but "ordinary use."

8    **REQUEST FOR ADMISSION NO. 102**:

9        Admit that Ricoh does not have any basis for claiming that Aeroflex Incorporated makes, uses,

10   imports, sell, or offers to sell within the United States or exports from the United States ASICs made

11   by the process recited in claims 13-17 of U.S. Patent No. 4,922,432.

12   **REQUEST FOR ADMISSION NO. 103**:

13       Admit that if a VHDL design containing only the statements "if csy or counter = 63 then

14   counter <= 0; else" is input into the V-2003.12-SP1 version of the Synopsys products-in-suit, no output

15   will result.

16   **REQUEST FOR ADMISSION NO. 104**:

17       Admit that if a VHDL design containing only the statements "if csy or counter = 63 then

18   counter <= 0; else" is input into the V-2003.12-SP1 version of the Synopsys products-in-suit, a syntax

19   error will result.

20   **REQUEST FOR ADMISSION NO. 105**:

21       Admit that if a VHDL design containing only the statements "if csy or counter = 63 then

22   counter <= 0; else" is input into the V-2003.12-SP1 version of the Synopsys products-in-suit, the

23   resulting netlist does not constitute a netlist for an application specific integrated circuit.

24   **REQUEST FOR ADMISSION NO. 106**:

25       Admit that if a VHDL design containing only the statements "if csy or counter = 63 then

26   counter <= 0; else" is input into the V-2003.12-SP1 version of the Synopsys products-in-suit, the

27   resulting netlist does not define the hardware cells and interconnections necessary to fabricate an

28   application specific integrated circuit.

1  **REQUEST FOR ADMISSION NO. 107**:

2      Admit that if a VHDL design containing only the statements "begin pe_az_data_sum <=

3  pe_az_data_signed + pe_az_sum_out; end process;" is input into the V-2003.12-SP1 version of the

4  Synopsys products-in-suit, no output will result.

5  **REQUEST FOR ADMISSION NO. 108**:

6      Admit that if a VHDL design containing only the statements "begin pe_az_data_sum <=

7  pe_az_data_signed + pe_az_sum_out; end process;" is input into the V-2003.12-SP1 version of the

8  Synopsys products-in-suit, a syntax error will result.

9  **REQUEST FOR ADMISSION NO. 109**:

10      Admit that if a VHDL design containing only the statements "begin pe_az_data_sum <=

11  pe_az_data_signed + pe_az_sum_out; end process;" is input into the V-2003.12-SP1 version of the

12  Synopsys products-in-suit, the resulting netlist does not constitute a netlist for an application specific

13  integrated circuit.

14  **REQUEST FOR ADMISSION NO. 110**:

15      Admit that if a VHDL design containing only the statements "begin pe_az_data_sum <=

16  pe_az_data_signed + pe_az_sum_out; end process;" is input into the V-2003.12-SP1 version of the

17  Synopsys products-in-suit, the resulting netlist does not define the hardware cells and interconnections

18  necessary to fabricate an application specific integrated circuit.

19  **REQUEST FOR ADMISSION NO. 111:**

20      Admit that if a VHDL design containing only the statements "v_ramp_down_res target :=

21  new_position + RAMP_DOWN_START; -- 168=159+(3*3Freqs) pos_state <= move 0;" is input into

22  the V-2003.12-SP1 version of the Synopsys products-in-suit, no output will result.

23  **REQUEST FOR ADMISSION NO. 112:**

24      Admit that if a VHDL design containing only the statements "v_ramp_down_res target :=

25  new_position + RAMP_DOWN_START; -- 168=159+(3*3Freqs) pos_state <= move 0;" is input into

26  the V-2003.12-SP1 version of the Synopsys products-in-suit, a syntax error will result.

27

28

1 **REQUEST FOR ADMISSION NO. 113:**

2     Admit that if a VHDL design containing only the statements "v_ramp_down_res target :=

3 new_position + RAMP_DOWN_START; -- 168=159+(3*3Freqs) pos_state <= move 0;" is input into

4 the V-2003.12-SP1 version of the Synopsys products-in-suit, the resulting netlist does not constitute a

5 netlist for an application specific integrated circuit.

6 **REQUEST FOR ADMISSION NO. 114:**

7     Admit that if a VHDL design containing only the statements "v_ramp_down_res target :=

8 new_position + RAMP_DOWN_START; -- 168=159+(3*3Freqs) pos_state <= move 0;" is input into

9 the V-2003.12-SP1 version of the Synopsys products-in-suit, the resulting netlist does not define the

10 hardware cells and interconnections necessary to fabricate an application specific integrated circuit.

11 **REQUEST FOR ADMISSION NO. 115:**

12     Admit that if a Verilog design containing only the statements "always @(posedge clock or

13 posedge rst) if (rst) hold <= 0; else" is input into the V-2003.12-SP1 version of the Synopsys products-

14 in-suit, no output will result.

15 **REQUEST FOR ADMISSION NO. 116:**

16     Admit that if a Verilog design containing only the statements "always @(posedge clock or

17 posedge rst) if (rst) hold <= 0; else" is input into the V-2003.12-SP1 version of the Synopsys products-

18 in-suit, a syntax error will result.

19 **REQUEST FOR ADMISSION NO. 117:**

20     Admit that if a Verilog design containing only the statements "always @(posedge clock or

21 posedge rst) if (rst) hold <= 0; else" is input into the V-2003.12-SP1 version of the Synopsys products-

22 in-suit, the resulting netlist does not constitute a netlist for an application specific integrated circuit.

23 **REQUEST FOR ADMISSION NO. 118:**

24     Admit that if a Verilog design containing only the statements "always @(posedge clock or

25 posedge rst) if (rst) hold <= 0; else" is input into the V-2003.12-SP1 version of the Synopsys products-

26 in-suit, the resulting netlist does not define the hardware cells and interconnections necessary to

27 fabricate an application specific integrated circuit.

28

1 **REQUEST FOR ADMISSION NO. 119:**

2      Admit that if a Verilog design containing only the statements "else begin case (sample_num) 0:

3 accum <= accum + sample[0];" is input into the V-2003.12-SP1 version of the Synopsys products-in-

4 suit, no output will result.

5 **REQUEST FOR ADMISSION NO. 120:**

6      Admit that if a Verilog design containing only the statements "else begin case (sample_num) 0:

7 accum <= accum + sample[0];" is input into the V-2003.12-SP1 version of the Synopsys products-in-

8 suit, a syntax error will result.

9 **REQUEST FOR ADMISSION NO. 121:**

10      Admit that if a Verilog design containing only the statements "else begin case (sample_num) 0:

11 accum <= accum + sample[0];" is input into the V-2003.12-SP1 version of the Synopsys products-in-

12 suit, the resulting netlist does not constitute a netlist for an application specific integrated circuit.

13 **REQUEST FOR ADMISSION NO. 122:**

14      Admit that if a Verilog design containing only the statements "else begin case (sample_num) 0:

15 accum <= accum + sample[0];" is input into the V-2003.12-SP1 version of the Synopsys products-in-

16 suit, the resulting netlist does not define the hardware cells and interconnections necessary to fabricate

17 an application specific integrated circuit.

18 **REQUEST FOR ADMISSION NO. 123:**

19      Admit that if a VHDL design containing only the statements "case astate is when IDO => if

20 (apostate ='1') then" is input into the V-2003.12-SP1 version of the Synopsys products-in-suit, no

21 output will result.

22 **REQUEST FOR ADMISSION NO. 124:**

23      Admit that if a VHDL design containing only the statements "case astate is when IDO => if

24 (apostate ='1') then" is input into the V-2003.12-SP1 version of the Synopsys products-in-suit, a

25 syntax error will result.

26

27

28

1    **REQUEST FOR ADMISSION NO. 125:**

2    Admit that if a VHDL design containing only the statements "case astate is when IDO => if

3    (apostate ='1') then" is input into the V-2003.12-SP1 version of the Synopsys products-in-suit, the

4    resulting netlist does not constitute a netlist for an application specific integrated circuit.

5    **REQUEST FOR ADMISSION NO. 126:**

6    Admit that if a VHDL design containing only the statements "case astate is when IDO => if

7    (apostate ='1') then" is input into the V-2003.12-SP1 version of the Synopsys products-in-suit, the

8    resulting netlist does not define the hardware cells and interconnections necessary to fabricate an

9    application specific integrated circuit.

10   **REQUEST FOR ADMISSION NO. 127:**

11   Admit that mask data cannot be used directly to fabricate an application specific integrated

12   circuit.

13   **REQUEST FOR ADMISSION NO. 128:**

14   Admit that mask data is used to create a mask prior to the fabrication of an application specific

15   integrated circuit.

16   **REQUEST FOR ADMISSION NO. 129:**

17   Admit that the rules identified in Col. 11:48-12:29 of the '432 patent are exemplary only.

18   **REQUEST FOR ADMISSION NO. 130:**

19   Admit that the rules identified in Col. 11:48-12:29 of the '432 patent are exemplary only and

20   are not intended to be a complete set of rules for a expert system knowledge base.

21   **REQUEST FOR ADMISSION NO. 131:**

22   Admit that the rules identified in Col. 11:48-12:29 of the '432 patent are not intended to be a

23   complete set of rules for an "expert system knowledge base" as used in Claim 13 of the '432 patent.

24   **REQUEST FOR ADMISSION NO. 132:**

25   Admit that the rules identified in Col. 11:48-12:29 of the '432 patent are a complete set of rules

26   for an "expert system knowledge base" as used in Claim 13 of the '432 patent.

27

28

**REQUEST FOR ADMISSION NO. 133:**

Admit that an application specific integrated circuit design tool that included only the rules set forth in Col. 11:48-12:29 of the '432 patent could not be used to create a netlist for an application specific integrated circuit.

**REQUEST FOR ADMISSION NO. 134:**

Admit that in 1988 the KBSC system had more rules than are disclosed in the '432 patent.

**REQUEST FOR ADMISSION NO. 135:**

Admit that in 1989 the KBSC system had more rules than are disclosed in the '432 patent.

**REQUEST FOR ADMISSION NO. 136:**

Admit that in 1990 the KBSC system had more rules than are disclosed in the '432 patent.

**REQUEST FOR ADMISSION NO. 137:**

Admit that mapping HDL operators to synthetic operators, in the V-2003.12-SP1 version of the Synopsys products-in-suit, does not include applying "rules" as the term "rules" is used in Claim 13 of the '432 patent.

**REQUEST FOR ADMISSION NO. 138:**

Admit that mapping HDL operators to synthetic operators, in the V-2003.12-SP1 version of the Synopsys products-in-suit, does not include applying "cell selection rules" as the term "cell selection rules" is used in Claim 13 of the '432 patent.

**REQUEST FOR ADMISSION NO. 139:**

Admit that mapping synthetic operators to synthetic modules, in the V-2003.12-SP1 version of the Synopsys products-in-suit, does not include applying "rules" as the term "rules" is used in Claim 13 of the '432 patent.

