1  Teresa M. Corbin (SBN 132360)
   Denise M. De Mory (SBN 168076)
2  Jaclyn C. Fink (SBN 217913)
   HOWREY LLP
3  525 Market Street, Suite 3600
   San Francisco, California 94105
4  Telephone: (415) 848-4900
   Facsimile: (415) 848-4999
5
   Attorneys for Plaintiff SYNOPSYS, INC.
6  and for Defendants AEROFLEX INCORPORATED,
   AMI SEMICONDUCTOR, INC., MATROX
7  ELECTRONIC SYSTEMS, LTD., MATROX
   GRAPHICS, INC., MATROX INTERNATIONAL
8  CORP., MATROX TECH, INC., and
   AEROFLEX COLORADO SPRINGS, INC.
9
10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13

14  RICOH COMPANY, LTD.,              Case No. C03-04669 MJJ (EMC)

            Plaintiff,                Case No. C03-02289 MJJ (EMC)
15
         vs.                          OPPOSITION TO RICOH'S LOCAL RULE 6-3
16                                    MOTION TO ENLARGE TIME REGARDING
    AEROFLEX INCORPORATED, AMI        THE MOTION FOR RULE 11 SANCTIONS
17  SEMICONDUCTOR, INC., MATROX
    ELECTRONIC SYSTEMS LTD., MATROX
18  GRAPHICS INC., MATROX
    INTERNATIONAL CORP., MATROX TECH,
19  INC., AND AEROFLEX COLORADO
    SPRINGS, INC.
20
            Defendants.
21
    SYNOPSYS, INC.,
22
            Plaintiff,
23
         vs.
24
    RICOH COMPANY, LTD.,
25
            Defendant.
26

27

28

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
OPP TO RICOH'S LOCAL RULE 6-3 MOTION TO ENLARGE
TIME REGARDING THE MOTION FOR RULE 11 SANCTIONS
DM_US\8389923.v1

1    Ricoh's motion to extend time should be denied. Ricoh has had more than ample time to

2    respond to Defendants' ripe Motion for Rule 11 sanctions.[1] Ricoh's argument that its trial preparation

3    should trump what is a very serious and ripe dispute that may itself moot the need for a trial is not well

4    taken. Rather than dismiss this case or appeal or seek clarification of the Court's Claim Construction

5    Order, Ricoh and its counsel have dragged Defendants through a year of extremely expensive and

6    burdensome litigation, demanded the production of 12 million pages of documents, filed numerous

7    motions, and taken more than 240 hours of depositions, only for Defendants to discover that counsel's

8    sole theory of infringement in this one patent, one independent claim, literal infringement case is one

9    that has already been rejected by this Court. Ricoh's motion to extend time demonstrates that Ricoh

10    has no non-frivolous substantive response to Defendants' Rule 11 Motion. The time for Ricoh and its

11    counsel to respond to this Motion is now, not after many more months of additional party and judicial

12    resources are wasted.

13    The Rule 11 Motion is based on counsel's continued assertion in signed pleadings that

14    Defendants infringe the '432 patent. *See* Case 03-4669 Docket No. 664 (Rule 11 Motion) at 11:18-26.

15    Rule 11 sanctions are appropriate because Ricoh's and its counsel's continued assertion of

16    infringement is premised on an infringement theory that Ricoh and its counsel know contradicts the

17    Court's Claim Construction Order. Ricoh argues that the Rule 11 Motion is procedurally flawed and

18    should be postponed indefinitely because counsel cannot be sanctioned for relying on the "inadequate

19    opinions and conclusions of its experts." Ricoh, however, cannot hide behind its expert. Ricoh's and

20    its counsel's instructions to its expert and reliance on its expert are not objectively reasonable. Instead

21    of relying on its current expert witness on infringement Ricoh's counsel hired a special expert to opine

22    on a single infringement issue, which as explained in the Rule 11 Motion, evidences a consciousness of

23    guilt. *See* Rule 11 Motion at 4-5; 10-11. Moreover, counsel instructed the specially hired expert on

24    what to do. It is Ricoh's and Ricoh's counsel's instructions to its specially hired expert as well as its

25

26    [1] The Rule 11 Motion was served on Ricoh on August 19, 2006. Ricoh's opposition is due on September 26. Thus, Ricoh
will have had five weeks to respond to the Motion. Moreover, that the Rule 11 Motion relies on facts that are the basis of a

27    pending summary judgment motion is irrelevant. Certainly, the same Rule 11 motion could have been filed without filing
the summary judgment motion, and thus, it is not premised on the summary judgment motion being granted.

28

1   continued assertion of infringement in various pleadings, including Ricoh's opposition to Defendants'

2   Motion for Summary Judgment of Noninfringement Number 1 (RTL), signed by counsel and filed

3   with the Court that give rise to the Rule 11 Motion.  *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1004 (10th

4   Cir. 1993) (reliance on expert opinion must be reasonable).

5          The issue presented in the Rule 11 Motion is whether Ricoh has a good faith basis to assert that

6   the Defendants infringe the patent.  Specifically, the question is whether this is a good faith basis for

7   the Ricoh's assertion that the Customer Defendant inputs fall outside the scope of the inputs

8   specifically disclaimed by the patentee during patent prosecution.  The Court has already and quite

9   clearly determined the scope of the disclaimer in its Claim Construction Order.  To determine the

10  scope of the disclaimer, the Court examined the prosecution history and the teachings of the Darringer

11  patent "to examine how closely it reads on" the '432 patent.  Exhibit 1 (Claim Construction Order

12  ("CC Order") at 12:4-5).  The Court determined that based on the teachings of the Darringer patent and

13  the public record for the '432 patent that:

14          (1)  Darringer included an explicit definition of RTL[2] that "the subsequent translation or

15               transformation steps in [the Darringer patent] do not alter."  Exhibit 1 (CC Order at 12:5-7).

16          (2)  "The '432's public record fails to provide any support for Ricoh's distinction between

17               'structural' and 'functional' RTL-type input systems."  Exhibit 1 (CC Order at 12:9-12).

18          (3)  "[T]he prosecution history indicates that *the patentee disclaimed all register-transfer level*

19               *descriptions*."  Exhibit 1 (CC Order at 12:14-15) (emphasis added).

20  Accordingly, the Court construed "architecture independent actions and conditions" to exclude RTL as

21  taught in Darringer.

22          Notwithstanding the clarity of the Court's order, Ricoh did not dismiss its case, seek

23  reconsideration, or appeal the Court's order.  Instead, Ricoh and its counsel hired an expert who is

24  completely unfamiliar with the requirements of Design Compiler to testify solely on the issue of

25

26  [2] As set forth in Defendants' Summary Judgment Motion 1 (Docket No. 568), an RTL description was explicitly defined as
    including a specification of inputs, outputs, latches (registers), and as well as, for each clock cycle, how the values of the
27  outputs and latches (registers) are set based on the values of the inputs and previous values of the latches (registers).
    Ricoh's expert report does not address this issue.  *See* Exhibit 3 at 13-16.

28

1    "architecture independent actions and conditions."[3]  Ricoh's counsel then instructed that expert to

2    examine teachings of the Darringer patent and the public record to determine the meaning of "RTL as

3    taught in Darringer," even though the Court already fully considered and ruled on the teachings of

4    Darringer as well as the scope of the disclaimer and concluded that the patentee disclaimed all register-

5    transfer level descriptions.[4]  Counsel did not ask the specially hired expert *to form an opinion about*

6    *whether or not the inputs were register-transfer level description.*[5]  Indeed, Dr. Papaefthymiou

7    testified that if the Court already examined the teachings of Darringer and determined that the

8    disclaimer excluded all register-transfer level descriptions "It's a completely separate question" than

9    what is addressed in his report.  Exhibit 2 at 124:18-125:3.  Put simply, because of Ricoh's counsel's

10   instructions and the premise of Dr. Papaefthymiou's expert report, Ricoh and its counsel are

11   deliberately proceeding in this litigation without any basis for the contention that the Defendant inputs

12   fall outside of the scope of the subject matter expressly disclaimed by the patentee.[6]

13        Indeed, Ricoh's specially hired expert based his opinions that the Customer Defendant inputs

14   (of which he was never provided copies but only viewed small, counsel-selected segments of a handful

15   of the 350+ designs at issue on WebEx calls – *see* Exhibit 2 at 66:17-22; 68:2-7; 191:13-192:20;

---

[3] On August 11, 2006, Dr. Papaefthymiou testified he has never used Design Compiler; has no idea what inputs Design Compiler required; had not seen a single Customer Defendant design 11 days prior to his deposition; had never seen the HDL Operators Search Report that formed the basis for his opinion that evidenced all the actions and conditions; had never "read" any of the Customer Defendant depositions; admits that he has no opinion if the Court intended to exclude all RTL; and concedes that his methodology does not even work if applied to the relevant inquiry.  Exhibit 2 at 18:23-19:5, 66:17-22, 75:6-24; 99:22-100:15, 124:18-125:3, 171:14-172:3, 175:8-22; 180:23-181:15.

[4] Exhibit 3 (Report at 2:15:18 ("This report also sets forth my opinion that these architecture independent inputs are not the type of "Register-Transfer Level (RTL)" formatted inputs specifications taught by the Darringer Patent (U.S. Patent No. 4,703,435) that was considered by the Court during claim construction); Exhibit 2 at 126:5-127:8 ("I have offered an opinion *independently of the court construction* about the nature of the inputs of the systems that the Darringer patent describes . . . ") (emphasis added).

[5] Dr. Papaefthymiou also testified that he "wasn't asked to look into the specific issue raised" on page 12, lines 9-12 as set forth in point (2) above.  Exhibit 2 at 118:10-21.  Dr. Papaefthymiou confirmed that he did not offer an opinion on whether the inputs were function or structural RTL or RTL at all.  *Id*. at 44:4-22.  And, Dr. Papaefthymiou acknowledges that of the exclusion of all RTL in the Court's claim construction order is inconsistent with his opinion:  "You did point out something which may be viewed as an inconsistency on line 15.  But, again, there needs to be a basis, and that basis is what you see between 16 and 19, between line 16 and 19.  That was the basis for the report."  *Id.* at 126:5-16.

[6] Ricoh's technical expert on all issues other than "architecture independent actions and conditions" agrees with Defendants, and as a long-time ASIC designer and user of Design Compiler, fully understands that the Defendants inputs are RTL.  *See* Rule 11 Motion at 4-5; 10-11.16-17.

1  Exhibit 3 at Appendix B (list of materials considered)) are not "RTL as taught in Darringer" because

2  his reading of the Darringer patent is that:

3      (1) "[T]he Darringer Patent uses the term *'RTL' in the sense of the older (then-prevalent)*

4      *structural RTL. . .*"  Exhibit 3 (Report at 13:6-8); and

5      (2) "[T]he requirement in the Darringer Patent that *the inputs undergo a simple translati*on of

6      the specification into equivalent AND/OR logic."  Exhibit 3 (Report at 13:19-14:1; 15:7-9).

7  However, as described above on page 2, lines 13 through 20, the Court already considered the

8  Darringer patent and the public record and expressly rejected both of these theories, concluding instead

9  that the patentee disclaimed all RTL.   Exhibit 1 (CC Order at 11-12).   Because Ricoh's counsel did

10 not ask its expert to consider this question, Ricoh and its counsel have no good faith basis for

11 continuing with this suit, notwithstanding Ricoh's substantial efforts to create confusion here, in their

12 opposition to Defendants' motion for summary judgment, and no doubt, in their to-be-filed opposition

13 to Defendant's Rule 11 Motion.

14     Because Ricoh has no objective good faith basis on which to proceed, it wants to delay

15 consideration of this motion indefinitely.  The Court should reject this request.  Defendants' Rule 11

16 Motion is not procedurally flawed.  Moreover, it is not brought for an improper purpose, but rather for

17 the salutary purpose of ending this litigation and recovering the costs of defending this case after the

18 Court's Claim Construction Order.  It is a procedurally and substantively proper motion that addresses

19 very serious issues of misconduct on the part of Ricoh and/or its counsel, and seeks to avoid significant

20 additional wasted resources (such as trial or trial preparation).  If Ricoh or its counsel sought to have

21 the Court's Claim Construction Order reconsidered, clarified[7] or evaluated on appeal, it should have

22 taken steps to do so.  It is both professionally irresponsible and sanctionable conduct to proceed with

23

24 ───────────────
   [7] Read in the light most favorable to Ricoh and its counsel, Dr. Papaefthymiou's opinion is a further claim construction of
25 the Court's Claim Construction Order, or more concisely, an expert opinion on claim construction.  During claim
   construction, however, Ricoh argued vociferously that the Court should not consider expert testimony in interpreting the
26 '432 claims. Docket No. 236 at 2:5-17, 8:12-20.  Thus, even under this most favorable reading of Ricoh's position, Rule 11
   sanctions are appropriate Ricoh's reliance on expert opinion regarding claim construction as its sole basis for continuing
27 this suit is entirely contrary to the position it successfully advocated earlier in these proceedings.  *See Helfand v. Gerson*,
   105 F.3d 530, 534 (9th Cir. 1997) ("Judicial estoppel . . .precludes a party from gaining an advantage by taking one
28 position, and then seeking a second advantage by taking an incompatible position.").

HOWREY LLP

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)                    -4-
OPP TO RICOH'S LOCAL RULE 6-3 MOTION TO ENLARGE
TIME REGARDING THE MOTION FOR RULE 11 SANCTIONS
DM_US\8389923.v1

1  this litigation in view of the fact that the only basis on which Ricoh can maintain this litigation was to

2  instruct a specially hired expert to provide an opinion that ignores, is contrary to, or reconsiders

3  without leave, the Court's Claim Construction Order.

4        Despite Ricoh's argument, a response to the Rule 11 Motion would not require delving into

5  attorney-client privileged or work product information of Ricoh and its counsel.  Instead, the inquiry is

6  solely an objective one:    Did Ricoh and its counsel have an objectively reasonable basis on which to

7  proceed?  Whether Ricoh's and its counsel's decision to proceed was made in good or bad faith or due

8  to incompetence is irrelevant.  *See Cabell v. Petty*, 810 F.2d 463, 466 (4th Cir. 1987) ("Rule 11 does

9  not prohibit merely intentional misconduct"); *see also Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir.

