Teresa M. Corbin (SBN 132360)
Denise M. De Mory (SBN 168076)
Jaclyn C. Fink (SBN 217913)
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, California 94105
Telephone: (415) 848-4900
Facsimile: (415) 848-4999

Attorneys for Plaintiff SYNOPSYS, INC.
and for Defendants AEROFLEX INCORPORATED,
AMI SEMICONDUCTOR, INC., MATROX
ELECTRONIC SYSTEMS, LTD., MATROX
GRAPHICS, INC., MATROX INTERNATIONAL
CORP., MATROX TECH, INC., and
AEROFLEX COLORADO SPRINGS, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| RICOH COMPANY, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> AEROFLEX INCORPORATED, AMI SEMICONDUCTOR, INC., MATROX ELECTRONIC SYSTEMS LTD., MATROX GRAPHICS INC., MATROX INTERNATIONAL CORP., MATROX TECH, INC., AND AEROFLEX COLORADO SPRINGS, INC. <br><br> Defendants. | Case No. C03-4669 MJJ (EMC) <br><br> Case No. C03-2289 MJJ (EMC) <br><br> REPLY IN SUPPORT OF MOTION FOR RULE 11 SANCTIONS AGAINST RICOH FOR ASSERTING FRIVOLOUS CLAIMS <br><br> Date:       October 17, 2006 <br> Time:       9:30 a.m. <br> Courtroom:   11, 19th Floor <br> Judge:      Hon. Martin J. Jenkins <br><br> **FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER** <br><br> **(Redacted Public Version)** |
| SYNOPSYS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RICOH COMPANY, LTD., <br><br> Defendant. | |

HOWREY LLP

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)
REPLY IN SUPPORT OF MTN FOR RULE 11 SANCTIONS
AGAINST RICOH FOR ASSERTING FRIVOLOUS CLAIMS
DM_US\8395458.v1

1

**TABLE OF CONTENTS**

2
**Page**

3   I.    INTRODUCTION ........................................................................................... 1

4   II.   ARGUMENT .................................................................................................. 2

5         A.   The Scope And Meaning Of The Disclaimer Is A Claim
               Construction Issue And A Pure Question of Law ................................ 2
6
7         B.   The Court Has Already Decided The Exact Legal Issue Addressed
               In Ricoh's Expert Report On Which It Allegedly Relies ..................... 4

8         C.   Ricoh's And Its Counsel's Actions Were Deliberate And Were Not
               Taken In Reliance On An Alleged Expert Opinion Received From
9              Dr. Papaefthymiou........................................................................... 7

10        D.   Everything Else In Ricoh's Opposition Simply Evidences That
               Ricoh is Grasping At Straws ............................................................ 10
11
12  III.  CONCLUSION ............................................................................................ 14

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)                    -i-
REPLY IN SUPPORT OF MTN FOR RULE 11 SANCTIONS
AGAINST RICOH FOR ASSERTING FRIVOLOUS CLAIMS
DM_US\8395458.v1

1

# TABLE OF AUTHORITIES

2

Page(s)

3

## CASES

4

*Bayer AG v. Elan Pharmaceutical Research Corporation,*
    212 F.3d 1241 (Fed. Cir. 2000) ................................................................. 3

5

*Eisenberg v. University of New Mexico,*
6       936 F.2d 1131 (10th Cir. 1991) .............................................................. 13

7

*Kumar v. Ovonic Battery Co., Inc.,*
    351 F.3d 1364 (Fed. Cir. 2003) ................................................................. 3

8

*Mendenhall v. National Transportation Safety Board,*
9       92 F.3d 871 (9th Cir. 1996) ................................................................... 13

10

*Monster Cable Products, Inc. v. The Quest Group,*
    2005 U.S. Dist. LEXIS 23466 (N.D. Cal. Oct. 13, 2005 (Patel, J.)) ......... 5

11

*Safe-Strap Co., Inc. v. Koala Corp.,*
12      270 F. Supp. 2d 407 (S.D.N.Y. 2003) ....................................................... 1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)        -ii-
REPLY IN SUPPORT OF MTN FOR RULE 11 SANCTIONS
AGAINST RICOH FOR ASSERTING FRIVOLOUS CLAIMS

DM_US\8395458.v1

1   **I.    INTRODUCTION**

2           Rule 11 sanctions are a serious matter.  Synopsys, the Customer Defendants, and their attorneys

3   fully appreciate that seriousness of the issue here.  The decision to serve and then file the instant

4   motion was made after much contemplation – not as a heavy handed litigation tactic – but to redress

5   injuries that summary judgment alone cannot redress – the injuries incurred because of the objectively

6   unreasonable conduct of Ricoh and its attorneys.  Given the Court's claim construction ruling, Ricoh's

7   opposition provides no evidence or argument to show that its conduct was anything but objectively

8   unreasonable.  Defendants' injuries include months of wasted effort, substantial diverted human

9   resources, and *millions* of dollars.  This motion is not premature,[1] or an effort to assert undue pressure.