**REQUEST FOR ADMISSION NO. 140:**

Admit that mapping synthetic operators to synthetic modules, in the V-2003.12-SP1 version of the Synopsys products-in-suit, does not include applying "cell selection rules" as the term "cell selection rules" is used in Claim 13 of the '432 patent.

1  **REQUEST FOR ADMISSION NO. 141:**

2      Admit that mapping generic operators to synthetic modules, in the V-2003.12-SP1 version of

3  the Synopsys products-in-suit, does not include applying "rules" as the term "rules" is used in Claim

4  13 of the '432 patent.

5  **REQUEST FOR ADMISSION NO. 142:**

6      Admit that mapping generic operators to synthetic modules, in the V-2003.12-SP1 version of

7  the Synopsys products-in-suit, does not include applying "cell selection rules" as the term "cell

8  selection rules" is used in Claim 13 of the '432 patent.

9  **REQUEST FOR ADMISSION NO. 143:**

10      Admit that mapping synthetic modules to DesignWare implementations, in the V-2003.12-SP1

11  version of the Synopsys products-in-suit, does not include applying "rules" as the term "rules" is used

12  in Claim 13 of the '432 patent.

13  **REQUEST FOR ADMISSION NO. 144:**

14      Admit that mapping synthetic modules to DesignWare implementations, in the V-2003.12-SP1

15  version of the Synopsys products-in-suit, does not include applying "cell selection rules" as the term

16  "cell selection rules" is used in Claim 13 of the '432 patent.

17

18  Dated:  April 17, 2006                         HOWREY LLP

19

20                                          By: _____

21                                              Ethan B. Andelman
                                                Attorneys for Plaintiff Synopsys, Inc.
22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA        )
                               )  ss.:

3

COUNTY OF SAN FRANCISCO    )

4

5

      I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is 525 Market Street, Suite 3600, San Francisco, California 94105.

6

      On April 17, 2006 I served on the interested parties in said action the within:

7

8

**THE CUSTOMER DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS**

9

by causing said document to be sent by Electronic Mail to the email addresses indicated for the parties listed below and by placing a true copy thereof in a sealed envelope(s) addressed as stated below and causing such envelope(s) to be delivered as follows:

10

11

Gary M. Hoffman, Esq.
HoffmanG@dsmo.com
Dickstein Shapiro Morin & Oshinsky, LLP
2101 L Street, N.W.
Washington, DC 20037-1526

Jeffrey Demain, Esq.
jdemain@altshulerberzon.com
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, CA 94108

12

13

Facsimile No.: (202) 887-0689

Facsimile No.: (415) 362-8064

14

15

Edward A. Meilman, Esq.
MeilmanE@dsmo.com
Dickstein Shapiro Morin & Oshinsky, LLP
1177 Avenue of the Americas
New York, NY 10036-2714

16

17

Facsimile No.: (212) 896-5471

18

19

[X]  (OVERNIGHT DELIVERY) on April 17, 2006 by depositing in a box or other facility regularly maintained by Federal Express, an express service carrier, or delivering to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for and causing such envelope(s) to be delivered by said express service carrier on.

20

21

22

      I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

23

      Executed on April 17, 2006, at San Francisco, California.

24

25

      Patricia Cranmer                             _Patricia Cranmer_

26

      (Type or print name)                         (Signature)

27

28

## LookSmart

**Avant! Shakes Up Front-End Design - Jupiter CAE software - Product Announcement**

Ann Steffora

Scottsdale, Ariz.-Avant! Corp., Fremont, Calif., last week charged into the great submicron land grab with the announcement of Jupiter, a new product that the company is billing as a complete front-end design creation tool.

With the announcement, Avant! becomes just the latest EDA vendor to cater to OEMs' need to retool for deep submicron designs. The lead up to this week's 36th Annual Design Automation Conference in New Orleans has seen a number of companies introduce tools that consider the physical effects of design decisions early in the planning stage to reduce cycle times. The companies are hoping these capabilities will lure business away from competitors during the submicron transition.

Avant!'s Jupiter is positioned to compete directly with the Chip Architect product from Mountain View, Calif.,-based Synopsys Inc. As its foundation, Chip Architect uses Physical Synthesis, which is the incorporation of physical data in the early design planning stages for early timing prediction. Cadence Design Systems Inc., San Jose, also is said to be preparing its approach to deep-submicron, high-level design planning.

Avant! said its approach to the front end is different from the competition because, as in its other deep-submicron design tools, the company's Milkyway database serves as the backbone for Jupiter. The use of Milkyway eliminates the need for complex interfaces between tools, Avant! said.

Jupiter also contains a synthesis capability, which has spurred speculation that Jupiter could pose a challenge to Synopsys' Design Compiler tool. However, Avant! is not immediately planning to market Jupiter as a Design Compiler replacement, said Michael Jackson, head of product management for Avant!.

Synopsys' Design Compiler still leads the synthesis market with 81 percent market share in 1997, according to the market research firm Dataquest, San Jose. Even if Avant!'s technology proves to be as formidable as it asserts, unseating Synopsys may not likely occur for a number of years.

Although not the immediate plans, observers believe this is the direction Avant! will take, since best results are obtained by using the integrated synthesizer in Jupiter. The real question is whether OEMs will buy into the strategy.

Industry experts are not so excited about Avant!'s stance.

"The message is that, of course you can use Design Compiler, but it won't work as well," said Gary Smith, chief analyst of worldwide EDA at Dataquest. "Probably more important is how many engineers will drop their Cadence or Synopsys simulator. Design libraries are really tied to your simulator. To use Jupiter, the RTL tool flow has to be changed completely and there's not a lot of chance that will happen."

While a silicon vendor will adopt anything in order to get more (and bigger) designs in the door, unfortunately, unlike the IC CAD world, engineers buy CAE tools. And selling CAE tools is a whole different world than selling CAD tools, Smith said. Therein lies Avant!'s main barrier to success with Jupiter, he said.

Changing an entire tool flow is a daunting task for any OEM. Thus some OEMs may choose to use more open EDA tools for the

Case 5:03-cv-04669-JW   Document 657-6   Filed 09/09/2006   Page 2 of 2

flexibility of tool choices, in order to leverage existing knowledge and protect productivity of design teams.

COPYRIGHT 1999 Cahners Publishing Company
COPYRIGHT 2000 Gale Group

**Soccol, Jason**

| | |
|---|---|
| **From:** | Soccol, Jason |
| **Sent:** | Friday, May 26, 2006 4:19 PM |
| **To:** | Soccol, Jason; 'brothersk@dsmo.com'; 'hoffmang@dsmo.com'; 'meilmane@dsmo.com'; 'olivere@dsmo.com'; 'allend@dsmo.com'; 'weinsteinm@dsmo.com' |
| **Cc:** | 'McCandlessd@dsmo.com' |
| **Subject:** | Production letter of May 26, 2006 |
| **Attachments:** | 05_26_06_Soccol_Ltr_Brothers_Re_Production.pdf |



05_26_06_Soccol_L
tr_Brothers_R...

Counsel:

Please see the attached production letter with Federal Express tracking slip.

Should you have any questions or comments, please do not hesitate to contact me.

> Jason J. Soccol
> Litigation Paralegal
> Howrey LLP
> 525 Market Street, Suite 3600
> San Francisco, CA 94105-2708
> Telephone: (415) 848-4972
> Fax: (415) 848-4999
> Email: soccolj@howrey.com

# HOWREY LLP

525 Market Street
Suite 3600
San Francisco, CA 94105-2708
T 415.848.4900
F 415.848.4999
www.howrey.com

May 26, 2006

DIRECT DIAL 415.848.4972
FILE 068160.0061.000000

## VIA FEDERAL EXPRESS OVERNIGHT

Kenneth W. Brothers, Esq.
DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, LLP
2101 L Street NW
Washington, DC 20037

      Re:    *Ricoh v. Aeroflex, et al.*

Dear Mr. Brothers:

      Please find enclosed production disks containing the following Bates numbers on behalf of AMI (3AMI); Aeroflex (AF), Matrox Graphic, Inc. (MGI), Matrox Electronics Systems (MES) and Synopsys (2SP):

| CD Title | Bates Range |
|----------|-------------|
| Vol_31 | AF 28660.01-285707 |
| 2SP_069 | 2SP 0763429-763460 |
| MGI_108 | MGI 688482-688905 |
| MES_108 | MES 327898-328665 |
| OM02 | 3AMI 2575653-2584698 |
| XE1-01 | 3AMI 2584699-2585109 |
| XHE3-01 | 3AMI 2585110-2585520 |
| XH13-01 | 3AMI 2585521-2585931 |

      Please find enclosed documents bate numbered LU 001-0295 produced by Lucent Technologies pursuant to the subpoena.

      Please note that pursuant to the protective order this production is labeled "CONFIDENTIAL".

AMSTERDAM   BRUSSELS   CHICAGO   HOUSTON   IRVINE   LONDON   LOS ANGELES   MENLO PARK   SAN FRANCISCO   WASHINGTON, DC

DM_US\8350644.v1

# HOWREY LLP

Should you have any questions or comments, please do not hesitate to contact me.

Sincerely,

Jason J. Soccol
Litigation Paralegal

JJS:jjs
Enclosures

Cc:    Gary Hoffman (via E-mail w/o enclosures)
       DeAnna Allen (via E-mail w/o enclosures)
       Eric Oliver (via E-mail w/o enclosures))
       Edward Meilman (via E-mail w/o enclosures)
       Michael Weinstein (via E-mail w/o enclosures)
       Douglas McCandless (via E-mail w/o enclosures)

FedEx | Ship Manager | Label 7909 3744 0541                                   Page 1 of 1

From:   Origin ID:  (415)848-4972
Jason Soccol
Howrey, LLP
525 Market St.

San Francisco, CA 94105



Ship Date: 26MAY06
ActWgt: 1 LB
System#: 8702141/INET2400
Account#: S *********

REF: 06816.0060.000000



Delivery Address Bar Code

SHIP TO:  (202)785-9700        BILL SENDER
**Kenneth Brothers**
**Dickstein Shapiro Morin & Oshinsky,**
**2101 L Street, NW**

**Washington, DC 20037**



**PRIORITY OVERNIGHT**                              **TUE**
TRK#  **7909 3744 0541**   FORM 0201        Deliver By: 30MAY06
                                            **IAD**        A1

**20037**  -DC-US

**XC DCAA**



Shipping Label: Your shipment is complete

1.  Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2.  Fold the printed page along the horizontal line.
3.  Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



| | |
|---|---|
| FedEx Express | U.S. Mail: PO Box 727 |
| Customer Support Trace | Memphis, TN 38194-4643 |
| 3875 Airways Boulevard | |
| Module H, 4th Floor | Telephone: 901-369-3600 |
| Memphis, TN 38116 | |

09/06/2006

Dear Customer:

The following is the proof of delivery you requested with the tracking number **790937440541**.