10 1994 ("Counsel can no longer avoid the sting of Rule 11 sanctions by operating under the guise of a

11 pure heart and an empty head.").

12       The seriousness of the issues here outweighs any alleged prejudice to Ricoh, including the need

13 to move some alleged meetings whose nature remains undisclosed.  Rather than push these issues out

14 indefinitely, it is much more appropriate in view of all the resources that have already been wasted to

15 date to have the Rule 11 Motion considered as quickly as possible.  Notably, the parties do not need a

16 ruling from the Court on summary judgment to determine how to respond to the Rule 11 Motion.

17 Ricoh and its counsel can and should explain now, before a ruling on summary judgment, how its

18 actions were objectively reasonable – if they are able to do so.

19       For all of these reasons, Defendants request that the Court deny Ricoh's Motion to Enlarge

20 Time.

21 Dated:  September 19, 2006          Respectfully submitted,

22                                     HOWREY LLP

23

24                          By:    */s/Denise M. De Mory*
                                   Denise M. De Mory
25                                 Attorney for Defendants

26

27

28

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)      -5-
OPP TO RICOH'S LOCAL RULE 6-3 MOTION TO ENLARGE
TIME REGARDING THE MOTION FOR RULE 11 SANCTIONS
DM_US\8389923.v1



**FILED**

APR 0 7 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SYNOPSYS, INC.,

           Plaintiff,

    v.

RICOH CO., LTD.,

           Defendant.

_____/

RICOH CO., LTD.,

           Plaintiff,

    v.

AEROFLEX, INC., ET AL.,

           Defendants.

_____/

No. C 03-2289 MJJ
No. C 03-4669

**CLAIM CONSTRUCTION ORDER**

**INTRODUCTION**

Before the Court is the parties' proposed construction of disputed terms contained in Plaintiff Ricoh Company, Ltd.'s ("Ricoh") patent. The suit involves an invention directed to a process for the design of application specific integrated circuits ("ASICs").

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FACTUAL BACKGROUND**

This case concerns the alleged infringement of U.S. Patent Number 4,922,432 ("the '432 patent") entitled "Knowledge Based Method and Apparatus for Designing Integrated Circuits Using Functional Specifications." The issue before the Court is the construction of ten disputed terms contained in the patent.

The '432 patent, owned by Ricoh, claims methods for using a CAD design system to design an ASIC. "An [ASIC] is an integrated circuit chip designed to perform a specific function, as distinguished from standard, general purpose integrated circuit chips, such as microprocessors, memory chips, etc." '432 patent, col. 1:13-17. According to the '432 patent, the ASIC design processes of prior art require the designer to consider the required objectives and tasks of the desired ASIC and define the structural level design specification for that ASIC. This structural level design specification must define the various hardware components and their required interconnections, as well as a system controller for synchronizing the operations of those hardware components. This process requires an ASIC designer to have an "extensive and all encompassing knowledge" of these hardware components and their required interconnections. '432 patent, col. 1:28-31. There are only a small number of very large scale integration technology (VLSI) designers who possess the highly specialized skills needed to create structural level integrated circuit hardware descriptions.

The stated goal of the '432 patent's claimed invention is to enable the non-expert designer to design ASICs. The '432 patent claims a method for enabling the use of higher level input descriptions by allowing designers to describe ASIC specifications at a functional level. This functional level description is done without specification of structure, implementing technology, or architecture. This process involves taking architecture independent specifications and selecting previously designed circuit components or structure used as building blocks for implementing an ASIC. The process selects the optimum hardware cells to be included in the desired ASIC. Following this method, a user who does not have expertise in VLSI design can write architecture independent ASIC descriptions that ultimately can result in the automatic selection of hardware cells to be used in the ASIC.

Claim 13 of the '432 Patent is at issue in this proceeding. Independent claim 13 describes a

1  process in which a designer describes an ASIC through an input specification using architecture

2  independent descriptions. These architecture independent descriptions are used to select architecture

3  dependent hardware cells. This process uses a library of definitions of the architecture independent,

4  functional descriptions, a library of available hardware cells, and a expert system knowledge base.

5  The expert system knowledge base contains a set of "rules" that embody the knowledge of VLSI

6  experts. In order for each desired function to be performed by the ASIC, one of the definitions from

7  the library of definitions is specified. The rules in the knowledge base are then applied to select

8  architecture dependent hardware cells from the library of available hardware cells.

9  **LEGAL STANDARD**

10      The construction of a patent claim is a matter of law for the Court. *Markman v. Westview*

11  *Instruments, Inc.*, 517 U.S. 370, 372 (1996). The Court must conduct an independent analysis of the

12  disputed claim terms. It is insufficient for the Court to simply choose between the constructions

13  proposed by the adversarial parties. *Exxon Chem. Patents v. Lubrizol Corp.*, 64 F.3d 1553, 1555

14  (Fed. Cir. 1995). To determine the meaning of a patent claim, the Court considers three sources: the

15  claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52

16  F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd, Markman*, 517 U.S. 370.

17      The Court looks first to the words of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90

18  F.3d 1576, 1582 (Fed. Cir. 1996). "Although words in a claim are generally given their ordinary and

19  customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner

20  other than their ordinary meaning, as long as the special definition of the term is clearly stated in the

21  patent specification or file history." *Id.* (citation omitted). "A technical term used in a patent

22  document is interpreted as having the meaning that it would be given by persons experienced in the

23  field of the invention, unless it is apparent from the patent and the prosecution history that the

24  inventor used the term with a different meaning." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78

25  F.3d 1575, 1578 (Fed. Cir. 1996). The doctrine of claim differentiation creates the presumption that

26  limitations stated in dependent claims are not to be read into the independent claim from which they

27  depend because different language used in separate claims is presumed to indicate that the claims

28  have different meanings and scope. *Tandon Corp. v. U.S. International Trade Com.*, 831 F.2d 1017,

3

United States District Court
For the Northern District of California

1    1023 (Fed. Cir. 1987).

2        Second, it is always necessary to review the specification to determine whether the inventor

3    has used any terms in a manner inconsistent with their ordinary meaning. *Vitronics*, 90 F.3d at 1582.

4    The specification can act as a dictionary when it expressly or impliedly defines terms used in the

5    claims. *Id.* Because the specification must contain a description of the invention that is clear and

6    complete enough to enable those of ordinary skill in the art to make and use it, the specification is

7    the single best guide to the meaning of a disputed term. *Id.* The written description part of the

8    specification itself does not delimit the right to exclude, however; that is the function and purpose of

9    claims. *Markman*, 52 F.3d at 980.

10        Third, the court may consider the prosecution history. *Vitronics*, 90 F.3d at 1582. "Although

11    the prosecution history can and should be used to understand the language used in the claims, it too

12    cannot enlarge, diminish, or vary the limitations in the claims." *Markman*, 52 F.3d at 980 (internal

13    quotation marks deleted) (citations omitted). However, a concession made or position taken to

14    establish patentability in view of prior art on which the examiner has relied, is a substantive position

15    on the technology for which a patent is sought, and will generally generate an estoppel. In contrast,

16    when claim changes or arguments are made in order to more particularly point out the applicant's

17    invention, the purpose is to impart precision, not to overcome prior art. Such prosecution is not

18    presumed to raise an estoppel, but is reviewed on its facts, with the guidance of precedent. *Pall*

19    *Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1995) (citations omitted).

20        Ordinarily, the Court should not rely on expert testimony to assist in claim construction,

21    because the public is entitled to rely on the public record of the patentee's claim (as contained in the

22    patent claim, the specification, and the prosecution history) to ascertain the scope of the claimed

23    invention. *Vitronics*, 90 F.3d at 1583. "[W]here the public record unambiguously describes the

24    scope of the patented invention, reliance on any extrinsic evidence is improper." *Id.* Extrinsic

25    evidence should be used only if needed to assist in determining the meaning or scope of technical

26    terms in the claims, and may not be used to vary or contradict the terms of the claims. *Id.* (quoting

27    *Pall Corp.*, 66 F.3d at 1216); *Markman*, 52 F.3d at 981.

28        The Court is free to consult technical treatises and dictionaries at any time, however, in order

4

United States District Court
For the Northern District of California

1  to better understand the underlying technology and may also rely on dictionary definitions when

2  construing claim terms, so long as the dictionary definition does not contradict any definition found

3  in or ascertained by a reading of the patent documents. *Vitronics*, 90 F.3d at 1584 n.6. The Court

4  also has the discretion to admit and rely upon prior art proffered by one of the parties, whether or not

5  cited in the specification or the file history, but only when the meaning of the disputed terms cannot

6  be ascertained from a careful reading of the public record. *Id.* at 1584. Referring to prior art may

7  make it unnecessary to rely on expert testimony, because prior art may be indicative of what all those

8  skilled in the art generally believe a certain term means. *Id.* Unlike expert testimony, these sources

9  are accessible to the public prior to litigation to aid in determining the scope of an invention. *Id.*

10         Disputed claim terms are construed consistently across all claims within a patent. *Southwall*

11  *Techs., Inc. V. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995). Where patents-in-suit share

12  the same disclosures, common terms are construed consistently across all claims in both patents.

13  *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1311 (Fed. Cir. 2001) *(overruled on other*

14  *grounds)*.

15         "The subjective intent of the inventor when he used a particular term is of little or no

16  probative weight in determining the scope of a claim (except as documented in the prosecution

17  history)." *Markman*, 50 F.3d at 985 (citation omitted). "Rather the focus is on the objective test of

18  what one of ordinary skill in the art at the time of the invention would have understood the term to

19  mean." *Id.* at 986.

20                              **DISPUTED CLAIM TERMS**

21         The following is a list of ten terms identified by the parties in the October 21, 2004 Joint

22  Submission of Terms, Phrases, and Clauses for Claims Construction:

23  **1) A computer-aided design process for designing**

24  **2) architecture independent actions and conditions**

25  **3) a set of definitions of architecture independent actions and conditions**

26  **4) describing . . . a series of architecture independent actions and conditions**

27  **5) expert system knowledge base**

28  **6) a set of cell selection rules**

5

1    7) selecting from said stored data for each of the specified definitions a corresponding

2    integrated circuit hardware cell

3    8) said step of selecting a hardware cell comprising applying to the specified definition of the

4    action or condition to be performed

5    9) specifying for each described action and condition of the series one of said stored definitions

6    10) a netlist defining the hardware cells which are needed to perform the desired function of

7    the integrated circuit

8                                         ANALYSIS

9    **A.    *A computer-aided design process for designing***

10          Ricoh contends that the term means "during manufacture of a desired application specific

11   integrated circuit (ASIC) chip . . . a process of designing the desired ASIC using a computer."

12   Aeroflex Inc. and Synopsys, Inc. ("Aeroflex") state that the term means "a process that uses a

13   computer for designing, as distinguished from a computer-aided manufacturing process, which uses a

14   computer to direct and control the manufacturing process." In essence, the parties' fundamental

15   disagreement revolves around whether the computer-aided design process described in claim 13 also

16   encompasses the ASIC manufacturing process.

17          Ricoh bases it proposed construction on the text of the patent specification. Specifically,

18   Ricoh directs the Court to language in the specification that states that "the present invention, for the

19   first time, opens the possibility for *the design and production* of ASICs by designers, engineers and

20   technicians who may not possess the specialized expert knowledge of a highly skilled VLSI design

21   engineer." '432 patent, col. 2:15-20 (emphasis added). Ricoh also emphasizes that the present

22   invention produces a "physical chip layout level description [that] provides the mask data needed for

23   fabricating the chip." '432 patent, col. 1:42-44; *see also* '432 patent, col. 3:68 - 4:4 ("FIG. 1c

24   illustrates a physical layout level representation of an integrated circuit design, which provides the

25   detailed mask data necessary to actually manufacture the devices and conductors which together

26   comprise integrated circuit.").

27          Aeroflex argues that Ricoh's proposed construction is contrary to the '432 patent's claims

28

                                             6

United States District Court

For the Northern District of California

1    and specifications.[1]  Specifically, Aeroflex focuses on the claim language that provides that the

2    invention is a "computer-aided design process for designing . . . ."  '432 patent, col. 16:34.  Aeroflex

3    also directs the Court to specification language that states the invention "relates to the design of

4    integrated circuits, and more particularly relates to a computer-aided method . . . for designing

5    integrated circuits."[2]  '432 patent, col. 1:9-12.

6          Ricoh's proposed definition is problematic because it clearly attempts to blur the line

7    between the process of designing integrated circuits and the process of manufacturing integrated

8    circuits.  Nothing in the claim language supports Ricoh's attempt to broaden the claims to include a

9    manufacturing process for a desired ASIC.  Rather, the claim language describes a "computer-aided

10   design process for designing an [ASIC] . . . ."  '432 patent, col. 16:34-35.  Likewise, the specification

11   consistently describes a design, rather than a manufacturing, process.  In fact, the term "manufacture"

12   does not appear in the claim or specification language.[3]  While the "netlist" may be required to

13   "produce the particular [ASIC]," *see* '432 patent, col. 2:44-49, that does not compel the conclusion

14   that the '432 patent's design process is inherently a part of the manufacturing process of the actual

15   ASIC chips.   Given the Court's "focus . . . on the objective test of what one of ordinary skill in the

16   art at the time of the invention would have understood the term to mean," *Markman*, 50 F.3d at 985,

17   the Court finds that the "computer-aided design process" described in claim 13 does not include a

18

19

20   _____

21   [1]Aeroflex also argues that Ricoh's proposed construction is contrary to statements made in the
     '432 patent's file history. Specifically, the April 1989 Amendment provides: "The present invention is
22   a computer-aided design . . . method whereby the use can design application specific integrated circuits
     . . . ." (April 1989 Amendment at 8).

23   [2]Aeroflex also argues that its proposed construction is more consistent with the '432 patent's
     title: "Knowledge Based Method and Apparatus For *Designing* Integrated Circuits Using Functional
24   Specifications" (emphasis added).