10  Quite to the contrary, Ricoh should have withdrawn its complaint long ago, along with every pleading

11  in which Ricoh alleges that the Customer Defendants infringe United States Patent 4,922,432 ("the

12  '432 patent") or that the Synopsys tools are capable of infringing the '432 patent, including the

13  pleadings that allege infringement that formed the procedurally proper basis for this motion.  (*See* Rule

14  11 Motion at 11:18-26).[2]

15          Based on Ricoh's own description of the issues as set forth in its Opposition,[3] it is indisputable

16  at this point that the expert opinion on which Ricoh and its counsel allegedly rely[4] relates to a pure

17

18  ―――――――――――――――――――

19  [1] Ricoh cites *Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407, 414 (S.D.N.Y. 2003) for the proposition that the
    Rule 11 motion should be deferred.  *Safe-Strap*, however, is inapposite because: "Koala moves for sanctions under unusual

20  circumstances. To date, the Defendant has not moved this Court to dismiss this action or for judgment on the pleadings. In
    addition, although the parties disagree about the manner in which the '687 Patent should be construed, neither party has

21  sought summary judgment or asked the Court to conduct a claim construction hearing in accordance with *Markman v.
    Westview Instruments, Inc.*, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996)." *Id.* at 412-413.  Clearly, this case is

22  in a completely different procedural posture, and thus, this motion is ripe.

23  [2] The Rule 11 Motion is based on specific pleadings filed in June and July that alleged infringement after Dr.
    Papaefthymiou issued his report (i.e., allegations of infringement made in reliance on a theory of the case on which it was

24  objectively not reasonable to rely), and was served more than twenty-one days before it was filed in compliance with the
    safe-harbor provisions of Rule 11.  *See* Rule 11 Motion at 11:18-26.  Even though withdrawal of these pleadings also

25  required Ricoh to withdraw all infringement claims (as specifically requested in the Notice of Motion), it does not make the
    Rule 11 Motion procedurally defective.  *See also* cased cited on page 12:13-13:3 of the Rule 11 Motion.

26  [3] *See*, for example, Opposition at 7:21-24 ("Dr. Papaefthymiou has repeatedly expressed his opinions . . . that the Darringer
    '435 patent teaches . . .").

27  [4] In fact, Ricoh could not have been relying on the opinion from Dr. Papaefthymiou because Ricoh did not even obtain the
    opinion until June of 2006.  *See infra* page 9.

28

1  question of law.  More significantly, that question of law has already been decided by this Court, and

2  Ricoh, its counsel, and its experts (at counsel's direction) all either ignore or contradict the Court's

3  ruling.  Accordingly, as more fully described below, Ricoh's Opposition further demonstrates why

4  Rule 11 sanctions are appropriate.

5  **II.    ARGUMENT**

6      **A.    The Scope And Meaning Of The Disclaimer Is A Claim Construction Issue And A**

7          **Pure Question of Law**

8          The substantive issue addressed in Ricoh's expert report on which it allegedly reasonably relies

9  is:  what is the scope of the disclaimer that the patentee made during the prosecution of the patent

10  application?  Ricoh now claims, without citing any authority, that this substantive issue is a question of

11  fact.  *See, e.g.*, Opp. at 1:5-6; 3:19-20; 10:10-17.  However, Ricoh fails to explain how it could

12  reasonably advance such an argument in view of the fact that the positions that Dr. Papaefthymiou

13  takes (or which Ricoh took in opposition to Summary Judgment Motion No. 1) are identical to

14  positions it took in its claim construction briefing, and which were arguments already expressly

15  rejected by this Court as a matter of law.  *See* Reply in Support of Summary Judgment Motion No. 1 at

16  2-5; Rule 11 Motion at 3.  Moreover, in the Claim Construction proceedings, Ricoh argued that expert

17  testimony should not be considered.  Now it relies on its expert to support the same rejected arguments

18  it made during claim construction, asserting that the same questions are questions of fact.  This flip-

19  flop tactic alone is clearly and objectively unreasonable.

20          As Ricoh and its counsel well know, the question at issue here – the scope of the disclaimer

21  which defines the scope of the claims – is purely a question of law.[5]  In *Omega Engineering, Inc. v.*

22  *Raytek Corporation*, 334 F.3d 1314 (Fed. Cir. 2003), a case cited and quoted by Ricoh in its claim

23  construction briefs, the Federal Circuit made clear that this issue is a question of law.  After indicating

24  that claim construction was a question of law, subject to *de novo* review, the Court continued that

25  _____

26  [5] For this reason, the cases that Ricoh cites in section IIIB are completely inapposite.  As Ricoh's parenthetical comments
and description make clear, in the cited cases, the issues on which the challenged opinions or positions were presented were

27  intensely factual inquiries.  (The Court should note that the citation to the *Screiber* case is incorrect in Ricoh's brief; it
should be 2006 U.S. DIST LEXIS 59160 (D. Nev. Aug. 17, 2006).)