## Delivery Information:

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivery date:** | May 30, 2006 09:05 |
| **Signed for by:** | G.ANDERSON | | |
| **Service type:** | Priority Overnight | | |



## Shipping Information:

| | | | |
|---|---|---|---|
| **Tracking number:** | 790937440541 | **Ship date:** | May 26, 2006 |
| **Recipient:** | | **Shipper:** | |
| WASHINGTON, DC US | | SAN FRANCISCO, CA US | |
| **Reference** | | 06816.0060.000000 | |

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

**CAMEO**

| Library Catalog | Course Reserves | Library Hours & News | User Self Service | Not in Cameo? Try here | Ask a Librarian |
|---|---|---|---|---|---|

University Libraries
**Carnegie Mellon**

| Go Back | Limit Search | New Search | Backward | Forward | Print/Email | Request |
| Exit |

# Search Results -- Simple Search of the Library Catalog

**3** records were found for your search on **"vlsi design automation assistant"** . Viewing **1** through **3**. Use check boxes    below to mark list items for Print/Email.

**#1** [View]  **CWR 87-26**
The VLSI Design Automation Assistant : reconstruction, evaluation and critique / Ranganadha R. Vemuri
Vemuri, Ranganadha R.

Copy 1 (TECH-REPT)
at: ENGR&SCI
pubyear: 1987

**#2** [View]  **THESIS KOWA,VSLI PH.D.**
The VLSI design automation assistant : a knowledge-based expert system
Kowalski, Thaddeus Julius

Copy 1 (DESK-4-NON)
at: HUNT
pubyear: 1984

**#3** [View]  **620.00420285 C28S 84-29**
The VLSI design automation assistant : a knowledge-based expert system / Thaddeus Julius Kowalski
Kowalski, Thaddeus J.

Copy 1 (TECH-REPT)
at: ENGR&SCI
pubyear: 1984

| Go Back | Limit Search | New Search | Backward | Forward | Print/Email | Request |
| Exit |

## Search Again

Keyword    Browse    Exact

`vlsi design automation assistant`                    library: `ALL`

| Word or Phrase | Author | Title | Subject | Series | Periodical Title |
|---|---|---|---|---|---|

Previous Searches: `----Choose a previous query----`

## Select Limiting Options

pubyear: `_____`

language: `ANY`                                       format: `ANY`

itemtype: `ANY`                                       location: `ANY`

CAMEO

sort by: None ▾

relevance rank:



Top

Copyright © 2000 - 2003, Sirsi Corporation

**Exhibit 15**

**Title:** | Design Automation Assistant – CMU |

<u>References:</u>

[Barbacci78]    Barabacci, Nagle, "The Symbolic Manipulation of Computer Descriptions: ISPS Application Note: An ISPS Simulator" (1978), DEF019581-019619.

[Snow78]    Snow, "Automation of Module Set Independent Register-Transfer Level Design" (1978), DEF019620-019821.

[Barbacci79]    Barabacci, Barnes, Cattell, Siewiorek, "The Symbolic Manipulation of Computer Descriptions: The ISPS Computer Description Language," CMU-CS-79-137 (1979), DEF020354-020462.

[Barbacci81]    Barbacci, "Instruction Set Processor Specifications (ISPS): The Notation and Its Applications," IEEE Transactions on Computers, Vol. C-30 No.1, 24-40 (1981), DEF017863-017880.

[Leive81]    Leive, "The Design, Implementation, and Analysis of an Automated Logic Synthesis and Module Selection System," DRC-02-03-81 (1981), DEF 019822 - 019994.

[Director82]    Director, Parker, Siewiorek, Thomas, "A design methodology and computer aids for digital VLSI systems" IEEE Transactions on Circuits and Systems, vol. Cas-28 No. 7, 634-645 (1981). *Alternate version* "The CMU DA/CAD Project" CMUCAD-82-2 (1982) (received from Don Thomas SDT), DEF016251 – 016263.

[Hafer82]    Hafer, "Automated Synthesis of Digital Hardware," IEEE Trans. Computers, Vol. C-31 No.1, 93-109 (1982), DEF 016264 - 016281.

[Thomas83]    Thomas, Hitchcock, Kowalski, Rajan, Walker, "Automatic Data Path Synthesis," Computer vol. 16 No. 12, 59-69 (1983), DEF 016282 - 016294.

[Dirkes85]    Dirkes, "A Module Binder for the CMU-DA System," CMUCAD-85-43 (1985), DEF 019995 - 020053.

[Kowalski83a]    Kowalski, Thomas, "The VLSI Design Automation Assistant: Prototype System," 20th DAC, 479-483 (1983), DEF 016319 - 016323.

[Kowalski83b]    Kowalski, Thomas, "The VLSI Design Automation Assistant: Learning to Walk," IEEE International Symposium on Circuits and Systems, 186-190 (1983), DEF 016324 - 016331.

[Kowalski84]      Kowalski, Thomas, "The VLSI Design Automation Assistant: An IBM
                  System/370 Design," IEEE Design & Test of computers, 60-69 (1984), DEF
                  016295 - 016307.

[Kowalski85a]     Kowalski, Thomas, "The VLSI Design Automation Assistant: What's in a
                  Knowledge Base," 22nd DAC 252-258 (1985), DEF 022874 - 022880.

[Kowalski85b]     Kowalski, An Artificial Intelligence Approach to VLSI Design, (1985). DEF
                  007122 – 007364. *Alternate version* "The VLSI Design Automation Assistant:
                  A Knowledge-Based Expert System" CMUCAD-84-29 (1984) (CMU Thesis
                  from DT docs).  [All pagination is to Alternate version], DTH00137 –
                  DTH00308.

[Kowalski85c]     Kowalski, Geiger, Wolf, Fichtner, "The VLSI Design Automation Assistant:
                  From Algorithms to Silicon" IEEE Design & Test 33-43 (1985), DEF 018108
                  - 01818.

[Kowalski 85d]    Kowalski, Geiger, Wolf, Fichtner "The VLSI Design Automation Assistant: A
                  Birth in Industry" 1985 ISCAS 889-892 (1985), DEF 018660 - 018664.

[Kowalski88]      Kowalski, "The VLSI Design Automation Assistant: An Architecture
                  Compiler," Silicon Compilation ch. 5 (ed. Gajski) (1988). (edited reprint of
                  Kowalski85b), DEF 006791 - 006821.

| storing a set of definitions of architecture independent actions and conditions; | A compiler, a program stored and executed on a computer, stores predefined operators that are used in preparing a dataflow graph representation from an ISPS source file. *See* [Kowalski85c] at 36.<br><br>"The ISPS language ... can now be used to describe the functional behavior of any digital system." [Director81] at 637.<br><br>"The ISPS description is considered an algorithmic description, not a representation of the structure of the implementation." [Kowalski85c] at 47.<br><br>"The key parameter that permits the realization of such an exploration of alternative designs is the fact that the initial behavioral description does not specify the actual implementation. By not specifying the actual components, the system is free to try alternative realizations, evaluate them, and select the best one." [Barbacci81] at 35.<br><br>"ISPS describes ... the behavior of the hardware units ... The behavioral aspects of the unit are described by procedures which specify the sequence of control and data operations in the machine." [Barbacci81] at 25.<br><br>"ISPS allows the declaration of procedures, which contain ... data and control operations." [Barbacci81] at 26.<br><br>"An ISPS description consists of a series of declaration of entities. Some of these are simple carriers, which hold the data being manipulated, similar to variables in a programming language. Other entities are procedures of functions much like the procedures or functions of a programming language. These define how the data is manipulated. The procedures are specified by data operators that do arithmetic, logical, relational, and shift operations on the data [i.e. actions], and by sequential, parallel, and conditional constructs that show the data operators are combined [i.e. conditions]." [Kowalski85b] at 46-47.<br><br>"The DAA actually works from a dataflow representation extracted from the ISPS description." [Kowalski85c] at 36. |
|---|---|

|  | CMU DAA is a computer-aided design system for designing an ASIC from functional specifications. Figure 1 of Kowalski85c illustrates a multi-stage process that uses a computer to assist in the design of a special purpose VLSI chip. [Kowalski85c] at 34.<br><br>The process employs at least one computer aided design |
|---|---|

- 3 -

CMU DAA                                                                    EX. 1

| | |
|---|---|
| storing data describing a set of available integrated circuit hardware cells for performing the actions and conditions defined in the stored set; | There are two such databases taught by Kowalski85c that collectively or individually meet this limitation.  First, there is the database used by the DAA that stores data describing a set of technology sensitive modules, *see* [Kowalski85c] at 35, which are hardware cells under the broadest reasonable interpretation.<br><br>"The DAA uses a technology-sensitive database… The technology-sensitive database contains expert knowledge about the trade-offs particular to the target technology;" [Kowalski85c] at 34-35.<br><br>"This technique allows easy change of target technologies and the individual fine tuning of design constraints." [Kowalski85b] at 39.<br><br>Second, there is the database used by the module binder that stores data describing a set of available integrated hardware cells.  *See* [Kowalski85c] at 37.<br><br>"The module binder chooses physically realizable technology-dependent cells to implement the technology-independent modules in the DAA's design.  The cells are chosen from the module database on the basis of user-supplied constraints on functionality, power dissipation, delay, and area." [Kowalski85d] at 891.<br><br>"MOBY employs a standard cell approach to binding hardware to the modules of the data path.  Interchangeable cell libraries which were provided by industrial affiliate are used.  The cell libraries in use contain gate array cells, however MOBY was designed to be used with any standard cell library.  The standard cell approach is appropriate for a module binder for the CMU-DA system." [Dirkes85] at 6.<br><br>"The technology-dependent modules are either selected from the module database or fabricated from simpler, equivalent database entries." [Kowalski85c] at 35. |
| storing in an expert system knowledge base a set of rules for selecting hardware cells to perform the actions and conditions; | "A cornerstone of our hardware synthesis approach is the use of knowledge-based expert systems.  Such systems make decisions based on knowledge, expressed as rules, obtained from expert designers." [Kowalski85c] at 34.<br><br>For example, the DAA, a knowledge-based expert system, stores a set of rules for selecting technology sensitive modules that perform each of the specified actions or conditions, wherein each rule embodies the knowledge of expert VLSI chip designers and is stored in an expert system knowledge base.  *See* [Kowalski85c] at 36.<br><br>Through application of these rules, the DAA maps the architectural independent actions or conditions into technology sensitive modules, linking paths and control logic, and then it optimizes the resulting design.  *See* [Kowalski85c] at 34.<br><br>"The DAA is implemented as a production system using the OPS5 |

| | |
|---|---|
| | knowledge-based expert-system, KBES, writing system." [Kowalski85a] at 252.