25   [3]In its reply, Ricoh focuses solely on the specification language that states "the present invention,
     for the first time, opens the possibility for the design *and production* of ASICs by designers, engineers
26   and technicians who may not possess the specialized expert knowledge of a highly skilled VLSI design
     engineer." '432 patent, col. 2:15-20 (emphasis added).  However, this language, standing alone, does
27   little to persuade the Court that the present invention was intended to encompass the ASIC
     manufacturing process.  Rather, a fair reading of this language is that the present invention simply
28   opened up the "possibility" that non-experts could produce or manufacture ASICs at some point in the
     future, but not that the present invention currently encompassed such a process.

7

United States District Court
For the Northern District of California

1    manufacturing process for ASICs.[4]

2           Given these considerations, the clearest reading of "A computer-aided design process for

3    designing" is *a process that uses a computer to direct and control the design of an ASIC chip.*

4           **B.    *architecture independent actions and conditions***

5           Ricoh contends that the term means "functional or behavioral aspects of a portion of a circuit

6    (or circuit segment) that does not imply any set architecture, structure or implementing technology."

7    Aeroflex states that the term means "the logical steps and decisions that are represented as rectangles

8    and diamonds in the flowchart; where register-transfer level (RTL, as defined in Darringer et al.)

9    descriptions are excluded." Thus, the parties disagreement focuses on whether claim 13 limits input

10   specifications for the proposed ASIC to data in a flowchart format.

11          Ricoh admits that Fig. 1a illustrates an embodiment that utilizes a flowchart representation.

12   However, Ricoh argues that Aeroflex's definition impermissibly attempts to limit the scope of the

13   claimed invention to the preferred embodiment of the '432 patent.  Ricoh contends that a broader

14   interpretation of "architecture independent actions and conditions" is supported by the patent

15   specification:

16   The architecture independent functional specifications can be defined in a suitable
     manner, *such as in list form* or preferably in a flowchart form.  The flowchart is a
17   highly effective means of describing a sequence of logical operations, and is well
     understood by software and hardware designers of varying levels of expertise and
18   training.  From the flowchart (*or other functional specifications*), the system and
     method of the present invention translates the architecture independent functional
19   specifications into an architecture specific structural level definition of an
     integrated circuit, which can be used directly to produce the ASIC.
20
21   '432 patent, col. 2:21-34 (emphasis added).[5]  Ricoh also relies on specification language stating that

22   "the present invention . . . enables a user to define the functional requirements for a desired target

23   integrated circuit, using an easily understood architecture independent functional level representation

24   . . . ." '432 patent, col. 2:6-11.  Ricoh also notes that patent claim 11, not patent claim 13,

25          [4]This conclusion is also bolstered by the language in claim 14.  Claim 14 describes "[a] process
26   as defined in claim 13, including generating from the netlist the mask data required to produce an
     integrated circuit having the desired function." '432 patent, col. 16:66-68. This language clarifies that
27   the generation of the netlist (the final step in claim 13) and the production of the integrated circuit are
     two distinct processes.

28          [5]Ricoh argues that a "list form" input specification is a preferred embodiment of the '432 patent.
     However, this argument does not find any support in the patent specification.

                                                  8

1 specifically references a flowchart format and recites "having boxes representing architecture

2 independent actions" and "diamonds representing architecture independent conditions." '432 patent,

3 col. 16:10-12. Ricoh argues that this demonstrates that if the patentee intended the use of

4 "architecture independent" in claim 13 to be restricted to a flowchart format, the patentee would

5 have used the same or similar limiting language as used in claim 11.

6          Aeroflex responds that the '432 patent's file history conclusively demonstrates that claim 13

7 requires a sequence of logical steps and decisions in a flowchart format.[6] *See* April 1989

8 Amendment at 11; October 1989 Examiner Interview Summary; November 1989 Amendment at 7.

9 Aeroflex contends that the Examiner Interview Summary explicitly states that the examiner and the

10 applicant reached an agreement on application term 20 (patent claim 13). Specifically, the Examiner

11 Interview Summary form shows that the examiner checked the box providing: "Agreement was

12 reached with respect to some or all of the claims in question." (October 1989 Interview Summary).

13 The summary form identifies application claim 20 (patent claim 13) as one of the claims discussed,

14 and states that the following agreement was reached: "It is agreed that the features 'flowchart editor'

15 and 'expert system for translating the flowchart into a netlist defining the necessary hardware cells of

16 the integrated circuit' are patentable [sic] distinct from the reference list above." Aeroflex argues

17 that this language demonstrates that an agreement was reached and that the features "flowchart

18 editor" and "expert system for translating the flowchart into a netlist" were the examiner's only basis

19 for allowing all of the claims including patent claim 13. Furthermore, Aeroflex contends that the file

20 history demonstrates that all register-transfer level descriptions were explicitly excluded from the

21 claimed invention.

22          Ricoh responds that the October Interview summary, at best, is ambiguous and inconclusive.

23 Ricoh states that while the Interview summary clearly identified the claims discussed in the

24 interview, it specifically left undefined which claims were subject to any agreement reached because

25 the form indicated that an agreement was reached as "to some or all of the claims." Thus, Ricoh

26

27          [6]Aeroflex's reliance on the specification language to support its argument is not well taken.
Aeroflex cites almost exclusively to language from the preferred embodiment. *See* '432 patent, col.
28 3:50-59; 4:5-22, 4:35-38, 7:12-23. However, in construing disputed claim terms, a limitation cannot be
imported from the preferred embodiment into the claims themselves. *Markman*, 52 F.3d at 980.

9

1  concludes that the only thing evidently agreed upon was that the features of a "flowchart editor" and

2  an "expert system" were distinct over prior art, and any claims containing those features would be

3  understood by both parties to be patentable over the cited prior art. Ricoh contends that this

4  understanding is supported in the November 1989 Amendment, in which the patentee stated as

5  follows:

6      During the interview, the Examiner carefully reconsidered the prior art and
       applicants' claims, and upon reconsideration agreed that certain features as
7      defined in applicants' claims, such as the "flowchart editor" and the "expert
       system for translating the flowchart into a netlist defining the necessary hardware
8      cells of the integrated circuit" patentably distinguish applicants' invention from
       the prior art of record, including Darringer et al. 4,703,435. Thus, it was agreed
9      that Claim 18 [patent claim 11] in its present form, for example, patently defines
       applicants' invention over the prior art of record.
10

11 November 1989 Amendment at 7. Ricoh argues that the patentee could have made a similar

12 statement with respect to application claim 20 (patent claim 13). Furthermore, Ricoh argues that

13 Aeroflex's attempt to exclude register-level transfer descriptions from the claimed invention

14 improperly distorts the file history.

15      Initially, the Court finds that the specification language supports Ricoh's arguments. While

16 the flowchart format input specification is the single embodiment of the '432 patent, the

17 specification explicitly contemplated alternative input descriptions. *See* '432 patent, col. 2:21-24;

18 2:27-28. "[I]t is improper to read limitations from a preferred embodiment described in the

19 specification – even if it is the only embodiment – into the claims absent a clear indication in the

20 intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v.*

21 *Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Given the explicit patent language, the Court

22 finds that the specification language does not support the conclusion that the input specification of

23 the claimed invention is limited to a flowchart format.

24      Furthermore, the Court is not persuaded that the prosecution history unmistakably

25 demonstrates that the input specification of the claimed invention is limited to the designer's use of a

26 flowchart format. As noted by Ricoh, the October Interview Summary specifically left undefined

27 which claims were subject to any agreement between the patentee and the examiner. Thus, contrary

28 to Aeroflex's

United States District Court
For the Northern District of California

10

1    argument, this case is distinguishable from cases such as *Spring Window Fashions LP v. Novo*
2    *Industries, L.P.*, 323 F.3d 989 (Fed Cir. 2003), in which the court held that a reasonable competitor
3    could rely on unequivocal statements of disclaimer made during the prosecution history. Here, the
4    statements made during the prosecution history upon which Aeroflex attempts to rely, are at best,
5    ambiguous.

6        In addition, while the patentee and the examiner evidently agreed that the features of a
7    "flowchart editor" and an "expert system" were distinct over prior art, there is no indication that
8    those terms necessarily applied to application term 20 (patent claim 13). Moreover, the fact that
9    those terms were not included in the final version of patent claim 13 suggests just the opposite. "To
10   be given effect, a disclaimer must be 'clear and unmistakable.'" *Sunrace Roots Enter. Co. v. SRAM*
11   *Corp.*, 336 F.3d 1298, 1306 (Fed. Cir. 2003) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d
12   1314, 1325 (Fed. Cir. 2003)). While Aeroflex's interpretation of the October Interview summary
13   may be reasonable, the law requires much more. Accordingly, "because the statements in the
14   prosecution history are subject to multiple reasonable interpretations, they do not constitute a clear
15   and unmistakable departure from the ordinary meaning of the [claim term at issue]." *Golight, Inc. v.*
16   *Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1332 (Fed. Cir. 2004).

17       Aeroflex's argument pertaining to the file history of register-transfer level descriptions is
18   more persuasive. The file history demonstrates that the patentee amended the patent claims to
19   include the phrase "architecture independent," and distinguished the claimed invention from prior art
20   partially on that basis. *See* November 1989 Amendment at 7. The patentee stated that the
21   "specifications used by Darringer et al. are not truly at an <u>architecture independent</u> level, but rather
22   are at a lower level which is indeed <u>hardware architecture dependent</u> and defines the system at a
23   'register-transfer' level description." *Id.*  Similarly, in the April 1989 Amendment, the patentee
24   stated that "a very clear distinction between Darringer and the present invention is that the input to
25   the Darringer system is in the form of a register transfer level flowchart control language . . . . [and]
26   input to the present invention is in the form of an architecture independent functional specification."
27   *Id.* Based on this language, Aeroflex argues that Ricoh disclaimed the "register-transfer" level
28   descriptions described in the Darringer prior art from the scope of its claimed invention. Ricoh

11

United States District Court
For the Northern District of California

1   responds that the patentee's use of the term "register-transfer level" was merely a shorthand

2   reference used to denote the "structural" RTL-type, as opposed to "functional" RTL-type, of input

3   systems prevalent at the time.

4        In order to make this determination, the Court must examine the Darringer 4,704,435 Patent

5   ("the '435 patent") and how closely it reads upon the present invention.  The '435 patent specifically

6   defines a register-transfer level description and the subsequent translation or transformation steps

7   described in that patent do not alter this explicit definition.[7]  '435 patent, col. 5:27-38.  The Court

8   finds no relevant distinction between the RTL described in the '435 patent and the RTL specifically

9   disclaimed by Ricoh in the April and November 1989 Amendments.  Furthermore, an examination of

10  the '432 patent's public record fails to provide any support for Ricoh's distinction between

11  "structural" and "functional" RTL-type input systems.  Given these findings, Ricoh's attempt to limit

12  the patentee's disclaimer to only "structural" level RTL-type input systems is unpersuasive.  *See*

13  *Kumar v. Ovonic Battery Co.*, Inc., 351 F.3d 1364, 1368 (Fed. Cir. 2003) (adopting definition of

14  term in cited prior art which is intrinsic evidence).  Accordingly, the prosecution history indicates

15  that the patentee expressly disclaimed all register-transfer level descriptions.

16       Given these considerations, the Court defines "architecture independent actions and

17  conditions" as *functional or behavioral aspects of a portion of a circuit (or circuit segment) that*

18  *does not imply a set architecture, structure, or implementing technology, but excludes the use of*

19  *register-transfer level descriptions as taught in Darringer.*

20       **C.    *a set of definitions of architecture independent actions and conditions***

21       Ricoh contends that the term means "a library of definitions of the different architecture

22  independent actions and conditions that can be selected for use in the desired ASIC."  In contrast,

23  Aeroflex proposes that the term means "a set of named descriptions defining the functionality and

24  arguments for the available logical steps and decisions that may be specified in the flowchart where

25

26  [7] "[T]he process of this invention begins at step 100 with a register-transfer level description e.g. of the type shown in Fig. 4.  The description consists of two parts: a specification of the inputs, outputs and latches of the chip to be synthesized; and a flowchart-like specification of control, describing for a

27  single clock cycle of the machine how the chip outputs and latches are set according to the values of the chip inputs and previous values of the latches.  At step 102 in FIG 2., the register-transfer level

28  description undergoes a simple translation to an initial implementation of AND/OR logic.  '435 patent, col. 5:27-38.

United States District Court
For the Northern District of California

1  register-transfer level (RTL, as defined in Darringer et al.) descriptions are excluded."

2     It appears that the parties real dispute centers, once again, around the term "architecture

3  independent actions and conditions." This phrase should be construed as explained *supra*. It does

4  not appear that the Court needs to construe "a set of definitions," as this term should be given its

5  ordinary and customary meaning. To the extent that "a set of definitions" needs to be construed by

6  the Court, Aeroflex's Responsive Brief is unhelpful because it never addresses Ricoh's proposed

7  construction. It appears that Aeroflex's use of the terms "named descriptions" and "arguments"

8  intends to encompass the "macros" shown in Table 1 of the '432 patent. *See* '432 patent, col. 7:29-

9  49. Given Aeroflex's lack of analysis of this term, the Court cannot accept Aeroflex's definition as it

10  has not presented a basis for narrowing the claim term. Ricoh's use of the term "library" is

11  supported by the patent's intrinsic evidence. *See* '432 patent, col. 2:20-22. Thus, the Court

12  construes "a set of definitions of architecture independent actions and conditions" as *a library of*

13  *definitions of the different architecture independent actions and conditions that can be selected for*

14  *use in the desired ASIC.*

15     **D.     *describing . . . a series of architecture independent actions and conditions***

16     Ricoh contends that the term means "a user describing an input specification containing the

17  desired functions to be performed by the desired ASIC." Aeroflex states that the term means "the

18  designer represents a sequence of logical steps (rectangles) and decisions (diamonds), and the

19  transitions (lines with arrows) between them in a flowchart format that excludes any register-transfer

20  level (RTL, as defined in Darringer et al.) descriptions.

21     Once again, it appears that the parties real dispute centers around the term "architecture

22  independent actions and conditions." This phrase should be construed as explained *supra* and is not

23  limited to the use of a "flowchart format." To the extent that the terms "describing" and "series"

24  need to be defined, they should be given their ordinary and customary meaning. "Describe" is

25  defined as "to represent or give an account in words." Merriam-Webster's Ninth New Collegiate

26  Dictionary (1987). The parties have not provided the Court with the ordinary meaning of the term

27  "series."