28

1  "[t]he doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding

2  patentees from recapturing through claim interpretation specific meanings disclaimed during

3  prosecution . . . . In light of the Court's guidance, we have adopted [the] doctrine [of prosecution

4  disclaimer] as a fundamental precept in our claim construction jurisprudence." *Id.* at 1323-24 (citations

5  omitted).

6      Moreover, there is no question from the case law that all aspects of determining the scope of

7  any prosecution disclaimer are a questions of law. In *Bayer AG v. Elan Pharmaceutical Research*

8  *Corporation*, 212 F.3d 1241, 1254 (Fed. Cir. 2000), the Court explained the law as follows:

9      The standard for determining whether a particular subject matter was relinquished . . . is
   an objective one ***which we determine as a matter of law***. . . . Having prosecution history
10     estoppel decided as a pure question of law is consistent with fostering certainty as to a
   patent's scope, a consideration that is important for reliance by those in the marketplace .
11     . . To allow a particular part of the prosecution history estoppel inquiry (such as the
   matter of what a reasonable competitor would conclude was surrendered during
12     prosecution) to be a question of fact would hamper the promotion of uniformity . . .
   Consequently, testimony as to what a reasonable competitor would conclude from the
13     prosecution history cannot create a disputed question of fact so as to bar summary
   judgment.

14

15  *Id.* (citations omitted) (emphasis added). The Court went on to say that, in the context of determining,

16  as a matter of law, what subject matter was relinquished, expert testimony is only a tool "which the

17  judge can use at his or her discretion, to aid in the legal determination . . ." *Id; see also Kumar v.*

18  *Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) (cited by the Court on page 12 of the

19  Claim Construction Order discussing the teachings of Darringer; in deciding claim construction issues

20  as a matter of law, the Federal Circuit in *Kumar* adopted the definition of a term from the prior art).

21      Thus, the ***most*** charitable reading of ***every*** argument Ricoh makes in its Opposition to this

22  Motion is that, in Ricoh's view, the Court's Claim Construction Order's ruling on the legal question of

23  claim construction is either: (1) not complete, or (2) not clear. Given this, Ricoh should have sought

24  clarification or reconsideration from the Court instead of pressing ahead and dragging Customer

25  Defendants through a year of extremely expensive and burdensome litigation, demanding the

26  production of over 12 million pages of documents, filing numerous motions, and taking more than 240

27  hours of depositions. The Court should find that this conduct alone was objectively unreasonable,

28  particularly now when compounded with Ricoh's objectively unreasonable argument that a pure

1  question of law already decided by the Court is now merely a disputed question of fact between

2  experts as to what was disclaimed.

3      **B.    The Court Has Already Decided The Exact Legal Issue Addressed In Ricoh's**

4              **Expert Report On Which It Allegedly Relies**

5          It is simply wrong that the Claim Construction Order is either incomplete or not clear.  In fact,

6  the Claim Construction Order fully addressed the legal question of what was specifically disclaimed by

7  the patentee (*i.e.,* what do the claims mean based on the intrinsic evidence).  Indeed, the relevant

8  portion of the Claim Construction Order begins:  "In order to make this determination, the Court must

9  examine the Darringer 4,704,435 Patent ('the '435 patent') and how closely it reads on the present

10 invention."  The Court determined, as a matter of law, based on the teachings of the Darringer patent

11 and the public record for the '432 patent, that:

12      (1)    Darringer included an explicit definition of RTL that "the subsequent translation or

13             transformation steps in [the Darringer patent] do not alter."  De Mory Decl. [Docket No.

14             584-1], Exh. 8 (CC Order at 12:5-7).

15      (2)    "The '432's public record fails to provide any support for Ricoh's distinction between

16             'structural' and 'functional' RTL-type input systems."  De Mory Decl. [Docket No.

17             584-1], Exh. 8 (CC Order at 12:9-12).

18      (3)    "[T]he prosecution history indicates that *the patentee disclaimed all register-transfer*

19             *level descriptions.*"  De Mory Decl. [Docket No. 584-1], Exh. 8 (CC Order at 12:14-15)

20             (emphasis added).

21 Accordingly, the Court clearly construed "architecture independent actions and conditions" to exclude

22 RTL as taught in Darringer.

23         Contrary to Ricoh's arguments in its Opposition, the Court also explained, as a matter of law,

24 exactly what was taught in Darringer.  As set forth above, the Court makes clear that the patentee

25 disclaimed all RTL descriptions – at all levels of "abstraction" (including the structural level once

26 again advocated by Ricoh and its expert) – by specifically considering and then rejecting Ricoh's

27 functional/structural argument.  The Court also made clear that an RTL description is something that

28 includes a specification of the inputs, outputs, and latches (registers), as well as the function of a circuit

1  in terms of transfers between registers (as the name implies) for a single clock cycle.  The Court also

2  made clear that the subsequent translation or transformation steps do not alter this definition of RTL.