"The rule memory is a collection of conditional statements that operate on elements stored in the working memory." [Kowalski85b] at 28.

"The prototype DAA system had about 70 rules… The development DAA system now has over 300 rules and has designed a much better MCS6502 microcomputer." [Kowalski85b] at 29.

"Rules were added to recognize when a multiplexer should be converted to a bus and how to share that bus with other distributed multiplexers." [Kowalski85b] at 34.

*See also* chapter 5 [Kowalski85b] at 62-97 and Table 14. |
| describing for a proposed application specific integrated circuit a series of architecture independent actions and conditions; | "[T]he design process begins with a behavioral specification of the digital system to be designed.  Such a specification provides a model which accurately characterizes the input-output behavior of the system without reflecting any internal structure.  This level of specification might be expressed in terms of a flowchart, or as we choose to do below, in terms of a high-level hardware description language." [Director82] at 635.

"Inputs to the system will be a behavioral description of the hardware to be designed, objectives which specify the user's optimization criteria, and a library specifying the components available to the design system." [Hafer82] at 93, 2nd col.

This element is met by Kowalski85c when the ISPS source file is entered by a user.  The ISPS source file is an algorithmic description of the functionality of the desired chip written by the designer that is not tied to any particular implementation style, fabrication technology, or structure. *See* [Kowalski85c] at 34.

"The designer first specifies the chip's functionality as an algorithm.  The algorithmic description is not tied to a particular implementation style [architecture], such as parallel or serial, sequential or pipelined." [Kowalski85c] at 34.

"The DAA is a knowledge-based expert system that uses a database of over 500 rules to synthesize an architectural implementation from an algorithmic description with constraints.  The description is written in ISPS" [Kowalski85c] at 36.

"The DAA actually works from a dataflow representation extracted from the ISPS description." [Kowalski85c] at 36.

"The ISPS language … can now be used to describe the functional behavior of any digital system" [Director81] at 637.

"An ISPS description consists of a series of declarations of entities.  Some of these are simple carriers, which hold the data being manipulated, |

| | |
|---|---|
| | similar to variables in a programming language. Other entities are procedures or functions much like the procedures or functions of a programming language. These define how the data is manipulated. The procedures are specified by data operators that do arithmetic, logical, relational, and shift operations on the data [i.e. actions] and by sequential, parallel, and conditional constructs that show how the data operators are combined [i.e. conditions]." [Kowalski85b] at 46-47. "The ISPS description is considered an algorithmic description, not a representation of the structure of the implementation. [i.e. architecture independent]" [Kowalski85b] at 47. |
| | "The key parameter that permits the realization of such an exploration of alternative designs is the fact that the initial behavioral description does not specify the actual implementation. By not specifying the actual components, the system is free to try alternative realizations, evaluate them, and select the best one." [Barbacci81] at 35. |
| | "ISPS describes … the behavior of the hardware units… The behavioral aspects of the unit are described by procedures which specify the sequence of control and data operations in the machine". [Barbacci81] at 25. |
| | "ISPS allows the declaration of procedures, which contain … data and control operations" [Barbacci81] at 26. |
| | See, e.g., Figure 3 in [Director82] at 637 for an example design of a PDP-8 computer. |
| specifying for each described action and condition of the series one of said stored definitions which corresponds to the desired action or condition to be performed; and | "The DAA actually works from a dataflow representation extracted from the ISPS description." [Kowalski85c] at 36. |
| | "An ISPS description consists of a series of declarations of entities. Some of these are simple carriers, which hold the data being manipulated, similar to variables in a programming language. Other entities are procedures or functions much like the procedures or functions of a programming language. These define how the data is manipulated. The procedures are specified by data operators that do arithmetic, logical, relational, and shift operations on the data [i.e. actions] and by sequential, parallel, and conditional constructs that show how the data operators are combined [i.e. conditions]." [Kowalski85b] at 46-47. "The ISPS description is considered an algorithmic description, not a representation of the structure of the implementation. [i.e. architecture independent]" [Kowalski85b] at 47. |
| | "The ISPS description is compiled into a VT data-flow representation…. The VT is a directed acyclic graph, DAG, similar in nature to those used in optimizing compilers, with the addition of control constructs to allow conditionals and subroutines in the VT. The nodes in the graph are called operators and correspond to operations that take certain values as input and produce new values as output. They are translations of the ISPS unary and binary operations [i.e. actions], operations that change or access fields |

| | |
|---|---|
| | in words or words in arrays, control operations such as procedure or block invocation, and conditional branches. [i.e. conditions]" [Kowalski85b] at 49. |
| | "The main characteristic [of the ISPS paradigm] is the use of a formally defined intermediate representation for the parse trees. This intermediate format (called Global Data Base or GDB, for short) can be easily used by a multitude of application programs, written in any language and running on any machine." [Barbacci81] at 25. In Fig. 1 on page 25, it is clear that the ISPS description is run through the parser to get to the GDB. |
| | "The ISP description is transformed into an alternative representation called the ValueTrace or VT" [Director82] at 638, col. 2. |
| | See, e.g., Figure 3 in [Director82] at 637 for an example design of a PDP-8 computer. |
| selecting from said stored data for each of the specified definitions a corresponding integrated circuit hardware cell for performing the desired function of the application specific integrated circuit, said step of selecting a hardware cell comprising applying to the specified definition of the action or condition to be performed, a set of cell selection rules stored in said expert system knowledge base and generating for the selected integrated circuit | "A cornerstone of our hardware synthesis approach is the use of knowledge-based expert systems. Such systems make decisions based on knowledge, expressed as rules, obtained from expert designers." [Kowalski85c] at 34. |
| | "The initial knowledge in the system was codified from the algorithms of the current CMU/DA allocator and the interviews [with chip design experts] discussed above." [Kowalski85b] at 26. |
| | "The DAA is implemented as a production system using the OPS5 knowledge-based expert-system, KBES, writing system." [Kowalski85a] at 252. |
| | "[DAA] begins by allocating the base variable storage elements … to hardware modules and ports. Next, it maps all data-flow operator outputs not bound to base-variable storage elements to register modules. Last, it maps each data-flow operator, with its inputs and outputs to modules, ports, and links." |
| | "The prototype DAA system had about 70 rules… The development DAA system now has over 300 rules and has designed a much better MCS6502 microcomputer." [Kowalski85b] at 29. |
| | "Rules were added to recognize when a multiplexer should be converted to a bus and how to share that bus with other distributed multiplexers." [Kowalski85b] at 34. |
| | "The DAA is a knowledge-based expert system that uses a database of over 500 rules to synthesize an architectural implementation from an algorithmic description with constraints. The description is written in ISPS". [Kowalski85c] at 36. |
| | "The knowledge-based expert system approach followed by the DAA uses a weak method, match [an inference engine methodology], in place of |

- 7 -

| | |
|---|---|
| hardware cells, a netlist defining the hardware cells which are needed to perform the desired function of the integrated circuit and the interconnection requirements therefor. | extensive backtracking." [Kowalski85c] at 36.<br><br>"The number of rule firings, or activations, for the complete design of the structured control-flow processor, SCF3, is provided in Table 1." [Kowalski85a] at 252-253.<br><br>**Table 1. RULES BY FUNCTION**<br><br>*(see table below)*<br><br>*See* discussion regarding the rules in Table 1. [Kowalski85a] at 253-254. *See also* chapter 5 [Kowalski85b] at 62-97.<br><br>"Primarily there are two estimators. One bridges the algorithmic to fabrication-dependent hardware-network level as a partitioner, while the other bridges the technology-independent to the technology-dependent hardware-network level as a cost function." [Kowalski85b] at 84.<br><br>"[Various factors] must be quantified, weighted, and combined to give a measure of how expensive a new module would be as opposed to the cost of sharing an already existing module." [Kowalski85b] at 88.<br><br>"This rule shows an important use of the technology database as part of the rule." [Kowalski85b] at 37.<br><br>"Rules that manage the technology-independent database." [Kowalski85b] at 39.<br><br>"The next type of management is module management. This set of rules has knowledge about creating, combining, and removing modules from the design. These rules allow the designer and thus the other rules in the DAA, to think about creating, combining and removing modules as atomic units, rather than as individual parts. [Kowalski85b] at 65.<br><br>"The decision making connected with the results of these estimators was kept in rules, but the calculation was moved to a C program... Primarily there are two estimators. One bridges the algorithmic to fabrication-dependent level as a partitioner, while the other bridges the technology-independent to the technology-dependent hardware-network level as a cost |

| Section | Rules | Firings |
|---|---|---|
| Service Functions | 88 | 4901 |
| Global Allocation | 78 | 104 |
| Dataflow Allocation | 55 | 1468 |
| Module Allocation | 47 | 1610 |
| Global Improvements | 46 | 460 |
| Total DAA | 314 | 8543 |

| | function." [Kowalski85b] at 83-84. |
|---|---|
| | "The module binder chooses physically realizable technology-dependent cells to implement the technology-independent modules in the DAA's design. The cells are chosen from the module database on the basis of user-supplied constraints on functionality, power dissipation, delay, and area." [Kowalski85d] at 891. |
| | "The module binder selects physical modules from the module set library to implement the generic components in the data path." [Hafer82] at 94, 2nd col. |
| | "The control allocator translates the technology-independent control specification, generated by the DAA, into a controller implementation in a chosen technology." [Kowalski85c] at 37. |
| | "The Design Automation Assistant is a knowledge-based expert-system, KBES, that generates a technology-independent list of operators, registers, data paths and control signals from an algorithmic description of a VLSI system." [Kowalski85a] at 252 See also [Kowalski83b] at 186 and [Kowalski83a] at 479. |
| | "The DAA produces a technology-independent hardware network description. This description is composed of modules [i.e. cells], ports, links [i.e. interconnection requirements], and a symbolic microcode. The modules can be registers, operators, memories, and buses or multiplexers with input, output, and bidirectional ports. The ports are connected by links and are controlled by symbolic microcode." [Kowalski85b] at 26. |
| | "The technology-independent, but technology-sensitive implementation description is given in a structure and control specification language, SCS (soon to be replaced by DIF). The structural specification models the functional and logical structural levels as a network of modules." [Kowalski85b] at 51-52. |
| | "The floor planner produces an abstract physical design for the technology-dependent network designed by the DAA and the module binder." [Kowalski85c] at 37. |
| | "Figure 4. Sample netlist to floor plan transformation." [Kowalski85c] at 37. |
| | The DAA, a knowledge-based expert system, first selects, for each of the architecture independent actions and conditions of the algorithmic description, one or more technology sensitive modules. *See* [Kowalski85c] at 35. The module binder then binds each of these modules to an integrated circuit hardware cell. [Kowalski85c] at 37. |
| 14. A process as defined in claim 13, including generating from the | "The VLSI Design Automation Assistant: From Algorithms to Silicon." [Kowalski85c] at 33. |
| | "A series of programs translates an algorithm into a chip design." |