28     Aeroflex argues that Ricoh's proposed construction is contrary to the claim language because

13

United States District Court
For the Northern District of California

1  it merely requires an input specification "containing the desired functions," and thus eliminates the

2  requirement that the designer must describe "a series." Aeroflex contends that such a definition

3  contradicts the actual words in the claim (i.e., "describing . . . a series) and is also contrary to the

4  requirement in the patent's specification that the designer must "describ[e] a sequence of logical

5  operations." '432 patent, col. 2:24-25. Ricoh does not address this argument. Accordingly, the

6  Court defines "describing . . . a series of architecture independent actions and conditions" as

7  *describing an input specification containing a series of desired functions to be performed by the*

8  *desired ASIC.*

9          E.    *expert system knowledge base*

10          Ricoh contends that the term means "a database used to store expert knowledge of highly

11  skilled VLSI designers." Aeroflex defines "expert system" and "knowledge base" separately.

12  Aeroflex states that "expert system" should be defined as "software that solves problems through

13  selective application of the rules in the knowledge base by an inference engine, as distinguished from

14  conventional software, which uses a predefined step-by-step procedure (algorithm) to solve

15  problems." Aeroflex asserts that a knowledge base is a "portion of the expert system software

16  having a set of rules, each rule having an antecedent portion (e.g. IF) and a consequent portion (e.g.,

17  THEN), and embodying the knowledge of expert designers for application specific integrated

18  circuits."

19          Ricoh's proposed construction relies heavily on the '432 patent's specification. Specifically,

20  the specification states that "[t]he knowledge base 35 contains ASIC design expert knowledge

21  required for data path synthesis and cell selection." '432 patent, col. 5:6-8. "Using a rule based

22  expert system with a knowledge base 35 extracted from expert ASIC designers, the KBSC system

23  selects from the cell library 34 the optimum cell for carrying out the desired function." '432 patent,

24  col. 5:25-29. Based on these passages, Ricoh argues that an "expert system knowledge base" is a

25  collection of data that represents knowledge obtained from experts in ASIC design.

26          Aeroflex dismisses Ricoh's proposed construction as overly simplistic. Aeroflex argues that

27  a person of ordinary skill in the art in 1988 would have known that two distinct approaches existed

28  for selecting hardware cells: 1) rule-based expert system software; and 2) conventional algorithmic

United States District Court
For the Northern District of California

1  software. Aeroflex further contends that a person of ordinary skill in the art would have understood

2  that rule-based expert system software must contain an inference engine, a knowledge base, and a

3  working memory, which enable the inference engine to selectively apply the rules stored in the

4  knowledge base to what is stored in the working memory (as distinguished from conventional

5  algorithmic software, which uses a predefined step-by-step procedure). To support its argument,

6  Aeroflex cites to a technical dictionary entitled "Artificial Intelligence Terminology" that states: "An

7  expert system will generally consist of a rule base, an inference engine and a user interface (which

8  will generally provide an explanation facility)." Aeroflex also cites the Court to the Dunn Patent

9  4,656,603 ("the '603 patent"). The '603 patent speaks in general terms regarding the distinction

10 between the two types of software and states that since rule-based expert systems "often must make

11 conclusions based on incomplete or uncertain information, they differ substantially from

12 conventional computer programs which solve problems in accordance with pre-defined algorithms

13 and complete data sets." '603 patent, col. 1:44-49.

14      Aeroflex also argues that the distinction between the rule-based expert system approach and

15 the conventional algorithmic approach is evident from the prior art that the patentee distinguished in

16 the patent's file history. In the November 1989 Amendment, the patentee added the following

17 language to application claim 5 (patent claim 1): "said cell selection means comprising an expert

18 system including a knowledge base containing rules for selecting hardware cells from said cell

19 library and inference engine means for selecting appropriate hardware cells from said cell library in

20 accordance with the rules of said knowledge base." November 1989 Amendment at 2. The patentee

21 stated that application claim 5 (patent claim 1) was amended to "clearly distinguish it over the cited

22 prior art by more clearly defining the expert system aspects of applicant's invention including the

23 provision of a knowledge base containing rules for selecting hardware cells, inference engine means

24 for selecting appropriate hardware cells, and netlist generator means for generating a netlist defining

25 the hardware . . . ." November 1989 Amendment at 8. Although this amendment applied only to

26 application claim 5 (patent claim 1), the patentee also amended application claim 20 (patent claim

27 13) to include "applying . . . a set of cell selection rules stored in said expert system knowledge base .

28 . . ." The patentee explained that this language was added to "emphasize the expert system aspects

15

United States District Court
For the Northern District of California

1  of applicants' method." November 1989 Amendment at 9. Thus, Aeroflex is essentially arguing that

2  the description of an expert system in patent claim 1 (including an inference engine) should also be

3  read to encompass the expert system described in patent claim 13.

4      Ricoh responds that the patentee's statement in the November 1989 Amendment only further

5  proves its point. Ricoh argues that this statement does not establish that an "expert system" had

6  become an element of claim 13, but merely confirmed the patentee intent to claim certain aspects

7  (i.e., the claimed "expert system knowledge base") of an expert system - not an expert system itself.[8]

8  Moreover, Ricoh argues that even if the Court finds that the patentee intended to encompass both an

9  "expert system" and a "knowledge base," there is nothing in the claim language, specification, or

10  prosecution history that requires that an expert system contain an inference engine and a working

11  memory.

12      Initially, the Court finds no support for Ricoh's argument that "expert system" is simply an

13  adjective modifying the noun "knowledge base." The patentee explicitly stated that claim 13 was

14  "amended to emphasize the expert system aspects of applicant's method." November 1989

15  Amendment at 9. Therefore, the Court finds that "expert system" was an element of claim 13.

16      Next, the Court finds that Aeroflex's assertion that a person of ordinary skill in the art would

17  have understood that rule-based expert system software must contain an inference engine, a

18  knowledge base, and a working memory is simply not supported by the intrinsic evidence. As noted

19  by Ricoh, claims one through nine of the '432 patent specifically claim an inference engine, while

20  claim 13 does not make such a claim. Aeroflex's attempt to have the Court read the description of

21  an expert system from patent claim 1 onto the expert system described in patent claim 13 is

22  unpersuasive. Additionally, the technical dictionary definition provided by Aeroflex states that an

23  inference engine is "generally" an element of an expert system. Given the qualified language of the

24  definition, in combination with the fact that claim 13 makes no mention of an "inference engine," the

25  Court finds the technical dictionary definition unhelpful in this context. Finally, Aeroflex's

26  reference to the '603 patent is ultimately unhelpful, as the '603 patent describes an intentional expert

27

28      [8]In other words, Ricoh is arguing that the term "expert system" is grammatically read as an
       adjective or other modifier for the noun "knowledge base."

16

United States District Court
For the Northern District of California

1    system, as opposed to a knowledge-based expert system, and makes no mention of an inference

2    engine. '603 patent, col. 5:53-56. Given these considerations, the Court defines "expert system" and

3    "knowledge base" separately. "Expert system" should be defined as *software that solves problems*

4    *through selective application of rules in the knowledge base.* "Knowledge base" should be defined

5    as a *portion of an expert system software having a set of rules and embodying expert knowledge of*

6    *highly skilled VLSI designers.*

7    **F.    *a set of cell selection rules***

8    Ricoh contends that the disputed term is defined as "a plurality of rules for selecting among

9    the hardware cells from the hardware cell library, wherein the rules comprise the expert knowledge

10    of highly skilled designers formulated as prescribed procedures." Aeroflex contends that the term is

11    properly defined as "a set of rules embodying the knowledge of expert designers for application

12    specific integrated circuits, each rule having an antecedent portion (e.g. IF) and a consequent portion

13    (e.g., THEN), which enables the expert system to map the specified stored definitions for each

14    logical step and decision represented in the flowchart to a corresponding stored hardware cell

15    description."

16    Aeroflex states that its proposed construction is consistent with contemporaneous technical

17    dictionaries, treatises, and the prior art. *See* Ex. 15 at 74-75, Ex. 17 at 10-11, Ex. 14 at 10, 53, Ex.

18    18 at 8, Ex. 20 at 14-15, Ex. 21 at 269. "The two parts of a rule are a premise and a conclusion, a

19    situation and an action, or an antecedent and a consequent. These statements are written in an IF-

20    THEN format." Ex. 15 at 74, Louis E. Frenzel Jr., *Understanding Expert Systems*. The technical

21    dictionary provided by Aeroflex defines "rule" as follows: "(If-Then Rule). A conditional statement

22    of two parts." Ex. 21, Paul Harmon, *Expert Systems: Tools & Applications*. Aeroflex also argues

23    that the patent's specification requires that the "rules" not only embody expert knowledge, but that

24    the expert knowledge also be used for mapping the specified definitions in the flowchart to the

25    hardware cell descriptions. Aeroflex Responsive Brief at 48; *see* '432 patent, col. 8:21-23; 8:34-37.

26    Ricoh contends that the general usage dictionary definition of "rule" should apply. Also,

27    while Ricoh admits that the preferred embodiment of the '432 patent disclosed that "rules" could be

28    in the format of "an antecedent portion (IF) and a consequent portion (THEN)," it also asserts that

1    nothing in the public record justifies restriction of the claimed "rules" to the exemplary format

2    disclosed as the preferred embodiment. Richo additionally contends that the '432 patent states

3    specific rules in the specification that are not stated in the if/then format. *See* '432 patent, col. 12:31-

4    35. Moreover, Ricoh also disagrees with Aeroflex's inclusion of the following requirement:

5    "embodying the knowledge of expert designers for application specific circuits." Ricoh argues that

6    to the extent Aeroflex is attempting to create a distinction between the knowledge of designers for

7    ASICs and the knowledge of designers skilled in VLSI design, the claim should be construed broadly

8    to include either skill. *See, e.g.*, '432 patent, col. 2:58-61 ("The KBSC utilizes a knowledge based

9    expert system, with a knowledge base extracted from expert ASIC designers with a high level of

10   expertise in VLSI design . . ."); col. 4:8-11 ("In the KBSC system of the present invention, however,

11   integrated circuits can be designed at a functional level because the expertise in VLSI design is

12   provided and applied by the invention.")

13       Based on Aeroflex's citation to the technical dictionary, it appears that "rule" as used in the

14   '432 patent would have had a particular meaning to one of ordinary skill in the art. Therefore, to the

15   extent Ricoh's definition relies on a general dictionary definition, it must be rejected. *See*

16   *Vanderlande Industries Nederland BV v. I.T.C.*, 366 F.3d 1311, 1321 (Fed. Cir. 2004). The technical

17   dictionary definition offered by Aeroflex demonstrates that the ordinary meaning of "rules" when

18   used to refer to rules that are contained in the knowledge base of a rule-based expert system must

19   include an "IF-THEN" component. The Court is not persuaded that column 12, lines 31 to 35 of the

20   '432 patent state "rules" as that term is understood in the patent. Rather, lines 31 to 35 appear to be

21   discussing other actions that a user could take if additional rules were present.

22       However, the Court finds little support for Aeroflex's argument that claim 13 requires that

23   the rules stored in the knowledge base of the rule-based expert system embody the expert knowledge

24   for mapping the specified definitions in the flowchart to the hardware cell descriptions. Certainly,

25   the plain language of claim 13 does not dictate that the "rules" encompass the "mapping" function.

26   Moreover, while the patent's specification does suggest that the rules might play such a role in the

27   preferred embodiment, *see* '432 patent, col. 8:34-37, such a conclusion is not compelled from the

28   specification language. In any event, the Court should not "limit[] the claimed invention to preferred

18

United States District Court

For the Northern District of California

1   embodiments or specific examples in the specification." *Ekchian v. Home Depot, Inc.*, 104 F.3d

2   1299, 1303 (Fed. Cir. 1997).

3       Furthermore, Ricoh correctly states that the definition should not make a distinction between

4   the knowledge of designers for ASICs and the knowledge of designers skilled in VLSI design. The

5   specification clearly contemplated that both sets of knowledge would be included in the knowledge

6   base. *See* '432 patent, col. 2:58-61; col. 4:8-11. Furthermore, Aeroflex's attempt to include the

7   following language in the definition - "for each logical step and decision represented in the

8   flowchart" - should be rejected for the reasons discussed *supra*. Accordingly, the Court construes "a

9   set of cell selection rules" as *a set of rules embodying the expert knowledge of highly skilled VLSI*

10   *designers, each rule having an antecedent portion (e.g., IF) and a consequent portion (e.g. THEN).*

11       G.    *selecting from said stored data for each of the specified definitions a corresponding*

12              *integrated circuit hardware cell*

13       Ricoh contends that the term means "selecting from the plurality of hardware cells in the

14   hardware cell library a hardware cell for performing the desired function of the desired ASIC."

15   Aeroflex contends that the term means "mapping the specified stored definitions for each logical step

16   and decision represented in the flowchart to a corresponding stored hardware cell description."

17       Ricoh's argues that this term simply refers to the process of selecting hardware cells from

18   those stored in the hardware cell library that can be used to implement the desired functions of the

19   ASIC to be produced. In support of its argument, Ricoh cites the specification language stating that

20   "[t]he Cell Selector 32 is a knowledge based system for selecting a set of optimum cells from the cell

21   library to implement a VLSI system." '432 patent, col. 8:21-23.

22       Aeroflex argues that its proposed construction is supported by the language in claim 13,

23   which according to Aeroflex, "dictates that mapping the specified definitions to the stored hardware

24   cell descriptions must be performed by a rule-based expert system and not conventional software."

25   Aeroflex Responsive Brief at 41:3-6. Aeroflex relies upon the following specification language to

26   support its argument: "To design a VLSI system from a flowchart description of a user application, it

27   is necessary to match the functions in a flowchart with cells from a cell library. This mapping needs

28   the use of artificial techniques because the cell selection process is complicated and is done on the

19

1    basis of a number of design parameters and constraints." '432 patent, col. 8:31-31-37.