3  Accordingly, Ricoh's argument that there remains a factual issue about what is taught in Darringer that

4  precludes summary judgment and/or supports Ricoh's reasonable reliance on its expert's testimony is

5  simply wrong and completely ignores or contradicts the Court's Claim Construction Order.  This alone

6  should be ground for sanctions.  Indeed, a case cited by Ricoh in its Opposition makes clear continuing

7  to litigate issues that depend on "willfully [misreading]" the court's claim construction order in a

8  manner that "defies grammar and logic" is grounds for sanctions.  *Monster Cable Products, Inc. v. The*

9  *Quest Group,* 2005 U.S. Dist. LEXIS 23466 at *18 (N.D. Cal. Oct. 13, 2005) (Patel, J.) (awarding

10  sanctions for willful misreading of claim construction order).[6]

11        There is also no ambiguity in the Court's Claim Construction Order about what the "explicit

12  definition" of RTL is.  As described in footnote 7 of the Court's Claim Construction Order, the Court

13  determined that RTL as taught by Darringer, consisted of (1) "a specification of the inputs, outputs and

14  latches of the chip to be synthesized" and (2) "a flowchart-like specification of control, describing for a

15  single clock cycle of the machine how the chip outputs and latches are set according to the values of

16  the chip inputs and previous values of the chip."  Although the Court did include the following line in

17  footnote 7: "[a]t step 102 in Figure 2, *the register-transfer level description* undergoes a simple

18  translation to an initial implementation of AND/OR logic," as noted above and in Summary Judgment

19  Motion No. 1,[7] the Court explained this sentence in the text as follows: "The '435 patent specifically

20

21

---

22  [6] Ricoh cites the previous page of *Monster Cable* case which the Court determined that Monster's "prefiling" investigation met the "bare minimum analysis" to file the Complaint. *Id.* at *17.  The portion of the case cited by Ricoh related solely to actions taken prior to claim construction – and even local patent rule disclosures. *Id.* However, after the *Markman* hearing, 23  the Court granted sanctions for Monster's objectively unreasonable conduct, including the willful misreading of the Court's claim construction order. *Id.* at *18-19.

24  [7] Ricoh's claim that Customer Defendants believe that the "simple translation to an implementation of AND/OR logic," 25  i.e., the "subsequent translation step" is part of the "explicit definition" of Darringer RTL is based upon a partial (mis)quotation of Defendants' brief.  In the passage quoted by Ricoh at page 10, footnote 7, Ricoh neglects to include all of 26  the language contained on page 6 of Defendants' RTL Summary Judgment Motion, including the discussion of the fact that the subsequent translation or transformation steps do not alter the explicit definition.  The complete language reads: "The 27  Court's footnote 7, following this passage [i.e., the subsequent translation or transformation or translation steps do not alter this explicit definition], points to the definition of RTL as set forth in the Darringer patent as follows: . . ."  It does not say, 28  without discussion of translation language, that the "definition of RTL as set forth in the Darringer patent [is] as follows,"
                                                                                                                (Continued...)

1  defines *a register-transfer level description* and the subsequent translation or transformation steps

2  described in the patent do not alter this explicit definition." (Underlining added). Read in context, the

3  last line of the footnote is included to make the point that although the "register-transfer level

4  description" described in the preceding lines "undergoes a subsequent translation," this translation

5  does not alter the preceding definition of "the register-transfer level description."

6        Moreover, Synopsys and the Customer Defendant's RTL Summary Judgment Briefs and Rule

7  11 Motion made clear, over and over again, that the Customer Defendant inputs meet – and Synopsys'

8  Design Compiler requires – the Court's explicit definition of Darringer RTL that includes a

9  specification of inputs, outputs, and registers, and a description of, for a single clock cycle, how the

10  outputs and registers are set according to the values of the chip, and that the subsequent translation

11  steps – including the translation to AND/OR logic – do not alter this definition. *See e.g.,* Rule 11

12  Motion at 14. Ricoh's experts admitted that they made no effort to determine whether or not the inputs

13  met this definition in their expert report. Thus, this evidence uncontroverted. Moreover, Ricoh's

14  "other" expert did admit that the inputs met this definition:

15      Q:    Do the customer designs include a specification of the inputs?

16      A:    Yes.

17      Q:    Do the customer Defendant designs include a specification of the outputs?

18      A:    Yes.

19      Q:    Let's do it this way. Do the customer Defendant designs include a specification of
20               FlipFlops[8] if we define specification of FlipFlops to include inferring if FlipFlop
                from statements such as always@(posclkedge)?

21      A:    Yes.

22

23  _____

(...Continued)

24  which is how Ricoh misquotes the statement. This is not what Defendants said, or intended, as is clearly evidenced by the
25  quote in its original context and by the remainder of the summary judgment brief.