- 9 -

| netlist the mask data required to produce an integrated circuit having the desired function. | [Kowalski85c] at 33.<br><br>*See* Figure 1 of [Kowalski85c] at 34.<br><br>"The floor planner produces an abstract physical design for the technology-dependent network [a.k.a. netlist] designed by the DAA and the module binder." [Kowalski85c] at 37.<br><br>"The data-path floor planner (DP): a knowledge-based expert system that is responsible for the complete physical design of the chip. It arranges the modules selected by the module binder and control allocator into a data-path floor plan and creates the cell-layout parameters". [Kowalski85c] at 35.<br><br>"At the same time the floor plan is being built, the specifications for the modules – size, shape, delay, etc. – are being refined. These specifications will be passed to the module generators to guide the production of the cells." [Kowalski85c] at 38.<br><br>"The generator program produces a Lava description of a cell from parameters that define the requirements on the cell." [Kowalski85c] at 39.<br><br>"The Lava chip compiler compacts the individual cells and assembles them into a chip according to the floor plan… This symbolic layout can be macro-expanded into a pure layout that can be used to fabricate the chip." [Kowalski85c] at 40.<br><br>"The symbolic layout can be can be made into masks to manufacture the integrated circuit." [Kowalski85d] at 890.<br><br>"The netlist can be used as input to any existing VLSI layout and routing tool 16 to create mask data 18 for geometrical layout." '432 patent, 4:44-46.<br><br>"Computer-aided design systems for cell placement and routing are commercially available which will lay out the respective cells in the chip, generate the necessary routing, and produce mask data which can be directly used by a chip foundry in the fabrication of integrated circuits." *Id.* at 5:40-46.<br><br>"From this netlist the mask data for producing the integrated circuit can be directly produced using available VLSI CAD tools." *Id.* at 14:4-7. |
| 15. A process as defined in claim 13 including the further step of generating data paths for the selected integrated circuit hardware | "The Design Automation Assistant is a knowledge-based expert-system, KBES, that generates a technology-independent list of operators, registers, data paths and control signals from an algorithmic description of a VLSI system." [Kowalski85a] at 252 See also [Kowalski83b] at 186 and [Kowalski83a] at 479.<br><br>"DAA synthesizes a technology-independent representation of memories, registers, operators, data-paths and timing signals from an algorithmic description of a VLSI system." [Kowalski85b] at 46. |

- 10 -

| cells. | "Our approach seeks to aid the designer with tools that automatically produce data paths and control sequences from an algorithmic system description within user-specified constraints". [Kowalski85c] at 33. |
|---|---|
|  | "The DAA allocates the clock phases, operators, registers, data paths and control logic in two subtasks, dataflow allocation and module allocation, which are shown in Figure 1. This allows the DAA to gather all the information about register usage in the dataflow allocation and then allocate registers and modules in the module allocation." [Kowalski85a] at 253. |
|  | "The data-path floor planner (DP): a knowledge-based expert system that is responsible for the complete physical design of the chip. IT arranges the modules selected by the module binder and control allocator into a data-path floor plan and creates the cell-layout parameters." [Kowalski85c] at 35. |
|  | "Synthesis of the data path is separated into two steps:..." [Director 82] at 635. See also section B.1 [Director82] at 635-36. |
| 16. A process as defined in claim 15 wherein said step of generating data paths comprises applying to the selected cells a set of data path rules stored in a knowledge base and generating the data paths therefrom. | "The Design Automation Assistant is a knowledge-based expert-system, KBES, that generates a technology-independent list of operators, registers, data paths and control signals from an algorithmic description of a VLSI system." [Kowalski85a] at 252; see also [Kowalski83b] at 186 and [Kowalski83a] at 479. |
|  | "Our approach seeks to aid the designer with tools that automatically produce data paths and control sequences from an algorithmic system description within user-specified constraints". [Kowalski85c] at 33. |
|  | "The DAA is a knowledge-based expert system that uses a database of over 500 rules to synthesize an architectural implementation from an algorithmic description with constraints. The description is written in ISPS". [Kowalski85c] at 36. |
|  | "The knowledge-based expert system approach followed by the DAA uses a weak method, match [an inference engine methodology], in place of extensive backtracking." [Kowalski85c] at 36. |
|  | "The DAA allocates the clock phases, operators, registers, data paths and control logic in two subtasks, dataflow allocation and module allocation, which are shown in Figure 1. This allows the DAA to gather all the information about register usage in the dataflow allocation and then allocate registers and modules in the module allocation. The 55 dataflow allocation rules assign operators to control phases, determine the minimum size needed to represent an operation, allocate temporary registers, and then associate the dataflow operations to register modules or create ALU modules." [Kowalski85a] at 253. |
|  | "The data-path floor planner (DP): a knowledge-based expert system that is responsible for the complete physical design of the chip. It arranges the |

| | |
|---|---|
| | modules selected by the module binder and control allocator into a data-path floor plan and creates the cell-layout parameters." [Kowalski85c] at 35. |
| 17. A process as defined in claim 16 including the further step of generating control paths for the selected integrated circuit hardware cells. | "Our approach seeks to aid the designer with tools that automatically produce data paths and control sequences from an algorithmic system description within user-specified constraints". [Kowalski85c] at 33. |
| | "ISPS describes … the behavior of the hardware units… The behavioral aspects of the unit are described by procedures which specify the sequence of control and data operations in the machine". [Barbacci81] at 25. |
| | "DAA … adds register, operator, data path and control signal detail to the VT description [algorithmic level] of hardware to form the SCS description. [technology-independent level". [Kowalski85b] at 5. |
| | "The DAA produces a technology-independent hardware network description. This description is composed of modules, ports, links, and a symbolic microcode [i.e. controller]. The modules can be registers, operators, memories, and buses or multiplexers with input, output, and bidirectional ports. The ports are connected by links and are controlled by symbolic microcode." [Kowalski85b] at 26. |
| | "The control specification describes the control sequences that govern the behavior of the network." [Kowalski85b] at 56. |
| | "Next a controller module is created for the design. The DAA currently has only rules that create single controller designs." [Kowalski85b] at 70. |
| | "The Design Automation Assistant is a knowledge-based expert-system, KBES, that generates a technology-independent list of operators, registers, data paths and control signals from an algorithmic description of a VLSI system." [Kowalski85a] at 252; see also [Kowalski83b] at 186 and [Kowalski83a] at 479. |
| | "This algorithmic description is then transformed into a technology-independent network … and a symbolic control description. This network is used to synthesize a technology-dependent network that includes implementations of the technology-independent modules and the controller in the target technology." [Kowalski85c] at 34. |
| | "The control allocator: an algorithmic program that designs the controller for the data-path logic designed by the DAA…" [Kowalski85c] at 35. |
| | "The control allocator translates the technology-independent control specification, generated by the DAA, into a controller implementation in a chosen technology." [Kowalski85c] at 37. |
| | "The control allocator receives information from the technology-dependent hardware network and the module database [i.e. hardware cells] to produce an output file for a specific style of controller." [Kowalski85c] |

CMU DAA

| | at 37. |
|---|---|

PAGES 1 - 122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARTIN J. JENKINS, JUDGE

SYNOPSYS, INC.,                    )
                                   )
          PLAINTIFF,               )
                                   )
  VS.                              )      NO. C 03-2289 MJJ
                                   )
RICOH COMPANY, LTD.,               )      WEDNESDAY, DECEMBER 15, 2004
                                   )
          DEFENDANT.               )      SAN FRANCISCO, CALIFORNIA
_____)
                                   )
RICOH COMPANY,                     )
                                   )
          PLAINTIFF,               )      C 03-4669 MJJ
                                   )
  VS.                              )      WEDNESDAY, DECEMBER 15, 2004
                                   )
AEROFLEX, INC. ET AL.,             )      SAN FRANCISCO, CALIFORNIA
                                   )
          DEFENDANTS.              )
_____)

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR RICOH:              DICKSTEIN, SHAPIRO, MORIN & OSHINSKY
                        2101 L STREET NW
                        WASHINGTON, DC 20037
                   BY:  GARY M. HOFFMAN, ESQUIRE
                        ERIC OLIVER, ESQUIRE

                        ALTSHULER, BERZON, NUSSBUAM
                        RUBIN & DEMAIN
                        177 POST STREET - SUITE 300
                        SAN FRANCISCO, CALIFORNIA  94108
                   BY:  JONATHAN WEISSGLASS, ESQUIRE

                        (APPEARANCES CONTINUED:)

REPORTED BY:            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                        OFFICIAL COURT REPORTER

1    MACRO AND WHAT YOU INITIALLY PUT IN SO YOU CAN MAKE SOME

2    ADJUSTMENTS THAT SIMULATES WHAT YOU'VE ASKED FOR IN A WAY THAT

3    IT ALLOWS YOU TO FURTHER USE THE EDITOR?

4         **MR. HOFFMAN:**  YES.

5         IN THE PREFERRED EMBODIMENT, IT WOULD ALLOW YOU TO

6    GO BACK AND MODIFY IT, GO BACK AND CHECK IT.  DOES IT MAKE

7    SENSE?  DOES IT LOOK RIGHT?  DO I WANT TO CHANGE ANYTHING?  I

8    WANT TO DO IT DIFFERENTLY.  I WANT IT TO ASSOCIATE IT WITH

9    SOMETHING ELSE.  I HAVE AN EDITING-TYPE FUNCTION.  OF COURSE,

10   OBVIOUSLY, I CAN GO BACK AND CHECK IT ALSO.

11        BUT WHAT THE DEFINITIONS ARE, THE SET OF

12   DEFINITIONS -- AND WE HAVE STAYED WITH THE WORD "DEFINITIONS"

13   INSTEAD OF SWITCHING IT.  OF COURSE, QUITE CANDIDLY, I THINK

14   DEFINITIONS IS AN EVERYDAY TERM AND IT SEEMED CLEAR ON ITS

15   ORDINARY MEANING AND NOT NEEDING A SEPARATE INTERPRETATION.

16        BUT IT IS THE LIBRARY OF MACROS OF THE DIFFERENT

17   ARCHITECTURE INDEPENDENT ACTIONS AND CONDITIONS.  WHERE THE

18   PRIMARY DIFFERENCE IS BETWEEN US AND THE DEFENDANTS IS THE

19   ISSUES OF FLOWCHART AND RTL, AGAIN, IS WHERE THE DISTINCTIONS

20   COME IN.

21        IN FACT, I BELIEVE THAT IN THEIR INTERPRETATION,

22   WHILE THEY DON'T USE THE WORD "DEFINITIONS," THEY REFER TO

23   DEFINING.  AGAIN, THE WORD DEFINE BEING THE ROOT THAT'S

24   UTILIZED IN BOTH OF THE INTERPRETATIONS.

25        LET ME BRIEFLY SKIP OVER THE EXPERT SYSTEM KNOWLEDGE



# WEBSTER'S
## Ninth New
### Collegiate
### Dictionary



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1988 by Merriam-Webster Inc.