2              Although it is a close question, Aeroflex's argument is ultimately more compelling. As

3    discussed above, the patent file history demonstrates that the patentee distinguished the present

4    invention based on the rule-based expert system's ability "to accomplish a task of selection of cells

5    from the cell library." April 1989 Amendment at 10. This amendment strongly suggests that the

6    mapping of the specified definitions to the stored hardware cells must be performed by a rule-based

7    system. *See* Aeroflex Responsive Brief at 42. Ricoh's proposed language does not include a

8    reference to a "rule-based system." Aeroflex's use of the word "mapping" is supported by the

9    specification language '432 patent, col. 8:34; col. 9:53. Furthermore, at the claims construction

10   hearing, Ricoh's counsel stated that he had no objection to the use of the term "mapping" in this

11   context. However, Aeroflex's inclusion of the phrase "for each logical step and decision represented

12   in the flowchart" is improper because it attempts to limit the claim to the preferred embodiment of

13   the flowchart input specification, as discussed *supra*. Therefore, the Court construes "selecting from

14   said stored data for each of the specified definitions a corresponding integrated circuit hardware cell"

15   as *mapping the specified stored function to a corresponding stored hardware cell.*

16         **H.    said step of selecting a hardware cell comprising applying to the specified
                definition of the action or condition to be performed**
17

18              Ricoh argues that the term is defined as "selecting from the plurality of hardware cells in the

19   hardware cell library a hardware cell . . . through application of the rules; and generating a netlist that

20   identifies the hardware cells needed to perform the function of the desired ASIC." Aeroflex

21   contends that the term should be defined as "the mapping of the specified definitions to the stored

22   hardware cell descriptions must be performed by applying to the specified definitions in the

23   flowchart a set of cell selection rules stored in an expert system knowledge base."

24              The parties proposed constructions are not substantially different. As discussed above,

25   Aeroflex's attempt to restrict the term to "definitions in the flowchart" is incorrect. However,

26   Aeroflex's proposed use of the term "expert system knowledge base" also seems incorrect because it

27   is unnecessary here; the term does not require a definition that specifies the location where the cell

28   selection rules are found. Similarly, Ricoh's inclusion of "generating a netlist that identifies the

20

United States District Court
For the Northern District of California

1  hardware cells needed to perform the function of the desired ASIC" seems unnecessary here; such a

2  definition would function to incorporate a separate step of the claim not covered by the current term.

3  Accordingly, the Court defines the term as *the mapping of the specified definitions to the stored*

4  *hardware cell descriptions by applying to the specified definitions a set of cell selection rules.*

5  **I.      *specifying for each described action and condition of the series one of said stored***
6  ***definitions***

7        Ricoh proposes that this term be construed as "specifying for each desired function to be

8  performed by the desired ASIC one of the definitions of the architecture independent actions and

9  conditions stored in the library of definitions that is associated with the desired function." Aeroflex

10  contends that the proper construction of the term is "the designer assigns one definition from a set of

11  stored definitions to each of the logical steps and decisions represented in the flowchart." The

12  parties dispute centers around whether the "specifying" step must be performed manually by a user,

13  or whether the assignment of macros can be done automatically.

14        Ricoh admits that the patent discloses a "manual mapping" embodiment. '432 patent, col.

15  7:24-25 ("Edit actions allows the designer to assign actions to each box."). However, Ricoh argues

16  that the construction of the claim should not be limited merely because it is the only embodiment

17  disclosed. *See Liebel-Flarsheim Co.*, 358 F.3d at 913. Furthermore, Ricoh contends that the patent

18  describes macros being "mapped" automatically through the application of rules. *See* '432 patent,

19  col. 9:14-18. Ricoh argues that if col. 9:14-18 is read in context, the passage shows that the quoted

20  rules are to be applied "during this stage," which refers to the "first step of cell list generation."

21  Accordingly, Ricoh contends that this passage does not apply to a statelist in which the "macros"

22  have already been assigned to the desired actions.

23        Aeroflex disagrees with Ricoh's proposed construction. First, Aeroflex argues that the

24  prepositional phrase "for each described action and condition of the series" refers only to the fact that

25  the "specifying" step is performed for each action and condition in the described series resulting

26  from the previous "describing" step. Thus, Aeroflex concludes that the claim language for this

27  "specifying" step requires that "the designer assigns one stored definition for each logical step and

28  decision described in the flowchart." Second, Aeroflex argues that other claims demonstrate that for

21

United States District Court
For the Northern District of California

1  each action and condition described, this step requires the designer to specify one stored definition

2  (from a macro library) and that this "specifying" step and the previous "describing" step together are

3  the steps that define the input specification for the claimed invention's method. Third, Aeroflex

4  argues that Ricoh's proposed construction impermissibly attempts to replace the phrase "for each

5  described action and condition" with the phrase "for each desired function to be performed by the

6  desired ASIC." Finally, Aeroflex argues that the '432 patent does not contain an automated

7  "mapping" embodiment.

8          The Court finds that Aeroflex's attempt to limit the "specifying" step to encompass only a

9  user manually assigning a single definition to each action and condition is too narrow of a

10  construction. The plain language of the claim simply does not support this construction, and the

11  Court should not "limit[] the claimed invention to preferred embodiments or specific examples in the

12  specification." *Ekchian*, 104 F.3d at 1303. Moreover, while Aeroflex is correct that claim 1 and

13  claim 9 require the designer to "specify" one stored definition for each action and condition

14  described, this contention alone does not suggest that the Court should juxtapose these claims onto

15  claim 13. Claim 13 simply does not contain similar language.[9]

16          Additionally Ricoh's attempt to replace the phrase "for each described action and condition"

17  with the phrase "for each desired function to be performed by the desired ASIC" is permissible.

18  Throughout the specification, each "action and condition" is referenced as a "function." *See* '432

19  patent, col. 2:21-30. Therefore, the Court construes "specifying for each described action and

20  condition of the series one of said stored definitions" as *specifying for each desired functional*

21  *specification to be performed by the desired ASIC one of the definitions from the set of stored*

22  *definitions.*

23      **J.      a netlist defining the hardware cells which are needed to perform the desired**
             **function of the integrated circuit**
24

25          Ricoh contends that the term means "a description of the hardware components (and their

26  interconnections) needed to manufacture the ASIC as used by subsequent processes, e.g., mask

27

28          [9]Aeroflex's proposed construction is also flawed because of its inclusion of the phrase "logical
       steps and decisions represented in the flowchart." *See* discussion *supra.*

                                                        22

United States District Court
For the Northern District of California

1   development, foundry, etc." Aeroflex states that the term means "producing a list of the needed

2   hardware cells by eliminating any mapped hardware cells that are redundant or otherwise

3   unnecessary, producing a custom controller type hardware cell for providing the needed control for

4   those other hardware cells, and producing the necessary structural control paths and data paths for

5   the needed hardware cells and the custom controller." '432 patent, col. 5:38-46.

6        Ricoh's proposed construction also relies heavily upon language in the specification.

7   Specifically, Ricoh notes that the specification states that "[t]he list of hardware cells and their

8   interconnection requirements may be represented in the form of a netlist. From the netlist it is

9   possible using either known manual techniques or existing VLSI CAD layout systems to generate the

10  detailed chip level geometrical information (e.g. mask data) required to produce the particular

11  application specific integrated circuit in chip form." '432 patent, col. 2:42-49. The specification

12  also states that "[t]he netlist provides all the necessary information required to produce the integrated

13  circuit. Computer-aided design systems for cell placement and routing are commercially available

14  which will receive netlist data as input and will lay out the respective cells in the chip, generate the

15  necessary routing, and produce mask data which can be directly used by the chip foundry in the

16  fabrication of integrated circuits."

17       Aeroflex also relies heavily upon the patent's specification to support its proposed

18  construction. Aeroflex initially argues that the claim language "generating for the selected . . .

19  hardware cells, a netlist defining the hardware cells which are needed to perform the desired function

20  of the integrated circuit" requires that this step eliminate any selected hardware cells that are not

21  needed. *See* '432 patent, col. 13:59-66. Aeroflex also contends that the patent's specification

22  defines the "interconnection requirements" for the necessary hardware cells defined in the netlist as

23  "data and control paths." *See* '432 patent, col. 5:30-35. Finally, Aeroflex contends that a system

24  controller must be generated for the netlist. In support of its argument, Aeroflex cites language from

25  the preferred embodiment that states "[t]he netlist includes a custom generated system controller, all

26  other hardware cells required to implement the necessary operations, and interconnection

27  information for connecting the hardware cells and the system controller." '432 patent, col. 4:39-43.

28  Additionally, Aeroflex asserts that the requirement that a controller be generated is also supported by

23

United States District Court

For the Northern District of California

1    the patent's file history. Specifically, Aeroflex argues that the file history limits the input

2    specification to exclude register-transfer level descriptions that would define the control for the

3    hardware cells of the ASIC, and thus a controller must be generated to provide necessary control for

4    the ASIC.

5         The Court agrees with Ricoh that Aeroflex's arguments regarding "eliminating any mapped

6    hardware cells that are redundant or otherwise unnecessary" and "producing a custom controller type

7    hardware cell for providing the needed control for those other hardware cells" bear no relationship to

8    a plain reading of claim 13. Additionally, contrary to Aeroflex's assertion, a review of the patent file

9    history does not reveal that a controller must be generated in claim 13. Furthermore, while claim 10

10   expressly includes the generation of a controller, claim 13 includes no such language. *See* '432

11   patent, col. 16:1-4 ("The system as defined in claim 9 additionally including control generator means

12   for generating a controller and control paths for the hardware cells selected by said cell section

13   means.").

14        The Court also finds that claim 13 does not restrict the interconnection requirements of the

15   hardware cells to "data and control paths." To be certain, "data and control paths" are the types of

16   interconnections disclosed in the patent's preferred embodiment. But, the Court should not "limit[]

17   the claimed invention to preferred embodiments or specific examples in the specification." *Ekchian*,

18   104 F.3d at 1303. Moreover, while claim 15 expressly includes the generation of control paths,

19   claim 13 includes no such language. *See* '432 patent, col. 17:1-3 ("A process as defined in claim 13

20   including the further step of generating data paths for the selected integrated circuit hardware

21   cells."). For these reasons, the Court agrees with Ricoh's proposed construction of the term. The

22   Court defines "a netlist defining the hardware cells which are needed to perform the desired function

23   of the integrated circuit" *as a description of the hardware components (and their interconnections)*

24   *needed to manufacture the ASIC as used by subsequent processes, e.g., mask development, foundry,*

25   *etc.*

26   ///

27   ///

28   ///

24

**CONCLUSION**

Based on the analysis above, the Court adopts the foregoing constructions of the disputed claim terms.

**IT IS SO ORDERED.**

Dated: April 7, 2005

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

25

Page 1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4

5        - - - - - - - - - - - - -x

6    RICOH COMPANY, LTD.,              :

7              Plaintiff,             :

8        vs.                          :    Case No.

9    AEROFLEX INCORPORATED,           :    C-03-4669-MJJ (EMC)

10   et al.,                          :

11             Defendants.            :

12   _____      :

13   SYNOPSYS, INC.,                  :

14             Plaintiff,             :    Case No.

15       vs.                          :    C-03-289-MJJ (EMC)

16   RICOH COMPANY, LTD.,             :

17             Defendant              :

18       - - - - - - - - - - - - -x

19

20       VIDEOTAPE DEPOSITION OF MARIOS PAPAEFTHYMIOU

21

22                            Washington, DC

23                            Friday, August 11, 2006

24

25       REPORTED BY:  ERIN AVERY, RPR

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 18

1              BY MS. DE MORY:

2         Q     What were the first names?

3         A     Michael and Amanda, Rebecca.   These are

4    all the names I remember.

5         Q     Prior to -- going back just a minute.

6    Prior to the time that you were retained as a

7    consultant on August 29th of 2005, had you discussed

8    the Synopsys tools at issue in this litigation with

9    anyone from Dickstein Shapiro?

10        A     No.

11        Q     So prior to August 29th of 2005, you did

12   not discuss with Dickstein Shapiro anything about

13   Design Compiler or HDL Compiler; is that correct?

14        A     That is my recollection.

15        Q     When was the first time you discussed

16   anything about Design Compiler or HD Compiler with

17   Dickstein Shapiro?

18              MS. ALLEN:  Objection to the extent any --

19   go ahead.  You asked the one question.  I'll

20   withdraw my objection.

21              THE WITNESS:  I don't remember exact.

22              BY MS. DE MORY:

23        Q     Prior to being retained as a consultant in

24   this case, had you used Design Compiler or HDL

25   Compiler?

Page 19

1      A      Personally, I have not used Design

2  Compiler or HDL Compiler.  My students do all the

3  time.  We talk about it all the time with my

4  students.  That's what my teaching and research to

5  some extent is about.

6      Q      At some point in time, did you discuss

7  with Dickstein Shapiro your knowledge of the types

8  of inputs that could be accepted by HDL Compiler and

9  Design Compiler?

10     A      Yes.

11     Q      And what's the basis for -- what was the

12 basis for your knowledge about the types of inputs

13 that could be accepted by HDL Compiler and Design

14 Compiler?

15     A      What do you mean by basis of my knowledge?

16     Q      Did you have knowledge about that before

17 you were retained as a consultant?

18     A      Yes, I was aware of the kinds of inputs

19 that you can provide, tools like Design Compiler.

20     Q      When you say tools like Design Compiler,

21 what do you mean?

22     A      Design Compiler is an EDA tool.  It is an

23 electronic design automation tool for designing

24 chips, semiconductor chips.

25     Q      What other tools are you aware of that are

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 44

1    quote/unquote, functional RTL or not.

2        A    I was not asked to formulate an opinion

3    about that.

4        Q    As you sit here today, do you have an

5    opinion about whether or not the customer designs at

6    issue in this litigation are structural RTL?

7        A    I was not asked to formulate an opinion

8    about that.

9        Q    And therefore you have no opinion about

10   that; is that correct?

11       A    At this point, I have not considered the

12   question.

13       Q    And the same is true with regard to the

14   functional RTL question, just so that the record's

15   clear.