26  [8] Latches and flip-flops are both memory elements, or registers. Dr. Soderman testified that in the case of the Customer
   Defendant designs, the customers used flip-flops as the register elements. CITE. Indeed, the fact that Dr. Soderman can
   determine this from the input totally undercuts Ricoh's argument about "architecture independent." Indeed, Dr. Soderman
27  testified that always@(posclkedge) infer a positive edge triggered flip-flop. Brothers Decl. [Docket No. 622], Exh. 32
   (Soderman Tr. 55:8-22, 80:1-13).

28

Q:     Let me try it again.  Do the customer Defendant designs include for each clock cycle a description of how the values of the outputs and FlipFlops should be set according to the values of the inputs, the previous values of the FlipFlops and the logic functionality as specified by the HDL operators?

A:     Yes.

Brothers Decl. [Docket No. 622], Exh. 32 (Soderman Tr. at 77:21-78:1; 80:1-13; 108:2-9).[9]

## C.     Ricoh's And Its Counsel's Actions Were Deliberate And Were Not Taken In Reliance On An Alleged Expert Opinion Received From Dr. Papaefthymiou

Tellingly, because Ricoh and its counsel understood the full import of the Claim Construction Order but wanted to maintain the case as long as possible so Customer Defendants would be forced to spend so much money during discovery that the case would settle, Ricoh did not seek either clarification or reconsideration of the Claim Construction Order.  Instead, Ricoh and its counsel embarked on a misguided effort to create a factual dispute about the meaning of "register-transfer level descriptions as taught in Darringer" by ignoring the Court's explicit discussion in the tutorial and Claim Construction Order of what Darringer actually teaches about RTL.  Although Ricoh already had Dr. Soderman, who: (1) had been working in the ASIC design business (including at such companies as Intel, IBM, LSI Logic, XILINX, and Synopsys competitor, Cadence Design Systems) since the 1970's and who was a long-time user of Design Compiler; (2) is an experienced expert who understands the meaning of court orders and claim construction proceedings and participated in the claim construction proceedings in this case; and (3) who ultimately offered an expert opinion on all the technical details in the case except for "architecture independent actions and conditions," Ricoh immediately sought out another expert.

---

[9] Ricoh does nothing to counter this testimony other than to posit that Dr. Soderman now agrees with Dr. Papaefthymiou as well as to point to its summary judgment declarations filed after the Rule 11 Motion that contain new opinions by Dr. Soderman and Dr. Papaefthymiou.  Even if these new opinions are considered (over Defendants' objections), they do not to advance Ricoh's position.  Dr. Soderman's new opinions are based on the same flawed legal analysis as Dr. Papaefthymiou's opinion.  Moreover, the late-filed declarations simply contain conclusory statements that cannot defeat summary judgment and have no relevance here (i.e., the designs do not specify inputs; the designs do not contain a flow-chart like description of control, etc.).

1         Ricoh sought out, tested, and then hired, Dr. Papaefthymiou,[10] a novice expert witness who had

2    never participated in Claim Construction proceedings, who had never used Design Compiler, and was

3    unfamiliar with the kind of inputs it could accept.  In Dr. Papaefthymiou, Ricoh sought out and found

4    someone with good paper qualifications who was willing to say, in essence, that Darringer teaches that

5    the earth is flat – even though the Court already had determined that Darringer shows the earth is

6    round.  Ricoh and its counsel took deliberate steps to ensure this result.  Ricoh and its counsel made

7    sure not to taint Dr. Papaefthymiou with the inconvenient details of the Claim Construction Order by

8    providing him only with the '432 patent and the Darringer patent.  Indeed, Dr. Papaefthymiou was not

9    provided withy any details of the Claim Construction Order and did not see a copy of it until June

10   2006.  Brothers Decl. [Docket No. 622], Exh. 40, (Papaefthymiou Tr. at 8:7-10; 69:25-70:2).  Ricoh's

11   "screening" process was simply to determine whether Dr. Papaefthymiou would look at the same

12   materials already considered by and ruled on by the Court in the Claim Construction Order and reach a

13   conclusion contrary to that reached by the Court.  Ricoh and its counsel undoubtedly knew then that it

14   was seeking an (unreasonable) opinion from an expert in order to find some (unreasonable) basis on

15   which to continue the litigation.

16        Dr. Papaefthymiou was retained after the screening process.  Dr. Papaefthymiou formed no

17   opinions prior to October 5, 2005, and did not work on the case from October of 2005 until May or

18   June of 2006 (at 62:14-63:2), when he was contacted for the first time to provide an opinion on

19   whether or not the Customer Defendant inputs were architecture independent actions or conditions.

20   Thus, Ricoh cannot argue that any activity between October 5, 2005 and June of 2006 was undertaken

21   in reliance on Dr. Papaefthymiou's opinions – because none had been given:

22         Q   When did you formulate the opinion that the inputs that the Customer Defendants use are
              architecture independent inputs?