Philippines Copyright 1988 by Merriam-Webster Inc.


Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.

   Includes index.
   1. English language—Dictionaries.   I. Merriam-
Webster Inc.
PE1628.W5638    1988       423        87-24041
ISBN 0-87779-508-8
ISBN 0-87779-509-6 (indexed)
ISBN 0-87779-510-X (deluxe)



Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U.S. Pat. Off.


All rights reserved. No part of this book covered by the copyrights hereon may be re-
produced or copied in any form or by any means—graphic, electronic, or mechanical,
including photocopying, taping, or information storage and retrieval systems—without
written permission of the publisher.


Made in the United States of America


27282930RMcN88

Case 5:03-cv-04669-JW   Document 857-11   Filed 09/09/2006   Page 3 of 3

## 334  definement • degeneration

CATE (rigidly *defined* property lines)  **b** : to make distinct, clear, or detailed in outline (the issues aren't too well *defined*)  **3** : CHARACTERIZE, DISTINGUISH (you ~ yourself by the choices you make) — *Denotation* Univ. Bull. > ~ vi 1 : to make a definition — **de·fin·able** \-ˈfī-nə-bəl\ *adj* — **de·fin·ably** \-blē\ *adv* — **de·fine·ment** \-ˈfīn-mənt \ *n* — **de·fin·er** \-ˈfī-nər\ *n*

**de·fi·ni·en·dum** \di-ˌfin-ē-ˈen-dəm\ *n, pl* **-da** \-də\ [L, something to be defined, neut. of *definiendus*, gerundive of *definire* (1871)] : an expression that is being defined

**de·fin·iens** \di-ˈfin-ē-ˌenz\ *n, pl* **de·fin·i·en·tia** \di-ˌfin-ē-ˈen-chē-ə\ [L, prp. of *definire*] (1871) : an expression that defines : DEFINITION

**def·i·nite** \ˈdef-(ə-)nət\ *adj* [L *definitus*, pp. of *definire*] **1 a** : having distinct or certain limits (set ~ standards for pupils to meet)  **2 a** : free of all ambiguity, uncertainty, or obscurity (demanded a ~ answer)  **b** : UNQUESTIONABLE, DECIDED (the quarterback was a ~ hero today)  **3** : typically designating an identified or immediately identifiable person or thing (the ~ article *the*)  **4 a** : being constant in number, esp. less than 20, and occurring in multiples of the petal number (stamens ~) **b** : CYMOSE  *syn* see EXPLICIT — **def·i·nite·ly** *adv* — **def·i·nite·ness** *n*

**definite integral** *n* (1860) : a number that is the difference between the values of the indefinite integral of a given function for two values of the independent variable

**def·i·ni·tion** \ˌdef-ə-ˈnish-ən\ *n* [ME *diffinicioun*, fr. MF *definition*, fr. L *definition-, definitio,* fr. *definitus*] **1 a** : an act of determining: *definition-, definitio,* fr. *definitus*  **b** : the formal proclamation of a Roman Catholic dogma  **2 a** : a statement expressing the essential nature of something (as by differentiation within a class)  **b** : a statement of the meaning a word or word group or a sign or symbol (dictionary ~s)  **c 1** : a product of defining  **3** : the action or process of stating or formulating a definition  **4 a** : the action or the power of describing, explaining, or making definite and clear (the ~ of a telescope) (her comic genius is beyond ~)  **b** : clarity (1) : distinctness of outline or detail (as in a photograph) (2) : clarity esp. of musical sound in reproduction  **c** : sharp demarcation of outlines (lines or limits (a jacket with definite waist ~) — **def·i·ni·tion·al** \-ˈnish-nəl, -ˈnish-ən-ᵊl\ *adj* — **def·i·ni·tion·al·ly** *adv*

**de·fin·i·tive** \di-ˈfin-ət-iv\ *adj* [ME *diffinitif,* fr. MF *definitif,* fr. L *definitivus,* fr. *definitus*] (14c)  **1** : serving to provide a final solution (a ~ victory)  **2** : authoritative and apparently exhaustive (a ~ biography)  **3** : serving to define or specify precisely (~ laws)  **4** : fully differentiated or developed  **5** of a postage stamp : issued as a regular stamp for the country or territory in which it is to be used  *syn* see CONCLUSIVE — **de·fin·i·tive·ly** *adv* — **de·fin·i·tive·ness** *n* — **definitive** *n* (1951) : a definitive postage stamp — compare PROVISIONAL

**definitive host** *n* (1901) : the host in which the sexual reproduction of a parasite takes place

**def·i·ni·tize** \ˈdef-(ə-)nə-ˌtīz, di-ˈfin-ə-\ *vt* **-tized; -tiz·ing** (1876) : to make definite

**de·fi·ni·tude** \ˈdef-ə-nə-ˌt(y)üd, -ˈfī-nə-\ *n* [irreg. fr. *definite*] (1836) : PRECISION, DEFINITENESS

**def·la·grate** \ˈdef-lə-ˌgrāt\ *vb* **-grat·ed; -grat·ing** [L *deflagratus,* pp. of *deflagrare* to burn down, fr. *de-* + *flagrare* to burn — more at BLACK] *vt* (1727) : to cause to deflagrate — compare DETONATE ~ *vi* : to burn rapidly with intense heat and sparks being given off — **def·la·gra·tion** \ˌdef-lə-ˈgrā-shən\ *n*

**de·flate** \di-ˈflāt, dē-\ *vb* **de·flat·ed; de·flat·ing** [*de-* + *-flate* (as in *inflate*)] *vt* 1 : to release air or gas from  2 : to reduce in size or importance (~ his ego with cutting remarks)  3 : to reduce (a price level) or cause (a volume of credit) to contract ~ *vi* 1 : to lose firmness through or as if through the escape of contained gas  *syn* see CONTRACT — **de·fla·tor** \-ˈflāt-ər\ *n*

**de·fla·tion** \di-ˈflā-shən, dē-\ *n* (1891)  **1** : an act or instance of deflating : the state of being deflated  **2** : a contraction in the volume of available money or credit that results in a decline of the general price level  **3** : the erosion of soil by the wind — **de·fla·tion·ary** \-shə-ˌner-ē\ *adj*

**de·flect** \di-ˈflekt\ *vb* [L *deflectere* to bend down, turn aside, fr. *de-* + *flectere* to bend] *vt* (1555) : to turn from a straight course or fixed direction : BEND ~ *vi* : to turn aside : DEVIATE — **de·flect·able** \-ˈflek-tə-bəl\ *adj* — **de·flec·tive** \-ˈflek-tiv\ *adj*

**de·flec·tion** \di-ˈflek-shən\ *n* (1605)  **1** : a turning aside or off course : DEVIATION  **2** : the departure of an indicator or pointer from the zero reading on the scale of an instrument

**de·flexed** \di-ˈflekst, dī-\ *adj* [L *deflexus,* pp. of *deflectere*] (1826) : turned abruptly downward (a ~ leaf)

**de·flo·ra·tion** \ˌdef-lə-ˈrā-shən, ˌdē-flə-\ *n* [ME *defloracioun,* fr. LL *defloration-, defloratio,* fr. *deflorare*] (15c) : rupture of the hymen

**de·flow·er** \(ˈ)dē-ˈflau̇(-ə)r\ *vt* [ME *deflouren,* fr. MF or LL; MF *deflorer,* fr. LL *deflorare,* fr. L *de-* + *flor-, flos* flower — more at BLOW] (14c)  **1** : to deprive of virginity : RAVISH  **2** : to take away the prime beauty of — **de·flow·er·er** *n*

**de·foam** \(ˈ)dē-ˈfom\ *vt* (1939) : to remove foam from : prevent the formation of foam in — **de·foam·er** *n*

**de·fog** \(ˈ)dē-ˈfȯg, -ˈfäg\ *vt* (1904) : to remove fog or condensed moisture from — **de·fog·ger** *n*

**de·fo·li·ant** \(ˈ)dē-ˈfō-lē-ənt\ *n* (1943) : a chemical spray or dust applied to plants in order to cause the leaves to drop off prematurely

**de·fo·li·ate** \ˌlē-ˌāt\ *vt* [LL *defoliatus,* pp. of *defoliare,* fr. L *de-* + *folium* leaf — more at BLADE] (1793) : to deprive of leaves esp. prematurely — **de·fo·li·a·tion** \ˌdē-ˌfō-lē-ˈā-shən\ *n* — **de·fo·li·a·tor** \(ˈ)dē-ˈfō-lē-ˌāt-ər\ *n*

**de·force** \(ˈ)dē-ˈfō(ə)rs, -ˈfȯ(ə)rs\ *vt* [ME *deforcen,* fr. MF *deforcier,* fr. *de-* + *force* to force] (15c)  **1** : to keep (as lands) by force from the rightful owner  **2** : to eject (a person) from possession by force — **de·force·ment** \ˈfȯr-smənt, -ˈfȯr-\ *n*

**de·for·cant** \di-ˈfor-skənt, -ˈfȯr-\ *n* [AF, fr. OF, prp. of *deforcier*] (15c) : one who deforces the rightful owner

**de·for·es·ta·tion** \(ˌ)dē-ˌfȯr-ə-ˈstā-shən, -ˌfär-\ *n* (1874) : the action or process of clearing of forests; *also* : the state of having been cleared of forests — **de·for·est** \(ˈ)dē-ˈfȯr-əst, -ˈfär-\ *vt*

**de·form** \di-ˈfo(ə)rm, dē-\ *vb* [ME *deformen,* fr. MF or L; MF *deformer,* fr. L *deformare,* fr. *de-* + *formare* to form, fr. *forma* form] *vt* (15c)  **1** : to spoil the form of  **2 a** : to spoil the looks of : DISFIGURE (a face ~ed by bitterness)  **b** : to make hideous or monstrous  **3** : to alter the shape of by stress ~ *vi* : to become misshapen or changed in shape  *syn* see DEFORM. DISTORT, CONTORT, WARP mean to mar or spoil by or as if by twisting. DEFORM may imply a change of shape through stress, injury, or some accident of growth. DISTORT and CONTORT both imply a wrenching from the natural, normal, or justly proportioned, but CONTORT suggests a more involved twisting and a more grotesque and painful result; WARP indicates physically an uneven shrinking that bends or twists out of a flat plane.