16            As you sit here today, you've not been

17   asked to formulate an opinion about whether or not

18   the customer designs at issue in this litigation are

19   functional RTL, and therefore you have no opinion on

20   that as you sit here today?

21       A    That is correct.  At this point I have not

22   formulated an opinion about that.

23       Q    Let's finish up where we were with the

24   invoices.  So if you would put Exhibit 5, 6 and 7

25   back in front of you.

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 66

1          Q      The first time you saw the report, how

2     long was it?

3          A      How long was the report?

4                 MS. ALLEN:  If you don't know, you don't

5     have to speculate.

6                 THE WITNESS:  I don't recall.

7                 BY MS. DE MORY:

8          Q      Do you recall whether it was more than

9     five pages the first time that you saw it?

10         A      I don't remember.

11         Q      The first time you saw it, were your

12    opinions already set forth in the draft?

13         A      I don't remember the exact, you know,

14    timing of things, but the opinions were being

15    entered into the report.  And, of course, gradually,

16    eventually they ended up in the report.

17         Q      Prior to June 12th of 2006, had you

18    physically looked at any of the Customer Defendant

19    designs that are at issue in this litigation?

20                MS. ALLEN:  Again, you don't have to

21    speculate, but if you know, you can answer.

22                THE WITNESS:  I did not.

23                BY MS. DE MORY:

24         Q      When was the first time that you looked at

25    a customer design that is at issue in this

Page 68

```
1    generic.

2        Q    So if we exclude reviewing the draft, did

3    those 4 hours reflected on this July 3, 2006 invoice

4    reflect the time during June that you spent

5    reviewing documents that were produced by the

6    parties in the litigation?

7        A    That is correct.

8        Q    I'm going to hand you what we will mark

9    as, quite unfortunately, Exhibit 11.  I say quite

10   unfortunately because it's so big.

11       A    Is this a single exhibit?

12       Q    It is.  Actually, she'll have to put a

13   sticker on the front of it.

14            (Papaefthymiou Exhibit 11 identified.)

15            BY MS. DE MORY:

16       Q    I will represent for the record that

17   Exhibit 11 is comprised of all of the exhibits to

18   your report.  So rather than attaching that stack to

19   every report, I've marked one exhibit, 11.

20            And for right now, I want to turn to

21   appendix B, which is tabbed right up there, way up

22   at the top just B.  You've got it right up there,

23   just the two pages.

24       A    Yeah.

25       Q    You see this list of other documents that
```

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 75

1        A    No.

2        Q    I'm going to hand you what I will mark as

3    the next exhibit in order, which is 12.

4             (Papaefthymiou Exhibit 12 identified.)

5             BY MS. DE MORY:

6        Q    Do you recognize Exhibit 12?

7        A    No.

8        Q    Do you know if you have seen Exhibit 12

9    before?

10       A    I don't recall seeing it before.

11       Q    Would you turn to page 15 of Exhibit 8?

12   It's the one right there on top.

13       A    8, okay.

14       Q    Last page.

15       A    Okay.

16       Q    With reference to Exhibit C, what do you

17   recall seeing with regard to an HDL operator search

18   report, or do you recall ever seeing an HDL operator

19   search report?

20       A    There was discussion about it in the

21   conference calls, and I had -- I was told about

22   certain numbers that came out of the searches with

23   respect to key words and that's basically the

24   extent.

25       Q    So you didn't actually see these HDL

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 99

1      than one function.  I'm not sure what that means.

2               BY MS. DE MORY:

3          Q    Do you have an opinion whether or not the

4      Customer Defendant designs are architecture

5      independent if architecture is defined as the

6      architecture of the entire circuit that is input

7      into the tool?

8               MS. ALLEN:  Objection; vague and

9      ambiguous, compound.

10              THE WITNESS:  I certainly have an opinion

11     with regard to what the customer inputs, the

12     Defendant inputs, make use of architecture

13     independent operators, actions and conditions.

14              MS. ALLEN:  Can we go off the record for a

15     second?

16              MS. DE MORY:  I'll give you a second to go

17     ahead and do whatever you need to do.

18              MS. ALLEN:  We can keep going.  We can do

19     this after.  If you feel like you're not at a good

20     stopping point, that's fine.

21              BY MS. DE MORY:

22         Q    Do you agree that in the context of the

23     customer designs, prior to the time that the RTL is

24     written for the design, a -- the designer -- a

25     designer actually makes decisions about where

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 100

1    various registers are going to be located in the

2    design, the functions between registers and the

3    cycle by cycle behavior of the circuit?

4              MS. ALLEN:  Objection; compound, vague and

5    ambiguous, calls for speculation and overly broad.

6              THE WITNESS:  I have no way of knowing

7    what the specific customers did before describing

8    their designs in Verilog HDL.

9              BY MS. DE MORY:

10       Q    Because you didn't read their depositions;

11   right?

12       A    Well, I didn't go through their

13   depositions in detail, that's --

14       Q    That's true?

15       A    You could say that.

16       Q    So it's not true that you have no way of

17   knowing that; isn't that correct?

18              MS. ALLEN:  Objection; vague and ambiguous

19   and calls for speculation.

20              BY MS. DE MORY:

21       Q    Can you answer that?

22       A    Well, I can certainly -- I can

23   certainly -- I can certainly inform myself about the

24   things that are in the depositions, material which

25   has been given to me.

Page 118

1    from the scope of its claimed invention."

2           It goes on and says, "Ricoh responds that

3    the patentee's use of the term, 'register-transfer

4    level' was merely a shorthand reference to denote

5    the 'structural' RTL-type, as opposed to

6    'functional' RTL-type, of input systems prevalent at

7    the time."

8           Do you see that?

9    A    Yes.

10    Q    And if you move down to line 9 on page 12,

11    the court says, "Furthermore, an examination of the

12    '432 patent's public record fails to provide any

13    support for Ricoh's distinction between 'structural'

14    and 'functional' RTL-type input systems."

15           Do you see that?

16    A    Yes.

17    Q    Do you agree with that statement?

18    A    It is what the court states.

19    Q    You don't dispute it?

20           MS. ALLEN:  Objection; outside the scope

21    of the opinion.

22           THE WITNESS:  I wasn't asked to look into

23    the specific issue raised in the statement.

24           BY MS. DE MORY:

25    Q    So did the statement, "Furthermore, an

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 124

1    intend to qualify in any way the statement, "The

2    prosecution history indicates that the patentee

3    expressly disclaimed all register-transfer level

4    descriptions," then -- strike that.  Let me start

5    over.

6         If the Court did not intend to qualify the

7    statement, "The prosecution history indicates that

8    the patentee expressly disclaimed all

9    register-transfer level descriptions," your expert

10   report does not address that issue?

11        MS. ALLEN:  Objection; compound and vague

12   and ambiguous and incomplete hypothetical.

13        THE WITNESS:  I cannot -- my opinion was

14   based on the -- on what the claim construction was,

15   and I haven't really considered what it could have

16   been if the claim construction were different.

17        BY MS. DE MORY:

18   Q    So if the claim construction is that the

19   prosecution history indicates that the patentee

20   expressly disclaimed all register-transfer level

21   descriptions, you haven't offered an opinion on

22   whether or not the Customer Defendant designs would

23   meet that claim construction; is that correct?

24        MS. ALLEN:  Objection; compound, vague and

25   ambiguous, assumes facts not in evidence, incomplete

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 125

```
 1    hypothetical.

 2              THE WITNESS:  It's a completely separate

 3    question.

 4              BY MS. DE MORY:

 5        Q    Your opinion depends on the fact that the

 6    Court intended to qualify register-transfer level

 7    descriptions with "as taught in Darringer"?

 8        A    My opinion is based on the exact text that

 9    I see as the final say of what the Court construes

10    as architecture independent actions and conditions,

11    that is correct.

12        Q    And your opinion is not based on the

13    sentence, "The prosecution history indicates that

14    the patentee expressly disclaimed all

15    register-transfer level descriptions;" is that

16    correct?

17        A    As I said, I took the entire claim

18    construction order into account as I was preparing

19    my opinion.  And at the end of the day, the

20    statements that were basically -- that formed a

21    basis of any opinion were exactly what you see at

22    the end of that section between lines 16 and 19.

23              Obviously, the Court took into account all

24    these other previous statements in formulating -- in

25    construing the claims.  I did too as I was going
```

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 126

1    through the claim construction order.  At the end of

2    the day, the terms are construed the way that we see

3    in line 16 through 19, so that was the basis for the

4    opinion.

5         Q    So if there's anything prior to line 16

6    through 19 that's inconsistent or not exactly

7    congruent with what's in line 16 through 19, you

8    didn't -- that didn't form the basis for your

9    opinion.  Is that fair?

10        A    It was taken into account, if there were

11   such inconsistencies.

12             You did point out something which may be

13   viewed as an inconsistency on line 15.  But, again,

14   there needs to be a basis, and that basis is what

15   you see between 16 and 19, between line 16 and 19.

16   That was the basis for the report.

17        Q    So if the Court thinks that what is taught

18   in Darringer is all register-transfer level transfer

19   descriptions, then you haven't offered an opinion on

20   whether or not the Customer Defendant inputs are

21   architecture independent; is that correct?

22             MS. ALLEN:  Objection; vague and ambiguous

23   and assumes facts not in evidence, incomplete

24   hypothetical.

25             THE WITNESS:  I have offered an opinion

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 127

```
 1    independently of the court construction about the

 2    nature of the inputs of the systems that the

 3    Darringer patent describes, and the nature of these

 4    inputs is structural.  We discussed, as you asked me

 5    before, about the simple transformations, and how I

 6    inferred that the inputs of the Darringer are

 7    structural, and that is a separate -- that is a

 8    separate opinion.

 9              BY MS. DE MORY:

10         Q     And you don't think, as you sit here

11    today, that the court has already rejected that

12    opinion that the Darringer inputs are structural

13    RTL; is that right?

14         A     I have no -- I don't know what the court

15    may or -- to my own -- I don't know.

16         Q     Nothing in the paragraph prior to line 16

17    through 19 leads you to believe that the court has

18    already rejected your opinion that the inputs to the

19    Darringer system are structural RTL; is that

20    correct?

21              MS. ALLEN:  Objection; vague.

22              THE WITNESS:  The way that I read the

23    previous text, I do not draw this conclusion.

24              BY MS. DE MORY:

25         Q     And you also -- strike that.
```

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 171

1    and compound.

2         THE WITNESS:  That is a slightly different

3    question, right, because having a description

4    presented to the tool and requiring the tool to

5    generate a design is one thing.  The tool may still

6    be able to handle the description in certain ways,

7    simulate it, for example, and still be unable to

8    generate the design.

9         So that's why I'm saying, one of the

10   reasons that it's not clear to me exactly what is it

11   that you require.  You clarified, and we can leave

12   it there.

13        BY MS. DE MORY:

14        Q    The requirement -- the definition of

15   "require" is that the input results in an output

16   that is a valid portion of an ASIC or the entire

17   design for an ASIC?

18        A    Okay.

19        Q    And so my question is, going back to the

20   most general question, which is at any time, did

21   Design Compiler require the input to specify a

22   description of how the chip outputs and latches are

23   set according to the value of the inputs for a clock

24   cycle?

25        A    The answer is I don't know.

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 172

```
1         Q      And the answer is you don't know whether I

2    ask you about 1997 or 2000 or 2003; is that correct?

3         A      Correct.

4                MS. ALLEN:  Objection; compound.

5                THE WITNESS:  I don't know.

6                BY MS. DE MORY:

7         Q      The answer is you don't know if I ask you

8    about today; is that correct?

9         A      Today, my understanding -- and I must say

10   that I have not used Design Compiler myself

11   recently.  I do rely on the opinion that I set

12   forth.  I did rely and I do rely on Dr. Soderman,

13   but my impression is that today Design Compiler can

14   handle behavioral descriptions, and they wouldn't

15   necessarily be descriptions that fit exactly the

16   description that you gave, the narrow -- relatively

17   narrow description that you gave.

18               BY MS. DE MORY:

19        Q      When you said behavioral descriptions in

20   your last answer, what did you mean?

21        A      A description which says more about the

22   intended function of a system as opposed to how this

23   function is implemented as opposed to the structure

24   of the system.

25        Q      So -- and what did you mean in your last
```

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 175

1    outputs and latches are affected by the value of the

2    inputs doesn't require -- strike that.

3               How does specifying how, for a single

4    clock cycle, the chip outputs and latches are

5    affected by the value of the inputs require

6    specifying particular hardware components?

7         A    It does not necessarily require it.

8         Q    Do you agree that one generally understood

9    definition of RTL includes the fact that the cycle

10   by cycle behavior of the circuit is described in the

11   input?

12              MS. ALLEN:  Objection; vague.

13              THE WITNESS:  At some point in time, that

14   was probably the case.

15              BY MS. DE MORY:

16        Q    Is that the case today?

17        A    I don't think so.

18        Q    Is describing the cycle by cycle behavior

19   of the circuit something that is, to your knowledge,

20   has it ever been a requirement of the input to

21   Design Compiler?

22        A    I don't know.

23        Q    Turning to page 6 of your report, in the

24   middle of the second full paragraph.  And there is a

25   sentence, and you can read the rest of the paragraph

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 180

1        Q     Now, my question is -- and I also

2    understand that you have not undertaken to determine

3    whether or not the inputs to the designs are

4    functional or structural RTL; is that correct?

5        A     That is correct.

6        Q     And, in fact, as part of your opinion, you

7    have not undertaken to determine whether they are

8    any kind of RTL.  Your opinion is that they use

9    architecture independent actions and conditions; is

10   that correct?

11       A     Correct, this is one of the opinions.

12       Q     Do you know whether to determine whether

13   or not something is structural, functional or some

14   other kind of RTL, you need to look at more than a

15   single operator in the design?

16            MS. ALLEN:  Object as vague and ambiguous,

17   and you guys were really quick on the last question

18   and answer, but I want to interject misstates prior

19   testimony.

20            THE WITNESS:  So the question, once again,

21   was whether I know --

22            BY MS. DE MORY:

23       Q     Well, the question is not necessarily

24   whether you know.  Can you determine if something is

25   structural or functional or RTL at all by looking at

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 181

1    one operator in a design?