23

24

-----

25   [10] Dr. Papaefthymiou's first contact with the Ricoh legal team was in the summer of 2005.  (Papaefthymiou 5:22-6:1.)  He
     was asked to perform up to 10 hours of consulting as a "candidate" for further consulting.  (*Id.* 7:13-20, 8:11-14.)  During

26   these 10 hours of consulting, Dr. Papaefthymiou did nothing more than look at the '432 and Darringer patents.  (*Id.* 7:25-
     8:6.)  He was not provided a copy of the Court's Claim Construction Order.  (*Id.* 8:7-10.)  Tellingly, he did not provide

27   Ricoh's counsel with any opinion.  Dr. Papaefthymiou was retained on August 29th, 2005, after a series of phone calls with
     counsel.

28

1    A    That was done during the month of June of – primarily during June of 2006.  That is when

2    I focused on that question.

3    Q    And were you asked to focus on it starting on or about June 12th of 2006?

4    A    No.  It was – we had some exchanges as far as back as May of 2006.

5    (*Id.* at 63:3-12).  Ricoh also cannot claim it relied on Dr. Papaefthymiou's reading of the Claim

6    Construction Order because counsel did not give Dr. Papaefthymiou a copy of the Court's Claim

7    Construction Order until June 2006 (and had not provided any details prior to October 5, 2005).  (*Id.*

8    69:25-70:2.)  Moreover, Dr. Papaefthymiou clearly had no involvement in the Final Infringement

9    Contentions served in March, and in fact testified at deposition that he does not believe he ever saw

10    them (which is confirmed by the list of documents considered in Dr. Papaefthymiou's expert report).

11    (*Id.* 192:5-20; De Mory Decl. [Docket No. 584-1], Exh. 9 at Appendix B).

12        These facts clearly demonstrate that Ricoh did not rely on the opinion of Dr. Papaefthymiou

13    from the time the Court issued the Claim Construction Order until shortly before Dr. Papaefthymiou's

14    expert report was served because *Dr. Papaefthymiou had not provided any opinion to Ricoh's counsel*

15    *until June 2006*.  Thus, there was no reliance on any opinion from Dr. Papaefthymiou for the entire

16    duration of Ricoh's concerted run-up-the-costs discovery barrage in 2005 and 2006 or when the Final

17    Infringement Contentions were served.  It is the height of hypocrisy for Ricoh to harshly criticize

18    Customer Defendants for relying on a legal "interpretation of the Court's interpretation" that allegedly

19    "ignore[s] the Court's construction," when that is precisely what Ricoh and its counsel have been

20    doing all along.  *See* Rule 11 Opp. at 7:1-3.  Its alleged reliance on its expert cannot justify its conduct.

21        Moreover, when confronted with the Court's Claim Construction Order, even Dr.

22    Papaefthymiou concedes something Ricoh still has failed to address: that the language on page 12 line

23    15 of the Court's Claim Construction Order – "[a]ccordingly, the prosecution history indicates that the

24    patentee disclaimed all register-transfer level descriptions" – "may be viewed as an inconsistency"

25    with his opinion.  Papaefthymiou Tr. at 126:5-16.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    **D.    Everything Else In Ricoh's Opposition Simply Evidences That Ricoh is Grasping**

19    **At Straws**

20        Ricoh cites a series of additional arguments that evidence that is nothing more than grasping at

21    straws.  For example, on page 12, Ricoh again claims that RTL is used inconsistently by Defendants

22    because RTL is sometimes used in conjunction with adjectives like behavioral or functional.  Ricoh's

23    descriptions are wrong, but in any event irrelevant because they fail to discuss the unavoidable fact that

24    _____

25    [11] For example, Ricoh's argument that it does not intend to claim that the NOT, DECODE, CMP and other actions
      described in the specification as architecture independent actions (the only type of actions disclosed in the specification)
26    that can be assigned to the flowchart are architecture independent is irrelevant.  Rule 11 Opp. at 18:18-19.  The question is
      what objectively did the patentee disclaim as a matter of law based on the Darringer reference and the public record.  It is
27    clear Dr. Papaefthymiou's opinion , even as to this legal issue, is insupportable in view of what the patent does say, how it
      does compare to Darringer, and the public record.

28

1  regardless of what adjectives are used, the RTL descriptions Ricoh points to, as pointed to in

2  Defendants' summary judgment reply, either meet the two part definition of Darringer, or are silent on

3  the issue.[12]

4        Moreover, Ricoh's claim that the Andelman e-mail can or does create a disputed question of

5  fact is likewise wrong.  Ricoh's contention is based upon an e-mail exchange between counsel, who

6  were at the time attempting to resolve a discovery dispute before Judge Chen, and thus, the e-mail

7  cannot create a disputed question of fact.  Furthermore, Ricoh's characterization of the e-mail is

8  substantively without merit.  Defendants issued subpoenas to the University of Michigan and two other

9  institutions Dr. Papaefthymiou has been associated with.  The subpoenas sought, in sum, potential

10 impeachment evidence; *i.e.*, any evidence relating to use of any of the terms in the Court's definition of

11 "architecture independent actions and conditions," including RTL.  During the course of the meet and