**de·for·mal·ize** \(ˈ)dē-ˈfȯr-mə-ˌlīz\ *vt* (1880) : to make less formal

**de·for·ma·tion** \ˌdē-fȯr-ˈmā-shən, ˌdef-ər-\ *n* (15c)  **1** : alteration of form or shape; *also* : the product of such alteration  **2** : the action of deforming : the state of being deformed  **3** : change for the worse — **de·for·ma·tion·al** \-shənəl, -shən-ᵊl\ *adj*

**de·for·ma·tive** \di-ˈfȯr-mət-iv, dē-\ *adj* (1641) : tending to deform

**de·formed** *adj* (15c) : distorted or unshapely in form : MISSHAPEN

**de·for·mi·ty** \di-ˈfȯr-mət-ē, dē-\ *n, pl* **-ties** [ME *deformite,* fr. MF *deformité,* fr. L *deformitat-, deformitas,* fr. *deformis* deformed, fr. *de-* + *forma* form] (15c)  **1** : the state of being deformed  **2 a** : a physical blemish or distortion : DISFIGUREMENT  **3** : a moral or aesthetic flaw or defect

**de·fraud** \di-ˈfrȯd\ *vt* [ME *defrauden,* fr. MF *defrauder,* fr. L *defraudare,* fr. *de-* + *fraudare* to cheat, fr. *fraud-, fraus* fraud] (14c) : to deprive of something by deception or fraud  *syn* see CHEAT — **de·fraud·er** *n*

**de·fray** \di-ˈfrā\ *vt* [MF *defrayer,* fr. *des- + frayer* to expend, fr. OF, fr. (assumed) OF *frai* expenditure, lit., damage by breaking, fr. L *fractum, fractus,* neut. of *fractus,* pp. of *frangere* to break — more at BREAK] (1543)  **1** : to provide for the payment of : PAY  *2 archaic* : to bear the expenses of — **de·fray·able** \-ˈfrā-ə-bəl\ *adj* — **de·fray·al** \-ˈfrā(-ə)l\ *n*

**de·frock** \(ˈ)dē-ˈfräk\ *vt* (1583) : UNFROCK

**de·frost** \di-ˈfrȯst, ˈdē-\ *vt* (1895)  **1** : to release from a frozen state (~ meat)  **2** : to free from ice (~ the refrigerator) ~ *vi* : to thaw out esp. from a deep-frozen state — **de·frost·er** *n*

**deft** \ˈdeft\ *adj* [ME *defte*] (15c) : marked by facility and skill  *syn* see DEXTEROUS — **deft·ly** *adv* — **deft·ness** \ˈdef(t)-nəs\ *n*

**de·funct** \di-ˈfəŋ(k)t\ *adj* [L *defunctus,* fr. pp. of *defungi* to finish, die, fr. *de-* + *fungi* to perform — more at FUNCTION] (1599) : having finished the course of life or existence (her ~ aunt's will) (the committee is now ~)  *syn* see DEAD

**de·fuse** \(ˈ)dē-ˈfyüz\ *vt* (1943)  **1** : to remove the fuse from (as a mine or bomb)  **2** : to make less harmful, potent, or tense : CALM (~ the crisis)

**de·fy** \di-ˈfī\ *vt* **de·fied; de·fy·ing** [ME *defyen* to renounce faith in, challenge, fr. MF *defier,* fr. *de-* + *fier* to entrust, fr. (assumed) VL *fidare,* alter. of L *fidere* to trust — more at BIDE] (14c)  **1** *archaic* : to challenge to combat  **2** : to challenge to do something considered impossible to combat  **3** : to confront with assured power of resistance : DISREGARD (~ public opinion)  **4** : to resist attempts at : WITHSTAND (the damage ~ classification)

**de·fy** \di-ˈfī, ˈdē-\ *n, pl* **defies** (1580) : CHALLENGE, DEFIANCE

**de·gage** \ˌdā-ˌgä-ˈzhā\ *adj* [F, fr. pp. of *dégager* to redeem a pledge, free, fr. OF *desgagier,* fr. *des- de-* + *gage* pledge — more at GAGE] (1696)  **1** : free of constraint : NONCHALANT  **2** : being free and easy (clothes with a ~ look)  **3** : extended with toe pointed in preparation for a ballet step

**de·gas** \(ˈ)dē-ˈgas\ *vt* (1920) : to remove gas from (~ an electron tube)

**De·gas** \də-ˈgä, ˌdā-ˌgä-\ , **(Hilaire Germain) Edgar** 1834-1917 — **de·gauss** \(ˈ)dē-ˈgau̇s\ *vt* [*de- + gauss,* alter. Karl F. Gauss] (ca. 1940)  **1** : to make (a steel ship) effectively nonmagnetic by means of electric coils carrying currents that neutralize the magnetism of the ship — **de·gauss·er** *n*

**de·mag·ne·tize** — **de·gauss·er** *n*

**de·gen·er·a·cy** \di-ˈjen-(ə-)rə-sē\ *n, pl* **-cies** (1664)  **1** : the state of being degenerate  **2** : the process of becoming degenerate  **3** : sexual perversion  **4** : the coding of an amino acid by more than one codon of the genetic code

**de·gen·er·ate** \di-ˈjen-(ə-)rət\ *adj* [ME *degeneratus,* fr. L *degeneratus,* pp. of *degenerare* to degenerate, fr. *de-* + *gener-, genus* race, kind — more at KIN] (15c)  **1 a** : having declined (as in nature, character, structure, or function) from an ancestral or former state  **b** : having sunk to a condition below that which is normal to a type; *esp* : having sunk to a lower and usu. peculiarly corrupt and vicious state  **c** : DEGRADED  **2** : being mathematically simpler (as by having a factor or constant equal to zero) than the typical case (the graph of a second degree equation yielding two intersecting lines is a ~ hyperbola)  **3** : characterized by degeneracy used esp. of physical characters that have been reduced or lost during the course of evolution : being subject to degeneracy — **de·gen·er·ate·ly** *adv* — **de·gen·er·ate·ness** *n*

**de·gen·er·ate** \di-ˈjen-ə-ˌrāt\ *vi* (1545)  **1** : to pass from a higher to a lower type or condition : DETERIORATE  **2** : to sink into a low intellectual or moral state  **3** : to decline in quality (his poetry gradually *degenerated* into jingles)  **4** : to decline from a condition or form characteristic of a species, race, or breed  **5** : to evolve or develop into a less autonomous or less functionally active form (*degenerated* into dependent parasites) (the digestive system *degenerated*) ~ *vt* : to cause to degenerate

**de·gen·er·a·tion** \di-ˌjen-(ə-)ˈrā-shən\ *n* (1555) : one that is degenerate  **a** : degraded from the normal moral standard  **b** : a sexual pervert  **c** : one showing signs of reversion to an earlier culture stage

**de·gen·er·a·tion** \di-ˌjen-ə-ˈrā-shən, dē-\ *n* (15c)  **1** : a lowering of effective power, vitality, or essential quality  **2** : passing from a higher to a lower type or condition  **3** : an embedded and worsened kind or state  **4** : decline  **5** : gradual deterioration of physical characters that represent the norm of earlier generations or forms  **6** : deterioration of a tissue or an organ in which its function is diminished or its structure is impaired  *syn* see DETERIORATION



# WEBSTER'S
## Ninth New
### Collegiate
#### Dictionary

Case 5:03-cv-04669-JW    Document 657-12    Filed 09/09/2006    Page 2 of 2

**688    libel • lichenous**

²libel *vb* -beled *or* -belled; -bel·ing *or* -bel·ling \-b(ə-)liŋ\ *vi* (1570) : to make libelous statements ~ *vt* : to make or publish a libel against — li·bel·er \-b(ə-)lər\ *n* — li·bel·ist \-b(ə-)ləst\ *n*

li·bel·ant *or* li·bel·lant \'li-bə-lənt\ *n* (1726) : one that institutes a suit by a libel

li·bel·ee *or* li·bel·lee \ˌlī-bə-'lē\ *n* (1856) : one against whom a libel has been filed in a court

li·bel·ous *or* li·bel·lous \'lī-b(ə-)ləs\ *adj* (1619) : constituting or including a libel : DEFAMATORY (a ~ statement)

Li·be·ra \'lē-bə-rə, 'lē-brə\, *n* [L., lit., deliver, imper. *of liberare* to liberate; fr. the first word of the responsory] (ca. 1903) : a Roman Catholic funeral responsory

¹liberal \'lib(-ə-)rəl\, *adj* [ME, fr. MF, fr. L *liberalis* suitable for a freeman, generous, fr. *liber* free; akin to OE *léodan* to grow, Gk *eleutheros* free] (14c)  1 a : of, relating to, or based on the liberal arts (~ education)  b *archaic* : of or befitting a man of free birth  2 a : GENEROUS, OPENHANDED (a ~ giver)  b : given or provided in a generous and openhanded way (a ~ meal)  c : AMPLE, FULL  3 *obs* : lacking moral restraint : LICENTIOUS  4 : not literal or strict : LOOSE (a ~ translation)  5 : BROAD-MINDED; *esp* : not bound by authoritarianism, orthodoxy, or traditional forms  6 a : of, favoring, or based upon the principles of liberalism  b *cap* : of or constituting a political party advocating or associated with the principles of political liberalism; *esp* : of or constituting a political party in the United Kingdom associated with ideals of individual esp. economic freedom, greater individual participation in government, and constitutional, political, and administrative reforms designed to secure these objectives — lib·er·al·ly \-ə-lē, -rə-lē\ *adv* — lib·er·al·ness *n*

**syn** LIBERAL, GENEROUS, BOUNTIFUL, MUNIFICENT mean giving freely and unstintingly. LIBERAL suggests openhandedness in the giver and largeness in the thing or amount given; GENEROUS stresses warmhearted readiness to give more than size or importance of the gift; BOUNTIFUL suggests lavish, unremitting giving or providing; MUNIFICENT suggests a scale of giving appropriate to lords or princes.