2              MS. ALLEN:  Objection; incomplete

3    hypothetical, vague.

4              THE WITNESS:  If you just give me one line

5    without telling me where this line came from.  I

6    don't know what that line is.

7              BY MS. DE MORY:

8        Q    So from just one line of code, you can't

9    tell whether or not the input for a particular ASIC

10   is functional RTL or structural RTL or RTL at all;

11   is that fair?

12             MS. ALLEN:  Objection; vague and

13   incomplete hypothetical.

14             THE WITNESS:  One line doesn't say

15   anything, really, for the question that you asked.

16             BY MS. DE MORY:

17       Q    To determine whether or not input code is

18   RTL, do you need to know more than the types of

19   operators that are included in the input?

20             MS. ALLEN:  Vague.

21             THE WITNESS:  Again, this is a line of

22   questions that we had a few hours ago.  It boils --

23   what is the meaning of RTL?  What is the definition

24   of RTL?

25             At the moment you gave me a description of

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 191

```
1    to algorithms.

2        Q    And algorithms are a behavioral

3    description; is that right?

4        A    An algorithm is -- I wouldn't equate it

5    to -- they're not the same thing.

6        Q    It could be a behavioral description?

7        A    It's the other way around, really.  A

8    behavioral description is an algorithm.

9        Q    Okay.  I'm going to hand you what we will

10   mark as Exhibit 16.

11            (Papaefthymiou Exhibit 16 identified.)

12            BY MS. DE MORY:

13       Q    The first question is, have you ever seen

14   this entire file before, which is lpfiler.v?

15            (Pause.)

16       A    Well, I must have seen it at some point

17   because on page 10 of my report, I have a part of

18   this file.  So the name doesn't really ring too many

19   bells, of course, but it's almost the same name.

20   So, yeah, I've looked at all sorts of files.  I

21   wouldn't have a way to remember specific files.

22       Q    And how did you look at these files?  Were

23   they paper?

24       A    You know, I've looked at files like this,

25   printouts sitting in front of a terminal.  And
```

Videotaped Deposition of:
Marios Papaefthymiou, Vol. I

August 11, 2006

Page 192

1    having the files electronically, you know, showing

2    up in front of me, in front of the monitor, I've

3    seen versions of electronic files in conference

4    calls.  So in all sorts of, you know, various ways.

5         Q    Now, did you review the -- Ricoh's final

6    infringement contentions?

7         A    The name of the document sounds familiar.

8    I may have been given a copy, but I don't really

9    remember.

10        Q    It's not something that you spent very

11   much time looking at?

12        A    I don't remember.

13        Q    It's three binders of documents that are

14   claim charts for each one of the ASICs.  Do you

15   recall seeing that?

16        A    That doesn't -- I mean, your description

17   doesn't really ring any bells.

18        Q    Which means you probably didn't see it if

19   it's comprised of multiple binders of claim charts?

20        A    Probably.

21             MS. ALLEN:  Objection; assumes facts.

22             BY MS. DE MORY:

23        Q    Now, other than looking at the one portion

24   of code that you pulled out of here, which is on

25   page 5, actually, and there's a little part of it

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

Gary M. Hoffman (*Pro Hac Vice*)
Kenneth W. Brothers (*Pro Hac Vice*)
Eric Oliver (*Pro Hac Vice*)
DeAnna Allen (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY LLP
2101 L Street NW
Washington, DC  20037-1526
Telephone:  (202) 785-9700
Facsimile:  (202) 887-0689

Edward A. Meilman (*Pro Hac Vice*)
DICKSTEIN SHAPIRO MORIN
  & OSHINSKY LLP
1177 Avenue of the Americas
New York, New York  10036-2714
Telephone:  (212) 835-1400
Facsimile:  (212) 997-9880

Jeffrey B. Demain, State Bar No. 126715
Jonathan Weissglass, State Bar No. 185008
ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
177 Post Street, Suite 300
San Francisco, California  94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Attorneys for Ricoh Company, Ltd.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> AEROFLEX INCORPORATED, et al., <br><br> Defendants | **CASE NO. C-03-4669-MJJ (EMC)** <br><br> **CASE NO. C-03-2289-MJJ (EMC)** |
| SYNOPSYS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RICOH COMPANY, LTD., <br><br> Defendant | **RICOH'S EXPERT REPORT OF MARIOS PAPAEFTHYMIOU ON INFRINGEMENT BY AMI SEMICONDUCTOR, INC.** |

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

## I.      Introduction

In this litigation, Ricoh Company Ltd. ("Ricoh") has asserted that AMI Semiconductor, Inc. ("AMIS") infringes and has infringed claims 13-17 of U.S. Patent No. 4,922,432 (the "'432 Patent") by performing certain processes in the design and production of ASICs. The '432 patent is owned by Ricoh, and collectively, I refer to claims 13-17 of the '432 Patent as the "asserted Ricoh claims."

This report is directed to, and will focus on, the nature of the inputs that Ricoh asserts are part of the accused processes. In particular, this report sets forth my opinion, and the basis therefore, that AMIS has used input specifications comprising architecture independent actions and conditions in connection with the design and production of certain ASIC products that I have been informed are sold, offered for sale, and/or imported into or exported out of the United States. This report also sets forth my opinion that these architecture independent inputs are not the type of "Register-Transfer Language (RTL)" formatted input specifications taught by the Darringer Patent (U.S. Patent No. 4,703,435) that was considered by the Court during claim construction.

## II.     Retention

Ricoh has retained me as an expert witness in this litigation. I am being paid $250 per hour for non-testifying work, and $500 per hour for testifying work in this case. I have no personal interest in this litigation.

I am a Professor of Electrical Engineering and Computer Science at the University of Michigan. My research interests are in the areas of computer-aided design, and VLSI (including custom and ASIC design). I have taught senior and graduate-level courses in logic synthesis and VLSI design. My research and teaching activities routinely involve hardware description languages, commercial design tools by Synopsys and other vendors, ASIC designs, and ASIC design processes at all levels of abstraction.

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

Appendix A, attached hereto, includes my *curriculum vitae*. My *curriculum vitae* includes additional details regarding my qualifications for forming the opinions provided herein. Exhibit A also includes a list of my publications and a list of the cases in which I have testified at deposition, hearing or trial during the past four years.

The opinions provided in this report are based on my own personal knowledge and professional judgment. If called as a witness during trial in this matter, I am prepared to testify competently about them.

## III.    **Preparation For This Report**

In addition to studying the '432 patent, its file history, and the Court's April 7, 2005 claim construction order (the "Claim Construction Order"), I have reviewed the information cited herein, including the cited: documentation; depositions of the employees and designated representatives of the parties in this case; the Darringer Patent, its file history and references cited therein; the cited declarations submitted on behalf of the parties; and information from the documents listed at Appendix B, which is attached hereto.

This report is based on my study of the information available to me at the time of its writing. I reserve the right to update, supplement or amend this report in view of additional information obtained through discovery or other information that is now or might become available between now and trial that is significant to the opinions set forth herein.

## IV.    **Complete Statement Of Opinions**

### A.    **Technology Background**

The asserted claims of the '432 patent are directed to a process for designing ASICs. ASICs are integrated circuit chips designed to perform a specific function. ASICs comprise interconnections of transistors that receive input data signals and produce corresponding output data signals. Typically, the operation of these transistors is controlled by one or more controllers which cause data values to be stored in memory (e.g., Random Access Memory ("RAM") or

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

1 Read Only Memory ("ROM")), and a clock is used to trigger the storing of data values.  Specific

2 configurations of transistors are often grouped together to form logic operations.  For example,

3 an AND logic operation represents a configuration of transistors that produces a specific output

4 $Z = X$ AND $Y$ for a certain configuration of inputs X and Y in accordance with the following

5 truth table:

| Z = X AND Y | | |
|---|---|---|
| X | Y | Z |
| 0 | 0 | 0 |
| 0 | 1 | 0 |
| 1 | 0 | 0 |
| 1 | 1 | 1 |

13      Similarly, OR, NOT, NAND, and NOR[1] logic operations each represents a

14 configuration of transistors that produce a specific output for a given input.

| Z = X OR Y | | | Z = NOT X | |
|---|---|---|---|---|
| X | Y | Z | X | Z |
| 0 | 0 | 0 | 0 | 1 |
| 0 | 1 | 1 | | |
| 1 | 0 | 1 | 1 | 0 |
| 1 | 1 | 1 | | |

[1] The NAND function is equivalent to the NOT AND function, and the NOR function is equivalent to the NOT OR function.

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

| Z = X NAND Y | | | Z = X NOR Y | | |
|---|---|---|---|---|---|
| X | Y | Z | X | Y | Z |
| 0 | 0 | 1 | 0 | 0 | 1 |
| 0 | 1 | 1 | 0 | 1 | 0 |
| 1 | 0 | 1 | 1 | 0 | 0 |
| 1 | 1 | 0 | 1 | 1 | 0 |

The logic operations are physically realized as hardware components of varying degrees of complexity. When ASICs are designed using logic synthesis, CAD tools are used to generate descriptions of the hardware components (and their interconnections); these descriptions are commonly known as netlists. The hardware components listed in the netlist are used to perform logic level operations of the ASIC. The netlist is targeted to a particular foundry process and in this sense is technology specific.

ASICs are designed using descriptions or specifications that describe the intended operations of the ASICs. These specifications can be input to CAD tools that perform logic synthesis to generate technology specific netlists for fabricating ASICs. The specifications that are input to such CAD tools can be written at various levels of abstraction. At higher levels of abstraction, the specification is easier to write and to understand, but harder to synthesize into a description that can be used to fabricate an ASIC. As CAD tools for logic synthesis evolved over time, so did their ability to synthesize inputs described at increasingly higher levels of abstraction.

Prior to the proliferation of CAD tools for ASIC design, many integrated circuits were designed manually, and required designers to describe the circuit operation at a low level, such as at the transistor level. Manually designing integrated circuits was time consuming and

RICOH'S EXPERT REPORT OF MARIOS PAPAEFTHYMIOU ON INFRINGEMENT BY AMI SEMICONDUCTOR
CASE NOS. C-03-4669-MJJ (EMC) and C-03-2289-MJJ (EMC)  Page 5

2106284.01

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

1   error prone and became impractical as market demands led to more and more functions being

2   incorporated into circuit operations.

3       CAD tools evolved to accept graphical descriptions (known as "schematics") of

4   integrated circuit hardware components. At that time, CAD tools commonly were capable of

5   converting the schematics to netlists that could be used for fabricating the ASICs. Although such

6   CAD tools required less design time than completely manual processes, the step of creating

7   schematic input descriptions was very time consuming and required detailed knowledge of the

8   hardware architecture of the ASIC components.

9

10      CAD systems further evolved to accept textual descriptions of the operation of

11  ASICs. These textual descriptions expressed ASIC operations in terms of Boolean operations

12  that describe the logic level operation of an ASIC in a short hand format. These logic-level

13  Boolean descriptions often were technology independent representations of ASICs in terms of

14  AND/OR/NOT, and NAND/NOR logic operations. For example, the statement A • B meant A

15  (AND) B and represented a logic level AND operation like that described at page 4 supra; and

16  the statement A + B meant A (OR) B and represented a logic level OR operation like that

17  described at page 4 supra. Such descriptions could be input to CAD systems which would

18  ultimately map the minimized description to technology dependent hardware cells targeted to the

19  selected foundry's process. Such descriptions were at a higher level of abstraction than the

20  transistor level and schematic input descriptions that preceded them. Designing ASICs using

21  these logic level and Boolean descriptions, however, was still time consuming and required a

22  high level of skill and understanding of the logic operations that comprised the ASIC hardware

23  architecture.

24

25      Over time, CAD tools have evolved to accept input formats in hardware description

26  languages (HDLs) that described the function, behavior or operation of the ASIC to be designed

27

28

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

1    without needing to describe the underlying hardware architectures for performing the desired

2    function, behavior or operation.  These functional or behavioral HDLs describe the design in

3    terms of higher level functions to be performed.  Such higher level descriptions do not require

4    detailed knowledge of the ASIC hardware architecture or implementing technology.  For

5    example, such descriptions do not require knowledge of the logic level operations implemented

6    by the hardware components that can be selected for inclusion in the netlist.  As such, ASIC

7    designers often use functional or behavioral HDL descriptions to describe complex operations

8    such as arithmetic operations (e.g., addition, multiplication) and conditional statements (e.g., IF

9    and CASE statements).  These functional or behavioral descriptions are also used to synthesize

10   memory devices, finite state machines, as well as operations that cannot be performed in a single

11   clock cycle ("multi-cycle" operations).  Today, these higher level functions are commonly

12   written in one of two HDLs known as Verilog and VHDL.

13

14          The term "RTL" or "register transfer language" has been used at times to describe

15   HDL inputs to logic synthesis tools (including synthesizable Verilog and VHDL).  The use of the

16   term "RTL" has varied over time, however, and is now primarily dependent on the context.

17   Many types of RTL exist and have been used to describe ASICs for purposes of logic synthesis.

18   In the mid-1980s, structural RTLs that comprised technology independent representations of

19   ASICs in terms of logic operations such as AND/OR/NOT, and NAND/NORs were

20   commonplace.  By the early 1990s, functional RTL formats, including functional descriptions

21   written in Verilog and VHDL languages started becoming more prevalent than architecture

22   dependent descriptions such as structural RTLs for describing many portions of ASICs being

23   designed.  Today, ASIC input descriptions having a range of abstraction levels are written in

24   VHDL and Verilog formats.  For example, higher level functional or behavioral input

25

26

27

28

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

1  descriptions as well as lower logic-level or Boolean descriptions can be written in Verilog or

2  VHDL for input to Synopsys Design Compiler System[2] logic synthesis tools.

3  **B.    Statement Of Opinion**

4  It is my opinion that as part of performing the processes alleged to infringe the

5  asserted Ricoh claims, AMIS inputs architecture independent descriptions to a logic synthesis

6  tool known as the Design Compiler System.  These architecture independent descriptions are

7  functional or behavioral descriptions that do not imply a set architecture, structure or

8  implementing technology.  It is also my opinion that these architecture independent input

9  descriptions are not the RTL descriptions taught by Darringer.