12 confer, the parties agreed that the scope of the requests would encompass more than simply documents

13 containing the terms "RTL" or "register-transfer level."  Yet Ricoh steadfastly insisted that the

14 requests specifically read that they were limited to documents "that define[] or otherwise refer[] to

15 register transfer level ('RTL')" because of the wording of the Court's order.  Defendants suggested that

16 this language would be acceptable *if* they were able to define "RTL" for purposes of the subpoenas

17 such that it would encompass all the documents they were seeking for impeachment purposes — in

18 other words, define the term "RTL" to include terms and concepts other than a simple definition of

19 RTL.  However, after trying to create such a definition, defendants recognized defining RTL to include

20 terms and concepts beyond the definition of RTL would be confusing – especially to third parties – and

21 they decided not to proceed in this manner as reflected by the e-mail exchange.

22        Similarly, Ricoh's attempts to mischaracterize the Soderman papers and patent also clearly

23 shows desperation.  Ricoh claims that they show why "context matters."  However, Ricoh's own

24

25

[12] Moreover, Ricoh's argument that adjectives control or are relevant is particularly ironic in light of its argument, two
26 pages later, that Dr. Papaefthymiou's failure to determine whether the inputs are structural RTL, functional RTL, or RTL at
all, is a red herring and then, its argument several pages later that "there is a big difference between (i) the functional or
27 behavioral operations in the architecture independent inputs that Ricoh accuses in this litigation and (ii) the Darringer
primitive descriptions . . ."  Compare Opp. at 15 and 20.

28

1  description demonstrates what Customer Defendants have said all along: only VHDL and Verilog

2  descriptions written in an RTL format are synthesizable, or in other words, the only VHDL and

3  Verilog descriptions Design Compiler can accept as input for purposes of synthesis are RTL Verilog

4  and VHDL descriptions.

5      Ricoh also chastises Customer Defendants for failing to take into account all the alleged

6  evidence from its experts, and in particular, the declarations filed in opposition to the RTL summary

7  judgment motion. The Rule 11 Motion was served on the day the summary judgment motion was

8  filed, and then, not changed thereafter. Thus, it could not take into account opinions formed for the

9  first time after it was served. The Rule 11 Motion, did, however, take into consideration Ricoh's

10  expert reports and deposition testimony, which should control the outcome of this Motion and the RTL

11  summary judgment motion.[13]

12      Finally, Ricoh claims that the fact that Customer Defendants served its Rule 11 Motion in

13  August shows that it lacks merit. The argument should be summarily rejected. Ricoh cannot deflect

14  attention from its own bad acts by insinuating that Customer Defendants improperly delayed. In the

15  first instance, Ricoh diverted every resource available to Defendants for months, taking over 240 hours

16  of deposition, demanding twelve million pages of documents, and filing numerous discovery motions,

17  including a motion for sanctions that Ricoh now touts (but which the Court rejected). This discovery is

18  also revealed to be objectively unreasonable in view of Ricoh's now revealed theory of the case: that

19  Darringer taught only structural level RTL descriptions that required a simple translation to AND/OR

20  logic; thus Ricoh undoubtedly long ago knew from its own use of Design Compiler, from the Synopsys

21  documentation, from the Synopsys depositions, from the first Customer Defendant deposition, and

22  most certainly, from the produced Customer Defendant inputs, that this is not the manner in which the

23  Synopsys tools were used or operate. How can it possibly justify its need or decision to take

24  depositions on each allegedly accused ASIC design? Moreover, while Judge Chen unequivocally

25  denied Ricoh's sanctions motion – and indeed would not hear argument on it in view of Ricoh's

26

27  [13] The additional "opinions" contained in the declarations are based on the same flawed legal theories discussed herein, are simply conclusory statements, or are new opinion which should be stricken. *See* Evidentiary Objections, Docket No. 679.

28

1  prehearing tactics – the discovery Ricoh sought, obtained, and took as result of the Motion was just

2  more of the same – more input files, more testimony about the input files, more testimony about RTL.

3  Clearly, this was all unneeded.  Customer Defendants had to deal with all this discovery and motion

4  practice while preparing its case, and in the off chance the case proceeded to trial, make sure they had

5  the discovery they needed.

6         Ricoh claims that Customer Defendants should have known of Ricoh's flawed legal theory as

7  of the time it served its Final Infringement Contentions.  The contentions, however, completely

8  obscure the issue of how Ricoh intended to get past the disclaimer issue, instead merely saying that:

9         "The description was written in a high-level design language . . . , and described a series
         of desired functions . . . without specifying or implying a set architecture or technology.
10        The input description by the ASIC Designer is thus a series of desired functions to be
         performed by the desired ASIC.  Claim Construction Order dated April 7, 2005 at 14.
11        The input description further includes 'functional or behavioral aspects of a portion of a
         circuit or circuit segment that does not imply a set architecture, structure, or
12        implementing technology, but excludes the use of register-transfer level description as
         taught in Darringer.'  Claim Construction Order dated April 7, 2005 at 12."
13

14  This says nothing about how the inputs meet the claim limitation.  Customer Defendants first real

15  insight into Ricoh's theory came from Ricoh's Settlement Conference Statement served in May of

16  2006,[14] and this theory was later confirmed by Dr. Papaefthymiou's "opinion" formed in June of 2006.