²liberal *n* (1816) : one who is liberal: as  a : one who is open-minded or not strict in the observance of orthodox, traditional or established forms or ways  b *cap* : a member or supporter of a Liberal political party  c : an advocate or adherent of liberalism esp. in individual rights

liberal arts *n pl* (14c)  1 : the medieval studies comprising the trivium and quadrivium  2 : the studies (as language, philosophy, history, literature, abstract science) in a college or university intended to provide chiefly general knowledge and to develop the general intellectual capacities (as reason and judgment) as opposed to professional or vocational skills

lib·er·al·ism \'lib(-ə-)rə-ˌliz-əm\, *n* (1819)  1 : the quality or state of being liberal  2 *often cap* : a movement in modern Protestantism emphasizing intellectual liberty and the spiritual and ethical content of Christianity  b : a theory in economics emphasizing individual freedom from restraint and usu. based on free competition, the self-regulating market, and the gold standard  c : a political philosophy based on belief in progress, the essential goodness of man, and the autonomy of the individual and standing for the protection of political and civil liberties  d *cap* : the principles and policies of a Liberal party — lib·er·al·ist \-rə-ləst\ *n or adj* — lib·er·al·is·tic \ˌlib(-ə-)rə-'lis-tik\ *adj*

lib·er·al·i·ty \ˌlib-ə-'ral-ət-ē\, *n, pl* -ties (14c) : the quality or state of being liberal; *also* : an instance of this

lib·er·al·ize \'lib(-ə)-rə-ˌlīz\, *vb* -ized; -iz·ing *vt* (1774) : to make liberal or more liberal ~ *vi* : to become liberal or more liberal — lib·er·al·i·za·tion \ˌlib(-ə)-rə-lə-'zā-shən\, *n* — lib·er·al·iz·er \'lib(-ə-)rə-ˌlī-zər\ *n*

lib·er·ate \'lib-ə-ˌrāt\, *vt* -at·ed; -at·ing [L *liberatus*, pp. of *liberare*, fr. *liber* free] (ca. 1623)  1 : to set at liberty : FREE; *specif* : to free (as a country) from domination by a foreign power  2 : to free from combination (~ the gas by adding acid)  3 : to take or take over illegally or unjustly (a ... barricade was constructed ... with material *liberated* from a nearby construction site —Thorne Dreyer) *syn* see FREE — lib·er·a·tor \-ˌrāt-ər\ *n*

lib·er·at·ed *adj* (1946) : freed from or opposed to traditional social and sexual attitudes or roles (a ~ woman) (a ~ marriage)

lib·er·a·tion \ˌlib-ə-'rā-shən\, *n* (15c)  1 : the act of liberating : the state of being liberated  2 : a movement seeking equal rights and status for a group (women's ~) — lib·er·a·tion·ist \-sh(ə-)nəst\, *n*

lib·er·tar·i·an \ˌlib-ər-'ter-ē-ən\, *n* (1789)  1 : an advocate of the doctrine of free will  2 : one who upholds the principles of absolute and unrestricted liberty esp. of thought and action — libertarian *adj* — lib·er·tar·i·an·ism \-ē-ə-ˌniz-əm\, *n*

lib·er·tin·age \'lib-ər-ˌtēn-ij\, *n* (1611) : LIBERTINISM

¹lib·er·tine \'lib-ər-ˌtēn\, *n* [ME *libertyn*, freedman, fr. L *libertinus*, fr. *libertus* freedman, fr. *libertus* freedman, fr. *liber* free] (1563)  1 : a freethinker esp. in religious matters — usu. used disparagingly  2 : a person who is unrestrained by convention or morality; *specif* : one leading a dissolute life

²libertine *adj* (1577)  1 : of, relating to, or characteristic of a libertine

lib·er·tin·ism \'lib-ər-ˌtē-ˌniz-əm, -tə-\, *n* (1611) : the quality or state of being libertine : the behavior of a libertine

lib·er·ty \'lib-ər-tē\, *n, pl* -ties [ME, fr. MF *liberté*, fr. L *libertas, libertas*, fr. *liber* free — more at LIBERAL] (14c)  1 : the quality or state of being free: as  a : the power to do as one pleases  b : freedom from physical restraint  c : freedom from arbitrary or despotic control  d : the positive enjoyment of various social, political, or economic rights and privileges  e : the power of choice  2 a : a right or immunity enjoyed by prescription or by grant : PRIVILEGE  b : permission esp. to go freely within specified limits  3 : an action going beyond normal limits: as  a : a breach of etiquette or propriety : FAMILIARITY  b : RISK, CHANCE (took foolish *liberties* with his health)  c : a violation of rules or a deviation from standard practice  d : a distortion of fact  4 : a short authorized absence from naval duty usu. for less than 48 hours  *syn* see FREEDOM  1 : FREE  2 : at leisure : UNOCCUPIED

liberty cap *n* (1803) : a close-fitting conical cap used as a symbol of liberty by the French revolutionists and in the U.S. before 1800

liberty pole *n* (1770) : a tall flagstaff surmounted by a liberty cap or the flag of a republic and set up as a symbol of liberty

li·bid·i·nal \lə-'bid-ᵊn-əl, -'bid-nᵊl\ *adj* (1922) : of or relating to the libido — li·bid·i·nal·ly \-ē\ *adv*

li·bid·i·nous \-ᵊn-əs, -'bid-nəs\ *adj* [ME, fr. MF *libidineus*, fr. L *libidinosus*, fr. *libidin-, libido*] (15c)  1 : having or marked by lustful desire : LASCIVIOUS  2 : LIBIDINAL — li·bid·i·nous·ly *adv* — li·bid·i·nous·ness *n*

li·bi·do \lə-'bēd-(ˌ)ō, -'bīd-; 'lib-ə-ˌdō\, *n, pl* -dos [NL *libidin-, libido*, fr. L *libido* desire, lust, fr. *libēre* to please — more at LOVE] (1909)  1 : emotional or psychic energy that in psychoanalytic theory is derived from primitive biological urges and that is usu. goal-directed  2 : sexual drive

Li·bra \'lē-brə, *or* 1 & 2a 'lē-brə *or* 'lī-brə\, *n, for* 1b -brə *or* 'lēv-rə\, *n* [ME, fr. L (gen. *Librae*), lit., scales, pound]  1 *cap*  a : a southern zodiacal constellation between Virgo and Scorpio represented by a pair of scales  b (1) : the 7th sign of the zodiac in astrology — see ZODIAC table (2) : one born under that sign  2 *n pl* libræ \'lī-ˌbrē, 'lē-ˌbrī, [L] : an ancient Roman unit of weight equal to 327.45 grams  3 [Sp & Pg, fr. L] : any of various Spanish, Portuguese, Colombian, or Venezuelan units of weight

Li·bran \'lē-brən, 'lī-\ *n* (1967) : LIBRA 1b(2)

li·brar·i·an \lī-'brer-ē-ən\, *n* (1713) : a specialist in the care or management of a library — li·brar·i·an·ship \-ˌship\ *n*

library \'lī-ˌbrer-ē; 'lī-brə-rē, -brē\ *n, pl* -brar·ies [ME, fr. MF *librairie*, fr. L *librarium*, fr. L, neut. of *librarius* of books, fr. *libr-, liber* book — more at LEAF] (14c)  1 *a* : a place in which literary, musical, artistic, or reference materials (as books, manuscripts, recordings, or films) are kept for use but not for sale  b : a collection of such materials  2 *a* : a collection resembling or suggesting a library (a ~ of computer programs) (wine ~)  b : MORGUE  3 : a series of related books issued by a publisher  *b* : a collection of publications on the same subject

**usage** While the pronunciation \'lī-ˌbrer-ē\ is the most frequent variant in the U.S., the other variants are not uncommon. The contraction \'lī-brē\ and the dissimilated form \'lī-ˌber-ē\ result from the relative difficulty of repeating \r\ in successive syllables and are heard from educated speakers, including college presidents and professors, as well as with somewhat greater frequency from less educated speakers.

library paste *n* (1953) : a thick white adhesive made from starch

library science *n* (1902) : the study or the principles and practices of library care and administration

li·bra·tion \lī-'brā-shən\ *n* [L *libration-, libratio*, fr. *libratus*, pp. of *librare* to balance, fr. *libra* scales] (1669) : an oscillation in the apparent aspect of a secondary body (as a planet or a satellite) as seen from the primary object around which it revolves — li·bra·tion·al \-shnəl, -shən-ᵊl\ *adj* — li·bra·to·ry \'lī-brə-ˌtōr-ē, -ˌtȯr-\ *adj*

li·bret·tist \lə-'bret-əst\ *n* (1862) : the writer of a libretto

li·bret·to \lə-'bret-(ˌ)ō\, *n, pl* -tos *or* -ti \-(ˌ)ē\ [It, dim. of *libro* book, fr. L *libr-, liber*] (1742)  1 : the text of a work (as an opera) for the musical theater  2 : the book containing a libretto

Lib·ri·um \'lib-rē-əm\, *trademark* — used for a preparation of chlordiazepoxide

Lib·y·an \'lib-ē-ən\, *n* (1607)  1 : a native or inhabitant of Libya  2 : the Berber language of ancient No. Africa — Libyan *adj*

lice *pl of* LOUSE

¹li·cense *or* li·cence \'līs-ᵊn(t)s\, *n* [ME, fr. MF *licence*, fr. L *licentia*, fr. *licent-, licens*, prp. of *licēre* to be permitted; akin to Latvian *līgt* to come to terms] (14c)  1 a : permission to act  b : freedom of action  2 a : a permission granted by competent authority to engage in a business or occupation or in an activity otherwise unlawful  b : a document, plate, or tag evidencing a license granted  3 a : freedom that allows or is used with irresponsibility  b : disregard for rules of personal conduct : LICENTIOUSNESS  4 : deviation from fact, form, or rule by an artist or writer for the sake of the effect gained  *syn* see FREEDOM

²license *also* licence *vt* -censed; -cens·ing (15c)  1 : to issue a license to  2 : to permit or authorize esp. by formal license — li·cens·able \-ᵊn(t)-sə-bəl\ *adj* — li·cens·er \-sər, *or* li·cens·or \-sər, ˌlīs-ᵊn-'sō(ə)r\ *n*

licensed practical nurse *n* (1951) : a person who has undergone training and obtained a license (as from a state) conferring authorization to provide routine care for the sick

li·cens·ee \ˌlīs-ᵊn-'sē\, *n* (1864) : one that is licensed

license plate *n* (1926) : a plate or tag (as of metal) attesting that a license has been secured and usu. bearing a registration number

li·cen·sure \'līs-ᵊn-shər, -ˌshü(ə)r\ *n* (ca. 1846) : the granting of a license esp. to practice a profession

li·cen·te \lə-'sent-ē\, *n, pl* licente *or* li·cen·ti \-ē\ [native name in Lesotho] (1966) — see *loti* at MONEY table

li·cen·ti·ate \lī-'sen-chē-ət, -ə\, *n, pl* in *sense 2* \-ə-ˌ\ [ML *licentiatus*, fr. pp. of *licentiare* to allow, fr. L *licentia*] (14c)  1 : one who has a license granted esp. by a university to practice a profession  2 : an academic degree ranking below that of doctor given by some European universities

li·cen·tious \lī-'sen-chəs\, *adj* [L *licentiosus*, fr. *licentia*] (1535)  1 : lacking legal or moral restraints; *esp* : disregarding sexual restraints  2 : marked by disregard for strict rules of correctness — li·cen·tious·ly *adv* — li·cen·tious·ness *n*

li·chee *var of* LITCHI

lichen \'lī-kən, *Brit also* 'lich-ən\, *n* [L, fr. Gk *leichēn, lichēn*; akin to Gk *leichein* to lick] (1601)  1 : any of numerous complex thallophytic plants (group Lichenes) made up of an alga and a fungus growing in symbiotic association on a solid surface (as a rock)  2 : any of several skin diseases characterized by a popular eruption — lichened *adj* — li·chen·ous \-kə-nəs\ *adj*



lichen 1