10  **1.    Relevant Claim Language And The Court's Construction**

11  The '432 patent claims architecture independent input descriptions.  Specifically,

12  claim 13 of the '432 patent recites the step of "...describing for a proposed application specific

13  integrated circuit a series of architecture independent actions and conditions...."  It is my

14  understanding that the Court has construed this claim language to mean "describing an input

15  specification containing a series of desired functions to be performed by the desired ASIC."  (Cl.

16  Construction at 14).  It is also my understanding that the court has construed the term

17  "architecture independent actions and conditions" to mean the "functional or behavioral aspects

18  of a portion of a circuit (or circuit segment) that does not imply a set architecture, structure or

19

20

21

22  _____

23  [2] As used herein the term "Design Compiler System" includes: 1) a software product provided by Synopsys, Inc. ("Synopsys") known as "VHDL Compiler" or "HDL Compiler for Verilog" (generically referred to herein as "HDL Compiler"); 2) a software product provided by Synopsys known as "Design Compiler" (including Design Compiler (or DC), DC Ultra, DC Ultra Opt, DC Expert, DC Expert Plus and DC Pro); and 3) certain Synthesis Libraries.  As used herein the term "Synthesis Libraries" includes: synthetic libraries provided by Synopsys known as "standard.sldb, dw_foundation.sldb, dw01.sldb, dw02.sldb, dw03.sldb, dw04.sldb, dw05.sldb, dw06.sldb, dw07.sldb, and dw08.sldb" (hereinafter "the DesignWare synthetic libraries"); and physical libraries provided by one or more foundries (hereinafter "Technology Libraries").

24

25

26

27

28

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

1   implementing technology, but excludes the use of register-transfer level descriptions as taught in

2   Darringer" (Cl. Construction at 12).

3         **2.    The Accused Processes Use Architecture Independent Inputs**

4         Having reviewed HDL inputs used by AMIS in this litigation, it is my opinion that

5   AMIS uses input specifications that include high level, functional or behavioral ("architecture

6   independent") inputs to perform processes that infringe claims 13-17 of the '432 patent. In

7   particular, AMIS uses HDL (i.e., Verilog and VHDL) input specifications that contain

8   descriptions of functionality or behavior desired in the ASIC product under design without

9   expressly (or implicitly) describing the architecture, structure, or implementing technology

10  needed to perform such functionality or behavior.[3] The input specifications used by AMIS in

11  this litigation thus meet the definition of "architecture independent actions and conditions," as

12  that term is construed by the Court in its Claim Construction Order. Examples of AMIS

13  descriptions include those set forth below:

14

15

16

17

18

19

20

21

22

---

23  [3] It is my understanding that AMIS has stated in declarations and deposition testimony in this

24  case that it uses Verilog and VHDL input specification formats for synthesis of ASICs using
    Design Compiler. (See, e.g., Supplemental Input Declaration Of Robert B. Smith Of AMI dated
    January 12, 2006; Clifford Warren 6/8/2006 Deposition Tr. at 26-30, 53-54; Robert Smith

25  2/9/2006 Deposition Tr. at  89, 110, 2/10/2006 Deposition Tr. at 206-219).  I have also reviewed
    ASIC design specifications including functional or behavioral descriptions produced by AMIS in

26  this litigation, some of which were written in Verilog and others in VHDL; examples of these
    functional or behavioral inputs are included in Appendix C, attached hereto.

27

28

RICOH'S EXPERT REPORT OF MARIOS PAPAEFTHYMIOU ON INFRINGEMENT BY AMI SEMICONDUCTOR
CASE NOS. C-03-4669-MJJ (EMC) and C-03-2289-MJJ (EMC) Page 9

2106284.01

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

Arithmetic operations such as addition (commonly denoted by "+") and multiplication (commonly denoted by "*"). An example input segment code is set forth below. Many similar inputs can be found throughout the input descriptions of the accused AMIS products.[4]

**REDACTED**

"If" statements, "If-Then" Statements, "If-Then-Else" Statements. An example input segment code is set forth below. Many similar inputs can be found throughout the input descriptions of the accused Aeroflex products.

[4] As used in these examples, the "+" represents an arithmetic addition operation, not a logical OR function.

CONFIDENTIAL:
SUBJECT TO PROTECTIVE ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13    **REDACTED**
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

1

2       The above examples are functional or behavioral descriptions that do not imply a set

3   architecture, structure or implementing technology.  AMIS uses many functional and behavioral

4   inputs including arithmetic operators (e.g., +, -, * /), relational operators (e.g., <, >, <=, >=), "if"

5   statements, "case" statements, "wait" statements, "always" statements, etc. and other high-level

6   functional descriptions (e.g., finite state machines).  Additional examples of such inputs are set

7   forth in Appendix C.

8                   a.      **The Darringer Patent Teaches Architecture Dependent**
9                           **RTL**

10                          i.      **The Darringer Patent Does Not Teach The Inputs**
                                    **Claimed In The Asserted Claims Of The '432 Patent**
11

12          It is my understanding that the Court in this case has construed the claimed inputs to

13   exclude the use of RTL descriptions as taught in the Darringer Patent.  In my opinion, the

14   Darringer Patent uses the term "RTL" in the sense of the older (then-prevalent) structural RTL

15   that is not claimed by the '432 patent.  As noted above at page 7 supra, the RTL commonplace at

16   the time of the Darringer Patent (i.e., in the mid-1980s) was a form of structural, architecture

17   dependent input that included short hand representations of desired logic operations (e.g.,

18   AND/ORs and NAND/NORs, etc.) of the ASIC[5] and a flowchart-like specification of control

19   that described how chip outputs and memory elements (i.e., latches) were set on each clock

20   cycle.  (Darringer Patent, col. 5 lines 27-38).  That the RTL used in the Darringer Patent closely

21   describes the architecture of the hardware desired in the design is evident from the requirement

22

23   _____

24   [5] The difference between the inputs disclosed in the Darringer Patent and claimed in the '432
     patent was recognized during prosecution of the '432 patent when the patent applicant argued
25   that the "specifications used by Darringer et al. are not truly at an architecture independent level,
     but rather are at a lower level which is indeed hardware architecture dependent and defines the
26   system at a 'register-transfer' level description."  (See Cl. Construction at 11 quoting '432 Patent
     Pros. History at Nov. 1988 Amendment p. 7 (emphasis in original)).
27

28

CONFIDENTIAL:
SUBJECT TO PROTECTIVE ORDER

1  in the Darringer Patent that the inputs undergo a simple translation of the specification into

2  equivalent AND/OR logic.  (Darringer Patent, col. 5 lines 35-41) ("At step 102 in FIG. 2, the

3  register-transfer level description undergoes a simple translation to an initial implementation of

4  AND/OR logic.  This AND/OR level is produced by merely replacing specification language

5  constructs with their equivalent AND/OR implementations in a well known manner.").

6

7       Like the Boolean descriptions noted above at pages 4-6, _supra_, the use in the

8  Darringer Patent of descriptions that are simply translated (by merely replacing specification

9  language constructs with logic operations) is, in my opinion, a description that either expressly

10  specifies (or at least implies) a set architecture or structure desired to be used in the ASIC under

11  design.  Specifically, the Darringer Patent teaches logic level inputs that specify or imply a set

12  architecture of AND/OR logic operations.  As noted above at page 7, _supra_, such descriptions

13  were well-known and commonplace for use in logic synthesis at the time of the Darringer Patent

14  (i.e., in the mid to late 1980s).  In my opinion, Darringer is not directed and does not teach logic

15  synthesis processes using high level, functional or behavioral input descriptions such as the

16  architecture independent input descriptions of the '432 patent.

17

18

19

20                          **REDACTED**

21

22

23

24

25

26

27

28

CONFIDENTIAL:
SUBJECT TO PROTECTIVE ORDER

REDACTED

ii.    **Darringer Does Not Teach The Inputs That Are Part Of the Accused Processes**

The Darringer Patent does not teach the inputs that Ricoh asserts are used as part of the accused AMIS processes. The Darringer Patent discloses that the system has only limited capability for synthesizing inputs. Specifically, the Darringer Patent states the inputs undergo "a simple translation to an initial implementation of AND/OR logic."

The accused AMIS inputs do not specify or imply set logic level descriptions such as AND/OR logic operations as taught by Darringer. Unlike the Darringer Patent inputs, the inputs that are part of the accused AMIS processes are not architecture dependent and do not undergo a "simple translation" to an initial implementation of logic-level (e.g., AND/OR) representations by "merely replacing specification language constructs with their equivalent AND/OR implementations," as required in the Darringer Patent. Rather, AMIS uses the Design Compiler System to synthesize architecture independent Verilog and VHDL descriptions of the functional or behavioral aspects of a portion of an ASIC or ASIC segment.

It is my understanding from my conversations with Dr. Soderman that the accused processes use architecture independent descriptions that undergo a complex mapping process

REDACTED

*CONFIDENTIAL:*
*SUBJECT TO PROTECTIVE ORDER*

1  using the Design Compiler System. In particular, the accused processes perform mappings using

2  the architecture independent descriptions and generic operators[8] in order to select corresponding

3  architecture dependent implementations, and ultimately technology specific hardware

4  components used in the ASIC under design. Such a process is not used (and, indeed, not needed)

5  in the Darringer Patent.

6  **V.        Conclusion**

7          In my opinion, AMIS uses input descriptions that are not disclosed in the Darringer

8  Patent. Unlike the Darringer inputs, the AMIS inputs are architecture independent descriptions

9  that describe function or behavior and do not imply a set architecture, structure or implementing

10  technology and that do not undergo a simple translation to AND/OR logic operations.

11

12  **VI.        Appendices**
        A.   *Curriculum Vitae* Of Marios Papaefthyimiou
13        B.   List Of Materials Reviewed In Developing Opinions
14        C.   HDL Operator Search Report (CD Bates No. RCL000011956)

15

16                                          Executed on June 23, 2006

17

18

19

20                              _____/s/_____
                                Marios Papaefthymiou, PhD
21

22

23

24

25

26  _____
[8] Generic operators include synthetic operators (e.g., ADD_UNS_OP) and other operators such
27  as MUX_OP, SELECT_OP, DP_OP, SEQGEN, FFGEN, and LOGDB.

28

1

**IN THE UNITED STATES DISTRICT COURT**
2                              **NORTHERN DISTRICT OF CALIFORNIA**
                               **SAN FRANCISCO DIVISION**
3
RICOH COMPANY, LTD.,                              )
4                                                 )
                      Plaintiff,                  )
5                                                 )
              v.                                  )
6                                                 )
AEROFLEX ET AL.,                                  )
7                                                 )     Case No. C-03-4669-MJJ (EMC)
                      Defendants.                 )
8    ----------------------------------------     )     Case No. C-03-2289-MJJ (EMC)
     SYNOPSYS, INC.,                              )
9                                                 )
                      Plaintiff,                  )     CERTIFICATE OF SERVICE
10                                                )
              v.                                  )
11                                                )
RICOH COMPANY, LTD.,                              )
12                                                )
                      Defendant.                  )
13

14         I am employed in Washington, District of Columbia.  I am over the age of eighteen
     (18) years and not a party to the within action; my business address is 2101 L Street, NW,
15   Washington, DC, 20037.  On June 23, 2006, I served **RICOH'S EXPERT REPORT OF
     MARIOS PAPAEFTHYMIOU ON INFRINGEMENT BY AMI SEMICONDUCTOR, INC.**
16   on the parties, through their attorneys of record, by sending true copies thereof to the e-mail
     addresses listed below:
17

18              Terry Corbin, Esq.
19              CorbinT@Howrey.com

20              Jacky Fink, Esq.
                FinkJ@Howrey.com
21
                Denise De Mory, Esq.
22              DeMoryD@Howrey.com

23
           I declare that I am employed in the office of a member *pro hac vice* of the Bar of this
24   Court at whose direction this service was made.

25         I declare under penalty of perjury that the foregoing is true and correct.  Executed in
     Washington, D.C. on June 23, 2006.
26

27                                          _____

28                                                  Solomon Seyoum

*Confidential Pursuant*

*To Protective Order*

## APPENDIX B

- The Court's Claim Construction
- Other Documents
  - SP000071009-1100
  - RCL 000000001-0265
  - AF 000023286-3481
  - MGI 000033893-3908
  - MGI 00034098-4128
  - MGI 000034441-4448
  - MGI 000034834-4864
  - DEF 000031060-1090
  - DEF 000045399-0476
  - AMI 000000712-1206
  - AMI 000021381-1866
  - MES 000003264-3287
  - MGI 000009804-10414
  - AF 000042696-3124
  - SP 000095701-6322
  - RCL 000011420-1425
  - RCL 000008307-8318
  - RCL 000011416-1418
  - RCL 000011419
  - SP 000168657-8785
  - SP 000167847-7881
  - SP 000147523-7532
  - AMI 000008669-8760
  - RCL 000009449-9622
  - SP 000184344-4349
  - SP 000121644-1745
  - DEF 000027028-7054
  - MGI 000001482-1647
  - SP 000060462-0659
  - SP 000059888-60461
  - SP 000058826-8846
  - RCL 000007749-7753
  - RCL 000009658-9659
  - AMI 000021867-1939
  - AMI 000129888-9959
  - DEF 000070214-0262
  - DEF 000018686-8689

DSMDB-2105606v01

- AMI 000129671-9761
- AMI 000124077-4080
- 2SP 000039904-9908
- SP 000098068-8593
- SP000002771-830
- SP 000003017-3019
- Darringer Patent File History & Associated References (attached to this AppendixB as Exh. 1)

- Depo Transcripts:
  - Boisvert 2/16/2006, 6/6/2006
  - Chiappini 2/23/2006, 2/24/2006, 6/7/2006
  - Warren 6/6/2006
  - Bourban 6/13/2006
  - Evans 6/14/2006
  - Packer 6/8/2006
  - Tran 12/16/2005
  - Chang 1/5/2006
  - Pieper 12/12/2005
  - Smith 2/9/2006, 2/10/2006
  - Adams 12/21/2005
  - Milliken 1/20/2006;
  - Webster 6/8/2006
  - Zepter 12/22/2005
  - Coco 1/19/2006, 4/20/2006