17  Thereafter, Ricoh filed signed pleadings in June and July alleging infringement based on what was

18  now revealed to be a wholly flawed legal theory.  During the same time period, Customer Defendants

19  met the many important deadlines set during the summer, including its own expert report deadlines and

20  the summary judgment deadline.  Contemporaneous with the summary judgment deadlines, and only a

21  week after Dr. Papaefthymiou's deposition was taken, Customer Defendants prepared and served this

22  motion.  While Ricoh clearly delayed in revealing its theory in the hopes of extracting a settlement by

23

24

[14] The Settlement Conference Statement alone can be used as a basis for Rule 11 sanctions.  Statements made by a party in
25  a settlement conference memorandum are admissible for Rule 11 purposes.  See *Mendenhall v. National Transportation
Safety Board*, 92 F.3d 871 (9th Cir. 1996) (although Federal Rule of Evidence 408 normally excludes the use of statements
26  made in settlement negotiations as evidence, "the rule does permit the inclusion of such evidence when it is offered for
another purpose such as proving bias or prejudice, or 'for purposes of determining a Rule 11 violation.'); *Eisenberg v.
27  University of New Mexico*, 936 F.2d 1131, 1134 (10th Cir. 1991) (affidavit submitted in support of request for settlement
conference is admissible for purposes of determining a Rule 11 violation, notwithstanding Fed. R. Evid. 408).

28

1  making this litigation outrageously expensive, there was no delay on the part of the Customer

2  Defendants and Synopsys once the theory was fully revealed.

3  **III.    CONCLUSION**

4          Customer Defendants find themselves here because of a deliberate course of action undertaken

5  by Ricoh and its lawyers starting in May of 2005. Ricoh and its counsel set out to find an expert who

6  would reconstrue the claims based on a limited and controlled subset of information in a manner that

7  had already been rejected by the Court, as illustrated below:

| What Dr. Papaefthymiou Says In His Expert Report | What the Court's Claim Construction Order Says |
|---|---|
| "In my opinion, the Darringer Patent uses the term 'RTL' in the sense of the older (then-prevalent) structural RTL that is not claimed by the '432 patent. Ex. 9A at 13:6-8. | "[A]n examination of the '432 patent's public record fails to provide any support for Ricoh's distinction between 'structural' and 'functional' RTL-type input systems. Given these findings, Ricoh's attempt to limit the patentee's disclaimer to only 'structural' level RTL-type input systems is unpersuasive." Ex. 8, at 12:9-12. |
| "That the RTL used in the Darringer Patent closely describes the architecture of the hardware desired in the design is evident from the requirement in the Darringer Patent that the inputs undergo a simple translation of the specification into equivalent AND/OR logic." Ex. 9A at 13:13-17. | "The '435 patent [Darringer patent] specifically defines a register-transfer level description and the subsequent translation or transformation steps described in that patent do not alter this explicit definition." Ex. 8 at 12:5-7. |

19  Ricoh has yet to explain this behavior because it cannot.

20          Ricoh did not rely on any expert opinion in continuing this lawsuit. Instead, it was Ricoh's and

21  its counsel's deliberate acts that are at issue here. Of course, Customer Defendants were not privy to

22  the details of these acts or theories of the case until quite recently, and promptly filed this Motion.

23  Customer Defendants have been injured by Ricoh's conduct in a manner that cannot be redressed by

24  summary judgment alone. Indeed, millions of dollars have been spent and countless party and judicial

25

26

27

28

1  resources have been wasted.  Customer Defendants have met their burden of showing that Ricoh's

2  conduct is objectively unreasonable.  Rule 11 Sanctions should be granted against Ricoh and/or its

3  counsel.

4  Dated:  October 3, 2006                        Respectfully submitted,

5                                                 HOWREY LLP

6

7                                                 By: _____ /s/Denise M. De Mory_____
                                                             Denise M. De Mory
8                                                  Attorney for Defendants AEROFLEX
                                                   INCORPORATED, AMI
9                                                  SEMICONDUCTOR, INC., MATROX
                                                   ELECTRONIC SYSTEMS, LTD.,
10                                                 MATROX GRAPHICS INC., MATROX
                                                   INTERNATIONAL CORP., MATROX
11                                                 TECH, INC., and AEROFLEX
                                                   COLORADO SPRINGS, INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case Nos. C03-4669 MJJ (EMC) and C03-2289 MJJ (EMC)        -15-
REPLY IN SUPPORT OF MTN FOR RULE 11 SANCTIONS
AGAINST RICOH FOR ASSERTING FRIVOLOUS CLAIMS
DM_US\8395458.v1